IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. CROIX

| | |
|---|---|
| **PETRO INDUSTRIAL SOLUTIONS, LLC (PETRO),**<br><br>          **PLAINTIFF,**<br><br>     **V.**<br><br>**ISLAND PROJECT AND OPERATING SERVICES, LLC (IPOS),** ET AL.,<br><br>          **DEFENDANTS.** | **CASE NO. 1:21-CV-00312** |

**OPTIS EUROPE, LTD.'S AND ANDREW CANNING'S**
**MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT**

Defendants OPTIS Europe, LTD. ("OPTIS") and Andrew Canning ("Canning"), move for summary judgment dismissing Plaintiff's case, with prejudice.

## I.  INTRODUCTION

OPTIS employee Canning is a consulting engineer who provided operational support services to Vivot Virgin Islands Corporation ("VVIC") and its affiliated company "Island Project and Operating Services, LLC ("IPOS"). VVIC owned, and IPOS operated, the explosive LPG plants adjacent to the Virgin Islands Water and Power Authority ("WAPA") power plants. Canning's role was to be VVIC's and IPOS's eyes and ears on both job sites and point out problems with plant operations, plant maintenance, plant integrity, statutory compliance and work conducted by IPOS's subcontractors, including Plaintiff, Petro Industrial Solutions, LLC ("Petro").

This litigation arose because Petro failed to deliver its services to the required operational standards (including compliance with design and construction codes and

practices designed to maintain the safety and integrity of the facility) and did not like it when Canning reported such deficiencies to VVIC (the plant owner) and IPOS (the plant operator).  Petro's dislike came to a head when Canning reviewed the Welder Performance Qualification Records ("WPQ") for Petro's welders and suspected—correctly as this litigation has finally revealed—that Petro had submitted falsified WPQs. Canning reported his suspicions to IPOS which conducted its own investigation—without Canning's involvement—and concluded that there were significant issues with the WPQs and terminated its contract with Petro.

Perhaps mindful of the adage that the best defense is a good offense, and frustrated that IPOS and/or VVIC were apparently withholding payment because of Petro's fraud, Petro filed suit against IPOS, VVIC, OPTIS and Canning primarily because Canning did exactly what he was supposed to do and flagged questionable work and activity. Canning may have been rigorous in demanding adherence to safety and quality requirements but, as Canning succinctly remarked, poor work at the WAPA Propane Facilities could compromise the assets and cause a total shutdown with concomitant long-term island-wide power outages (if not much worse given that the facilities were, by their nature, explosive). Petro's dislike of Canning is apparent from the tenor of its Second Amended Complaint ("SAC") where it attempts to cloth legitimate criticism of substandard work and non-compliant practices as racial animus. Regardless of Petro's efforts, each of its legal theories fails on one or more elements of the theories as a matter of law. Consequently, OPTIS and Canning are entitled to summary judgment.

## II. Background

In 2013, the Virgin Islands Water and Power Authority ("WAPA") selected Vitol Virgin Islands Corporation ("VVIC") to, *inter alia*, build, own, operate and transfer ("BOOT")

liquified petroleum gas ("LPG") facilities on land adjacent to WAPA's power plants on St. Thomas and St. Croix. IG Report at 1.[1] Vitol used affiliated companies, including Vitol Tank Terminals International B.V. ("VTTI") and a VTTI subsidiary, Island Project and Operating Services ("IPOS") to provide some of the services under its contract with WAPA. IG Report at 2. Specifically, IPOS was to "operate and maintain the [LPG] storage terminals on a 24-hour basis." *Id.*

IPOS subcontracted the maintenance portion of its contract to Petro. SUMF ¶¶9, 11. IPOS originally entered into a contract with Petro in April 2018. SUMF ¶9. That contract was terminable-at-will. SUMF ¶9. On or about September 1, 2019, IPOS and Petro replaced this contract with a new contract. SUMF ¶11. Critically, that contract was not terminable-at-will and provided for a minimum initial term of five years. SUMF ¶11.

From 2016 until October 31, 2020, OPTIS had a contract with IPOS and/or VTTI (IPOS's parent company) to provide operational support consulting services. SUMF ¶¶4-8. From November 1, 2020 until November 20, 2022, OPTIS entered into a contract to provide similar operational support consulting services with Vitol Virgin Islands Corp. ("VVIC"). That latter contract specified that OPTIS's duties included, among other tasks,

> Manage, in conjunction with Island Project and Operating Services LLC ("IPOS"), the operator of the Plants, the on-going operation of the Plants, including but not limited to, the implementation of maintenance activities and scheduled terminal outages and any other related activities as specified by the Company;

SUMF ¶5.

