IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| PETRO INDUSTRIAL SOLUTIONS, LLC (PETRO),<br><br>        Plaintiff,<br><br>vs.<br><br>ISLAND PROJECT AND OPERATING SERVICES, LLC (IPOS), VITOL HOLDING, CO., VITOL VI and ANDREW CANNING,<br><br>        Defendants. | CASE NO. 1:21-CV-00312<br><br>**BREACH OF CONTRACT**<br><br><u>JURY TRIAL DEMANDED</u> |

**ANDREW CANNING'S RESPONSES TO
PETRO INDUSTRIAL SOLUTIONS, LLC'S FIRST SET OF INTERROGATORIES**

### INTERROGATORIES

1. Please identify yourself, to include your full legal name and any other name by which you have been known, your present residence and/or current address (physical and mailing) and telephone numbers, educational background, including highest level of education, your place and date of birth, social security number, and driver's license number.

**RESPONSE:**

This interrogatory consists of two separate lines of inquiry (identification and educational background) and thus counts as two interrogatories. See LRCI 33.1(b).

Part 1 (identification)
    Andrew David Canning
    Oak House, Fairview Close, Hythe, Hampshire. SO45 5EX
    +44 796 7126557, +1 340 513 3293
    Place of birth: Portsmouth, England

    Canning objects to providing a date of birth, social security number and driver's license number as this information is not related to the claim or defense of any party.

**Exhibit D**

**PETRO INDUSTRIAL SOLUTIONS, LLC V. IPOS, ET. AL., CASE NO. 1:21-CV-00312**
*PLAINTIFF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT ANDREW CANNING*
Page 2

Part 2 (educational background)
  i. Time served mechanical technician apprentice (indentured 1973)
  ii. Post-graduation award UK MOD Professional & Technological Officer IV
  iii. Mechanical Engineering HND (Portsmouth University)
  iv. UKOOA certified Offshore Installation Manager
  v. UKOOA certified OIM regulations
  vi. UKOOA certified competent in Management of Major Emergencies

2.   Please identify each and every place of employment where you have been employed for the last fifteen (15) years, and provide the physical address for each entity named, state the time period of your employment, job title, name of your supervisor, and the reason why you left said employment.

**RESPONSE:**

OPTIS Europe Limited, Technical Director 2000 to date

  i.   Assignment 2005 – 2006 Centrica Storage, Dimlington Road, Dimlington, Hull. NE Yorkshire. Maintenance Coordinator. Supervisor Tariq Mirza. Reason for leaving; work scope completion through maintenance backlog reduction.

  ii.   Assignment 2006 – 2007 Centrica Storage, Unit One, St Augustine's Park, Hedon, Hull. Catastrophic failure investigation team engineer (mechanical). Supervisor Don Reid. Reason for leaving: completion of work scope through clear definition of failure mechanisms with implementation of facility, and national corrective measures through the issuance of safety notices under the UK Health and Safety Executive.

  iii.   Assignment 2007 – 2008 Centrica Storage, Unit One, St Augustine's Park, Hedon, Hull. Rotating Machinery. Reliability and Integrity Engineer. Supervisor: Tariq Mirza. Reason for leaving: Progression of work scope into facility lifecycle extension program.

  iv.   Assignment 2008 -2009 Centrica Storage, Unit One, St Augustine's Park, Hedon, Hull. Gas Storage Facility Lifecyle Extension Engineer. Supervisor: Don Reid. Reason for leaving: clear definition of lifecycle degradation mechanisms for a facility operating beyond design life and the identification of mitigating measure options.

**Exhibit D**

Case: 1:21-cv-00312-WAL-EAH  Document #: 299-4  Filed: 02/15/24  Page 3 of 19

PETRO INDUSTRIAL SOLUTIONS, LLC V. IPOS, ET. AL., CASE NO. 1:21-CV-00312
*PLAINTIFF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT ANDREW CANNING*
Page 3

v.  Assignment 2009 -2010 Centrica Storage, Unit One, St Augustine's Park, Hedon, Hull. Maintenance Manager. Supervisor: Mike Benson. Reason for leaving: Transition to a full time Centrica company replacement.

vi.  Assignment 2010 - 2011 Centrica Energy, Centrica House, Staines, Middlesex. Condition and Integrity Assessment Engineer. Supervisor: Glenn Sibbick. Reason for leaving: completion of equipment remnant life assessments and completion of preparations for depleted gas well site facilities for future storage utilization.

