## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

## DIVISION OF ST. CROIX

PETRO INDUSTRIAL SOLUTIONS, LLC, )
                                   )
            Plaintiff,       )
                                   )
      vs.                 ) Case No. 1:21-CV-00312
                                   )
ISLAND PROJECT AND OPERATING    )
SERVICES, LLC; VITOL US HOLDING )
II CO.; VITOL VIRGIN ISLANDS    )
CORP.; ANDREW CANNING; and OPTIS )
EUROPE, LTD.,                     )
                                   )
           Defendants.     )

## THE VIDEOTAPED ORAL DEPOSITION OF

## PETRO INDUSTRIAL SOLUTIONS, LLC

**as a 30(b)(6) witness through its representative, ADRIAN MELENDEZ, JR.,** also taken personally, on the 28th day of April, 2023, at the Law Offices of Beckstedt & Kuczynski, LLP, 2162 Church Street, Christiansted, St. Croix, U.S. Virgin Islands, and via Zoom teleconference, between the hours of 9:45 a.m. and 4:45 p.m., pursuant to Notice and Federal Rules of Civil Procedure.

_____

Reported by:

Susan C. Nissman RPR-RMR
Registered Merit Reporter
Caribbean Scribes, Inc.
1244 Queen Cross Street, Suite 1A
Christiansted, St. Croix
U.S. Virgin Islands  00820
(340) 773-8161

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1              THE VIDEOGRAPHER:  In the matter of Petro
 2   Industrial Solutions, LLC, the plaintiff, versus Island
 3   Project and Operating Services, LLC; Vitol U.S. Holding II
 4   Company; Vitol Virgin Islands Corporation; Andrew Canning
 5   and Optis Europe, Ltd., the defendants.
 6              In the District Court of the Virgin Islands,
 7   Division of St. Croix.  Civil Action Number 1:21-CV-00312.
 8              My name is Sam Halvorson.  I am the
 9   videographer for today's proceedings.  Our court reporter is
10   Susan C. Nissman-Coursey, RMR.
11              Today's date is April 28, 2023.  The deponent
12   is Adrian Melendez, Jr., and Rule 30(b) and Rule 36 (sic)
13   deposition of plaintiff.  The time is 9:45.
14              For the purposes of voice identification, I'm
15   asking -- requesting that the attorneys present identify
16   themselves at this time.
17              MR. KAPLAN:  Alex Kaplan, of Susman Godfrey,
18   on behalf of Vitol Virgin Islands Corp. and Vitol U.S.
19   Holding II Co.
20              MR. BECKSTEDT:  Attorney Carl Beckstedt, of
21   Beckstedt and Kuczynski, also on behalf of the Vitol
22   defendants.
23              MS. ROHN:  Lee Rohn, on behalf of the
24   plaintiff.
25              THE VIDEOGRAPHER:  Please swear the witness.
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
1        A.    Yes.

2        Q.    All right.  Who prepared the form here in

3   Exhibit 12, the page ending in 94, the welder performance

4   qualification record?

5        A.    Again, describe -- who prepared the form?

6        Q.    Yes.

7        A.    Okay.  So Mr. Castro was the one that actually

8   prepared the form.

9        Q.    So all of the information listed on the form

10  that's filled in each of these lines, that was filled out by

11  Mr. Castro?

12       A.    Correct.

13       Q.    And when you say, "Mr. Castro," you're referring

14  to Guillermo Castro?

15       A.    Correct.

16       Q.    All right.  Mr. Castro did not sign the welder

17  certification --

18       A.    Correct.

19       Q.    -- correct?

20             You signed the welding certification,

21  correct?

22       A.    That's right.

23       Q.    And you -- the date on the bottom of this form is

24  February 19th, 2021, right?

25       A.    Correct.
```

**PIS, LLC/A. MELENDEZ, JR. -- DIRECT**

1     **Q.**   Okay.  Is that the date that you signed the form?

2     **A.**   That's correct.

3     **Q.**   Okay.  When did Mr. Castro fill out all the

4     information on the form?  On the same date?

5     **A.**   February 2021.

6     **Q.**   I'm sorry.  Say again?

7     **A.**   February of 2021.

8     **Q.**   Okay.  Not on the same date that you signed the

9     form?

10    **A.**   Can't recall that.

11    **Q.**   Okay.  How did you get the form to sign for Mr.

12    Castro?

13    **A.**   Oh, it was actually through FedEx.  Got

14    information through FedEx.

15    **Q.**   Mr. Castro sent you a FedEx with this whole form

16    filled out, except for your signature on the bottom?

17    **A.**   Correct.

18    **Q.**   Okay.  Did Mr. Castro fill in the part that said

19    Petro Industrial Solutions?

20    **A.**   True.

21    **Q.**   He filled that in, or you filled that in?

22    **A.**   No, he did.

23    **Q.**   Okay.  And did Mr. Castro fill in the date on the

24    bottom?

25    **A.**   I believe so.  I believe so.

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
1        Q.    When did Mr. Castro do the testing that is
2    reflected in this welding performance qualification record
3    in Exhibit 12 on the page ending 94?
4        A.    I believe around the same date.
5        Q.    On what date?
6        A.    The same date of 2-19.
7        Q.    So you believe Mr. Castro tested Mr. Batista on
8    February 19th, 2021, and then FedExed to you this form that
9    you signed?
10       A.    I believe so.
11       Q.    All right.  Where did the testing that Mr. Castro
12   did of Mr. Batista take place?
13       A.    The facility -- he was working for a client there
14   in -- in Puerto Rico, and we tested all the welders there.
15       Q.    Where in Puerto Rico?
16       A.    In the San Juan area.  He actually just said, show
17   up this area, and that's what the guys did.
18       Q.    Were you present at the time that Mr. Castro
19   tested any of your welders?
20       A.    No, I was not.
21       Q.    Were any of the Petro managers or supervisors,
22   superintendents, any management of Petro present?
23       A.    No.
24       Q.    Did you know Mr. Castro from before February of
25   2021?
```

Exhibit I

**PIS, LLC/A. MELENDEZ, JR. -- DIRECT**

1    **A.**    Yes, I did.

2    **Q.**    Okay.  How did you know Mr. Castro?

3    **A.**    We worked -- he was the lead inspector/technician

4    for Limetree.  In Limetree Bay.

5    **Q.**    When's the last time you spoke to Mr. Castro?

6    **A.**    Oh, my goodness.  This had to be actually July of

7    2021.

8    **Q.**    Do you know anything about Mr. Castro's current

9    whereabouts?

10    **A.**    No, I do not.

11    **Q.**    Have you had any written communications with

12    Mr. Castro since July of 2021?

13    **A.**    No.

14    **Q.**    E-mails?  Texts?

15    **A.**    No.

16    **Q.**    Any phone calls?

17    **A.**    No.

18    **Q.**    Okay.  Now, at the time Mr. Castro did this

19    testing in February of 2021, Mr. Castro did not work for

20    Acuren Inspection Services, true?

21    **A.**    True.

22    **Q.**    Mr. Castro, on the form, it says, "Welding Test

23    Conducted By: Guillermo Castro," and then it says, "LIII."

24              Do you see that?

25    **A.**    Correct.

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1      Q.   Do you know what the LIII signifies?

2      A.   Level III.

3      Q.   Okay.  Level III.  Do you know what -- Level III

4    what?

5      A.   So that's kind of the highest level.  So he's --

6    he's performed the third level of his craft, which is phased

7    array or PATUTs (sic), which is phased array ultrasonic

8    testing.

9      Q.   Do you know whether Mr. Castro, in fact, holds the

10   Level III certification?

11     A.   Currently?

12     Q.   At any time?

13     A.   Yes.

14     Q.   How do you know that?

15     A.   Through Acuren.

16     Q.   In what way did Acuren inform you that Mr. Castro

17   holds a Level III certification?

18     A.   Actually, a certificate itself.

19     Q.   Do you possess the certificate?

20     A.   I believe I do.

21     Q.   Okay.  In what context did you receive a

22   certificate from Acuren, showing that Mr. Castro has a Level

23   III certification?

24     A.   Different testing that we've done, he actually

25   attaches a certification in the back of it.

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1      **Q.**   So testing that you did with Mr. Castro before

2   February of 2021?

3      **A.**   Yes.

4      **Q.**   Okay.  In what -- what project?

5      **A.**   Limetree.

6      **Q.**   Okay.  So sometime working on the Limetree Bay

7   project, you believe Acuren provided you with a certificate,

8   indicating Mr. Castro held a Level III certification?

9      **A.**   Correct.

10      **Q.**   And you believe you currently possess that

11   certificate?

12      **A.**   I do.  This has to be -- I mean, this is 2017 or

13   so.  I believe I do.

14      **Q.**   Okay.  Do you have any other information that

15   would indicate one way or the other whether Mr. Castro, in

16   fact, holds the Level III certificate, other than this

17   Limetree Bay certificate?

18      **A.**   No.

19      **Q.**   Have you read the declaration that was submitted

20   in this case from Doug Rice of Acuren?

21      **A.**   No.

22              **MS. ROHN:**  You were supposed to look at every

23   document?  How could you say that?

24      **A.**   I read so much.

25      **Q.**   **(Mr. Kaplan)** Did you have a contract with

Exhibit I

**PIS, LLC/A. MELENDEZ, JR. -- DIRECT**

1    Mr. Castro to do a certain scope of weld testing or

2    certifications in February of 2021 --

3         **A.**   No.

4         **Q.**   -- for your employees?

5         **A.**   No.

6         **Q.**   So how did you make arrangements for him to do

7    this testing?

8         **A.**   Literally, a phone call.  Hey, I need you to

9    retest these welders.  Are you available?  Yes, I'm in

10   Puerto Rico, and that's the way it was.

11        **Q.**   Did you pay Mr. Castro for him performing this

12   certification?

13        **A.**   Yes.

14        **Q.**   Okay.  Did Mr. Castro issue any form of invoice or

15   documentation for this testing?

16        **A.**   No, but I do have a PayPal that I sent him.  Copy

17   of the PayPal that I sent him.

18        **Q.**   Do you recall how much you paid for the

19   certification records?

20        **A.**   I believe it was a thousand bucks.

21        **Q.**   Per welder or total?

22        **A.**   Total.

