## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. CROIX

| | |
|---|---|
| PETRO INDUSTRIAL SOLUTIONS, LLC (PETRO), | CASE NO. 1:21-CV-00312 |
| Plaintiff, | |
| v. | |
| ISLAND PROJECT AND OPERATING SERVICES, LLC, VITOL US HOLDING II CO., VITOL VIRGIN ISLANDS CORP, ANDREW CANNING, OPTIS EUROPE, LTD., VTTI, and VITOL, INC., | JURY TRIAL DEMANDED |
| Defendants. | |

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Plaintiff, Petro Industrial Solutions, LLC, ("Petro") hereby files its Opposition to motion for summary judgment by Defendants Andrew Canning and OPTIS Europe, Ltd. This motion must be denied because the evidence reveals genuine disputes of fact on all of Plaintiff's claims against these two Defendants.

## STATEMENT OF FACTS

Plaintiff references and incorporates its Responses to Defendants' Statement of Undisputed Facts ("RSOF"), as if fully set forth herein.

## LEGAL DISCUSSION

### I.  Standard of Review -- Summary Judgment

In evaluating a motion for summary judgment under Federal Rule of Civil Procedure 56, courts must apply a standard highly protective of the non-moving party's right to a jury trial. The U.S. Supreme Court mandates that courts must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party, ensuring that any doubts are resolved against granting summary judgment. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

The initial burden is on the movant to demonstrate the absence of a genuine dispute concerning any material fact. Only if this burden is met does the burden shift to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). It is crucial to note that

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
Page 2

the non-moving party need not produce evidence in a form that would be admissible at trial but must merely indicate that such evidence "could be produced." *Id.* at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").

## II. Defendants waived and/or forfeited their affirmative defense that Plaintiff lacked statutory standing under the Virgin Islands Civil Rights statutes.

### A. Defendants intentionally waived their statutory standing defense.

"[W]aiver is the 'intentional relinquishment or abandonment of a known right.' " *Kontrick v. Ryan,* 540 U.S. 443, 458, n. 13, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004) (quoting *United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Courts agree that "statutory standing" is an affirmative defense that is waived if not asserted in an Answer. Statutory standing arguments, unlike constitutional standing arguments, can be waived. *See Gribben v. United States (In re Gribben),* 158 B.R. 920, 921–22 (S.D.N.Y.1993) (the Government's failure to raise issue of standing in proceedings before bankruptcy court waived any argument on appeal that debtor lacked statutory standing to seek turnover of tax refunds.); *see also MHANY Management Inc. v. Incorporated Village of Garden City*, 985 F.Supp.2d 390, 411 (E.D.N.Y., 2013) (holding the Garden City Defendant's statutory standing arguments under Section 1982 civil rights statute were waived.).

Statutory standing is a jurisdictional inquiry concerning whether a party may pursue a cause of action *pursuant to a specific statute. See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 S. Ct. 1377, 1387 and n.4, 188 L.Ed.2d 392 (2014) (explaining the label "statutory standing" rather than "prudential standing" "correctly places the focus on the statute"). "Accordingly, questions concerning statutory standing -- unlike those concerning constitutional standing -- are waivable." *Kansas by and through Kansas Department for Children and Families v. SourceAmerica*, 826 Fed.Appx. 272, 283 (C.A.4 (Va.), 2020) (citing *Del Webb Cmtys., Inc. v. Carlson*, 817 F.3d 867, 872 (4th Cir. 2016); *see also Bancor Group Inc. v. Rodriguez,* 2023 WL 6441904, at *2 (S.D.Fla., 2023) (holding "Defendants cannot amend their affirmative defenses via a response to a summary judgment motion" to assert lack of statutory standing.)

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
Page 3

Defendants knew Petro was asserting a discrimination claim under the Virgin Islands Civil Rights statutes since Plaintiff filed its initial Complaint on September 28, 2021. For over two years, Defendants OPTIS and Canning have litigated the discrimination cause of action, including responding to discovery and attending depositions where the discrimination claim was discussed in depth. Never did OPTIS or Canning assert it in answering the original or amended complaints. Therefore, the defense is waived.

**B. Defendants forfeited their statutory standing defense by failing to raise it in their Answers or a Rule 12 motion.**

Forfeiture is defined as: "the loss of a right, privilege, or property because of a crime, breach of obligation, or neglect of duty." Black's Law Dictionary 677 (8th ed.2004); *see also* Webster's Third New International Dictionary 891 (1993) (Forfeit means "something which is lost or the right to which is alienated by a crime, offense, neglect of duty, or breach of contract"). The U.S. Supreme Court asks courts to focus on whether the defendant "knowingly relinquish[ed] its right" to a defense "by acting inconsistently with that right?" *See Morgan v. Sundance, Inc.,* 142 S.Ct. 1708, 1714, 596 U.S. 411, 416, 419 (U.S., 2022) (considering a defendant's relinquishing of a right under a framework of "waiver, forfeiture, estoppel, laches, or procedural timeliness."). In *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1107, 440 U.S.App.D.C. 451, 463 (C.A.D.C., 2019), the Court of Appeals expressed that although jurists and litigants have used the terms "waiver" and "forfeiture" interchangeably, they are not synonymous. *Id.* While a party may "intelligently choose to waive a statute of limitations defense," "[t]he failure to plead need not be intentional for the party to lose its right to raise the defense." *Id.* (citations omitted).

