## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

|  |  |
|---|---|
| PETRO INDUSTRIAL SOLUTIONS, LLC (PETRO), | CASE NO. 1:21-CV-00312 |
| Plaintiff, |  |
| v. |  |
| ISLAND PROJECT AND OPERATING SERVICES, LLC, VITOL US HOLDING II CO., VITOL VIRGIN ISLANDS CORP, ANDREW CANNING, OPTIS EUROPE, LTD., VTTI, and VITOL, INC., | <u>JURY TRIAL DEMANDED</u> |
| Defendants. |  |

## <u>PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

Plaintiff Petro Industrial Solutions, LLC, by and through undersigned counsel, files this Response to Defendant OPTIS Europe, Ltd. and Andrew Canning's Statement of Undisputed Facts.

**Relevant parties are**:

- **Petro Industrial Solutions, LLC** – called "PIS" or "Plaintiff" or "Petro"

- **Adrian Melendez** -- sole member and President of Petro LLC, a local Virgin Islander who started Petro in April 2018.

- **IPOS** – Island Project and Operating Services, LLC – had a $1M+ five-year contract with Petro for maintenance work at WAPA's propane facility. IPOS is a subsidiary of VTTI.

- **VTTI** – a global energy storage company founded and headquartered in Netherlands, owned by three entities, one of which is VITOL, with over $375m in revenue. VTTI

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 2

is "the parent of IPOS" and owns multiple terminals across the world.[1]

- **VITOL Group** – a giant global energy and commodities company founded in Netherlands, headquartered in Switzerland, over $5bn revenue in 2022.

- **VITOL Inc**. **--** operates as the U.S. subsidiary of the Vitol Group, one of the world's largest independent energy trading companies.

- **VVIC** -- VITOL Virgin Islands Corp. is under umbrella of VITOL Inc. VVIC has "no employees"[2]  VITOL, Inc's employees do the work for VVIC.[3]

- **OPTIS Europe Ltd.** – A consultancy company specializing in oil and gas operations co-founded by **Defendant Andrew Canning** (50% owner). OPTIS had a consulting contract with VTTI during construction of WAPA propane (2016 – 2020); then a contract with VVIC (Nov. 2020-2021), but never with IPOS.

1. At all relevant times, Petro was a legal entity organized under the laws of the Territory and not a natural person. See Second Amended Complaint ("SAC"), ¶1.

**RESPONSE**: **Deny.** Petro was a Limited Liability Company organized under the laws of the Virgin Islands. Per the Uniform Limited Liability Company Act,

> (a) A limited liability company may be organized under this chapter for any lawful purpose, subject to any law of the Virgin Islands governing or regulating business.
> (b) Unless its articles of organization provide otherwise, **a limited liability company has the same powers as an individual to do all things necessary or convenient to carry on its business or affairs, including power to:**
> **(1) sue and be sued, and defend in its name;**
>
> § 1113 Nature of business and powers, 13 V.I.C. § 1113 (emphasis added)

---

[1] *See* **Exhibit 9**, Charlotte Horowitz Depo, 30(b)(6) witness for VVIC, pp. 17-18.
[2] *See* **Exhibit 9**, Charlotte Horowitz Depo, 30(b)(6) witness for VVIC, p. 14.
[3] *See* **Exhibit 9**, Charlotte Horowitz Depo, 30(b)(6) witness for VVIC, pp. 18-19.

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 3

2. At all relevant times, IPOS was under contract with Vitol Virgin Islands Corp. (VVIC) to manage and operate the WAPA Propane Facilities on St. Thomas and St. Croix (the "WAPA Facilities"). SAC, ¶17.

**RESPONSE**: **Admit.** IPOS entered into a Facilities Services Agreement with Vitol Virgin Islands Corp., ("VVIC" or "Vitol") on November 1, 2016. (**Exhibit 28**, IPOS/Vitol Agreement). Pursuant to the Agreement, IPOS was an "independent contractor" and was not Vitol's "agent, servant, employee or representative." (**Exhibit 28**, Sec. V).

3. At all relevant times, VVIC owned the propane facilities adjacent to WAPA's Randolph Harvey Power Plant (STT) and Richmond Power Plant (STX). SAC ¶20.

**RESPONSE**: **Deny**. VITOL Inc.'s Vice President of Operations, Sebastian Moretti, testified, "[H]onestly, I'm not certain who owns the [propane] facility. They are on WAPA's land. VTTI was in charge of building those facilities, and the contract was established to return those facilities at some point back to WAPA." (**Exhibit 7**, Sebastian Moretti, May 25, 2023, pp. 22-23). Mr. Moretti testified that as of the date of his deposition, May 25, 2023, VITOL was in the process of returning the propane facilities to WAPA. He could not identify which VITOL entity owned or was transitioning the facility back to WAPA. (**Exhibit 7** at p. 23).

4. From September 2016 until October 31, 2020, OPTIS, through Andrew Canning, provided operational support consulting services relating to the WAPA Facilities to IPOS. See Exh. A, Canning Declaration, ¶¶4-6.; see also SAC ¶¶24-26.

**RESPONSE**: **Deny.** David Smith, IPOS's General Manager testified that OPTIS, an engineering

company, did not have either a verbal or written contract with IPOS to provide IPOS with any services or support relating to the WAPA propane facilities. (**Exhibit 8**, David Smith Depo, pp. 44, 47- 48). OPTIS had a contract with VTTI, the construction company in charge of constructing the propane facility for WAPA. (**Exhibit 8** at p. 47). Andrew Canning never worked for IPOS. (**Exhibit 8** at p. 46). "Andrew stayed for the punch list work that was agreed upon between . . . Vitol and WAPA, what was still remaining from the construction." (**Exhibit 8**, p. 46).

After the VTTI construction company left, OPTIS' invoices came to IPOS and IPOS took over the payments to OPTIS for Andrew Canning's services even though there was no contract. (**Exhibit 8**, pp. 47-49). Mr. Canning was involved in IPOS's meetings to discuss what to do at WAPA's propane facilities. (**Exhibit 8**, pp. 48-49). Canning's services included the punch list items left over from the construction, then after Hurricane Maria hit in 2017, he was doing recovery work for IPOS, then general overseeing of the maintenance work by Petro and overseeing special project works for VITOL. David Smith made clear that Canning was not supposed to "supervise" Petro, but "oversee" the maintenance work, up until IPOS hired Calvin Schmidt in St. Croix and Coury Hodge in St. Thomas to oversee maintenance. (**Exhibit 8**, pp. 54-56). Once IPOS hired the two maintenance supervisors, then Canning had oversight ***only over special projects***. (**Exhibit 8**, pp. 55-56). Despite the fact that from November 2020 onwards, Canning only had oversight over VITOL's "special projects" at WAPA's facilities, Canning inserted himself between IPOS and Petro by feeding false negative information to IPOS's General Managers, David Smith and Merlin Figueira, in order for IPOS to terminate Petro's maintenance contract. *See* Response to No. 19 below.

David Smith testified that as the General Manager of IPOS, he was pleased with Petro's maintenance work for IPOS in 2018 under Petro's first contract with IPOS, and he renewed Petro's

contract. (**Exhibit 8**, pp. 33-35). He testified he was satisfied with Petro's maintenance work in 2019, 2020, and 2021. (**Exhibit 8**, pp. 36, 42-43). Smith distinguished between IPOS's maintenance work contracted out to Petro, and VITOL's "special projects," and explained that Andrew Canning had oversight over both *only* until IPOS hired Calvin Schmidt and Coury Hodge to be maintenance supervisors in St. Croix and St. Thomas respectfully. (**Exhibit 8**, pp.56, 62-64). Petro did both regular maintenance for IPOS and special projects for VITOL. (*Id.*). Everyone testified those were separate as Petro had to bid on the special projects. *See* Response to No. 12, below. After IPOS hired Calvin Schmidt and Courty Hodge, Andrew Canning had oversight only over Petro's special project work. (*Id.*).

However, Canning admits he continued to inform IPOS about his view of Petro's work even after he was supposed to oversee only VITOL's special projects. (**Exhibit 12**, Canning's Resp. to Petro's First Set of Interrogatories, No. 5). For instance, Merlin Figueira, IPOS former General Manager, testified that Canning's communications about Petro's special project work for VITOL were sent directly to IPOS personnel, including the general manager, despite the projects being under VITOL (VVIC) supervision, which was inappropriate. (**Exhibit 15**, pp. 14-15, 93-94). These unauthorized communications to IPOS included Canning's false and defamatory statements about Petro. *See* Response to No. 6.

