IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

PETRO INDUSTRIAL SOLUTIONS, LLC, )
                                 )
            Plaintiff,           )
                                 )
    vs.                          )  Case No. 1:21-CV-00312
                                 )
ISLAND PROJECT AND OPERATING     )
SERVICES, LLC; VITOL US HOLDING  )
II CO.; VITOL VIRGIN ISLANDS     )
CORP.; ANDREW CANNING; and OPTIS )
EUROPE, LTD.,                    )
                                 )
            Defendants.          )

THE VIDEOTAPED ORAL DEPOSITION OF

PETRO INDUSTRIAL SOLUTIONS, LLC

as a 30(b)(6) witness through its representative, ADRIAN MELENDEZ, JR., also taken personally, on the 28th day of April, 2023, at the Law Offices of Beckstedt & Kuczynski, LLP, 2162 Church Street, Christiansted, St. Croix, U.S. Virgin Islands, and via Zoom teleconference, between the hours of 9:45 a.m. and 4:45 p.m., pursuant to Notice and Federal Rules of Civil Procedure.

————————————

Reported by:
Susan C. Nissman RPR-RMR
Registered Merit Reporter
Caribbean Scribes, Inc.
1244 Queen Cross Street, Suite 1A
Christiansted, St. Croix
U.S. Virgin Islands 00820
(340) 773-8161

---

APPEARANCES

A-P-P-E-A-R-A-N-C-E-S

**For the Plaintiff:**

Law Offices of Lee J. Rohn & Associates, LL
1108 King Street, Third Floor
Christiansted, St. Croix
U.S. Virgin Islands  00820

By:  Lee J. Rohn

**For the Defendant Island Project and Operating Services, LLC:**

Law Offices of Ogletree, Deakins, Nash, Smoak & Stewart, LLC
The Tunick Building, Suite 201
1336 Beltjen Road
Charlotte Amalie, St. Thomas
U.S. Virgin Islands  00802

By:  Simone R.D. Francis (Via Zoom)

**For the Defendant Vitol US Holding II Co. and Vitol Virgin Islands Corp.:**

Law Offices of Beckstedt & Kuczynski, LLP
2162 Church Street
Christiansted, St. Croix
U.S. Virgin Islands  00820

By: Carl A. Beckstedt, III
              and

Law Offices of Susman Godfrey
1000 Louisiana Street, Suite 5100
Houston, Texas  77002

By: Alex Kaplan

---

APPEARANCES

**For the Defendant Andrew Canning:**

Law Offices of Andrew C. Simpson
2191 Church Street, Suite 5
Christiansted, St. Croix
U.S. Virgin Islands 00820

By: Matthew Ceradini (Via Zoom)

**Also Present:**  Sam Halvorson, Videographer

---

INDEX

E-X-A-M-I-N-A-T-I-O-N

| Description | Counsel | Page |
|---|---|---|
| Direct | by Mr. Kaplan | 7 |
| Cross | by Ms. Francis | 215 |
| Cross | by Mr. Ceradini | 249 |

E-X-H-I-B-I-T-S

| Exhibit | Description | Page |
|---|---|---|
| 1 – | Notice of Combined Deposition of Adrian Melendez, Jr. and Rule 30(b)(6) Deposition of Plaintiff | 8 |
| 2 – | First Amended Complaint | 27 |
| 3 – | Maintenance Contract | 31 |
| 4 – | E-mail dated March 7, 2018 from Andrew Canning to João Rodriguez | 49 |
| 5 – | Petro's Response to Vitol's Second Set of Interrogatories | 55 |
| 6 – | E-mail dated February 4, 2018. Subject:  XL Spreadsheet Invoices | 65 |
| 7 – | E-mail Chain 12-23-20 through 1-21-21.  Subject:  Updated AR | 78 |
| 8 – | E-mail chain dated January 21, 2021.  Subject:  RIO Shades | 87 |
| 9 – | E-mail chain dated February 11-12, 2021.  Subject:  St. Thomas | 106 |
| 10 – | E-mail dated July 15, 2021. Subject:  LPG Vent Line Replacement: CCT1717466:Labeling and Markings | 123 |

EXHIBIT
1

INDEX

| 11 - | E-mail dated February 24, 2021. Subject: STX-Vent Piping Project WAPA Deliverables | 131 |
| 12 - | E-mail dated April 15, 2021. Subject: 3" SS Vent Line Project | 134 |
| 13 - | E-mail Chain July 2021. Subject: Testing Requirements | 150 |
| 14 - | Letter dated July 29, 2021 from Guillermo Castro to Petro Industrial | 153 |
| 15 - | Letter dated July 28, 2021 from David Smith to Petro Industrial Solutions, LLC. Re: Maintenance Contract dated September 1, 2019 | 167 |
| 16 - | Plaintiff Petro's Second Supplemental Response to Defendant Vitol's Third Set of Interrogatories | 170 |

---

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1  THE VIDEOGRAPHER:  In the matter of Petro

2  Industrial Solutions, LLC, the plaintiff, versus Island

3  Project and Operating Services, LLC; Vitol U.S. Holding II

4  Company; Vitol Virgin Islands Corporation; Andrew Canning

5  and Optis Europe, Ltd., the defendants.

6        In the District Court of the Virgin Islands,

7  Division of St. Croix.  Civil Action Number 1:21-CV-00312.

8        My name is Sam Halvorson.  I am the

9  videographer for today's proceedings.  Our court reporter is

10  Susan C. Nissman-Coursey, RMR.

11        Today's date is April 28, 2023.  The deponent

12  is Adrian Melendez, Jr., and Rule 30(b) and Rule 36 (sic)

13  deposition of plaintiff.  The time is 9:45.

14        For the purposes of voice identification, I'm

15  asking -- requesting that the attorneys present identify

16  themselves at this time.

17        MR. KAPLAN:  Alex Kaplan, of Susman Godfrey,

18  on behalf of Vitol Virgin Islands Corp. and Vitol U.S.

19  Holding II Co.

20        MR. BECKSTEDT:  Attorney Carl Beckstedt, of

21  Beckstedt and Kuczynski, also on behalf of the Vitol

22  defendants.

23        MS. ROHN:  Lee Rohn, on behalf of the

24  plaintiff.

25        THE VIDEOGRAPHER:  Please swear the witness.

---

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1  I'm sorry.

2        MR. BECKSTEDT:  Go ahead, Matthew.

3        MR. CERADINI:  Matthew Ceradini, on behalf of

4  Andrew Canning and Optis Europe, Ltd.

5        MS. FRANCIS:  Good morning.  Simone Francis,

6  Ogletree, Deakins, Nash, Smoak & Stewart, on behalf of

7  Island Project and Operating Services, also known as IPOS.

8        THE VIDEOGRAPHER:  Please swear the witness.

9        PETRO INDUSTRIAL SOLUTIONS, LLC,

10    through its representative, ADRIAN MELENDEZ, JR.,

11        and personally called as a witness,

12        having been first duly sworn,

13        testified on his oath as follows:

14        DIRECT EXAMINATION

15  BY MR. KAPLAN:

16  Q.   Good morning, sir.

17  A.   Good morning.

18  Q.   Mr. Melendez, you are the president of Petro

19  Industrial Services, LLC?

20  A.   Solutions, LLC.

21  Q.   Petro Industrial Solutions.  Pardon me.

22  A.   That's how.

23  Q.   You are -- are you the owner of --

24  A.   Yes.

25  Q.   -- Petro?

---

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1  A.   Single member.

2  Q.   Single-member LLC?

3  A.   That's right.

4  Q.   Have you always been the sole member of -- of

5  Petro?

6  A.   Yes.

7  Q.   Do you understand that you're here today both

8  individually, and as well as the corporate representative of

9  Petro?

10  A.   Yes.

11        MS. ROHN:  Did I get an individual notice of

12  deposition?

13        MR. KAPLAN:  It's a joint notice.

14        MS. ROHN:  Okay.  That's fine.

15  Q.   (Mr. Kaplan) Let's go ahead and mark the notice.

16        All right, sir.  I've handed you what I've

17  marked as Exhibit 1.

18        (Deposition Exhibit No. 1 was

19        marked for identification.)

20        Have you seen that document before, sir?

21  A.   Give me one second.

22        Yes.

23  Q.   And are you prepared to testify as Petro's

24  corporate representative on the topics listed in the notice

25  in Exhibit 1, sir?

1  A.   Yes.

2  Q.   Mr. Melendez, in this lawsuit, Petro has made

3 various allegations about the conduct of Andrew Canning,

4 correct?

5  A.   Correct.

6  Q.   And we're going to go through today the

7 allegations about Mr. Canning, but I'd like to start and

8 talk specifically about the Vitol defendants, all right?

9  A.   Okay.

10  Q.   You've met before Charlotte Horowitz, correct?

11  A.   Correct.

12  Q.   You understand Ms. Horowitz works for Vitol?

13  A.   Correct.

14  Q.   And you met once with Ms. Horowitz in person,

15 true?

16  A.   True.

17  Q.   In Houston?

18  A.   True.

19  Q.   At Vitol's office?

20  A.   Correct.

21  Q.   And do you recall when that meeting was?

22  A.   2001.  I'll say February 2001, I believe.

23  Q.   If I told you the meeting occurred on March 25th,

24 2021, does that sound right to you?

25  A.   That sounds about right.

1  Q.   Other than the one meeting in Houston with

2 Mr. Horowitz, have you ever met with Ms. Horowitz in person?

3  A.   Just that one meeting.

4  Q.   All right.  At the meeting that you had in

5 Houston, a gentleman named Sebastian Moretti was present,

6 right?

7  A.   Correct.

8  Q.   And also an individual named Tim Kologinczak?

9  A.   Correct.

10  Q.   Was there anyone else at that meeting that you

11 attended in Houston at Vitol's office?

12  A.   Not for Vitol.

13  Q.   Who was present with you?

14  A.   Chad.  Chetram Persuad.

15  Q.   And who's Mr. Persuad?

16  A.   Chetram is basically my general manager.

17  Q.   Was there anyone else in the meeting besides you,

18 Mr. Persuad, and the three Vitol employees we just

19 mentioned, Ms. Horowitz, Mr. Moretti, and Mr. Kologinczak?

20  A.   That's all I recall.

21  Q.   All right.  You enjoyed your March 25th, 2021

22 meeting with Vitol?

23  A.   Correct.

24  Q.   You told Vitol it was a pleasure meeting with --

25 with them, with Sebastian, Charlotte, and Tim, correct?

1  A.   Correct.

2  Q.   Okay.  Have you talked to Ms. Horowitz on the

3 phone?

4  A.   Correct, yes.

5  Q.   Have you exchanged e-mails with her?

6  A.   Absolutely.

7  Q.   You do not allege that Ms. Horowitz has ever made

8 any kind of racist comment to you, or to anyone, to your

9 knowledge, at Petro, correct?

10  A.   Not to my knowledge.

11  Q.   You're not alleging, Petro's not alleging, to your

12 knowledge, that Ms. Horowitz ever did anything that Petro

13 claims was discrimination, right?

14  A.   Correct.

15  Q.   Okay.  Same question about Mr. Moretti:  You're

16 not alleging that Mr. Moretti ever did or said anything that

17 was racist or discriminatory to Petro, correct?

18  A.   Correct.

19  Q.   Same question for Mr. Kologinczak:  You're not

20 alleging, Petro's not alleging, that Mr. Kologinczak ever

21 did or said anything that was racist or discriminatory as to

22 Petro, correct?

23  A.   Correct.

24  Q.   Other than the time you've met with Mr. Moretti at

25 the meeting in Houston, have you ever met or talked to

1 Mr. Moretti, personally?

2  A.   First time.

3  Q.   First and only time?

4  A.   Yes.

5  Q.   All right.  Mr. Kologinczak, is that, the

6 March 25th, '21 meeting, was that the only time you ever met

7 with him?

8  A.   No.  Met him on site a few times.

9  Q.   And all your dealings with Mr. Kologinczak, has he

10 ever done anything or said anything that you believed was

11 racist or discriminatory?

12  A.   No.

13  Q.   Other than the three individuals we've talked

14 about at Vitol, Ms. Horowitz, Mr. Morreti, Mr. Kologinczak,

15 have you ever spoken or exchanged correspondence with any

16 other Vitol employee related to your work for Petro?

17  A.   Yes.

18  Q.   Who?

19  A.   Oh, my gosh, he used to work for -- he was

20 actually the general manager for Vitol.  Eduardo Garcia.

21  Q.   Eduardo Garcia?

22  A.   Yes.

23  Q.   Mr. Garcia had departed before the maintenance

24 contract at issue in this case was signed, correct?

25  A.   Do not recall that.

1  Q.  You're not alleging Mr. Garcia ever did or said

2  anything --

3  A.  No.

4  Q.  -- that was racist or discriminatory?

5         MS. ROHN:  Sir, let him finish his

6  question --

7  A.  Okay.

8         MS. ROHN:  -- then answer, okay?

9  A.  Thank you.

10  Q.  (Mr. Kaplan) That's all right.

11         Have you ever been deposed, sir?

12  A.  No.  First time.  Sorry.

13  Q.  No worries.

14         I do have a tendency to talk fast, so if you

15  don't hear my question, want me to repeat it, just tell me,

16  okay?

17  A.  Will do.

18  Q.  Let me ask the question again.

19         You're not alleging that Eduardo Garcia, when

20  he worked for Vitol, ever did or said anything that was

21  racist or discriminatory to you or to Petro, correct?

22  A.  Correct.

23  Q.  Okay.  Now, let me ask about another defendant in

24  this case, Island Project and Operating Services.

25         You're familiar with the company referred to

1  often as IPOS or IPOS?

2  A.  IPOS, yes.

3  Q.  IPOS, is that how you refer to them?

4  A.  Yes.

5  Q.  All right.  Petro is not accusing any employee of

6  IPOS of any racist or discriminatory conduct, true?

7  A.  True.

8  Q.  Okay.  Is it fair to say that Petro's claims of

9  racist or discriminatory or defamatory behavior are based

10  entirely on the alleged conduct of Andrew Canning?

11  A.  Could you rephrase that?  It's kind of a little

12  vague.

13  Q.  Sure.

14         Petro's claims in this case of racist,

15  discriminatory, defamatory conduct, are based on your

16  allegations about what Mr. Andrew Canning did, correct?

17         MS. ROHN:  Well, I think that calls --

18  objection.  Calls for a legal conclusion.

19  Q.  (Mr. Kaplan) You may answer, sir.

20  A.  The way I see it, it was that they harbored

21  Mr. Canning.  They -- we told them what was going on, and

22  they kept on.  They kept him on.

23  Q.  Who's "they", sir?

24  A.  IPOS.

25  Q.  Did IPOS do anything -- let me back up.

1         I understand you have your allegations about

2  what Canning did or said, and we're going to go through

3  those, but I want to be specific.

4         Is Petro alleging that IPOS said or did

5  anything that was discriminatory, racist, or defamatory to

6  Petro?

7         MS. ROHN:  Objection.  Asked and answered.

8  Q.  (Mr. Kaplan) Please answer, sir.

9  A.  I -- that's -- I guess that's my answer.

10  Q.  You have to answer the question.

11         MS. ROHN:  He did.

12  A.  Yes, I did.  I believe they harbored him.  I

13  believe that that's -- that was -- them not doing anything

14  was -- speaks for itself.

15  Q.  (Mr. Kaplan) Okay.  Other than, to use your term,

16  "harboring Mr. Canning," do you believe that IPOS did

17  anything racist, discriminatory, or defamatory as to Petro?

18  A.  By not doing anything, yes.

19  Q.  Please listen to my question carefully.

20         Other than harboring him, or not doing

21  anything, do you believe IPOS did anything that was racist,

22  discriminatory, or defamatory as to Petro?

23  A.  Yes.

24  Q.  What?

25  A.  Again, by not doing anything, they were part of

1  the racist atmosphere.

2  Q.  Yes.  I understand you're saying IPOS didn't do

3  anything.

4         I'm asking you, other than your claim that

5  IPOS didn't do anything, is there anything else that you

6  contend that IPOS didn't do or didn't do that is racist,

7  defamatory, or discretionary as to Petro?

8  A.  That is my claim.

9  A.  There's nothing else?

10  A.  That's right.

11  Q.  Okay.  Before Petro, you worked for a company

12  called Vivot Construction Corp?

13  A.  Correct.

14  Q.  For how long did you work for Vivot?

15  A.  Less than a year.  I would say -- yeah, less than

16  a year.

17  Q.  Could you place the time frame when you started

18  working for Vivot?

19  A.  October to March of '18.  No.  Sorry.  '17-'18.

20  So '17 into '18, yes.

21  Q.  Were you an employee of Vivot?

22  A.  Correct.

23  Q.  Did you -- were you a shareholder or owner of

24  Vivot in any respect?

25  A.  No.

**Page 17**

1    Q.   What was your position at Vivot?

2    A.   I was general manager for Vivot.

3    Q.   You believe you stopped working for Vivot sometime

4    in the fall of 2018?

5    A.   No.  Spring of 2018.

6    Q.   Where were you based when you worked for Vivot?

7    A.   On St. Croix.

8    Q.   Vivot did work for IPOS at the time you were

9    there?

10   A.   Rephrase that.  Sorry.

11   Q.   At the time you worked for Vivot, did Vivot do

12   work for IPOS?

13   A.   I believe they had.  I can't recall.  I couldn't

14   tell you.

15   Q.   Before you went to work for Petro, you had worked

16   with Andrew Canning, right?

17   A.   Correct.

18   Q.   In what context had you worked with Mr. Canning

19   before you worked at Petro?

20   A.   Through Vivot.

21   Q.   And on what projects did you work with Mr. Canning

22   while you were working at Vivot?

23   A.   Maintenance, welding.  After the hurricane, we

24   helped him kind of get a lot of things back in order.

25   Q.   At what facilities did you work with Mr. Canning

**Page 18**

1    while you were working at Vivot?

2    A.   Both St. Thomas and St. Croix.

3    Q.   The WAPA facilities?

4    A.   Correct.

5    Q.   When did you form Petro?

6    A.   End of Feb -- I'm sorry.  End of April, 2018.

7    Q.   And did you form Petro, or did you acquire it?

8    A.   I formed it.

9    Q.   Incorporated in the Virgin Islands?

10   A.   Correct.

11   Q.   And you said you're the sole member of Petro,

12   correct?

13   A.   Correct.

14   Q.   And you've always been the sole member?

15   A.   Correct.

16   Q.   Are there any other officers of Petro?

17   A.   No.

18   Q.   How many employees does Petro have?

19   A.   It varies per project, 20 to 80.

20   Q.   How many employees do you have today?

21   A.   I'd say about 35.

22       MS. FRANCIS:  I'm sorry.  I need the witness

23   to speak up, please.

24   A.   Okay.  No problem.

25   Q.   (Mr. Kaplan)  Mr. Melendez, where were you born,

**Page 19**

1    sir?

2    A.   St. Charles, Illinois.

3    Q.   And how old did you live in Illinois?

4    A.   Parents left there when I was an infant.  Probably

5    not even two years.

6    Q.   Where did -- where did you move after that?

7    A.   Texas.

8    Q.   Where, in Texas?

9    A.   Houston, Texas.

10   Q.   Where, in Houston?

11   A.   Actually, there in -- kind of Channelview area, I

12   guess.

13   Q.   And did you go to elementary and primary school in

14   Houston?

15   A.   I went to elementary only, and then we moved again

16   down to south Texas, McAllen, Texas.  I went to third grade

17   there.

18   Q.   Okay.  And how long did you live in Texas?

19   A.   Graduated from high school, Texas.

20   Q.   And what did you do after high school?

21   A.   I'm sorry.  Graduated college in Texas.  I'm

22   sorry.

23   Q.   Where did you go to college?

24   A.   University of Houston.

25   Q.   What did you study?

**Page 20**

1    A.   Accounting.

2    Q.   And what did you do after graduating from the

3    University of Houston?

4    A.   Various jobs.  Latest one before I came here was

5    El Paso Energy.

6    Q.   Doing what kind of work?

7    A.   Pipeline work.  Inspecting.  Reviewing.

8    Preparing.

9    Q.   Based in Houston?

10   A.   Based in Houston.

11   Q.   How long did you live in Houston after graduating

12   college?

13   A.   2000.  Off and on, probably about a good eight

14   years.

15   Q.   When did you graduate college?

16   A.   Twenty-one.  I'm sorry.  2021.  I'm sorry.  2001.

17   Q.   2001?

18   A.   Sorry.  So many different --

19   Q.   Oh, I understand.

20       You graduated college, 2001.  You lived in

21   Houston roughly eight years after that?

22   A.   Correct.

23   Q.   Where did you go after you left Houston?

24   A.   Back to south Texas, McAllen.  And then in 2015,

25   '14, actually came to St. Thomas.

1    Q.    In 2014 or '15?

2    A.    Fifteen.  I'm sorry.

3    Q.    You moved to St. Thomas in 2015?

4    A.    That's right.  November.

5    Q.    What job did you have on St. Thomas when you first

6 moved there?

7    A.    Actually worked for Vitol-IPOS.

8    Q.    Who was your employer?

9    A.    RG Construction.

10    Q.    RG Construction?

11    A.    RG Construction.  RG Construction, yes.

12    Q.    Is that the letters R-G --

13    A.    Yeah, RG.

14    Q.    -- or is that a name?

15                RG?

16    A.    Yeah.

17    Q.    What was your job at RG Construction?

18    A.    I was their quality control guy.

19    Q.    And how long did you work for RG Construction?

20    A.    Three months.

21    Q.    Why did you leave RG Construction?

22    A.    Finishing out the start-up for IPOS-Vitol in

23 St. Thomas.  Limetree Bay was opening up, so I moved over to

24 work with Limetree Bay.

25    Q.    So sometime in 2015, or so?

1    A.    Yeah.  Beginning of 2015.

2    Q.    You started working for Limetree Bay?

3    A.    That's right.

4    Q.    Was Limetree Bay your employer?

5    A.    No.  Company called NIS.

6    Q.    What does NIS stand for?

7    A.    National Industrial Services, I believe.

8    Q.    All right.  So moved to St. Thomas in 2015.

9 Worked for three months for RG Construction.  Then you went

10 to work for Nash -- for NIS, which you think is National

11 Industrial Services?

12    A.    I believe.

13    Q.    How long did you work for NIS?

14    A.    I worked there for approximately two years.

15    Q.    What was your job?

16    A.    Coordinator.  Project coordinator.

17    Q.    And that was -- all your work at NIS was at the

18 Limetree Bay facility?

19    A.    Correct.

20    Q.    So that's 2015 through, roughly, 2017ish?

21    A.    2017.  Right after the hurricane.

22    Q.    Okay.  And did you go right from NIS to Vivot?

23    A.    Correct.

24    Q.    So you've never been employed by Vitol, correct?

25    A.    Correct.  No.

1    Q.    You've never been employed by IPOS, correct?

2    A.    Correct.

3    Q.    Sir, how do you describe your racial identity?

4    A.    Mexican American Hispanic.

5    Q.    Is Petro a -- a pass-through entity, or does it

6 file tax returns at the corporate level?

7    A.    Files tax returns.

8    Q.    At a LLC level?

9    A.    Correct.

10    Q.    Does Petro have an accountant or a bookkeeper?

11    A.    Yes.

12    Q.    Who?

13    A.    The name of the person?

14    Q.    Yes.

15    A.    I apologize.  Kathleen.  I'll get her information,

16 if you wish.

17    Q.    Is she an employee of Petro, or is she an

18 outside accountant?

19    A.    Outside accountant.

20    Q.    Is she based here in the Virgin Islands --

21    A.    Yes.

22    Q.    -- or in the States?

23    A.    In the Virgin Islands.

24                MS. ROHN:  Sir, you have to let him finish

25 his question.  You can't know what he's asking till he

1 finishes.

2    A.    Yes, ma'am.  I know.

3    Q.    (Mr. Kaplan) How do you keep your financial books

4 at Petro?  Do you use QuickBooks, or some other accounting

5 software?

6    A.    QuickBooks.

7    Q.    Have you used QuickBooks since you started Petro?

8 Since you formed it?

9    A.    Yes.

10    Q.    You use QuickBooks to prepare profit and loss

11 statements for Petro?

12    A.    Correct.

13    Q.    Do you use QuickBooks for project-related

14 accounting, or do you use a different type of software for

15 that?

16    A.    Yes.

17    Q.    So if I wanted to see Petro's financial records on

18 a particular project, you would use QuickBooks to look up

19 that project?

20    A.    Correct.

21    Q.    All right, sir.  I'm going to turn your attention

22 to the maintenance contract at issue in this case, all

23 right?

24    A.    Okay.

25    Q.    The maintenance contract is between Petro and

**Page 25**

1  IPOS, and was dated September 1st, 2019, right?
2        MS. ROHN:  That's not a question.  You just
3  said it's dated this date.
4        MR. KAPLAN:  I asked my question.  You can
5  answer.
6        MS. ROHN:  Are you asking if that's correct?
7        MR. KAPLAN:  I said, right.
8        MS. ROHN:  Oh, I didn't hear your right.
9  Sorry.
10       MR. KAPLAN:  That's okay.  I'll repeat my
11  question so it's clear.
12    Q.  (Mr. Kaplan) The maintenance contract at issue in
13  this case is a contract between Petro and IPOS, correct?
14    A.  Correct.
15    Q.  The maintenance contract is dated September 1st,
16  2019, correct?
17    A.  Correct.
18    Q.  Did Petro use any contractors to do work under the
19  maintenance contract with IPOS?
20    A.  Rephrase that.  I'm sorry.
21    Q.  Petro has employees, correct?
22    A.  Correct.
23    Q.  Did Petro use any non-employees, any contractors,
24  to do any of the work that Petro did under the maintenance
25  contract?

Susan C. Nissman, RPR-RMR
(340) 773-8161

**Page 26**

1    A.  Subcontractors, yes.
2    Q.  Which subcontractors did Petro use to do work
3  under the maintenance contract?
4    A.  The maintenance contract was big, so a lot of
5  stuff was passed through to us, either through boilerwork or
6  anything else, so those are subcontractors under us.  I
7  can't tell you who all of them were, or what subcontracts
8  there were.  The daily maintenance was just our employees.
9    Q.  When you say, "subcontractors," are you referring
10  to companies or individuals?
11    A.  Companies.
12    Q.  Can you identify any of the subcontractor
13  companies that Petro used for the -- under the maintenance
14  contract?
15    A.  Oh, my goodness.  For example, we were tasked to
16  repair their cameras, so we had to get, I think, Reliable
17  Network under us.  Example.
18    Q.  What about mechanical work, pipe fitters, welders,
19  painters, did Petro use only its employees, or did it use
20  any contractors for -- for that type of mechanical work
21  under the maintenance contract?
22    A.  Only our employees.
23    Q.  All of the welders, who did work for Petro under
24  the maintenance contract, were employees of Petro?
25    A.  Correct.

Susan C. Nissman, RPR-RMR
(340) 773-8161

**Page 27**

1    Q.  All of the folks who did painting work, under the
2  maintenance contract, were employees of Petro?
3    A.  Correct.
4    Q.  All right, sir.  I'm going to hand you what I've
5  marked as Exhibit 2.
6         (Deposition Exhibit No. 2 was
7          marked for identification.)
8        MS. FRANCIS:  Can you please identify the
9  document for the record?
10       MR. KAPLAN:  Yes.  I'm sorry, Simone.
11    Q.  (Mr. Kaplan) I've shown you Exhibit 2, sir.  Do
12  you recognize this as Petro's First Amended Complaint, filed
13  in this lawsuit?
14    A.  Give me one minute.  I apologize.
15         (Respite.)
16         Correct.
17    Q.  You personally authorized this lawsuit to be
18  filed, correct?
19    A.  Correct.
20    Q.  Did you review the Complaint before it was filed?
21    A.  Correct.
22    Q.  If you saw anything that was inaccurate in the
23  Complaint, you would have pointed that out, correct?
24    A.  Correct.
25    Q.  Okay.  So you stand by what's stated in the

Susan C. Nissman, RPR-RMR
(340) 773-8161

**Page 28**

1  Complaint, true?
2    A.  True.
3    Q.  All right.  All right.  Take a look, if you would,
4  sir, on the third page, Paragraph Number 17.
5         Paragraph 17 says, "On September 10th, 2019,
6  Petro and IPOS entered into a contract for Petro to perform
7  preventative maintenance, remedial maintenance, scheduled
8  projects, and provide equipment rentals, and material
9  procurement."
10        Do you see that?
11    A.  I see it.
12    Q.  You believe that's true, correct?
13    A.  True.
14    Q.  All right.  Paragraph 18 then says, "The term of
15  the contract was to commence on September 1st, 2019.  Could
16  be terminated by either party giving sixty-days written
17  notice to the other party after the first five-years."
18        Do you see that?
19    A.  I see it.
20    Q.  And do you agree with what's stated in
21  Paragraph 18?
22    A.  Correct.
23    Q.  Okay.  Paragraph 19 says, "Otherwise, the contract
24  could only be cancelled for cause after one-year."
25        Do you, sir, agree, on behalf of Petro, with

Susan C. Nissman, RPR-RMR
(340) 773-8161

1    the -- what is stated in Paragraph 19 of the Complaint, that

2    the contract could only be cancelled for cause after one

3    year?

4        A.   Correct.

5        Q.   Okay.  Do you agree that Petro was required to

6    perform all of its work under the contract with reasonable

7    care?

8        A.   Can you restate that, or rephrase it?

9        Q.   Sure.

10          You agree Petro was required, under the terms

11   of the maintenance contract, to perform its work with

12   reasonable care, right?

13       A.   Correct.

14       Q.   If Petro failed to perform its work with

15   reasonable care, that would be cause for IPOS to terminate

16   the contract, correct?

17       A.   Not correct.

18       Q.   On what grounds do you believe IPOS could

19   terminate your maintenance contract, sir?

20       A.   What was on the contract itself.

21       Q.   Tell me what grounds you believe IPOS could rely

22   on to terminate the contract with Petro?

23       A.   Sixty-days written notice.

24       Q.   So on 60-days notice, IPOS could terminate the

25   contract on any basis after --

1        A.   After -- after five years.

2        Q.   After five years.  Okay.

3          But after one year, on what grounds could

4   IPOS terminate the contract for cause?

5       A.   It's IPOS's decision.

6       Q.   All right.  If IPOS concluded that Petro was not

7   performing its work with care, and to the right standard of

8   quality, would that be a proper basis for IPOS to terminate

9   the maintenance contract?

10       A.   You're asking me -- I just repeated -- after five

11   years, 60-day notice, they can cancel the contract for

12   whatever reason they wanted to.

13       Q.   I'm asking you, before five years.  Do you

14   understand?  Do you understand my question?

15          Before five years --

16       A.   Um-hum.

17       Q.   -- on what grounds could IPOS terminate the

18   maintenance contract?

19       A.   Can't answer that question.

20       Q.   If IPOS concluded that Petro's work was unsafe or

21   didn't meet a high standard of care, under your view, would

22   IPOS have the right to terminate the contract?

23          MS. ROHN:  Objection.  Calls for speculation.

24       A.   Yeah, that is not for me to answer.

25       Q.   (Mr. Kaplan) All right.

1          MS. FRANCIS:  I'm sorry.  What did you say?

2          MS. ROHN:  It's not for me to answer.

3       Q.   (Mr. Kaplan) All right, sir.  I'm going to show

4   you Exhibit 3, which is a copy of the maintenance contract.

5       A.   Okay.

6          (Deposition Exhibit No. 3 was

7          marked for identification.)

8       Q.   Mr. Melendez, have you ever read the maintenance

9   contract?

10       A.   Yes.

11       Q.   The maintenance contract does not guarantee to

12   Petro any particular dollar amount of work, correct?

13       A.   Correct.

14       Q.   The maintenance contract does not guarantee to

15   Petro any particular number of projects, correct?

16       A.   Correct.

17       Q.   Under the maintenance contract, it was up to IPOS

18   to decide, based on its contract with the project owner,

19   what work to do, right?

20       A.   There was already set maintenance to be done, so

21   there was a workflow.  So, yes, there is work.

22       Q.   Who decided what maintenance to do under the

23   maintenance contract?

24       A.   General managers that were there.

25       Q.   The general manager of IPOS, correct?

1        A.   Yeah.

2       Q.   IPOS would decide, under the maintenance contract,

3   what work, what maintenance work IPOS wanted or needed to do

4   at the facility, correct?

5       A.   There's -- I mean, there's a set maintenance on

6   equipment.  There's not like they have to decide; they have

7   to do it.  There's a set maintenance for all types of

8   equipment, everything.  So that's already set.

9       Q.   Set by who?

10       A.   By the manufacturer, where they got it.  By

11   everybody.  It's preventative maintenance.

12       Q.   There are types of preventative maintenance that

13   has to be done on a periodic basis, is what you're saying?

14       A.   Correct.

15       Q.   Some maintenance can be deferred, correct?

16          MS. ROHN:  Objection.  Speculative.

17       A.   That's not for me to say.  I'm not the expert.

18       Q.   (Mr. Kaplan) Under the contract, the maintenance

19   contract does not specify the maintenance projects, the

20   specific projects, that Petro is going to do, right?

21          MS. ROHN:  Asked and answered.

22       Q.   (Mr. Kaplan) Correct?

23       A.   This is a maintenance correct.  There's nothing

24   about projects.

