IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. CROIX

PETRO INDUSTRIAL SOLUTIONS, LLC, )
                                 )
              Plaintiff,         )
                                 )
        vs.                      )   Case No. 1:21-CV-00312
                                 )
ISLAND PROJECT AND OPERATING     )
SERVICES, LLC; VITOL US HOLDING  )
II CO.; VITOL VIRGIN ISLANDS     )
CORP.; ANDREW CANNING; and OPTIS )
EUROPE, LTD.,                    )
                                 )
              Defendants.        )

THE ORAL DEPOSITION OF CHETRAM PERSUAD

was taken on the 22nd day of May, 2023, at the Law Offices

of Beckstedt & Kuczynski, LLP, 2162 Church Street,

Christiansted, St. Croix, U.S. Virgin Islands, and via Zoom

teleconference, between the hours of 9:38 a.m. and

3:37 p.m., pursuant to Notice and Federal Rules of Civil

Procedure.

_____

Reported by:

Susan C. Nissman RPR-RMR
Registered Merit Reporter
Caribbean Scribes, Inc.
1244 Queen Cross Street, Suite 1A
Christiansted, St. Croix
U.S. Virgin Islands  00820
(340) 773-8161

---

A-P-P-E-A-R-A-N-C-E-S

For the Plaintiff:

Law Offices of Lee J. Rohn & Associates, LL
1108 King Street, Third Floor
Christiansted, St. Croix
U.S. Virgin Islands  00820

By:  Lee J. Rohn


For the Defendant Island Project and Operating Services,
LLC:

Law Offices of Ogletree, Deakins, Nash, Smoak & Stewart, LLC
The Tunick Building, Suite 201
1336 Beltjen Road
Charlotte Amalie, St. Thomas
U.S. Virgin Islands  00802

By:  Simone R.D. Francis (Via Zoom)


For the Defendant Vitol US Holding II Co. and Vitol Virgin
Islands Corp.:

Law Offices of Beckstedt & Kuczynski, LLP
2162 Church Street
Christiansted, St. Croix
U.S. Virgin Islands  00820

By: Carl A. Beckstedt, III

---

For the Defendant Andrew Canning:

Law Offices of Andrew C. Simpson
2191 Church Street, Suite 5
Christiansted, St. Croix
U.S. Virgin Islands 00820

By: Andrew C. Simpson(Via Zoom)


**Also Present:**  Adrian Melendez, Jr.

---

E-X-A-M-I-N-A-T-I-O-N

| Description | Counsel | Page |
|---|---|---|
| Direct | by Mr. Beckstedt | 5 |
| Cross | by Ms. Francis | 124 |
| Cross | by Mr. Simpson | 156 |
| Cross | by Ms. Rohn | 168 |
| Redirect | by Mr. Beckstedt | 173 |
| Recross | by Mr. Simpson | 177 |
| Recross | by Ms. Francis | 178 |

E-X-H-I-B-I-T-S

| Exhibit | Description | Page |
|---|---|---|
| 17 - | Versa Report dated April 3, 2021 | 114 |

**EXHIBIT 2**

CHETRAM PERSUAD -- DIRECT

```
 1                  CHETRAM PERSUAD,
 2    called as a witness, having been first duly sworn,
 3          testified on his oath as follows:
 4                 DIRECT EXAMINATION
 5   BY MR. BECKSTEDT:
 6        Q.   Mr. Persuad, my name is Carl Beckstedt, and I
 7   represent Vitol Virgin Islands Corporation, and Vitol U.S.
 8   Holding II Company, which I'll refer to as Vitol in this
 9   deposition, okay?
10        A.   Okay.
11        Q.   All right.  Could you please state your name for
12   the record?
13        A.   Chetram Persuad.
14        Q.   All right.  Do you have any nicknames or false
15   names that you go by?
16        A.   A nickname would be Chad.
17        Q.   Now, Mr. Persuad, have you ever had your
18   deposition taken before?
19        A.   Never.
20        Q.   Okay.  You're here today in my office, and it's an
21   informal setting, but it is part of a court proceeding
22   that's pending in the District Court of the Virgin Islands
23   in St. Croix, so it's as if you're before the judge on the
24   witness stand, subject to the penalty of perjury to tell the
25   truth, and I'm going to ask you some questions regarding the
```

CHETRAM PERSUAD -- DIRECT

```
 1   case that's before the Court, okay?
 2        A.   Okay.
 3        Q.   The court reporter is taking down everything
 4   that's said as part of this proceeding, so it's important
 5   that we probably talk slower than I am right now, that we
 6   speak up loudly, and that we don't talk on top of each
 7   other, okay?
 8        A.   Okay.
 9        Q.   The last -- or two last instructions:  One is, if
10   you don't understand my question, please tell me, and I'll
11   try to clarify it or rephrase it so that you do understand.
12             Fair enough?
13        A.   Yes.
14        Q.   And also, is there any reason today, because of
15   either an event in your life or illness, that you cannot
16   devote your full attention, or are you prepared to proceed
17   today with my questioning?
18        A.   Yes.
19        Q.   You're prepared to proceed?
20        A.   Yes.
21        Q.   Okay.  So, first of all, where do you currently
22   reside?
23        A.   On St. Croix, 39 Little Fountain.
24        Q.   Okay.  And how long have you lived at 39 Little
25   Fountain?
```

CHETRAM PERSUAD -- DIRECT

```
 1        A.   Since '97.
 2        Q.   Okay.  And where are you originally from, if I
 3   may?
 4        A.   I was born in South America, Guyana, and I was
 5   raised in New York.
 6        Q.   All right.  And when did you first come to reside
 7   in the Virgin Islands?
 8        A.   I think it's 2000.  Right after Hurricane Hugo.
 9        Q.   Okay.  Right after Hugo?
10        A.   Yeah.
11        Q.   So Hugo was 1989.
12        A.   '89.  So that was 2000.
13        Q.   That's missing ten years.
14        A.   Oh, I'm sorry.
15        Q.   1990?
16        A.   1990.  Sorry.  Yes.
17        Q.   Okay.  All right.  And did work bring you down
18   post hurricane?
19        A.   No.  Came to visit a friend.
20        Q.   Okay.  And have you resided in St. Croix ever
21   since you came after Hurricane Hugo?
22        A.   Yes.
23        Q.   All right.  And where are you currently employed?
24        A.   At Petro Industrial.
25        Q.   And that's a company, if I understand, that's
```

CHETRAM PERSUAD -- DIRECT

```
 1   owned by Mr. Adrian Melendez, Jr., who's present here today
 2   at the deposition, correct?
 3        A.   That is correct.
 4        Q.   All right.  And how do you know Adrian Melendez?
 5        A.   We worked at the refinery together.
 6        Q.   And when you say, "the refinery," which iteration
 7   of the refinery do you mean?
 8        A.   Limetree Bay.
 9        Q.   Okay.  And did you work for a different company at
10   the Limetree Bay refinery?
11        A.   No.  We worked for the same company.
12        Q.   And what company was that?
13        A.   NIS.
14        Q.   All right.  And that was Jeff Nations' company?
15        A.   That's correct.
16        Q.   All right.  And how long did you work at NIS?
17        A.   Roughly about three years.
18        Q.   And what positions were you and Mr. Melendez in at
19   NIS while you were working there?
20        A.   I was superintendent of nights; and Mr. Melendez,
21   superintendent day.
22        Q.   He was in the same position as you at the daytime?
23        A.   Yes.
24        Q.   Got it.
25             All right.  And -- and what years did you
```

1    work at NIS with Mr. Melendez?

2    A.   I think it was '15, '16, '17.

3    Q.   All right.  And after your -- when did you leave

4    NIS?

5    A.   Right after Irma and Maria.

6    Q.   And where did you go after Irma and Maria?

7    A.   I didn't go anyplace.  Worked at my house, 'cause

8    it was badly damaged.  And after that, started with

9    Mr. Melendez.

10    Q.   Okay.  So, in other words, you started with

11    Mr. Melendez' company, Petro Industrial?

12    A.   That's correct.

13    Q.   All right.  And when did you start with Petro

14    Industrial?

15    A.   I'd say the hurricane was in '18, I think it was.

16    Q.   I believe it was September 2017.

17    A.   Well, it was going to be right after.  I would say

18    November or December.

19    Q.   Okay.  So shortly after the hurricane?

20    A.   Yes.

21    Q.   All right.  And you were employed directly by

22    Petro at that time?

23    A.   That's correct.

24    Q.   Is it fair to refer to it as Petro?

25    A.   Petro Industrial, yes.

1    Q.   Petro Industrial?

2    A.   Yeah.

3    Q.   So if I accidently just call it Petro, I will mean

4    Petro Industrial, okay?

5    A.   I understand.

6    Q.   Thank you.

7         Okay.  And what was the job that -- what was

8    the position you were hired for at Petro Industrial in 2017?

9    A.   I was basically the field superintendent/manager.

10    Q.   And what are the duties and responsibilities in

11    that position?

12    A.   Basically make sure the work is getting done on

13    time.  Make sure costs is to a minimum.  Client is happy

14    with the production.

15    Q.   Okay.  And who did you -- all right.

16         Are you still with Petro today?

17    A.   Yes.

18    Q.   Okay.  And what position do you hold?

19    A.   Same position.

20    Q.   All right.  Can you just give me an outline of the

21    management structure at Petro Industrial?

22         Let me back up.

23         Has it changed at all since it started in

24    2017?

25    A.   No.

CHETRAM PERSUAD -- DIRECT

1    Q.   Okay.  So can you give me an outline of the

2    management structure at Petro?

3    A.   Adrian, myself, our office manager.  That's it.

4    And the employees.

5    Q.   All right.  So you report directly to Adrian?

6    A.   That's correct.

7    Q.   Do you know what title he holds at the office?

8    A.   Not sure, but I know he's the owner.

9    Q.   Fair enough.

10         All right.  And you said you have an, I'm

11    sorry, office manager, was it, who was under you?

12    A.   Not under me.  Under Adrian.  Santhia Rodriguez.

13    Q.   All right.  And what's her position again?  I

14    apologize.

15    A.   Office personnel.  Office manager.

16    Q.   Got it.

17         So you both directly report up to Adrian?

18    A.   Yes.

19    Q.   And then you have, I guess for lack of a better --

20    the workers, then, that actually do the hands-on skilled

21    labor?

22    A.   That is correct.

23    Q.   And I take it those fluctuate, depending upon the

24    jobs you have at the time?

25    A.   That is correct.

CHETRAM PERSUAD -- DIRECT

1    Q.   All right.  And you're responsible for that

2    workforce?

3    A.   Yes.

4    Q.   Okay.  And the office manager handles the office

5    paperwork related to that workforce?

6    A.   That's correct.

7    Q.   All right.  Does Petro have a quality control

8    manager?

9    A.   Myself or Adrian.

10    Q.   All right.  So do you guys flip flop in that role?

11    A.   If I'm on St. Croix, I'll do it.  If I'm on

12    St. Thomas and Adrian is not here, I will do it.

13    Q.   Got it.

14         All right.  So that role is filled based upon

15    who's available, as opposed to, say, assignments for

16    projects?

17    A.   That is correct.

18    Q.   Okay.  Now, are you aware of the lawsuit that

19    Petro has filed against various entities, including Vitol?

20    A.   Yes.  I'm aware of it.

21    Q.   All right.  And what do you understand that

22    lawsuit to be about?

23    A.   Pretty much my understanding is breach of

24    contract.  And as far as how Petro was treated, it was

25    unfairly.

13

1    Q.   Okay.  Now, one of the defendants in this lawsuit
2   is Andrew Canning.
3         Do you know him?
4    A.   Yes.
5    Q.   All right.  And -- sorry.  Just check something.
6         Another defendant in this lawsuit is Optis
7   Europe, Limited.
8         Do you know that company?
9    A.   Never heard of that company.
10   Q.   And another defendant in this lawsuit is Island
11  Project and Operating Services, LLC.
12        Familiar with that?
13   A.   Yes.  IPOS.
14   Q.   Okay.  So if we refer to it today as IPOS, you
15  would understand that to mean the company I just named,
16  right?
17   A.   That is correct.
18   Q.   Okay.  Now, do you know any of the -- well, first.
19  Let me strike that.
20        Did there come a time where you met Charlotte
21  Horowitz?
22   A.   Yes.
23   Q.   All right.  And you know who Charlotte Horowitz
24  is?
25   A.   I don't know her position.  I know who she is.

14

1   She's one of the representatives for Vitol.
2    Q.   Okay.  And you met with her in Texas, right?
3    A.   That is correct.
4    Q.   All right.  And do you recall when that meeting
5   was?
6    A.   No, I don't.
7    Q.   Okay.  Do you recall who was present at that
8   meeting?
9    A.   Yes.
10   Q.   Who?
11   A.   Charlotte, Tim, Sebastian, Adrian, myself.
12   Q.   Okay.  And who are -- are there any other
13  individuals at Vitol that you have interacted with over the
14  years working with Petro?
15   A.   David Smith, Merlin Figueira.  I'm not a
16  hundred-percent sure of his last name.  They had several
17  supervisors or managers that came and went.  I can't
18  remember their names.
19   Q.   Okay.  Now, it's my understanding that David Smith
20  and Merlin both work for IPOS.
21        Is that what you understand, or no?
22   A.   Yes.
23   Q.   Okay.  And during the time that you were working
24  with Petro for IPOS, you understood that David Smith and
25  Merlin were employees of IPOS?

15

1    A.   That is correct.
2    Q.   And do you know what positions they held?
3    A.   At first, David was the general manager for both
4   islands; and after he left and went to his other position,
5   he, Merlin, came in for the spot.
6    Q.   Okay.  And what was David Smith's other position,
7   to your knowledge?
8    A.   I think he went to work at Cape Canaveral, if not
9   correct.
10   Q.   Okay.  And then Merlin, to your knowledge, became
11  the general manager for both St. Thomas and St. Croix?
12   A.   That's correct.
13   Q.   Okay.  Now, do you have any knowledge of any type
14  of racist comment that Charlotte Horowitz has ever made with
15  respect to Petro, or any Petro employees?
16   A.   Not to my knowledge.
17   Q.   Do you have any knowledge of any discriminatory
18  conduct by Ms. Horwitz, Charlotte Horowitz, with respect to
19  Petro, or any Petro employees?
20   A.   No.
21   Q.   All right.  I have the same question for the other
22  Vitol people that you interacted with.
23        So are you familiar, or have any personal
24  knowledge, I should say, with respect to any racist comments
25  by Sebastian Moretti?

16

1    A.   Best answer to your question is, we never
2   interacted.  We met one time with these people that you're
3   asking, Sebastian, Charlotte.  We worked with Tim on several
4   occasion.  But as far as communicating with them, they
5   probably would have been in a meeting once or twice via
6   satellite or something like that, but we never took
7   instructions directly from them.
8    Q.   Okay.  That's fair enough.  I understand.
9         would it be fair to say -- and I just need to
10  make sure we're clear on the record -- would it be fair to
11  say that you have no personal knowledge of any racist
12  comments or discriminatory conduct towards Petro, or any
13  Petro employees, by Sebastian Moretti?
14   A.   No knowledge of that.
15   Q.   Okay.  And would it be fair to say you do not have
16  any knowledge of any racist comments or discriminatory
17  conduct against Petro, or any of Petro's employees by Tim
18  Kologinczak?
19   A.   That's correct.
20   Q.   And would it be fair to say that you do not -- do
21  you know who Eduardo Garcia is?
22   A.   I met him a few times.  He was here before we
23  started working -- or Sebastian and these other guys, he was
24  the one that I understand started the whole Vitol process
25  down here with this propane facility.

```
 1     Q.   Okay.  All right.  So did you have occasion to
 2   interact and observe Mr. Garcia in your job?
 3     A.   No.  I met him on three occasions, probably.
 4     Q.   Okay.  So you did have occasion to meet him, but
 5   you didn't interact with him --
 6     A.   No.
 7     Q.   -- regularly?
 8     A.   No.
 9     Q.   Is that correct?
10     A.   That is correct.
11     Q.   Okay.  Do you have any knowledge of Mr. Eduardo
12   Garcia making any racist comments, or engaging in any
13   discriminatory conduct against Petro, or any of Petro's
14   employees?
15     A.   No.
16     Q.   Okay.  What about with respect to any of the IPOS
17   personnel?  Do you have any personal knowledge of any racist
18   comments or discriminatory conduct that Mr. David Smith
19   engaged in with respect to any Petro employees?
20     A.   No.
21     Q.   And what about Merlin Figueira?  Do you have any
22   personal knowledge of Mr. Figueira engaging in any racist
23   comments or discriminatory conduct against the Petro
24   employees?
25     A.   No.
```

```
 1     Q.   All right.  For any of those people for IPOS or
 2   for Vitol, do you have any personal knowledge of any sort
 3   of, I guess, to use your words, unfair -- I'm sorry -- yeah,
 4   unfair treatment of Petro or Petro employees?
 5     A.   No.
 6     Q.   Okay.  What about with respect to Mr. Canning?  Do
 7   you have any personal knowledge of Mr. Canning ever making
 8   any kind of racist comments towards any Petro employees?
 9     A.   Yes.
10     Q.   Okay.  And what knowledge do you have with respect
11   to Mr. Canning making racist comments to Petro employees?
12     A.   To set the record straight, we took most of our
13   orders from Andrew Canning.  He was their representative on
14   site.  Mr. Canning would have -- would lay -- we would lay
15   out a job that Canning gave us, and he would say, This is
16   incorrect.  We would --
17     MR. SIMPSON:  Can you please --
18     Q.   (Mr. Beckstedt)  They need you to?
19     A.   Speak up.
20     Q.   Yeah.
21     A.   I said, Andrew Canning pretty much run the
22   maintenance work for IPOS.  And pretty much, he would give
23   us a potential task to do.  And right off the bat, we'll
24   come up with the numbers, timewise, and he said, This is
25   incorrect.
```

```
 1          we'll go over the task three or four times,
 2   and then we'll go back to the same initial one, and say this
 3   is better for him.
 4          As far as that, he was saying, You island
 5   boys don't know what you're doing.  You island people cannot
 6   get it right.
 7          At his request, he would have said, Hey, this
 8   is not correct.  Can you get somebody else to do this?  We
 9   have been doing this job for several times for Andrew.  And
10   like I said, he always come back, saying that, You island
11   people, or you locals cannot get it right.
12     Q.   Okay.  All right.  Any other racist comments that
13   you have personal knowledge of that were made by Mr. Canning
14   to Petro employees?
15     A.   Yes.
16     Q.   What other knowledge?
17     A.   Our personnel out of Puerto Rico, he said, These
18   guys are worthless.  They don't know what they're doing.
19   They can't even communicate with them.  We need to get
20   better personnel than these Hispanics.
21     Q.   Okay.  Any -- anything else in terms of
22   Mr. Canning making any racist comments?
23     A.   Mr. Canning would make remarks, our payroll, our
24   timesheets, even our quotes.  Again, he would go back and
25   say, You guys can't even get the numbers right as locals.
```

```
 1   You can't even calculate hours on a timesheet as locals.
 2   And he would go on to say, As far as myself and Adrian
 3   Melendez, we're worthless as running the company.
 4     Q.   And are those Mr. Canning's words?
 5     A.   Yes.
 6     Q.   Okay.
 7     A.   I can even go further.
 8          Andrew Canning, on several occasion, accused
 9   us of forgery.  Trying to rob the company.
10     Q.   Meaning IPOS?
11     A.   IPOS.
12          And we have proved to him, time and time
13   again, all he has to do is ask if he doesn't understand
14   something.
15     Q.   Okay.  Anything else?
16     A.   As far as that's it for right now.
17     Q.   All right.  My -- of course my questions were with
18   respect to racist comments.
19          I have the same questions with respect to
20   discriminatory conduct.
21          Do you have any personal knowledge of
22   Mr. Canning engaging any type -- in any type of
23   discriminatory conduct different, or other than, what you've
24   already told me about with respect to his racist comments?
25     A.   Yes.  He had a gentleman by the name of David
```

1    Nagle on site.

2        Q.    Uh-huh.

3        A.    And I don't know what was their affiliation

4    between the two of them, but eventually they became -- he

5    worked at IPOS, also.  I don't know if it's a contract or

6    what was the affiliation with Andrew Canning.  How he

7    treated David Nagle versus our employees and ourself was

8    totally different.

9        Q.    And can you explain for me the differences that

10   you observed in Mr. Canning's treatment of David Nagle?

11       A.    I'll give you one example.

12            The RIO panels we were working on, David

13   Nagle was asked to design it and assist us in putting them

14   together.

15            On several times in the field, David Nagle

16   would make several mistakes in telling the welders exactly

17   where to weld, what to do.  Andrew Canning would come out

18   and say, If David Nagle made a mistake, you guys should

19   catch it.  Your local guys cannot read a tape.  You local

20   guys don't know what you're doing.  He would not have said

21   anything to David Nagle, although I pointed out that David

22   Nagle was the one who's telling the welders exactly what to

23   do, where to weld.

24       Q.    When you say, they can't read a tape, can you

25   explain that to me?

1        A.    Regular measuring tape.

2        Q.    Ah, okay.

3             All right.  All right.  Any other examples of

4    your -- so -- so you said that you -- well, first of all,

5    any other examples of you observing Mr. Canning engaging in

6    discriminatory conduct?

7        A.    By all means.  Again, with the same gentleman,

8    David Nagle.

9        Q.    Uh-huh.

10       A.    He would go out there and stop our job on the RIO

11   panels again, and we lost hours, time.  Then Canning and

12   come back and ask us, You guys are worthless.  Why aren't

13   you picking up the pace?  And this job was stopped by David

14   Nagle.

15       Q.    All right.  Any other examples?

16       A.    On behalf of myself, I've spoken to Andrew Canning

17   on several occasion in regards to a job.  He would agree up

18   front, yes, this is what I want you to do.  And after that

19   it's finished, three months later on the timesheet, he would

20   say, Why did you -- why were you on that timesheet?  And he

21   agreed, he's the one who asked me to go on different places,

22   include St. Croix or St. Thomas.  Look at the job.  Came up

23   with the numbers for the job, and would he say, I did not

24   ask you to go there.

25       Q.    So just so I'm clear, what you're saying is, that

1    you and Mr. Canning would come to an agreement at the

2    beginning or in the earlier stage of project that you were

3    going to do certain things, and then later, when you

4    submitted time for those certain tasks, he basically

5    disagreed that you had agreed -- that the two of you had

6    agreed that you would do that work?

7        A.    That is correct.

8             And to make this perfectly clear, it would be

9    a three month's process after he will come back and say

10   this.  Not a week.  Not a month.  Three months.

11       Q.    And with respect to this last example, is this for

12   one particular job in particular, or many jobs?

13       A.    No, with multi jobs.  Multiple jobs that we did on

14   the site.

15       Q.    Okay.  Did you have any forms -- anything in

16   writing as to your agreement at the beginning of these

17   projects as to what your role would be that Mr. Canning

18   later said he had not agreed that you would do it?

19       A.    We had no form of writing.  He would communicate

20   verbally.  Send an e-mail out to myself or Adrian was very

21   limited from Andrew.

22       Q.    Got it.

23             So as you sit here today, you're not aware

24   with respect to any of these examples that you gave me on

25   this last point, where you can show, like a written e-mail

1    communication that says, Mr. Canning agreed that I would do

2    this, and then later he would take a different position?

3        A.    No.  This would have been discussed by at least

4    four to six people on a weekly meeting, whatever project is

5    coming up.  And Canning would say, This would be the -- the

6    procedure we was going to follow.  I was going to go across

7    St. Thomas, St. Croix.  Scope the job out.  Give him all

8    what he needs, personnel hours, material, and we go from

9    there.

