IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

PETRO INDUSTRIAL SOLUTIONS, LLC    )
(PETRO)                             )
                                    ) CASE NO. 1:21-CV-00312
            Plaintiff,              )
                                    )
    vs.                             )
                                    )
ISLAND PROJECT AND OPERATING        )
SERVICES, LLC, VITOL US HOLDING II  )
CO., VITOL VIRGIN ISLANDS CORP.,    )
ANDREW CANNING and OPTIS            )
EUROPE, LTD.,                       )
                                    )
            Defendants.             )
_____ )

THE ORAL DEPOSITION OF **ELIAS RIVERA**, called for examination by the Vitol Defendants in the above-entitled cause, for purpose of discovery, for use in evidence and for such other and further uses as are provided by the Federal Rules of Civil Procedure, was taken before YVONNE SAMUEL-SETORIE, Registered Professional Reporter, at the law offices of Beckstedt & Kuczynski LLP, 2162 Church Street, Christiansted, Virgin Islands, on the 21st day of June 2023, commencing at 3:09 p.m., pursuant to Notice.

ELITE REPORTING SERVICES, INC.
P.O. Box 5619
Christiansted, VI 00823
(340) 718-1318
elitereportingsvcs@gmail.com



EXHIBIT 3

ELITE REPORTING SERVICES, INC.                    (340) 718-1318

```
 1     A-P-P-E-A-R-A-N-C-E-S:
       ON BEHALF OF THE PLAINTIFF:
 2     LEE J. ROHN AND ASSOCIATES, LLC
       1108 King Street, Suite 3 (mailing)
 3     56 King Street, 3rd Floor (physical)
       Christiansted, VI 00820
 4
       BY:  LEE J. ROHN, ESQ.
 5

 6     ON BEHALF OF THE DEFENDANTS:
       OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
 7     Attorneys for Island Project and Operating Services, LLC
       The Tunick Building, Suite 201
 8     1336 Beltjen Road
       St. Thomas, VI 00802
 9
       BY:  SIMONE R. D. FRANCIS, ESQ. (Via Zoom)
10

11     SUSMAN GODFREY L.L.P.
       Attorneys for Vitol Defendants
12     1000 Louisiana St., Suite 5100
       Houston, TX 77002
13
       BY:  SARAH HANNIGAN, ESQ. (Via Zoom)
14
       BECKSTEDT & KUCZYNSKI LLP
15     Attorneys for Vitol Defendants
       2162 Church Street
16     Christiansted, VI 00820

17     BY:  CARL A. BECKSTEDT, III, ESQ.

18
       ANDREW C. SIMPSON, P.C.
19     Attorneys for Andrew Canning and OPTIS Europe, LTD.
       2191 Church Street, Suite 5
20     Christiansted, VI 00820

21     BY:  ANDREW C. SIMPSON, ESQ. (Via Zoom)

22
       Also Present:
23     Sam Halverson, MJS Visions, Videographer
       Gabriela Loncar, Spanish Interpreter (Via Zoom)
24     Adrian Melendez, Jr. (Via Zoom)
       Andrew Canning (Via Zoom)
25     David Smith (Via Zoom)
```

3

1                          I-N-D-E-X

2

3                                                              Page

4   Direct Examination by Ms. Hannigan                           5

5   Cross-Examination by Mr. Simpson                            16

6   Cross-Examination by Ms. Francis                            19

7   Cross-Examination by Ms. Rohn                               26

8   Recross-Examination by Ms. Francis                          26

**Page 4**

P-R-O-C-E-E-D-I-N-G-S

THE VIDEOGRAPHER: In the matter of Petro Industrial Solutions, LLC, the Plaintiff vs. Island Project and Operating Services LLC, Vitol US Holding II Company, Vitol Virgin Islands Corp., Andrew Canning, and OPTIS Europe, Ltd., Defendants, In The District Court of the Virgin Islands, Division of St. Croix, Civil Action No. 1:21-CV-00312.

