2

```
            IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
                        DIVISION OF ST. CROIX


PETRO INDUSTRIAL SOLUTIONS, LLC, )
                                 )
              Plaintiff,         )
                                 )
      vs.                        ) Case No. 1:21-CV-00312
                                 )
ISLAND PROJECT AND OPERATING     )
SERVICES, LLC; VITOL US HOLDING  )
II CO.; VITOL VIRGIN ISLANDS     )
CORP.; ANDREW CANNING; and OPTIS )
EUROPE, LTD.,                    )
                                 )
              Defendants.        )
_____)


         THE VIDEOTAPED ORAL DEPOSITION OF FRANK KIRSCH
```

was taken on the 20th day of June, 2023, at the Law Offices of Beckstedt & Kuczynski, LLP, 2162 Church Street, Christiansted, St. Croix, U.S. Virgin Islands, and via Zoom teleconference, between the hours of 9:43 a.m. and 11:07 a.m. AST, pursuant to Notice and Federal Rules of Civil Procedure.

```
                        _____
                          Reported by:

                       Susan C. Nissman RPR-RMR
                       Registered Merit Reporter
                        Caribbean Scribes, Inc.
                    1244 Queen Cross Street, Suite 1A
                         Christiansted, St. Croix
                        U.S. Virgin Islands  00820
                            (340) 773-8161
```

---

APPEARANCES

A-P-P-E-A-R-A-N-C-E-S

For the Plaintiff:

Law Offices of Lee J. Rohn & Associates, LL
1108 King Street, Third Floor
Christiansted, St. Croix
U.S. Virgin Islands  00820

By:  Lee J. Rohn


For the Defendant Island Project and Operating Services, LLC:

Law Offices of Ogletree, Deakins, Nash, Smoak & Stewart, LLC
The Tunick Building, Suite 201
1336 Beltjen Road
Charlotte Amalie, St. Thomas
U.S. Virgin Islands  00802

By:  Simone R.D. Francis (Via Zoom)


For the Defendant Vitol US Holding II Co. and Vitol Virgin Islands Corp.:

Law Offices of Beckstedt & Kuczynski, LLP
2162 Church Street
Christiansted, St. Croix
U.S. Virgin Islands  00820

By: Carl A. Beckstedt, III

              and

Law Offices of Susman Godfrey
1301 Avenue of the Americas, 32nd Floor
New York, New York  10019

By:  Sarah Hannigan (Via Zoom)

---

3

APPEARANCES

For the Defendant Andrew Canning:

Law Offices of Andrew C. Simpson
2191 Church Street, Suite 5
Christiansted, St. Croix
U.S. Virgin Islands 00820

By: Andrew C. Simpson (Via Zoom)


Also Present:   Adrian Melendez, Jr.
                Andrew Canning (Via Zoom)
                Sam Halvorson, Videographer

---

4

INDEX

E-X-A-M-I-N-A-T-I-O-N

| Description | Counsel | Page |
|---|---|---|
| Direct | by Ms. Hannigan | 6 |
| Cross | by Mr. Simpson | 34 |
| Cross | by Ms. Francis | 39 |
| Cross | by Ms. Rohn | 48 |
| Redirect | by Ms. Hannigan | 49 |
| Recross | by Ms. Francis | 50 |
| Recross | by Mr. Simpson | 51 |

E-X-H-I-B-I-T-S

| Exhibit | Description | Page |
|---|---|---|
| 1 - | First Amended Complaint | 8 |
| 2 - | Bates Stamp PIS 7557-7558 | 13 |
| 3 - | Bates Stamp PIS 506-828 | 28 |

EXHIBIT
4

## Page 5

COLLOQUY

1  THE VIDEOGRAPHER: In the matter of Petro
2  Industrial Solutions, LLC, the plaintiff. Island Project
3  and Operating Services, LLC; Vitol U.S. Holding II Company;
4  Vitol Virgin Islands Corp.; Andrew Canning; and Optis
5  Europe, Ltd., the defendant.
6          In a District Court of the Virgin Islands,
7  Division of St. Croix. Civil Action Number 1:21-CV-00312.
8          My name is Sam Halvorson. I am the
9  videographer for today's proceedings. Our court reporter is
10 Susan Nissman. Today's date is June 20th, 2023. The
11 deponent is Frank Kirsch. The time is 9:43.
12         For the purposes of voice identification, I'm
13 requesting that the attorneys present identify themselves at
14 this time.
15         MS. HANNIGAN: Sarah Hannigan, for the Vitol
16 defendants.
17         MS. ROHN: Good morning. Lee Rohn for the
18 plaintiff.
19         MR. SIMPSON: Good morning. Andy Simpson for
20 Andrew Canning and Optis Europe, Limited.
21         MS. FRANCIS: Good morning. Simone Francis
22 for Island Project and Operating Services.
23         THE VIDEOGRAPHER: Please swear the witness.
24
25

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 6

FRANK KIRSCH -- DIRECT

1                      FRANK KIRSCH,
2  called as a witness, having been first duly sworn,
3           testified on his oath as follows:
4                   DIRECT EXAMINATION
5  BY MS. HANNIGAN:
6      Q.  Good morning, Mr. Kirsch. Could you please
7  introduce yourself, and state your full name for the record?
8      A.  Good morning. My name is Frank Kirsch. I work
9  for Petro Industrial, safety supervisor.
10     Q.  And could you spell your name, please?
11     A.  F-R-A-N-K; K-I-R-S-C-H.
12     Q.  Great.
13         First we're going to talk a little bit about
14 your background.
15         What is your current role at Petro?
16     A.  Safety supervisor.
17     Q.  And how long have you held that -- that position?
18     A.  Roughly four-and-a-half years.
19     Q.  And did you work at Petro before then, as well?
20     A.  No.
21     Q.  What was your role before you joined Petro?
22     A.  I was a contractor in Texas.
23     Q.  And what is your educational background?
24     A.  We did a lot of work for Exxon Mobile, Shell,
25 Coast Guard, which had a lot of safety involved. OSHA 10

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 7

FRANK KIRSCH -- DIRECT

1  and OSHA 30 classes. Pretty much it.
2      Q.  Got it.
3          So what is your highest level of education
4  attained?
5      A.  Say again?
6      Q.  What's the highest level of education you've
7  attained?
8      A.  OSHA 30.
9      Q.  Okay. And did you attend any college or post-grad
10 institutions?
11     A.  No.
12     Q.  And when did you first move to the Virgin Islands?
13     A.  Six years ago.
14     Q.  So that was before you started working for Petro?
15     A.  Yes.
16     Q.  And had you always lived in Texas before you moved
17 to the Virgin Islands?
18     A.  Yes.
19     Q.  So you're originally from Texas?
20     A.  Yes.
21     Q.  And what would you describe as your race identity?
22     A.  White.
23         MS. HANNIGAN: As Exhibit 1, Carl, can you
24 please show the Complaint?
25         MR. BECKSTEDT: Yes.

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 8

FRANK KIRSCH -- DIRECT

1          (Deposition Exhibit No. 1 was
2           marked for identification.)
3      Q.  (Ms. Hannigan) Mr. Kirsch, what Mr. Beckstedt's
4  about to hand you is the Complaint in this case.
5          Could you please turn to Paragraph 14?
6      A.  Okay.
7      Q.  Do you see -- are you there?
8      A.  Yes.
9      Q.  Do you see that it says, "Petro is a company made
10 up of all local West Indian or local Hispanic employees, as
11 are its management team and owners"?
12     A.  Yes.
13     Q.  Is that a true statement?
14         MS. ROHN: Object to the form.
15     Q.  (Ms. Hannigan) You may answer.
16     A.  Mostly.
17     Q.  But you are not --
18     A.  Correct.
19     Q.  -- West Indian --
20     A.  Correct.
21     Q.  -- or Hispanic?
22     A.  Correct.
23     Q.  So it's false in that you do not fall into those
24 categories?
25     A.  Right.

