IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

PETRO INDUSTRIAL SOLUTIONS, LLC (PETRO),

    Plaintiff,

v.

ISLAND PROJECT AND OPERATING SERVICES, LLC, VITOL US HOLDING II CO., VITOL VIRGIN ISLANDS CORP, ANDREW CANNING, OPTIS EUROPE, LTD., VTTI and VITOL, INC.,

    Defendants.

CASE NO. 1:21-CV-00312

BREACH OF CONTRACT

JURY TRIAL DEMANDED

## AFFIRMATION OF CALVIN SCHMIDT

TERRITORY OF THE VIRGIN ISLANDS  )
                                      ) SS.
DIVISION OF ST. CROIX                )

    I, Calvin Schmidt, being first duly sworn, declare under penalty of perjury that the following is true and correct.

1. I make this affirmation of my own personal knowledge.
2. I am a black local man.
3. I was employed by IPOS beginning in August 2019, until it went out of business as a Maintenance Supervisor in St. Croix.
4. I had previously worked for Petro since September 2017 as a Maintenance Supervisor for both islands.
5. I saw the position with IPOS posted and applied. David Smith and a guy from VTTI interviewed me in St. Thomas.

EXHIBIT 5

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**AFFIRMATION OF CALVIN SCHMIDT**
Page 2

6. The position was created because Vitol and VTTI wanted a Maintenance Supervisor on St. Croix.

7. I was assigned to share an office with Andrew Canning.

8. It was a 40-foot trailer, and the environment was such that I could hear what Canning was saying and he could hear me.

9. When I worked at Petro, Canning would frequently claim I did not know how to do my job; he questioned my skills and abilities; and he constantly played games with words.

10. For instance, he would suggest I do a job one way; if it turned out not to be the right way to do it, he would deny he ever suggested doing it that way. If I said, "no", you shouldn't do it that way; even if I was right, he would report me for insubordination in emails to Chad.

11. When I first started working at Petro, we all believed Andrew Canning was the boss because he would give direct orders to the Petro men and not go through Chad or anyone else.

12. His treatment of the Petro employees got so bad, and he kept speaking derogatorily to me and all the maintenance guys, who were black or hispanic, that I finally went to Chad and complained about how he was treating the maintenance workers and falsely calling them lazy. Chad went to Canning, and told Canning to stop speaking to us directly. After that, I instructed my maintenance crew not to take any more

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**AFFIRMATION OF CALVIN SCHMIDT**
Page 3

instructions or have any more conversations with Canning, as he was clearly racist and had created a hostile work environment.

13. I also reported his racist conduct to David Smith, and told him Canning would go behind our backs, take pictures of the gate log-ins, when we went to lunch, and constantly act like we were cheating, in keeping with his racist attitude that we couldn't be trusted. The security guards warned us that he was doing this. Even though we actually came to work at 7:00, if he didn't see us until 7:30, because we were somewhere else working, he would falsely claim we were falsifying our time records as part of his racist attitude.

14. During this period of time, our times in St. Croix were paid according to the gate logs. At the end of the week, we turned in a timesheet, but it had to match the gate log. When we turned in our timesheet, he would go to the gate logs to double check them, like we were liars.

15. It got so bad that Bryan Melendez and Elvis Lloyd and I went to St. Thomas and again complained to David Smith. We told him that Canning was constantly looking over our backs and acting like we were cheating. David Smith told us that he was not supposed to be doing that, it was not part of his job duties, and he was just supposed to be doing engineering on projects. But David Smith never took any action because Canning continued with his racist attitude and continued to cause the job to be a hostile workplace.

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**AFFIRMATION OF CALVIN SCHMIDT**
Page 4

16. He used to constantly refer to my maintenance workers as "Puerto Ricans" or "lazy Puerto Ricans", but never as Petro's employees or by their names. They were not all Puerto Ricans, but they were all Hispanics. It clearly showed his racist attitude.

17. When I was at IPOS, I was in the trailer speaking to Canning about an upcoming project, and Canning kept referring to Corey Hodge as Merlin's blue-eyed "boy", *i.e.*, calling him a nigger. After he said it three times in the conversation, I told him to stop saying it, as it was not nice. He just smirked. I reported the incident to Corey Hodge that he was calling a Petro employee who was black a "boy".

18. When I was in the trailer with him, I constantly observed the difference as to how he spoke to and treated white/continental employees and what he would perceive as locals, *i.e.*, employees' of color. He was kind, engaging and respectful to the continental and condescending, aggressive and demeaning to the employees of color.

19. When Petro wanted to promote Johnny to lead man in St. Thomas, Canning opposed that, falsely claiming he was not "productive" enough. He would also question me as to whether I could understand what Johnny said, inferring he couldn't understand him. After that, he would go through me or Corey and avoid talking to Johnny.

20. He got so discriminatory and demeaning and created such a hostile work environment that Corey Hodge and I talked, and we decided we would not talk to him anymore, as he was not our boss, and he was not over maintenance.

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**AFFIRMATION OF CALVIN SCHMIDT**
Page 5

21. We were doing a job with the electricians, Elvis Lloyd and Hookfin, in St. Croix, and the guys were questioning how Canning was instructing that the job be done a certain way, and the well-skilled electricians (who were black locals) were explaining to him that it was not the correct way. In a racist manner, he asked if they were even qualified to do that work and wanted them tested to see if they were even electricians. It was clear from his demeanour that because they were black, he didn't think they could have the skills of electricians.

