IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

PETRO INDUSTRIAL SOLUTIONS, LLC    )
(PETRO)                            )
                                   )CASE NO. 1:21-CV-00312
                    Plaintiff,     )
                                   )
        vs.                        )
                                   )
ISLAND PROJECT AND OPERATING       )
SERVICES, LLC, VITOL US HOLDING II )
CO., VITOL VIRGIN ISLANDS CORP.,   )
ANDREW CANNING and OPTIS           )
EUROPE, LTD.,                      )
                                   )
                    Defendants.    )
_____)


THE ORAL DEPOSITION OF **SEBASTIAN MORETTI**, called

for examination by the Plaintiff in the above-entitled

cause, for purpose of discovery, for use in evidence and

for such other and further uses as are provided by the

Federal Rules of Civil Procedure, was taken before

YVONNE SAMUEL-SETORIE, Registered Professional Reporter,

via Zoom video conference on the 25th day of May 2023,

commencing at 9:07 a.m., pursuant to Notice.


ELITE REPORTING SERVICES, INC.
P.O. Box 5619
Christiansted, VI 00823
(340) 718-1318
elitereportingsvcs@gmail.com



EXHIBIT
7

2

```
 1    A-P-P-E-A-R-A-N-C-E-S:

 2    ON BEHALF OF THE PLAINTIFF:
      LEE J. ROHN AND ASSOCIATES, LLC
 3    1108 King Street, Suite 3 (mailing)
      56 King Street, 3rd Floor (physical)
 4    Christiansted, VI 00820

 5    BY:  LEE J. ROHN, ESQ.

 6
      ON BEHALF OF THE DEFENDANTS:
 7    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
      Attorneys for Island Project and Operating Services, LLC
 8    The Tunick Building, Suite 201
      1336 Beltjen Road
 9    St. Thomas, VI 00802

10    BY:  SIMONE R. D. FRANCIS, ESQ.

11
      SUSMAN GODFREY L.L.P.
12    Attorneys for Vitol Defendants
      1000 Louisiana St., Suite 5100
13    Houston, TX 77002

14    BY:  ALEX KAPLAN, ESQ.
               - and -
15         SARAH HANNIGAN, ESQ.

16    BECKSTEDT & KUCZYNSKI LLP
      Attorneys for Vitol Defendants
17    2162 Church Street
      Christiansted, VI 00820
18
      BY:  CARL A. BECKSTEDT, III, ESQ.
19

20    ANDREW C. SIMPSON, P.C.
      Attorneys for Andrew Canning and OPTIS Europe, LTD.
21    2191 Church Street, Suite 5
      Christiansted, VI 00820
22
      BY:  ANDREW C. SIMPSON, ESQ.
23

24    Also Present:
      Adrian Melendez, Jr.
25
```

SEBASTIAN MORETTI

3

1                                      I-N-D-E-X

2

3                                                              Page

4    Direct Examination by Ms. Rohn                             4

5    Cross-Examination by Mr. Simpson                         112

6

7

8

9

10                                  E-X-H-I-B-I-T-S

11   No.                                                       Page

12   66   IPOS' First Supplemental Response to Plaintiff's     93
          First Set of Interrogatories
13
     68   IPOS' First Supplemental Response to Plaintiff's     93
14        Second Request For Production of Documents

15   74   E-Mails Bates Nos. 3894 to 3895                     110

16   81   IPOS' First Supplemental Response to Plaintiff's     52
          Request For Production of Documents
17

18

19

20

21

22

23

24

25

SEBASTIAN MORETTI

4

1       P-R-O-C-E-E-D-I-N-G-S

2

3       (SEBASTIAN MORETTI,

4   having been called as a witness, was duly sworn by the

5   Notary Public, was examined and testified as follows:)

6

7       DIRECT EXAMINATION

8   BY MS. ROHN:

9       Q.   Good morning.  My name is Lee Rohn, and I

10  represent Petro in this lawsuit.

11      And could you state your name for the record, please?

12      A.   Sebastian Moretti.

13      Q.   And, Mr. Moretti, where are you employed?

14      A.   Vitol Inc. in Houston.

15      Q.   Have you ever had your deposition taken before?

16      A.   No.

17      Q.   So let me -- I'm sure your lawyer has done a very

18  good job explaining what a deposition is, but just to make

19  sure you understand.  If you have -- my job is to ask

20  questions that are clear that you can understand, and your

21  job is to tell the truth.  A deposition is just like you're

22  in court under oath, same penalties of perjury apply.

23      If I ask you a question that's not clear, please let

24  me know.  I'll try to make it clear.  If I still don't have

25  it clear, you're entitled to ask me to ask the question

5

1   until you feel like you understand it.  If you --

2   otherwise, I'll assume that you did understand the

3   question.

4       Is that fair?

5       A.   Yes.

6       Q.   Okay.  This is not an endurance test.  You're

7   free to take breaks when you need them, just let me know.

8   That's about it.  That's just about it, but I'm sure your

9   attorney has already told you as to a deposition.

10      So, Mr. Moretti, what did you do to prepare to be

11  deposed today?

12      A.   I have a -- I meet -- I met with internal counsel

13  and external counsel about three times.

14      Q.   And over what period of time?

15      A.   Between three hours and five hours.

16      Q.   And was this last week or over -- over what

17  period of time, meaning -- see that question wasn't

18  probably very clear.

19      When did you begin the meetings, and when did you end

20  the meetings?  Not time wise but date wise or week wise.

21      A.   Was about the -- the first one was about three

22  weeks ago, two weeks ago, and the last one was yesterday.

23      Q.   Was anybody present besides your counsel?

24      A.   Anyone sorry?

25      Q.   Was anyone else present besides your counsel?

6

1       A.   No.

2       Q.   Did you review any documents in preparation for

3   your deposition?

4       A.   I was showed some -- some documents, yes.

5       Q.   What documents did you review?

6       A.   All my e-mails that I wrote, some letters.

7       Q.   What letters did you review?  I've seen a lot of

8   e-mails.  I can't remember seeing letters.

9       A.   One of the letters was that -- the letter you --

10  actually, your communication on -- first communication on

11  this case.

12      Q.   I didn't understand that.  The letter was what?

13      A.   The letter that actually you sent to -- to IPOS

14  on the --

15      Q.   Okay.  Did you review that letter that I sent to

16  IPOS at or about the time that it was sent?

17      A.   I did.

18      Q.   And what was the purpose that you reviewed that

19  letter?

20      A.   I was -- it was sent to me.

21      Q.   And did you discuss that letter, other than

22  counsel, with anyone else?

23      A.   No.  No.

24      Q.   And can you tell me the basis for which you

25  failed to agree to have Petro paid as a result of receiving

7

1   that letter?

2       A.   They fail -- can you -- can you say it again,

3   please?

4       Q.   Sure.  Can you tell me why you -- well, as a

5   result of that letter, what did you decide to do?

6       A.   I mean, it wasn't my decision to do anything on

7   that.

8       Q.   Whose decision was it?

9       A.   IPOS.

10      Q.   Did you discuss the letter with IPOS?

11      A.   No, I didn't discuss them.  I -- made a comment

12  with -- to them about that letter.

13      Q.   What was that comment?

14      A.   If I recall correctly, there was a childish --

15  childish argument.

16      Q.   It was what?

17      A.   Childish argument.

18      Q.   A childless argument?

19      A.   Childish.

20      Q.   What's childless?

21      A.   The definition of a naive approach.

22      Q.   And why do you believe it was a naive approach?

23      A.   Basically it was with a lightly approach on

24  the -- not underestimating the gravity of the case of what

25  was behind all those -- all those facts.

8

1    Q.    And what was behind all of those facts?
2    A.    The lack of documentation of -- provided on the
3  -- on that -- on that specific operation were done.
4    Q.    Anything besides that?
5    A.    No, I don't think so.
6    Q.    Well, did you believe that one of the gravities
7  of the matter was that you believed there were forged
8  documents as to the credentials of the welders?
9    A.    No, I don't -- I don't have expertise to say
10  that's how the documents were relevant or not.
11    Q.    Did you believe one of the gravity of the
12  situation was that the document that certified the welders
13  was in some way deficient or improper?
14    A.    I -- I don't have that expertise.
15    Q.    Was part of the gravity of the situation the fact
16  that you'd been told that the document was somehow
17  improper?
18    A.    That the documents were -- those letters were
19  modified.  Is that the word?
20    Q.    Modified.  That's a word.
21       And where did you get the information that the
22  documents were modified?
23    A.    From David Smith.
24    Q.    Do you know where David Smith got that
25  information?

9

1    A.    From Andrew Canning.
2    Q.    Was that the only letter you reviewed?
3    A.    Say again.
4    Q.    Was that the only letter you reviewed in
5  preparation for your deposition?
6    A.    I don't -- I don't -- I don't think that I
7  reviewed it.  I was showed -- it was showed to me again,
8  because I didn't recall what -- what was my comment from.
9    Q.    Have you had any conversations with
10  Charlotte Horowitz in the last few days?
11    A.    Yes, I did.
12    Q.    And when did you have a conversation with
13  Charlotte Horowitz?
14    A.    We talked about training.  She's very involved in
15  Vitol training and classes that we are moving from one
16  format to the -- to the other.  We were talking about
17  energy operations.
18    Q.    Have you talked to Charlotte Horowitz about --
19  that the -- in which the conversation in any way involved
20  this lawsuit in the last week?
21    A.    No.
22    Q.    Have you in any way learned the substance of
23  Charlotte Horowitz's testimony in this case?
24    A.    No.
25    Q.    Mr. Moretti, where were you born?

10

1    A.    Where?
2    Q.    Yes.
3    A.    In Argentina.
4    Q.    And can you tell me your educational background
5  after high school?
6    A.    I was in Argentina Naval Academy.
7    Q.    Naval Academy, is that what you said?
8    A.    Yes.
9    Q.    From when to when?
10    A.    I was in the Naval Academy from 1990 to 1993 and
11  the Navy until 2000.
12    Q.    So from '93 to 2000?
13    A.    Yeah.  '90 to -- 1990 to 2000 I was in the Navy.
14    Q.    And what type of work did you do when you were in
15  the Navy?
16    A.    Uhm, I was -- most of my career was a naval
17  aviator.
18    Q.    A naval aviator?
19    A.    That's correct.
20    Q.    And after leaving the Naval -- sorry.  After
21  leaving the Navy, can you tell me what your employment has
22  been?
23    A.    Yes, I was flying private for the one year.
24    Q.    You were flying private?  Is that what you said?
25    A.    Yeah.  Private planes for a year.  And then I

11

1  started working with Trafigura.
2    Q.    Whoo.  Started working with who?
3    A.    Trafigura.
4    Q.    Can you spell that?
5    A.    T-r-a-f-i-g-u-r-i -- r-a.
6    Q.    Okay.  And what jobs did you have with Trafigura?
7    A.    I started in Buenos Aires for -- as an operator.
8  I was in Buenos Aires for two years doing some barging
9  operations and land operations and -- but mostly marine
10  operations.  Then in the 2000 -- 2003, I was transferred to
11  Stanford, Connecticut.  I was there for -- for over -- for
12  a year.  And then -- yeah, 2003 -- sorry, 2004 I move from
13  Stanford, Connecticut, to Houston, Texas, and I was with
14  Trafigura until -- to the end of 2007, always doing marine
15  operations on different -- different products, different
16  regions.
17    Q.    And when you say marine operations, can you tell
18  me what marine operations entailed?
19    A.    Yes.  Yes.  Definitely when the -- when the code
20  of this company wanted to move different products, what we
21  call products from gasoline, different type of gasoline or
22  components, distillate, which means different kind of
23  diesels, jet fuels, crude oil, LPG, means butane and
24  propane.  So the trader makes a deal to go to -- load a
25  cargo on certain port, and then to -- to discharge in

SEBASTIAN MORETTI

12

1  another port. And that's my work was basically to get that
2  vessel to the port and then safely discharge it on the --
3  on the other end with the vessel arriving on time and on a
4  spec within the contractual terms.
5      Q.  And so after 2007 what did you do?
6      A.  I moved to Vitol.
7      Q.  And why did you move from Trafi -- I can never
8  say this word correct. -- Trafigura --
9      A.  Trafigura.
10     Q.  Huh?
11     A.  Trafigura, yes.
12     Q.  -- to Vitol?
13     A.  Why? I mean, it was definitely a better job
14 opportunity, and Vitol offer me to - to be in charge of
15 Latin America, working with -- at that time Vitol had an
16 office in Buenos Aires and Rio de Janeiro, and then we
17 opened Bogotá and Mexico, so I -- and my -- my Spanish and
18 knowledge of the region was what Vitol was most interested
19 on.
20     Q.  And what was your first position with Vitol? You
21 said in charge of Latin America. But did it have a title?
22     A.  No, not really. Not really.
23     Q.  Did you do the same type of thing for Vitol when
24 you were in charge of Latin America?
25     A.  The -- same type of what I was doing at

13

1  Trafi?
2      Q.  Yes.
3      A.  Yes, it was the same.
4      Q.  And how long were you in charge of Latin America?
5      A.  Uhm, I'm still are, not -- not on the day-to-day
6  operations, but I'm still are in charge of Latin America.
7      Q.  But did your job position change any?
8      A.  My job position change in 2013.
9      Q.  And what did it change to?
10     A.  Changed for -- to take care of other departments,
11 other --
12     Q.  Well, did you -- did you get a job title in 2013?
13     A.  Yes.
14     Q.  And what was that?
15     A.  Was operations manager.
16     Q.  And what were your responsibilities as operations
17 manager?
18     A.  At the time was in charge of the physical
19 operators, in charge of the commercial analysts, in charge
20 of the root cause of claims and --
21     Q.  I'm sorry. I didn't hear that. Was that root
22 cause of planes? Is that what you said?
23     A.  Claims, claims and demurrage.
24     Q.  Okay. Anything else?
25     A.  No, I think -- I think I thought they were three

14

1  main departments that I -- I received at that time.
2      Q.  And in that position who did you report to?
3      A.  At that time I reported directly to the CEO.
4      Q.  Who was whom?
5      A.  Mike Loya.
6      Q.  Can you spell the last name?
7      A.  L-o-y-a.
8      Q.  And how long were you operations manager?
9      A.  I'm still are.
10     Q.  Well, I understood that you are the CEO of
11 Vitol Inc. Is that not correct?
12     A.  No, that's not correct. Actually, at some point
13 my title changed to vice president of operations.
14     Q.  Okay. So when you said you went to work for
15 Vitol in 2013, I think, which Vitol did you go to work for?
16     A.  Say it again. Sorry.
17     Q.  When you said you went to Vitol in 2013, which
18 Vitol did you go to work for?
19     A.  Where Vitol? Where?
20     Q.  What's the name of the Vitol company you went to
21 work for?
22     A.  Vitol, Vitol Inc.
23     Q.  Vitol Inc. Okay.
24        And when you were operations manager, were you
25 operations manager for Vitol Inc.?