---

[1] This background information is taken from the November 19, 2021 Report of the Virgin Islands Inspector General entitled "Inspection of the WAPA-Vitol Fuel Contracting Process and Transactions" ("IG Report"). The report is available on the V.I. Inspector General's website at https://www.viig.org/wp-content/uploads/2021/11/INR-07-VITOL-19.pdf

The scope of Canning's duties under both contracts required him to observe the quality of work performed at the LPG Facilities, including safety and integrity issues, and report his findings to IPOS General Management. SUMF ¶¶ 7-8. Effectively, Canning was the head of quality assurance for the LPG Facilities. As a result, OPTIS and Canning had a professional business relationship with IPOS/VVIC that required OPTIS/Canning to report any unsafe or improper issues that Canning observed at the two LPG plants. *Id.*

Canning's job duties naturally required him to observe and report on Petro's work performed at the Facilities. *See* SUMF ¶¶8. However, the SAC is replete with unsupported allegations of racial and personal animus leveled at Canning for various reports he provided IPOS and VITOL. Importantly, all these allegedly false and injurious reports were made within the scope of Canning's duties as the engineer responsible for maintaining quality assurance and safety at the WAPA Facilities. Thus, Canning had a genuine business purpose for reporting deficient and/or bad conduct on behalf of Petro and its employees and/or agents. Additionally, almost all these reports turned out to be true, and those that weren't were based on a bona fide belief of their truth based on supporting information (such as logs, reports, and observations). SUMF, ¶¶22-30, 39, 41, 46. Petro has no evidence that would create a question of fact to suggest that these reports and observations were made in an improper manner or for an improper motive.

Lastly, it is undisputed that Petro is not a natural person. *See* SAC, ¶1. Thus, it cannot meet the definition of an "individual" for purposes of the Territory's discrimination laws, making Petro's discrimination claim inapplicable as a matter of law.

## III. ARGUMENT

### A. STANDARD OF REVIEW - SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, (1986) (citations omitted). In reviewing the evidence, facts and inferences must be viewed in the light most favorable to the nonmoving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment must be entered in favor of the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party...." *Matsushita*, 475 U.S. at 586-87 (citations omitted).

In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law. *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Liberty Lobby*, 477 U.S. at 248). "If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).

"The non-moving party cannot rest on mere pleadings or allegations," *El v. Southeastern Pennsylvania Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228,

5

231-32 (3d Cir. 2001). Allegations made without evidentiary support may be disregarded. *Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000). The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989). Under these controlling authorities, Petro's claims cannot survive summary judgment.

## B. DEFENDANTS ARE ENTITLE TO SUMMARY JUDGMENT ON PETRO'S CLAIM FOR VIOLATION OF THE DISCRIMINATION STATUTE OF THE VIRGIN ISLANDS.

Count II of the SAC attempts to make a claim for "Violation of the Discrimination Statutes of the Virgin Islands." Unfortunately, the claim is not well articulated and seems to be based on the allegations of Canning's "racial animus," which are peppered throughout the SAC. However, Petro is a corporate entity and corporate entities have no race, national origin, sex or other characteristic protected by discrimination laws.

Petro specifically limited its claims to discrimination under Virgin Islands law.[2] There are only two chapters of the Virgin Islands Code that are potentially applicable to this case: Title 10, Chapter 1 (Equal Rights of All Persons Against Discrimination) and Title 10, chapter 5 (Virgin Islands Civil Rights Commission).[3] However, this law does not recognize discrimination against corporate entities and as a result, Petro's claim must fail as a matter of law.

Title 10, Chapter 1 of the Virgin Islands Code protects "[a]ll natural persons" from certain forms of discrimination. 10 V.I.C. § 3(a). Title 10, Chapter 5 is likewise limited to "individuals." *See* 10 V.I.C. § 61 ("The Legislature hereby finds and declares that the

---

[2] See SAC, ¶124: "VITOL Defendants, and Andrew Canning while in the course and scope of his employment with OPTIS, violated the discrimination statutes *of the U.S. Virgin Islands*." (Emphasis added.)