vii.  Assignment 2011-2012 Leni Oil & Gas. Compania Petrolifera de Sedano S.L., No35 la Planta, Madrid 28002. Spain. Operations & Maintenance Engineer. Supervisor: Garry Stoker. Reason for leaving: Completion of equipment integrity assessments and operational risk assessments for the facilities and operation.

viii.  Assignment 2012 & 2014 Baker Hughes Inc. Middle East – UAE /Kuwait. Operation & Maintenance Engineer. Supervisor Charles Goedhals. Reason for leaving: Delivery of advance integrated digital field technology solutions to West Kuwait oil field operations.

ix.  Assignment 2014 - 2015. Tullow Ghana Limited Plot No. 71 Off George Walker Bush Highway, North Dzorwulu Accra, Ghana. Operations & Maintenance Engineer. Supervisor: Peter O'Toole. Reason for leaving: Delivery of maintenance program and population of the CMMS for two FPSO's

x.  Assignment 2016 – 2016. Caracal Energy Chad Africa, communications through Upstream Advisors, Bowman House, 29 Wilson Street, London EC2M 2SJ. Maintenance and Operations Engineer. Supervisor Hiren Sanghrajka. Reason for leaving: Completion of operations support including operating procedures & maintenance program.

**Exhibit D**

**PETRO INDUSTRIAL SOLUTIONS, LLC V. IPOS, ET. AL., CASE NO. 1:21-CV-00312**
*PLAINTIFF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT ANDREW CANNING*
Page 4

3.   Please describe in detail all relationships that exist or existed between you and Co-Defendants IPOS, Vitol Virgin Islands Corp., and/or Vitol US Holding Co., and provide all applicable dates.

**RESPONSE:**

Canning objects to this interrogatory as the term "relationships" is vague and the definition of "relationships" in the interrogatories is circular. Further, the definition includes "legal relationships" which is also vague. Without waiving this objection, Canning responds:

I had no direct relationship between IPOS, Vitol Virgin Islands Corp. and/or Vitol US Holding Co. I was not a party to a contract with any of those companies. I had no ownership interest in those companies. I was not an employee of any of those companies. I do not understand what you mean by "legal" relationship or "business" relationship.

From September 2016 until November 30, 2020, on behalf of my employer, I provided consulting services to IPOS to advise as to the installation, commissioning and operation of the plants on St. Thomas and St. Croix.

Commencing on December 1, 2020 to the present, on behalf of my employer, I provided consulting services to Vitol Virgin Islands Corporation. See my response to Interrogatory No. 5 for a more detailed explanation of my role.

4.   Please describe in detail all relationships that exist or existed between you and Tampa Tank and provide all relevant dates.

**RESPONSE:**

Canning objects to this interrogatory as the term "relationships" is vague and the definition of "relationships" in the interrogatories is circular. Further, the definition includes "legal relationships" which is also vague. Without waiving this objection, Canning responds:

   No relationship.

**Exhibit D**

**PETRO INDUSTRIAL SOLUTIONS, LLC V. IPOS, ET. AL., CASE NO. 1:21-CV-00312**
*PLAINTIFF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT ANDREW CANNING*
Page 5

5. Please describe in detail your involvement, influence, approval, authorization, supervision, management, direction, control, instruction and/or decision making with respect to any work performed by Plaintiff at the WAPA Propane Facilities in St. Thomas and St. Croix at any time from 2018 to 2021, identify the entity which granted you this authority, and provide all applicable dates.

**RESPONSE:**

Until December 1, 2020, my involvement around any work performed by PIS on maintenance or repairs was in my consulting capacity for my employer in which I reported observations or comment to the IPOS General Manager. During that same period, I reported directly to Vitol Virgin Islands Corp. on the delivery of capital expenditure and asset improvement activities (projects). Commencing December 1, 2020, my reporting on behalf of my employer changed directly to Vitol Virgin Islands Corp. for maintenance, repair, and project activities; however, I continued to provide advice directly to IPOS on safety and integrity issues and provided technical support as needed.

I had no approval, authorization, supervision, management, direction, control, instruction and/or decision making with respect to work performed by PIS. I do not have personal knowledge as to whether my reports to IPOS and/or Vitol Virgin Islands Corp. influenced them or decisions they made.

6. Please provide a chronology of all communications between you and Plaintiff concerning in any manner the project for the one-inch vent line which is described in Plaintiff's Complaint, including, but not limited to, any request to Plaintiff for an estimate for the project, when you received the estimate from Plaintiff, any discussions with Plaintiff regarding the estimate provided, and all communications with Plaintiff concerning a bid for the project, including communications wherein you informed Plaintiff that the estimate provided was not an official bid and Plaintiff was too late to bid, communications concerning the competitiveness of Plaintiff's bid, and communications that the bid had been awarded to a Florida company.