23        **Q.**   And how many times did Mr. Castro do any

24   certification testing for Petro welders?

25        **A.**   On this occasion, it was about six of them, I

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    believe.  Yeah, six.

2         **Q.**   Was there more than one occasion, though, where

3    Mr. -- where you had Mr. Castro do welding certifications

4    for Petro welders?

5         **A.**   No, I believe that was it.

6         **Q.**   So you believe it was February 19th, 2021,

7    Mr. Castro did welding certifications for a number of Petro

8    welders, and that's the only one you recall?

9         **A.**   No.  There was -- yeah, there were two other ones

10   that were done in April.  In March and in April, yeah.

11        **Q.**   Were you present at any of the welding

12   certifications?

13        **A.**   I was not.

14        **Q.**   Were any Petro managers or supervisors present at

15   any of the welding certifications?

16        **A.**   No.

17        **Q.**   All right.  So on the certification form

18   underneath Mr. Castro's name, it says, "Mechanical Tests

19   Conducted By: Acuren Inspection Services," correct?

20        **A.**   Correct.

21        **Q.**   But you knew that in February of 2021, Mr. Castro

22   did not, in fact, work for Acuren Inspection Services,

23   right?

24        **A.**   I did not know that.

25        **Q.**   You believed, in February 2021, that Mr. Castro

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

 1   worked for Acuren?

 2        **A.**   I never asked the question.

 3        **Q.**   Well, you certainly believed that Mr. Castro did

 4   work for Acuren, based on this form, right?

 5        **A.**   Yeah.   Took the form at value.

 6        **Q.**   Would you have signed and submitted this form to

 7   WAPA and Vitol and IPOS if you knew that Mr. Castro did not,

 8   in fact, work for Acuren --

 9             **MS. ROHN:**   Objection.

10        **Q.**   **(Mr. Kaplan)** -- at the time this form was signed?

11             **MS. ROHN:**   Calls for speculation.

12        **A.**   Those forms are actually Petro's forms.   So -- so

13   these forms, this is Petro paying for what we actually paid

14   for.

15             So your question is, as far as if it was

16   Acuren, or if it was any other company overseeing

17   independently, that -- that's irrelevant.   I mean, would I

18   sign them?   I would have signed them.

19        **Q.**   **(Mr. Kaplan)** Even if you knew Mr. Castro didn't

20   work for Acuren, you would have signed and submitted this

21   form?

22        **A.**   Yes.

23        **Q.**   And now you see at the bottom above your

24   signature, it says, "we," and that's you, on behalf of

25   Petro, right?

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    **A.**    Yeah.

2    **Q.**    Petro.  Says, "We certify that the statements in

3    this record are correct," right?

4    **A.**    Correct.

5    **Q.**    Okay.  So you're certifying that Mr. Castro did

6    this work, and then, quote, "Mechanical Tests (were)

7    Conducted By: Acuren Inspection Services," right?

8    **A.**    I didn't certify -- or, actually, I am okay with

9    the actual certification, yes.

10    **Q.**    But included in the certification is the factual

11    statement that mechanical tests were conducted by Acuren

12    Inspection Services, right?

13    **A.**    What it states here is correct, and the test

14    coupons were prepared and weld in accordance to ASME.

15    That's what I signed.  Acuren is an afterthought.

16    **Q.**    Acuren is what?

17    **A.**    An afterthought.  Like that is -- for me, the

18    biggest thing is that he certified my welder.

19    **Q.**    You don't think it was important to have the name

20    Acuren Inspection Services on this certification to indicate

21    a company with a reputation for doing this type of work had

22    actually done the mechanical tests?

23    **A.**    The actual -- the value of it is his name.  The

24    value is that he is a Level III.  He is actually -- he is or

25    was the highest level technician for that firm.  So that's

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    the value.  I am putting that liability on Petro.  This is

2    my document.  All I needed him to do was to certify my

3    welder.

4        Q.   Who certifies someone as a Level III inspector?

5        A.   So he actually has to go through different -- he,

6    himself, personally, has to go through different levels

7    himself.  He has to pay through different classes.

8        Q.   But Acuren is the one who certifies -- classifies

9    someone, correct?

10       A.   Correct, but he's actually independent, though.

11   He can actually certify other people, if he wants, himself.

12       Q.   Mr. Castro wrote on the form, Acuren?

13       A.   That was on the form.

14       Q.   And you're telling us you thought, at the time, he

15   did work for Acuren?

16       A.   I didn't know either way.  I mean, either way, I

17   didn't know.

18       Q.   Okay.  But just to be clear about the facts, at

19   the time, you received the welding certifications in

20   February --

21       A.   No, actually.  No, you know, he did tell me he

22   didn't work for Acuren.  You're right.  Correct.

23       Q.   Let's be --

24       A.   Correct.

25       Q.   -- very clear on the facts.

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
1        A.   Correct.

2        Q.   In February of 2021, when you received this form,

3    the welding certification records, you knew, because

4    Mr. Castro told you, that he did not work for Acuren,

5    correct?

6        A.   I believe that was the conversation, yeah.

7        Q.   Okay.  And next to where it says, "Mechanical

8    Tests Conducted By:  Acuren," it has a laboratory test

9    number.

10                  Do you see that?

11       A.   That's right.

12       Q.   And on the -- on the form for Mr. Batista, it

13   says, "PAUT021621-EB," right?

14       A.   Yes.

15       Q.   And if you look at all the other welding

16   certifications, it has a similar, but different test number,

17   right?

18       A.   Okay.

19       Q.   Do you see that?

20       A.   Yes.

21       Q.   Okay.  But they all start with PAUT, correct?

22       A.   Correct.

23       Q.   Do you know what that stands for?

24       A.   PAUT is phased array ultrasonic testing.

25       Q.   Do you have copies of the tests?  These test
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1   numbers that were done on these welders?
 2        A.   I do not.
 3        Q.   Mr. Castro should have a copy of these?
 4        A.   As I understand, no, he didn't.
 5        Q.   I'm sorry?
 6        A.   As I understand, no, he did not.
 7        Q.   What do you mean, "no, he did not"?  It says he
 8   performed a mechanical test.
 9        A.   Correct.  I didn't request actual reports, so he
10   did not.  Actually just performed the tests.  Pass.  Move
11   forward.
12        Q.   I'm not -- I'm not following what you're saying.
13             So you're saying Mr. Castro doesn't have a
14   copy of the test results?
15        A.   That's what I understand.
16        Q.   So how -- he filled out this form from memory?
17   How would he know the information to put in the form?
18        A.   There's a test coupon, right?  So let's just say
19   it's a 6-inch piece of pipe.  Put a weld together.  And then
20   you're right there.  Pass or fail.  And that's basically it.
21   So that actually is a record of what this test is about.
22        Q.   But you said this was a Petro form, right?
23        A.   I'm sorry.  This form?
24        Q.   Yeah.  You told me it was a Petro form?
25        A.   No, I never said it was a Petro form.
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1              MS. ROHN:  You said that.

 2         A.   That this was a Petro form?  No, no, no.  This is

 3    not a Petro form.

 4         Q.   (Mr. Kaplan) Okay.  Where did you get the form?

 5         A.   This is Mr. Castro's form.

 6         Q.   Okay.  So --

 7         A.   I'm sorry if I said that.  Correct.

 8         Q.   This is Mr. Castro's form, but you're saying he

 9    does this test coupon, and then he pulls up this form on a

10    computer, and he fills out this information, but there's no

11    written test report?

12         A.   That's correct.

13         Q.   So what does the test number signify, then?

14         A.   So he'll put a test number on the actual coupon

15    itself.

16         Q.   Okay.  Do you have copies of the coupon?

17         A.   I don't believe.  This was 2-3 years ago.  No, I

18    do not.

19         Q.   But did you ask Mr. Castro for any copies of

20    those?

21         A.   I did not.

22         Q.   Now, a photo -- a phased array is a particular

23    type of welding test, right?