For instance, in the 2019 case, *Maalouf v. Islamic Republic of Iran*, the Court of Appeals found that Iran had forfeited its affirmative defense simply by failing to appear and assert it. 923 F.3d at 1108, 440 U.S.App.D.C. at 464. The *Maalouf* Court disagreed with assertions that Iran waived rather than forfeited its defenses, stating, it cannot reliably determine if Iran intentionally relinquished or abandoned a defense. But forfeiture does not require the action to be intentional. The failure to timely assert a right will result in forfeiture of that right. Here, OPTIS and Canning forfeited their affirmative defense of lack of statutory standing by failing to timely assert it. An affirmative defense, once forfeited, is excluded from the case and, as a rule, cannot be asserted on appeal. *Wood v.*

*Milyard*, 132 S.Ct. 1826, 1828 (U.S., 2012). A party can forfeit a defense even if it raised it in an answer but then failed to actively litigate the defense for years. *Statek Corp. v. Coudert Bros. LLP,* 2018 WL 834227, at \*9 (D.Conn., 2018). In this case, Defendants neglected their duty to assert their affirmative defense. Therefore, they forfeited their right to the defense under the law. *See Burton v. Ghosh*, 961 F.3d 960, 969 (7th Cir. 2020) (holding that a failure to raise the affirmative defense of *res judicata*, after case had been open for six years and extensive discovery conducted, constituted waiver or forfeiture of issue). The same is true here.

III.    **If the defense is not waived or forfeited, Petro has statutory standing to sue Defendants for discrimination under the Virgin Islands Civil Rights Act.**

Petro has filed a discrimination claim, including retaliation, against Defendants Canning and OPTIS under the Virgin Islands Civil Rights Act (VICRA). Defendants claim Petro lacks standing to sue for discrimination pursuant to the V.I. Civil Rights Act because Petro is not a "natural person," or an "individual" under either 10 V.I.C. § 3, 10 V.I.C. § 61, or 10 V.I.C. § 64(1)(a)[1]. *See* Motion, pp. 6-7.

Petro is a Limited Liability Company organized under the laws of the Virgin Islands and is a statutory "individual" who can sue and be sued. Under the Uniform Limited Liability Company Act,

(a)  A limited liability company may be organized under this chapter for any lawful purpose, subject to any law of the Virgin Islands governing or regulating business.

(b) Unless its articles of organization provide otherwise, **a limited liability company has the same powers as an individual to** do all things necessary or convenient to carry on its business or affairs, including power to:

**(1) sue and be sued, and defend in its name;**

§ 1113 Nature of business and powers, 13 V.I.C. § 1113 (emphasis added).

Further, under the ULLA definitions:

---

[1]The Virgin Islands Civil Rights Act provides, in pertinent part, that it is an unlawful discriminatory practice [f]or an employer, because of age, race, creed, color, national origin, place of birth, sex, disability and/or political affiliation of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. 10 V.I.C. § 64(1)(a). *See LIAT (1974), Ltd. v. Cherubin*, 77 V.I. 472, 480, 2022 VI 21, ¶ 14, 2022 WL 17414952, at \*3 (V.I., 2022)

(n) 'Person' means an individual, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture, government, governmental subdivision, agency, or instrumentality, or any other legal or commercial entity.

13 V.I.C. § 1102, Definition.

As an "individual" and a "person," Petro can sue Defendants for discrimination under VICRA. Indeed, the Civil Rights statutes were enacted in the Virgin Islands precisely to prevent the type of racial animus and discrimination documented by the evidence in this case (RSOF 6 and exhibits thereto).

The Virgin Islands Supreme Court stated in *Rennie,* "The Virgin Islands Civil Rights Act provides that **all individuals**, regardless of race or national origin, are entitled to "equal treatment with respect to employment, pay and working conditions in any and all businesses and industry," and correspondingly prohibits employers from "directly, indirectly or by subterfuge, deny[ing] employment in or at such business to any applicant therefor, or engage in or permit any discrimination or differential in pay or working conditions for workers doing the same work." *Rennie v. Hess Oil Virgin Islands Corporation*, 62 V.I. 529, 551–52, 2015 WL 525941, at *12 (V.I., 2015) (citing 10 V.I.C. § 3) (emphasis added).

Further, the Civil Rights Act at 10 V.I.C. § 2 set forth the "Definitions" and under "Revision" it states, "The definition of 'person' was omitted as covered by section 41 of Title 1." *See* 10 V.I.C. § 2.

Regarding Section § 41, the definition of "'person' and 'whoever' respectively include corporations, companies, associations, joint stock companies, firms, partnerships, and societies, as well as individuals." 1 V.I.C. § 41. Therefore, the definition of "person" for Title 10 includes a company like Petro.

Further, "[w]here the words of a statute are not explicit, the intention of the legislature may be ascertained by considering the object to be obtained, the mischief to be remedied, and the consequences of a particular interpretation." 10 V.I. Op. Att'y Gen. 67. "Interpretation of a statute is essentially a question of intention and where the legislative purpose is couched in plain and unambiguous language, the courts are not at liberty to modify the expression." 10 V.I. Op. Att'y Gen. 64. *Rennie* declared that "the Virgin Islands Civil Rights Act, in addition to being significantly broader in scope than the federal Civil Rights Act, is one of the original provisions of the Virgin

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
Page 6

Islands Code that went into effect on September 1, 1957, and thus predates the adoption of the federal Civil Rights

Act—originally enacted by Congress in 1964—by nearly a decade." *Rennie v. Hess Oil Virgin Islands Corporation*, 62

V.I. 529, 551–52, 2015 WL 525941, at *11 (V.I., 2015). As one of the original provisions adopted in 1957, VICRA

was ahead in rectifying wrongful conduct based on impermissible racial factors. Therefore, its broad reach would

encompass a right of action for a Virgin Islands company such as Petro. The defendants' argument that Petro lacks

standing to assert a discrimination claim under the Virgin Islands Civil Rights laws must be denied.