In Canning's intrusive "oversight" of Petro's work, Canning exhibited a pattern of aggressively micro-managing, nit-picking, and falsely criticizing Petro's work. Defendants have not produced any evidence that Canning treated other contractors in a similar fashion. There is a plethora of evidence showing that Canning demeaned and degraded Petro's employees. *See* Response to No 6. Canning displayed overt and covert discrimination towards Petro, created a hostile working environment for

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 6

Petro's employees. (*Id.*). Canning aggressively interfered with Petro's contract with IPOS by maligning Petro and calling Petro and its employees fraudsters, incompetent, and lazy workers, who lacked qualifications and failed to follow procedures. *See* Response No. 6. As a result of Canning's false and prejudicial attacks on Petro, IPOS terminated Petro's contract and evicted Petro from the facilities. (**Exhibit 6**, David Smith Declaration).

5. From November 1, 2020, until November 20, 2022, OPTIS had a consulting agreement with Vitol Virgin Islands Corp. for similar operational support consulting services relating to the WAPA Facilities. Exh. A, Canning Declaration, ¶5; see also SAC ¶¶18, 24-25.

**RESPONSE**: **Admit** that OPTIS had a consulting agreement. (**Exhibit 27**, OPTIS Consulting Agreement). Pursuant to that Agreement, OPTIS and Canning were not "agents" of VITOL nor was there any relationship between them other than independent contractor. (**Exhibit 27**, #4). **Deny** that VVIC was an entity that had any employees with whom OPTIS consulted with. VITOL Virgin Islands Corp. (VVIC) is under the umbrella of VITOL Inc. VVIC has "no employees"[4] VITOL, Inc's employees do the work for VVIC.[5] Therefore, OPTIS was technically a consultant *for* VITOL, Inc.

Andrew Canning was the OPTIS consultant in the Virgin Islands, directly overseeing Plaintiff Petro when Petro did special projects for VITOL. Charlotte Horowitz, VVIC's 30(b)(6) witness, who works for VITOL, Inc., admits that **Canning had absolutely NO entity or person supervising him at the WAPA facilities.** (**Exhibit 9** at p. 89; *see also* **Exhibit 11**, OPTIS Supp. Resp. to Interrogatory No. 3) (confirming Canning "is not supervised by anyone at OPTIS.") Canning could do as he pleased and no one at VITOL, Inc., or at VVIC, IPOS, OPTIS or *anywhere* had oversight over

---

[4] *See* **Exhibit 9**, Charlotte Horowitz Depo, 30(b)(6) witness for VVIC, p. 14.
[5] *See* **Exhibit 9**, Charlotte Horowitz Depo, 30(b)(6) witness for VVIC, pp. 18-19.

Canning's conduct, behavior, and actions in the Virgin Islands WAPA facilities. *Id. See also* Response to No. 4 above.

6. At all relevant times, Defendant Andrew Canning ("Canning") was an employee of OPTIS. See SAC ¶26; see also Exh. A, Canning Declaration, ¶6.

**RESPONSE**: **Deny.** Andrew Canning is a co-owner of OPTIS, owning 50% of OPTIS. (**Exhibit 10**, Canning Deposition, p. 24). It was in Canning's best interest as co-owner of OPTIS to ensure that the VITOL entities continued to contract with OPTIS. Canning used his position as a consultant to VITOL to intimidate, discriminate, and harass Petro, a local Virgin Islands sole member LLC, and Petro's employees, who are mostly Black or Hispanic West Indians. (**Exhibit 5**, Calvin Schmidt Affirmation). Mr. Schmidt attests:

> I also reported his racist conduct to David Smith, and told him Canning would go behind our backs, take pictures of the gate log-ins, when we went to lunch, and constantly act like we were cheating, in keeping with his racist attitude that we couldn't be trusted. The security guards warned us that he was doing this. Even though we actually came to work at 7:00, if he didn't see us until 7:30, because we were somewhere else working, he would falsely claim we were falsifying our time records as part of his racist attitude.

(**Exhibit 5**, Schmidt Affirmation, ¶ 13).

Chetram Persuad, Petro's black field superintendent, testified about Canning's racist behavior and improper criticism of Petro's work aimed solely at getting IPOS to terminate its contract with Petro. (**Exhibit 2**, Persuad Depo, pp. 156-160). Persuad confirmed Canning made derogatory comments, referring to Petro employees as "islanders," "locals," and spoke negatively about Hispanics. He also noted that Calvin Schmidt, a colleague, reported similar derogatory remarks by Canning about Petro employees being not up to par and referred to as "lazy islanders." (**Exhibit 2**, 156-160).

Mr. Persuad testified:

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 8

> Andrew Canning pretty much run the maintenance work for IPOS. And pretty much, he would give us [Petro] a potential task to do. And right off the bat, we'll come up with the numbers, timewise, and he said, This is incorrect. . . . We'll go over the task three or four times, and then we'll go back to the same initial one, and say this is better for him. . . . [Canning] was saying, You island boys don't know what you're doing. You island people cannot get it right. . . . Can you get somebody else to do this? We have been doing this job for several times for Andrew. And like I said, he always come back, saying that, You island people, or you locals cannot get it right.

(**Exhibit 2**, Persuad Depo, pp. 18-20).

> Our personnel out of Puerto Rico, [Canning] said, These guys are worthless. They don't know what they're doing. They can't even communicate . . . . We need to get better personnel than these Hispanics. . . . Mr. Canning would make remarks, our payroll, our timesheets, even our quotes. Again, he would go back and say, You guys can't even get the numbers right as locals . . . . You can't even calculate hours on a timesheet as locals. And he would go on to say, As far as myself and Adrian Melendez, we're worthless at running the company. . . . Andrew Canning, on several occasion, accused us of forgery. Trying to rob [IPOS].

(**Exhibit 2**, pp. 18-20).

Regarding Petro's Hispanic employees, Calvin Schmidt, IPOS's maintenance supervisor on St.

Croix, noted:

> [Canning] used to constantly refer to my maintenance workers as "Puerto Ricans" or "lazy Puerto Ricans", but never as Petro's employees or by their names. They were not all Puerto Ricans, but they were all Hispanics. It clearly showed his racist attitude.

(**Exhibit 5**, Schmidt Affirmation, ¶ 16; *see also* **Exhibit 3**, Rivera Depo, p. 12).

Canning took it upon himself to ban four of Petro's Hispanic employees from working at the

WAPA facility. (**Exhibit 3**, Elias Rivera Depo, pp. 12-13; *see also* **Exhibit 12**, Canning's Resp. to

Petro's First Set of Interr. at No. 10, discussing his email of January 22, 2021; **Exhibit 30**, Canning's

Email January 22, 2021). In that email to IPOS General Managers, Canning falsely accuses three of

Petro's Hispanic employees of conspiring with Petro to maximize earnings from "time and material

activities" like poor timekeeping and loss of materials even though the job was a fixed price, such that

Canning demanded the Hispanic employees be banned, which they were. (**Exhibit 30**). Canning did

not treat other non-Hispanic or non-Black employees in the same degrading way. (**Exhibit 2**, Persuad Depo, pp. 20-23) (describing how Canning showed respect and listened to David Nagle, a white man, unlike how Canning treated Petro's employees) ("How he treated David Nagle versus our employees and oursel[ves] was totally different.").

Canning stopped Petro from getting a bid by accusing the Plaintiff of corruption. (**Exhibit 17**, No. 1). In June 2020, a project called 1 inch vent line, was out for bid being overseen by Andrew Canning and David Nagle. Petro was not given an opportunity to bid on it. Petro had given IPOS a budgetary estimate in late 2019 for the same project. When Petro asked about the job, it was falsely told by Andrew Canning that it was too late for Petro to submit its bid. Petro went to the general manager, Merlin, and finally, the bid package was given to Petro. Petro submitted its bid, which was a competitive amount in Andrew Canning's words, but he then, in turn, falsely accused Petro of stealing viable information from supplier Traeger brothers, which was not true. Petro explained to Merlin, David Smith, and Andrew Canning that Traeger had given Petro the pricing on a bill of material they had already submitted because of the short deadline. (**Exhibit 17**, No. 1). Because of Canning's false accusations, Petro lost the bid. (**Exhibit 17**, No. 1).

In August of 2018, Andrew Canning falsely accused Petro again of falsifying the gate entry log. (Exhibit 17, No. 1). IPOS has a gate attendant who observes everybody who walks in and out of their facility. The attendant has a logbook that everyone must sign in and sign out with the time and their signature next to it. Andrew Canning who always played these gotcha games, falsely accused Petro of falsifying these logbooks, and said that he would report Petro to the authorities because Petro was a criminal. (**Exhibit 17**, No. 1). Melendez testified that he proved to Canning the gate logs were right. (**Exhibit 1**, p. 43). Canning did not apologize for the wrongful accusations. (**Exhibit 1**, pp. 43-

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 10

44). On February 14, 2021, IPOS recognized that Andrew Canning's repeated accusations against Petro appeared targeted at Petro and not borne out of any legitimate concerns. (**Exhibit 31**, Email from Merlin Figueria to David Smith dated February 14, 2021.) Because of the demeanor and attitude of Andrew Canning toward Petro's Hispanic/West Indian crew and Melendez, it was clear that Canning's intentional actions occurred because of discrimination as to Petro's employees' race, color and national origins. (**Exhibit 17**, No. 1).