25       Q.   The maintenance contract does not specify any

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1 specific maintenance projects that Petro is going to do,
2 true?
3     A.   It's maintenance in general, so, yes.
4     Q.   Which maintenance projects does this contract
5 specify that Petro is going to do?
6     It's maintenance in general.  Again, there is a
7 workflow.  There is a schedule that is already set, done,
8 period.
9     Q.   So this contract was entered into on
10 September 1st, 2019, and was going to have a five-year term,
11 right?
12     A.   Correct.
13     Q.   You're telling me, in September 1st, 2019, there
14 was a five-year set schedule of maintenance to be done?
15     A.   Yearly, yes.  Yearly, yes.
16     Q.   In 2019, who set the maintenance schedule for the
17 first year of the contract?
18     A.   Again, it's collaboration between general
19 managers, their managers, us, as maintenance, yes.
20     Q.   If there was a particular aspect of maintenance to
21 be done at the facility, and IPOS decided to do that work
22 itself, would that be a violation of your contract, in your
23 view?
24     A.   I can't answer that.
25     Q.   If there was some maintenance work to be done at

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1 the facility, and IPOS decided to put that work out to bid
2 to multiple contractors, does Petro contend that that would
3 be a violation of the contract?
4         MS. ROHN:  Objection.  Asks for a legal
5 conclusion.
6     A.   If it was maintenance, I believe so.
7     Q.   (Mr. Kaplan)  Did you ever challenge IPOS for
8 putting any work out to bid as a violation of your contract?
9     A.   It's just too gray.  I -- can you repeat the
10 question?
11         If it's just maintenance, no.  If it's
12 projects, yes.
13     Q.   Okay.  Let me understand that distinction.
14         You're saying if it's not a maintenance
15 project, if it's any other type of project, you believe it
16 would be okay for IPOS to put that work out to bid to
17 multiple contractors?
18     A.   That's their choice.
19     Q.   You're saying if it's a maintenance project, you
20 believe you had the contractual right to all of that work?
21     A.   Yes.
22     Q.   All right.  Help me understand the difference,
23 what you're calling maintenance work and project work.  Can
24 you explain what would qualify as maintenance work, and what
25 would qualify as project work?

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1         MS. ROHN:  Object to the form.
2     A.   General maintenance was scheduled.  A lot of it
3 was done under a time and material basis, which you have
4 a -- a hourly rate for it.
5         Projects was actually budgeted.  That's the
6 difference, meaning that we had to provide a budget for it.
7     Q.   (Mr. Kaplan)  So if you provided a budget, that
8 means it's project work, not maintenance work?
9     A.   Let me -- so with IPOS, we were in -- we were in
10 the roots of everything.  So even on maintenance, we
11 provided -- I mean, budgets, so they can actually go to
12 Vitol and say, this is how much we need.
13         Again, if I can explain projects, we actually
14 were given, like, hey, there is this project that's going to
15 happen, we need a budget for.  So they would call it a
16 project.  I guess, that's my -- it's hard to explain it.  We
17 were so interweaved that -- yeah.  I mean, most of the time,
18 like I said, maintenance was done on time and material.
19 True, true maintenance.  Yeah.
20     Q.   Turn to the last page, if you would, of the
21 maintenance contract, Exhibit 3.
22         This is the time and material rates sheet you
23 were just referring to?
24     A.   Correct.
25     Q.   Do you see at the middle, kind of above the

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1 schedule there, it says, "2019 T&M Rate Sheet - Labor"?
2     A.   Correct.
3     Q.   And if you go up from that, it says, under
4 Project, it says "2020 T&M Rate Sheet."
5         Do you see that?
6     A.   Correct.
7     Q.   And the date is 9-1-2020.
8         Do you see that?
9     A.   Correct.
10     Q.   Do you know why the contract was signed September
11 1, 2019, and has attached to it a schedule that is dated the
12 following year, 2020?
13     A.   Don't recall.
14     Q.   Do you recall how this Appendix A, the schedule,
15 came to be part of the maintenance contract?
16     A.   How it came to be?
17     Q.   Yeah.  How this document got incorporated or
18 attached to the contract?
19     A.   It was just attached.
20     Q.   Are you aware of any other appendix or schedule
21 that the parties used to set forth Petro's rates under the
22 maintenance contract, other than this one here, as
23 Appendix A?
24     A.   Cannot recall.
25     Q.   Okay.  Mr. Melendez, do you agree that people can

1  make allegations of discrimination that are untrue?
2       MS. ROHN:  Objection.  Calls for speculation.
3    A.  I don't understand what you're asking.
4    Q.  (Mr. Kaplan) Do you agree that not every
5  allegation of discrimination that is made is true?
6       MS. ROHN:  Objection.  Calls for speculation.
7    A.  I don't know how that pertains to this.
8    Q.  (Mr. Kaplan) In your experience, have you
9  experienced an allegation of racial discrimination that you
10  believe was untrue?
11    A.  Against me?
12    Q.  Yes.
13    A.  Okay.  Yes.
14    Q.  Petro was accused of racial discrimination,
15  correct?
16    A.  Correct.
17    Q.  A secretary, who worked for Petro, sued Petro,
18  claiming she was denied benefits, and ultimately lost her
19  job on account of her race, correct?
20    A.  Correct.
21    Q.  Do you recall this was a former employee, Kenia
22  Johny?  Johny?
23    A.  Johny.
24    Q.  Ms. Johny was a -- a black female, native of
25  St. Lucia, who lived on St. Croix, correct?

1    A.  Correct.
2    Q.  And she was employed by you at Petro, correct?
3    A.  Correct.
4    Q.  And in May of 2020, Ms. Johny filed a lawsuit
5  against Petro, claiming unlawful racial discrimination,
6  correct?
7    A.  I believe so.
8    Q.  And on behalf of Petro, you denied Ms. Johny's
9  allegations of racial discrimination, correct?
10    A.  Correct.
11    Q.  You didn't believe that the allegation of racial
12  discrimination was true, right?
13    A.  Correct.
14    Q.  Do you recall that in her lawsuit, Ms. Johny
15  alleged that your brother -- your brother's name is Brian
16  Melendez, correct?
17    A.  Correct.
18    Q.  And your brother works with you at Petro?
19    A.  Did.
20    Q.  Okay.  Do you recall that Ms. Johny, in her
21  lawsuit, alleged that your brother had altered timesheets
22  for work at Petro?
23    A.  That's what she stated.
24    Q.  Okay.  And Ms. Johny alleged that Petro had billed
25  customers for time not worked by Mr. -- by your brother,

1  Mr. Melendez?  That was her allegation, correct?
2    A.  That's her allegations, correct.
3    Q.  And Ms. Johny alleged in her Complaint that Petro
4  had falsified payroll records, crediting hours to you, to
5  Mr. Persuad, and your brother, for hours not worked, right?
6    A.  That's what she alleged.
7    Q.  Did Petro ever submit bills to IPOS for work that
8  was not done, or time that was not spent?
9    A.  No.
10    Q.  Was Ms. Johny fired because of her race?
11    A.  No.
12    Q.  This lawsuit by Ms. Johny in 2020 against Petro,
13  to your eyes, was an example of someone alleging that they
14  were terminated, or had some adverse consequence taken
15  against them, because of their race, but really you believe
16  they were valid concerns about performance, right?
17       MS. ROHN:  Objection.  Compound question, and
18  objection to form.
19    A.  Repeat the question.
20    Q.  (Mr. Kaplan) Sure.
21       So Ms. Johny was alleging, in her lawsuit
22  against Petro, that she was terminated because of her race,
23  right?
24    A.  Correct.  That's what she alleged.
25    Q.  But you and Petro believed that, in fact,

1  Ms. Johny was terminated because of valid concerns about her
2  performance, right?
3    A.  Correct.
4    Q.  Were you deposed in the lawsuit that Ms. Johny
5  filed?
6    A.  No.
7    Q.  What happened with the lawsuit that Ms. Johny
8  filed against Petro?
9    A.  If I recall, it got dismissed here.  It went to
10  EEOC, and I don't know what it is, but in Puerto Rico.  It
11  got dismissed here.  The civil case with us here.  We
12  finally settled for nothing.
13    Q.  Did you pay money to Ms. Johny to settle the case?
14       MS. ROHN:  Wait, wait, wait.  First of all,
15  was this a confidential settlement?
16    A.  Yes.
17       MS. ROHN:  Sorry.  Can't answer.
18    Q.  (Mr. Kaplan) Take a break?
19    A.  Please.
20       MR. KAPLAN:  Five minutes.
21       THE VIDEOGRAPHER:  Going off the record.  The
22  time is 10:30.
23            (Short recess taken.)
24       THE VIDEOGRAPHER:  Going back on the record.
25  The time is 10:41.

41

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1  Q.  (Mr. Kaplan) All right, Mr. Melendez. Petro first
2  filed this lawsuit on September 28th, 2021.
3       Do you recall that?
4  A.  Sounds correct.
5  Q.  All right. The Complaint that was filed was the
6  first time that Petro ever complained about discrimination
7  related to the maintenance contract, correct?
8  A.  Not correct.
9  Q.  Did you, or to your knowledge, anyone at Petro,
10 ever tell anyone at Vitol that Mr. Canning had engaged in
11 any racist or discriminary behavior?
12      A.  Do not recall.
13      Q.  Okay. As you sit here today, as Petro's corporate
14 representative, you cannot recall ever telling anyone at
15 Vitol that Andrew Canning had ever done anything that was
16 racist or discriminary towards Petro, true?
17      A.  I can say true.
18      Q.  What about IPOS, did you, or to your knowledge,
19 anyone at Petro, ever tell anyone at IPOS that Mr. Canning
20 had engaged in any racist or discriminary behavior as to
21 Petro?
22      A.  We have communicated, yes.
23      Q.  Okay. Tell me who, at IPOS, you communicated that
24 Mr. Canning had engaged in some sort of racist or
25 discriminary behavior as to Petro?

42

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1  A.  Both general managers, Merlin Figueria, David
2  Smith. Their -- their operations supervisors, Granger
3  Rawle. I forget the other gentleman's name. I can't think
4  of it right now. From their -- from their -- actually,
5  operations manager also as well, Calvin Schmidt, Coury
6  Hodge. So, yes, the list is there.
7  Q.  Tell me when -- and are these conversations that
8  you had, or someone else at Petro had?
9  A.  Both.
10 Q.  Let's talk about your conversations.
11      Tell me when you spoke with Mr. Figueria, and
12 reported to him that Mr. Canning had engaged in some racist
13 or discriminary behavior.
14      A.  Can't give you an exact date.
15      Q.  What about Mr. Smith, tell me when you told
16 Mr. Smith that Mr. Canning had engaged in some sort of
17 racist or discriminary behavior?
18      A.  The first year in our -- 2018. I can't recall a
19 date.
20      Q.  During 2018, you believe Mr. Canning had engaged
21 in racist or discriminary behavior as to Petro?
22      A.  That was the beginning of it, yes.
23      Q.  When, in 2018?
24      A.  This was actually the first summer of 2018.
25      Q.  All right. So during the summer of 2018, you

43

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1  believe that Mr. Canning was racist and discriminary as to
2  Petro, correct?
3  A.  That was the beginning of it, yes.
4  Q.  What did Mr. Canning do or say in the summer of
5  2018 that you believe showed that he was racist or
6  discriminary as to Petro?
7  A.  We shared an office building where I was sometimes
8  on my computer. He was on the other side. The office
9  building was actually a 40-foot trailer. Construction
10 building.
11      There was one occasion that I was on the
12 other side. He didn't know that I was there, but he was
13 looking over at my crew, which were islanders, and just was
14 playing where he was trying to track them when they were
15 coming in and out. He was playing. He was like, I got you,
16 I got you. Like, he was talking out loud, and I heard him
17 say that.
18      Later that -- later that week, he brought me
19 in, and was demanding that I show him gate logs of when my
20 guys were in or when they were out. I gave him the gate
21 logs. Nothing was correct. He accused us of stealing from
22 the company -- being thieves of, you know, just,
23 this is the way island people work. So all that. We proved
24 to him that the gate logs were right. That the actual gate
25 attendant were the one logging in. No apologies came about.

44

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1  That was the beginning of it.
2  Q.  Did you ever hear Mr. Canning use a racial slur or
3  a racist word in reference to you, or any other Petro
4  employee?
5  A.  "Islander" was a big to him, meaning lazy.
6  Meaning not doing what they needed to. For me, that was
7  race.
8  Q.  Other than the term "islander," did you ever hear
9  Mr. Canning use any other term that you believe was a racist
10 slur, or some evidence of discrimination?
11      A.  Not that I recall.
12      Q.  All right. Now, on -- on this issue of time
13 records and gate logs, there were multiple occasions where
14 you had back and forth with Mr. Canning about time records
15 for Petro employees, correct?
16      A.  Correct.
17      MS. ROHN: Object to the form.
18      Q.  (Mr. Kaplan) Yes?
19      A.  Correct.
20      Q.  Okay. Is it your position that Petro's time
21 records, in every case, were accurate and never had issues
22 that Mr. Canning pointed out that were correct?
23      A.  I can say there was some errors that were pointed
24 out, and were corrected.
25      Q.  Now, you charged Mr. Canning with racist and

1  discriminatory behavior, right?

2      A.   Correct.

3      Q.   But the truth is, you didn't believe that

4  Mr. Canning discriminated against you or Petro until you

5  filed this lawsuit, right, sir?

6      A.   Not correct.

7      Q.   In fact, Mr. Canning supported you and your

8  companies for years, right?

9      A.   That's gray.  I mean, supported?  No.

10     Q.   Mr. Canning helped you, and your companies, make a

11 lot of money, true?

12         MS. ROHN:  Objection to form.

13     A.   We worked for our money.  We did our jobs for our

14 money.

15     Q.   (Mr. Kaplan)  You used to work for Vivot, as we

16 talked about, right?

17     A.   Correct.

18     Q.   And at the time you worked for Vivot, you did work

19 with Mr. Canning, correct?

20     A.   Correct.

21     Q.   The work that Vivot did at the WAPA facilities was

22 fairly limited in scope, compared to the work that Petro did

23 under the maintenance contract?

24         MS. ROHN:  Objection to form.  You can

25 answer.

1      A.   We -- we grew the -- the scope, correct.

2      Q.   (Mr. Kaplan)  And you grew the scope of the work

3  that you did during the time you were working with

4  Mr. Canning, correct?

5          MS. ROHN:  Objection to form.

6      A.   Again, there's maintenance.  There's -- there's

7  projects.  It's not -- it's not about all Mr. Canning.

8  There's also -- I mean, there's also David Smith.  There was

9  also Merlin.  So it's bigger than just Mr. Canning.

10     Q.   (Mr. Kaplan)  My question, during the time that you

11 grew the scope of work you were doing, Mr. Canning was there

12 the whole time?  He was a constant presence, correct?

13     A.   Correct.

14     Q.   Mr. Canning didn't stand in the way of your new

15 company, Petro, getting the maintenance contract with IPOS,

16 right?

17         MS. ROHN:  Objection to form.  Assumes facts

18 not in evidence.

19     A.   I mean, he, David Smith, was the one who signed

20 the contract.

21     Q.   (Mr. Kaplan)  To your knowledge, did Mr. Canning

22 object or protest Petro getting the maintenance contract?

23     A.   I can say, yes, he did.  Actually, like I said,

24 there was instances that we were complaining already of what

25 he was doing or what he was saying to Petro.  So, yes, there

1  was some friction there.

2      Q.   But whatever Mr. Canning did, he obviously didn't

3  have enough muscle, because you got the maintenance

4  contract with IPOS in September --

5          MS. ROHN:  Objection.

6      Q.   (Mr. Kaplan)  -- of 2019, correct?

7          MS. ROHN:  Objection.  Argumentative.

8      A.   Correct.

9      Q.   (Mr. Kaplan)  Mr. Canning helped you and Petro get

10 additional work beyond your work for IPOS and Vitol, right?

11     A.   Rephrase.  What -- what type of work are you

12 talking about, or what -- what jobs are you talking about?

13 I'm sorry.

14         MS. ROHN:  Objection.

15     Q.   (Mr. Kaplan)  Did Mr. Canning help you, help Petro,

16 get additional work for companies, other than IPOS or Vitol?

17         MS. ROHN:  Objection.  Vague.

18     A.   Yeah, you got to be more specific.  I'm sorry.

19     Q.   (Mr. Kaplan)  Do you deny that Mr. Canning ever

20 helped you get work from any third-party companies?

21         MS. ROHN:  Objection.  Vague.

22     A.   Yeah.  Again, be more specific.  I don't -- I

23 think I know where you're getting at, and I think I know

24 what you're doing, but specifically, did he put a

25 recommendation letter or something down, no.

1      Q.   (Mr. Kaplan)  Well, if you know what I'm doing, I'd

2  like you to answer my question.

3          Did Mr. Canning --

4          MS. ROHN:  Do not be argumentative with my

5  client, please.

6      Q.   (Mr. Kaplan)  Did Mr. Canning ever help you, sir,

7  get any work from any third parties?

8      A.   Again, you know, let me say no, then, okay?  I

9  know where you're coming with, but go ahead.

10         MS. ROHN:  Sir, just answer the question.

11     A.   Okay.  Sorry.

12     Q.   (Mr. Kaplan)  So your sworn testimony is

13 Mr. Canning never helped you get work from any third

14 parties?  That's what you just said, right?

15         MS. ROHN:  Objection.  It's a vague question.

16     A.   It is.  That's my problem.  I can't answer yes or

17 no, because it's very vague.  You're saying, you know, ever,

18 ever.  I mean, Mr. Canning and I worked hand in hand on a

19 lot of different things.  You know, we were working in the

20 same construction trailer for months.  But, go ahead.

21     Q.   (Mr. Kaplan)  Did Mr. Canning ever recommend you,

22 or Petro, to any third parties for work, to your knowledge?

23     A.   Yes.

24     Q.   If Mr. Canning was, as you say, a racist, and had

25 it out for Petro, why do you think Mr. Canning recommended

49

1   Petro to third parties?

2       A.   I can't answer that.

3       Q.   Let me show you what I've marked as Exhibit 5,

4   which is -- for the record, I'll just read the Bates number.

5   It's Canning 002815.

6           MR. BECKSTEDT:  Is that Exhibit 4 or 5?

7           MR. KAPLAN:  Oh, I'm sorry.  Did I mess up?

8           MS. ROHN:  Yeah, you missed a number.

9           MR. KAPLAN:  Let me fix that.

10          (Deposition Exhibit No. 4 was

11          marked for identification.)

12          Okay.  I'm going to show you what I've marked

13  as Exhibit 4, sir --

14      A.   Yes.

15      Q.   -- which is Canning 002815.

16          MS. ROHN:  Thank you.

17          MR. KAPLAN:  You're welcome.

18      Q.   (Mr. Kaplan) All right, sir.  Exhibit 4 is an

19  e-mail from Mr. Canning to a Mr. Rodriguez at a company

20  called Aggreko.

21          Do you see that?

22      A.   True.

23      Q.   And Mr. Canning sent this e-mail.  And you see

24  that you're listed, Mr. Melendez, as a bcc on the e-mail?

25      A.   Correct.

50

1       Q.   You were blind copied by Mr. Canning, correct?

2       A.   Correct.

3       Q.   Do you know -- you're familiar with the company

4   Aggreko, right?

5       A.   Correct.

6       Q.   It's a HVAC and industrial rental --

7       A.   Yeah --

8       Q.   -- equipment company?

9       A.   -- they work for WAPA.

10          MS. ROHN:  Sir, let me finish his question.

11      Q.   (Mr. Kaplan) The last part, you trailed off there.

12          You said Aggreko works for WAPA, is that what

13  you said?

14      A.   They're providing temporary units for WAPA right

15  now.

16      Q.   All right.  And do you know this gentleman, Joao

17  Rodrigues?

18      A.   Correct.

19      Q.   Okay.  Who is Mr. Rodrigues?

20      A.   He was the project manager for that Aggreko job.

21      Q.   All right.  If you look at Mr. Canning's e-mail,

22  if you look at the first line, he says, "I've discussed the

23  ground testing that you require in the WAPA yard site with

24  Adrian Melendez project manager with Petro Industrial

25  Solutions and their sister company Vivot engineering."

51

1           Do you see that?  Yes?

2       A.   Correct.

3       Q.   All right.

4           THE COURT REPORTER:  Oh, actually, you can't

5   mark on it.

6       A.   Oh.  Didn't know.

7       Q.   (Mr. Kaplan) All right.  If you go down to the

8   full paragraph there towards the bottom, Mr. Canning writes

9   to Aggreko, "When you have time I would like to introduce to

10  Adrian, his team and the range of services that Petro-

11  Industrial Solutions delivered to ourselves at IPOS."

12          Do you see that?

13      A.   Yes.

14      Q.   Mr. Canning says, "As said in our discussions

15  yesterday, we have been working with Adrian and his team at

16  Petro Industrial Solutions and Vivot for the last year and

17  have been extremely happy with the professional services

18  that they provide, and the quality of work that they

19  deliver."

20          Do you see that?

21      A.   I see that.

22      Q.   Mr. Canning, to your knowledge, was certainly

23  under no obligation to write this sort of recommendation

24  e-mail to Aggreko, right?

25      A.   Correct.

52

1       Q.   Mr. Canning, making this recommendation, and

2   providing these positive remarks, was helpful to you and to

3   Petro, correct?

4       A.   With Aggreko, yes.

5       Q.   In fact, after Mr. Canning's recommendation in

6   March of 2018, Petro got work from Aggreko, right?

7       A.   Correct.

8       Q.   In fact, Petro got $800,000 of work from Aggreko

9   after Mr. Canning recommended you to Aggreko, right?

10          MS. ROHN:  Objection.  Form of question.

11      A.   It was not just Mr. Canning's doing.  I mean, we

12  have -- the reason Mr. Canning's saying that is because we

13  stand by our work.  We do our work.  He was happy with our

14  work, so, therefore, of course.  I mean.  I'm sorry.  But,

15  yeah, I mean, you can see that Mr. Canning is happy with our

16  work, and was happy, period.  So -- anyways.  I'm sorry.

17  Sorry.

18          MS. ROHN:  You can answer the question.

19      Q.   (Mr. Kaplan) My question, after Mr. Canning's

20  March 7th, 2017 e-mail, introducing you to Aggreko and

21  praising your work, Petro got more than $800,000 of work

22  from Aggreko, true?

23          MS. ROHN:  Asked and answered.

24          MR. KAPLAN:  Not answered.

25          MS. ROHN:  Yes, it was.

1   MR. KAPLAN:  You can object to the form of
2   the question, but --
3       MS. ROHN:  You're not going to harass my
4   client by asking him the same questions over and over again,
5   which he has answered.
6   Q.  (Mr. Kaplan) Objection.  Nonresponsive.  I'll ask
7   my question again.
8       It's a simple question, sir.
9   A.  Go ahead.
10  Q.  After Mr. Canning's March 7th, 2018 e-mail to
11  Aggreko, Petro got work from Aggreko, true?
12      MS. ROHN:  Objection to the form of the
13  question.
14  A.  Again, it was not just that easy.  Just because of
15  Mr. Canning's okay or -- or whatever, we didn't get the
16  contract just right after that.  I mean, it's a series of --
17  of performance.  We had to get recommendations from a lot
18  more than Mr. Canning.
19  Q.  (Mr. Kaplan) That's not my question.  My question
20  is simply the sequence.
21      Before Mr. Canning sent this e-mail in March
22  of 2018, did you have a contract or any work from Aggreko?
23  A.  We started a conversation of with looking at the
24  job.
25  Q.  Please listen to my question.

1       MS. ROHN:  He answered your question.
2   Q.  (Mr. Kaplan) Please listen to my question
3   carefully.
4       Before the March 7, 2018 e-mail from
5   Mr. Canning, did Petro have a contract with Aggreko?
6   A.  No.
7   Q.  Thank you.
8       After Mr. Canning's recommendation, did Petro
9   get a contract from Aggreko?
10      MS. ROHN:  Objection to the form of the
11  question.
12  A.  Okay.  Yes.
13  Q.  (Mr. Kaplan) Okay.
14  A.  Eventually.
15  Q.  Now, ultimately, the work that Petro did for
16  Aggreko wound up earning Petro $800,000, true?
17      MS. ROHN:  Objection to the form of the
18  question.
19  A.  I think the contract was that, but I don't -- I
20  mean, I can't recall.
21  Q.  (Mr. Kaplan) Let me show you --
22  A.  I mean, there's so many costs involved with that.
23  It's not like it's profit, if I can say that.
24  Q.  Let me show you what I'm going to mark as
25  Exhibit 5.

1   A.  Okay.
2       MS. FRANCIS:  Can you please identify the
3   Bates number?
4       MR. KAPLAN:  Yes, I will.  I'll just -- I'll
5   get there, I promise.
6       (Deposition Exhibit No. 5 was
7       marked for identification.)
8   Q.  (Mr. Kaplan) Okay.  I'm showing Exhibit 5.  This
9   is Petro's Response to Vitol's Second Set of
10  Interrogatories.
11      Take a look, if you would, sir, at the second
12  page, Interrogatory Number 8.
13  A.  Number 8.  Okay.
14  Q.  Now, this question asked Petro to list all
15  clients, other than IPOS and the Vitol defendants, for which
16  Petro performed services between January 2018 and
17  December 31, 2021.
18      Do you see that?
19  A.  Correct.
20  Q.  All right.  And in the answer, the first company
21  listed is this company, Aggreko, right?
22  A.  Right.
23  Q.  And the dates that are listed are January 2019 to
24  April 2019, correct?
25  A.  Correct.

1   Q.  So Petro didn't perform any work for Aggreko
2   before January 2019, correct?
3   A.  You can say that.
4   Q.  I'm sorry.  I didn't hear you, sir.
5   A.  Yeah.  Correct.  I mean, we started prework during
6   '18, December 2018, so --
7   Q.  Well, this is your interrogatory answer.  I want
8   to make sure it's accurate.
9   A.  Correct.  Yes.
10  Q.  Your interrogatory response says that Petro
11  performed work for Aggreko from January 2018 to April 2019.
12      Is that accurate?
13  A.  Correct.
14  Q.  It identifies the type of work.  It says,
15  "Electrical, Mechanic, & Civil work" at the WAPA facility.
16      Do you see that?
17  A.  Yes.
18  Q.  And says approximately $800,000, right?
19  A.  Correct.
20      MS. ROHN:  Says "payment."
21      MR. KAPLAN:  Please don't testify.
22      MS. ROHN:  You left out a word.
23      MR. KAPLAN:  No, it doesn't -- please, do not
24  testify for the witness.
25  Q.  (Mr. Kaplan) Now, it says approximately $800,000,

1  correct?

2      A.   Right.

3      Q.   What does the $800,000 represent?  Is that profit

4  to Petro?  Is that revenue?

5      A.   That's revenue to Petro.

6      Q.   Okay.  Do you know what Petro's profit margin was

7  on the $800,000 in revenues that Petro received from

8  Aggreko?

9      A.   I can't tell you that right now.

10     Q.   All right.  While we're looking at this

11 interrogatory, if you go down to the last company listed

12 there, it says, "WAPA USVI."

13          Do you see that?

14     A.   Correct.

15     Q.   And it says, "September 2019 to present."

16          Do you see that?

17     A.   Yes.

18     Q.   All right.  Now, this interrogatory response is

19 dated June 23, 2022.

20     A.   Okay.

21     Q.   Do you see that?

22     A.   Correct.

23     Q.   If you look at the last page, you certified the

24 interrogatory on the same date.  So that -- do you see that

25 date in your mind, June 23, 2022?

1      A.   Yes.

2      Q.   Okay.  Was Petro providing work to WAPA in June of

3  2022?

4      A.   Correct.

5      Q.   Okay.  What work were you doing for WAPA in June

6  of 2022?

7      A.   If I can recall, it was in St. Thomas.  We were

8  doing some coating work.

9      Q.   Was this work you were hired directly by WAPA for?

10     A.   Correct.

11     Q.   Did you have a contract with WAPA for that work?

12     A.   No.  Just a -- just a PO.

13     Q.   Purchase order?

14     A.   A purchase order.

15     Q.   When was the purchased order entered into?

16     A.   I can't recall, sir.

17     Q.   You said coating work?

18     A.   Yeah.  Coating.  Painting.

19     Q.   What can you tell us about the scope of that work?

20 What were you painting or coating?

21     A.   If I'm not mistaken, their diesel line that is

22 heavily corroded, so we were trying to remedy by basically

23 taking off the rust and putting coating on it.

24     Q.   Which specific facility was this work done?

25     A.   St. Thomas.

1      Q.   And when were you awarded this purchase order?

2      A.   Again, I can't recall.  I mean, it was within

3  the -- the time frame.  I just can't give you an exact date.

4      Q.   Okay.  Do you recall the IPOS termination of your

5  maintenance contract occurred in late July of 2021?

6      A.   Yes.

7      Q.   Okay.  After the IPOS termination of the

8  maintenance contract in late July of 2021, did you continue

9  to do work for WAPA thereafter?

10     A.   Correct.

11     Q.   Okay.  On a continuous basis, or was it just this

12 one coating purchase order that you mentioned?

13     A.   WAPA calls.  Says, hey, we need this.  We need a

14 price.  If it's good, then we work.  If it's not, then we

15 don't.  It's not a contract.

16     Q.   Did you have more than one purchase order with

17 WAPA after the time that the -- that the -- sorry.

18 Withdrawn.  Let me ask that again.

19          After IPOS terminated your maintenance

20 contract in late July of 2021 --

21     A.   Okay.

22     Q.   -- did you have more than one purchase order with

23 WAPA?

24     A.   Don't recall.

25     Q.   You certainly have records in your system where

1  you could go check and find out which purchase orders you

2  had from WAPA after July of 2021?

3      A.   Of course.

4      Q.   Okay.  Is there any other work, besides this

5  coating painting work, that you specifically do recall doing

6  for WAPA after the termination of the maintenance contract?

7      A.   I can't narrow down the dates.  I know there was

8  something else, but I don't know if it was within that time

9  frame.  I apologize.

10     Q.   Do you recall the amount of purchase order for the

11 coating work?

12     A.   I don't recall.  I apologize.

13     Q.   Is the coating work, where you had the PO with

14 WAPA, part of the maintenance that would have been done

15 under the maintenance contract?

16     A.   No.

17     Q.   Why is that?

18     A.   I mean, WAPA has their own facility, right?  They

19 have their own equipment different from IPOS.  Completely

20 separate companies.

21     Q.   Do you recall answering an interrogatory listing of

22 the projects where you believe you lost work because of the

23 conduct that you're alleging in this case?  The 30 projects,

24 do you recall that?

25     A.   I believe I do.

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1      Q.   Okay.
 2      A.   Yes, I do.
 3      Q.   And we'll get into that in some detail a little
 4  bit later, but there are some painting and coating projects
 5  on that list.
 6           Do you recall that?
 7      A.   Yes, I do.
 8      Q.   And are you saying that the painting and coating
 9  projects on the list of lost profits that you identified are
10  painting and coating equipment that IPOS owns at a IPOS
11  facility?
12      A.   In the IPOS facility, correct.  And there's
13  completely divides.  You have IPOS and you have WAPA.
14  Completely, yeah.
15      Q.   Who, at WAPA, did you deal with on this purchase
16  order?
17      A.   Gentleman named Hillary.  Hillary Baptiste,
18  St. Thomas.
19      Q.   Hillary Baptiste?
20      A.   Yes.
21      Q.   He awarded you the -- Mr. Baptiste awarded Petro
22  this purchase order?
23      A.   Yes, I believe that's -- he's basically the person
24  responsible for the job.
25      Q.   Is your work for WAPA ongoing?
```

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1      A.   Not right now.
 2      Q.   So as of June 2023 -- excuse me.  As of June 23rd,
 3  2022, your work for WAPA was ongoing, but it ended when?
 4      A.   Say probably those days.  We haven't worked for
 5  them last year.
 6      Q.   Did Mr. -- to your knowledge, did Mr. Canning
 7  reach out to any other companies or third parties and
 8  recommend Petro for work?
 9      A.   No.
10      Q.   What about Wartsila?  Are you familiar with a
11  company named Wartsila?
12      A.   Correct.
13      Q.   Has Petro done any work for Wartsila?
14      A.   No.
15      Q.   All right.  Earlier, sir, when I was asking you
16  about IPOS, you said that IPOS "harbored" Mr. Canning.
17           Do you recall using that word?
18      A.   Yes.
19      Q.   Tell me what you mean when you said, IPOS harbored
20  Mr. Canning?
21      A.   It was multiple times, where we discussed
22  Mr. Canning's attitude toward us or his -- the way he talked
23  to our employees, or the way he was toward our employees,
24  was very -- to our employees' knowledge, it was very, just
25  dismissive.  Very -- not even looking their way.  Not even
```

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1  talking to them.  In a racist way.
 2      Q.   Not talking to them in a racist way?
 3      A.   Not acknowledging them.  Instead of saying, excuse
 4  me, this not -- you know, why are you doing this?  He
 5  would just pass him by like if they were not there, and
 6  then they would -- he would go and send an e-mail out.
 7      Q.   That's what you're saying Mr. Canning did, but
 8  tell me what you mean when you said IPOS "harbored"
 9  Mr. Canning?
10      A.   Again, we had multiple discussions about
11  Mr. Canning's behavior toward us.  And we would have a
12  meeting or two, okay.  What happened here and there, and
13  nothing was ever done.  Nothing was ever reprimanded.
14  Nothing was ever -- it wasn't -- nothing was ever -- there
15  was no remedy for it.
16      Q.   So by "harboring," are you saying IPOS should have
17  terminated Mr. Canning as a consultant?
18      A.   I'm not saying that.  That's for them to know.  I
19  mean, for them to answer.
20      Q.   Did you ever ask IPOS to terminate Mr. Canning's
21  consulting contract?
22      A.   No.
23      Q.   Did you ever ask -- well, did you know that for a
24  period of time, Mr. Canning was a -- his company, Optis.
25  Let me back up.
```

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1           You're familiar with the company Optis?
 2      A.   Correct.
 3      Q.   You know that Mr. Canning, all the e-mails he sent
 4  you, came from an e-mail address that were Optis co, right?
 5      A.   Correct.
 6      Q.   And you know that was the firm through which
 7  Mr. Canning did his consulting work, Optis, correct?
 8      A.   Correct.
 9      Q.   And -- and you were aware, at the time the
10  maintenance company was signed, that Mr. Canning was a,
11  through Optis, was a consultant to IPOS, correct?
12      A.   Yes.
13      Q.   Okay.  You don't recall, you or anyone, to your
14  knowledge, at Petro, ever asking IPOS to terminate
15  Mr. Canning's consulting contract or Optis's consulting
16  contract, correct?
17      A.   Absolutely not.
18      Q.   Did you ever ask IPOS to have Mr. Canning or Optis
19  removed from the -- the job?
20      A.   No.
21      Q.   The same is true as to Vitol, you never said
22  anything to Vitol about Mr. Canning needs to be removed from
23  the job, or should -- his consulting arrangement should be
24  terminated, correct?
25      A.   Correct.
```

---

**65**

```
(Respite.)
```

Q. All right, sir. I'm going to show you what I've marked as Exhibit 6, which is Canning 001703.

```
(Deposition Exhibit No. 6 was
marked for identification.)
```

For some reason, it didn't print the Bates number, but that's the Bates number.