10       Q.    Okay.  And these weekly meetings where this was

11   discussed, were there regular attendees at these weekly

12   meetings, like week in and week out?

13       A.    David Smith, the IPOS employee between St. Thomas

14   St. Croix.

15       Q.    Okay.  I'm sorry.  Let's back up.

16             For IPOS at these weekly meetings, David

17   Smith would be in attendance?

18       A.    Yeah.  Via conference.  And you'll have the

19   employees from St. Thomas and St. Croix.

20       Q.    Okay.  And this -- these meetings were happening

21   at that time via videoconference?

22       A.    That is correct.

23       Q.    Got it.

24             And who, from Petro, was in attendance?

25       A.    Either myself, Adrian, or -- or employees at the

25

1  site at the time.
2      Q.  Okay.  And were any personnel from Vitol in
3  attendance at those meetings?
4      A.  No.
5      Q.  Okay.  I'm going to go back and spend some time on
6  some of these examples, but just from a high-altitude
7  perspective, are there any other examples that you have of
8  discriminatory conduct by Andrew Canning towards Petro or
9  Petro employees?
10      A.  Yes.
11      Q.  What are some more examples?
12      A.  Job-wise, Andrew Canning would say, This is not to
13  code, to our employees.  Andrew Canning would not have known
14  what code.  Is it a boiler code or pipe code whatever code,
15  but he would say, That's not to code.  We have to go to
16  Merlin.  We have to look up what code he's talking about and
17  prove to him that it's wrong.
18      Q.  All right.  Is this something that was happening
19  continuous --
20      A.  Continuous.
21      Q.  -- or with respect to one particular job?
22      A.  Continuous.
23      Q.  Okay.  Was there ever any time that he was correct
24  that something was not up to code?
25      A.  Not to my knowledge.

26

1      Q.  Okay.  All right.  Any other examples?
2      A.  Not at this time.  I can't remember right now.
3      Q.  Okay.  With respect to the discriminatory conduct
4  and racist comments that you've been testifying to with
5  respect to Mr. Canning, did anyone, at -- to your personal
6  knowledge, did you ever tell anyone at Vitol that
7  Canning was engaging in this conduct?
8      A.  No.
9      Q.  All right.
10            MS. ROHN:  Wait.  Wait.  He was about to say
11  something.
12      Q.  (Mr. Beckstedt)  Yeah.
13      A.  We never reported this to anybody at Vitol.  We
14  would have these meetings.  David Smith, the general
15  manager, and Andrew Canning would get in the meeting and
16  say, right off the bat, These are the best employees we
17  have.  This happened on several occasions with several
18  general managers that came on site.
19           As we get into the meeting, These guy's price
20  are right.  The employees are great.  We're the best people
21  they have at the time doing their maintenance.
22           As we walk out of there the next day, we go
23  back to being the same thing.  And this happened on several
24  occasions.
25      Q.  Okay.  I want to make sure I understand what

27

1  you're saying.
2           You're talking about an initial meeting
3  before a project starts, or are you just talking about the
4  weekly meetings?
5      A.  There would come a time where it was too much from
6  Andrew Canning, and we'd request a meeting from David Smith
7  and the general manager to discuss unfair practices.
8      Q.  I get it.
9      A.  Before we say anything in the meeting, Andrew
10  Canning would say, These guys are the greatest guy here.  We
11  do everything correctly.  And we had nothing to bring
12  forward at that time.
13      Q.  Okay.  So let me just, first of all, understand
14  the stage here, if I may.
15           You're going about your work and becoming
16  frustrated with Canning's behavior, correct?
17      A.  That's correct.
18      Q.  And you ask for a meeting?  You ask for a meeting
19  with IPOS?
20      A.  That is correct.
21      Q.  To address Canning's behavior that you're
22  frustrated with?
23      A.  Yes.
24      Q.  And the meeting is held, and the people that are
25  present are yourself and --

28

1      A.  Adrian.
2      Q.  -- and whomever -- and Adrian.  David Smith or
3  Merlin?
4      A.  And Merlin.
5      Q.  And Merlin?
6      A.  Yes.
7      Q.  And Andrew Canning?
8      A.  That is correct.
9      Q.  Okay.  And no one from Vitol, right?
10      A.  No.
11      Q.  That's correct?
12      A.  That is correct.
13      Q.  Okay.  And at that meeting, the very first part of
14  the meeting would be Andrew Canning basically singing
15  Petro's praises?
16      A.  That is correct.
17      Q.  And then you said, so we would have nothing to,
18  what?
19      A.  So I said, as he starts singing the praises, that
20  we're the best people, what are we going to complain?  We
21  have a great working relationship with these guys.  They're
22  the best thing we ever had in this facility so far.
23           So now, that shut us down as far as
24  complaining to.  What are we going to complain about?
25      Q.  Did you ever request a meeting with IPOS, where

CHETRAM PERSUAD -- DIRECT

```
1    you specifically requested that Mr. Canning not be present?
2         A.   No.
3         Q.   Did you ever, after Mr. Canning gave one of these
4    introductory praises at the meeting, did you ever say, Time
5    out.  That's not what's happening on the field.  He's not
6    treating us as if we're the best people, or the way he's
7    singing our praises?  Did you ever call him out, basically?
8         A.   No, I never did, because of fear that as that
9    would happen, we continue working there, and get treated in
10   a different perspective.
11        Q.   And you're telling me today that this happened
12   more than one time, where you asked for a meeting because of
13   Mr. Canning's conduct?
14        A.   Yes.
15        Q.   And so as this continued to become, I guess, in
16   your words, a routine, right?
17        A.   That's correct.
18        Q.   I mean, those aren't your words, but am I
19   characterizing your testimony correctly?
20        A.   Yes.
21        Q.   Okay.  So as this became a routine, you still
22   didn't ever call him out at any of these meetings?
23        A.   Never.
24        Q.   Okay.  And -- all right.
25                  Is there anything else that Petro did to tell
```

CHETRAM PERSUAD -- DIRECT

```
1    anyone at IPOS about Canning's behavior that you've been
2    discussing?
3         A.   It was discussed off the record, general manager,
4    Merlin Figueira.
5         Q.   Okay.
6         A.   And he agreed that Andrew was purposely pressuring
7    us and treating us unfairly.
8         Q.   And what do you mean by "off the record"?
9         A.   So after the meeting was over, we go out, the next
10   day, it would happen.  Go about our business on the job
11   site, and we would get back right into the same routine with
12   Andrew, you know, as far as the work, you guys can't do
13   something simple.  Picking on our guys.  Go to Merlin.
14   Merlin, this has to stop.  We had this meeting yesterday.
15   This gentleman is back to doing the same dirty thing that he
16   was doing all along, picking on our employees.  Harassing
17   our employees.  Not allowing them to do what they want to
18   do.  Doing their job.
19                  Merlin have said he seen it on several
20   occasion.  And we just continue talking about it back and
21   forth, but I don't think it went anywhere beyond Merlin
22   discussing it.
23        Q.   All right.  Did you ever ask Merlin, you know, if
24   IPOS or Merlin was going to do anything about it?
25        A.   Well, the reason I complained, I wanted somebody
```

CHETRAM PERSUAD -- DIRECT

```
1    to do something about it.
2         Q.   Okay.
3              MR. SIMPSON:  I'm sorry.  You need to speak
4    up.
5         A.   The reason I discuss it with Merlin or talked to
6    Merlin about it, I wanted some -- someone from IPOS to step
7    up, but it never happened.
8         Q.   (Mr. Beckstedt) Okay.  So let me ask my question a
9    little differently.
10                  Did Merlin Figueira ever relate to you in any
11   of these conversations what he had or had not done about the
12   situation?
13        A.   No.
14        Q.   All right.  So you have no knowledge as to what
15   Mr. Figueira may or may not have done in light of the
16   continued, I believe, as you said, conduct of Mr. Canning
17   pressuring and treating you unfairly?
18        A.   I have no knowledge of that.
19        Q.   Okay.  Did you ever bring this up directly to
20   Mr. Canning?
21        A.   No.
22        Q.   Do you have any recollection as to how many times
23   you had these meetings, where you asked specifically for a
24   meeting with respect to Mr. Canning's conduct?
25        A.   Three times.
```

CHETRAM PERSUAD -- DIRECT

```
1         Q.   Okay.  Do you remember the dates of those
2    meetings?
3         A.   Sorry, no.
4         Q.   Do you remember specifically what the project --
5    projects were that were going on, related to these three
6    meetings?
7         A.   Not at the time, no.
8         Q.   Okay.  Do you know -- do you know the approximate
9    time frame of these three meetings?
10        A.   About three months apart.
11        Q.   So each one was roughly three months apart?
12        A.   Roughly.
13        Q.   Do you have any recollection of which year or
14   years these meetings took place?
15        A.   I would say 2019.
16        Q.   You can't look to Mr. Melendez for answers.
17        A.   No, no.  I just -- I can't recollect.  I can't
18   recollect.  Sorry.
19        Q.   Okay.  All right.  Do you, by -- do you know the
20   date that Petro entered into their maintenance agreement
21   with IPOS?
22        A.   Around 2017-18.
23        Q.   Okay.  Did you ever work for Vivot Construction?
24        A.   That's correct.
25        Q.   All right.  Did Mr. Melendez work with you at
```

1   Vivot Construction?

2      A.  Yes.

3      Q.  All right.  When was this?

4      A.  Prior to Petro starting.

5      Q.  Okay.  So you worked at NIS with Mr. Melendez,

6   that's the first time the two of you worked together, right?

7      A.  Yes.

8      Q.  And that's when you met Mr. Melendez?

9      A.  That is correct.

10     Q.  Okay.  And Mr. Melendez was working for NIS?

11     A.  Yes.

12     Q.  Okay.  And after Irma and Maria, you stopped

13  working for NIS and attended to your property?

14     A.  That's right.

15     Q.  And then I believe you told me that you and

16  Mr. Melendez, you then went to work for Petro, but actually

17  you worked for Vivot in between?

18     A.  We worked -- yes, right after Irma and Maria, we

19  worked for Vivot.

20     Q.  Okay.  And what was your position at Vivot?

21     A.  Supervisor.

22     Q.  Okay.  And what was Mr. Melendez's position, to

23  your knowledge, at Vivot?

24     A.  I think he was a manager.

25     Q.  Did you report to Mr. Melendez?

1      A.  Yes.

2      Q.  Okay.  And what time frame did you work at Vivot?

3      A.  I would say about three to six months.

4      Q.  And then you went to Petro?

5      A.  Yes.

6      Q.  So since you've lived on St. Croix -- I'm

7   concerned from the time you were with NIS, when you first

8   met Mr. Melendez forward.  Not before, okay?

9      A.  Um-hum.

10     Q.  So on St. Croix, since you worked at NIS, the only

11  other companies you've ever worked for were Vivot, and then

12  Petro?

13     A.  Yes.

14     Q.  No other companies?

15     A.  No other companies.

16     Q.  And did you do any work independently, like

17  yourself?  Self-employed during that time?

18     A.  No.

19     Q.  Okay.  Before Petro got the contract for work at

20  the propane facilities at WAPA on St. Thomas and St. Croix,

21  had you done any work on those facilities through Vivot?

22     A.  Yes.

23     Q.  Okay.  And was Andrew Canning involved in any of

24  that work?

25     A.  Yes.

1      Q.  Was any of the conduct that you have described

2   today with respect to Mr. Canning being either racist or

3   discriminatory or unfairly treating employees, was any of

4   that conduct, did any of that occur when Vivot was doing the

5   work?

6      A.  Yes.

7      Q.  So the examples you gave me earlier, did that

8   include both -- the examples of Mr. Canning's conduct that

9   you've testified to earlier today, did that involve conduct

10  that was both during the Vivot period of time and the Petro

11  period of time?

12     A.  Yes.

13     Q.  Got it.

14         The three meetings that you're talking about,

15  where you went to IPOS to discuss Mr. Canning's conduct, do

16  you have any recollection -- you said you don't recall the

17  dates of those meetings, correct?

18     A.  That's correct.

19     Q.  Do you have any recollection, or can you say with

20  any certainty, whether those meetings occurred when Vivot

21  was doing the work, versus when Petro was doing the work?

22     A.  We never had any meeting with -- during the Vivot

23  time with them to report this.

24     Q.  Okay.

25     A.  We never asked for any.

1      Q.  Okay.  Got it.

2         So when Mr. Canning was engaging in some of

3   this conduct that you've described while you were working

4   for Vivot, nobody ever called a meeting with IPOS or raised

5   concerns about it, correct?

6      MS. ROHN:  Objection to form.  Compound.

7      Q.  (Mr. Beckstedt) All right.  Am I -- when you were

8   working for Vivot, and experiencing this conduct that you've

9   testified to with respect to Mr. Canning, did -- do you have

10  any knowledge of Mr. Canning's conduct being raised to IPOS?

11     A.  No.

12     Q.  Okay.  Did you raise it to Vivot?

13     A.  No.

14     Q.  Is there -- are you -- are you aware of anything

15  in writing, either via e-mail, note, or otherwise, that

16  documents the request for these three meetings that you've

17  talked about with IPOS to discuss Mr. Canning's conduct?

18     A.  No.

19     Q.  Do you know if, during those meetings, anybody was

20  taking any kind of minutes or notes or agendas?

21     A.  Not to my knowledge.

22     Q.  Okay.  With respect to actual derogatory terms,

23  you know, racist terms or discriminatory terms, I understand

24  that you used the word "islander," right?

25     A.  Yes.

37

```
 1      Q.   All right.  Did I also hear you use the word
 2  "local"?
 3      A.   That is correct.
 4      Q.   All right.  Any other words that Mr. Canning used
 5  specifically that you perceived or understood to be racist
 6  or discriminatory?
 7      A.   Not that I can recall, but he may or may not.
 8      Q.   Just what you have personal knowledge of today?
 9      A.   Yes.
10      Q.   So those are the two, right?
11      A.   Right.
12      Q.   And what do you understand an islander to be?
13      MS. ROHN:  Object to the form.
14      Q.   (Mr. Beckstedt) Well, you perceived it as
15  discriminatory or racist, correct?  The word "islander"?
16      A.   That's correct.
17      Q.   Why?
18      A.   Basically from past experience.
19      Q.   Can you explain?
20      A.   We worked in the refinery.  Everybody that came
21  from the States believed we cannot perform any task
22  correctly.
23      Q.   And that's your basis of -- that's it?
24      A.   That's correct.
25      Q.   Okay.  And when did you first work in the
```

38

```
 1  refinery?
 2      A.   '97.
 3      Q.   And who did you work for in '97?
 4      A.   IMC.
 5      Q.   What other contractors have you worked for at the
 6  refinery since IMC in '97?
 7           Let's back up.
 8           First of all, that was the Hess Virgin
 9  Islands Corp., HOVIC, refinery, right?
10      A.   That's correct.
11      Q.   Okay.  So can you walk me through your history of
12  working at the refinery?
13      A.   Started out with IMC.  Went to Jacob-IMC.  Worked
14  for Turner.  Worked directly for HOVENSA.  Worked for
15  Pinnacle.  Then worked for NIS.
16      Q.   Okay.  Do you remember approximately what year
17  Mr. Adrian Melendez, Jr. started working at the refinery?
18      A.   I think when they restarted with Limetree Bay.
19  The year, I'm not sure.  I'd be lying to you.
20      Q.   Got it.
21           All right.  Were you -- were you ever
22  involved in any other -- you said -- well, let's back up.
23           You said this is the first time you've ever
24  been deposed, right?
25      A.   Yes.
```

39

```
 1      Q.   Were you involved in any other lawsuits related to
 2  either discrimination or racism with respect to any of your
 3  work at the refinery?
 4      A.   Never.
 5      Q.   Okay.  Now, you said that you also perceived the
 6  word -- Mr. Canning's use of the word "local" as racist or
 7  discriminatory, right?
 8      A.   Yes.
 9      Q.   And I have the same question:  Why did you
10  perceive the word "local" as discriminatory or racist?
11      A.   My position at the refinery was general
12  superintendent for the entire refinery in the evening.  Each
13  one of these companies that I mentioned, they would have
14  these -- brought these groups down from the States.  And
15  they would continue proceeding to a task, which they'd come
16  to a roadblock, and they would also blame the locals, 'cause
17  of their lack of knowledge.
18           I had to go behind of them and repair or fix
19  these issues, where would they have said to the locals, you
20  know, You guys are monkeys swinging from the trees.  You
21  guys are coconuts.
22      Q.   To be clear, the "they" that you're referring to
23  in this response were stateside contractors that were at the
24  refinery back in the day, not -- not Mr. Canning, correct?
25      A.   Not Mr. Canning.
```

40

```
 1      Q.   This is what informs you of --
 2      A.   Yes.
 3      Q.   -- why you perceive these words as being
 4  discriminatory?
 5      A.   That's correct.
 6      Q.   Understood.
 7           And when you said you'd have to come behind
 8  them and repair and fix things, are you talking about the
 9  relationships with the workers, or the actual work?
10      A.   The actual work, and the relationship with the
11  employees.
12      Q.   Okay.  And the fixing of the actual work, you're
13  saying you had to go -- you mean you, personally, or your
14  crew had to go and fix work that was performed improperly by
15  stateside contractors?
16      A.   That's correct.
17      Q.   Got it.
18           Who were complaining about the poor work of
19  the, quote, unquote, "locals" or "islanders"?
20      A.   That's right.
21      Q.   Okay.  All right.
22           Incidentally, do you consider yourself a
23  local or an islander?
24      A.   Yes.
25      Q.   Okay.  And what defines to you -- first of all,
```

41

1  are those words interchangeable in your mind, or do they
2  mean something different?
3      A.  No.  I think if you're a local, you live here.
4  And if you're an islander, you've been here for quite some
5  time.  Can say this is home.
6      Q.  So there's a difference in your mind between a
7  local and an islander?
8      A.  I would say the same thing.
9      Q.  Okay.  So you said a local lives here?
10     A.  Um-hum.
11     Q.  And an islander has been here a long time?
12     A.  Considers yourself to be home, pretty much, yes.
13     Q.  I'm sorry.  Can you say that a little louder for
14  the people that are --
15     A.  Okay.  A local, you know, they've been here.  They
16  lived here.  The islander is a person who's been here.
17  Consider that.  Or somebody's moved here, and live here,
18  also.
19     Q.  Okay.  Just to be clear, to understand this, you
20  haven't -- you weren't born here, right?
21     A.  No.
22     Q.  And you were born where?
23     A.  South America, Guyana.
24     Q.  That's right.  I remember.
25             And then grew up in --

Susan C. Nissman, RPR-RMR
(340) 773-8161

---

42

1      A.  New York.
2      Q.  -- New York.  Okay.
3             And you came down here as an adult?
4      A.  Yes.
5      Q.  Okay.  And you've resided -- do you have a home
6  anywhere else outside of St. Croix?
7      A.  No.
8      Q.  Okay.  And am I clear in understanding that since
9  1989, or just past Hugo, you've lived on St. Croix
10  continuously?
11     A.  Yes.
12     Q.  No -- no exemptions to go live somewhere else?
13         MS. ROHN:  We know what continuously means.
14         MR. BECKSTEDT:  Thank you.  Okay.
15     Q.  (Mr. Beckstedt) Did Petro have anybody that worked
16  as a safety officer at any time?
17     A.  We have presently Frank Kirsch.
18     Q.  Okay.  When did -- do you consider him management?
19     A.  No.  He's a safety representative.
20     Q.  Okay.  Does he report to you?
21     A.  Myself and Adrian.
22     Q.  Okay.  And how long has Frank Kirsch been with the
23  company?
24     A.  Knowledge serve me correctly, probably two to
25  three years, or around --

Susan C. Nissman, RPR-RMR
(340) 773-8161

---

43

1         MS. ROHN:  Don't guess.  If you don't know,
2  don't guess.
3      A.  I don't know.
4      Q.  (Mr. Beckstedt) Okay.  Was Mr. Kirsch here during
5  the period of time when Mr. Canning was engaging in this
6  conduct with respect to Petro's work at the propane
7  facilities?
8      A.  I think he was there once.
9      Q.  What's the one time you think he was?  You are
10  recalling?
11     A.  In regards to St. Thomas.
12     Q.  And what particular event?
13     A.  Andrew Canning fell through a grating in
14  St. Thomas.
15     Q.  Okay.  But at that time, Mr. Kirsch was already an
16  employee of Petro, and in the capacity as safety
17  representative?
18     A.  Yes.
19     Q.  Got it.
20             All right.  Did -- did Petro, at that time,
21  employ any other people who were not strictly skilled labor?
22     A.  No.
23     Q.  Okay.
24         MS. ROHN:  I want to make it clear that
25  Mr. Persuad is not our 30(b)(6) witness.

Susan C. Nissman, RPR-RMR
(340) 773-8161

---

44

1      Q.  (Mr. Beckstedt) Right.  I understand.
2             This is your personal knowledge of the
3  employees.
4             If I understand correctly, you reported
5  directly to Mr. Melendez, correct?
6      A.  Yes.
7      Q.  And then everybody else in the company, with the
8  exception of the office manager, reported to you, right?
9      A.  Pretty much, yes.  As I said, myself and Adrian,
10  our employees reported to.
11     Q.  Okay.  But you could still direct all those
12  employees, right?
13     A.  That's correct.
14     Q.  Okay.  And Frank Kirsch is one of the employees
15  that you could direct?
16     A.  Yes.
17     Q.  Okay.  And when I say, "skilled labor," I'm
18  talking about like your welders.
19             What are the skilled laborers that Petro
20  employed during the period of time that it had the contract
21  with IPOS for the propane facilities?
22     A.  Welders, boilermakers, pipe fitters, electricians,
23  instrument techs, civil personnels.
24     Q.  Huh?
25     A.  Civil personnels.  Concrete workers and stuff like

Susan C. Nissman, RPR-RMR
(340) 773-8161

1    that. Rebar.

2        Q.    All right.  Did Petro employ a safety

3    representative before Mr. Kirsch?

4        A.    We had -- yes, we did.  I can't think of his name

5    right now.  Josh.

6        Q.    Josh.

7              You can't remember his last name?

8        A.    No.

9        Q.    Can you describe Josh for me?

10       A.    His position?

11       Q.    No.

12             What -- do you know what race he is or --

13       A.    Oh, white?  Black?

14             Okay.  He's white.

15       Q.    Do you know if he was from the States?

16       A.    From the States.

17       Q.    All right.  Do you know his national origin?

18       A.    He's a redhead.  I guess Irish.

19       Q.    You don't consider him an islander or local,

20   right?

21       A.    No.

22       Q.    Okay.  I'm correct?

23       A.    That's correct.

24       Q.    All right.  All right.  Did -- oh, the office

25   manager, what race would you consider her?

1        A.    She's Hispanic from Puerto Rico.

2        Q.    And do you understand, to your personal knowledge,

3    that she is -- her national origin is Puerto Rican?

4        A.    Yes.

5        Q.    Do you know how long she's -- does she live on

6    St. Croix or in Puerto Rico?

7        A.    She lives on St. Croix.

8        Q.    Do you know how long she's lived on St. Croix?

9        A.    2002, I would say.

10       Q.    Okay.  All right.  You consider her a local or an islander?

11       A.    She's a local.

12       Q.    Okay.  All right.  Are there any individuals that

13   were kind of core Petro employees during the period of time

14   that Petro had the contract with IPOS for the propane

15   maintenance?  The maintenance of the propane facilities?

16       A.    Our welders, our boilermakers, our electrician,

17   our instrument tech, and the individual who did a few

18   designs for Andrew Canning.

19       Q.    Okay.  Do I understand that you had one instrument

20   tech?