My name is Sam Halverson. I'm the videographer for today's proceedings. Our court reporter is Yvonne Setorie. Today's date is June 21, 2023. The deponent is Elias Rivera. The time is 3:14.

For the purposes of voice identification, I am requesting that the attorneys present identify themselves at this time.

MS. HANNIGAN: Sarah Hannigan for the Vitol defendants.

MS. ROHN: Lee Rohn for the plaintiff.

MR. SIMPSON: Let me try that with my mute off. Andrew Simpson on behalf of Andrew Canning and OPTIS Europe, Limited.

MS. FRANCIS: Simone Francis on behalf of Island Project and Operating Services, LLC, also known

**Page 5**

as IPOS.

THE VIDEOGRAPHER: Please swear the witness.

THE INTERPRETER: This is the interpreter. I'm sorry. Would you like that to be interpreted, or would you like me to start when the questions begin?

MS. ROHN: You can start when the questions begin.

THE INTERPRETER: Thank you.

(GABRIELA LONCAR, called as the interpreter in this matter, was duly sworn by the Notary Public to accurately and faithfully translate the questions propounded to the witness from English in to Spanish and the answers given by the witness from Spanish in to English.)

(ELIAS RIVERA, having been called as a witness, was duly sworn by the Notary Public, was examined and testified through the interpreter as follows:)

DIRECT EXAMINATION

BY MS. HANNIGAN:

Q. Mr. Rivera, please state and spell your full name for the record.

A. (The answer was not interpreted.)

**Page 6**

Q. Thank you. What is your current job title?

(Interruption by the court reporter.)

THE INTERPRETER: Yes, ma'am.

MR. BECKSTEDT: Sarah, you gonna have to wait until the interpreter finishes every time.

MS. HANNIGAN: Sorry.

BY MS. HANNIGAN:

A. Yes. The spelling is -- yes. My name is Elias Rivera. It's E-l-i-a-s R-i-v-e-r-a.

Q. What is your job title?

A. Welding and manufacturing supervisor.

Q. What are your responsibilities in that position?

A. It's to ensure that a good job is done with good quality and within the specifications of the requester.

Q. How long have you held that position?

A. About 20 years.

Q. And how long have you been working for Petro?

A. Five years.

Q. What was your most recent position before working for Petro?

A. I was a manufacturing and welding supervisor.

Q. And do you currently work for Petro Industrial Services?

A. Yes.

**Page 7**

Q. Do you speak any English?

A. Yes.

Q. And do you read any English?

A. A lot.

Q. And what would you describe as your proficiency level in speaking English?

A. Communicative. I can communicate.

Q. In your work for Petro, do you mostly communicate in English or in Spanish?

A. Both.

Q. Have you ever interacted with someone name Charlotte Horowitz?

A. No.

Q. Have you ever interacted with someone name Tim Kologinczak?

A. No.

Q. Have you ever interacted with Sebastian Moretti?

A. No.

Q. Have you ever interacted with Eduardo Garcia?

A. No.

Q. So you've never interacted with anyone from Vitol?

MS. ROHN: Object to the form of the question.

BY MS. HANNIGAN:

Q. Have you ever interacted with anyone from Vitol?

**Page 8**

1  A. No.
2  Q. Did you work at the propane facilities run by
3  IPOS and WAPA for Petro?
4  A. Yes.
5  Q. When did you begin work on that project?
6  A. I don't recall. A long time. Two years I
7  believe.
8  Q. And when did you last work at the IPOS or WAPA
9  propane facilities for Petro?
10  A. I don't remember.
11  Q. Was it a few months ago or a few years ago?
12  A. Over a year ago.
13  Q. Does February 2021 sound about right?
14       MS. ROHN:   Objection to form.
15  BY MS. HANNIGAN:
16  A. I don't remember.
17  Q. What sort of work did you do for Petro at the
18  propane facilities?
19  A. Piping, and any type of conductivity.
20  Q. And what were your responsibilities? Were you a
21  supervisor?
22  A. Follow the rules of the plant, and deliver the
23  quality that was requested by the plant.
24  Q. And who did you consider to be the client?
25       MS. ROHN:   Objection to form.