Susan C. Nissman, RPR-RMR
(340) 773-8161

9

FRANK KIRSCH -- DIRECT

1              MS. ROHN:  Objection to the form of the
2    question.
3         Q.   (Ms. Hannigan) Okay.  So back to your professional
4    background.  You mentioned OSHA 30.
5              Do you mind walking through what your other
6    qualifications are to hold the title of safety supervisor?
7         A.   OSHA 10, OSHA 30, and many years of being around
8    and in safety.  Safety -- you know, on the job with a lot of
9    safety.
10        Q.   Thank you.
11             And which -- in your roles prior to Petro,
12   were the roles similar?  Were you similarly on hydrocarbon
13   facilities, or what did those roles entail?
14             MS. ROHN:  Objection.  Compound.
15        Q.   (Ms. Hannigan) You may answer.
16        A.   I was in commercial flooring.  Contractor.
17        Q.   So working for Petro was your first time working
18   for facilities maintenance at a hydrocarbon facility?
19        A.   I don't know about hydrocarbon or not, but I've
20   worked in Shell facilities.  I've worked in Exxon Mobile.
21   worked in Dow Chemical, so, however.
22        Q.   Okay.  So you had some familiarity with working on
23   energy facilities?
24        A.   Yes.
25        Q.   Okay.  And a few more background points.

Susan C. Nissman, RPR-RMR
(340) 773-8161

10

FRANK KIRSCH -- DIRECT

1              Are you a licensed engineer?
2         A.   A licensed what?
3         Q.   Engineer?  Are you an engineer?
4         A.   No.
5         Q.   Are you a certified welder?
6         A.   Negative.  No.
7         Q.   And are you able to evaluate or sign off on
8    welding yourself?
9         A.   No.
10        Q.   So do you consider yourself qualified to evaluate
11   welding?
12        A.   No.
13        Q.   Okay.  Moving on to Vitol.
14             In your work at Petro, did you interact with
15   any Vitol employees?
16        A.   Just Andrew, to my knowledge.
17        Q.   So you never met Charlotte Horowitz?
18        A.   No.
19        Q.   You never met Sebastian Moretti?
20        A.   No.
21        Q.   You never met Tim Kologinczak?
22        A.   No.
23        Q.   And you never met Eduardo Garcia?
24        A.   Not that I know of.
25        Q.   So you've never interacted with anyone from Vitol?

Susan C. Nissman, RPR-RMR
(340) 773-8161

11

FRANK KIRSCH -- DIRECT

1         A.   No.
2         Q.   Did you ever tell anyone from Vitol about any
3    issues you had with Mr. Canning?
4         A.   No.
5         Q.   Okay.  Moving on to your role as safety supervisor
6    of Petro, what were your main responsibilities, or what are
7    your main responsibilities in that role?
8         A.   Safety meetings, JSAs every day.  Making sure we
9    have all the correct PPE ordered.  Making sure the guys have
10   the correct PPE they're using for their job tasks at hand,
11   and then safety walks.
12        Q.   And what is a JSA?
13        A.   Job safety analysis.  They write down what their
14   job is for the day.  What it entails.  What's safe.  What's
15   not safe.  What could be done safe.
16        Q.   Okay.  And you held weekly safety meetings
17   regarding the facilities on St. Croix, right?
18        A.   Yes.
19        Q.   And who would be present at those meetings?
20        A.   Really, everybody should be, but I couldn't tell
21   you, you know, some days this person wasn't there, some days
22   that person wasn't there, but everybody on the job should be
23   there.
24        Q.   So all Petro employees working on the job site
25   should attend?

Susan C. Nissman, RPR-RMR
(340) 773-8161

12

FRANK KIRSCH -- DIRECT

1         A.   Petro, IPOS, yeah.
2         Q.   And would anyone external attend, or just Petro
3    and IPOS employees?
4              MS. FRANCIS:  Objection.
5         A.   Pretty much just IPOS and Petro.
6         Q.   (Ms. Hannigan) And what would be discussed or
7    covered at these meetings?
8         A.   What we were doing that day.  Pretty much the same
9    thing as the JSA:  What's going on.  What jobs do we have,
10   and our safety.  What do we need, as far as our PPE, and
11   what do we need to do the job safe, and get home safe that
12   day.
13        Q.   And how much times per week, or approximately how
14   many times per week were you present at the WAPA or IPOS
15   facilities on St. Croix?
16        A.   Sometimes every day; sometimes once a week.  It
17   just depends on what was going on.
18        Q.   So you were pretty actively involved in the Petro
19   projects at the IPOS or WAPA facilities?
20        A.   Yes.
21        Q.   And were you ever aware of any safety concerns
22   that were brought to Petro's attention?
23        A.   No.
24        Q.   Do you remember an incident in February of 2021
25   involving Mr. Canning?

Susan C. Nissman, RPR-RMR
(340) 773-8161

13

FRANK KIRSCH -- DIRECT

1  A.  Where? What was the date again?
2  Q.  In February 2021?
3  A.  Okay. This is in St. Thomas?
4  Q.  This was in St. Thomas, yes, at the IPOS facility.
5  A.  Yes, I remember it.
6  Q.  And you prepared an incident report, correct?
7  A.  No.
8        MS. HANNIGAN: Carl, could you please show
9  the witness PIS 7557? That will be marked as Exhibit 2.
10       (Deposition Exhibit No. 2 was
11        marked for identification.)
12       (Respite.)
13  Q.  (Ms. Hannigan) In the meantime, while we're
14 waiting for that, Mr. Kirsch, what do you consider to be the
15 main safety considerations on the IPOS or WAPA facilities?
16 The main safety concerns or priorities you have to address?
17       MS. ROHN: Objection. Compound.
18  Q.  (Ms. Hannigan) You may answer.
19  A.  No. Petro -- I'm safety for Petro; not for WAPA
20 or IPOS.
21  Q.  Well, in your work for Petro at those facilities,
22 what do you consider to be the main safety issues?
23       MS. ROHN: I need a copy of that.
24  A.  Say again?
25  Q.  (Ms. Hannigan) In your work for Petro at those

Susan C. Nissman, RPR-RMR
(340) 773-8161

14

FRANK KIRSCH -- DIRECT

1  facilities, what do you consider to be the main safety
2  issues?
3  A.  Depending on what job you're doing, I guess. I
4  mean, you can cut a hand off, or leg, or get run over by a
5  machine, or depends what's going on.
6  Q.  So there can be dangerous work that happens at
7  those facilities, correct?
8  A.  Correct.
9  Q.  And so safety, in your role, is important to
10 maintain the safety of everyone in those facilities,
11 correct?
12       MS. ROHN: Objection. Leading.
13  Q.  (Ms. Hannigan) You may answer.
14  A.  Yes.
15  Q.  Okay. So in front of you, we'll mark this as
16 Exhibit 2, PIS 7557.
17       Do you see this document called
18 "Incident/Property Damage Report Form"?
19  A.  Yes.
20  Q.  Did you prepare this form?
21  A.  No.
22  Q.  Was it typically your responsibility to prepare
23 safety reports?
24  A.  This is an incident, not a safety report.
25  Q.  Okay. Was it your responsibility, typically, to