22. As to the welders on the jobs, who were Hispanic, Canning constantly questioned if they were qualified to do the work, and kept asking for certifications, particularly as to Elias Rivera, Juan Gulloghty, and Ricardo Velasquez. I personally observed their work as welders, and it was obvious they were very qualified welders. I also observed that they worked hard. Canning constantly falsely claimed they were lazy and unprofessional as part of his racist attitude.

23. We were doing a job on the mound. Akiz Jackman, a black local, was on the job. I observed that black men were one of Canning's favorite targets for abuse. That day, I observed and heard Canning punching the wall, while repeatedly saying Jackman was useless and he should be run off the job. I had observed Jackman's work, and Canning had no justifiable reason to make those statements, other than his racist attitude. We had a standard U.S. torquing chart that we were following. Canning wanted to do it his way, not the standard way, but we refused and did it correctly. He then falsely claimed we had done it incorrectly, falsely claimed we had damaged the

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**AFFIRMATION OF CALVIN SCHMIDT**
Page 6

equipment. Actually, the WAPA operator inspected the job and signed off on the correct work we had done.

24. I was present for the Rio Panel construction in St. Croix. These panels had been discussed since 2018. The original design as to the framing of the panels did not work because the measurements required attachments in areas where there was solid concrete with rebar in it. If the designer had consulted the specs originally for the mounts, he would have seen that there was rebar every so many feet. This was not disclosed, so the Petro crew spent a lot of time drilling and having bits break. It was finally discovered by Petro that there was rebar in the area, and we then began to use the diamond tools. The local Petro crews kept showing Canning that there was metal in the concrete, and he repeatedly refused to accept that fact. As a result, Canning repeatedly falsely claimed the local crew was incompetent and lazy and didn't know how to use tools correctly. When Petro finally established that there was rebar and switched to diamond tips, the job was quickly completed. It would have been completed sooner, but it was obvious Canning wouldn't listen to the workers of color, who had figured out the problem, because he did not feel they were incompetent to do so.

25. The Petro workers on the Rio Shades, who had shown Canning, he was wrong, within weeks were accused of signing in incorrectly on the guard logs and were thrown off the job by Canning.

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**AFFIRMATION OF CALVIN SCHMIDT**
Page 7

26. This was around the time of COVID, and the guards would write in the names and the time in the logbooks when you came to work. If you went in and out during the day, the guards would not write you out and back in and would only write you out at the end of the day. When Canning started claiming that Elias and his crew were stealing time, I explained to Canning how the guards were writing in the times, and I told him he could have dealt with it differently because the guys, when they learned of the mistake, had corrected the times. I told him, he should not have gone to Vitol and demanded they be kicked off the job. Canning told me "as to Elias, it's personal". He had it out for Elias and his crew since the fire pump line in St. Thomas. Canning told them to do the job one way. Elias and his crew tried to explain why it wouldn't work. Because Elias and his crew were Hispanic, he wouldn't listen to them and demanded they do it his way. They did, it didn't work, and they laughed at Canning, and ever since then he had it out for them.

27. As to the platform in the boiler room that Canning claims to have fallen through, I walked that platform the week before without the clips. I weigh 310 lbs, and I did not fall through it. Andrew Canning had originally been assigned to be in charge of building that platform, but instead Merlin gave it to Petro Maintenance. When I discussed this with Merlin along with Corey, Granger, and Alex, I recommended that Andrew Canning be disciplined by firing him because he did not have a permit or sign the logbook where he was going. As such, he was in the area illegally. The logbook was in the control room for IPOS. If he had signed in as he was required to,

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**AFFIRMATION OF CALVIN SCHMIDT**
Page 8

the IPOS operator would have warned him of the condition of the area. Canning did not sign into the logbook, which was a security and operations violation. Every worker for IPOS, Petro, or any other contractor had to sign the logbook, or they are terminated.

28. In the regulations at IPOS and Petro, if there is an injury, there is supposed to be an immediate drug test, the person has to go for medical, and it has to be documented in the logbook. Canning did not follow any of those procedures.

29. Canning often came to me and complained about Merlin and falsely stated he was not qualified to do the work. I observed that when Merlin came to the job, he got the jobs Canning was doing finished, so Canning had less work. We were working on vessel 208; Canning was over it, and it took a year and a half to complete. Then I went to Merlin and suggested the exact same work on vessel 105 should be given to Petro, which Merlin agreed to. Petro did it within seven (7) days. I heard Canning try to convince David Smith not to let Petro do it, claiming it would be too expensive to bring St. Croix workers over. When Merlin kept cutting Canning's jobs, Canning constantly badmouthed Merlin. He said to me, "Merlin thinks he is an engineer, but he is not".

30. Canning made working at the Propane terminals a hostile work environment due to his racism; Andrew even said if he had gotten a TWIC card, he would have been terminal manager.

Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al., Case No. 1:21-CV-00312
**AFFIRMATION OF CALVIN SCHMIDT**
Page 9

31. I never complained about the discrimination to IPOS except the two conversations with David Smith because Canning and David Smith were close friends, and from what I observed, I would have lost my job, and David never did anything about our complaints about Canning. Further, Canning had such a racist attitude Smith had to have observed it himself.

6/27/23

Dated: _____	_____
	Calvin Schmidt