15

1      A.  Yes.
2      Q.  And when you were vice president of operations,
3  is it vice president of operations for Vitol Inc.?
4      A.  Correct.
5      Q.  When did you become vice president of operations?
6      A.  I think the title start in 2016.
7      Q.  And what were your responsibilities as vice
8  president of operations?
9      A.  Same ones.
10     Q.  And have you had any other titles with Vitol Inc.
11 since then?
12     A.  No.
13     Q.  Okay. And as vice president of operations of
14 Vitol Inc., who do you report to?
15     A.  Currently to the CEO.
16     Q.  And who is that?
17     A.  Ben Marshall.
18     Q.  Ben Marshall, is that what you said?
19     A.  Yes.
20     Q.  And when you say you were in charge of physical
21 operators, what does that mean?
22     A.  Basically it's the -- what I was doing when I
23 started in Trafigura -- within Vitol. I mean, what I
24 described before as the personnel loading the -- the ships.
25 In this case right now, we move on all mode of

SEBASTIAN MORETTI

**16**

1  transportations, not only marine operations. We have some
2  trucks --
3        (Interruption by the court reporter.)
4        MS. ROHN:    Heard trucks. We have trucks.
5  BY MS. ROHN:
6        A.  I said we move or operate on any kind of mode of
7  transportation from trucks, rail cars, pipelines, barges
8  and to BLCCs -- or BLGCs.
9        Q.  What are BLGCs?
10       A.  BLGC is a very large gas cargo carrier.
11       Q.  And you also said you were in charge of the
12  commercial analysts. Can you tell what commercial analysts
13  do?
14       A.  Yes. Those are -- those are the ones basically
15  that they say the bookkeepers for the traders, the one who
16  basically keep in order or keep track of the -- when the
17  cargo is priced, they -- meaning that how much they're
18  going to pay, they basically keep track of those -- with
19  those costs, and when need to be invoiced or when need to
20  be hedged, et cetera, et cetera.
21       Q.  And then you also said you are in entitled to
22  (sic) claims and demurrage. Can you tell me what type of
23  claims you're in charge of?
24       A.  Yes. The claims and demurrage is -- the
25  demurrage is the term of when the vessel or -- when the

**17**

1  late time of the vessel or the charter party expires or
2  finish, you enter on what is call demurrage. And that is
3  the -- what is a fixed cost of that ship when it's not
4  loading or discharging or when that period of time extend
5  or over past that laytime. So that create a claim, that
6  the claim is passed from the owners to the charterers and
7  to the charters to the end receiver or supplier.
8        Q.  So let me see if I understand this. So would
9  that be if the vessel was not -- didn't reach a port on
10  time, or would that rather be a vessel was not being used,
11  or is it both?
12       A.  When -- when you load and discharge, the contract
13  is closed with a window, right. Let's say the -- May 25th
14  to 26th, right, and there is different aspect of that.
15  Let's say if you fix a ship, well, to load on 26th -- 25th,
16  26th, would usually supposed to -- will be better if you
17  have -- you go back to back with the contract that you have
18  supplier or receiver.
19       So let's say the vessel arrives before that -- that
20  what we call window or laycan, right; so you don't pay
21  anything until midnight or 0001 on the 25th. So that's
22  when you are on the clock. So -- and that's when the time
23  is started.
24       So usually typically for any of these cargoes, you
25  have 84 hours laytime, so and divided for what is 36 plus

**18**

1  6, 36 hours of laytime plus 6, what is called NOR for load
2  and then for the discharging.
3        So the other option, let's say you arrive outside that
4  window later; you are already on the clock by your
5  receiver/supplier. You cannot claim that receiver/supplier
6  because you arrive outside the window on -- and after. So
7  that's when also the owner has a claim against you, but you
8  don't have a claim against the supplier/receiver.
9        And also when you arrive within the window, right, and
10  let's say you go straight to the dock and you start
11  unloading or discharging, but so on the receiver/supplier
12  contract, you have also the 36 hours plus 6, what we call.
13  And then if that period of time is extended, you have a
14  claim -- you can claim for those extra hours to your
15  receiver and -- and supplier. The 36 hours plus 6 are
16  the -- the 6 are what we call NOR.
17       Q.  I'm sorry. Called what?
18       A.  NOR.
19       Q.  Okay. NOR. Okay.
20       A.  Notice of Readiness.
21       So when vessel arrives, tender this NOR, and you have
22  let's say extra six -- six hours that -- of cushion there
23  that -- for those -- those 36 hours doesn't start yet. So
24  that's -- that's basically what originated the -- the
25  claims, right.

**19**

1        But also, there are -- I mean, if you have a vessel,
2  charter party said you have is one -- one load port, one
3  disport, but then you need two load ports, because you need
4  to load in two different terminals, that create extra
5  expenses that are -- are considered or called claims, but
6  actually there is no -- there's no claim. It's extra
7  expenses for that extra port.
8        Q.  So, Mr. Moretti, who reports to you in your
9  position of vice president of operations? Well, who
10  reported to you in your position of vice president of
11  operations from 2020 through 2021?
12       A.  2020, 2021 -- no, it's still -- it's still the
13  same -- no, sorry. The CAs, the commercial analysts, they
14  at that time didn't report to me any -- any longer. So at
15  that time I had -- 2021 I had the physical operators,
16  claims and demurrage, and customs compliance.
17       Q.  Well, did -- during that time period, did
18  Charlotte Horowitz report to you?
19       A.  She's one of the physical operators.
20       Q.  And when I call Tim K., because I can't pronounce
21  his last name.
22       A.  No one can.
23       Q.  Did he report to you as well?
24       A.  Yes.
25       Q.  Were there particular people at Vitol Inc. that

SEBASTIAN MORETTI

20

1  performed work for Vitol Virgin Islands Corp.?
2      A.   No.  No as a -- no as employees, no.
3      Q.   No as a what?
4      A.   No -- no as employees.
5      Q.   Right.  I understand they weren't employees of VI
6  -- oops.  Sorry.  Virgin -- Vitol Virgin Islands, but did
7  they do work that benefited Vitol Virgin Islands?
8      A.   No.
9      Q.   Well, did -- to your knowledge, did
10 Vitol Virgin Islands have any employees?
11     A.   No, it doesn't.
12     Q.   Okay.  Well, then how did it operate, sir?
13     A.   Sorry?
14     Q.   How did it operate?
15     A.   That operation consisted on the supply for
16 propane to the -- to both plants, St. Croix and St. Thomas.
17 But that was Vitol Inc. operation.
18     Q.   Well, as part of the contract with WAPA to supply
19 propane from -- to St. Croix and St. Thomas, did it include
20 an agreement to maintain the propane facilities?
21     A.   Vitol Inc. has -- has --
22     Q.   Vitol Inc. has what?
23     A.   Can you -- can you say the question again,
24 please?
25     Q.   Yes.  As part of the operations to supply propane

21

1  to St. Croix and St. Thomas, did the agreement with WAPA
2  include -- well, first of all, did the agreement with WAPA
3  include constructing a propane facility?
4      A.   No.  That -- that was a separate thing.  And,
5  actually, I'm not certain who had the contract to build the
6  -- both facilities.
7      Q.   Well, am I correct you couldn't have fulfilled
8  the contract to supply propane to St. Thomas and St. Croix
9  without a propane facility?
10     A.   Yes, Vitol has the contract to supply the
11 propane.
12     Q.   So you don't know who constructed the propane
13 facility?
14     A.   The -- one who constructed the -- the
15 facilities was VTTI.
16     Q.   Was what?
17     A.   VTTI.
18     Q.   And who oversaw the construction work of VTTI?
19     A.   I -- I don't know who on VTTI.
20     Q.   What company?
21     A.   Was VTTI.
22     Q.   But who oversaw the work that VTTI did to make
23 sure that it was satisfactory to be able to be used to
24 provide propane?
25     A.   VTTI is the -- I mean, was the same company.  I

22

1  mean, VTTI is their own company.  They have that expertise
2  and experience to operate --
3      Q.   Excuse me.  Once the propane facilities were
4  constructed in St. Croix and St. Thomas, is it not correct
5  -- is it correct that if the agreement to supply
6  propane included maintaining those facilities?
7      A.   Sorry.  Can -- what's -- what's the question?
8      Q.   Sure.  I'll try it again.
9      Once the propane facilities were constructed --
10     A.   Yeah.
11     Q.   -- was the agreement -- did the agreement with
12 WAPA to supply propane include in an agreement to maintain
13 the propane facilities?
14     A.   Not -- not -- Vitol Inc. only has the propane --
15 the supply permit -- the supply of the propane.
16     Q.   Well, who maintains the facilities?
17     First of all, the propane facilities that were
18 constructed, who owned those facilities?
19     A.   I'm -- honestly, I'm not certain who owns the
20 facility.  They are on WAPA's land.  VTTI was in charge of
21 building those facilities, and the contract was established
22 to return those facilities at some point back to WAPA.
23     Q.   Well, currently those facilities are being sold
24 to WAPA; correct?
25     A.   They're being -- they are in the transition to

23

1  return the plants to WAPA.
2      Q.   And who is involved with the transition to return
3  -- which Vitol company is involved in transferring those
4  plants -- that facility back to WAPA?
5      A.   Which -- which company is involved?
6      Q.   Yes.
7      A.   I would say Vitol.
8      Q.   Which Vitol?  Is that Vitol Inc.?
9      A.   I am not certain if it's -- which -- I'm not
10 certain which Vitol is.
11     Q.   Okay.  Well, which of them could it be?
12         MR. KAPLAN:   Objection to form.
13     You may answer.
14 BY MS. ROHN:
15     Q.   You may --
16     A.   Which should be, probably VVIC.
17     Q.   Who?
18     A.   Vitol Virgin Islands.
19     Q.   Well, how can Vitol Virgin Islands be in charge
20 of that when it has no employees?
21         MR. KAPLAN:   Objection.  Form.
22     You may answer.
23 BY MS. ROHN:
24     A.   I -- it's a legal -- a legal -- how -- that's how
25 the legal --

SEBASTIAN MORETTI

24

1    (Interruption by the court reporter.)
2        MR. KAPLAN:    He said that's how the legal
3    entity is put together.
4    BY MS. ROHN:
5    Q.    Well, sir, does -- does Charlotte Horowitz
6    perform work that is beneficial to Vitol Virgin Islands?
7    A.    Sorry.  Is -- is that a question or --
8    Q.    Yes.  Does Charlotte Horowitz perform work that
9    is beneficial to Vitol Virgin Islands?
10    A.    In which regard?
11    Q.    Well, does IPOS report -- did IPOS report to
12    Charlotte Horowitz?
13    A.    No.
14    Q.    So Charlotte Horowitz had no ability to tell IPS
15    what -- for instance, what documents to get when work was
16    being done; is that right?
17    A.    That's correct.
18    Q.    And did Tim K. have any ability or did Tim K. do
19    any work that was beneficial to Vitol Virgin Islands?
20    A.    No.
21    Q.    Did you answer?
22    A.    No.  No.  The answer is no.
23    Q.    Sorry.  You had your hand in front of your face.
24    I couldn't hear you.
25        So Tim K. had no authority, am I correct, to tell IPOS

25

1    what documents needed to be produced, is that correct, if
2    certain job was being done?
3        MR. KAPLAN:    Objection to form.
4        You may answer.
5    BY MS. ROHN:
6    A.    That's correct.
7    Q.    And who -- am I correct that there are from time
8    to time contracts given to companies to maintain the
9    propane facilities?
10    A.    Sorry.  Can you ask it again, please?
11    Q.    Yes.  Am I correct that from time to time there
12    are contracts with companies to maintain the propane
13    facilities?
14    A.    Yes.
15    Q.    And who decides who those contractors are going
16    to be?
17    A.    The company that needs the service.
18    Q.    Pardon?
19    A.    The company that needs the service.
20    Q.    Okay.  What company is that?
21    A.    You asked hypothetical question.  What -- I
22    mean --
23    Q.    No, it wasn't hypothetical.  I asked whether or
24    not time to time there are contracts with people, companies
25    to maintain their facilities.  That wasn't a hypothetical.

26

1    A.    Okay.  Which company are you referring to?
2    Q.    Well, let's start with IPOS.
3    A.    Okay.  So what's the question, please?
4    Q.    Who made the decision to give the contract to
5    IPOS?
6    A.    That's -- I mean, at that time I -- IPOS is a
7    company related to VTTI.  I assume that was VTTI.
8    Q.    And who gave VTTI the authority to hire IPOS?
9    A.    It was his -- their C -- ex-CEO Larry,
10    Larry Stoker.
11    Q.    And who did IPOS report to as far as that
12    contract?
13        MR. KAPLAN:    Objection.  Form.  Ambiguous.
14        You can answer.
15    BY MS. ROHN:
16    A.    IPOS reported to VTTI.
17    Q.    And who would VTTI report to?
18        MR. KAPLAN:    Objection.  Form.
19        You can answer.
20    BY MS. ROHN:
21    A.    They are their own company.
22    Q.    And are you aware that there came a time that the
23    contract to IPOS was not renewed?
24    A.    Correct.
25    Q.    And who made the decision not to renew that

27

1    contract?
2    A.    IPOS' contract expire.
3    Q.    Right.  Who made the decision not to renew it?
4    A.    IPOS was -- in order to renew it, they -- they
5    come up with a -- they made an offer that was too expensive
6    than what we assumed or thought outside the market -- of
7    the market.
8    Q.    Who did they make that offer to?
9    A.    The offer was sent to -- to -- at that time to --
10    to Max, Max Bulk.
11    Q.    Max who?
12    A.    Max Bulk.
13    Q.    Can you spell it, please?
14    A.    B-u-l-k.
15    Q.    And who did he work for?
16    A.    Vitol Inc.
17    Q.    I'm sorry.  VTTI, is that what you said?
18    A.    No.  Vitol Inc.
19    Q.    Vitol Inc.  I'm sorry.  I'm starting to get used
20    to your accent just a little.
21        Okay, Vitol Inc.  All right.
22        And why would that have been made to Vitol Inc.?
23    A.    Because we -- we were the ones supplying the --
24    the propane.
25    Q.    I thought you said Vitol Virgin Islands supplied

SEBASTIAN MORETTI

28

1  the propane?
2         MR. KAPLAN:    Objection. Form.
3         You can answer.
4  BY MS. ROHN:
5     A.   No, was Vitol Inc.
6     Q.   And who made decision to give the contract to
7  Saintnals?
8     A.   Was a joint decision.
9     Q.   The same John --
10    A.   No.  No.  Was a joint decision.
11    Q.   Between who and who?
12    A.   At that point it was Max Bulk the COO, ex-COO.
13    Q.   Can you say that name again?
14    A.   Max, Max Bulk.
15    Q.   Maxwell who?
16    A.   Max Bulk was the COO.  He was the COO.
17    Q.   Of who?
18    A.   Vitol Inc.
19    Q.   And who else?
20    A.   Myself.
21    Q.   Anyone else?
22    A.   No, I think it was --
23    Q.   And who made the decision to discontinue Mr. --
24  OPTIS' contract?
25    A.   It was mine.