[3] Title 24, Chapter 17 of the Virgin Islands Code is inapplicable because it deals with discrimination in employment and Petro was not an employee of OPTIS/Canning. Regardless, that chapter likewise is restricted to discrimination against "any person." 24 V.I.C. § 451(a)

territory has the responsibility to act to assure that every individual within this territory is afforded an equal opportunity . . ."); *see* also 10 V.I.C. § 64(1)(a) (making it illegal to discriminate in employment based upon the "race, creed, color, national origin, place of birth, sex, sexual orientation, gender identity, disability and/or political affiliation *of any individual*) (emphasis added).

Petro, a limited liability corporation, is not a natural person[4] or individual. *See* SAC, ¶1. Therefore, Virgin Islands law does not provide any protection from discrimination to it. Petro has no actionable claim for discrimination even if its discrimination allegations were true (which they are not). As a result, Petro's discrimination claim fails as a matter of law and must be dismissed.

## C. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PETRO'S CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT.

Under Virgin Islands law, to state a claim for tortious interference with existing contractual relations, a plaintiff must establish: "(1) the existence of a contract between the plaintiff and a third party; (2) *that the defendant knew of that contract*; (3) that the defendant interfered with the contract using improper means or with an improper motive; and (4) that the plaintiff was damaged as a result." *Jahleejah Love Peace v. Banco Popular de P.R.*, 75 V.I. 284, 294-95 (2021) (referring to the tort of intentional interference with existing contracts) (emphasis added) (quoted by *Ainger v. Great Am. Assurance Co.*, Civil Action No. 2020-0005, 2022 U.S. Dist. LEXIS 171487, at *55-56 (D.V.I. Sep. 22, 2022) (not reported)); *see also Rondon v. Caribbean Leasing & Eco Transp., Inc.*, 74 V.I. 397, 418-19 (V.I. Super. Ct. 2021) (citing *Donastorg v. Daily News Publishing Co., Inc.*, 63 V.I. 196, 288-

---

[4] A natural person is "a human being as distinguished from a person (as a corporation) created by operation of law." Merriam-Webster.com Legal Dictionary, Merriam-Webster, https://www.merriam-webster.com/legal/natural%20person (last visited February 9, 2024 at 8:09 am).

89 (V.I. Super. Ct. 2015))[5]; *Merchants Com. Bank v. Oceanside Vill., Inc.*, 64 V.I. 3, 30 (V.I. Super. Ct. 2015).

### i. NEITHER OPTIS NOR CANNING KNEW OF PETRO'S CONTRACT WITH IPOS

Here, it is undisputed that the operative contract between IPOS and Petro was the second contract, dated September 1, 2019. SUMF ¶11. Neither OPTIS nor Canning were parties to this contract.  SUMF ¶¶12-13.  Although Canning (and therefore OPTIS) was aware of the April 2018 Service Agreement between IPOS and Petro, SUMF ¶10, that contract was a terminable at-will contract. SUMF ¶9. This contract was replaced by the September 1, 2019, Maintenance Contract, which is the subject of this lawsuit. SUMF ¶11. Neither Canning nor OPTIS were aware of, or had seen, this new contract. SUMF ¶12. At the time IPOS terminated its contract with Petro, Canning and OPTIS believed that the contract that was terminated was the First IPOS-Petro contract. Because it is uncontested that neither Canning nor OPTIS were aware of the new contract until after it was terminated, Petro's claim of tortious interference must fail as a matter of law.

### ii. CANNING'S ACTIONS WERE LEGALLY JUSTIFIED AND NOT MADE FOR AN IMPROPER PURPOSE OR BY AN IMPROPER MOTIVE.

However, assuming for the sake of argument that Canning and/or IPOS knew of the September 2019 Maintenance Contract, Canning's alleged interference was justified by a genuine business purpose and privileged as an operational support consultant tasked with managing, "in conjunction with [IPOS], the on-going operation of the Plants, including but not limited to, the implementation of maintenance activities and scheduled terminal

---

[5] The *Donastorg* court conducted a *Banks* analysis and determined the Territory recognizes distinct claims for intentional interference with existing contractual relations and intentional interference with prospective business relations.

outages and any other related activities as specified by [VVIC]." SUMF ¶5 & Exh. E.  Thus, Canning's conduct, and by extension, OPTIS, was carried out for a proper purpose and for proper motives.