**RESPONSE:**

I do not recall any communication with PIS regarding the 1-inch vent line project described in Plaintiff's complaint.

**Exhibit D**

**PETRO INDUSTRIAL SOLUTIONS, LLC V. IPOS, ET. AL., CASE NO. 1:21-CV-00312**
*PLAINTIFF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT ANDREW CANNING*
Page 6

7. Please describe in detail all communications between you or anyone on your behalf and any Co-Defendants in this matter concerning in any manner the estimate and/or bid submitted by Plaintiff for the project for the one-inch vent line for which a request for bids was published in about June 2020, including, but not limited to, any communications wherein you claimed that Plaintiff had stolen information from Traeger Brothers, identify all persons involved in each communication, state the method of each communication, and provide all applicable dates.

**RESPONSE:**

    a. On June 9, 2020, David Smith forwarded a copy of an October 16, 2019 email from Adrian Melendez that referenced a cost breakdown for 1" Flare Return System – Pump Alley with total amount $213,738.80.

    On June 10, 2020, I emailed Merlin Figueira and copied David Smith and summarized three bids received for fabricating, testing and painting the 1-inch pipe for Pump Alley. Cost summary presented based on bids received from Specialty Fabrication ($150500); Quality Fabrication ($150,067.87); and PIS ($213,738.80).

    On June 10, 2020, Figueira responded and requested that a purchase order be set up for materials purchases.

    On June 15, 2020, Figueira authorized proceeding with a purchase order for 1-inch vent piping, the temporary manifold, hoses and spools.

    On June 15, 2020, I responded to Figueira and confirmed that Specialty Fabrication working through Traeger Brothers was an approved vendor so that a purchase order could be generated and issued.

    On June 17, 2020, Figueira emailed me and indicated that he was going to be meeting with Adrian and Chad for lunch and was going to inform them that due to the urgency and timing of the replacement, IPOS was going to move forward with the quotations it already had.

    b. I did not claim, and am not aware of any communication with a codefendant in which I claimed, that PIS had stolen information from Traeger Brothers.

**Exhibit D**

**PETRO INDUSTRIAL SOLUTIONS, LLC V. IPOS, ET. AL., CASE NO. 1:21-CV-00312**
*PLAINTIFF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT ANDREW CANNING*
Page 7

8. Please state what your reason or basis was for claiming that Plaintiff had stolen valuable information from Traeger Brothers for the bid provided by Plaintiff for the one-inch vent line, including any sources from which you acquired that information, and describe what, if anything, you did to verify the truthfulness of the information received.

**RESPONSE:**

I made no such claim.

9. Please describe in detail your involvement in the bid evaluation and selection process for the project for the one-inch vent line for which a request for bids was put out in about June 2020, describe what your position was regarding the bid submitted by Plaintiff and why the bid should not have been awarded to Plaintiff.

**RESPONSE:**

All bids were summarized and delivered to Merlin Figueira and David Smith in an email dated June 10, 2020, which explained the bids received from Specialty Fabrication ($150,500); Quality Fabrication ($150,067.87); and PIS ($213,738.80).

The decision to award the contract to the successful bidder was made by IPOS.

10. Please identify by date and describe in detail all complaints, criticisms, and negative or unfavorable remarks you made about Plaintiff, including, but not limited to, remarks that Plaintiff did shabby work, caused incidents, forged time sheets, recorded false times worked, provided false welders' certificates, or did improper welds, identify the forum in which each remark was made, identify by name, employer, and job title all persons to whom these complaints, criticisms, and remarks were made, describe all facts which support each remark you made about Plaintiff, identify all persons with knowledge and provide all relevant dates.