24         A.   Correct.

25         Q.   It's different from a mechanical test, right?
```

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    **A.**   Don't know what the difference is of what you're

2    asking.

3    **Q.**   All right.  So if you turn to the last page of

4    this document welder certification for Mr. Philips, right?

5    **A.**   Okay.

6    **Q.**   How do you pronounce his first name?

7    **A.**   Richie or -- yeah.  Richael, actually.

8    **Q.**   Is Richael one of your employees, sir?

9    **A.**   No, not currently.

10   **Q.**   But Mr. Philips was one of your welders?

11   **A.**   Correct.

12   **Q.**   And the date on his form is 3-22-21, right?

13   **A.**   Okay.

14   **Q.**   Okay.  So you're saying Mr. Castro sent you a

15   FedEx also on 3-22?

16   **A.**   I believe so.

17   **Q.**   Okay.  And he also sent you a FedEx on April 1?

18   **A.**   I believe so, yeah.  Within those times.

19   **Q.**   Okay.  So there's a -- there's a FedEx to you on

20   February 19th, you're saying, from Mr. Castro, right?

21   **A.**   Should be.

22   **Q.**   Yes?

23   **A.**   Yes.

24   **Q.**   Okay.  And you believe there's another one on

25   March 22, and another one on April 1, correct?

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
1        A.   I believe so, yes, sir.

2        Q.   Okay.  And the way you think the forms would be is

3   Mr. Castro would fill out this whole form, and it would come

4   to you, and you would sign it, and that -- that it was

5   complete, right?

6        A.   Correct.

7        Q.   Okay.  All right.  I'm going to show you what I've

8   marked as Exhibit 13, which is PIS61.

9                 (Deposition Exhibit No. 13 was

10                   marked for identification.)

11               All right.  Do you recall, in July of 2021,

12   IPOS was asking for a variety of information related to

13   welding procedures, welding inspections, test reports, and

14   certifications/qualifications?

15       A.   Yes, I do.

16       Q.   Okay.  And there was an individual, Andreas

17   Constantinou.  Do you recall?

18       A.   On the e-mail.  I've never met the gentleman.

19       Q.   Okay.  But do you recall that Mr. Smith was saying

20   that Andreas was responsible for requesting and reviewing

21   all of this information about your welding and procedures

22   and qualifications and alike?

23       A.   I do recall.

24       Q.   Okay.  So if you look on the second page, you're

25   responding to Mr. Smith.  And you say, "please find our
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1   response below along side your questions."

2            Do you see that?

3      **A.**   Yes, sir.

4      **Q.**   Okay.  And the question was, or the request was

5   for Petro's full inspection and test plan, right?

6      **A.**   Correct.

7      **Q.**   And what you wrote in the bold and underlined part

8   there is, you write "no I&TP reports were required from

9   IPOS/Vitol and therefore none can be provided," right?

10     **A.**   Correct.

11     **Q.**   So you're saying you have no inspection or test

12  plan reports, right?

13     **A.**   Inspection, we did.  Obviously, we provided all

14  the actual x-rays that were actually perform on the vent

15  line, so that was.

16            But as far as the test plan, yeah, there was

17  no written test plan.

18     **Q.**   And then the other thing that they asked for were

19  daily records for welding, fitting, and visual inspections.

20            And you say, "we do not have daily reports

21  but have included weld logs with all NDT which includes VT

22  on all welds from the third party inspection," correct?

23     **A.**   Correct.

24     **Q.**   Okay.  And then the last item says, "Welding and

25  mechanical tests of WPQs," and that's welder performance

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1  qualifications, correct?

2      **A.**   Um-hum.

3      **Q.**   Okay.  So the request here was to actually provide

4  the tests that were used to qualify the welders, right?

5      **A.**   Okay.

6      **Q.**   Is that how you understood it?

7      **A.**   Yes.

8      **Q.**   And what you wrote, is, you wrote, "The actual

9  welders' qualification certificates were given to Petro in

10  lieu of a PAUT report," right?

11      **A.**   Gotcha.

12      **Q.**   "Each Welder was tested on four different

13  positioned coupons which were phase array inspected and

14  passed.  Certifications were then approved, accepted and

15  signed by Petro," right?

16      **A.**   Correct.

17      **Q.**   Okay.  And if you look, Mr. Smith responds to you

18  at the top of the page, and he says, "you signed the

19  qualification certificate on behalf of Acuren/Costas." I

20  think he means Castro.

21      **A.**   Castro.

22      **Q.**   Okay.  He says, "you signed the quotation

23  certificate -- qualifications certificate on behalf of

24  Acuren.  We believe there must be a report/certificate/

25  document from Acuren/Costas in order for you to sign the

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1    WPQ.  Can you please provide it?"  Right?
 2         A.   Right.
 3         Q.   In response to that, that's when you told
 4    Mr. Melendez -- sorry.  When you, Mr. Melendez, told
 5    Mr. Smith, and others at IPOS, to "see Mr. Castro's attached
 6    letter regarding this question," right?
 7         A.   Correct.
 8         Q.   Okay.  So in response to questions about the
 9    welding certifications, you said, look at this letter from
10    Guillermo Castro, correct?
11         A.   Correct.
12         Q.   Okay.  And the date of this e-mail is what, sir,
13    when you said, look at the attached letter from Mr. Castro?
14         A.   The letter from what, sir?  I'm sorry.
15         Q.   When you told Mr. Smith, and others at IPOS, to
16    see Mr. Castro's letter, when did you tell them that?
17         A.   July 27th, looks like.
18         Q.   Okay.  Let me show you what I've marked as
19    Exhibit 14, which is IPOS 553.
20                   (Deposition Exhibit No. 14 was
21                    marked for identification.)
22         A.   Thank you.
23         Q.   You're welcome.
24                   Do you recognize Exhibit 14 as the letter
25    that you sent to IPOS as the letter from Mr. Castro?
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1        A.    Yes.

 2        Q.    Okay.  And so we just looked at Exhibit 13, dated

 3   July 27, 2021, where you said, "see Mr. Castro's attached

 4   letter," right?

 5        A.    Correct.

 6        Q.    Okay.  But Mr. Castro's letter in Exhibit 14 is

 7   dated two days later, July 29th, 2021.

 8              Do you see that?

 9        A.    I see it.

10        Q.    So how did you send a letter to IPOS on July 27th

11   that was dated two days later, July 29th?

12        A.    That's when Mr. Castro sent.  I don't know if he

13   was in Japan at the moment, I believe.  I don't know if he

14   was working at night.  I don't know if it was, you know,

15   just a mistake, or what it was.  Never questioned him.

16        Q.    Sure.

17              Mr. Castro sent you a letter that had the

18   July 29 date on it?

19        A.    Correct.

20        Q.    How did you get, physically get, this letter from

21   Mr. Castro?  Did he FedEx it to you?

22        A.    No.  An e-mail.

23        Q.    He e-mailed it to you?

24        A.    Correct.

25        Q.    So he e-mailed you a -- a Word document?  A PDF
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1   document?
 2        A.    I believe it was PDF.
 3        Q.    Okay.  Do you have a copy of the e-mail from
 4   Mr. Castro that transmits this -- this letter to you?
 5        A.    I'm sure I do.
 6        Q.    We haven't seen that in the production.
 7              You believe you produced the e-mail?
 8        A.    No?
 9              MS. ROHN:  I haven't seen it.
10        A.    Okay.  I will send it to you guys.
11              MS. ROHN:  Sorry, guys.
12        A.    I'm sorry.  Sorry.  Sorry.  My error.
13        Q.    (Mr. Kaplan) Do you have other e-mails with
14   Mr. Castro?
15        A.    No.  This is it.
16        Q.    How did Mr. Castro know to provide the letter?
17   Did you e-mail?  Did you call him?
18        A.    I called him.
19        Q.    And what did you tell Mr. Castro when you called
20   him before he sent this letter to you?
21        A.    I told him about the whole situation.  Told him
22   about, Hey, you know what?  The welders' quals are being
23   questioned.  There's a couple discrepancies between, you
24   know, kind of, you know, see that there's overwriting or
25   whatever it is, or, you know, kind of missing with dates
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

 1    here and there, can you please explain it, and this is what

 2    he came back with.

 3         **Q.**   Okay.  If you look at Mr. Castro's letter, in the

 4    middle of that second paragraph, he says, "I tested six

 5    welders for Adrian, at my Client's shop in Puerto Rico."

 6                   Do you see that?

 7         **A.**   Correct.

 8         **Q.**   Okay.  Then he says, "but unfortunately did not

 9    have the original Quals under Acuren saved and to re-certify

10    the previous reports I had to adjust the old welders' quals

11    and changed the welders' tensile number, the qualification

12    date, and the four test coupons."

13                   Do you see that?

14         **A.**   Correct.

15         **Q.**   Do you know what any of that means?

16         **A.**   Yes.  So what he had to do is basically from the

17    original quals that he had from Limetree Bay, and the new

18    coupons that he had, he had to just superimpose them.

19    That's what he meant.

20         **Q.**   But he said he didn't have the original

21    qualifications, right?

22         **A.**   Well, that's what he meant.

23                   And then if you keep reading a little bit

24    further -- yeah.  So he actually just had to superimpose.

25    He basically had to cut and paste.  That's what he's saying.

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    **Q.**   So if you look at the welding certification forms

2    that were in Exhibit 12, if we look at the first one for

3    Mr. Cruz that ends on Page 95, and you're saying cut and

4    paste or superimpose.

5    **A.**   Uh-huh.

6    **Q.**   That's why you see those two right columns in the

7    middle, why they don't line up with the other lines, right?

8    **A.**   Actually, I'll be honest with you, I think from

9    the original -- not that I have them, but from the original

10   ones from Limetree Bay, this was -- this is the way it was.

11   There's no reason why it's like that, so --

12   **Q.**   Okay.  Well, look at the next form for

13   Mr. Rodriguez, 96.  Do you see how he has the similar issue,

14   where the lines don't line up there for the -- the actual

15   test results?

16   **A.**   I think they all look the same, don't they?  I

17   mean, they're all the same.

18   **Q.**   Is that -- is this what you're referring to, about

19   the forms not lining up, when you said superimpose or cut

20   and paste?

21   **A.**   No, no, no.  What he had to do was basically

22   change the stamp.  What he's saying, the actual welding

23   coupons, what he's saying here, and test number here.

24   That's what he's saying.  Not that he changed any of this

25   other stuff, or changed the lining or the leveling of it.

Susan C. Nissman, RPR-RMR
(340) 773-8161

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    **Q.**   Okay.  You're going to have to walk me through

2    this, sir.

3              What information, on this form -- let's take

4    one of the welders.  Let's start with Mr. Batista, okay?

5    **A.**   Okay.

6    **Q.**   All right.  So we're looking at Exhibit 13?

7    **A.**   Correct.

8    **Q.**   Pardon me.  We're looking at Exhibit 12?

9    **A.**   Correct.

10   **Q.**   We're looking at the certification form for