The defendants' burden on summary judgment is to prove they are entitled to judgment as a matter of law

on Petro's discrimination claims.  However, the only argument advanced by the defendants against Petro's

discrimination claim is a lack of statutory standing. Since that argument fails as a matter of law, the defendants

have conceded that, for purposes of summary judgment, Petro has stated a claim for discrimination under VICRA,

and this issue must be sent to a jury. *See RLF Nazareth, LLC v. York RSG (International), Limited*, 2023 WL 4531956,

at *6 (D.Virgin Islands, 2023) (holding "because Lloyds did not meaningfully address the issue until the reply brief,

the Court will consider the argument abandoned.").

**IV.    Genuine disputes of fact exist on Petro's defamation claims.**

"In the Virgin Islands, a claim of defamation requires: (a) a false and defamatory statement concerning

another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of

the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special

harm caused by the publication." *Mosler v. Gerace*, 2024 VI 1, ¶ 36, 2024 WL 26761, at *9 (V.I., 2024) (citing *Espersen*,

76 V.I. at 614 (citing *Kendall v. Daily News Pub. Co.*, 55 V.I. 781, 787 (V.I. 2011)).

A statement or communication is defamatory if "it tends so to harm the reputation of another as to lower

him in the estimation of the community or to deter third persons from associating or dealing with him." *Joseph v.*

*Daily News Publ'g Co., Inc.*, 57 V.I. 566, 586 (V.I. 2012)(citing Restatement (Second) of Torts § 559). "[A] disparaging

remark that tends to harm someone in his business or profession is actionable irrespective of harm as such a remark

falls within the definition of slander or defamation per se." *Bethea v. Merchants Commercial Bank*, No. CV 11-51, 2014

WL 4413045, at *20 (D.V.I. Sept. 8, 2014)(examining defamation claim under V.I. Supreme  Court law of *Chapman*

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
Page 7

*v. Cornwall,* 58 V.I. 421, 444 (2013); *see* Restatement (Second) of Torts § 573); *see also Espersen v. Sugar Bay Club & Resort Corp.,* No. ST-14-CV-355, 2018 WL 6177341, at *14 (V.I. Super. Nov. 21, 2018) ("Remarks that impute a criminal offense to a plaintiff are considered defamation *per se,* that is they are actionable regardless of whether the plaintiff can show special harm.") (citation omitted).

Defendants argue that statements Canning made disparaging Petro's quality of work and Petro's honesty and integrity and accusing Petro of corrupt bidding practice were truthful and privileged as they had a legitimate business reason to make them, and/or they are opinions. (Motion, pp. 12, 15-16, 18). Defendants are wrong. [2]

**A. Canning's statements are false and defamatory, and/or implies a false and defamatory narrative by omitting key facts.**

"[T]he truth or falsity of a statement is generally a question of fact for the jury," *Kirkland v. Feddersen,* 2023 VI SUPER 25U, ¶ 17, 2023 WL 3727501, at *4 (V.I.Super., 2023), "as is the question of whether a statement is defamatory." *Santiago v. United Corporation,* 73 V.I. 405, 420, 2020 VI SUPER 105, ¶ 37, 2020 WL 8212978, at *7 (V.I.Super., 2020).

In a case that *did go to a jury,* the Virgin Islands Supreme Court in *Mosler v Gerace* acknowledged that "a statement must be false to constitute defamation, and opinions and true statements thus are not calculated to form the basis for defamation liability because they are not provably false." 2024 VI 1, ¶ 39, 2024 WL 26761, at *10–11 (citing *Espersen,* 76 V.I. at 614). However, the Court clarified "this does not necessarily mean that true statements cannot be defamatory, because 'in certain circumstances even a technically true statement can be so constructed as to carry a false and defamatory meaning by implication or innuendo.'" *Mosler,* 2024 WL 26761, at *10–11 (citing *Martin v. Hearst Corp.,* 777 F.3d 546, 552 (2d Cir. 2015)) (describing a situation where the omission of certain facts can imply "a meaning both false and defamatory."). The same is true of statements framed as opinions. *Mosler,* 2024 VI 1, ¶ 40, 2024 WL 26761, at *11.

---

[2] A corporation may maintain a cause of action for defamation where the alleged defamatory communications also tend to "reflect discredit upon the method by which the corporation conducts its business." *See* Restatement § 561, comment b.

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
Page 8

The Virgin Islands Supreme Court in *Mosler*, cited to the Second Restatement, § 566, which expressly provides that:

> A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory fact as the basis for the opinion.

RESTATEMENT (SECOND) OF TORTS § 566.

The Court relied on the comments to §566, to clarify that "if the recipient draws the reasonable conclusion that the derogatory opinion expressed in the comment must have been based on undisclosed defamatory facts, the defendant is subject to liability." *Id.* at cmt. c. "The bottom line is [that] protected opinion exists if the reader is in as good a position as the author to judge whether the conclusion is correct." *Loftus v. Nazari*, 21 F.Supp.3d 849, 853 (E.D. Ky. 2014) (collecting cases). *Mosler v. Gerace*, 2024 VI 1, ¶ 40, 2024 WL 26761, at *11 (V.I., 2024). Applying that law with the facts in *Mosler v Gerace*, the Virgin Islands Supreme Court held:

> Mosler's statement that Plaintiffs did not know how to run a restaurant—while nominally an opinion—must be considered together with his statements that (1) Plaintiffs were always late with rent, (2) that Plaintiffs borrowed $150,000 from family, (3) that Defendants had reduced Plaintiffs' rent, and (4) that drugs were around the property."