7. Canning is a mechanical engineer and was the individual who provided OPTIS's operational support consulting services relating to the WAPA Facilities. See Exh. D, Canning Response to Interrogatories # 1 – 3; see also Exh. E; SAC ¶¶24-25.

**RESPONSE**: **Admit** that Canning, an engineer who owned 50% of OPTIS, had contracted to provide consulting services to VTTI and then VVIC at WAPA's facility. See Response to Nos. 4 and 6 above.

8. As part of Canning's job duties, Canning would report observations to IPOS General Management regarding maintenance and repair work and asset improvement activities (projects). Canning's duties included reporting on issues of safety and integrity and offering technical support as needed. Exh. D, Resp. to Interrogatories # 5.

**RESPONSE**: **Deny.** OPTIS Response to Interrogatory #5 states:

> OPTIS, only through Andrew Canning, observed site conditions, work performed, and reviewed paperwork such as invoices and provided consulting services to IPOS until November 30, 2020. Thereafter, it provided similar services, only through Andrew Canning, to Vitol Virgin Islands Corporation.

Canning's Response to Interrogatory 5 stresses he was hired to "report observations" and "provide advice" to IPOS. (**Exhibit 12**, Canning's Resp. to First Set of Interr. No. 5). However, Canning did much more than "report observations" or "provide advice" regarding Petro's work.

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 11

Canning's alleged "observations" and "reports" must be considered in the context that OPTIS/Canning did not have either a verbal or written contract with IPOS to provide IPOS with any services or support relating to Petro's work at the WAPA propane facilities. (**Exhibit 8**, David Smith Depo, pp. 44, 47- 48). Mr. Smith admitted there were no "guidelines" in place for Canning in overseeing Petro's work. (**Exhibit 8**, David Smith Depo, p. 56). However, Smith testified that Canning ***was not supposed to inspect and oversee the welding*** on IPOS maintenance projects. (**Exhibit 8**, pp. 85-86). Mr. Smith's testimony reads:

> Q. was it Mr. Canning's job to actually inspect and oversee the actual welding?

> A.  No, it was not.  It was the responsibility of Petro to provide the documentation.

(**Exhibit 8**, pp. 85-86).

Nevertheless, Canning took it upon himself to inspect the welding on a VITOL 3-inch vent line special project that Petro had been hired to do. *See* Response to No. 19. Canning falsely criticized the welds and demanded paperwork from Petro about the welders' qualifications even after that paperwork had already been provided. *See* Response to No. 19. Then, Canning gave knowingly false and misleading conclusions (not observations or advice) to IPOS and VITOL management claiming that Petro was unqualified to perform work that Petro had been performing for years for IPOS in a satisfactory manner. *Id.* Falsely claimed that the welding certificates were forgeries and falsely claimed the welds did not meet welding standards when they did.

9. In April 2018, IPOS and Petro entered a maintenance support contract that specified that it was terminable for any reason, including "convenience," with 30-days' written notice. See Ex. B ("the First IPOS-Petro Contract").

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 12

**RESPONSE**: **Admit**.


10. Canning was aware of and had read the First IPOS-Petro Contract. See Ex. A,

Canning Declaration, ¶7.

**RESPONSE**: **Admit**.


11. On or about September 1, 2019, IPOS and Petro replaced the First IPOS-Petro Contract with a

new contract that was not terminable-at-will and which had a minimum initial term of five years. See

Ex. C ("the Second IPOS-Petro Contract").

**RESPONSE**: **Admit**. Petro and IPOS entered into a Maintenance Contract, that included

Preventative Maintenance, Remedial Maintenance and Scheduled Projects. (**Exhibit 26**). This

Maintenance Contract did not include the "special projects' that Petro would have to bid on or apply

for with VITOL. *Id.*


12. Neither Canning nor OPTIS were aware of, or had ever seen, the Second IPOS-Petro Contract

until it was produced in this litigation, long after IPOS had terminated its contractual relationship with

Petro. Both Canning and OPTIS believed that the First IPOS-Petro Contract remained in full force

and effect up until the time that IPOS terminated its contract with Petro on July 28, 2021. See Ex. A,

Canning Declaration, ¶¶8-9.

**RESPONSE**: **Deny**. First, Canning and OPTIS admit they knew that Petro had a contract to do

maintenance for IPOS at WAPA's facility. *See* SOF #10 above. It is irrelevant to any of Plaintiff's

claims whether Defendants knew the first IPOS contract had been replaced with a second contract,

because Defendants still knew Petro worked with IPOS pursuant to a contract.

Second, it is undisputed that Defendants also knew Petro contracted to do special projects with VVIC as Canning testified about reviewing documents related to projects (like the 3-inch vent line project) and communications regarding Petro's performance and completion of tasks, such as reviewing Dropbox files for project documentation (**Exhibit 10**, pp. 147-148) and concerns about Petro's timesheets and work productivity (**Exhibit 10**, pp. 149-160). Merlin Figueira testified that Canning "managed" the special projects Petro worked on for VITOL. (**Exhibit 15**, p. 23). Significantly, Canning was directly involved in assessing Petro's bids on special projects and criticizing Petro's bids to get IPOS and VITOL to deny Petro the projects. (**Exhibit 6**, David Smith Declaration, ¶¶ 8-9). This evidence demonstrates Canning's awareness of Petro's ongoing work and underlying contractual obligations related to project completion and performance metrics with both IPOS and VITOL. (**Exhibit 10**, pp. 147-16; **Exhibit 15**, p. 23; **Exhibit 6**, ¶¶ 8-9). It was Petro's contractual relationships to do the maintenance and special projects that Defendants sought to destroy and succeeded in destroying.


13. Neither OPTIS nor Canning were parties to the maintenance support contract between IPOS and Petro. See Ex. B & C.

**RESPONSE**: **Admit**.


14. Neither OPTIS nor Canning had any approval or decision-making authority over the bidding or selection process for projects at the WAPA Facilities. See Exh. D, Resp. to Interrogatory No. 5

**RESPONSE**: **Deny**. Pursuant to Defendants' consulting agreement with VVIC, Defendants had

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.,* Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 14

authority to "[m]anage the procurement process for all phases of work in relation to the capital project." (*See* Def's Ex. E, Consulting Agreement between OPTIS and VVIC, at §2 (b)(vi), Scope of Services). Further, Defendants influenced the bidding and selection process per IPOS General Manager David Smith. He attested that Canning was directly involved in assessing Petro's bids on special projects and criticizing Petro's bids to get IPOS and VITOL to deny Petro the projects. (**Exhibit 6**, David Smith Declaration, ¶¶ 8-9). Mr. Smith attested:

> On June 17, 2020, Andrew Canning sent an email to me concerning a quotation for work on a 1" vent line. Specifically, Mr. Canning stated that he had learned from David Nagle that Dave Tilden at Trager Brothers, a supplier that IPOS had utilized from time to time, "sent Adrian Melendez all the material quote and fabrication quote information for the 1" line work." Mr. Canning stated "I have no idea why he did this, as it is at a minimum unprofessional but probably more exactly corrupt." Mr. Canning's email concluded by noting that he would consider the actions of David Tilden for Trager Brothers and Adrian Melendez of Petro Industrial "are worthy of removal of both companies from the IPOS approved vendors list."

(**Exhibit 6**, ¶ 8).

Merlin Figueira recounts this email exchange where Canning criticizes the Traeger Brothers for providing Petro with quote information, describing the act as potentially corrupt. Figueira testified that Canning falsely suggested that this enabled Petro to revise their quotation to be competitive unfairly. Canning's skepticism about the integrity of the bidding process and his advocation of barring Petro and Traeger Brothers from IPOS's approved vendors list indicates his influence on vendor selection and his bias against certain companies. (**Exhibit 15**, Figueira Depo, pp. 51-54). Defendants never produced any evidence of potential "corruption." Instead, Defendants' aspersions on Petro's honesty and integrity were clearly to prevent Petro from getting the contract and Defendants succeeded as the bid was given to another contractor despite Petro offering the lowest bid. (**Exhibit 9**, Charlotte Horowitz Depo, pp. 114-16).

Mr. Smith also affirmed:

On January 23, 2021, Andrew Canning copied me on an email to David Nagle about the RIO Shade Project in which he stated "it certainly helps if the contractor comes with the necessary tools and equipment to undertake the work, which is something Petro has consistently failed to do especially when most of their activities are time and materials – where is the incentive to get the work done and this certainly appears to be another example here?" Andrew Canning also represented that he did not feel that Petro had the necessary resources or capability to complete the Rio Shade Project in a reasonable timeframe or cost and advocated that quotations from Tampa Tank or another contractor from the states should be reviewed again, claiming that those other quotations "are starting to look very competitive alongside the PIS costs to date."

(**Exhibit 6**, ¶ 9).