MS. ROHN: This is Exhibit 6?

MR. BECKSTEDT: Five, right?

MS. ROHN: Five.

MR. KAPLAN: Did I do it again?

MS. ROHN: Yep.

MR. KAPLAN: No, I thought I marked --

A. Yeah, this one's 5.

MR. KAPLAN: The second interrogatories were 5.

MS. ROHN: Sorry.

MR. KAPLAN: I'm prone to doing that, so keep on me.

Q. (Mr. Kaplan) All right, sir. Looking at Exhibit 6, which, again, for the record, is Canning 001703. And you see this as an e-mail from Andrew Canning to you, copied to Mr. Persaud or Mr. Smith, right?

A. Yeah.

Q. And it's dated February 4th, 2018, correct?

---

**66**

A. Yes, sir.

Q. Okay. And Mr. -- you see on the bottom there, you had sent a -- some sort of spreadsheet to Mr. Canning. Says, "Spreadsheet Invoices," right?

A. Correct.

Q. Okay. And just to orient ourselves, I mean, this is more than a full year before the maintenance contract was signed, correct?

MS. ROHN: Objection. Form.

A. I'm sorry, sir. If I can say, this is through Vivot. Is not through Petro.

Q. (Mr. Kaplan) Right. That's my point. Just for context, Exhibit 6, this e-mail back and forth with Mr. Canning, this is more than a year before the Petro and IPOS maintenance contract is signed, correct?

A. I understand. I mean, it was months before we started Petro in April of 2018.

Q. Right. Okay.

And you're sending Mr. Canning invoices, and Mr. Canning responds to you and says, "Adrian, I am rejecting more than accepting the summaries at STX as there are WAPA site jobs being invoiced to IPOS and then turning up at the IPOS site after 8 hours to do 2 hours of overtime," right?

A. Correct. I see.

---

**67**

Q. And then he goes on, "fabrication teams being charged when absent from the site for one week (or no timesheets submitted)."

Do you see that?

A. Correct.

Q. He also says, "On average over 30% overcharge for labour not actually onsite working on IPOS activities," right?

A. Correct.

Q. He asks you to "please correct all the anomalies." He says, "as I am spending days trying to highlight the tens of errors."

Do you see that?

A. Correct.

Q. And then he says, "It is now imperative that we review all invoices to date for the recovery period as this amount of errors and potential overcharge is unacceptable."

Do you see that?

A. I see it.

Q. All right. So Mr. Canning's close review/scrutiny of time records and bills that you submitted is not something that just started under the maintenance contract in 2019, right?

A. Correct.

Q. Mr. Canning -- now you mentioned earlier that one

---

**68**

of the reasons you believe Mr. Canning was racist and discriminatory in 2018 was his review of the time records, and comparing them to gate logs, right? And the way he handled that situation, right?

MS. ROHN: Objection to form.

A. No, that's not correct.

Q. (Mr. Kaplan) That's not correct?

A. No.

Q. What was the incident in 2018 that you mentioned about time records and gate logs?

A. Again, he was using the word "local" while he was trying to say that they were trying to steal, and they were trying to rob, and he was going to call the police, that's what I'm saying.

Q. Okay. Earlier --

A. Not review.

Q. I didn't mean to interrupt you. Go ahead.

A. Not review.

Q. Okay. All right. So let's make that distinction.

You have no issue with Mr. Canning doing a review/hard scrutiny of all time records and invoices that Petro submitted, true?

A. Absolutely not.

Q. Okay.

A. Yes.

69

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    Q.   Part of Mr. Canning's role was to do a careful,
2    through review of all information/invoices/bills that Petro
3    submitted, correct?
4    A.   Yes.  That's his job.
5    Q.   Okay.  Now, earlier, you said Mr. Canning used the
6    term "islander."
7         And I asked you, other than the term
8    "islander," did he ever use any other term that you took as
9    racist or discriminatory?
10    A.   Not that I heard.
11    Q.   Now, you just said he used the term "local,"
12    right?
13    A.   Local, islander.  Like I said, for me, it's the
14    same thing.
15    Q.   Okay.  I want to be very specific.
16    A.   Correct.  Local, islander.
17    Q.   Which term did Mr. Canning use?
18    A.   Both.
19    Q.   Local and islander?
20    A.   Correct.
21    Q.   Other than the term "local islander," do you
22    recall Mr. Canning using any other term that you believe was
23    racist or discriminatory?
24    A.   Not that.
25    Q.   Not that you recall.

70

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    A.   Not that I recall.
2    Q.   All right.  So here, in February of 2018, when
3    Mr. Canning is saying that he's rejecting more than
4    accepting the time records, and saying that there's work
5    being charged when the workers are not on the site, and that
6    there's being overcharge for labor, you don't believe this
7    was the result of Mr. Canning being racist or
8    discriminatory, do you?
9    A.   If I can explain this?
10    Q.   Can you answer my question?
11         MS. ROHN:  Object to the form.
12    A.   I mean, again, different way of -- I mean, ask me
13    the question a different way.
14    Q.   (Mr. Kaplan)  Yes.
15         When Mr. Canning here, in Exhibit 6, in
16    February of 2018, says he's rejecting more than accepting
17    the time invoices and complains about time being invoiced
18    for workers who are not on site and being overcharged for
19    labor, do you believe that was a -- Mr. Canning's good-faith
20    review of the records, or do you believe that's the result
21    of racist or discriminatory conduct?
22    A.   No.  Just review records.
23    Q.   Because as we saw, even after this issue in
24    Exhibit 6, in February of 2018, when Mr. Canning is
25    complaining about inaccurate time records and overbilling, a

71

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    month later, Mr. Canning is recommending you and Petro to
2    Aggreko, right?
3         MS. ROHN:  Objection to form.
4    Q.   (Mr. Kaplan)  That's the sequence, correct?
5    A.   Correct.
6    Q.   All right.  Let's talk a little bit about the WAPA
7    facilities.
8         The WAPA facilities are what's known as live
9    hydrocarbon facilities, right?
10    A.   Correct.
11    Q.   The WAPA facilities can pose extremely serious
12    safety risks, right?
13    A.   Correct.
14    Q.   Propane is a highly flammable material, right?
15    A.   Correct.
16    Q.   There are risks of fires and explosions at the
17    facilities where Petro and IPOS and Vitol operated, right?
18    A.   Correct.
19    Q.   There's the risk of releasing toxic gases or
20    vapors at these facilities, right?
21    A.   Correct.
22    Q.   Therefore, there are serious health and
23    environmental risks for all work and activities that are
24    done at these facilities at issue in this case, right?
25    A.   Correct.

72

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1    Q.   And the -- the health and environmental risks are
2    posed to all of the workers and contractors on the site,
3    right?
4    A.   Correct.
5    Q.   They also pose a health and environmental risk for
6    the entire community and for the entire island, correct?
7    A.   Correct.
8    Q.   And because of the extreme health and safety and
9    environmental risks, everything done on the job sites must
10    be done safely, right?
11         MS. ROHN:  Object to the form.
12    A.   Correct.
13    Q.   (Mr. Kaplan)  And because of the extreme health,
14    safety and environmental risks, everything done on the WAPA
15    sites must be done in compliance with safety and technical
16    requirements, correct?
17         MS. ROHN:  Objection to the form.
18    A.   There's standards, if that's what you're saying.
19    Q.   (Mr. Kaplan)  And all work done and all
20    activities done at the WAPA, IPOS, and Vitol jobs, have to
21    be done in accordance with safety and technical standards,
22    right?
23         MS. ROHN:  Object to the form.
24    A.   Correct.
25    Q.   (Mr. Kaplan)  Now, Petro had an obligation to make

**Page 73**

1　sure all of Petro's employees who worked at the propane
2　facilities were properly trained, right?
3　　　**A.**　Correct.
4　　　**Q.**　And Petro had an obligation to make sure that all
5　of its employees who worked at the WAPA facilities were
6　qualified, properly qualified, right?
7　　　**A.**　Correct.
8　　　**Q.**　Petro also had an obligation to make sure all of
9　its employees, who worked at the facilities, were properly
10　supervised, right?
11　　　**A.**　Correct.
12　　　**Q.**　What was your understanding, sir, of what
13　Mr. Canning's job was in September of 2019, at the time of
14　the maintenance contract was signed?
15　　　**A.**　What I understood, he was the project -- I mean,
16　he was the facility engineer.  I don't know what his
17　technical, or what his job was, but what I understood, he
18　was the facility engineer.  He was directly responsible for
19　projects, and basically our work, in general.  The site
20　maintenance.
21　　　**Q.**　As the facility engineer, was it your
22　understanding that Mr. Canning was responsible for the
23　overall safety of all work done at the facility?
24　　　　　**MS. ROHN:**  Objection to the form.
25　　　**A.**　Yes.

**Page 74**

1　　　**Q.**　**(Mr. Kaplan)** Was it your understanding
2　Mr. Canning, as the facility engineer, was responsible for
3　the overall quality and integrity of all of the work that
4　was done at the facility?
5　　　**A.**　Yes.
6　　　**Q.**　Now, you didn't believe that Mr. Canning was an
7　employee of IPOS, right?
8　　　**A.**　No.
9　　　**Q.**　You knew that Mr. Canning was not an employee of
10　IPOS, right?
11　　　**A.**　Correct.
12　　　**Q.**　And you knew that Mr. Canning was not an employee
13　of Vitol, correct?
14　　　**A.**　I do believe he was, at some part, an employee of
15　Vitol.  There was a contract with him, that I understand.
16　This is just my understanding.
17　　　**Q.**　Do you believe he was an employee of Vitol, or
18　just a contractor of Vitol?
19　　　**A.**　I don't know the difference.
20　　　**Q.**　All right.  Mr. Canning wasn't at your meeting
21　with Vitol in Houston in March of 2021, correct?
22　　　**A.**　Correct.
23　　　**Q.**　As the facility engineer, to your understanding,
24　did Mr. Canning have a proper role to review planned work?
25　　　**A.**　Yes.

**Page 75**

1　　　**Q.**　Did Mr. Canning have proper responsibility, as you
2　understood it, to review budgets for maintenance and project
3　work?
4　　　**A.**　Yes.
5　　　**Q.**　All right.  So I take it you -- you have no issue
6　with Mr. Canning carefully reviewing Petro's work plans,
7　right?
8　　　**A.**　Correct.
9　　　**Q.**　You have no issue with Mr. Canning carefully
10　reviewing Petro's work procedures, right?
11　　　**A.**　That's right.
12　　　**Q.**　And you have no issue with Mr. Canning carefully
13　reviewing the actual quality of the work that Petro
14　performed, correct?
15　　　**A.**　Correct.
16　　　**Q.**　Okay.  And you also would have no issue with
17　Mr. Canning expressing concerns or criticisms about Petro's
18　budgets, right?
19　　　**A.**　Correct.
20　　　**Q.**　You would have no issue with Mr. Canning
21　expressing concerns or criticisms with the quality of the
22　Petro's procedures, correct?
23　　　**A.**　Correct.
24　　　**Q.**　And you would have no issue with Mr. Canning
25　expressing any concerns or criticisms of the quality of

**Page 76**

1　Petro's work, correct?
2　　　**A.**　Correct.
3　　　**Q.**　Now, you agree that Petro had an obligation to
4　submit information to IPOS that was accurate and truthful,
5　correct?
6　　　**A.**　Correct.
7　　　**Q.**　And the same would be true to WAPA or to Vitol,
8　all the information that Petro would submit on its work, you
9　needed to be truthful and accurate, correct?
10　　　**A.**　Correct.
11　　　　　(Respite.)
12　　　**Q.**　Did you have weekly meetings with Andrew Canning
13　during the term of the maintenance contract?
14　　　**A.**　We had weekly meetings with IPOS, and he was in
15　there.
16　　　**Q.**　These were in-person meetings?
17　　　**A.**　Zoom, Skype.  Whatever.  Some of them were in
18　person, but a lot of them was.
19　　　**Q.**　And who -- who -- who attended these meetings?
20　　　**A.**　Obviously -- I'm sure attendance differed at
21　various points, but were there consistent folks who attended
22　these meetings?
23　　　**A.**　Generally, the general managers, David Smith,
24　Merlin.  The supervisors in charge, operations manager.  I
25　mean, operations supervisors.  Maintenance supervisors.

77

1    Yeah, right, of IPOS.
2         Q.   So you identified Mr. Smith and Mr. Figueria?
3         A.   Andrew Canning.  Merlin.
4         Q.   Sorry.  Merlin and Mr. Smith, you're saying those
5    are the terminal managers?  The general managers, right?
6         A.   Those are the general managers.
7         Q.   Okay.  And who are the supervisors?
8         A.   Coury Hodge.  Calvin Schmidt.  Granger Rawle.
9    Etienne, Alex Etienne.
10        Q.   Yes.
11        A.   And then you had Mr. Canning.
12        Q.   Anyone else you recall, who was sort of a regular
13   player, would attend any of these meetings?
14        A.   Obviously, my general manager, which is Chad
15   Persuad, also.
16        Q.   No one from Vitol participated in these weekly
17   meetings?
18        A.   Toward the end, they -- they were wanting to be
19   part of the meeting.
20        Q.   Who was that?
21        A.   Charlotte and Tim.
22        Q.   Anyone else?
23        A.   That's it.
24        Q.   Okay.  And when, during -- you said, "toward the
25   end."  At what point in time?

78

1         A.   I don't know.
2         Q.   You said, "towards the end."  At what point in
3    time do you recall Ms. Horowitz or Mr. Kologinczak getting
4    involved in the weekly meeting?
5         A.   They wanted to get involved after we visited them
6    in Houston.  After they found out there was a weekly
7    meeting.
8         Q.   So sometime after late March 2021?
9         A.   Correct.
10        Q.   Let me show you what I'm going to mark as
11   Exhibit 7.
12             (Deposition Exhibit No. 7 was
13             marked for identification.)
14             And this is a IPOS 008440.
15        A.   Thank you.
16        Q.   Take a look.  Take a minute, if you would, sir --
17        A.   Yes.
18        Q.   -- and familiarize yourself with Exhibit 7?
19        A.   Correct.  (Witness complies.)
20        Q.   Do you recall the back and forth with Mr. Canning
21   about the timesheets and the bills that's reflected here in
22   Exhibit 7?
23        A.   Yes.
24        Q.   Now, Ms. Rodriguez, she works for Petro?
25        A.   Yes.

79

1         Q.   She is the office manager?
2         A.   Correct.
3         Q.   Okay.  So Ms. Rodriguez would send out invoices or
4    bills or other information?
5         A.   Yes.
6         Q.   All right.  So there were various issues being
7    talked about here, involving certain travel arrangements to
8    bring workers onto the job site, right?  The chartering of a
9    plane.  Do you recall that?
10        A.   Correct.
11        Q.   And then there was an issue of a welder billing
12   for 10 hours of time on a day, when he didn't arrive until
13   3:00 p.m. that afternoon, right?
14        A.   Correct.
15        Q.   Okay.  And in response to Mr. Canning's concerns,
16   Petro revised the invoice to reduce the time for the welder
17   from 10 hours to five hours, correct?
18        A.   Correct.
19        Q.   And there were other changes that -- that Petro
20   made in response to Mr. Canning's concerns?
21             For example, on the third page, Mr. Canning
22   points out that Chad and Elias were both being charged at
23   superintendent rates.
24             Do you recall that?
25        A.   Yes, I do.

80

1         Q.   Okay.  And in response to Mr. Canning's concerns,
2    Petro changed Chad's designation to project manager instead
3    of project superintendent, right?
4         A.   Correct.
5         Q.   Who was the project superintendent?
6         A.   As I recall, it was Elias.
7         Q.   And did it -- did the role of project manager or
8    project superintendent change over time for Petro?
9         A.   If I recall -- trying to figure out which job this
10   was.  What project it was.  I just can't recall which
11   project it was.  I apologize.  I can tell you if you give me
12   a second real quick.
13             Oh, here it is.  Okay.  So this is the
14   reverse loading project that we had here, and it states
15   there on the back page.  So, yeah, that was a project, so we
16   did have project manager and a project superintendent.
17        Q.   All right.  If you go up on the second page to the
18   bottom of that long e-mail, Mr. Canning is asking for
19   justification of charging for Elias, as the project
20   superintendent, right?
21        A.   Okay.
22        Q.   Do you see that?
23        A.   Yes, I do.
24        Q.   Great.
25             And then he says, he's also asking for

81

1  justification for why Chad was elevated to project manager.

2          Do you see that?

3      A.  Correct.

4      Q.  Says, "I don't remember this being agreed, in my

5  opinion it's unjustified and more importantly it does raise

6  further the requirement for PIS," that's Petro, right?

7      A.  Correct.

8      Q.  "Does raise the requirement for Petro to submit

9  clear a plan for the manning that they propose to use and

10 their roles on any future work," right?

11     A.  Correct.

12     Q.  Did you believe it was a fair request from

13 Mr. Canning to ask for a clear plan for the staffing of

14 projects and their roles?

15     A.  If I can add to this, this was basically almost 60

16 days after we submitted this invoice.  So we basically just

17 had to say what he wanted so we could get paid.

18     Q.  But was the request a fair request; to have a

19 clear plan for the staffing and the staff's roles on the

20 project?

21         MS. ROHN:  Objection to form.

22     A.  So my answer to that was -- and I did answer it

23 was not on here -- was that we need to do that before the

24 project started, not after, or 60 days after.

25     Q.  (Mr. Kaplan) Mr. Canning goes on to say, "I do not

82

1  expect to pay any more for Elias than I do for Johnny."

2          Do you know who Johnny is?

3      A.  Where is that, sir?

4      Q.  It's the next sentence on the second page.

5      A.  Okay.

6      Q.  So Mr. Canning says, "So, I do not expect to pay

7  any more for Elias than I do for Johnny."

8          Do you see that?

9      A.  Correct.

10     Q.  Who's Johnny?

11     A.  Johnny is our foreman in St. Thomas.

12     Q.  Okay.  And Mr. Canning goes about Johnny.  He

13 says, "who performed head and shoulders above his peers."

14         Do you recall that?

15     A.  Correct.

16     Q.  So Mr. Canning was being complimentary of Johnny's

17 work, correct?

18     A.  Yes.

19     Q.  So whatever you believe about Mr. Canning, he

20 didn't bias his view about the quality of Johnny's, your

21 foreman's, work, right?

22     A.  Johnny is in our maintenance team, and Elias is in

23 our project.  Completely two different scopes of work.

24 Complete different projects.  So what Elias does is

25 completely different from whatever Johnny does.

83

1      Q.  I'm asking about Johnny.

2          Whatever you believe about Mr. Canning,

3  didn't influence Mr. Canning's view of the quality of

4  Johnny, your fore -- your maintenance foreman's work, right?

5      A.  Okay.  Yes.

6      Q.  True?

7      A.  True.

8      Q.  All right.  Then if you go up to the top of the

9  e-mail on the first page.

10     A.  First page.

11     Q.  There's a discussion about timesheets --

12     A.  Correct.

13     Q.  -- right?  Okay.

14         Mr. Canning says, "In respect of the

15 timesheets, it's clear that two of the timesheets have been

16 changed since signing which under any circumstances is an

17 unacceptable practice."

18         Do you see that?

19     A.  Correct.

20     Q.  Okay.  Then he says, "however in the two cases

21 presented I'm satisfied that there was no fraudulent intent

22 related to the changes and just an oversight."

23         Do you see that?

24     A.  Correct.

25     Q.  Okay.  So Mr. Canning, in this situation, whatever

84

1  concerns that he had, he concluded, after going back and

2  forth, that it was an oversight, and not some intent to --

3  to overcharge, right?

4          MS. ROHN:  Objection.  Compound.

5      A.  Correct.  His way of saying it, and that's the way

6  it is, he'll throw the jab out there, and say, oh, because

7  we've already discussed this, about this is not the way it

8  was, this is the way it happened.  He puts an e-mail, but,

9  again, that is Andrew.  Just -- anyways.

10     Q.  (Mr. Kaplan) The conclusion that was reached here

11 was a conclusion that the billing issue -- the bills were

12 incorrect, right?

13     A.  No, they were actually correct.  And he concluded

14 that, yes, there was some adjustments on there, but the

15 adjustments were justifiable, and that's why he was okay

16 with it.  And there's more to this than just --

17         MS. ROHN:  You have to finish your sentence.

18     A.  I'm sorry.  Yes.

19         So, anyways, what I'm saying is that there's

20 more to this, right?  So it was not that we were -- we were

21 trying to amend or change timesheets.  It's not like that,

22 okay?  And he accepted that.  He said, I understand why.

23     Q.  (Mr. Kaplan) Okay.  Mr. Canning then goes on at

24 the bottom, he says, "Going forward it's clear that work

25 hour recording and authorization procedures must be

85

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1  tightened up on both sides," right?

2      A.   Correct.

3      Q.   He said, "so I'm suggesting the following

4  procedural changes."

5           Do you see that?

6      A.   Correct.

7      Q.   And he lays out a five-part procedure for the

8  submission and review of timesheets, right?

9      A.   Correct.

10     Q.   Did you think there was anything unfair or

11 discriminatory about the procedure that Mr. Canning was

12 proposing that both sides use for time records?

13     MS. ROHN:  Objection.  Compound.

14     A.   This is the same thing that we've been using

15 for -- since we've had, with the exception of a Z that he

16 drew for the rest of the columns, yes.

17     Q.   (Mr. Kaplan) Do your -- at Petro, do your -- does

18 your staff, project manager, superintendents, all the way

19 down, keep daily timesheets?

20     A.   Yes.

21     Q.   And do they describe the tasks that they're doing

22 during the day?

23     A.   Yes, they do.

24     Q.   In what form are those documents kept at Petro?

25     A.   I'm sorry.  It's literally a form, and they're

86

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1  just filling it out on a daily basis.  Those are submitted

2  over to our office.

3      Q.   They're submitted over to Petro's office?

4      A.   Correct.

5      Q.   To the office manager?

6      A.   Correct.

7      Q.   And the office manager, what does she do with the

8  timesheets?

9      A.   Those are used also for payroll.  So payroll's

10 first, and then also those are used for billing.

11     Q.   Does Petro maintain copies of the timesheets?

12     A.   Yes.

13     Q.   Okay.  For how long?

14     A.   Gosh, we have not thrown anything away since the

15 last -- since we exist, five years.

16     Q.   Okay.  So Petro has records of -- daily records of

17 the timesheets for all the workers and staff who did work

18 under the maintenance contract for IPOS, correct?

19     A.   Yes.

20     Q.   Have you produced those daily timesheets in the

21 case?

22     A.   Yes.  In fact, every invoice has the daily

23 timesheets.

24     Q.   Are the timesheets the same as the invoices?

25     A.   So you have an invoice, and to actually back up

87

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1  that invoice, there's timesheets.  There's receipts.  So

2  every single one of them, yes.

3      Q.   Okay.  So the daily timesheets, you're saying, get

4  submitted, at the end of the day, to the office manager.

5  Those are attached to or in the file with the invoices?

6      A.   Correct.

7      Q.   Okay.

8           (Respite.)

9           All right, sir.  I'm going to show you what

10 I've marked as Exhibit 8, PIS12.

11          (Deposition Exhibit No. 8 was

12          marked for identification.)

13          Exhibit 8 is an e-mail chain from January 21,

14 2021.

15          Do you see that?

16     A.   Yes.

17     Q.   Okay.  And the subject is RIO, R-I-O, shades.  RIO

18 shades.  Do you see that?

19     A.   RIO, yes.

20     Q.   Okay.  What are RIO shades?

21     A.   They're RIO panels.  Basically covering

22 instrumentation.  Providing a shade for instrumentation.

23     Q.   All right.  On this e-mail, you are writing

24 to Mr. -- to Merlin and several others at IPOS, and

25 Mr. Persaud, right?

88

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1      A.   Correct.

2      Q.   "Good morning gents, I met with Andrew this

3  morning to discuss a few issues regarding the RIO panels.

4  These were the issues that were discussed."

5           The first one, it says, "quality of a few

6  welds on the panel by the boiler room."

7           Do you see that?

8      A.   Correct.

9      Q.   And then where it has blue in there, that's your

10 comment on the e-mail, correct?

11     A.   Okay.  Yes.

12     Q.   Okay.  And you wrote, "bad positioning.  welds are

13 acceptable but told the guys better quality is needed."

14          Do you see that?

15     A.   Correct.

16     Q.   So Mr. Canning expressed some concerns about the

17 welds that were done on this particular project, correct?

18     A.   Correct.

19     Q.   And you reviewed them, and you concluded there was

20 bad positioning, the welds are acceptable, but you told your

21 guys that better quality is needed, right?

22     A.   Correct.

23     Q.   Another issue that had been -- Mr. Canning had

24 raised with you was, "break-times running long including

25 leaving early."

1      Do you see that?

2         A.   Correct.

3         Q.   All right.  And you wrote, "No excuse the guys

4    will improve on this," correct?

5         A.   Correct.

6         Q.   So on these two issues that Mr. Canning raised

7    with you, you acknowledged that Mr. Canning had raised

8    legitimate concerns, true?

9         A.   Correct.

10        Q.   All right.  And you say at the bottom, "we will

11   improve and complete the job," right?

12        A.   Correct.

13        Q.   Okay.  You recognized a need for improvement,

14   correct?

15        A.   Correct.

16        Q.   All right.  So here, in January 21, Mr. Canning

17   wasn't raising baseless concerns about your work; he was

18   raising legitimate concerns about Petro's work, right?

19        A.   Correct.

20             Can we read Number 3, though?

21        Q.   Sure.

22        A.   I mean, there's also more to that.

23        Q.   "work not progressing fast enough."  And you

24   described that there was an engineer, project manager, and

25   they're having to make adjustments --

1         A.   Correct.

2         Q.   -- to his request, right?

3         A.   Correct.

4         Q.   And there was an issue with a magnetic drill being

5    used, and the pace of the drill, right?

6         A.   Yep.  Correct.

7              MR. KAPLAN:  All right, sir.  I want to talk

8    about -- actually, you know what?  Let's take a little

9    restroom break, and we'll change topics, if that's all

10   right?  Off the record.

11             THE VIDEOGRAPHER:  Going off the record.  The

12   time is 11:46.

13             (Short recess taken.)

14             THE VIDEOGRAPHER:  Going back on the record.

15   The time is 11:58.

16        Q.   (Mr. Kaplan) Okay.  Mr. Canning, I just want to

17   make sure we're clear on one topic, and then I want to move

18   to this issue about the so-called platform incident.

19        A.   Well, hold on, can I just go back to RIO -- RIO

20   shades again?

21        Q.   Sure.

22        A.   Just wanted to not clarify, just kind of bring up.

23             The two -- the two items that -- number one

24   and number two, which I agreed needed to be improved.

25             The second one, and just to give you guys

1    more of insight on this, this was a hard-dollar project that

2    we had.  We had to give a price.  We had to give an amount

3    to start and to finish it, okay?  That's why the third

4    comment on here was that there was a project engineer/

5    manager running the job.  That's the way it was.  That's the

6    way it was -- it was -- the job had -- had to produce, or

7    had to done, right?  That person was David Nagle.

8              By what I was saying on here, and if I can

9    just read, there was a lot more than what the actual project

10   scope that was given to us for us to price.  Because of

11   these delays, our budget was -- was going to be over --

12   over -- over budget, so that's why I had to include this.

13   So this kind of went on deaf ears, both by Andrew Canning

14   and by David Nagle.  There was just more exploratory work

15   than it was -- actually was, so that's why I had to explain

16   myself.  It wasn't just our performance was doing badly; it

17   was just that their scope, original scope, was not accurate.

18        Q.   You're not accusing Mr. Nagle of any

19   discrimination, are you?

20        A.   No.  No, I'm not saying him.  What I'm saying is,

21   that's -- it's not about our performance, or why we were

22   doing it wrong or what have you.  Yes, there was some

23   improvements to do, but a lot of the performance it was, it

24   was because of their lack of scope.

25        Q.   The break times running long was a result of this

1    scope issue?

2         A.   Break longs were five minutes.  It was not -- the

3    scope issue was weeks, not five minutes.

4         Q.   So the break -- the breaktime issue was, in your

5    mind, was just a total non-issue, right?

6         A.   Yeah.  I mean, of course, we needed to improve on

7    it, but, again, it was weeks because of the -- the scope

8    issue.

9         Q.   But what you wrote, at the time, in Exhibit 8,

10   about the breaktime issue was, "no excuse the guys will

11   improve on this," right?

12        A.   Correct.  Correct, but the same token, what I'm

13   saying here, is that we were drilling.  The scope was not in

14   there.  The pace got slower because of that, and

15   unfortunately, that was not predicted.  Again, scope.  I'm

16   sorry.  It was the scope.  It's just the engineering

17   scope was not there.

18             Actually, what happened was, there's a RIO

19   panel or a RIO shade panel in St. -- in St. Croix, which

20   this is part of it.  And, I mean, Merlin, the general

21   manager, just told us in St. Thomas, don't worry about David

22   Nagle.  Don't worry about Andrew Canning.  You guys go do

23   the panel yourself.  We completed it.  They accepted it, and

24   we still haven't gotten paid for it.

25        Q.   By IPOS?

**Page 93**

1  A.  No.  This is a project list for Vitol.

2      Well, strike that.  I don't know if it's

3  Vitol or IPOS.  One of them haven't paid us.  We invoiced

4  IPOS, but I understand it was a Vitol project, so that was

5  internal.  I don't know.

6  Q.  You don't know who owes you money on the RIO

7  project in St. Thomas?

8  A.  I believe it was Charlotte, which is Vitol.  But,

9  again, their accounting was just -- I don't know.

10  Q.  All right.  Did you submit a change order for the

11  RIO shades project for this expanded scope that you're

12  talking about?

13  A.  We submitted a change order.

14  Q.  Was it rejected?

15  A.  It hasn't got paid.

16  Q.  But was the change order signed?

17  A.  The change order was acknowledged by Merlin,

18  correct.

19  Q.  Okay.  We talked about Johnny, your foreman.  I

20  didn't catch his last name.  Could you tell me what his last

21  name is?

22  A.  Johnny Alfonseca.

23  Q.  Could you spell that for us?

24  A.  Oh, my gosh.

25  Q.  Give us your best effort.

**Page 94**

1  A.  I can't write this.  Let me just --

2  Q.  That's okay.

3  A.  So, A-L-F-O-N-S-E-C-A.

4  Q.  What's Johnny's racial or ethnic background?

5  A.  I believe he is Dominican.

6  Q.  And we talked about this term you used of

7  "harboring."  We talked about -- you told me that you never

8  reported any allegation of discrimination or racist behavior

9  of Andrew Canning to anyone at Vitol, correct?

10  MS. ROHN:  Objection.  Asked and answered

11  multiple times.

12  A.  I answered yes.

13  Q.  (Mr. Kaplan) I just want to make sure.

14      You're not aware of anyone else, are you,

15  reporting any racist or discriminatory behavior of

16  Mr. Canning to anyone at Vitol?

17  A.  Repeat.  I'm sorry.  Answer your question.

18  Q.  Just, you told me that you didn't, and no one, to

19  your knowledge, at Petro, ever reported any allegation of

20  racist or discriminatory behavior of Mr. Canning to Vitol.

21      What I'm asking you now is, are you aware of

22  anyone outside of Petro ever telling anyone at Vitol about

23  any allegation of racist or discriminatory behavior by

24  Mr. Canning?

25  A.  Not that I know of.

**Page 95**

1  Q.  Okay.  I want to talk about this platform

2  incident.

3      Do you recall, in February of 2021, there was

4  an incident on St. Thomas with a -- the grating over a

5  platform above a boiler?

6  A.  Correct.  Yes.

7  Q.  Okay.  Were you present when this incident

8  occurred, and Mr. Canning fell through the platform?

9  MS. ROHN:  Objection.  Form.

10  A.  He didn't fall through the platform, but, no, I

11  was not there.

12  Q.  (Mr. Kaplan) Okay.  Tell me what you understand

13  happened with this platform incident.

14  A.  So I was called the day -- the day of.  What I

15  understand was that we had -- we had -- we were working on

16  the platform.  That we had given instructions over to IPOS

17  operations and their maintenance manager that the platform

18  was not complete, okay?

19      What I understand is that Andrew Canning was

20  in the area.  Decided to go up to the platform.  While he

21  went up there, there was some jumping or some -- I don't

22  know what he was doing, and that he came back angrily back

23  to the control room, and stated that he almost fell.

24  Q.  When you said you were called, do you remember who

25  called you on --

**Page 96**

1  A.  Chad Persaud, and I'm sure also my safety manager,

2  Frank Kirsch.

3  Q.  They called you together, or separately?

4  A.  Separately.

5  Q.  As far as you're aware, there's no video footage

6  of this incident, correct?

7  A.  Not to my knowledge.

8  Q.  Are you aware of any photos of the incident or the

9  aftermath of the incident?

10  A.  I understand that they had a safety review.  I

11  don't know what that involved.  This is IPOS.

12  Q.  Okay.  But Petro, you're not aware of Petro, or

13  anyone at Petro, to your knowledge, having any videos or

14  photos of the incident or its aftermath?