21       A.    Yes.

22       Q.    Was it the same person the whole time?

23       A.    Yes.

24       Q.    And who was that?

25       A.    Calvin Schmidt.

1        Q.    Do you know where Calvin Schmidt's from?

2        A.    His parents are from Aruba, and I think he was

3    born here.

4        Q.    Okay.  You consider him a local islander?

5        A.    Yes.

6        Q.    Okay.  And you had one electrician?

7        A.    Yes.

8        Q.    And who was that?

9        A.    Anthony Theodore.

10       Q.    Anthony what?

11       A.    Theodore.

12       Q.    Okay.  And do you know his race or ethnicity?

13       A.    His parents are St. Lucian.  He was born here.

14       Q.    Another person you would consider a local

15   islander?

16       A.    Yes.

17       Q.    And who was the designer?

18       A.    It was Brian Melendez, the draft person.

19   Designer.

20       Q.    And that's Mr. Adrian Melendez's brother, correct?

21       A.    That's correct.

22       Q.    And do you know where Mr. Brian Melendez was born?

23       A.    Texas.

24       Q.    Okay.  And do you know where he currently lives?

25       A.    Texas.

1        Q.    And at the time that he was a designer, do you

2    know where he was working?  Or living?

3        A.    Living on St. Croix.

4        Q.    Okay.  Do you know if Mr. Brian Melendez owns any

5    property on St. Croix?

6        A.    Not to my knowledge.

7              MS. ROHN:  Objection.

8        Q.    (Mr. Beckstedt) All right.  Do you consider him to

9    be a local or an islander?

10       A.    No.  He does not consider himself to be a local

11   islander.  He always considered going back to Texas to live.

12       Q.    And what about Mr. Adrian Melendez, Jr.?  Do you

13   consider him to be a local or an islander?

14       A.    He's paying taxes and bought a house here.

15       Q.    Where's his house?

16       A.    Not sure.

17       Q.    You don't know?

18       A.    No.

19       Q.    Never been there?

20       A.    I've been there.  I can't remember where it was.

21       Q.    Do you know how you get there?

22       A.    Buccaneer.

23       Q.    And it overlooks the golf course?

24             MS. ROHN:  Objection.  Relevance.

25       Q.    (Mr. Beckstedt) Local islander relevance.

CHETRAM PERSUAD -- DIRECT

1   **A.**   Yes.

2   **Q.**   It does overlook the golf course, right?

3   **A.**   Yes.

4   **Q.**   Are any of the welders that Petro employed, do you

5   consider any of those welders, that you mentioned, to be

6   non-local or non-islanders?

7   **A.**   They all live in Puerto Rico.

8   **Q.**   Are they -- do you know whether or not they're all

9   Hispanic or latino?

10  **A.**   They're all latino.

11  **Q.**   Okay.  What about the boilermakers?  Are there any

12  of the boilermakers that work for Petro that you would

13  consider not to be islanders or locals?

14  **A.**   All of them are locals.

15  **Q.**   Okay.

16          **MS. FRANCIS:**  I'm sorry.  All of them are

17  what?

18  **A.**   Local.  They live here on the island.

19  **Q.**  **(Mr. Beckstedt)** Do you know if any of them were

20  originally from the States and moved here?

21  **A.**   No, I don't know.

22  **Q.**   In terms of the boilermakers?

23  **A.**   I do not know.

24  **Q.**   Okay.  Does that pretty much cover all of the core

25  employees for Petro during the period of time that it had

CHETRAM PERSUAD -- DIRECT

1   the maintenance contract with IPOS?

2   **A.**   Yes.

3   **Q.**   Okay.  Do you remember an employee named Kenia

4   Johny?

5   **A.**   Yes.

6   **Q.**   Did she work for Petro when it had the contract

7   with IPOS?

8   **A.**   She worked with Vivot when we had that contract.

9   **A.**   Oh, okay.

10  **A.**   Briefly probably a month, or so, with us.  With

11  Petro.

12  **Q.**   All right.  Are you familiar with the fact that

13  she sued Petro for discrimination?

14  **A.**   Yes.

15  **Q.**   Did you have any personal knowledge about any of

16  the facts underlying that lawsuit?

17  **A.**   Not to my knowledge, no.

18  **Q.**   Okay.

19              (Respite.)

20          Are you familiar with a point in time where

21  Mr. Canning questioned the certifications of Petro welders?

22  **A.**   Yes.

23  **Q.**   Okay.  Do you have any personal knowledge about

24  those events?

25  **A.**   Yes.

CHETRAM PERSUAD -- DIRECT

1   **Q.**   What do you know?

2          **MS. ROHN:**  Objection.  Overly broad.

3   **Q.**  **(Mr. Beckstedt)** You can answer.

4   **A.**   I think it was the 3-inch WAPA line.  Vent line,

5   that is.  3-inch vent line.

6   **Q.**   And what do you recall happening with respect to

7   the questioning of the qualifications of the welders for the

8   3-inch vent line?

9   **A.**   That's the only time I recall, for all the work

10  that we have done at IPOS, this is a vent line.  It's not a

11  propane line.  Propane line is much dangerous.  This just

12  goes to atmosphere.  Vent.  We work on high-pressure stuff

13  in St. Thomas, St. Croix, and was never asked for any

14  certifications.

15  **Q.**   So am I to understand what you're implying is that

16  you felt it was unusual that they would ask for

17  certifications on this particular job?

18  **A.**   Yes.

19  **Q.**   Do you have any knowledge as to the reason that

20  the certifications were asked for with respect to this

21  particular job?

22  **A.**   No.

23  **Q.**   Okay.  Do you have any personal knowledge as to --

24  well, no.  Strike that.

25          So were -- were -- well, let's back it up.

CHETRAM PERSUAD -- DIRECT

1          What -- what type of qualifications were the

2   Petro welders required to have at this time?

3          **MS. ROHN:**  Objection.  Vague as to by whom.

4   **Q.**  **(Mr. Beckstedt)** For Petro.  Does Petro require its

5   welders to be qualified?

6   **A.**   Yes.

7   **Q.**   So what qualifications did Petro require at that

8   time for the 3-inch vent line?

9   **A.**   Our welders have to go through a process.

10  **Q.**   What is the process?

11  **A.**   Pretty much to do a weld, and it would be examined

12  by a qualified person.

13          Basically, since we left the refinery, our

14  welders have been qualified all along, based upon their

15  welds, which was being done by x-ray, phase array.  And if

16  somebody continue working in the same field, it's not

17  necessary to keep passing all their goals and their welds.

18  It's not necessary to go have somebody come from outside to

19  recertify them again.

20  **Q.**   Okay.

21  **A.**   Because you're using the x-rays as the test.

22  **Q.**   All right.  So let's break that down.

23          Your welders were certified when Petro was

24  doing work at Limetree?

25  **A.**   Yes.

1    Q.   Okay.  And incidentally, are you familiar with the
2    fact that there's -- well, let's -- let me back up.
3         Was -- were the welders working for Petro at
4    that time, or were they working for Vivot, when they were
5    qualified at the Limetree facility?
6    A.   We were working for Vivot at the time.
7    Q.   Okay.  So these welders were qualified while they
8    were employees of Vivot?
9    A.   Yes.  Petro also did work in the refinery with
10   same welders, which made them qualified under Petro.
11   Q.   Okay.  For the record, do you have -- do you know
12   the names of these welders we're talking about?
13   A.   We have several welders in the refinery.  Our
14   staff was large.  I may have remember one or two.  Best
15   guesstimate right now.
16   Q.   That's fine.
17        Who are the one or two that you remember, as
18   you sit here today?
19   A.   Dan Martinez.  Eduardo.  The rest is vague to me.
20   Q.   That's fine.
21   MS. FRANCIS:  I'm sorry.  What was the second
22   name?
23   A.   Eduardo.
24   Q.   (Mr. Beckstedt) Eduardo.
25        And what was Mr. Martinez's first name?

1    A.   Dan.
2    Q.   Dan.  Okay.
3        Now, do these -- are there different types of
4    welds that these guys do?
5    A.   Yes.
6    Q.   What are the types of welds they do?
7    A.   You have plate weld, structure weld, pipe weld.
8    You weld on stainless steel.  You weld on carbon pipe.  You
9    got weld with wire.  Weld with stick.
10   Q.   Okay.  And do they have to be qualified in each of
11   these types of welds?
12   A.   Not necessarily.
13   Q.   Okay.  Are there particular types of welds where
14   they do have to be qualified in?
15   A.   Yes.
16   Q.   What are those welds where they're required to be
17   qualified in?
18   A.   Once you work in a pressure vessel or pipe, you
19   have to be qualified.
20   Q.   And is it a type of weld that you have to be
21   qualified for?
22   A.   It could be stick or what's called TIG weld wire.
23   Q.   Tape?
24   A.   TIG.  Yeah, TIG.  T-I-G.
25   Q.   TIG.  Got it.  Sorry.  I should have known that.

1        Okay.  And you were saying that if they're
2    continuing to do welding, then they don't have to be
3    requalified; is that right?
4    A.   That's not what I said.
5    Q.   Okay.  Could you clarify that for me?
6    A.   I said, once the welders are welding and passing
7    their welds, which is being done by shear wave or x-ray,
8    that's how they continue with their qualifications.
9    Q.   Okay.  And is there any period of time where, if
10   they haven't done these welds, that they have to be
11   requalified?
12   A.   Unless required by an entity.
13   Q.   What do you mean by that?
14   A.   If IPOS request it, or Limetree request it.
15   Q.   So Petro -- so Petro itself doesn't have any
16   requirement that if its welders do not do particular welds
17   for a period of time, that they have to be requalified?
18   A.   My understanding, for a qualification, we do it in
19   house solely for Petro.
20   Q.   Okay.  And I want to make sure I understand that.
21        Did Petro ever, at any time, qualify the
22   Petro welders in house?
23   A.   Yes.
24   Q.   And was there documentation for that?
25   A.   Like I said, based upon the x-rays and phase

1    arrays on several projects, they continued that way.
2    Q.   All right.  I'm sorry, but I'm not understanding.
3        You're telling me that your welders go out
4    and do welding.  And then someone comes along and inspects
5    and does either a x-ray or phase array, correct?
6    A.   That's right.
7    Q.   Then somebody looks at the x-rays or phase ray --
8    phase arrays, and approves or disapproves of the weld,
9    right?
10   A.   That's correct.
11   Q.   And if they approve of the weld, you consider the
12   welder to be qualified?
13   A.   Yes.
14   Q.   Okay.  And if there's a period of time from the
15   last time -- is there any period of time from the last time
16   that welder's weld was either x-rayed or phase arrayed that
17   could expire where you'd have to requalify the welder?
18   A.   That would be requested by a client.
19   Q.   Did Petro have any internal requirements in that
20   regard?
21   A.   Once they're welding for us?
22   Q.   Yes.
23   A.   We don't have -- we don't need it if they're
24   welding for us.
25   Q.   Okay.  So if a guy did a weld for you, and it was

CHETRAM PERSAUD -- DIRECT

1   x-rayed in January of a year, and then they were going to do
2   a weld, say, in December of that same year, they wouldn't
3   need to be recertified because of a lapse of time?
4        A.   We're in the business of welding, and that's all
5   we do.  That's the majority of our bulk.  We have not had a
6   lapse in time, as far as a six-month's period or three-month
7   period that we would have to requalify somebody.  They've
8   been continuous welding.
9        Q.   Got it.
10       A.   So there's no need internally for us, Petro, to
11  ask for a qualification of the welder.
12       Q.   Got it.  Okay.
13            And do you keep records for each welder every
14  time they do have these x-rays and phase arrays that keep
15  them qualified?
16       A.   It's our documentation for every job that we do.
17  We have to keep paperwork.
18       Q.   Okay.  Do you have any internal documents that are
19  tagged to the welders themselves that show that they're
20  constantly doing these welds, and that the welds are, I
21  guess, qualified or approved through the x-ray/phase array
22  process?
23       A.   Their stencils that go according to each welder.
24       Q.   A what?
25       A.   A stencil.  A weld number.

CHETRAM PERSAUD -- DIRECT

1        Q.   That's on the actual weld, though, right?
2        A.   It's on the weld, and it says which welder would
3   have.
4        Q.   Right.  But you'd have to go out to wherever they
5   did the weld on the material to see the stencil, right?  Or
6   is that something that's kept at the office?
7        A.   Prior to any work being done, there's a weld map
8   that's been created.  A drawing we have to follow.  And you
9   will see Weld 1.  If you got 20 welds, 1 through 20.  And
10  each welder that welds on -- you don't have to go out in the
11  field, because you're looking at a weld map already.  You
12  could go out in the field, identify which welder is welding
13  away.
14       Q.   Got it.
15            But are there any records that are kept in
16  the office --
17       A.   Not to my knowledge.
18       Q.   -- of Petro --
19       MS. ROHN:  Let him finish.
20       Q.   (Mr. Beckstedt) -- that would tell you that this
21  welder did these welds?
22       A.   Not to my knowledge.
23       Q.   Okay.  So if I wanted to just, for example, let's
24  say I wanted to know, did Eduardo actually, you know, doing
25  welds over the last six or eight months, that have been, you

CHETRAM PERSAUD -- DIRECT

1   know, x-rayed or phase arrayed, and show that he's doing
2   them correctly and he qualifies, there's no record I could
3   go to at Petro to like see his welds?
4        A.   That's a question for Adrian Melendez.
5        Q.   Got it.
6            So not to your knowledge?
7        MS. ROHN:  He's not Petro.
8        Q.   (Mr. Beckstedt) Right.
9            But in your years of working for Petro, you
10  haven't gone to go, you know, look in the files to check to
11  see whether your welders are up on their welding and have
12  been doing it correctly and they're still qualified,
13  correct?
14       MS. ROHN:  Objection to form.  You can
15  answer.
16       A.   Right.
17       Q.   (Mr. Beckstedt) Is that correct?
18       A.   No.  What I explained to you already, is our
19  welders were continuing welding.  If a welder failed by any
20  reason, there's a red flag.
21       Q.   Okay.
22       A.   So he had a chance to correct that weld, and
23  that's how he's qualified.
24       Q.   Okay.  Let me understand how that works in the
25  field.

CHETRAM PERSAUD -- DIRECT

1            You've got a project.
2        A.   Um-hum.
3        Q.   You've got a welding diagram.
4        A.   Um-hum.
5        Q.   And your welder goes out, and, say, Eduardo, for
6   example, or Eduardo, for example, does Weld Number 4, and
7   puts his stencil on it, right?  So you know it's his weld.
8   And then later, it comes -- someone comes along and x-rays
9   it or phase arrays it to see if it's good, right?
10       A.   Yes.
11       Q.   Is that correct?
12       A.   That's correct.
13       Q.   Okay.  And you're saying that if, on that imaging
14  study that's done of the -- of the weld, it fails, there's a
15  red flag, right?
16       A.   Yes.
17       Q.   Okay.  Now, how -- what happens -- explain to me
18  practically what happens that gets that welder, who got a
19  red flag, requalified?
20       A.   I'll go one step further.
21            We're doing a hundred welds.  You're allowed
22  a percentage of failure.  Your percentage may be 10 percent.
23  If you did a hundred, and you have one that is bad, that
24  means all the weld pass.
25            Internally, how I proceed with my work, I

CHETRAM PERSUAD -- DIRECT

1   would have them correct that.

2      Q.  So they have to go out and redo the weld or cut

3   out the pipe and put a new --

4      A.  No cut out of pipe.  No.

5            When you read an x-ray, you could say it

6   passed, I could say it failed.  It is an interpretation.

7   There may be porous parts in a weld, slag in a weld, and if

8   you are in the field as long, and you understand what you're

9   doing, a new person would have been a little more lenient or

10  more harsh, all depends how they read it.  Your opinion and

11  my opinion is totally different.

12     Q.  Okay.

13     A.  And it's the same thing when you read an x-ray or

14  a phase array.

15     Q.  In the example that you just gave, where if you do

16  a hundred welds and only one fails, they all pass, because

17  it's within the percentage of error that's allowed, right?

18  Are you talking about the same welder does all hundred, or

19  could it be different welders?

20     A.  It could be different welders.

21     Q.  Got it.

22          So what has to happen -- let's say that

23  you've got one welder, who's routinely failing a weld, how

24  do you monitor the quality control for that?

25     A.  I would fire him.

CHETRAM PERSUAD -- DIRECT

1     Q.  Okay.  So you don't requalify him or give him --

2     A.  No.

3     Q.  -- any training?

4     A.  No.

5     Q.  Got it.

6          And when you find -- you said that even if

7   you find one red flag, even though it passes as a whole, you

8   will address that red flag?

9     A.  That is correct.  We correct it.

10     Q.  Do you send the same welder out to correct it, or

11  a different one?

12     A.  Same welder.

13     A.  Got it.

14     A.  Because that's where the red flag would come in.

15     Q.  And then it gets re-phase arrayed?

16     A.  It has to.

17     Q.  Got it.

18          But when you're doing a welding job, you do

19  not -- or do they typically image every single weld, or do

20  they just pick a sampling?  Like if you had a hundred welds,

21  would they go and image all hundred welds?

22         MS. ROHN:  Objection to form.  Compound.

23     Q.  (Mr. Beckstedt)  Okay.  Let me rephrase the

24  question.

25         Let's just use your example, where you got a

CHETRAM PERSUAD -- DIRECT

1   project that's going to have a hundred welds on it, okay?

2   will -- will every weld be imaged?

3     A.  No.

4     Q.  Okay.  Yes?

5     A.  May I?

6     Q.  You may.

7     A.  We're talking about IPOS.

8         Andrew Canning or WAPA would select whatever

9   weld -- which weld they would like to inspect.  Not Petro.

10  So they may select the one on the highest point, the one in

11  the lowest point, the middle, wherever.  It's not being

12  done, okay, we have the best welder, and we pick that one to

13  do it.  It's not like that.

14        Andrew Canning or WAPA would come and select

15  which weld they would like to have phase arrayed or x-rayed.

16     Q.  Okay.  Getting back to the welder qualifications

17  for the 3-inch vent line.

18        Did you have any -- did you participate at

19  all in getting those welders qualification certificates?

20     A.  No.

21     Q.  Okay.  Do you have any knowledge about what the

22  welders had to do to get those qualification certificates?

23     A.  They had to go through a test, of course.

24     Q.  Okay.  Did you have any involvement in arranging

25  for that testing to happen?

CHETRAM PERSUAD -- DIRECT

1     A.  No.

2     Q.  And you didn't participate in traveling to go see

3  that testing done, correct?

4     A.  No.

5     Q.  All right.  Do you know whether anybody did attend

6  that -- that testing?

7     A.  You don't have to.

8     Q.  I realize.  I'm sorry.  My question is just

9  simply, do you know if anybody attended the testing with the

10  welders?

11     A.  I'm saying to you, no, you do not have to.  You

12  could send a welder to Alabama, New York, to be tested, and

13  you get a piece of paper back internally for your own use.

14  So no one has to go and witness.  It's that company

15  reputation is going to be on the line that they tested a

16  particular welder, and he passed or failed, or whatever the

17  situation may be, and he using that piece of paper.

18     Q.  Understood.  I get that nobody has to go.  I'm

19  just asking if anybody did?

20     A.  I don't know.

21     Q.  Okay.  Do you know who did the testing?

22     A.  Guillermo.

23     Q.  Do you know Guillermo?

24     A.  I've met him once or twice in the refinery.

25     Q.  Okay.  Do you know who he worked for at the time

1  that he did the testing of the Petro welders related to the
2  3-inch vent line?
3      A.   No.
4      Q.   Okay.  Do you have knowledge as to his
5  certification?
6      A.   He worked for Acuren, as -- my knowledge of
7  Guillermo, he created the phase array.  So he's well
8  straight up when it comes to welding.  Ain't nothing else
9  that I can say bad about this guy in regards to his
10 qualification.  It's not by me.  It's not by Acuren or
11 Versa.  Anybody.  He's well-known in the industry.  Not by
12 my opinion, but anyone in the industry you speak to, he's
13 well recommended.
14     Q.   Got it.
15              (Respite.)
16     MS. ROHN:  Can we take a bathroom break?
17     MR. BECKSTEDT:  Yeah.  That's fine.
18              (Short recess taken.)
19     Q.   (Mr. Beckstedt)  Petro has alleged in this action
20 that some of Andrew Canning's decisions were in error or
21 improper.
22          Do you have any knowledge of specific
23 instances where Mr. Canning's decisions, as to operations,
24 were in error or improper?
25     A.   So I'm not involved in operations for IPOS, so I

1  cannot make a decision for that, or an opinion in that.
2  That's solely IPOS.
3      Q.   Okay.  So just to be clear, then -- hold on a
4  second.  Let me check something.  Bear with me.
5          Let me make sure.  Let me re-ask the
6  question.  Make sure that I got a clear answer.
7          Did you ever point out to Andrew Canning that
8  his decisions as to operations were in error or improper?
9      A.   So it's a little confusing right here.
10         So there's something called Operation IPOS,
11 where they process the propane, and those people work for
12 operations.
13     Q.   Okay.
14     A.   If you're speaking about work in the field, I
15 mean, I can answer to that.
16     Q.   Okay.
17     A.   But if you say, "operations," I'm thinking the
18 process that the employee, IPOS employee, deals with.
19     Q.   All right.  Well, then, let's talk about work in
20 the field.
21     A.   Yes.
22     Q.   What can you answer as to work in the field?
23     MR. SIMPSON:  If you guys have begun, I'm not
24 hearing anything.
25     MR. BECKSTEDT:  Can you hear me, Andy, or

1  not?
2      MR. SIMPSON:  Sorry.  The problem was on my
3  end.  It's fixed.
4      MR. BECKSTEDT:  No problem.
5      THE WITNESS:  Repeat your question, please.
6      Q.   (Mr. Beckstedt)  Okay.  With respect to work in the
7  field, did you ever point out to Andrew Canning that any of
8  his decisions were in error or improper?
9      A.   Andrew role at IPOS, from my knowledge, as long as
10 I've known him, he's very procrastinated in everything that
11 he do, which causes a delay in maintenance, which internally
12 causes operation to spend money.
13         For example, on several piping that we could
14 have done within a month, he would have send it off, and it
15 would take at least a year.  We will have leaks in the
16 plant.  We would have to put clamps on these pipes.  The
17 valves would fail.  And that's how I would say -- that's one
18 instance he would hinder their operation.
19         There's certain valves that he wants to
20 replace.  It's been over three years since we've been
21 working there, I think, roughly, and he has not produced any
22 of these valves.
23         We have brought Traeger Brother to site.  The
24 valves are available in two or three months, and Andrew
25 Canning would not order the valves.

1  So, I mean, if you're asking me, he's holding
2  back, or he's somewhat not working with them, I would say,
3  yes, he's holding them very much back.
4      Q.   Okay.  Did you ever bring this up directly to
5  Andrew Canning, what you've just explained?
6      A.   Yes.
7      Q.   And how did he respond?
8      A.   You guys are overpriced.  You guys don't know what
9  you're doing.  It's going to take us longer, Petro longer to
10 do the job.  And we've even proved to him on several
11 occasions we could possibly do it in a shorter time that
12 he's estimating.  Not a year.  Something that could be done
13 in months or weeks.  Not years.
14     Q.   Can you give me an example of one occasion where
15 you proved to him that you could do it in a shorter time?
16     A.   In St. Thomas, the welds that he wanted to bring a
17 company in to do the welds, we did it within, I think, three
18 days.
19     Q.   Which project was that?
20     A.   This was the tie-in for the -- I think the tie-in
21 for the loading rack.  I think it's the loading rack, yes.
22 I think it's the loading rack.
23         And I can point out another one.  The first
24 job I worked with Andrew Canning is in WAPA, demo a -- I
25 think it was a 6-inch line in WAPA.  Andrew wanted 21 days.