**Page 9**

1  BY MS. HANNIGAN:
2  A. IPOS.
3  Q. And how did you know what quality or standards
4  IPOS wanted?
5  A. Because I would follow -- there were people who
6  would tell us how to do that.
7  Q. Did they give you any documents outlining
8  standards or requirements?
9  A. No, not to me.
10  Q. Did you hear about any such documents given
11  Petro?
12  A. They must have had them.
13  Q. And why do you say "they must have had them"?
14  A. That's the way the work is done.
15  Q. So you need the specifications from the client in
16  order to know the work that needs to be done?
17       MS. ROHN:   Objection to form. Leading.
18  BY MS. HANNIGAN:
19  Q. You can answer.
20  A. Yes.
21  Q. Did those specifications or guidelines given
22  Petro include welding specifications or guidelines?
23  A. Yes.
24  Q. And did you ever see those guidelines?
25  A. We discussed them.

**Page 10**

1  Q. Who did you discuss them with?
2  A. With the people from Petro.
3  Q. Which people from Petro?
4  A. Adrian Melendez.
5  Q. And what did Mr. Melendez tell you about these
6  welding standards or specifications?
7  A. I don't remember at this time.
8  Q. Was it part of your job to make sure the Petro
9  crew was following those specifications or guidelines?
10  A. Yes.
11  Q. Did you ever have any interactions with a
12  gentleman by the name of Andrew Canning?
13  A. I tried.
14  Q. What was your understanding of his role at the
15  facilities?
16  A. He would design the work.
17  Q. Did you ever have any negative interactions with
18  Mr. Canning?
19  A. I would talk to him, but he would never answer
20  me.
21  Q. Would you talk to him in English or Spanish?
22  A. In English.
23  Q. And he wouldn't answer you?
24  A. He would ignore me.
25  Q. Did he ever say anything negative to you or

**Page 11**

1  critical to you?
2  A. No.
3  Q. Did you hear him say anything negative or
4  critical to anyone else at Petro?
5  A. No.
6  Q. Did you ever hear him say anything racist?
7  A. No.
8  Q. And those are the only interactions with
9  Mr. Canning that you remember him ignoring you?
10  A. Yes.
11  Q. Were you ever asked not to return to the IPOS or
12  WAPA propane facilities?
13  A. Yes.
14  Q. Who told you that?
15  A. The supervisor.
16  Q. Who was the supervisor?
17  A. Chad.
18  Q. And did Chad tell you why you were asked not to
19  return?
20       MS. ROHN:   Objection. Calls for hearsay.
21  BY MS. HANNIGAN:
22  Q. You may answer.
23  A. No, not at that time. No.
24  Q. Did he tell you later why you were asked not to
25  return?

12

```
1    A.  No.
2    Q.  So sitting here today, you're not sure why you
3  were asked not to return to the jobsite?
4        MS. ROHN:    Objection.
5  BY MS. HANNIGAN:
6    A.  I think that -- I think discrimination.
7    Q.  Why do you say that?
8    A.  Because they would ignore me and wouldn't talk to
9  me.
10   Q.  When you say "they," who do you mean by "they"?
11   A.  Andrew.
12   Q.  Did anyone else at IPOS refuse to interact with
13 you?
14   A.  No.
15   Q.  Did anyone at Vitol refuse to interact with you?
16   A.  No.
17   Q.  Are you a certified welder?
18   A.  No.
19   Q.  What are your qualifications to be a welding
20 supervisor?
21   A.  Experience.
22   Q.  Are you certified to check the quality of welds?
23   A.  No.
24   Q.  Have you ever completed any welding on a Petro
25 job?
```