Susan C. Nissman, RPR-RMR
(340) 773-8161

15

FRANK KIRSCH -- DIRECT

1  prepare incident reports?
2  A.  No.
3  Q.  Did you have any oversight into preparing incident
4  reports?
5  A.  I'm not sure.
6  Q.  What's the difference between a safety report and
7  an incident report?
8  A.  Well, an incident report is something that
9  happened to somebody -- but to Chet, he's the one who wrote
10 this. And a safety report would be something that happened
11 on the job with one of our guys that was either -- was
12 unsafe.
13  Q.  So an incident report and a safety report are --
14 both involve instances of employees having an issue on the
15 job site?
16  A.  I guess so.
17       MS. ROHN: Don't guess.
18  A.  Right.
19       MS. HANNIGAN: Don't instruct the witness.
20  A.  Yeah, I'm not sure.
21  Q.  (Ms. Hannigan) So have you ever prepared an
22 incident report?
23  A.  No. I believe this is probably the only one that
24 I can recall.
25  Q.  Have you ever prepared a safety report with --

Susan C. Nissman, RPR-RMR
(340) 773-8161

16

FRANK KIRSCH -- DIRECT

1  with respect to your work for Petro?
2  A.  Yes.
3  Q.  So you've never prepared any incident reports?
4  A.  Not to my knowledge, no.
5  Q.  If an incident came to your attention, where there
6  were complaints regarding safety of personnel at -- through
7  the course of Petro's work, would you prepare a safety
8  report for that?
9  A.  If I was part of the job and the situation, yeah.
10  Q.  What if the situation was just reported to you,
11 but you weren't there, would you still prepare a safety
12 report?
13  A.  I would help.
14  Q.  When was the first time you heard of the Andrew
15 Canning incident in February of 2021?
16  A.  That day.
17  Q.  Who told you about it?
18  A.  I guess Chad called me into the control room, and
19 then Andrew.
20  Q.  So you were on site that day at the facility?
21  A.  Yes, I was.
22  Q.  Did you witness the incident occur?
23  A.  No.
24  Q.  So you heard about it secondhand through Chad and
25 Andrew?

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 17

FRANK KIRSCH -- DIRECT

1  A.   Yes.
2  Q.   And have you ever seen this incident report in
3  front of you before?
4  A.   Um, I can't answer that.  I don't know.
5  Q.   So you've never seen it before?
6  A.   Maybe.  I don't know.  I can't answer it.
7  Q.   Okay.  Right now, you can't recall ever having
8  seen this before, right?
9  A.   Yeah.  That's two-and-a-half years ago, so, yeah,
10 I don't.  I don't remember, exactly.
11 Q.   Did you prepare a safety report, or any type of
12 evaluation regarding this incident?
13 A.   No, we did not.
14 Q.   Why not?
15 A.   I guess it just revolves around here.  This was
16 done a couple days later, and that's what -- we just rolled
17 with that.
18 Q.   So you thought this incident report was a
19 sufficient analysis of the situation?
20         MS. ROHN:  Objection to form.  Leading.
21 Q.   (Ms. Hannigan) So you thought this incident report
22 was sufficient?
23         MS. ROHN:  Objection.  Leading.
24 Q.   (Ms. Hannigan) You may answer.
25 A.   I'm not sure.

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 18

FRANK KIRSCH -- DIRECT

1  Q.   Could you please turn to -- slightly towards the
2  bottom of the first page, it says, "Andrew claimed to have
3  fallen through the grading of the platform to the boiler,"
4  correct?
5         MS. ROHN:  What second page?
6  A.   What page?  I only have one.
7  Q.   It's marked 7557 at the bottom.
8         MS. ROHN:  That's what we have, 7557.
9  A.   "Andrew claimed to have" -- okay.  I got it down
10 here.  "Briefly Describe What Happened"?
11 Q.   (Ms. Hannigan) Yes.
12         So it says, "Andrew claimed to have fallen
13 through the grading of the platform to the boiler."
14 A.   Correct.
15 Q.   And would you agree that someone falling through
16 to the boiler would be a potentially dangerous incident?
17 A.   Sure.
18 Q.   Because the boiler's very hot.  As we said, it's a
19 dangerous facility?
20         MS. ROHN:  Assumes facts not in evidence.
21 Q.   (Ms. Hannigan) You said before that this is a
22 dangerous facility, right?
23         MS. ROHN:  Objection.  Leading.
24 Q.   (Ms. Hannigan) You may answer.
25 A.   Yes.

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 19

FRANK KIRSCH -- DIRECT

1  Q.   And a boiler is part of why this is a dangerous
2  facility, right?
3  A.   Yes.
4  Q.   And if we go to the next page -- it's probably,
5  just, if you flip around the sheet that you have in front of
6  you, it says 7558 at the bottom.
7         MS. ROHN:  We don't have anything in front of
8  us.
9         MR. BECKSTEDT:  Sarah, can you just tell me
10 the Bates number of this exhibit?
11         MS. HANNIGAN:  Yes.  7557 to 7558.
12         MR. BECKSTEDT:  Okay.  Well, I know we marked
13 7558 as DX-3, and I'll give him that.
14         MS. ROHN:  Why don't you make it part of 2?
15         MR. BECKSTEDT:  Okay.  All right.  I don't
16 have a stapler, but we'll put them together.  No problem.
17         MS. HANNIGAN:  Correct.
18         MR. BECKSTEDT:  Sorry about that.  Thank you,
19 Sarah.  Just one second.
20         All right.  He has both pages before him.
21 Q.   (Ms. Hannigan) Thank you.
22         Do you see Page 7558, where it's marked down
23 at the bottom?
24 A.   It's marked what?
25 Q.   7558 at the bottom.

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 20

FRANK KIRSCH -- DIRECT

1  A.   Yes, yes, yes, yes.  I gotcha.  I gotcha.
2  Q.   And do you see that this a continuation of the
3  same incident report?
4  A.   Yes.
5  Q.   And it states, "Once he arrived, Andrew in a upset
6  manner told Chad that he had fallen through the platform
7  because of substandard bullshit work," right?
8  A.   Um-hum.
9  Q.   Did you witness this interaction?
10 A.   No.  I was outside first, when Chad went in by
11 himself.
12 Q.   Did you speak to Chad or Andrew directly about
13 this incident?
14 A.   Yes.  I was called in minutes later.
15         MS. ROHN:  Yes or no?
16 A.   Yes.
17 Q.   (Ms. Hannigan) What did Chad tell you about the
18 incident?
19 A.   Chad didn't say much.
20 Q.   What did Andrew tell you about the incident?
21 A.   He explained that he almost fell through, and he
22 was blaming us, and he was real loud and started cursing,
23 and I told him, I ain't dealing with this shit, and I'm
24 walking out.
25 Q.   And --

Susan C. Nissman, RPR-RMR
(340) 773-8161

FRANK KIRSCH -- DIRECT

1  A. And that's what happened. That was the end of it.
2  Q. -- why did you say that you weren't dealing with
3  it and walked out?
4  A. I also explained to him that I've never treated
5  him that way. That I should not be treated the same way.
6  He's not going to holler and scream and cuss at me, and
7  that's why I walked out.
8  Q. But you acknowledge that he would have a right to
9  be upset if he fell --
10 A. Upset is -- upset is one thing.
11       MS. ROHN: Wait, wait.
12 A. Okay.
13       MS. ROHN: You can't answer the question --
14 A. All right.
15       MS. ROHN: -- until she finishes the
16 question.
17 A. I gotcha. All right.
18 Q. (Ms. Hannigan) Do you agree that he has a right to
19 be upset if he did fall in a boiler room?
20       MS. ROHN: Objection. Calls for speculation.
21 Q. (Ms. Hannigan) You may answer.
22 A. Could you repeat that again?
23 Q. Do you agree that he has a right to be upset or
24 would understandably be upset if he fell in a boiler room?
25 A. Upset, yes.