29

1         Q.   And what was the basis for deciding not to
2  continue the contract with OPTIS?
3      A.   Uhm, when we put Saintnals, Saintnals became the
4  operator of IPOS -- sorry.  Saintnals replaced IPOS, and
5  Saintnals became the -- the operator of the plant,
6  Saintnals came with a more robust extended team that -- and
7  having the expertise --
8         (Interruption by the court reporter.)
9         MS. ROHN:    Of Canning was a redundancy.
10  BY MS. ROHN:
11    Q.   All right.  At the deposition of
12  Vitol Virgin Islands, you were designated to answer for
13  certain questions.
14       Hold on.  Give me a minute.  Sorry.
15       The first one is as to the propane facility.  Who --
16  what company contracted with OPTIS for Mr. Canning to come
17  there?
18         MR. KAPLAN:    Counsel, can I -- can we just get
19  clear on this?  So what I have recorded from Wednesday
20  is that you asked the Vitol Virgin Islands Corp. rep,
21  Ms. Horowitz, why the contract -- why Mr. Canning of
22  OPTIS' consulting services went from IPOS to
23  Vitol Virgin Islands.
24         MS. ROHN:    That's it.
25         MR. KAPLAN:    That's -- that's the topic on

30

1  which we agreed to present Mr. Moretti as the
2  corporate rep.  And he's prepared to answer your
3  questions on that.  So --
4         MS. ROHN:    So my notes were so bad that I
5  couldn't -- I couldn't decipher my own notes.
6         MR. KAPLAN:    That's fine.  All I want to do is
7  be clear that we're starting that portion now.  And
8  that as soon as we're done, we go back to --
9  everything we've done thus far is in Mr. Moretti's
10  individual capacity.  You can ask him questions on
11  that topic, and when we're done, we'll mark that we
12  are transitioning back to his individual capacity.
13         MS. ROHN:    Yeah, I want to do all the issues
14  for 30(b)(6) all at one time.  So that's exactly what
15  I'm attempting to do.
16         MR. KAPLAN:    I think that's the only issue for
17  Mr. Moretti.
18         MS. FRANCIS:    Can we just identify which topic
19  you're referring to, please?
20         MR. KAPLAN:    Yes.  So that's -- that's what
21  I'm getting at.
22         MS. FRANCIS:    Okay.
23         MR. KAPLAN:    I don't believe there's an
24  actual topic in the notice that expressly states that.
25  What I agreed -- but nonetheless, I committed on the

31

1  record to make Mr. Moretti available on this topic, as
2  I stated, which is why did -- from
3  Vitol Virgin Islands Corp.'s standpoint, why was the
4  decision made to contract directly with OPTIS and
5  Mr. Canning, as opposed to his prior arrangement as a
6  consultant for IPOS.
7         MS. ROHN:    Correct.
8  BY MS. ROHN:
9      Q.   Can you answer that question, Mr. Moretti?
10    A.   Yes.  There were more projects relate -- related
11  -- related directly to -- to Vitol --
12    Q.   I'm sorry.  Can you start that over again?  I'm
13  not understanding your answer.
14    A.   There were more projects related to Vitol than --
15  than WAPA, and -- and the way that the contract was
16  stipulated with Andrew Canning, we needed to go through
17  IPOS.  So switching the -- contract from Andrew Canning
18  -- from IPOS to Vitol, that will allow us to interact
19  directly with Andrew Canning.
20    Q.   Again, but am I correct that the contract went
21  from OPTIS to Vitol Virgin Islands?  Or did it go from
22  OPTIS to Vitol Inc.?
23    A.   Honestly, I -- I don't know.  And when -- when we
24  refer to Vitol, it's sometimes -- most of the time it's the
25  same to -- to answer that.  I don't know if it was

SEBASTIAN MORETTI

32

1  Vitol Virgin Islands or Vitol Inc.  I don't know.

2      Q.  When you said when you refer to Vitol, sometimes
3  it's what?

4      A.  Or else it's Vitol.  We don't -- we don't define
5  most of the time which companies.

6      Q.  Okay.  So I -- a follow-up question that was
7  asked of Ms. Horowitz for Vitol Virgin Islands, she said
8  that one of the basis for the transfer was that because of
9  Canning's experience with IPOS, that's why Vitol VI decided
10  to hire Canning.

11      And the question was:  And what experience was that
12  that would be necessary for Vitol Virgin Islands?

13      A.  Sorry.  I couldn't hear the first part.

14      Q.  One of the follow-ups was -- one of the
15  statements made by Ms. -- Vitol Virgin Islands was is that
16  one of the reasons that Canning was transferred from IPOS
17  to work for Vitol Virgin Islands was because of the
18  experience that Canning had from Vitol.

19      Can you answer what experience that was -- I mean,
20  with IPOS, can you -- let me start over again.

21      The question to Ms. Horowitz was one of the reasons
22  that Canning was transferred from IPOS to
23  Vitol Virgin Islands was because of the experience he had
24  gotten from IPOS.  And the question was asked what
25  experience was that that would be beneficial to

33

1  Vitol Virgin Islands, which she was unable to answer.

2      Can you explain what experience Canning had with IPOS
3  that would have been beneficial to Vitol Virgin Islands?

4      A.  His engineering experience and knowledge of the
5  terminal.

6      Q.  And do you know whether or not --

7      MS. ROHN:    This is, I think, the end of the
8  30(b)(6) questions.

9  BY MS. ROHN:

10      Q.  Do you know if Saintnals is a Virgin Islands
11  company or U.S. company?

12      MR. KAPLAN:    Sorry.  I don't mean to
13  interrupt.  But just to clarify, when you say "this is
14  the end," you mean you are done, and this is a new
15  question or --

16      MS. ROHN:    That's correct.  That is the end.
17  I've concluded my 30(b)(6).

18      MR. KAPLAN:    You can ask the question again.

19  BY MS. ROHN:

20      Q.  Do you know if Saintnals is a Virgin Islands or
21  U.S. company?

22      A.  I don't know.

23      Q.  And then I was told that you would know, not
24  necessarily as a 30(b)(6) witness, why the truck rack at
25  WAPA is not now in service.

34

1      A.  Lack of permits.

2      Q.  Were you in any way involved in the decision of
3  hiring Petro to work at the St. Thomas, St. Croix propane
4  facilities?

5      A.  No, I wasn't.

6      Q.  Were you at some point aware that Petro had been
7  hired to work at those facilities?

8      A.  I -- they made me aware at some point.

9      Q.  How did you become aware?

10      A.  I think that when -- I think when they visit us,
11  they asked to visit us in Houston.  That's when I think I
12  got knowledge of them being one of the contractors.

13      Q.  And did you attend that meeting?

14      A.  Yes.

15      Q.  And do you recall approximately when it was?

16      A.  Was a social visit, and I remember about -- that
17  we talked about maintenance and importance of a maintenance
18  plan.

19      Q.  My question was:  Do you recall approximately
20  when that was?

21      A.  Two years ago.  Beginning 2021.  I don't -- I
22  don't remember.

23      Q.  And how did you come to attend that meeting?

24      A.  How what?  Sorry.

25      Q.  Yeah.  How did it come about that you were at

35

1  that meeting?

2      A.  I -- I was invited.

3      Q.  By whom?

4      A.  Probably it was by -- by Charlotte.

5      Q.  And why would you be invited by Charlotte to
6  attend that meeting?

7      A.  Because she reports to me, and I'm the operations
8  manager.

9      Q.  Well, what involvement did you have with the
10  St. Croix, St. Thomas propane facility that caused you to
11  be invited to the meeting?

12      A.  Same, I'm the operations manager.

13      Q.  And when you were invited by Charlotte to the
14  meeting, did she -- what did she tell you as to the purpose
15  of the meeting?

16      A.  That Petro Industrial was visiting us.

17      Q.  I'm sorry.  I didn't understand that one.

18      A.  That Petro Industrial was visiting us, if I would
19  like to meet them.  That's --

20      Q.  And why would you have liked to meet them?

21      A.  Because I never say no to anyone that want to
22  visit us.

23      Q.  Well, was part of the reason that you were
24  invited to this meeting is because you oversaw the
25  operations of the propane facilities in St. Croix,

SEBASTIAN MORETTI

36

1    St. Thomas?
2        A.    No.  I over -- oversaw the supply.
3        Q.    Well, sir, wouldn't it be true that you couldn't
4    supply propane to WAPA if your facilities were not properly
5    maintained?
6        A.    That's for sure.
7        Q.    So didn't you have an interest in making sure
8    those facilities were maintained as a supplier of the
9    propane?
10       A.    You can say so.
11       Q.    And so part of the supplying of propane included
12   making sure that the propane facilities were properly
13   maintained; correct?
14       A.    No.  That was IPOS' responsibilities.
15       Q.    And IPOS was contracted with Vitol; correct?
16       A.    Correct.
17       Q.    And at that meeting who attended?
18       A.    I think it was Charlotte, Tim, myself, Adrian,
19   and -- and Chad.
20       Q.    And how long before the meeting were you aware
21   there was going to be a meeting?
22       A.    I don't know.  I don't recall.
23       Q.    Okay.  And where did the meeting occur?
24       A.    Where?
25       Q.    Yes.

37

1        A.    At Vitol's office.
2        Q.    And when you say Vitol, are you referring to
3    Vitol Virgin Islands and Vitol Inc.?
4        A.    Vitol Inc. in Houston.
5        Q.    And you said one of the subjects that was
6    discussed was maintenance; am I correct?
7              Is that a yes?
8        A.    Yes.
9        Q.    Okay.  It's helpful for the court reporter if you
10   speak up, because she has to take it down.  She can take
11   down a nod of the head, but it takes her longer.
12             So what about maintenance was discussed?
13       A.    Nothing in particular.
14             (Interruption by the court reporter.)
15       A.    Nothing in particular.  Just in general.
16       Q.    What was discussed in general?
17       A.    How important the maintenance was for -- for the
18   terminal.
19       Q.    Well, was there any discussion as to what types
20   of maintenance needed to be done to the propane facilities?
21       A.    No.
22       Q.    And was anything else discussed?
23       A.    No.
24       Q.    I beg your pardon?
25       A.    No.

38

1        Q.    Okay.  How long did the meeting last?
2        A.    I would say 30 minutes, no more than 45.
3        Q.    So do you recall Petro giving suggestions for
4    what types of maintenance would be -- should be done?
5        A.    No.
6        Q.    Do you recall any discussions as to time sheets?
7        A.    No.
8        Q.    At some time was there a decision to -- did you
9    learn of a decision to terminate Petro's contract?
10       A.    What about it?  Sorry.
11       Q.    At some time did you learned of a decision to
12   terminate Petro's contract?
13       A.    When I learn of that?
14       Q.    Okay.  When did you learn about it?
15       A.    No, I -- June -- June last -- June 2021,
16   July 2021.
17       Q.    And how did you learn about it?
18       A.    I -- I'd -- David Smith gave me a call.
19       Q.    Who?  David Smith?
20       A.    (Nodding.)
21       Q.    And what did David Smith tell you?
22       A.    That -- I don't recall if he -- he was telling me
23   that was terminated or he will terminate Petro Industrial's
24   contract.
25       Q.    Okay.  I don't -- you said I don't understand if

39

1    he said it was terminated or he was going to terminate.  Is
2    that what you said?
3        A.    Yeah, I don't know which one it was.  I recall
4    having the -- the -- that conversation with him.
5        Q.    Okay.  And was it a discussion as to why?
6        A.    We -- he was -- he was telling me about the --
7    about communicating to me about what -- what's going on.
8        Q.    Was what?
9        A.    What's -- what's going on.
10       Q.    Which is what did he tell you about what was
11   going on?
12       A.    I mean, first, as we discussed at the beginning,
13   the -- the doubts on the certificates, and then there were
14   communications about other anomalies.
15       Q.    Abnormalities, is that what you said?
16       A.    Anomalies.
17       Q.    Anomalies.  Sorry.
18             Okay.  So what was discussed about the doubts of these
19   certificates?  Is these -- are these welder certificates
20   you're referring to?
21       A.    Yes.
22       Q.    What was discussed as to the doubts as to the
23   welder certificates?
24       A.    The validity.
25       Q.    And what was discussed as to their validity?

SEBASTIAN MORETTI

---

**40**

1    A.    About the signature on -- on those certificates.

2    Q.    What were the anomalies that were discussed?

3    A.    That they were signed by the person that wasn't

4    working for that company at that -- at that time.

5    Q.    Did you do anything to verify whether or not

6    there were doubts to the certificates -- as to the

7    certificates?  Did you do anything to verify whether or not

8    there were in fact any anomalies?

9    A.    No, I didn't.

10    Q.    And how often would you speak to David Smith?

11    A.    I speak with him quite often.

12    Q.    Well, how -- how -- how often is quite often to

13    you?

14    A.    Well, he's the manager of one of the terminal

15    that we are in in Florida; so I will -- we call -- we talk

16    about every other week or once a month.

17    Q.    At some point were you aware that David Smith was

18    the manager of Petro -- excuse me, was the manager of IPOS?

19    A.    Yes, of course.

20    Q.    And when David Smith was the manager of IPOS, how

21    often did you speak to him?

22    A.    I would say every other week.

23    Q.    What sorts of things would you speak to him

24    about?

25    A.    Basically, if there was something that will delay

---

**41**

1    the -- and the operation meaning that our vessels wouldn't

2    be able to get into the -- into the dock.

3    Q.    Well, sir, didn't you speak to him about

4    maintenance issues at the facility?

5    A.    Once in a while, probably.

6    Q.    Who did you understand -- when David Smith was --

7    did you know David Smith to be the manager of IPOS?

8    A.    Correct.

9    Q.    Okay.  And why would you be speaking to the

10    manager of IPOS?

11    A.    Because I'm operations manager at -- at Vitol,

12    and he's providing a service to Vitol.

13    Q.    And when you're referring to Vitol, you're

14    referring to Vitol Inc.?

15    A.    Yes.

16    Q.    And this is another name I have a hard time with;

17    so I also refer to Merlin as Merlin F., because I have a

18    hard time with his last name as well.

19          Do you know Merlin F., Figueira or something like

20    that?

21    A.    Figueira, yes.

22    Q.    Figueira.  Thank you.

23          The answer is yes?

24    A.    Yes.

25    Q.    And who did you understand Merlin F. to be?

---

**42**

1    A.    He was the -- the office manager before

2    David Smith.

3    Q.    And how often would you speak to Mr. Merlin

4    Figuor -- Figuerois?  Is that what you said?

5    A.    Figueira.

6    Q.    Figueira.  Sorry.  Figueira.

7          How often would you speak to him?

8    A.    Same.  Every other week or so.

9    Q.    And how often would you e-mail with Mr. Figueira?

10    A.    Not -- not that often.

11    Q.    How much would you e-mail to or receive e-mails

12    from David Smith?

13    A.    Same thing, not -- not very often.

14    Q.    And would you be copied on e-mails from

15    David Smith to Charlotte Horowitz?

16    A.    Sometimes, yes.

17    Q.    How often would that occur?

18    A.    When they need some -- when they need something

19    to report.

20    Q.    And what types of things would they copy you on

21    when they report to -- they -- what kinds of things were

22    they reporting about when they would copy you on them?

23    A.    Some damages, some, some delays, some things out

24    of the normal operation.

25    Q.    And why would they report to you about things out

---

**43**

1    of the normal operation at the St. Croix, St. Thomas

2    propane facilities?

3    A.    Because I'm the operations manager at Vitol.

4    Q.    Are you aware of the procedure of how contractor

5    employees' times were kept at the St. Croix, St. Thomas

6    propane facilities?

7    A.    Sorry, what's -- what's the question?

8    Q.    Were you involved or did you -- were you involved

9    or did you have any knowledge as to how the contractor

10    employees' times were kept at the St. Croix or St. Thomas

11    propane facility?