The communications by Canning, which Petro alleges led to the termination of its contract with IPOS, were all made pursuant to his position as an operational support consultant under the contract between OPTIS and VVIC. *See* SUMF ¶¶7-8; *see also* SUMF ¶5, Exh. E (Consulting Agreement §§ 1-2) and Exh. D (Canning Resp. to Interrogatory #5). Canning, and by extension OPTIS, was merely fulfilling his contractual duties. Furthermore, the relationship created by the OPTIS/VVIC consulting contract placed Canning in a relationship with IPOS whereby Canning had to communicate with IPOS. Canning was empowered (and contractually required) by VVIC to work with VVIC's other contractor, IPOS, in "conjunction with" the operation and maintenance of the LPG facilities. This necessarily included commenting and reporting upon quality assurance and safety issues. SUMF ¶¶7-8 & Exh. D (Canning Resp. to Interrogatory #5).  Thus, not only did Canning and OPTIS have genuine business interests in their own contract, but Canning also acted as part of a team with IPOS relating to the operation and maintenance of the LPG facilities. Thus, he had to be able to communicate the results of his inspections and report his opinion on compliance issues affecting IPOS, such as reporting substandard work done by Petro. Canning's conduct was legally justified and carried out for a proper purpose and motive.

The courts of the Virgin Islands have held that a corporation or its agents cannot tortuously interfere with its own contract. *Sorber v. Glacial Energy VI, LLC*, No. ST-10-CV-588, 2013 V.I. LEXIS 12, at *20 (Super. Ct. Mar. 7, 2013). "The agents of the corporation are part of the corporation, and thus no third-party interference can be said to have

occurred." *Thompson v. World Fresh Mkt.*, No. ST-08-CV-512, 2013 V.I. LEXIS 149, at *6 (Super. Ct. May 17, 2013) (citations omitted).

Fundamentally, tortious interference claims are directed at non-parties to a contract that improperly interferes with its performance, *i.e.*, an "outsider" to the contract. *See Kia v. Imaging Scis. Int'l, Inc.*, 735 F. Supp. 2d 256, 268 (E.D. Pa. 2010) ("Tortious interference with contract thus requires the involvement of at least three parties—the two contracting parties and a third person who interferes with that contract.") (cited by *Bethea v. Merchs. Commer. Bank*, No. 11-51, 2014 U.S. Dist. LEXIS 124764, at *53-54 (D.V.I. Sep. 8, 2014)); *see also Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 690 (Tex. 2017) (To be legally capable of tortious interference, the defendant must be a stranger to the contract with which he allegedly interfered). Thus, parties to the contract, and by extension their employees and agents, are not "non-outsiders," and their exercise of a legal right under a contract may not be considered tortious conduct absent special circumstances. *Kelly v. Harvester Co.*, 278 N.C. 153, 166, 179 S.E.2d 396, 403 (1971) (quoted by *Browning-Ferris Indus. v. Wake Cty.*, 905 F. Supp. 312, 324 (E.D.N.C. 1995) for the same); *see also RPR & Assocs. V. O'Brien/Atkins Assocs., P.A.*, 24 F.Supp.2d 515 (M.D.N.C. 1998), *aff'd*, 103 F.3d 120 (4th Cir.1996) (where the defendant has an interest in the subject matter of the contract, he or she enjoys qualified immunity for actions taken in furtherance of that interest).

Here, the undisputed facts show that Canning was acting pursuant to a genuine business interest—the OPTIS consulting agreement—which charged OPTIS (and therefore Canning) with working jointly with IPOS on issues relating to the operation and maintenance of the LPG facilities. SUMF ¶¶4-8. Canning must also be considered a "non-outsider" because it was his job to report his observations to IPOS General Management. *See* SUMF ¶8, Exh. E (Consulting Agreement §§ 1-2) and Exh. D (Canning Resp. to Interrogatory #5). Thus,

Canning was completely justified in making communications about Petro's deficient work to IPOS. Consequently, Petro cannot prove that making any such communications was an "improper means" of conduct for the purpose of their claim.