**RESPONSE:**

See my email of January 22, 2021 sent at 2:44 (UTC) to David Smith and Merlin Figueira in which I described PIS workers as "struggling for many reasons to make what I consider to be reasonable progress." In that email, I noted that there had been numerous occasions over the previous two weeks that "would appear to have been instigated intentionally to stall the progress of the installation" and then described those occurrences under the categories of "poor timekeeping"; "apparent loss of

**Exhibit D**

**PETRO INDUSTRIAL SOLUTIONS, LLC V. IPOS, ET. AL., CASE NO. 1:21-CV-00312**
*PLAINTIFF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT ANDREW CANNING*
Page 8

materials"; "poor workmanship"; and "Apparent lack of tools and or the ability to use them." I concluded by stating,

> As far as I am concerned the performance, timekeeping, quality of work and overall abilities / objectives of the following individuals has been unacceptable on a number of levels both in the RIO shade installation on St Croix and during the previous Reverse Flow installation work on St Thomas. If this is not the case then I can only assume that they are complicit with PIS in an objective of maximising the earnings for PIS from time and materials activities.
>
> PIS welding team individuals involved in the underperforming installation activities are:
>
> - Elias Rivera
> - Ricardo Velazquez
> - Juan Guigliotty
>
> My recommendation is that these individuals be removed / barred from attending the site in future and classified as 'Not Required Back' for any current or future VITOL project work and also any work that PIS may want to engage them for IPOS operations activities associated with VITOL assets.

In a January 28, 2021 email to Figueira and Smith, with a blind copy to Garry Stoker, I contrasted this work with the work of three other PIS employees who I described as having done "excellent work" and described the progress they had made in contrast to the "unacceptable underperformance of the original PIS crew."

Although not a "complaint, criticism or negative or unfavorable comment" by me, on August 31, 2018, David Smith informed me in an email that Kenia Johny (last known contact information: 91 Cane Carlton, Frederiksted, VI 00840) had been terminated by PIS and that she alleged she was terminated for refusing "to pay Brian for work he didn't perform at IPOS" and that PIS had told her to charge IPOS "for 3 folks that didn't show up 'because we [IPOS] wouldn't know.'"

Although not a "complaint, criticism or negative or unfavorable comment," based upon what appeared to me to be anomalies in the evidence of welder performance qualification provided by PIS, I requested from IPOS in an email to Figueira and Smith dated April 13, 2021 sent at 9:42 p.m. (UTC) welder qualification records for the PIS welders working on the WAPA vent line and the IPOS vent and drain systems.

Similarly, in an email from me to Garry Stoker copied David Smith and blind

**Exhibit D**

copied to David Nagle dated 20th July 2021 at 8:09 p.m. (UTC) with the subject IPOS Welders Certification, I stated:

> Further to our conversation this morning, I am now as certain as I can be that the welders certification (WPQ) presented by Petro Industrial Services are not genuine:
>
> • The WPQ documents for the welders (attached) have been edited (you can clearly see the font difference and clarity change if you zoom in this looks to be a basic PDF edit of a PDF scan):
>
>   ○ Welders name
>
>   ○ Stamp number
>
>   ○ Laboratory test number
>
>   ○ Signature date
>
>   ○ Signature description (PM was the grade for one of the company owners Adrian Melendez when he worked at Lime tree – where I suspect these forms came from)
>
>   ○ Misplaced name typed in the remarks section for Bernardo Cruz (PDF editor cursor error)
>
> • Mechanical test conducted by:
>
>   ○ Welding test conducted by Guillermo Castro LIII (I spoke with the manager of Acuren Inspection Services today in Louisiana who was very helpful):
>
>     ▪ There is no record of Guillermo Castro within their current or recent employee roll (LinkedIn has him in Japan for over 2 years)
>
>     ▪ Acuren did not have any inspectors on the island in 2021 the company having left in 2020 when the NDT contract moved to Versa
>
>   ○ Mechanical test conducted by: Acuren Inspection Services:

**Exhibit D**

Case: 1:21-cv-00312-WAL-EAH Document #: 299-4 Filed: 02/15/24 Page 10 of 19

**PETRO INDUSTRIAL SOLUTIONS, LLC V. IPOS, ET. AL., CASE NO. 1:21-CV-00312**
*PLAINTIFF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT ANDREW CANNING*
Page 10

> > ▪ Even if they had inspectors they did not have the equipment to perform the referenced bend test or pull test
> >
> > ▪ Laboratory test number starts with a PAUT which suggests that it was a phase array examination not a mechanical test as referenced – I left the manager with the number to see if he could find any reference.
>
> • The welding procedure qualification procedure for the asset is very clear (document 1309-M03-403-104 section 2.12 and subsections 2.12.2 and 2.12.3) on the processes that should be followed for welding (see document attachment).
>
> • What started me looking into the certification was the number of defects in the welds for the replacement 3inch stainless steel vent lines from the WAPA gas turbines:
>
> > ○ GT17 shows x-ray defects in 63% of the weld shots taken (across all welders) – these files are too large to attach
> >
> > ○ GT20 shows x-ray defects in 52% of the weld shots taken (across all welders) – these files are too large to attach

At best this falsification puts VTTI in a very embarrassing position with VITOL and WAPA at worst it compromises the lack of quality assurance compromises the integrity of the asset not only for this work but all other fabrication undertaken by this particular team and possibly other previous fabrications undertaken by PIS 'certified welders'. Even worse is the potential affect on the supply of propane to WAPA which could require a full stoppage during the replacement of the compromised systems.