11   Mr. Batista that you submitted to WAPA and Vitol and IPOS,

12   right?

13   **A.**   Correct.

14   **Q.**   We're looking at Mr. Batista's form that ends in

15   Bates Number 994.

16             What information on this form was from the

17   time that you say Mr. Castro originally tested these people

18   from Limetree Bay, what information is new from the testing

19   done in February of 2021?

20   **A.**   So the welder stamp up here in the corner.

21   **Q.**   The stamp number at the top right corner?

22   **A.**   Correct.

23   **Q.**   EB (74)?

24   **A.**   Correct.

25   **Q.**   What about that?

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1        A.   So that's changed.

 2        Q.   That's a new number?

 3        A.   That's a new number.

 4        Q.   Okay.

 5        A.   So now that's a Petro number.

 6        Q.   Okay.

 7        A.   Okay?  So then that, he's saying the actual test

 8   coupons themselves, which is described right here, where it

 9   actually says, "Trans. Root & Face," okay?  And then he says

10   the laboratory test number, that's what he's changed.

11        Q.   So the guide bend test results, that's new

12   information, based on new work done in February of 2021?

13        A.   That's actual coupons he tested, correct.

14        Q.   Great.

15             What about all the information above it on

16   the form, where it says, "Manual or Semi-Automatic Variables

17   for Each Process"?  Do you see that?  The whole middle

18   section of the form?

19        A.   Correct.

20        Q.   That's -- that information is from prior tests

21   done at Limetree Bay?

22        A.   Well, all that is basically the same test, right?

23   Because all that's changed, because it's actually a

24   procedure changed, right?

25        Q.   I don't understand.
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    **A.**    Okay.  So if I may -- let me see real quick.

2                Actually, all this is the same.  This

3    Limetree Bay one.  So all he's doing is saying, okay, so the

4    same test that we did at Limetree Bay, all we're doing is

5    just changing the stamp, changing the actual results, and

6    then changing the laboratory tests, 'cause all the rest is

7    the same.

8    **Q.**    When you say, "all the rest," tell us

9    specifically --

10   **A.**    So basically --

11   **Q.**    -- what information is all the same?

12   **A.**    What you're asking, basically all the center, all

13   the center markings, they're all going to be the same.

14   **Q.**    Everything from where it says, "Manual or

15   Semi-Automatic Variables for Each Process," all the way down

16   to where it says, "Guide Bend Test Results"?

17   **A.**    Correct.  And, actually, even the top portion,

18   where it says the weld testing procedure number, where it

19   says, "PISL-GT," well, that's our procedure that we started

20   back in 2018.  So all that is going to be the same, 'cause

21   that's the same procedure that he's testing under, right?

22   So it's still going to be gas ten -- tungsten arc, which is

23   TIG welding, all that is going to be the same.  Again,

24   because he's just requalifying that welder for that specific

25   procedure.

Exhibit I

1  **Q.**   Okay.  But Mr. Castro's telling you, he didn't

2  have the original qualifications in his files from Acuren,

3  correct?

4  **A.**   That's what he's saying.

5  **Q.**   How did Mr. Castro have any of this information

6  about the procedures used at Limetree Bay?

7  **A.**   Well, what I understand, what he told me, is that

8  he didn't have the original form to be able to -- to just

9  basically put it out.  He actually had a copy of the

10  original procedures, saying that, yes, I did qualify this

11  welder.  I mean, in Limetree.  This is, again, 2018,

12  correct.  Or before that, 2016.  Yeah.

13  **Q.**   Did Mr. Castro send you the original form?

14  **A.**   No.

15  **Q.**   Have you ever seen the original form?

16  **A.**   No, those are actually Limetree Bay documents.  So

17  everybody worked for Limetree, and they paid for everything

18  there.

19  **Q.**   Okay.  So when you said earlier something about

20  cut and paste or superimpose, tell us what you meant by

21  that.

22  **A.**   What I understand is basically just the stamp,

23  because the stamp was different.  And then the actual

24  laboratory, and in the middle, where it says, "bend test."

25  The center portion of it.

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1        Q.    Okay.  Cut and paste from what?

 2        A.    To add the new information on there.  The new

 3    coupons.

 4              So in Limetree Bay, Limetree Bay paid -- they

 5    hired all of us as time and material employees.  So they

 6    hired the inspection company, which was Acuren.  They hired

 7    us as the contractor.  And they, themselves, in person,

 8    would test the actual welders themselves.  They, themselves,

 9    paid for it, and they, themselves, actually had and owned

10    the possession of these actual welding logs.

11              So ever since then, we follow the same

12    welding logs, which is actually the welding logs, which

13    actually, if you stayed on the welding logs, when this -- in

14    the same year, if you're testing or actually welding the

15    same procedure, it is still valid.  Meaning the welding

16    procedure, the welding log, the actual welding

17    qualifications are still valid, 'cause you're still testing

18    on the same thing.

19              In between that, we do test, like you guys

20    have seen before, through x-ray, through phase array and

21    different welds through same welder.  So requalifying that

22    welder over and over and over.  And we've done that through

23    Limetree.  I'm so sorry, through IPOS and Vitol's project,

24    because we have requalified them over and over again through

25    different types of testing.
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    **Q.**   Who did the requalifications -- so you said the

2    original one was done in Limetree Bay 2017?

3    **A.**   I'll say probably --

4    **Q.**   '16-'17?

5    **A.**   '16-'17.

6    **Q.**   Okay.  Fair enough.

7         Who did the recertification in 2018 and 2019

8    and 2020 for your welders?

9                   (Cross talk.)

10   **Q.**   So you had to do recertifications every year,

11   right?

12   **A.**   No.  So if you're following the same procedure, if

13   you're doing the same procedure, and you're holding welding

14   logs of what weld it was, what procedure you're using, what

15   welder it was -- I mean, what welder tensile it is, dates on

16   it, that same procedure, that same welding log is valid.

17        A new client, if you have one, they can ask

18   for new testing.  They can.  And, therefore, you have to

19   bring the inspector, you have to bring the welder on site to

20   reinspect.

21   **Q.**   Okay.  Is -- was the 3-inch vent line project the

22   first time that IPOS or WAPA or Vitol asked for a

23   recertification of any of the Petro welders?

24   **A.**   They've never asked for recertification.

25   **Q.**   Okay.  But why did you provide the welder

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1   qualification forms here in -- in advance of the 3-inch vent

2   line project in 2021?

3       **A.**   Because they asked for my qualifications. Those

4   are my qualifications. Those are Petro qualifications.

5   They're not IPOS. They're not Vitol's. Those are Petro's

6   qualifications.

7       **Q.**   Okay. Why did you provide the qualifications back

8   from '16 or '17? Why did you provide those?

9       **A.**   Because those were recent. And I -- I, myself,

10   wanted to see if these welders were still going. So those

11   are mine.

12            In what you brought up earlier, you have VTTS

13   piping and welding specs. In there, it states that after

14   Andrew Cannon gave it to me, and, you know, after or during

15   the whole procedure, that the welders should be certified on

16   site with a representative overlooking them. That was never

17   done.

18            So, again, these are my qualifications.

19       **Q.**   But Mr. Castro's -- is doing the testing, not you,

20   correct?

21       **A.**   I signed them. They're my qualifications.

22       **Q.**   But you're not -- you're not licensed or qualified

23   to do welding and certifications, correct?

24       **A.**   I'm liable with Petro, so, yes.

25       **Q.**   That's not my question. I understand you're

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1  liable for Petro.
 2                  My question is, you are not certified/
 3  licensed/qualified to actually do a welder performance
 4  qualification?
 5      A.   Of course not.  That's why I hired on Mr. Castro.
 6      Q.   Just to be clear, 'cause you're saying these are
 7  "my records."
 8                  You're not qualified to certify a welder as
 9  qualified, right?
10      A.   Correct.  That's why I got Mr. Castro.
11      Q.   Mr. Castro, in his letter, says -- he goes on, "I
12  gave Petro Industrial a welder's qualification certificate
13  for each welder, which all welders passed, in lieu of a PAUT
14  report."
15                  Do you see that?
16      A.   Correct.
17      Q.   Then he says, "No qualification reports were
18  created," right?
19      A.   Correct.
20      Q.   Okay.  But if no -- the form is a qualification
21  record, right?
22      A.   Yeah.  So he was referring more back, because I
23  had called him about, for example, they were asking for
24  actually where is the actual report for the PAUT report.
25  That's what he was referring to.
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
1        Q.    But Mr. Castro is saying he doesn't have the
2   report that IPOS and WAPA and Vitol were requesting,
3   correct?
4        A.    IPOS and Vitol, not WAPA.
5        Q.    But you had been -- okay.
6        A.    And if you do look forward, he did mention, and I
7   was talking to David Smith, he would actually come on site
8   to actually recertify, retest everything, so this could be
9   cleared up, and that was just thrown under the rug.  I could
10  have solved so much.  And I paid --
11            MS. ROHN:  There's no question to you.
12       A.    Sorry.
13       Q.    (Mr. Kaplan) Are you saying WAPA didn't ask for
14  specific project documentation, including welder
15  qualification reports?
16       A.    That's not what I said.
17       Q.    WAPA, in fact, did ask for project documentation,
18  and included in WAPA's request, were the welder
19  certification test reports, correct?
20       A.    They did ask that, correct.  IPOS and Vitol were
21  asking for a report from those welder qualifications, which
22  were not there.
23       Q.    You were unable to provide the welder
24  qualification test reports, correct?
25       A.    They -- they do not exist.
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
1        Q.   All right.  Let's switch gears.
2             Let me show you -- show you what I've marked,
3    sir, as Exhibit 15, which is IPOS 5359.
4             (Deposition Exhibit No. 15 was
5              marked for identification.)
6        A.   Thank you.
7        Q.   All right, sir.  So you recognize Exhibit 15?
8    This is the July 28th, 2021 letter that IPOS sent to Petro,
9    providing notice of termination of the maintenance contract,
10   correct?
11       A.   Correct.
12       Q.   Did you talk to Mr. Smith about this termination
13   notice?
14       A.   Afterwards, yes.
15       Q.   Did you talk to Mr. Smith about the termination
16   notice in person or by phone?
17       A.   Phone.
18       Q.   Tell me what you recall about your conversation
19   with Mr. -- well, back up.
20            Did you ask Mr. Smith, during your phone
21   conversation, why the contract was terminated?
22       A.   Yes.
23       Q.   Okay.  What do you recall Mr. Smith telling you,
24   during this phone conversation, about why the maintenance