*Id.*

The *Mosler* Court noted that when "[a]ll the above statements," are read together, and "not analyzed in isolation divorced from context," a listener could draw conclusions that implies disparaging meanings onto the Plaintiffs. *Id.* The *Mosler* Court emphasized that the *relationship* between the parties such as the landlord/tenant one between Mosler and the Plaintiffs would "give enhanced credence" to Mosler's negative assertions about the Plaintiffs. *Id.* Therefore, "what otherwise might be a protected statement of opinion—that Plaintiffs did not know how to run a business—[turns] into a defamatory statement, in that it implies that Plaintiffs got to the point where they are severely in debt, unable to ever pay rent on time despite having their rent reduced, and permitted drugs in their restaurant due to their own bad business decision." *Id.*

By omitting "the fact that the restaurant had been closed for two months due to a fire, or that Plaintiffs had spent money on repairs and renovations they did not wish to make but paid for anyway because Defendants

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
Page 9

made them a precondition to receiving a long-term lease that was never offered," Mosler created a false and defamatory narrative about the Plaintiffs, similar to what Canning and OPTIS (through Canning), did in this case about Petro. *Mosler,* 2024 WL 26761, at *11–12. The V.I. Supreme Court found that "[t]he evidence in the present case, when viewed in the light most favorable to Plaintiffs, was sufficient for a rational jury to conclude that Mosler's statements were collectively false, even if some may have been technically true." *Id.* (sustaining jury verdict on defamation claim against Mosler). In applying Virgin Islands law from its highest court, this Court must rule similarly.

> 1. **A jury may conclude that Canning's statement that Petro's work was "shoddy" is false and defamatory.**

This Court, applying Virgin Islands law on defamation, denied summary judgment on a claim for defamation where the alleged statement was that Plaintiff was "incompetent" at his job. *Kantz v. Univ. of the Virgin Islands*, 2016 WL 2997115, at *21 (D.V.I., 2016). The Court held:

> Assuming . . . the alleged statement of Dr. Howard is an opinion, it draws on unstated facts, thereby rendering the underlying basis for the opinion unknown. Therefore, it would be premature to rule as a matter of law that Plaintiff cannot establish a valid claim for defamation. *See, e.g., Bethea,* 2012 U.S. Dist. LEXIS 115039, at *7, 2012 WL 3550781 (finding statements that plaintiff was "incompetent and negligent in performing his duties" reflected negatively on his integrity and capacity to perform his duties as a loan executive and were therefore defamatory per se).

*Kantz,* 2016 WL 2997115, at *22 (D.Virgin Islands, 2016).

Here, Canning called Petro's work "shoddy" after he almost fell through a platform at the WAPA facility. (RSOF 18). Petro was working on the platform and had informed IPOS it was incomplete. (*Id.*) Petro still had to install clips to secure the grating. (RSOF 18). The clips had been ordered and were on their way. (*Id.*). Petro secured the platform with toe plates so no one could slip on it while waiting for the clips. (*Id.*). Petro's employees, Chad Persuad and Elias Rivera, separately informed the IPOS maintenance supervisor, Coury Hodge, that the platform was not secured, so Hodge would take necessary precautions. (*Id.*).

To access the incomplete platform, Canning needed a WAPA area permit, which he did not obtain. (RSOF 18). Canning violated WAPA's regulations when he improperly accessed the platform area without an area permit.

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
Page 10

(*Id.*) IPOS's investigation noted no permit was granted for Canning to be in that area, and IPOS called it a "near miss." (RSOF 18). Canning also acted unsafely by jumping up and down on the platform until it gave way. (*Id.*) Adrian Melendez, owner of Petro, testified that this action by Canning was reckless and contributed to the confrontation that ensued, where Canning then verbally attacked the quality of Petro's work. (*Id.*). Canning's derogatory statements were that Petro's work was "shoddy" "bullshit work" and he called the welding "substandard." (RSOF 18). Canning cursed out Chad Persuad (Petro's foreman) and Frank Kirsch (Petro's safety manager) in front of everyone. (RSOF 18). Canning said that Petro's employees did not know how to do their jobs. (RSOF 18). On that day, February 11, 2021, Canning sent an email to IPOS managers, amongst others, falsely blaming Petro for the platform incident but left out the relevant background facts. (*Id.*)

Further, IPOS, General Manager, Mr. Smith declared:

On January 23, 2021, Andrew Canning copied me on an email to David Nagle about the RIO Shade Project in which he stated "it certainly helps if the contractor comes with the necessary tools and equipment to undertake the work, which is something Petro has consistently failed to do especially when most of their activities are time and materials – where is the incentive to get the work done and this certainly appears to be another example here?" Andrew Canning also represented that he did not feel that Petro had the necessary resources or capability to complete the Rio Shade Project in a reasonable timeframe or cost and advocated that quotations from Tampa Tank or another contractor from the states should be reviewed again, claiming that those other quotations "are starting to look very competitive alongside the PIS costs to date."

(RSOF 14). Canning published these defamatory statements to have Petro terminated from its maintenance contract, which happened six months after more damaging emails from Canning.

> ### 2. A jury may conclude Canning's statement that Petro forged documents and produced false welders' qualification certificates is false and defamatory.

Canning made false, derogatory statements about Petro's welders' certificates to IPOS in March 2021, then again in April, May, and July 2021. (RSOF 19). This defamation came on the heels of Canning complaining to IPOS that he "fell" through a platform in February 2021 and blamed Petro, stating that Petro did "shoddy" work and other derogatory statements about Petro (RSOF 18). Canning had Petro's $1.5M + contract with IPOS terminated.

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
Page 11

Canning questioned the validity of the certificates and requested that they be produced even after they had already been provided for the job (RSOF 19). He then took it upon himself to investigate the Welder Certificate forms and signatures, even calling outsiders to confirm details and zooming in on the forms to find any detail that could lead to him proving the certificates were false (RSOF 19).

The evidence supports a jury seeing the case in this light and supports a jury finding for Petro **on all its claims.** For instance, Mr. David Smith, IPOS's General Manager with personal knowledge of the facts, testified:

- With respect to the 3" vent line project, on March 31, 2021, Mr. Canning sent an email to Adrian Melendez of Petro, and to various other individuals including me, in which he requested clarification about a welding procedure because of "a few potential anomalies that I observed during a site visit earlier today."
- On April 13, 2021, Mr. Canning sent an email to me and to IPOS Terminal Manager Merlin Figueira in which he requested that IPOS ask Mr. Melendez to provide IDs and qualification records for welders working on the vent line and for material certification and mechanical testing for the welding consumables being used because he thought the certificates were suspect.