15. Neither OPTIS nor Canning had any approval or decision-making authority over the payment of Petro invoices. Exh. D, Resp. to Interrogatory Nos. 5 and 16.

**RESPONSE**: **Deny.** Canning refused to sign off on Petro's time sheets and blocked Petro from being paid numerous times. For instance, on December 15, 2020, Canning sent an email to IPOS management stating he is "refusing to sign the time sheets for three of the PIS [Petro] team." (**Exhibit 15**, Figueira Depo at pp. 61-62). Canning had the authority to approve Petro's payments for special projects, and while IPOS made payments, they were ultimately for VITOL projects. (**Exhibit 15**, pp. 66-67; **Exhibit 20**, Tim Kologinczak Depo, p. 41). Canning sent an email on January 21, 2021, to IPOS, Petro, and others in which he falsely criticized Petro's timekeeping practices, falsely accused Petro of dishonesty and fraud with regard to their billing, and suggested that IPOS should consider subjecting Petro "to suspension, dismissal from the facility or **cancellation of the contract** and permanent removal from the approved contractor list" (**Exhibit 15**, pp. 56-57, 77, 79, 81-83) (emphasis added). Canning falsely indicated that changes were made to timesheets after his approval, which he found unacceptable and potentially fraudulent (*Id.* pp. 56-57, 82-83). Canning recommended

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 16

procedural changes to tighten work hour recording and authorization procedures (*Id.* pp. 81-82).

In an email dated January 23, 2021, Canning falsely accused a particular PIS team of engaging in "lies, deceit, and what would be regarded as fraudulent activity," suggesting a pattern of behavior aimed at maximizing earnings through time and material activities. He proposed a review of the St. Thomas boiler room access platform project in light of these concerns (**Exhibit 15**, pp. 97-98).

Merlin Figueira reprimanded Canning for direct interference in IPOS's operational matters and making unauthorized requests for security gate logs, which Figueira noted as creating problems due to the sensitive nature of these logs and the established protocol for accessing them. (**Exhibit 15**, pp. 129-130). Figueira's request to Canning was to follow the correct procedure by reaching out to him first with any concerns or questions, instead of directly engaging with contractors working under IPOS supervision (*Id.).* Canning wanted to check the security gate logs to micro-manage and nitpick the sign in and sign out of Petro's employees to see if they were working; to "check" to see if a Petro employee was living in a container on the property; and to see if a Petro employee whom Canning banned from working at the facility was still working there. (**Exhibit 15**, pp. 130-132). None of these accusations were supported by any evidence. A jury could find that Canning was attempting to disparage Petro to get IPOS to terminate Petro's contract and persuade VITOL not to hire Petro again.

16. Canning's alleged false claim in Paragraph 43 of the SAC (alleging that Canning falsely claimed Petro had stolen valuable information from Plaintiff's supplier, Traeger Brothers). was actually a criticism leveled at Traeger Brothers for it improperly providing information to Petro and how such information could unfairly compromise the bidding process. Exh. A, Canning Declaration, ¶10; see

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 17

also Exh. D, Resp. to Interrogatory No. 14.

**RESPONSE**: **Deny**. See Response to No. 14 above.


17. Canning never made the claim described in Paragraph 43 of the SAC and specifically never accused Petro of stealing anything from Traeger Brothers. Exh. A, Canning Declaration, ¶11; see also Exh. D, Resp. to Interrogatory No. 14.

**RESPONSE**: **Deny**. See Response to No. 14 above.


18. Canning did, in fact, fall through a platform at a WAPA Facility on February 11, 2021, that Petro was responsible for fabricating. ") See SAC ¶58; see also Exh. A, Canning Declaration, ¶12.

**RESPONSE**: **Deny**. Canning did not fall or accidentally "fall through a platform." (**Exhibit 1**, Melendez Depo, p. 95). Petro was working on the platform and had informed IPOS it was not complete. (**Exhibit 1**, pp. 95-97). Petro still had to install clips to secure the grating. (**Exhibit 1**, p. 97). The clips had been ordered and were on their way. (*Id.*). Petro secured the platform with toeplates so no one could slip on it while waiting on the clips. (**Exhibit 1**, p. 97). Petro's employees, Chad Persuad and Elias Rivera separately informed IPOS maintenance supervisor, Coury Hodge, that the platform was not secured. (**Exhibit 1**, p. 98).

To access the incomplete platform, Canning needed a WAPA area permit, which he did not obtain. (**Exhibit 1**, p. 99). Canning was in violation of WAPA's regulations when he improperly accessed the platform area without an area permit. (**Exhibit 1**, pp. 99-100). "You can't just walk around aimlessly because there's danger." (**Exhibit 1**, p. 100). IPOS's own investigation noted there was no permit granted for Canning to be in that area, and IPOS called it a "near miss." (**Exhibit 1**, p.

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 18

101-103). Canning acted in an unsafe manner by jumping up and down on the platform, until it gave way. (**Exhibit 1**, Melendez Depo, pp. 108-114). Melendez testified that this action by Canning was reckless and contributed to the confrontation that ensued, where Canning then verbally attacked the quality of Petro's work. (*Id.*). Melendez recounts Canning's direct criticism of Petro's work on the platform incident, describing it as "shoddy" "bullshit work" and labeling the welding as "substandard." (**Exhibit 1**, pp. 104-105, 108-109, 111). Melendez recounts that, following the platform incident, Canning confronted Chad Persuad (Petro's foreman) and Frank Kirsch (Petro's safety manager), disparaging Petro's work and even threatening legal action against both Petro and IPOS. (**Exhibit 1**, pp. 109-114). Melendez testified that Canning expressed these views directly to Petro's staff, including a safety manager, in a manner that was confrontational and unprofessional. (*Id.*; *see also* **Exhibit 13,** Incident Report and email). Frank Kirsch, Petro's Safety manager testified that the platform was "Andrew's project" and he, Kirsch, was on another job. (**Exhibit 4**, Kirsch Depo, p. 25). Canning blamed Petro for almost falling through the platform and was "loud" and "cursing" at Chad Persuad and Frank. (**Exhibit 4**, pp. 20-21; **Exhibit 1**, pp. 103, 106). Kirsch testified that Canning had a degrading attitude toward Petro employees. (**Exhibit 4**, p. 44). Canning said that Petro's employees did not know how to do their jobs. (**Exhibit 4**, p. 51). Kirsch refused to take the cursing from Canning and walked off. (**Exhibit 13**, Email from Melendez to Merlin Figueria and David Smith).

On that day, February 11, 2021, Canning sent an email to IPOS managers, amongst others, blaming Petro for the platform incident but left out the relevant background facts. (**Exhibit 12**, No. 12).

19. IPOS investigated the suitability and veracity of Petro's Welder Certificates, or WPS and WPQ,

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 19

for compliance with Industry standards. See Exh. D, Resp. to Interrogatory Nos. 10 and 17; see also SAC ¶¶62-66, 74-75, 82-94.

**RESPONSE**: **Deny** an investigation was necessary; **Admit** one was instigated solely at Andrew Canning's insistence. (**Exhibit 6**, David Smith Declaration). **Deny** there was anything wrong with Petro's Welder Certificates as they complied with industry standards.

Canning's complaints about Petro's welders' certificates to IPOS in March 2021, came on the heels of Canning complaining to IPOS that he "fell" through a platform in February 2021, where he blamed Petro and stated they did "shoddy" work and other derogatory statements about Petro (*see* Response to No. 18); after Canning complained to IPOS on January 23, 2021 that Petro could not do the RIO Shade project[6] (*see* **Exhibit 6**, ¶ 9); after Canning complained to IPOS and VITOL in December 2020 and January 2021 that Petro's employees were liars and fraudsters allegedly puffing time sheets (*see* **Exhibit 15**, pp. 97-98); after Canning tried to obtain IPOS's security logs improperly in January 2021 to check up on Petro's workers (*see* **Exhibit 15,** pp. 129-132); and after months of racial animus towards Petro's Hispanic and Black employees. (see Response No. 6).

Mr. Smith, IPOS's General Manager with personal knowledge of the facts, testified:

- With respect to the 3" vent line project, on March 31, 2021, Mr. Canning sent an email to Adrian Melendez of Petro, and to various other individuals including me, in which he

---

[6] Melendez attested: "January 2021 for the RIO Shades Project, Andrew Canning and another engineer named David Nagle, were supposed to run a job that we provided manpower for. It turned out that they were purposely delaying my guys from doing work and in turn blamed us for the delays. Also, Andrew Canning blamed my crew of forging the gate logs by writing down earlier times than when they came in. We explained that our crew mistakenly put the incorrect time. Chad Persaud had also called Andrew Canning to tell him that the crew would be running late due to an emergency in another facility. On our time sheets that Andrew Canning signed for this project he again corrected the time and signed the timesheet. But again, Andrew Canning went ahead and falsely accused Petro of forging and lying, then had that crew permanently removed from the facility. Merlin Figueira, David Smith, and Chad Persaud has knowledge of this." (**Exhibit 17**, Petro's Resp. to VVIC's First Set of Interr. No. 1 (a)).