15  A.  No.

16  Q.  Okay.  And you said you were not there on site

17  when this incident happened at the platform, correct?

18  A.  Correct.

19  Q.  So you don't have firsthand knowledge of what did

20  or didn't happen, true?

21  A.  Correct.

22  Q.  Now, you said that your -- your team was working

23  on the platform, but it wasn't completed, right?

24  A.  Correct.

25  Q.  Okay.  Tell me, as best you know, what work had

97

```
 1   been done on the platform, and what work remained to be done
 2   on the platform, at the time this incident occurred.
 3       A.   What remained was, we had to install some -- some
 4   clips to tie down, or to basically secure down the grating.
 5       Q.   Okay.
 6       A.   Those were ordered.
 7       Q.   I'm sorry?
 8       A.   Those were ordered, and they were -- they were on
 9   their way.
10       Q.   Okay.  What work had been done, up to the point of
11   time where you needed to install these clips?
12       A.   What had been done?  I'm sorry.  Actually, the
13   platform itself?
14       Q.   Yes, sir.
15       A.   Okay.  So, yeah.  We secured the platform.  We put
16   some, called toeplates, so you can't slip out of it.  We
17   repaired the swinging gate.  I think we installed -- we
18   actually raised the platform.  Actually lowered the
19   platform.  Yeah, lowered the platform section.  I'm sorry.
20   Raised the platform, so we could have access to a -- to a
21   valve.  That's the general scope.
22       Q.   Was there any welding that had been done on the
23   platform at the time of this incident?
24       A.   When we raised it, we had to adjust it, yes.
25       Q.   And was it through tack welded?  Do you know what
```

98

```
 1   that means?
 2       A.   Yes.
 3       Q.   Was that the state of the welding on the platform
 4   at the time of the incident, that it had been tack welded?
 5       A.   Not that I recall.
 6       Q.   Was there any additional welding done to the
 7   platform after the Canning incident?
 8       A.   Not that I recall.
 9       Q.   Were these additional clips installed after the
10   incident?
11       A.   Yes.
12       Q.   Now, you mentioned when you -- a minute ago, that
13   Petro had told IPOS that the work on the platform was not
14   done, correct?
15       A.   Correct.
16            MS. ROHN:  Sorry.
17            MR. KAPLAN:  No worries.
18       Q.   (Mr. Kaplan)  Who, at Petro, told IPOS that the
19   work on the platform had not been done before the date of
20   this February 12th, 2021 incident?
21       A.   Okay.  I understand that Chad Persuad was one of
22   them.  The second person was Elias Rivera, so it was twice.
23   It was communicated over to Coury Hodge, which is actually
24   the maintenance manager.  I'm sorry.  Supervisor.
25   Maintenance supervisor for the facility.
```

99

```
 1       Q.   Okay.  So you believe Petro -- Mr. Persuad told --
 2   and Mr. Rivera --
 3       A.   Yes.
 4       Q.   -- both told Rawle Granger?
 5       A.   No.  Coury Hodge.
 6       Q.   Okay.  I'm sorry.  You believe Mr. Persuad and
 7   Mr. Rivera both told Mr. Hodge that Petro's work on the
 8   platform was incomplete, as of February 11th, 2021?
 9       A.   I believe so.
10       Q.   Okay.
11       A.   I believe the date is right, yes.
12       Q.   Do you know when Mr. Persuad and Mr. Rivera told
13   IPOS that Petro's work on the platform was incomplete?
14       A.   I can't recall the date.
15       Q.   Do you know if Petro had marked or signed or done
16   anything around the area to indicate that it was not a safe
17   zone to be in or on?
18       A.   Okay.  So the reason we tell the maintenance
19   manager is so they'll tell the operation manager not to give
20   permits, right?  So if you don't have a permit, you should
21   not access any of the facility.  So, therefore, Andrew
22   Canning didn't have a permit to go in that access platform.
23   To go there.  So if he would have gone to get a permit, he
24   would have found out that it was not secured.
25       Q.   Okay.  So I understand you're saying you told
```

100

```
 1   IPOS, and, therefore, IPOS shouldn't have given permits to
 2   folks.  But my question is different.
 3            Did Petro do anything to blockade the area,
 4   mark the area, or do anything else to indicate to anyone
 5   that they shouldn't be in or on that area of the platform?
 6       A.   No.
 7       Q.   Now, tell me what permit you're saying that you
 8   believe Mr. Canning needed to have to be in the area of the
 9   platform?
10       A.   There's area permits, right?  And there's -- you
11   go every morning, what we're going to do, because it's a
12   live facility, so specifically, you have to go.  Hey, I'm
13   going to access this valve on this access platform.  Go get
14   a permit for that.  I have to go see this.  I have to go see
15   the boiler.  You got to get a permit.  So everything has a
16   permit.  You can't just walk around aimlessly, because
17   there's danger.
18       Q.   Okay.  So what specific permit would be needed to
19   go access this area where the platform above the boiler is?
20       A.   There's an -- there's an actual valve that I
21   understand Andrew was looking at.
22       Q.   Okay.  And so you believe that this incident
23   should have been avoided by Petro not issuing a permit to
24   Mr. Canning to be in the area where this platform was above
25   the boiler?
```

1    A.   So IPOS.  Petro is not issuing a permit.

2    Q.   Sorry.

3    A.   Yeah.

4    Q.   Excuse me.  I misspoke.  Fair enough.

5    A.   So IPOS's not issuing a permit.

6    Q.   Yes.  To be clear, you believe this platform

7   incident in February 2021 should have been avoided because

8   IPOS shouldn't have issued a permit to Mr. Canning to be in

9   the area where the platform was above the boiler, right?

10    A.   That's what I understand.

11         And to further that, IPOS did a

12   investigation, what have you.  They call it a miss -- near

13   miss, and they put on there that there was no permit

14   granted.

15    Q.   Did Petro -- did Petro do any investigation of

16   this platform incident?

17    A.   Correct, yes.

18    Q.   You did?

19    A.   Yes.

20    Q.   Okay.  Did you document -- who did the

21   investigation?

22    A.   Safety manager, Frank Kirsch.

23    Q.   Okay.  Did Mr. Kirsch issue a report or a memo or

24   any other document that reflects his safety investigation?

25    A.   Yes.

1    Q.   Okay.  And in what form is -- is Mr. Kirsch's

2   investigation?

3    A.   There's an incident report that he filled out, and

4   that's internal documentation.

5    Q.   So there should be a Petro incident report for the

6   platform incident?

7    A.   Correct.

8    Q.   And you believe Petro has produced the incident

9   report for this platform investigation?

10    A.   I believe so.  If not, I'll produce it.

11    Q.   Are there any other incidents during the term of

12   the maintenance contract for which Petro wrote an incident

13   report?

14    A.   Not that I recall.

15    Q.   So the only incident that you recall, during the

16   term of the maintenance contract, where Petro did a internal

17   incident report, is this February 2021 platform incident

18   with Mr. Canning?

19    A.   That's correct.

20    Q.   Okay.  Tell me, what do you understand

21   Mr. Kirsch's conclusion to have been on his incident report?

22   The cause of this near miss?

23    A.   Well, the cause of the near miss is

24   non-permitting.  Should not be in an area where you don't

25   have a permit.  You should not access that area.  It's still

1   a near miss, because somebody was still up there.

2         Now, the reason he was up there is still

3   unknown.  What he was doing up there is still unknown.  It's

4   actually a grating.  If you ever sat on a -- stood on a

5   grating, it's not going to move.

6         Now, if you're jumping on it, that's a

7   different story.  The story was that he was actually jumping

8   on it, and he was being -- he was trying to see if something

9   would happen.  There was -- David Nagle was next to him,

10   too.  Next to Andrew Canning on the -- well, actually, I

11   don't think got on there, but he was -- he was not on the

12   access platform, but I understand he was actually on the

13   ground.  And actually the comments were that David Nagle

14   came back to the control room, told -- told Chad Persaud

15   that Andrew Canning was actually jumping on it.

16    Q.   Was Mr. Nagle, do you believe, in an area that he

17   shouldn't have been in?

18    A.   No.

19         Furthermore, to that, when Mr. Canning came

20   back to the operations room, he was livid, cussing, calling

21   everybody out in front of operations, Petro, my safety

22   manager, everybody.  And I did send out a lengthy e-mail to

23   general manager, David Smith, and Mr. Merlin, about the

24   occasion, which is completely unprofessional.

25    Q.   You didn't hear anything that Mr. Canning did or

1   didn't say on this day, correct?

2    A.   Not that I.

3    Q.   Right?

4    A.   No.

5    Q.   You don't know where Mr. Nagle was, or Mr. Canning

6   was, yourself, do you?

7    A.   I was not there.

8         MS. ROHN:  He is the 30(b)(6) witness for the

9   company, however.

10    Q.   (Mr. Kaplan) You, sir, personally, have no

11   firsthand knowledge about where Mr. Nagle was or Mr. Canning

12   was on the day of the platform incident, correct?

13    A.   Correct.

14    Q.   You talked to Mr. Nagle about this incident?

15    A.   No.

16    Q.   Ever?

17    A.   No.

18    Q.   You talked to Merlin about the platform incident?

19    A.   Yes.

20    Q.   When?

21    A.   By e-mail.  By phone.  Yes.  Actually the day of.

22    Q.   You talked to Mr. -- you talked to Mr. Figueira

23   the night of the incident by phone?

24    A.   Correct.

25         And I did tell him the discussions were, I'm

105

1    going to sue the shit out of Petro.  I'm going to sue the
2    shit out of IPOS.  Shitty -- shoddy work.  Said shoddy, not
3    shitty.  Shoddy work that you guys performed.  What kind of
4    company do you guys run?
5        Q.    Mr. -- you told Merlin that Mr. Canning told you
6    that Petro had done shoddy work?
7        A.    Not me.  Not me.  I wasn't out there.
8        Q.    What you told Merlin, on the day of the incident,
9    was that Mr. Canning had told the Petro employees on the job
10   that Petro had done shoddy work, right?
11       A.    Correct.
12       Q.    Not shitty work, right?
13       A.    No, but he was cussing up a storm.
14       Q.    You just made a distinction.
15       A.    Correct.
16       Q.    I want to make sure your testimony is clear.
17       A.    Correct.  Not shoddy work, but he said, What kind
18   of fucking company is Petro?  Is what I understand.  And
19   that was not just by my -- my employees, this was also by
20   IPOS employees as well.  I mean, literally, it's
21   smaller than this.  The control room is smaller than this
22   place, so you can hear everything.  So, yeah.
23       Q.    Did Mr. Canning, to your knowledge, say Petro had
24   done shoddy work or shit work?
25       A.    I said, shoddy work.

106

1        Q.    Okay.
2        A.    I corrected myself.
3        Q.    But you said Mr. Canning did say, what kind of
4    fucking company is Petro?
5        A.    Yeah, he did cuss.  Absolutely.
6        Q.    And who told you that?
7        A.    Frank Kirsch, Chad Persuad, and, yeah,
8    that's what I remember.
9        Q.    Okay.  Let me show you Exhibit 9, sir.
10             (Deposition Exhibit No. 9 was
11             marked for identification.)
12             Exhibit 9 is PIS25.
13             I'm sorry.
14             MS. ROHN:  That's all right.  Just a bad
15   pass.
16       Q.    (Mr. Kaplan)  Okay.  Let's start at the bottom of
17   the first page, sir.  This is an e-mail from you to
18   Mr. Figueira and Mr. Smith, dated February 11, 2021,
19   correct?
20       A.    Correct.
21       Q.    And it was sent at 6:14 p.m., at the end of the
22   workday, right?
23       A.    Okay.
24       Q.    Yes?
25       A.    Yes.

107

1        Q.    Okay.  The subject is St. Thomas.  And you say,
2    "Good evening gents.  This is not to lessen the near mess
3    that happened this morning in St. Thomas."
4              Do you see that?
5        A.    Correct.
6        Q.    Do you think you were trying to say "near miss"?
7        A.    Correct.
8        Q.    Near miss is sort of a term of art in the
9    construction business, right?
10       A.    Correct.
11       Q.    In the safety world, it means there was an
12   incident that could have been a serious injury or fatality,
13   right?
14       A.    Correct.
15       Q.    Okay.  And so you're saying, "This is not to
16   lessen the near miss that happened ... but I did want to
17   make you guys aware of the interaction that happened
18   afterwards," right?
19       A.    Correct.
20       Q.    Okay.  Now, making Mr. Figueira and Mr. Smith
21   aware of what happened afterwards, you were telling them
22   information you got from other people, because you were not
23   there, correct?
24       A.    Correct.
25       Q.    Okay.  But Mr. Smith was.

108

1              Was Mr. Smith there?
2        A.    No.
3        Q.    Okay.  And Mr. Figueira, was he there?
4        A.    No.
5        Q.    All right.  So let's go through what you -- what
6    you wrote here.
7              You say, "Andrew confronted Chad about him
8    falling through the grading (sic) of the platform to top of
9    the boiler."
10             Do you see that?
11       A.    Yes.
12       Q.    Okay.  So Mr. Canning fell through the grating of
13   the platform on top of the boiler.  That's what you wrote,
14   right?
15       A.    That's what he claims; that he was -- he fell
16   through.
17       Q.    Okay.  Then it says, "Andrew calling our work,
18   quote, 'bullshit work,' quote, and our welding, quote,
19   'substandard' and has no place at the facility."
20             Do you see that?
21       A.    Yes.
22       Q.    So here, you said Mr. Canning did call your
23   work bullshit, but a minute ago, you said he didn't.  He
24   just called it shoddy.
25             Which one was it, sir?

109

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1    A.   It's bullshit.
 2    Q.   Then it says, "Chad went down to boiler room and
 3  met Corey and Granger which were already investigating the
 4  incident."
 5         Do you see that?
 6    A.   Correct.
 7    Q.   "Chad says that they went up on the platform to
 8  check what welding Andrew was speaking of and realized that
 9  it was not the welding and only needed additional fastener
10  clips."
11         Do you see that?
12    A.   Correct.
13    Q.   But it says here, "Chad realized that it only
14  needed additional fastener clips," right?
15    A.   Correct.
16    Q.   I thought you told me Petro had -- had already
17  told IPOS that the work wasn't done, and needed additional
18  clips, and, therefore, that the area should not be accessed,
19  right?
20    A.   Correct.
21    Q.   Okay.  So why did Chad realize, for the first time
22  after the incident, that it needed additional fastener
23  clips, sir?
24    A.   No, it needed fastener clips.
25    Q.   That's something Chad should have known before the
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

110

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1  incident, right?
 2    A.   No, it needed fastener clips, period.  Yeah.
 3    Q.   So -- but Chad knew that before the incident,
 4  right?
 5    A.   Yes.  Correct.
 6    Q.   'Cause you're saying Chad told that to IPOS,
 7  right?
 8    A.   What -- sorry, to IPOS, yes.  What I'm saying is,
 9  it needed more.  It needed fastener clips.  If it needed
10  five more, needed ten more, it needed more fastener clips.
11    Q.   Okay.  And then it goes on to say, "Andrew calls
12  Frank," that's your safety guy, correct?
13    A.   Correct.
14    Q.   That's Mr. Kirsch?
15    A.   Mr. Kirsch.
16    Q.   Okay.  What's Mr. Kirsch's background?
17    A.   For safety, he used to work in a Houston refinery.
18    Q.   What's Mr. Kirsch's racial or ethnic background?
19    A.   White.
20    Q.   What's that?
21    A.   Anglo.  White.
22    Q.   Okay.  "Andrew calls Frank over by saying 'hey you
23  safety guy, I fell through a platform because of bullshit
24  work that petro did.  How could you guys consider yourself a
25  welding company when all your work is substandard.'"
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

111

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1         Do you see that?
 2    A.   Correct.
 3    Q.   And then it says that Frank said he didn't "'need
 4  this shit' and had to walk out of Andrew's office," correct?
 5    A.   Correct.
 6    Q.   And you say to Merlin and David, that you're
 7  e-mailing them, because you thought this was not
 8  professional, right?
 9    A.   Correct.
10    Q.   Okay.  You said, to be told that your work is
11  substandard or bullshit in front of not only our employees,
12  but could be heard by IPOS employees, too, right?
13    A.   Yeah.
14    Q.   And then say, "Last thing, for whatever it's
15  worth, David Nagle did tell Chad and Frank that Andrew was
16  jumping up and down on the platform to check its integrity,"
17  right?
18    A.   Correct.
19    Q.   Okay.  David Nagle didn't tell you that
20  Mr. Canning was jumping up and down, right?
21    A.   Yeah.  That's what I said before.
22    Q.   Okay.  You're saying David Nagle told Chad and
23  Frank, and Chad and Frank told you, right?
24    A.   That's what I said before, yes.
25    Q.   Now, nowhere in your e-mail, do you say anything
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