1   I looked at the job, and I told Andrew, this job could be
2   done in three days.  He said we're crazy.  We don't know
3   what we're talking about.  We're unsafe.
4           I proved to him.  He was on site.  Within two
5   days, the job was done.
6       Q.   Just to be clear, this job related to something
7   that Petro did directly for WAPA, not through the IPOS
8   contract; is that correct?
9       A.   This is for -- IPOS lines run through WAPA.  So
10  they're feeding them propane.  All the propane lines belongs
11  to IPOS.  So this is a IPOS job in WAPA that we're talking
12  about.
13      Q.   Okay.  I just wanted to be clear on that.
14      A.   Yes.
15      Q.   So this -- and this job was a demo of a 6-inch
16  line?
17      A.   Yes.  In St. Thomas.
18      Q.   In St. Thomas.  Okay.
19           All right.  Do you have any personal
20  knowledge of Andrew Canning doing anything to retaliate
21  against you for bringing up these issues with respect to
22  error or impropriety?
23      A.   Yes.
24      Q.   What, specifically?  What is that knowledge?
25      A.   He would go out further out of his way to prolong

1   our jobs, or to reject our quotes.
2       Q.   And what informs you that he went out of his way
3   to do that?
4       A.   For example, in this RIO panel, we gave him three
5   quotes that he requested.  First one was too high.  The
6   second one was too low.  The third one, we send them back
7   the first quote, and it's okay.
8       Q.   And so did they ultimately accept that third
9   quote?
10      A.   Andrew Canning did.
11      Q.   And you got the work?
12      A.   Yes.
13      Q.   Do you recall a meeting with Traeger Brothers in
14  June of 2021, June 22nd, 2021, where, if I understand
15  correctly, Petro told IPOS that Canning was a problem for
16  delays?
17      A.   I don't know if Petro told him that.  I was
18  present at the meeting.
19      Q.   And what do you remember about the meeting?
20      A.   Dave was here on island and he was visiting
21  St. Thomas.
22      Q.   Dave who?
23      A.   Dave Tillman.  And he was visiting St. Thomas, and
24  he asked for a meet with Merlin, at the time, in St. Thomas.
25  The conversation came up during the meeting about the

1   valves, and that's where the valves, Dave Tillman said the
2   valves are available within two months.  And these valves
3   had been sourced about three to four years with Andrew
4   Canning.
5       Q.   Okay.  So who, exactly, was present at that
6   meeting?
7       A.   Merlin, Rawle Granger, Coury Hodge, myself,
8   Merlin.  I said Merlin, right?  Yeah.
9       Q.   And Dave Tillman from Traeger Brothers?
10      A.   That's correct.
11      Q.   And was Andrew Canning at the meeting?
12      A.   He was right next door.  He was not at the
13  meeting.
14      Q.   Okay.
15      A.   He was in his office.
16      Q.   So, to your knowledge, you don't know that he
17  heard anything that was said at the meeting?
18      A.   No.  Don't know.
19      Q.   Okay.  All right.  And do you know whether Andrew
20  Canning ever had any knowledge of what was said at the
21  meeting at any point?
22      A.   No, I would not have know.
23      Q.   Okay.  And -- all right.  Fair enough.
24           With respect to the -- oh, never mind.
25           Okay.  Do you recall there coming a time when

1   there was a concern about Andrew Canning communicating
2   directly with Petro?
3       A.   Andrew Canning have to communicate directly with
4   Petro.  That's how the work is to proceed at IPOS.  Any kind
5   of maintenance, any kind of activities, Andrew Canning was
6   the one who was instructing us from the beginning.
7       Q.   Okay.  All right.  Do you ever recall there
8   becoming an issue with respect to him communicating directly
9   with Petro, such that he then began communicating through
10  Merlin or IPOS?
11      A.   Andrew had a problem with communicating with our
12  employees and Petro, so that's why I was sent on every
13  project, St. Thomas/St. Croix, so he could communicate
14  through me to the employees.  They speak perfectly good
15  English.  They understand clear directions.  But he wanted
16  to tell them what and how to do their job.
17      Q.   Okay.  And that was of concern to Petro?
18      A.   It's a cost to Petro, because Andrew Canning did
19  not want to pay for my salary, my plane ticket, my hotel
20  going to St. Thomas.
21      Q.   Okay.  All right.  I want to make sure I
22  understand what your testimony is.
23           You're saying that you became an intermediary
24  between Mr. Canning and the Petro workers?
25      A.   Yes.

73

1   Q.   All right.  And did you have any problem with

2   that?

3   A.   That's how I make my living.

4   Q.   Right.  Okay.

5   A.   So I shouldn't have a problem with it.

6   Q.   And Petro then directs its own employees, right?

7   A.   Yes.

8   Q.   And you -- is it your testimony that Andrew

9   Canning should or should not have been communicating

10  directly with the Petro employees?

11  A.   Should.

12  Q.   You think he should?

13  A.   Yes, 'cause if you're not paying me, why should I

14  go there?  Who's paying me?  Andrew Canning don't want to

15  pay me.  So why am I going to buy a plane ticket, rent a

16  car, pay a hotel, and don't get pay?  Does that make any

17  sense to anyone?

18  Q.   So what -- are we talking now about a specific

19  project that was going on in St. Thomas?

20  A.   Every project that went on in St. Thomas.

21  Q.   Every single project?

22  A.   Yes.

23  Q.   All right.  And so did Petro have -- the employees

24  that we're talking about, did they have employees that were

25  residing in St. Thomas?

74

1   A.   No.

2   Q.   Okay.  So they were either coming from St. Croix

3   or Puerto Rico?

4   A.   St. Croix and Puerto Rico, yes.

5   Q.   And they would go to the St. Thomas facility to do

6   a project?

7   A.   Yes.

8   Q.   All right.  And did they have a foreman or a

9   superintendent that was overseeing their work?

10  A.   Johnny is the superintendent over there.

11  Supervisor over there.

12  Q.   And what's -- is that Johnny's first name or last

13  name?

14  A.   Johnny Alfonseca.

15  Q.   Johnny Alfonseca?

16  A.   Yes.

17  Q.   Is he Puerto Rican?

18  A.   I think he's Dominican.

19  Q.   Okay.  Where did he live at that time?

20  A.   St. Thomas.

21  Q.   So you did -- so Petro did have someone who lived

22  in St. Thomas?

23  A.   So projects, and you got maintenance.  So the

24  maintenance people, if we got to bring them back and forth,

25  that would be a big cost, so we did get a few guys from

75

1   St. Thomas who lived there.

2   Q.   Okay.  And Johnny Alfonseca was in charge of the

3   maintenance people in St. Thomas?

4   A.   That's correct.

5   Q.   Okay.  And were the maintenance people welders and

6   boilermakers and alike?

7   A.   Boilermakers.

8   Q.   Just boilermakers?

9   A.   Boilermakers.  Yes, just boilermaker.

10  Q.   Okay.  Do you know if any of those boilermakers in

11  St. Thomas were from the States?

12  A.   No.

13  Q.   They were all from St. Thomas?

14  A.   St. Thomas.

15  Q.   Okay.  And do you know whether or not Andrew

16  Canning had any difficulty communicating with Johnny

17  Alfonseca?

18  A.   Yes.

19  Q.   And how -- what's your knowledge of that?

20  A.   Johnny take his responsibilities from Coury Hodge.

21  While doing so, Andrew would interrupt Johnny's job or his

22  task for the day, pull him off, do something else.  And

23  because on several occasion, Andrew pointed out that he is

24  the representative of Vitol here.  He had to stop his task,

25  and do something else.

76

1   At the end of the day, Johnny's task would

2   not be completed, he's doing what Andrew wanted, not what

3   Coury Hodge wants.  So we had a problem with communication

4   there.  Coury Hodge would call us directly.  Adrian.  Adrian

5   will ask me what happened here.

6   Talk to Adrian, 'cause we're in St. Croix,

7   he's in St. Thomas.  And that was the explanation.  Andrew

8   would pull him off, do this over here.  He had the task for

9   the day with Coury Hodge, and communication breakdown back

10  and forth.

11  Q.   All right.  So am I to understand, then, as a

12  result of this communication breakdown, you got put into the

13  intermediary position?

14  A.   On all projects, yes.  On projects, not

15  maintenance.

16  Q.   So putting aside whether or not people agreed to

17  pay you or not to do that, you then became the intermediary

18  for Petro with Canning?

19  A.   Yes.

20  Q.   And then Canning would talk to you about the scope

21  of the work, and then you could have your employees do it?

22  A.   Yes.

23  Q.   All right.  And did you have any problems

24  communicating with Mr. Canning?

25  A.   No.

1    Q.   Okay.  So was that a workable solution?

2    A.   That was a workable solution.

3    Q.   Okay.  There was a point in time, I think it's

4  February of 2021, when Mr. Canning had a fall on a platform

5  in St. Thomas, right?

6    A.   Yes.

7    Q.   Were you personally present at that time?

8    A.   I was on site.  I wasn't present where he was.  He

9  was in WAPA; I was on IPOS.

10   Q.   Okay.  And just so I'm clear, when you say you

11  were "on IPOS," you were in IPOS, does that mean you were in

12  the propane facility?

13   A.   In St. Thomas, the propane facility is up here.

14  And about a 20-minute ride or 10-minute ride down, that's

15  where WAPA is, down here.

16   Q.   Okay.  And that's different from the way it's set

17  up in St. Croix?

18   A.   Yes.

19   Q.   And, just for the record, how is the setup in

20  St. Croix?

21   A.   It's right next door to each other.

22   Q.   Got it.

23        And were you called to the WAPA part of the

24  facility after the incident?

25   A.   No.

1    Q.   Okay.

2    A.   I was called to Andrew Canning office, where he

3  was ranting, cursing with foul language in regards to the

4  poor, shitty, shoddy work, incompetent welders that Petro

5  kept.  Can't do anything correctly.

6    Q.   And that was Mr. Canning's office in St. Thomas?

7    A.   That's correct.

8    Q.   And that was at the WAPA facility?

9    A.   That's at the IPOS facility.

10   Q.   So that was at the IPOS facility --

11   A.   Yes.

12   Q.   -- up on the hill?

13   A.   That's correct.

14   Q.   All right.  Just so I have the chronology correct,

15  Mr. Canning had his incident down in the WAPA facility.

16  Then made his way back up to his office in the IPOS

17  facility, where you were already up at the IPOS facility,

18  and then you went, when you were called to his office?

19   A.   That's right.

20   Q.   Okay.  And was that the first you had notice of

21  what had happened to Mr. Canning, or had somebody either

22  radioed or telephoned you before you met with Mr. Canning?

23   A.   No.  I didn't know what he was calling about.

24   Q.   Got it.

25        So you went in there, innocent of knowing

1  about any incident?

2    A.   Right.

3    Q.   And then encountered him?

4    A.   Right.

5    Q.   Got it.

6        And what -- did you ever come to make -- have

7  an understanding of what happened?

8    A.   Yes.

9    Q.   And what was your -- what informed your

10  understanding?

11   A.   My understanding, the task was not completed on

12  that platform that Andrew Canning went up.  Fall through.

13   Q.   Okay.

14   A.   If Andrew Canning had gotten a permit from IPOS,

15  he would have understand that.  Operations will give you the

16  permit.  Petro tells them, because that's who we are working

17  for.  It's their facility.  This job is incomplete.  We're

18  missing some clips.  Please barricade it off.  Don't let

19  anybody go in there.  That was told to Coury Hodge.

20   Q.   And Coury -- for the record, Coury Hodge is who?

21   A.   The maintenance for IPOS.  He runs the maintenance

22  department.

23   Q.   And who told Coury Hodge that the job was not

24  complete?

25   A.   Myself.

1    Q.   And when did you do that in relationship to when

2  Andrew Canning had his incident?

3    A.   About two weeks prior.

4    Q.   So the job had been incomplete for two weeks,

5  waiting on the clips?

6    A.   That's correct.

7        That's right after the storm, when they had

8  all the shipment not coming in, so the clips were missing.

9    Q.   You're talking about the Irma/Maria storms?

10   A.   Yeah.  Somewhere around there.

11   Q.   So it's late 2017?

12   A.   Right.

13   Q.   All right.  Am I correct that Petro did not

14  barricade the area or put up tape or caution tape to keep

15  people off the platform; is that correct?

16   A.   Petro do not have to do that.  We have to report

17  this to Coury Hodge.  It's their equipment.  It's their

18  property.  They will have to barricade it off.

19   Q.   All right.  So Petro did not do that, right?

20   A.   No.

21   Q.   Okay.  And your testimony is that Petro did not

22  have to do that?

23   A.   No.

24   Q.   That IPOS should do that?

25   A.   Yes.

81

1    Q.   But Petro could have done it, correct?

2         MS. ROHN:   Objection.  Argumentative.

3    Q.   (Mr. Beckstedt) Am I right, if Petro is working on

4    the platform, when it's done, knowing the platform is not

5    completed, it could have put some sort of sign or barricade

6    up, correct?

7    A.   So there's certain valves on top of there.

8    Operation went up there.  They were knowledgeable that it

9    was not complete.  They have to open the valves on top of

10   this platform.  On every shift and every day.  No one fell

11   through.  Operations was aware of the situation.

12        If someone was pretty much aware, and go

13   through the proper steps to go down in there, they clearly

14   would have known.

15   Q.   Got it.

16        Did you do an investigation of this incident?

17   A.   Our safety person did the investigation, not

18   myself.

19   Q.   And that was Mr. Kirsch?

20   A.   That's right.

21   Q.   All right.  And so the information that you have

22   is based upon -- did you review that incident report?

23   A.   No, I did not.

24   Q.   You did not?

25   A.   No.

82

1    Q.   So did you speak with Mr. Kirsch?

2    A.   Adrian Melendez would have done it.

3    Q.   where are you getting your knowledge of what

4    happened to Mr. Canning?  Just from Mr. Canning?

5    A.   From Mr. Canning.

6    Q.   Okay.  And what exactly did Mr. Canning tell you

7    happened?

8    A.   He fell through the grating.

9         Prior for him saying so, David Nagle was with

10   him.  He said Andrew was jumping on the platform.

11   Q.   Did David Nagle say that to you?

12   A.   To me.  Right -- Andrew was sitting right here.

13   David Nagle was standing right in the door.

14   Q.   Got it.

15   A.   And he fell through the platform by jumping on the

16   platform.

17   Q.   And this is Mr. Canning's office?

18   A.   Mr. Canning's office in St. Thomas, yes.

19   Q.   So you get called to Mr. Canning's office, which

20   you don't know why he's calling you?

21   A.   Um-hum.

22   Q.   He's upset or furious about the incident?

23   A.   Yes.

24   Q.   Mr. Nagle is there as well --

25   A.   That's correct.

83

1    Q.   -- standing in the doorway?  You're inside the

2    office?

3    A.   Yes.

4    Q.   Who else was there, other than Mr. Canning,

5    Mr. Nagle, and yourself?

6    A.   Frank Kirsch came after.

7    Q.   So while the meeting was going on, Mr. Kirsch

8    attended?

9    A.   Yes.

10   Q.   Got it.

11        Did Mr. Kirsch say anything?

12   A.   It was not a meeting.  This was a shouting match.

13   Q.   I understand.

14        But while the conversation, the shouting

15   match, was occurring, Mr. Kirsch showed up?

16   A.   Yes.

17   Q.   All right.  Did Mr. Kirsch engage at all?

18   A.   Mr. Kirsch got very upset, because Andrew Canning

19   start cursing at Mr. Kirsch.

20   Q.   What were the curse words that Mr. Canning used?

21   A.   What the F are you guys doing here?  You're

22   supposed to be the F-ing safety person, and I fell through

23   the platform.

24   Q.   Okay.  Is there anything else about that

25   conversation that you recall happening?

84

1    A.   Not to my knowledge.  Not with Mr. Kirsch.

2    Mr. Kirsch turned around and walked out.  Said, you will not

3    be speaking to me like that.  I do not communicate that way

4    to you, and he turned around and left.

5    Q.   Okay.  Do you have knowledge regarding Mr. Canning

6    blaming the Petro crew for forging gate logs related to the

7    RIO Shades project?

8    A.   Yes.

9    Q.   Okay.  I believe that's one of the incidents you

10   were talking -- referring to earlier on in the testimony,

11   correct?  About Mr. Canning's discriminatory conduct?

12   A.   Yes.

13   Q.   All right.  What do you know about that?  What

14   personal knowledge do you have about the RIO Shades, the

15   allegations for forging the gate logs?

16   A.   In St. Thomas and St. Croix, it's different.

17        In St. Thomas, the security guard will stop

18   you, and ask you, and give you to sign yourself in.

19        On St. Croix, the security guard would sign

20   you.

21   Q.   Okay.

22   A.   You'll just have to show up.  What's your name.

23   Mr. Persuad, they sign you in.  You work for Petro?  Yes.

24   They'll put that down.

25   Q.   Okay.  I got you.

85

1      So in St. Thomas, the workers have to sign in
2  their time?
3      A.  Yes.
4      Q.  And --
5      A.  You sign a gate log.  Time of entrance.  You go to
6  lunch or whatever.  You leave the facility to go to Home
7  Depot, electrical store, whatever, you will sign out and
8  sign back in.
9      Q.  Okay.  And you signed this log yourself?
10     A.  Yes.  In St. Thomas.  Not in St. Croix.
11     Q.  Right.
12         And in St. Thomas, who writes the time down
13 on the logs?
14     A.  Security.
15     Q.  Got it.
16         So there's a gate log --
17     A.  Yes.
18     Q.  -- in St. Thomas?
19     A.  Yes.
20     Q.  Is that different from the timesheets that -- that
21 Petro fills out for its employees?
22     A.  I wouldn't say what the gate log reflect, but if
23 we're there for eight hours, and we leave to go to the store
24 to buy material or parts that we need, that gate log will
25 reflect that.

86

1      Q.  I get it.  But what I'm trying to say is, the gate
2  log is not the document that Petro uses for recording its
3  employees' time, correct?
4      A.  No.
5      Q.  You use a Petro document?
6      A.  That's correct.
7      Q.  A timesheet?
8      A.  Yes.
9      Q.  Okay.  Who fills out the timesheet for the Petro
10 employees?
11     A.  The supervisor who's on site.
12     Q.  Okay.  So if it was maintenance work over in
13 St. Thomas, would that be Mr. Alfonseca?
14     A.  That's correct.
15     Q.  Got it.
16         And so he fills out a timesheet for his crew?
17     A.  Yes.
18     Q.  All right.  And so I understand the difference now
19 between St. Thomas and St. Croix's gate logs.
20         Can you please continue to tell me what
21 knowledge you have about Andrew Canning blaming the Petro
22 crew for forging gate logs?
23     A.  Yes.
24         Job in regards to the RIO panel?
25     Q.  Correct.

87

1      A.  I spoke to Andrew Canning prior to that happened
2  the day before, that our employees would be on site.  we had
3  an emergency.  I phoned Mr. Canning.  Our employees will be
4  a little late.  Our supervisor, Elias, dropped the employees
5  off and went to look at the emergency.  So the employees was
6  there on site:  His welder, fitter, and -- I think his
7  welder and fitter.  And Mr. Elias Rivera went to look at
8  another job.
9      Q.  This is St. Thomas, right?
10     A.  St. Croix.
11     Q.  This is St. Croix?
12     A.  Yes.
13     Q.  I apologize.
14         And we're talking about Elias Rivera?
15     A.  Yes.
16     Q.  Okay.  So he was the counterpart to Mr. Alfonseca,
17 but on St. Croix?
18     A.  On this particular job, yes.
19     Q.  Okay.  So he dropped off the welder and fitter,
20 and then went to look at an emergency at another project
21 that Petro was doing somewhere else?
22     A.  That's correct.
23     Q.  Okay.  And so -- so continue.  So how -- so -- so
24 tell me what knowledge you have about Andrew Canning blaming
25 the Petro crew for forging the gate logs?

88

1      A.  Like I said, on St. Croix, the security guard
2  would sign you in.
3      Q.  Uh-huh.
4      A.  The guys -- two guys showed up.  They went in.
5  Elias went about his business.  Andrew Canning went back and
6  saying these guys signed in at 7 o'clock, when they were not
7  there at 7 o'clock.  That's my understanding.
8      Q.  Okay.  So what I'm confused about, or not
9  understanding in your testimony, is what was Andrew Canning
10 looking at that suggested that --
11     A.  The gate logs.
12     Q.  The gate logs.
13         That are filled out by the security guard?
14     A.  Yes.
15     Q.  So what you're saying is that Andrew Canning was
16 falsely accusing the Petro employees when, in fact, it's the
17 security guard who doctored the logs or miswrote the time?
18     A.  Yes.
19     Q.  That's Petro's -- that's your understanding?
20     A.  That's my understanding.
21     Q.  Okay.  Did you ever look at the gate logs?
22     A.  Yes.
23     Q.  All right.  And what time did the gate logs
24 reflect?
25     A.  I can't -- I don't know, honestly.

89

1    Q.    Okay.  How did you get pulled into this situation?

2    A.    Because I was running that job.

3    Q.    So Canning spoke to you?

4    A.    Canning spoke to myself and Adrian, yes.

5    Q.    And then am I following correctly, that you then

6    went and looked at the logs?

7    A.    Yes.

8    Q.    Okay.  So you went over to the security guard and

9    asked, Can I see the logs?

10   A.    Well, I think how -- Andrew Canning pulled the

11   logs.  Photocopied or sent it out.  I can't remember

12   exactly.  And then after, maybe about 12 o'clock or after

13   1:00, or whatever, whatever time, I went to look at the

14   logs.  But I think Andrew Canning already made a scene about

15   this.

16         In the past, Andrew Canning has always

17   accused us of stealing time.  Stealing the company's money.

18   And we -- all Andrew Canning has to ask, if he doesn't

19   understand the timesheet, or if there's a correction to be

20   made, it will be made, and it always has been that in the

21   past.

22   Q.    Okay.  Would you agree with me that there have

23   been times where the timesheets have been questioned and

24   then they've been corrected?

25   A.    Yes.

90

1    Q.    And they were -- would you agree with me that

2    there have been times where Petro's timesheets were

3    corrected because they were incorrect?

4    A.    No.

5          Andrew Canning was -- he had to have an

6    understanding of how the timesheet is.

7          For example, again, if I put my time on the

8    timesheet, I'm running this job, and I can't get paid for

9    it, who's going to pay me?

10   Q.    Okay.  I understand what you're saying, but I'm --

11   what I want to know is, you've told me that Petro has

12   corrected its timesheets in the past?

13   A.    Yes, I have.

14   Q.    All right.  Corrected, in and of itself, means

15   that the timesheet was incorrect, so then it gets corrected.

16   That's what the word "corrected" means.

17         Do you have a different understanding of the

18   word "corrected"?

19   A.    No.

20   Q.    Okay.

21   A.    The correction we made was a error on behalf of

22   Andrew Canning, and where Petro lost, several times,

23   hundreds of dollars.  The reason being, the timesheets are

24   coming three months later after our job is done.  And Andrew

25   Canning would hold up three to six months of payroll of

91

1    Petro to correct one or two hours in a timesheet.

2    Q.    Okay.

3    A.    And basically, upon myself, when I put myself on

4    that timesheet.

5    Q.    All right.  So are you talking about the incident

6    where --

7    A.    Several incident.  Not just this incident.

8    Q.    Okay.

9    A.    Several incidents.

10   Q.    Have any of the labor, non-management employees'

11   time, been corrected on any timesheets that have been

12   submitted for Mr. Canning's review?

13   A.    Based upon, like I said, three months or four

14   months.  It was done for convenience to Andrew Canning in

15   order for Petro to get paid.