13

```
1    A.  No.
2    Q.  When you would be overseeing the quality of
3  welds, what does that entail?  What would you look for?
4    A.  The fitting, that the tubing be straight.
5    Q.  Did you ever observe any issues with Petro
6  welding at the IPOS or WAPA facilities?
7    A.  No.
8    Q.  Have you heard of a company called
9  Versa Integrity, Inc.?
10   A.  Yes.
11   Q.  What is your understanding of what they do?
12   A.  It's an inspection company.
13   Q.  Are you aware that they inspected welds that
14 Petro completed on the IPOS and WAPA facilities?
15   A.  Could be, yes.  It could be.
16   Q.  So you weren't involved in the inspection or weld
17 testing process at the time?
18   A.  Not the whole time.
19   Q.  What time were you involved in the inspection or
20 testing of the welds?
21   A.  When the PT would do it, just then.
22   Q.  What is the PT, or who is the PT?
23   A.  It's a painting test that you do on the weld on
24 the first phase or the first step.
25   Q.  And was Versa involved at all in that step?
```

14

```
1    A.  They would do it.
2    Q.  And what was your level of involvement?
3    A.  To look to see that it was good --
4        (Interruption by the court reporter.)
5    A.  To look to see that it was good to continue.
6  BY MS. HANNIGAN:
7    Q.  Did you ever determine that any welds on the
8  Petro site -- that the Petro completed at the IPOS or WAPA
9  facilities were not good or not good to be completed?
10   A.  No.
11   Q.  Were you involved at all in the process of Petro
12 welders being recertified?
13   A.  No.
14   Q.  Have you heard of Guillermo Castro?
15   A.  No.
16   Q.  So your job overseeing welding didn't have to do
17 with overseeing the qualifications of the welders?
18   A.  No.
19   Q.  Who was responsible for overseeing the
20 qualifications of the welders?
21   A.  Petro.
22   Q.  Who in particular at Petro?
23   A.  Adrian Melendez.
24   Q.  Have you ever seen a Petro quality control
25 manual?
```

15

```
1        THE INTERPRETER:    Repeat.
2        MR. BECKSTEDT:    Excuse me, the interpreter, I
3    don't think, got that correctly, his last answer.
4        Madam Interpreter, he said two names,
5    Adrian Melendez and Chad Persaud.
6        THE INTERPRETER:    Oh, yes.  I did not hear
7    the second name.  I can ask him to just repeat the
8    names.
9        MR. BECKSTEDT:    We can stipulate to that.  We
10   can proceed.
11       THE INTERPRETER:    I think there was voice
12   overlap.
13 BY MS. HANNIGAN:
14   Q.  Have you ever heard of or seen a Petro quality
15 control manual?
16   A.  Yes.
17   Q.  Was it your understanding that you were required
18 to follow that manual?
19   A.  Yes.
20   Q.  And have you heard of any other Petro manuals or
21 guidelines that you were required to follow?
22   A.  For the personnel.
23   Q.  And what's that guideline?
24   A.  I don't remember them all right now.  I don't
25 remember.
```

**16**

1  Q. Is that generally kind of a human resources or
2  behavioral guideline?
3      MS. ROHN:  Objection. Form.
4  BY MS. HANNIGAN:
5  A. Yes. Yes, it has to do.
6      MS. HANNIGAN:  Let's do a five-minute break.
7      THE VIDEOGRAPHER:  Going off the record. It's
8  3:40.
9      (Off the record.)
10     THE VIDEOGRAPHER:  Going back on the record.
11  The time is 3:44.
12  BY MS. HANNIGAN:
13  Q. Mr. Rivera, you said that you never heard
14  Mr. Canning say anything discriminatory or racist; right?
15  A. Right.
16  Q. Did you ever see Mr. Canning engage in any
17  behavior or conduct that was discriminatory or racist?
18  A. No.
19     MS. HANNIGAN:  No further questions.
20     MR. SIMPSON:  I have a few follow-up
21  questions.
22              CROSS-EXAMINATION
23  BY MR. SIMPSON:
24  Q. My name is Andrew Simpson, and I represent
25  Andrew Canning and OPTIS Europe in this case.