Susan C. Nissman, RPR-RMR
(340) 773-8161

FRANK KIRSCH -- DIRECT

1  Q. Do you agree that he had a right to be upset?
2  A. Yes.
3  Q. And your disagreement is with the way that he
4  expressed that he was upset?
5  A. Correct.
6  Q. On this page, the same page we were on, do you see
7  where it says, about halfway down the paragraph, "Chad went
8  up the platform to check Andrew's claim of substandard
9  work/welding only to confirm that additional fastener clips
10 were needed"? Do you see that?
11 A. Yes.
12 Q. What is a fastener clip?
13 A. A fastener clip is a little metal device that
14 clips the two grates together.
15 Q. And do you agree that additional fastener clips
16 were needed on that platform?
17 A. Yes.
18 Q. And whose responsibility was it to maintain that
19 platform?
20 A. Say again?
21 Q. Whose responsibility was it to maintain that
22 platform?
23 A. Maintain?
24 Q. Yes.
25 A. I don't understand that.

Susan C. Nissman, RPR-RMR
(340) 773-8161

FRANK KIRSCH -- DIRECT

1  Q. Whose responsibility was it to install the
2  fastener clips on that platform?
3  A. Petro.
4  Q. And why had Petro not installed fastener clips on
5  that platform?
6  A. I believe they were on backorder.
7  Q. And when did Petro learn that the fastener clips
8  were on backorder?
9  A. Say again?
10 Q. When did Petro learn that the fasteners --
11       MS. ROHN: Okay. This is not a Petro
12 30(b)(6) witness. You cannot make him a Petro 30(b)(6)
13 witness. He can only testify of his own knowledge.
14 Q. (Ms. Hannigan) Okay. Mr. Kirsch, did you know
15 that the fasteners were on backorder?
16 A. I later found out.
17 Q. When did you find out?
18 A. I guess that day.
19 Q. Do you know whose responsibility it would be to
20 order fastener clips?
21 A. Adrian, I'm assuming.
22       MS. ROHN: Don't assume.
23 A. To my knowledge. Ain't my job.
24 Q. (Ms. Hannigan) Who told you that the fastener
25 clips were on backorder?

Susan C. Nissman, RPR-RMR
(340) 773-8161

FRANK KIRSCH -- DIRECT

1  A. I can't recall.
2  Q. Do you consider fastener clips to fall under your
3  responsibility as safety manager?
4  A. No.
5  Q. Do you consider them to fall under your
6  responsibility if they're creating a potentially unsafe
7  situation?
8  A. If I was part of the job.
9  Q. So as part of your job, to make sure that the
10 platform was secure?
11 A. I wasn't part of the job.
12 Q. But you said you were on site as the safety
13 supervisor that day?
14 A. That was the first time on the job.
15 Q. So this day that you learned of this platform
16 incident was your first day as a safety supervisor?
17 A. Do what? Say again?
18 Q. The day of this platform incident was your first
19 day working as safety supervisor?
20 A. No.
21 Q. So why did you say that this wasn't part of your
22 job?
23 A. I was not on the platform job. I was there for
24 another job.
25 Q. What job were you there for?

Susan C. Nissman, RPR-RMR
(340) 773-8161

25

FRANK KIRSCH -- DIRECT

1  A.  I think we were doing some pipe tie-in up on the
2  vessel. Couldn't tell you the exact name or --
3  Q.  Okay. So as the Petro safety supervisor working
4  at that site, you were only responsible for specific
5  projects?
6  A.  Yes.
7  Q.  Were there any safety supervisors responsible for
8  the platform project?
9  A.  I have no -- I don't know. That was Andrew's
10 project.
11 Q.  Were there any other safety supervisors working at
12 Petro besides you at this time?
13 A.  No.
14 Q.  What steps should be taken to mark off hazards, if
15 you're aware of a potential hazard on a job site?
16 A.  Use either a caution tape or hazard tape.
17 Barricade signs.
18 Q.  And what's the purpose of those hazard indicators?
19 A.  To keep people out.
20 Q.  And were there any hazard indicators on the
21 platform that day?
22 A.  When I got there, no.
23 Q.  Do you know if there had been -- and why do you
24 believe there were no hazard indicators?
25 A.  Say again?

Susan C. Nissman, RPR-RMR
(340) 773-8161

26

FRANK KIRSCH -- DIRECT

1  Q.  Why do you believe there were no hazard
2  indicators?
3  A.  I'm not a hundred-percent sure.
4  Q.  Do you think there should have been hazard
5  indicators?
6       MS. ROHN: Objection. Calls for speculation.
7  Q.  (Ms. Hannigan) You may answer.
8  A.  I wasn't part of the job, so I don't know what was
9  going on.
10 Q.  Do you think there should have been a Petro safety
11 person responsible for the platform maintenance?
12      MS. ROHN: Objection. Calls for speculation.
13 Q.  (Ms. Hannigan) You may answer.
14 A.  Well, should I tell them about Andrew, and I'm not
15 part of his job?
16      MS. ROHN: I can't answer your question.
17 A.  Okay. So Andrew said he don't need Petro Safety
18 all the time, so there were a lot of jobs that were his in
19 St. Croix and in St. Thomas that I was not a part of. I was
20 there, at that time, on a job for Merlin on a tie-in.
21 Q.  (Ms. Hannigan) Okay. And what do you mean when
22 you say this was Andrew's job?
23 A.  He was -- he was running the job.
24 Q.  So it was his responsibility to run this job, is
25 what you're saying?

Susan C. Nissman, RPR-RMR
(340) 773-8161

27

FRANK KIRSCH -- DIRECT

1  A.  It was his responsibility for what?
2  Q.  To run this job, right?
3  A.  That's part of it. I guess so. I mean, it ain't
4  a part of me.
5  Q.  But Petro was the one doing the maintenance,
6  correct?
7  A.  Right.
8  Q.  So even if Andrew was running the job, it was
9  still Petro's responsibility to perform the maintenance?
10      MS. ROHN: Objection. Asked and answered.
11 Q.  (Ms. Hannigan) You may answer.
12 A.  Whatever's in their contract. I don't know.
13 Q.  Did Chad tell you anything else that day about the
14 platform incident?
15 A.  No. I didn't know about the platform incident
16 until me and Chad met in Andrew's office, so, no, he did
17 not.
18 Q.  So he didn't tell you that any racist statements
19 were made by Mr. Canning?
20 A.  I don't know.
21 Q.  You just said that he didn't tell you anything
22 further about the platform incident.
23      So he didn't tell you about any racist
24 statements made by Mr. Canning?
25 A.  Are you asking me if he told me something before

Susan C. Nissman, RPR-RMR
(340) 773-8161

28

FRANK KIRSCH -- DIRECT

1  the incident?
2  Q.  No. After the incident? In the context of this
3  fall on the 15th?
4  A.  No. We met in Andrew's office. I don't know what
5  you're saying.
6  Q.  In general, in your role as safety supervisor,
7  what standards or guidelines do you use to ensure safety at
8  the facilities that Petro's working on?
9  A.  JSAs, and safety walks.
10 Q.  Do you use any manuals or other guidelines?
11 A.  Yes.
12 Q.  What do you use?
13 A.  Petro has a safety manual. The contractors that
14 we work for usually have a safety manual.
15      MS. HANNIGAN: Carl, could you please pull
16 PIS 506? And we'll mark that as Exhibit 4.
17      MR. BECKSTEDT: Actually, Sarah, I think
18 we're at Exhibit 3, 'cause we're going to staple those two
19 pages together.
20      MS. HANNIGAN: Okay. Great.
21      So we'll mark PIS 506 as Exhibit 3.
22      (Deposition Exhibit No. 3 was
23       marked for identification.)
24 A.  Can I get some water?
25      MR. BECKSTEDT: Yep. I'll get you some.