12    A.    No, I'm not.

13    Q.    Were you ever made aware of any irregularities of

14    how the contractors' time sheets were kept?

15    A.    I hear about -- about the issue.

16    Q.    Okay.  And what issue are you talking about?

17    A.    That the time sheets were not accurate.

18    Q.    Do you remember when you heard that?

19    A.    No.

20    Q.    Who did you hear that from?

21    A.    Was it Charlotte was one that mentioned at that

22    time.

23    Q.    Was that in person or by e-mail or both?

24    A.    Person, for sure.

25    Q.    Can you recall the details about what she told

---

SEBASTIAN MORETTI

44

1  you about the inaccuracies on the time sheets?
2    A.   No.
3    Q.   As a result of learning of the inaccuracies, the
4  alleged inaccuracies of the time sheets, did you recommend
5  any actions?
6    A.   No.
7    Q.   Were you ever made aware of claims by
8  Andrew Canning that he fell through a grate that had been
9  constructed by Petro?
10    A.   No.
11    Q.   Are you aware that in January of 2021 there began
12  to be holdbacks of payments to Petro on accounts
13  receivables?
14  I'm sorry.  Did you answer?
15    A.   Yes.  The answer is no --
16    Q.   Oh, sorry.  I didn't hear you.
17    A.   -- I wasn't aware.
18    Q.   At any time did you become aware that there were
19  outstanding receivables or outstanding invoices of Petro
20  that were not being paid?
21    A.   Say it again.  Sorry.
22    Q.   At any time were you made aware that there were
23  outstanding invoices of Petro that were not being paid?
24    A.   Yes.
25    Q.   And when did you first become aware of that?

45

1    A.   I don't -- I don't remember.
2    Q.   Was it in 2021? 2020?
3    A.   Has to be 2021.
4    Q.   Okay.  And how did you become aware of that?
5    A.   By e-mail.
6    Q.   By what?
7    A.   By e-mail.
8    Q.   Oh, sorry.
9  And who was the e-mail from?
10    A.   Most probably from -- from Charlotte.
11    Q.   And why did you understand those invoices were
12  not being paid?
13    A.   Because of lack of documentation.
14    Q.   Well, if Charlotte had no ability to say what
15  types of documentation needed to be made, why would she be
16  telling you about lack of documentation?
17      MR. KAPLAN:   Objection.  Form.
18      You could answer.
19  BY MS. ROHN:
20    A.   That -- that was coming from -- from IPOS.  IPOS
21  or -- or someone who -- someone involved on that -- on that
22  part of the -- of the operation that there are -- they
23  assess that all the documents were not there.
24    Q.   Who did you understand had requested those
25  documents?

46

1    A.   I mean, I would I say that IPOS need all those
2  documents to -- to have the proper documentation of what's
3  -- what's done.
4    Q.   Well, then why wasn't IPOS telling you about the
5  lack of documentation but instead telling Charlotte?
6      MR. KAPLAN:   Objection.  Form.
7      You can answer.
8  BY MS. ROHN:
9    A.   Charlotte had more daily interaction with them.
10    Q.   And why was Charlotte having more activity with
11  IPOS?
12    A.   She was the operator who was working on the ships
13  that were supplying the propane to the island.
14    Q.   And so she was the person who was directly making
15  sure that the propane facilities were maintained; correct?
16    A.   No, that's not correct.
17    Q.   So if she didn't care that whether or not the
18  facilities were maintained or not, why was she having
19  conversations with IPOS?
20    A.   Say it again.  Sorry.
21    Q.   So if she didn't care whether or not the
22  facilities were maintained, why was she having
23  conversations with IPOS, who was in charge of the
24  maintenance of the facilities?
25    A.   Because if anything goes wrong, we wouldn't be

47

1  able to discharge our ships.
2    Q.   Well, sir, it's more than just something
3  preventing discharge of the ships, isn't it?  She was
4  involved in issues of maintenance of the facilities, was
5  she not?
6    A.   That -- that she may knew, yes.  She was
7  involved, no.  The -- the maintenance was responsibility
8  was IPOS.  Like -- like now is Saintnals.  Was she
9  responsible for the maintenance?  Definitely, no, she
10  wasn't.  She may give some advice or basically put the --
11  the urgency that things need to be done for her to be able
12  to discharge the propane, yes.  Why there was urgency to
13  get the propane discharged, to keep the lights on on the
14  island.
15    Q.   Well, let's talk about the lights on on the
16  island.  There are times when Vitol has threatened to cut
17  off propane to the island, is there not?
18      MR. KAPLAN:   Objection.  Form.
19      You may answer.
20  BY MS. ROHN:
21    A.   No, there wasn't any threats.
22    Q.   Really?  There weren't statements that if
23  payments weren't made by a certain time, that there'd be no
24  more propane sent?
25      MR. KAPLAN:   Objection.  Form.

SEBASTIAN MORETTI

48

1  BY MS. ROHN:
2      A.  That's -- that's not a threat.  that's a fact.  I
3  mean, if you don't get paid for a service, you stop the
4  service, right?
5      Q.  But you realize, of course, that would turn off
6  the lights in the Virgin Islands; correct?
7      A.  Not -- not -- not certainly, because WAPA has the
8  -- the possibility to switch to diesel.  Of course, it's
9  cheaper for propane.  That it was convenient for everyone.
10     Q.  Were you ever made aware of any complaints about
11 Andrew Canning and his treatment of Virgin Islanders or
12 local residents?
13     A.  No.
14     Q.  Even to this day you don't know about that?
15     A.  I hear about that.
16     Q.  Okay.  Well, when did you hear about that?
17     A.  Actually, when I -- I was called for this
18 deposition.
19          MR. KAPLAN:    In your answer --
20 BY MS. ROHN:
21     Q.  Okay, if it's something your attorney told you, I
22 don't want to know that.
23     Other than your attorney telling you that, did you
24 hear about it from anywhere else?
25     A.  No.

49

1      Q.  Did you ever participate in e-mails or
2  conversations about holding back payment of Petro's
3  invoices at any time?
4      A.  Yes.
5      Q.  Okay.  And when did you begin to have those
6  conversations or e-mails?
7      A.  At the time they happen.  I would say two years
8  ago.  Sometime in 2021.
9      Q.  And why were you involved?
10     A.  Because I'm the operations manager of Vitol Inc.
11     Q.  And were you in favor of holding back the
12 payments on the invoices?
13     A.  If I was -- was what?  Sorry.
14     Q.  Were you in favor of holding back the payments on
15 the invoices?
16     A.  If there was some kind of a issue that -- or --
17 or the documents not provided or the actions not made or
18 the job not done, yes, I was in favor to not pay for that
19 service that wasn't -- wasn't finalized.
20     Q.  Well, did you receive any information that the
21 jobs weren't done?
22     A.  No.
23     Q.  So would you agree with me that the jobs had been
24 completed, and, am I correct, the issue of holding back
25 invoices was as a result of documentation?

50

1      A.  That the job -- the -- the payment was delayed
2  because of the -- the lack of documentation and all.
3      Q.  Now, Petro actually did work directly for Vitol
4  as well, did they not?
5      A.  No.
6      Q.  You weren't aware that Vitol Virgin Islands hired
7  Petro to do certain work themselves?
8      A.  No, I'm not aware of that.
9      Q.  Are you aware, sir, that the invoices that were
10 held back by IPOS have now all been paid, and the only
11 outstanding invoices are those that were to Vitol itself?
12     A.  No.
13     Q.  Is it your testimony that Vitol did not do work
14 -- I'm sorry, that Petro did not do work for Vitol?
15     A.  Petro was hired by IPOS.
16     Q.  So, I'm sorry, I want to make sure.  Is it your
17 testimony that Petro did not do work for either
18 Vitol Virgin Islands or Vitol Inc.?
19     A.  That's correct.  Petro was hired by IPOS.
20     Q.  As to the quality of Petro's work, did you ever
21 hear any criticisms as to the quality of Petro's work?
22     A.  I did hear.
23     Q.  Okay.  And what did you hear as to the quality of
24 Petro's work?
25     A.  About the -- the anomalies, failures on the

51

1  weldings.
2      Q.  On the anomalies of the what?
3      A.  Or failures or wrongdoing on the weldings.
4      Q.  And when did you hear that?
5      A.  It was two years ago.
6      Q.  2021, would that be fair?
7      A.  Yes.
8      Q.  Okay.  And how did you hear that?
9      A.  I would say by -- by e-mail.
10     Q.  And from whom?
11     A.  David, David Smith.
12     Q.  And at that time was David Smith at IPOS, or was
13 David Smith an operator in Florida?
14     A.  I think it was still the operation manager of
15 IPOS but already based in -- in Florida.
16     Q.  He was the operations manager of IPOS, but based
17 in where?
18     A.  Florida.
19     Q.  Well, how was he operations manager of IPOS but
20 in Florida?
21          MS. FRANCIS:    Objection.  Foundation.
22 BY MS. ROHN:
23     Q.  You may answer.
24     A.  I don't know.
25     Q.  Well, who was he in Florida working for?

SEBASTIAN MORETTI

52

1      MS. FRANCIS:    Objection.

BY MS. ROHN:

3      Q.  You may answer.

4      A.  David Smith, who works for VTTI.

5      MS. ROHN:    I'm going to start sharing

6  documents, so -- it might be -- we been going for

7  about an hour and a half, how about a ten-minute

8  break?

9      MR. KAPLAN:    That sounds great.

10      (A recess was taken at this time.)

11  BY MS. ROHN:

12      Q.  Okay, I'm going show you documents Bates stamps

13  4401 to 4404 out of Exhibit 81.

14      (IPOS' First Supplemental Response to Plaintiff's

15  Request for Production of Documents was previously

16  marked as Exhibit 81 for identification.)

17      MS. ROHN:    And if you scroll down.

18  BY MS. ROHN:

19      Q.  These are e-mails from April 2019.

20      MR. KAPLAN:    Hold on one second.  You're on

21  Exhibit 81, and what pages did you say?

22      MS. ROHN:    4401 through 4404.

23      MR. KAPLAN:    That's not the Exhibit 81 that we

24  have.  Exhibit 81 that we have is --

25      MS. ROHN:    Oh, it's IPOS, sorry, 4401 to 4404.

53

1      MR. KAPLAN:    Exhibit 81 that you sent us is

2  IPOS document responses.  You're saying these were

3  documents that were attached to those?

4      MS. ROHN:    Yep.  That's what happens when

5  people document dump.

6      MR. KAPLAN:    I can't speak to any of that, but

7  he doesn't have --

8      MS. FRANCIS:    I would object to that comment.

9  That's completely unwarranted.

10      MS. ROHN:    Well, we'll see when we rule on the

11  motion for sanctions.

12      MR. KAPLAN:    I'll advise the witness doesn't

13  have a physical or electronic copy of that.  He can

14  only see it through the screen share; so you just have

15  to make sure --

16      MS. ROHN:    Okay.

17      MR. KAPLAN:    -- you're showing him documents

18  that he can view.

19      MS. ROHN:    I will do so.

20      MR. KAPLAN:    Thank you.

21      MS. ROHN:    So this -- this exhibit, which will

22  now be 81A for the purposes of this deposition because

23  I have multiple depo -- exhibits from 81, starts --

24      Can you go to 4403?  Go down to the bottom of

25  that.  Right there is perfect.

54

1      (E-mails Bates Nos. IPOS 4401 to 4404 were marked

2  as Exhibit 81A for identification.)

3  BY MS. ROHN:

4      Q.  So do you need that to be made any bigger, sir?

5      A.  No.

6      Okay.  Great.

7      This is from Ignacio Tolosa.  Do you know

8  Ignacio Tolosa?

9      A.  Yes.

10      Q.  And who is Ignacio Tolosa?

11      A.  He was a finance person in Seaport Canaveral.

12      Q.  I'm sorry.  He was a finance person for whom?

13      A.  Seaport Canaveral.  It's a terminal in Florida.

14      Q.  Seaport Canaveral?

15      A.  Yes.

16      Q.  Okay.  And then there -- this is also from -- to

17  Laura Ryan @vitol.com.  Do you know Laura Ryan?

18      A.  No.

19      Q.  And then also copied to Eduardo Garcia

20  @vitol.com.  Do you know Eduardo Garcia?

21      A.  Yes.

22      Q.  And who is -- what company did Eduardo Garcia

23  work for?

24      A.  For Vitol.

25      Q.  Vitol Inc.?

55

1      A.  Vitol Inc.

2      Q.  And what was his position with Vitol Inc.?

3      A.  He was our originator.

4      Q.  What does an originator do?

5      A.  The person who -- the people that goes and go for

6  new business, starting new projects on.

7      Q.  Okay.  And then it's also copied to David Smith,

8  vtti.com, and others.  "Subject:  IPOS Budget July 2017 to

9  June 2018."

10      It says "Hi Laura, As discussed, the attached

11  spreadsheet contains the actuals per month, per budget line

12  item, making up the 70 -- 772.9k operating expense overruns

13  for the period of July 2017 - June 2018."

14      Do you know why Tolosa would be sending that to

15  Vitol Inc.?

16      A.  Vitol would be paying this -- this amount.

17      Q.  Vitol Inc. would be paying these amounts?

18      A.  Correct.

19      MS. ROHN:    And then if you scroll up.

20  BY MS. ROHN:

21      Q.  On the top is another e-mail from Tolosa on

22  March 14, 2019, to Laura.

23      "Attached please find two excel files including all

24  the lines for all accounting entries into our systems.

25  Each file has pivot tables per month reconciling to the

SEBASTIAN MORETTI

**56**

1  spreadsheet we sent before with the overruns?"
2      Would this be being sent to Vitol Inc. again because
3  Vitol Inc. is actually paying the bills for IPOS' overruns?
4      A.   What's the question?  Sorry.
5      Q.   Sorry.  Would this e-mail had been sent to
6  Vitol Inc. as well because Vitol Inc. was paying the cost
7  of operating expenses for the -- the St. Croix, St. Thomas
8  propane facility?
9      A.   Correct.
10     Q.   And if you look to the bottom --
11         MS. ROHN:    Hold on.  It's the last paragraph.
12     Right there.
13  BY MS. ROHN:
14     Q.   It says "We would like to propose this one as the
15  new structure for controlling the budget on a monthly basis
16  going forward as we have discussed before, as you will have
17  the possibility of requesting details per general ledger
18  account."
19     So did Vitol Inc. review the budgets for the
20  maintenance of the propane facilities in the
21  Virgin Islands?
22     A.   No.
23     Q.   What?
24     A.   No.
25     Q.   So can you tell me why Mr. Ignacio would be

**57**

1  telling Laura of Vitol Inc. that they're proposing this new
2  structure for controlling the budget; why those
3  conversations would be had with Vitol Inc.?
4      A.   Assume because of the one paying -- was paying
5  the other.  This was not about the amounts.  It was about
6  how the -- the -- the structure will be -- will be done
7  from that time moving forward.
8      Q.   I didn't understand that.  Could you repeat that,
9  please?
10     A.   Trying to establish the process, not the budget.
11     Q.   Well, if they weren't involved with the budget,
12  why would they be establishing a process?
13     A.   Because Vitol was the one funding this.
14     Q.   And that Vitol is Vitol Inc.; correct?
15     A.   Yes.
16         MS. ROHN:    And then if you go to 4402, Mikey.
17     In the middle of the Document 4402.  That's
18     not 4402.  That's 4403.  There you go.  Scroll up a
19     little bit.  All right.  Sorry, at the bottom.
20  BY MS. ROHN:
21     Q.   Then on March 14, 2019, Mr. Eduardo Garcia of
22  Vitol tells Mr. Tolosa and David Smith -- and at that time,
23  am I correct, in 2019 Mr. David Smith was the operations
24  manager of IPOS; correct?
25     A.   Who -- David Smith, yes.