It is undisputed that Canning's observations and concerns regarding the quality of Petro's welding work and the inauthenticity of their Welding Certificates were truthful and justified communications. *See* SUMF ¶¶22-30. Canning had identified numerous defects in Petro's welding work during a certain 3-inch stainless steel vent line replacement project for certain WAPA gas turbines. SUMF ¶¶29-30. Canning then made a well-reasoned, professional, and truthful report of his findings and concerns to IPOS as required and authorized under his job duties and his consulting contract.  IPOS thereafter conducted an independent investigation into the Petro welding certificates. SUMF ¶¶19-20, 31. Canning had no part in this investigation and did not learn of the outcome until after the final determination was made and after the decision to terminate the contract had been communicated to Petro. SUMF ¶¶32, 34-40, 50-52. The faulty Welding Certificates and withholding and/or lack of supporting information are what ultimately led to IPOS terminating the Petro Maintenance Contract. SUMF ¶¶28[6], 33-49.

Even if the Court considers all the "racial animus" allegations in a light most favorable to Petro, it still cannot prove Canning acted with an improper motive. The allegations are based upon suppositions and interpretations of actions taken by Canning that were entirely consistent with Canning's job duties. All of Canning's communications regarding Petro's poor welding work and fraudulent Welding Certificates were made for the proper purpose

---

[6] The Declaration of Acuren is particularly shocking.   Doug Rice, General Manager at Acuren Inspection Services ("Acuren"), testified that Acuren had no records of Petro ever being a client and Acuren could not locate any records of conducing welding tests for Petro's welders.

of fulfilling his job duties. Thus, he had a legitimate business objective in making the statements. Even if Petro's allegations of racial animus by Canning could raise an inference that he was motivated by racism, Petro's problem is that there is a stronger inference that Canning was simply doing his job. "The possibility of the existence of an event does not tend to prove its probability." *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 75 (3d Cir. 1996). Petro's circumstantial evidence of racial animus as a motivating factor is at best a mere possibility and insufficient to justify an inference of probability (that racial animus was the motivation for Canning to report such things as obviously fraudulent Welder Performance Qualifications). *Fedorczyk*, 82 F.3d at 74.

Furthermore, the statements were all proven to be true. *See* SUMF ¶¶28, 46. Providing truthful information about another's contractual relationship is legally justified, even if you are considered a "third person" (*i.e.*, an "outsider") to the contract. *See, e.g., George A. Fuller Co., Div. of Northrop Corp. v. Chi. Coll. of Osteopathic Med.*, 719 F.2d 1326, 1332 (7th Cir. 1983) (truthfully commenting to others about the status of its contractual relationships cannot be considered tortious interference) (citing RESTATEMENT (SECOND) OF TORTS § 772(a) (1979)). Thus, even if Canning is considered a "third party" and not an agent of IPOS, he was still legally justified in making the communications. Consequently, Petro cannot prove improper motive for the communications.

### D. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PETRO'S CLAIM FOR DEFAMATION.

Petro bears the burden of showing to the Court that Canning, and by extension, OPTIS, published false and defamatory statements to third parties causing harm. However, Canning made the alleged offensive statements pursuant to and during the course of his job duties. Thus, the communications cannot be considered "published to a third party."

Furthermore, it is undisputed that his statements turned out to be true; any statements made in error (if any) were not negligent or intentionally faulty. Consequently, the statements were not false, and even if one or two statements turned out to be incorrect, they were not defamatory.

The Supreme Court of the Virgin Islands "has adopted the basic elements for a claim of defamation set forth in the Second Restatement of Torts." *Joseph v. Daily News Publishing Co.*, 57 V.I. 566, 585-86 (V.I. 2012) (citing *Kendall v. Daily News Pub. Co.*, 55 V.I. 781, 787 (V.I. 2011)). In a defamation claim under Virgin Islands law, a plaintiff must prove the following elements: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting to at least negligence on the part of the publisher; and (d) either the actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Kendall*, 55 V.I. at 788 (quoting RESTATEMENT (SECOND) OF TORTS § 558 (1977)); *see also Atl. Human Res. Advisors, LLC v. Espersen,* 76 V.I. 583, 614 (2022) (quoting *Kendall*); *Chapman v. Cornwall*, 58 V.I. 431, 444 (2013) (internal citations omitted); *Illaraza v. Hovenza LLC*, 2010 U.S. Dist. LEXIS 56212, *12 (D.V.I 2010).