I hope the foregoing summarises my concerns adequately and the findings of a brief review of the facts.

In follow up to that email, I sent an email on July 22, 2021 at 6:30 p.m. (UTC) to Andreas Constantinou, David Smith, Merlin Figueira, and Terence Keogh, stating:

> Andreas,
>
> Thank you for the documentation summary which will provide a good basis to form an assessment from.

**Exhibit D**

Case: 1:21-cv-00312-WAL-EAH Document #: 299-4 Filed: 02/15/24 Page 11 of 19

**PETRO INDUSTRIAL SOLUTIONS, LLC V. IPOS, ET. AL., CASE NO. 1:21-CV-00312**
*PLAINTIFF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT ANDREW CANNING*
Page 11

One of the big document anomalies is with the attached WPQ documents which are on close inspection are obviously PDF edits of someone else's original certification (if you zoom in you can see the print clarity and font changes in certain fields) and while it clearly states the assessment was based on acceptance of guide bend test they are now telling us that the test were done by phase array for which I suspect (conveniently) no hard copy test results are available. You did say that phase array testing could be done using specialist software – can you provide details and we can check if this software was used? Other original certificate anomalies exist such as stating that the welds were completed on 1" pipe whereas the actual welds were to be made on 3" 304 stainless steel pipework. I am not sure whether it was intended to provide the same certificates (perhaps 'edited' further) for each welder for each pipe system they have worked on within the recent period but this includes 1" & 2" 3BIL LTCS, and 1" 1A1 carbon steel as well as the 304 stainless steel, I guess one of the questions should be what materials have the welders actually been tested for and certified to work on? One worrying aspect that was evident during the 304 system fabrication job was the lack of understanding of the need to segregate carbon steel and stainless steel fabrication jobs, wire brushes, grinders etc which makes me wonder how qualified the welders really are. Finally the number of defects identified by the 10% radiography on the stainless line is something I find quite worrying (up to 63% of the radiography images showed defects), despite the acceptance by the NDT company, however it is unclear who set the acceptance criteria limits (some of the defect sizes are quite large and the defect densities high on the x-ray images).

Thanks again for your insight, I am sure we will came back for further clarification, comment and your teams views over the next couple of days if that would be acceptable?

I also raised concerns with Merlin Figueira and David Smith, with a blind copy to David Nagle, in an email sent on April 24, 2021 at 2:21 p.m. (UTC) in which I stated:

It is apparent that PIS are not following good practice in the fabrication of the stainless steel turbine cavity vent system. They clearly do not recognise the need to segregate stainless and carbon steel materials in the handling, preparation and welding process. On Thursday I observed what appeared to be a carbon steel fabrication being finished adjacent to the stainless steel pipework on stands within the fabrication tent on the WAPA site, this is troubling as tools such as grinders, wire brushes (stainless for stainless

**Exhibit D**

**PETRO INDUSTRIAL SOLUTIONS, LLC V. IPOS, ET. AL., CASE NO. 1:21-CV-00312**
*PLAINTIFF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT ANDREW CANNING*
Page 12

> materials) pipe stands etc. should not be shared between ferrous and stainless fabrication. Further, today on a quick walk through the fabrication area at WAPA I observed a length of partially fabricated stainless vent pipework adjacent to an carbon steel I beam section that had, as far as I can tell, been cut with an angle grinder from which the cutting have heavily contaminated the surface of the stainless steel pipe in several areas. Such contamination is impossible to remove mechanically (wire brushing will only spread it) and failure to do so (chemically) will initiate and sustain surface corrosion which will negate the purpose of using stainless steel. Similarly if tools such as wire brushes, and grinding wheels are shared between carbon steel and stainless steel fabrication, iron particle contamination will be present in the weld which lead metallic granular corrosion.
>
> This observation may appear on first read as 'petty' however the quality, strength and integrity of the final fabrication of stainless materials requires meticulous segregation, handling, preparation and welding in a contamination controlled environment, this does not appear to be happening.
>
> Given the concerns over direct (potentially controversial) communication with contractors including the general contractor PIS, I wonder if you could highlight the poor practice concerns summarised above and ask what they plan to do to mitigate the issues to date and going forward?