25   contract was terminated?
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1        A.   If I recall correctly, it was just saying there
 2   was too much liability, or there was just too much
 3   inaccuracies in the welding certifications, and that was
 4   basically the -- the gist of the matter.
 5        Q.   Do you recall anything else about your
 6   conversation with Mr. Smith, following your receipt of the
 7   contract termination notice?
 8        A.   I don't recall.
 9        Q.   Did you talk with anyone else at IPOS after your
10   receipt of the July 28th, 2021 termination notice?
11        A.   That was basically it.
12        Q.   Okay.  Did you talk with anyone at Vitol,
13   following your receipt of IPOS's contract termination
14   notice?
15        A.   I don't believe so.
16        Q.   Did you talk with Mr. Canning, following receipt
17   of the contract termination notice?
18        A.   No.
19        Q.   Okay.  Did you talk to anyone at WAPA about the
20   contract termination notice you received from IPOS?
21        A.   No.
22        Q.   Okay.
23                      (Respite.)
24             All right.  Mr. Melendez, I want to talk a
25   little bit about the damages that you're claiming in this
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    lawsuit, all right?

2         **A.**   Yes, sir.

3         **Q.**   I should say, the damages that Petro is claiming

4    in this lawsuit, okay?

5         **A.**   Yes, sir.

6         **Q.**   As I understand it, Petro is claiming two kinds of

7    damages in this case:  First, Petro claims it's still owed

8    money for work Petro actually performed, right?

9         **A.**   Correct.

10        **Q.**   Okay.  And in your Complaint, if you find in that

11   stack in front of you, it should be Exhibit 2.

12        **A.**   Okay.  Hold on a second.

13             Okay.

14        **Q.**   If you look at your Complaint, look at

15   Paragraph 71.

16             In Paragraph 71, Petro alleges that past-due

17   invoices for work done prior to the cancellation of the

18   contract in the amount of $213,379, correct?

19        **A.**   You said seventy --

20        **Q.**   Paragraph 71.

21        **A.**   Oh, sorry.

22        **Q.**   Do you see that?

23        **A.**   Correct.

24        **Q.**   Okay.  So just to be clear, do you agree that the

25   amount stated in Paragraph 71, $213,379.90, is the total

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1   amount that Petro claims it is owed for work actually

2   performed?

3       A.   Correct.

4       Q.   And the second category of damages, that I

5   understand Petro's claiming in this case, is that Petro

6   claims, as a result of IPOS terminating the contract, Petro

7   future profits, right?

8       A.   Correct.

9       Q.   And I want to show you what I'm marking as

10  Exhibit 16, which is Petro's Second Supplemental Response to

11  Vitol's Third Set of Interrogatories.

12                  (Deposition Exhibit No. 16 was

13                   marked for identification.)

14          All right.  If you look on the first page,

15  Interrogatory Number 10, do you see where it says --

16  question that's asked to Petro, to "identify, on a

17  project-by-project or job-by-job basis, all work for which

18  you are claiming lost profits damages in this case," right?

19      A.   Correct.

20      Q.   Okay.  And then it has specific requests for each

21  one of the projects identified.  Tell us the date on which

22  you say the project would have been awarded.  When you would

23  have started/completed, and done the work.  How much you say

24  you would have been paid, and the amount of profit that you

25  said you would have made, right?

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
1        A.    Correct.

2        Q.    And as well as all costs and expenses you would

3    have incurred, correct?

4        A.    Correct.

5        Q.    Okay.  And then Petro provided a chart on Page 2

6    that has 30 different projects, right?

7        A.    Correct.

8        Q.    Okay.  Did you prepare the answer to this

9    interrogatory?

10        A.    Did I provide this information?

11        Q.    Yes.

12        A.    Yes.

13        Q.    Okay.  And you verified the answer?  If you look

14    at the back, you signed the declaration, attesting that the

15    information was true and correct, right?

16        A.    Correct.

17        Q.    I don't think there's a verification on this.  Let

18    me show you a prior one.

19                   Let me just ask you:  Now under oath, do you

20    attest to the accuracy of the information stated here in

21    Petro's Second Supplemental Response to the Third Set of

22    Interrogatories in Exhibit 16?

23        A.    Yes.  I believe this is accurate.

24        Q.    Okay.  All right.  So big picture first.

25                   You've identified 30 projects that you say
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    are projects that -- work you would have done for which

2    you're claiming damages in this case, correct?

3         A.   Correct.

4         Q.   And you're saying, across those 30 total projects,

5    that Petro would have been paid $4.48 million, right?

6         A.   Correct.

7         Q.   Okay.  And you're saying that to perform those

8    projects, it would have cost Petro $3.38 million, right?

9         A.   Correct.

10        Q.   Okay.  And so what you're saying is, you're

11   projecting that Petro, but for the termination of the

12   contract, Petro would have earned a projected profit of

13   $1,095,000, right?

14        A.   Correct.

15        Q.   Okay.  All right.  First, I want to go through

16   the -- the columns here.

17        A.   Okay.

18        Q.   This list of projects, these 30 projects, tell me,

19   where's this list derived from?  What is it based on?

20        A.   So this was a collaboration between, again, both

21   general managers, Andrew Canning, Vitol themselves, which is

22   Tim and Charlotte.  So it's a culmination of everything.  So

23   they would ask me for, for example, removal of the first

24   one, removal of the MLA.  What's it going to cost to do

25   that?  I would provide them a budget, and this is what it

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    is.  And I think you see some of them -- most of them back

2    here, as far as copies.

3        Q.   Just so we're clear, obviously Mr. Canning and

4    Vitol didn't work with you to prepare your interrogatory

5    response.

6              So what -- in what form did this list exist

7    before the lawsuit was filed that you're saying everyone had

8    agreed on this list?

9        A.   So they would ask me -- this is what -- there was

10   something called a wish list.  I think you've probably seen

11   it.  So a wish list is basically what -- what was happening,

12   or what was actually going to happen the following year,

13   right?  So that -- that list, because IPOS was the operator

14   of the facility, Vitol the owner, they had to go and request

15   monies from them.  So that's where these actual projects

16   came about.

17       Q.   So you believe all 30 of these projects were

18   approved by Vitol?

19       A.   Correct.

20       Q.   To do?

21       A.   Correct.

22       Q.   In 2021 or 2022?

23       A.   If we were still there, we would have done them,

24   yes.

25       Q.   Okay.  You believe, in fact, Vitol had approved

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
1    the budget to do every one of these 30 projects?

2         A.   Correct.  There was actually probably another 20

3    more that they'd x'd out.  Yeah, this was actually approved.

4         Q.   Now, earlier, you made a distinction between

5    maintenance projects and special projects, right?

6         A.   Correct.

7         Q.   Okay.  I want to go through these.

8                   Project 1, maintenance or special project?

9         A.   Project.

10                  I'm sorry.  You said maintenance or project?

11        Q.   Earlier -- just make sure I'm using your

12   understanding.

13        A.   Yeah.

14        Q.   We talked about maintenance projects, which you

15   said were governed by the -- the contract?

16        A.   Yeah.

17        Q.   And special projects which could be bid on and

18   could go to other contractors, right?

19        A.   Correct.

20        Q.   Okay.

21        A.   So easier, let's just say, maintenance and

22   projects.

23        Q.   Okay.

24        A.   That would probably be easier.

25        Q.   So let's just go through.
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1                   Project 1, MLA removal.  Maintenance or a
 2     project?
 3                          (Cross talk.)
 4                   THE COURT REPORTER:  I'm sorry.  Slow down,
 5     please.
 6                   MR. KAPLAN:  Just let me finish the question.
 7                   MS. ROHN:  Stop talking while he's talking.
 8          A.    Okay.
 9                   MS. ROHN:  Sorry, Susan.
10                   THE COURT REPORTER:  Okay.
11          Q.    (Mr. Kaplan) Project Number 1, MLA removal in STX.
12                   Maintenance or project?
13          A.    Project.
14          Q.    Project Number 2, replacement of rotating
15     Dolphins?
16          A.    Project.
17          Q.    Number 3, replacement transfer pumps?
18          A.    That's Number 3?
19                   Project.
20          Q.    Number 4, replacement of two-way radios?
21          A.    Maintenance.
22          Q.    Sure about that?
23          A.    More than likely.  That was just a simple just
24     replacing these little mobile radios, so that would be
25     maintenance.
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
1          Q.    Number 4.  Sorry.  Number 5, replacement of the
2    portable gas testers?
3          A.    Yeah, that should probably be maintenance, also.
4          Q.    Number 6, painting of the control room?
5          A.    Projects.
6          Q.    Number 7, painting of the pipe?
7          A.    Projects.
8          Q.    Number 8, replacement block valves?
9          A.    Projects.
10         Q.    Number 9, additional stainless steel gearboxes and
11   brackets for manual valves?
12         A.    That should probably be maintenance.
13         Q.    Okay.  Number 10, repair of the CCTV systems?
14         A.    They covered that under projects.
15         Q.    Eleven, annual outages?
16         A.    Projects.
17         Q.    Number 12, annual boiler maintenance?
18         A.    Projects.
19         Q.    Thirteen, annual tank level gauges?
20         A.    Projects.
21         Q.    Fourteen, API tank inspections?
22         A.    Projects.
23         Q.    Fifteen, boiler feed pump replacements?
24         A.    Projects.
25         Q.    Sixteen, maintenance of new security system?
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1        A.    Maintenance.

 2        Q.    There you go.

 3              Seventeen?

 4        A.    That was easy.

 5        Q.    Seventeen, mound settlement repairs?

 6        A.    Projects.

 7        Q.    That was a significant project, right?

 8        A.    Very.

 9        Q.    And multiple bids went out on the mound settlement

10  repairs to multiple different contracting and engineering

11  firms, right?

12        A.    That was after.

13        Q.    That was after what?

14        A.    That was after we got our contract terminated.  We

15  were -- actually had already submitted our thing, and it was

16  already approved.

17        Q.    It's your testimony Vitol had already approved the

18  budget and the work scope for the mound settlement repairs?

19        A.    Yes.

20        Q.    Can you identify a document that approves that?

21        A.    More than sure I can.  This was probably right

22  before -- probably the beginning or second week in July,

23  yeah.  By Charlotte herself.

24        Q.    All right.  So you believe Ms. Horowitz can speak

25  to this?
```