(RSOF 19).

Adrian Melendez repeatedly submitted the welder qualification certifications to IPOS, Vitol, and WAPA for the 3-inch vent line project, emphasizing the necessity of accuracy in these records and confirming the accuracy of the certifications submitted. (RSOF 19). The Welders' Certificates were proper, and neither Canning, IPOS, nor VITOL found any issue with the certificates. IPOS and VITOL informed Canning to leave Petro alone and to stop communicating with Petro directly. Still, Canning continued his smear campaign to impugn Petro and get them out of the facility. (RSOF 19, 20).

### 3. A jury may conclude that Canning's statement that Petro submitted false timecards and invoices is false and defamatory.

Canning made derogatory statements to IPOS and VITOL in December 2020 and January 2021 that Petro's employees were liars and fraudsters allegedly puffing time sheets (RSOF 19). In August 2018, Andrew Canning falsely accused Petro of falsifying the gate entry log. (RSOF 6). However, IPOS has a gate attendant who observes everybody who walks in and out of their facility. The attendant has a logbook that everyone must sign in and sign out with the time and their signature next to it. Andrew Canning reported the false accusations to IPOS and others. (RSOF 6). Canning sent an email on January 21, 2021, to IPOS, Petro, and others in which he criticized

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
Page 12

Petro's timekeeping practices, accused Petro of dishonesty and fraud with regard to their billing, and suggested that IPOS should consider subjecting Petro "to suspension, dismissal from the facility or **cancellation of the contract** and permanent removal from the approved contractor list," because Canning felt there was potentially fraudulent activity. (RSOF 15).

In an email dated January 23, 2021, Canning accused a particular PIS team of engaging in "lies, deceit, and what would be regarded as fraudulent activity," falsely suggesting a pattern of behavior aimed at maximizing earnings through time and material activities. He proposed a review of the St. Thomas boiler room access platform project because of his drummed-up concerns. (RSOF 15).  However, none of Canning's accusations of fraud were true, and he was reprimanded for interfering with IPOS's operational matters. (RSOF 15)

### 4.  Canning's statement that Petro's bid was corrupt is false and defamatory.

Canning stopped Petro from getting a bid by falsely accusing the Plaintiff of potential corruption. (RSOF 6; RSOF 14). In June 2020, a project called 1 inch vent line, was out for bid by Andrew Canning and David Nagle. Petro was not given an opportunity to bid on it. Petro had given Caning a budgetary estimate in late 2019 for the same project. When Petro asked about the job, they were told by Andrew Canning that it was too late for Petro to submit its bid. Petro convinced the general manager, Merlin Figueira, and finally, the bid package was given to Petro. Petro submitted its bid, which was a competitive amount in Andrew Canning's words, but he then, in turn, falsely accused Petro of stealing viable information from supplier Traeger brothers, which was not the case. Petro explained to Merlin Figueira, David Smith, and Andrew Canning that Traeger had given Petro the pricing on a bill of material they had already submitted because of the short deadline. (RSOF 6). Because of Canning's false accusations about the bid being corrupt, Petro lost the bid despite having the lower bid. (RSOF 6).

### B.  Defendants' false and defamatory statements were published to third parties.

Defendants argue that their false statements about Petro were not published to "third parties" because they were "internal communications within a business or between a business and its agent." (Motion, p. 18). Defendants claim that Canning's accusations of Petro's alleged fraudulent documents, theft, dishonesty, and shoddy work were

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
Page 13

"not directed toward impinging Petro's character or integrity" but were "within the scope of Canning's job duties."

(Motion, pp. 15-16).

### 1.  IPOS was a "third party" to VITOL's special projects.

Canning was a consultant for VITOL, not for IPOS. (**Exhibit 27**). At the time Canning communicated the false and defamatory statements about Petro to IPOS, Petro was working on special projects for VITOL not for IPOS. Canning was managing the special projects for VITOL not for IPOS. General managers for IPOS stated they did not know why Canning was telling them about Petro while Petro worked on VITOL's special projects, especially in light of IPOS status as an independent contractor who was not an agent to VITOL. (RSOF 2). Canning did not have any privilege to publish the false and defamatory statements about Petro to IPOS, with whom Petro had a maintenance contract, separate from the special projects Petro was required to bid on for VITOL. (RSOF 2). Canning's emails directed toward IPOS and disparaging Petro were not "internal communications" subject to a conditional privilege, and even if they were, Canning abused his privilege.

### 2.    Canning abused any conditional privilege

Even if Canning could claim a "conditional privilege" it is well-settled that, "[o]ne who publishes defamatory matter concerning another upon an occasion giving rise to a conditional privilege is subject to liability to the other if he abuses the privilege. *See* Restatement (Second) of Torts § 599 (1977). "One who upon an occasion giving rise to a conditional privilege publishes false and defamatory matter concerning another abuses the privilege if he: (a) knows the matter to be false, or (b) acts in reckless disregard as to its truth or falsity. Restatement (Second) of Torts § 600 (1977). The privilege is also abused if the defamatory statements, though conditionally privileged, were made "solely from spite or ill will." Restatement (Second) of Torts § 603 (1977).  If Canning had a privilege, which he did not, as IPOS was a third party, a jury could easily find that Canning abused the conditional privilege. Therefore, the Court should deny summary judgment on this claim of defamation.