> requested clarification about a welding procedure because of "a few potential anomalies that I observed during a site visit earlier today."

- On April 13, 2021, Mr. Canning sent an email to me and to IPOS Terminal Manager Merlin Figueira in which he requested that IPOS ask Mr. Melendez to provide IDs and qualification records for welders working on the vent line and for material certification and mechanical testing for the welding consumables being used.

(**Exhibit 6**, ¶¶ 11-12).

Adrian Melendez repeatedly submitted the welder qualification certifications to IPOS, Vitol, and WAPA for the 3-inch vent line project, emphasizing the necessity of accuracy in these records, and confirming the accuracy of the certifications submitted. (**Exhibit 1**, pp. 132-133; *see also* **Exhibit 16**, Email from Melendez, April 15, 2021, PIS 000862). Melendez was questioned at his deposition about how he obtained the welding certifications. He described the process and responsibility for preparing and signing these certifications, specifically explaining Guillermo Castro's role in testing, and certifying the welders in Puerto Rico in February 2021. (**Exhibit 1**, pp. 134-138; *see also* **Exhibit 14**, Petro's Resp. to IPOS' First Set of Interrogatories, No. 5). Since actual test results are on the welders' qualification certificates, no other documentation exists nor was required. (**Exhibit 14**, No. 7). Mr. Melendez explained, "[t]he procedure for storing records for welders are that welding procedure specifications (WPS), procedure qualification records (PQR), Welder's performance qualifications (WPQ), welder logs, weld maps, third party inspection reports, and equipment testing reports (Hydro/pneumatic) are maintained and stored at Petro Industrial Solution's office by the Quality Control Manager." (**Exhibit 14**, No. 9).

The Welders' Certificates were proper and neither Canning, IPOS nor VITOL found any issue with the certificates. IPOS and VITOL informed Canning to leave Petro alone and to stop communicating with Petro directly. In early April 2021, IPOS GM Merlin Figueira had requested that a conference call between David Smith, himself, Canning and Petro's Adrian Melendez to discuss

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 21

Canning's unauthorized interference with IPOS's contractor, Petro. (**Exhibit 15**, pp. 125-126). On

April 4, 2021, Canning responded by email, refusing to have a conference call with Petro. He stated:

> I do not think the intended purpose of the telephone conference on Monday with Petro
> Industrial will be met ('to reset our relationship as there have been a few hiccups these last few
> weeks') unless I better understand the comments you made in our brief telephone discussion
> on Saturday where you talked about my -- talked about 'my continued interference with the
> operation and operations led work.

(**Exhibit 15**, pp. 127-128).

On April 4, 2021 by email, Merlin Figueria, IPOS's General Manager, responded to Andrew

Canning, saying he was happy to do a separate call, but pointing out, "What I don't like to see is you

asking questions and/or giving directions to Contractors under our direct control. For example, you

were asking the Security Guard for the Gate logs. Both David [Smith] and I have spoken to you before

of a sensitive of your review of these logs. In spite of discussing this with you this situation has

reoccurred." (**Exhibit 15**, p. 129).

Canning was accused of direct interference in operational matters and making unauthorized

requests for security gate logs, which Figueira noted as creating problems due to the sensitive nature

of these logs and the established protocol for accessing them. Figueira's request to Canning was to

follow the correct procedure by reaching out to him or Calvin first with any concerns or questions,

instead of directly engaging with contractors working under IPOS supervision (**Exhibit 15**, pp. 129-

130). Figueira mentioned an incident where Petro informed him that Canning had stopped their work.

This raised concerns about Canning's direct involvement and influence on Petro's operations. Figueira

emphasized the need for Canning to communicate through proper channels within IPOS for any

project-related queries or issues (**Exhibit 15**, pp. 129-130)

In response to Figueira's proposal for a group discussion to address recent issues, Canning expressed a preference for a separate dialogue with Figueira alone, without Petro's involvement. This was in reaction to what Canning perceived as accusations of him interfering with operations. Canning's stance on preferring separate conversations over a collective discussion could be seen as avoiding the resolution of issues with Petro present. (**Exhibit 15**, pp. 127-128).

On June 22, 2021, a representative of Traeger, Dave Tilman, came for a site visit and informed Petro that they were missing critical information needed to move forward on various projects that had been delayed for months and even years. Andrew Canning was the one who had not given the needed information but blamed it on Petro. Andrew Canning was furious that Petro went over his head and went directly to IPOS for the information. Merlin Figueira, the previous general manager, set up a meeting a week later to discuss with Petro how Petro and IPOS could move forward without involving Andrew Canning. (**Exhibit 17**, No. 3.)

After IPOS asked Canning to stop interfering with Petro in April 2021, and after the incident in June 22, 2021 when IPOS decided to avoid working with Canning, Canning stepped up his attempt to discredit Petro and get Petro's contract terminated by refocusing on the welder certificates. IPOS's David Smith attested:

- On July 13, 2021, Andrew Canning sent me an email stating that he had "real concerns with the poor quality of work fabrication" Petro had been producing for months. He alleged that some of the welds were "pretty poor, possibly from uncertified welders." He claimed that Petro had presented Danny Martinez's welding certificate and procedures for the turbine work, which he had challenged. He claimed that Danny Martinez had actually separated from Petro almost two years ago.

- As the project was drawing to a close, Mr. Canning on July 20, 2021 sent an email to me about certain documentation provided by Petro in which he stated that "***I am now as certain as I***

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.,* Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 23

> ***can be that the welders certification (WPQ) presented by Petro Industrial Services are not genuine.***" Discussing the documents furnished by Petro, Mr. Canning stated that "The WPQ documents for the welders (attached) have been edited (you can clearly see the font difference and clarity change if you zoom in this looks to be a basic PDF edit of a PDF scan)." Mr. Canning also noted that the documents stated that the welding test was conducted by Guillermo Castro LIII, and Mr. Canning asserted that he had reached out to the manager of Acuren Inspection Services who advised that there was no record of Guillermo Castro within their current or recent employee roll, and that LinkedIn has Castro in Japan for over two years. Mr. Canning went on to note that Acuren did not have any inspectors on the island in 2021 as the company left in 2020 when the NDT contract moved to Versa and that even if they had inspectors they did not have the equipment to perform the referenced bend test or pull test.

(**Exhibit 6**, David Smith Declaration, ¶¶ 13-14).

Guillermo Castro was a certified Level III welder known to Melendez as the Lead Inspector/Technician working on the Limetree Bay project. (**Exhibit 1**, p. 138). Level III refers to the highest level of the craft. (*Id.,* p. 139). Acuren certified Castro as a Level III welder, which Castro attaches to the back of the welder certifications he issues. (**Exhibit 1**, p. 139). At the time Castro did the welding tests on Petro's welders in Puerto Rico to certify them, for which Petro paid $1000, Castro was not working for Acuren and Petro never claimed he was. (**Exhibit 1**, pp. 137-141). Petro did welder testing with Castro at Limetree Bay project before February 2021. (**Exhibit 1,** p. 140). Castro did two other certifications for Petro in March and April 2021. (**Exhibit 1**, p. 142). On the certification forms, underneath Mr. Castro's name, it says, "Mechanical Tests 19 Conducted By: Acuren Inspection Services." (**Exhibit 1**, p. 142). Melendez explained that he knew Castro was a Level III welder with authority to certify welders; he knew Castro met with, tested and certified Petro's welders; and the name Acuren was irrelevant, because Castro is authorized to certify welders as an independent welder. (**Exhibit 1**, p. 144). Melendez stressed it is just a form. With the name "Acuren" on it. It is irrelevant to the fact that Petro's welders got tested and certified by an authorized person who is allowed to do that. (**Exhibit 1**, pp. 144-145).

Q. You don't think it was important to have the name Acuren Inspection Services on this certification to indicate a company with a reputation for doing this type of work had actually done the mechanical tests?

A. The actual -- the value of it is his name. The value is that he is a Level III. He is actually -- he is or was the highest-level technician for that firm.

(**Exhibit 1**, p. 145).

In July 20, 2021, after Canning sent his "gotchu" email to IPOS and IPOS asked Petro to explain, Melendez called Castro, who was working in Japan and told him the welders' certifications were being questioned. (**Exhibit 1**, pp. 155-156). Mr. Castro wrote a letter back to Petro and explained how he tested the welders. (**Exhibit 1**, pp. 155-156; *see also* **Exhibit 18**, Castro's Letter re: welders' certification, PIS 000069; **Exhibit 19**, Petro's Resp. to VVIC's 4th Set of Interr).

Castro sent the letter on July 27, 2021, but it is dated July 29, 2021, which appears to be a scrivener's error. (**Exhibit 1**, p. 154; *see also* **Exhibit 18**). Petro verified that six of Petro's welders were retested by Castro in early 2021 because he had personally qualified them at Limetree Bay while they were working in the terminals. (**Exhibit 19**, Nos. 14-15). Petro does not have the original records and only has a continuity log for each welder to track welds from then after. (**Exhibit 19,** No. 16; **Exhibit 1**, pp. 161-162).