112

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

```
 1  about Petro having told IPOS that the platform needed
 2  additional fastener clips, and should -- no one should
 3  access that area, right?  You don't write that anywhere in
 4  your e-mail on Exhibit 9, do you?
 5    A.   Not here, that's correct.
 6    Q.   Okay.  That's pretty significant, though, wasn't
 7  it?  I mean, you believed that was --
 8    A.   This was the incident report.
 9    Q.   Hold on, sir.  Hold on.
10         was it not significant to you, at the time,
11  that no one should have been anywhere near the platform
12  because it needed additional fastener clips?
13    A.   That was IPOS design.  They actually do the
14  permitting themselves.  I had told them what they needed to
15  do.  If they wanted to, they could give a permit or not give
16  a permit.  That is their decision.
17    Q.   You didn't say anything to IPOS in your report,
18  the day of the incident, that you had -- Petro had
19  previously told IPOS that the work was not done, and no one
20  should access the platform, right?
21    A.   That's not on the e-mail, correct.
22    Q.   Now, you mentioned earlier that Petro had done an
23  incident report.
24         Do you understand that IPOS was going to do
25  an investigation?
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

113

1   A.   That's what I understand.  I never saw it, so --

2   that's what I understand; they were -- they were -- they

3   were doing it, too, correct.

4   Q.   After -- all right.  So hold on.

5        You send your e-mail at 6:14 p.m. Merlin

6   responds 20ish minutes later.

7   A.   Um-hum.

8   Q.   Says, "Adrian, today was difficult for us

9   considering the situation that occurred.  We are reviewing

10  the incident and once we finalized our findings we will

11  revert," right?

12  A.   Okay.

13  Q.   Okay.  Then you wrote back the next morning.

14       Do you see that, the second e-mail on the

15  first page?

16  A.   Correct.

17  Q.   Okay.  You wrote back to Mr. Figueira and

18  Mr. Smith.  You say, "Merlin, one last thing Andrew shouted

19  out I fell to mention."  I think you meant "failed to

20  mention."

21  A.   Yeah, "I failed to mention."

22  Q.   Okay.  You say, "One last thing Andrew shouted out

23  I failed to mention in the prior email.  He stated he was

24  going to sue Petro and IPOS because he fell through the

25  platform," correct?

114

1   A.   Correct.

2   Q.   Okay.  And Mr. Figueira writes, "Ok thanks

3   Adrian," right?

4        Now, earlier, you told me that you talked to

5   Mr. Figueira by phone on the night of the incident?

6   A.   Correct.

7   Q.   Are you sure you talked to Mr. Figueira by phone,

8   in light of reading this e-mail chain in Exhibit 9?

9   A.   Of course.  Mr. Figueira and I had open

10  communication.  We talked quite a bit.  Yeah, absolutely,

11  because I was so mad and so upset, yes.

12  Q.   Okay.  Well, then, why did you wait until the next

13  morning, and why did you say to Mr. Figueira, "one thing I

14  failed to mention in the prior email?"  Didn't you tell that

15  to Mr. Figueira on the phone the night before?

16  A.   Obviously not.  I didn't put it in the e-mail,

17  that's why I put it in the e-mail.

18  Q.   Okay.  But you didn't say, One thing I forgot to

19  tell you on the phone; you said, one thing I forgot to tell

20  you in an e-mail, right?

21       MS. ROHN:  Objection.  Argumentative.

22  A.   Correct.  That's not in the e-mail.

23  Q.   (Mr. Kaplan)  Okay.  Did you ever have any further

24  discussion with Mr. Figueira about this incident after

25  February 11th or 12th, 2021?

115

1   A.   I don't recall.

2   Q.   Did anyone at Petro ever have a further discussion

3   with anyone at IPOS about the platform incident after the

4   day of, or the morning after, in this e-mail chain in

5   Exhibit 9?

6   A.   I don't recall.  It just seemed like it was kind

7   of swept underneath the carpet.  Meaning, like they were

8   just, let's move on.

9   Q.   Did you ever raise the issue of what happened at

10  the platform incident with anyone at IPOS after your e-mail

11  in Exhibit 9?

12  A.   Yes, correct.  I did mention it to Merlin that

13  this is just a constant thing of -- of Andrew just trying to

14  make us look bad.  Trying to make us look like we are

15  substandard.  That our welding -- this is just -- it was

16  just a adding.  First for the RIO panels, and now with this

17  thing.  It was just building, yes.

18  Q.   So you say you mentioned it to Merlin.  That's on

19  your -- in this e-mail and phone call you had?

20  A.   No.  This is conversation, personal.  I mean, this

21  is a phone call conversation.

22  Q.   The night of the incident?

23  A.   No, this is probably later on.  You said if we

24  mentioned this before.  Yes, I'm telling you, this was

25  mentioned before.

116

1   Q.   I'm sorry.  I'm not following.

2        MS. ROHN:  You asked him a question, if he'd

3   ever mentioned it again.

4        MR. KAPLAN:  Yes.

5        MS. ROHN:  And he said, yes.

6   Q.   (Mr. Kaplan)  And now he's saying he mentioned it

7   before.

8   A.   You were mentioning it before, so --

9   Q.   Okay.  All right.  Let me make sure I'm clear.

10       You wrote this e-mail on February 11th, 2021,

11  the day of the incident.  And you believe you also had a

12  phone call with Merlin that night, correct?

13  A.   Correct.

14  Q.   Okay.  And you're telling me, at some point,

15  thereafter, you also talked with Merlin about this incident

16  again?

17  A.   Yes.

18  Q.   Okay.  And can you place that in time at all?

19  A.   Can't recall exactly.

20  Q.   Did you ever ask Merlin for a copy of IPOS's

21  findings from the incident?

22  A.   No.

23  Q.   Did you ever ask anyone at IPOS for their

24  findings?

25  A.   No.

1    Q.   Did you ever share Petro's incident record with
2  IPOS?
3    A.   No.  Didn't ask for it.
4    Q.   Did you think it was important to provide it?
5    A.   If they didn't ask for it, no.
6    Q.   Did you ever provide Petro's incident report to
7  anyone at Vitol?
8    A.   No.
9    Q.   Did you ever tell anyone at Vitol about this
10  incident, or what you heard Mr. Canning said after the
11  incident?
12    A.   Yes, actually.  Yes, when I went to go visit them
13  in -- in March --
14    Q.   Okay.
15    A.   -- this subject came up, actually.
16    Q.   Tell me what came up in the meeting in March.
17    A.   That same thing.  You know, what happened with
18  this platform.  I explained kind of what it was.  What
19  happened.  The incident itself.
20    Q.   Did you tell anyone at Vitol, at your meeting in
21  March of 2021, that you believed Mr. Canning had acted in
22  any kind of racist or discriminatory manner?
23    A.   Not racist, no.
24    Q.   Now, the -- the additional clips that you're
25  talking about, help me understand what that means.

1    Are you talking about fasteners?  Screws?
2  Bolts?
3    A.   They're basically just -- if you see the regular
4  grating, it's basically just something holding it down with
5  a screw.  So it's just basically a clip to hold it down.
6  It's not going to -- it's just basically holding it down.
7    (Respite.)
8    Q.   How long was the time period between when you
9  finished the initial work on the platform and when you were
10  waiting for the additional clips to arrive and be installed?
11    A.   It was within that week, I believe.  Yeah, it was
12  relatively quick.  I can't give you an exact date, but it
13  should have been relatively quick.
14    Q.   Are you aware of any document from Petro to IPOS,
15  saying the clips are not -- have not been installed and no
16  one should go in the area?
17    A.   Not that I'm aware of.
18    Q.   Did Petro ever tell that -- Mr. Canning that the
19  clips had not been installed, and no one should go near?
20    A.   Not that I recall.
21    Q.   All right, sir.  I'm going to ask you some
22  questions about the vent line, 3-inch vent line project.
23    Are you familiar with that project?
24    A.   Yes, I am.
25    Q.   In fact, the work on the 3-inch vent line project

1  all started after this platform incident in February 2021,
2  correct?
3    A.   Correct.
4    Q.   Okay.  So whatever happened with that incident,
5  whatever Mr. Canning did or said, didn't prevent Petro from
6  being awarded the 3-inch vent line project, right?
7    A.   Correct.
8    Q.   And the 3-inch vent line project, that was a --
9  that wasn't a maintenance project; that was a special
10  project, right?
11    A.   Correct.
12    Q.   And the 3-inch vent line project was a project
13  done directly for Vitol Virgin Islands Corp.?
14    A.   Correct.
15    Q.   And so -- now, on the vent line project -- well,
16  withdrawn.
17    You're familiar with the acronym or -- MSDS
18  or material safety data sheets?
19    A.   Correct.
20    Q.   Tell us what an MSDS is.
21    A.   MSDS basically is a makeup.  It's not -- MSDS is
22  more basically a makeup.  It's used more on a -- on a
23  product or chemical, which basically is just a makeup of
24  that product.  And if they're explosion-proof, or if it's
25  volatile, or if it's -- basically, that's what it is.

1    Q.   It's an identification of material, and there are
2  certain traceability standards, right?
3    A.   For products, yes.
4    Q.   Are you familiar with the American Society of
5  Mechanical Engineers, the ASME?
6    A.   Yes, sir.
7    Q.   Are you an engineer, sir?
8    A.   No, I'm not.
9    Q.   Do you consider yourself to be -- do you hold
10  yourself out to be an expert on the ASME codes and standard?
11    A.   No.
12    Q.   Do you agree that Petro's work at the facility on
13  these projects had to comply with the American Society of
14  Mechanical Engineering standards?
15    A.   Yes.
16    Q.   Now, on the 3-inch vent line project, did you --
17  before you purchased materials for that project, did you
18  review the specifications that were in place from WAPA and
19  from IPOS and from Vitol?
20    A.   So, I did review.  It's VTTI's specification, pipe
21  specifications.  IPOS does not have any, and Vitol does not
22  have any, either.
23    Q.   And by VTTI, you understand that to be IPOS?
24    A.   I -- I believe they are.
25    Q.   Okay.  Now, did you understand, before you did the

1  vent line project, that there was a specification in place
2  that prohibited use of material manufactured or sourced from
3  China?
4      A.   This was an aftereffect, yes.
5           What happened was that we got quotes.  That
6  quote was from Traeger Brothers.  We paid off that quote.
7  Actually, the material, once it got here, unfortunately, it
8  was Chinese.  We were not aware of.
9      Q.   But did you know before you -- before Petro
10  ordered the material for the 3-inch vent line project, you
11  were aware that the specification for the job did prohibit
12  the use of Chinese-manufactured source material, correct?
13      A.   Correct.
14      Q.   Okay.  And you're saying you sourced material from
15  Traeger Brothers.  And learned, once it arrived, that what
16  Traeger Brothers delivered was Chinese-sourced or
17  manufactured material, correct?
18      A.   That's right.
19      Q.   Okay.  So it wasn't -- it was consistent, then,
20  with the specification in place before you did the work on
21  the vent line project, to reject the use of Chinese-
22  manufactured or sourced material?
23      A.   Understood, yes.
24      Q.   So you're not faulting IPOS, or anyone else
25  involved in this project, for saying that the material that

1  you sourced from Traeger Brothers shouldn't be used on the
2  project, per the specification that says no Chinese-sourced
3  or manufactured material, right?
4      A.   Again, the specification of VTTI were actually in
5  construction in 2016, and the construction phase, right?
6           These specifications could be changed, right?
7  It's not an American -- it's not a ASME product.  This is
8  just their specification.  If it was ASME, we've used ASME
9  through pipe specifications for Chinese in the refinery.
10  We've used it anywhere else.  Diageo's.  So it's not like
11  it's -- it's not an American Standard Engineering code.
12  It's just basically their -- their -- their spec, and this
13  was just in the construction phase.
14      Q.   But you understood, by saying no to
15  Chinese-sourced or manufactured materials, that was
16  consistent with the spec that was in place?
17      A.   That's what they had, yes.
18      Q.   Okay.  So you're not saying the rejection of the
19  Chinese-sourced or manufactured material was the result of
20  any discrimination or racist behavior by anyone, right?
21      A.   Correct.
22      Q.   Okay.  Let me show you what I've marked as
23  Exhibit 10, which is Vitol 014011.
24
25

1           (Deposition Exhibit No. 10 was
2           marked for identification.)
3      MS. ROHN:  It's 12:30.  When are we taking a
4  break?
5           MR. KAPLAN:  Oh, I'm sorry.  Whenever you all
6  would like.  I'm happy to stop.
7           MS. ROHN:  Since we're starting a new
8  document.
9           MR. KAPLAN:  Okay.  I can do this real quick.
10  Can you give this five minutes, and then we'll take a break?
11           MS. ROHN:  Okay.
12      Q.   (Mr. Kaplan)  Okay.  Mr. Melendez, I've shown you
13  Exhibit 10.  This is a July 15, 2021 e-mail to you,
14  Ms. Horowitz, Mr. Figueira, and others from Matthias Clarke
15  at WAPA, correct?
16      A.   Correct.
17      Q.   And this is part of the 3-inch vent line project,
18  right?
19      A.   Correct.
20      Q.   Okay.  If you turn to the second page, there's an
21  e-mail from Mr. Moses, also at WAPA.  He's the safety
22  officer, right?
23      A.   Correct.
24      Q.   Okay.  And he points out to Mr. Clarke, says
25  something I'd like to bring to your attention.  "While

1  conducting a walk-down on GT20."
2           What's GT20?
3      A.   Gas Turbine 20.  There's one of your -- their big
4  units that actually power up.  There's four different units.
5      Q.   Okay.  Says, "While conducting a walk-down on GT20
6  I observed IPOS contractor labeling the vent-to-atmosphere
7  lines," right?
8      A.   Correct.
9      Q.   Okay.  Then he says, "The labeling in its current
10  state does not meet the ANSI."
11           What's that?  Do you know that what stands
12  for?
13      A.   It's ANSI.  It's American National -- I just can't
14  give you the whole -- ANSI.  It's the same ANSI, or it's the
15  American Standard.  It's within the same platform.
16      Q.   Okay.  Then it says, "ASME," that's the American
17  Society of Mechanical Engineers, right?
18      A.   Um-hum.
19      Q.   Okay.  It says, the current state does not meet
20  the standard, the piping identification standards in
21  "maintain labeling consistency between both the IPOS
22  terminal and the Richmond facility," right?
23      A.   Yes.
24      Q.   And then he says, "See below for list of
25  observations."

125

1    IPOS was -- excuse me.  Petro has -- was
2    doing the labeling for the vent lines, correct?
3       A.   Correct.
4       Q.   Okay.  And what WAPA is complaining about is that
5    the labeling was inconsistent, in terms of the colors that
6    were being used on the -- and the signage that was being
7    used on the lines, correct?
8       A.   Correct.
9       Q.   And you understand that this is significant,
10   because you're indicating which lines are live LPG lines,
11   and which lines are not, correct?
12      A.   Correct.
13      Q.   Okay.  So it's obviously on a line that's carrying
14   propane, it's very important for it to be marked clearly for
15   everyone to know that it's carrying highly flammable gas,
16   correct?
17      A.   Correct.
18      Q.   Okay.  If you look at the first e-mail, what the
19   safety official at WAPA says, is that "the labeling that was
20   placed around the plant marking the uncolored propane vents
21   lines are highly inconsistent with the current color
22   standards in the plant."
23           Do you see that?
24      A.   Correct.
25      Q.   Okay.  Then he says, "While you've indicated that

126

1    the pipes could not be painted, I apologize if it was not
2    clear that the color white is used to denote all of the LPG
3    lines, not the yellow," right?
4       A.   Correct.
5       Q.   Okay.  So this was an issue raised about the
6    labeling that Petro had done to vent lines here in July of
7    2021, correct?
8       A.   Correct.
9       Q.   Okay.  There's some pictures attached.
10           Look at the first photo that's attached --
11      A.   Okay.
12      Q.   -- if you don't mind, sir?  The page that's 013.
13      A.   Okay.
14      Q.   Okay.  And tell me what you see in that picture,
15   and what -- what you understand WAPA's concern may have been
16   here.
17           MS. ROHN:  Objection to the form.  Go ahead.
18      A.   What -- I'm sorry.  What are you asking?  What is
19   their concern?
20      Q.   (Mr. Kaplan) Yeah.  What did you understand WAPA
21   to be saying to you labeling was -- hold on.  Let me ask a
22   better question.
23      A.   Okay.
24      Q.   What did you understand WAPA to be saying to you
25   when they said that "The labeling placed around the plant

127

1    marking the uncolored propane vent lines are highly
2    inconsistent with the color standards in the plant"?
3       A.   To me, it's just the labeling itself.  That's what
4    they're saying.
5            What's interesting is that there was no
6    labeling before we actually did this whole thing.  There was
7    absolutely no labeling.  So when they said, "labeling,"
8    what -- IPOS's labels are completely different from what
9    WAPA's labels are.  So we followed IPOS labels.
10           If you go down to the terminal itself, down
11   to the actual thing, they're all consistent to what we put
12   up, so they just wanted it different.
13      Q.   Petro used IPOS's labels for this vent
14   line project?
15      A.   Correct.
16      Q.   And did you wind up changing the labeling on that
17   project?
18      A.   We did change it to what -- their liking.
19      Q.   Did the 3-inch vent line project -- withdrawn.
20   Okay.  Why don't we take a break?
21      A.   Yeah.  Absolutely.  How long?
22           THE VIDEOGRAPHER:  Going off the record.  The
23   time is 12:41.
24           (Lunch recess taken.)
25           THE VIDEOGRAPHER:  Going back on the record.

128

1    The time is 1:41.
2       Q.   (Mr. Kaplan) All right, sir.  Your father,
3    Mr. Melendez, Sr., right?
4       A.   Correct.
5       Q.   Your father worked for Petro from January 2019
6    until May of 2020; is that right?
7       A.   I believe so.
8       Q.   And your father's position at Petro is quality
9    control supervisor?
10      A.   Correct.
11      Q.   In May 2020, did your father retire?
12      A.   Yeah, he did.  COVID came around, and he was down
13   with it.
14      Q.   There's an allegation in the Complaint about your
15   father's prior employment before he worked for Petro.
16           Who was your father's employer before he
17   worked with you at Petro?
18      A.   He was a contractor for Vitol.  I don't know the
19   company.  I believe it was Burdock that he worked for.
20      Q.   Say the name again, sir?
21      A.   Burdock.  I believe that's the company name, and
22   they were -- they were contracted directly through -- to
23   Vitol during the construction phase.  VTTS, I believe.
24      Q.   Your father was not an employee of Vitol?  He
25   worked for this Burdock company that did contract work

---

129

1  for -- you believe, for Vitol?

2      A.   Correct.

3      Q.   And you say in your interrogatory responses that

4  your dad lost his job at Burdock, right?

5      A.   Correct.

6      Q.   You believe your dad lost his job at Burdock

7  because of something that Mr. Canning did?

8      A.   I believe that Mr. Canning was a big part of why

9  he had to be dismissed, yes.  Correct.

10      Q.   Tell me the reasons, as you understand it, about

11  why your dad was dismissed by Burdock.  Tell me the reasons,

12  as you understand them, about why your dad was dismissed by

13  the Burdock company?

14      A.   So after the hurricane, 2027 (sic) he was

15  always -- he was employed by Burdock, contracted through --

16  to Vitol, and this had been happening since the construction

17  phase of this whole facility, which I understand was 2014

18  and on.  So he had been there for quite a bit of years.

19           So he actually had his own expenses, which

20  was housing expenses, car expense, whatever, so he would

21  actually expense that to Burdock.  Burdock would expense

22  that over to Vitol.

23           After the hurricane, his apartment got

24  annihilated.  He was offered the -- the Vitol -- let's just

25  say, I'm sorry, IPOS house or apartment that they had there,

---

130

1  to be able to -- to live there, right?  Because there was

2  nothing else.  It was also Andrew Canning had a Jeep, a

3  four-door Jeep over there that he only uses when he was

4  there, and he was not there, was also offered to him to use,

5  the Jeep.

6           My understanding was that -- that through the

7  prior -- the -- from the hurricane on toward where he was

8  actually dismissed or -- from IPOS/Vitol, let's just say it

9  was September, all the way up to March of the following

10  year, he had been living there and using their vehicle.

11           So what I understand is, when they came back,

12  said, well, why are you guys -- why are you still charging

13  me for the expenses or what have you?  That's when -- that's

14  when all this came about.

15           Now, I understand that Andrew was a big

16  contributor of this, because he wanted to live there, and he

17  wanted to leave his Jeep there.  And unfortunately, my

18  father was there at the time, so he wanted him out.

19      Q.   And the Burdock company is the one who dismissed

20  your dad?  Terminated your dad?

21      A.   No.  My dad actually just -- they gave him an

22  ultimatum, where either you fall into -- they gave him an

23  ultimatum, saying, either fall into or actually even -- what

24  I understand, either fall into IPOS, for the reduction of

25  rate, reduction of fees, and actually even threaten to --

---

131

1  they had -- he had to pay some money back, or get dismissed.

2  So he just went ahead and said, I'm done with you guys.

3      Q.   You're not alleging that Vitol did anything

4  improper in respect of your father's leaving the Burdock

5  firm, are you?

6      A.   I -- yeah, I don't recall that.

7      Q.   Let me show you what I've marked as Exhibit 11,

8  which is Vitol-0011500.

9           (Deposition Exhibit No. 11 was

10           marked for identification.)

11           All right.  In Exhibit 11, Mr. Kologinczak is

12  e-mailing you and Merlin and -- about the vent piping

13  project, the 3-inch vent piping project, correct?

14      A.   Correct.

15      Q.   And he's talking about what he's calling the WAPA

16  deliverables, right?

17      A.   Correct.

18      Q.   And you understand that is the documentation and

19  information that WAPA -- that's required at the end of the

20  project to deliver to WAPA, correct?

21      A.   Correct.

22      Q.   Okay.  And among the things that Mr. Kologinczak

23  tells you and Merlin, are going to be the WAPA deliverables

24  are welder certificates, right?

25      A.   Correct.

---

132

1      Q.   So you knew at the beginning of the 3-inch vent

2  line project that having certificates for the welders, who

3  were going to do work, was required, correct?

4      A.   Correct.

5      Q.   And certainly you agree, the welders had to be

6  properly qualified to do the work, right?

7      A.   Correct.

8      Q.   All right.  And among the other deliverables were

9  inspection reports, right?

10      A.   Correct.

11           THE VIDEOGRAPHER:  Pardon me, Attorney.  Let

12  me make sure, switching tapes, I want to make sure we're not

13  missing anything.

14           MR. KAPLAN:  Okay.

15           THE VIDEOGRAPHER:  Going off the record.  The

16  time is 1349.

17           (Short recess taken.)

18           THE VIDEOGRAPHER:  Going back on the record.

19  The time is 1:50.

20      Q.   (Mr. Kaplan)  All right.  Now, in 2021, in

21  connection with the vent, the 3-inch vent line project, you

22  sent welder qualification certifications to IPOS, to Vitol,

23  and to WAPA, correct?

24      A.   Correct.

25      Q.   You agree, you had to submit accurate and truthful

---

133

1  records, right?

2      A.  Correct.

3      Q.  Okay.  Do you stand by the accuracy of all the

4  welding qualifications/certifications that Petro submitted

5  to IPOS --

6      A.  Correct.

7      Q.  -- to Vitol and to WAPA?

8      A.  Yes.

9      Q.  Are you aware of any inaccuracies in the welding

10  qualifications/certifications that Petro submitted to IPOS?

11     A.  They were brought forward with some here and

12  there's, dates or whatever it was, but for Petro, we stand

13  by it.  They're accurate.

14     Q.  Do you believe there are any inaccuracies in the

15  welding certificates that Petro submitted to Vitol?

16     A.  Inaccuracies, as of?  Sorry.

17     Q.  Do you believe that the welding certifications

18  that Petro submitted to Vitol were true and correct?

19     A.  Yes.

20     Q.  Are you aware of any things -- any information in

21  the welding certifications submitted to IPOS, to Vitol, or

22  WAPA that you now believe to be incorrect?

23     A.  No.

24     Q.  Let me show you Exhibit 12.  Exhibit 12 is

25  Vitol-011972.

---

134

1                  (Deposition Exhibit No. 12 was

2                  marked for identification.)

3      On April 15th, 2021, Mr. Melendez, you

4  submitted Petro's welding procedures and welding

5  qualifications to IPOS, to Vitol, to Mr. Canning, and to

6  WAPA, correct?

7      A.  Yes.

8      Q.  All right.  Let's go towards the back of the

9  document, and let's start with the page that ends in 994 on

10  the bottom right.

11     A.  Got it.

12     Q.  Do you see that?

13     A.  Yes.

14     Q.  All right.  Okay.  At the top, it says, "Welder

15  Performance Qualification Record (WPQ)."

16          Do you see that?

17     A.  Yes.

18     Q.  Okay.  And the welder's name is Edgardo Batista,

19  correct?

20     A.  Correct.

21     Q.  Is Mr. Batista an employee of Petro?

22     A.  Not currently.

23     Q.  He was at the time?

24     A.  Yes.

25     Q.  In February of -- pardon me, in April of 2021?

---

135

1      A.  Yes.

2      Q.  All right.  Who prepared the form here in

3  Exhibit 12, the page ending in 94, the welder performance

4  qualification record?

5      A.  Again, describe -- who prepared the form?

6      Q.  Yes.

7      A.  Okay.  So Mr. Castro was the one that actually

8  prepared the form.

9      Q.  So all of the information listed on the form

10  that's filled in each of these lines, that was filled out by

11  Mr. Castro?

12     A.  Correct.

13     Q.  And when you say, "Mr. Castro," you're referring

14  to Guillermo Castro?

15     A.  Correct.

16     Q.  All right.  Mr. Castro did not sign the welder

17  certification --

18     A.  Correct.

19     Q.  -- correct?

20          You signed the welding certification,

21  correct?

22     A.  That's right.

23     Q.  And you -- the date on the bottom of this form is

24  February 19th, 2021, right?

25     A.  Correct.

---

136

1      Q.  Okay.  Is that the date that you signed the form?

2      A.  That's correct.

3      Q.  Okay.  When did Mr. Castro fill out all the

4  information on the form?  On the same date?

5      A.  February 2021.

6      Q.  I'm sorry.  Say again?

7      A.  February of 2021.

8      Q.  Okay.  Not on the same date that you signed the

9  form?

10     A.  Can't recall that.

11     Q.  Okay.  How did you get the form to sign for Mr.

12  Castro?

13     A.  Oh, it was actually through FedEx.  Got

14  information through FedEx.

15     Q.  Mr. Castro sent you a FedEx with this whole form

16  filled out, except for your signature on the bottom?

17     A.  Correct.

18     Q.  Okay.  Did Mr. Castro fill in the part that said

19  Petro Industrial Solutions?

20     A.  True.

21     Q.  He filled that in, or you filled that in?

22     A.  No, he did.

23     Q.  Okay.  And did Mr. Castro fill in the date on the

24  bottom?

25     A.  I believe so.  I believe so.

1  Q.   When did Mr. Castro do the testing that is
2  reflected in this welding performance qualification record
3  in Exhibit 12 on the page ending 94?
4  A.   I believe around the same date.
5  Q.   On what date?
6  A.   The same date of 2-19.
7  Q.   So you believe Mr. Castro tested Mr. Batista on
8  February 19th, 2021, and then FedExed to you this form that
9  you signed?
10  A.   I believe so.
11  Q.   All right.  Where did the testing that Mr. Castro
12  did of Mr. Batista take place?
13  A.   The facility -- he was working for a client there
14  in -- in Puerto Rico, and we tested all the welders there.
15  Q.   Where in Puerto Rico?
16  A.   In the San Juan area.  He actually just said, show
17  up this area, and that's what the guys did.
18  Q.   Were you present at the time that Mr. Castro
19  tested any of your welders?
20  A.   No, I was not.
21  Q.   Were any of the Petro managers or supervisors,
22  superintendents, any management of Petro present?
23  A.   No.
24  Q.   Did you know Mr. Castro from before February of
25  2021?

1  A.   Yes, I did.
2  Q.   Okay.  How did you know Mr. Castro?
3  A.   We worked -- he was the lead inspector/technician
4  for Limetree.  In Limetree Bay.
5  Q.   When's the last time you spoke to Mr. Castro?
6  A.   Oh, my goodness.  This had to be actually July of
7  2021.
8  Q.   Do you know anything about Mr. Castro's current
9  whereabouts?
10  A.   No, I do not.
11  Q.   Have you had any written communications with
12  Mr. Castro since July of 2021?
13  A.   No.
14  Q.   E-mails?  Texts?
15  A.   No.
16  Q.   Any phone calls?
17  A.   No.
18  Q.   Okay.  Now, at the time Mr. Castro did this
19  testing in February of 2021, Mr. Castro did not work for
20  Acuren Inspection Services, true?
21  A.   True.
22  Q.   Mr. Castro, on the form, it says, "Welding Test
23  Conducted By: Guillermo Castro," and then it says, "LIII."
24        Do you see that?
25  A.   Correct.

1  Q.   Do you know what the LIII signifies?
2  A.   Level III.
3  Q.   Okay.  Level III.  Do you know what -- Level III
4  what?
5  A.   So that's kind of the highest level.  So he's --
6  he's performed the third level of his craft, which is phased
7  array or PATUTS (sic), which is phased array ultrasonic
8  testing.
9  Q.   Do you know whether Mr. Castro, in fact, holds the
10  Level III certification?
11  A.   Currently?
12  Q.   At any time?
13  A.   Yes.
14  Q.   How do you know that?
15  A.   Through Acuren.
16  Q.   In what way did Acuren inform you that Mr. Castro
17  holds a Level III certification?
18  A.   Actually, a certificate itself.
19  Q.   Do you possess the certificate?
20  A.   I believe I do.
21  Q.   Okay.  In what context did you receive a
22  certificate from Acuren, showing that Mr. Castro has a Level
23  III certification?
24  A.   Different testing that we've done, he actually
25  attaches a certification in the back of it.

1  Q.   So testing that you did with Mr. Castro before
2  February of 2021?
3  A.   Yes.
4  Q.   Okay.  In what -- what project?
5  A.   Limetree.
6  Q.   Okay.  So sometime working on the Limetree Bay
7  project, you believe Acuren provided you with a certificate,
8  indicating Mr. Castro held a Level III certification?
9  A.   Correct.
10  Q.   And you believe you currently possess that
11  certificate?
12  A.   I do.  This has to be -- I mean, this is 2017 or
13  so.  I believe I do.
14  Q.   Okay.  Do you have any other information that
15  would indicate one way or the other whether Mr. Castro, in
16  fact, holds the Level III certificate, other than this
17  Limetree Bay certificate?
18  A.   No.
19  Q.   Have you read the declaration that was submitted
20  in this case from Doug Rice of Acuren?
21  A.   No.
22        MS. ROHN:  You were supposed to look at every
23  document!  How could you say that?
24  A.   I read so much.
25  Q.   (Mr. Kaplan) Did you have a contract with

Mr. Castro to do a certain scope of weld testing or
certifications in February of 2021 --

    A.   No.

    Q.   -- for your employees?

    A.   No.

    Q.   So how did you make arrangements for him to do
this testing?

    A.   Literally, a phone call.  Hey, I need you to
retest these welders.  Are you available?  Yes, I'm in
Puerto Rico, and that's the way it was.

    Q.   Did you pay Mr. Castro for him performing this
certification?

    A.   Yes.

    Q.   Okay.  Did Mr. Castro issue any form of invoice or
documentation for this testing?

    A.   No, but I do have a PayPal that I sent him.  Copy
of the PayPal that I sent him.

    Q.   Do you recall how much you paid for the
certification records?

    A.   I believe it was a thousand bucks.

    Q.   Per welder or total?

    A.   Total.

    Q.   And how many times did Mr. Castro do any
certification testing for Petro welders?

    A.   On this occasion, it was about six of them, I

believe.  Yeah, six.

    Q.   Was there more than one occasion, though, where
Mr. -- where you had Mr. Castro do welding certifications
for Petro welders?

    A.   No, I believe that was it.

    Q.   So you believe it was February 19th, 2021,
Mr. Castro did welding certifications for a number of Petro
welders, and that's the only one you recall?

    A.   No.  There was -- yeah, there were two other ones
that were done in April.  In March and in April, yeah.

    Q.   Were you present at any of the welding
certifications?

    A.   I was not.

    Q.   Were any Petro managers or supervisors present at
any of the welding certifications?

    A.   No.

    Q.   All right.  So on the certification form
underneath Mr. Castro's name, it says, "Mechanical Tests
Conducted By: Acuren Inspection Services," correct?

    A.   Correct.

    Q.   But you knew that in February of 2021, Mr. Castro
did not, in fact, work for Acuren Inspection Services,
right?

    A.   I did not know that.

    Q.   You believed, in February 2021, that Mr. Castro

worked for Acuren?

    A.   I never asked the question.

    Q.   Well, you certainly believed that Mr. Castro did
work for Acuren, based on this form, right?

    A.   Yeah.  Took the form at value.

    Q.   Would you have signed and submitted this form to
WAPA and Vitol and IPOS if you knew that Mr. Castro did not,
in fact, work for Acuren --

    MS. ROHN:  Objection.

    Q.   (Mr. Kaplan) -- at the time this form was signed?

    MS. ROHN:  Calls for speculation.

    A.   Those forms are actually Petro's forms.  So -- so
these forms, this is Petro paying for what we actually paid
for.

       So your question is, as far as if it was
Acuren, or if it was any other company overseeing
independently, that -- that's irrelevant.  I mean, would I
sign them?  I would have signed them.

    Q.   (Mr. Kaplan) Even if you knew Mr. Castro didn't
work for Acuren, you would have signed and submitted this
form?

    A.   Yes.

    Q.   And now you see at the bottom above your
signature, it says, "we," and that's you, on behalf of
Petro, right?

    A.   Yeah.

    Q.   Petro.  Says, "we certify that the statements in
this record are correct," right?

    A.   Correct.

    Q.   Okay.  So you're certifying that Mr. Castro did
this work, and then, quote, "Mechanical Tests (were)
Conducted By: Acuren Inspection Services," right?

    A.   I didn't certify -- or, actually, I am okay with
the actual certification, yes.

    Q.   But included in the certification is the factual
statement that mechanical tests were conducted by Acuren
Inspection Services, right?

    A.   What it states here is correct, and the test
coupons were prepared and weld in accordance to ASME.
That's what I signed.  Acuren is an afterthought.

    Q.   Acuren is what?

    A.   An afterthought.  Like that is -- for me, the
biggest thing is that he certified my welder.

    Q.   You don't think it was important to have the name
Acuren Inspection Services on this certification to indicate
a company with a reputation for doing this type of work had
actually done the mechanical tests?

    A.   The actual -- the value of it is his name.  The
value is that he is a Level III.  He is actually -- he is or
was the highest level technician for that firm.  So that's

145

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1  the value.  I am putting that liability on Petro.  This is
2  my document.  All I needed him to do was to certify my
3  welder.
4      Q.  Who certifies someone as a Level III inspector?
5      A.  So he actually has to go through different -- he,
6  himself, personally, has to go through different levels
7  himself.  He has to pay through different classes.
8      Q.  But Acuren is the one who certifies -- classifies
9  someone, correct?
10     A.  Correct, but he's actually independent, though.
11 He can actually certify other people, if he wants, himself.
12     Q.  Mr. Castro wrote on the form, Acuren?
13     A.  That was on the form.
14     Q.  And you're telling us you thought, at the time, he
15 did work for Acuren?
16     A.  I didn't know either way.  I mean, either way, I
17 didn't know.
18     Q.  Okay.  But just to be clear about the facts, at
19 the time, you received the welding certifications in
20 February --
21     A.  No, actually.  No, you know, he did tell me he
22 didn't work for Acuren.  You're right.  Correct.
23     Q.  Let's be --
24     A.  Correct.
25     Q.  -- very clear on the facts.

Susan C. Nissman, RPR-RMR
(340) 773-8161

146

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1      A.  Correct.
2      Q.  In February of 2021, when you received this form,
3  the welding certification records, you knew, because
4  Mr. Castro told you, that he did not work for Acuren,
5  correct?
6      A.  I believe that was the conversation, yeah.
7      Q.  Okay.  And next to where it says, "Mechanical
8  Tests Conducted By:  Acuren," it has a laboratory test
9  number.
10         Do you see that?
11     A.  That's right.
12     Q.  And on the -- on the form for Mr. Batista, it
13 says, "PAUT021621-EB," right?
14     A.  Yes.
15     Q.  And if you look at all the other welding
16 certifications, it has a similar, but different test number,
17 right?
18     A.  Okay.
19     Q.  Do you see that?
20     A.  Yes.
21     Q.  Okay.  But they all start with PAUT, correct?
22     A.  Correct.
23     Q.  Do you know what that stands for?
24     A.  PAUT is phased array ultrasonic testing.
25     Q.  Do you have copies of the tests?  These test

Susan C. Nissman, RPR-RMR
(340) 773-8161

147

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1  numbers that were done on these welders?
2      A.  I do not.
3      Q.  Mr. Castro should have a copy of these?
4      A.  As I understand, no, he didn't.
5      Q.  I'm sorry?
6      A.  As I understand, no, he did not.
7      Q.  What do you mean, "no, he did not"?  It says he
8  performed a mechanical test.
9      A.  Correct.  I didn't request actual reports, so he
10 did not.  Actually just performed the tests.  Pass.  Move
11 forward.
12     Q.  I'm not -- I'm not following what you're saying.
13        So you're saying Mr. Castro doesn't have a
14 copy of the test results?
15     A.  That's what I understand.
16     Q.  So how -- he filled out this form from memory?
17 How would he know the information to put in the form?
18     A.  There's a test coupon, right?  So let's just say
19 it's a 6-inch piece of pipe.  Put a weld together.  And then
20 you're right there.  Pass or fail.  And that's basically it.
21 So that actually is a record of what this test is about.
22     Q.  But you said this was a Petro form, right?
23     A.  I'm sorry.  This form?
24     Q.  Yeah.  You told me it was a Petro form?
25     A.  No, I never said it was a Petro form.

Susan C. Nissman, RPR-RMR
(340) 773-8161

148

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1      MS. ROHN:  You said that.
2      A.  That this was a Petro form?  No, no, no.  This is
3  not a Petro form.
4      Q.  (Mr. Kaplan)  Okay.  Where did you get the form?
5      A.  This is Mr. Castro's form.
6      Q.  Okay.  So --
7      A.  I'm sorry if I said that.  Correct.
8      Q.  This is Mr. Castro's form, but you're saying he
9  does this test coupon, and then he pulls up this form on a
10 computer, and he fills out this information, but there's no
11 written test report?
12     A.  That's correct.
13     Q.  So what does the test number signify, then?
14     A.  So he'll put a test number on the actual coupon
15 itself.
16     Q.  Okay.  Do you have copies of the coupon?
17     A.  I don't believe.  This was 2-3 years ago.  No, I
18 do not.
19     Q.  But did you ask Mr. Castro for any copies of
20 those?
21     A.  I did not.
22     Q.  Now, a photo -- a phased array is a particular
23 type of welding test, right?
24     A.  Correct.
25     Q.  It's different from a mechanical test, right?

Susan C. Nissman, RPR-RMR
(340) 773-8161

1  A. Don't know what the difference is of what you're
2 asking.
3  Q. All right. So if you turn to the last page of
4 this document welder certification for Mr. Philips, right?
5  A. Okay.
6  Q. How do you pronounce his first name?
7  A. Richie or -- yeah. Richael, actually.
8  Q. Is Richael one of your employees, sir?
9  A. No, not currently.
10  Q. But Mr. Philips was one of your welders?
11  A. Correct.
12  Q. And the date on his form is 3-22-21, right?
13  A. Okay.
14  Q. Okay. So you're saying Mr. Castro sent you a
15 FedEx also on 3-22?
16  A. I believe so.
17  Q. Okay. And he also sent you a FedEx on April 1?
18  A. I believe so, yeah. Within those times.
19  Q. Okay. So there's a -- there's a FedEx to you on
20 February 19th, you're saying, from Mr. Castro, right?
21  A. Should be.
22  Q. Yes?
23  A. Yes.
24  Q. Okay. And you believe there's another one on
25 March 22, and another one on April 1, correct?

1  A. I believe so, yes, sir.
2  Q. Okay. And the way you think the forms would be is
3 Mr. Castro would fill out this whole form, and it would come
4 to you, and you would sign it, and that -- that it was
5 complete, right?
6  A. Correct.
7  Q. Okay. All right. I'm going to show you what I've
8 marked as Exhibit 13, which is PIS61.
9    (Deposition Exhibit No. 13 was
10    marked for identification.)
11    All right. Do you recall, in July of 2021,
12 IPOS was asking for a variety of information related to
13 welding procedures, welding inspections, test reports, and
14 certifications/qualifications?
15  A. Yes, I do.
16  Q. Okay. And there was an individual, Andreas
17 Constantinou. Do you recall?
18  A. On the e-mail. I've never met the gentleman.
19  Q. Okay. But do you recall that Mr. Smith was saying
20 that Andreas was responsible for requesting and reviewing
21 all of this information about your welding and procedures
22 and qualifications and alike?
23  A. I do recall.
24  Q. Okay. So if you look on the second page, you're
25 responding to Mr. Smith. And you say, "please find our

1 response below along side your questions."
2    Do you see that?
3  A. Yes, sir.
4  Q. Okay. And the question was, or the request was
5 for Petro's full inspection and test plan, right?
6  A. Correct.
7  Q. And what you wrote in the bold and underlined part
8 there is, you write "no I&TP reports were required from
9 IPOS/Vitol and therefore none can be provided," right?
10  A. Correct.
11  Q. So you're saying you have no inspection or test
12 plan reports, right?
13  A. Inspection, we did. Obviously, we provided all
14 the actual x-rays that were actually perform on the vent
15 line, so that was.
16    But as far as the test plan, yeah, there was
17 no written test plan.
18  Q. And then the other thing that they asked for were
19 daily records for welding, fitting, and visual inspections.
20    And you say, "we do not have daily reports
21 but have included weld logs with all NDT which includes VT
22 on all welds from the third party inspection," correct?
23  A. Correct.
24  Q. Okay. And then the last item says, "Welding and
25 mechanical tests of WPQs," and that's welder performance

1 qualifications, correct?
2  A. Um-hum.
3  Q. Okay. So the request here was to actually provide
4 the tests that were used to qualify the welders, right?
5  A. Okay.
6  Q. Is that how you understood it?
7  A. Yes.
8  Q. And what you wrote, is you wrote, "The actual
9 welders' qualification certificates were given to Petro in
10 lieu of a PAUT report," right?
11  A. Gotcha.
12  Q. "Each Welder was tested on four different
13 positioned coupons which were phase array inspected and
14 passed. Certifications were then approved, accepted and
15 signed by Petro," right?
16  A. Correct.
17  Q. Okay. And if you look, Mr. Smith responds to you
18 at the top of the page, and he says, "you signed the
19 qualification certificate on behalf of Acuren/Costas." I
20 think he means Castro.
21  A. Castro.
22  Q. Okay. He says, "you signed the quotation
23 certificate -- qualifications certificate on behalf of
24 Acuren. We believe there must be a report/certificate/
25 document from Acuren/Costas in order for you to sign the

1   WPQ.  Can you please provide it?"  Right?

2       A.   Right.

3       Q.   In response to that, that's when you told

4   Mr. Melendez -- sorry.  When you, Mr. Melendez, told

5   Mr. Smith, and others at IPOS, to "see Mr. Castro's attached

6   letter regarding this question," right?

7       A.   Correct.

8       Q.   Okay.  So in response to questions about the

9   welding certifications, you said, look at this letter from

10  Guillermo Castro, correct?

11      A.   Correct.

12      Q.   Okay.  And the date of this e-mail is what, sir,

13  when you said, look at the attached letter from Mr. Castro?

14      A.   The letter from what, sir?  I'm sorry.

15      Q.   When you told Mr. Smith, and others at IPOS, to

16  see Mr. Castro's letter, when did you tell them that?

17      A.   July 27th, looks like.

18      Q.   Okay.  Let me show you what I've marked as

19  Exhibit 14, which is IPOS 553.

20              (Deposition Exhibit No. 14 was

21              marked for identification.)

22      A.   Thank you.

23      Q.   You're welcome.

24              Do you recognize Exhibit 14 as the letter

25  that you sent to IPOS as the letter from Mr. Castro?

1       A.   Yes.

2       Q.   Okay.  And so we just looked at Exhibit 13, dated

3   July 27, 2021, where you said, "see Mr. Castro's attached

4   letter," right?

5       A.   Correct.

6       Q.   Okay.  But Mr. Castro's letter in Exhibit 14 is

7   dated two days later, July 29th, 2021.

8              Do you see that?

9       A.   I see it.

10      Q.   So how did you send a letter to IPOS on July 27th

11  that was dated two days later, July 29th?

12      A.   That's when Mr. Castro sent.  I don't know if he

13  was in Japan at the moment, I don't know if he

14  was working at night.  I don't know if it was, you know,

15  just a mistake, or what it was.  Never questioned him.

16      Q.   Sure.

17              Mr. Castro sent you a letter that had the

18  July 29 date on it?

19      A.   Correct.

20      Q.   How did you get, physically get, this letter from

21  Mr. Castro?  Did he FedEx it to you?

22      A.   No.  An e-mail.

23      Q.   He e-mailed it to you?

24      A.   Correct.

25      Q.   So he e-mailed you a -- a word document?  A PDF

1   document?

2       A.   I believe it was PDF.

3       Q.   Okay.  Do you have a copy of the e-mail from

4   Mr. Castro that transmits this -- this letter to you?

5       A.   I'm sure I do.

6       Q.   We haven't seen that in the production.

7              You believe you produced the e-mail?

8       A.   No?

9           MS. ROHN:  I haven't seen it.

10          Okay.  I will send it to you guys.

11          MS. ROHN:  Sorry, guys.

12      A.   I'm sorry.  Sorry.  Sorry.  My error.

13      Q.   (Mr. Kaplan)  Do you have other e-mails with

14  Mr. Castro?

15      A.   No.  This is it.

16      Q.   How did Mr. Castro know to provide the letter?

17  Did you e-mail?  Did you call him?

18      A.   I called him.