16   Q.    Okay.  So that's -- that's different.

17         So what you're saying is, Petro submitted

18   timesheets that it believed, and to this day believes,

19   accurately reflected the time that its employees worked,

20   correct?

21   A.    Yes.

22   Q.    Andrew Canning had problems with those timesheets.

23   And Petro, motivated by getting paid and not having invoices

24   held up, decided to change the time to meet Andrew Canning's

25   approval, and then resubmit the changed timesheets so that

92

1    it could get paid?  That's what you're saying?

2    A.    Yes.  That's exactly what I'm saying.

3    Q.    Okay.  That's what I'm trying to understand.

4          So you have never corrected timesheets

5    because they were incorrect; you've just changed them to

6    satisfy the customer, so to speak?

7    A.    Yes.

8    Q.    And you believe that every one of those timesheets

9    that you've -- that Petro has changed, were actually

10   correct, right?

11   A.    Exactly.

12   Q.    Okay.  And those timesheets were completed by

13   not -- there's no -- so there's no individual sign-in that

14   Petro requires its employees to complete?

15   A.    At the end of the day, the supervisor and his crew

16   would have -- we have Johnny.  We have Simon.  We have

17   Adrian on a timesheet.  At the end of the day, you'll put

18   the times in for each, and submit something to the office at

19   the end of the week.

20   Q.    Got it.

21         Am I correct that there came a time where

22   Andrew Canning saw a timesheet that had an employee getting

23   paid for time that would have included periods prior to them

24   being logged into the facility on the security guard logs?

25   A.    Not to my knowledge.

1      Q.  Not to your knowledge.  Okay.

2          Did you have any involvement in formulating

3  budgets for projects?

4      A.  Yes.

5      Q.  What was your involvement?

6      A.  I would give the estimated time, manpower,

7  duration.

8      Q.  All right.

9      A.  I will not solely do this.  It would involve

10  Adrian and myself.

11      Q.  Okay.  Did you have any involvement in determining

12  the numbers for the budget?  In other words, like, Okay.

13  We're going to pay the manpower this much, and we're going

14  to mark it up that much?

15      A.  No.

16      Q.  Okay.  So you're just, I'm going to need three

17  welders, and two boilermakers, and it's going to take five

18  days to do the project, and -- and then -- and then

19  Mr. Melendez was responsible for doing the number crunching?

20      A.  That's correct.

21      Q.  Okay.  Do you have any personal knowledge as to

22  what any of the markup or profit margins --

23      A.  No.

24      Q.  -- are of the company?

25      A.  No.

1      Q.  Do you ever -- through your job duties and

2  responsibilities for Petro during the period of the IPOS

3  contract, did you ever have to go in and do any work on any

4  of the accounting software, like QuickBooks or anything?

5      A.  No.

6      Q.  Okay.

7          (Respite.)

8          All right.  One last topic area I want to

9  talk about.  I think I'll be done.

10          There came a time, if I understand correctly,

11  in March of 2021, when Canning questioned Petro with regard

12  to welding procedures, do you recall that?

13      A.  Yes.

14      Q.  And what do you remember about that?

15      A.  He asked --

16      MS. ROHN:  Objection.  Overly broad.  You can

17  answer.

18      A.  My understanding of this, right?

19          Any company that goes to work for IPOS,

20  HOVENSA, any company that is doing welding, you present your

21  welding procedures.  And then the client would ask for what

22  they need at that time.  Not three years later.  Not, you

23  know, three months later, immediately that comes along with

24  it.  So if I did 25 welds, or 125 welds, and you're going to

25  come three years later and ask for a welding certification,

1  I don't know how that goes, sir.

2      Q.  (Mr. Beckstedt) Okay.  I'm talking about welding

3  procedures.

4          Does Petro -- did Petro have its own welding

5  procedures?

6      A.  Yes.

7      Q.  All right.  Was Petro aware of whether or not IPOS

8  was required to follow Vitol welding procedures and

9  specifications for the work done at the propane facilities?

10      A.  Everything was asked up front.  This was not asked

11  of us with regard to welding certification, I understand.

12      Q.  Okay.  So let's --

13      MS. ROHN:  Listen to his question.

14      Q.  (Mr. Beckstedt) I'm not -- we're leaving welding

15  certification now.  We're moving to a different topic.

16      A.  Um-hum.

17      Q.  Welding procedures.

18      A.  Right.

19      Q.  Materials --

20      A.  Right.

21      Q.  -- that are required.  What needs to be done with

22  respect to welding.

23          Petro has its own welding procedures,

24  correct?

25      A.  That's correct.

1      Q.  And its own policies on welding, right?

2      A.  Yes.

3      Q.  Are you familiar with, or were you familiar with,

4  at the time that you were doing work for IPOS, that there

5  were Vitol welding procedures that were required for the

6  work at the WAPA facility?

7      A.  None was presented, and none was given to us, so I

8  was not aware of it.

9      Q.  So IPOS --

10      A.  No.

11      Q.  -- never conveyed those procedures?

12      A.  No.

13      Q.  Okay.  Do you -- do you have any knowledge

14  regarding an attempt by IPOS in September of 2020 to work

15  directly with Petro and to remove Canning from the equation?

16      A.  Not to my knowledge.

17      Q.  Okay.  Do you have any information or knowledge

18  relating to Petro being accused of stealing bid information

19  from Traeger Brothers related to the 1-inch vent line

20  project?

21      A.  That was shared by Dave Tillman.

22      Q.  So you have information?

23      A.  I don't have any information, no.

24      Q.  Okay.  Were you involved in it in any way?

25      A.  No.

1    Q.   So this was -- what you know about it, you
2    received from, who, Mr. Melendez?
3    A.   Yes.
4    Q.   No personal knowledge yourself?
5    A.   No.
6    Q.   No interaction with Traeger Brothers yourself?
7    A.   No.
8         May I?
9         MS. ROHN:  Go ahead.  He's already -- he's
10   already in so much trouble that he can't help himself.
11   A.   I'm going to order material.  Let's say 1-inch
12   material from Traeger Brothers.  You're going to order
13   1-inch material from Traeger Brother.  The same amount of
14   material, the cost is going to be the same to you, the same
15   cost to me.  So I don't understand if they're saying we're
16   stealing or inside trading information.  I -- I missed that
17   totally.
18   Q.   (Mr. Beckstedt)  All right.  But the bottom line
19   is, you didn't have any personal --
20   A.   No.
21   Q.   -- involvement --
22        MS. ROHN:  Let him finish his question.
23   Q.   (Mr. Beckstedt)  You didn't have any personal
24   involvement in -- in that bidding?
25   A.   No.

1         MR. BECKSTEDT:  Okay.  All right.  So what
2    I'd like to do, at this point, is pass the witness.  I might
3    reserve a right to ask a couple of other questions after the
4    other lawyers go.  I don't think I have anything more, but
5    that's where I'm at right now.
6         MS. ROHN:  Okay.  Well, it's noon.  So how
7    about if this is a good time to take a break?
8         MR. BECKSTEDT:  Simone, Andy, are you good
9    with that?
10        MS. FRANCIS:  Yeah.  That's fine.
11        MR. SIMPSON:  Yes.
12        (Lunch recess taken.)
13   Q.   (Mr. Beckstedt)  All right.  Mr. Persuad, I have a
14   few more questions.  I was looking over my notes.
15        First of all, you had testified earlier that
16   Mr. Nagle -- and I think this was in respect to the RIO
17   panels, had made some mistakes with respect to the design,
18   and that you were, I guess, chastised by Mr. Canning for not
19   catching the mistakes and following Mr. Nagle's design; is
20   that correct?
21   A.   That's correct.
22   Q.   Okay.  And just what were the mistakes that
23   Mr. Nagle made that -- that Mr. Canning thought you should
24   have caught?
25   A.   Well, not thought we should've caught it.  Went

1    out directly and instruct the welders.  He would take a
2    measurement.  Weld here.  Weld here.  That was it.  The guys
3    would weld what he wanted to do.  Measure it off, the other
4    part wouldn't fit.  They'd have to cut it back out.
5         Initially, this whole project we gave him
6    time for each one, and Andrew Canning said we're crazy.  It
7    took about two days for each one.  According to Andrew
8    Canning, it's a puzzle that you're supposed to put together
9    within four hours.  Very impossible.
10   Q.   So you're saying that Mr. Nagle would come out and
11   tell your people where to cut?  Is that what you're saying?
12   A.   Mr. Nagle, he designed it.  He went out to the
13   factory and looked at it.  He came back with drawings, and
14   he's the one supposed to oversee this job with Mr. Canning.
15        The guys would continue doing what they're
16   doing.  We did a couple of them without him.  But when
17   Nagle's in sight, Guys, let me take a measurement.  You look
18   off here.  Okay.  He'll put it in.  Guys will clamp it.
19   Weld it.  Boom.  Measure it up.  Two inches off; other part
20   is three inches off.  Cannot put together.  Why did we
21   catch it?
22        Nagle is the one who design it, and
23   instructing the guys, interfering with their work, and
24   Canning's after us, You guys are taking too long.
25   Q.   Is this what -- was it this type of work that led

1    to the allegations or the remarks about not being able to
2    use a tape measure?
3    A.   Yes.
4    Q.   Okay.  And you said that Mr. Canning interacted
5    with Mr. Nagle differently than he interacted with the Petro
6    employees, right?
7    A.   Yes.
8    Q.   Can you just give me examples of how you observed
9    Mr. Canning interacting differently with Mr. Nagle?
10   A.   That same example I just gave you.  He wouldn't
11   have said anything to Nagle, but he would come and chastise
12   our employee for not being able to measure.
13   Q.   Got it.
14        You also said that Andrew Canning accused
15   Petro of forgery and robbing the company?
16   A.   Yes.
17   Q.   All right.  What were the -- what were the
18   accusations of forgery?
19   A.   Not so much forgery, but robbing the company.
20   Q.   Okay.
21   A.   I remember on several occasion, myself and Adrian,
22   we worked in the same trailer when we were doing the
23   designing and building for Aggreko.  And he came back, and
24   said, You guys are robbing the company.  I'm going to report
25   you to the highest.  Nothing ever came about it.  He never

101

1    brought anything, but he was very much in a rage when he
2    said that.
3        Q.    And when he said, "robbing the company," which
4    company was he referring to?
5        A.    IPOS.
6        Q.    Okay.  How does the Aggreko work fit in there?
7        A.    Well, Andrew Canning worked on the IPOS side.  And
8    Aggreko is something that they were going to sell propane
9    to.  So he was the lead designer and the liaison between
10   IPOS and Aggreko.
11       Q.    So the remarks that you're talking about with
12   respect to "robbing the company," related -- did not relate
13   to work that Petro was doing under the IPOS maintenance
14   contract?
15       A.    Yes.  There was work, because they had worked for
16   the same time for the -- Aggreko.  You had to do certain
17   modification on the IPOS side.
18       Q.    Got it.  Okay.
19             You -- if I follow correctly, you had said --
20   you had testified that when the issue of providing welding
21   certificates came up, that was for the 3-inch vent line to
22   atmosphere?
23       A.    Yes.
24       Q.    And if I follow your testimony earlier correctly,
25   this had been the first time that you were aware that

Susan C. Nissman, RPR-RMR
(340) 773-8161

102

1    Mr. Canning had asked for these qualifications, right?
2        A.    That is correct.
3        Q.    And if I follow further, you're saying that you
4    had done lots of work on arguably more dangerous lines like
5    propane lines and whatnot that actually have substance,
6    hazardous substance in them, and you had never been asked
7    for the qualifications for that work, right?
8        A.    That is correct.
9        Q.    Okay.  And to your knowledge, prior -- when did
10   the 3-inch vent line project take place?
11       A.    Right before -- I can't give you a date, but right
12   before our contract was pulled.
13       Q.    Okay.  So would it be fair to say that sometime in
14   the late -- or in spring or early summer of '21?  Your
15   contract was pulled, when, July of '21, I believe?
16             MS. ROHN:  If you don't know, say you don't
17   know.
18       A.    No.
19             MS. ROHN:  He's not going to guess.
20       Q.    (Mr. Beckstedt) Do you recall the year 2021?
21       A.    I don't know.
22       Q.    All right.
23       A.    Honestly.
24       Q.    Okay.  The vent -- so this all -- the vent line
25   project had been completed by the time the contract was

Susan C. Nissman, RPR-RMR
(340) 773-8161

103

1    pulled, right?
2        A.    Yes.
3        Q.    Okay.  But there were still concerns about getting
4    the documentation, right?  The qualifications and other
5    records?
6        A.    I think that's correct, yes.
7        Q.    Okay.  And how long did the vent line project
8    take?
9        A.    My guesstimate, I would say three months.  Two
10   months.
11       Q.    Okay.  And at no time had -- before the project
12   started, nobody had told you that they were going to need
13   the welding certifications?
14       A.    No.
15       Q.    Okay.  I'm going to mark -- who told you that they
16   needed -- that you needed the welding certifications?  Who
17   actually told you?
18             MS. ROHN:  So he's not -- he is not IPOS.  I
19   mean, he's not Petro.  You keep saying, who told you?  So
20   you mean him, personally, because he is not Petro.
21             MR. BECKSTEDT:  Yes.  That is what I mean.
22             MS. ROHN:  Okay.
23       Q.    (Mr. Beckstedt) Who told you, Chad Persuad, that
24   they needed the welding certifications?
25       A.    No one told me directly.

Susan C. Nissman, RPR-RMR
(340) 773-8161

104

1        Q.    Nobody?
2        A.    No.  Adrian.  It was Adrian.
3        Q.    Adrian told you?
4        A.    Yeah.
5        Q.    And he told you after the project was completed?
6        A.    Whenever Andrew Canning send that e-mail out, I
7    guess, that's when it was.
8        Q.    Okay.  And you don't remember that date?
9        A.    Don't remember.
10       Q.    Okay.  Fair enough.  I won't use that exhibit.
11             I want to ask you a couple questions about
12   the timesheets.
13             You testified that, to your knowledge, all of
14   the timesheets that were completed for the projects that you
15   were involved in, they were accurate, correct, for the
16   employees at Petro?
17       A.    To my knowledge.
18       Q.    Okay.  You said that some of the discrepancies
19   with respect to the logbooks that were at the facility would
20   be because of employees had to go outside the facility to do
21   part of their job, like get materials and things?
22       A.    That's correct.
23       Q.    Okay.  Are you familiar with concerns that
24   Mr. Canning had that employees checked in hours later, where
25   their timesheets said they were working in the morning?

Susan C. Nissman, RPR-RMR
(340) 773-8161

105

1      A.  Not to my knowledge.
2      Q.  Okay.  Do you have knowledge of timesheets that
3  were changed, or where time had been entered after
4  Mr. Canning had received the timesheets?
5      A.  Yes.
6      Q.  What knowledge do you have of that?
7      A.  In St. Thomas, one particular job.  And we brought
8  it to Andrew Canning -- in jobs that Andrew Canning, we
9  would have -- here's a timesheet.  Review it and sign off on
10 it.
11          There was one guy that was not added to the
12 timesheet, and the following morning we brought it to Andrew
13 Canning, brought to his attention.  We added somebody here,
14 and he was aware of it.
15        MS. ROHN:  There's an e-mail about that.
16        MR. BECKSTEDT:  Right.
17     Q.  (Mr. Beckstedt) Okay.  So let's talk about that
18 e-mail.  I will mark this as -- this was marked as Exhibit 7
19 to the Melendez deposition.  I'm going to mark it as --
20        MS. ROHN:  Oh, why don't we keep the numbers
21 the same, so it just --
22        MR. BECKSTEDT:  Can we go off the record for
23 one second?
24          (Discussion off the record.)
25     Q.  (Mr. Beckstedt) All right.  So I'm going to show

106

1  the witness what we previously marked as Melendez Exhibit
2  Number 7.
3      A.  Sorry, guys.  I didn't walk with my glasses.  I
4  didn't know I'd have to read some stuff.
5      Q.  So you can't read it?
6      A.  Not from here, no.
7         MR. BECKSTEDT:  All right.  Does anyone have
8  any reading glasses?
9         MS. ROHN:  Mine wouldn't look very good on
10 him.
11        MR. BECKSTEDT:  Just for reading.  We don't
12 have video.
13        MS. ROHN:  No, it will stretch out my new
14 glasses.  I like my new glasses.
15        THE WITNESS:  I'm sorry, guys.  I didn't know
16 I needed them.
17        MR. BECKSTEDT:  Do you mind, for the future
18 depositions of the people that you bring, that if they need
19 reading glasses, that you instruct them to bring them?
20        MS. ROHN:  I had no idea that somebody who
21 needed reading glasses wouldn't bring them with them.
22        THE WITNESS:  I didn't know I had to read
23 anything.  Sorry.  This is my first, ever, lawyer
24 confrontation.
25     Q.  (Mr. Beckstedt) So, in order to push through this,

107

1  I'm going to read into the record, and if anybody thinks I'm
2  misconstruing or representing what this document says,
3  they'll object, and we can deal with it.
4           But this is an e-mail from Andrew Canning on
5  January 21st, 2021 at 3:47:47 p.m. to Santhia Rodriguez,
6  David Smith, Coury Hodge, Cyla Gooding, and copied on it are
7  a number of people, including Adrian Melendez and Chad
8  Persuad.  So presumably you received a copy of this e-mail.
9  It's very long.  I'm not going to read everything.  But it's
10 a follow-up under the subject:  Updated AR.
11          And Andrew says, "Santhia, thank you for the
12 reply in organising the timesheets in question."
13          And then he has different headings.  And it
14 talks about Authorized Timesheets, Private Jet Charter and
15 Timing, welder hours for December 11th, 2020, and Levels of
16 PIS Management Changed, okay?  Those are the headings under
17 the e-mail.
18          Do you have any recollection of this e-mail?
19     A.  Not the e-mail.  We discussed it with Adrian.
20     Q.  Okay.  But you have a recollection of these topics
21 being discussed?
22     A.  Yes.
23     Q.  In this e-mail, with respect to the timesheets,
24 "It is clear that two of the timesheets have been changed
25 since signing which under any circumstances is an

108

1  unacceptable practice, however in the two cases presented
2  (the 11th and 12th of December 2021) I am satisfied that
3  there was no fraudulent intent related to the changes just
4  an oversight of the specialist welder who's name, site hours
5  and cumulative -- cumulative -- cumulative," excuse me.
6         MS. ROHN:  Easy for you to say.
7      Q.  (Mr. Beckstedt) -- "time has been entered after I
8  signed the timesheets."
9           Okay.  That's the first sentence.  Does that
10 ring a bell?
11     A.  Yes.
12     Q.  Okay.  Is that what you were just talking about?
13     A.  Yes.
14     Q.  Okay.  And then Andrew says, "Clearly this
15 oversight should have been recognised and brought to my
16 attention and no amendments made on the signed and
17 authorized timesheets.  Going forward," and then he talks
18 about a procedure.
19     A.  May I?
20        MS. ROHN:  Now, sir, I'm going to have to
21 take you outside.
22     A.  All right.  Go ahead.
23        MS. ROHN:  Let him finish his question, then
24 answer his question.
25     Q.  (Mr. Beckstedt) All right.  So that last sentence,

1  where Mr. Canning says, the "oversight should have been
2  recognised and brought to my attention," do you agree or
3  disagree that this was not brought to his attention?
4      A.   It was brought to his attention.
5      Q.   Okay.  And you're saying that you brought it to
6  his attention the day after?
7      A.   The job finished at 1 o'clock in the morning.
8  Andrew left before we did.  The timesheet was brought to his
9  attention, 7 o'clock the next day.
10      Q.   Meaning, the change of the timesheet?
11      A.   Yes.
12      Q.   Okay.  And so who brought it to Mr. Canning's
13  attention?
14      A.   I brought it to him.
15      Q.   You, personally?
16      A.   Brought the timesheet.  Here, Andrew, I added this
17  person to it.
18      Q.   Okay.  All right.  I have -- also have here, which
19  I'm going to show you for the record, but you can -- I
20  understand you can't read this.  It is Melendez Number 8.
21          You can't read this, correct?
22      A.   No.
23      Q.   Okay.
24      A.   I'm trying.
25      Q.   Don't even try.  It's bad quality to begin with.

1          There's one -- there is an e-mail in here,
2  which you are copied on, which is Thursday, January 21st,
3  2021 at 11:51 a.m. from Mr. Melendez, Jr. to Merlin
4  Figueira, with a copy of various people, including yourself,
5  and it's regarding the subject, RIO Shades, okay?
6          And there had been some concerns brought up
7  about various different things.  I'll just tell them to see
8  if it refreshes your recollection.
9          Quality of welds on the panel by the boiler
10  room.  Break times running long, including leaving early.
11  work not progressing fast enough.
12          Do you have a recollection of those e-mail
13  communications?
14      A.   Yes.
15      Q.   Okay.  And Mr. Melendez writes back with respect
16  to break times running long, including leaving early, "No
17  excuse.  The guys will improve on this," okay?
18      A.   Yes.
19      Q.   Do you recall Mr. Melendez saying that?
20      A.   Yes.
21      Q.   Do you agree that there was no excuse for the
22  break times running long and the guys leaving early?
23      A.   There's no excuse.
24          The guys have three breaks.  Two breaks.  I'm
25  sorry.  One at 9 o'clock to 9:15.  Fifteen minutes.  And

1  then they have one at lunchtime.  They would omit the
2  9 o'clock break, 9:15, and just add a longer lunch.  I'm
3  aware of that.
4      Q.   Okay.
5      A.   I explain this to Mr. Canning.
6      Q.   Okay.  So when -- when Mr. Melendez says, "There's
7  no excuse.  The guys will improve on this," are you agreeing
8  or disputing that the Petro employees were taking longer
9  breaks than they were allowed?
10      A.   Like I said, the lunchtime pushed over to 9:45
11  because they omitted a break.  The 15-minute break at
12  9 o'clock.
13      Q.   Okay.  So your testimony is that they took breaks
14  in the total amount of time that was allowed; they just
15  didn't do it at the time that they were supposed to?
16      A.   Yes.
17      Q.   But they didn't go over?
18      A.   I don't think they go over.
19      Q.   And you say you don't think -- okay.
20          So you would disagree that the break times
21  were running long?
22      A.   Yeah.
23      Q.   They were just taken at different times?
24      A.   That's correct.
25      Q.   Okay.  Now, what about leaving early?  Did your

1  employees leave early before they should?
2      A.   Work for us, and when I'm on site, stops at 3:15.
3  Pack away their tools.  Clean up the area at 3:15, which
4  extends to 4 o'clock.  Employee only gets paid till 3:30, so
5  I would disagree with that.
6      Q.   So you have no personal knowledge of any of your
7  employees leaving early?
8      A.   No.
9      Q.   All right.  So basically when Mr. Melendez said,
10  "No excuse.  The guys will improve on this," which you would
11  agree with me, is an admission that the break times were
12  running long and people were leaving early, right?
13      A.   Yes.
14      Q.   You would say that he admitted to something that
15  wasn't actually happening?
16      A.   I am not in the field; he's in the office.
17      Q.   Got it.  Okay.
18          So the Petro employees never took long breaks
19  and they never left early?
20      A.   In my knowledge, no.
21      Q.   Okay.
22      A.   Before you go further, one more thing you said
23  there.
24          Shoddy welds.  This is a structural weld.
25  Not --

1    Q.   I didn't say shoddy.

2    A.   What did you say?

3    Q.   I said, "Quality of a few welds on the panel by

4  the boiler room."

5    A.   This is a structure.

6    Q.   Okay.

7    A.   Anybody who's starting out to weld, this is how

8  they learn to weld.  These are qualified welders welding all

9  Andrew Canning piping.  Pressure vessels.  So for him to say

10 something like this, I disagree highly with that.