**17**

1  My first question is: Have you ever been certified as
2  a welder?
3  A. No.
4  Q. What were your -- I'm sorry. Let me -- your
5  position with Petro was as a welding supervisor; is that
6  correct?
7  A. Correct.
8  Q. What were your duties as a welding supervisor?
9  A. To verify that the measurements were right and
10  that the fittings were correct and the cleaning.
11  Q. What do you mean by "the cleaning"?
12  A. The cleaning, in other words, removing the -- the
13  mold from the pipes, from the metal.
14  Q. Did your duties include quality assurance or
15  quality control?
16  A. No.
17  Q. Would you inspect the welds once they were
18  completed?
19  A. No.
20  Q. How many times did you speak with Andrew Canning?
21  A. I don't remember.
22  Q. More than one time? More than five times? More
23  than ten times?
24     MS. ROHN:  Objection. Compound question.
25  BY MR. SIMPSON:

**18**

1  Q. You can answer.
2  A. More than five times.
3  Q. Less than ten times?
4  A. Could be.
5  Q. And what were the circumstances under which you
6  were speaking to Mr. Canning?
7  A. When I had any doubts.
8  Q. Any doubts about what?
9  A. About what we were doing at the moment.
10  Q. Can you recall any specific doubts that you had
11  that you asked him about?
12  A. I don't remember.
13  Q. Were any other people present when you tried to
14  have these communications?
15  A. Yes.
16  Q. Who else was present?
17  A. My coworkers.
18  Q. Which coworkers?
19  A. Julio Gonzalez, Juan Egliotie (phonetic),
20  Ricardo Velasquez.
21  Q. Were Chad or Adrian ever present during these
22  conversations?
23  A. No.
24  Q. What would you do to get the answers about your
25  doubts since Mr. Canning did not respond to you?

**19**

1  A. I would call my boss.
2  Q. And who was your boss?
3  A. Chad.
4  Q. And would Chad know the answer, or would he have
5  to get the information from someone else?
6  A. Andrew would call him.
7  Q. Would Andrew initiate the call?
8  A. Yes.
9  Q. And would he do that in your presence?
10  A. No.
11  Q. How do you know that he would call Chad?
12  A. Because Chad would call me after.
13     MR. SIMPSON:  I have no further questions.
14  Thank you.
15     MS. FRANCIS:  I do have questions.
16              CROSS-EXAMINATION
17  BY MS. FRANCIS:
18  Q. Good afternoon. I introduced myself earlier, but
19  my name is Simone Francis, and I represent IPOS in this
20  matter.
21  Mr. Rivera, immediately before working for Petro,
22  where did you work?
23  A. Light Tree Bay.
24     MS. FRANCIS:  I think he said Limetree.
25  BY MS. FRANCIS:

20

1  Q.  What company did you work for at Limetree Bay?
2  A.  Wyatt First Service.
3      THE WITNESS:  Field Service.
4  BY MS. FRANCIS:
5  Q.  And the second one?
6  A.  NIS.
7  Q.  Did you work with Mr. Melendez or Mr. Persaud at
8  NIS?
9  A.  Yes.
10 Q.  During what years did you work for NIS?
11 A.  I think it was 2015 through 2017.
12 Q.  What position or positions did you hold with NIS?
13 A.  Supervisor.
14 Q.  Supervisor of what?
15 A.  Welding and fabrication supervisor.
16 Q.  Did you hold those roles at the same time, or
17 were those different roles?
18 A.  It was practically the same role.
19 Q.  At the time you worked for NIS, you were not a
20 certified welder; is that correct?
21 A.  Correct.
22 Q.  What position or positions did you hold for
23 Wyatt Field Service?
24 A.  Pipefitter and boilermaker supervisor.
25 Q.  During what years did you work for