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 29

FRANK KIRSCH -- DIRECT

1  A. Okay. Appreciate it.
2       (Respite.)
3  MS. ROHN: Do you have a copy for me?
4  MR. BECKSTEDT: Yeah, I do.
5       This is abridged of a 380-page document.
6  MS. ROHN: I object to not having a complete
7  document.
8  MR. BECKSTEDT: You can go on -- if you want
9  to go on a break, I'll print it out.
10 MS. ROHN: I don't care about it, but if it's
11 going to be attached to the deposition, it should be a full
12 document.
13 MR. BECKSTEDT: Okay. So we can send Susan
14 the full -- I sent it already to everybody via PDF.
15 MS. ROHN: Yeah. Perfect.
16 MR. BECKSTEDT: Okay.
17      Sarah, did you catch that?
18 MS. HANNIGAN: Yes. Got it.
19 Q. (Ms. Hannigan) Mr. Kirsch, have you seen this
20 document before?
21 A. Not this one, no.
22 Q. You've never seen a document titled, "Site
23 Specific Safety Plan"?
24 A. Yes, in our office.
25 Q. So have you seen a version of the document before?

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 30

FRANK KIRSCH -- DIRECT

1  A. Yes.
2  Q. And what do you understand it to be?
3  A. A safety plan.
4  Q. And who's responsible for creating the safety
5  plan?
6  A. This was created before I started, so I'm assuming
7  Adrian Melendez.
8  Q. You say it was created before you started?
9  A. Yes.
10 Q. This version is marked as January 2020, though,
11 right?
12 A. Right.
13 Q. And you said you've been at Petro for
14 four-and-a-half years?
15 A. Yes.
16 Q. So wouldn't this be from after you started?
17 A. Looks that way.
18 Q. So this -- this document was your responsibility?
19 MS. ROHN: Objection. Form. Leading.
20 Q. (Ms. Hannigan) You may answer.
21 A. Not to my knowledge.
22 Q. Sorry. I didn't understand you.
23 A. No.
24 Q. So whose responsibility was creating and
25 overseeing this document?

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 31

FRANK KIRSCH -- DIRECT

1  A. I can't answer that.
2  Q. So you don't know whose responsibility it was to
3  create the Site Specific Safety Plan?
4  A. I'm assuming Adrian.
5  Q. But you don't know?
6  A. No.
7  Q. Have you read this document before?
8  A. Not this one here. The one -- the one in the
9  office, yes. When I first started, yes. And a couple times
10 throughout, we had an issue here and there, I would read up
11 on it.
12 Q. So you agree that this document should be followed
13 for the safety plan?
14 MS. ROHN: Object to the form.
15 A. Yes.
16 Q. (Ms. Hannigan) You may answer.
17 MS. ROHN: He did, and he said, yes.
18 MS. HANNIGAN: Thank you.
19 A. I said, yes.
20 Q. (Ms. Hannigan) Could you please turn to PIS 600?
21 It's probably the second page in your packet there.
22 MR. BECKSTEDT: It's double-sided.
23 A. Oh, okay.
24      Okay.
25 Q. (Ms. Hannigan) Do you see that it says, "Fall

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 32

FRANK KIRSCH -- DIRECT

1  Prevention and Protection," at the top?
2  A. Yes.
3  Q. So this is a policy that applies to protect people
4  from falls, right?
5  A. Correct.
6  Q. So this policy has to be followed to protect from
7  falls?
8  A. Yes.
9  MS. HANNIGAN: I think now would be a good
10 time for a break, if everyone agrees?
11 MS. FRANCIS: It's fine with me.
12 MS. HANNIGAN: Okay. Let's rejoin in five
13 minutes, or do you all want ten minutes?
14 MR. BECKSTEDT: The videographer has to go
15 off the record, and then we could talk then.
16 THE VIDEOGRAPHER: Going off the record. The
17 time is 10:17.
18      (Short recess taken.)
19 THE VIDEOGRAPHER: Going back on the record.
20 The time is 10:31.
21 Q. (Ms. Hannigan) Mr. Kirsch, how do you communicate
22 with other Petro employees?
23 A. Cell phone, safety meetings, talking.
24 Q. Do you communicate by e-mail with them, using your
25 Petro e-mail address?

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 33

FRANK KIRSCH -- DIRECT

1  A.  Not -- if so, not a lot.
2  Q.  Got it.
3      So mostly texting?
4  A.  Texting, calling, yeah.
5  Q.  Okay. Do you know what Versa Integrity Group is?
6  A.  No, I don't.
7  Q.  You've never heard of that before?
8  A.  No.
9  Q.  So you were not involved at all in the process of
10 checking the welds that Petro does?
11 A.  No.
12 Q.  Have you ever heard of a man by the name of
13 Guillermo Castro?
14 A.  I don't know. I don't think so.
15 Q.  Were you aware that Petro welders went to Puerto
16 Rico to be retested by Mr. Castro?
17 A.  I'm not. Yeah, I don't know whether they went to
18 Puerto Rico, but I know they went somewhere.
19 Q.  Were you involved at all in the welder
20 certification or recertification process?
21 A.  No.
22 Q.  Do you think welding can be a safety concern?
23     MS. ROHN:  Objection. Vague.
24 Q.  (Ms. Hannigan) Do you think the quality of welds
25 can be a safety concern?

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 34

FRANK KIRSCH -- CROSS

1  A.  No.
2     MS. HANNIGAN:  I have no further questions.
3     MR. SIMPSON:  I have a few follow-up.
4             CROSS-EXAMINATION
5  BY MR. SIMPSON:
6  Q.  Mr. Kirsch, my name is Andy Simpson, and I
7  represent Andrew Canning and Optis Europe in this case.
8      When you said that Andrew was running the
9  job, what did you mean?
10 A.  That it was his job. He was running the job. We
11 had a Merlin job or Andrew job.
12 Q.  Okay. What do you mean by an "Andrew job"?
13 A.  That he was head. He was the head. That it was
14 his job. I guess it was a Vitol job, if it was Andrew's.
15 Q.  All right. Was -- was he expected, to your
16 understanding, to be present when the work was being done?
17    MS. ROHN:  Object to form. Go ahead.
18 A.  Say it again?
19 Q.  (Mr. Simpson) To your understanding, was -- if it
20 was his job -- well, let me ask it a different way.
21     If it was his job, what were his duties, to
22 your understanding?
23 A.  That has nothing to do with me.
24 Q.  Okay. Did you ever hear Andrew say something of a
25 racist nature?

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 35

FRANK KIRSCH -- CROSS

1  A.  No.
2  Q.  Did you ever hear Andrew say something that was
3  critical of people, based upon their national origin?
4  A.  No.
5  Q.  Did you ever hear Andrew referring to -- in a
6  derogatory fashion, or pejorative fashion, to locals or
7  islanders?
8  A.  Not when I was present, no.
9  Q.  I'm sorry. I couldn't hear your answer.
10 A.  No.
11    MS. ROHN:  He said, "Not when I was present,
12 no."
13 Q.  (Mr. Simpson) Did you have any problems
14 interacting with Andrew, other than the interaction
15 immediately following the grating incident?
16 A.  I wasn't really involved in many jobs with Andrew,
17 so, no.
18 Q.  What is the normal process for the custody of
19 incident reports filled out by Petro employees?
20    MS. ROHN:  Objection. Not a -- not a Petro
21 30(b)(6) witness.
22 Q.  (Mr. Simpson) You can answer.
23 A.  Say it again?
24 Q.  What was the normal chain of custody -- let me ask
25 it a different way.