**58**

1      Q.   Okay.  And Mr. Edward Garcia (sic) of Vitol Inc.
2  says "We are waiting to receive actuals for the
3  July 2018-February 2019.  Could you please provide?"
4      Do you know why that was being requested of
5  Ignacio Tolosa of VTTI?
6      A.   No.
7      Q.   Okay.  And then if you scroll up, on March 15th,
8  Mr. Tolosa tells Edward Garcia of Vitol Inc.
9  "January and February added to the report I sent yesterday.
10  "We will send you a new version of the projection for
11  the remaining 4 months of the proposed budget for
12  July 2019-June 20 early next week."
13     So, sir, the budgets were in fact going to Vitol Inc.,
14  were they not, sir?
15     A.   Correct.
16     Q.   And the reason the budgets were going to
17  Vitol Inc., sir, is what?
18     A.   Eduardo was the -- the one in contact with WAPA
19  at that time; so Eduardo was the one communicating the
20  budget for the following year and the actuals to WAPA.
21     Q.   Well, as I -- as -- as the 30(b)(6) witness for
22  Vitol Virgin Islands has testified, there were yearly
23  projected budgets, and then they would be divided into 12
24  payments, and WAPA would make a monthly payment, but Vitol
25  would actually pay the invoices from those monthly payments

**59**

1  or if not enough money from Vitol itself.  Is that not
2  correct, sir?
3      A.   I didn't follow the -- the question.
4      Q.   Okay.  My understanding is that there would be
5  yearly -- proposed budgets for the year of the things that
6  were thought would be done that year.  Those would then be
7  quantified as to costs, and the total would then be divided
8  into 12 monthly payments for which WAPA would make monthly
9  payments but not actually pay any invoices.
10     Vitol would pay the invoices, some from the monthly
11  payments.  And if not enough, then Vitol would make those
12  additional payments, and at the end of the year, there
13  would be a reconciliation.  Is that not a fact, sir?
14     A.   WAPA was paying -- WAPA was paying Vitol, and
15  Vitol was paying IPOS for whatever was agreed on the -- on
16  the contract provided in the operations and maintenance.
17  Is that -- is that what you were asking me?
18     Q.   Well, this indicates that there were -- the
19  original e-mail -- e-mail is talking about cost overruns.
20  And those e-mails as to cost overruns are going from VTTI
21  to Vitol, are they not?  Isn't that what we established?
22     A.   I don't know.  I don't know what was established
23  here.  I don't know if what -- what are you asking exactly?
24     Q.   Well, sir, isn't it a fact, sir, that -- that
25  Vitol Inc. paid invoices; and then expected to get the

60

1  reimbursement from those invoices for maintenance and other
2  projects at the propane facility from WAPA?
3      A.   Correct, that's what they structured.
4      Q.   And, in fact, one of the issues is that there are
5  numerous invoices that Vitol claims were billed to WAPA
6  that WAPA hasn't paid.  Isn't that -- isn't that a fact,
7  sir?
8      A.   I don't see that fact here on this document.
9      Q.   No, sir, I'm not asking about it in here.  Isn't
10  that one of the whole issues about why you were going to
11  cut off propane?
12          MR. KAPLAN:    Object to the form of the
13  question.
14          You may answer.
15  BY MS. ROHN:
16      A.   No.  Actually, no.  There -- there are different
17  structures of payments.  When -- the one that was more
18  critical was the product itself, the propane.
19      Q.   But it is a fact, isn't it, sir, that they also
20  weren't making their maintenance payments; correct?
21      A.   That's correct.
22          MR. KAPLAN:    Object to the form of the
23  question.
24          You may answer.
25  BY MS. ROHN:

61

1      Q.   Did you say that's correct?
2      A.   That's correct.
3      Q.   And then if you go up some more, it's an e-mail
4  from Eduardo Garcia, which is on the next page.  You'll
5  just have to trust me.  Eduardo Garcia, April 11, 2019, to
6  Ignacio Tolosa, cc'd to Ms. Prendergast at Vitol and
7  David Smith.
8          "Hi David, The charge of the $242k in March for
9  Petro Industrial, is this all maintenance related?  Or are
10  these charges related to the rack as well?"
11          Can you tell me why Vitol would be involved in what
12  types of payments were being made to Petro?
13      A.   Can you move a little over to see that?
14      Q.   Sure.
15      A.   Okay.
16          What was the question again?  Sorry.
17      Q.   Why would Vitol be involved in what types of work
18  is being done by Petro for the sums of money charged by
19  Petro?
20      A.   Because part of this would be rebilled it was --
21  to WAPA, it was maintenance, and the rack, no.
22      Q.   What?  Could you say that again?
23      A.   It have here $242,000 supposed to be an invoice
24  from Petro Industrial.  What is it related to?
25      Q.   Well, why do you want to know whether or not it's

62

1  maintenance or some other charge?
2          MR. KAPLAN:    Object to the form of the
3  question.
4          You can answer.
5  BY MS. ROHN:
6      A.   Because if we did maintenance, would be rebilled
7  to WAPA.
8      Q.   Right, sir.
9          And if it was on the rack, that was a Vitol project,
10  and would be billed to Vitol, isn't that correct, sir?
11      A.   Would be paid for Vitol.
12      Q.   Okay.  So in order to be paid by Vitol, wouldn't
13  it be billed to Vitol?
14      A.   Not necessarily.
15      Q.   Okay.  So Vitol would also pay invoices that were
16  invoiced to IPOS?
17      A.   The contract was with IPOS; so we cannot pay
18  invoices that not -- that added to Vitol Inc. but we don't
19  have a contract with.  So, yes, we -- we can pay invoices
20  as to IPOS.
21      Q.   Okay, I didn't understand.
22          So in other words, you're saying that in order --
23  you're claiming under oath that in order for Vitol to pay
24  Petro, the invoice had to go to IPOS, and then Vitol would
25  pay it?

63

1      A.   No, I didn't say that.
2      Q.   Okay.  Please tell me again, 'cause I didn't
3  follow that.
4      A.   In order for you to pay an invoice, a contractual
5  link --
6      Q.   A what?  Contractual what?
7      A.   Link.
8      Q.   Link?
9      A.   It would be a contract.
10      Q.   Okay.  Could you say that again?
11      A.   If someone invoiced someone on -- what was the
12  purpose?  The purpose of that invoice is because there is a
13  contract, an agreement.  And there was an agreement, but
14  there is no agreement with Petro Industrial.  Our agreement
15  was with IPOS.  Our contract was with IPOS.
16      Q.   And you're saying Vitol Inc.'s contract was with
17  IPOS?
18      A.   Yes.
19          MS. ROHN:    And then if you go to 4401, the
20          bottom.  At the bottom.
21  BY MS. ROHN:
22      Q.   Then there's an e-mail from David Smith to
23  Eduardo Garcia of Vitol and Laura of Vitol.
24          "Eduardo, They are all maintenance related.  The truck
25  rack has only been the initial pre-payment that you had

SEBASTIAN MORETTI

64

1  previously funded."
2      So indeed Vitol had previously paid the initial
3  pre-payment for the rack; correct?
4      A.  That's -- that's what the document said.
5      Q.  Okay.  And then if you go up, this is where you
6  come into this document.
7      This is from Edward Garcia from Vitol to David Smith,
8  Andrew Canning, Tim K., and yourself, Sebastian Moretti;
9  correct?
10     A.  Correct.
11     Q.  "Subject:  IPOS Budget July 2017-June 2017 versus
12  actual."
13     See that as the subject line?
14     A.  Yep.
15     Q.  And Eduardo Garcia of Vitol is telling
16  David Smith of IPOS, correct, "Please be advised we will
17  need to limit the maintenance activities to critical items
18  only for the remainder of this budget year.  Once we
19  receive from IPOS the maintenance plan/activities and
20  related budget for the coming July 19 to --" July --
21  "June 20 budget year we can discuss with WAPA to make sure
22  they ok the plan and budget."
23     You see that?
24     A.  I see that.
25     Q.  So Vitol had the ability to tell IPOS what items

65

1  they could engage in or not, correct, sir?
2      A.  No.
3      Q.  Is not this Vitol from -- through Mr. Garcia
4  saying to IPOS to David Smith, "Please be advised we will
5  need to limit the maintenance activities to critical
6  items"?  Isn't that what Mr. Garcia from Vitol is telling
7  IPOS?
8      A.  We -- we should ask Eduardo Garcia what is --
9      Q.  No, sir.  Sir, you're on this e-mail.  Did you
10  send an e-mail and say wait, wait, none of this correct?
11     A.  No, I didn't.  Did I?
12     Q.  If you go to the top, where you are also on the
13  e-mail, April 22, 2019, same subject line, same recipients.
14  "Thank you, Eduardo."  This is from David Smith of
15  IPOS.  "This is very clear.  We will notify Petro at the
16  end of the day that will bring them onsite -- we will
17  notify Petro at the end of the day that will bring them
18  onsite for critical maintenance only."
19     So you're telling -- Vitol told IPOS stop it, and then
20  as response -- as a result of the direction by IPO --
21  sorry, by Vitol, IPOS then told Petro to stop anything but
22  critical maintenance, correct, sir?
23         MR. KAPLAN:    Object to the form of the
24  question.
25         You may answer.

66

1  BY MS. ROHN:
2      A.  That's what Eduardo Garcia seems to -- to say.
3  They are not all going to expend other than what is for
4  critical maintenance only.
5         MS. ROHN:    Now if we can go to that document
6  in that same 81, IPOS 4409 to 410.
7         MR. KAPLAN:    Please repeat the Bates number
8  for me.
9         MS. ROHN:    Sure.  4409 to 410.
10     If you go to the second page, 4410.
11     (Off the record.)
12        MS. ROHN:    I'm -- he's going to scan in a
13  document that's not in the --
14     (Off the record.)
15        MS. ROHN:    Go to the second page, please.
16  BY MS. ROHN:
17     Q.  There's an e-mail from David Smith, dated
18  May 8, 2019, to Eduardo Garcia.  You are -- it says to
19  Eduardo Garcia, and yourself, Mr. Moretti.  Do you see
20  that?
21     A.  Yes.
22     Q.  And also to Tim K.
23     Did Charlotte take over Eduardo Garcia's position?
24     A.  No.
25     Q.  Okay.  Was Charlotte employed in 2019 in the

67

1  present position she's in now?
2      A.  Under -- as operations -- sorry.  As the physical
3  operator, yes.  I don't recall about 2019 which desk she
4  was.
5      Q.  Okay.  And this is cc'd to Andrew Canning.  And
6  David Smith is telling you and Mr. Eduardo, "Here's a
7  summary that Andrew put together.  It's through November,
8  but that is where the largest overrun was.
9      "Andrew went through the individual time sheets.
10     "We have already had meetings about better tracking
11  going forward.
12     "Please let us know if you have any questions.
13     "Andrew is still working on the maintenance plan."
14     So was it Andrew who did the -- Canning who did the
15  maintenance plan?
16     A.  Andrew was participating on the -- on the
17  maintenance plan.  It was just IPOS' responsibility.
18     Q.  And why were you getting documents showing where
19  the largest overruns were?
20     A.  Again, I'm -- I'm the operations manager, and I
21  supposed to know certain things.
22     Q.  And overruns on the budget is one of them, is
23  that correct, sir?
24     A.  Yes.
25         MS. ROHN:    If you go to the first page.

SEBASTIAN MORETTI

68

1  BY MS. ROHN:
2      Q.   This is Edward Garcia responding to David Smith
3  of IPOS, and including you.
4      "David, How did you reconcile the spreadsheets
5  prepared by Andrew with these actual expenditures for M&R
6  from IPOS actuals to date report?  The numbers are not even
7  close.  The actuals report shows IPOS has spent $2,241,666
8  in M&R so far.  How can Vitol justify this figure with
9  WAPA?"
10      First of all, is M&R -- what is M&R?
11      A.   Maintenance and repairs.
12      Q.   And why would you be copied on this?
13      A.   I'm the operations manager of Vitol Inc.
14      Q.   All right.  And then at the top of this it says
15  your -- David Smith of IPOS responds to you and Eduardo and
16  Tim K.
17      "This doesn't reconcile.  Perhaps I was mistaken, but
18  all of the e-mails and conversations were about Petro and
19  their costs, so that is where Andrew was focused.
20      "We have sent all the invoices for IPOS, we sent the
21  list of the maintenance projects that are listed every
22  quarter and --" tied "-- tried to create something you can
23  use in your discussions.
24      "As mentioned, we don't have individual wo/po's for
25  each specific job done by Petro."

69

1      Why were you involved in how much Petro was billing?
2      A.   No, it wasn't about Petro.  It was about the
3  budget in general.
4      Q.   The what?
5      A.   It wasn't about Petro specifically.  It was about
6  the situation in general and the -- and the budget in
7  general, the moneys spent in general.  At the end --
8      Q.   I'm sorry.
9      WO/POs, is that work orders/purchase orders?
10      A.   Where is that?  Sorry.
11      Q.   It says "As we mentioned, we don't have
12  individual wo/po's for each specific job done by Petro."
13      Is that work orders or purchase orders?
14      A.   Yes.
15      Q.   Next out of Exhibit 81, I think, is IPOS 748.
16      This is a e-mail from David Smith to Eduardo Garcia,
17  dated June 3, 2019.
18      MS. ROHN:     Scroll to 753, please.
19      There you go.  If you'll go back up then.
20  BY MS. ROHN:
21      Q.   Starts out June 3rd at 1:27 from David Smith,
22  IPOS, to Vitol.  "Please find attached the information
23  requested.
24      "Andrew and Coury continue to refine."
25      MS. ROHN:     Then if you go up.

70

1  BY MS. ROHN:
2      Q.   It says from Vitol, Mr. Garcia, to David Smith of
3  IPOS.  "Thank you David for sending this information.
4      "Where can I find the budget associated with the
5  maintenance plan IPOS is proposing?"
6      So, indeed, Vitol was involved in reviewing the
7  budgets of IPOS; correct?
8      A.   Vitol was the one communicating to WAPA, so need
9  to be aware of what we communicated to WAPA.
10      MS. ROHN:     If you go to the next page, 752,
11      the bottom.
12  BY MS. ROHN:
13      Q.   June 3, 2019, 2:32, David Smith, IPOS, to Vitol.
14  "The proposed budget hasn't changed from what Coury
15  initially put together.  Andrew's work is more of a true
16  plan and he is continuing to refine the costs associated.
17      "This morning Petro sent a yearly contract proposal
18  that reduced the cost some.  It's about 20% on full-time
19  labor.  Call-out and specialty craft would not have the
20  contract labor.  We haven't been able to cost it out, but
21  we'll save.
22      "Let me know if you have any additional questions."
23      Why would IPOS be discussing Petro's contract with
24  Vitol?
25      A.   I was -- I was on a different -- different page.