The first element of the claim uses the conjunctive "and" when describing actionable statements. Thus, a statement must be both false and defamatory to be actionable. Also, under both the First Amendment to the United States Constitution and Virgin Islands law, only statements that are provable as false are actionable. *Kendall*, 55 V.I. at 788 (citation and internal quotation marks omitted). "[H]yperbole and expressions of opinion not provable as false" fail to meet this actionability element of a defamation claim and are also constitutionally protected. *Kendall*, 55 V.I. at 788. When the alleged offending statements are not materially distinguishable from the facts, such communications cannot be

considered defamatory. *Atl. Human Res. Advisors, LLC v. Espersen*, 76 V.I. 583, 615 (2022) (citations omitted).

A statement is only defamatory "if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Greene v. V.I. Water and Power Auth.*, 2011 U.S. Dist. LEXIS 80325, at *30 (D.V.I. July 22, 2011) (quoting RESTATEMENT (SECOND) OF TORTS § 559); *see also Joseph*, 57 V.I. at 586. "A disparaging remark that tends to harm someone in his business or profession is actionable irrespective of harm as such a remark falls within the definition of slander or defamation per se." *Illaraza v. Hovensa, LLC*, 2010 U.S. Dist. LEXIS 77402, at *13 (D.V.I. July 30, 2010) (citing *VECC, Inc. v. Bank of Nova Scotia*, 296 F. Supp. 2d 617, 623 (D.V.I. 2003)). Statements that are deemed to harm an individual's business or professional reputation either "impugn the integrity of the individual with respect to their job performance" or "attack the competence or skill of the employee in carrying out his or her duties." *Wilson v. V.I. Water & Power Auth.*, 2010 U.S. Dist. LEXIS 129229, at * 19 (D.V.I. Dec. 7, 2010) (citing *VECC, Inc.*, 296 F. Supp. 2d at 623).

### i. PETRO'S ALLEGATIONS ARE NOT SPECIFIC ENOUGH TO MEET ITS BURDEN OF PROOF.

None of the allegations in the SAC state clearly what Canning said and to whom. The allegations merely make vague and conclusory allegations without properly identifying what exactly was said, who it was said to exactly, and how the communication was made.

To support a claim of defamation, Petro must specifically identify "what alleged defamatory statements were made, including who made them, and to whom the statements were made." *Bethea v. Merchants Commercial Bank*, 2014 U.S. Dist. LEXIS 124764, at *59

(D.V.I. Sept. 8, 2014) (citing *Smith v. V.I. Port Authority*, 2010 U.S. Dist. LEXIS 32534, at *54 (D.V.I. Mar. 31, 2010)).

Petro has failed to accurately identify the information that is required to establish what was said and to whom. Instead, Petro accuses Canning, and sometimes OPTIS (but only vicariously through Canning) of making defamatory statements to one or more of the co-defendants without specifying exactly what was said, how the statement was made, or who exactly the statements were made to one or more of the co-defendants without specifying exactly who it was made to. *See e.g.*, SAC ¶¶36-38, 43, 54-55, 70, 84, 106, 116. To survive summary judgment, Petro must identify the allegedly false and defamatory statements and establish that there is sufficient evidence from which a reasonable jury could conclude that the statement(s) were false. Because Petro has no such evidence, Canning/OPTIS are entitled to summary judgment.

### ii. PETRO CANNOT PROVE THE OFFENDING STATEMENTS WERE FALSE OR DEFAMATORY.

Petro has alleged five categories of communications made by Canning which were allegedly false and defamatory (*see* SAC, ¶130 (Doc. 239)): (a) false reports of Petro doing shoddy work (*Id.* at ¶¶38, 58-61, 67, 70, 79); (b) accusations that Petro forged documents and failed to provide certain welding qualification/certification paperwork (*Id.* at ¶¶62-75, 84-94), (c) falsely reporting Petro as the cause of certain incidents (*Id.* at ¶¶58-61), and (d) falsely accusing Petro of providing false time cards and billing statements (*Id.* at ¶¶36-37, 54-55, 103-106). The burden is on Petro to demonstrate a jury question as to the falsity of each of these claims.

Furthermore, even as to those statements that may have been inaccurate (which Canning and OPTIS deny), they were not defamatory because they were not directed

towards impinging Petro's character or integrity but instead were made as part of bona fide reporting within the scope of Canning's job duties. *See* SUMF ¶¶4-8.