In an email sent on May 31, 2021 at 10:44 p.m. (UTC) to Tim Kologinczak, with a cc to Charlotte Pratt Horowitz, I stated:

> On a side note, I walked through the mound top task and stages in detail with Adrian, Chetrum and Merlin last week so that PIS could assess what works needed to be done to stabilise the mounds (excavate to install sumps & pumps [for which I have generated a bench mark estimate of the manhours required], run low voltage pump power supplies, and install pump drainage pipework, then also the requirements to reinstate the existing supports (which is likely to be an ongoing requirement) with an expectation of PIS providing an estimate with tasks breakdown (against a general outline of requirement which they requested and I am in the process of generating) in the next week or so. I must admit that I was rather surprised that they never took a single measurement or surveyed a single pipe support to enable them to put together a meaningful estimate, instead they choose to leave to mound top along with Merlin and myself. I suspect that we are at best likely to get a general manpower time and materials estimated cost from them, which based on their performance of work undertaken under similar arrangements in recent weeks would not, in my opinion, be acceptable because of the inefficiencies that

**PETRO INDUSTRIAL SOLUTIONS, LLC V. IPOS, ET. AL., CASE NO. 1:21-CV-00312**
*PLAINTIFF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT ANDREW CANNING*
Page 13

> encourages. Rather than continue to single source work to PIS without them providing adequate details on cost breakdown against which we can assess their value, I would like to look at engaging other competent companies with motivated workers who are now becoming available as the rundown of Lime Tree reconstruction project progresses, as I believe that it would be prudent to obtain alternative comparative quotations to assess the competitiveness of the expected PIS bid, and thereafter the possibility of awarding work to more specialised contractors.
>
> Do you Charlotte or Sebastian foresee any problems or have a view on the alternative contracting strategy proposed?

11.  Please describe the circumstances surrounding the incident where you fell through a platform on or about February 11, 2021, including all reasons why you were on the platform at the time of the occurrence, how long you had been on the platform prior to the occurrence, any actions in which you were engaged when the incident occurred, and identify all persons who witnessed the incident.

**RESPONSE:**

We were up on the boiler access platform at St Thomas as part of the close checks on the installation access ladders and safety gates that had been fabricated and delivered for IPOS by the project team and installed by PIS. Whilst on the deck I also looked at the installation of the pneumatic boiler feed water valves that were also delivered for IPOS by the project team and partially installed by PIS. As I turned to walk back from above the A boiler, an access hatch in the grating on which I was standing collapsed through the platform and my feet dropped around 2 feet on to the casing of the running boiler which cased me to fall backwards. David Nagle who was the access ladder and safety gate design technical resource was with me on the platform and helped me up from the grating and helped me retrieve the access hatch and put it roughly back in place to try ensure that an operator would not have a similar accident whilst we reported the incident. The inspection of the access ladder and gate took around 10 to 15 minutes because it had been installed incorrectly.

**Exhibit D**

**PETRO INDUSTRIAL SOLUTIONS, LLC V. IPOS, ET. AL., CASE NO. 1:21-CV-00312**
*PLAINTIFF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT ANDREW CANNING*
Page 14

12. Please describe in detail all communications between you and Plaintiff or any employees, agents, or representatives of Plaintiff concerning the incident where you fell through a platform on or about February 11, 2021, including, but not limited to, any remarks to Plaintiff's employees that Plaintiff's work was "bull shit", that their welding was "substandard" or any other criticisms of Plaintiff and/or Plaintiff's employees, identify all parties to each communication and provide all pertinent dates.

**RESPONSE:**

After making the area as safe as possible we returned to the control building and on the way into the building from the parking lot we met the Operations Supervisor (Rawle Granger) and the Maintenance Supervisor (Coury Hodge) and I explained that part of the boiler access platform had given way and asked if they could make sure that it was barriered off until it could be made safe. I returned to my office where I started compiling an incident summary email and whilst I was working on that document Chetrum Persaud entered the control building and passed my office. I called him in. I told him that I had fallen through the boiler access because an access hatch had collapsed and told him that the grating area around the hatch didn't seem to be supported, Chetrum said that they had not yet received the grating clips required to secure the grating so they had tack welded the edges of some of the grating section to the frame. As I was asking him whether the deck was safe to use in that condition the PIS Safety Man (Frank Kirch) happened by my office and I called him in to ask both parties if the deck had been inspected and if it had been signed off as accepted by IPOS.