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1        A.    Yes.
 2        Q.    All right.  To this day, do you know if the mound
 3   settlement repairs, the work scope that's reflected here in
 4   your interrogatory response, has been done?
 5        A.    Can't speak to that.
 6        Q.    Eighteen, valves and control revision for "on the
 7   fly" switching?
 8        A.    Maintenance.
 9        Q.    Dock hose emergency disconnects?
10        A.    Maintenance.
11        Q.    Nitrogen generator?
12        A.    That was a project.
13        Q.    Stainless steel bolts?
14        A.    That was -- I think that was projects.  I'm sorry.
15   That was maintenance.  Maintenance.
16        Q.    Replacement grating?
17        A.    Maintenance.
18        Q.    The tank PRV double block and bleed valves?
19        A.    Oh, that was projects.
20        Q.    Maintenance on the expert pump motors?
21        A.    Maintenance.
22        Q.    Replacement wet end of fire pumps?
23        A.    That was maintenance.
24        Q.    Design and installation of fire pump test loop in
25   both STT and STX?
```

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1        A.    That was project.

 2        Q.    Electrical test equipment?

 3        A.    Maintenance.

 4        Q.    Purchase of the VINCO valves?

 5        A.    Maintenance.  That was just extra valves to be

 6   purchased.

 7        Q.    Rotork actuators?

 8        A.    Maintenance.

 9        Q.    And semi-annual checks on the nitrogen generator?

10        A.    Maintenance.

11        Q.    Now, on the projects, you agree, those are things

12   that can, and in many cases, were put out for bids by

13   multiple contractors, correct?

14        A.    No.  I do not know that.

15        Q.    I'm sorry?

16        A.    I do not know that.

17        Q.    But your maintenance contract did not entitle you

18   to do any projects.  IPOS could decide to give that work to

19   whoever they believed was qualified or suitable on a

20   particular project basis, right?

21        A.    So the reason we entered a maintenance contract

22   with IPOS was because we were going to be the first person

23   to get, or to get -- to be asked to get projects.  We

24   lowered our hourly wages on that contract for that reason,

25   so we are the -- we were, and -- we were the first option.
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
1        Q.   Was IPOS required to give any projects to Petro

2   under the terms of the contract?

3        A.   I'm not saying required.  We were their first

4   option.

5        Q.   Okay.  But my question is required.

6                  Was IPOS required to give Petro any projects

7   under the terms of the contract?

8        A.   I don't know that.

9        Q.   You're not saying that Petro was entitled to

10  receive all the projects, correct?

11       A.   I'm not saying that.

12       Q.   Okay.  It would be up to IPOS, in consultation

13  with Vitol and WAPA, to make a decision on a

14  project-by-project basis as to what project to do, and who

15  to award that project to, true?

16       A.   True.

17       Q.   Okay.  Now, to go through the column headings,

18  just to make sure I understand this spreadsheet that you

19  prepared, so obviously you have project number, the title of

20  the project.  We just talked about that.

21                  The third column says, "unit cost."

22       A.   Correct.

23       Q.   Okay.  What is the unit cost that you have listed

24  here?

25       A.   Basically, the cost of the -- the cost of itself,
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1    right?  So if it's -- for example, first one, MLA removal,
 2    the cost would be $55,000 to remove it.
 3         Q.   Okay.  The next column is estimated cost.
 4              It appeared to me, when I looked at this, but
 5    you tell me, sir, that the unit cost and the estimated cost
 6    are the same.  The only difference is some places, there's a
 7    breakdown between St. Thomas and St. Croix?
 8         A.   Correct.  So if there's two different units, it
 9    will add it up.  That's basically it.
10         Q.   Got it.  Okay.
11              The total is the same for the unit; you're
12    just breaking it in two?
13         A.   Correct.
14         Q.   Okay.  Now, as you sit here today, you don't know
15    which, if any, of these projects have been done, right?
16         A.   We're not there.  I can't speak to that.
17         Q.   And you don't know -- to the extent any of these
18    projects have been done, you don't know what scope was
19    actually approved and executed, correct?
20         A.   If they haven't been done, then we're in trouble.
21    I mean, they have to be done.  It's maintenance.
22         Q.   Well, you just told me that more than half of
23    these were not major projects, correct?
24         A.   It's a project, but it's part of the maintenance
25    that had to be done.  Like if there's coating issues.
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    Again, I hope they did it.

2         **Q.**    You believe every one of these projects is a

3    regulatory requirement to do on an annual basis?

4         **A.**    I can't speak to that.

5         **Q.**    You're not saying that any of these projects could

6    not properly be deferred, right?

7              **MS. ROHN:**   Objection.  Argumentative.

8         **A.**    I can't -- I can't speak to that.

9         **Q.**    **(Mr. Kaplan)** All right.  So then you have a

10   projected award date, right?

11        **A.**    Correct.

12        **Q.**    Okay.  And what did you base that date on?

13        **A.**    That was basically what we had scheduled, going

14   forward.

15        **Q.**    Okay.  What -- is there a particular document I

16   should be looking for when you say, this was agreed?  Are

17   you saying there was a -- it's a -- it's an agreed budget

18   that all parties signed off on, or is it a spreadsheet that

19   lists all these, and everyone had a project award date and a

20   projected time frame?

21        **A.**    No.  They would actually just be scheduled.  This

22   is what we're going to do next.

23        **Q.**    Okay.  So you believe every one of these 30

24   projects was scheduled, and the commencement date for the

25   project that all the parties signed off on is the

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1  commencement date here in your interrogatory response?

2      A.   Again, I'm not saying they signed on to, but this

3  is basically the schedule.  So everything was scheduled from

4  the outages, from the -- everything had to be scheduled,

5  because it wasn't just us, it wasn't just -- I mean, IPOS,

6  it was actually WAPA, so we had to schedule those.  Those

7  were actually scheduled ahead of time.

8      Q.   Okay.  But I want to be clear.

9           Are you saying Vitol and IPOS signed off on

10  these projects all being awarded on the dates listed in your

11  interrogatory?

12      A.   I cannot speak to that.

13      Q.   Okay.  Are you saying that Vitol or IPOS and WAPA

14  signed off on the estimated cost for every one of these 30

15  projects?

16      A.   Correct.

17      Q.   Yes?

18      A.   I mean, we definitely discussed it a few times.

19  They were okay with the pricing, and we were moving forward.

20      Q.   Did purchase orders issue for any of these 30

21  projects?

22      A.   Can't recall that.  But, again, we had been doing

23  this for the last two years prior to this, so it was -- it

24  was there.  It was -- there's a history of it.  So it's not

25  like if I said, Yeah, this is what we're going to do next

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
1    year.  There was a history in the last two years that we
2    actually did this.
3         Q.  So you believe all 30 of these projects have been
4    done on an annual basis in 2019?
5         A.  I'm not saying all 30, but I would say probably
6    about 90 percent of them, yeah.
7         Q.  And you believe all, or 90 percent of these, were
8    also done in 2020?
9         A.  I believe so.  I mean, with the exception of the,
10   you know, getting new radios, or getting stuff like that,
11   yeah, but a lot of the maintenance, a lot of the actual
12   projects, yes.  Absolutely.  The big -- the big-ticket
13   items, yes.
14              The mound, that was a different story.  Yeah,
15   that's a different story.  That's a project that needed to
16   be corrected, and hopefully you don't have to do anything
17   after that.
18        Q.  Okay.  You have a projected time frame that's part
19   of the schedule.
20              Okay.  You say, "projected total amount."
21   And that's the same as the estimated cost column --
22        A.  Correct.
23        Q.  -- correct?
24        A.  Yeah.
25        Q.  Okay.  And then you say, "projected total cost,"
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    right?

2         A.   Correct.

3         Q.   Okay.  And with the column that says, "projected

4    total cost," does that reflect your estimate of Petro's

5    all-in cost to perform that project?

6         A.   That's correct.

7         Q.   And then you have a column that says, "projected

8    profit," right?

9         A.   Correct.

10        Q.   And that column reflects your calculation of what

11   Petro's margin would be, Petro's profit would be on a

12   project-by-project basis, right?

13        A.   That's correct.

14        Q.   Now, didn't -- didn't Petro do some work on a

15   not-to-exceed basis on these facilities?

16        A.   I believe so.

17        Q.   Okay.  Which of these projects are you claiming

18   was approved on a not-to-exceed basis?

19        A.   I can't recall which ones it was.  Probably --

20   maybe it's back here.

21             We had a relationship with IPOS that if we

22   bid a lot more or we had a lot more with them, we could

23   correct basically the time on it, we would correct it.  It

24   wasn't -- it wasn't like anything else.  But, yeah, all

25   these here were basically total amounts.  They were not

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1    amount to exceed.
 2        Q.   Did your projected total cost figure, does it
 3    include any contingency?
 4        A.   No, not on -- not on the budget, correct.
 5    Sometimes they add it after the budget.
 6        Q.   But when you're calculating your cost to perform
 7    these projects, did you include any contingency amount?
 8        A.   No.
 9             There is one here, removal of MLA equipment.
10        Q.   I'm sorry.  Tell me what page you're on, sir.
11        A.   This is 90 -- 795.
12        Q.   Seven nine what?
13        A.   Seven ninety-five.
14        Q.   Seven ninety-five.
15             Okay.  This says, "Cost Breakdown - MLA
16    Removal & Cribbing on Trailer"?
17        A.   Correct.
18        Q.   Okay.  And it has -- you're pointing out that it
19    has a not-to-exceed number?
20        A.   That's right.
21        Q.   Okay.
22        A.   And I think after that, there's a couple of more
23    back there.
24        Q.   Okay.  So tell me, on the interrogatory response,
25    what project does this breakdown for MLA removal and
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1   cribbing on trailer correspond to?
 2        A.   Number 1.
 3        Q.   Okay.  So Project 1, MLA removal, Page 6795,
 4   that's the budget for that project.  And so that's a not-to-
 5   exceed $54,000 estimated cost, correct?
 6        A.   Correct.
 7        Q.   Okay.  You overshot that one by 200 bucks.
 8        A.   Rounding up.
 9        Q.   Rounding up.  Right.
10             Okay.  Well, let's look at the first part of
11   this budget breakdown.
12        A.   Okay.
13        Q.   This is the Page 6765.  Says, "Cost Breakdown -
14   STT Vessel Inspection Budget."
15             Do you see that?
16        A.   Yes.
17        Q.   Okay.  These attachments, these budget breakdowns,
18   these are the documents that Petro cited in its response as
19   the backup for this lost profits calculation, right?
20        A.   Correct.
21        Q.   Okay.  So tell me, on this STX vessel inspection
22   budget, which project does this correspond to?
23        A.   Which number do you have?
24        Q.   It's the first page of this budget breakdown.
25        A.   765?
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1        Q.   6765.

 2        A.   67.  Okay.  So this is STT vessel inspection

 3   budget.

 4        Q.   Yes.  Tell me which project, in the interrogatory,

 5   that corresponds to.

 6        A.   So this is going to be Number 14.  And that's

 7   actually both of them included.  St. Croix and St. Thomas

 8   are included under Number 14.

 9        Q.   Okay.  All right.  So your budget breakdown for

10   this Project 14, it has an equipment cost of 28 -- $27,000.

11   It's got a material cost of $675.  It's got labor charges

12   for a subtotal of $83,000, correct?

13        A.   Correct.

14        Q.   Okay.  And then behind that is the St. Croix

15   portion, correct?

16        A.   Correct.

17        Q.   Okay.  And that also has an equipment cost, a

18   material cost, a labor cost, right?

19        A.   Correct.

20        Q.   Now, there's a line item for the St. Thomas

21   portion that says, "Profit & Tax Rate, 15%," right?  Do you

22   see that?

23        A.   Correct.

24        Q.   Okay.  What portion of that 15 percent is profit?

25   What portion is tax?
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    **A.**    Exact numbers, I can't give you exact numbers.

2              What -- what do you want me -- I mean, we

3    know that, for example, like a -- the local tax is

4    5 percent, so that would come out of there.  If I give you

5    exact numbers.  We have insurance.  We have background

6    offices.  Is that what you're asking?

7    **Q.**    Well, first, I'm asking, what it says on your

8    budget breakdown, "Profit & Tax Rate, 15%."