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
Page 14

**V.    Genuine disputes of fact exist on Petro's claim for tortious interference with Petro's contract with IPOS, which includes special projects with VITOL**

In the Virgin Islands, there are two causes of action for a party's interference with another's contracts. One is interference with existing contracts, and the second is interference with prospective business relations. To recover on a claim for interference with existing contracts, a plaintiff must prove: (1) the existence of a contact between the plaintiff and a third party, (2) the defendant knew of the contract, (3) the defendant interfered with the contract using improper means or with an improper motive, and (4) the plaintiff was damaged as a result of the defendant's interference. *Rondon v. Caribbean Leasing & Eco. Transp., Inc.,* 74 V.I. 397 (V.I. Super. Ct. 2021).

To prevail on a claim for interference with prospective contracts, a plaintiff must establish: (1) the existence of a professional business relationship that is reasonably certain to produce an economic benefit for the plaintiff, (2) intentional interference with that relationship by the defendant, (3) which the defendant accomplished through improper means or for an improper purpose, and (4) the defendant's interference damaged the plaintiff. *Id.* The two torts include the same elements. *Id.; Love Peace v. Banco Popular De Puerto Rico*, 2022 WL 374274, at *2 (V.I., 2022). Because "the requirements for ... interference with business relations includes the same elements as interference with existing contracts[,]" 2022 WL 374274 at *2, 2022 V.I. Supreme LEXIS 2 at *5., the interference torts will be considered together.

Here, the defendants make several specious arguments to try to show a lack of genuine dispute of fact regarding the elements of tortious interference with Petro's contract. First, the Defendants claim they did not know about the September 2019 five-year maintenance contract between IPOS and Petro. They argue that when the contract was terminated, they believed it to be a previous contract. (Motion, p. 8). Canning and OPTIS admit they knew Petro had a contract to do maintenance for IPOS at WAPA's facility. (RSOF 9-10). It is irrelevant whether Defendants knew the first IPOS contract had been replaced with a second contract because Defendants still knew Petro worked with IPOS pursuant to a contract. Defendants also knew about Petro's contracts with VITOL to do special projects as Defendants had oversight of the bidding. (RSOF 12). Defendants reviewed and criticized Petro's timesheets and work productivity. (RSOF 6, 12). Canning refused to sign off on Petro's time sheets and blocked

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
Page 15

Petro from being paid numerous times. (RSOF 15). Moreover, Canning was advocating for the termination of Petro's contract long before July 28, 2021, when it happened. (RSOF 15). Canning sent an email on January 21, 2021, to IPOS and others in which he criticized Petro's timekeeping practices, accused Petro of dishonesty and fraud with regard to their billing, and suggested that IPOS should consider subjecting Petro "to suspension, dismissal from the facility or **cancellation of the contract** and permanent removal from the approved contractor list," because Canning felt there was potentially fraudulent activity. (RSOF 15). No fraud was ever established. (RSOF 6, 12).

Second, Defendants argue they were legally justified in taking the actions that cost Petro its maintenance contract, or in other words, they argue they were privileged to make false and defamatory comments about Petro. (Motion, 8-12). Defendants were not privileged to make defamatory statements about Petro, as shown above. Even if Canning had a legitimate business privilege, he abused it with his reckless disregard for the truth and his omission of critical facts that led IPOS and VITOL management to see Petro in a damaging light such that IPOS terminated Petro's contract on July 28, 2021. (RSOF 19). IPOS even recognized that Canning was abusing any privilege when IPOS General Manager Merlin Figueira accused Canning of improper interference in operational matters and making unauthorized requests for security gate logs, which Figueira noted as creating problems due to the sensitive nature of these logs and the established protocol for accessing them. (RSOF 19). Figueira's request to Canning was to follow the correct procedure by reaching out to him or Calvin first with any concerns or questions, instead of directly engaging with contractors including Petro working under IPOS supervision. (RSOF 19).

After IPOS told Canning to stop interfering with Petro in April 2021, and after the incident on June 22, 2021, when IPOS decided to avoid working with Canning, Canning, in retaliation, stepped up his attempts to discredit Petro and get Petro's contract terminated by refocusing on the welder certificates. IPOS's David Smith attested:

- On July 13, 2021, Andrew Canning sent me an email stating that he had "real concerns with the poor quality of work fabrication" Petro had been producing for months. He alleged that some of the welds were "pretty poor, possibly from uncertified welders." He claimed that Petro had presented Danny Martinez's

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
Page 16

welding certificate and procedures for the turbine work, which he had challenged. He claimed that Danny Martinez had actually separated from Petro almost two years ago.

- As the project was drawing to a close, Mr. Canning on July 20, 2021 sent an email to me about certain documentation provided by Petro in which he stated that "***I am now as certain as I can be that the welders certification (WPQ) presented by Petro Industrial Services are not genuine.***" Discussing the documents furnished by Petro, Mr. Canning stated that "The WPQ documents for the welders (attached) have been edited (you can clearly see the font difference and clarity change if you zoom in this looks to be a basic PDF edit of a PDF scan)." Mr. Canning also noted that the documents stated that the welding test was conducted by Guillermo Castro LIII, and Mr. Canning asserted that he had reached out to the manager of Acuren Inspection Services who advised that there was no record of Guillermo Castro within their current or recent employee roll, and that LinkedIn has Castro in Japan for over two years. Mr. Canning went on to note that Acuren did not have any inspectors on the island in 2021 as the company left in 2020 when the NDT contract moved to Versa and that even if they had inspectors they did not have the equipment to perform the referenced bend test or pull test.

(RSOF 19). Instead of asking Petro directly how, when, and why the weld testing and re-certifying was done, Canning furtively went behind Petro's back to "investigate" the certificates for any problems. Defendants clearly were searching for any evidence of fraud to inform IPOS and VITOL, and get Petro's contract terminated. This is far from any legitimate business reason or objective, and no Virgin Islands' jury would countenance this behavior.