The following are the bates numbers of the re-testing done in 2021:

Daniel Martinez - Bates No. PIS000192 - Not tested in 2021 because Petro had in its possession the continued weld logging such that retesting was not necessary

Edgardo Batista - Bates No. PIS000070 – tested 2/16/21

Bernardo Cruz - Bates No. PIS000071 – tested 2/16/21

George Rodriguez - Bates No. PIS000072 – tested 2/16/21

Fernando Lebron - Bates No. PIS000073 – tested 3/30/21

Jonathan Rodriguez - Bates No. PIS000074 – tested 3/20/21

Richael Philips - Bates No. PIS000075 – tested 3/17/21

(**Exhibit 19**, Nos. 16, 17; *see also* **Exhibit 21**, WPQ Records).

Melendez testified that after Castro retested the six welders, he did not have the previous qualifications saved that were originally on an Acuren form, but he had a copy of the original Acuren procedures that were followed to qualify the welders. (**Exhibit 1**, pp. 161-162). There was nothing nefarious or deceptive about using Acuren's procedures and name as Acuren had originally qualified these welders through Castro and the new results were part of a continuous welding log, using the continuous welding procedures and welding tests for which Castro was qualified and authorized to re-test Petro's welders. (**Exhibit 1**, pp. 144-145; 161-162).

Further, Petro tested these welders many times while working at IPOS and VITOL "through x-ray, through phase array, and different welds . . . requalifying the welder over and over," which Defendants Canning and OPTIS were well aware of. (**Exhibit 1**, p. 162). Moreover, if the welders' qualifications were really an issue, Castro offered to come to St. Croix immediately and retest the welders again for IPOS and VITOL. (**Exhibit 18**).

But OPTIS and Canning's attempts to poison IPOS and VITOL against Petro and paint Petro as dishonest and lacking integrity worked. IPOS began demanding extensive technical documents from Petro that the parties had never agreed were needed for Petro's contract. *See* Response to No. 36 below.

IPOS's General Manager David Smith attested:

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.,* Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 26

- Prior to Mr. Canning raising these complaints about Petro's work and raising concerns that the welding certificates were forged or illegitimate, **no one from IPOS had identified these issues with the quality of Petro's welding work or the certifications of the welders as IPOS accepted that Petro would perform work using properly qualified individuals**. In addition, IPOS had not experienced any significant issues with the quality of the maintenance services that Petro had provided during the years that Petro had performed such services pursuant to a contract with IPOS.

- As a direct result of the concerns and questions and statements made by Mr. Canning, I made the decision to enlist additional technical guidance concerning these issues, and began to seek additional documentation from Petro.

(**Exhibit 16**, ¶¶ 17-18) (emphasis added).

20. After investigation, IPOS concluded Petro's Welder Certificates, or WPS and WPQ, did not meet Industry standards and were unacceptable. See Exh. D, Resp. to Interrogatories #10 & #17.

**RESPONSE**: **Deny**.  The Welder Certificates met industry standards. See Response to No. 19.  Petro knew at the beginning of the 3-inch vent line project that welder certificates were needed to deliver to WAPA for completion of the project. (**Exhibit 1**, p. 132). VITOL, through Tim Kologinczak, its field engineer and project manager for WAPA projects, requested welding certificates from Petro in February 2021 for the 3-inch vent line project and Petro produced them in March 2021. (**Exhibit 9**, Horowitz Depo. pp. 55). That was the first time the welder certification were requested and first time Petro produced them before being asked for them again by Canning in April 2021. (**Exhibit 6**, ¶ 12). If there was a problem with the welder certificates in March 2021, IPOS or VITOL's engineer would have notified Petro.

21. Petro's deficient Welder Certificates were a breach of their agreement with IPOS. See Exh. C.

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.,* Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 27

**RESPONSE**: **Deny** that Petro's Welder Certificates were deficient. *See* Response to Nos. 19-20.

**Deny** that Petro breached the IPOS agreement as the certificates, which had been produced many times, were not deficient.

22. On July 20, 2021, Canning advised IPOS that "I am now as certain as I can be that the welders certification (WPQ) presented by Petro Industrial Services are not genuine." Exh. G, Bates # IPOS 007845.

**RESPONSE**: **Admit** that Canning falsely advised IPOS that Petro's welder certificates were fraudulent. (**Exhibit 6**, David Smith Declaration, ¶ 14). *See also* Response to No. 19 above.

23. Exhibit H, consisting of PIS000186 through PIS000192, are true copies of the WPQ records presented by Petro Industrial Services that Canning referred to in Exhibit G.

**RESPONSE**: **Admit.** These certificates had been given to IPOS several times. *See* Response to No. 20.

24. The WPQs referenced in Exh. H indicated that Guillermo Castro conducted the welding tests and that Acuren Inspection Services conducted the Mechanical Tests.

**RESPONSE**: Deny the implication that the WPQs were fraudulent. *See* Response to No. 19.

25. Canning spoke with Doug Rice of Acuren Inspection Services on or about July 20, 2021, and was advised that it had no record of Castro as a current or recent employee of Acuren. Exh. A, Canning Declaration, ¶14.

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.,* Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 28

**RESPONSE**: **Deny**. This statement is inadmissible hearsay. Further, Castro never represented he was employed by Acuren in 2021.

26. Petro now admits that Castro did not work for Acuren at the time he supposedly administered the welding tests. Exh. I, Deposition of Petro at 138:18-21.

**RESPONSE**: **Deny**. Petro never claimed that Castro worked for Acuren. *See* Response to No. 19.

27. Petro admits that at the time it received the WPQs referenced in Exh. H, it knew that Castro did not work for Acuren. Exh. I, Deposition of Petro at 146:2- 6.

**RESPONSE**: **Admit.** It is irrelevant whether Castro worked for Acuren or not. The form used had Acuren's name on it as having down the welders' mechanical test, which Acuren had done at the Limetree Bay project previously and this 2021 test was a re-certification using the same Acuren procedures. Nowhere on the form does Castro indicate he worked for Acuren. (**Exhibit 21**); *see also* Response to Nos. 19, 26.

28. In responding to a subpoena dues tecum served by VVIC and Vitol US Holding, Co., Acuren's Doug Rice testified in a declaration that Acuren had no records of Petro ever being a client, it could not locate any records of conducting welding tests for Petro's welders, and Castro did not hold a Level III certification as depicted on the qualification testing records. Acuren further testified that the welder qualification testing records provided as exhibits to the subpoena did not originate from Acuren.3 Exh. J (Declaration of Doug Rice).

**RESPONSE**: **Deny** the relevancy of Doug Rice's declaration. Neither Petro nor Castro claimed to

be employed by Acuren. Petro testified that Castro did have a Level III certification, and Castro had that certification when Castro worked at Limetree Bay and did welder testing there on the same welders employed by Petro. *See* Response to No. 19.

29. Canning had begun looking into the welding certification of the Petro welders because of "the number of defects in the welds for the replacement 3-inch stainless steel vent lines from the WAPA gas turbines." Exh. G, IPOS 007846.

**RESPONSE**: **Deny.** There were no "number of defects" as any defects in the welds for the replacement 3-inch stainless steel vent lines were within American Society of Mechanical Engineers (ASME) industry standard of 5-10 percent. (**Exhibit 22**, Michael McCullough Depo, pp. 12-13). David Smith admitted that as part of the bid process under VITOL, Petro would follow industry standard and have ten percent of the welds tested. (**Exhibit 8**, Smith Depo, pp 123-124). Petro paid Versa, a testing company, to test the welds. *Id.* In addition, Johnas Phillip Semien, a Versa Integrity Group computer radiographer who tested welds for Versa testified that weld testers may vary on whether they find a weld to be acceptable or not. "It is called interpretation." (**Exhibit 23**, Johnas Phillip Semien Depo, p. 46).

Further, Petro offered to repair any alleged defects in the welds on the 3-inch line vent free of charge. VITOL hired a stateside firm, Tampa Tanks. (**Exhibit 9**, Horowitz Depo, p. 60). Canning had been urging VITOL and IPOS to hire stateside firms to replace Petro all along. (**Exhibit 2**, Persuad Depo, pp. 169-173). Tampa Tanks came to St. Croix to repair welds for the cost of more than the entire project. (**Exhibit 9**, pp. 60-61). That cost was billed to WAPA, and ultimately the rate payers. (*Id.*). Thus, the citizens of the V.I. paid for Canning's contractor of choice to do work that a local

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 30

company would have done for free. *See also* Response to No. 19 above.


30. As Canning explained at the time, "the lack of quality assurance compromises the integrity of the asset not only for this work but all other fabrication undertaken by this particular team and possibly other previous fabrications undertaken by PIS 'certified welders.' Even worse is the potential affect [sic] on the supply of propane to WAPA which could require a full stoppage during the replacement of the compromised systems." Id.