19      Q.   And what did you tell Mr. Castro when you called

20  him before he sent this letter to you?

21      A.   I told him about the whole situation.  Told him

22  about, Hey, you know what?  The welders' quals are being

23  questioned.  There's a couple discrepancies between, you

24  know, kind of, you know, see that there's overwriting or

25  whatever it is, or, you know, kind of missing with dates

1   here and there, can you please explain it, and this is what

2   he came back with.

3       Q.   Okay.  If you look at Mr. Castro's letter, in the

4   middle of that second paragraph, he says, "I tested six

5   welders for Adrian, at my Client's shop in Puerto Rico."

6              Do you see that?

7       A.   Correct.

8       Q.   Okay.  Then he says, "but unfortunately did not

9   have the original Quals under Acuren saved and to re-certify

10  the previous reports I had to adjust the old welders' quals

11  and changed the welders' tensile number, the qualification

12  date, and the four test coupons."

13              Do you see that?

14      A.   Correct.

15      Q.   Do you know what any of that means?

16      A.   Yes.  So what he had to do is basically from the

17  original quals that he had from Limetree Bay, and the new

18  coupons that he had, he had to just superimpose them.

19  That's what he meant.

20      Q.   But he said he didn't have the original

21  qualifications, right?

22      A.   Well, that's what he meant.

23              And then if you keep reading a little bit

24  further -- yeah.  So he actually just had to superimpose.

25  He basically had to cut and paste.  That's what he's saying.

1    Q.   So if you look at the welding certification forms
2    that were in Exhibit 12, if we look at the first one for
3    Mr. Cruz that ends on Page 95, and you're saying cut and
4    paste or superimpose.
5    A.   Uh-huh.
6    Q.   That's why you see those two right columns in the
7    middle, why they don't line up with the other lines, right?
8    A.   Actually, I'll be honest with you, I think from
9    the original -- not that I have them, but from the original
10   ones from Limetree Bay, this was -- this is the way it was.
11   There's no reason why it's like that, so --
12   Q.   Okay.  Well, look at the next form for
13   Mr. Rodriguez, 96.  Do you see how he has the similar issue,
14   where the lines don't line up there for the -- the actual
15   test results?
16   A.   I think they all look the same, don't they?  I
17   mean, they're all the same.
18   Q.   Is that -- is this what you're referring to, about
19   the forms not lining up, when you said superimpose or cut
20   and paste?
21   A.   No, no, no.  What he had to do was basically
22   change the stamp.  What he's saying, the actual welding
23   coupons, what he's saying here, and test number here.
24   That's what he's saying.  Not that he changed any of this
25   other stuff, or changed the lining or the leveling of it.

1    Q.   Okay.  You're going to have to walk me through
2    this, sir.
3         What information, on this form -- let's take
4    one of the welders.  Let's start with Mr. Batista, okay?
5    A.   Okay.
6    Q.   All right.  So we're looking at Exhibit 13?
7    A.   Correct.
8    Q.   Pardon me.  We're looking at Exhibit 12?
9    A.   Correct.
10   Q.   We're looking at the certification form for
11   Mr. Batista that you submitted to WAPA and Vitol and IPOS,
12   right?
13   A.   Correct.
14   Q.   We're looking at Mr. Batista's form that ends in
15   Bates Number 994.
16        What information on this form was from the
17   time that you say Mr. Castro originally tested these people
18   from Limetree Bay, what information is new from the testing
19   done in February of 2021?
20   A.   So the welder stamp up here in the corner.
21   Q.   The stamp number at the top right corner?
22   A.   Correct.
23   Q.   EB (74)?
24   A.   Correct.
25   Q.   What about that?

1    A.   So that's changed.
2    Q.   That's a new number?
3    A.   That's a new number.
4    Q.   Okay.
5    A.   So now that's a Petro number.
6    Q.   Okay.
7    A.   Okay?  So then that, he's saying the actual test
8    coupons themselves, which is described right here, where it
9    actually says, "Trans. Root & Face," okay?  And then he says
10   the laboratory test number, that's what he's changed.
11   Q.   So the guide bend test results, that's new
12   information, based on new work done in February of 2021?
13   A.   That's actual coupons he tested, correct.
14   Q.   Great.
15        What about all the information above it on
16   the form, where it says, "Manual or Semi-Automatic Variables
17   for Each Process"?  Do you see that?  The whole middle
18   section of the form?
19   A.   Correct.
20   Q.   That's -- that information is from prior tests
21   done at Limetree Bay?
22   A.   Well, all that is basically the same test, right?
23   Because all that's changed, because it's actually a
24   procedure changed, right?
25   Q.   I don't understand.

1    A.   Okay.  So if I may -- let me see real quick.
2         Actually, all this is the same.  This
3    Limetree Bay one.  So all he's doing is saying, okay, so the
4    same test that we did at Limetree Bay, all we're doing is
5    just changing the stamp, changing the actual results, and
6    then changing the laboratory tests, 'cause all the rest is
7    the same.
8    Q.   When you say, "all the rest," tell us
9    specifically --
10   A.   So basically --
11   Q.   -- what information is all the same?
12   A.   What you're asking, basically all the center, all
13   the center markings, they're all going to be the same.
14   Q.   Everything from where it says, "Manual or
15   Semi-Automatic Variables for Each Process," all the way down
16   to where it says, "Guide Bend Test Results"?
17   A.   Correct.  And, actually, even the top portion,
18   where it says the weld testing procedure number, where it
19   says, "PISL-GT," well, that's our procedure that we started
20   back in 2018.  So all that is going to be the same, 'cause
21   that's the same procedure that he's testing under, right?
22   So it's still going to be gas ten -- tungsten arc, which is
23   TIG welding, all that is going to be the same.  Again,
24   because he's just requalifying that welder for that specific
25   procedure.

1    Q.  Okay.  But Mr. Castro's telling you, he didn't

2  have the original qualifications in his files from Acuren,

3  correct?

4    A.  That's what he's saying.

5    Q.  How did Mr. Castro have any of this information

6  about the procedures used at Limetree Bay?

7    A.  Well, what I understand, what he told me, is that

8  he didn't have the original form to be able to -- to just

9  basically put it out.  He actually had a copy of the

10  original procedures, saying that, yes, I did qualify this

11  welder.  I mean, in Limetree.  This is, again, 2018,

12  correct.  Or before that, 2016.  Yeah.

13    Q.  Did Mr. Castro send you the original form?

14    A.  No.

15    Q.  Have you ever seen the original form?

16    A.  No, those are actually Limetree Bay documents.  So

17  everybody worked for Limetree, and they paid for everything

18  there.

19    Q.  Okay.  So when you said earlier something about

20  cut and paste or superimpose, tell us what you meant by

21  that.

22    A.  What I understand is basically just the stamp,

23  because the stamp was different.  And then the actual

24  laboratory, and in the middle, where it says, "bend test."

25  The center portion of it.

1    Q.  Okay.  Cut and paste from what?

2    A.  To add the new information on there.  The new

3  coupons.

4    So in Limetree Bay, Limetree Bay paid -- they

5  hired all of us as time and material employees.  So they

6  hired the inspection company, which was Acuren.  They hired

7  us as the contractor.  And they, themselves, in person,

8  would test the actual welders themselves.  They, themselves,

9  paid for it, and they, themselves, actually had and owned

10  the possession of these actual welding logs.

11    So ever since then, we follow the same

12  welding logs, which is actually the welding logs, which

13  actually, if you stayed on the welding logs, when this -- in

14  the same year, if you're testing or actually welding the

15  same procedure, it is still valid.  Meaning the welding

16  procedure, the welding log, the actual welding

17  qualifications are still valid, 'cause you're still testing

18  on the same thing.

19    In between that, we do test, like you guys

20  have seen before, through x-ray, through phase array and

21  different welds through same welder.  So requalifying that

22  welder over and over and over.  And we've done that through

23  Limetree.  I'm so sorry, through IPOS and Vitol's project,

24  because we have requalified them over and over again through

25  different types of testing.

1    Q.  Who did the requalifications -- so you said the

2  original one was done in Limetree Bay 2017?

3    A.  I'll say probably --

4    Q.  '16-'17?

5    A.  '16-'17.

6    Q.  Okay.  Fair enough.

7    Who did the recertification in 2018 and 2019

8  and 2020 for your welders?

9    (Cross talk.)

10    Q.  So you had to do recertifications every year,

11  right?

12    A.  No.  So if you're following the same procedure, if

13  you're doing the same procedure, and you're holding welding

14  logs of what weld it was, what procedure you're using, what

15  welder it was -- I mean, what welder tensile it is, dates on

16  it, that same procedure, that same welding log is valid.

17    A new client, if you have one, they can ask

18  for new testing.  They can.  And, therefore, you have to

19  bring the inspector, you have to bring the welder on site to

20  reinspect.

21    Q.  Okay.  Is -- was the 3-inch vent line project the

22  first time that IPOS or WAPA or Vitol asked for a

23  recertification of any of Petro welders?

24    A.  They've never asked for recertification.

25    Q.  Okay.  But why did you provide the welder

1  qualification forms here in -- in advance of the 3-inch vent

2  line project in 2021?

3    A.  Because they asked for my qualifications.  Those

4  are my qualifications.  Those are Petro qualifications.

5  They're not IPOS.  They're not Vitol's.  Those are Petro's

6  qualifications.

7    Q.  Okay.  Why did you provide the qualifications back

8  from '16 or '17?  Why did you provide those?

9    A.  Because those were recent.  And I -- I, myself,

10  wanted to see if these welders were still going.  So those

11  are mine.

12    In what you brought up earlier, you have VTTS

13  piping and welding specs.  In there, it states that after

14  Andrew Cannon gave it to me, and, you know, after or during

15  the whole procedure, that the welders should be certified on

16  site with a representative overlooking them.  That was never

17  done.

18    So, again, these are my qualifications.

19    Q.  But Mr. Castro's -- is doing the testing, not you,

20  correct?

21    A.  I signed them.  They're my qualifications.

22    Q.  But you're not -- you're not licensed or qualified

23  to do welding and certifications, correct?

24    A.  I'm liable with Petro, so, yes.

25    Q.  That's not my question.  I understand you're

1  liable for Petro.
2          My question is, you are not certified/
3  licensed/qualified to actually do a welder performance
4  qualification?
5      A.  Of course not.  That's why I hired on Mr. Castro.
6      Q.  Just to be clear, 'cause you're saying these are
7  "my records."
8          You're not qualified to certify a welder as
9  qualified, right?
10     A.  Correct.  That's why I got Mr. Castro.
11     Q.  Mr. Castro, in his letter, says -- he goes on, "I
12 gave Petro Industrial a welder's qualification certificate
13 for each welder, which all welders passed, in lieu of a PAUT
14 report."
15         Do you see that?
16     A.  Correct.
17     Q.  Then he says, "No qualification reports were
18 created," right?
19     A.  Correct.
20     Q.  Okay.  But if no -- the form is a qualification
21 record, right?
22     A.  Yeah.  So he was referring more back, because I
23 had called him about, for example, they were asking for
24 actually where is the actual report for the PAUT report.
25 That's what he was referring to.

1      Q.  But Mr. Castro is saying he doesn't have the
2  report that IPOS and WAPA and Vitol were requesting,
3  correct?
4      A.  IPOS and Vitol, not WAPA.
5      Q.  But you had been -- okay.
6      A.  And if you look forward, he did mention, and I
7  was talking to David Smith, he would actually come on site
8  to actually recertify, retest everything, so this could be
9  cleared up, and that was just thrown under the rug.  I could
10 have solved so much.  And I paid --
11         MS. ROHN:  There's no question to you.
12     A.  Sorry.
13     Q.  (Mr. Kaplan) Are you saying WAPA didn't ask for
14 specific project documentation, including welder
15 qualification reports.
16     A.  That's not what I said.
17     Q.  WAPA, in fact, did ask for project documentation,
18 and included in WAPA's request, were the welder
19 certification test reports, correct?
20     A.  They did ask that, correct.  IPOS and Vitol were
21 asking for a report from those welder qualifications, which
22 were not there.
23     Q.  You were unable to provide the welder
24 qualification test reports, correct?
25     A.  They -- they do not exist.

1      Q.  All right.  Let's switch gears.
2          Let me show you -- show you what I've marked,
3  sir, as Exhibit 15, which is IPOS 5359.
4          (Deposition Exhibit No. 15 was
5          marked for identification.)
6      A.  Thank you.
7      Q.  All right, sir.  So you recognize Exhibit 15?
8  This is the July 28th, 2021 letter that IPOS sent to Petro,
9  providing notice of termination of the maintenance contract,
10 correct?
11     A.  Correct.
12     Q.  Did you talk to Mr. Smith about this termination
13 notice?
14     A.  Afterwards, yes.
15     Q.  Did you talk to Mr. Smith about the termination
16 notice in person or by phone?
17     A.  Phone.
18     Q.  Tell me what you recall about your conversation
19 with Mr. -- well, back up.
20         Did you ask Mr. Smith, during your phone
21 conversation, why the contract was terminated?
22     A.  Yes.
23     Q.  Okay.  What do you recall Mr. Smith telling you,
24 during this phone conversation, about why the maintenance
25 contract was terminated?

1      A.  If I recall correctly, it was just saying there
2  was too much liability, or there was just too much
3  inaccuracies in the welding certifications, and that was
4  basically the -- the gist of the matter.
5      Q.  Do you recall anything else about your
6  conversation with Mr. Smith, following your receipt of the
7  contract termination notice?
8      A.  I don't recall.
9      Q.  Did you talk with anyone else at IPOS after your
10 receipt of the July 28th, 2021 termination notice?
11     A.  That was basically it.
12     Q.  Okay.  Did you talk with anyone at Vitol,
13 following your receipt of IPOS's contract termination
14 notice?
15     A.  I don't believe so.
16     Q.  Did you talk with Mr. Canning, following receipt
17 of the contract termination notice?
18     A.  No.
19     Q.  Okay.  Did you talk to anyone at WAPA about the
20 contract termination notice you received from IPOS?
21     A.  No.
22     Q.  Okay.
23         (Respite.)
24         All right.  Mr. Melendez, I want to talk a
25 little bit about the damages that you're claiming in this

1    lawsuit, all right?

2        A.    Yes, sir.

3        Q.    I should say, the damages that Petro is claiming

4    in this lawsuit, okay?

5        A.    Yes, sir.

6        Q.    As I understand it, Petro is claiming two kinds of

7    damages in this case:  First, Petro claims it's still owed

8    money for work Petro actually performed, right?

9        A.    Correct.

10       Q.    Okay.  And in your Complaint, if you find in that

11   stack in front of you, it should be Exhibit 2.

12       A.    Okay.  Hold on a second.

13             Okay.

14       Q.    If you look at your Complaint, look at

15   Paragraph 71.

16             In Paragraph 71, Petro alleges that past-due

17   invoices for work done prior to the cancellation of the

18   contract in the amount of $213,379, correct?

19       A.    You said seventy --

20       Q.    Paragraph 71.

21       A.    Oh, sorry.

22       Q.    Do you see that?

23       A.    Correct.

24       Q.    Okay.  So just to be clear, do you agree that the

25   amount stated in Paragraph 71, $213,379.90, is the total

1    amount that Petro claims it is owed for work actually

2    performed?

3        A.    Correct.

4        Q.    And the second category of damages, that I

5    understand Petro's claiming in this case, is that Petro

6    claims, as a result of IPOS terminating the contract, Petro

7    future profits, right?

8        A.    Correct.

9        Q.    And I want to show you what I'm marking as

10   Exhibit 16, which is Petro's Second Supplemental Response to

11   Vitol's Third Set of Interrogatories.

12             (Deposition Exhibit No. 16 was

13             marked for identification.)

14             All right.  If you look on the first page,

15   Interrogatory Number 10, do you see where it says --

16   question that's asked to Petro, to "identify, on a

17   project-by-project or job-by-job basis, all work for which

18   you are claiming lost profits damages in this case," right?

19       A.    Correct.

20       Q.    Okay.  And then it has specific requests for each

21   one of the projects identified.  Tell us the date on which

22   you say the project would have been awarded.  When you would

23   have started/completed, and done the work.  How much you say

24   you would have been paid, and the amount of profit that you

25   said you would have made, right?

1        A.    Correct.

2        Q.    And as well as all costs and expenses you would

3    have incurred, correct?

4        A.    Correct.

5        Q.    Okay.  And then Petro provided a chart on Page 2

6    that has 30 projects, right?

7        A.    Correct.

8        Q.    Okay.  Did you prepare the answer to this

9    interrogatory?

10       A.    Did I provide this information?

11       Q.    Yes.

12       A.    Yes.

13       Q.    Okay.  And you verified the answer?  If you look

14   at the back, you signed the declaration, attesting that the

15   information was true and correct, right?

16       A.    Correct.

17       Q.    I don't think there's a verification on this.  Let

18   me show you a prior one.

19             Let me just ask you:  Now under oath, do you

20   attest to the accuracy of the information stated here in

21   Petro's Second Supplemental Response to the Third Set of

22   Interrogatories in Exhibit 16?

23       A.    Yes.  I believe this is accurate.

24       Q.    Okay.  All right.  So big picture first.

25             You've identified 30 projects that you say

1    are projects that -- work you would have done for which

2    you're claiming damages in this case, correct?

3        A.    Correct.

4        Q.    And you're saying, across those 30 total projects,

5    that Petro would have been paid $4.48 million, right?

6        A.    Correct.

7        Q.    Okay.  And you're saying that to perform those

8    projects, it would have cost Petro $3.38 million, right?

9        A.    Correct.

10       Q.    Okay.  And so what you're saying is, you're

11   projecting that Petro, but for the termination of the

12   contract, Petro would have earned a projected profit of

13   $1,095,000, right?

14       A.    Correct.

15       Q.    Okay.  All right.  First, I want to go through

16   the -- the columns here.

17       A.    Okay.

18       Q.    This list of projects, these 30 projects, tell me,

19   where's this list derived from?  What is it based on?

20       A.    So this was a collaboration between, again, both

21   general managers, Andrew Canning, Vitol themselves, which is

22   Tim and Charlotte.  So it's a culmination of everything.  So

23   they would ask me for, for example, removal of the first

24   one, removal of the MLA.  What's it going to cost to do

25   that?  I would provide them a budget, and this is what it

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1   is. And I think you see some of them -- most of them back
2   here, as far as copies.
3       Q.  Just so we're clear, obviously Mr. Canning and
4   Vitol didn't work with you to prepare your interrogatory
5   response.
6           So what -- in what form did this list exist
7   before the lawsuit was filed that you're saying everyone had
8   agreed on this list?
9       A.  So they would ask me -- this is what -- there was
10  something called a wish list. I think you've probably seen
11  it. So a wish list is basically what -- what was happening,
12  or what was actually going to happen the following year,
13  right? So that -- that list, because IPOS was the operator
14  of the facility, Vitol the owner, they had to go and request
15  monies from them. So that's where these actual projects
16  came about.
17      Q.  So you believe all 30 of these projects were
18  approved by Vitol?
19      A.  Correct.
20      Q.  To do?
21      A.  Correct.
22      Q.  In 2021 or 2022?
23      A.  If we were still there, we would have done them,
24  yes.
25      Q.  Okay. You believe, in fact, Vitol had approved

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1   the budget to do every one of these 30 projects?
2       A.  Correct. There was actually probably another 20
3   more that they'd x'd out. Yeah, this was actually approved.
4       Q.  Now, earlier, you made a distinction between
5   maintenance projects and special projects, right?
6       A.  Correct.
7       Q.  Okay. I want to go through these.
8           Project 1, maintenance or special project?
9       A.  Project.
10          I'm sorry. You said maintenance or project?
11      Q.  Earlier -- just make sure I'm using your
12  understanding.
13      A.  Yeah.
14      Q.  We talked about maintenance projects, which you
15  said were governed by the -- the contract?
16      A.  Yeah.
17      Q.  And special projects which could be bid on and
18  could go to other contractors, right?
19      A.  Correct.
20      Q.  Okay.
21      A.  So easier, let's just say, maintenance and
22  projects.
23      Q.  Okay.
24      A.  That would probably be easier.
25      Q.  So let's just go through.

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1           Project 1, MLA removal. Maintenance or a
2   project?
3                   (Cross talk.)
4       THE COURT REPORTER: I'm sorry. Slow down,
5   please.
6       MR. KAPLAN: Just let me finish the question.
7       MS. ROHN: Stop talking while he's talking.
8       A.  Okay.
9       MS. ROHN: Sorry, Susan.
10      THE COURT REPORTER: Okay.
11      Q.  (Mr. Kaplan) Project Number 1, MLA removal in STX.
12  Maintenance or project?
13      A.  Project.
14      Q.  Project Number 2, replacement of rotating
15  Dolphins?
16      A.  Project.
17      Q.  Number 3, replacement transfer pumps?
18      A.  That's Number 3?
19          Project.
20      Q.  Number 4, replacement of two-way radios?
21      A.  Maintenance.
22      Q.  Sure about that?
23      A.  More than likely. That was just a simple just
24  replacing these little mobile radios, so that would be
25  maintenance.

PIS, LLC/A. MELENDEZ, JR. -- DIRECT

1       Q.  Number 4. Sorry. Number 5, replacement of the
2   portable gas testers?
3       A.  Yeah, that should probably be maintenance, also.
4       Q.  Number 6, painting of the control room?
5       A.  Projects.
6       Q.  Number 7, painting of the pipe?
7       A.  Projects.
8       Q.  Number 8, replacement block valves?
9       A.  Projects.
10      Q.  Number 9, additional stainless steel gearboxes
11  and brackets for manual valves?
12      A.  That should probably be maintenance.
13      Q.  Okay. Number 10, repair of the CCTV systems?
14      A.  They covered that under projects.
15      Q.  Eleven, annual outages?
16      A.  Projects.
17      Q.  Number 12, annual boiler maintenance?
18      A.  Projects.
19      Q.  Thirteen, annual tank level gauges?
20      A.  Projects.
21      Q.  Fourteen, API tank inspections?
22      A.  Projects.
23      Q.  Fifteen, boiler feed pump replacements?
24      A.  Projects.
25      Q.  Sixteen, maintenance of new security system?

177

1    A.    Maintenance.

2    Q.    There you go.

3          Seventeen?

4    A.    That was easy.

5    Q.    Seventeen, mound settlement repairs?

6    A.    Projects.

7    Q.    That was a significant project, right?

8    A.    Very.

9    Q.    And multiple bids went out on the mound settlement

10   repairs to multiple different contracting and engineering

11   firms, right?

12   A.    That was after.

13   Q.    That was after what?

14   A.    That was after we got our contract terminated.  We

15   were -- actually had already submitted our thing, and it was

16   already approved.

17   Q.    It's your testimony Vitol had already approved the

18   budget and the work scope for the mound settlement repairs?

19   A.    Yes.

20   Q.    Can you identify a document that approves that?

21   A.    More than sure I can.  This was probably right

22   before -- probably the beginning or second week in July,

23   yeah.  By Charlotte herself.

24   Q.    All right.  So you believe Ms. Horowitz can speak

25   to this?

178

1    A.    Yes.

2    Q.    All right.  To this day, do you know if the mound

3    settlement repairs, the work scope that's reflected here in

4    your interrogatory response, has been done?

5    A.    Can't speak to that.

6    Q.    Eighteen, valves and control revision for "on the

7    fly" switching?

8    A.    Maintenance.

9    Q.    Dock hose emergency disconnects?

10   A.    Maintenance.

11   Q.    Nitrogen generator?

12   A.    That was a project.

13   Q.    Stainless steel bolts?

14   A.    That was -- I think that was projects.  I'm sorry.

15   That was maintenance.  Maintenance.

16   Q.    Replacement grating?

17   A.    Maintenance.

18   Q.    The tank PRV double block and bleed valves?

19   A.    Oh, that was projects.

20   Q.    Maintenance on the expert pump motors?

21   A.    Maintenance.

22   Q.    Replacement wet end of fire pumps?

23   A.    That was maintenance.

24   Q.    Design and installation of fire pump test loop in

25   both STT and STX?

179

1    A.    That was project.

2    Q.    Electrical test equipment?

3    A.    Maintenance.

4    Q.    Purchase of the VINCO valves?

5    A.    Maintenance.  That was just extra valves to be

6    purchased.

7    Q.    Rotork actuators?

8    A.    Maintenance.

9    Q.    And semi-annual checks on the nitrogen generator?

10   A.    Maintenance.

11   Q.    Now, on the projects, you agree, those are things

12   that can, and in many cases, were put out for bids by

13   multiple contractors, correct?

14   A.    No.  I do not know that.

15   Q.    I'm sorry?

16   A.    I do not know that.

17   Q.    But your maintenance contract did not entitle you

18   to do any projects.  IPOS could decide to give that work to

19   whoever they believed was qualified or suitable on a

20   particular project basis, right?

21   A.    So the reason we entered a maintenance contract

22   with IPOS was because we were going to be the first person

23   to get, or to get -- to be asked to get projects.  We

24   lowered our hourly wages on that contract for that reason,

25   so we are the -- we were, and -- we were the first option.

180

1    Q.    Was IPOS required to give any projects to Petro

2    under the terms of the contract?

3    A.    I'm not saying required.  We were their first

4    option.

5    Q.    Okay.  But my question is required.

6          Was IPOS required to give Petro any projects

7    under the terms of the contract?

8    A.    I don't know that.

9    Q.    You're not saying that Petro was entitled to

10   receive all the projects, correct?

11   A.    I'm not saying that.

12   Q.    Okay.  It would be up to IPOS, in consultation

13   with Vitol and WAPA, to make a decision on a

14   project-by-project basis as to what project to do, and who

15   to award that project to, true?

16   A.    True.

17   Q.    Okay.  Now, to go through the column headings,

18   just to make sure I understand this spreadsheet that you

19   prepared, so obviously you have project number, the title of

20   the project.  We just talked about that.

21          The third column says, "unit cost."

22   A.    Correct.

23   Q.    Okay.  What is the unit cost that you have listed

24   here?

25   A.    Basically, the cost of the -- the cost of itself,

1    right?  So if it's -- for example, first one, MLA removal,
2    the cost would be $55,000 to remove it.
3        Q.  Okay.  The next column is estimated cost.
4            It appeared to me, when I looked at this, but
5    you tell me, sir, that the unit cost and the estimated cost
6    are the same.  The only difference is some places, there's a
7    breakdown between St. Thomas and St. Croix?
8        A.  Correct.  So if there's two different units, it
9    will add it up.  That's basically it.
10       Q.  Got it.  Okay.
11           The total is the same for the unit; you're
12   just breaking it in two?
13       A.  Correct.
14       Q.  Okay.  Now, as you sit here today, you don't know
15   which, if any, of these projects have been done, right?
16       A.  We're not there.  I can't speak to that.
17       Q.  And you don't know -- to the extent any of these
18   projects have been done, you don't know what scope was
19   actually approved and executed, correct?
20       A.  If they haven't been done, then we're in trouble.
21   I mean, they have to be done.  It's maintenance.
22       Q.  Well, you just told me that more than half of
23   these were not major projects, correct?
24       A.  It's a project, but it's part of the maintenance
25   that had to be done.  Like if there's coating issues.

Susan C. Nissman, RPR-RMR
(340) 773-8161

1    Again, I hope they did it.
2        Q.  You believe every one of these projects is a
3    regulatory requirement to do on an annual basis?
4        A.  I can't speak to that.
5        Q.  You're not saying that any of these projects could
6    not properly be deferred, right?
7            MS. ROHN:  Objection.  Argumentative.
8        A.  I can't -- I can't speak to that.
9        Q.  (Mr. Kaplan) All right.  So then you have a
10   projected award date, right?
11       A.  Correct.
12       Q.  Okay.  And what did you base that date on?
13       A.  That was basically what we had scheduled, going
14   forward.
15       Q.  Okay.  What -- is there a particular document I
16   should be looking for when you say, this was agreed?  Are
17   you saying there was a -- it's a -- it's an agreed budget
18   that all parties signed off on, or is it a spreadsheet that
19   lists all these, and everyone had a project award date and a
20   projected time frame?
21       A.  No.  They would actually just be scheduled.  This
22   is what we're going to do next.
23       Q.  Okay.  So you believe every one of these 30
24   projects was scheduled, and the commencement date for the
25   project that all the parties signed off on is the

Susan C. Nissman, RPR-RMR
(340) 773-8161

1    commencement date here in your interrogatory response?
2        A.  Again, I'm not saying they signed on to, but this
3    is basically the schedule.  So everything was scheduled from
4    the outages, from the -- everything had to be scheduled,
5    because it wasn't just us, it wasn't just -- I mean, IPOS,
6    it was actually WAPA, so we had to schedule those.  Those
7    were actually scheduled ahead of time.
8        Q.  Okay.  But I want to be clear.
9            Are you saying Vitol and IPOS signed off on
10   these projects all being awarded on the dates listed in your
11   interrogatory?
12       A.  I cannot speak to that.
13       Q.  Okay.  Are you saying that Vitol or IPOS and WAPA
14   signed off on the estimated cost for every one of these 30
15   projects?
16       A.  Correct.
17       Q.  Yes?
18       A.  I mean, we definitely discussed it a few times.
19   They were okay with the pricing, and we were moving forward.
20       Q.  Did purchase orders issue for any of these 30
21   projects?
22       A.  Can't recall that.  But, again, we had been doing
23   this for the last two years prior to this, so it was -- it
24   was there.  It was -- there's a history of it.  So it's not
25   like if I said, Yeah, this is what we're going to do next

Susan C. Nissman, RPR-RMR
(340) 773-8161

1    year.  There was a history in the last two years that we
2    actually did this.
3        Q.  So you believe all 30 of these projects have been
4    done on an annual basis in 2019?
5        A.  I'm not saying all 30, but I would say probably
6    about 90 percent of them, yeah.
7        Q.  And you believe all, or 90 percent of these, were
8    also done in 2020?
9        A.  I believe so.  I mean, with the exception of the,
10   you know, getting new radios, or getting stuff like that,
11   yeah, but a lot of the maintenance, a lot of the actual
12   projects, yes.  Absolutely.  The big -- the big-ticket
13   items, yes.
14           The mound, that was a different story.  Yeah,
15   that's a different story.  That's a project that needed to
16   be corrected, and hopefully you don't have to do anything
17   after that.
18       Q.  Okay.  You have a projected time frame that's part
19   of the schedule.
20           Okay.  You say, "projected total amount."
21   And that's the same as the estimated cost column --
22       A.  Correct.
23       Q.  -- correct?
24       A.  Yeah.
25       Q.  Okay.  And then you say, "projected total cost,"

Susan C. Nissman, RPR-RMR
(340) 773-8161

1    right?

2        A.    Correct.

3        Q.    Okay.  And with the column that says, "projected

4    total cost," does that reflect your estimate of Petro's

5    all-in cost to perform that project?

6        A.    That's correct.

7        Q.    And then you have a column that says, "projected

8    profit," right?

9        A.    Correct.

10       Q.    And that column reflects your calculation of what

11   Petro's margin would be, Petro's profit would be on a

12   project-by-project basis, right?

13       A.    That's correct.

14       Q.    Now, didn't -- didn't Petro do some work on a

15   not-to-exceed basis on these facilities?

16       A.    I believe so.

17       Q.    Okay.  Which of these projects are you claiming

18   was approved on a not-to-exceed basis?

19       A.    I can't recall which ones it was.  Probably --

20   maybe it's back here.

21             We had a relationship with IPOS that if we

22   bid a lot more or we had a lot more with them, we could

23   correct basically the time on it, we would correct it.  It

24   wasn't -- it wasn't like anything else.  But, yeah, all

25   these here were basically total amounts.  They were not

1    amount to exceed.

2        Q.    Did your projected total cost figure, does it

3    include any contingency?

4        A.    No, not on -- not on the budget, correct.

5    Sometimes they add it after the budget.

6        Q.    But when you're calculating your cost to perform

7    these projects, did you include any contingency amount?

8        A.    No.

9              There is one here, removal of MLA equipment.

10       Q.    I'm sorry.  Tell me what page you're on, sir.

11       A.    This is 90 -- 795.

12       Q.    Seven nine what?

13       A.    Seven ninety-five.

14       Q.    Seven ninety-five.

15             Okay.  This says, "Cost Breakdown - MLA

16   Removal & Cribbing on Trailer"?

17       A.    Correct.

18       Q.    Okay.  And it has -- you're pointing out that it

19   has a not-to-exceed number?

20       A.    That's right.

21       Q.    Okay.

22       A.    And I think after that, there's a couple of more

23   back there.

24       Q.    Okay.  So tell me, on the interrogatory response,

25   what project does this breakdown for MLA removal and

1    cribbing on trailer correspond to?

2        A.    Number 1.

3        Q.    Okay.  So Project 1, MLA removal, Page 6795,

4    that's the budget for that project.  And so that's a not-to-

5    exceed $54,000 estimated cost, correct?

6        A.    Correct.

7        Q.    Okay.  You overshot that one by 200 bucks.

8        A.    Rounding up.

9        Q.    Rounding up.  Right.

10             Okay.  Well, let's look at the first part of

11   this budget breakdown.

12       A.    Okay.

13       Q.    This is the Page 6765.  Says, "Cost Breakdown -

14   STT Vessel Inspection Budget."

15             Do you see that?

16       A.    Yes.

17       Q.    Okay.  These attachments, these budget breakdowns,

18   these are the documents that Petro cited in its response as

19   the backup for this lost profits calculation, right?

20       A.    Correct.

21       Q.    Okay.  So tell me, on this STX vessel inspection

22   budget, which project does this correspond to?

23       A.    Which number do you have?

24       Q.    It's the first page of this budget breakdown.

25       A.    765?

1        Q.    6765.

2        A.    67.  Okay.  So this is STT vessel inspection

3    budget.

4        Q.    Yes.  Tell me which project, in the interrogatory,

5    that corresponds to.

6        A.    So this is going to be Number 14.  And that's

7    actually both of them included.  St. Croix and St. Thomas

8    are included under Number 14.

9        Q.    Okay.  All right.  So your budget breakdown for

10   this Project 14, it has an equipment cost of 28 -- $27,000.

11   It's got a material cost of $675.  It's got labor charges

12   for a subtotal of $83,000, correct?

13       A.    Correct.

14       Q.    Okay.  And then behind that is the St. Croix

15   portion, correct?

16       A.    Correct.

17       Q.    Okay.  And that also has an equipment cost, a

18   material cost, a labor cost, right?

19       A.    Correct.

20       Q.    Now, there's a line item for the St. Thomas

21   portion that says, "Profit & Tax Rate, 15%," right?  Do you

22   see that?

23       A.    Correct.

24       Q.    Okay.  What portion of that 15 percent is profit?

25   What portion is tax?

1    A.   Exact numbers, I can't give you exact numbers.
2         What -- what do you want me -- I mean, we
3    know that, for example, like a -- the local tax is
4    5 percent, so that would come out of there.  If I give you
5    exact numbers.  We have insurance.  We have background
6    offices.  Is that what you're asking?
7    Q.   Well, first, I'm asking, what it says on your
8    budget breakdown, "Profit & Tax Rate, 15%."
9    A.   Yeah.
10   Q.   That means 15 percent includes your profit margin,
11   but it also includes taxes that you have to pay, correct?
12   A.   What I would have to pay, correct.  Yes.
13   Q.   So 15 percent is, therefore, not your profit
14   margin; it's something less than 15 percent, right?
15   A.   Okay.  I see what you're saying.
16   Q.   Do you agree?
17        If what you're saying on your budget
18   breakdown is you have a profit and tax rate of 15 percent,
19   and you have to pay tax out of that 15 percent, then your
20   ultimate profit is something less than 15 percent, correct?
21   A.   Okay.  Yes.
22   Q.   You agree with that?
23   A.   Correct.
24   Q.   All right.  And let's look at the next project.
25   That's St. Thomas.

1         Going to St. Croix.  Same thing.  It says,
2    "Profit & Tax Rate, 15%," right?
3    A.   Correct.
4    Q.   Okay.  And so, again, of that 15 percent on this
5    project, you have to pay taxes out of that amount.  So your
6    profit would actually be something less than 15, right?
7    A.   Correct.
8    Q.   And we go to the next one.
9         The cost breakdown - budget estimate for
10   St. Thomas painting jetty to north mound.
11        Do you see that?
12   A.   Correct.
13   Q.   This is Page 6769.
14        It says, "Profit & Tax Rate, 15%." Same point
15   would hold here, right?
16   A.   Correct.
17   Q.   You're telling -- in your budget breakdown for all
18   this work, you're saying your profit and tax rate is
19   15 percent.  You're going to pay at least 5 percent in tax,
20   so, therefore, your profit would not exceed 10 percent,
21   right?
22   A.   Correct.
23   Q.   Okay.  And, in fact, if we look through every
24   single one of the projects, and your budget breakdown
25   attached to your interrogatory response, your line item is

1    "Profit & Tax Rate, 15%," right?
2    A.   Correct.
3    Q.   Okay.  And there's a minimum tax of at least
4    5 percent, so your profit on all these projects would,
5    therefore, not exceed 10 percent, correct?
6    A.   Correct.
7    Q.   All right.
8    A.   Now, you understand also my labor.  I'm not paying
9    my labor the full cost rate, right?  So I have profit off
10   the labor as well, okay?
11        So there's a billing rate to my -- there's a
12   billing rate, and there's a cost rate to my labor.
13   Q.   When you say, "Profit & Tax Rate," let's look.
14   Let's look at an example.  Let's look at the cost
15   breakdown --
16   A.   Correct.
17   Q.   -- for the St. Thomas painting?
18   A.   Correct.
19   Q.   Are we on the same page?
20   A.   Yes.
21   Q.   6769?
22   A.   Right.
23   Q.   When you calculate your profit and tax rate,
24   you're at 15 percent --
25   A.   Um-hum.

1    Q.   -- you're calculating on the total, correct?
2    A.   Correct.
3    Q.   The $46,000, right?
4    A.   That's right.
5    Q.   And that includes the charges for your labor,
6    correct?
7    A.   Correct.  Yes.
8    Q.   So it's calculating your profit rate on the total
9    amount that you're being paid -- or you're saying you would
10   have been paid on this project, correct?
11   A.   Correct.
12   Q.   It's not -- it doesn't exclude labor?
13        MS. ROHN:  No, what he's saying -- sorry.
14   A.   What I'm saying is, that you guys saw there's a
15   rate sheet in prior documents, right?  A welder gets charged
16   at, for example, $45 an hour, right?  I'm not paying that
17   welder $45 an hour.
18   Q.   (Mr. Kaplan) How much do you pay your welders?
19   A.   $30 an hour.
20   Q.   Okay.
21   A.   So I'm making a profit out of that, as well.
22   Q.   So what -- on your budget, where it says, "Profit
23   & Tax Rate," and it's calculated as a percentage of the
24   total --
25   A.   Correct.

1    Q.   -- you're saying it excludes the profit you make
2  on labor?
3    A.   No.
4         MS. ROHN:  Includes it.
5         MR. KAPLAN:  Umm?
6         MR. BECKSTEDT:  He's getting profit on
7  profit.
8         MS. ROHN:  He's getting profit on profit.
9    A.   Yes, correct.
10        So my equipment and my material, it is a
11 cost.  Say the material's costing me a thousand bucks, I'm
12 going to charge him a thousand bucks, plus 15 percent.
13   Q.   (Mr. Kaplan) Okay.
14   A.   So I'm doing profit on profit.
15   Q.   Where's your actual labor costs, that you're going
16 to incur on these projects, reflected?
17   A.   Well, that's what I put here, my costs, and then
18 my profit is over here on this page.
19   Q.   But where is the actual calculation, project by
20 project, of your labor costs?
21        'Cause, here, you're telling me in all the
22 budget breakdowns --
23   A.   Uh-huh.
24   Q.   -- that it's inclusive of your profit?
25   A.   Correct.

1    Q.   What's the actual cost figure on a project --
2    A.   The cost figure total is the second column right
3  here.
4    Q.   Right.  But if I want to know what your labor cost
5  is for each project, that's not reflected anywhere in your
6  interrogatories in any of these budget breakdowns?
7         MS. ROHN:  You need to redo the chart to show
8  what profits you're making off the labor and the equipment.
9    A.   The equipment, absolutely.  The equipment is the
10 cost, and I just have to add 15 percent to it.  The only
11 thing is the labor.
12        MS. ROHN:  Okay.  Well, then, you have to put
13 that in your chart.
14   A.   Okay.  I understand.
15        MS. ROHN:  Sorry.  I didn't realize that was
16 the case.
17   A.   I'm sorry.
18        MS. ROHN:  You have to put down your actual
19 labor costs and your charged labor cost.
20   A.   I understand.
21        MS. ROHN:  And you can redepose him on that,
22 if you want.
23        MR. BECKSTEDT:  And equipment, too.
24        MS. ROHN:  No -- and your equipment, you're
25 going to put what you charged for the equipment, and what

1  you paid for the equipment.
2    A.   Yeah.  So we do have an equipment -- for example,
3  on each invoice, you have, if there's equipment done.  If,
4  for example, it's a scaffold, the cost of the equipment is
5  on there, and then we just charge 15 percent, which is
6  included in this.  So that's very black and white.
7         So equipment is, we just charge 15 percent.
8  Material, we just charge 15 percent.  If it's just a labor,
9  that we actually charge -- we actually have a billing rate,
10 and our --
11        MS. ROHN:  Okay.  So you're going to have
12 to -- then you're going to have to factor out what the
13 charge is.  What you pay for your labor versus what you
14 charge for your labor.
15   A.   I understand.
16        MR. KAPLAN:  Let's go off the record a
17 minute?
18        THE VIDEOGRAPHER:  Going off the record.  The
19 time is 3:03.
20        (Short recess taken.)
21        THE VIDEOGRAPHER:  Going back on record.  The
22 time is 3:05.
23   Q.   (Mr. Kaplan) All right.  Mr. Melendez, do you
24 understand, in the second-to-last column in your
25 Interrogatory Number 10, where it says, "Projected Total

1  Costs," in your projected total costs, you need to provide
2  for all of your costs, what your actual costs are going to
3  be --
4    A.   Okay.
5    Q.   -- for each item, equipment, labor, materials, et
6  cetera, so that we can actually determine the full amount of
7  your claimed loss profit on each project.
8         Do you understand?
9    A.   I understand.
10   Q.   You're agreeing, on behalf of Petro, to supplement
11 your interrogatory response?
12   A.   Yes.
13   Q.   Okay.  And this -- the attachments, these budget
14 documents, these were prepared and have dates on the top
15 when they were prepared, right?
16   A.   Correct.
17   Q.   And when you prepare this analysis, you're going
18 to prepare -- in what form are you going to prepare?
19 Spreadsheet?  How are you going to do this?
20   A.   If you want, I can just attach to that just what
21 are labor costs, and then basically profit at the end,
22 that's fine?
23   Q.   You do it however you need to do it.  I just want
24 to make sure --
25        MS. ROHN:  We'll -- we'll meet and confer, so

1    that -- you and I will, so it's done, so it's easy to

2    determine.

3         MR. KAPLAN: All right.

4         MS. ROHN: And I think probably the easiest

5    thing then would be to give him the -- actually the rate

6    sheet of what you actually pay the people, and a rate sheet

7    of what you actually charge for the same person.

8         A.  Correct.

9         MS. ROHN: Okay? Typed. Typed, of course.

10        Q.  (Mr. Kaplan) Now, your employees are -- are

11   so-called W-2 employees, right?

12        A.  Most of them, yes.

13        Q.  So you pay payroll taxes?

14        A.  Yes.

15        Q.  You pay social security taxes?

16        A.  Correct.

17        Q.  So when you calculate your labor costs, are you

18   including the difference between what you're charging, for

19   example, for a welder and what you're paying a welder, are

20   you including all of the taxes and benefits that you pay for

21   the -- that employee?

22        A.  Of course.

23        Q.  Okay.

24        MS. ROHN: Wait, wait. I think what he's

25   saying, is your base, when you talk about what your base

1    cost is for the employee, you have to factor in that --

2    whatever the labor costs are when you're making that chart.

3         A.  Okay.

4         MS. ROHN: Correct?

5         MR. KAPLAN: Correct.

6         A.  Correct.

7         Q.  (Mr. Kaplan) When you say, "total profit plus tax

8    of 15 percent" -- excuse me, 5 percent. You're saying of

9    that 15 percent, you're saying that's profit on top of

10   whatever profit you're making on the difference between what