11   Q.   Got it.

12        Are you familiar with the company, Versa?

13   A.   Yes.

14   Q.   Who's Versa?

15   A.   Inspection company.

16   Q.   All right.  And they inspect welds, right?

17   A.   Yes.

18   Q.   All right.  They're the ones that did the

19 inspections that you were talking about earlier, where

20 they -- there could be a red flag; is that right?

21   A.   Um-hum.

22   Q.   Okay.  I'd like to just show you a couple of these

23 reports and ask you a few questions.  But going to be hard

24 without your reading glasses, but I'm going to try it, all

25 right?

1         MS. ROHN:  I may be able to save the day.  I

2  do have another pair of reading glasses.

3    A.   You're stylish.

4         MS. ROHN:  You're going to owe me.

5    Q.   (Mr. Beckstedt)  All right.  So I am marking

6  Persuad Number 16.  Tell me if you can read that.

7         (Deposition Exhibit Persuad No. 17 was

8          marked for identification.)

9         And for the people that are attending

10 remotely, this is the Versa document I circulated, dated

11 April 3, 2021, starting with PIS 239 Bates number.

12        MS. ROHN:  This is Persuad 18?

13        MR. BECKSTEDT:  Oh, did I write the wrong

14 number?  You're right.  It's 17.

15        MS. ROHN:  Seventeen.

16        MR. BECKSTEDT:  My apologies.  I can't count.

17   Q.   (Mr. Beckstedt)  Are you able to read them with

18 those glasses?

19   A.   Yes.  It's there someplace.

20   Q.   All right.  So, first of all, Versa has put down,

21 I guess, the client, Limetree Bay Refinery/IPOS.

22        Is there something on this document that

23 tells you where -- where this work was?  Where, that they're

24 imaging?  Where these welds are located?

25   A.   I would say St. Croix IPOS.

1    Q.   Okay.  Do you see on the second page, Bates number

2  on the bottom, 240, the big black thick?

3    A.   Yes.

4    Q.   Up at the top, it says, "Client:  LimeTree Bay

5  Refinery/IPOS."

6         Do you see that?

7    A.   Yes.

8    Q.   All right.  And it's just confusing me whether or

9  not these are welds that they were examining that were out

10 at the Limetree Bay refinery, or if they were actually out

11 at the propane facility at WAPA?

12   A.   So, initially, these guys, they work out of

13 Limetree Bay.  Andrew Canning asked us to get a welding

14 company with x-ray, which is nearly impossible without

15 federal authorization to move the radiation that you need to

16 have this.

17        We jumped through hoops to go to Limetree and

18 ask them to do this.

19        They're contracted to Limetree Bay.  Moving

20 the radiation has to go back to one source, and one place

21 only.  And I would assume that's why they have Limetree Bay.

22   Q.   Okay.

23   A.   Because you have to go through so much federal

24 mandate, just to move the radiation.

25   Q.   So on page -- on the third page of this document,

1  under 241, where it lists the components, and it says, "IPOS

2  PURGE DRAIN LINE."  Do you see that?

3    A.   Um-hum.  Yes.

4    Q.   So this is out at the -- out at the WAPA facility,

5  correct?

6    A.   Yes.

7    Q.   Okay.  So now I just am turning the pages.

8    A.   Um-hum.

9    Q.   And is there a weld on here that has a red flag,

10 as you described in your testimony earlier?

11   A.   In regards to this, this would be interpreted, and

12 reported back to the client.  I'm not qualified to read

13 this.  I am not a welding inspector.

14   Q.   Okay.  So let me understand.

15        You told me that if your welders are

16 continually doing welding work, they don't need to be

17 recertified, right?

18   A.   That's correct.

19   Q.   And the way that Petro maintains knowledge that

20 their welders are qualified to do welds is by monitoring the

21 x-ray, and is it phase array?

22   A.   Yes.

23   Q.   That was being done, and confirming that your

24 welders aren't getting red flags, right?

25   A.   That's correct.

CHETRAM PERSUAD -- DIRECT

1    Q.   Is this an example of an x-ray or phase array
2 report that Petro would review to see if their welders are
3 getting a red flag?
4    A.   So it would be reviewed by the guy who's taking
5 it.  So one technician come out, take these welds.  He
6 doesn't know if they're good or bad.  He's going to bring
7 them back to somebody else to develop it.  Read it.  Go to
8 his supervisor.  And then we'll have something that comes
9 out to say yes or no.  Weld Number 1 is bad.  Weld 5 is
10 bad.  But for me to look at this now and tell you this is
11 good, that is good, I am not qualified to do that, sir.
12    Q.   I get that.
13         But ultimately, someone at Petro gets a
14 report that says this was good or not good, right?
15    A.   That's correct.
16    Q.   Does that report come in a different format than
17 what we're seeing here?
18    A.   No.  It's pretty much same format, and it's marked
19 up by the -- the inspection company.
20    Q.   Can you turn to the last page of this document?
21    A.   Sure.
22    Q.   All right.  I see something on this document
23 that's in red with an arrow that says, "nonfusion" over the
24 x-ray.
25         Do you see that?

CHETRAM PERSUAD -- DIRECT

1    A.   Yes.
2    Q.   What -- is that an example of a red flag?
3    A.   That's correct.
4    Q.   Like you were talking about before?
5    A.   Yes.
6    Q.   All right.  So this is something that would have
7 been given to Petro, and then you would look at it to see if
8 there was a red flag, right?
9    A.   That's correct.
10    Q.   Did you look at this when it came in?
11    A.   I looked at this when it came in.  Like I said,
12 it's not for us to determine we're going to go back and look
13 at Weld Number 10.  Whatever number is on this one.  And
14 this one has it.  Read the inconsistency with the weld, and
15 make a repair.
16    Q.   Who made -- who did this weld?
17    A.   Offhand, let me see.  I can't say.
18    Q.   Is there anything on this x-ray that identifies
19 your welder who did this?
20    A.   There's a number it should be on there.
21    Q.   Where?
22    A.   It should be on the weld map, not on here.
23 There's one of these numbers on the end over here, but it
24 should be on the weld map, also.
25         So I'll go back to the weld map, and look at

CHETRAM PERSUAD -- DIRECT

1 it, and say, This is the guy who did it.
2    Q.   Okay.  Which number on this piece of paper that
3 we're looking at, where it says -- has the red flag for
4 non-fusion, signifies the welder who did the weld?
5    A.   I'm not a hundred -- I'm not correct.  I'm not
6 sure which one is it --
7    Q.   Okay.
8    A.   -- honestly.
9    Q.   You're one of the quality control guys for Petro,
10 right?  You and Adrian?
11    A.   And Adrian -- not Adrian.  Javier Vazquez.
12    Q.   Okay.  And what's Javier Vazquez's title?
13    A.   He's our quality control person, along with us.
14    Q.   All right.  So when I asked you earlier today who
15 the quality control people were, you didn't mention him?
16    A.   No, I did not.  I failed to mention that.  I
17 didn't remember at the time.
18    Q.   Is there anybody else who does quality control for
19 Petro?
20    A.   Not at this time, no.
21    Q.   Okay.  But you're one of the people that does it?
22    A.   Yes.
23    Q.   And within the scope of your duties as a quality
24 control person for Petro, you have the knowledge and ability
25 to review these reports to determine whether your welders

CHETRAM PERSUAD -- DIRECT

1 are -- are doing -- are properly welding?
2    A.   According to this, alongside with a a weld map,
3 you will determine.
4    Q.   Got it.
5         And Petro keeps the weld maps in their
6 possession?
7    A.   Yes.
8    Q.   How long do they keep those records?
9    A.   I cannot tell you that.
10    Q.   Got it.
11         All right.  So I apologize.  We got a little
12 off track.  But you're telling me that you can't see a
13 number on this piece of paper that signifies --
14    A.   I'm saying it's one of these numbers -- sorry
15 about that.
16    Q.   All right.  You were just pointing when you were
17 told to stop interrupting my question.
18         So there's numbers on the black x-ray up in
19 the upper right corner, right?
20    A.   Um-hum.
21    Q.   Is that correct?
22    A.   That's correct.
23    Q.   All right.  And you're saying one of those numbers
24 identifies a welder?
25    A.   Yes.

1    Q.   Okay.  But you're not sure which one of the
2    numbers identifies the welder?
3         A.   Without a weld map, I cannot tell you that.
4         Q.   Okay.  And if we looked at a weld map, there would
5    be some number on the weld map --
6         A.   Associated with this.
7         Q.   Okay.  And that would somehow tell you which one
8    of these numbers actually signifies a welder?
9         A.   That's correct.
10        Q.   All right.  And then where -- does the weld map
11   have the name of the welder that goes to the number?
12        A.   It has a name and a stencil.
13        Q.   What's a stencil?
14        A.   It's the number that you're looking at right
15   there.  One of these numbers.
16        Q.   Okay.  All right.  These numbers have in front of
17   them -- well, one of them looks like a date.  The second one
18   down looks like it's a date, 4/3/2021, is that a date?
19        A.   Yeah, that's a date.
20        Q.   The one above it starts with the FW257 EB.
21             Do you know what the FW or EB stands for?
22        A.   No.
23        Q.   All right.  The one below the date starts with the
24   letter C, and then it's followed by five numbers.
25             Do you know what the C stands for?

1         A.   No.
2         Q.   And the last one starts with W.
3              Do you know what that stands for?
4         A.   No.
5         Q.   Okay.  Do you know what a non-fusion is?
6         A.   Yes.
7         Q.   What's that?
8         A.   It's not bonded together.
9         Q.   Does that typically mean something that has to be
10   redone?
11        A.   Yes.
12        Q.   Do you know what kind of weld that was that we
13   just looked at that had the non-fusion?
14        A.   Well, if it's the 3-inch line we're talking about,
15   I would say it would be on that stainless steel part that we
16   welded.  That's all I could refer to.
17        Q.   Well, according to the second page that we looked
18   at, these are related to the IPOS purge drain line.
19             Is that different?
20        A.   Yes.
21        Q.   So based on that, do you know what kind of welds
22   these are?
23        A.   Same stainless steel.
24        Q.   Same stainless steel.
25             And your guys weld on stainless steel at that

1    time?  They were welding on stainless steel constantly?
2         A.   Our business is welding.  That's where we make our
3    most money.  We weld stainless steel all the time, yes.
4         Q.   Okay.  What's the longest gap that you have
5    between -- for each -- for your welders, what's the longest
6    period of time between welding stainless steel that they
7    have?
8         A.   Between the distilleries that we have locally
9    here, which is primarily stainless steel.
10        Q.   Like Diageo and Cruzan Rum?
11        A.   Yes.  It's all stainless.
12        Q.   And the same welders are out there welding?
13        A.   Yes.
14        Q.   Got it.
15             So with the distilleries, what -- how --
16   what's the most amount of time that you believe your welders
17   go without welding stainless steel?
18        A.   Christmas break.  They take vacation.
19             MR. BECKSTEDT:  Okay.  All right.  I think
20   that exhausts my questions.
21             Do you need a break, Simone or Andy?
22             MS. FRANCIS:  No, I can start.
23             MR. SIMPSON:  I do not.
24             MS. FRANCIS:  But before we start,
25   Mr. Melendez, are you okay -- I'm sorry.  Mr. Persuad, are

1    you okay to continue?
2              THE WITNESS:  Sure.
3              CROSS-EXAMINATION
4    BY MS. FRANCIS:
5         Q.   Okay.  Good afternoon, Mr. Persuad.  My name is
6    Simone Francis, and I represent IPOS.
7              Are you able to hear me?
8         A.   Clearly.
9         Q.   Excellent.
10             Versa.  You were just shown some report by
11   Versa.  Would you consider or regard Versa to be qualified
12   to do the sort of testing that is represented in those
13   reports?
14        A.   They're the number-one North American company that
15   does inspection.  Yes, they're more than qualified.
16        Q.   And earlier, you were shown Exhibit 8, Melendez 8.
17   That's the e-mail that speaks to the break times running
18   long, including leaving early.
19             If the employees did not take breaks at their
20   scheduled time, would you be the person responsible for
21   monitoring or ensuring that the break times are taken at the
22   scheduled time, or who has responsibility for that?
23        A.   Their supervisor.
24        Q.   I'm sorry?
25        A.   Their supervisor.

125

1    Q.  Okay.  And who would that have been in January of

2  2021?  Is that -- I believe you mentioned a name earlier,

3  but I just want to make sure.

4    A.  Elias Rivera.

5    Q.  And was there a separate supervisor on St. Thomas,

6  did you say?

7    A.  Yes.

8    Q.  Okay.  And that individual's name?

9    A.  For maintenance, Johnny Alfonseca.

10    Q.  And do you have personal knowledge whether either

11  Mr. Rivera or Mr. Alfonseca would take measures to ensure

12  that Petro employees took both a rest break and then a

13  separate lunch break or meal break?

14    A.  Yes.

15    Q.  And what is your knowledge in that regard?

16    A.  Company's standard, it would be 9 o'clock to 9:15,

17  is the morning break.  The lunch break, 12 o'clock to 12:30.

18       If the job they're doing, they would speak to

19  an IPOS representative.  We would work -- 'cause the start,

20  we start at 7:30.  To stop two hours after setting up and

21  all that stuff, you're just wasting time.  So it was set up

22  we work through the morning without that break, and then

23  take a longer lunch break.

24    Q.  In response to Attorney Beckstedt's questions, you

25  had given some testimony about the interactions between

126

1  Mr. Canning and Mr. Nagle.

2       Do you recall that?

3    A.  Yes.

4    Q.  I take it -- would it be fair to say that

5  Mr. Canning and Mr. Nagle may have had interactions

6  concerning work matters that you were not a party to,

7  correct?

8    A.  Yes.

9    Q.  I'm going to go back to some other issues.

10       During the lunch break, did you have any

11  discussion with anyone about any testimony that you gave

12  during the first part of the deposition?

13    A.  No.

14    Q.  Okay.  During the lunch break, did you have any

15  discussion with anyone about any testimony that you might

16  give when the deposition resumed this testimony?

17    A.  No.

18    Q.  And apart from the fact that you had not mentioned

19  Mr. Javier Vazquez earlier in your deposition, is there any

20  other testimony that you gave in response to questions this

21  morning that you now realize contain some omission or

22  misstatement?

23    A.  No.

24    Q.  Did you review any documents in preparation for

25  your deposition?

127

1    A.  No.

2    Q.  Did you speak to anyone in preparation for your

3  deposition?

4    A.  Attorney Lee Rohn.

5    Q.  And when was that?

6    A.  Friday.

7    Q.  And by "Friday," are you referring to Friday, May

8  19th?

9    A.  I'm sorry.  It was Saturday.  Not Friday,

10  Saturday.

11    Q.  Okay.  This past Saturday, May 20th, sir?

12    A.  Yes.

13    Q.  Was anyone else present for your conversation?

14    A.  Myself, Adrian Melendez, Ms. Lee Rohn.

15    Q.  And was the meeting on Saturday, May 20th, the

16  only meeting that you had in preparation for your

17  deposition?

18    A.  Yes, ma'am.

19    Q.  Okay.  How long did you meet?

20    A.  Fifteen minutes.  Twenty minutes.

21    Q.  Was that in person or by telephone or --

22    A.  In person.

23    Q.  -- video?

24       With respect to e-mail communications

25  concerning the work that was being done, such as the e-mails

128

1  that are in Exhibit 7 and 8, what was your normal habit or

2  practice?

3    A.  Can you refresh what 7 and 8 is, please?

4    Q.  Sure.

5       Exhibit 7 would have been one of the exhibits

6  you were shown while you didn't have the reading glasses.

7  And that's the e-mail from Mr. Canning that speaks to the

8  alterations of authorized timesheets, use of private jet

9  charter and timing, welder hours.  And Attorney Beckstedt

10  read to you the portion of that e-mail that stated that

11  Mr. Canning had determined that there was no fraudulent

12  intent with respect to the changes, just an oversight.

13       And so my specific question was, did you tend

14  to read e-mails during the business day?  Did you read them

15  at the end of the day?  Did you typically respond by e-mail?

16  Or leave it to Mr. Melendez to communicate by e-mail

17  concerning matters related to the work that was being done

18  at the propane facility?

19    MS. ROHN:  Objection.  Compound question.

20  You can answer, if you can.

21    A.  Ma'am, my poor eyesight, Adrian reads most of the

22  e-mails.  I do most of the work in the field.

23    Q.  (Ms. Francis) And tell me exactly the nature of

24  your vision limitations?

25    A.  I can't see close.  I can see far.

CHETRAM PERSUAD -- CROSS

1   Q.   And was that the case during 2019, 2020, 2021?

2   A.   Yes, ma'am.

3   Q.   Did you attend high school in New York?

4   A.   Yes.

5   Q.   Okay.  And did you graduate from high school?

6   A.   Yes.

7   Q.   Following high school, did you undergo any other

8 formal education?

9   A.   Two years of technical college.

10   Q.   Where was that?

11   A.   New York.

12   Q.   I'm sorry.  I did not hear you.

13   MS. ROHN:  New York.

14   Q.   (Ms. Francis) What institution?

15   A.   New York Technical College.

16   Q.   And did you receive a degree or a certificate at

17 the end of that two-year period?

18   A.   No, ma'am.  I was one -- one point away from

19 graduating and start working.  I never followed that.

20   Q.   What were you studying during the two-year period

21 that you attended New York Technical College?

22   A.   Machine tool technology.

23   Q.   Have you, at any point since interrupting those

24 studies, attempted to resume formal education at any

25 institution, either in person or online?

CHETRAM PERSUAD -- CROSS

1   A.   I went to a couple classes.  Not institution.

2 Informal setting.

3   Q.   Could you explain what you mean by that?

4   A.   Went to training in regards to developing better

5 work habits.  Training in applications that we have to work

6 on a pipe.  Courses of that matter.

7   Q.   Were those trainings or course work during your

8 employment with Petro or before?

9   A.   Before.

10   Q.   And with what companies?

11   A.   Turner, Jacob, and HOVENSA.

12   Q.   Did you go directly from New York to St. Croix?

13   A.   Yes, ma'am.

14   Q.   And what kind of work did you do in New York after

15 you ended your studies at New York Technical College?

16   A.   Worked in a machine shop at New York Transit

17 Authority.  Worked at Indian Point, a nuclear power plant

18 for Con Edison, and their machine shop in Bronx, New York.

19   Q.   Were those the only two entities that you worked

20 for in New York before moving to St. Croix?

21   A.   Yes, ma'am.

22   Q.   In your current position with Petro, are you paid

23 hourly or are you a salaried employee?

24   A.   Hourly.

25   Q.   And was that also the case in 2019, 2020, and

CHETRAM PERSUAD -- CROSS

1 2021?

2   A.   Yes.

3   Q.   Is your -- are your wages from Petro dependent

4 upon Petro being paid by clients for time that you spent

5 working?

6   A.   Yes, ma'am.

7   Q.   Okay.  And can you explain how that works?

8   A.   If Petro don't get paid, I don't get paid, based

9 upon the work that we're doing.  We're a small local

10 company, and we depend.  We don't have no major overheads.

11 And if somebody doesn't pay for three months, we're pretty

12 much going under.

13   Q.   Sir, have there been occasions when Petro has

14 withheld salary or wages from you because of a claim that it

15 had insufficient funds to pay your -- pay you for work you

16 had performed?

17   A.   Yes, ma'am.

18   Q.   Okay.  Tell me about that.

19   A.   Again, directly from IPOS, because I'm a

20 supervisor or manager, I would say most of our employees,

21 they need to get paid.  They do the work.  And basically, it

22 would be a discussion between myself and Adrian Melendez and

23 our office manager.  I miss this week, next week, and I'll

24 get compensated whenever we can.

25   Q.   So even though you're not an owner of the

CHETRAM PERSUAD -- CROSS

1 business, your wages are dependent upon the -- Petro

2 receiving money or not receiving money from its clients?

3   A.   That's correct.

4   Q.   Are you paid any bonuses by Petro?

5   A.   No.

6   Q.   Okay.  And have you -- has your salary or your

7 hourly rate increased at all between January of 2019 and the

8 present?

9   A.   No.

10   Q.   When you travel for work, either between

11 St. Thomas and St. Croix or elsewhere, does Petro advance

12 the travel costs, or do you pay for that out of pocket and

13 then seek reimbursement from Petro?

14   A.   Petro would not give an advance, but they would

15 have get the room for the hotel, rental car.  And after the

16 job is completed, you get reimbursed.  That would be the per

17 diem.

18   Q.   And I may have asked an unclear question, so let

19 me try again.

20   Does the hotel or rental car, are those bills

21 going directly to you and being paid by you in the first

22 instance, or are they going directly to Petro, and Petro is

23 paying them?

24   A.   Directly to Petro.

25   Q.   Did I understand your testimony correctly, that at

1  some point in time, you were on site acting as a liaison
2  between the Petro employees and Mr. Canning; is that
3  correct?
4      A.  Yes.
5      Q.  Okay.  And if I understood your testimony
6  correctly, and I'm not trying to put words in your mouth,
7  but it sounds like you were frustrated, because Mr. Canning,
8  at some point, either took the position or appeared to take
9  the position that Petro should not charge for your work in
10 overseeing work of Petro employees; is that correct?
11         MS. ROHN:  Objection to the form of the
12 question.  It's compound, and it's difficult to follow.
13     Q.  (Ms. Francis) Well, Mr. Persuad, if, at any time,
14 you don't understand a question, please feel free to let me
15 know, and I will -- I will restate it or rephrase it.
16     A.  Okay.
17     Q.  Did you understand the question that I asked?
18     A.  Please rephrase it.
19     Q.  Sure.
20         Did you understand that Andrew Canning was
21 taking the position that Petro should not charge for your
22 time on the job, or that Canning was taking the position
23 that Petro should not charge for the time of other
24 supervisors?
25     A.  Ma'am, Andrew Canning agree verbally for me to

1  leave St. Croix to go to St. Thomas and manage this job.  He
2  agree.  He wrote it down on his notes, his minutes, that,
3  yes, I will take the management position and liaison for
4  this particular job.  And after three months, he cannot
5  recall this.
6      Q.  And remind me, again, at what point did
7  Mr. Canning agree that you would take the management
8  position?
9      A.  Before this job started.
10     Q.  And by "this job," which -- which job?
11     A.  This would be RIO panel in St. Thomas.
12     Q.  Okay.  Thank you.
13         Do you have a recollection of how long that
14 work or project took?
15     A.  We were only to do three weeks of work in
16 St. Thomas.  Was scheduled, I think, for a month.
17 Mr. Canning left the site, and all work came to a complete
18 halt.
19     Q.  And then did it resume at some point in time?
20     A.  Not with Mr. Canning.  It resumed with Merlin.
21 There was two more panels to be done, and he called us.
22 Without Canning being on site, the job was completed.
23     Q.  And do you have any criticism of Mr. Figueira
24 taking that action in calling you to complete the work?
25     A.  Ma'am, could you repeat the question, please?