21

1  Wyatt Field Service?
2  A.  From 2003 to 2012.
3  Q.  Did you go directly from working with NIS to
4  working with Petro?
5  A.  Not directly.  Not quickly.
6  Q.  What did you do between the end of your work with
7  NIS and the time you began to work for Petro?
8  A.  I was fixing the disasters that Maria left behind
9  at my home.
10 Q.  How long have you lived in St. Croix?
11 A.  From 2003.
12 Q.  Do you currently live in St. Croix?
13 A.  Yes.
14 Q.  Prior to moving to St. Croix in 2003, where did
15 you live?
16 A.  Puerto Rico.
17 Q.  Were you born in Puerto Rico, sir?
18 A.  Yes.
19 Q.  And did you live in Puerto Rico from the time of
20 your birth until 2003?
21 A.  Not that whole time.
22 Q.  Where else did you live?
23 A.  Pennsylvania.
24 Q.  During what period did you live in Pennsylvania?
25 A.  1993 through '98.

22

1  Q.  During that period from 1993 to 1998, were you
2  employed or were you doing something else?
3  A.  Employed.
4  Q.  Where?
5  A.  In factories that were -- factories.
6  Q.  What company or companies?
7  A.  Wokler Foods (phonetic).
8      THE INTERPRETER:  Phonetically repeating it.
9  BY MS. FRANCIS:
10 A.  Wonder Tria and Moyer Packing Company.
11 Q.  During the period that you worked at the propane
12 facilities in St. Croix, did you ever work on the 1-inch
13 vent lines?
14 A.  No.
15 Q.  Did you work on the 3-inch vent line project?
16 A.  No.
17 Q.  What project or projects did you work on at the
18 propane facility?
19 A.  Reverse loading and rear panels.
20     MS. ROHN:  RIO.
21 BY MS. FRANCIS:
22 A.  RIO panels.
23     MS. ROHN:  R-I-O, RIO.
24     THE INTERPRETER:  Okay, sorry.  Okay, thank
25 you.