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 36

FRANK KIRSCH -- CROSS

1      Were incident reports supposed to come to you
2  as the safety manager?
3  A.  Not necessarily.
4  Q.  What was the process for dealing with an incident
5  report after it was completed?
6  A.  Really didn't have many.
7  Q.  Well, when you had any, what was the process?
8  Did -- did the supervisor just fill it out, and then it gets
9  forgotten or --
10 A.  No, no.
11    MS. ROHN:  Objection to form.
12 Q.  (Mr. Simpson) So I'm trying to understand the
13 process.
14     What happens once an incident is completed?
15 A.  I don't really recall any, except for one in the
16 refinery, and it went through me, Adrian, and Chad, and the
17 supervisor that was on site.
18 Q.  And this, the particular incident report, relating
19 to the grating incident, never came through you; is that
20 correct?
21 A.  Afterwards, but not during the initial.
22 Q.  Okay. How -- how long afterwards?
23 A.  I have no idea.
24 Q.  I mean, are we talking weeks? Days? Months?
25 Years?

Susan C. Nissman, RPR-RMR
(340) 773-8161

```
                                    37
     FRANK KIRSCH -- CROSS
 1      A.   I would assume days.
 2      Q.   Okay.  So do you recall reviewing this particular
 3   incident report within days or weeks of it?  Of the
 4   incident?
 5      A.   I don't recall.
 6      Q.   Did you investigate anything relating to this
 7   incident?
 8      A.   Yes.  I walked it.
 9      Q.   Okay.  And what did you observe when you walked
10   it?
11      A.   That there were no clamps, and --
12      Q.   Okay.  I'm sorry.  Go ahead.
13      A.   There were no clamps.
14      Q.   Okay.  Did you observe that even with clamps, the
15   grating was not adequately supported?
16           MS. ROHN:  Object to the form.  Leading.
17      A.   Say again?
18      Q.   (Mr. Simpson)  Did you observe that even with clips
19   installed, the grating was not adequately supported in the
20   middle?
21      A.   With the clips installed?
22      Q.   Yes.
23      A.   No.  Yeah, I didn't go back to the job.
24      Q.   Okay.  Did you ever look at the grating after the
25   clips were installed?
```
                    Susan C. Nissman, RPR-RMR
                         (340) 773-8161

```
                                    38
     FRANK KIRSCH -- CROSS
 1      A.   No.
 2      Q.   Did you talk to anyone who was present at the time
 3   of the incident, other than Mr. Canning?
 4      A.   That's all it was, him and David, no.
 5      Q.   So you did not talk to David?
 6      A.   No.
 7      Q.   And that would be David Nagle, right?
 8      A.   Yes.
 9      Q.   Did anyone tell you that Andrew was jumping up and
10   down on the grating?
11      A.   It was a rumor I heard, yeah.
12      Q.   I'm sorry.  That was a rumor you heard?
13      A.   Yes.
14      Q.   Who did you hear that rumor from?
15      A.   I can't tell you that.  I don't know.  I don't
16   remember that.
17      Q.   When did you hear that rumor?
18      A.   I'm going to assume that day.
19      Q.   But you said you're going to assume, so that means
20   you don't know?
21      A.   Yeah, I don't know what day it was.
22      Q.   I couldn't hear that.  I'm sorry.
23      A.   Yeah, I don't know what day it was.
24      Q.   Okay.  So you don't know what day it was, and you
25   don't know who the source of the rumor was, correct?
```
                    Susan C. Nissman, RPR-RMR
                         (340) 773-8161

```
                                    39
     FRANK KIRSCH -- CROSS
 1      A.   No, I don't remember that.
 2      Q.   And when you -- you visited the site of the
 3   incident the same day, correct?
 4      A.   Correct.
 5      Q.   Approximately how long after the incident did you
 6   visit it?
 7      A.   An hour, two hours.  I don't know what it was.
 8   Hour, I guess.
 9      Q.   Okay.  And when you visited it, you said you saw
10   no evidence of barricades, correct?
11      A.   No.
12      Q.   No, you did not, or --
13      A.   No, I did not.
14           MR. SIMPSON:  Okay.
15              (Respite.)
16           I have no further questions.  Thank you.
17           MS. ROHN:  Go ahead, Simone.
18           MS. FRANCIS:  I do.  Just one second.
19                  CROSS-EXAMINATION
20   BY MS. FRANCIS:
21      Q.   Good morning, Mr. Kirsch.  My name is Simone
22   Francis, and as indicated earlier, I represent IPOS in this
23   action.  I just have a few follow-up questions for you.
24      A.   Sure.
25      Q.   And I'm just trying to understand a little more
```
                    Susan C. Nissman, RPR-RMR
                         (340) 773-8161

```
                                    40
     FRANK KIRSCH -- CROSS
 1   clearly your -- your role at the -- in terms of jobs at the
 2   propane facilities in the Virgin Islands.
 3           First of all, did you perform work as a
 4   safety manager, both in St. Thomas and in St. Croix?
 5      A.   For Petro, yes.
 6      Q.   What island do you live on?
 7      A.   St. Croix.
 8      Q.   And have you lived in St. Croix for the entirety
 9   of the time that you've lived in the Virgin Islands?
10      A.   No.
11      Q.   So during what period did you live in St. Thomas?
12      A.   I never lived in St. Thomas.
13      Q.   Oh, I'm sorry.  You said you have lived in
14   St. Croix for the entirety of your time in the Virgin
15   Islands?
16      A.   Yes.
17      Q.   Did you have any role in supervising Petro's
18   maintenance workers?
19      A.   No supervising, no.
20      Q.   Did you have any role in terms of establishing or
21   monitoring safety standards for Petro's maintenance workers
22   who worked at the propane facility?
23      A.   Yes.
24      Q.   Okay.  Tell me what your role was with respect to
25   safety for the maintenance workers.
```
                    Susan C. Nissman, RPR-RMR
                         (340) 773-8161

1  A.  Well, every week, we had a safety meeting.  And
2  then I would do safety walks on certain jobs, or maybe even
3  I may be there all day.  I may be there just for an hour.
4  Just different from day to day.
5  Q.  Okay.  And did you have any role in terms of
6  ensuring or monitoring safety with respect to work done by
7  Petro's welders?
8  A.  Not sure.
9      I didn't understand that question.
10 Q.  Did you have any work role in terms of monitoring
11 or overseeing safety with respect to Petro's welders?
12 A.  Safety only, yes.
13 Q.  Okay.  And what was your role with respect to
14 monitoring or overseeing safety concerning Petro's welders?
15 A.  Make sure they got the right PPE.  Make sure
16 they're working safe.  Whatever conditions we have for the
17 day, make sure everything is -- the welder or the welds or
18 everything is protected.  Pretty much it.
19 Q.  Okay.  Earlier, you testified that you, yourself,
20 are not a -- qualified to do welding work, correct?
21 A.  Correct.
22 Q.  And you are not qualified to test or certify
23 welders, correct?
24 A.  Correct.
25 Q.  During the time that you have worked at Petro, has

                    Susan C. Nissman, RPR-RMR
                         (340) 773-8161

1  there been an individual who held -- who holds or has held
2  the position of quality control manager?
3  A.  Yes.  Chad, Adrian.
4      Say again?
5  Q.  I was going to ask you, who holds that position?
6  A.  Depending on the job, it could be Chad Persuad.
7  Two years ago, it could have been Brian Melendez.  Could
8  be -- well, most of our supervisors are quality control,
9  also.
10 Q.  So have you ever acted as a quality control
11 manager?
12 A.  No.
13 Q.  And, again, so we're clear, the individuals who
14 you understand to act as -- have acted as quality control
15 managers are Chad Persaud and Brian Melendez?
16 A.  And our supervisors, depending on what job it is.
17 But mainly Chad, and like I said, back then, it was probably
18 Brian, too, but Elias Rivera could be one.  Carmen Santiago.
19 Q.  I'm sorry.  What was that name?
20 A.  Carmen Santiago.
21 Q.  Okay.  Does -- is that a male or female?
22 A.  Female.
23 Q.  Okay.  And does Carmen Santiago currently work for
24 Petro?
25 A.  Yes.