71

1      This is an e-mail that you -- you were reading?
2      MS. ROHN:     752.  752.
3      MS. FRANCIS:     What you were reading,
4      Attorney Rohn, was not on the screen; so the
5      witness --
6      MS. ROHN:     No worries.
7      752.  Okay, go to the bottom of that page.  There
8      we go.
9  BY MS. ROHN:
10      Q.   Can you read that, sir?
11      My question is:  Why would IPOS be discussing Petro's
12  contract and how much it would be to Vitol?
13      MR. KAPLAN:     Object to the form of the
14      question.
15      You can answer.
16  BY MS. ROHN:
17      A.   It was part of the budget that Vitol need to
18  discuss with WAPA.
19      Q.   And there is -- if you go to 751, there's some
20  discussions about discussing this with WAPA.  And at the
21  top of that page, 751, top of the page.  On June 21, 2019,
22  David Smith includes yourself.
23      Do you see that in this chain?
24      A.   I think it's down.
25      Q.   It's at the very top.

SEBASTIAN MORETTI

72

1    MS. ROHN:    It's at the very top.  Very top,
2  Michael.
3    A.  Okay.
4    MS. ROHN:    751.  You see right there?  Yes.
5  BY MS. ROHN:
6    Q.  "IPOS Maintenance Plan and Budget."
7    A.  Yes.
8    Q.  You see that you're copied on that?
9    And then -- that's all I have for that document.
10    MS. ROHN:    3698.  IPOS 3698.
11    MR. KAPLAN:    Is that the same exhibit, 81A?
12    MS. ROHN:    Yes, 81.
13  BY MS. ROHN:
14    Q.  On 3698 at the bottom is an e-mail from yourself,
15  correct, sir?
16    A.  That's correct.
17    Q.  Okay.  To IPOS.  "Subject:  Andrew Canning
18  contract with Vitol."
19    In 2020 did Andrew Canning have a contract with Vitol
20  or a contract with IPOS?
21    A.  At that time I -- because of this e-mail, was
22  still with IPOS.
23    Q.  Okay.  So you say "Hi David and Happy Holiday!
24  We are working on Andrew's contract and we would like to
25  add Appendix 4 & 5 but both needs to be modified from VTTI

73

1  to Vitol.  Do you have a word format?  Also can you please
2  facilitate Andrew's current insurance policy.
3    "Thanks a lot, Seba."
4    Is that a nickname for you?
5    A.  Short for Sebastian.
6    Q.  Okay.
7    So, sir, why were you, of Vitol, working on Andrew's
8  contract with IPOS?
9    A.  It was at the time that we were switching from
10  IPOS to Vitol.
11    Q.  So you said he was still working for IPOS, did
12  you not, sir, under oath?
13    A.  Still working for IPOS, we were -- we work for
14  Vitol.  At this time, because of this e-mail, was working
15  for IPOS.
16    Q.  And you were deciding what appendixes to add,
17  sir; correct?
18    A.  Say it again.
19    Q.  And you were deciding what appendixes to add,
20  correct, sir?
21    (Interruption by the court reporter.)
22    MS. ROHN:    He said that's what it says.
23  BY MS. ROHN:
24    Q.  And why would Vitol be asking IPOS to facilitate
25  Andrew's current insurance policy?

74

1    A.  He needed -- he needed an insurance to -- to work
2  for any company.
3    MS. ROHN:    And if you can go to Bates-stamped
4    3349.
5  BY MS. ROHN:
6    Q.  3349, if you go up, there's an -- in response --
7    MS. ROHN:    Just go up a little bit.
8  BY MS. ROHN:
9    Q.  There's a response from David Smith to you that
10  says "Seba, Just to be clear, do you want a copy of the
11  Online insurance or what our requirements are?"
12    And then you answer --
13    MS. ROHN:    Scroll up.
14  BY MS. ROHN:
15    Q.  "A copy of what he currently has so -- so can be
16  reviewed by our insurance specialist.
17    "Your requirements are the one in the contract,
18  right?"
19    When you say "our insurance specialist," is that
20  Vitol's insurance specialist?
21    A.  That's correct.
22    Q.  And that --
23    MS. ROHN:    And then if you scroll up.
24  BY MS. ROHN:
25    Q.  David Smith says, "I think that Andrew and

75

1  Eduardo had a discussion about it.  But this is what IPOS
2  currently uses.
3    "And I'm attaching Petro's as an example as well."
4    Eduardo wouldn't be working for Vitol, correct --
5  Vitol; correct?
6    A.  Correct.
7    MS. ROHN:    Bates No. 4589.
8    You got that one?  You're good.  You are good.
9  BY MS. ROHN:
10    Q.  This is a series of e-mails starting in May.
11    MS. ROHN:    If you go to 4597.  Oops, sorry.
12  Hold on.  Sorry.  If you go to 4591.  You got that?
13    If you scroll to the bottom 459 -- I'm sorry,
14  You're right, 4591.
15  BY MS. ROHN:
16    Q.  So there's an e-mail, starts on page 4590 from
17  Merlin Figueira to Eduardo Garcia, Charlotte.
18    MS. ROHN:    And that's the bottom of page
19  4590.  There you go.
20  BY MS. ROHN:
21    Q.  And yourself, Sebastian.
22    "Outage update.  Lady and Gents, On behalf of the team
23  I'd like to give you an update on the outage.  At the end
24  of today we have," and then there's a list of what has been
25  done.

SEBASTIAN MORETTI

76

1    "We reached the desired milestone yesterday and today.
2    Now our milestone for tomorrow is the following." Listing
3    what is to be done.
4    "We have a tailgate Safety Meeting each morning at
5    7 a.m. and an update meeting at 3 p.m. Our team as well as
6    the Contractor attend the Safety Meeting. In addition we
7    invited the Preventive Maintenance Manager at WAPA for
8    these meetings and he has attended.
9    "Barring any surprises we believe we are on track to
10   restart as scheduled at the end of Monday, September 7th."
11       Why would IPOS be telling Vitol these detailed
12   statements about what work is being done by IPOS?
13       MR. KAPLAN:    Object to the form of the
14   question.
15       You may answer.
16       MS. ROHN:    Huh? I didn't hear that.
17       MR. KAPLAN:    I objected to the form and told
18   the witness he may answer.
19   BY MS. ROHN:
20       A.   Because this was related to -- if you go to the
21   subject, this is -- was in the first e-mail.
22       There's -- there's an e-mail before this one.
23       Q.   This is the first e-mail in the chain.
24       A.   So as per the subject, "outage update," the -- I
25   don't recall the situation exactly, but probably was an

77

1    interruption of supply to WAPA.
2        MS. ROHN:    All right. And then if you go to
3    the top of 4589. Okay.
4    BY MS. ROHN:
5        Q.   There's from Merlin Figueira, 9 -- September 8th.
6    You're included in this, along with David Smith,
7    Andrew Canning. And it Mr. Figueira says to Eduardo of
8    Vitol, "It was indeed a Team effort; Alex managed the Ops
9    side of the outage, Calvin the maintenance side, Andrew and
10   David Nagle on the engineering inputs and then the
11   dedication by our Contract, Petro. We couldn't have done
12   this safely and on schedule without the entire team pulling
13   together."
14       Why would that information be going to Vitol?
15       A.   Letting us know about the job well done.
16       Q.   So it's your testimony, sir, under oath that
17   Vitol wasn't overseeing the maintenance operations of IPOS?
18   Is that right, sir?
19       A.   Correct.
20       Q.   Huh?
21       A.   That's correct.
22       MS. ROHN:    Let's go to -- I think this is 81
23   again. IPOS 6739.
24       MS. FRANCIS:    I'm sorry. What was that Bates
25   number?

78

1        MS. ROHN:    6739. Up one.
2        Actually, you can start at 6738.
3    BY MS. ROHN:
4        Q.   This is an e-mail that starts February 24, 2021,
5    at 7:33 p.m. from Charlotte to Tim K. and Adrian Melendez
6    and also to IPOS.
7        So why would Vitol be sending Adrian Melendez from
8    Petro e-mails?
9        MR. KAPLAN:    Object to the form of the
10   question.
11       You may answer.
12   BY MS. ROHN:
13       A.   What's -- I can't read the whole e-mail.
14       Q.   Okay. Well, it starts out the very bottom from
15   Mr. Figueira.
16       MS. ROHN:    Are you on 6738?
17   BY MS. ROHN:
18       Q.   Very bottom, see that, from Mr. Figueira to
19   Tim K. "We will have the documents listed for your files
20   and for onward transfer to WAPA."
21       And then Charlotte says to Mr. Figueira and to Tim K.
22   and Adrian Melendez as to the "Vent Piping Project WAPA
23   Deliverables.
24       "Merlin - Sebastian is requiring the following before
25   starting work because we need to pass them to WAPA. Can

79

1    you get them before Monday?"
2    No. 1. "Support for the pipe replacement which
3    confirms that it will meet or exceed requirements for
4    operation."
5        2. "Demolition of LO/TO and P&ID markups."
6        Do you see that?
7        A.   Yes.
8        Q.   Okay. So why were you requesting this before
9    work could start by Petro?
10       A.   Basically, every project need to be properly
11   documented --
12       Q.   I couldn't understand that.
13       A.   Every -- every project need to be properly
14   documented before starting.
15       Q.   But, sir, when I asked you asked earlier if Vitol
16   requested -- required certain documentation on the IPOS
17   projects, you told me under oath no.
18       Isn't this you requiring certain documents, sir?
19       MR. KAPLAN:    Object to the form of the
20   question.
21       You may answer.
22   BY MS. ROHN:
23       A.   These documents were requested for -- to pass to
24   WAPA on their project. WAPA was require -- requiring the
25   -- the documents to us. We were requiring the documents to

SEBASTIAN MORETTI

80

1  the next one.
2      Q.  So why would you be telling that to -- why would
3  you be telling that maybe to IPOS, but why would you be
4  telling that to Petro?
5      A.  'Cause my contract was with IPOS.
6      Q.  But you're telling it to Petro.
7      Why would you be doing that, sir?
8      A.  I'm not telling Petro anything.
9      Q.  He's on the e-mail.
10         MR. KAPLAN:    Object to the statement.
11  BY MS. ROHN:
12     A.  It wasn't --
13         MR. KAPLAN:    Wait for a question.
14  BY MS. ROHN:
15     Q.  What is LO/TO and P&ID markups?
16     A.  I don't know what the LO/TO is.
17     Q.  What is a P&ID markup?
18     A.  I don't know.
19     Q.  And then there's a e-mail, if you scroll up, from
20  Merlin, "Let me know what I can gather by tomorrow.  I'm
21  leaving."
22     And then -- then if you scroll up, there's an answer
23  from Adrian Melendez.  "Merlin, I can help out with the
24  support for the replacement of the pipes including the
25  inspection reports."

81

1      And he sends that -- oh, he doesn't send that to you.
2  I lied.
3      If you go to the next page, there is an e-mail --
4         MS. ROHN:    6739.  No, the next page, 6739.
5  Sorry.
6         Okay.  Is that -- are we on 6739?
7  BY MS. ROHN:
8      Q.  There's an e-mail from Tim K., February 24th, to
9  Merlin and Adrian Melendez copying Charlotte, same Vent
10  Piping Project.
11     "Merlin/Adrian, per our conversation on Tuesday, we
12  will be providing WAPA with all job book documentation for
13  this project.  This includes the engineering/design/scope/
14  construction documentation for them to review - and after
15  completion for their records as this work is being done on
16  their property.
17     "Can you please send over the following."
18     So first of all, Tom -- Tim K. has admitted in this
19  e-mail that he had a conversation on Tuesday with Petro,
20  Adrian; correct?
21         MR. KAPLAN:    Object to the form of the
22  question.
23         You can answer.
24  BY MS. ROHN:
25     A.  I don't know.

82

1      Q.  Well, you think Tim is the kind of person, from
2  working with him, that he would say something in e-mail
3  that's not true?
4      A.  No.  He may be talking with Merlin, not both of
5  them.
6      Q.  Well, the mail is to -- the e-mail is to
7  Merlin/Adrian; right?
8      A.  That's a question for Tim K.
9      Q.  Well, doesn't that what it says on the document,
10  sir?
11     A.  "Per our conversation on Tuesday we will be
12  providing," yes.
13     Q.  So if Vitol Inc. wasn't involved in obtaining
14  documentation related to the work being done by IPOS, why
15  is Tim K. having conversations with Adrian and sending
16  e-mails to Adrian as to what documentation is needed?
17         MR. KAPLAN:    Object to the form of the
18  question.
19         You may answer.
20  BY MS. ROHN:
21     A.  It seems to be a request from WAPA.
22     Q.  WAPA is not sending this e-mail, is it, sir?
23     A.  No.  But Tim wouldn't -- wouldn't been asking for
24  something that he -- just for the purpose of asking.  WAPA
25  for sure asked us for these documents.

83

1      Q.  So, sir, the contract between WAPA is actually
2  with Vitol Virgin Islands, is it not, sir?
3      A.  I don't have that document in front of me, but I
4  -- I think so.
5      Q.  Okay.  So why would WAPA be talking to
6  Vitol Inc.?
7         MR. KAPLAN:    Object to the form of the
8  question.
9         You may answer.
10  BY MS. ROHN:
11     A.  Because exactly that reason, that the -- the
12  contract is between WAPA and Vitol.
13     Q.  So, again, Vitol is Vitol Virgin Islands and
14  Vitol Inc.?
15         MR. KAPLAN:    Object to the form of the
16  question.
17         You may answer.
18  BY MS. ROHN:
19     A.  I don't have the document in front of me.  I
20  don't -- I don't know which company exactly.
21     Q.  Well, sir, do you treat those two companies as --
22  as one?
23         MR. KAPLAN:    Objection to the form.
24         You may answer.
25  BY MS. ROHN:

84

1    A.   Both are totally different legal entities.
2    Q.   They're what?
3    A.   Both of the companies are totally legal different
4  entities.
5    Q.   But isn't it true, sir, that Vitol Virgin Islands
6  has no employees?
7        MR. KAPLAN:    Objection.  Asked and answered.
8  You may answer again.
9  BY MS. ROHN:
10    A.   That's correct.
11    Q.   And so -- so this is a request for various
12  documentations for the job; correct?  And being
13  communicated between Vitol, from Tim K., and IPOS and
14  Petro; correct?
15    A.   Correct.
16        MS. ROHN:    If we go to 4856.
17        THE WITNESS:    Can we have a five minutes
18  break?
19        MS. ROHN:    Oh, absolutely, sir.  Let's take a
20  break.
21        (A recess was taken at this time.)
22        MS. ROHN:    If you go to 4850?
23        MR. KAPLAN:    I'm sorry.  You're in the same
24  Exhibit 81.  What the Bates number?
25        MS. ROHN:    Yeah, but we're gonna -- well

85

1  because -- yes, we're going to another part of it.
2        MR. KAPLAN:    That's fine.  Can you tell the
3  number, document number?
4        MS. ROHN:    That's because it's -- that one is
5  the number 600.  But the way these documents have been
6  produced by IPOS, the end of that chain is No. 4850.
7        MR. KAPLAN:    Okay.  Thank you.
8  BY MS. ROHN:
9    Q.   All right.  If you scroll up, this 4850 is the
10  same as 6739.
11        And then if you scroll up, 4851.  If you go to 4852,
12  it's the same e-mail again.  Then the same e-mail about
13  "Merlin I can help out" on 4852.
14        4853, it's the same e-mail we did before.  And then if
15  you go to 4855, there is the same e-mail on the top -- at
16  the top of that page Merlin says in response to Adrian
17  saying he can help with -- for the replacements of the
18  pipes.
19        "Okay, Adrian, let's discuss tomorrow to see what we
20  have what is requested.  I may need your drawing that
21  shows the existing lines to show what is going to be
22  demolished."
23        And Adrian says to Merlin, that he's going to be on a
24  flight "but I will call you in between my layover and see
25  if I can figure something out."