With respect to statements about Petro's shoddy work, in many cases, Petro's work was, in fact, deficient. *Compare* SCA ¶¶58-61, 67, 79 (allegations of shoddy work) *with id.* at ¶¶59, 79, 96-99 (admission by Petros certain work needed to be corrected, such as failure to install fastener clips, replacing wrongly installed items, and correcting deficient welds). Furthermore, the statements were made pursuant to Canning's duties as the consulting engineer, whose job was to find deficiencies and have them corrected. *See* SUMF ¶4-8. Consequently, these statements, even if Canning turned out to be wrong in his assessment of the work, were made for a legitimate business objective.

With regards to accusations that Petro forged documents and failed to provide certain welding qualification/certification paperwork, Canning's alleged defamatory statements all turned out to be true. Petro spent a considerable amount of space in the SAC discussing the incident, which eventually led to losing its contract with IPOS. *See* SAC ¶¶62-75, 84-94. What we can see from the evidence is Canning did, in fact, question the quality of certain welding work done by Petro and whether the welds had been inspected. *See* SUMF ¶¶29-30. This was exactly what Canning was supposed to do as the safety and quality assurance engineer: double-check the work performed at the WAPA Facilities. *See* SUMF ¶¶4-8. Canning also double-checked Petro's Welding Certificates (WPS and WPQ) and became concerned they were not authentic. *Id.* at ¶¶22. During his initial investigation, Canning discovered that the person who allegedly did the welding tests for Petro's employees, Guillermo Castro, was not even employed with the company that allegedly issued the certifications, a fact Petro admitted during discovery. *Id.* at SUMF ¶¶23-27. IPOS began its own investigation, which Canning was not a part of. *Id.* at ¶¶31-50. Through its own

investigation, IPOS determined Petro's Welding Certificates were not authentic, and Petro's inspection records were deficient. *Id.* at ¶¶33-49. In fact, Petro nearly admitted as much by offering to submit his welders to recertification in lieu of providing the paperwork requested during IPOS's investigation. *Id.* at ¶41; *see also SAC,* ¶98. Since these alleged defamatory statements turned out to be true, Petro cannot sustain its claim for defamation based on these facts.

With regards the allegations of falsely reporting Petro as the cause of Canning falling through a platform, although Petro attempts to blame Canning for the incident, Petro admits in the SAC that it did not install all the required fasteners clips. *See* SAC ¶¶59; see also SUMF, Ex. D (Resp. to ROGs #11-12). Whether the cause of Canning falling through was the welding work or failure to install required hardware, the incident nonetheless occurred, and Petro was responsible for the work. *Compare* SUMF ¶18 & Exh. D (Resp. to ROGs #11-12) *with* SAC ¶¶58-61. Since Petro cannot show anything about this incident to be untrue or Canning's alleged statements were anything other than (at worst) "[H]yperbole and expressions of opinion not provable as false" (*Kendall*, 55 V.I. at 788) these facts cannot sustain Petro's claim.

Lastly, Petro accuses Canning of making false reports about Petro's timecards and billing statements. *See* SAC ¶¶36-37, 54-55, 103-106. The allegations are insufficient to identify exactly what was said and to whom. Furthermore, the allegations themselves admit Canning's allegedly false statements (if made) were based on concrete information (logs, records, and first-hand observations) and not made up out of whole cloth. Whether Canning was accurate or not is irrelevant. The important point is he believed the statements were true based on credible information, the reports were within the scope of his duties, and Petro

has failed to articulate how the statements were defamatory. Consequently, these facts cannot support Petro's claim.

      **iii.** **PETRO CANNOT PROVE THE ALLEGED DEFAMATORY STATEMENTS WERE "PUBLISHED."**

Internal communications within a business or between a business and its agents are not communications to third parties, even when those communications are made by supervisors to subordinate employees, since the business is, in effect, communicating within itself. *Espersen*, 76 V.I. at 616-17 (citing collection of cases for *Banks* analysis). It is undisputed that Canning, at all relevant times in the SAC, was acting in his capacity as the operational support consultant for the VITOL and IPOS defendants. *See* SUMF ¶¶4-8. In this capacity, Canning had a business relationship with VVIC and IPOS such that all of his communications must be considered "internal" communications within and between businesses running the WAPA Facilities. Therefore, none of the defamation allegations in the SAC can be considered published to third parties. As a result, Petro's claim for defamation fails as a matter of law.