Frank appeared to find the situation mildly amusing and I asked him if that was the case, he said he always smiles and when I said that this is serious, I could have been seriously injured and potentially suing PIS for their apparent failures to which he said "this is bullshit and I am leaving" and that is what he did. As the reverse flow project had ordered grating clips which we didn't need to use at that stage we gave them to Chetrum so that he could complete the grating installation and any modifications to make the access platform safer.

I completed my incident email and sent that immediately to the General Managers: Email from andrew.canning@optis.co.uk to Merlin Figueira, David Smith, copied Rawle L. Granger, Coury Hodge, Alexander Etienne. Dated 11th February 2021 at 14:52. Subject Near Miss Report.

**Exhibit D**

**PETRO INDUSTRIAL SOLUTIONS, LLC V. IPOS, ET. AL., CASE NO. 1:21-CV-00312**
*PLAINTIFF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT ANDREW CANNING*
Page 15

13. Please state whether you or anyone to your knowledge conducted any investigation into the cause of the incident described in Interrogatory No. 12 above, and if so, identify the persons who performed the investigations, describe the results of the investigations, and provide the applicable dates.

**RESPONSE:**

Merlin Figueira contacted me by phone within half an hour of receiving the near miss report and stated that Coury and Granger would be contacting me should they need further support in writing a Near Miss Report. I have not seen any such report and don't know what investigation was done by them.

14. Please describe in detail the substance of all communications between you and any Co-Defendant in this matter concerning in any manner the meeting between Traeger Brothers and IPOS in or about June of 2021, identify all parties to each communication, state the method of each communication, and provide all pertinent dates.

**RESPONSE:**

I have no recollection about a meeting with Traeger Brothers in or around June 2021. I do have an email from David Nagle on June 28, 2021 in which he described a meeting between IPOS, Traeger and Petro. That email states:

> There were a few concerns after my discussion this morning with Lloyd at Kitz regarding the meeting with Traeger Brothers and IPOS on STT. He stated they met with Merlin and Coury, with Petro present, and they were discussing the valve specs to initiate a quotation. Lloyd stated they discussed the temperature specifications and their discussion didn't align with what we discussed with Lloyd during our meeting on Wednesday regarding multiple valves, multiple seat considerations, and multiple piping specifications for the different valves in question. He contacted me requesting clarification on the specifications including the temperature specifications for the valve quote.
>
> There are multiple kitz valve quotations from Traeger Brothers that were quoted incorrect. These were not finalized because Traeger Brothers was unable to put together a quote that included the correct specifications. None of the quotations provided to date from Traeger Brothers should be used to place a Kitz Valve order or try to discern any valve specifications. In order to quote the correct valves Lloyd has requested confirmation of the four piping specifications that were provided with the original project.

**Exhibit D**

Case: 1:21-cv-00312-WAL-EAH   Document #: 299-4   Filed: 02/15/24   Page 16 of 19

**PETRO INDUSTRIAL SOLUTIONS, LLC V. IPOS, ET. AL., CASE NO. 1:21-CV-00312**
*PLAINTIFF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT ANDREW CANNING*
Page 16

> Lloyd also stated that he is not confident that the current actuators will be powerful enough to turn the new Kitz Valves until he reviews the torque requirements. I will be forwarding another email with a request for general temperature clarification for each valve type in question. In the meantime, Lloyd is looking into the torque requirements for the valves in question.
>
> I suggest the seat designations be reviewed again before submitting the final information to Kitz for quotation.
>
> After all the information is provided to Kitz, Lloyd will have MRC provide a quotation and lead time as requested by VITOL.

15. Please describe in detail the substance of all communications between you or anyone on your behalf and any Co-Defendant in this matter concerning the letter from Guillermo Castro dated July 29, 2021, state the method of each communication, identify all parties to each communication and provide the applicable dates.

**RESPONSE:**

Adrian Melendez's email of July 27, 2021 at 10:18 p.m. to David Smith which attached the July 29, 2021 letter from Guillermo Castro was forwarded to me without comment by David Smith on July 28, 2021 at 11:32:45.

I responded in an email to David Smith sent on July 28, 2021 at 3:18 p.m. as follows:

> I find it curious that the letter is dated 29th July (tomorrow) along with a number of inconsistencies such as why he needed to change the name on what was supposedly their preceding certificate which as this was apparently just completed at Lime Tree albeit 'just' means 3 years ago (such are not transferable between companies). We still have numerous anomalies within the certification including the claim to have completed mechanical testing (which were acceptable) on the certificates and conveniently no verifiable record of the testing. It should also be noted that the welder certification was apparently for stainless (3E1) whereas three of the welders worked immediately on the 1" vent / drain and the replacement 2 inch drain system (3B1L)….
>
> Where is Guillermo Castro's AWS accreditation and CWI stamp on the certificates or letter (he would clearly no longer be covered by the Acuren QA processes and certification as an independent)?
>
>  Looks to me to be a poor attempt to justify anomalous certification.