9    **A.**    Yeah.

10   **Q.**    That means 15 percent includes your profit margin,

11   but it also includes taxes that you have to pay, correct?

12   **A.**    What I would have to pay, correct.  Yes.

13   **Q.**    So 15 percent is, therefore, not your profit

14   margin; it's something less than 15 percent, right?

15   **A.**    Okay.  I see what you're saying.

16   **Q.**    Do you agree?

17             If what you're saying on your budget

18   breakdown is you have a profit and tax rate of 15 percent,

19   and you have to pay tax out of that 15 percent, then your

20   ultimate profit is something less than 15 percent, correct?

21   **A.**    Okay.  Yes.

22   **Q.**    You agree with that?

23   **A.**    Correct.

24   **Q.**    All right.  And let's look at the next project.

25   That's St. Thomas.

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1              Going to St. Croix.  Same thing.  It says,
 2    "Profit & Tax Rate, 15%," right?
 3         A.   Correct.
 4         Q.   Okay.  And so, again, of that 15 percent on this
 5    project, you have to pay taxes out of that amount.  So your
 6    profit would actually be something less than 15, right?
 7         A.   Correct.
 8         Q.   And we go to the next one.
 9              The cost breakdown - budget estimate for
10    St. Thomas painting jetty to north mound.
11              Do you see that?
12         A.   Correct.
13         Q.   This is Page 6769.
14              It says, "Profit & Tax Rate, 15%." Same point
15    would hold here, right?
16         A.   Correct.
17         Q.   You're telling -- in your budget breakdown for all
18    this work, you're saying your profit and tax rate is
19    15 percent.  You're going to pay at least 5 percent in tax,
20    so, therefore, your profit would not exceed 10 percent,
21    right?
22         A.   Correct.
23         Q.   Okay.  And, in fact, if we look through every
24    single one of the projects, and your budget breakdown
25    attached to your interrogatory response, your line item is
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1    "Profit & Tax Rate, 15%," right?
 2         A.   Correct.
 3         Q.   Okay.  And there's a minimum tax of at least
 4    5 percent, so your profit on all these projects would,
 5    therefore, not exceed 10 percent, correct?
 6         A.   Correct.
 7         Q.   All right.
 8         A.   Now, you understand also my labor.  I'm not paying
 9    my labor the full cost there, right?  So I have profit off
10    the labor as well, okay?
11              So there's a billing rate to my -- there's a
12    billing rate, and there's a cost rate to my labor.
13         Q.   When you say, "Profit & Tax Rate," let's look.
14    Let's look at an example.  Let's look at the cost
15    breakdown --
16         A.   Correct.
17         Q.   -- for the St. Thomas painting?
18         A.   Correct.
19         Q.   Are we on the same page?
20         A.   Yes.
21         Q.   6769?
22         A.   Right.
23         Q.   When you calculate your profit and tax rate,
24    you're at 15 percent --
25         A.   Um-hum.
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    **Q.**   -- you're calculating on the total, correct?

2    **A.**   Correct.

3    **Q.**   The $46,000, right?

4    **A.**   That's right.

5    **Q.**   And that includes the charges for your labor,

6    correct?

7    **A.**   Correct.  Yes.

8    **Q.**   So it's calculating your profit rate on the total

9    amount that you're being paid -- or you're saying you would

10   have been paid on this project, correct?

11   **A.**   Correct.

12   **Q.**   It's not -- it doesn't exclude labor?

13         **MS. ROHN:**  No, what he's saying -- sorry.

14   **A.**   What I'm saying is, that you guys saw there's a

15   rate sheet in prior documents, right?  A welder gets charged

16   at, for example, $45 an hour, right?  I'm not paying that

17   welder $45 an hour.

18   **Q.**   **(Mr. Kaplan)** How much do you pay your welders?

19   **A.**   $30 an hour.

20   **Q.**   Okay.

21   **A.**   So I'm making a profit out of that, as well.

22   **Q.**   So what -- on your budget, where it says, "Profit

23   & Tax Rate," and it's calculated as a percentage of the

24   total --

25   **A.**   Correct.

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    **Q.**    -- you're saying it excludes the profit you make

2    on labor?

3        **A.**    No.

4                **MS. ROHN:**   Includes it.

5                **MR. KAPLAN:**   Umm?

6                **MR. BECKSTEDT:**   He's getting profit on

7    profit.

8                **MS. ROHN:**   He's getting profit on profit.

9        **A.**    Yes, correct.

10               So my equipment and my material, it is a

11   cost.  Say the material's costing me a thousand bucks, I'm

12   going to charge him a thousand bucks, plus 15 percent.

13       **Q.**    **(Mr. Kaplan)** Okay.

14       **A.**    So I'm doing profit on profit.

15       **Q.**    Where's your actual labor costs, that you're going

16   to incur on these projects, reflected?

17       **A.**    Well, that's what I put here, my costs, and then

18   my profit is over here on this page.

19       **Q.**    But where is the actual calculation, project by

20   project, of your labor costs?

21               'Cause, here, you're telling me in all the

22   budget breakdowns --

23       **A.**    Uh-huh.

24       **Q.**    -- that it's inclusive of your profit?

25       **A.**    Correct.

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
1          Q.   What's the actual cost figure on a project --

2          A.   The cost figure total is the second column right

3     here.

4          Q.   Right.  But if I want to know what your labor cost

5     is for each project, that's not reflected anywhere in your

6     interrogatories in any of these budget breakdowns?

7               MS. ROHN:  You need to redo the chart to show

8     what profits you're making off the labor and the equipment.

9          A.   The equipment, absolutely.  The equipment is the

10    cost, and I just have to add 15 percent to it.  The only

11    thing is the labor.

12              MS. ROHN:  Okay.  Well, then, you have to put

13    that in your chart.

14         A.   Okay.  I understand.

15              MS. ROHN:  Sorry.  I didn't realize that was

16    the case.

17         A.   I'm sorry.

18              MS. ROHN:  You have to put down your actual

19    labor costs and your charged labor cost.

20         A.   I understand.

21              MS. ROHN:  And you can redepose him on that,

22    if you want.

23              MR. BECKSTEDT:  And equipment, too.

24              MS. ROHN:  No -- and your equipment, you're

25    going to put what you charged for the equipment, and what
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1   you paid for the equipment.

2        **A.**   Yeah.  So we do have an equipment -- for example,

3   on each invoice, you have, if there's equipment done.  If,

4   for example, it's a scaffold, the cost of the equipment is

5   on there, and then we just charge 15 percent, which is

6   included on this.  So that's very black and white.

7            So equipment is, we just charge 15 percent.

8   Material, we just charge 15 percent.  If it's just a labor,

9   that we actually charge -- we actually have a billing rate,

10  and our --

11       **MS. ROHN:**  Okay.  So you're going to have

12  to -- then you're going to have to factor out what the

13  charge is.  What you pay for your labor versus what you

14  charge for your labor.

15       **A.**   I understand.

16            **MR. KAPLAN:**  Let's go off the record a

17  minute?

18            **THE VIDEOGRAPHER:**  Going off the record.  The

19  time is 3:03.

20                 (Short recess taken.)

21            **THE VIDEOGRAPHER:**  Going back on record.  The

22  time is 3:05.

23       **Q.   (Mr. Kaplan)** All right.  Mr. Melendez, do you

24  understand, in the second-to-last column in your

25  Interrogatory Number 10, where it says, "Projected Total

Exhibit I

1   Costs," in your projected total costs, you need to provide

2   for all of your costs, what your actual costs are going to

3   be --

4        **A.**   Okay.

5        **Q.**   -- for each item, equipment, labor, materials, et

6   cetera, so that we can actually determine the full amount of

7   your claimed loss profit on each project.

8             Do you understand?

9        **A.**   I understand.

10       **Q.**   You're agreeing, on behalf of Petro, to supplement

11   your interrogatory response?

12       **A.**   Yes.

13       **Q.**   Okay.  And this -- the attachments, these budget

14   documents, these were prepared and have dates on the top

15   when they were prepared, right?

16       **A.**   Correct.

17       **Q.**   And when you prepare this analysis, you're going

18   to prepare -- in what form are you going to prepare?

19   Spreadsheet?  How are you going to do this?

20       **A.**   If you want, I can just attach to that just what

21   are labor costs, and then basically profit at the end,

22   that's fine?

23       **Q.**   You do it however you need to do it.  I just want

24   to make sure --

25             **MS. ROHN:**  We'll -- we'll meet and confer, so

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    that -- you and I will, so it's done, so it's easy to

2    determine.

3                MR. KAPLAN:  All right.

4                MS. ROHN:  And I think probably the easiest

5    thing then would be to give him the -- actually the rate

6    sheet of what you actually pay the people, and a rate sheet

7    of what you actually charge for the same person.

8        A.   Correct.

9                MS. ROHN:  Okay?  Typed.  Typed, of course.

10       Q.   (Mr. Kaplan) Now, your employees are -- are

11   so-called W-2 employees, right?

12       A.   Most of them, yes.

13       Q.   So you pay payroll taxes?

14       A.   Yes.

15       Q.   You pay social security taxes?

16       A.   Correct.

17       Q.   So when you calculate your labor costs, are you

18   including the difference between what you're charging, for

19   example, for a welder and what you're paying a welder, are

20   you including all of the taxes and benefits that you pay for

21   the -- that employee?

22       A.   Of course.

23       Q.   Okay.

24                MS. ROHN:  Wait, wait.  I think what he's

25   saying, is your base, when you talk about what your base

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1   cost is for the employee, you have to factor in that --
 2   whatever the labor costs are when you're making that chart.
 3        A.   Okay.
 4             MS. ROHN:  Correct?
 5             MR. KAPLAN:  Correct.
 6        A.   Correct.
 7        Q.   (Mr. Kaplan) When you say, "total profit plus tax
 8   of 15 percent" -- excuse me, 5 percent.  You're saying of
 9   that 15 percent, you're saying that's profit on top of
10   whatever profit you're making on the difference between what
11   you're paying your employees and what you're getting under
12   the contract, correct?
13        A.   That's correct.
14        Q.   And that 5-percent tax, that is the gross receipts
15   tax that you're talking about?
16        A.   That's correct.
17        Q.   Okay.
18             MS. ROHN:  But that's not including -- but
19   that wouldn't be -- then, but in your labor costs, you're
20   going to have to do your -- whatever workmans' comp,
21   whatever percentage of that.
22        A.   Insurance.
23             MR. KAPLAN:  All -- all -- all your taxes and
24   cost of employment need to be reflected and deducted --
25             MS. ROHN:  Right.
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1              MR. KAPLAN:  -- from whatever you're
 2   calculating on your profit --
 3              MS. ROHN:  And you'll probably need an
 4   accountant to do that.
 5      Q.  (Mr. Kaplan) Well, that was my question earlier.
 6   I asked you if you have an accountant, and you said someone
 7   named Kathleen.
 8      A.   Correct.
 9      Q.   And she's an outside accountant?
10      A.   Correct.
11      Q.   Do you know the name of -- do you know Kathleen's
12   last name?
13      A.   I can find it.  Gallagher.  I have to find it on
14   my phone.  Call her Kat.  Sorry.
15      Q.   That's all right.
16              MS. ROHN:  I bet you -- I bet you, in order
17   to be able to calculate what it is, there's some formula for
18   that.
19              MS. FRANCIS:  Are we on the record, or is
20   this off the record?
21              MS. ROHN:  We're on the record.
22              MS. FRANCIS:  Okay.  Mr. Melendez, now we
23   need you to speak up.  We don't want to have to ask you to
24   repeat things, but this is --
25      A.   Okay.  I apologize.  Can you hear me?
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
1                MS. FRANCIS:  That was better, yes.

2       A.   Okay.

3                MS. FRANCIS:  Please keep your voice up,

4   because we are still on the record.

5       A.   Yes, ma'am.

6                     (Respite.)

7                MR. BECKSTEDT:  I understood there's an

8   agreement we can reconvene for purposes of questioning

9   regarding that?

10               MS. ROHN:  That one issue, so far.

11      Q.   (Mr. Kaplan) Okay.  Project 21, the stainless

12   steel bolts.

13               Do you see that?

14      A.   Yes.

15      Q.   As I understand it, you sourced the bolts from

16   Traeger Brothers, but IPOS paid Traeger directly for those

17   materials, correct?

18      A.   I have to verify that.  I know that they paid for

19   some bolts.  I don't know if it was particular for this one.

20   This is an ongoing project that's been going for the last

21   two years of replacing all the carbon steel bolts with

22   stainless steel bolts, so I don't know if it was one or the

23   other.  I apologize.

24      Q.   If IPOS paid for the materials, you haven't lost

25   any money on the materials?  Your only loss would be a claim
```