Third, Defendants seem to argue they were "agents" based on OPTIS consulting agreement with VITOL. This Court has previously held that "the Virgin Islands has expressly adopted the theory that a corporate agent may be personally liable in tort if, although acting on behalf of a corporate entity, he directs or participates in the tortious act. In order to prove liability, a plaintiff must prove that each defendant director or officer was an active and knowing participant in the alleged tortious activity." *Bethea v. Merchants Com. Bank*, No. CV 11-51, 2014 WL 4413045, at *17 (D.V.I. Sept. 8, 2014)(internal citations and quotations omitted).

In *Bethea*, this Court denied summary judgment sought by the defendant Bank's officer's, director' and attorney agents finding that there "is a genuine issue of material fact based on credibility as to whether defendants Simon, Crites, and Burgamy were acting within the scope of their employment or based on personal animus and to advance their personal financial interests." *Bethea v. Merchants Com. Bank*, No. CV 11-51, 2014 WL 4413045, at *17 (D.V.I. Sept. 8, 2014) The Court in *Bethea* further found that there "is a genuine issue of material fact as to whether Bolt [the Bank's attorney] intentionally interfered with Plaintiff's employment at MCB because of personal animus. *Bethea v. Merchants Com. Bank*, No. CV 11-51, 2014 WL 4413045, at *18 (D.V.I. Sept. 8, 2014).

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
Page 17

Pursuant to that Agreement, OPTIS and Canning were not "agents" of VITOL, nor was there any relationship between them other than an independent contractor. (RSOF 5**).** OPTIS is even further removed from IPOS. Pursuant to the IPOS Agreement, IPOS was an "independent contractor" and was not Vitol's "agent, servant, employee or representative," Therefore, it could not contract with anyone on Vitol's behalf, and Canning was not in privity with either party under their contracts. (RSOF 2). But even if Canning was an "agent," this does not insulate him from liability due to the credibility assessments a jury must make regarding his racial and personal animus towards Petro. (RSOF 6).

And fourth, Defendants argue that even if it acted with racial animus toward Petro, that is not an improper motive because Defendants had legitimate business reasons to be racists. *See* (Motion, p. 11) ("Even if the Court considers all the "racial animus" allegations in a light most favorable to Petro, it still cannot prove Canning acted with improper motive."). (RSOF 6). Defendants proceed to argue that Petro's racial animus allegations are "interpretations of actions taken by Canning that were entirely consistent with Canning's job duties." (Motion, p. 11). And that "[e]ven if Petro's allegations of racial animus by Canning could raise an inference that he was motivated by racism, Petro's problem is that there is a stronger inference that Canning was simply doing his job." (Motion, p. 12). While Canning is free to make these arguments to a jury, this Court cannot, on summary judgment, weigh the evidence and interpret the evidence in Canning's favor, and under Virgin Islands law, racial animus is not a proper business reason. *See* 10 V.I.C. § 3; 10 V.I.C. § 64(a)(1); 24 V.I.C.§ (a).

In Canning's intrusive "oversight" of Petro's work, Canning exhibited a pattern of aggressively micro-managing, nit-picking, and criticizing Petro's work. Defendants have not produced any evidence that Canning similarly treated other contractors. There is a plethora of evidence showing that Canning demeaned and degraded Petro's employees. (See RSOF No. 6.) On February 14, 2021, IPOS recognized that Andrew Canning's repeated accusations against Petro were targeted at Petro and not borne out of legitimate concerns. (**Exhibit 31**, Email from Merlin Figueria to David Smith dated February 14, 2021.) Canning displayed overt and covert discrimination towards Petro, creating a hostile working environment for Petro's employees. (*Id.*). Canning aggressively interfered with Petro's contract with IPOS by maligning Petro and calling Petro and its employees fraudsters, incompetent,

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
Page 18

and lazy workers, who lacked qualifications and failed to follow procedures. (See RSOF No. 6.)  Regarding Petro's

Hispanic employees, Calvin Schmidt, IPOS's maintenance supervisor on St. Croix, noted:

> [Canning] used to constantly refer to my maintenance workers as "Puerto Ricans" or "lazy Puerto Ricans",
> but never as Petro's employees or by their names. They were not all Puerto Ricans, but they were all
> Hispanics. It clearly showed his racist attitude.

(**Exhibit 5**, Schmidt Affirmation, ¶ 16; *see also* **Exhibit 3**, Rivera Depo, p. 12).

Due to Canning's false and prejudicial attacks on Petro, IPOS terminated Petro's contract and evicted

Petro from the facilities. (RSOF 4). David Smith made clear that Canning was not supposed to "supervise" Petro

but "oversee" the maintenance work up until IPOS hired Calvin Schmidt in St. Croix and Coury Hodge in St.

Thomas to oversee maintenance. (RSOF 4). Once IPOS hired the two maintenance supervisors, Canning had

oversight ***only over special projects***. (RSOF 4). Even though from November 2020 onwards, Canning only had

oversight over VITOL's "special projects" at WAPA's facilities, Canning wedged himself between IPOS and Petro

by feeding false information to IPOS's General Managers David Smith and Merlin Figueira in order for IPOS to

terminate Petro's maintenance contract. (RSOF 4, 19). It did not help that Canning is 50% co-owner of OPTIS

and had no one overseeing him at the job site, so his loose-cannon racist behavior was left unchecked. (RSOF 5-

6).

The emphasis on viewing the evidence in the light most favorable to the non-moving party requires that

the court not make credibility determinations or weigh the evidence, as these are functions reserved for the jury.

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000). Therefore, a court must avoid granting summary

judgment whenever the materials indicate that the factual context could lead a reasonable jury to rule in favor of

the non-moving party.