**RESPONSE**: **Deny.** Neither IPOS nor VITOL had complained of Petro's work quality, professionalism, worker certifications or job completion for years of Petro working at the WAPA propane facilities. (**Exhibit 20**, Tim Kologinczak Depo, pp. 13-14). Petro's welds were determined to be "professional" by Versa Integrity Group's radiography inspector, Johna Phillip Semien. (**Exhibit 23**, p. 49). Mr. Kologinczak testified that WAPA accepted the 3-inch vent line project and only needed some labels colors changed, and some other "small bits and pieces" fixed. (**Exhibit 20**, pp. 32-33). Melendez for Petro testified that IPOS and WAPA's labels for vent lines were different colors, so he switched the IPOS labels for the WAPA ones and the problem was fixed. (**Exhibit 1,** pp. 126-127). Mr. Kologinczak testified that those issues were repaired and WAPA never requested any changes to the 3-inch line vent project. (*Id.*). IPOS and VITOL were paid for the work and Petro was terminated from its contract wrongfully despite completing a special project that WAPA accepted and paid for. (**Exhibit 20**, p. 32).


31. After Canning informed IPOS of his concerns on July 20, 2021, he was informed by IPOS that it would investigate the matter. Ex. A, Canning Declaration, ¶13.

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.,* Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 31

**RESPONSE**: **Deny.** Canning did not frame the issues he fabricated about Petro's welder certificates as "concerns." Canning gave IPOS a false narrative to paint Petro in a bad light and get Petro's contract terminated with IPOS. (**Exhibit** 6, David Smith Declaration, ¶ 14). Mr. Smith noted, "Mr. Canning on July 20, 2021 sent an email to me about certain documentation provided by Petro in which he stated that "I am now as certain as I can be that the welders certification (WPQ) presented by Petro Industrial Services are not genuine." (*Id.*). *See also* Response to No. 19.

32. Canning had no involvement in IPOS's investigation. Id., Canning Declaration, ¶¶13, 15.

**RESPONSE**: **Deny.** (**Exhibit 9**, Horowitz Depo, p. 44; **Exhibit 6**, Smith Declaration at ¶¶ 12-13, 16-17). *See* Response to No. 19.

33. IPOS did indeed investigate the concerns over the WQS. It began by asking Petro on July 22, 2021, to provide copies of the welding test records. See Exh. F at IPOS 006026.

**RESPONSE**: **Deny.** IPOS already had Petro's welding test records as Petro sent them to IPOS and Canning in March 2021 and again in April 2021. See Responses to Nos. 19 and 20. The fact is that VITOL needed the welding certificates and records for the Job Data Book to give to WAPA to sign off on the 3-inch vent line project and get paid. (**Exhibit 9**, Horowitz Depo, pp. 45-47; **Exhibit 20**, Kologinczak Depo, pp. 30-31, 68, 71). This 3-inch vent line project was the first ever that VITOL requested a Job Book and a list of documentation from Petro despite working on numerous projects with Petro at WAPA's facility. (**Exhibit 20**, pp. 71-75). Mr. Kologinczak followed up on the requested documentation and Job Book after WAPA requested it. (**Exhibit 20**, pp. 77-78). Andrew Canning told Mr. Kologinczak that Petro had not produced all the documents. (**Exhibit 20**, p. 78). VITOL

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 32

relied on Canning to be their eyes and ears on the projects since they were not present on the islands often and VITOL did not check to see if Canning was truthful about Petro. (**Exhibit 20**, p. 79). There is no evidence that WAPA ever got the Job Book, but WAPA paid for the project.

34. Canning was not included in the email requesting the welding test records. Id.

**RESPONSE**: Deny. Canning himself initiated an email in April 2021 telling IPOS to request the welding records from Petro. Whether he was included on a later emails requesting the same records is irrelevant. (**Exhibit 6**, Smith Declaration, ¶ 12). And on **July 20, 2021**, two days before IPOS sent Petro that request, Canning sent an email to Garry Stoker of VITOL and Davis Smith at IPOS with subject line: IPOS Welders Certification informing them that "I am now as certain as I can be" that the certifications "are not genuine." (**Exhibit 29,** Canning's July 20, 2021 Email to Garry Stoker and David Smith IPOS 007845-7846).

35. Petro provided IPOS with copies of "welders' quals" on July 22, 2021, and did not copy Canning on the email forwarding the welders' quals. Exh, F at IPOS 006025—006026.

**RESPONSE**: **Admit.** But Petro had already provided the welder's certificates several times previously, including pursuant to Canning's April 2021 email to IPOS. (**Exhibit 6**, Smith Declaration, ¶ 12; **Exhibit 16**, Email from Melendez, April 15, 2021, PIS 000862).

36. In response to Petro's email with the welders' quals, IPOS responded by informing Petro that its Global Technical Director was asking for detailed records consisting of:

• Approved Welding Procedures (stamped by third party would be
my recommendation —Notified Body in Europe —where ASME is

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 33

followed the equivalent is Authorized Inspection Agency I think)

  o Welding procedures to be representative of the work
  that would be carried out

• Submit Quality control documentation that they plan to follow
during the project

  o Inspection and Test Plan (ITP)
  o Material certificates and traceability records
  o Daily records (for welding, fitting, visual inspection,
  pressure test etc)
  o Welding maps and welding monitoring and finished
  welding records
  o Any internal inspections carried out (separate to the
  third party ones) —see previous to last bullet point
  below

  o Record and Certificates for consumables (gases,
  electrodes etc)
  o Documentation of Welding procedures utilized in the
  project and valid welder certificates for anyone on
  the site
  o NDT reports received from third party
  o Pressure testing report

See Exh. F at IPOS 006026; see also Exh. D, Resp. to Interrogatories #10.

**RESPONSE**: **Deny**. Genuine disputes of fact exists as to the reason for the email exchanges in Def's

Exhibit F, IPOS 006021-006026. Evidence shows the July 2021 emails between VITOL, IPOS and

Petro were requesting Petro to provide documents that were on WAPA's list of documents that

VITOL needed to get WAPA to accept and pay for the 3-inch vent line job. (**Exhibit 20**, pp. 71-78,

103) (list of documents testified about in Mr. Kologinczak deposition aligns with those requested by

the Global Technical Director in the emails of Def's Exhibit F). Mr. Kologinczak testified it was his

job as VITO's field engineer and project manager to provide WAPA with the Job Data book of

requested documents. (**Exhibit 20**, pp. 71-78, 103). *See* Response to No. 33. Even if you accepted

Defendants' Exhibit F as IPOS's investigation into the alleged fraudulent welder certificates, David

Smith declared:

As a direct result of the concerns and questions and statements made by Mr. Canning, I made the decision to enlist additional technical guidance concerning these issues, and began to seek additional documentation from Petro. I am not an expert, and I would not have made the decision to pursue these requests in July 2021 had it not been for the representations and statements initially made by Mr. Canning. I substantially relied on the representations of Mr. Canning of OPTIS in making my decision to seek additional documentation from Petro. Soon thereafter, I made the decision to terminate the Maintenance Contract between IPOS and Petro because I felt that we needed to protect IPOS's integrity.

(**Exhibit 6**, Smith Declaration, ¶ 18).

Once the **Maintenance Contract was terminated by IPOS on July 28, 2021**, Petro also ceased doing any work on welding or other projects at the facilities and removed its equipment from the site.

(**Exhibit 6**, Smith Declaration, ¶ 19) (emphasis added).

Therefore, Canning and OPTIS directly interfered with Petro's maintenance contract with IPOS and Petro's special project contracts with VITOL.

37. Canning was not involved in preparing the above request for information and was not copied on the email from IPOS to Petro requesting that information. See Exh. F at IPOS 006026.

**RESPONSE**: **Admit**. This alleged fact is irrelevant.

38. On July 23, 2021, IPOS informed Petro that its Global Technical Director was reviewing the documentation Petro had provided and that he would be following up with requests for more specific information. Canning was not included in this email. Exh. F, at IPOS 006024.

**RESPONSE**: **Admit.** This alleged fact is irrelevant. Canning had already taken the steps to get IPOS and VITOL to terminate their contracts with Petro. (**Exhibit 6**, Smith Declaration).

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 35

39. On July 26, 2021, IPOS informed Petro that its Global Technical Director was still awaiting the "Full inspection and test plan"; "Daily records (for welding, fitting, visual inspection)"; and "Welding and mechanical tests of WPQs." Exh. F at IPOS 006023.

**RESPONSE**: **Deny.** Petro had produced the welding and mechanical tests of the WPQs numerous times. *See* Response to Nos. 19, 20, 35).

40. Canning had not been involved in preparing the above request for information and was not copied on the email from IPOS to Petro requesting the information that IPOS's Global Technical Director was "still awaiting." See Exh. A, Canning Declaration ¶17.