11   you're paying your employees and what you're getting under

12   the contract, correct?

13        A.  That's correct.

14        Q.  And that 5-percent tax, that is the gross receipts

15   tax that you're talking about?

16        A.  That's correct.

17        Q.  Okay.

18        MS. ROHN: But that's not including -- but

19   that wouldn't be -- then, but in your labor costs, you're

20   going to have to do your -- whatever workmans' comp,

21   whatever percentage of that.

22        A.  Insurance.

23        MR. KAPLAN: All -- all -- all your taxes and

24   cost of employment need to be reflected and deducted --

25        MS. ROHN: Right.

1         MR. KAPLAN: -- from whatever you're

2    calculating on your profit --

3         MS. ROHN: And you'll probably need an

4    accountant to do that.

5         Q.  (Mr. Kaplan) Well, that was my question earlier.

6    I asked you if you have an accountant, and you said someone

7    named Kathleen.

8         A.  Correct.

9         Q.  And she's an outside accountant?

10        A.  Correct.

11        Q.  Do you know the name of -- do you know Kathleen's

12   last name?

13        A.  I can find it. Gallagher. I have to find it on

14   my phone. Call her Kat. Sorry.

15        Q.  That's all right.

16        MS. ROHN: I bet you -- I bet you, in order

17   to be able to calculate what it is, there's some formula for

18   that.

19        MS. FRANCIS: Are we on the record, or is

20   this off the record?

21        MS. ROHN: We're on the record.

22        MS. FRANCIS: Okay. Mr. Melendez, now we

23   need you to speak up. We don't want to have to ask you to

24   repeat things, but this is --

25        A.  Okay. I apologize. Can you hear me?

1         MS. FRANCIS: That was better, yes.

2         A.  Okay.

3         MS. FRANCIS: Please keep your voice up,

4    because we are still on the record.

5         A.  Yes, ma'am.

6         (Respite.)

7         MR. BECKSTEDT: I understood there's an

8    agreement we can reconvene for purposes of questioning

9    regarding that?

10        MS. ROHN: That one issue, so far.

11        Q.  (Mr. Kaplan) Okay. Project 21, the stainless

12   steel bolts.

13        Do you see that?

14        A.  Yes.

15        Q.  As I understand it, you sourced the bolts from

16   Traeger Brothers, but IPOS paid Traeger directly for those

17   materials, correct?

18        A.  I have to verify that. I know that they paid for

19   some bolts. I don't know if it was particular for this one.

20   This is an ongoing project that's been going for the last

21   two years of replacing all the carbon steel bolts with

22   stainless steel bolts, so I don't know if it was one or the

23   other. I apologize.

24        Q.  If IPOS paid for the materials, you haven't lost

25   any money on the materials? Your only loss would be a claim

1    for some sort of profit on the labor, correct?

2        A.    Correct.

3        Q.    All right.  Project 14, a propane vessel

4    inspection.

5        A.    Okay.

6        Q.    You say tank inspection work would have been

7    awarded on January 1st, 2022, right?

8        A.    Okay.

9        Q.    Now, you don't know if any API tank inspections

10   were done in 2022, do you?

11       A.    No.  I'm not there.

12       Q.    And it's not a regulatory requirement to do the

13   API tank inspections every year, right?

14       A.    So you're right, but what happened is we're

15   alternating tanks.  So each -- each -- each facility, the

16   one in St. Croix has four tanks.  I'm sorry.  eight

17   tanks.  And the one in St. Thomas has ten tanks.  So we were

18   rotating, because they were already five years past

19   inspection.  So we were rotating each of the tanks.  So each

20   year, we were going to do one on each site.  So, yes, it is

21   important.

22       Q.    If the API tank inspections were not done in 2022,

23   you would not have any damages for lost profits on API tank

24   inspections, correct?

25       A.    Again, you're asking me if it needed to be done.

1    It has to be done.

2        Q.    I didn't ask you -- my question was different.

3              If it was not done.  If the API tank

4    inspections were not done in 2022, Petro would have not lost

5    any profits on that project, correct?

6        A.    Correct.

7        Q.    All right.  And the same is true for any project?

8        A.    I was going to say.

9        Q.    If a project was not done in 2021 or 2022, Petro

10   would not have lost any profits on that project, correct?

11       A.    Correct.

12       Q.    Now, MLA removal, Number 1, actually, we talked

13   about that.  We'll move on.

14       A.    Correct.

15       Q.    The painting of the control room, Number 6, the

16   painting of the control room is certainly not required to be

17   done every year, right?

18       A.    So some sort of painting program was to be

19   implemented.  So this was the first one.  Well, actually,

20   not the first one.  The last two years, we had a painting

21   program.  So this year was going to be the actual

22   facility -- I mean, the actual building itself.  Before it

23   was a section of pipe.  The year before, it was the actual

24   pump alley.  So, yeah, there is some kind of sort of coating

25   maintenance that had to be done.

1        Q.    Okay.  What about the reverse loading rack?  In

2    addition to the reverse loading rack?  That's Project

3    Number 8, is that what it is?  Replacement block valves?

4        A.    Correct.

5        Q.    And as I understand it, I guess Mr. Canning, do

6    you recall he recommended some reverse-flow pumps; do you

7    recall that?

8        A.    Yes.

9        Q.    Okay.  But you understand that Vitol hired a

10   different engineering firm that determined the reverse-flow

11   project could be done without a pump installation?

12       A.    Again, I was not there.

13       Q.    The loading rack could be loaded by gravity?

14       A.    Again, I wasn't there.

15       Q.    Do you know that the engineering firm Exsol,

16   actually finalized a different scope of work on the reverse-

17   loading rack?

18       A.    Did not know that.

19       Q.    Okay.  If the scope of work changed, and was done

20   by a different engineering contractor on a project, that

21   would not be damages for Petro, correct?

22       A.    Well, we would have still done the actual

23   installation itself.  We would have still been the

24   contractor to install.  This was the engineer that you're

25   saying that said it wasn't, but there still needed to be

1    work done.

2        Q.    But Exsol Engineering firm did the work?

3        A.    They actually did the work themselves?

4        Q.    Do you know that?

5        A.    No.

6        Q.    Okay.  Do you dispute that?

7        A.    What's that?

8        Q.    Do you dispute that?

9            MS. ROHN:    Objection to form.

10       A.    Actually, wasn't Exsol the company that took over

11   maintenance for us?  They're -- they're from Surinam.

12   They're the company that took over, so we would have done

13   the work if we were there for maintenance.

14       Q.    (Mr. Kaplan)  On the reverse-loading rack?  A

15   different scope of work, though, right?  You're talking

16   about on Project 8, was the installation of reverse-flow

17   pumps, correct?

18       A.    Correct.

19       Q.    And if it was a different scope of work where no

20   pump installation would be required, there would be no

21   installation work, correct?

22       A.    You said that Exsol actually did the installation

23   themselves.

24       Q.    Not pump installation.  Did a different scope of

25   work on that project.

1  A.  But it's still in the scope of work that we would
2  have done.
3  Q.  It would be different than the scope of work and
4  estimated cost that you have in your interrogatory, correct?
5  A.  I understand.  But, again, we would have been
6  doing the scope of work, if it was different or not.
7  Q.  Okay.  Just a few more questions, sir.
8      Did you search your e-mail account for
9  documents in this case?
10  A.  Yes.
11  Q.  Okay.  We talked earlier.  You said you believe
12  you have an e-mail with Mr. --
13      MS. ROHN:  Castro.
14  Q.  (Mr. Kaplan) -- Castro, right?
15  A.  Castro.
16  Q.  You're going to look for that e-mail, correct?
17      MS. ROHN:  He didn't use Castro as a search,
18  so --
19  Q.  (Mr. Kaplan) You're going to look for any e-mails
20  to or from Mr. Castro, correct?
21  A.  Will do.
22  Q.  All right.  Now, have you produced any e-mail, in
23  this case, internal to Petro?  With any of your supervisors?
24  Any of your employees?  Any internal e-mail at Petro, did
25  you search for any of those documents?

1  A.  Yes.
2  Q.  Okay.  Have you produced a single document that's
3  an e-mail internal to Petro?
4  A.  I believe I have.
5  Q.  With your office manager?  Your accountant?  Any
6  of your supervisors?  Any of your staff?
7  A.  What e-mails I have, I produced.
8      MS. ROHN:  He's given us.  We produced a
9  bunch of e-mails.
10      MR. KAPLAN:  Internal e-mails?
11      MS. ROHN:  Uh-huh.
12  Q.  (Mr. Kaplan) Okay.  You believe you've done a full
13  search for all your e-mails during this contract to see if
14  anything deals with the issues in this case?
15      MS. ROHN:  We searched three -- we searched
16  the names of projects.  We searched --
17  A.  I believe so.
18      MS. ROHN:  We searched --
19  Q.  (Mr. Kaplan) Did you communicate with Mr. Persuad,
20  Mr. Kirsch, any of your maintenance folks?  Your
21  supervisors, superintendents by e-mail?
22  A.  Chat Persuad doesn't use his e-mail.  That's the
23  way.  He's a field guy, correct.
24      Frank is there, I'll say 20 percent of the
25  time in the office, so e-mails are not there.

1      So basically, e-mails would be me with vitol,
2  with IPOS, or anybody associated.  So my --
3      MS. ROHN:  He's talking about your internal
4  e-mails.
5  A.  Yeah.  So like I said, my internal e-mails, we
6  don't communicate through e-mails.
7  Q.  (Mr. Kaplan) So you don't believe you have
8  internal e-mails with your staff?
9  A.  I don't believe so.
10      MS. ROHN:  I think he said he gave a few.  I
11  think we produced them.
12  A.  What I did.
13      MS. ROHN:  He did an extensive search.
14  Q.  (Mr. Kaplan) Okay.  You told me the last time --
15  I'm going to go through just some names of some folks.
16      You told me the last time you communicated
17  with Mr. Castro was around the time he sent you that letter
18  in July of 2021, correct?
19  A.  Correct.
20  Q.  Okay.  What about Merlin?  I'm sorry.  I always
21  mispronounce it.
22  A.  Figueria.  Figueria.
23  Q.  Okay.  When's the last time you communicated
24  with -- with Merlin?
25  A.  Mr. Merlin, I would say probably the same time,

1  July/August of 2021.
2  Q.  Okay.  And by "communicate," I mean to be as broad
3  as possible.  Via phone, text, anything?
4  A.  Yeah.
5  Q.  Okay.  Last time you talked to Merlin was sometime
6  in July 2021?
7  A.  Yeah.
8  Q.  What about Mr. Smith?
9  A.  Mr. Smith, we had been e-mailing back and forth,
10  as far as payment.  This was -- had been going on since
11  2022.  Maybe early '22.  So that's basically the
12  communication.  No phone calls.  Last phone call was
13  probably after the termination of the contract.
14  Q.  Okay.  Mr. Nagle, when's the last time you talked
15  to David Nagle?
16  A.  Oh, goodness.  This had to be by the RIO panels
17  project.
18  Q.  Mr. Nagle used to work for you at Petro?
19  A.  Correct.
20  Q.  What are the circumstances -- why did Mr. Nagle
21  stop working for you?
22  A.  We didn't see eye-to-eye.  We had a project,
23  actually you mentioned, Aggreko.  Actually, before that, he
24  was in Limetree Bay with us.  We hired him on to actually
25  work directly with the staff engineer at Limetree Bay.  They

1   didn't see eye-to-eye.  They couldn't work together.

2   Unfortunately, we had to transfer him over to the Aggreko

3   project, start that up.  He just didn't work out.  We didn't

4   see eye-to-eye.

5       Q.  You and Mr. Nagle personally didn't see

6   eye-to-eye?

7       A.  Correct.

8       Q.  Mr. Nagle left Petro, and went to work for IPOS?

9       A.  That's what I understand.  As a contractor.  I

10  don't think he worked directly with.  That's what I

11  understand.

12      Q.  Okay.  Did you talk to Mr. Nagle in any respect

13  about any of the -- after the RIO shades project?

14      A.  Not at all.

15      Q.  Okay.  What about these other folks, Coury Hodge

16  and Rawle Granger, when's the last time you spoke to either

17  of them?

18      A.  I did talk to -- Mr. Granger, I have not talked to

19  Mr. Granger.  Coury I did talk to Coury.  We had a -- he

20  was in between jobs from IPOS to the new company, and I did

21  talk to him about possibly, you know, either, you know, us

22  working directly with WAPA with him or what have you, but

23  that was the conversation.

24      Q.  When was that?

25      A.  Oh, my goodness.  Beginning of the year.

1       Q.  Beginning 2023?

2       A.  I believe so.

3       Q.  Anything come of that?

4       A.  No.  No, he went back to work with Drexel or

5   whatever.  The new company that --

6       Q.  Earlier, you said you had done some coating work

7   for WAPA in the summer of 2022?

8       A.  That's right.

9       Q.  And you hadn't done any work thereafter with WAPA?

10      A.  That's right.

11      Q.  Have you sought additional work from WAPA --

12      A.  No.

13          MS. ROHN:  Let him finish his question.

14      Q.  (Mr. Kaplan) Have you elected not to pursue any

15  additional work?

16      A.  I have -- we have submitted some quotes.  They're

17  in a rough position right now, that there's no payment

18  coming.  The last time -- the last job that we did, we got

19  paid almost a year later, so we're kind of very hesitant to

20  work there.

21      Q.  All right.

22          Does Elias Rivera still work for you?

23      A.  Yes.

24      Q.  Mr. Kirsch still works for you?

25      A.  Yes.

1           MR. KAPLAN:  Okay.  Let's go off the record.

2   Take a break.  Let me look at my notes, and I may -- I may

3   be -- be done.

4           THE VIDEOGRAPHER:  Going off the record.  The

5   time is 3:21.

6               (Short recess taken.)

7           THE VIDEOGRAPHER:  Going back on the record.

8   The time is 3:31.

9       Q.  (Mr. Kaplan) Okay.  Mr. Castro (sic), we talked

10  earlier about your accountant, Kathleen and you said you

11  thought her last name was Gallagher.

12          Do you have her contact information in your

13  phone?  Can you look?

14      A.  It's actually Mr. Melendez, not Mr. Castro, but

15  anyway --

16      Q.  Oh, I'm sorry.

17      A.  It's okay.

18      Q.  I'm looking at this document that says Mr. Castro

19  in front of me.

20      A.  I'm sorry.  Kathleen Cooke.

21      Q.  Kathleen Cooke.

22      A.  Yes.

23      Q.  And do you have her address or company name?

24      A.  She actually works independently under her name.

25      Q.  Okay.  Do you have a physical address or a phone

1   number in there?

2       A.  I have her phone number.  E-mail.

3           MS. ROHN:  No, no, no.  We're not going to

4   have you contact his accountant and talk about him to his

5   accountant.

6           MR. KAPLAN:  It's discoverable information.

7   Contact information of witnesses that have documents --

8           MS. ROHN:  We haven't named her as a Rule 26.

9           MR. KAPLAN:  But I'm entitled to take

10  discovery from an accountant for Petro in a lost profits

11  case.

12          MS. ROHN:  We'll breach that gap when it

13  comes, but you're not going to talk to his accountant.

14  Somebody who has confidential information from him of all

15  different kinds of matters.  And if you want to notice her

16  deposition, where we will be present, we can talk about

17  that.

18          MR. KAPLAN:  Do you represent Ms. Cooke?

19          MS. ROHN:  My client is going to call his

20  accountant, and tell his accountant not to speak to you

21  without me present.

22          MR. KAPLAN:  Just asked a question:  Do you

23  represent Ms. Cooke?

24          MS. ROHN:  Not really any of your business,

25  is it?

1　　Q.　(Mr. Kaplan) Do you have Mr. Castro's contact

2　information in your phone?

3　　　　MS. ROHN:　I thought -- did we -- we listed

4　Mr. Castro, I think, under Rule 26 disclosures.

5　　A.　Correct.

6　　　　MS. ROHN:　We did.

7　　Q.　(Mr. Kaplan) Do you have his contact information?

8　　　　MS. ROHN:　I think you have his contact

9　information.

10　　Q.　(Mr. Kaplan) We're sitting here.  I'm just asking.

11　Do you have information?

12　　　　MS. ROHN:　But this is over.  This is over.

13　We gave you his -- if we didn't, I'll supplement my Rule 26

14　disclosures, but we are not doing this chitchat discovery.

15　　Q.　(Mr. Kaplan) This isn't a chitchat.

16　　　　I'm asking the witness, do you have, in your

17　phone --

18　　　　MS. ROHN:　You know what?

19　　Q.　(Mr. Kaplan) -- Mr. Castro's phone number and last

20　known address?

21　　A.　Last known address, no, but I have his contact.

22　　Q.　Can you tell me his contact information?

23　　　　MS. ROHN:　No.  If you would like it, go

24　through his attorney to get it.

25　　　　MR. KAPLAN:　Are you willing to provide

1　Mr. -- whatever information Mr. Melendez has in his

2　contacts --

3　　　　MS. ROHN:　You know what?  You're not

4　cross-examining me today.

5　　　　MR. KAPLAN:　Then don't instruct your witness

6　not to answer the question.

7　　　　MS. ROHN:　Because we're not in a deposition.

8　This is -- are we in a deposition?

9　　　　MR. KAPLAN:　Yes.

10　　　　MS. ROHN:　Oh, we started the deposition.

11　　　　The way to get discovery is to write a

12　written discovery request.  I believe we've already given

13　this to you.  If we haven't, we will do a supplemental

14　Rule 26 disclosure, and everybody will have his number,

15　okay?

16　　　　MR. BECKSTEDT:　So to be clear, Lee, you're

17　instructing the witness not to answer that last question?

18　　　　MS. ROHN:　Yes.  We'll give a formal Rule 26

19　disclosure.

20　　　　MR. KAPLAN:　The basis for your objection is

21　what?

22　　　　MS. ROHN:　That he doesn't have to go through

23　his phone when he's in a deposition to try and find people's

24　phone numbers.

25　　　　MR. KAPLAN:　Subject to any additional

1　questioning from other counsel, I will pass the witness,

2　subject to the stipulation made on the record earlier about

3　any supplementation that you provide.

4　　　　Thank you, sir.

5　　　　THE WITNESS:　Thank you.

6　　　　CROSS-EXAMINATION

7　BY MS. FRANCIS:

8　　Q.　Good afternoon, Mr. Castro.  I'm sorry,

9　Mr. Melendez.

10　　A.　Good afternoon.

11　　Q.　I introduced myself earlier.  My name is Simone

12　Francis, and I represent IPOS in this matter.

13　　　　Did anybody communicate with Mr. Castro

14　concerning the welder certificates that you provided, anyone

15　on behalf of Petro, other than yourself?

16　　A.　No, just myself.

17　　Q.　And I think you testified that your last

18　communication with Mr. Castro was in July of 2021?

19　　A.　I believe so.

20　　Q.　Is that correct?

21　　A.　I believe, yes.

22　　Q.　And was your last communication with Mr. Castro --

23　well, let me ask you this:  Did you ever communicate with

24　Mr. Castro after you received the notice of termination of

25　the contract from IPOS?

1　　A.　I do not believe.

2　　Q.　Did you communicate with Mr. Castro after he sent

3　you the letter that is marked as Exhibit 14?

4　　A.　I did communicate, because he was willing to come

5　down to IPOS, and actually recertify the welders.

6　　Q.　And how did he give you that information?  Was it

7　a phone call or some other form of communication?

8　　A.　A phone call.

9　　Q.　And at the time you spoke to Mr. Castro, where was

10　he, physically?

11　　A.　He was in Japan, if I wasn't mistaken.  Somewhere

12　in -- I mean, I'm sorry, Asia.  I believe he was in Japan.

13　　Q.　And how did you know that?

14　　A.　'Cause now I remember that actually I would have

15　to call him like at a certain time at night, or -- because

16　he was in the morning, and it was -- it was very -- very

17　different.

18　　Q.　And you're testifying that Mr. Castro stated to

19　you that he would come back from Japan to St. Croix --

20　　A.　Correct.

21　　Q.　-- to certify the welders?

22　　A.　Yes.  He actually had some time in August, that he

23　had mentioned, that he would be back in the States,

24　California, and he would be willing to come to St. Croix.

25　　Q.　But you never reached out to him in August to

1  arrange for that to occur, did you?

2      A.   IPOS never gave me the green light.

3      Q.   Independent of that, you never reached out to him

4  to have that occur, correct?

5      A.   Correct.

6      Q.   Okay.  And if you -- you said Mr. Castro was in

7  Asia at the time.  What, then, is the meaning of his letter

8  where he says, "I will be leaving on a project overseas and

9  will have very limited internet access?"  Because you just

10 now told me he was already overseas?

11     A.   Correct.  I understand that he was going to go to

12 the next project.  I don't know when, but that's what I

13 understand.  That's what he stated.

14     Q.   Okay.  But Japan is overseas, as compared to

15 St. Croix, correct?

16     A.   Correct.

17     Q.   Okay.  So Mr. Castro, when he wrote the July 29th,

18 2021 letter, was already overseas?

19     A.   That's what I understand.

20     Q.   Okay.  But he wrote a letter saying he "will be

21 leaving on a project overseas"?

22     A.   That's what I understand, yes, ma'am.

23     Q.   And you said when he was -- he e-mailed you this

24 letter that is Exhibit 14; is that correct?

25     A.   I'm sorry.  Repeat the question.

1      Q.   Did Mr. Castro e-mail you the letter that is

2  Exhibit 14?

3      A.   I believe so.

4      Q.   So at that time, Mr. Castro had internet access,

5  correct?  In Japan?

6      A.   I believe so.  Or wherever he was.  I just don't

7  recall where he was.  I apologize.  But I understand he was

8  overseas.

9      Q.   And where was he going overseas that he would have

10 very limited internet access?

11     A.   I -- I do not know, ma'am.  I didn't ask that

12 question.

13     Q.   In his July 21, 2021 letter, Mr. Castro describes

14 himself as "an independent contractor with my own business."

15         Do you see that?  Were you aware of that?

16     A.   Yes, I believe.  I can get that letter again.

17     Q.   And we've already looked at Exhibit 12, which

18 represents that Mr. Castro indicated that the testing on

19 those certificates was done by Acuren Inspection Services,

20 correct?

21     A.   I'm sorry.  Repeat the question again.

22     Q.   I said, the actual WPQs, welder performance

23 qualification record, represent that Mr. Castro was

24 conducting tests, or that there were mechanical tests

25 conducting by Acuren Inspection Services; is that correct?

**PIS, LLC/A. MELENDEZ, JR. -- CROSS**

1      A.   These -- the actual -- the original ones were done

2  through Acuren, but Mr. Castro's the one who did them.

3      Q.   Okay.  But as of 2021, when these records were

4  created, you knew and understood that Mr. Castro had no

5  affiliation with Acuren Inspection Services?

6      A.   Like I said earlier, I didn't realize it.  For me,

7  it wasn't an issue.

8      Q.   What is the name of Mr. Castro's company that he

9  operated, or business that he operated as 2021?

10     A.   Do not know, ma'am.  I apologize.

11     Q.   And your testimony is you had no written contract

12 with Mr. Castro?

13     A.   That's correct.

14     Q.   And he never issued an invoice?

15     A.   No.  I just paid him through PayPal.

16     Q.   And you don't know the -- the exact address where

17 your welders were tested?

18     A.   Unfortunately, not.

19     Q.   Let me ask you another question.

20         Edgardo Batista, does he still work for you?

21     A.   Edgardo Batista does work for me.

22     Q.   Okay.  Is he a W-2 employee, or 1099?

23     A.   W-2.

24     Q.   Bernardo Cruz, does he still work for you?

25     A.   No, he does not.

**PIS, LLC/A. MELENDEZ, JR. -- CROSS**

1      Q.   And in February of 2021, where did Mr. Batista

2  live?

3      A.   February of 2021.  They're from Puerto Rico.  I

4  don't have an exact address.

5      Q.   I didn't ask for an exact address, sir.  I just

6  asked you where.  And when I say, "where," in case that

7  wasn't clear, I meant, did he live in Puerto Rico?  Did he

8  live in St. Croix?  Did he live elsewhere?

9      A.   I'm sorry.  Repeat the question.

10     Q.   In February of 2021, on what island, or in what

11 state, or country, did Mr. Batista reside?

12     A.   So while he was working for us on island, he's

13 going to be in St. Croix.  When he is not, his home is in --

14 in Puerto Rico.

15     Q.   So was he commuting on a daily basis, or as

16 needed?

17     A.   As needed.

18     Q.   And does Petro Industrial operate -- have any

19 operations in Puerto Rico?

20     A.   No, we do not.

21     Q.   So the only place that Mr. Batista worked for you

22 was in St. Croix?

23     A.   I believe he also worked in St. Thomas.

24     Q.   Okay.  In the U.S. Virgin Islands?

25     A.   Yes.

1    Q.  Okay.  And Bernardo Cruz, you said he does not
2  work for you, correct?
3    A.  No.
4    Q.  Was he a W-2 employee?
5    A.  Yes, he was.
6    Q.  When did he cease being an employee?
7    A.  Say again.
8    Q.  When did he cease being an employee?
9    A.  After the 3-inch vent line project.
10    Q.  And where did Mr. Bernardo Cruz live in February
11  of 2021?
12    A.  He is a -- no, he has a residence in St. Croix, I
13  believe, and also -- he always is a resident of Dominican
14  Republic.
15    Q.  And do you know where he's located now?
16    A.  No, I do not.
17    Q.  George Rodriguez, does he still work for you?
18    A.  No, he does not.
19    Q.  When did Mr. Rodriguez leave his employ?
20    A.  At the end of the project, July of '21.
21    Q.  And was he a W-2 employee?
22    A.  Yes, he was.
23    Q.  Where did he reside?
24    A.  Puerto Rico.
25    Q.  In 2021?

1    A.  Puerto Rico.
2    Q.  Does Fernando Lebron still work for you?
3    A.  No.
4    Q.  I'm sorry.  I didn't hear the answer.
5    A.  I'm sorry.  No, he does not.
6    Q.  Was he a W-2 employee?
7    A.  Yes, he was.
8    Q.  And when did he cease working for you?
9    A.  July '21.
10    Q.  And where did he reside at the time --
11    A.  Puerto Rico.
12    Q.  -- that he left?
13        Does Jonathan Rodriguez still work for you?
14    A.  No, he does not.
15    Q.  Was Mr. Rodriguez a W-2 employee or a contractor?
16    A.  W-2.
17    Q.  And where did he reside in April of 2021?
18    A.  Puerto Rico.
19    Q.  And the last individual, Richael, R-I-C-H-A-E-L;
20  Philips, does Mr. Philips still work for you?
21    A.  No, he does not.
22    Q.  Was he a W-2 employee?
23    A.  Yes, he was.
24    Q.  And when did he stop working for you?
25    A.  July of '21.

1    Q.  And where did he reside in March of 2021?
2    A.  To be honest, with him, I do not recall.  I would
3  have to go back and check.
4    Q.  You testified that Mr. Castro sent to you the
5  welder performance qualification records dated February 2021
6  via FedEx; is that correct, sir?
7    A.  Correct.
8    Q.  And to what address were those -- was that packet
9  sent?
10    A.  Those are to my office at -- did you want the
11  whole address, or it's Castle Coakley, here in St. Croix.
12    Q.  And where did Mr. Castro -- from what address did
13  Mr. Castro send these records?
14    A.  I do not recall that, ma'am.
15    Q.  Was it an address -- do you know what state, city,
16  country he sent it from?
17    A.  I do not recall.  I apologize.
18    Q.  Do you still have any of the FedEx labeling or
19  records?
20    A.  I really doubt that I do, no.
21    Q.  Did the March -- does the March 2021
22  certification, was that also sent to your office in Castle
23  Coakley in St. Croix?
24    A.  Yes.
25    Q.  Okay.  And from what address did Mr. Melendez send

1  that document?
2    A.  Again, I do not recall.
3    Q.  Do you have any records showing the receipt of a
4  package from FedEx from Mr. Castro in March of 2021?
5    A.  No, ma'am.  I do not.
6    Q.  Same questions of April of 2021?
7    A.  Yeah, same answers.
8    Q.  Okay.  These welder qualification records state
9  that "the test coupons were prepared, welded, tested in
10  accordance with the requirements of ASME Section," looks
11  like, "IX/2013."
12    A.  Yes, ma'am.
13    Q.  Is that what you --
14        And what are the requirements of ASME Section
15  IX/2013?
16    A.  I -- I don't have that in front of me.
17    Q.  Did you have that in front of you when you
18  executed this document, Mr. Melendez?
19    A.  Yes, ma'am.
20    Q.  And is that something that Mr. Castro also sent to
21  you?
22    A.  Yes, ma'am.
23        Well, I'm sorry.  That's just a Google search
24  that, you know, obviously, it's a standard with process
25  piping.  But the exact definition of it, I don't have it in

225

1  front of me.

2       Q.   And your testimony was that neither you, nor

3  anyone else, on behalf of Petro, actually witnessed these

4  tests being performed?

5       A.   Correct.

6       Q.   And you don't actually have any test coupons,

7  correct?

8       A.   Correct.

9       Q.   Did you use -- did you use WhatsApp messaging or

10 any other messaging to communicate with Mr. Castro?

11      A.   Don't recall.  I think it was just a phone call.

12 Phone call conversations.

13      Q.   But you still have Mr. Castro's contact

14 information in your phone, correct?

15      A.   Correct.

16      Q.   And if you had WhatsApp or text messages with

17 Mr. Castro relating to welder certifications, those would

18 still also be accessible to you?

19      A.   If he has the same contact, possibly so.  I --

20 again, yeah.

21      Q.   Do you have the same contact, or do you have a

22 different contact?

23      A.   Yeah, I've had the same contact for years.

24      Q.   Okay.  And have you done any search for any

25 WhatsApp or text messages with Mr. Castro relating to this

226

1  case?

2       A.   I believe I did, but I think there's some --

3  obviously that one letter.  I mean, that one e-mail is

4  missing with the -- with the e-mail with the letter that he

5  also provided.  So, but, yeah, I can verify.

6       Q.   So, to be clear, you are going to search for

7  e-mails and text messages and WhatsApp for any

8  communications with Mr. Guillermo Castro, correct?

9       A.   I will do that.

10                     (Respite.)

11      Q.   And, sir, you are aware that Acuren discontinued

12 its services and operations in the U.S. Virgin Islands on or

13 about January 10th, 2021?

14      A.   I was not aware of that.

15      Q.   And are you aware that Acuren's records indicate

16 that he last employed Mr. Castro in July of 2019?

17      A.   That's what I heard later on from -- from my boss.

18      Q.   And does it concern you at all that these welding

19 qualification statements represent certification with

20 Mr. Castro with a company that he was not affiliated with

21 for more than a year before he executed these?

22      A.   Like I said before, for me, it's him doing the

23 actual certification.  I didn't know that he didn't work for

24 Acuren.  And for me, it really doesn't matter.

25      Q.   So the accuracy or inaccuracy of the

227

PIS, LLC/A. MELENDEZ, JR. -- CROSS

1  representations on those welder certification records

2  doesn't matter to you, sir?

3       A.   I'm not saying that.  That's not what I'm saying.

4  What I'm saying is, the actual testing themselves, that he

5  tested them, and he just requalified my welders under my

6  same procedures, that's what counts on those certifications.

7       Q.   You weren't physically there, and no one from

8  Petro was physically present, correct?

9       A.   Correct.

10      Q.   And you don't have any videotape, or any other

11 record of this actual testing having been performed,

12 correct?

13      A.   The welders, obviously, were testing.  So, yeah,

14 that's what we have.  I was not presently there, but, yeah,

15 the testing was there.

16      Q.   And you're basing that on what you were told by

17 Mr. Castro.

18      A.   Correct.

19      Q.   And since the time that this -- your contract with

20 IPOS was terminated, have you ever asserted to Mr. Castro

21 that you may have a claim against him, or a concern in any

22 way that the information represented on those certificates

23 is false or incorrect?

24      A.   I have -- I did mention that there was questioning

25 about his certifications through a -- through a current

228

PIS, LLC/A. MELENDEZ, JR. -- CROSS

1  client, which is IPOS.  And, therefore, that's what the

2  letter -- letter that he came about.  He did state, let me

3  remedy it.  So I can go ahead and go to the island and

4  recertify these welders.  That's my way of verifying that

5  everything was correctly done.

6       Q.   But the certificate is supposed to be the

7  verification that it was correct and done; isn't that true?

8       A.   The certificate for me is a valid certificate.

9  That's why I signed it.

10      Q.   Okay.  Mr. Melendez, in Exhibit 13, which is an

11 e-mail chain that begins -- I guess it begins with a

12 July 22nd, 2021 e-mail, and ends with a July 28th, 2021

13 e-mail.

14           Do you have that document before you?

15      A.   Yes, I do.

16      Q.   Okay.  On the page that's PIS64, there's a

17 reference to a 3-inch vent holder, which was shared on

18 Dropbox with Andreas?

19      A.   Yes, ma'am.

20      Q.   And then there was further discussion.

21           Did you, at some point, remove the document

22 from that Dropbox, or remove the access to that Dropbox?

23      A.   I think after the termination letter, I think

24 everything was brought down.  But that was -- that -- that's

25 now shared with everybody.  The same QC qualifications that

229

1    were attached to this -- to this as well.

2        Q.   I'm sorry.  You're saying that the contents of the

3    Dropbox for the welding certificates that we just looked at?

4        A.   Correct.

5        Q.   Was there anything else provided?

6        A.   What they were asking for.  I think there's

7    another page.  They were asking for MTRs.  They were asking

8    for basically a copy of pictures of labels for the -- for

9    the welding rods.  There's a list of stuff that was provided

10   on there.  There's a prior e-mail or prior one of these

11   exhibits that had all that stuff in there.

12        THE WITNESS:  Excuse me, real quick.

13   Ms. Rohn, do you know what time they shut down the parking

14   lot right there?  When they start --

15        MS. ROHN:  Oh.

16        THE WITNESS:  Because I --

17        MS. ROHN:  Does anybody know what time?

18        THE VIDEOGRAPHER:  Over by the National Park

19   Service?

20        THE WITNESS:  Yes.

21        THE VIDEOGRAPHER:  I think 5 o'clock, they

22   start hauling cars.

23        THE WITNESS:  Okay.

24        MS. ROHN:  Yeah, they start hauling cars.

25        THE WITNESS:  All right.  Because my truck is

Susan C. Nissman, RPR-RMR
(340) 773-8161

230

1    there, and I don't want it to get hauled off.  I'm sorry for

2    interrupting.

3        MS. FRANCIS:  No, that's fine.  I was just

4    going to suggest we go off the record, if you needed a

5    break.

6        A.   I'm good now.

7        MS. ROHN:  We just have -- he has to leave

8    before 5:00 to move his truck, so it doesn't get towed.

9        MS. FRANCIS:  Understood.

10        Q.   (Ms. Francis) So just to be clear, when you used

11   Mr. Melendez's services, you never obtained any business

12   license from him?

13        MS. ROHN:  Mr. Melendez's services?

14        Q.   (Ms. Francis) I mean, Mr. Castro's services?

15        A.   Correct.  No, I've known Mr. Castro when we worked

16   at the refinery.  He's the one that, like I was telling you

17   before, he's the one that qualified all the welders.  Not

18   just my welders, every single one of the company's welders,

19   so his representation is very well.  I mean, he's a very

20   qualified person.  He's a Level III phased array technician,

21   where there's not -- there's not too many of them.  So,

22   yeah, absolutely.  I mean, his qualifications exceed.

23        Q.   Okay.  And you said you've never read the

24   declaration that was produced in this case in which Acuren

25   has declared that Acuren has no record of Guillermo Castro

Susan C. Nissman, RPR-RMR
(340) 773-8161

231

PIS, LLC/A. MELENDEZ, JR. -- CROSS

1    ever having held a Level III certification with Acuren, or

2    any other employer?

3        MS. ROHN:  You know, Simone, that's been

4    asked several times.  I think he's answered that question

5    several times.

6        MS. FRANCIS:  Okay.  Well, he can answer it

7    again.

8        MS. ROHN:  I think we'll just stick with the

9    record.

10        Q.   (Ms. Francis) You do not dispute that that's what

11   Acuren has represented in this matter, correct,

12   Mr. Melendez?

13        A.   Correct.

14        Q.   You've testified that you are the sole owner of

15   Petro Industrial Solutions, LLC, correct?

16        A.   That's correct.

17        Q.   Okay.  And that has been the case for the entire

18   duration that the maintenance contract was in effect with

19   IPOS?

20        A.   Correct.

21        Q.   And so when the Complaint that is marked as

22   Exhibit 2 refers to Petro's owners, there's, in fact, only

23   one owner, correct?

24        A.   Correct.

25        Q.   The Complaint indicates that -- and who is

Susan C. Nissman, RPR-RMR
(340) 773-8161

232

PIS, LLC/A. MELENDEZ, JR. -- CROSS

1    Petro's management team?

2        A.   My management team, general manager, Chetram

3    Persaud.  I have an office manager named Santhia Rodriguez.

4    I have a safety manager, which is Frank Kirsch.  And I

5    have -- those are my main ones.  I have the field

6    supervisors.

7        Do you want me to list more?  I'm sorry.

8        Q.   Okay.  Well, you consider your field supervisors

9    to be your management team?

10        A.   No.  No, they're not.  They're my field

11   supervisors, correct.  I also have a quality control

12   manager.  I think that's it for managers.

13        Q.   And who's the quality control manager?

14        A.   Currently his name is Javier Vazquez.

15        Q.   How do you spell that last name?

16        A.   Vazquez; V-A-Z-Q-U-E-Z, I believe.

17        Q.   When you say, "currently," how about during the --

18   when did Mr. Vazquez begin his role of quality control

19   manager?

20        A.   Actually, he began at the beginning of this

21   project, which was March/April of 2021.

22        Q.   And do you regard yourself as local West Indian,

23   Mr. Melendez?

24        A.   No, I do not.

25        Q.   Do you regard yourself as local Hispanic?

Susan C. Nissman, RPR-RMR
(340) 773-8161

1    A.    I would say so.  I've been here for eight years.
2    I don't know when you become a local, but I think, I'm here.
3    I own a house here.  I own a company here, so, yeah.  I
4    consider myself a local.
5         Q.    And just quickly going through your -- your team
6    of people that you mentioned, Mr. Persuad, do you know where
7    he's from?
8         A.    He is -- what is he?  He was born in West Guyana.
9    He's been on island for 20-some years.  So, yes, he's a
10   local.
11        Q.    Okay.  And Ms. Rodriguez?
12        A.    Ms. Rodriguez is originally from Puerto Rico.
13   She's been on island for, I believe, 10 to 12 years.
14        Q.    Okay.  Mr. Kirsch, you said he's from somewhere on
15   the mainland?
16        A.    He's white Anglo.  He came from Houston.  He's
17   been on St. Croix for, I believe, six years.
18        Q.    And then Mr. Vazquez?
19        A.    Mr. Vazquez, originally Puerto Rican.  He's been
20   on island for the last 20-some years, I would say.
21        Q.    And during the time that you worked with IPOS, I
22   think you mentioned a couple folks you worked with.
23              Was Coury Hodge one of them?
24        A.    Yes.
25        Q.    Okay.  And is -- would you consider Mr. Hodge as a

1    local West Indian?
2         A.    Yes, I would consider him.
3         Q.    Okay.  Let's talk about Mr. Granger.
4               Have you met him?
5         A.    Yes, I have.
6         Q.    Okay.  And what do you regard his background as?
7         A.    I'm sorry.  What -- what is this -- where is this
8    going?  I'm sorry.  I mean -- why am I -- why?
9         Q.    Mr. --
10        A.    I just don't know why I'm categorizing or -- or
11   saying.  I don't -- I don't know where they're from.  I
12   don't even know if they're from down island, or what have
13   you.  I don't know.
14             MS. ROHN:  Then you say, I don't know.
15        A.    Okay.
16             MS. ROHN:  Don't guess.
17        Q.    (Ms. Francis)  So you would of -- based on your
18   observations of IPOS's workforce at the time that
19   maintenance agreement was in effect, were there a variety of
20   individuals from potentially different places and
21   backgrounds, including local West Indians?
22        A.    That's correct.
23        Q.    And in the First Amended Complaint that you filed
24   in this matter, you stated that you believed or you alleged
25   that Andrew Canning violated the discrimination statutes of

1    the U.S. Virgin Islands?
2              That's Paragraph 82.
3         A.    Correct.
4         Q.    Do you recall making that allegation?
5         A.    Yes.
6         Q.    And have you now recited all facts upon which you
7    base that assertion?
8         A.    I'm sorry.  Repeat the question.
9         Q.    Have you now identified all facts that you -- upon
10   which you base that assertion?
11        A.    Yes.
12        Q.    And you indicated that you believe that the Vitol
13   defendants violated the discrimination statutes of the U.S.
14   Virgin Islands, correct?
15        A.    I stated before that --
16        Q.    I'm asking you what your Complaint states,
17   Mr. Melendez.
18              Is that what it states in Paragraph 82, that
19   the Vitol defendants violated the discrimination statutes of
20   the U.S. Virgin Islands?
21        A.    Give me a quick second.
22              Okay.  Correct.
23                   (Respite.)
24        Q.    Okay.  And up through the time that IPOS provided
25   the notice of termination of your contract, you had been

1    party to a contract with IPOS since -- well, you had a
2    maintenance contract with IPOS that was entered in September
3    1, 2019, correct?
4         A.    I also had a service agreement with IPOS before
5    then.
6         Q.    But at the time of this Complaint, the Complaint
7    references, and the contract that was terminated, was the
8    maintenance contract that is Exhibit 3, correct?
9         A.    Correct.
10        Q.    And that was the only contract that you had with
11   IPOS at the time, correct?
12        A.    Like I was saying, we replaced a service
13   maintenance -- or service agreement that we had before.
14        Q.    Mr. Melendez, please take a look at Exhibit 3.
15        A.    Yes, ma'am.
16        Q.    And if you would look at Paragraph 7?
17        A.    Okay.
18        Q.    And 7(d) says, "This Contract constitutes the sole
19   and only Contract of the parties and supersedes any prior
20   understandings or written or oral Contracts between the
21   parties respecting the subject matter of this Contract."
22              Do you see that?
23        A.    Correct.
24        Q.    And that paragraph also says that this contract
25   may be amended by the parties only by a written contract.

1    Do you see that?

2    A.   Yes.

3    Q.   And there are no written amendments to the

4 September 1, 2019 maintenance contract, correct?

5    A.   Correct.

6    Q.   And the only written contract in effect between

7 Petro and IPOS, as of September 2019, and continuing through

8 July of 2019 (sic), was this maintenance contract, correct?

9    A.   Ms. Rohn is going to be upset.  I think there was

10 an amendment to this.

11    MS. ROHN:  You have to speak up.  She can't

12 hear you.

13    A.   Okay.  So in 20 -- 2020, we had requested an

14 increase on rates, and there should be an amendment to this.

15    Q.  (Ms. Francis)  Well, you haven't --

16    A.   That's correct.

17    Q.   And where is that document, Mr. Melendez?  Is

18 there a assigned addendum or amendment to this contract?

19    A.   I will have to verify that.  I apologize.  But,

20 yes, now you say this, yes.

21    Q.   Yes, what?

22    A.   Yes.  There should be a signed contract or e-mail

23 or something verifying that.  I think I did put it somewhere

24 on there, but I'll verify it.

25    Q.   And where is that, in the production of documents

1 that you furnished to us, Mr. Melendez?

2    A.   It should be there.  I will verify where it is.

3    Q.   Well, we've pointed out before, I believe Attorney

4 Kaplan asked you about the fact that the last page of the

5 agreement has a date of 9-1-2020 for the rate sheet.

6    Do you see that?

7    A.   I do see that.  And it's very possible that's

8 basically the attachment or the change.  I just have to

9 verify that.  That's very possible.

10    Q.   Okay.

11    A.   Yes, ma'am.

12    Q.   And you're not aware of any other rate sheet that

13 pertains to any agreement with Island Project and Operating

14 Services, correct?

15    A.   I will verify that, ma'am.  But I believe that's

16 the reason why this 2020 rate sheet is on the back.  I will

17 verify that.

18    (Respite.)

19    Q.   And apart from Kathleen, who you've identified, I

20 did not hear her last name, but has Petro Industrial

21 Solutions used any external accountants at any time between

22 September 1, 2019, and the present?

23    A.   No.  I do my own books.

24    Q.   So what services does Kathleen provide?

25    A.   Generally, it's labor payroll taxes, is what she

1 deals with.

2    Q.   So she handles labor and payroll taxes, and you

3 actually do the other accounting for the company; is that

4 right?

5    A.   That's correct.

6    Q.   And did you say you had an undergraduate degree,

7 was it in accounting?

8    A.   Yes, ma'am.  Yes, it is.

9    Q.   Are you a CPA?

10    A.   No, I'm not.

11    Q.   And did you do any graduate course work in

12 accounting?

13    A.   No, I did not.

14    Q.   And have you done the books of Petro, with the

15 exception of labor and payroll taxes, has that been the case

16 continuously from September of 2019 through the present?

17    A.   Yes, ma'am.

18    Q.   During the time that Merlin Figueira served as the

19 general manager, you worked with him from time to time,

20 correct?

21    A.   Yes.

22    Q.   And how would you describe your relationship with

23 Mr. Figueira?

24    A.   Excellent.

25    Q.   You don't contend that Mr. Figueira engaged in any

1 racist conduct towards you, correct?

2    A.   Absolutely not.

3    Q.   Do you contend that he engaged in any racist

4 conduct towards any of your management team?

5    A.   No.

6    Q.   I'm sorry.  I didn't hear you.

7    A.   No.

8    Q.   Do you contend that Mr. Figueira engaged in any

9 racist conduct towards your employees?

10    A.   No.

11    Q.   Following Mr. Figueira's -- end of his tenure as

12 general manager, did you work or have any interactions with

13 David Smith?

14    A.   After the termination?  I'm sorry?

15    Q.   No.  Following Mr. Figueira's departure from

16 St. Croix?

17    A.   So what I understand, Mr. Figueira left August of

18 2021, and, therefore, I only dealt with David Smith after

19 that.  So I had interaction regarding payment of -- of

20 invoices with Mr. David Smith.

21    Q.   Okay.  So during the term that the contract was in

22 effect, your only dealings were with Mr. Figueira?

23    A.   No, no, no.  Both with -- with both of them, David

24 Smith and Mr. Merlin.

25    Q.   Okay.

241