1      Q.  Sure.
2          Do you have -- do you have any criticism of
3  Mr. Figueira's actions in that regard?
4      A.  No.
5      Q.  When is the most recent occasion that you've had
6  any communications with Mr. Figueira?
7      A.  I cannot give you a date, but the last week, he
8  was on St. Croix.
9      Q.  And what was your interaction or interactions with
10 Mr. Figueira on that occasion?
11     A.  He thanked us for the work that we did, and he was
12 taking off.  And he wasn't sure if he was taking off the
13 Wednesday or the Friday.  So all he said was thank you for
14 everything.  Appreciate all your hard work, and that was the
15 end of it.
16     Q.  Did you consider yourself to have a good working
17 relationship with Mr. Figueira?
18     A.  A good working relationship, yes, 'cause he
19 understand the work that was meant to be done.
20     Q.  And did I correctly understand you to testify in
21 response to Attorney Beckstedt's questions that you had no
22 knowledge of any racist comments or discriminatory comments
23 against Petro by Merlin Figueira; is that correct?
24     A.  That is correct.
25     Q.  And did I also understand you to testify in

1  response to Attorney Beckstedt's questions that you have no
2  knowledge of any racist comments or discriminatory conduct
3  against Petro, or any Petro employees, by David Smith?
4      A.  That's correct.
5      Q.  You also mentioned an IPOS employee by the name of
6  Coury Hodge.
7          Do you have any knowledge of any racist
8  comments or discriminatory conduct against Petro, or any
9  Petro employees, by Coury Hodge?
10     A.  No.
11     Q.  In your role with Petro, did you ever conduct any
12 performance evaluations for any of the Petro welders?
13     A.  Ma'am, not performance.  I explained to Mr. Beck
14 here that pretty much as they weld, that's how they're
15 qualified.
16     Q.  And does Petro do annual or semi-annual job
17 evaluations of its welders?
18     A.  No, ma'am.  It's not necessary, once they
19 continuous welding, and their weld continuous to pass.
20     Q.  Do you conduct performance evaluations for any
21 Petro employees?
22     A.  Yes, we do.
23     Q.  Okay.  You, personally, what Petro employees do
24 you conduct performance reevaluations of?
25     A.  Our boilermaker.  Our civil work.

137

1  Q.  I'm sorry.  Boilermaker, and who else?

2  A.  Civil workers.  Concrete, rebar, stuff like that.

3  Q.  Do you have any responsibility for hiring any

4  Petro employees?

5  A.  I evaluate them, not hire them.

6  Q.  And when you say you "evaluate," do you make

7  recommendations about hiring?

8  A.  Yes.

9  Q.  And how about firing employees?  Do you have any

10  responsibility for firing any employees?

11  A.  Again, madam, I make recommendation, and it's up

12  to the office person and Adrian to fire them.

13  Q.  Have you ever -- well, let me rephrase that.

14       Does Petro have any written policies about

15  discrimination or harassment?

16  A.  Yes.

17  Q.  And where are those contained?

18  A.  In at the office, and it's passed out to every

19  employee upon start date.

20  Q.  Do you personally do that, or does someone else

21  handle that?

22  A.  Office manager.

23  Q.  So that would be Ms. Rodriguez?

24  A.  That's correct.

25  Q.  Does Petro conduct any training about workplace

138

1  discrimination or harassment?

2  A.  Not to my knowledge.

3  Q.  And if a Petro employee had a complaint about

4  discrimination or harassment, to whom would those complaints

5  be reported?

6  A.  Adrian Melendez.

7  Q.  Has any Petro employee ever reported a complaint

8  about harassment or discrimination directly to you?

9  A.  Not to my knowledge.

10  Q.  Do you speak Spanish, sir?

11  A.  No.

12  Q.  You testified earlier that Mr. Canning allegedly

13  said at some point, words to the effect of, he can't

14  communicate with them.  We need to get -- or you need to get

15  better personnel than these Hispanics.

16       Do you recall that testimony?

17  A.  Yes.

18  Q.  And when did Mr. Canning make that statement?

19  A.  I cannot give you a date, ma'am, but while we were

20  working on site on several occasion.

21  Q.  And is this something you personally heard on

22  several occasions, or was it reported to you by others?

23  A.  It was reported by Andrew Canning to me.

24  Q.  Andrew Canning reported to you that he said that

25  Petro needs to get better personnel than these Hispanics?

139

1  A.  Ma'am, Andrew Canning stated that these Hispanics

2  don't know what they're doing.  He can't communicate with

3  them.

4  Q.  And my question was, were you personally present

5  when Mr. Canning made that statement?

6  A.  Ma'am, he told it to me.

7  Q.  Oh, okay.

8       And your testimony is that he said that to

9  you on more than one occasion?

10  A.  That is correct.

11  Q.  Was anyone else present with you when Mr. Canning

12  said that on any of these -- the occasions that you recall?

13  A.  No, ma'am.

14  Q.  And was that statement a reference to the welders?

15  A.  Yes.

16  Q.  And did I understand you correctly that you did

17  not directly report to Merlin Figueira or David Smith that

18  Andrew Canning had made a statement to the affect of, We

19  need to get better personnel than these Hispanics?

20  A.  No.  Never reported it.

21  Q.  At some point, you testified that Andrew Canning

22  made a statement to the effect of some work of Petro was not

23  up to code.

24       Do you recall that testimony?

25  A.  Andrew Canning, yes.

140

1  Q.  And did that occur on one occasion, or more than

2  one occasion?

3  A.  More than one occasion.

4  Q.  How many?

5  A.  Ma'am, I can't say.  It's more than one.  Two,

6  three.  I really can't say.

7  Q.  Were those occasions in one-on-one conversations

8  between you and Mr. Canning?

9  A.  Yes.

10  Q.  So no one else was present?

11  A.  No.

12       Ma'am, in meetings, also, he would say these

13  things are not up to code.  And when asked of Andrew Canning

14  what code, he would not have known what code.

15       And then the general manager, Merlin or David

16  Smith, at the time, would ask, Can you tell me what code

17  he's talking about?

18  Q.  Would ask you --

19  A.  Yes.

20  Q.  -- is that correct?

21  A.  Myself or Adrian Melendez, whoever is on site,

22  yes.

23  Q.  And at that point, would you or Mr. Melendez

24  respond?

25  A.  We would not respond.  We'll go get him the code.

CHETRAM PERSUAD -- CROSS

1   Bring it to him.  Here it is.  And he'll go -- he will take

2   that back to Andrew Canning.

3       Q.   And I believe you said -- you testified something

4   to the effect of Merlin would look up the code and determine

5   that Mr. Canning was wrong.

6            Did I understand you correctly?

7       A.   Ma'am, just like we have a QC, IPOS, Vitol, they

8   have a QC department in Holland.  They would send these

9   codes out to them, and the QC department will come back and

10  say, Hey, this is correct what these guys presented to us.

11           But Andrew, on the other hand, would not have

12  to present anything at all.  All he would say, this is not

13  to code.  This is not to spec without any proof.

14      Q.   But then someone would check that, correct?

15      A.   That is correct.

16           Like I said, we would give the information to

17  IPOS, David Smith or Merlin, and he would send it off to

18  Holland.

19      Q.   So at that point, you understood that IPOS wasn't

20  just taking Mr. Canning's word for it, but was doing some

21  further due diligence?

22      MS. ROHN:   Objection to the form of the

23  question.  Calls for speculation.

24      Q.   (Ms. Francis)  Mr. Persuad, based upon your

25  testimony, was it your understanding that Mr. Smith or

CHETRAM PERSUAD -- CROSS

1   Mr. Figueira were doing some due diligence to investigate or

2   try to confirm the accuracy or inaccuracy of Mr. Canning's

3   statements?

4       A.   Yes.

5       Q.   You testified at some point that you had some,

6   what you called, off-the-record discussions with Mr.

7   Figueira about Mr. Canning?

8       A.   Yes, ma'am.

9       Q.   And did you say that you had more than one such

10  meeting?

11      A.   One meeting, ma'am.

12      Q.   Okay.  I'm sorry.  I had misunderstood you.  Thank

13  you.

14           And when was that?

15      A.   I cannot recall.

16      Q.   To the best of your knowledge and recollection, as

17  you sit here today, what -- well, first of all, was that an

18  in-person meeting, a phone meeting, or what was the format?

19      A.   In-person meeting.

20      Q.   St. Thomas or St. Croix?

21      A.   St. Croix.

22      Q.   Where, in St. Croix?

23      A.   At IPOS.

24      Q.   And was anyone else present?

25      A.   No, ma'am.

CHETRAM PERSUAD -- CROSS

1       Q.   To the best of your recollection, what did you

2   discuss or say to Mr. Figueira?

3       A.   Prior, we had these three meetings with everybody

4   from IPOS.  David Smith and Merlin.  Nothing came about it.

5   I had enough of it, and approached Merlin directly, Hey,

6   something had to give here, 'cause every time this guy say

7   nothing is wrong with us, we're the greatest people around,

8   and after the meeting, he tells a whole different side.  And

9   I got tired of it and said, Merlin, something has to be

10  done.  And he listened to me.  I don't know if he did

11  anything about it or not.  I really can't say.

12      Q.   And the comment that you were complaining about to

13  Mr. Figueira was Mr. Canning saying that your folks were the

14  greatest guys in the group meeting, but saying something

15  else either before or after those meetings?

16      A.   Well, all the meeting came about because Andrew

17  Canning was, like I said, have this derogative stuff about

18  Petro Industrial and their employees.

19           At the meeting, everything was great.  After

20  the meeting, two days later, he's back to his old ways.

21      Q.   And what I'm trying to understand is what is it

22  that you -- when you said something -- yeah, I'm just trying

23  to understand.  what is it that you said or recall saying to

24  Mr. Figueira in a meeting that occurred after these three

25  meetings that you described?

CHETRAM PERSUAD -- CROSS

1       A.   I said, Andrew Canning is picking on Petro and its

2   employees.  He's harassing us unnecessarily.  And this

3   cannot continue, because it's making the work environment

4   very intolerable.

5       Q.   Do you recall saying anything else?

6       A.   No, ma'am.

7       Q.   Did you refer to Mr. Canning in that discussion as

8   racist?

9       A.   Yes.

10      Q.   And what specific -- what, specifically, did you

11  say about Mr. Canning that characterized him as racist?

12      A.   Pretty much, I said to him, was our work is to

13  par.  Our employees are to par, and he's never satisfied.

14  He's always picking and calling names to our employees,

15  which is making for a hostile environment in the workplace.

16      Q.   Did you say anything else?

17      A.   No, ma'am.

18           (Respite.)

19      Q.   Did you, at any point, review any of the Versa

20  reports about the welding, such as the one that Attorney

21  Beckstedt showed you earlier?

22      A.   No, ma'am.

23      Q.   And when is the first occasion that you had any

24  interactions with Mr. Castro?

25      A.   Ma'am, can't recollect a Mr. Castro.

145

Q. So I believe you testified something to the effect of regarding Mr. Castro's reputation in the industry?

A. Ma'am, is that Guillermo Castro?

Q. Correct.

A. I'm sorry. I don't know his last name. I know him as Guillermo. Sorry.

Q. I believe his last name is Castro.

A. I'm sorry. I don't know his last name. I know him as Guillermo.

Would you please repeat the question?

Q. Sure.

Do you recall making some statements during your deposition testimony earlier about Mr. Guillermo's reputation in the industry?

A. Yes, ma'am.

Q. Okay. And what is the basis for the statements that you made?

A. Ma'am, he's -- like I said, being his reputation, he has pretty much invented the phase array/shear wave method.

Q. He invented what?

A. A form of inspection. And he's pretty much worked for every inspection company in North America, Europe, South America, and his word is pretty much trusted as an inspector.

146

Q. And what form of inspection did Mr. Guillermo Castro invent?

A. It's called a shear wave.

MS. FRANCIS: Susan, did you get that?

THE COURT REPORTER: Shear wave.

Q. (Ms. Francis) And when did he invent that?

A. Ma'am, I'm not sure. I don't know.

Q. And how do you know he invented that?

A. Acuren. He worked for one of the major companies in North America, Acuren. And when he invented it, it was published in the industry journals.

Q. And did someone from Acuren give you that information, sir?

A. No, ma'am. When he came to Limetree Bay, someone said he's the guy who invented it. And at the time, with HOVENSA, they usually have all these industrial journals that they share with their employees, and he was in one of these.

Q. Other than Acuren, are you familiar with any other company that Mr. Guillermo Castro has worked with?

A. Versa.

Q. And when do you believe he worked for Versa?

A. Pardon me?

Q. When do you believe he worked for Versa?

A. I don't know, ma'am.

147

Q. Do you know of any other company he's worked with?

A. No.

Q. Do you know how he was employed in 2021?

A. No.

Q. And as I understand it, you didn't have any direct communications with him concerning certification of any Petro welders, correct?

A. That is correct.

Q. And when's the most recent occasion you had any communications with him?

A. I can't recollect, but the gentleman passed away now, John Carter, that was quite -- 10 years ago, maybe.

Q. I'm sorry. Ten years ago is the last time you had a communication with Mr. Castro?

A. Roughly. I think so.

Q. Do you have any knowledge of his present whereabouts?

A. No.

(Respite.)

Q. With respect to your testimony about the gate logs at the facility, did I understand you to say that in St. Thomas, the security guard would ask the individual entering whether that's a Petro employee or someone else, and signed the log, correct?

A. Yes, ma'am.

148

Q. Okay. And then did you say the security would write in the time that person entered and left, or does the actual visitor to the facility write that in?

A. In St. Thomas, the individual would write that in.

Q. Okay. They would write their name and their time they were entering or leaving?

A. Yes, ma'am.

Q. And in St. Croix, I believe you testified that the security guard would make all of those entries, name and time of entry or departure?

A. Yes, ma'am. It's a smaller facility here in St. Croix, compared to St. Thomas.

Q. Do you have any knowledge of Mr. Canning ever making any recommendations, or recommending Petro for any projects or jobs?

A. Yes, ma'am.

Q. And what's your knowledge in that regard?

A. The Aggreko project on St. Croix.

Q. When was that?

A. Sorry, ma'am. Can't -- can't recollect the date.

(Respite.)

Q. With respect to the welders, was there -- that were used in 2021, was there a lead welder, or someone who is directing the other welders?

A. Yes, ma'am. There was a supervisor on the job.

149

1    Q.   And who was that?

2    A.   At first, it was Elias Rivera, and they were

3    removed from the site as a recommendation of Andrew Canning,

4    and Ricardo took his spot.

5    Q.   And what's Ricardo's last name?

6    A.   I can't -- at this time, I can't remember.

7    Q.   So was Ricardo a welder?

8    A.   No, ma'am.  He was the lead person and a pipe

9    fitter.

10   Q.   Oh.  Was he a resident of Puerto Rico or a

11   resident of the Virgin Islands?

12   A.   Puerto Rico.

13   Q.   And was Mr. Rivera a resident of Puerto Rico or

14   the Virgin Islands?

15   A.   Puerto Rico.

16   Q.   Do you know if any of the welders were bilingual?

17   A.   Yes, ma'am.

18   Q.   And what is your knowledge in that regard?

19   A.   Ma'am, I don't speak Spanish, and I communicate

20   clearly with everyone on site.

21   Q.   You had no negotiations with any contracts between

22   IPOS and Petro, correct?

23   A.   That's correct.

24   Q.   And what was the purpose of your trip to Houston

25   that you testified about?

150

1    A.   Ma'am, I went on a weekend getaway, and while we

2    were there, we had a call from Merlin.  If you guys are in

3    town, stop by the head office and say hello to these people.

4    Q.   So Mr. Figueira suggested that you meet with

5    Mr. Horwitz, and the other individual that you testified

6    about?

7         MS. ROHN:  That's what he just said.

8    Q.   (Ms. Francis) Is that correct?

9    A.   That's correct.

10   Q.   You testified that from time to time, you don't --

11   either don't receive a paycheck, or it's delayed, due to

12   Petro receivables.

13        As you sit here today, are you up to date on

14   all paychecks, or are any of them delayed?

15   A.   Yes, ma'am.  I'm up to date on everything.

16   Q.   And are you currently managing or acting as a

17   Petro representative for any Petro projects?

18   A.   Yes, ma'am.

19   Q.   Okay.  And what projects are those?

20   A.   We're presently at Cruzan Rum -- Diageo with a

21   shutdown.  Diageo, they have a few projects beside the

22   shutdown to improve their production.

23        We're presently involved at Cruzan Rum,

24   upgrading some of their systems.

25   Q.   Any others?

151

1    A.   Not at the moment I can remember.

2    Q.   And when did you start the Cruzan Rum work?

3    A.   Right now, it's basically trying to put numbers

4    together, and it's been going for over a year right now

5    until Cruzan Rum make a decision when to pull the trigger

6    and do the job.

7    Q.   Okay.  So there's no actual work being done at

8    Cruzan?

9    A.   Not at the moment.

10   Q.   Has Petro performed work at Cruzan Rum in the

11   past?

12   A.   Ma'am, we perform work at Cruzan Rum regular

13   throughout the year.  And as they approve our budgets or

14   approve our jobs, we will continue.

15   Q.   And there's work currently being performed at

16   Diageo?

17   A.   Yes.

18   Q.   Okay.  And when did that begin?

19   A.   It's been ongoing for probably four weeks.

20   Q.   Prior to four weeks ago, had Petro done any work

21   at Diageo?

22   A.   Yes, ma'am.  Ongoing.  They have a shutdown, and

23   they have their maintenance.  We're presently on their

24   shutdown work right now.  Throughout the year, we have a

25   presence at Diageo doing their maintenance.

152

1    Q.   And when did Petro start doing maintenance work

2    for Diageo?

3    A.   I would say about three years ago.

4    Q.   Did you have any work in -- any involvement,

5    rather, in any work that Petro did directly for WAPA?

6    A.   Yes, ma'am.

7    Q.   Okay.  Tell me what involvement you had, and

8    during what period.

9    A.   The job was a diesel line in St. Thomas from the

10   port to storage.  It had sprung several leaks.  Went in and

11   did the repairs for them.

12   Q.   When was that?

13   A.   Not sure, ma'am.

14   Q.   Okay.  Was it within the past three years?

15   A.   Yes.

16   Q.   Are there any other projects or work sites that

17   you have worked on for Petro between the start of the

18   pandemic and the present?

19   A.   Yes, ma'am.  Waste Management on St. Croix.  Waste

20   Management on St. Thomas.  Worked on the gas turbine system

21   for Frenchman's Reef.

22   Q.   When did the Frenchman's Reef occur?

23   A.   Earlier on this year.

24   Q.   It's concluded?

25   A.   Pardon me?

153

1    Q.   Is it concluded?

2    A.   Yes.

3    Q.   And what -- do you know what entity Petro was

4  working for?

5    A.   Polaris, at the time.

6    Q.   Say that again?

7    A.   Polaris.

8    Q.   Any additional work scheduled for -- to be

9  performed with Polaris?

10    A.   Yes, ma'am.

11    Q.   What additional work do you expect to be involved

12  in?

13    A.   Sugar Bay Resort.  Frenchman Cove.  The new hotel

14  they plan to build in Havensight.

15    Q.   And does Petro actually have contracts for any of

16  that work?

17    A.   Ma'am, it's all tentative.  They have to go

18  through and get their budget, and then they'll let us know

19  when.

20    Q.   When did Petro start performing work for Waste

21  Management in St. Thomas?

22         MS. ROHN:  Okay.  This is not -- this client

23  is not testifying for Petro.

24         MS. FRANCIS:  I understand.

25         MS. ROHN:  So I don't know why you keep

Susan C. Nissman, RPR-RMR
(340) 773-8161

154

1  asking when did Petro do something.

2         MS. FRANCIS:  Fair enough.

3    Q.   (Ms. Francis) Mr. Melendez -- I mean, Mr. Persuad,

4  I am only asking you about your personal knowledge.  I'm not

5  asking you about anything you don't have knowledge about.

6         To the best of your personal knowledge, when

7  were you first involved in work that was being performed by

8  Petro for Waste Management in St. Thomas?

9    A.   Earlier part of this year, we started putting a

10  proposal together.

11    Q.   And what was the nature of the work?

12    A.   Sandblasting.  Painting.  Repairing of motors.

13  Replacing of motors and fans.  Mechanical work.

14    Q.   And has there been actual work done for Waste

15  Management that you are aware of, or just a proposal that

16  you are aware of?

17    A.   The one in St. Thomas, proposal; the one in

18  St. Croix, we actually have been doing several jobs for

19  them.

20    Q.   Okay.  And to the best of your knowledge, when

21  did -- when were you first involved in Petro work for Waste

22  Management in St. Croix?

23    A.   Early part of this year again.

24    Q.   Is that work for Waste Management on St. Croix

25  continuing, or has it concluded?

Susan C. Nissman, RPR-RMR
(340) 773-8161

155

1    A.   We concluded a few.  We got a few proposal.  And

2  like I said, everything is based upon budget.

3    Q.   After you had a conversation with Merlin about

4  Mr. Canning that you testified about before, did you have

5  any further direct interactions with Mr. Canning after that

6  point?

7    A.   Yes.

8              (Respite.)

9    Q.   And what specific direct interactions did you

10  recall with Mr. Canning after the conversation with

11  Mr. Figueira that you testified about?

12    A.   Ma'am, Mr. Canning represented Vitol on site, so

13  whatever work had to be done, it had to come from

14  Mr. Canning.

15    Q.   And am I correct in understanding that the change

16  you testified about was that at some point, Mr. Canning

17  would just communicate with you, as opposed to communicating

18  directly with Petro employees; is that correct?

19    A.   Yes.

20         MS. FRANCIS:  I have no further questions.  I

21  will yield to counsel for Mr. Canning.

22         MR. SIMPSON:  Thank you.  Do you guys want to

23  take a break before we continue?

24         MS. FRANCIS:  Sure.

25         MS. ROHN:  Yes, please.

Susan C. Nissman, RPR-RMR
(340) 773-8161

156

1         MR. SIMPSON:  Okay.  Five minutes?

2         MS. ROHN:  Sounds good.

3              (Short recess taken.)

4              CROSS-EXAMINATION

5  BY MR. SIMPSON:

6    Q.   Mr. Persuad, my name is Andy Simpson.  I represent

7  Andrew Canning in this matter.  I've got a few follow-up

8  questions.  I will try not to repeat myself with questions

9  that have already been asked, but it's hard to hear you,

10  especially in the beginning, so there may be some

11  repetition.  I apologize.

12         You told Attorney Beckstedt that Mr. Canning

13  referred to the Petro employees as islanders or locals; is

14  that correct?

15    A.   Yes.

16    Q.   And I think you also said that at one point, he

17  referred to someone as being Hispanic?

18    A.   Yes.

19    Q.   Are there any other racial or discriminatory

20  comments that you believe Mr. Canning made, other than those

21  three you told us about?

22    A.   Not -- not to my knowledge.

23    Q.   To your knowledge, did anyone, other than

24  yourself, ever hear Mr. Canning make such comments?

25    A.   Yes.

Susan C. Nissman, RPR-RMR
(340) 773-8161

1      Q.    Who else heard him say that?

2      A.    Calvin Schmidt.

3      Q.    I'm sorry.  Who?

4      A.    Calvin Schmidt.

5      Q.    And were you present when he made the comment to

6  Mr. Schmidt?

7      A.    Yes.

8      Q.    And that first name was Alvin?

9      A.    Calvin.

10      Q.    Calvin.  Sorry.

11            And what -- was Mr. Canning speaking to you

12  or Mr. Schmidt or both when he made the comment that you are

13  referring to now?

14      A.    He made the comments to Mr. Schmidt.

15      Q.    And what, specifically, did he say to Mr. Schmidt?

16      A.    Mr. Schmidt relayed to me that Mr. Canning has

17  made derogatory remarks toward our employees.  And these

18  Hispanics that we have working here, they're not qualified.

19      Q.    Were you present when Mr. Canning made this

20  comment to Mr. Schmidt?

21      A.    No.

22      Q.    So this is, what you're telling me now, is based

23  upon a report Mr. Schmidt gave to you?

24      A.    Verbally, yes.

25      Q.    Okay.  And did Mr. Schmidt ever put anything in

1  writing about that comment?

2      A.    No.

3      Q.    Did you ever put anything in writing about that

4  comment?

5      A.    No.

6      Q.    Other than the -- did Mr. Schmidt ever report to

7  you any other such comments coming from Mr. Canning?