23

1  BY MS. FRANCIS:
2  Q.  Did you work on RIO panels in St. Croix?
3  A.  Yes.
4  Q.  Did you work on RIO panels in St. Thomas?
5  A.  No.
6  Q.  What work did you do on the RIO panels in
7  St. Croix?
8  A.  Installing the first two.
9  Q.  On that project were you doing the work, or were
10 you acting as a supervisor?
11 A.  Supervisor.
12 Q.  And what were the roles of the individuals who
13 you were supervising?
14 A.  They were doing the installations, the augering,
15 and the welding as well.
16 Q.  What work did you do on the reverse loading
17 project?
18 A.  The installation.
19 Q.  On the reverse loading projects, were you acting
20 as a supervisor, or were you doing work?
21 A.  Both.
22 Q.  What individuals or roles were you supervising on
23 the reverse loading when you functioned as a supervisor?
24 A.  The welders and the installers, the boilermakers.
25 Q.  And when you were doing work on the reverse

```
                                                    24
 1   loading, what kind of work were you doing?
 2       A.   Operating heavy equipment.
 3       Q.   Please identify the welders that you supervised
 4   on the RIO panel project?
 5       A.   Can you repeat the question?
 6       Q.   Yes.  When you supervised welders on the reverse
 7   -- on the RIO panel project, what were the names of those
 8   welders?
 9       A.   Daniel Martinez.
10       Q.   Anyone else?
11       A.   No.
12       Q.   Did you ever examine any credentials of
13   Mr. Martinez to work as a welder?
14       A.   No.
15       Q.   Did you ever observe Mr. Martinez wear or carry a
16   card that certified him as a welder?
17       A.   No.
18       Q.   What were the names of the welders that you
19   supervised on the reverse loading project?
20       A.   Angel Justiniano.  That's the only one I
21   remember.
22       Q.   Please spell Justiniano.
23       A.   J-u-s-t-i-n-i-a-n-o.
24       Q.   Did you ever examine any credentials of
25   Mr. Justiniano to conduct welding?
```

```
                                                    25
 1       A.   No.
 2       Q.   Did you have any role in hiring any welders who
 3   worked for Petro Industrial?
 4       A.   No.
 5       Q.   Who was responsible for hiring welders who worked
 6   for Petro Industrial that you supervised?
 7       A.   Petro.
 8       Q.   Who at Petro?
 9       A.   Adrian Melendez and Chad Persaud.
10       Q.   As the supervisor, did you have the ability to
11   recommend any discipline or termination of any welders who
12   worked for Petro?
13       A.   Yes.
14       Q.   And did you ever recommend discipline or
15   termination of any Petro welders?
16       A.   No.
17       Q.   Are you paid on an hourly basis, or are you paid
18   a salary by Petro?
19       A.   Hourly.
20       Q.   And what is your hourly compensation as an
21   employee of Petro?
22       A.   $40 an hour.
23       Q.   What was your hourly compensation in the year
24   2020?
25       A.   Same thing.
```

```
                                                    26
 1       Q.   Has your compensation been $40 an hour for the
 2   entire time you have worked for Petro?
 3       A.   No.
 4       Q.   What was it when you started?
 5       A.   33.
 6       Q.   And when did it increase from $33 an hour?
 7       A.   I don't remember.
 8       Q.   Have you ever received any training on Petro
 9   policies about discrimination?
10       A.   No.
11            MS. FRANCIS:    I have no further questions.
12                  CROSS-EXAMINATION
13   BY MS. ROHN:
14       Q.   Mr. Rivera, who did you understand Andrew Canning
15   worked for?
16       A.   For IPOS.
17            MS. ROHN:    No further questions.
18            MS. FRANCIS:    I have one follow-up.
19                  RECROSS-EXAMINATION
20   BY MS. FRANCIS:
21       Q.   Mr. Rivera, have you ever heard of a company
22   called OPTIS Europe?
23       A.   No.
24       Q.   Have you ever heard of a company called
25   Vitol Virgin Islands Corp.?
```

```
                                                    27
 1       A.   I believe so.
 2       Q.   And what do you understand
 3   Vitol Virgin Islands Corp. to be?
 4       A.   I don't know.  I just heard the name, but I don't
 5   know what it does.
 6       Q.   And did Mr. -- what is the basis for your belief
 7   that Mr. Canning worked for IPOS?
 8       A.   Because he was an IPOS.
 9       Q.   That's it?
10            MS. ROHN:    Object to the form.
11   BY MS. FRANCIS:
12       Q.   Sir, is that the only basis for your belief about
13   Mr. Canning's employer?
14       A.   His helmet said IPOS.
15       Q.   Have you ever spoken to David Smith?
16       A.   Yes.
17       Q.   When?
18       A.   When we would install the RIO panels.
19       Q.   What specific conversation do you claim that you
20   had with Mr. Smith about the installation of the RIO
21   panels?
22       A.   With Mr. Smith?
23       Q.   Yes.
24       A.   I don't know who Mr. Smith is.
25            MS. FRANCIS:    No further questions.
```

ELIAS RIVERA

28

1  THE VIDEOGRAPHER:  This concludes the
2  deposition.  The time is 4:18.
3
4  (At 4:18 p.m., the deposition of this witness
5  was concluded.)

29

1  CERTIFICATE OF REPORTER
2
3  I, YVONNE SAMUEL-SETORIE, Registered
4  Professional Reporter, do hereby certify that the above and
5  named witness, ELIAS RIVERA, after being duly sworn, was
6  examined and testified via Zoom video conference as is set
7  forth; and that the answers of said witness to the oral
8  interrogatories propounded by counsel were taken by me in
9  machine shorthand, and represents the official transcript of
10 said deposition; and that said deposition is true and
11 correct, to the best of my ability.
12
13 I FURTHER CERTIFY that I am not counsel,
14 attorney, or relative of either party, nor financially or
15 otherwise interested in the event of this lawsuit.
16
17 IN WITNESS WHEREOF, I have hereunto
18 subscribed my hand on this 31st day of July 2023.
19
20
21
    _____
22  YVONNE SAMUEL-SETORIE, RPR

ELITE REPORTING SERVICES, INC.          (340) 718-1318