                    Susan C. Nissman, RPR-RMR
                         (340) 773-8161

1  Q.  And what other positions does she hold?
2  A.  She's a supervisor.  She supervises a crew.
3  Q.  During the period that you worked for Petro, did
4  you have interactions with Merlin Figueira?
5  A.  Of course.
6  Q.  Can you tell me the nature and frequency of your
7  interactions with Mr. Figueira?
8  A.  We do the safety meeting in St. Thomas every
9  month, so I would see him then.
10     And then if we had a big job going over
11 there, and if it was his job, especially, I was usually on
12 it, and even some of Andrew's jobs, I was on, too, but just
13 not a whole lot, but that's when I would meet with Merlin.
14 Q.  And as I understood your prior testimony, you
15 never made any complaints about Mr. Canning to Merlin
16 Figueira?
17 A.  No.  Nothing written, no.
18 Q.  Did you make any verbal complaints about
19 Mr. Canning to Mr. Figueira?
20 A.  If I did, it was just usually about his attitude.
21 Q.  What about his attitude?
22 A.  He was always very sharp.  Wasn't a
23 hundred-percent professional, in my opinion.  That would be
24 about it.
25 Q.  And when you say, "he was always very sharp," what

                    Susan C. Nissman, RPR-RMR
                         (340) 773-8161

1  do you mean by that?
2  A.  Well, could be negative.  Could be positive.  Just
3  sharp.  Just kind of degrading.  Sharp.
4  Q.  I didn't hear what you said.
5      MS. ROHN:  "Kind of degrading.  Sharp."
6  Q.  (Ms. Francis)  And did you say that could be
7  negative or could be positive?
8  A.  Yes.  Sometimes it was positive.  It wasn't a
9  negative thing, he was just coming off sharp.  Sometimes it
10 was negative, but sometimes it was just, you know, you're
11 like, Why did he have to say that?
12 Q.  And is the "that" that you're referring to
13 something regarding the work that was being done?
14 A.  Possibly.
15 Q.  And tell me each specific incident that you
16 recall, in which you made -- expressed a concern about
17 Mr. Canning being sharp or not 100-percent professional to
18 Mr. Figueira?
19 A.  Wait a minute.  Say that again?
20 Q.  Tell me every incident that you recall, as you sit
21 here today, in which you expressed a concern that
22 Mr. Canning was sharp or not 100-percent professional to
23 Mr. Figueira?
24 A.  To him?
25 Q.  Yes, sir.

                    Susan C. Nissman, RPR-RMR
                         (340) 773-8161

```
                                    45
     FRANK KIRSCH -- CROSS
 1        A.   Well, I don't know what he said.  I wasn't there,
 2   probably.  I thought you were talking about --
 3        Q.   No.  I said, what did you say to Mr. Figueira?
 4        A.   Oh, okay.  Well, I mean, it was -- it was a while
 5   back, so I don't remember exactly what I said.  Just, you
 6   know, that he's -- he was sharp.  That's it.  I don't know
 7   what word to tell you.  That's about all I got.
 8        Q.   Okay.  That's what you recall, is that your
 9   testimony?
10        A.   Yes.
11        Q.   Did you ever have any interactions with David
12   Smith?
13        A.   Not a whole lot.  Just, he went to Florida, pretty
14   much.  Just as soon as I started, I believe.
15        Q.   And did you ever express any concerns about
16   Mr. Smith to -- I'm sorry -- about Mr. Canning to Mr. Smith?
17        A.   No.
18        Q.   Did you have any interactions with -- or let me
19   ask you a different question.
20             Did you ever express any concerns about
21   Mr. Canning to any other IPOS employees?
22        A.   Yeah, maybe Granger.
23        Q.   Tell me exactly what you said to Granger.  Well,
24   when you say, "maybe Granger" --
25        A.   That would be like --
                    Susan C. Nissman, RPR-RMR
                         (340) 773-8161
```

```
                                    46
     FRANK KIRSCH -- CROSS
 1        Q.   -- are you guessing?
 2        A.   -- probably the only one who I was talking to.
 3        Q.   I'm sorry?
 4        A.   He's probably the only other person that I really
 5   talked to a lot.
 6        Q.   Okay.  Do you have a specific recollection of --
 7   about expressing a concern about Mr. Canning to Granger?
 8        A.   No, I don't remember everything.
 9        Q.   Sir, can I ask you to repeat that?  Either you're
10   mumbling or the transmission is not --
11             MS. ROHN:  He said, "I don't remember that,
12   either."
13        A.   No, I don't remember.
14        Q.   (Ms. Francis) So as you sit here today, you have
15   no specific recollection?
16        A.   Yeah.
17        Q.   Okay.  What, if anything, did you do to prepare
18   for your deposition today?
19        A.   Nothing.
20        Q.   Did you meet with anyone?
21        A.   Excuse me?
22        Q.   Did you meet with or speak to anyone about --
23        A.   No.
24        Q.   -- the deposition?  Okay.
25             And have you given deposition testimony prior
                    Susan C. Nissman, RPR-RMR
                         (340) 773-8161
```

```
                                    47
     FRANK KIRSCH -- CROSS
 1   to today?
 2        A.   I didn't hear you.
 3        Q.   Have you ever given testimony at a deposition
 4   prior to today?
 5        A.   I've given one statement, yes.
 6        Q.   Okay.  And was that in connection with this
 7   matter, or a different matter?
 8        A.   This matter.
 9        Q.   Okay.  And what one statement have you given?
10        A.   Just to the lawyer, that's it.  To our lawyer.
11        Q.   May I ask you to repeat that, sir?
12        A.   Just to our lawyer.
13             MS. ROHN:  Just to our lawyer.
14        Q.   (Ms. Francis) "Just to our own lawyer," is that
15   what you said?
16        A.   Yes.
17        Q.   Meaning Attorney Rohn?
18        A.   What's that?
19        Q.   Who is the lawyer to whom you gave a statement?
20        A.   The lady sitting next to me to the right here.
21        Q.   Okay.  And when was that?
22        A.   Oh, my goodness.  When was that?  I have no idea.
23   March.  April.  Somewhere in there, I guess.
24        Q.   Did you give a verbal statement, or something in
25   writing?
                    Susan C. Nissman, RPR-RMR
                         (340) 773-8161
```

```
                                    48
     FRANK KIRSCH -- CROSS
 1        A.   Verbal.
 2        Q.   Okay.  And who else was present?
 3        A.   Adrian.
 4        Q.   Okay.  And is that the only time you've had a
 5   discussion about anything related to this lawsuit?
 6        A.   Yes.
 7        Q.   Have you had any discussions, whether phone, text,
 8   or any other medium with Chad Persuad concerning --
 9        A.   No.
10        Q.   -- this matter?
11             MS. FRANCIS:  I have no further questions.
12             MS. HANNIGAN:  I have a few more before we
13   wrap up.
14             MS. ROHN:  I have -- I have a few, please.
15                    CROSS-EXAMINATION
16   BY MS. ROHN:
17        Q.   The area where the grate was, was there a reason
18   that you -- there could not be a barricade on that area?
19        A.   Well, there was only a ladder to get up there, but
20   I'm not sure the whole situation of what.  I know they had
21   to get up there.  I know IPOS had to get up there to read
22   their -- their meters.  But if there was an agreement.  But,
23   yeah, I mean, the ladder itself could have been barricaded.
24        Q.   But if the ladder was barricaded, then the IPOS
25   people who had to get up there couldn't get up the ladder,
                    Susan C. Nissman, RPR-RMR
                         (340) 773-8161
```