86

1        MS. ROHN:    And then if you go to the 45 --
2  856.  We have the same request for documents.
3  BY MS. ROHN:
4    Q.   "Per our conservation we will providing WAPA
5  the --
6        MS. ROHN:    4856.
7  BY MS. ROHN:
8    Q.   See where it says, again, the same e-mail, "Per
9  our conversation on Tuesday, we will be providing WAPA with
10  all the job book documentation."
11        Sir, have you ever seen -- well, let me see.  In the
12  outage job that we referred to earlier where there was an
13  outage, and you guys were talking to IPOS, were there --
14  were the same types of documents required for that outage
15  job as to the welding?
16        MR. KAPLAN:    Object to the form of the
17  question.
18        You may answer.
19  BY MS. ROHN:
20    A.   I don't know.  I don't know what --
21    Q.   I beg your pardon?
22    A.   I don't know what document will be.
23    Q.   Well, these documents that are referred to in
24  this e-mail, the job book, was that required on every job
25  where there was welding?

87

1    A.   It's required on any job.
2    Q.   Oh.  So is it your testimony on behalf -- is it
3  your testimony that on every job there should have been a
4  job book?
5    A.   Every construction job in general, anything has
6  -- has engineering book.
7    Q.   Do you know if whether before the 3-inch vent
8  piping project there had ever been a job book?
9    A.   No, I don't know.
10    Q.   Well, if it would be required on every job,
11  should there have been a job book?
12    A.   Yes.
13    Q.   Do you know of this decision to have a job book
14  on the 3-inch vent line was a requirement that was put in
15  place by Vitol?
16    A.   No.  That's a standard industry -- industry
17  standard.  Sorry.
18    Q.   Okay.  But if there had not been job books on
19  other projects, was this Vitol now deciding that there were
20  going to be job books?
21        MR. KAPLAN:    Form objection.
22        You may answer.
23  BY MS. ROHN:
24    A.   There are books required on every job that I've
25  been involved or overseen or hear about it.

SEBASTIAN MORETTI

88

1    Q.   So IPRS -- IPOS, should have a job book for every
2  job they did at the propane facility; correct?
3        MS. FRANCIS:    Objection.
4  BY MS. ROHN:
5    Q.   Is that a shaking your head yes, sir?
6    A.   That's a yes.
7    Q.   Okay.  And that job book should have been given
8  to WAPA on every job that IPOS did, is that correct, sir?
9        MS. FRANCIS:    Objection.  Foundation.
10  BY MS. ROHN:
11    Q.   You may answer.
12    A.   If the project was in WAPA facilities, yes.
13    Q.   And if IPOS did jobs for Vitol, should there have
14  been a job book that was given to Vitol?
15    A.   Say it again.  Sorry.
16    Q.   If IPOS did a job for Vitol, should IPOS have had
17  a job book given to Vitol?
18    A.   It's the -- the book is to -- to remain within
19  the facilities.
20        MS. ROHN:    4863.  Starts with 4864.
21  BY MS. ROHN:
22    Q.   4864, you see this is a continuation from Tim to
23  Charlotte, Merlin, Adrian, cc'd to Andrew Canning,
24  yourself, and David Smith, same vent piping program.
25        MS. FRANCIS:    Attorney Rohn, what you're

89

1  reading is not on the screen.  Can you give --
2        MS. ROHN:    4864, please.  You need to go up or
3  maybe down.  I don't know.
4        Okay.  There we go.  Scroll down.  That's perfect
5  right there.
6  BY MS. ROHN:
7    Q.   February 25th, 10:50, a.m., Tim, from Vitol, to
8  Charlotte at Vitol, Merlin at IPOS, Adrian from Petro, cc'd
9  to Andrew Canning, and yourself, and David Smith.
10        And by that time David Smith was working for VTTI;
11  correct?
12        MS. FRANCIS:    Objection.
13  BY MS. ROHN:
14    Q.   Is that correct, sir?
15    A.   David Smith was working -- yes.
16    Q.   Yes.  Okay.
17        "Adrian --" this is written from Vitol to Adrian;
18  correct?
19        "-- Attached is a purchase order along with the quote
20  documentation.
21        "Please ensure your invoices have both the purchase
22  order and requisition number on them when sent to us.  This
23  is located in the attached PO for the reference down
24  below."
25        You see that, sir?

90

1    A.   Yes.
2    Q.   And then it gives a PO number and a recognition
3  -- requisition number.
4        Why would Mr. Adrian Melendez of Petro be sending
5  purchase orders and requisition orders to Vitol?
6    A.   To be review.
7    Q.   Excuse me?
8    A.   To be review.
9    Q.   Why would Vitol be reviewing something that's
10  been contracted through IPOS?
11    A.   We were supporting IPOS.
12    Q.   Well, why was Vitol providing Petro with a
13  purchase order?
14    A.   I -- I don't -- I don't see -- I don't know
15  what's the document there.
16    Q.   Well, it says "Adrian, Attached is the purchase
17  order along with the quote documentation."
18    A.   To facilitate the process.
19    Q.   Excuse me?  Say that again.
20    A.   To facilitate the process.
21    Q.   To dictate the process, is that what you said?
22    A.   Facilitate.
23        MS. FRANCIS:    Facilitate.
24  BY MS. ROHN:
25    Q.   Oh, facilitate.  Sorry.

91

1        Okay.  And then if you go to 4863, there is on
2  February 26th, at the bottom, from Charlotte at Vitol to
3  Adrian Melendez, cc Andrew Canning and yourself.
4        "Hi Adrian - I received your revised budget from Tim.
5  Thank you.
6        "We will need an itemized breakdown of why the cost
7  has changed from 187,000 and change to 194,000 and change
8  for WAPA.  We already gave them your original quote for
9  their approval.  Now you are stating that this project will
10  cost more despite the original quote stating that it was
11  not to exceed quote.  I see from your e-mail that
12  additional cost was due to an effort to minimize downtime
13  but you will need to be more specific.
14        "I would like to see the below -- see the below format
15  for the original quote."
16        Why is Vitol talking to Petro about how to document
17  its billing?
18        MR. KAPLAN:    Object to the form of the
19  question.
20        You may answer.
21  BY MS. ROHN:
22    A.   We need to give WAPA the, as they say there,
23  revised budget, and this specific topic was with -- with
24  Petro.
25        MS. ROHN:    4845.

SEBASTIAN MORETTI

92

1    4843.  Wait.  Wait.
2    Okay, 4 -- 4874.  You got it?
3    4874.  I need 4874.
4    BY MS. ROHN:
5    Q.   This is a document, March 29, 2021, from
6    Charlotte of Vitol to Figueira and Adrian Melendez, and
7    various people from WAPA and copied to you.
8    "Merlin/Adrian, I want to introduce you to
9    Matthias Clarke, he will be the WAPA representative
10   overseeing the vent line replacement project for WAPA.
11   Please liaise with him and answer all --" I think he means
12   his.  -- "questions timely and thoroughly (copying Vitol
13   and Andrew."
14   "At the moment he would like the manufacturer material
15   data sheets for the replacement of piping procured for use.
16   "Matthias - please let us know --"
17   Why would Vitol be doing that interim -- being an
18   intermediary between WAPA and IPOS, instead of WAPA going
19   directly to IPOS?
20   A.   Because we have a contract with WAPA.
21   Q.   And then in response above, Adrian Melendez says,
22   "Good afternoon Charlotte & Matthias, Please find the
23   attached MTR for replacement S 3 pipe.  Let me know if you
24   have any questions."
25   Right?  So Charlotte is asking Petro directly for

93

1    information; correct?
2    A.   Can I read the previous e-mail, please?
3    Q.   Sure.
4    MS. ROHN:    Can you scroll down, Mickey.
5    BY MS. ROHN:
6    A.   Yes.
7    Q.   And Adrian is then providing Vitol and WAPA with
8    a copy of the material sheets the same day they're asked
9    for; correct?
10   A.   Yes.
11   MS. ROHN:    Exhibit 68.  IPOS 68.
12   (IPOS' First Supplemental Response to Plaintiff's
13   Second Request for Production of Documents was
14   previously marked as Exhibit 68 for identification.)
15   MS. ROHN:    23 -- 23 -- sorry.  2396.  Oops.
16   23 -- yeah, looks like 2396 -- nope, 2397.  Sorry.
17   Got that?  2397 in Exhibit 68.
18   MR. KAPLAN:    Did you say Exhibit 68, 2397?
19   MS. ROHN:    Yes.
20   2396.
21   All right, go to Exhibit 66, IPOS Exhibit 66 at
22   2020.
23   (IPOS' First Supplemental Response to Plaintiff's
24   First Set of Interrogatories was previously marked as
25   Exhibit 66 for identification.)

94

1    MS. FRANCIS:    Just to be clear, these are
2    plaintiff's exhibits not IPOS' exhibits.
3    MS. ROHN:    The Bates numbers on these are
4    IPOS.
5    MS. FRANCIS:    No, I understand that, but you
6    said IPOS exhibit, and I just wanted the record to be
7    clear that you're referring to your exhibits.
8    MS. ROHN:    Oh.  Sorry.
9    No, they have IPOS on them.  They're not my
10   exhibits.  They're IPOS' Bates numbers.
11   MS. FRANCIS:    We don't need to argue.  These
12   are the exhibits your office circulated for
13   depositions.
14   MS. ROHN:    They're the production by IPOS.
15   2408.
16   BY MS. ROHN:
17   Q.   2408 IPOS --
18   MS. ROHN:    If you scroll to the bottom.
19   BY MS. ROHN:
20   Q.   There's an e-mail from Andrew Canning to IPOS and
21   David Smith.
22   "Merlin, Given the sensitivities on my direct
23   communication with Petro, the recent communication
24   requesting data from WAPA and also to meet the project
25   Piping Welding Specifications, could you ask Adrian to

95

1    provide the following information, please."
2    Were you aware of the fact that by July of 2021 that
3    Canning was not speaking to Adrian of Petro?
4    MR. KAPLAN:    Object to the form of the
5    question.
6    You may answer.
7    BY MS. ROHN:
8    A.   No, I didn't know.
9    MS. ROHN:    1984.
10   1987.
11   If you could go to 1988.  1988.
12   BY MS. ROHN:
13   Q.   So if you go to the bottom of this 1988, this is
14   -- has to do with the suspected anomaly of the welding
15   documentation.
16   MR. SIMPSON:    Objection.
17   BY MS. ROHN:
18   Q.   And there is an e-mail on July 22nd from
19   David Smith to -- and David Smith worked for VTTI by then.
20   -- to Merlin, Andrew Canning, and Terence Keogh, I guess.
21   "Hi Everyone, Chad from Petro called me.  They want me
22   to join a call with the person who conducted the welding
23   tests, lab tests.  He apparently arrived from Japan last
24   night.
25   "Chad says that he conducted all the tests in

SEBASTIAN MORETTI

96

1  Puerto Rico on all of these welders.  He's available today
2  after 1:30.  I am not available until at least 4:00.  I
3  think we definitely need Andrew as he knows our
4  requirements.  Chad said that we would expect -- said what
5  we would expect, none of the defects failed.
6       "I don't know the best way to approach?  I don't know
7  availability.  Can just push until tomorrow."
8       Were you aware that Petro had offered to provide a
9  conference call with Guillermo Castro, the man who had done
10 the welding test?
11      MR. KAPLAN:     Object to the form of the
12  question.
13      You may answer.
14 BY MS. ROHN:
15      A.   No idea, no.
16      Q.   And then Andrew -- if you scroll up,
17 Andreas Constantinou asks, which says "Re: Petro/Guillermo
18 Castro.
19      "Do we have records of the tests?"
20      And then Andrew Canning responds, "No test records
21 have been supplied."
22      And then Constantinou says "Before any meeting with
23 them I would propose first seeing these records."
24      And then Andrew Canning, if you scroll up, says
25 "Previous operations welder qualifications records will

97

1  also include photographic records of the test samples, is
2  this normal in the US?  Our welding procedures also call
3  for the welders to have photographic ID cards showing
4  welding certifications, I have never seen this from PIS
5  with the exception of Daniel Martinez who was formally
6  trained and assessed at a welding facility.  This should
7  all be part of the qualification record issued to the
8  client before the fabrication work starts.
9       "We should also have proof of ID from Guillermo Castro
10 including his claimed NDT qualifications."
11      Were you aware that Mr. -- at the time this was going
12  on, that Mr. Canning wasn't sure what were the requirements
13 for welding certifications?
14      MR. KAPLAN:     Object to the form of the
15  question.
16      You may answer.
17 BY MS. ROHN:
18      A.   No, I wasn't.
19      Q.   And then if you go to the next page or actually
20 the top of this page, this is from David Smith.
21      "I was even thinking one more step that we approach
22 Acuren rather than Guillermo and ask them to certify in
23 writing?"
24      And then David Smith says again, if you go to page 119
25 -- 1987, "I have another contractor here onsite and he

98

1  recommends Richard Holdren."  Gives some qualifications.
2       And then if you scroll up, David Smith says "Just to
3  keep the conversation going.  I spoke to Chad and asked him
4  in writing for the test results.  He told me that the lab
5  test was Phased array, which is by the test was PAUT...
6  which is why it was not bend test.
7       "That all folks were from Puerto Rico and they were
8  certified while they were there.
9       "That he is a 3rd party to Acuren and that is why it
10 says that.
11      "I did tell him someone on his side is talking about
12  what is going on and he needs to seal it up."
13      Do you know what Mr. Smith is talking about about
14  sealing it up?
15      A.   No, I don't know.
16      Q.   Then it says that "Out of respect, we did not
17 tell our own employees including Supervisors, yet everyone
18 knows the story now.
19      "I'll let you know more as I can.  Chad didn't want to
20 speak for Guillermo, but his knowledge is much higher than
21 mine in welding.  I need help on the right information."
22      You understand this to be part of the investigation
23 into Petro and whether or not there were anomalies in the
24 welding certifications?
25      A.   If I was what?  Sorry.  What's the first part of

99

1  the question?
2       Q.   Were you aware that there was an investigation
3  going on by IPOS as to whether or not there was an anomaly
4  in Petro's welding certifications?
5       A.   No, I wasn't.
6       Q.   And then David Smith says -- Constantinou -- if
7  you go up.  Constantinou responds to David Smith about
8  needing more information.
9       "David, I am preparing an e-mail to you with all the
10 required information we need from the contractor, which is
11  on the basis of an ASME job.  They need to give us this
12  documentation in full.  I will forward it to you."
13      And then, if you scroll up, Constantinou on
14 July 2, 2021, sends to David Smith the documentation that
15 he believes, if were an AMSE job, would be required.  Do
16 you see that?
17      Do you see that, sir?
18      A.   (Nodding.)
19      MS. ROHN:     Scroll down, and scroll to the next
20  page.
21 BY MS. ROHN:
22      Q.   Sir, do you know whether or not this information
23 sent by Constantinou -- Constantinou was ever requested of
24 Mr. Adrian Melendez or Petro at the beginning of the job?
25      MR. SIMPSON:     Objection.