      **E.** **PETRO HAS NO COMPETENT EVIDENCE TO PROVE DAMAGES. THEREFORE, THE CASE SHOULD BE DISMISSED ON SUMMARY JUDGMENT.**

Petro bears the burden of proving its damages. Because it is a corporate entity, the only damages it can recover are economic damages. In its initial Rule 26 disclosures in this case, Petro did not itemize its damages as required by Fed. R. Civ. P. 26(a)(1)(A)(iii). Instead, Petro stated that an expert would be retained to calculate its damages. SUMF ¶53.

In the 30(b)(6) deposition of Petro, Adrian Melendez was the designated corporate representative. He attempted to explain how Petro's lost profits were calculated, but he was clearly in over his head and had to be corrected by his attorney and ultimately agreed that an accountant would need to provide an opinion as to Petro's alleged lost profits. Exh. I,

excerpts from the 30(b)(6) deposition of Petro at 194:4-14 (admitting that in his attempted calculation of damages, Petro's labor cost was not reflected anywhere and thus lost profit could not be calculated); 197:24 - 198:25 (Petro's counsel agreeing that Petro needs to rework its loss of profit calculations needed to deduct its labor burden costs such as workers' compensation payments, insurance from the calculations that Petro was attempting to use to show damages); 199:3-4 (Petro's counsel indicating that Petro will need an accountant to the lost profit calculations).

Initially, Petro produced an expert report from Don Law, an MBA, that purported to project Petro's lost profits over a four-year period (contrary to the year-and-five-month period used by Petro in its 30(b)(6) deposition). *See* ECF Doc. No. 295-1 (expert report). However, in the fact of Canning's and OPTIS's motion to exclude that expert, Petro chose to withdraw the expert as a witness in the case. ECF Doc. No. 296. In the notice of withdrawal, Petro stated that it would instead "rely on the testimony of its founder, owner, and manager, Adrian Melendez, Jr., to establish economic damages." *Id.* at 1.

The Court should not allow Melendez to provide such testimony for two reasons. First, as shown in the Petro 30(b)(6) deposition, Melendez is not competent to testify as to the company's business losses—to the point that his attorney interjected during his testimony to state that Petro would hire an accountant to project its lost profits. Second, this Court set a September 30, 2023 deadline for Petro to produce the disclosures required in Fed. R. Civ. P. 26(a)(2). *See* ECF Doc. 250. Assuming that Melendez was competent to project Petro's economic losses, he would still be a lay witness providing opinion testimony and was required to serve a disclosure that describes the subject matter on which the witness will testify and a summary of the facts and opinions to which the witness is expected to testify. Petro filed no such disclosure in this case and therefore his testimony should not be

19

permitted.    Furthermore, to establish Petro's damages, Melendez would need to testify about technical accounting issues which he is barred from doing under Fed. R. Evid. 701(c)[7]. And because Petro does not have any competent evidence to prove its economic losses, it cannot prove damages in this case. Consequently, Canning and Optis are entitled to summary judgment dismissing the case in its entirety.

## IV.  CONCLUSION

Canning and OPTIS have shown that they are entitled to summary judgment. The Territory's discrimination laws protect individuals, not corporate entities. Consequently, Petro cannot recover for discrimination and that count of the SAC should be dismissed.

Canning could not have knowingly interfered with the September 2019 contract between IPOS and Petro because he had no knowledge of it. Furthermore, it is undisputed that Canning was an operational support consultant and the VVIC-OPTIS contract directed him to provide support to IPOS. Consequently, he had a legitimate business purpose in communicating to IPOS his concerns about Petro's work. As Canning put it, "lack of quality assurance compromises the integrity of the asset." *See* SUMF ¶30. Canning had legitimate business interests in making the observations and reports he did. Thus, his perceived criticisms of Petro's work were not made by improper means, nor is there any competent evidence that his criticisms were made with improper motives.

Petro's defamation claim cannot survive because it cannot prove that the statements it attributes to Canning were false. Further, Canning had a legitimate business interest in

---

[7] "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is … not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701(c).

making these statements, and they were made while he was an agent of IPOS. Thus, there was no publication to third parties.

For the foregoing reasons, Petro cannot sustain its claims for discrimination, tortious inference, and defamation. Consequently, OPTIS and Canning respectfully submit that the Court should grant summary judgment and dismiss the case, with prejudice.

Respectfully submitted,

Dated: February 15, 2024,             /s/ Andrew C. Simpson
Andrew C. Simpson (VI Bar #451)
2191 Church Street, Ste. 5,
Christiansted, VI 00820
Telephone: (340) 719-3900
asimpson@coralbrief.com