**Exhibit D**

**PETRO INDUSTRIAL SOLUTIONS, LLC V. IPOS, ET. AL., CASE NO. 1:21-CV-00312**
*PLAINTIFF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT ANDREW CANNING*
Page 17

On July 28, 2021 at 7:37 p.m. (UTC) David Smith responded to me and informed me that IPOS had decided to terminate its contract with Petro before it had received the Castro letter and attached a copy of the termination letter.

On July 28, 2021 at 7:39 p.m. (UTC), David Smith responded to me and suggested that the anomaly in the date of Castro's letter might have been because it was the 29th in Japan.

On July 28, 2021 at 7;41 p.m. (UTC) I responded, "But I thought he had just arrived from Japan last week . . ."

To my recollection, I had no other communications regarding the Castro letter.

16. Please state whether you instructed any person(s) to hold payments for invoices received from Plaintiff at any time from 2021 to the present, and if so, describe with specificity what your instructions were, provide the dates of any such instructions, identify the persons to whom you gave these instructions, state the reasons why you gave these actions, and identify the date and amount of each invoice involved.

**RESPONSE:**

I gave no such instruction and had no authority to give such an instruction.

17. Please describe in detail the nature and extent of your involvement in the decision to terminate the contract between Plaintiff and IPOS, including any requests, advice, recommendations, or approvals given by you concerning the termination of the contract by IPOS and the substance of all discussions with IPOS concerning the same.

**RESPONSE:**

I was not involved in the decision to terminate the contract and was notified after-the-fact that IPOS had decided to terminate the contract, by email sent on July 28, 2021 at 7:37 p.m. (UTC) from David Smith.

**Exhibit D**

**PETRO INDUSTRIAL SOLUTIONS, LLC V. IPOS, ET. AL., CASE NO. 1:21-CV-00312**
*PLAINTIFF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT ANDREW CANNING*
Page 18

18. Please provide the factual basis for your denial of paragraph 53 of Plaintiff's Complaint that, "On April 15, 2021, Andrew Canning, on behalf of VITOL Defendants, sent an email to IPOS acknowledging that he did not want to have any direct communications with Plaintiff."

**RESPONSE:**

I denied the allegation because I have no recollection of sending such an email and after searching my emails could not find any such email.

Separate and apart from any email in which I allegedly said that I did not want to have direct communications with PIS, I had been instructed by IPOS that I should not communicate directly with PIS and that I should direct any communications regarding PIS to IPOS.

19. Please explain all reasons why you required Plaintiff to replace the materials which had been manufactured in China that Plaintiff obtained for a project for IPOS, and include in your response specific references to welding procedures or industry standards that support your decision.

**RESPONSE:**

Section 1 ("General"), paragraph 3 of project specification 1309-M03-403-201 Piping Materials Technical Conditions of Supply specifies, "Materials originating from China shall not be used."

20. If you contend that Plaintiff was unable to fulfill its obligations under the contract, please explain why and include detailed descriptions of each occasion on which Plaintiff demonstrated such inability or nonperformance, identify all persons with knowledge and provide all relevant dates.

**RESPONSE:**

I contend only that PIS appeared unable to present valid Welder Performance Qualification Records (WPQ's) for their welders working on IPOS projects. Whether that was an inability to fulfill obligations under the contract is a question for IPOS.

**Exhibit D**

PETRO INDUSTRIAL SOLUTIONS, LLC V. IPOS, ET. AL., CASE NO. 1:21-CV-00312
*PLAINTIFF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT ANDREW CANNING*
Page 19

21.  Please identify and describe any and all lawsuits, claims, and/or complaints against you which involve allegations of discrimination, defamation, and/or tortious interference with contract, identify all parties to each case, set forth the case number, jurisdiction, nature of the case, disposition of each and every case, and identify each and every law firm and/or attorney representing the parties in such matters.

**RESPONSE:**

None.

## DECLARATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. to the best of my knowledge and belief.

**ANDREW CANNING**

DATED: 09/15/2022      By: _____
                              Signature


Attorney for Defendant

DATED: 9/16/2022      By: _____
                              Andrew C. Simpson

**Exhibit D**