Exhibit I

```
1    for some sort of profit on the labor, correct?
2         A.   Correct.
3         Q.   All right.  Project 14, a propane vessel
4    inspection.
5         A.   Okay.
6         Q.   You say tank inspection work would have been
7    awarded on January 1st, 2022, right?
8         A.   Okay.
9         Q.   Now, you don't know if any API tank inspections
10   were done in 2022, do you?
11        A.   No.  I'm not there.
12        Q.   And it's not a regulatory requirement to do the
13   API tank inspections every year, right?
14        A.   So you're right, but what happened is we're
15   alternating tanks.  So each -- each -- each facility, the
16   one in St. Croix has four tanks.  I'm sorry.  Has eight
17   tanks.  And the one in St. Thomas has ten tanks.  So we were
18   rotating, because they were already five years past
19   inspection.  So we were rotating each of the tanks.  So each
20   year, we were going to do one on each site.  So, yes, it is
21   important.
22        Q.   If the API tank inspections were not done in 2022,
23   you would not have any damages for lost profits on API tank
24   inspections, correct?
25        A.   Again, you're asking me if it needed to be done.
```

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1   It has to be done.

2          **Q.**   I didn't ask you -- my question was different.

3                 If it was not done.  If the API tank

4   inspections were not done in 2022, Petro would have not lost

5   any profits on that project, correct?

6          **A.**   Correct.

7          **Q.**   All right.  And the same is true for any project?

8          **A.**   I was going to say.

9          **Q.**   If a project was not done in 2021 or 2022, Petro

10  would not have lost any profits on that project, correct?

11         **A.**   Correct.

12         **Q.**   Now, MLA removal, Number 1, actually, we talked

13  about that.  We'll move on.

14         **A.**   Correct.

15         **Q.**   The painting of the control room, Number 6, the

16  painting of the control room is certainly not required to be

17  done every year, right?

18         **A.**   So some sort of painting program was to be

19  implemented.  So this was the first one.  Well, actually,

20  not the first one.  The last two years, we had a painting

21  program.  So this year was going to be the actual

22  facility -- I mean, the actual building itself.  Before it

23  was a section of pipe.  The year before, it was the actual

24  pump alley.  So, yeah, there is some kind of sort of coating

25  maintenance that had to be done.

Susan C. Nissman, RPR-RMR
(340) 773-8161

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    **Q.**   Okay.  What about the reverse loading rack?  In

2    addition to the reverse loading rack?  That's Project

3    Number 8, is that what it is?  Replacement block valves?

4    **A.**   Correct.

5    **Q.**   And as I understand it, I guess Mr. Canning, do

6    you recall he recommended some reverse-flow pumps; do you

7    recall that?

8    **A.**   Yes.

9    **Q.**   Okay.  But you understand that Vitol hired a

10   different engineering firm that determined the reverse-flow

11   project could be done without a pump installation?

12   **A.**   Again, I was not there.

13   **Q.**   The loading rack could be loaded by gravity?

14   **A.**   Again, I wasn't there.

15   **Q.**   Do you know that the engineering firm Exsol,

16   actually finalized a different scope of work on the reverse-

17   loading rack?

18   **A.**   Did not know that.

19   **Q.**   Okay.  If the scope of work changed, and was done

20   by a different engineering contractor on a project, that

21   would not be damages for Petro, correct?

22   **A.**   Well, we would have still done the actual

23   installation itself.  We would have still been the

24   contractor to install.  This was the engineer that you're

25   saying that said it wasn't, but there still needed to be

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    work done.

2        **Q.**   But Exsol Engineering firm did the work?

3        **A.**   They actually did the work themselves?

4        **Q.**   Do you know that?

5        **A.**   No.

6        **Q.**   Okay.  Do you dispute that?

7        **A.**   What's that?

8        **Q.**   Do you dispute that?

9            **MS. ROHN:**  Objection to form.

10       **A.**   Actually, wasn't Exsol the company that took over

11   maintenance for us?  They're -- they're from Surinam.

12   They're the company that took over, so we would have done

13   the work if we were there for maintenance.

14       **Q.**   **(Mr. Kaplan)** On the reverse-loading rack?  A

15   different scope of work, though, right?  You're talking

16   about on Project 8, was the installation of reverse-flow

17   pumps, correct?

18       **A.**   Correct.

19       **Q.**   And if it was a different scope of work where no

20   pump installation would be required, there would be no

21   installation work, correct?

22       **A.**   You said that Exsol actually did the installation

23   themselves.

24       **Q.**   Not pump installation.  Did a different scope of

25   work on that project.

Exhibit I

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    **A.**   But it's still in the scope of work that we would

2    have done.

3    **Q.**   It would be different than the scope of work and

4    estimated cost that you have in your interrogatory, correct?

5    **A.**   I understand.  But, again, we would have been

6    doing the scope of work, if it was different or not.

7    **Q.**   Okay.  Just a few more questions, sir.

8             Did you search your e-mail account for

9    documents in this case?

10   **A.**   Yes.

11   **Q.**   Okay.  We talked earlier.  You said you believe

12   you have an e-mail with Mr. --

13           **MS. ROHN:**  Castro.

14   **Q.   (Mr. Kaplan)** -- Castro, right?

15   **A.**   Castro.

16   **Q.**   You're going to look for that e-mail, correct?

17           **MS. ROHN:**  He didn't use Castro as a search,

18   so --

19   **Q.   (Mr. Kaplan)** You're going to look for any e-mails

20   to or from Mr. Castro, correct?

21   **A.**   Will do.

22   **Q.**   All right.  Now, have you produced any e-mail, in

23   this case, internal to Petro?  With any of your supervisors?

24   Any of your employees?  Any internal e-mail at Petro, did

25   you search for any of those documents?

Exhibit I

**C-E-R-T-I-F-I-C-A-T-E**

I, SUSAN C. NISSMAN, a Registered Merit Reporter and Notary Public for the U.S. Virgin Islands, Christiansted, St. Croix, do hereby certify that the above named witness, **PETRO INDUSTRIAL SOLUTIONS, LLC, through its representative, ADRIAN MELENDEZ, JR., and personally**, was first duly sworn to testify the truth; that said witness did thereupon testify as is set forth; that the answers of said witness to the oral interrogatories propounded by counsel were taken by me in stenotype and thereafter reduced to typewriting under my personal direction and supervision.

I further certify that the facts stated in the caption hereto are true; and that all of the proceedings in the course of the hearing of said deposition are correctly and accurately set forth herein.

I further certify that I am not counsel, attorney or relative of either party, nor financially or otherwise interested in the event of this suit.

IN WITNESS WHEREOF, I have hereunto set my hand as such Registered Merit Reporter on this the 13th day of May, 2023, at Christiansted, St. Croix, United States Virgin Islands.

_____/s/ Susan C. Nissman_____

My Commission Expires:     Susan C. Nissman, RPR-RMR
June 28, 2023                        NP 234-19

**Exhibit I**