Disputes involving subjective judgments and inferences about parties' actions are particularly ill-suited for

resolution at the summary judgment stage. *See e.g., Chu v. Legion of Christ, Inc.,* 2 F.Supp.3d 160, 176 (D.R.I., 2014);

*Isaac v. City of New York*, 701 F.Supp.2d 477, 486 (S.D.N.Y., 2010) ("discrimination and retaliation claims usually

involve issues of intent, which are often ill-suited to resolution at the summary judgment stage. . . ."). Here, based

on the credible evidence and drawing all inferences in Plaintiff's favor, a jury could easily find that Canning and

OPTIS tortiously interfered with Petro's maintenance contract with IPOS and their ability to do special projects

with VITOL.

## VI.    Petro has produced competent evidence of its economic damages

In the Virgin Islands, "[i]t is well settled that a single, nonconclusory affidavit or witness's testimony, when

based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment or judgment

as a matter of law." *Burd v. Antilles Yachting Services, Inc.,* 57 V.I. 354, 360 (V.I.2012) (internal quotations omitted).

"This remains true even if the affidavit is 'self-serving' in the sense of supporting the affiant's own legal claim or

interests." *Id.; see also Greenaway v. Virgin Islands Water & Power Authority*, 74 V.I. 363, 370, 2021 VI SUPER 54, ¶ 8,

2021 WL 3291777, at *2 (V.I.Super., 2021). Even when the evidentiary burden is extremely high as "beyond a

reasonable doubt," the V.I. Supreme Court "has repeatedly held that the testimony from a single eyewitness is

sufficient to prove the elements of a crime, even if uncorroborated by other eyewitness testimony or forensic

evidence." *Ponce v. People*, 72 V.I. 828, 834, 2020 VI 2, ¶ 14, 2020 WL 1551324, at *3 (V.I., 2020) (citing *Rivera v.*

*People*, 64 V.I. 540, 553 (V.I. 2016); *Ventura v. People*, 64 V.I. 589, 606 (V.I. 2016).

In their last-ditch attempt at summary judgment, Defendants advance a cursory argument, already rejected

by the Third Circuit Court of Appeals, that expert testimony is required to prove economic damages.  The *Donlin*

*v. Philips Lighting N. Am. Corp.,* 581 F.3d 73, 81-82 (3d Cir. Pa. 2009), the Third Circuit Court of Appeals held that:

> This does not mean that an expert is always necessary whenever the testimony is of a specialized or
> technical nature. When a lay witness has particularized knowledge by virtue of her experience, she may
> testify -- even if the subject matter is specialized or technical -- because the testimony is based upon the
> layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702. See
> Notes to 2000 Amendments. At the same time, we have consistently required that lay testimony requiring
> future projections of a business or operation come from someone who has intimate and thorough
> knowledge of the business gathered from either a lengthy tenure or a position of authority.
>
> For instance, in *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993), we allowed a company's
> founder and owner to testify regarding his lost future profits and harm to the value of his business. *Id.* at
> 1175. Though the testimony concerned a "specialized" field and involved predictions about future business
> performance, we found that the witness had **adequate personal knowledge in light of his in-depth**
> **experience** with the business's contracts, operating costs, and competition. *Id.*; cf. In re Merritt Logan,
> Inc., 901 F.2d 349, 360 (3d Cir. 1990) (principal shareholder of business properly testified concerning
> business projections where he was intimately involved with the investments and management of the
> business); *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 403 (3d Cir. 1980) (company's licensed public
> accountant was allowed to testify regarding lost profits based on his personal knowledge of company's

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
Page 20

balance sheets).

*Id*[3]

In this case, Plaintiff's testimony is actual evidence based on his own knowledge, observations, and experiences regarding the kind of business revenues Petro was earning and the profits it lost. Defendants have not argued otherwise. Petro's Adrian Melendez can testify to Petro's loss of profits and business opportunities, as well as non-payment of past due invoices to IPOS and Vitol (RSOF 53). Melendez confirms the accuracy of financial figures presented in Petro's Second Supplemental Response to Vitol's Third Set of Interrogatories, specifically addressing the breakdown of costs, projected profits, and the differentiation between project types (maintenance vs. project-specific work). (RSOF 53).

In the recent case *Desmond v. Virgin Islands Water and Power Authority*, 77 V.I. 135, 145, 2022 WL 7000666, at *6 (V.I.Super., 2022), the Court noted that "the only evidence presented as to causation" was contained in the plaintiff's deposition testimony and another witness' Affirmation, "both of which rely on statements and admissions allegedly made by an unknown Haugland employee." *Id.* The Court held that the plaintiff's deposition testimony and the Affirmation were "appropriate vehicle[s] to establish a fact for summary judgment purposes" if they "present actual evidence showing a genuine issue for trial."

In sum, Defendants have not established a lack of genuine disputes of fact concerning Plaintiff's claims. Therefore, summary judgment must be denied.

---

[3] The Advisory Committee Notes to FRE 701 further provide:

> For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. *See, e.g., Lightning Lube, Inc. v. Witco Corp.* 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

*Id.*

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
Page 21

                                        RESPECTFULLY SUBMITTED
                                        LEE J. ROHN AND ASSOCIATES, LLC
                                        Attorneys for Plaintiff


DATED:  April 8, 2024                    BY:    /s/ Lee J.  Rohn
                                        Lee J.  Rohn, Esq.
                                        VI Bar No. 52
                                        1108 King Street, Suite 3 (mailing)
                                        56 King Street, Third Floor (physical)
                                        Christiansted, St. Croix
                                        U.S. Virgin Islands 00820
                                        Telephone: (340) 778-8855
                                        lee@rohnlaw.com


**CERTIFICATE OF SERVICE**

   **THIS IS TO CERTIFY** that on April 8, 2024, I electronically filed the foregoing with the Clerk of the Court using the electronic filing system, which will send a notification of such filing to the following:


   All Counsel of Record


                                        BY:    */s/ Lee J.  Rohn*        (dvn)