**RESPONSE**: **Admit.** This alleged fact is irrelevant.

41. That same day, Petro responded and admitted that it did not have the requested records but offered that "All welders could be re-qualified under IPOS/VTTI supervision via X-ray or PAUT if need be." Exh. F, IPOS 006023.

**RESPONSE**: **Deny**. This email at IPOS 006023 clearly states that Petro had welders qualification certificates. But Petro offered to have them retested if IPOS and VITOL wanted that. Petro also informed VITOL and IPOS in that email exchange that the documents they were requesting such as the Inspection and Test Plan reports had not been required by VITOL/IPOS for the job, so they could not be produced. Further, Petro informed VITOL and IPOS that they did not have the daily reports, but they were including weld logs with all the relevant information requested. (*See* Def's Exhibit F, at IPOS 0060230). Moreover, on July 22, 2021, Petro sent an email to VITOL, IPOS and the "Global Technical Director" informing them that all relevant documents for the 3-inch vent line

job were in a Dropbox they could access. (*See* Def's Exhibit F, at IPOS 006024-25). The evidence clearly shows Petro doing whatever it took to cooperate and provide the necessary documents and meet all industry standards. But as David Smith attested, based on OPTIS and Canning's false conclusions that Petro lacked honesty and integrity, IPOS terminated Petro's contract. (**Exhibit 6, ¶¶** 18-19).

42. On July 27, 2021, IPOS requested alternative information in lieu of the information that Petro had indicated on July 26, 2021 it could not provide. Exh. F at IPOS 006022—006023.

**RESPONSE**: **Deny**. IPOS and VITOL requested if Petro's internal welding procedures were approved by an ASME Authorized Inspection Agency. Petro responded by explaining that its welding procedures have ASME approval. VITOL and IPOS then requested a report or certificate from Acuren/Costas granting Melendez authorization to sign off on the welder certificates. (Def's Ex. F, IPOS 006022-23). However, Melendez's signature on the welder certificates is certifying that the statements in the record are correct. He does not need authorization from Acuren to certify to that. (**Exhibit 1**, pp. 143-144).

43. The alternative information included a request that since Petro's Adrian Melendez had signed the WPQs on behalf of Acuren/Castro, Petro provide the report/certification/document from Acuren/Castro that allowed Melendez to sign the WPQs. Exh. F at IPOS 006022.

**RESPONSE**: **Deny** that is a proper request. See Response to No. 42 above.

44. Petro's response to the request for proof that Melendez was authorized to sign was to provide an

unsigned letter from Castro. Exh. F at IPOS 006022.

**RESPONSE**: **Deny.** Petro submitted Castro's July 2021 letter to show that the welder's certificates are valid and to show Castro was willing to come and re test the welders to satisfy IPOS and VITOL if necessary. *See* Response to No. 19.

45. As IPOS noted internally, "Interestingly the Letter is not signed, even so the test records weren't saved. In my view, the Letter does not support WPQ provided. On the Welding Procedures I am not sure why those weren't attached if they had them." Exh. F at IPOS 006021.

**RESPONSE**: Admit the email states as such, but IPOS relied on Canning's numerous false emails telling IPOS that Petro's welder certificates were fraudulent. Further, there is never any saving of the test records, the welds of the welder are observed as they are done and then certified by the inspector. (Deposition of Andrian Melendez (PETRO)**,** p. 147:7-21, **Exhibit 1).** David Smith declared, "I substantially relied on the representations of Mr. Canning of OPTIS in making my decision to seek additional documentation from Petro. Soon thereafter, I made the decision to terminate the Maintenance Contract between IPOS and Petro because I felt that we needed to protect IPOS's integrity." (**Exhibit 6**, ¶ 18).

46. On July 28, 2021, IPOS's Global Technical Director wrote in an internal IPOS email, "We gave opportunities for [Petro] to come forward with the required documentation. They have not done so. Believe we should exclude them from future pipe modification and repair works." Exh. F at IPOS 006021.

**RESPONSE**: **Deny**. David Smith of IPOS testified that he does not know which entity the Global

Technical Director, Andreas Constantinou, works for, but he is headquartered in Rotterdam. (**Exhibit 8**, Smith Depo, pp. 120-121). Andreas never saw any of Petro's welds. *Id.* VITOL was influenced by Canning's false accusations about Petro's lack of honesty and integrity and wanted to terminate Petro from working on the refinery.

47. The Global Technical Director identified his concerns and concluded that IPOS should "start working immediately in securing a competent electromechanical contractor." Exh. F at IPOS 006021.

**RESPONSE**: Admit the Global Technical Director was influenced by Canning and decided to terminate Petro from all potential activities with VITOL. See Response to Nos. 46.

48. IPOS's David Smith responded to the Global Technical Director on July 28, 2021, indicating that IPOS "had reached consensus agreement already yesterday." Exh. F at IPOS 006021.

**RESPONSE**: Admit. Smith admitted he was heavily influenced by Canning's emails painting Petro as a lying, fraudulent company. (**Exhibit 6**, ¶¶ 17-18, Smith Declaration).

49. IPOS terminated its contractual relationship with Petro on July 28, 2021, relying upon paragraph 6 of the Second IPOS-Petro Contract. See Exh. C, IPOS 000003-000004.

**RESPONSE**: **Admit** IPOS terminated the contract on July 28, 2021, but Deny that there was contractual support for terminating the contract. (**Exhibit 6**, Smith Affirmation, ¶¶ 17-19).

50. Canning was not aware that IPOS intended to terminate the contract with Petro until after IPOS had informed Petro that it was terminating the contract. See Exh. A, Canning Declaration, ¶16.

**RESPONSE**: **Deny.** The evidence shows Canning wanted IPOS to terminate Petro's contract. (**Exhibit 6**, Smith Declaration, ¶¶ 17-18). Terence Keogh, IPOS Terminal Manager testified that Canning wanted to terminate Petro's contract. (**Exhibit 24**, Terence Keogh Depo. p. 76).  Chetram Persuad, Petro's field superintendent, testified that he often heard Canning saying that IPOS should replace Petro with stateside contractors as they were allegedly better qualified. (**Exhibit 2**, Persuad Depo, pp. 169, 173-174, 177-178).

51. Canning had no involvement in the discussions within IPOS, or in IPOS's communications with Petro, from July 21, 2021, through July 28, 2021 relating to the investigation done by IPOS or the decision to terminate Petro. See Exh. A, Canning Declaration, ¶¶17-18.

**RESPONSE**: **Deny.** (**Exhibit 6**, Smith Declaration, ¶¶ 17-18).

52. Canning did not learn of the internal communications within IPOS or of the communications between IPOS and Petro relating to IPOS's inquiry into the welding qualifications from July 21, 2021 through July 28, 2021 until seeing copies of the communications produced in discovery in this case. See Exh. A, Canning Declaration, ¶18.

**RESPONSE**: **Deny**. This fact is irrelevant. There is significant evidence that Canning was directly involved in painting Petro as a fraudulent, incompetent company that influenced IPOS to lose trust in Petro and as a result, terminate Petro's contract. (**Exhibit 6**). There is significant evidence that Canning informed IPOS and VITOL and others outside the WAPA facility that IPOS should replace Petro because Petro was incompetent. *See* Response to No. 50.

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 40

53. In Petro's initial disclosures, it stated it would retain an economist to calculate its damages. Exh. K (initial disclosures).

**RESPONSE**: **Admit.** Petro's Adrian Melendez can testify to Petro's loss of profits and business opportunities as well as non-payment of past due invoices to IPOS (**Exhibit 17**, at No. 5). Melendez confirms the accuracy of financial figures presented in Petro's Second Supplemental Response to Vitol's Third Set of Interrogatories, specifically addressing the breakdown of costs, projected profits, and the differentiation between project types (maintenance vs. project-specific work). (**Exhibit 1**, pp. 170-171; *see also* **Exhibit 25**, Petro's Second Supplemental Response to Vitol's Third Set of Interrogatories, No. 10).


                                        RESPECTFULLY SUBMITTED
                                        LEE J. ROHN AND ASSOCIATES, LLC
                                        Attorneys for Plaintiff


DATED:  April 8, 2024                    BY:   */s/ Lee J. Rohn*
                                        Lee J. Rohn, Esq.
                                        VI Bar No. 52
                                        1108 King Street, Suite 3 (mailing)
                                        56 King Street, Third Floor (physical)
                                        Christiansted, St. Croix
                                        U.S. Virgin Islands 00820
                                        Telephone: (340) 778-8855
                                        lee@rohnlaw.com

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.,* Case No. 1:21-CV-00312
**PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**
Page 41

## <u>CERTIFICATE OF SERVICE</u>

**THIS IS TO CERTIFY** that on April 8, 2024, I electronically filed the foregoing with the Clerk of the Court using the electronic filing system, which will send a notification of such filing to the following:

All Counsel of Record

BY: ___*/s/ Lee J. Rohn*___ (dvn)