```
1      A.   They were both -- I'm sorry.  Go ahead.
2      Q.   I'm sorry.  They were what?
3      A.   They were both active.  They were both active
4  managers.  I'm sorry.
5      Q.   And do you contend that Mr. Smith engaged in any
6  racist conduct toward you?
7      A.   No.
8      Q.   Do you contend that Mr. Smith engaged in any
9  racist conduct toward your employees?
10     A.   No.
11     Q.   Do you contend -- just in case you're
12 distinguishing -- do you contend that Mr. Smith engaged in
13 any racist conduct towards your management team?
14     A.   No.
15     Q.   Do you contend that anyone else that you -- any
16 other IPOS employee engaged in any racist conduct towards
17 you?
18     A.   No.
19     Q.   Do you contend that any IPOS employee engaged in
20 any racist conduct towards your management team?
21     A.   No.
22     Q.   Do you contend that any IPOS employee engaged in
23 racist conduct towards your employees?
24     A.   No.
25                        (Respite.)
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

242

```
1      Q.   And in your Complaint, you allege that the "VITOL
2  Defendants, OPTIS and Andrew Canning defamed Plaintiff to
3  IPOS and others as to forging documents, causing incidents,
4  doing shabby work, all of which are not true."
5           I know you've already testified and mentioned
6  in an e-mail the incident in which you allege that
7  Mr. Canning referred to -- after the platform incident.
8           Is that a -- one of the bases for your claim
9  of defamation?
10     A.   One of many, yes.
11     Q.   And according to the e-mail that you wrote to
12 Mr. Figueira and Mr. Smith in February of 2021 concerning
13 that platform incident, that's Exhibit 9, if you want a
14 minute to look at that.
15     A.   Yes, ma'am.
16     Q.   And you've already noted that after the
17 February 11th communication with Mr. Figueira, you followed
18 up with him the following morning to say -- to tell
19 Mr. Figueira that Mr. Canning allegedly stated that he was
20 going to sue Petro and IPOS because he fell through the
21 platform; is that correct?
22     A.   Yes, ma'am.  That's my e-mail.
23     Q.   Okay.  So is it my understanding that Mr. Canning
24 was alleging that he was going to sue your company, Petro,
25 and IPOS, as a result of that incident?  You weren't
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

243

PIS, LLC/A. MELENDEZ, JR. -- CROSS

```
1  alleging that Mr. Canning was acting on behalf of IPOS when
2  he made any of the statements that you described in your
3  February 11th e-mail, correct?
4      A.   I'm sorry.  Repeat that one more time.  I'm sorry.
5      Q.   You described certain statements that Mr. Canning
6  reportedly made when he was yelling after the platform
7  incident, and those are summarized in your February 11th,
8  2021 e-mail, correct?
9      A.   Correct.
10     Q.   And you don't contend, do you, that when
11 Mr. Canning made these alleged statements, that he was
12 making them on IPOS's behalf, do you?
13     A.   I -- I don't know how -- yeah.  I don't know
14 how -- I can't respond to that.  That's not for me to
15 respond.  That's his comments.
16     Q.   Right.  I'm asking you what you contend.
17          You were not contending, certainly when you
18 wrote to Mr. Figueira and Mr. Smith, and told them about
19 this incident, you didn't allege to either of them that you
20 believed that Mr. Canning was making those statements for
21 IPOS or at IPOS's instigation, correct?
22     A.   He worked for Vitol and IPOS.  I mean, I don't
23 know if he was making it to them or on their behalf or not.
24 All I know is what he said, and that's kind of what I wrote.
25     Q.   Well, you didn't say to either Mr. Smith or
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

244

PIS, LLC/A. MELENDEZ, JR. -- CROSS

```
1  Mr. Figueira, did you, Mr. Melendez, that Mr. Canning was
2  taking this action on our behalf, and I expect you to stop
3  it?  You didn't make any -- you didn't make any such
4  statement in your e-mail, correct?
5      A.   On IPOS's behalf, you're asking?
6      Q.   Correct.
7      A.   Okay.  Yeah, I guess that's -- I mean, I see what
8  you're saying.  He does work for Vitol and IPOS.  I just
9  don't -- I mean, that's just the way Andrew is.  Andrew was
10 just a person that he just was above everybody, basically.
11 So he didn't care if it was IPOS.  He didn't care if it was
12 Vitol.  It's just him.
13     Q.   Sir, are you saying that you think Mr. Canning
14 doesn't take direction from anyone?
15     A.   I -- I can't answer that, ma'am.
16     Q.   Well, I mean, you're making claims in this
17 lawsuit.
18     A.   Okay.
19     Q.   I'm trying to get to the bottom of them,
20 Mr. Melendez.  So this is actually your opportunity to
21 answer them.  To answer those questions.
22     A.   So, okay.  So further answering that question,
23 Mr. Canning would be very brandish about him having --
24 working for Vitol directly.  So him saying that he was above
25 IPOS, and above, obviously, us, as Petro.  So I don't know
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

245

```
1    if that -- if that applies to this or not, but that's just
2    the way he was.
3        Q.   So you're saying that Mr. Canning would say he was
4    above Petro and above IPOS?
5        A.   I'm not saying he was saying that.  That's the way
6    he just acted.
7                     (Respite.)
8        Q.   And according to the Complaint that you filed,
9    your -- your allegation is that Mr. Canning was an employee
10   of the entity known as Optis, correct?
11       A.   I know that we have e-mails from Optis.  If he was
12   a contractor for Optis -- I know about Optis because of him.
13   That's basically it.
14                    (Respite.)
15       Q.   Apart from any actual business entities, were
16   there any individuals that you paid on a 1099 basis, who
17   performed work in -- with respect to the maintenance
18   contract?
19       A.   No.
20            MS. ROHN:  I'm just going to put on the
21   record it's 4:25.  Going to have to wrap this up.
22       Q.   (Ms. Francis) I didn't hear your answer,
23   Mr. Melendez.
24       A.   No.  No 1099 employee were working on the
25   maintenance.
```

246

```
1        Q.   I actually asked a different question.
2             I said, were there any individuals that you
3    paid on a 1099 basis for work done on the maintenance
4    contract?
5        A.   No.
6        Q.   And how many employees does Petro Industrial
7    Solutions have as of today?
8        A.   Approximately 35 employees.
9        Q.   And how many employees did Petro Industrial have
10   at the start of 2022?
11       A.   I -- I can't.  I don't have that info in front of
12   me, ma'am.
13       Q.   How many employees did Petro Industrial have in
14   July of 2021?
15       A.   Again, I -- I don't have that information in front
16   of me.
17                    (Respite.)
18       Q.   And we talked about this briefly before, so you
19   don't know -- you know your headcount now, but you don't
20   know what your headcount was at the start of 2022 or July of
21   2021.
22            With respect to your employees, you --
23   your -- you paid them wages.
24            Do you offer your employees any health
25   insurance?
```

247

PIS, LLC/A. MELENDEZ, JR. -- CROSS

```
1        A.   Yes.
2        Q.   What other benefits do you offer your employees?
3        A.   Holiday pay.  Vacations.  Sick pay.  I think
4    that's pretty much it.
5        Q.   Retirement benefits?
6        A.   No.
7        Q.   Life insurance?
8        A.   I don't believe so.
9        Q.   Do you pay housing for them?
10       A.   If they're from off island, we do.  And those
11   off-island ones are just on projects.  It's not -- it's not
12   a regular employee.
13       Q.   How about transportation, or other --
14       A.   Yeah, so if you're off-island or temporary
15   employees, yes, we provide housing and transportation.
16       Q.   And the 35 employees that you have now, those
17   are -- is that -- are those all regular employees, or
18   regular plus temporary?
19       A.   So those are regular plus temporary.  Those are
20   regular and temporary.
21       Q.   And how is it -- what is -- what is your
22   definition of a temporary employee, just really quickly?
23       A.   Somebody that works with us less than six months,
24   continuously, I guess you could say.
25       Q.   I think you indicated that you only -- that
```

248

PIS, LLC/A. MELENDEZ, JR. -- CROSS

```
1    Mr. Kirsch doesn't use e-mail to communicate, 'cause he's
2    not in the office?
3        A.   Correct.
4        Q.   Is that your --
5             How do you communicate with Mr. Kirsch, then?
6    What is your normal means of communicating with him?
7        A.   Via phone or in person.
8        Q.   How about Mr. Persuad?  Do you use e-mail to
9    communicate with him?
10       A.   No.  Again, e-mail and in person.
11       Q.   I'm sorry.  Did you say e-mail and in person?
12       A.   No.  I'm sorry.  Phone and in person.
13            MS. ROHN:  Okay.  Simone, you got 10 minutes.
14       Q.   (Ms. Francis) So is it your testimony that you
15   don't have any text messages or any other e-mail
16   communications internal to Petro that are relevant to the
17   claims in this case?
18       A.   That's correct.
19            MS. FRANCIS:  Okay.  I'm going to yield to
20   counsel for Canning and Optis.
21            MS. ROHN:  Okay.  You got 10 minutes.
22            MS. FRANCIS:  Well, perhaps -- would you like
23   to move your car first, Mr. --
24            MS. ROHN:  No.  I have to pick up kids.  I
25   put it on the record early on that 5 o'clock is the cutoff,
```

1  so you got 10 minutes.

2            CROSS-EXAMINATION

3  BY MR. CERADINI:

4      Q.  I'll go ahead and start with some questions.  I

5  don't think it will run that long.

6            This is Attorney Matthew Ceradini for Andrew

7  Canning and Optis Europe, Limited.

8            Mr. Melendez, you had testified that

9  Mr. Canning's job was a facility's engineer; is that

10  correct?

11      A.  That's -- that's my knowledge.  Again, I don't

12  know his -- his title.

13      Q.  Okay.  And -- but as part of his job, was to

14  review work plans, work procedures, and quality of work.

15            My -- my question is, what's the difference

16  between Mr. Canning expressing criticisms of Petro

17  employees' work versus Mr. Canning being racist or

18  discriminatory?

19      A.  Again, repeat that?  For me --

20      Q.  Absolutely.

21      A.  Repeat it, please.

22      Q.  Let me try to clarify that.

23      A.  Yes.

24      Q.  You testified that you didn't have any issues with

25  Mr. Canning expressing criticisms about those matters within

1  the scope of his job, which were viewing plans, procedures,

2  quality of work.

3            And so my question is, what is the

4  difference, in your mind, between Mr. Canning expressing

5  criticisms about work quality versus Mr. Canning being

6  racist, as you've alleged in the Complaint?

7      A.  Okay.  So there's a big difference for me.

8  Obviously, he can review our work.  He can review our

9  timesheets, and we can have conversation on how to -- how to

10  repair it.  How to fix it.  How to get further from that.

11            From him being a racist, who, being, you

12  know, calling my employees, or saying this about, you know,

13  my supervisors, or just flat out just kicking my, you know,

14  a supervisor and welder and pipe fitter out of his facility.

15  There's a complete difference from that.

16      Q.  When did he kick a welder and pipe fitter out of

17  the facility?

18      A.  This was January or -- maybe January, late January

19  of 2021.

20      Q.  Did he make any racist or discriminatory comments

21  when he did it?

22      A.  There was a few underhanded jabs.  Kind of

23  something to the fact, you know, I don't know how to say

24  this name.  Spanish name.  I don't even know whatever.  You

25  know.

PIS, LLC/A. MELENDEZ, JR. -- CROSS

1            MS. ROHN:  You have to say more than

2  "whatever."  Whatever he said.

3      A.  Yes.  So saying, yeah, he couldn't pronounce their

4  name.  They all sound the same, you know, to that effect.

5      Q.  (Mr. Ceradini)  Okay.  Are there any other

6  incidents of Mr. Canning expressing racism or discriminatory

7  feelings towards your employees that you can think of --

8      A.  Yes.

9      Q.  -- that you haven't expressed already?

10      A.  I did express already about the opening

11  conversation in 2018, I believe.  A conversation about time

12  logs.

13            Throughout -- throughout our, I guess

14  throughout our work history, my maintenance guys, the guys

15  that actually work for maintenance, they're all locals.

16  They're all down-island locals.  They're all black

17  individuals.

18            If I -- I have asked them, what is their

19  interaction with Andrew Canning.  And it's, I mean, he

20  basically looks the other way.  He doesn't even look at us.

21  He just completely just is blind to what we do and what we

22  not do.  And that caused a lot of problems for me, because

23  instead of just correcting, if there was correction needed,

24  it should have been done there with that individual.  If

25  not, he would call me or call another supervisor to go down

PIS, LLC/A. MELENDEZ, JR. -- CROSS

1  there, because he couldn't speak to the actual individual

2  that was there.

3            So that was just a continuous thing that was

4  just -- again, this was just, you know, years of working

5  together.

6      Q.  Was he in a position where he could directly

7  correct one of your employees?

8      A.  Yes.

9      Q.  Would he be required to tell you about it?

10      A.  I'm just saying that this is just nitpicky things.

11  Pick up this trash, or, you know, just -- it's not like

12  they're -- they had to do something critical, or weren't

13  doing something critical.  This was just nitpicky things.

14      Q.  Did he ever use any pejorative racial terms to

15  describe any of your employees?

16      A.  I guess, for me, when you use local.  When you

17  use -- when you use those types of terms, they -- they're

18  very derogatory.  They're very discriminatory, just because

19  when you say, oh, you're just a local.  Or, oh, you're

20  just -- that, just for them, just number one, it says you're

21  considering -- you're saying I'm lazy.  You're saying that

22  I'm not going to do anything.  That you're -- that you're

23  stealing.  Like that's basically the connotation that goes

24  with that, so that was his terms.

25      Q.  So you're saying that the way he used the term,

1  the connotation implied a deeper meaning that you thought
2  was racist; is that correct?
3      **A.**  It's not just what I thought.  This is just the
4  way it is here on island.
5      **Q.**  The way for everyone on island?
6      **A.**  If you work enough on island, you understand what
7  you can use and not use, yes.
8              **MR. CERADINI:**  I have no further questions.
9              **MS. ROHN:**  Thank you.
10             Go move your car.
11             **THE WITNESS:**  I know.  They literally will
12  tow it.
13             **MR. BECKSTEDT:**  Are we done?
14             **MR. KAPLAN:**  Off the record.
15             **THE VIDEOGRAPHER:**  This concludes the
16  deposition.  The time is 4:45.
17
18
19
20
21             (Whereupon the deposition concluded
22                     at 4:45 p.m.)
23
24
25

C-E-R-T-I-F-I-C-A-T-E

I, SUSAN C. NISSMAN, a Registered Merit Reporter
and Notary Public for the U.S. Virgin Islands,
Christiansted, St. Croix, do hereby certify that the above
named witness, **PETRO INDUSTRIAL SOLUTIONS, LLC, through its
representative, ADRIAN MELENDEZ, JR., and personally,** was
first duly sworn to testify the truth; that said witness did
thereupon testify as is set forth; that the answers of said
witness to the oral interrogatories propounded by counsel
were taken by me in stenotype and thereafter reduced to
typewriting under my personal direction and supervision.

I further certify that the facts stated in the caption
hereto are true; and that all of the proceedings in the
course of the hearing of said deposition are correctly and
accurately set forth herein.

I further certify that I am not counsel, attorney or
relative of either party, nor financially or otherwise
interested in the event of this suit.

IN WITNESS WHEREOF, I have hereunto set my hand as such
Registered Merit Reporter on this the 13th day of May, 2023,
at Christiansted, St. Croix, United States Virgin Islands.

                          /s/ Susan C. Nissman
                    _____
My Commission Expires:    Susan C. Nissman, RPR-RMR
June 28, 2023             NP 234-19