8      A.    Mr. Schmidt reported another time that our work

9  ethics, according to Andrew Canning, and our employees, it's

10  not to par.  And complained about our boilermakers being

11  lazy islanders.

12      Q.    And, again, this was a comment that was made to

13  you by Mr. Schmidt, but you were not there when

14  Mr. Canning say that to Mr. Schmidt, correct?

15      A.    That's correct.

16      Q.    Are you aware of anyone else who claims that

17  Mr. Canning made a racial or discriminatory remark to them

18  or about any Petro Industrial employees?

19      A.    No.

20      Q.    Did you ever record any of the comments you heard

21  Mr. Canning make?

22      A.    No.

23      Q.    Did you ever record anything that Mr. Canning

24  said?

25      A.    No.

1      Q.    Do you know of anyone who recorded anything that

2  Mr. Canning ever said?

3      A.    No.

4      Q.    And is it my under -- is my understanding correct,

5  that other than a complaint you made to Merlin, you never

6  complained to anybody about alleged racial or discriminatory

7  comments by Mr. Canning?

8            MS. ROHN:  Objection.  Does not conform with

9  his prior testimony.

10      Q.    (Mr. Simpson) You may answer.

11      A.    Repeat the question, please.

12      Q.    Sure.  Well, let me rephrase it.

13            I believe you told us earlier that you

14  complained following one of the three meetings to Mr. Merlin

15  Figueira about racial or discriminatory comments made by

16  Mr. Canning.

17            Did I understand that correctly?

18      A.    Yes.

19      Q.    Okay.  Did you ever complain, other than that

20  particular instance, to anyone, about Mr. Canning making

21  racial or discriminatory comments?

22      A.    No.

23      Q.    And in that meeting with -- or conversation with

24  Mr. Figueira, what specifically did you say to him about

25  Mr. Canning saying something that was racial or

1  discriminatory?

2      A.    According to what I said to Mr. Merlin was, Andrew

3  Canning repeatedly discriminating against us as calling us

4  islanders, locals, and apart from that, our work ethics that

5  he complained about.

6            As far as Merlin see it, our work ethic was

7  fine.  That's according to Merlin.  But Andrew Canning had

8  issue with that, and had an issue with the employees at the

9  site.

10      Q.    I'm sorry.  I had trouble understanding all of

11  your answer.

12            Did you say that Merlin agreed that there was

13  a problem with Mr. Canning?

14      A.    Yes.

15      Q.    Did he specifically agree that there was a problem

16  related to race or discrimination?

17      A.    Sir, I don't know what Merlin was relating to, but

18  he clearly stated Andrew Canning had a issue with Petro

19  Industrial and their employees.

20      Q.    On those three meetings you told us about, how

21  would those meetings be scheduled?

22      A.    I think by e-mail form from the IPOS -- IPOS

23  general manager at the time, whoever it may be.

24      Q.    And what specifically was the topic or topics for

25  these meetings?

1     **A.**   The performance of Petro Industrial and their
2 employees.
3     **Q.**   But there would be something -- there would be
4 something either on the subject line of the e-mail or the
5 body of the e-mail that let you know that that was going to
6 be discussed at the meeting?
7         **MS. ROHN:**   Objection to form. Not a
8 question.
9     **Q.**   **(Mr. Simpson)** Is that correct?
10     **A.**   Can you repeat the question, please?
11     **Q.**   Sure.
12         So am I correct that either the subject of
13 those e-mails or the body of the e-mails informed you that
14 the meeting, one of those three meetings, were going to
15 be about Petro Industrial's performance?
16     **A.**   Yes. We would have asked the general manager for
17 this meeting, 'cause Andrew Canning was just getting out of
18 control on several occasion.
19     **Q.**   So you said the e-mail scheduling the meeting came
20 from IPOS, but it was someone from Petro that actually
21 requested the meeting?
22     **A.**   That's correct.
23     **Q.**   And who, specifically, from Petro requested the
24 meeting?
25     **A.**   It would have been Adrian or myself, verbally.

1     **Q.**   So none of these requests to IPOS would have been
2 in an e-mail?
3     **A.**   Not to my knowledge.
4     **Q.**   Where did these meetings occur?
5     **A.**   At IPOS site.
6     **Q.**   St. Thomas or St. Croix?
7     **A.**   St. Croix.
8     **Q.**   So all three meetings were on St. Croix?
9     **A.**   Yes.
10     **Q.**   Did you ever complain to Mr. Canning that you
11 thought he was acting in a racist or discriminatory manner?
12     **A.**   I told Mr. Canning he run this place like a
13 plantation, and we're no longer in the slavery days.
14     **Q.**   When did you tell him that?
15     **A.**   I told him that on two occasions. I'm terrible
16 with dates. I cannot remember.
17     **Q.**   So you said you told him two different times?
18     **A.**   Yes.
19     **Q.**   Do you remember for either time what kind of work
20 Petro was doing at the time?
21     **A.**   For maintenance, he would follow our employees
22 around while they were working. Birddogging them. Standing
23 over them directly on a mediocre task. Someone picking up
24 trash. Someone cleaning out a gutter.
25     **Q.**   And you told him that that was similar to working

1 on a plantation?
2     **A.**   Yes, because if the guys leave to go get a garbage
3 bag, for example, he wants to know, where did they go, how
4 long did they take, and they are walking into the control
5 room to their job site, which is no more than 4-5 minutes,
6 and he's asking these questions. I haven't seen you for
7 half a day. Where have you been? Is the work being
8 completed? And he's on site. He's making his rounds,
9 walking around, every two hours.
10     **Q.**   Okay. And what's wrong with that?
11     **A.**   There's nothing wrong with that, sir. It's just
12 that the harassment of our employees, and asking them a
13 simple task as cleaning a drain, do you know what you're
14 doing? Are you qualified to clean a drain?
15     **Q.**   What did you understand Mr. Canning's role was
16 with respect to the propane projects out there?
17     **A.**   As far as I could recollect, Andrew Canning said
18 he's the representative for IPOS. For -- I'm sorry. Not
19 for IPOS. For Vitol.
20     **Q.**   So is this just a case of you not liking
21 Mr. Canning's management style?
22     **A.**   It's not about liking manage. I've worked with
23 several different people, besides Andrew Canning. But
24 Mr. Canning went above and beyond to make the work
25 environment hostile.

1     **Q.**   Were you aware that Mr. Canning recommended Petro
2 to IPOS?
3         **MS. ROHN:**   Objection to the form. Assumes
4 facts not in evidence. You can answer.
5     **A.**   Can you repeat that, please?
6     **Q.**   **(Mr. Simpson)** Sure.
7         Were you aware that Mr. Canning recommended
8 to IPOS that it replace Vivot with Petro?
9     **A.**   Not to my knowledge.
10     **Q.**   Is the term "islander" or "local" or "Hispanic"
11 the worst thing you ever heard Mr. Canning say, from a
12 racial or discriminatory perspective?
13     **A.**   That sums it up.
14     **Q.**   So your answer is yes?
15     **A.**   Yes.
16     **Q.**   Have you spoken with Mr. Canning at any time since
17 the termination of the Petro Industrial contract with IPOS?
18     **A.**   Yes. I bought him two beers: One for myself, and
19 one for Adrian.
20     **Q.**   One from you and one from Adrian?
21     **A.**   I said, one from me, and I told him this other one
22 is from Adrian.
23     **Q.**   Okay. When did you do that?
24     **A.**   I was at the Palms about, I don't know, six
25 months. Six to eight months. Can't really recollect. Was

165

CHETRAM PERSUAD -- CROSS

1 the last time I saw him.

2 Q. Did you have any other discussion with him, other

3 than that?

4 A. No. He was with someone there, and, you know,

5 just being the person that I am.

6 Q. So because he was with someone else, you did not

7 have further conversation?

8 A. No. He either had a meeting or he had a

9 discussion going on, so I did not want to interrupt him.

10 Q. Okay. You mentioned that Mr. Canning recommended

11 that Mr. Rivera be removed from the site.

12        Do you know why that recommendation was made?

13 A. Pardon me? I did not hear that. Please repeat

14 that.

15 Q. Sure.

16        You told us that Mr. Canning recommended that

17 Mr. Rivera be removed from the site?

18 A. Yes.

19 Q. Okay. Do you know why he recommended -- he made

20 that recommendation?

21 A. Yes.

22 Q. Why did he make that recommendation?

23 A. To the best of my knowledge, Mr. Rivera correct

24 Andrew Canning on several occasion. And every time he

25 corrected him, he will have gotten upset with Mr. Rivera.

166

CHETRAM PERSUAD -- CROSS

1 And all you had to do, do what I ask. It's not the correct

2 thing to do, and he would not have done it.

3 Q. What did Mr. Canning correct Mr. Rivera about?

4 A. Mr. Canning recommend to Mr. Rivera, for example,

5 if a pipe was bent. Turn the pipe around and bolt it up.

6 It will straighten it up. It's a 6-inch pipe. No bolt can

7 straighten up no 6-inch pipe. So Mr. Rivera would say, You

8 know, that's impossible. I am not doing that task.

9        Mr. Rivera, again, on several occasion, when

10 it comes to -- on the welding side of things, Andrew Canning

11 wanted him to do certain things, which did not make any

12 sense, according to Mr. Rivera. And said, you know, hey, we

13 have a plan. We're proceeding with our plan. Please don't

14 stop us. Mr. Canning would reinforce, I am the Vitol

15 representative. And if you can't do what I want, I'll

16 escort you off site.

17 Q. What, specifically, was Mr. Canning recommending

18 be done with regard to welding?

19 A. Again, with these RIO panels. We're supposed to

20 drill into the side of this huge mound, hitting some heavy

21 material that we use diamond tips to cut into them, and we

22 was still having a problem. Immediately we went to

23 Mr. Canning and report this. Mr. Canning said, That is not

24 true. There's nothing there. You guys are being lazy. You

25 guys should be replaced immediately.

167

CHETRAM PERSUAD -- CROSS

1        We brung Mr. Canning out, and David Nagle.

2 Took a flashlight. Showed it to him what was the problem,

3 and he continue saying, These guys are lazy. worthless.

4 Q. What happened to the completion of that job?

5 A. The guys did not listen to Mr. Canning and

6 performed the task according to how they know, and they got

7 through with it.

8 Q. The same people finished this task?

9 A. The same people finished the task. Like I said,

10 this is more than one occasion Andrew Canning had it out for

11 Mr. Rivera.

12 Q. Have you ever heard the expression, If it's not

13 written, it didn't happen?

14 A. No.

15 Q. You indicated that Mr. Canning said that you and

16 Mr. Melendez were worthless for running a company.

17        Do you recall that testimony?

18 A. Yes.

19 Q. Did you actually hear him say that?

20 A. To our faces.

21 Q. Who else was present?

22 A. It was in the evening on the Aggreko job, and

23 that's what he said to us. At the same time, he said we

24 were robbing the company, and he will report us to the

25 highest authority.

168

CHETRAM PERSUAD -- CROSS

1 Q. So that was not in a face-to-face meeting, that

2 was in an e-mail?

3 A. No, it was face to face. He told us to our face.

4 Q. Okay. I'm sorry. I thought you said it was in an

5 e-mail. That's why I was confused.

6 A. No, I did not.

7 Q. When -- when did that occur?

8 A. I cannot give you a date, but it was during the

9 Aggreko project, and it was about 8 o'clock, 9 o'clock in

10 the evening.

11 Q. And other than you and Mr. Melendez, was anyone

12 else present?

13 A. No.

14        MR. SIMPSON: I have no further questions.

15 Thank you very much.

16        MS. ROHN: Can we have a short break, and I

17 can talk to my client?

18        (Short recess taken.)

19        CROSS-EXAMINATION

20 BY MS. ROHN:

21 Q. Thank you.

22        Mr. Persuad? Persuad is the correct way to

23 pronounce it?

24 A. That's correct.

25 Q. Persuad.

169

CHETRAM PERSUAD -- CROSS

1        Mr. Persuad, did you ever hear Mr. Canning
2  advocating that IPOS or Vitol should be hiring stateside
3  companies instead of these local companies?
4     A.  Yes.
5     Q.  And how often would he do that?
6     A.  As far as every job that we did perfectly correct
7  and came in on budget.  As much time as we did, 5-6 times.
8     Q.  Okay.  So frequently?
9     A.  Frequently.
10    Q.  And who would he say these things to?
11    A.  He would say directly to us.  He would recommend
12  it to -- on several occasion to David Smith, Merlin.  The
13  higher-ups at Vitol.
14    Q.  And did you ever hear him say why he thought they
15  should be hiring stateside companies instead of your local
16  Virgin Islands company?
17         MR. SIMPSON:  Objection.
18    Q.  (Ms. Rohn) You can answer.
19    A.  'Cause he said we do not -- Petro do not know what
20  they're doing.  They don't have qualified people.
21    Q.  Now, there came a time, am I correct, that Traeger
22  Brothers met directly with you guys and IPOS?
23    A.  Yes.
24    Q.  Were you at that meeting?
25    A.  Yes.

---

170

CHETRAM PERSUAD -- CROSS

1     Q.  Okay.  And did they make any statements about
2  Mr. Canning and his inability to properly control the jobs?
3     A.  Yes.
4     Q.  And what --
5         MR. SIMPSON:  Objection.
6    Q.  (Ms. Rohn) And what did they say in that regard?
7    A.  Mr. Canning is stalling every job that he has.  He
8  does not want to move forward.  And in turn, we were
9  supposed to be helping.  And sometimes the blame he was
10  trying to put on us for not proceeding.
11    Q.  Okay.  And did Mr. -- did the Traeger Brothers at
12  that meeting -- who was the person at that meeting?  Do you
13  recall the name?
14    A.  Dave Tillman.  The guy from KITZ valve.  I can't
15  remember his name.  The company name.  The guy name.  But
16  he's directly from the company that was trying to source
17  these valve for three years.  Etienne, was another
18  representative.  Etienne for Traeger Brothers.  Merlin,
19  Coury Hodge, Rawle Granger, and myself.
20    Q.  And the person who was saying this, what was the
21  name of the person who was saying this?
22    A.  That the valves were available?
23    A.  No.  That Canning was stalling the jobs?
24    A.  It was presented to Merlin.
25    Q.  But who said that?

---

171

CHETRAM PERSUAD -- CROSS

1     A.  Merlin.
2     Q.  No.  Who told Merlin that?
3     A.  Oh, the representative.  Traeger Brother.
4     Q.  And who was the person from Traeger Brothers?
5     A.  Dave Tillman.
6     Q.  Dave Tillman.  Okay.
7         And did Mr. Tillman, at that time, say he was
8  doing to have that conversation with Mr. Canning about that?
9    A.  Yes.
10    Q.  What did he say about going to tell Mr. Canning
11  about what his position was?
12    A.  The valves were readily available.  All he had to
13  do is make a decision, and the valves would be here.
14    Q.  Okay.  And after that meeting where you guys met
15  with Traeger Brothers without Mr. Canning, what was -- what
16  was the reaction that Mr. Canning had towards your company?
17    A.  I would say --
18         MR. SIMPSON:  Objection.
19    A.  -- the straw that broke the camel's back.  He was
20  very malicious and spiteful then.
21    Q.  (Ms. Rohn) And what kinds of things did he do to
22  be malicious and spiteful?
23    A.  He started like going out more in the jobs.
24  Finding nitpicking on little small details on our work
25  ethics.  Our proposals.  As far as the timing, you know,

---

172

CHETRAM PERSUAD -- CROSS

1  everything was just back and forth with him.
2    Q.  And was it after this meeting with the Traeger
3  Brothers that all of a sudden you were asked for
4  qualifications of your welders?
5    A.  That is correct.
6    Q.  And do you know where that request for
7  qualifications from your welders actually came from?
8    A.  No.
9    Q.  And as to Mr. Canning's negative context --
10  comments about you and your crew and the company, did that
11  increase or decrease after the Traeger Brother meeting?
12    A.  It increased.
13         MR. SIMPSON:  Objection.
14    Q.  (Ms. Rohn) And how would you describe the
15  increase?
16    A.  He was frequently more on the job.  Frequently
17  nitpicking, like I said.  And pretty much he went after our
18  welders and Elias, as far as on this one job, remove him
19  from site.
20         MS. ROHN:  I have no further questions.
21         MR. BECKSTEDT:  I've got follow-up to that
22  questioning.
23
24
25

173

REDIRECT EXAMINATION

BY MR. BECKSTEDT:

Q.   You said that you -- did you personally hear, with your own ears, Andrew Canning advocating to hire stateside people?

A.   To our faces, yes.

Q.   Okay.  And you said that occurred five or six times, right?

A.   That is correct.

Q.   And then you said that Andrew Canning recommended it to the higher-ups, to Vitol, right?

A.   Yes.

Q.   And by "it," you mean --

A.   David Smith.

Q.   Well, wait a second.  Okay.  Well --

MS. ROHN:  Let him ask the question.

A.   Gotcha.

MS. ROHN:  I haven't kicked you once today.

Q.   (Mr. Beckstedt)  You said that Andrew Canning recommended it to higher-ups.  To Vitol.

When you say, "recommended it to higher-ups," are you talking about hiring stateside companies?

A.   Recommending hiring stateside companies, yes.

Q.   All right.  And you said to the higher-ups to Vitol.

---

174

A.   David Smith.

Q.   David Smith.

Q.   All right.  And that's the only higher-up to Vitol that -- that you're -- that he recommended it to?

A.   To my knowledge.

Q.   All right.  And what informs your knowledge that Andrew Canning made that recommendation or statement to David Smith?

A.   He prove it to us.  We're supposed to do a job, small job, take three weeks.  Took the job away from us, and it took a year before the piping came back.

Q.   Okay.  First of all, I want to understand that. I'm going to break it down.

Did you actually hear or observe David Canning make the recommendation to David Smith?

A.   Yes.

Q.   So he did it in your presence?

A.   Yes.

Q.   Okay.  Explain that.

A.   We were in one of these meetings with IPOS, a weekly meeting about jobs moving forward.  We gave our proposal, and he recommended he wants to give it to somebody in the States, do the job, versus us being here.

Q.   Okay.  And what was the job that was at issue at that time?

---

175

A.   What?

Q.   What is the job he was recommending that they hire a stateside company?

A.   Replacing some 1-inch piping.

Q.   Okay.  Is that the only time you heard Andrew Canning recommend to David Smith that they hire a stateside firm?

A.   No.  He made it, that statement, several times. And I think after this first time that he tried it, and it took a year instead of weeks.  In my opinion, it fell on deaf ears.

Q.   What fell on deaf ear?

A.   The recommendation to get another company from the stateside.

Q.   So then they ultimately did use Petro?

A.   Yes.

Q.   Okay.  All right.  And so Andrew Canning told -- said in meetings that you were present at that he was advocating to hire stateside companies.  And you heard him say that, right?

A.   Yes.

Q.   And you also heard him say that directly to David Smith, right?

A.   Yes.

Q.   Okay.  But you never were present or know of any

---

176

time that Andrew Canning advanced that recommendation up to any actual Vitol employees?

A.   Not to my knowledge.

Q.   Okay.  All right.  And with the exception of, I guess, the one job for replacing 1-inch piping, those recommendations by Andrew Canning fell on deaf ears?

A.   Yes.

Q.   Okay.  But am I correct in understanding that there was one job for replacing 1-inch piping, where they did actually use a stateside company?

A.   Yeah.

Q.   And it just took a long time?

A.   Took over a year.

Q.   Got it.  Okay.

Do you know the name of that company?

A.   No.

Q.   Okay.  And do you know about the time frame of when that occurred?

A.   I know it was in the pump.  I know the job.  I can't tell you.  I'm sorry.

Q.   And what about the job can you tell me that would help me to find out which job it was?

A.   Replacing the 1-inch piping in the pump alley.

Q.   In the pump alley.

Is there more than one pump alley?

177

1    A.   There's one in St. Thomas; one is here, St. Croix.

2    Q.   It was the St. Croix pump alley?

3    A.   Yes.

4        MR. BECKSTEDT:   Okay.  All right.  I don't

5   have any further questions on that.

6        Simone or Andy, do you have any questions

7   further?

8        MR. SIMPSON:   I think I have a follow-up.

9   I'll let Simone, if that's the order, if she has something.

10        MR. BECKSTEDT:   Simone, you're on mute.

11        MS. FRANCIS:   Yeah, I'll let you go.  I may

12   have.  I'm not quite ready, so why don't you go?

13        MR. SIMPSON:   Sure.

14                RECROSS-EXAMINATION

15   BY MR. SIMPSON:

16    Q.   With respect to the statement that you heard

17   Canning say that IPOS should not -- should -- I'm sorry,

18   should hire off-island companies, did he specifically use

19   the term "off-island companies," or did he simply recommend

20   a particular company or companies?

21    A.   It was a broad statement that he made that the

22   local company, which is Petro Industrial, stateside

23   companies can do a whole lot better job than Petro

24   Industrial can do.

25    Q.   Did he specifically use the term "stateside

178

1   company" in that conversation?

2    A.   Yes.

3    Q.   And did he specifically refer to Petro as a "local

4   company" in that conversation?

5    A.   Yes.

6    Q.   And have you seen any part of that conversation

7   documented in any e-mail report?

8    A.   No.

9    Q.   And you didn't complain about that statement

10   either at the time?

11    A.   It was said in a broad spectrum with David Smith,

12   the general manager, the employees of IPOS, and myself, and

13   Adrian Melendez.

14    Q.   Okay.  I don't think you answered the question I

15   asked.

16        Was that conversation documented in any

17   fashion?

18    A.   Not to my knowledge.

19        MR. SIMPSON:   I have no further questions.

20                RECROSS-EXAMINATION

21   BY MS. FRANCIS:

22    Q.   Mr. Persuad, I just have one point of

23   qualification or clarification.

24        Did you say that you recently, within the

25   past six months, ran into Andrew Canning on island and

179

1   bought him two beers?

2    A.   Six, eight months.  I can't remember exactly the

3   date, but the last time I spoke to him, I was at The Palms,

4   and I bought him two beers.

5    Q.   And this is the same individual that you contend

6   is racist and discriminated against local companies?

7    A.   That's Andrew Canning perspective.  That's not my

8   perspective.  I'm good with everybody.

9    Q.   So your testimony is that you're good with

10   Mr. Canning?

11    A.   Not the way he treated us; but as an individual,

12   as a human being, yes.

13        MS. FRANCIS:   I have no further questions.

14        MS. ROHN:   I think that's a wrap.

15        MR. BECKSTEDT:   Thank you, sir.

16

17

18        (whereupon the deposition concluded

19            at 3:37 p.m.)

20

21

22

23

24

25

180

C-E-R-T-I-F-I-C-A-T-E

    I, SUSAN C. NISSMAN, a Registered Merit Reporter
and Notary Public for the U.S. Virgin Islands,
Christiansted, St. Croix, do hereby certify that the above
named witness, CHETRAM PERSUAD, was first duly sworn to
testify the truth; that said witness did thereupon testify
as is set forth; that the answers of said witness to the
oral interrogatories propounded by counsel were taken by me
in stenotype and thereafter reduced to typewriting under my
personal direction and supervision.

    I further certify that the facts stated in the caption
hereto are true; and that all of the proceedings in the
course of the hearing of said deposition are correctly and
accurately set forth herein.

    I further certify that I am not counsel, attorney or
relative of either party, nor financially or otherwise
interested in the event of this suit.

    IN WITNESS WHEREOF, I have hereunto set my hand as such
Registered Merit Reporter on this the 8th day of June, 2023,
at Christiansted, St. Croix, United States Virgin Islands.


                            /s/ Susan C. Nissman

My Commission Expires:     Susan C. Nissman, RPR-RMR
June 28, 2023                      NP 234-19