## Page 49

FRANK KIRSCH -- REDIRECT

```
 1  correct?
 2      A.   Correct.
 3           MS. FRANCIS:  Objection.  Leading.
 4           MS. ROHN:  No further questions.
 5                   REDIRECT EXAMINATION
 6  BY MS. HANNIGAN:
 7      Q.   Few more questions.
 8           So the ladder going to the platform wasn't
 9  barricaded off at all?
10      A.   No.
11      Q.   And you mentioned that you would text or call
12  people from Petro about work?
13      A.   About what?
14      Q.   About work?
15      A.   If it involved me, yes.
16      Q.   And would those communications mostly be on
17  regular text or on what --
18      A.   Probably regular text.
19      Q.   And did you communicate with Canning at all about
20  the work at the propane facilities on text?
21      A.   Never.
22      Q.   Did you communicate with other Petro employees on
23  text about the work at the propane facilities?
24      A.   If it concerned me.
25      Q.   And do you still have those texts?
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 50

FRANK KIRSCH -- RECROSS

```
 1      A.   I don't know.  Not -- yeah, I don't know.
 2      Q.   You don't know?  Okay.
 3      A.   Yeah, I would say not.
 4           MS. HANNIGAN:  No further questions.
 5      A.   Okay.
 6                   RECROSS-EXAMINATION
 7  BY MS. FRANCIS:
 8      Q.   I do have one follow-up.
 9           Mr. Kirsch, the statement that you testified
10  you provided to Attorney Rohn, did you ever see a typed or
11  written version of any information you provided?
12      A.   No.  She was just sitting there writing, like
13  she's doing now.  No, I never seen nothing else.
14      Q.   Have you ever signed any affidavit or declaration
15  concerning any information that you provided?
16      A.   No, not that I remember.
17      Q.   Have you ever reviewed an affirmation or
18  declaration that you did not sign?
19      A.   No.
20      Q.   And what was the subject or subjects of the
21  information that you provided?
22      A.   She asked me the same thing you've all been asking
23  me.
24      Q.   That's a little vague.
25           Can you be more specific?
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 51

FRANK KIRSCH -- RECROSS

```
 1      A.   We started out about me, and about me and Petro,
 2  and about me and Petro and IPOS, and then what I had to do
 3  with IPOS here in St. Thomas.  My whole job.  What happened
 4  with the -- the incident.
 5      Q.   Have you ever testified in court before,
 6  Mr. Kirsch?
 7      A.   Nope.
 8           MS. FRANCIS:  No further questions.
 9           MR. SIMPSON:  I have a few follow-up
10  questions.
11                   RECROSS-EXAMINATION
12  BY MR. SIMPSON:
13      Q.   Can you give me an example of what you mean by
14  Mr. Canning being "sharp"?
15      A.   Him telling us that we don't know how to do our
16  jobs.
17      Q.   I'm sorry.  I didn't hear you.  Could you say that
18  again?
19      A.   Him telling us that we do not know how to do our
20  jobs.
21      Q.   And when did you ever hear him say that?
22      A.   To me, or someone else in the company?
23      Q.   To you, or to someone else?
24      A.   Usually he would see something.  He would get mad.
25  Say something.  He would call Chad.  But how often, yeah, I
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

## Page 52

FRANK KIRSCH -- RECROSS

```
 1  couldn't tell you all that.
 2      Q.   What -- what are the types of things that he would
 3  see that he would call Chad about?
 4      A.   I have no idea.
 5      Q.   For example, if he saw poor welding, would he call
 6  Chad?
 7           MS. ROHN:  Objection.  Leading.
 8      A.   That's not -- that's not my --
 9           MS. ROHN:  Assumes facts not in evidence.
10      A.   Yeah, that's no issue for me.
11      Q.   (Mr. Simpson) I'm sorry.  I couldn't hear you.
12      A.   I have no part of that.
13      Q.   Did you ever hear Mr. Canning describe to Chad his
14  objection to the work that had been done?
15      A.   Yes.
16      Q.   And what did you hear him say?
17      A.   What's wrong with this?  What's wrong with this?
18  Why can't we do it this way?  Usually trying to solve a
19  problem.
20      Q.   Do you recall any specific problems he was trying
21  to solve?
22      A.   Those little covers we did over in -- in
23  St. Croix.  The -- nobody knew how this was going to work
24  out.  How it was going to go together, so there was a lot of
25  issues with that.  Even though it was -- they designed it,
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

53

FRANK KIRSCH - CROSS

```
 1  nobody knew how to put it together.  So it was like a, you
 2  know, an hour-by-hour, day-to-day process, and I heard -- I
 3  heard a lot of stuff about that for sure.
 4      Q.   Was that what was called the RIO, R-I-O, shades?
 5      A.   I'm going to assume.
 6      Q.   Okay.
 7      A.   Yeah, it was about four of them, I believe.  Four
 8  or five.
 9      Q.   Did you ever witness Mr. Canning being more upset
10  than the day of the incident with the grating?
11      A.   I heard.  Did not witness.
12      Q.   What do you mean, you "heard"?
13      A.   Couple times with -- on that job, on the louver
14  job, or the RIO, whatever you called it, I heard about that
15  at the time.  And that was probably the main one, really,
16  that I can remember.
17      Q.   And -- but you did not actually witness
18  Mr. Canning being upset about that job?
19      A.   No.  I was not there, no.
20      Q.   Okay.  So is the grating incident the most upset
21  you've ever seen Mr. Canning?  You, personally?
22      A.   Yeah.  I guess so, yeah.
23      Q.   And he was -- he was cursing, that's what bothered
24  you about -- that made you walk out?
25      A.   The incident in St. Thomas?
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

54

FRANK KIRSCH - CROSS

```
 1      Q.   Yeah.
 2      A.   Yeah.  And hollering, yeah.
 3           MR. SIMPSON:  Okay.  I have no further
 4  questions.  Thank you.
 5           MS. ROHN:  I have no questions.
 6           THE VIDEOGRAPHER:  This concludes the
 7  deposition.  The time is 11:07.
```

                    (whereupon the deposition concluded
                               at 11:07 a.m.)

Susan C. Nissman, RPR-RMR
(340) 773-8161

55

C-E-R-T-I-F-I-C-A-T-E

I, SUSAN C. NISSMAN, a Registered Merit Reporter and Notary Public for the U.S. Virgin Islands, Christiansted, St. Croix, do hereby certify that the above named witness, FRANK KIRSCH, was first duly sworn to testify the truth; that said witness did thereupon testify as is set forth; that the answers of said witness to the oral interrogatories propounded by counsel were taken by me in stenotype and thereafter reduced to typewriting under my personal direction and supervision.

I further certify that the facts stated in the caption hereto are true; and that all of the proceedings in the course of the hearing of said deposition are correctly and accurately set forth herein.

I further certify that I am not counsel, attorney or relative of either party, nor financially or otherwise interested in the event of this suit.

IN WITNESS WHEREOF, I have hereunto set my hand as such Registered Merit Reporter on this the 24th day of July, 2023, at Christiansted, St. Croix, United States Virgin Islands.

                    /s/ Susan C. Nissman
                    _____
My Commission Expires:    Susan C. Nissman, RPR-RMR
June 28, 2027             NP-644-23