100

1 BY MS. ROHN:
2     A.  I don't know.
3     Q.  And do you have any information that the -- this
4 information as to this types of documents ever existed
5 before July 22, 2021?
6         MR. KAPLAN:    Object to the form of the
7     question.
8 BY MS. ROHN:
9     A.  No, I don't know.
10    Q.  And then as we scroll up to that, this is from
11 Andrew Canning responding to Constantinou, "Thank you for
12 the documentation summary which will provide a good basis
13 to form an assessment from.
14    "One of the big document anomalies is with the
15 attached WPQ documents which are on close inspection --
16 which on close inspection are obviously PDF edits to
17 someone else's original certification. (If you zoom in you
18 can see the print clarity and font changes in certain
19 fields) and while it clearly states the assessment was
20 based on acceptance of guide bend test, they are now
21 telling us that the tests were done by Phase array for
22 which I suspect (conveniently) no hard copy test results
23 are available."
24    Did you ever see this e-mail from Mr. Canning?
25    A.  I don't -- I don't recall.

101

1     Q.  Well, then how did you know what the anomalies
2 were?
3     A.  I was told by David Smith there was anomalies on
4 the -- on the certificates.
5     Q.  And then, if you go to 1985, David Smith --
6 David Smith asked at the bottom of the page --
7         MS. ROHN:    Go up a little bit.  No, go down a
8     little bit I mean.  I want to go up on the page which
9     is down on the thing.  Sorry.  Little bit up.  Little
10    -- no, the other way.  Wait.  Wait.  No -- yeah,
11    that's it.
12 BY MS. ROHN:
13    Q.  "Hi, everyone, Just to be clear, should I copy
14 and paste Andreas' comments," i.e. the list of
15 documentation.
16    "And ask Petro to add Andreas and I to the Dropbox?"
17 Who did -- who did Andreas Constantinou work for?
18    A.  This -- his e-mail is from VTTI.
19    Q.  And then if you scroll up, Andrew says, "I was
20 thinking more of asking PIS to submit their complete
21 Quality dossier and full coding assessment records for the
22 welders - to be honest I think we probably already have
23 seen what they have to submit.
24    "Does anyone else think we should provide Andreas'
25 list for them to try and deliver against?"

102

1     So it appears, would you agree with me, sir, that
2 there are changes that are being made as to what
3 documentation is required?
4         MR. KAPLAN:    Object to the form of the
5     question.
6     You may answer.
7         MS. FRANCIS:    Objection.  Form.
8 BY MS. ROHN:
9     A.  We trying to agree which are the correct
10 documents to be requested or reviewed.
11    Q.  Right.  But this job started in February of 2021,
12 did it not, sir?
13    A.  I don't remember when it started.
14    Q.  And then if you'll scroll, there's an e-mail from
15 Andrew Canning that's on the top of the page to
16 David Smith.
17    "I think we --"  oops, sorry.
18    "I think we should speak to Guillermo Castro without
19 Chad and Adrian so they can explore the full scope of the
20 supposed welder certification services, ideally via
21 videoconference."
22    So at or near at the time of this, is it not true that
23 IPOS had the ability to actually speak to Guillermo Castro
24 about the certifications and to clarify them; correct?
25    A.  What was --

103

1         MS. FRANCIS:    Objection.
2 BY MS. ROHN:
3     Q.  I'm sorry.  I didn't understand what you said.
4     A.  No, I didn't understand the question.
5         MS. FRANCIS:    Objection.  Foundation, before
6     you repeat it.
7         MS. ROHN:    Okay.
8 BY MS. ROHN:
9     Q.  So from these e-mails, it's clear that -- would
10 you agree it's clear that Petro -- I mean that IPOS had the
11 ability to talk to Guillermo Castro about these welds and
12 the certifications?
13        MR. KAPLAN:    Sorry.  Object to the form of the
14    question.
15    You may answer.
16        MS. FRANCIS:    Objection.  Form.  Foundation.
17 BY MS. ROHN:
18    A.  I don't know if they could talk to him or not.
19    Q.  Well, how can they be talking about seeing him on
20 videoconferencing without Chad and Adrian?
21        MS. FRANCIS:    Foundation.
22 BY MS. ROHN:
23    Q.  You may answer.
24    A.  I can't -- I can't say why.
25    Q.  And then if you scroll up on 1984, David Smith on

SEBASTIAN MORETTI

---

**104**

1  July 22nd at 21:27, says "Andrew, they have made it clear
2  they want us to speak with him"; i.e., Petro wanted IPOS to
3  speak to Guillermo Castro.
4      Do you dispute that that was true?
5          MR. KAPLAN:    Objection.  Form.
6          MS. FRANCIS:    Objection.  Foundation.
7      (Interruption by the court reporter.)
8          MR. KAPLAN:    I said, objection.  Form.  The
9  witness is not on any of these e-mails.  So I'll stop
10  objecting to form if you to want rephrase your
11  questions.
12          MS. FRANCIS:    And objection.  Foundation.
13  Same reason.
14  BY MS. ROHN:
15      Q.  You weren't on the e-mails.  But did -- were you
16  aware, did anybody from IPOS make Vitol aware that they had
17  access to speak to Guillermo Castro?
18      A.  No.
19      Q.  And that in fact Petro was asking them to speak
20  to Guillermo Castro?
21      A.  No.
22      Q.  And then there's a question from Andrew Canning,
23  "Does that mean you, Merlin, Terry and Guillermo, Chad and
24  Adrian?"
25      And David Smith answers, "No, just Garry, Andreas,

---

**105**

1  Wendy, Merlin, Terry and I.  Just VTTI internal to discuss
2  with Garry."
3      Do you know who G-a-r-r-y is?
4      A.  Which one, sorry?
5      Q.  Do you know who this G-a-r-r-y is?
6      A.  I don't -- I don't see it here.
7      Q.  Okay.  Well, the e-mail from David Smith says "We
8  have an internal call with Garry," G-a-r-r-y, "tomorrow.
9  Will develop a plan."
10      You see that?
11      A.  Garry.  Garry Stoker, I guess.  That was the CEO.
12      Q.  Okay.  And who is Garry Stoker?
13      A.  I assume it's the same Garry.
14      Q.  Okay.  What position did Garry Stoker have?
15      A.  He was the CEO.
16      Q.  Of who?
17      A.  VTTI.
18      Q.  And then Andrew Canning, if you scroll up, says
19  -- Andrew Canning says "Interesting, are you and the VTTI
20  team wavering on the invalidity of the information and
21  answers provided to date?"
22      And Mr. David Smith says "We just want the truth and
23  to understand what the implications are."
24      Do you know why no one ever spoke to Guillermo Castro?
25          MR. KAPLAN:    Object to the question.

---

**106**

1      You may answer.
2  BY MS. ROHN:
3      A.  No, I don't know.
4          MS. ROHN:    6374.
5      Let's go to another subject.  Let's do 4054 in
6  81.
7  BY MS. ROHN:
8      Q.  4054 out of IPOS 81 is from David Smith to
9  yourself and Eduardo Garcia, April 4, 2019, "As discussed,
10  here is the contract."
11          MS. ROHN:    If you scroll to the next page.
12  BY MS. ROHN:
13      Q.  It is a contract with Petro.
14      Why would Vitol be receiving a copy of the contract
15  with Petro?
16      A.  I don't recall why -- why we receiving this
17  contract.
18      Q.  Well, it was sent to you, sir, wasn't it?
19      A.  Four years ago.
20      Q.  And then in Exhibit 40 -- on Exhibit 81, 541.
21  BY MS. ROHN:
22      Q.  All right.  I'm almost finished.
23      This is IPOS Exhibit 81, 541, from David Smith to
24  yourself, to Sebastian Moretti, and then Tim K. and
25  Charlotte.

---

**107**

1      Re Petro Industrial notification.
2      "Good morning, Just FYI, this was sent certified
3  yesterday and was sent via e-mail today.  We are speaking
4  to our supervisor shortly.  We are working for onboarding
5  another company, waiting on rates, et cetera.
6      "If you have any questions let me know."
7      Isn't this, sir, an e-mail about terminating Petro?
8          MR. KAPLAN:    Object to the form of the
9  question.
10  BY MS. ROHN:
11      A.  I -- I don't --
12          MR. KAPLAN:    Can you show the witness the --
13  BY MS. ROHN:
14      A.  Is there anything attached?
15      Q.  Well, because it was produced without the
16  attachment.
17      Sir, isn't -- isn't it a fact, sir, that you were
18  involved in the decision to terminate Petro?
19          MR. KAPLAN:    Object to the form of the
20  question.
21      You may answer.
22  BY MS. ROHN:
23      A.  No, I wasn't.
24      Q.  Well, why would they be telling you that they're
25  "working for onboarding another company, waiting on rates"

---

SEBASTIAN MORETTI

108

1  if they weren't terminating Petro?
2      A.   Say it again.  Sorry.
3      Q.   Why would they be telling you that they were
4  "working for onboarding another company, waiting for rates"
5  if they weren't terminating Petro?
6      A.   To avoid any communications with them.
7      Q.   What?
8      A.   To avoid any communications.  I mean, there were
9  several communications with Petro Industrial; so at this
10  point they're telling us that --
11          (Interruption by the court reporter.)
12  BY MS. ROHN:
13     Q.   They're telling you who was not working with
14  Petro anymore -- I mean IPOS anymore?
15          MR. KAPLAN:    I don't think the court reporter
16     got his prior answer, so...
17          MS. ROHN:    Oh, I'm sorry.
18  BY MS. ROHN:
19     Q.   Please repeat your prior answer.
20     A.   Sure.  As per this e-mail, they were telling that
21  Petro Industrial wasn't working with IPOS any -- any
22  longer.
23     Q.   Right, because they sent him a certified mail
24  yesterday telling them that their contract had been
25  terminated.

109

1      Q.   Isn't it a fact, sir, their contract was terminated on
2  July 29, 2021?
3          MR. KAPLAN:    Object to the form of the
4      question.
5          You may answer.
6  BY MS. ROHN:
7      A.   I mean, I don't -- I don't remember what was the
8  attachment.  But if the -- the contract -- you say the
9  contract was terminated on that date, the contract was
10  terminated on that date.
11     Q.   Why would you be told that?
12     A.   As you see, there were several communications
13  between Petro Industrial and Vitol; so they were telling us
14  that Petro Industrial wasn't working for IPOS any longer.
15     Q.   And then finally --
16          MS. FRANCIS:    I'm sorry.  What is the Bates
17     number on that document?
18          MS. ROHN:    541.
19          MS. FRANCIS:    I did not hear you.  Could you
20     say that --
21          MS. ROHN:    541.
22          MS. FRANCIS:    Thank you.
23          MS. ROHN:    Uh-huh.
24          And then finally in Exhibit 74, 3894.
25          Well, I need this document.  So can you scan it

110

1  in?  This is my last document.
2          (Off the record.)
3          (E-mails Bates Nos. 3894 to 3895 were previously
4      marked as Exhibit 74 for identification.)
5          MS. ROHN:    So this is IPOS 3894.  If you
6      scroll down.
7  BY MS. ROHN:
8      Q.   And you see --
9          MS. ROHN:    Let's do the top.  Go back to the
10     stop.
11  BY MS. ROHN:
12     Q.   You see, sir, that on July 21, 2021, David Smith
13  sends to yourself a copy of the e-mail below; correct?
14  "IPOS Welders Certification."  Importance:  High.
15  Sensitivity:  Company Confidential?"
16          What does "Company Confidential" mean?
17     A.   To try to not resend it outside the company.
18     Q.   Okay.  And what qualifies for an importance high?
19     A.   Usually market information.
20     Q.   Okay.  And this is from David Smith, says "Seba,
21  Here is what Andrew found out."
22          Correct?
23          And then you scroll down.  On July 2021,
24  Andrew Canning to Garry Stoker, David Smith, "Subject:
25  IPOS, Welders Certification."

111

1          "Garry, further to our conversation this morning, I am
2  now as certain as I can be that the welder certification,
3  (WPQ) presented by Petro Industrial Services are not
4  genuine."  And he lists a number of reasons.
5          Is this where you got your statement that said that
6  you understood that there were anomalies with the welder
7  certifications?
8      A.   That's correct.
9      Q.   Other than this e-mail from Mr. Canning, do you
10  have any information in that regard from anyone else?
11          MR. KAPLAN:    Object to the form of the
12     question.
13  BY MS. ROHN:
14     A.   Not -- not that I -- I recall.
15     Q.   And in making the decisions about Petro, did you
16  rely on this document from Mr. Canning?
17          MR. KAPLAN:    Object to the form of the
18     question.  Misstates prior testimony.  Assumes facts
19     not in evidence.
20  BY MS. ROHN:
21     Q.   You can answer.
22     A.   It wasn't my decision at all -- or Vitol decision
23  at all to --
24     Q.   Well, then why were they sending this to you,
25  sir?

112

1    MR. KAPLAN:    Object to the form of the
2    question.
3    You may answer.
4    BY MS. ROHN:
5    A.   Just to keep me informed.
6    MS. ROHN:    I have no further questions.
7    MR. KAPLAN:    Counsel for Mr. Canning or IPOS,
8    are there any additional questions for the witness?
9    MS. FRANCIS:    I do not on behalf of IPOS have
10   additional questions.
11   MR. SIMPSON:    I have a couple of follow-ups.
12   CROSS-EXAMINATION
13   BY MR. SIMPSON:
14   Q.   This is Andy Simpson.  I represent
15   Andrew Canning.
16   Sir, early in your deposition today you said that you
17   got information from David Smith and that he -- that he
18   said that he got the information from Andrew Canning.
19   Do you know what information David Smith got from
20   Canning?
21   A.   I think it was a copy of the -- the certificates
22   on that e-mail.
23   Q.   You said you think.  My question is:  Do you know
24   what David Smith got from Andrew Canning?
25   A.   Those e-mails -- that e-mail where they found

113

1    this of Andrew that David Smith knew and communicated to
2    him.
3    MR. SIMPSON:    Okay.  Thank you.  No further
4    questions.
5
6    (At 12:59 p.m., the deposition of this witness
7    was concluded.)

114

1    CERTIFICATE OF REPORTER
2
3    I, YVONNE SAMUEL-SETORIE, Registered
4    Professional Reporter, do hereby certify that the above and
5    named witness, SEBASTIAN MORETTI, after being duly sworn,
6    was examined and testified via Zoom video conference as is
7    set forth; and that the answers of said witness to the oral
8    interrogatories propounded by counsel were taken by me in
9    machine shorthand, and represents the official transcript
10   of said deposition; and that said deposition is true and
11   correct, to the best of my ability.
12
13   I FURTHER CERTIFY that I am not counsel,
14   attorney, or relative of either party, nor financially or
15   otherwise interested in the event of this lawsuit.
16
17   IN WITNESS WHEREOF, I have hereunto
18   subscribed my hand on this 7th day of July 2023.
19
20
21
_____
22   YVONNE SAMUEL-SETORIE, RPR

23
24
25

ELITE REPORTING SERVICES, INC.        (340) 718-1318