IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

PETRO INDUSTRIAL SOLUTIONS, LLC    )
(PETRO)                            )
                                   )CASE NO. 1:21-CV-00312
                    Plaintiff,     )
                                   )
        vs.                        )
                                   )
ISLAND PROJECT AND OPERATING       )
SERVICES, LLC, VITOL US HOLDING II )
CO., VITOL VIRGIN ISLANDS CORP.,   )
ANDREW CANNING and OPTIS           )
EUROPE, LTD.,                      )
                                   )
                    Defendants.    )
_____)


THE 30(B)(6) DEPOSITION OF **ISLAND PROJECT AND OPERATING SERVICES, LLC (IPOS), by DAVID MICHAEL SMITH**, called for examination by the Plaintiff in the above-entitled cause, for purpose of discovery, for use in evidence and for such other and further uses as are provided by the Federal Rules of Civil Procedure, was taken before YVONNE SAMUEL-SETORIE, Registered Professional Reporter, via Zoom video conference on the 21st day of May 2023, commencing at 9:08 a.m., pursuant to Notice.


ELITE REPORTING SERVICES, INC.
P.O. Box 5619
Christiansted, VI 00823
(340) 718-1318
elitereportingsvcs@gmail.com



EXHIBIT
8

IPOS by DAVID SMITH

2

```
 1    A-P-P-E-A-R-A-N-C-E-S:

 2    ON BEHALF OF THE PLAINTIFF:
      LEE J. ROHN AND ASSOCIATES, LLC
 3    1108 King Street, Suite 3 (mailing)
      56 King Street, 3rd Floor (physical)
 4    Christiansted, VI 00820

 5    BY:  LEE J. ROHN, ESQ.

 6
      ON BEHALF OF THE DEFENDANTS:
 7    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
      Attorneys for Island Project and Operating Services, LLC
 8    The Tunick Building, Suite 201
      1336 Beltjen Road
 9    St. Thomas, VI 00802

10    BY:  SIMONE R. D. FRANCIS, ESQ.

11

12    BECKSTEDT & KUCZYNSKI LLP
      Attorneys for Vitol Defendants
13    2162 Church Street
      Christiansted, VI 00820
14
      BY:  CARL A. BECKSTEDT, III, ESQ.
15

16    ANDREW C. SIMPSON, P.C.
      Attorneys for Andrew Canning and OPTIS Europe, LTD.
17    2191 Church Street, Suite 5
      Christiansted, VI 00820
18
      BY:  ANDREW C. SIMPSON, ESQ.
19

20

21    Also Present:
      Adrian Melendez, Jr.
22    Andrew Canning

23

24

25
```

IPOS by DAVID SMITH

3

1                    I-N-D-E-X

2

3                                                      Page

4    Direct Examination by Ms. Rohn                      6

5    Cross-Examination by Mr. Beckstedt                265

6

7

8

9                    E-X-H-I-B-I-T-S

10   Plaintiff's                                       Page

11     19     E-Mails Bates No. Canning 19            200

12    46AA    E-Mails Bates Nos. IPOS 2947 and 9248   180

13    46AB    E-Mails Bates Nos. IPOS 9254 to 9256    202

14    46AC    E-Mail Bates No. IPOS 9273              165

15    46AD    E-Mails Bates No. IPOS 9366             209

16    46AE    E-Mails Bates No. IPOS 9385             214

17    46B     E-Mails Bates No. IPOS 1401             230

18    46C     E-Mails Bates No. IPOS 1972             253

19    46D     E-Mails Bates Nos. IPOS 1973 to 1974    259

20    46G     E-Mails Bates Nos. IPOS 2621 to 2623    227

21    46I     VIWAPA Security Guard Log Sheet         221

22    46K     E-Mails Bates No. IPOS 6262             250

23    46L     E-Mails Bates Nos. IPOS 6275 to 6277    255

24    46O     E-Mails Bates Nos. IPOS 6667 to 6668    217

25    46P     E-Mails Bates Nos. IPOS 6677 to 6678    234

IPOS by DAVID SMITH

4

1                          I-N-D-E-X

2                        E-X-H-I-B-I-T-S
    Plaintiff's                                          Page
3
    46Q      E-Mails Bates Nos. IPOS 6693 to 6700        239
4
    46R      E-Mails Bates No. IPOS 8701                 235
5
    46S      E-Mails Bates Nos. IPOS 7864, 7865, 7845,   257
6             7846

7   46T      E-Mails Bates Nos. IPOS 8440 to 8441        226

8   46Z      E-Mails Bates No. IPOS 9245                 176

9   47U      E-Mails Bates Nos. IPOS 8835 to 8836        260

10  173      E-Mails Bates Nos. Canning 312 to 316       172

11  180      E-Mails Bates Nos. Canning 468 to 470       158

12  181      E-Mails Bates Nos. Canning 484 to 485       158

13  182      E-Mails Bates Nos. Canning 748 to 757       160

14  198      E-Mails Bates Nos. Canning 1 to 7           202

15  205      E-Mails Bates Nos. Canning 25 to 26         197

16  211      E-Mails Bates Nos. Canning 57 to 60         196

17  224      E-Mails Bates Nos. PIS 7087 to 7088         162

18  225      E-Mails Bates Nos. PIS 7091 to 7093         164

19  227      E-Mails Bates No. PIS 7098                  171

20  228      E-Mails Bates No. PIS 7104                  174

21  230      E-Mails Bates No. PIS 7118                  170

22  231      E-Mails Bates No. PIS 7129                  188

23  232      E-Mails Bates No. IPOS 7130 to 7131         190

24  237      E-Mails Bates No. PIS 7200                  197

25  252      E-Mails Dated July 15, 2021                 256

IPOS by DAVID SMITH

5

1                         I-N-D-E-X

2                     E-X-H-I-B-I-T-S
  Plaintiff's                                              Page
3
      264      E-Mails Bates No. PIS 7239                  216
4
      271      E-Mails Bates No. IPOS 271                  237
5
      275      E-Mails Bates Nos. IPOS 4054 to 4071        192
6
      279      E-Mails Bates Nos. IPOS 4409 to 4410        194
7
      280      E-Mails Bates No. IPOS 4074                 222
8
      295      E-Mails Bates No. IPOS 4856, 4839, 4840,    244
9              4838

10    301      USVI LPG Conversion Project Volume 4F       153
               Piping Specifications and Welding
11
      303      E-Mails Bates Nos. Canning 14278 to 14280   245
12
      305      Time Records Bates Nos. IPOS 289 to 293     224
13

14  Defendant's

15      1      Services Agreement Bates No. IPOS 4055 to   272
               4072
16
        2      Maintenance Contract Bates Nos. PIS 2 to 7   273
17
        3      Facilities Services Agreement Bates Nos.    275
18             Vitol 12 to 36

19      4      Documents Bates Nos. IPOS 656 to 666        284

20      5      E-Mail Bates No. Vitol 11500                286

21      6      RFQ - Rio Shade Installation St. Croix      296
               Bates Nos. IPOS 8322 to 8341
22

23

24

25

IPOS by DAVID SMITH

6

1       P-R-O-C-E-E-D-I-N-G-S

2

3       (DAVID MICHAEL SMITH,

4   having been called as a witness, was duly sworn by the

5   Notary Public, was examined and testified as follows:)

6

7            DIRECT EXAMINATION

8   BY MS. ROHN:

9       Q.  Good morning.  Could you state your name --

10          MS. FRANCIS:    Sorry.  Before we get started,

11  this is Simone Francis for IPOS.

12          MS. ROHN:    You're reverberating.

13          MS. FRANCIS:    I understand that.

14      (Off the record.)

15          MS. FRANCIS:    For the record I do object to

16  the recording.  The notice that was filed in this

17  matter for this deposition does not indicate that the

18  deposition is being video recorded, and so we do

19  object to that, because the rules require the notice

20  to specify the manner of examination, and there's no

21  indication of a recording.  So we do object to that.

22          MS. ROHN:    Note your objection.  Please

23  record.  You can -- we can argue about it later.

24          MS. FRANCIS:    We'll take -- we'll take that up

25  with the court, but I just want the record to be

7

1   clear.

2           MS. ROHN:    I think the record is perfectly

3   clear.

4   BY MS. ROHN:

5       Q.  Good morning, Mr. Smith.  Could you state your

6   name for the record, please?

7       A.  Sure.  David Michael Smith.

8       Q.  And, Mr. Smith, where do you currently reside?

9       A.  Orlando, Florida.

10      Q.  And how long have you resided there?

11      A.  June 2018.

12      Q.  And what did you do, if anything, to prepare to

13  be deposed?

14      A.  I've reviewed documents.  I've reviewed with our

15  counsel, and have talked to other representatives of IPOS

16  to understand anything that I may not have seen in the

17  documents.

18      Q.  Okay.  Can you recall what documents you

19  reviewed?

20      A.  There have been multiple documents, thousands of

21  documents turned over, and I've tried to go through as many

22  as possible to understand based upon the filings, the more

23  than 80 points that were filed in order to understand

24  correctly.

25          MS. ROHN:    One second.

8

1       (Off the record.)

2   BY MS. ROHN:

3       Q.  Over what period of time have you prepared for

4   your deposition?

5       A.  Approximately the last 30 days or so has been

6   primarily focused on that.

7       Q.  And what persons from IPOS did you discuss issues

8   with?

9       A.  Merlin Figueira.

10      Q.  Anyone else?

11      A.  I spoke to Terry Keogh as well.

12      Q.  Anyone else?

13      A.  No, that is it.

14      Q.  And when did you begin to speak with

15  Merlin Figueira about issues related to the deposition of

16  IPOS?

17      A.  Again, within the last 30 days.

18      Q.  How often did you speak to him?

19      A.  Two times.

20      Q.  And the first time that you spoke to him, what

21  was the purpose of that conversation?

22      A.  It was together with counsel to understand how

23  the depositions occur and the scheduling involved since he

24  is not in the United States and not anywhere in this

25  territory.

9

1       Q.  Where is he?

2       A.  He's in Nigeria.

3       Q.  And the second time that you spoke with him, what

4   was the subject of those conversations -- that

5   conversation?

6       A.  Again, to review some of the allegations made by

7   Petro Industrial to ensure that things that I was not

8   present at to make sure that I was able to speak to it on

9   behalf of the company as a representative today.

10      Q.  And so what sorts of things were those?

11      A.  The allegations made by Petro Industrial about

12  whether or not there were ever complaints registered to him

13  about Andrew Canning.

14      Q.  And what did you learn?

15      A.  That there were never any complaints registered

16  to Merlin Figueira on behalf of Petro Industrial based upon

17  race and discrimination.

18      Q.  Well, were there complaints raised about

19  Mr. Canning?

20      A.  There were related to the grating incident, yes.

21      Q.  Well, didn't Mr. Figueira believe that

22  Mr. Canning was undermining Petro?

23      A.  I can't speak as to what Mr. Figueira said there,

24  but, no, he did not tell me that.

25      Q.  Have you seen the e-mails to you that say that

IPOS by DAVID SMITH

**10**

1   it's a good thing that they're going to see Charlotte and
2   Sebastian because it will help with the efforts by Canning
3   to undermine Petro?
4       A.   Yes, I have seen those e-mails.
5           MS. FRANCIS:    Objection.
6   BY MS. ROHN:
7       Q.   And have you -- did you have discussions at the
8   time with Mr. Figueira about that?
9       A.   I don't -- no, I do not recall that I did have
10  discussions at the time about that.
11      Q.   Did you ever try to figure out the basis for
12  which Mr. Canning had decided to undermine Petro?
13      A.   I don't know -- again, I can't speak to
14  Mr. Canning or Mr. Figueira.  I was not aware personally
15  that any things were being done to undermine Mr. --
16  Petro Industrial.
17      Q.   Did you -- were you the party to multiple e-mails
18  from Mr. Canning making allegations about Mr. -- about
19  Petro being unprofessional, stealing time, being lazy,
20  those kinds of things?
21          MR. SIMPSON:    Objection.
22  BY MS. ROHN:
23      A.   I don't know --
24      Q.   You may answer.
25      A.   I don't know that I could answer about every one

**11**

1   of those you said.  If you could rephrase and go through
2   each one, perhaps then I could do it.  But I don't know
3   that I would categorize what you said correctly.
4       Q.   Okay.  Well, did you -- were you -- did you
5   receive the e-mail from Mr. Canning in which he referred to
6   three of Petro's employees as lazy Puerto Ricans?
7           MS. FRANCIS:    Objection.  Misstates the
8   record.
9           MS. ROHN:    Please don't yell.
10          MR. SIMPSON:    Please don't misstate the
11  record.
12          MS. FRANCIS:    Objection.  Foundation.
13  BY MS. ROHN:
14      Q.   Are you aware of those e-mails?
15          MS. FRANCIS:    Same objection.
16  BY MS. ROHN:
17      Q.   You may answer.
18      A.   I'm aware of e-mails.  I do not recall seeing
19  those specific words that you used.  I'd have to see it
20  e-mail again to verify that.
21      Q.   Do you know Calvin Schmidt, sir?
22      A.   Yes, I do.
23      Q.   And didn't Mr. Schmidt complain to you about
24  Mr. Canning and his attitude towards locals?
25      A.   No, he did not.

**12**

1       Q.   When you got the lawsuit concerning Petro against
2   IPOS and others claiming discrimination, did you on behalf
3   -- did IPOS conduct any investigation as to those
4   allegations?
5       A.   At the time we had never received any complaints,
6   anything from anyone in writing to any of the people about
7   it.  We have done everything we can to produce any records
8   associated with it, and don't believe it has merit.
9       Q.   My question was:  Did you conduct an
10  investigation after the lawsuit to determine whether or not
11  there was discrimination?
12      A.   We -- no.  Not a formal investigation, no.
13      Q.   And why do you think a complaint has to be in
14  writing?
15          MS. FRANCIS:    Objection.  Misstates the
16  witness' testimony.
17  BY MS. ROHN:
18      Q.   You said "we received no complaint in writing."
19          MS. FRANCIS:    That's what he said.  Your
20  question misstates --
21          MS. ROHN:    Please stop making speaking
22  objections.
23  BY MS. ROHN:
24      Q.   Sir, why did you say "no complaint in writing"?
25      A.   Well, I did not -- I guess, if you ask the

**13**

1   question, I have not received a verbal complaint either.
2       Q.   And I believe the other person you said you spoke
3   to was Terry Keogh.  Is that -- am I pronouncing his name
4   correctly?
5       A.   Yes, ma'am.
6       Q.   And what information did you obtain from
7   Terry Keogh?
8       A.   He was only around for 15 or so days until the
9   decision was made to terminate.  But I also had to arrange
10  with him when his deposition would be, as he's no longer an
11  IPOS employee, and was traveling as well.
12      Q.   And whose employee is he now?
13      A.   I am not sure.  I do not know.
14      Q.   Does he work for one of the Vitol companies?
15      A.   I do not know.
16      Q.   Well, how did you know how to get ahold of him?
17      A.   I have his personal cell phone.
18      Q.   And you didn't ask him, Hey, how are you?  Who
19  are you working for now?
20      A.   I know he is still in the Virgin Islands working.
21  I do not know the entity of which he is employed by.
22      Q.   Other than making travel arrangements, did you
23  have any other conversations with Mr. Keogh about this
24  30(b)(6) deposition?
25          MS. FRANCIS:    Objection.

IPOS by DAVID SMITH

---

**14**

1  BY MS. ROHN:
2      A.  No, I did not.
3          MS. FRANCIS:      Misstates the testimony.
4  BY MS. ROHN:
5      Q.  So, sir, by the way, my name is Lee Rohn, and I
6  am representing Petro.
7      So have you ever had your deposition taken before?
8      A.  Yes.
9      Q.  And on how many occasions?
10     A.  One time.
11     Q.  And what -- when was that?
12     A.  I don't recall the exact year.  Approximately
13 2018.
14     Q.  And what was the case about that you were deposed
15 in?
16     A.  It was a case where your firm represented the
17 client.  It was IPOS vs. Troy Mason.
18     Q.  I believe, was it not.  Troy Mason vs. IPOS?
19     A.  I'm sorry.  I -- I don't know the correct legal
20 name of it.
21     Q.  And were you deposed as IPOS or individually?
22     A.  I do not recall.  I suspect -- I do not recall.
23     Q.  Well, sir, do you understand that today you're
24 here to testify on behalf of IPOS?  You understand that?
25     A.  Yes.  Yes, ma'am.

---

**15**

1      Q.  So, sir, what is your current job?  Where are you
2  employed?
3      A.  Seaport Canaveral Corporation.
4      Q.  How long have you worked there?
5      A.  Since June of 2018.
6      Q.  And where is Seaport Canaveral Corporation?
7      A.  Cape Canaveral, Florida.
8      Q.  And how did it come about that you got a job
9  there?
10         MS. FRANCIS:      Objection.  Beyond the scope of
11     the 30(b)(6).  This witness is not being deposed
12     individually.
13         MS. ROHN:      Noted.
14 BY MS. ROHN:
15     Q.  Answer my question, please.
16         MS. FRANCIS:      Please don't speak to my client
17     that way, Attorney Rohn.
18         MS. ROHN:      I am not speaking to him anyway.  I
19     am just asking him to answer my question.
20 BY MS. ROHN:
21     Q.  Could you answer my question, please?
22     A.  Can you repeat it, please?
23     Q.  Yes.  What came about that you went to work for
24 Seaport Canaveral Corporation?
25     A.  I was asked by the company to move to

---

**16**

1  Seaport Canaveral Corporation.
2      Q.  And what company is that?
3      A.  VTTI.
4      Q.  And what do you do at
5  Seaport Canaveral Corporation?
6      A.  I'm the general manager.
7      Q.  And what does Seaport --
8      A.  Excuse me a second.  The light turned off.
9      Q.  No worries.
10     A.  I'm sorry.  Please -- please repeat that.
11     Q.  Sure.  What kind of business is
12 Seaport Canaveral Corporation?
13     A.  An oil storage terminaling company.
14     Q.  I'm sorry.  You broke up a little bit.  Could you
15 say that again?
16     A.  Sure.  An oil storage terminaling company.
17     Q.  Whose oil does it store?
18     A.  It's a third party independent company.  We have
19 different clients.  Currently the client that is in the
20 storage is Vitol.
21     Q.  Which Vitol?
22     A.  I'm not sure the name of the company that -- the
23 specific entity.  I don't know.
24     Q.  How long since 2018 has that been a storage for
25 Vitol?

---

**17**

1      A.  The entire time.
2      Q.  And who at VTTI approached you to transfer to
3  Seaport Canaveral Corporation?
4      A.  The CEO, Rob Nijst.
5      Q.  I'm sorry.  Could you say that name again?
6      A.  Rob Nijst.
7      Q.  And where does Mr. Nijst work?
8      A.  He's currently retired.
9      Q.  Where did he work at the time he had that
10 conversation with you?
11         MS. FRANCIS:      Objection.  Beyond the scope.
12 BY MS. ROHN:
13     Q.  You may answer.
14     A.  He was the CEO of VTTI.
15     Q.  Right.  But where was he working out of?
16     A.  Oh, I'm sorry.  Rotterdam.
17     Q.  Prior to working for Seaport Carnival
18 Corporation, where did you work?
19         MS. FRANCIS:      Misstates the testimony.
20 BY MS. ROHN:
21     Q.  You may answer.
22     A.  It was Seaport Canaveral.  You said Carnival.
23     Q.  Oh, sorry.  But my handwriting is terrible.
24     A.  IPOS.
25     Q.  At the time that you worked for IPOS, did you

---

IPOS by DAVID SMITH

18

1    also work for VTTI?
2        A.    No.
3        Q.    What period of time did you work for IPOS?
4        A.    May 2017 until June 2018.
5        Q.    So how was it that VTTI could come and ask you as
6    an IPOS employee to transfer?
7             MS. FRANCIS:    Objection. Speculation.
8    BY MS. ROHN:
9        Q.    You may answer.
10       A.    VTTI is the parent company.
11       Q.    Of IPOS?
12       A.    I -- I don't know the corporate hierarchy to --
13   to where that is, but that's the CEO of -- there's all of
14   the terminals are part of the VTTI group.
15       Q.    And prior to working for IPOS from May 2017 to
16   June 2018, where did you work?
17       A.    I was a consultant with my own LLC from 2016
18   until 2017.
19       Q.    What was the name of the LLC?
20            (Interruption by the court reporter.)
21       A.    Lotigroup, L-o-t-i-g-r-o-u-p, LLC.
22       Q.    And were any of the people that you consulted
23   with as Lotigroup any of the Vitol companies?
24       A.    No.
25       Q.    No VTTI, no Vitol Inc. work?

19

1        A.    No.
2        Q.    How did you come to work for IPOS?
3        A.    I applied --
4             MR. BECKSTEDT:    Sorry. I apologize. I just
5        am objecting to that last question of Attorney Rohn.
6    BY MS. ROHN:
7        Q.    You may answer. I mean, so how did you come
8    about to work for IPOS?
9        A.    I applied online through a recruiter.
10       Q.    I'm sorry. You applied online and what?
11       A.    Through a recruiter.
12       Q.    So how did you know the job was available?
13       A.    It was on LinkedIn.
14       Q.    And why did you want to leave your consultant
15   group?
16       A.    There was an interim prior to another job I had
17   held for multiple years before.
18       Q.    What was the job that you had held for multiple
19   years before?
20       A.    NuStar Energy.
21       Q.    And where did you work out at NuStar Energy?
22       A.    San Antonio, Texas.
23       Q.    What did NuStar Energy do?
24       A.    Oil terminaling, pipeline business.
25       Q.    How long did you work for them?

20

1        A.    From 2008 until 2016.
2        Q.    And what caused you to leave that position?
3        A.    We signed a mutual separation agreement.
4        Q.    And why did you do that?
5        A.    The assets that I was responsible for had all
6    been sold.
7        Q.    And what was your position with them when you
8    left?
9        A.    Vice president, international operations.
10       Q.    And prior to that where did you work?
11       A.    Aruba.
12       Q.    For what company?
13       A.    It was different organizations, that when I left
14   it was Valero Energy.
15       Q.    How long did you -- so how long did you work in
16   Aruba?
17       A.    1998 until 2008.
18       Q.    When you worked for IPOS, what was your position
19   at IPOS?
20       A.    General manager.
21       Q.    And what were your responsibilities as general
22   manager?
23       A.    Operations, health, safety and environmental,
24   projects, finance, accounting, hiring people, banking.
25       Q.    And who did you report to?

21

1        A.    Reported to the CEO of VTTI, Rob Nijst.
2        Q.    And did you have persons who reported to you?
3        A.    Yes, I did.
4        Q.    And who reported to you?
5        A.    Alex Etienne, Calvin Schmidt, Cyla Gooding,
6    Rawle Granger, and Coury Hodge.
7        Q.    When you left IPOS in June of 2018, did you
8    retain any positions with IPOS?
9        A.    Yes, I retained the title of general manager.
10       Q.    And how did you retain the title of general
11   manager but be working for Canaveral, Seaport Canaveral?
12       A.    I had a responsibility for the terminal.
13   However, I was paid a hundred percent by Seaport Canaveral.
14       Q.    And who made that decision?
15            MS. FRANCIS:    Objection. Relevance. Beyond
16       the scope of the notice. This witness is not here on
17       his personal capacity.
18   BY MS. ROHN:
19       Q.    Who informed you that you would be -- keep your
20   job as terminal manager at IPOS but be paid for working at
21   IPOS through Seaport Canaveral?
22            MS. FRANCIS:    Objection. Misstates the
23       testimony.
24   BY MS. ROHN:
25       Q.    Could you repeat your answer, please?

IPOS by DAVID SMITH

22

1  A.  Rob Nijst.
2  Q.  Does VTTI have an ownership interest in
3  Seaport Canaveral?
4  A.  I'm not sure of the exact corporate structure,
5  hierarchy; so I'm unable to answer that.
6  Q.  At Seaport Canaveral who do you report to?
7  A.  Alice Niewold Cordova.
8  Q.  And where does she work?
9  A.  Argentina.
10  Q.  No, what company does she work for?
11  A.  Oh.  VITCO.
12  Q.  VITCO?
13  A.  Yes.  It's an acronym like IPOS, but I don't know
14  what it stands for.
15  Q.  Is it a Vitol related company?
16  A.  No, it is not.
17  Q.  Do you know why a non-Vitol or VTTI company would
18  pay for you to be a general manager at IPOS?
19     MR. BECKSTEDT:   Objection.
20     MS. FRANCIS:   Objection.
21  BY MS. ROHN:
22  Q.  You can answer.
23  A.  You didn't ask me about VTTI.  You asked me about
24  Vitol.
25  Q.  Okay.  Is it a VTTI related company?

23

1  A.  Yes, it is.
2  Q.  And when you were working for Seaport Canaveral,
3  what was your job -- I thought you said your job there was
4  -- tell me what -- was general manager; is that correct?
5  A.  Yes.
6  Q.  So what were your job responsibilities as general
7  manager for Seaport Carnival?
8  A.  Canaveral.
9  Q.  Sorry.  Canaveral.
10  A.  Similar.  Accounting, finance, responsibility for
11  the terminal, health, safety and environmental, operations,
12  commercial.
13  Q.  And who reported -- who reported to you at
14  Seaport?
15     MS. FRANCIS:   Objection.  Relevance.
16  BY MS. ROHN:
17  Q.  Answer my question, please.
18  Q.  Do you want names or job titles?
19  Q.  Job titles would be fine.
20  A.  Commercial manager, operations manager, technical
21  manager, health, safety and environmental manager, finance
22  manager.
23  Q.  And how often when you became the general manager
24  of Seaport -- Seaport Canaveral would you be in the
25  Virgin Islands?

24

1  A.  I was attempting to come once per month.
2  Q.  How much did you actually come?
3  A.  I don't know the answer to that.
4  Q.  How many times in a year would you come?
5     (Interruption by the court reporter.)
6     MS. FRANCIS:   Asked and answered.
7  BY MS. ROHN:
8  Q.  How many times a year would you come?
9  A.  It varied depending on the year.
10  Q.  From what to what?
11  A.  Well, during COVID I was unable to travel; so,
12  therefore, it was severely limited.  And at that time also
13  we were trying to find a terminal manager.  And when --
14  when -- so in 2018 when I left, it was much more frequent.
15  In 2019 it was much more frequent.  2020, 2021, not as
16  frequent.
17  Q.  And when you say "more frequent," what would --
18  how would you describe more frequent?
19  A.  I don't know the exact number, ma'am.
20  Q.  More or less than five times a year?
21  A.  Uhm, well, since I left in June, it was less in
22  2018.  In 2019 probably more.
23  Q.  And what would be your purpose to travel to the
24  Virgin Islands at those times?
25  A.  Well, to meet with the team to review budgets.  I

25

1  attended all of the meetings virtually while I wasn't there
2  as well.  So, I mean, normal operations, accounting, any
3  banking that needed to be done.
4  Q.  And when you transferred to Seaport Canaveral in
5  2018, who at IPOS continued to report to you?
6  A.  The same names I gave earlier.
7  Q.  Did Mr. Figueira report to you?
8  A.  He did not.
9  Q.  Was Mr. Figueira there at the time that you were
10  there from 2017 to 2018?
11  A.  He was there prior to me coming.  I believe there
12  was one month overlap in 2017, and then he left for another
13  assignment.
14  Q.  And then when you left in 2018 to go to Seaport,
15  did he come back to IPOS?
16  A.  He did not.
17  Q.  So did he take on any roles at IPOS?
18  A.  Not in 2018, no.
19  Q.  No, at any time after 2018.
20  A.  Oh, I'm sorry.  Then, yes.  Yes, he did.  He did
21  return later.  I thought you were specifically talking
22  about 2018.
23  Q.  And when did he return?
24  A.  December 2019.
25  Q.  And why did he return?

IPOS by DAVID SMITH

---

**26**

1  A.  He had medical issues; so he was no longer
2  working at the terminal he was with before.  And when he
3  recovered, we were still searching for a terminal manager
4  position, and so he was available and agreed to go on a
5  short-term basis.
6  Q.  Was he an acting terminal manager?
7  A.  Yes.
8  Q.  And who did he report to?
9  A.  He reported to Rob Nijst.
10  Q.  And was he actually an employee of IPOS or
11  someone else -- or some other company?
12  A.  An employee of IPOS.
13  Q.  Paid by IPOS?
14  A.  Paid by IPOS.
15  Q.  And did he report to you in the position as
16  acting terminal manager?
17  A.  I would say dotted line.  I still had ultimate
18  responsibility.
19  Q.  So were you coequals?
20  A.  I would say not because of the fact that I had
21  the responsibility, and I was appointed to be the
22  representative for the company.
23  Q.  Representative for what company?
24  A.  For IPOS.
25  Q.  And what sorts of things did you report to VTTI?

---

**27**

1  A.  Monthly --
2  MS. FRANCIS:  Objection.
3  BY MS. ROHN:
4  A.  Monthly profit and loss statement, health safety
5  and environmental records, financial accounting, budgeting.
6  Q.  And why would you be reporting monthly profit and
7  loss to VTTI?
8  MS. FRANCIS:  Objection.  Outside the scope.
9  BY MS. ROHN:
10  Q.  You may answer.  Go ahead, you can answer.
11  A.  Every entity rolls up into, you know, a V -- it's
12  a VTTI reporting.  I don't know how to answer other than
13  that's every terminal does that.
14  Q.  Where did IPOS receive its funding to operate?
15  MS. FRANCIS:  Objection.  Outside the scope.
16  BY MS. ROHN:
17  Q.  You may answer.
18  A.  In the U.S. Virgin Islands.
19  Q.  How did it obtain its funding?
20  A.  Vitol would make monthly payments to the
21  U.S. Virgin Islands bank account.
22  Q.  Why did you report budgets to VTTI?
23  MS. ROHN:  Somebody's got their microphone on.
24  Somebody is not on mute.
25  MS. FRANCIS:  Yes, I'm not on mute because I

---

**28**

1  need to make objections.
2  Objection.
3  MS. ROHN:  There is some reverberation going
4  on.
5  MR. SIMPSON:  I'm not hearing anything.
6  BY MS. ROHN:
7  Q.  I'm sorry.  I didn't hear your answer as to why
8  you reported budgets to VTTI.
9  MS. FRANCIS:  Asked and answered.
10  BY MS. ROHN:
11  Q.  You may answer.
12  A.  VTTI is the -- the company that -- that handles
13  all the accounting, the -- the supervision.
14  Q.  What kind of supervision?
15  A.  Well, service level agreements to provide
16  accounting support, health, safety and environmental
17  support, technical support.
18  Q.  Did it provide human resource support?
19  A.  If necessary, yes.
20  Q.  And what sort of human resource support did it
21  provide?
22  MS. FRANCIS:  Objection.  Outside the scope of
23  the notice.
24  BY MS. ROHN:
25  Q.  You may answer.

---

**29**

1  A.  More limited because of the fact it would be on
2  the onboarding process, and we could -- the most times if
3  there was, you know, a labor issue, we would use local
4  counsel, as they had more expertise.
5  Q.  Who would pay the local counsel?
6  MS. FRANCIS:  Objection.  Do not answer that.
7  That is outside the scope of the notice.
8  MS. ROHN:  You can't direct him not to answer.
9  He is allowed to answer of his own personal knowledge,
10  and you and I both know that.
11  BY MS. ROHN:
12  Q.  Answer my question, please.
13  MS. FRANCIS:  Don't speak to me like that,
14  Attorney Rohn.  This is a court proceeding.
15  BY MS. ROHN:
16  Q.  Answer my question, please.
17  A.  IPOS.
18  Q.  So other than onboarding employees for IPOS, did
19  it give any other human resource assistance?
20  A.  Not that I'm aware.
21  Q.  And when the decisions were contemplated about
22  Petro, whether or not to cancel its contract, what
23  involvement did VTTI have?
24  A.  I don't know specifically VTTI.  However, we used
25  support based upon other agreements to help us, technical

---

IPOS by DAVID SMITH

---

**30**

1  support; but I made the decision myself.

2  Q.  Who's Garry Stoker?

3  A.  He was the chief operating officer.

4  Q.  For whom?

5  A.  I'm not sure.  I don't know what entity he works

6  for.

7  Q.  At the time in 2021, who did he work for?

8  A.  Again, I don't know the specific corporate entity

9  he works for.

10  Q.  Can you tell me why Garry Stoker was copied on

11  e-mails concerning whether or not to terminate Petro?

12      MS. FRANCIS:    Objection.  Foundation.

13  Misstates the record.  No document --

14  BY MS. ROHN:

15  Q.  You can answer.

16      MS. FRANCIS:    -- was put in front of the

17  witness.

18  BY MS. ROHN:

19  Q.  You can answer.

20  A.  He provided -- he provided operational support

21  for the terminal.  He is an engineer; has more technical

22  knowledge than I have.

23  Q.  How long had you known Garry Stoker?

24  A.  Maybe during the initial interviewing process; so

25  maybe three or four months prior to my start date in May

---

**31**

1  of 2017.

2  Q.  And how often did you interact with him?

3  A.  Monthly.

4  Q.  Are you familiar with a company called Petro?

5  A.  Yes, I am.

6  Q.  How are you familiar with Petro?

7  A.  They provided maintenance support and project

8  support to the terminal.

9  Q.  Were you involved in the determination to enter

10  into a contract with Petro on behalf of IPOS?

11  A.  Yes, I was.

12  Q.  And can you recall when the first contract

13  between IPOS and Petro occurred?

14  A.  I don't know the exact date.  The year was 2018.

15  Q.  And how did it come about that IPOS contracted

16  with Petro?

17  A.  After the hurricane we were looking for support,

18  and Adrian Melendez came to the terminal offering support

19  for recovery.  At that time he had affiliated himself with

20  Vivot.  And so we never signed a contract.  We did make

21  payments, and they did repairs.  And then he said he was

22  going to start his own company and would we consider

23  signing with him, and the answer was yes; and so we

24  negotiated a contract.

25  Q.  Okay.  Let me break that down.  When he came and

---

**32**

1  said -- wanted to know if you would sign a contract with

2  his company directly, did you have any discussions with

3  anybody else about whether or not to do so?

4  A.  No, I did not.

5  Q.  Did you inform anybody else that you planned to

6  do so?

7  A.  No, I did not.

8  Q.  And when you say "we negotiated a contract," who

9  negotiated the contract?

10  A.  Adrian and I.

11  Q.  And who actually drafted the contract?

12  A.  I drafted the contract.

13  Q.  Had you ever drafted contracts like that before?

14  A.  No, I had not.

15  Q.  Did you have anyone look at the contract that you

16  drafted?

17  A.  No, I did not.

18  Q.  And if VTTI was giving assistance, why didn't you

19  have VTTI look at the contract?

20      MS. FRANCIS:    Objection.

21  BY MS. ROHN:

22  Q.  You may answer.

23  A.  They did not have any U.S. based type of

24  contract.

25  Q.  Did you consult with any attorney about the

---

**33**

1  contract?

2  A.  No.

3  Q.  Did you look at any other types of contracts in

4  order to come up with the contract?

5  A.  Yes.

6  Q.  And what types of contracts did you look at?

7  A.  Existing IPOS contracts.

8  Q.  With whom?

9  A.  I don't recall.

10  Q.  Did IPOS ever have a contract with Vivot?

11  A.  No, they did not.

12  Q.  The original contract with Petro, do you recall

13  how long it was for?

14  A.  One year.

15  Q.  And what was -- who -- why was it for a one-year

16  basis?

17  A.  Yeah, that was what we agreed upon.  I -- I don't

18  have a specific reason.

19  Q.  Well, did any -- did Mr. Melendez from Petro in

20  any way draft that contract?

21  A.  Uhm, it was given to him for comments.  I do not

22  remember if any changes were made at that time.

23  Q.  Were there discussions during the first contract

24  about giving a lower rate -- charging a lower rate for men

25  and equipment in order to get the contract?

---

IPOS by DAVID SMITH

---

34

1    A.   No, there was not.

2    Q.   What was the contract for?  What work was Petro
3 supposed to do?

4    A.   General maintenance support as -- you know, for
5 our capital budget -- for our budget.

6    Q.   Were there any contracts at that time about
7 supplying equipment?

8    A.   No, there were not.

9    Q.   And were there any contracts at that time about
10 engaging in special projects?

11    A.   No, there were not.

12    Q.   And during that first year of -- that the
13 contract -- the first year of contract, were you pleased
14 with the services of Petro?

15    A.   Yes, I was.

16    Q.   And what about their services caused you to be
17 pleased?

18    A.   Uhm, they -- the workforce did good quality work
19 for the embedded maintenance.  It did what we needed.  Up
20 until then we had not had a maintenance department at all.
21 We were still recovering from the hurricane and needed
22 daily support, and they were able to provide that.

23    Q.   How was Adrian Melendez to work with?

24    A.   Fine.

25    Q.   And what causes you to say fine?

---

35

1    A.   There were no problems.  There were -- it was a
2 professional relationship.

3    Q.   Well, did you form the opinion that he would go
4 out of the way to try to do the job well?

5         MS. FRANCIS:    Objection.  Foundation.

6 BY MS. ROHN:

7    Q.   You may answer.

8    A.   I don't know that -- no, I don't know that I held
9 that opinion.  The job was done.

10    Q.   Did there come a time that the Petro contract was
11 renewed?

12    A.   Yes, it was.

13    Q.   And for how long was the next contract?

14    A.   For -- it was a one-year contract with the
15 possibility of extension.

16    Q.   Would that have been in 2019?

17    A.   Yes.

18    Q.   And who negotiated that contract?

19    A.   Adrian and I.

20    Q.   When you say "Adrian and I," did he draft
21 something and give it to you, or did you draft something
22 and give it to him?

23    A.   In this case he drafted that and gave it to me.

24    Q.   And did you accept what he drafted?

25    A.   I -- I don't recall if there were changes made at

---

36

1 that time, but ultimately I signed it.

2    Q.   And what was in the contract regarding a
3 possibility of -- of more than a year?

4    A.   It said that the contract was one year, that
5 either side could terminate with 60 days notice, and that
6 the ability to continue on in the same terms until five
7 years.

8    Q.   And is it your -- was the ability to terminate
9 with 60 days notice with or without cause?

10    A.   Without cause.

11    Q.   And was that contract ever renewed?

12    A.   No.  Well, no, it was not renewed.

13    Q.   So it remained in effect?

14    A.   That is correct.

15    Q.   And during 2019 how would you describe whether or
16 not you were pleased with the work done by Petro?

17    A.   Again, it was performed to our satisfaction.

18    Q.   And in 2019 were there any other contracts with
19 Petro other than a maintenance?

20    A.   Not with IPOS.

21    Q.   Sorry.  With Petro.  Sorry.  Were there any other
22 contracts with Petro other than maintenance?

23    A.   No other contracts with IPOS, no.

24    Q.   Okay.  Were there any contracts, to your
25 knowledge, with Petro with any other company associated

---

37

1 with the terminals?

2    A.   I don't know the answer to that.  I was not privy
3 to any other contracts.

4    Q.   In 2019 did Pet -- well, did at some point did
5 Petro also begin doing work for VVAC (sic)?

6    A.   They performed other work.  I don't know the
7 entity, because I wasn't part of the contract.

8    Q.   Well, who did they -- who did you understand that
9 the work benefited that they did?

10    A.   Yeah, a -- a Vitol entity on the island, but I
11 don't know the name of the company.

12    Q.   Did you ever have any meetings or dealing with
13 that Vitol entity on the island?

14    A.   Uhm, there were weekly project meetings and
15 weekly operations meetings in which people from Vitol had
16 participated.

17    Q.   Who were the people from Vitol who participated?

18    A.   Tim Kologinczak and Charlotte Horowitz,
19 occasionally Sebastian Moretti but rarely.  And
20 Eduardo Garcia before he left Vitol.  I don't know the
21 year.

22    Q.   And did they attend these weekly meetings?

23    A.   Virtually, yes.

24    Q.   What were the purpose of the weekly meetings?

25    A.   IPOS had a contract, a service contract with

---

IPOS by DAVID SMITH

---

**38**

1  VVIC.

2  Q.  Wait.  Sorry.  You broke up.  Had a service

3  contract with who?

4  A.  With VVIC, Vitol Virgin Islands Corporation, that

5  supply services for WAPA.  And so, therefore, there were

6  discussions about how the operations were going, and all

7  budgets were approved that way through WAPA.

8  Q.  And what was -- what was the involvement of

9  Tim K. or Charlotte or Sebastian or Eduardo in establishing

10  those budgets?

11  MS. FRANCIS:  Objection.  Compound.

12  BY MS. ROHN:

13  Q.  You may answer.

14  A.  VVIC -- IPOS would prepare an annual budget.  It

15  was then submitted to VVIC, and then at some point in the

16  future, we would get a either revised or approved budget

17  based upon their discussions with WAPA.  And that would set

18  the basis for our budgets of the year.

19  Q.  And you stated that IPOS got a monthly payment.

20  Who did the monthly payment come from?

21  A.  Again, I don't know the specific entity.

22  Q.  Well, how -- what form did the payment come in?

23  A.  It was a electronic wire transfer.

24  Q.  You never looked to see who was transferring the

25  funds?

---

**39**

1  A.  No.

2  MS. FRANCIS:  Objection.  Argumentative.

3  BY MS. ROHN:

4  Q.  You may answer.

5  A.  I'm sure our finance manager did, but I did not

6  go through individual bank statements, no.

7  Q.  And who was your finance manager?

8  A.  Kunal Patal.

9  Q.  And who did he work for?

10  A.  Seaport Canaveral.

11  Q.  And how would someone working for

12  Seaport Canaveral be the finance manager for IPOS?

13  A.  Again, we were a small entity, and so we needed

14  finance work to be done, and so Seaport provided that

15  accounting.

16  Q.  And Seaport was ultimately controlled by VTTI; is

17  that correct?

18  MS. FRANCIS:  Objection.

19  BY MS. ROHN:

20  A.  No, that's not correct.

21  Q.  Okay.  What involvement did VTTI have in Seaport?

22  MS. FRANCIS:  Objection.  Beyond the scope.

23  He's not here as a 30(b)(6) for Seaport Canaveral.

24  MS. ROHN:  Noted.

25  BY MS. ROHN:

---

**40**

1  Q.  Answer, please.

2  A.  Again, I'm not sure the corporate hierarchy

3  structure, but it's a VTTI company.

4  Q.  At some point did -- from your observations, did

5  Petro begin doing special projects at the propane

6  terminals?

7  A.  Yes.  Petro had been involved in special

8  projects.

9  Q.  And were those special projects -- were any of

10  those special projects for IPOS?

11  A.  There -- so, yes, there could have been some

12  special projects, but traditionally, those would full under

13  the maintenance budget.  Any of the sort of projects were

14  coordinated by Vitol for the most part.  In some cases, it

15  was assisting Vitol and WAPA.

16  Q.  What do you mean "it was assisting Vitol and

17  WAPA"?  Who is it?

18  A.  Petro.

19  Q.  So why would those projects be under IPOS'

20  budget?

21  A.  They were not -- that's what -- they were not.

22  Any of those projects were not under IPOS' budget.

23  Q.  I thought you said that some of the special

24  projects came under the IPOS budget.  Am I incorrect?

25  A.  No -- well, maybe -- maybe I misunderstood you.

---

**41**

1  You said was I aware of projects being done by Petro, and I

2  said, yes, some were done for IPOS, some were done for

3  Vitol, and -- a Vitol entity, and some were done in

4  coordination for Vitol and WAPA.

5  Q.  So how would it be determined which of the -- as

6  to a special project whether or not it would be for IPOS or

7  Vitol?

8  A.  So, if it was not in our budget -- so, for

9  example, a tank inspection is not a normal everyday

10  maintenance work.  So we would then have, you know, a

11  purchase order; we have a quote beforehand in order to --

12  to show specifically that this wasn't general maintenance.

13  So that would be an IPOS project, for example.

14  Q.  So would it be paid out of the IPOS budget?

15  A.  Yes, it would.

16  Q.  And what types of projects would be paid out of

17  the Vitol project -- budget by Vitol?

18  A.  I'm not really here to speak on behalf of Vitol.

19  However, a project that they might be working on would be

20  like the truck rack, a reverse load in which IPOS had no --

21  had no interest, design, approval.

22  Q.  Would that include the RIO shades?

23  A.  The RIO shades was a Vitol project; correct.

24  Q.  Was the No. 1-inch vent line a Vitol project?

25  A.  The 1-inch and the 3-inch vent line, yes, were

---

IPOS by DAVID SMITH

42

1  Vitol projects.

2      Q.  So in 2020 were you satisfied with the work Petro

3  did for IPOS?

4      A.  For the maintenance work, yes.

5      Q.  And in either 2018, 2019, or 2020, did you

6  receive any complaints from any -- from Vitol about any

7  work that Petro had done?

8      A.  I don't know what work was done by Petro on

9  behalf of Vitol during that period.

10      Q.  Well, did you -- you, as the general manager of

11  IPOS, did you ever receive any criticism from Vitol about

12  Petro?

13      MS. FRANCIS:    Objection.  Form.

14  BY MS. ROHN:

15      Q.  You may answer.

16      MS. FRANCIS:    It's so broad it does not permit

17  an answer.

18      MS. ROHN:    Please stop making speaking

19  objections.

20  BY MS. ROHN:

21      Q.  You may answer.

22      A.  So who do you consider a representative of Vitol?

23      A.  No, who do you consider a representative of

24  Vitol?

25      A.  Well, I mean, we've gone through different names.

43

1  I'm trying to understand where the concern might be.  I'm

2  not sure who you mean.  And it's three years.

3      Q.  Charlotte, Sebastian, Eduardo, or Tim K.?

4      A.  No.

5      Q.  In 2021 did -- were you satisfied with the work

6  that was done by Petro?  You being IPOS.

7      A.  For the maintenance work, yes.

8      Q.  Was there any other work you were unsatisfied

9  with?

10      A.  No.

11      Q.  In 2021 did you receive or learn of any criticism

12  by Vitol of the work being done by Petro?

13      A.  By the names said earlier, no.

14      Q.  So are you aware of a company called OPTIS?

15      A.  Yes, I am.

16      Q.  How are you aware of OPTIS?

17      A.  OPTIS was initially brought in prior to my

18  arriving to help with the commissioning of the facility.

19      Q.  And who brought them in?

20      A.  The construction entity.

21      Q.  Which was who?

22      A.  I believe VT -- part of VTTI.  I don't know which

23  entity name.

24      Q.  And so, as we say in the Virgin Islands, you met

25  OPTIS there?

44

1      A.  That's correct.

2      Q.  And who from OPTIS was the person or persons that

3  were there?

4      A.  It was Glenn Sibbick, as he was leaving, and

5  Andrew Canning, and there was another gentleman named Mark

6  that had come and gone as part of commissioning and restart

7  that was part of OPTIS as well.  I don't remember his last

8  name.

9      Q.  And what is your understanding of what type of

10  company OPTIS is?

11      A.  An engineering company.

12      Q.  And when you were first made general manager in

13  2017, did -- was -- was OPTIS already formed or had already

14  been established, or was OPTIS formed at that point?

15      MS. FRANCIS:    Objection.  Form.

16  BY MS. ROHN:

17      A.  Yeah, I'm not sure I understand your question,

18  ma'am.

19      Q.  When was OPTIS -- excuse me.  When was IPOS

20  formed?

21      A.  2014.

22      Q.  And what was the purpose of OPTIS -- I'm sorry,

23  of IPOS?

24      A.  Yes.  It was established as an LLC established on

25  the Virgin Islands to -- to work in WAPA to vaporize

45

1  propane for the WAPA terminal for power generation.

2      Q.  And in 2017 when you got there, what was the work

3  that IPOS was doing at that time?

4      A.  So the plans had been commissioned; so it was

5  operating, again, taking liquid propane in, vaporizing it,

6  handing it off to WAPA, again, oversimplifying, and then

7  WAPA would generate the power in -- in that way.

8      Q.  And when you took over in 2017, who was doing the

9  work for maintenance for IPOS?

10      A.  There was no maintenance company established at

11  that point.  There was still construction punch list work

12  being done.

13      Q.  When approximately was it first decided that

14  there -- IPOS would benefit from having a maintenance

15  company?

16      A.  After the hurricanes in September 2017, it was --

17  it was actually not decided for a maintenance covery, but

18  it was a recovery, rebuild, restore, and regenerate, that's

19  when the work started then.  And then that transitioned,

20  again, into 2018 with Vivot as a maintenance contractor.

21      Prior to that they had only done civil work.  Adrian

22  represented that they would do mechanical work.  And when

23  he had said that he was going on his own, that's when we

24  discussed it in 2018.

25      Q.  Did you have any discussions with any other

46

1  persons, including was it discussed at the weekly meetings
2  with Vitol your intention to hire a maintenance company?
3      A.  No.
4      Q.  Why wouldn't you discuss that at a weekly
5  meeting?
6      A.  I had a budget with Vitol, and as long as I met
7  the budget, it was IPOS' decision on how we executed that
8  budget.
9      Q.  Did there come a time that the personnel working
10  for IPOS changed from Glenn, Andrew, and Mark?
11      MS. FRANCIS:    Objection.  Foundation.
12  BY MS. ROHN:
13      Q.  You may answer.
14      A.  Glenn, Andrew, and Mark never worked for IPOS.
15      Q.  OPTIS.  Sorry.  OPTIS.
16      A.  Okay, can you repeat that then?
17      Q.  Sure.  Did the personnel working for OPTIS,
18  working for OPTIS but at IPOS, change any after you came
19  there?
20      A.  Glenn and Mark had left because the facility was
21  commissioned, and Andrew stayed for the punch list work
22  that was agreed upon between IPOS -- well, between Vitol
23  and WAPA, what was still remaining from the construction.
24      Q.  During the time that Glenn, Andrew, and Mark were
25  there, did they have a contract with IPOS, or did IPOS have

47

1  a contract?
2      A.  They did not.
3      Q.  Did OPTIS have a contract with IPOS at that
4  point?
5      A.  It did not.
6      Q.  At what point, if ever, did OPTIS obtain a
7  contract with IPOS?
8      A.  We did not.
9      Q.  So OPTIS never had a contract with IPOS?
10      A.  That is correct.
11      Q.  Who is it your understanding OPTIS had a contract
12  with?
13      A.  The construction entity.
14      Q.  The VTTI construction entity?
15      A.  That's correct.
16      Q.  So is it your testimony that from 2017 until
17  2021, OPTIS never contracted with IPOS?
18      A.  That is correct.
19      Q.  Did OPTIS do -- through Andrew Canning, do work
20  for IPOS?
21      A.  Yes.
22      Q.  And how did it come about that even though OPTIS
23  didn't have a contract with IPOS, Andrew Canning was doing
24  work with IPOS?
25      A.  After the VTTI construction entity left after the

48

1  contract, the payments -- or the invoices came direct to
2  IPOS, and we made those payments.
3      Q.  But there was no contractual agreement?
4      A.  No, ma'am.
5      Q.  Was there a verbal contractual agreement?
6      A.  No, ma'am.
7      Q.  So, from your understanding as IPOS, how did
8  Mr. Canning know what to do?
9      A.  Well, we had the punch list and the work that
10  needed to be done when he initially got there.  And then
11  also during the hurricane, the punch list work, a lot of it
12  was long-term items, and then also during the hurricane,
13  was recovery efforts as well.
14      Q.  How would he know what to do in the recovery
15  efforts?
16      A.  Well, we --
17      MS. FRANCIS:    Objection.  Calls for
18  speculation as to Mr. Canning's knowledge.
19  BY MS. ROHN:
20      Q.  What did you observe as to how Mr. Canning would
21  know what to do?
22      MS. FRANCIS:    Same objection.
23  BY MS. ROHN:
24      A.  Yeah.  He was involved --
25      Q.  You may answer.

49

1      A.  He was involved in the meetings.
2      Q.  Okay.  What was your understanding of the scope
3  of work that IPOS paid -- did IPOS pay Mr. Canning
4  directly, or did they pay OPTIS?
5      A.  Paid OPTIS.
6      Q.  What was the understanding the scope of the work
7  that OPTIS was doing for IPOS after the hurricane?
8      A.  It was a day rate for providing services.  So
9  essentially what -- whatever work needed to be done, we
10  could have done.
11      Q.  And who would tell Mr. Canning what work needed
12  to be done?
13      A.  Well, that would -- that would ultimately fall to
14  my responsibility.
15      Q.  And did that stay true through 2019?
16      A.  Yes, that's correct.
17      Q.  Did the budget for -- did IPOS put in its budget
18  funds to pay OPTIS?
19      A.  Yes, it did.
20      Q.  And did that increase any between 2018 and 2020?
21      A.  I'm sorry.  Can you restate that?  I don't --
22      Q.  Did that -- that budget item as to OPTIS increase
23  any between 2018 and 2020?
24      MS. FRANCIS:    Objection.  Relevance.
25  BY MS. ROHN:

IPOS by DAVID SMITH

50

1    A.   No.
2    Q.   So it stayed relatively the same?
3    A.   Correct.
4    Q.   At some point did IPOS stop paying OPTIS out of
5    its budget?
6    A.   Yes.
7    Q.   And when did that occur?
8    A.   Uhm, it would be the fiscal year -- I'm sorry.
9    Let me think for a second.  I don't want to answer
10   incorrectly.
11        So the budget that started July 1, 2020, is when the
12   assignment went over, I believe.
13   Q.   And it went over to --
14   A.   I may need to look at the budget.  I'm -- I'm not
15   sure.  I might have that -- that mistaken.
16   Q.   So and went over to whom?
17   A.   At that point it was taken out of the IPOS
18   budget, and so Vitol -- a Vitol entity made those payments.
19   Q.   Was that at the request of IPOS?
20   A.   It was at the request of Vitol.
21   Q.   Do you know why Vitol made that request?
22   A.   Yes.
23   Q.   And why was that?
24   A.   So there were several capital type projects, for
25   example, Aggreko, APR, reverse flow, truck rack, several

51

1    projects that IPOS were not part of the scope of IPOS to
2    perform, and IPOS did not have the technical knowledge and
3    did not want to do those projects.  So then those were
4    directly contracted for Vitol to WAPA.
5    Q.   And so why was it then in 2020 that OPTIS stopped
6    working for IPOS?  There's too many words that are really
7    similar.  So OPTIS to IPOS?
8    A.   Well, Andrew at that point was the only OPTIS
9    employee; so, therefore, as his services were no longer
10   necessary at IPOS and were not in our budget, that's why we
11   stopped making payments to OPTIS.
12   Q.   Did Mr. Canning continue to go to the weekly
13   meetings?
14   A.   So there were two different weekly meetings.
15   There was an operation meeting and a maintenance technical
16   project meeting.  So he did not attend, and he never
17   attended -- or let me say not never, but was not expected
18   ever to attend the operational meetings.  But the technical
19   meetings, yes, he still attended.
20   Q.   And did he still give advice to IPOS?
21   A.   If asked.
22   Q.   Well, were there occasions when he volunteered
23   advice to IPOS?
24   A.   Uhm, possibly.  I don't remember specifics.
25   Q.   To your knowledge, did Petro ever have any

52

1    contracts with Vitol?
2    A.   I don't know the answer to that.
3    Q.   While Petro was contracted to IPOS, did Petro do
4    work for Vitol?
5    A.   Yes.
6    Q.   And who paid for that work?
7    A.   In some cases it was billed to IPOS, and it was
8    outside of the budget.  It was a reimbursable pass-through,
9    and in some cases it was paid direct by a Vitol entity.
10   Q.   And did IPOS have to agree to allow Petro to do
11   that work rather than doing the work for IPOS?
12        MS. FRANCIS:   Objection.  Form.
13   BY MS. ROHN:
14   A.   I'm sorry.  Can you -- can you restate that,
15   please?
16   Q.   Well, in Petro doing work for Vitol, did that
17   affect Petro's ability to do the maintenance work for IPOS?
18        MS. FRANCIS:   Objection.  Calls for
19   speculation.
20   BY MS. ROHN:
21   Q.   You may answer.
22        MS. FRANCIS:   He's not here as a Petro
23   witness.
24        MS. ROHN:   Not even remotely what I asked.
25   BY MS. ROHN:

53

1    Q.   When Petro was doing work for Vitol, did it
2    affect its ability to do the work that IPOS needed to have
3    done?
4    A.   They were different crews.  So our embedded
5    people stayed in the IPOS work.
6    Q.   And do you know how it would be decided whether
7    or not it would be billed to IPOS as a pass-through or when
8    Vitol would actually just pay it?
9    A.   I'm sorry.  Can you restate -- restate that again
10   one more time?
11   Q.   Do you know the basis of the decision of whether
12   it would be billed to IPOS as a pass-through or that Vitol
13   would pay it directly?
14   A.   Not really.  Sometimes the invoices were
15   submitted on behalf of Petro to us, sometimes direct to
16   Vitol, and we try to work it out to make sure that they
17   were getting paid.
18   Q.   And who would you have to try to work it out
19   with?
20   A.   So with Petro and with a Vitol entity.
21   Q.   And who would you work that out through for the
22   Vitol entity?
23   A.   Charlotte and Tim.  And Eduardo when he was
24   there.
25   Q.   What type of --

---

**54**

1    (Interruption by the court reporter.)

2  BY MS. ROHN:

3    Q.  What type of technical work was Canning supposed

4  to provide to IPOS?

5    MS. FRANCIS:    Objection.  Foundation.

6  BY MS. ROHN:

7    A.  So, again, when he initially was there, it was

8  for punch list work, still related to construction.

9  Shortly after my arrival, in fact within four months, three

10  months is when the hurricane happened, and immediately had

11  switched over to recovery and support and restart work.  So

12  those were the things that he was assisting with.

13    Q.  Did he ever assist with anything besides

14  recovery?

15    A.  Punch list work, yes.

16    Q.  What else did he --

17    A.  Initially we did not have a maintenance

18  supervisor.  We -- Calvin Schmidt, who you asked about

19  earlier, is a former Petro employee, and we hired him as

20  maintenance supervisor.  So Andrew did help support some

21  maintenance work prior to Calvin coming on board.

22    Q.  And what did he do to support that?

23    A.  Whatever was required.

24    Q.  Well, what types of things?

25    A.  I mean, if it's general maintenance, it's

---

**55**

1  ensuring that the work is prepared, that it's isolated,

2  it's locked out, it was permitted correctly through the

3  operations team, that the work -- the work was completed

4  satisfactorily and safely, at the end of it that the area

5  was cleaned.

6    Q.  So that's how Mr. Canning would support

7  maintenance work; is that right?

8    A.  Correct.

9    Q.  Okay.  And then when Mr. Schmidt was hired, what

10  was -- what work did Canning do on behalf of IPOS --

11  Canning through OPTIS on behalf of IPOS?

12    A.  Project-related work.

13    Q.  And in what way was he supposed to support

14  project-related work?

15    A.  Again, as I mentioned a few minutes ago, there

16  were different crews for different work.  So the embedded

17  everyday maintenance were -- were less skilled, let's say,

18  you know, laborers, boilermakers, pipefitter types that

19  were doing general maintenance, painting, you know, support

20  in there and so there -- but there were also projects I

21  mentioned, for example, the vessel inspection and some --

22  some of the other projects that were discussed earlier.

23    Q.  So did -- was Canning supposed to supervise the

24  work done by Petro?

25    A.  He's supposed to oversee, because even still, our

---

**56**

1  maintenance contractors don't supervise.  They oversee.  We

2  hire a company to do the job.

3    Q.  Well, he was to oversee the work done by Petro.

4  Would that be fair?

5    A.  That would be fair.

6    Q.  And would that include both the projects work and

7  the maintenance work?

8    A.  Again, it depended on the time period.  Once we

9  had Calvin in place and Coury in place in St. Thomas, it

10  would be project work.

11    Q.  And were there any guidelines in place, whether

12  verbal or written, as to the manner in which Canning should

13  oversee the projects work of Petro?

14    A.  Not to my knowledge.

15    Q.  And who was Canning to report to as to his

16  overseeing the work of Petro?

17    A.  While OPTIS was paid by IPOS, that reported to

18  me.  Afterwards it reported to Vitol when Vitol started

19  paying.

20    Q.  At some point did he report to Mr. -- I like to

21  call him Merlin, because I always botch his last name.

22    A.  Yeah, so Merlin was day-to-day on the site, but

23  ultimately I was the responsible party.  So as an acting

24  terminal manager, yes, he did work with Merlin daily more

25  so than me when I was not there.

---

**57**

1    Q.  And at any point did Mr. Canning begin to

2  complain about the work done by Petro?

3    A.  Uhm, there -- there's always issues that can come

4  up, and that's with any contractor for -- in any industry.

5    Q.  Did there come a time when you noted that

6  Mr. Canning's complaints about Petro increased?

7    MS. FRANCIS:    Objection.  Foundation.

8  BY MS. ROHN:

9    Q.  I'm sorry.  Can you state your answer again?

10    A.  No, I did not notice a noted increase.

11    Q.  Was it Mr. Canning's job to oversee the work done

12  by Merlin?

13    A.  No.

14    Q.  Did there come a time when Mr. Canning began

15  reporting to you about things that he perceived that Merlin

16  was not properly doing?

17    A.  There were times, yes.

18    Q.  And do you have any understanding of why

19  Mr. Canning felt like that was something he should report

20  to you?

21    A.  No.

22    Q.  Did you ever ask him to do that?

23    A.  No.

24    Q.  Did you ever tell him, I'm not interested in

25  having you do that?

---

IPOS by DAVID SMITH

58

1   A.  No.
2   Q.  Did you draw the conclusion that there was a cold
3  war going on between Merlin and Mr. Canning?
4   A.  I know you're referring to a e-mail that I had
5  sent, and -- and it's a matter of context.  But I'm sure
6  we're going to talk about it; so I don't know if now is the
7  time, or how you'd like me to address that.
8   Q.  Well, I'm kinda edging into it now.
9   A.  Okay.  You know the reality is, similar to a lot
10  of professions, they were both engineers.  And you can put
11  ten engineers in a room, and they have ten different ideas
12  on how to make something happen, and they can all be right.
13  So I'm not an engineer; so, therefore, that's the way I
14  understood the code was, they approached projects,
15  engineering differently.  That's not to say one's right and
16  one's wrong, but it can cause friction.
17   Q.  Well, did Mr. Canning make derisive comments
18  about Mr. Merlin's ability to be a manager?
19   MR. SIMPSON:    Objection.
20  BY MS. ROHN:
21   A.  I can't speak to -- my definition of derisive may
22  be different than yours; so I could say no.
23   Q.  Well, have you seen e-mails or did you receive
24  e-mails where he would complain as to Merlin's interactings
25  with Petro and then make statements like, But he's your --

59

1  But he's your manager?
2   MR. SIMPSON:    Objection.
3   MS. FRANCIS:    Objection to the extent that
4   misstates the record and does not refer this witness
5   to any specific document.
6  BY MS. ROHN:
7   Q.  You may answer.
8   A.  Yeah, I'd need to see specifically what you're
9  talking about to understand context.
10   Q.  Well, we're about to -- at some point today, we
11  will get to the e-mails.  I'm just trying to get a general
12  feel for it.
13   Did you ever suggest to Mr. Canning that his comments
14  about Mr. Merlin were inappropriate?
15   A.  Sorry.  The network was spinning.
16   Q.  I'm sorry.  I couldn't hear you.
17   A.  No.  No.  Something happened with the network.
18  It froze up for a second.  Could you repeat that?  I'm
19  sorry.
20   Q.  Yes.  Did you ever suggest to Mr. Canning that
21  his comments about Mr. Merlin were inappropriate?
22   A.  Not that I can recall.
23   Q.  What is your understanding of the racial
24  background of Mr. Merlin?
25   A.  He is an American citizen.  He was born somewhere

60

1  in Africa and is of Indian descent.  But I don't know
2  specifics.
3   Q.  Did Mr. Canning ever complain to you about
4  Mr. Schmidt?
5   A.  No.
6   Q.  And is it your testimony Mr. Schmidt never
7  complained to you about Mr. Canning?
8   A.  Yes.
9   Q.  So we've been going on for over an hour and a
10  half.  Would you like a short break, sir?
11   A.  Sure, that would be fine.
12   Q.  And by the way, I didn't get to go through the
13  what is a deposition since you've been deposed before.
14  But, Mr. Smith, this is not an endurance test.  So anytime
15  you need a break, just let me know.
16   A.  Okay.
17   MS. ROHN:    So shall we take 10 minutes?
18   MS. FRANCIS:    That's fine.
19   MS. ROHN:    Okay.  We'll be back in 10 minutes.
20   (A recess was taken at this time.)
21  BY MS. ROHN:
22   Q.  So let me ask you, where are you currently?
23   A.  Miami, Florida.
24   Q.  And is anybody in the room with you?
25   A.  Counsel.

61

1   Q.  And where in Miami, Florida, are you?
2   A.  At the counsel's offices.  I don't know the exact
3  address.
4   Q.  Do you have any notes in front of you?
5   A.  I do not.
6   Q.  So as to Mr. Canning, what in regards to -- you
7  said he was in charge of overseeing the work done by
8  Mr. Petro -- by Petro.  Did that include approving time
9  sheets?
10   A.  It approved -- include -- included approving
11  invoices, yes.
12   Q.  No, I'm talking about time sheets.
13   A.  Well, an invoice is time sheets, consumables, you
14  know, corporate overhead.  So, yes, every portion of the
15  invoice that was presented to us had all of those in there;
16  so yes.
17   Q.  So now you actually, am I correct, as to
18  maintenance work, had Calvin Schmidt, who was supposed to
19  be overseeing the Petro maintenance work.  Would that be
20  fair?
21   A.  Well, yes, and, again, it gets back to the timing
22  before Calvin, and there was no maintenance supervisor,
23  then -- and most of that was project work coming out of the
24  hurricane, then that, even in St. Thomas, all fell towards
25  Andrew.  But when Calvin started, yes, it was transitioned

IPOS by DAVID SMITH

62

1  to just time sheets for maintenance and time sheets for
2  projects, and they were separated then.
3      Q.   And Calvin Schmidt was, am I correct, responsible
4  for approving the maintenance time sheets for Petro?
5      A.   For St. Croix.  For St. Croix, that's correct.
6      Q.   And Coury Hodge, am I correct, was in charge of
7  overseeing or approving the maintenance time sheets in St.
8  -- for Petro; correct?
9      A.   That's correct.
10     Q.   So did Andrew Canning have the ability to
11 overrule the approval of Calvin or Coury's approval of
12 Petro's time sheets as to maintenance?
13     A.   No.
14     Q.   Did he in fact do that?
15     A.   No.
16     Q.   And as to the invoices submitted by Petro as to
17 maintenance, did Canning have the -- as part of oversight,
18 the ability to approve or disapprove of those invoices?
19     A.   Again, you need to be specific on timing.  Prior
20 to Calvin --
21     Q.   After Calvin Schmidt.
22     A.   After Calvin, no.
23     Q.   Did he in fact refuse to approve invoices after
24 Calvin Schmidt?
25     A.   You're specifically asking me about maintenance.

63

1  No.
2      Q.   Did Mr. Canning as part of his oversight have the
3  ability to approve or disapprove invoices, for lack of a
4  better word, for operations versus maintenance?
5      A.   There were no operations.  What I'm referring to
6  was projects.
7      Q.   Did he have the ability to over -- as part of his
8  oversight, to approve or disapprove invoices as to
9  projects?
10     A.   Yes.
11     Q.   And who gave him that authority?
12     A.   Most of those projects were for Vitol; so then
13 Vitol would have given him the approval on that.
14     Q.   So would that include those that were passed
15 through for IPOS?
16     A.   Yes.
17     Q.   So in the -- to the extent that he was -- Canning
18 was disapproving contracts for projects, was he doing that
19 for IPOS or was he doing that for Vitol?
20     A.   For Vitol.
21     Q.   You had stated at some point you made the
22 determination to terminate Petro; correct?
23     A.   Yes.
24     Q.   And would it be fair to say that the work that
25 was in question that led to the termination of the Petro

64

1  contract was the No. 3 vent line?  Would that be fair?
2      A.   Yes.
3      Q.   And the No. 3 vent line was a Vitol project;
4  correct?
5      A.   Yes.
6      Q.   So why would IPOS terminate Petro's contract over
7  work that Petro was doing for Vitol?
8      A.   IPOS still had the operational responsibility for
9  ensuring the project was completed safely, and that's part
10 of our contract with VVIC.  When we were unable to
11 determine the qualifications of the welders related to that
12 project, it was a loss of trust for the entire -- we tried
13 multiple times in order to ask for documentation and was
14 never provided.
15     Q.   But that documentation was documentation
16 concerning welders that were working on a Vitol project;
17 correct?
18     A.   But still on the IPOS and WAPA facility.  Yes.
19     Q.   Well, IPOS doesn't own that facility, does it,
20 sir?
21     A.   No.  But we are responsible for it -- were
22 responsible for it.
23     Q.   Who at IPOS was the QA/QC?
24         MS. FRANCIS:   Objection.  Form.
25 BY MS. ROHN:

65

1      Q.   You may answer.
2      A.   Uhm, it -- there -- there was no officially
3  appointed person.  It was a combination of Merlin and
4  Andrew, depending on the work.
5      Q.   And what was your understanding of the
6  qualifications of Canning to be a QA?
7      A.   My understanding is that he's an engineer and has
8  done this for multiple years.
9      Q.   You understand whether or not he has any
10 particular welding knowledge?
11     A.   Not to my knowledge.
12     Q.   So where was IPOS incorporated?
13     A.   U.S. Virgin Islands.  It's not incorporated.
14 It's a LLC.
15     Q.   Okay.  And who are or were its members?
16     A.   Vitol -- sorry.  VTSSBV.
17     Q.   VTSSBV?
18     A.   Yes.
19     Q.   Okay.  What does --
20     A.   It's VTTI -- VTTI Terminal Services B.V.
21     Q.   VTTI Terminal Services B.V.  What does B.V. stand
22 for?
23     A.   A Netherlands incorporation.  I don't know
24 specifically the dutch word for it.
25     Q.   And where is V -- VTT -- was it VTTI or VTT

IPOS by DAVID SMITH

66

1  Terminals?
2      A.  VTTI Terminals, but VTSS is the acronym, I guess,
3  similar to IPOS.
4      Q.  Okay.  I don't know about you, but all these
5  initials driving me crazy.
6      A.  Agreed.
7      Q.  Where is VTTI Terminal Services out of?
8      MS. FRANCIS:    Objection.  Beyond the scope of
9  the notice.  This witness --
10 BY MS. ROHN:
11     Q.  You may answer.
12     MS. FRANCIS:    -- is not a designee of another
13 entity.
14 BY MS. ROHN:
15     A.  I don't know.
16     Q.  So is there any other member besides
17 VTTI Terminal Services?
18     A.  No.
19     Q.  And has VTTI Terminal Services been the sole
20 member since it was created?
21     A.  Yes.
22     Q.  And is -- does IPOS currently exist?
23     A.  Yes.
24     Q.  And what work does IPOS do now?
25     A.  Currently no work at all.

67

1      Q.  Does it have any employees at all?
2      A.  No, it does not.
3      Q.  Does it have any assets?
4      A.  No, it does not.
5      Q.  And when did it cease operating?
6      A.  July 1, 2022, or June 30, 2022.
7      Q.  And why did it stop existing -- or operating?
8  Sorry.
9      A.  Our service agreement expired, and it was not
10 extended.
11     Q.  The service agreement was with whom?
12     A.  Vitol Virgin Islands Corp., VVIC.
13     Q.  Prior to June 30th of 2022, did you know that the
14 contract was not going to be renewed?
15     A.  I knew when the period to effect the renewal
16 wasn't given, yes, then as of then.
17     Q.  And when was that?
18     A.  I don't know the exact date.  It is in the
19 contract but I don't know the exact date.
20     Q.  Do you remember what --
21     A.  Six months prior approximately they had to give
22 notice to renew.  It was a unilateral.
23     Q.  Did you ever discuss with anyone why they were
24 not going to renew the IPOS contract?
25     A.  No, I --

68

1      MS. FRANCIS:    Objection.  Scope.
2  BY MS. ROHN:
3      A.  No, I did not.
4      Q.  Do you have any knowledge as to why they decided
5  -- it was decided not to renew the contract?
6      A.  No, I do not.
7      Q.  Did you ever give any opinions or advice as to
8  whether or not to not renew the contract?
9      A.  I'm sorry.  You broke up there.  Can you repeat
10 that one?
11     Q.  Did you ever give any advice or guidance or
12 discussions about not renewing the contract with anyone?
13     A.  No, I did not.
14     Q.  And does IPOS -- did or does IPOS have any
15 subsidiaries?
16     A.  No, it does not.
17     Q.  Does it have any affiliates?
18     A.  No, it does not.
19     Q.  And who is its parent company?
20     A.  Again, that would be -- it's not incorporated,
21 but it would be VTSS, VTTI Terminal Services B.V.
22     Q.  And did IPOS have -- was IPOS a member or
23 participant in any services -- service agreements?
24     A.  Yes.
25     Q.  Okay.  And with whom?

69

1      A.  With VVIC.  And then also a service agreement for
2  VTTI to provide the services we discussed earlier, like HR
3  and IT and --
4      Q.  And what was the scope of its service agreement
5  with VVIC?
6      A.  Again, to -- to -- to staff, to operate, to
7  provide annual budgets, to operate a safe, efficient,
8  reliable operation, and, you know, and then reimbursable
9  budgeting and -- and submission, yeah.
10     Q.  I'm sorry.  The last word broke up.  What was the
11 last word?
12     A.  I said and -- and submission of reporting and
13 running a safe facility.
14     Q.  And the facility being the propane terminals?
15     A.  That's correct.
16     Q.  And does IPOS currently still have a service
17 agreement with VTTI Services?
18     A.  No, it does not.
19     Q.  When did that end?
20     A.  Uhm, I -- I don't know the date.
21     Q.  Before or after the contract with IPOS was not
22 renewed?
23     A.  After the contract.
24     MS. FRANCIS:    Objection.  Misstates the
25 record.

IPOS by DAVID SMITH

---

**70**

BY MS. ROHN:

1  Q.  Do you know how long after that contract?

3  A.  I do not.

4  Q.  Are you aware of whether or not any of the

5  affiliates of IPOS have ever entered into any consent

6  judgments regarding illegal activities?

7  A.  I'm sorry. I don't know what that means.

8  Q.  So, for instance, Vitol Inc. has entered into

9  consent judgments as to bribery. Are you aware of any --

10  of any other affiliates or parents of IPOS or VVIC who have

11  entered into similar consent --

12  A.  I --

13  MS. FRANCIS:  Objection. Form. Compound.

14  Objection. Foundation to the extent it misstates the

15  record concerning any relationship between IPOS and

16  VVIC.

17  BY MS. ROHN:

18  Q.  You may answer.

19  A.  I'm not aware of any.

20  Q.  Other than yourself with your -- other than

21  yourself and Mr. Adrian Melendez in negotiating the

22  contracts between Petro and IPOS, was anybody else involved

23  in the negotiations of those contracts?

24  A.  No.

25  Q.  So in the First Amended Complaint in paragraph

---

**71**

1  15, Petro has alleged that "Petro and IPOS discussed Petro

2  doing business for IPOS, and Petro informed IPOS that

3  because Petro wanted a chance to do the business and show

4  IPOS what it could -- what it could do, it gave IPOS

5  reduced rates on the initial contract in exchange for a

6  minimum five-year contract."

7  That has been denied. What facts do you rely on for

8  that denial?

9  A.  That conversation never happened.

10  Q.  Have you reviewed e-mails where you asked Petro

11  to lower its rates in exchange for renewal of contracts?

12  A.  I'm not familiar with that, no.

13  MS. FRANCIS:  Objection.

14  BY MS. ROHN:

15  Q.  Personally, how did you and Adrian Melendez get

16  along?

17  A.  Personally, very well.

18  Q.  And were you friends?

19  A.  Yes. I would say yes.

20  Q.  Did you consider him to be an honest person?

21  MS. FRANCIS:  Objection.

22  MS. ROHN:  Noted.

23  MS. FRANCIS:  Foundation.

24  BY MS. ROHN:

25  Q.  You can answer.

---

**72**

1  A.  Mostly.

2  Q.  Did you consider him to be a person with

3  integrity?

4  MS. FRANCIS:  Again, objection. Lack of

5  foundation as to personal knowledge.

6  BY MS. ROHN:

7  A.  Mostly.

8  Q.  You may answer.

9  When you say "mostly," what did you think he wasn't

10  honest about?

11  A.  Well, for example, on a personal basis, if I may?

12  Q.  Uh-huh.

13  A.  So when we left I had a smoker that I was trying

14  to give to Calvin Schmidt, and Adrian picked it up, kept it

15  for himself. Calvin was too afraid to approach him to ask

16  for it.

17  Q.  And what personally on an integrity basis?

18  A.  While we never investigated, there were certainly

19  allegations where we had police show up at the terminal

20  related to questioning about equipment that Petro had, but

21  we did not get involved.

22  Q.  Was that scaffolding?

23  A.  No, it was not.

24  Q.  What equipment was it?

25  A.  If I remember, it was -- it was a crane. It was

---

**73**

1  a crane company, and police showed up.

2  Q.  To your knowledge, was anybody ever arrested?

3  A.  Not to my knowledge. I said we did not

4  investigate. That's why I said mostly, because I -- I

5  didn't choose to make a formal decision on it.

6  Q.  What did you understand the allegations to be?

7  A.  Uhm, that they had bought stolen equipment. It

8  was stolen from Limetree.

9  Q.  And do you know who they were supposed to have

10  bought that stolen equipment from?

11  A.  No, I do not. The owner of the company arrived

12  with the police and said that's what the investigation was,

13  and we allowed them access on the site to perform their

14  investigation.

15  Q.  Owner of what company?

16  A.  I -- I don't remember the name of the company

17  now.

18  Q.  Well, did the crane -- was the crane removed from

19  the property?

20  A.  Uhm, it was removed from the property.

21  Q.  Do you have any knowledge that Petro or Adrian

22  knew that the equipment that it was purchasing was stolen?

23  A.  No, I did not -- no, I do not.

24  Q.  Do you dispute that in April of 2018 Petro began

25  doing business with IPOS?

---

74

1    A.   I don't know the exact date of when formation of
2  Petro was, but the contract was signed later.  But they
3  started during the formation.
4    Q.   And they started without a contract; is that
5  correct?
6    A.   That is correct.
7    Q.   And what was the verbal agreement when they
8  started?
9    A.   Similar to how it was with Vivot prior to that.
10  It was just submitting invoices, and we were paying
11  invoices.
12    Q.   Was there an agreement as to rates?
13    A.   I don't recall.
14    Q.   Okay.  And was there ever between IPOS and Petro
15  any equipment rental agreements?
16    A.   I believe it was covered under the general agree
17  -- the general agreement.
18    Q.   So when there was a question about the No. 3 vent
19  line welding issue, and you decided to terminate the
20  contract, why did you also terminate the maintenance
21  contract?
22        MS. FRANCIS:    Objection.  Asked and answered.
23  BY MS. ROHN:
24    Q.   You may answer.
25    A.   As I stated earlier, that it was a lack of trust

75

1  as a company, because of the fact we had asked for the
2  information, and we were never provided it.
3    Q.   And what information were you never provided?
4    A.   It's clearly spelled out in the documents.  I
5  don't profess to be a technical expert.  I would have to
6  see the document, and I can read those specific things that
7  were being looked for and asked to be put -- sent to us and
8  never were.
9    Q.   Did you ever receive a Dropbox, sir?
10    A.   I was the last person to receive it.  Yes.
11    Q.   And is it your testimony that the documents that
12  you wanted were not in that Dropbox?
13    A.   Yes, that's correct.
14    Q.   And did you ever open, review the documents in
15  the Dropbox?
16    A.   Yes, I did.
17    Q.   Do you know the data books for projects,
18  understand that term?
19    A.   Yes, ma'am.
20    Q.   Okay.  And did IPOS have any procedures for when
21  data books were required and when they weren't?
22    A.   No.
23    Q.   How would it be determined when data books were
24  required and when they weren't?
25        MS. FRANCIS:    Objection.  Foundation.

76

1  BY MS. ROHN:
2    A.   To the best of my knowledge, it was for the
3  non-IPOS projects that the data books were asked for.
4    Q.   And how did you learn that for non-IPOS projects
5  data books were required?
6    A.   I was copied on e-mails requesting that
7  information.
8    Q.   So the non-IPOS projects that passed through
9  IPOS, were data books required on those?
10    A.   I don't know the answer to that.  They were for
11  Vitol.  My responsibility was passing through the invoice,
12  not the work, data accumulation.
13    Q.   But the contractual obligations of Petro were --
14  were set out in the contract between Petro and IPOS;
15  correct?
16    A.   That's correct.
17    Q.   And were there any contractual obligations
18  between Petro and IPOS to have data books at the end of the
19  job?
20    A.   There are IPOS policies and -- or quality and
21  data book type of documents required in the quotes provided
22  by Petro.  Even in the 3-inch line in their initial quote,
23  they say they will adhere to all IPOS safety records, all
24  IPOS documentation records.  And then there were multiple
25  e-mails that also asked for the data books for that prior

77

1  to the work even beginning.
2    Q.   As to the data books, you broke up after that.
3    A.   Prior to the work beginning as to what the Vitol
4  representatives were looking for.
5    Q.   So my question is though:  In the contract
6  between Petro and IPOS, were there contractual obligations
7  to provide data books?
8    A.   I'd have to look at the documents to give the
9  exact answer.  I don't recall specifically without seeing
10  it.
11    Q.   So on the special projects, was IPOS responsible
12  for the specifications on those projects or was Vitol?
13    A.   It -- it would have been Vitol responsible for
14  the specifications.
15        MR. BECKSTEDT:    This is Carl Beckstedt.  I
16      just wanted to object to that last question.
17        MS. ROHN:    Okay.  Well, now you have.
18  BY MS. ROHN:
19    Q.   So would those specifications be included in the
20  specs for the jobs?  In other words, what types of
21  documentations would those have included in the scope of
22  work for the bid for the job?
23        MS. FRANCIS:    Objection.  Form.
24  BY MS. ROHN:
25    Q.   You may answer.

IPOS by DAVID SMITH

---

78

1    MR. BECKSTEDT:    Same objection.

2  BY MS. ROHN:

3    A.  So for the request for the quotes, they did refer

4  to using IPOS documentation, qualifications, and so that

5  was upfront.  And again, in the initial proposal for the

6  3-inch vent line from Petro, it also said that everything

7  would be done in -- in accordance with the IPOS documents.

8    Q.  So your position is that IPOS in its policies and

9  procedures had requirements for certain documentations on

10  jobs?

11    A.  So in addition to welding specs, paint specs,

12  that's -- that's what I'm referring to, that those were

13  quoted and -- and clearly sent multiple times back and

14  forth between the parties as to what was expected.

15    Q.  But I am speaking of data -- what paperwork data

16  is required.

17    A.  Again --

18    Q.  Let me finish my question.

19    A.  Yeah.  Sorry.

20    Q.  Does IPOS have in its policy manual a listing of

21  particular documents that are required on particular jobs?

22    MS. FRANCIS:    Objection.  Foundation.

23  BY MS. ROHN:

24    A.  I don't personally know.  I'd need to have to

25  review it again.

---

79

1    Q.  Well, when you say that the Vitol contract

2  referred to adhering to IPOS' policies and procedures,

3  other than welding specifications, what are you referring

4  to?

5    A.  Painting specifications, material specifications,

6  overall engineering specifications.

7    Q.  So would you agree that what paperwork that Petro

8  was responsible to give on the No. 3 vent line, would be

9  the paperwork set out in the IPOS policies and procedures?

10    MS. FRANCIS:    Objection to the extent that

11    calls for any legal conclusion.  This witness is not

12    here to provide legal conclusions.

13    MS. ROHN:    Not asking for a legal conclusion.

14  BY MS. ROHN:

15    Q.  You said that the specifications required that

16  they follow the IPOS policies and procedures; correct?

17    A.  No.  What I said was that's what Petro put into

18  their quote that they were going to follow the IPOS quality

19  and procedure.  I wasn't part of the bidding process.

20    Q.  Right.  Right.  I understand that.  But so any

21  policies and procedures as to what paperwork had to be

22  turned over at the end of the job, would be IPOS' policies

23  and procedures, correct, sir?

24    A.  No.  In this 3-inch vent line, Vitol clearly

25  stated what they were looking for, and I've seen the

---

80

1  e-mails on that.  I was not part of the bidding process on

2  what they expected to be provided at the end of the job.

3    Q.  Well, I thought you said the specifications were

4  to adhere to IPOS' policies and procedures.

5    A.  I think -- I think either I -- you're

6  misrepresenting what I said or confusing what I'm saying.

7  But I'm saying there were two different sets related to

8  this specific project.  In the initial quote from Petro

9  that I have seen, it said that they were going to perform

10  the work based upon IPOS' qualifications, procedures,

11  et cetera.

12    In the e-mails that I have seen for Vitol, who was

13  commissioning the work, they also listed additional items

14  that they wanted done.  And how that was resolved, I wasn't

15  party to those discussions or to that project to be able to

16  answer that.

17    Q.  So other than some e-mails that may be out there,

18  though, the actual specifications for the bid refer to IPOS

19  policies and procedures and qualifications, correct, sir?

20    A.  That is correct.

21    Q.  Okay.  So in paragraph 17, the First Amended

22  Complaint, Petro says "On September 10, 2019, Petro and

23  IPOS entered into a contract for Petro to perform

24  preventive maintenance, remedial maintenance, schedule

25  projects, and provide equipment rentals and material

---

81

1  procurement."

2    What was the factual basis for denying that

3  allegation?

4    A.  I need to see my -- my response on what I

5  actually said on that.

6    Q.  Your response is "IPOS denies the allegation of

7  paragraph 17 in the Complaint as written, except admits

8  that IPOS entered into a maintenance contract with

9  Plaintiff on or about September 1, 2019."

10    So what is the factual basis that the contract was to,

11  number one, perform preventive maintenance?

12    A.  That -- that is the primary responsibility, yes,

13  of the contract.

14    Q.  What are the facts that it did not include

15  remedial maintenance?

16    A.  I'm not sure that those words are specifically

17  mentioned in the contract.  I need to review that to --

18    Q.  Well, did Petro perform remedial maintenance

19  pursuant to the IPOS contract?

20    A.  They did, but it doesn't necessarily say that it

21  was in that contract.  And I believe that was the basis for

22  the objection.

23    Q.  What is the factual basis for scheduled projects?

24    A.  Again, I don't believe it specifically said

25  scheduled projects.

---

IPOS by DAVID SMITH

---

82

1    Q.   Did they do -- did they do scheduled projects?

2    A.   Yes, they did.

3    Q.   "Provide equipment rentals." What is the factual

4    basis of their denial of that?

5    A.   Again, I don't know if it's specifically listed

6    in the contract as such.

7    Q.   Did they do equipment rentals?

8    A.   Yes, they did.

9    Q.   And finally, material procurement, what is the

10   factual basis for your denial of that?

11   A.   Again, I don't know if it's specifically listed

12   as a responsibility.

13   Q.   Did they do material procurement?

14   A.   Yes, they did.

15   Q.   Paragraph 18 of the Complaint says "The term of

16   the contract was to commence on September 1, 2019, and

17   could be terminated by either party giving 60 days written

18   notice to the other party after the first five years."

19       What is the factual basis for your denial of that?

20   A.   I need to see the contract. I don't believe

21   that's what it says.

22   Q.   Well, that's one of your areas that you're

23   supposed to be prepared to answer.

24   A.   No, I understand, but I don't believe the entire

25   statement what you're saying is what's represented there.

---

83

1    It does say after one year, and you did not read that to

2    me.

3    Q.   So you believe that after one year it could be

4    terminated by either party?

5    A.   Yes.

6    Q.   And then paragraph 19, which you -- which is

7    denied says "Otherwise the contract could only be canceled

8    for cause after one year."

9        What is the factual basis for IPOS' denial of that?

10   A.   Yes, we didn't -- we don't believe that that's

11   what it says. We believe that after one year it can be

12   canceled without cause.

13   Q.   Okay. During the time that Petro worked with

14   IPOS from sometime in 2018 until July 2021, did IPOS ever

15   ask for welder certifications of its employees -- its

16   welders?

17   A.   Yes. There was a -- there was a Petro employee,

18   Daniel Martinez, who was certified, wore the badges per the

19   -- the IPOS policy. In fact, in one of the e-mails related

20   to the 3-inch line, his qualifications were sent to Vitol

21   as well. So, yes, he was a certified welder for -- for

22   Petro.

23   Q.   Other than Daniel Martinez, did they ever request

24   any welding certifications for any other welders of Petro?

25   A.   Not to my knowledge.

---

84

1    Q.   Whether or not requested, did Petro ever

2    provide --

3    A.   I'm sorry. I'm sorry. I stated that

4    incorrectly. If I may?

5    Q.   Sure. Of course.

6    A.   Yeah, so that's not true. In the -- in the vent

7    line -- vent flare repair project in September of 2019, I

8    believe, it was specifically stated that welder

9    qualifications for that would be needed -- need to be done

10   so...

11   Q.   Okay.

12   A.   I might be -- yeah. Yeah. I'm sorry. That's

13   the answer. No -- yes.

14   Q.   Was that a Vitol pass-through job?

15   A.   I don't remember.

16   Q.   Did Petro provide the welder certifications?

17   A.   I don't remember.

18   Q.   Well, would they have been allowed to do the work

19   without the certifications?

20   A.   What I'm not sure of is the timing. I'd need to

21   look at that file specifically, because it could have been

22   Daniel Martinez, who, again, we know was a certified

23   welder.

24   Q.   So you don't know whether or not any

25   certifications were requested or not?

---

85

1    A.   No, they were requested. I just -- yes, they

2    were requested.

3    Q.   You just don't recall whether or not they were

4    received? Is that what you're saying?

5    A.   Yes, I'm not sure if they were received.

6    Q.   And what would be the purpose for -- on the vent

7    flare repair project in 2019 to ask for those

8    certifications?

9    A.   Again, it wasn't traditional normal welding

10   related to that repair, and so, again, our responsibility

11   is to ensure that all welding is certified.

12   Q.   Did Mr. Canning have the responsibility of

13   overseeing the actual welding done on the job?

14   A.   I think that's a question for Vitol, because the

15   3-inch line was not a IPOS project.

16   Q.   When Mr. Canning worked for IPOS on an IPOS job,

17   was Mr. Canning supposed to oversee the actual welding that

18   was being done?

19       MS. FRANCIS:    Objection. Foundation.

20   BY MS. ROHN:

21   Q.   You may answer.

22   A.   There was very few welding jobs that Petro did

23   for IPOS. It was primarily the maintenance work.

24   Q.   On the ones that there were, was it Mr. Canning's

25   job to actually inspect and oversee the actual welding?

---

IPOS by DAVID SMITH

86

1    A.   No, it was not.  It was the responsibility of
2  Petro to provide the documentation.
3    Q.   So did Petro make complaints to IPOS about
4  Andrew Canning?
5    A.   Not to me.
6    Q.   So this is you as IPOS?
7    A.   Correct.
8    Q.   So my question is:  Did Petro make complaints
9  about Mr. Canning to anyone at IPOS?
10   A.   The only complaint that I'm aware of was related
11 to the grating incident on an e-mail that Adrian had sent.
12   Q.   And what was the nature of that complaint?
13   A.   Andrew's behavior related -- in their opinion,
14 related to how he addressed -- I don't know the gentleman's
15 name.  -- the safety person, I think Frank and Chad, at
16 St. Thomas when it occurred.
17   Q.   What did he complain about the manner in which he
18 addressed them?
19   A.   That he said that -- that -- that he was told --
20 that Adrian was told by Frank and Chad that it was BS work,
21 and that -- and that Andrew was going to sue Petro and
22 IPOS.
23   Q.   Did you ever speak to Mr. Canning about that?
24   A.   No, I did not.
25   Q.   Why not?

87

1    A.   The -- the actual investigation was being done
2  locally by Merlin Figueira and Rawle Granger.
3    Q.   Did you ever discuss those complaints with
4  Merlin?
5        MS. FRANCIS:    Objection.  Foundation.  Vague
6  as to those complaints.
7  BY MS. ROHN:
8    Q.   You may answer.
9    A.   Yes.
10   Q.   What was the substance of that discussion?
11   A.   Again, we didn't give it much credibility.
12   Q.   Didn't give what much credibility?
13   A.   The fact that -- that Andrew was threatening to
14 sue Petro and IPOS.
15   Q.   Did you give any credibility to the complaint
16 that he was saying that the work done by Petro was BS?
17   A.   Yes.
18   Q.   And as a result of -- and what -- and did you
19 believe that that was true -- that he had said that?
20   A.   Yes.
21   Q.   And as a result, did anybody at IPOS counsel
22 Mr. Canning about that behavior?
23       MS. FRANCIS:    Objection.  Vague.
24 BY MS. ROHN:
25   Q.   You may answer.

88

1    A.   I did not.
2    Q.   Did anybody else from IPOS --
3    A.   Not to my knowledge.
4    Q.   -- counsel --
5    Why not?
6    A.   Because of the fact it was left in an unsafe
7  condition.  The appropriate reaction wasn't correct, but
8  the fact is is that it was a dangerous situation.
9    Q.   Was it your understanding that the grating was up
10 a ladder up aboveground?
11   A.   Yes.
12   Q.   And was it your understanding that that was an
13 area that was on WAPA's property?
14   A.   Almost 50 percent of the St. Thomas facility is
15 on WAPA's property; so yes.
16   Q.   And when you go on WAPA's property, are you
17 supposed to get a WAPA permit?
18   A.   No.
19   Q.   Don't tell WAPA I'm going in a certain area on
20 your property?
21   A.   Not for a walkthrough, no.
22   Q.   So anybody at IPOS can just walk through WAPA's
23 property anywhere they want to go?
24   A.   Yes.
25   Q.   Have you ever requested permits from WAPA to go

89

1  in particular areas?
2    A.   For work, yes.
3    Q.   Well --
4    A.   But walking, no.
5    Q.   Well, wasn't Mr. Canning going to that area to
6  oversee the work that had been done in that area?
7    A.   No.  There was no one working at that time.
8    Q.   But overseeing the work that had -- how the work
9  had been done?
10   A.   Yes.
11   Q.   And that's part of Mr. Canning's work, isn't it?
12   A.   To oversee to that, yes.
13   Q.   So how is Mr. Canning not working in the area
14 when he was going to oversee work that had just been
15 completed in that area?
16   A.   You can always go through an area.  You can
17 always walk into a facility.  You can always walk into the
18 tank farm for visual inspection.  If you're going to
19 perform actual work, then you would need to get a permit
20 that would say do you have the proper PPE; do you have the
21 proper hearing protection; do you have the proper eye
22 protection; is it going to be a hot work; is it going to be
23 sparks; do you need a monitor.  Just going to visually
24 inspect, you do not need a work permit.
25   Q.   Even if it's going up a ladder, correct, sir?

IPOS by DAVID SMITH

---

90

1    A.    That's correct.

2    Q.    Okay. And were you aware that the reason that

3  that area couldn't be barricaded off was because IPOS

4  personnel had to be able to walk through that area to get

5  to equipment they had to use?

6         MR. SIMPSON:    Objection.

7  BY MS. ROHN:

8    A.    That is incorrect. Sorry.

9    Q.    What about that is incorrect?

10   A.    That it cannot be barricaded for that very reason

11 is absolutely not correct.

12   Q.    So how would the people get through the barricade

13 to get to the equipment?

14   A.    A barricade doesn't need to be a physical

15 barricade with locking. I mean, it can be something as

16 simple as caution tape, and then everyone is notified.

17 That's -- that's considered a barricade in our industry.

18 So, therefore, to alert somebody of a potential hazard that

19 they're coming across. This wasn't done in that case.

20   Q.    Did you as part -- did IPOS as part of the

21 investigation, talk to the IPOS employees in that area to

22 learn whether or not they had indeed been warned that the

23 grating wasn't safe to step on?

24   A.    That was conducted by Merlin and Granger, yes,

25 and that was not said to the employees.

---

91

1    Q.    And which employees were talked to?

2    A.    The -- the operators that were on duty. I don't

3  recall the names at this point. I'd need to look at the

4  shift schedule.

5    Q.    You're speaking of WAPA employees or IPOS

6  employees?

7    A.    IPOS.

8    Q.    Did Andrew Canning make any complaints to IPOS as

9  to the plaintiff's employees' time records, working

10 ability, or knowledge?

11        MS. FRANCIS:    Objection. Form.

12 BY MS. ROHN:

13   Q.    No. 22 of the topics.

14   Can you read that to me, please?

15   Q.    Sure. "What complaints did Andrew Canning make

16 to IPOS as to Plaintiff's employees' time records, working

17 ability, knowledge, when and to whom?"

18   A.    Can -- can you tell me what my response was on

19 that?

20   Q.    I'm sorry. You broke up. What?

21   A.    Can you tell me what my response was to that --

22   Q.    No. No. This is on my 30(b)(6) list of

23 topics --

24   A.    Sorry.

25   Q.    -- we're going to discuss.

---

92

1    A.    Okay. Yes, there was a concern that had been

2  raised regarding time sheets and hours not worked, yet

3  still charged to IPOS.

4    Q.    And how often did he make those complaints?

5    A.    I don't have an exact number on that.

6    Q.    You were asked when and by whom. So who made

7  those?

8    A.    Andrew related to --

9    Q.    To whom?

10   A.    To me.

11   Q.    Okay. Did you when -- when Canning would make

12 these complaints, did you ever go to Calvin Schmidt and

13 say, Calvin, you signed off on this sheet; why did you sign

14 off on this sheet and Mr. Canning says you shouldn't have?

15        MR. SIMPSON:    Objection.

16 BY MS. ROHN:

17   Q.    You may answer.

18   A.    To the best of my knowledge, that was not on the

19 general maintenance worksheets. It was all project-related

20 worksheets. They were separate invoices; so then Calvin

21 would not have had that -- that responsibility for those.

22   Q.    So wasn't one of the complaints in

23 January 13, 2021, which was a maintenance agreement, in

24 which he claimed that the people had signed in at 7:30, but

25 they were really at Cruzan Rum, and that they had billed

---

93

1  for the entire day?

2         MS. FRANCIS:    Objection.

3         MR. SIMPSON:    Objection.

4         MS. FRANCIS:    Form.

5  BY MS. ROHN:

6    Q.    You may answer.

7         MS. FRANCIS:    Foundation to the extent that

8    mischaracterizes any document or documents.

9  BY MS. ROHN:

10   Q.    You may answer.

11        MR. BECKSTEDT:    Same objection.

12 BY MS. ROHN:

13   A.    So as far as the time sheets that were turned in

14 by Petro versus what he saw on the gate logs, yes.

15   Q.    And did you ever go to the actual time sheets

16 turned into Calvin Schmidt to determine how many hours

17 Petro actually allocated on that day for its workers?

18   A.    I don't recall.

19   Q.    Were you aware that Calvin Schmidt clearly told

20 Mr. Canning that the workers don't sign in on the logs,

21 that ever since COVID no one is allowed in the guard gate,

22 and it's the guard gate who record the time?

23        MR. SIMPSON:    Objection.

24        MS. FRANCIS:    Objection. Foundation.

25 BY MS. ROHN:

---

94

1    Q.   You may answer.
2    A.   I am not aware of Calvin telling Andrew that. I
3 am aware that in fact security did sign everyone in, IPOS
4 employees included.
5    Q.   But didn't Mr. Canning claim that they had signed
6 in themselves as coming in at that time?
7         MR. SIMPSON:   Objection.
8         MS. ROHN:   Noted.
9         MS. FRANCIS:   Objection. Foundation.
10 BY MS. ROHN:
11   A.   I don't recall. I need to see the document. I
12 do not recall that he said that they signed themselves in.
13   Q.   Didn't he accuse them of forgery; they had signed
14 in at a wrong time?
15        MR. SIMPSON:   Objection.
16        MR. BECKSTEDT:   Objection.
17        MS. ROHN:   Noted.
18        MS. FRANCIS:   Objection. Foundation.
19 BY MS. ROHN:
20   A.   He -- he did make accusations that the time logs
21 turned in by Petro did not match the gate logs at IPOS.
22   Q.   And in fact, isn't it true, sir, that the time
23 sheets turned in by Petro were far less than what were
24 shown on the gate logs?
25   A.   I don't know the answer to that.

95

1    Q.   And isn't it a fact, sir, that as to the gate
2 logs, people are signed in when they come in, and then
3 they're signed out when they leave for the day, but as they
4 come and go, they aren't signed in and out?
5    A.   Absolutely incorrect.
6    Q.   How do you claim the gate logs are done?
7    A.   That they're done every time people leave,
8 whether it's for lunch, whether it's to run an errand. As
9 soon as the gate log -- somebody leaves the premises,
10 they're logged in and logged out.
11   Q.   So what was the procedure at IPOS as to how the
12 work times were kept as to Petro workers?
13        MS. FRANCIS:   Objection. Foundation.
14        MS. ROHN:   No. 23 on the topics.
15        MS. FRANCIS:   My objection isn't -- I
16 appreciate you pointing out which category you were
17 referring to, Counsel. That was not my objection as
18 to whether it was on the notice. My objection was
19 foundation to the extent that that category misstates
20 or assumes facts.
21 BY MS. ROHN:
22   Q.   How were the work times of Petro's employees kept
23 on the job that was for IPOS?
24   A.   I'm sorry. You broke up there. Could you --
25 could you repeat that question?

96

1    Q.   How were the work times of Petro's employees kept
2 on jobs working for IPOS?
3    A.   It was the responsibility of Petro to record
4 their times and submit it to IPOS for approval.
5    Q.   And who at IPOS was supposed to be -- they were
6 supposed to be submitted to?
7    A.   Again, it depends on --
8    Q.   Who's Calvin Schmidt?
9    A.   He had the three or four guys, usually four, that
10 were the maintenance folks that were there for the everyday
11 embedded maintenance.
12   Q.   And what involvement did the security guards time
13 have in documenting IPOS' -- excuse me, Petro's employees'
14 time sheets?
15   A.   I'm sorry. Can you -- part of that broke up. If
16 you can repeat that, please.
17   Q.   Yeah. I said what involvement did the gate logs
18 have in recording Petro's time as to work done for IPOS?
19   A.   We have used the security logs not only for
20 contractors but also employees, also for safety. It's --
21 it's part of our facility security plan for the
22 Coast Guard, we're required to maintain 'em so if there is
23 a discrepancy or a concern, and also to know who is on-site
24 in the event of an emergency, that's where those logs come
25 in handy.

97

1    Q.   So are the logs, gate logs used to determine the
2 times worked by Petro's employees?
3    A.   It's -- it's a check if there's a concern -- if
4 there's a valid concern raised, yes.
5    Q.   Did Petro have any punch machines?
6    A.   Not to my knowledge, no.
7    Q.   Did IPOS have any electronic means of recording
8 times?
9    A.   No.
10   Q.   So in 2020 -- in 2020 was there a 1-inch vent
11 line put out to bid?
12   A.   Yes.
13   Q.   And was that a IPOS job, pass-through IPOS job or
14 a Vitol job?
15   A.   I believe that was a pass-through.
16   Q.   So as a pass-through with IPOS, would the bid for
17 it have gone to IPOS or to Vitol?
18   A.   I'm not sure. I mean, we would have both been
19 copied on it.
20   Q.   Both been copied on what?
21   A.   On -- on the bid itself.
22   Q.   And the specifications, would they have been
23 specified by IPOS or specified by Vitol?
24   A.   Well, again, referencing with the 3-inch --
25   Q.   No, I'm talking about the 1-inch.

IPOS by DAVID SMITH

98

1    A.   I understand, but it's similar to how it was
2  handled in the 3-inch.  It would be using IPOS
3  specifications.
4    Q.   So what would have been the Vitol defendant
5  involvement in the bid process?
6         MR. BECKSTEDT:    Objection.
7         MS. FRANCIS:    Also objection.  Compound, as
8  there's more than one Vitol defendant.
9  BY MS. ROHN:
10    Q.   You may answer.
11    A.   Yeah, ultimately, once the bids were received and
12  the decision was made, as it would have been a pass-through
13  to Vitol, they would have had ultimate approval on who
14  would be performing the work.
15    Q.   And what would Canning's responsibility have been
16  as far as overseeing that bid?
17    A.   Well, at the time of the 1-inch, he was a --
18  being paid or -- OPTIS was being paid by Vitol.  So he
19  would have been the one that accumulated the bids, compared
20  them and made a recommendation, and responsible overall for
21  the execution.
22    Q.   So you're saying in 2020 Mr. Canning, through
23  OPTIS, worked for Vitol?
24    A.   That's correct.
25         MR. BECKSTEDT:    Objection to the form of that

99

1  last question, Lee.
2  BY MS. ROHN:
3    Q.   I think you said it would ultimately have been
4  Vitol who made the selection on the bid?
5    A.   Yes, that's correct.
6    Q.   And prior to 2020 had there been a 1-inch vent
7  line contemplated in 2019?
8    A.   Yes, it had been discussed for quite some time.
9    Q.   And at that point was -- in 2019 was Mr. Canning
10  still working for -- through IPOS?
11         MS. FRANCIS:    Objection.  Form.
12  BY MS. ROHN:
13    A.   I believe so, yes.
14    Q.   And would that have -- in 2019 would that have
15  been a pass-through project?
16    A.   I'd have to look at the budget from that year.  I
17  don't specifically recall that project.  It didn't happen;
18  so I don't remember how it was budgeted for that year.
19    Q.   Do you recall why it didn't happen?
20    A.   Similar to a lot of things.  It could have been
21  materials.  It could have been time.  It could have been
22  budget.  I don't specifically remember that one.
23    Q.   As to --
24    A.   I mean, the only other thing -- I mean, it could
25  have been COVID, because it was also COVID was just

100

1  starting in as we were collecting bids on that.
2    Q.   And was part of Petro's bid for the 2019 1-inch
3  vent line used in the bid for the 2020 vent line?
4         MS. FRANCIS:    Objection.  Foundation.  Calls
5  for speculation.
6  BY MS. ROHN:
7    Q.   2020 vent line bid.
8    A.   Again, I don't think I can speak to that.  To the
9  best of my knowledge, that bid was not put out by IPOS.
10    Q.   Well, did IPOS encourage Mr. Canning to allow
11  Petro to bid on -- bid on that 1-inch vent line in 2020?
12    A.   I don't think we encouraged or discouraged.
13  Petro was always invited to bid on projects.
14    Q.   Were you -- do you dispute that Mr. Canning had
15  taken the position that Petro hadn't timely bid on it, and
16  he wasn't going to consider the original 2019 bid?
17    A.   I'm not aware of that.
18    Q.   Do you remember Canning making accusations that
19  Petro and Traeger Brothers had acted improperly when they
20  allowed Petro to use a Traeger Brothers material
21  information on the 2020 bid?
22         MR. SIMPSON:    Objection.
23  BY MS. ROHN:
24    Q.   You may answer.
25    A.   I remember there was discussions at the time of

101

1  accusations.
2    Q.   What were --
3    A.   But specifically -- but specifically the
4  accusations, I do not know.
5    Q.   Who was making those accusations?
6    A.   I do not remember.
7    Q.   Remember if it was Mr. Canning claiming that they
8  were immoral?
9    A.   No, I don't know that at all.
10    Q.   Do you know what other countries bid -- companies
11  bid on that 2020 1-inch line?
12    A.   No, I don't know.  It was a Vitol project.
13    Q.   So what work did Traeger Brothers do between 2018
14  and 2021 at the propane terminals?
15    A.   They actually did no work.  They only provided
16  materials.
17    Q.   So would they -- that be on a bid process?
18    A.   No, not necessarily.  It's more of a procurement
19  process.  They're -- they were primarily procuring
20  materials for Petro's behalf, for our behalf.
21    Q.   And, ultimately, IPOS would pay for those
22  materials; is that correct?
23    A.   That's correct.  Unless it was, again, for a
24  Vitol project, then it would be passed through.
25    Q.   Did Traeger Brothers ever complain to anyone at

IPOS by DAVID SMITH

102

1 IPOS about Andrew Canning or OPTIS?

2 A. No. In fact, I've worked with Traeger Brothers

3 for more than 20 years, know the owner personally. Not to

4 my knowledge has there ever been any accusations.

5 Q. So it's your testimony on behalf of IPOS that

6 Traeger never -- Traeger Brothers never made the

7 observation that Mr. Canning was slowing jobs down and not

8 getting them done efficiently and costing additional money

9 by the way he was managing the jobs?

10 A. That's correct. There was a conversation, again,

11 between the owner and I specifically about potential issues

12 with Traeger, and that was never brought up.

13 Q. What issues were you discussing with Traeger?

14 A. Just general between, you know, the --

15 complaints and the concerns of resupply, the bidding, the

16 general business.

17 Q. Does IPOS dispute that in January of 2021 there

18 began to be holdbacks of payments to plaintiff on accounts

19 -- to Petro on accounts receivable?

20 MS. FRANCIS: What paragraph is this?

21 MS. ROHN: 30.

22 BY MS. ROHN:

23 A. IPOS disputes the characterization of what you

24 said, yes.

25 Q. What about the characterization is being

103

1 disputed?

2 A. Yes, that's related to the work. There's e-mails

3 that have been -- or documents that have been produced

4 specifically talking about, and the concern that Vitol had

5 not approved those projects. So -- and it wasn't IPOS

6 holding money back.

7 Q. But it was IPOS was supposed to pay it; correct?

8 A. In the pass-through, yes.

9 Q. So how could IPOS have an obligation to pay a

10 contractor and Vitol prevent it from doing so?

11 A. Because Vitol would not have paid IPOS for it,

12 because they didn't feel that the work was completed.

13 Q. Where in the contract between Petro and IPOS was

14 there a condition that Vitol would have to approve the work

15 in order for IPOS to get paid -- for Petro to get paid?

16 A. I'm not aware of any condition.

17 MS. FRANCIS: Objection to the extent that

18 question misstates the testimony, conflates various

19 things, lacks foundation.

20 BY MS. ROHN:

21 Q. And what was your understanding as to what

22 paperwork was missing in January of 2021?

23 MS. FRANCIS: Objection. Misstates the

24 witness' testimony.

25 BY MS. ROHN:

104

1 A. I would need to look at the documents related to

2 that e-mail. But I specifically remember it being

3 something to do with either the truck rack or a reverse

4 flow, which was a Vitol project, and that the budget hadn't

5 been approved, and I believe that -- I believe the e-mail

6 states that Petro mobilized on their own.

7 Q. Well, if Petro were to come in and mobilize on

8 their own and start doing work, how would that be allowed?

9 A. I guess what I'm specifically saying is

10 mobilizing meaning moving from one island to the other. I

11 -- because it was not my project, I do not know if they

12 performed actual work. But I mean the cost associated with

13 mobilization, per diem, flights, that was what was, I

14 believe, under dispute on that specific one.

15 Q. So who was the -- who ultimately had to approve

16 Petro being paid on those projects?

17 MS. FRANCIS: Objection. Form. Foundation.

18 Vague as to those projects.

19 MR. BECKSTEDT: Objection.

20 BY MS. ROHN:

21 Q. Can you answer my question, please?

22 A. It would be ultimately Vitol.

23 Q. In January of 2021, what work does IPOS claim

24 plaintiff was engaged in?

25 MS. FRANCIS: Objection. Foundation.

105

1 MS. ROHN: No. 31.

2 BY MS. ROHN:

3 A. Can you read that to me, please?

4 Q. No. 31 is "What work Defendant --" that's you,

5 IPOS, -- "claim Plaintiff was engaged in January 2021?"

6 A. The -- the same work that they had been doing

7 since the -- they had started working with us. I'm not

8 sure I understand.

9 Q. Was there a special project that they were

10 working on January of 2021?

11 A. I know that the 1-inch vent and the 3-inch vent

12 projects were going on or starting around then. But I'm

13 not familiar with any other specific project.

14 Q. And did Petro make any complaints to IPOS as to

15 Andrew Canning or Vitol preventing them from timely

16 performing the work?

17 A. Again, I think you need to tell me specifically

18 which project. I'm not sure I understand.

19 Q. This question is No. 31, which is what work was

20 -- IPOS claims that Petro was engaged in January 2021,

21 and whether or not they complained about that work that

22 Canning was preventing them from doing the work?

23 A. The -- again, without knowing the exact date or

24 having the document in front of me, that sounds like it was

25 more related to the RIO shades and panels and the time

IPOS by DAVID SMITH

---

**106**

1  required to get that work done.
2      Q.  So let's talk about the RIO shades.  I believe
3  David Nagle was involved in that project; is that correct?
4      A.  That's correct.
5      Q.  And then Mr. Canning as well; correct?
6      A.  That's correct.
7      Q.  And were you aware that there was a problem with
8  the design of those RIO shades, that it didn't work when
9  you tried to construct according to the design?
10     A.  From what I understand is that was the allegation
11 made by Petro.  I don't know that to be factually true.
12     Q.  Well, ultimately -- there were two RIO shades,
13 the St. Thomas job and the St. Croix job; right?
14     A.  Yes.
15     Q.  And, ultimately, on the -- I don't remember which
16 came first, St. Thomas or St. Croix.  So, ultimately, on
17 the St. Croix job -- well, first of all, isn't it true that
18 the St. Croix job took a lot more time than was expected
19 because of design issues?
20         MS. FRANCIS:   Objection. Foundation. Form.
21     Vague as to what is a lot more time.
22         MS. ROHN:    Please don't make speaking
23     objections.
24 BY MS. ROHN:
25     Q.  Isn't that true, sir?

---

**107**

1      A.  No.  I understand that it was due to improper
2  materials and unable to complete the drilling and not
3  having materials safe to do the drilling.
4      Q.  Where did you get that information?
5      A.  From various e-mails that have been produced.
6      Q.  From whom?
7      A.  From David Nagle and Andrew.
8      Q.  And this was a set pay job; correct?
9      A.  That's correct.
10     Q.  So the longer it took, the more Petro lost money;
11 correct?
12     A.  That's correct.
13     Q.  And --
14         MS. FRANCIS:    I'm going to just object related
15     to the foundation.  This witness is not here as a
16     Petro witness to know Petro's findings.
17         MS. ROHN:    Please stop making speaking
18     objections.
19 BY MS. ROHN:
20     Q.  Now, so it would certainly be in Petro's interest
21 to get this job done as quickly and efficiently as
22 possible, correct, sir?
23     A.  Again, that sounds correct.
24     Q.  And were you aware that it was Petro who
25 rectified the design problems and got the St. Croix RIO

---

**108**

1  shades done?
2      A.  Again, I don't know that I can say I -- I agree
3  with that.
4      Q.  In what way do you not agree with that?
5      A.  Because I have Petro stating that that's how it
6  was done, but I also have folks representing IPOS that say
7  it was, again, them not able to follow the directions that
8  took long, and finally it was the finish.
9      Q.  Do you know that the St. Thomas RIO shades were
10 then done exactly the way Petro had designed the St. Croix
11 RIO shades?
12     A.  Well, I don't believe Petro designed them, but
13 the way they installed them.
14     Q.  Correct?
15     A.  That I do -- yes, they did install 'em.
16     Q.  So, sir, when all this came up, did you ever have
17 anyone look at the original design of Mr. Nagle and
18 Mr. Canning for the RIO shades?
19         MR. SIMPSON:    Objection.
20 BY MS. ROHN:
21     Q.  You may answer.
22     A.  I'm not an engineer.  I do -- I wouldn't know
23 what I'm looking at.
24     Q.  Sir, did you have an independent engineer -- you
25 have two people saying contradictory things; correct?

---

**109**

1      A.  That's correct.
2      Q.  So how did you resolve that conflict?
3      A.  Ultimately, we -- we didn't.  We just moved on.
4  Similar to what I said earlier, when -- if you get ten
5  engineers in a room, there's ten different ideas.  they can
6  all work.
7         Once the project's done, we didn't go back to say how
8  do we -- we knew we'd never put additional ones in.
9      Q.  Was it Mr. Canning telling you that Petro didn't
10 know how to use drill bits, they didn't know how to do the
11 job, they were unprofessional?  That's somebody you're
12 contracting with.  What did you do to resolve those
13 criticisms?
14         MS. FRANCIS:    Objection.
15         MR. SIMPSON:    Objection.
16         MS. FRANCIS:    Compound.
17         MR. SIMPSON:    Objection.
18         MS. FRANCIS:    Objection. Foundation.
19         MR. BECKSTEDT:    Objection.
20 BY MS. ROHN:
21     Q.  What did you do --
22         MS. ROHN:    I note your objection.
23 BY MS. ROHN:
24     Q.  What did you do to resolve those conflicts?
25         MS. FRANCIS:    Same objection.

---

110

1  BY MS. ROHN:
2      A.   A conversation was held with Merlin and Andrew
3  and David.  And what I was able to determine, representing
4  IPOS in that, is that, yeah, there were definitely
5  disagreements, there were concerns, and then, ultimately,
6  there were people that were -- because of the work
7  assigned, some of those people that worked on that job were
8  not allowed back on-site.
9      Q.   Did you ever sit down with Petro to hear Petro's
10  view of what was going on?
11     A.   I did not.
12     Q.   Well, what did you do to make sure that
13  Mr. Canning wasn't making false representations to you?
14     A.   I don't know that I could characterize as false
15  representations.  He's making observations and comments.
16  And that Merlin and I had reviewed them, and, again,
17  instructed Andrew to continue to work on the Vitol
18  projects, which this RIO panel was one, and then we would
19  keep working on the IPOS as we had done.
20     Q.   Did IPOS have any discrimination training of its
21  employees?
22     A.   Yes.
23     Q.   And when did that discrimination training begin?
24     A.   From the moment before you actually started work,
25  you were given an employee handbook that sign that you

111

1  acknowledge the document, that it was reviewed with you.
2  And so every single employee went through that.  Again, I
3  had been told -- I wasn't there when it happened.  -- that
4  Mr. Figueira prior to my arrival had done the same with
5  contractors that were fully embedded, paid for by IPOS.
6  Additionally, we had --
7      Q.   So other --
8      A.   Sorry.  Go ahead.
9      Q.   Other than giving an employee a handbook that
10  says you are not supposed to discriminate, what else was
11  done as training?
12     A.   There were continual follow-up, as well as we use
13  a electronic version that's an annual refresher that all
14  employees are required to go through.
15     Q.   What did you do for continual follow-up?
16     A.   Periodically in the monthly safety meetings, we
17  addressed different topics.  We'd have employee meetings as
18  well.
19     Q.   In safety meetings you would bring up
20  discrimination?
21     A.   Absolutely.
22     Q.   Is that right, sir?
23     A.   Absolutely.
24     Q.   So would there be minutes of these safety
25  meetings?

112

1      A.   It would only be recorded as a safety meeting and
2  who attended.  But we did annual electronic refresher as
3  well.
4      Q.   And those are for employees.  What did you do for
5  contractors?
6      A.   We did no further follow-up.
7      Q.   Did you ever give any discrimination training to
8  Mr. Canning?
9      A.   That's what I said.  I did not.  Mr. Figueira had
10  said that he had done that prior to my arrival.
11     Q.   And as IPOS, what did that consist of?
12     A.   Again, it would be the -- the same set of
13  policies, the employee handbook, reviewing that IPOS does
14  not tolerate it.  In the event that you feel harassed, the
15  steps that you can take, up to including a phone number
16  that was posted on the wall that was an international
17  number to escalate as necessary.
18     Q.   So what does IPOS claim is a correct way to
19  certify welders?
20          MS. FRANCIS:    What topic is this,
21  Attorney Rohn?
22          MS. ROHN:    35.
23  BY MS. ROHN:
24     A.   Can -- can you read that to me, please?
25     Q.   Sure.  "What does defendant contend are the

113

1  correct ways to certify employees as welders, and what is
2  the basis for that claim?"
3      A.   We have our policy as to -- to what is required
4  for someone to be certified.  It's ultimately up to the
5  individual contractor to perform that certification.
6      Q.   What's the name of that policy?
7      A.   Again, I need to have the document in my hands to
8  be able to read you specific.  I'm not an engineer.
9  However, it requires the testing methods involved in the
10  certification, as well as during the work performed, the
11  amount of welds that would need to be x-rayed on a daily
12  basis and recertified if the welder didn't pass.
13     Q.   Okay.  So what would be the testing method, sir?
14  This is a subject you're supposed to be able to tell me
15  about.
16     A.   Yes.  Again, I would need to -- to pull the
17  policy, and I could read you specifically what it meant.
18  I'm not an engineer.  I can't speak effectively to how the
19  test is done.
20     Q.   And what policy is that you need look at?
21     A.   It was -- it was provided to you multiple times,
22  but it's -- it's the IPOS pipe welding policy.
23     Q.   So IPOS relies on that as to how welders are
24  supposed to be certified?
25     A.   That's the basis for performing welding on our

114

1  site. It's up to every company to certify their -- their
2  own welder and present the qualifications.
3      Q.  My question is:  What does IPOS claim is the
4  correct way to certify welders?
5      MS. FRANCIS:    Objection. Asked and answered.
6  BY MS. ROHN:
7      Q.  Please answer that question.
8      A.  Yeah.  Again, I would have to go to the policy
9  and -- again, I'm not a certified welder; so, therefore, I
10  would not be doing the certification.  I would tell you
11  what is in the policy and get an expert that could.
12     Q.  So that was my question.  Then I asked you, well,
13  does that policy say how to certify welders.  And then I
14  believe you told me the policy is how to do the welds and
15  how to test the welds, but it doesn't include how to
16  certify the welders.  Am I incorrect?
17     A.  What that policy does, it talks about the minimum
18  specs that are needed to perform the welding.
19     Q.  What does that mean?
20     A.  Again, I'd need to look at the policy, and I
21  could answer that better for you.
22     Q.  Well, does IPOS adopt the ASME --
23     A.  I'm sorry.  I didn't hear you.
24     Q.  Does IPOS adapt the ASME requirements?
25     A.  I believe those are listed in there, as well as

115

1  European standards as well, yes.
2      MS. FRANCIS:    Attorney Rohn, we have been
3  going for more than an hour. Practically an hour and
4  a half, and it is 12:20. Can we take a lunch break
5  when you get to a point that we can stop?
6      MS. ROHN:    Sure. I'm at the end here. I can
7  stop now. I can tell you that I'm probably going to
8  take most of the day today so...
9      MR. BECKSTEDT:    Why don't we take a break at
10  2 o'clock --
11     MS. ROHN:    No, sir, I'm going to go through
12  this witness and finish this witness. I am not going
13  to break at 2 o'clock.
14     MR. BECKSTEDT:    So we noticed Mr. Rivera about
15  a month ago for the date that was agreed to before --
16     First of all, we're still recording. Do we want
17  to go on a break and talk about this, or do we want to
18  do it on the record, 'cause I'm happy to do it on the
19  record.
20     MS. ROHN:    No, we can take a break. We can
21  take a break.
22     (A luncheon recess was taken at 12:21 p.m.)
23     (The afternoon session resumed at 1:12 p.m.)
24     MS. FRANCIS:    Continued objection to the
25  recording as stated previously.

116

1  BY MS. ROHN:
2      Q.  No. 36, "What is VTTI, and who are its owners?"
3      A.  VTTI is the name of the corporation. As far as
4  the owners, there is public shareholders, but I don't know
5  exactly who is the owners of them.
6      Q.  What did you do to find out?
7      A.  I mean, so I can tell you what it's published on
8  generally found numbers; however, I don't know the names of
9  the various entities. So I can tell you sort of big names
10  of who owns what for percentage wise, but I don't know if
11  there's a specific entity that might be tied into that, if
12  that makes sense.
13     Q.  Tell me what you know, please.
14     A.  Okay.
15     MS. FRANCIS:    Just for the record, I'm gonna
16  object. This is a deposition of IPOS, but to the
17  extent IPOS has knowledge or this witness has personal
18  knowledge.
19  BY MS. ROHN:
20     Q.  You may answer.
21     A.  Yeah. Vitol is 45 percent owner.
22     Q.  Which entity is that?
23     A.  That's what I don't know, ma'am. I don't know
24  the name of the entity. I just -- that's what I mean by
25  generically Vitol.

117

1      Q.  Okay.
2      A.  ISM is a 45 percent owner.
3      Q.  That makes it 90.
4      A.  Yeah. Yeah. Sorry. I thought you were taking
5  notes. I was waiting for you to look at me.
6      And ADNOC is 10 percent.
7      Q.  Would you spell that?
8      A.  Well, it's another acronym. It's A-D-N-O-C,
9  Abu Dhabi National Oil Company.
10     Q.  Does VTTI have any affiliates with IPOS?
11     A.  Not to my knowledge, no.
12     Q.  I thought that IPOS was a subsidiary of VTTI?
13     A.  Well, again, I don't know the name of the entity,
14  whether VTTI is an entity itself, and how the corporate
15  secretary rolls up. Again, I know that IPOS is part of
16  VTTI Technical Services B.V., who owns it. But how it gets
17  there, I don't know.
18     Q.  Has VTTI done any work at WAPA since 2017?
19     A.  No, it has not.
20     Q.  And has it done work with OPTIS or Andrew Canning
21  in the past six years?
22     A.  No, it has not.
23     Q.  Did IPOS ever use VTTI's standards or procedures
24  during plaintiff's contract with IPOS?
25     A.  I'm sorry. Can you repeat that, ma'am?

IPOS by DAVID SMITH

---

118

1    Q.   Sure.  Did IPOS ever use VTTI's standards or
2    procedures during its contract with Petro?
3    A.   Yes.
4    Q.   And were those -- and what were the policies and
5    procedures --
6    A.   I'm sorry.  Let me back up.  The policies work
7    came from VTSS.
8    Q.   Okay.  Do you know why on the documents that were
9    produced it says VTTI procedures?
10   A.   It's just a letterhead.  I don't know the answer
11   to that.
12   Q.   So in No. 38, "What complaints Andrew Canning
13   started making of Plaintiff's welds in March 2021?"
14   A.   I'm sorry.  Say that again.
15   Q.   What complaints Andrew Canning began to make of
16   plaintiff's welds in March of 2021?
17   A.   There were documents that were produced that
18   talked about coloring, his observations of the placing of
19   the welds, and how they were finishing related to the
20   welds.
21   Q.   And what expertise, to your knowledge,
22   Mr. Canning have as to weldings, coloring, placing, or
23   finishes?
24        MS. FRANCIS:    Was that a category,
25   Attorney Rohn?

---

119

1        MS. ROHN:    Yes.
2        MR. SIMPSON:    Objection.
3   BY MS. ROHN:
4    Q.   Can you answer my question, please?
5    A.   Yes.  I'm not aware.
6    Q.   Well, when he started making these complaints,
7   did you do anything to determine whether or not he had the
8   qualifications to make these complaints?
9    A.   No, we did not.
10   Q.   Well, would -- do you assume because someone is
11   an engineer they know about the details of welding?
12   A.   No, I do not.
13   Q.   So when he made these complaints, did you ask
14   Mr. Canning what expertise you have to make these
15   complaints?
16   A.   No, I did not.
17   Q.   Why not?
18   A.   Because, again, it was an observation made and
19   there was -- we were trying to determine it, and then as
20   part of the project, the bidding and the scope, all of the
21   qualifications were supposed to be sent in.  And when they
22   started to be reviewed, that's when some of the questioning
23   came up.
24        And there was e-mail back forth.  He was very clear.
25   There were e-mail back and forth with Petro and with Andrew

---

120

1   as to some of his concerns on the coloring and -- and some
2   of the other things related to it.
3    Q.   Okay.  Well, what about the fact that he was
4   specific about the coloring makes you think he had any
5   knowledge whether or not that coloring made any difference
6   or not?
7    A.   I guess, I should actually state that this wasn't
8   our project.  This was a Vitol project.  So while even if
9   we he had concerns, we could raise them, but it wasn't us
10   making the decisions or doing the investigation.
11   Q.   Who was doing the investigation?
12   A.   Well, again, you'd have to ask Vitol.  It was not
13   a Vitol -- it was not an IPOS project, this 3-inch vent
14   line.
15   Q.   Well, sir, weren't you part of that
16   investigation?
17   A.   I was part of the investigation to determine
18   whether or not records were falsified, not to determine
19   whether or not the welders were qualified.
20   Q.   And who do you claim was involved in the
21   investigation as to whether the welders were qualified?
22   A.   So, again, Andrew -- I'm sorry.  Adrian was
23   copied on the e-mail.  We referred to Andreas Constantinou
24   for support, and there were other people that were listed
25   on the e-mails where, again, determination was trying to be

---

121

1   made, and that's where the request for documents and the
2   request for testing was made.
3    Q.   Who is Mr. Constantinou?
4    A.   He's the technical director.
5    Q.   For whom?
6    A.   Well, again, I don't know the specific entity,
7   but in Rotterdam.
8    Q.   Did he ever come and look at any of the welds?
9    A.   He did not.
10   Q.   Did he ever send anybody to come look at any of
11   the welds?
12   A.   He did not.
13   Q.   How would he have an involvement in a Vitol IPOS
14   contract to be the investigator?
15        MS. FRANCIS:    Objection.  Misstates the
16        witness' testimony.
17   BY MS. ROHN:
18   Q.   You may answer.
19        MR. BECKSTEDT:    Same -- well, objection.
20   BY MS. ROHN:
21   Q.   You may answer.
22   A.   Again, he wasn't there to determine whether the
23   welds were accurate or not.  Only an inspection company can
24   do that by x-raying.  And so at that point of the
25   conversation, there was concerns about the qualification

---

122

1 documents that were presented to us, and we asked for his
2 technical support as we have, as mentioned earlier, service
3 agreements, whether it's HR or technical or HSE or
4 computers, to help us for areas that we're not versed in.
5 So that's what started the discussion.
6    Q.   So what service agreement was this --
7 Mr. Constantinou involved in the welding qualification,
8 what service agreement was that?
9    A.   It's all one encompassing where we pay a service
10 fee for a corporate overhead support.
11    Q.   Who did you pay a service fee to?
12    A.   I believe --
13    MS. FRANCIS:   Objection.  Outside the scope of
14 the --
15 BY MS. ROHN:
16    Q.   You may answer.
17    A.   I really -- I don't know off the top of my head.
18 I'd have to look at the invoice.
19    Q.   So you're telling me, as a general manager, you
20 monthly pay a service fee, and you don't know who it went
21 to?
22    A.   It's an annual fee, and it goes to a VTTI entity,
23 but I don't want to mistake and give you the name of the
24 wrong entity.
25    Q.   And have you worked with Mr. Constantinou before?

123

1    A.   Yes, I have.
2    Q.   And on what occasions have you worked with him
3 before?
4    A.   Never personally, just in global calls.  We have
5 technical global calls, budgeting, various projects.
6    Q.   What do you mean "various projects"?
7    A.   Well, for example, at Seaport we worked on a
8 $16 million dock line project, and he was involved in that.
9    Q.   So what is your understanding of the knowledge of
10 the qualifications to be certified as a welder?
11    A.   Again, I think that's what he was trying to
12 determine, and Petro wasn't forthcoming with the
13 documentation to make that determination.
14    Q.   And what was -- what was missing to make that
15 determination?
16    A.   Again, it's been documented to you.  I will need
17 to get the specifics.  It gets into the technical based
18 upon the, again, documents that have been provided.
19    Q.   Which documents are those?
20    A.   As part of the discovery, the e-mails going back
21 and forth with Adrian on the e-mails related to questioning
22 about what welding procedures and what we were trying to
23 determine.
24    Q.   Now, you -- are you not aware of the fact that
25 Petro paid Versa to test the welds to see if the welding

124

1 done on the 3-inch line project passed the welding test?
2    MS. FRANCIS:   Objection.  Form.  Foundation.
3 BY MS. ROHN:
4    Q.   You may answer.
5    A.   I am aware that as part of the bid process and
6 the document provided by Vitol that there would be a
7 percentage of welds inspected by a third party inspection
8 company, yes.
9    Q.   Was that percentage 10 percent?
10    A.   Yes.
11    Q.   And in fact, did an independent company, Versa,
12 test the welds?
13    A.   Yes.
14    Q.   And did they come in at less than 10 percent?
15    MS. FRANCIS:   Objection.  Form.
16 BY MS. ROHN:
17    Q.   You may answer.
18    A.   No, I think you're -- I think you're incorrect.
19 They -- I don't know the exact percentage.  They -- they
20 x-rayed 10 percent of the welds.  It wasn't a 10 percent
21 failure rate.  It was the number of welds.
22    Q.   Correct.  You're correct.  I'm sorry.
23    They did in fact do 10 percent, and they qualified the
24 job as having passed; correct?
25    A.   That's correct.

125

1    Q.   Okay.  And have you had any engineer that said
2 that the way they -- the percentage that they -- of welds
3 they tested and their -- the way they tested those welds
4 was in any way incorrect?
5    A.   Not that I'm aware of.
6    Q.   And is it -- do you have any dispute that Versa
7 is a reputable welding testing company?
8    A.   I do not.
9    Q.   Now, to your knowledge, did anybody voice the
10 belief that plaintiff's welding certificates were forged or
11 illegitimate?
12    A.   Yes.
13    Q.   Okay.  And who made those allegations?
14    A.   Andrew Canning.
15    Q.   And who did he make them to?
16    A.   To me.
17    Q.   Anybody else?
18    A.   I -- I don't know the answer to that.
19    Q.   Weren't there other people on the e-mail that he
20 sent to you?
21    A.   There may have been.  I don't want to guess and
22 misrepresent, but I know it was me.  And as the
23 representative, that's the most important.
24    Q.   And what was -- do you know what the basis of
25 Mr. Canning's statement that the welds were -- the

IPOS by DAVID SMITH

126

1  certifications were forged or illegitimate?
2      MR. SIMPSON:    Objection.
3      MS. FRANCIS:    Objection. Compound.
4  BY MS. ROHN:
5      Q.  You may answer.
6      A.  There were several things listed on there; so I
7  don't know that I can give an all-encompassing.  The first
8  one is he believed that the PDF document font lineup wasn't
9  correct.  The second was that he had verified with Acuren
10 that the person who had been designated to -- that said
11 they tested the person hadn't worked there for several
12 years.  And so that's what started the initial.  There were
13 some other ones.  I'd have to look at the document to say
14 that.
15     Q.  So Mr. Castro offered to speak to you; correct?
16     A.  I never spoke to Mr. Castro.
17     Q.  That's not my question.  He offered to speak to
18 you; correct?
19     A.  He never sent me an e-mail.  He never called me.
20 That's -- that's what Mr. Melendez has said.  But
21 Mr. Castro did not say that to me.
22     Q.  Mr. Castro in a letter said he offered to come to
23 St. Croix and recertify them, didn't he?
24     MR. SIMPSON:    Objection.
25     MS. FRANCIS:    Objection. Argumentative.

127

1      MS. ROHN:    You know, you're just trying to
2  waste my time.  It's not going to work.  I'm taking
3  all this objection stuff off.
4      MS. FRANCIS:    I'm not trying to waste your
5  time.  I am allowed to make objections for the record.
6      MS. ROHN:    I'm not going to argue with you.
7  BY MS. ROHN:
8      Q.  Would you answer my question, please.
9      A.  The letter wasn't signed, had no letterhead.  We
10 have no idea who Mr. Castro is.  And our contract was not
11 with him.
12     Q.  Weren't there e-mails back and forth about how
13 you were going to talk to Mr. Castro and who was going to
14 be present?
15     MR. SIMPSON:    Objection.
16     MS. ROHN:    Objection noted.
17 BY MS. ROHN:
18     Q.  You may answer.
19     A.  No, that's how Petro had asked.  We had always
20 said we do not intend on speaking to him till we get the
21 documentation and can review anyway.  Which we've still
22 not, as of today, not received.
23     Q.  Well, weren't there things that said let's talk
24 to him, but let's not have Chad and Adrian present?
25     MR. SIMPSON:    Objection.

128

1  BY MS. ROHN:
2      Q.  Weren't there, sir?
3      A.  I'm not familiar with that.  I -- I don't know
4  it.
5      Q.  So Mr. Constantinou, what -- what advice did he
6  give or input did he give into the investigation?
7      A.  He was the one that reviewed what we had, and he
8  was the one that assisted with compiling a letter to go
9  back to Petro to ask them for additional documentation to
10 help us sort through the certification.
11     Q.  And is that his sole participation in this
12 investigation?
13     A.  Yes.
14     Q.  What investigation did Mr. Stoker have in this --
15 what participation did Mr. Stoker have in this
16 investigation?
17     A.  To my knowledge, none.
18     Q.  Do you know why he was copied on e-mails?
19     A.  I do not.
20     Q.  What participation did Mr. Canning have in this
21 investigation?
22     A.  He had none.
23     Q.  Wasn't he the guy that say I think there's
24 anomalies in this testing certificate?
25     A.  Yes, he did.

129

1      Q.  And didn't he participate in all the discussions
2  as to whether or not to meet with Mr. Castro and what to do
3  next?
4      A.  No, he did not.
5      Q.  Are you saying he wasn't on the e-mails as to
6  whether or not to meet with Mr. Castro?
7      A.  No.  You asked if he was involved in all the
8  discussions.  He was not involved in all the discussions.
9      Q.  Was he involved in the e-mails about whether or
10 not to talk to Mr. Castro?
11     A.  I'd need to look at the e-mail.  I don't recall,
12 but he was not part of the investigation.  This was -- he
13 was not an IPOS employee.  We did not have a contract in
14 paying his company.  He brought forward an allegation, and
15 we acted -- we were investigating based upon that.
16     Q.  So is it your belief that because the letter
17 wasn't signed that it was a forgery?
18     MS. FRANCIS:    I'm going to object to the
19 extent that misrepresents the witness' testimony.
20     MS. ROHN:    Noted.
21 BY MS. ROHN:
22     Q.  Answer my question, please.
23     A.  No.  There were several things.  We never even
24 got to that point because of the fact that the testing
25 itself was never produced.  However, as mentioned, the

IPOS by DAVID SMITH

---

130

1  dates were different dates than it was sent.
2      We don't know who Mr. Castro is. It was
3  misrepresented who he actually worked for to certify this,
4  and he wasn't in the country. Where he did offer at some
5  point to go back, according to the e-mail, but he wasn't
6  even in the -- in this hemisphere.
7      Q. Well, I thought you originally said we didn't get
8  in contact with Mr. Castro because the letter wasn't dated
9  and it wasn't signed. Is that not what you told me?
10     A. Well, I guess that wasn't the only thing. There
11 were several factors to it.
12     Q. Well, did you think someone forged that letter?
13     A. Again, I asked for whether or not these documents
14 were qualified. It's -- I don't know if you can consider
15 it a forgery when it's not signed.
16     Q. But did you think someone other than Mr. Castro
17 wrote that letter?
18     A. As I've said, I have no idea who Mr. Castro is
19 so -- all I know is that the company that was listed as who
20 he was doing the inspection for said he did not work for
21 them. So whether -- whether his qualifications are, the
22 document that was presented to us signed by Mr. Melendez
23 misrepresented who he was working on behalf of.
24     Q. Okay. So the form -- Mr. Castro never spoke to
25 you. The form that he put the information on indicated it

---

131

1  was an Acuren form; correct?
2      A. No, it was signed as the company Acuren. I
3  believe the form was a generic form, and it may have been
4  populated by Petro. I don't know where the form came from.
5  It's not the same -- it's not the same document that Petro
6  provided us concerning Daniel Martinez, for example.
7      Q. Did you understand that Mr. Martinez was tested
8  at a different time than the rest of these people?
9      A. No, I completely understand that.
10     Q. So did you then go to Petro and Adrian and say to
11 him, who is this Mr. Castro? What's his experience?
12     A. I'd have to look at exactly what was said in all
13 of the e-mails, but we asked for multiple things. We've
14 produced those files, and we asked for multiple things to
15 try to determine the validity of the welding.
16     Q. Do you know that Mr. Castro is the person that
17 certified all the welders at HOVENSA?
18         MS. FRANCIS:   Objection. Foundation.
19         MR. SIMPSON:   Objection.
20 BY MS. ROHN:
21     Q. Do you know that, sir?
22     A. No, I have no idea. I don't know --
23         MR. BECKSTEDT:   Same objection.
24 BY MS. ROHN:
25     Q. Sir, did you ever ask anyone does anybody know

---

132

1  what the qualifications of Mr. Castro are?
2      A. Again, it wasn't my responsibility to do that.
3  It was my responsibility to get the documents related to
4  the training -- to the testing.
5      Q. Did you -- were you aware that Mr. Castro had
6  certified the welders at Diageo?
7         MS. FRANCIS:   Again, objection. Foundation.
8         MR. BECKSTEDT:   Same objection.
9  BY MS. ROHN:
10     A. No, I don't work for Diageo. I have no idea.
11     Q. And when you keep saying the test results, why do
12 you think that there's a test result when he was doing
13 these POD test?
14     A. So if you look at the VTTI, VTSS, IPOS document
15 for welding, it talks about the testing and the
16 qualifications required, and so how that's done. And it is
17 the responsibility of the contractor, and so -- so again,
18 as to the testing method, I can't speak to that.
19     Again, there were concerns about the documentation,
20 and that's what we tried to find out more details
21 surrounding that, and never received them.
22     Q. Well, weren't -- didn't you keep asking for the
23 tests themselves?
24     A. Yes, that was one of the requests.
25     Q. Did you understand this was retesting, and so

---

133

1  there are tests -- there are no welds saved or tests saved;
2  it's a recertification?
3         MR. SIMPSON:   Objection.
4         MS. FRANCIS:   Objection. Foundation.
5  BY MS. ROHN:
6      Q. Sir, answer my question.
7      A. I'm sorry, I can't speak to that. I'm not
8  qualified in welding testing.
9      Q. Well, then why were you asking for tests if you
10 weren't certified to know whether or not there were tests?
11     A. Again, as my role as representative, I was the
12 one sending the e-mails and having the experts asking
13 questions based upon that.
14     Q. And that expert was supposedly Mr. Constantinou?
15     A. Yes.
16     Q. What was Mr. Constantinou's expertise in welding?
17     A. I don't know the answer to that.
18     Q. Then how did you know he was an expert?
19     A. Again, maybe I'm stating this incorrectly. It
20 was the question of the documentation or the methods on how
21 that was done that was never provided by Petro.
22     Q. You said you relied on the expert on that issue.
23 How did you know Mr. Constantinou was an expert on that
24 issue?
25     A. That's -- that's -- that was the person that I

---

IPOS by DAVID SMITH

---

134

1  had gone to in VTTI for other issues. That's his role. If
2  he was not, he would have put me in touch with someone
3  else.
4      Q.  But you had gone to Mr. Constantinou on other
5  welding issues before?
6      A.  I had never seen this in my career, so no.
7      Q.  So why did you want the full inspection and test
8  plan?
9      A.  Again, as I said prior, I was taking what the --
10  the qualified people in the company had asked, and as
11  representative of the company, had passed it on to be
12  tested. I'm not an expert. I can't speak to that.
13      Q.  Well, how did you determine that these were
14  reasonable requests to be made by IPOS if you didn't know
15  what they were about?
16      A.  Again, it was never -- it was never stated by
17  anyone that they were unreasonable, and so, therefore, we
18  were just asking for documentation to try to clear the
19  name. And when we didn't get that forthcoming, that's when
20  we decided to terminate the contract for lack of trust.
21      Q.  So did you get the full inspection and test band
22  -- plan?
23      A.  We did not.
24      Q.  Not in that Dropbox?
25      A.  There's documents were on and then gone.

---

135

1      Q.  I have no idea what that means.
2      A.  So there were some documents initially, and they
3  were immediately removed. So they're still not there to
4  this day. So I don't know what was put on there.
5      Q.  Sir, do you understand that if you don't download
6  a Dropbox within a certain period of time, the documents
7  are no longer there?
8          MR. SIMPSON:  Objection.
9  BY MS. ROHN:
10      A.  I do understand that. It was less than two
11  weeks, and the documents were removed.
12      Q.  How do you know they were removed rather than the
13  fact that the time span for that Dropbox had -- had ended?
14          MR. BECKSTEDT:  Objection.
15          MS. ROHN:  Noted.
16  BY MS. ROHN:
17      Q.  Sir, answer my question.
18      A.  They're still documents there today, but not all
19  the documents that we requested. So I'm not aware. I'm
20  not an expert in Dropbox, but that some would automatically
21  auto delete and not others.
22      Q.  Well, did -- when that happened and they -- and
23  they, quote, disappeared, did you contact Mr. Melendez and
24  say some of the documents in the Dropbox are not in there
25  anymore?

---

136

1      A.  They disappeared after we had given the
2  termination notice.
3      Q.  So at the time you gave the termination notice,
4  were -- was there in the Dropbox the full inspection and
5  test plan?
6      A.  Not to my knowledge, no.
7      Q.  Do you know what that is, sir?
8      A.  I would know if I saw it, yes.
9          But we had asked for multiple documents and not all
10  the documents were there.
11      Q.  Sir, I'm just asking about that, sir. One at a
12  time.
13          So what do you think one of those looks like?
14      A.  So I didn't have -- I mean, I would have to look
15  at one. If you put one in front of me, I could tell you
16  what it looks like. But it shows the x-ray -- it shows the
17  weld plan, the weld sites. Again, I was relying on the
18  technical expertise of our team.
19      Q.  Daily records for welding, filling and field
20  inspections. Did you get those?
21      A.  Again, I would need to look at the -- the
22  documents that we produced for you to be able to tell you
23  what was missing. I couldn't specifically tell you.
24      Q.  Did you get the mechanical tests of WPQs?
25      A.  Those were the initial documents. Yes.

---

137

1      Q.  Okay. Did you have conversations with
2  Mr. Canning about cc'ing to have conversations with Petro
3  or contractors' employees?
4      A.  Merlin instituted that, and I was part of that
5  conversation, yes.
6      Q.  And why did you have that conversation?
7      A.  Merlin, who was on scene, felt that there was a
8  lot of tension, and so because of the fact that Andrew was
9  not an IPOS representative, we instructed him to only have
10  the conversations that related to the Vitol projects and
11  let us -- I say us, meaning IPOS, handle the conversations
12  related to other issues.
13      Q.  Did IPOS and Petro work directly on inspecting
14  propane vessels in a weld tie into an existing propane pipe
15  without the involvement of Andrew Canning?
16      A.  Yes.
17      Q.  And why did you do so without the involvement of
18  Andrew Canning?
19      A.  Again, that's considered general maintenance.
20  That was not a project.
21      Q.  Was Mr. Canning told to not be involved in that?
22      A.  Not that I'm aware of, no.
23      Q.  So tell me, sir, the reasons for the termination
24  of Petro's contract?
25          MR. SIMPSON:  Objection.

---

IPOS by DAVID SMITH

138

BY MS. ROHN:

A.    When -- when the accusations were brought to us about the unqualified welders, we -- we felt that we needed to protect IPOS' integrity.  And when the documents were never provided us to certifying the welders, we decided that it was a lack of trust with them and then decided to cancel the contract at that point.

Q.    And was the reason that you felt there was a lack of trust because -- one of the reasons, because Mr. Canning said that -- brought to your attention he thought the certification was illegitimate and forged?

MR. SIMPSON:    Objection.

BY MS. ROHN:

Q.    You may answer.

A.    It certainly was one of the main ideas that was brought forward as to the work that Petro was providing for us.

Q.    Now, up until those certifications, had you had certifications of the welders before?

A.    Yes.

Q.    Had any problems with them?

A.    Again, I gonna refer back to Danny Martinez.  It was a different certification, so no.  The -- the policy itself also says that they're supposed to be wearing a -- or have on their person a certification card, and he's the

139

only one I can recall that ever had that.

Q.    There had been other welding done -- done on jobs by Petro's workers before; correct?

A.    Different welders, correct.

Q.    Mr. Martinez wasn't the only person that had done welding prior to this; correct?

A.    Correct.

Q.    Have you had any problems with any of those welds?

A.    Not to my knowledge, no.

Q.    They'd all passed the test; right?

A.    Yes.  Well, the 10 percent required pass, yes.

Q.    Well, but that is the test, isn't it, sir?

A.    It is.  In the event here after the termination of the contract, because we were unable to -- to validate the welds, we then did a hundred percent inspection on the 3-inch.

Q.    Well, was it you were unable to validate the welds or you were unable --

A.    The welders.  Yeah, the qualification of the welders; so, therefore, we put a hundred percent inspection.

MS. FRANCIS:    Mr. Smith, can I just remind you that only one person can talk at a time.  So if you would attempt to allow Attorney Rohn to finish her

140

question in its entirety before you get to your answer.

THE WITNESS:    Sorry.

BY MS. ROHN:

Q.    No worries.  It happens.  It's all the time.

MS. FRANCIS:    I'm trying to make the court reporter's job easier.

MS. ROHN:    Okay, let's just move along, shall we.

BY MS. ROHN:

Q.    So did you have any reason to think that the welders that had worked previously for -- on the IPOS projects were not qualified welders?

A.    No.

Q.    And what made -- what made you think because the welders' certificates had anomalies, that meant that the welding itself was no good?

A.    Well, for this project those welders had never worked with us before.  And, therefore, because of the fact that -- that it was a Vitol project, but Vitol's concern and our concern is that the integrity of it, if we're using welders -- again, the policy from VTTI also talks about -- about unqualified welds and welders and x-ray and so -- on what was done.  So that caused us to then verify in order to get an appropriate engineering sign-off to do a hundred

141

percent inspection.

Q.    Did anybody from WAPA ask you to do a hundred percent inspection?

A.    I don't know specifically what WAPA asked.  However, there's several e-mails and documents relating to where they wanted the documents, the weld reports.  There was even an e-mail document produced that talk about weld testing requirements.

I believe once we had the issue -- I don't want to speak for Vitol.  -- I believe they would have to speak to the conversation they had to WAPA about the hundred percent welding inspection.

Q.    You -- you, IPOS --

A.    No, it was not my project.

Q.    Sir, if you let me finish my question.

A.    Sorry.

Q.    You, IPOS, never told WAPA we're gonna do a hundred percent inspection of the welds?

A.    Not that I'm aware, no.

Q.    And in fact, without the additional documents, WAPA accepted the No. 3 vent line and began using it; correct?

A.    Yes, I believe that's correct.

Q.    And so when IPOS was let -- excuse me, when Petro was let go, who was hired to do the work Petro had done?

IPOS by DAVID SMITH

142

1    A.    TTI/Peak.
2    Q.    Is that Tampa Tank something?
3    A.    Yes.  I don't know -- I don't know what it stands
4  for, but the name of the entity was TTI/Peak.
5    Q.    Where were they out of?
6    A.    The U.S. Virgin Islands, I believe.
7    Q.    And how did you know who they were?
8    A.    Again, there were multiple contractors on the
9  island.  It's -- it's -- it's a small island.  I mean, we
10  -- we knew people -- they were available and called them up
11  to see if they would be willing to step in.
12    Q.    And who did you speak to at TTI/Peak?
13    A.    I believe Fred Rikiyo (phonetic).
14    Q.    And did you contact TTI/Peak before or after you
15  terminated Petro?
16    A.    After.
17    Q.    Weren't you looking for a contractor to be put in
18  place before you gave Petro their termination letter?
19    A.    No, we did not sign a contract with anyone.
20    Q.    Let's talk about silent contract.  Weren't you
21  looking for contractors before you ever provided Petro with
22  a termination letter?
23    A.    Not that I recall, no.
24    Q.    Did somebody have to -- were there bids for this
25  new company?

143

1    A.    There were not.
2    Q.    Did you have to bid the job?
3  Why not?
4    A.    Same reason we didn't when we put Vivot in.  Same
5  reason when we put Petro in.  We were always planning on
6  going for a formal maintenance contract.  However, we
7  needed to make sure that we had somebody in there that
8  could respond in the event we had maintenance projects.
9    Q.    And how did IPOS --
10  What happened to the equipment rental agreement with
11  Petro?
12        MS. FRANCIS:    Objection.  Misstates the
13        record.  Foundation.
14  BY MS. ROHN:
15    Q.    You can answer.
16    A.    Yeah, I mean, I would -- I'm not a hundred
17  percent sure.  I really don't know.  I believe Tampa Tank
18  just started renting equipment and sending it to us as
19  well.
20    Q.    Well, how long did it take before Petro could get
21  their equipment off of IPOS' property?
22    A.    Some of the hand tools and things like that, they
23  had access to right away.  There was an e-mail from Adrian
24  about 10 days later, and we said that he was welcome to go
25  pick it up.  As to the exact date that they left, I really

144

1  don't know the answer to that.  I really don't answer
2  of when the last day the equipment was removed.
3    Q.    Didn't you send an e-mail that said nobody that
4  works for Petro was allowed on the property?
5    A.    Initially, yes.
6    Q.    Was there a determination that outstanding
7  invoices would not be paid?
8    A.    So there was a discussion again with counsel, and
9  so I --
10        MS. FRANCIS:    I'm just going to remind the
11        witness not to testify about any discussions with any
12        counsel that has provided counsel to IPOS.
13  BY MS. ROHN:
14    A.    We paid all of the invoices that were
15  attributable to IPOS.
16    Q.    That were attributable to what?  IPOS?
17    A.    IPOS.  Yeah.  Yes.
18    Q.    And initially, though, you did not; correct?
19    A.    That's correct.
20    Q.    And what made you decide to pay them?
21    A.    Well, we had to verify whether it was for the
22  maintenance, whether it was for the project, what was --
23  what was related to what.  We had to go through each
24  invoice and determine.
25    Q.    Did you refuse to pay for the spool, the 8-inch

145

1  spool?
2    A.    Yes.
3    Q.    Why?
4    A.    It was determined it wasn't built to specs that
5  it was supposed to be.
6    Q.    Wasn't the reason because it had welding on it
7  that you didn't know whether or not was done by certified
8  welders?
9    A.    I don't recall at this point, but that may be
10  correct.
11    Q.    Do you recall what information was requested on
12  July 27, 2021, of Petro?
13    A.    I would need to look at that document to -- to
14  refresh my memory.
15    Q.    What was the basis of selecting
16  Versa Integrity Group to inspect plaintiff's welds --
17  welding after plaintiff was taken off the job?
18    A.    I believe it was two reasons.  One was that was
19  who Petro had already hired, and who had done it, and they
20  were familiar with the welds.  Therefore, you know, it
21  wouldn't be disputed as to their capabilities.  And, number
22  two, I believe they at the time were the only inspection
23  company with source material in order to do the radiography
24  required.
25    Q.    And what was the result of their testing?

IPOS by DAVID SMITH

146

1    A.  Again, I'd have to look at the exact numbers, but
2  there -- there were identified that there were failures on
3  some of the welds that needed a failure, some were recut,
4  some were reworked.  Again, I'd need to look at document to
5  give you the exact number.
6    Q.  According to the -- whether or not the weldings
7  been correctly done, it's -- in order for welding to be
8  correctly done, every weld doesn't have to pass the test,
9  correct, sir?
10    A.  That's correct.
11    Q.  So do you have any evidence after having Versa
12  look at it, that that weld -- the welding as a whole did
13  not pass the welding certification requirements to prove
14  the welding done?
15    MS. FRANCIS:    Objection.  Form.
16  BY MS. ROHN:
17    Q.  You may answer.
18    A.  I'm not a welding expert; so I wasn't able to
19  make that determination personally.
20    Q.  Did Versa tell you?
21    A.  Versa gave us the -- the reports.  We didn't ask
22  their conclusions.  We took the reports and corrected the
23  welds that failed or that needed to be reworked.
24    Q.  And who corrected those?
25    A.  Tampa Tank.  TTI/Peak.  Sorry.

147

1    Q.  Did you somehow form the conclusion, IPOS, that
2  somehow those needed to be corrected?
3    A.  So we felt that, based upon how we weren't able
4  to verify the qualification of the welders, that, yes, in
5  order to do this job correctly, all of the -- the welds
6  that were found to need repairs were to be corrected.
7    Q.  But hadn't WAPA already begun using the 3-inch
8  vent line by that time?
9    A.  I think you can attribute that similar to
10  construction.  You have a punch list, means there are still
11  things that you're trying to correct and make -- make it
12  based upon the standards that you set.  Doesn't mean it
13  can't be used.
14    Q.  Well, WAPA didn't put that on the punch line, did
15  they?
16    MS. FRANCIS:    Punch line?
17    MS. ROHN:    Punch line.  That's what he said, a
18  punch list.
19  BY MS. ROHN:
20    Q.  Did they put that on a --
21    A.  Punch list.  Punch list is what I said, yeah.
22  Again --
23    Q.  Did WAPA put --
24    A.  I think in --
25    Q.  Go ahead.

148

1    A.  -- that case -- no, it's a question for Vitol
2  again.  The project was with Vitol and WAPA.  We were help
3  facilitating.
4    Q.  After plaintiff's contract was terminated, was
5  any additional documentation asked of from plaintiff?
6    A.  Yes.
7    Q.  What additional documentation was that?
8    A.  Again, it was a Word document that was sent to
9  Petro, and it -- actually, I -- I would need to look at the
10  document to get the exact date.  It may have been sent
11  beforehand, but it was trying to validate all the various
12  projects that were done for books, qualification books.
13    Q.  And those were verification books that had never
14  been asked at the time that the work had been completed;
15  correct?
16    A.  That's correct.
17    Well, let me -- let me qualify.  For the IPOS ones,
18  yes.  For the Vitol projects that were listed on there, I
19  can't speak to that.
20    Q.  Now, did not -- did Petro offer to repair any of
21  the welds for free?
22    A.  I don't know about for free, but they did offer
23  to repair their welds.
24    Q.  And who was -- who was involved in the decision
25  not to allow them to do so?

149

1    A.  Ultimately, that would be me.
2    Q.  And why did you decide not to let them do so?
3    A.  Again, due to the lack of trust, we did not want
4  to pursue that matter.
5    Q.  And the lack of the trust is again this question
6  about certifications?
7    A.  Correct.  The qualifications, yes.
8    Q.  And was the repair work to the welds put out for
9  bid?
10    A.  It was not.
11    Q.  Why not?
12    A.  Again, similar to when we had Vivot and initially
13  had Petro without a contract, it was easier to have the
14  company that was there.  They did give a bid, but it was
15  not put out to bid.  So we did get a bid for that work.
16    Q.  Why wasn't it put out for bid?
17    A.  Again, we were trying to do it as expeditiously
18  as possible and to get everything certified.
19    Q.  Did you have any communications with WAPA that
20  you were going to pay to have every weld repaired?
21    A.  I'm sorry.  I'm waiting for the camera to move.
22  It was kind of spun.
23    Can you say that again, please?  I'm sorry.
24    Q.  Did you have any conversations with WAPA that you
25  intended to have every weld repaired?

150

1    A.   I did not, but again, it was a Vitol project.  So
2  I would not have had that conversation.
3    Q.   But you were getting the people to do that work,
4  weren't you, sir?
5    A.   That's correct.  But I never had a contract with
6  WAPA; so that conversation should have been between Vitol
7  and WAPA as to what was being done.
8    Q.   And, ultimately, WAPA paid for that work; isn't
9  that true?
10   A.   I don't know the answer to that.  Again, I know
11 that IPOS was paid by Vitol to facilitate.
12   Q.   Well, who reimburses Vitol?
13   A.   Again, I -- I don't know if every project is or
14 not.  I can't speak for Vitol.
15   Q.   Normally who -- who reimburses Vitol?
16       MS. FRANCIS:    Asked and answered.
17 BY MS. ROHN:
18   Q.   We're talking about every project.  Normally.
19   A.   But again, I can -- the only thing that I can
20 testify to is that the maintenance contract, not projects,
21 were directly reimbursed by Vitol with approval of WAPA.  I
22 don't know how any of those projects.  You can list them
23 all.  I don't know.
24   Q.   Do you know what a POD phase array ultra sonic is
25 -- test is?

151

1    A.   I've seen it in the documentation.  I'm not
2  personally familiar with it.
3    Q.   Sir, do you dispute that in April of 2021 Petro
4  provided IPOS with the certifications for its welders?
5    A.   Yes.
6    Q.   You do?
7    A.   Well, I don't know the exact date, but I do know
8  that the certifications were provided, yes.
9    Q.   And that that was the second time certifications.
10 The first ones were in February, second ones were in --
11 were in April; correct?
12       MS. FRANCIS:    Objection.
13 BY MS. ROHN:
14   A.   Again, I don't know the specific dates.
15   Q.   But previously you had received certifications of
16 the welders?
17   A.   That is correct.
18   Q.   Correct?
19       And were those the same welders that were then -- you
20 asked for certifications for in July of 2021?
21   A.   No, we didn't ask for certifications.  We asked
22 for documentation related to the certification, yes.
23   Q.   What was different about the certifications from
24 approximately February and approximately April of 2021 and
25 the ones in July?

152

1    A.   Again, it was not for our project.  That was part
2  of the scope bid that Petro had put in for the 3-inch that
3  they would provide those.  It was part of the Vitol e-mail.
4  It was passed on.  So it would -- that's a question for
5  Vitol.
6    Q.   And I'm asking you, weren't the certifications
7  the same?
8    A.   They were the same.  I'm saying that we -- it
9  wasn't our responsibility at that time to review them.  It
10 was for a Vitol project.
11   Q.   I understand that, sir.  But I'm just simply
12 asking weren't they the same certifications?
13   A.   Yes.
14   Q.   So did you think those certifications were --
15 were fraudulently done as well?
16   A.   Again, we merely passed them on to Vitol.  It
17 wasn't our purpose, because that was not our project.
18   Q.   Why wouldn't IPOS agree to allow the Petro
19 welders to be recertified if there was a question about
20 their certification?
21   A.   Again, it was loss of -- lack of trust, loss of
22 trust at that point, and we had decided to terminate the
23 contract.
24       MS. ROHN:    I'm going to start sharing
25 documents; so you want to take a ten-minute break, so

153

1  I can get everybody ready to start sharing.
2        MS. FRANCIS:    We can take as much time as you
3  want to, Attorney Rohn.
4        MS. ROHN:    Well, how about I just have to get
5  Michael on and Michael ready.
6        Mr. Smith, would you like a five-minute break or
7  ten-minute break?
8        THE WITNESS:    It doesn't matter.  It doesn't
9  matter.  Whatever makes it easier for everyone on the
10 call.
11       MS. ROHN:    Let's do 10 minutes.
12       (A recess was taken at this time.)
13       MS. ROHN:    I'd like the witness to be shown
14 Exhibit 301.
15       (USVI LPG Conversion Project Volume 4f Piping
16 Specifications and Welding was previously marked as
17 Exhibit 301 for identification.)
18       MS. FRANCIS:    Can you identify the Bates
19 numbers?
20       MS. ROHN:    IPOS 3902 to 3932.
21       It's not showing, Karima.
22       MS. FRANCIS:    For the record, I realized
23 exhibits were sent this morning.  We did not have an
24 opportunity to download those and print them.  The
25 witness, therefore, does not have any documents in

IPOS by DAVID SMITH

---

154

1  front of him and will need an opportunity to review
2  the documents.
3       MS. ROHN:    So these are all documents I
4  previously gave them.  I just put them in a different
5  order, as the order that they're going to be used.
6  But you had 301 for weeks.
7       MS. FRANCIS:    The witness does not have
8  physical documents in front of him.  So he will review
9  documents on the screen, provided he's given an
10  opportunity to review the document.
11 BY MS. ROHN:
12      Q.   This is the USVI PG -- P -- LPG Conversion
13 Project Volume 4f Piping Specifications and Welding.
14 Are you familiar with this document, sir?
15      A.   Yes, ma'am.
16      Q.   And is this the welding -- is this the welding
17 specifications that you've been referencing in your
18 deposition?
19      A.   Yes, it is.
20      MS. ROHN:    And if you go to page 3904, under
21 "Applicable Codes & Standards."
22 BY MS. ROHN:
23      Q.   Do you dispute that those are the codes and
24 standards for the welding?
25      A.   I do not.

---

155

1       Q.   And this would have been -- and if you look at
2  the second page of this document -- the top first page of
3  this document where it has the little wavy lines.
4       MS. ROHN:    Go to the first page, please.
5  BY MS. ROHN:
6       Q.   That line right there.  Those little wavy lines
7  and then VTTI.  What does that stand for?
8       A.   I don't know that it stands for anything.  I'm
9  not --
10      Q.   Well, aren't there companies that are referred to
11 as VTTI?
12      A.   Yes.  I thought you meant like an acronym like
13 IPOS.  I don't know what VTTI stands for.
14      Q.   In fact, your e-mail is a VTTI e-mail, correct,
15 sir?
16      A.   Yes, that's correct.
17      Q.   And so the welding certifications would be the
18 welding certifications that are referenced in this
19 specifications and procedures; is that correct?
20      A.   That's correct.
21      MS. ROHN:    And if you go to page 3912.
22 If you scroll down, please.
23      MR. SIMPSON:    Excuse me.  Are we still on
24 Exhibit 301?
25      MS. ROHN:    Yes, we are.

---

156

1       MR. SIMPSON:    Because the Exhibit 301 your
2  office provided to us is 33 pages, not 584 pages.
3       MS. ROHN:    This is 33 as well.  In any event,
4  your objection is noted for the record.
5  BY MS. ROHN:
6       Q.   See it says section 2.12.2, "Welding Procedure
7  Qualification"?
8       A.   Yes.
9       Q.   It's 3912.
10      A.   Yeah, it was -- it was not scrolled up.  Yes.
11      Q.   And do you dispute that that is the welding
12 procedure qualification?
13      A.   I do not.
14      MS. ROHN:    And if you go to 2.12 -- the next
15 page, 2.12.3 under "Welder Qualifications.
16      "Welder shall be qualified in accordance with the
17 ASME Section IX, 2008.  The Owner/ Company's/
18 Engineers inspector shall witness the test and certify
19 the qualification of each welder separately."
20      You see that?
21      A.   Yes, ma'am.
22      Q.   And it also says that "no welder" -- if you look
23 under No. w, "no welder shall be permitted to work without
24 the possession of identify card."
25      But you just testified that you saw welders but didn't

---

157

1  see their cards.  How's -- how could that be, sir?
2       MS. FRANCIS:    Objection.  To the extent that
3  misstates the testimony.
4  BY MS. ROHN:
5       Q.   Didn't you say, sir, that the only welder you saw
6  with a card was Mr. Miguel, whatever his name was?
7  Martinez.
8       A.   Yes.
9       Q.   Well, how did that happen, sir?
10      A.   I don't know.  It says it "shall be the
11 responsibility of contractor to issue the identity cards
12 after duly certified."
13      Q.   But it also says "No welder shall be permitted to
14 work without the possession of identity card"; right?
15      A.   Yes.
16      Q.   But you allowed people to work without the
17 identity card; is that correct?
18      MR. SIMPSON:    Objection.
19      MS. FRANCIS:    Objection.  Misstates the
20 document.
21 BY MS. ROHN:
22      Q.   You may answer.
23      A.   Again, it was not our project; so that's a
24 question for Vitol.
25      MS. ROHN:    Exhibit 180, which are Canning 468

---

IPOS by DAVID SMITH

158

1   through 470 and page 485.
2        (E-mails Bates Nos. Canning 468 to 470 were
3   previously marked as Exhibit 180 for identification.)
4        (E-mails Bates Nos. CANNING 484 to 485 were
5   previously marked as Exhibit 181 for identification.)
6        MS. FRANCIS:    What exhibit is that,
7   Attorney Rohn?
8        MS. ROHN:    180.
9        MS. FRANCIS:    And that exhibit has a gap in
10  Bates numbers?
11       MS. ROHN:    It does.
12       Did you find 180?
13  BY MS. ROHN:
14       Q.   Okay, 180 is an e-mail from Chris Neophytou to
15  Tim K. and Petro Constantinou.  "Information submittal to
16  Vitol."
17       MS. ROHN:    Can you scroll up, please?  I mean
18  find 468.  Canning 468.  You're on the wrong document.
19  No.  You're in the wrong -- you're in the wrong --go
20  to the first page of 180, please.  Okay, go -- 180.
21  That's after 179.
22       Okay, there we go.  Okay.  And if you scroll to
23  the middle there.
24  BY MS. ROHN:
25       Q.   You see Mr. Petro Constantinou on this e-mail?

159

1        Do you know who --
2        A.   Yes.
3        Q.   Do you know who Chris Neophytou is?
4        A.   I'm not -- I think it's pronounced differently.
5   But he is with Hiteco Engineering.
6        Q.   And what was Merlin Figueira's position in March
7   of 2017?
8        A.   He was general manager then.
9        Q.   Of?
10       A.   Of IPOS.
11       Q.   It says "Petro is reviewing the Welding
12  procedures and will reply tomorrow."
13       Do you know what -- do you have any reason to believe
14  that those welding procedures were any different than the
15  welding procedures on the 3-inch line?
16       A.   Again, this was before I started with the
17  company; so I don't have a frame of reference.  I didn't
18  review this document.
19       MS. ROHN:    Then if you go to 485 of that
20  exhibit.  Page 485, it's about three down.
21  BY MS. ROHN:
22       Q.   All right.  This is an e-mail from
23  Eiser Benjamin.  "Final Drawings USVI Binder and LPG filing
24  procedures and requested datasheet."
25       It says "VITOL & WAPA Team."

160

1        Do you know if this is the Vitol documents to the
2   construction of the propane terminals?
3        MS. FRANCIS:    I'm going to object to the
4        extent that this is outside the scope of the 30(b)(6)
5        notice.
6        MS. ROHN:    Noted.
7   BY MS. ROHN:
8        A.   I have no idea what this document is.  I've never
9   seen it before.
10       Q.   Okay.  Do you know what a 1/2-inch venting line
11  is?
12       A.   I'm sorry --
13       Q.   Do you know what a 1/2-inch venting line is?
14       A.   I do, but not this specific one.
15       Q.   Okay.
16       MS. ROHN:    Exhibit 182.
17       (E-mails Bates Nos. Canning 748 to 757 were
18  previously marked as Exhibit 182 for identification.)
19       MS. FRANCIS:    Bates numbers, please.
20       MS. ROHN:    Canning 748 to 757.
21       182.  Keep going.
22  BY MS. ROHN:
23       Q.   All right.  This is an e-mail December 6, 2017,
24  from Andrew Canning to yourself, it says "RE: APR support
25  timesheets.

161

1        "David, Further to our discussion regarding the costs
2   associated with Adrian and Felix supporting the APR
3   project."
4        Do you know what the APR project is?
5        A.   Yes, I do.
6        Q.   And what is that?
7        A.   It was a project that WAPA had undertaken.  APR
8   is a company, and they were gonna to take one of the
9   existing turbines.  I don't remember the exact specifics
10  because the project never finished, but they were going to
11  get liquid propane and run it through their own, similar to
12  what the IPOS was, and it was gonna be done on St. Thomas.
13       MS. ROHN:    And if you go to the Canning 752.
14       That's it right there.
15  BY MS. ROHN:
16       Q.   So you see these time sheets, "USVI --
17       A.   Yes.
18       Q.   -- VTTI WAPA"?
19       And you --
20       MS. ROHN:    If you'll scroll through down.
21  BY MS ROHN:
22       Q.   This time sheet appears to have been signed off
23  on by Adrian Melendez; correct?
24       A.   Adrian Sr.  Sr. signed it, yes.
25       MS. ROHN:    If you'll go to --

162

1    MS. FRANCIS:    This document refers to Burdock,
2  which is a nonparty to this lawsuit, and it predates
3  the existence --
4    MS. ROHN:    You don't have to bother. I am
5  through with that. I thought that was
6  Adrian Melendez, Jr.
7    Exhibit 224, PIS 708 -- 78 -- 7087 to 88.
8    (E-mails Bates Nos. PIS 7087 to 7088 were
9    previously marked as Exhibit 224 for identification.)
10   MS. ROHN:    If you go to -- you've gone too
11 far.
12   If you go to the second page of 224, which is
13 7087.
14   That's 225. Please go up one. This page right
15 here. Thank you.
16 BY MS. ROHN:
17   Q.   This is an e-mail from your -- from yourself,
18 David Smith, to Adrian Melendez, cc Andrew Canning.
19 Wednesday, April 25, 2018. "Attached Services Agreement.
20   "Good morning Adrian, Here are our contracts for your
21 review."
22   Would that have been the review of the contract that
23 was entered into in 2019?
24   A.   No. For the original.
25   Q.   Okay. That was --

163

1    A.   2018.
2    Q.   In 2018.
3    Why would you be sending a copy of that contract to
4  Adrian Canning -- I mean, Andrew Canning?
5    A.   At that point all of the work, we did not have a
6  maintenance supervisor. That was prior to hiring
7  Calvin Schmidt. As I had mentioned earlier, at that point
8  it was shortly after the hurricane. We were still on prep,
9  and so all of that project work and punch list work was
10 originally falling under Andrew to execute.
11   Q.   Why would Andrew need to know what your contract
12 was with Petro?
13   A.   I mean, the -- the maintenance contractors,
14 Coury Hodge and Calvin Schmidt, were aware of it, the
15 operations supervisors were aware of it. I mean, people in
16 -- that were going to be dealing with them. I don't -- I
17 don't see anything wrong with that.
18   Q.   Why would they know how much they were getting
19 paid?
20   A.   Again, that's only the billing rates. It's not
21 how much they were --
22   Q.   Why would they need -- why would they get to know
23 the billing rate?
24   A.   I don't understand why they wouldn't. I mean,
25 there's nothing in it that said this needs to be kept

164

1  confidential.
2    Q.   So Petro could have given a copy of the contract
3  to anybody they wanted to?
4    A.   Ultimately. And at this point it was still -- it
5  was still a review.
6    Q.   Well, Adrian responds to --
7    A.   They hadn't even -- yeah. I'm sorry.
8    Q.   "I'll be sending you all the new docs for the
9  LLC."
10   There's no other comments on that, is there?
11   A.   Right, but it didn't say to sign. We waited
12 until we received his documents before signing the
13 contract. And they were put in -- and they were put into
14 the contract.
15   MS. ROHN:    Exhibit 225.
16   (E-mails Bates Nos. PIS 7091 to 7093 were
17   previously marked as Exhibit 225 for identification.)
18   MS. FRANCIS:    Bates numbers, please?
19   MS. ROHN:    PIS 791 to 793.
20   If you go to 793.
21 BY MS. ROHN:
22   Q.   It says July 12, 2000 --
23   MS. ROHN:    Are you there?
24 BY MS. ROHN:
25   Q.   There's an e-mail from Petro saying "Hope all is

165

1  well. Could you please advise on status of the payment of
2  the attached?"
3    And you --
4    MS. ROHN:    Right there.
5  BY MS. ROHN:
6    Q.   And then you say "Good morning, Adrian, Do you
7  have anytime to talk?"
8    Do you know what that's about?
9    A.   Yes.
10   Q.   What's that about?
11   A.   There was a period of time where there was a
12 dispute as far as repayment between IPOS and Vitol, and so,
13 therefore, we were waiting on payments for them to make
14 other payments.
15   Q.   Okay. And then --
16   MS. ROHN:    Exhibit 46AC, IPOS 9273.
17   (E-mail Bates No. IPOS 9273 was previously marked
18   as Exhibit 46AC for identification.)
19 BY MS. ROHN:
20   Q.   This is an e-mail, October 9, 2018, from yourself
21 to Alexander Etienne, Rawle Granger, Andrew Canning, and
22 Coury Hodge. "Maintenance/Project discussion."
23   MS. FRANCIS:    Is this one page, Attorney Rohn?
24   MS. ROHN:    Sorry. What?
25   MS. FRANCIS:    You said IPOS 9273. Is that

IPOS by DAVID SMITH

166

1    entirety of the exhibit?
2        MS. ROHN:    Yes. Yes, it is.
3    BY MS. ROHN:
4        Q.    It says -- it says "Yesterday morning Alex,
5    Andrew and I had a conversation that I wanted to pass on."
6    Is that Andrew referring to Andrew Canning?
7        A.    Yes.
8        Q.    And then you say "First of all, to reiterate, in
9    every action we take, safety of our people, the community
10   and the assets we manage are the first priority. Every
11   employee and contractor has the right to stop any job, for
12   any reason."
13   Is that true, sir?
14       A.    Yes, it is.
15       Q.    And then it says "We should talk about it as a
16   leadership group. We should follow MOC and all work should
17   be permitted."
18   What is an MOC?
19       A.    Management of change.
20       Q.    And what was your position in October of 2018?
21       A.    General manager.
22       Q.    And in fact, was every job permitted?
23       A.    For a permit, yes. You need -- yes, you need a
24   work permit to do work inside the facility.
25       Q.    Did you need work permits to do maintenance in

167

1    the propane terminal?
2        A.    Yes.
3        Q.    It says "It is -- it is the only way to ensure
4    that we know what is going on." Then it says "VTTI is
5    working on an online permit to work, but until then, we
6    need to make sure everyone understands?"
7    Was it VTTI that did your permits procedure?
8        A.    Uhm --
9        MS. FRANCIS:    I didn't hear that. What was
10   the question?
11   BY MS. ROHN:
12       Q.    Was it VTTI that did your -- did IPOS' permit
13   procedure?
14       A.    No, we had our own IPOS permit procedure that we
15   printed ourselves.
16       Q.    Do you know what you meant when you said "VTTI is
17   working on an online permit to work"?
18       A.    Yes. Actually, it never happened, but the -- so
19   we use hard copies. So every day when you go inside the
20   facility as a contractor or you want to perform work, you
21   report to the control room. You know, you discuss what the
22   work is. Similar to what I was saying earlier today, you
23   know, it'll be a discussion to say do you need safety
24   glasses; do you need a safety helmet; do you need a
25   monitor; do you need -- what type of tools, sparking,

168

1    non-sparking tools --
2        Q.    Thank you. I don't need -- thank you.
3        A.    Okay. But -- okay.
4        MS. FRANCIS:    You asked a question, Attorney
5    Rohn.
6        MS. ROHN:    Well, I didn't ask every detail of
7    what it was supposed to be on the permit.
8    BY MS. ROHN:
9        A.    But the point maybe is that it was going to try
10   to be moved to electronic, and that never happened. So
11   until then we were still using the paper permits, which
12   were still being used in IPOS for our entire time there.
13       Q.    Then if you go to the next paragraph you say,
14   "Andrew is a resource for all of us to use. He is
15   responsible for the punch list items and the
16   APR/Wartsila/Aggreko interface, but, ultimately, it is
17   operations decision with his advice and counsel."
18   Is that true for how the work was done at IPOS?
19       A.    Well, during that period, yes. That was still
20   coming out of the hurricane, yes.
21       Q.    And it says that "If we don't organize work, he
22   will step in to make sure we are getting value from the
23   folks we have onsite."
24   That was one of his jobs; is that right?
25       A.    Well, the reality is, I mean, that's everyone's

169

1    responsibility, if people aren't working.
2        Q.    Well, you singled out Mr. Canning, did you not?
3        A.    Well, I don't specifically remember this e-mail,
4    but someone must have brought an issue up related to him
5    asking the guys that work.
6        Q.    And then it goes on to say down from that, "We
7    have shifted our focus in the past year, we no longer have
8    separate bank accounts for project and ops, we only have
9    ops, and Vitol reimburses us for the project/punch list
10   work."
11   Was that true at the time you said it?
12       A.    Yes.
13       Q.    And then it says, "As we are trying to reduce the
14   cost of Petro, we have scaled back the folks onsite."
15   Why were you trying to scale back the cost of Petro?
16       A.    At the end of this fiscal budget year, we were
17   well over budget, and Vitol had us actually send them home
18   and leave the facility without working at the -- at that
19   contract year until the new fiscal year started on
20   July 1st. They actually were sent home, and we were only
21   calling in on emergency because of the fact we were so far
22   over budget, we were told no more spend.
23       Q.    Okay. Exhibit -- and who told you no more spend?
24       A.    So that came from Eduardo Garcia of Vitol.
25       MS. ROHN:    If you can go to 230.

170

1          (E-mails Bates No. PIS 7118 were previously
2      marked as Exhibit 230 for identification.)
3   BY MS. ROHN:
4      Q.   This is an e-mail --
5          MS. ROHN:    230.  That's it.
6   BY MS. ROHN:
7      Q.   -- from you to Adrian Melendez, March 2, 2019.
8          MS. FRANCIS:    What is the Bates number?  We
9   cannot see it on the screen.
10         MS. ROHN:    PIOS 7118.
11  BY MS. ROHN:
12     Q.   Says good -- this is a statement.  In March you
13  say to Melendez, cc Andrew Canning.
14     "Good morning gents, I know there is a lot going on
15  but can you revisit at some point and update the schedule
16  and cost?"
17     And that's followed --
18         MS. ROHN:    Scroll down.
19  BY MS. ROHN:
20     Q.   By an e-mail on October 29, 2000 -- that's
21  preceded, sorry, by an e-mail October 29, 2018, from Andrew
22  -- from Adrian to Andrew Canning.
23     "Please find the attached Budget & Schedule and Work
24  Scope for the Outage of Vessel 208 for your review."
25         Would that have been a maintenance issue or a project?

171

1      A.   Still maintenance.  I'd have to look at the exact
2   dates, but this could have predated Calvin being hired.
3          MS. ROHN:    All right, if you go to 227.
4          (E-mails Bates No. PIS 7098 previously marked as
5      Exhibit 227 for identification.)
6   BY MS. ROHN:
7      Q.   This is an e-mail from yourself,
8   October 29, 2018, to Santhia Rodriguez, cc Adrian Melendez.
9      Do you understand Ms. Rodriguez to be the accounting
10  person at Petro?
11     A.   There were two, but yes, she was one of them.
12     Q.   "We just approved over $60k today, I need to
13  speak with Andrew, this catches us up to what he has
14  reviewed."
15     Does that mean that each of the invoices from Petro
16  was being reviewed by Canning?
17     A.   Is it possible to scroll down so I can see the
18  entire document?
19     Q.   Sure.
20     It's a number of invoices.
21     A.   Okay.
22     Yes, a change was ultimately made, as I discussed
23  earlier.  At that point, we were still having Andrew review
24  every invoice; and then once we got Calvin and Coury, we
25  then had the maintenance individual specific Petro invoices

172

1   going to them for approval, and then the project work would
2   go to Andrew for approval.
3      Q.   And why were those invoices -- why was 178,245.50
4   in invoices that were ever 60 days and only $60,000 was
5   being paid on them?
6          MS. FRANCIS:    Objection.  Argumentative.
7   BY MS. ROHN:
8      A.   The only answer I can give you is as he had
9   signed off on it, we were making payments.
10     Q.   And why wouldn't he promptly sign off on it?
11         MS. FRANCIS:    Objection.  Foundation.
12  BY MS. ROHN:
13     A.   I don't know specific answers, but generally, it
14  could have been that there was a discrepancy on time, a
15  discrepancy on the addition, a discrepancy on the
16  consumables.  You know, I can't -- I'd have to look at the
17  individual invoice.  I don't know the reasons why, but
18  those are some reasons.
19         MS. ROHN:    Exhibit 173, which is Canning 33 --
20  313 -- actually, 312 through 316.
21         (E-mails Bates Nos. Canning 312 to 316 was
22     previously marked as Exhibit 173 for identification.)
23         MS. FRANCIS:    I'm sorry.  Could you say the
24     exhibit number again, Attorney Rohn?
25         MS. ROHN:    313 to 316, Canning.

173

1          MS. FRANCIS:    No, the exhibit number, not the
2      Bates number.
3          MS. ROHN:    73 -- 173.
4   BY MS. ROHN:
5      Q.   Who was Ignacio Tolosa?
6      A.   He was the former finance manager at
7   Seaport Canaveral.
8      Q.   And this is 2017, 2018 O&M expenses over budget;
9   right?
10     A.   That's correct.  Correct.
11     Q.   And then if you go to the second page of that
12  document, 314.
13         MS. ROHN:    Yeah, that document right there.
14  BY MS. ROHN:
15     A.   Yeah.  Scroll down just a little.  Go ahead,
16  sorry.
17         MS. ROHN:    Scroll down, please.
18  BY MS. ROHN:
19     A.   Thank you.
20     Q.   What is this?
21     A.   So it's two things.  As I had mentioned earlier,
22  when -- every year IPOS was required to present an O&M
23  budget, and then once that was submitted, it will be given
24  to Vitol, who would then work whatever they did and make a
25  separate budget that was presented to WAPA that we weren't

174

1   privy to.  Then they would ultimately come back to us and
2   say that this is what the approved budget is.
3       And so at the end of that actual fiscal year,
4   depending on if you were over budget or under budget, there
5   was a true-up with -- with Vitol, and then as I had
6   mentioned also -- so some of these could have been
7   hurricane expenses as well, because it was in that period,
8   but also the punch list related items, so that was the
9   transition from the construction to the operation.  So for
10  that fiscal year, that's what the overrun invoice presented
11  was.
12      Q.  Who is Cameron Neal?
13      A.  I don't know him.  I would -- he works for Vitol.
14  Must be in their accounting department.
15      Q.  And this is addressed to Vitol Virgin Islands
16  Corporation at 2925 Richmond Avenue.
17      Is that the address of Vitol Inc.?
18      A.  I don't know the answer to that.
19      Q.  Well, did -- is -- do you know why
20  Vitol Virgin Islands Corporation or a Virgin Islands
21  corporation has an address in Houston, Texas?
22      A.  I don't know the answer to that.
23          MS. ROHN:    228.
24          (E-mails Bates No. PIS 7104 was previously marked
25  as Exhibit 228 for identification.)

175

1   BY MS. ROHN:
2       Q.  Okay, there's an e-mail, it says "PIS 7104."
3   There's an e-mail that says December of 2018 from Coury and
4   Andy.
5       Is Andy Andrew or is Andy somebody else?
6       A.  Andy is Andrew.
7       Q.  And they're suggesting, am I correct --
8          MS. ROHN:    Would you scroll down, Karima,
9   please?
10  BY MS. ROHN:
11      A.  Not yet.  Yeah, thank you.
12      Q.  So I take it that this is some --
13          MS. ROHN:    Scroll back up.
14  BY MS. ROHN:
15      A.  Just to where my name is so I can read.  Thank
16  you.  Right there.  So I can read.
17      A little too far.  Okay, right there.  Thank you.
18      Q.  All right.
19          MS. FRANCIS:    Can the witness review the
20  document first, please?
21          MS. ROHN:    I couldn't understand you.
22          MS. FRANCIS:    He is -- the witness is
23  attempting to read the document.
24          MS. ROHN:    Okay.
25          MS. FRANCIS:    Then you can ask your questions.

176

1           MR. BECKSTEDT:    While he's reading, I just
2   want to note, Attorney Rohn, it's 2:53.
3           MS. ROHN:    Yeah, I know.  This is my last 2018
4   document, and then I'm going to jet.  Okay?
5   BY MS. ROHN:
6       A.  Can you just go up a little bit so I can read the
7   top part, where it says "Coury/David/Granger."
8       Q.  In fact, I am going to ask you about the top
9   e-mail.
10          MS. ROHN:    So if you will scroll up.
11          There you go right there.  Up.
12  BY MS. ROHN:
13      Q.  You say "Hi Alex, Great points.  Sorry for the
14  delay.  At the airport going to visit Vitol."
15      Where were you going to go visit Vitol?
16      A.  Well, at that point I was at Seaport Canaveral.
17  It was for a Christmas party in Houston.
18      Q.  Was that at the same address?
19      A.  We did not go to the office.  We just met at a
20  restaurant.
21          MS. ROHN:    All right.  That is my last -- this
22  is my last document for 2018, which is Exhibit 46Z,
23  which is that document.
24          (E-mails Bates No. IPOS 9245 were previously
25  marked as Exhibit 46Z for identification.)

177

1           MS. FRANCIS:    I didn't see a Bates number
2   because you were scrolling too fast.
3           MS. ROHN:    IPOS 9245.
4   BY MS. ROHN:
5       A.  Is it possible to scroll to the bottom so I can
6   look at them?
7       Q.  Sure.
8       At the bottom --
9       A.  Okay, that's good.
10      Q.  From the bottom there are --
11          MS. ROHN:    What?
12          MS. FRANCIS:    The mouse is obscuring the text.
13  BY MS. ROHN:
14      Q.  The bottom is a December 29, 2018, e-mail from
15  David Nagle to Andrew Canning.
16      A.  I see that.
17      Q.  It says "Hi Andrew, I hope you had a nice
18  Christmas.  I'm working on finishing up the estimates for
19  the projects.  I will be e-mailing the estimates next week.
20  Do you know where we stand as far as vendor approval for my
21  business?  I am planning to return on the 6th."
22          MS. ROHN:    And then if you scroll up.
23  BY MS. ROHN:
24      Q.  There is an -- that says from David.
25      A.  If you can scroll back down a little bit, just a

178

1 little bit.

2     I see -- I see my part there starting on

3 December 30th.

4     Q.   Right.  It says from David to Andrew -- from

5 Andrew to David.  Sorry.

6     "In response to David's question below, this is -- do

7 you know if Cyla has enough information / entered David's

8 details into the IPOS system such that he is now an

9 approved vendor?"

10     And then it says "Have you heard anything more about

11 the shenanigans around PIS and David Nagle contracting

12 directly with IPOS?  I do feel all the issues with the poor

13 business practices lay with Adrian, as I have seen -- seem

14 to get a reasonable and fair response in discussions with

15 Chad but this never happens to come through to written

16 agreements."

17     Do you know what Andrew is talking to you about?

18     A.   I don't know what happened, but I do know that

19 David Nagle worked for Petro at some point.

20     Q.   No.  Okay.

21     A.   And then after he left, then we added him as a

22 vendor and started using his engineering services.

23     Q.   Do you know that there was an effort being made

24 to have David Nagle return as working with Petro, and that

25 Petro refused to rehire him?

179

1     A.   I have no knowledge, no.

2     Q.   And do you know what shenanigans that Mr. Canning

3 is referring to around PIS and David Nagle?

4     A.   I do not.

5     Q.   Was there ever an -- a plan that Petro and

6 David Nagle would contract directly with IPOS?

7     A.   No.  What this is referring to is when David was

8 an employee, that it was being billed through us, and then

9 when he left, he asked if he could be set -- set up as a

10 vendor for his own engineering.  And that's what -- so

11 David Nagle contracting directly with IPOS.

12     Q.   And what poor business practices of PIS was

13 Mr. Canning referring to?

14     A.   I do not know.

15     Q.   Did you ever ask him why he was claiming that

16 Adrian was responsible for poor business practices?

17     A.   Not that I recall.

18     Q.   And then you respond on December 30th --

19     MS. ROHN:    If you scroll up.

20 BY MS. ROHN:

21     A.   Yes, please.

22     Q.   "There has been -- I haven't seen anything signed

23 by David as far as contracts."

24     Then you say "There has been nothing from PIS."

25     What are you referring to?

180

1     A.   Meaning, it would -- if they had an objection if

2 we contracted directly with David.

3     Q.   And then it says "Can you confirm something was

4 signed and sent?"

5     What signed and sent?

6     A.   That would have been the service agreement

7 contract with David Nagle.  Can you confirm with David

8 something was signed by him and sent to me.

9     MS. ROHN:    So I am at the end of 2018.

10     Shall we come to your office and hopefully in one

11 hour get Mr. Rivera done?

12     MR. BECKSTEDT:    Yes.  I believe, yeah, Sam is

13 set up for the video, and I think everyone is ready to

14 log on as soon as we get the Zoom going.  So we're

15 here ready to go.  Sarah says it should be less than

16 an hour.

17     (A recess was taken at 3:00 p.m.)

18     (The deposition resumed at 4:22 p.m.)

19     MS. FRANCIS:    I object to the recording for

20 the record.

21     MS. ROHN:    Karima, you're ready?

22     MS. JENKINS-GUZMAN:    Yes, I am.

23     MS. ROHN:    Can we go to Document 46A?  This

24 would be IPOS 9247 and 9248.

25     (E-mails Bates Nos. IPOS 2947 and 9248 were

181

1 previously marked as Exhibit 46AA for identification.)

2     MS. ROHN:    I think you're going the wrong way.

3 It should have been the one right after the one we are

4 doing.

5     (Off the record.)

6     MS. ROHN:    Karima, this is the one after 46AA.

7 You're way too far.

8     Yep, that's it.

9     MS. FRANCIS:    9247 to what?

10     MS. ROHN:    IPOS 9248.

11     Could you go to that, the second page?

12 BY MS. ROHN:

13     Q.   If you start at the bottom of that page, it

14 says --

15     MS. ROHN:    Are you at the bottom of that page?

16     Yes.

17 BY MS. ROHN:

18     Q.   From Andrew Canning to you, David Smith.

19     "Find attached David Nagle's completed contract

20 paperwork and the 'agreed' final version."

21     Why would Canning be involved in getting David Nagle's

22 contract signed?

23     A.   He was going to do project work for Andrew, as

24 well as for Vitol.

25     Q.   Was he going to be paid by OPTIS?

182

1    A.   No.  It was direct to David Nagle's company.

2    Q.   Was David Nagle's company going to get paid by
3    IPOS?

4    A.   Yes.

5    Q.   And was David Nagle's company going to get paid
6    by Mr. Canning?

7    A.   No.

8    Q.   Then what do you mean that he was working for
9    Canning?

10   A.   Well, he was providing engineering resources for
11   IPOS and for Vitol.

12   Q.   Well, I thought Canning was an engineer?

13   A.   He is.

14   Q.   Why did you need two engineers?

15   A.   That's pretty standard to have one person doing
16   the actual designing, and the other doing the installation.

17   Q.   And at the bottom of that page it says "We
18   discussed the attached project estimates and currently only
19   considering the RIO panel shades for which he has some good
20   innovative ideas and as the designs cover both islands I
21   believe that we should consider progressing these."

22   So was Mr. Nagle who designed the RIO shades?

23   A.   Is there anything else below that, or is that the
24   end of the document?

25   Q.   No, that's the end of the e-mail.

183

1    A.   Yes, he did the engineering on the RIO shades.

2    Q.   And then if you go up on that page,
3    January 17, 2019, David Smith to Andrew, "Contract and
4    Estimates.

5    "I'll look at this at this morning.  I have some newly
6    imposed VTTI deadlines on some due diligence Vitol is
7    doing."

8    Why would VTTI be giving you deadlines?

9    A.   That was at the period when ADNOC was looking to
10   become a shareholder.

11   Q.   And why would that be -- give you deadlines?

12   A.   For Seaport Canaveral, not related to IPOS.

13   Q.   Who were you being paid by, Seaport?

14   A.   I was being paid by Seaport.

15   Q.   This indicates "I also mentioned to Bill this
16   morning, Ignacio gave me financials for July 1 to
17   December 31st and we are already $750k over budget on
18   maintenance/repair and parts."

19   Then it goes down a little bit.  "Long story short, as
20   many times as I told Petro we are going to run out of
21   money, Alex allowed them to overload people."

22   Who is Alex?

23   A.   He was the operations supervisor on St. Croix for
24   IPOS.

25   Q.   What do you mean by "overload people"?

184

1    A.   There was only supposed to be three people, and
2    yet there were four, five, six, depending on the projects
3    he was trying to get done.

4    Q.   Well, did Alex have the authority to hire those
5    people or allow them to work?

6    A.   He had the authority to bring them in, yes, but
7    it was my responsibility to then meet the budget, which was
8    tell them to go back out and prioritize projects.

9    Q.   And then if you go to the first page at the
10   bottom.

11   MS. ROHN:   Scroll up.  Keep scrolling.  Okay,
12   right there.

13   BY MS. ROHN:

14   Q.   There's an e-mail from Andrew back to you, same
15   January 17th.

16   "It was fairly evident that a crunch on finances was
17   looming I guess after Vitol put the breaks on the project
18   activities without paying what was already owed on work
19   completed $900k."

20   And then it has some ideas for cutting back; correct?

21   A.   I'd like to read the whole document, if possible.

22   Q.   Sure.

23   A.   I'll start there and ask when it's ready to
24   scroll down.

25   Q.   Okay.  Well, it starts out "I have already

185

1    discussed the partial redeployment of the St. Thomas PI --"

2    A.   The cursor is kind of on the word.  I don't know
3    what that word is.  If they can move it just kind of into
4    that -- well, or move it to like -- okay.

5    MS. FRANCIS:   If someone can move the cursor
6    entirely to right of the document, that would help.

7    BY MS. ROHN:

8    Q.   It starts out with "I have already partially
9    discussed --"

10   A.   Yeah.  I'm trying to read that, yes.

11   Okay, scroll down.

12   Q.   I'm only going to ask you about the first two
13   lines.

14   "I've already discussed the partial redeployment of
15   the St. Thomas PIS personnel who have used a number of
16   months to do non-value adding task by Jean, Coury
17   (currently are well-intentioned but not well executed
18   painting program, installation of the control room fence
19   poles etc.) and Granger."

20   Did you form the opinion that they were doing
21   non-value tasks?  That Petro was doing non-value tasks?

22   A.   First, I'd still like to finish reading what it
23   says about --

24   Q.   Sir, I have a limited number -- amount of time
25   with you.  And I'm not asking you about anything that's on

IPOS by DAVID SMITH

186

1  the second page. I'm only asking you about that sentence.
2      MS. FRANCIS:    Attorney Rohn, if the witness
3  needs to read the entire document in order to
4  formulate an answer about a portion that you would
5  like to direct his attention to --
6      MS. ROHN:    The rest of the document has
7  nothing to do with the portion I'm asking about.
8      MS. FRANCIS:    Right. But he's -- he's not
9  required to take your word for that, Attorney Rohn.
10  He's entitled to read the document --
11      MS. ROHN:    Court reporter, please note the
12  turning off of the time and the turning on of the time
13  while he's reading something that has nothing to do
14  with the question that I'm going to ask him.
15      MS. FRANCIS:    Please note that Attorney Rohn
16  is trying to prevent the witness from reading a
17  document that --
18      MS. ROHN:    Go ahead. I'm just not going to do
19  it on my time.
20      MS. FRANCIS:    You're asking him to testify
21  about the document.
22      MS. ROHN:    Do not argue with me. Please.
23      MS. FRANCIS:    Don't argue with me, please.
24      MS. ROHN:    I simply instructed the court
25  reporter.

187

1      (Time noted reading e-mail 16:32:06 to 16:32:16.)
2  BY MS. ROHN:
3      A.  Can you repeat the question, please?
4      Q.  Sure. "I have already discussed the partial
5  redeployment of the St. Thomas PIS personnel who have been
6  used a number of months to do non-value adding task."
7      Did you agree that the work being done by Petro had
8  non-value?
9      A.  That's Andrew's statement. That wasn't mine. I
10  don't know -- you haven't showed me the top of the document
11  to see if I responded.
12      Q.  My question, sir, to you is: Did you ever form
13  the opinion that the work the Petro workers were doing had
14  no value?
15      MS. FRANCIS:    Objection. Foundation.
16  BY MS. ROHN:
17      A.  Yes, but not because of Petro, because of what
18  our folks were asking them to do.
19      Q.  Okay.
20      MS. ROHN:    If you scroll up.
21  BY MS. ROHN:
22      Q.  It says "Maybe give Bill a call."
23      Who's Bill?
24      A.  He was a consultant that worked approximately
25  60 days in 2019.

188

1      Q.  And then you say, "We need to tell Petro, gravy
2  train over, I've only said it for a year."
3      Who did you tell that they were on a gravy train?
4      A.  It would have been Adrian.
5      Q.  Did you use the term "gravy train," sir?
6      A.  I don't recall.
7      MS. ROHN:    Exhibit 231.
8      (E-mails Bates No. PIS 7129 were previously
9      marked as Exhibit 231 for identification.)
10      MS. ROHN:    Keep going. That's it right there.
11  BY MS. ROHN:
12      Q.  There's an e-mail from Andrew Canning to
13  Ms. Rodriguez of Petro that indicates that their rental
14  charges for a forklift and welding machine were exclusively
15  for the Aggreko project work and therefore should be -- not
16  be charged to IPOS.
17      How would Petro know who to charge work to?
18      A.  Well, they have what work they're doing. The
19  work with Aggreko had nothing to do with us. We didn't
20  make any payments. We didn't -- we didn't control their
21  people. So if they were doing work there and were using
22  their own equipment for that, they should be the ones
23  keeping track of that.
24      Q.  And who's Aggreko?
25      A.  That's one of the companies that the WAPA

189

1  received federal funds after the hurricane to put in
2  St. Croix. It's located on our site. They split us in
3  half in order to give half of it to Aggreko, and Petro did
4  the tying-in work in order to run it on propane.
5      Q.  And then you respond --
6      MS. ROHN:    If you scroll up, Karima, please.
7  BY MS. ROHN:
8      Q.  On March 28, 2019, re -- "Duplicate no -- no
9  Rejected Material and Equipment Expenses
10  November-December 2018.
11      "I'll be in next week. We should sit down and
12  discuss.
13      "Billing seems to be getting worse. I'm under a lot
14  of pressure from Vitol since we are so far over budget.
15      And "there is also room for improvement on our side as
16  well."
17      What are you referencing?
18      (Interruption by the court reporter.)
19      MS. FRANCIS:    I said as to what part of that?
20      MS. ROHN:    Statements that he made in that
21  sentence. "Billing seems to be getting worse. I'm
22  under a lot of pressure from Vitol."
23  BY MS. ROHN:
24      A.  Well, for -- for a long time there was a lot of
25  issues on time sheets where they were incorrect and sent

190

1 back multiple, multiple times. From our side, I imagine
2 that I was talking about the speed in which we were turning
3 them around.
4      MS. ROHN:     And then Exhibit 232, which is IPOS
5      7130 to 7131.
6      (E-mails Bates No. IPOS 7130 to 7131 were
7      previously marked as Exhibit 232 for identification.)
8 BY MS. ROHN:
9      Q.   If you look at the first -- you look at the
10 first, it says "Santhia, Please find attached --" this is
11 from Andrew Canning to Santhia Rodriguez of Petro.
12 "Please find attached --"
13      A.   Sorry. I don't -- I don't see that part.
14      MS. ROHN:     Karima, please go to the -- no, go
15 to the first page of this Exhibit 7131. Not
16 scrolling. Up please. Up. Okay.
17 BY MS. ROHN:
18      Q.   Andrew Canning to Ms. Rodriguez of Petro.
19 "Please find attached rejected invoice 3208,
20 unfortunately the summary spreadsheet and cumulative
21 charges do not match the associated timesheets."
22 Was Mr. Canning allowed to speak directly to the
23 contractors and tell them he was rejecting a sheet -- an
24 invoice?
25      MS. FRANCIS:    Objection. Form.

191

1      Q.   You may answer.
2      A.   For a period of time. She was actually sitting
3 in the same office as us before Petro had an office, that's
4 how the work was being done and calculated. But yes, if
5 there was a problem with the invoice, yes, it was sent back
6 to them so she could work on it.
7      Q.   And why would he be allowed to communicate
8 directly with contractors?
9      MS. FRANCIS:    Objection. Foundation.
10 BY MS. ROHN:
11      Q.   You may answer.
12      A.   I'm gonna ask -- I'm gonna ask to see the whole
13 e-mail. The last three times you scrolled up on comments
14 without allowing me to read.
15      Q.   I've asked you a simple question. Why would he
16 be allowed to speak directly to contractors' employees?
17      MS. FRANCIS:    Attorney Rohn, please don't
18 speak to the witness like that.
19 BY MS. ROHN:
20      Q.   There's -- it's not related to a document. I'm
21 simply asking Mr. Canning would be allowed to speak
22 directly to contractors' employees?
23      MS. FRANCIS:    Like that refers to a document,
24 which the witness is entitled to --
25

192

1 BY MS. ROHN:
2      Q.   Answer my damn question, please.
3      MS. FRANCIS:    Excuse me, Attorney Rohn. This
4 is not the avenue for profanity.
5      MS. ROHN:     Sorry. You have repeated the same
6 objection over and over again. I note your objection.
7 BY MS. ROHN:
8      Q.   Please answer my question.
9      A.   How can I answer the question if I can't read the
10 e-mail?
11      Q.   Sir, was Mr. Canning allowed to speak directly to
12 contractors' employees?
13      A.   So in this case, it's a bookkeeper, and in this
14 case, it was in order to try to expedite payment.
15      Q.   Sir, my question is a general question. Was
16 Mr. Canning allowed to speak directly to contractors'
17 employees?
18      A.   He should have only spoken to either the
19 administration or to the management, not to direct
20 employees.
21      MS. ROHN:     Exhibit 275.
22      (E-mails Bates Nos. IPOS 4054 to 4071 were
23      previously marked as Exhibit 275 for identification.)
24 BY MS. ROHN:
25      Q.   This is an e-mail 4/4/2'19 --

193

1      MS. ROHN:     Sorry. I thought you were there.
2 Scroll up.
3 BY MS. ROHN:
4      Q.   This is an e-mail 4/4/2'19 from David Smith to
5 Eduardo Garcia, Sebastian Moretti, Coury Hodge. "Subject:
6 Petro contract.
7 "As discussed, here is the contract."
8      MS. ROHN:     If you go to the next page,
9 please, Karima.
10 BY MS. ROHN:
11      Q.   Would you agree with me that appears to be a
12 Services Agreement between IPOS and Petro Industrial?
13      A.   From what I can see, yes.
14      MS. ROHN:     You can keep scrolling, Karima.
15 BY MS. ROHN:
16      Q.   Why would you be sending this contract to Vitol?
17      A.   Because of the fact that they were looking to do
18 additional project work that was not going to be under our
19 scope, and they asked if we had a contract in place for
20 them to be able to contact them and use them for project
21 work.
22      Q.   You know whether or not they ever entered into an
23 individual contract with Petro?
24      A.   I do not, no.
25      Q.   Did you ever have any discussions with them about

194

1  that?
2      A.  I did not.
3      Q.  And then --
4      A.  Can I get up for just a second to get my drink?
5      Q.  Of course.
6      A.  I'm not leaving the room.  I just need a drink.
7      Q.  No worries.
8      A.  Thank you.
9      Q.  Sure.  No worries.
10         MS. ROHN:    Exhibit 279.
11         (E-mails Bates Nos. IPOS 4409 to 4410 were
12     previously marked as Exhibit 279 for identification.)
13  BY MS. ROHN:
14     Q.  This is IPOS 4409 to 410.
15         MS. ROHN:    Keep going.  279.  It's the next
16  one I think.  There we go.  And if you could start at
17  the top and scroll, please.
18         THE WITNESS:    Wait.  Wait.  Sorry.  That was
19  too fast.  Okay.
20         MS. FRANCIS:    Can we scroll up?  We can't see
21  the date.
22         THE WITNESS:    Okay, you can continue
23  scrolling.
24         Is there any more?
25         MS. ROHN:    Yeah, you can go to the next page.

195

1          THE WITNESS:    Okay.
2  BY MS. ROHN:
3      Q.  All right.  This starts out on the second page,
4  May 8, 2019, discussing, "Here is the summary that Andrew
5  put together.  It is through November, but that was the
6  largest overrun was.
7      "Andrew went through the individual timesheets?"
8      Do you know what time sheets are being referenced?
9      A.  Yes.  So this was in preparation for the next
10  year's budget.  And as you scroll up towards the rest of
11  the conversation, it was a miscommunication between Eduardo
12  and myself.  We were -- we thought he wanted to know how
13  much we spent on Petro, because he thought that was the
14  only maintenance work that we were doing for the whole
15  facility.
16      So at that point, we did not have any accounting
17  systems to be able to track any of these costs.  It was a
18  system that was ultimately phased out and a new system was
19  put in.  So the only way to do it was to go through
20  individual time sheets to find out whether it was for
21  hurricane, whether it was for project, whether it was for
22  operations.  And the whole purpose of that, as you could
23  see, it was put -- it was through November.  That's where
24  the largest overrun was.
25      If you continue to go up, I'm happy to discuss.  But

196

1  that's in preparation for the budget to come up with a
2  maintenance and repair number to be presented to WAPA for
3  the annual budget.
4      Q.  And did Vitol have to approve that budget before
5  it went to WAPA?
6      A.  Yes.
7         MS. ROHN:    You can start scrolling.  I'm --
8  I'm going through some exhibits I'm not going to use.
9  I'm on 234, so you can start catching up.
10      And if you go to Exhibit -- get to Exhibit 211.
11      Got it.
12         (E-mails Bates Nos. Canning 57 to 60 were
13     previously marked as Exhibit 211 for identification.)
14  BY MS. ROHN:
15      Q.  211 is a "Please find attached agreement for your
16  review.  This is a start so let me know any changes that
17  need to be done."
18      That's from Adrian to you.
19         MS. ROHN:    Scroll to the top, please.
20  BY MS. ROHN:
21      Q.  Correct?
22      If you -- and then if you go -- scroll to two pages
23  later, that's a contract dated August 1st -- part of a
24  contract, the only pages I have of a contract dated
25  August 1, 2019.

197

1      Did the contract that was actually entered into in
2  September of 2019, did you then alter that agreement and
3  the original August 2009 agreement?
4      A.  I'm sorry.  I'm sorry.  Can you repeat that?  I
5  don't understand.
6      Q.  Actually, let me just go to Exhibit 237.
7         (E-mails Bates No. PIS 7200 was previously marked
8     as Exhibit 237 for identification.)
9  BY MS. ROHN:
10      Q.  Dated August 29, 2019.
11         MS. ROHN:    237.
12  BY MS. ROHN:
13      Q.  This is from Adrian to you.  "Please find the
14  attached contract for you to review."
15      And if you scroll to the top, you say "Good afternoon
16  Adrian, Sorry for the delay.
17      "Here is the executed contract."
18      So you executed the contract that was proposed to you
19  by Adrian; is that correct?
20      A.  That is correct.
21         MS. ROHN:    And Exhibit 205.
22         (E-mails Bates Nos. Canning 25 to 26 was
23     previously marked as Exhibit 205 for identification.)
24         MS. ROHN:    Exhibit 205.
25      There you go.

198

1    BY MS. ROHN:
2        Q.    This is an e-mail from Adrian to Scott Schlueter.
3    Do you know who Scott Schlueter is?
4        A.    That's not what I see on the screen.
5    But yes, I do know who Scott Schlueter is.
6        MS. ROHN:    Scroll up, please.  It should be
7    document No. Canning 26 in 205.
8        You're going the wrong way.  Page up.  Up.
9        There you go.
10   BY MS. ROHN:
11       Q.    This is Adrian Melendez August 26, 2019, to
12   Scott Schlueter.
13   Who's Scott Schlueter?
14       A.    I'm happy to answer, but can I see the rest of
15   the e-mail?  Or is that going to be related to this
16   conversation?
17       Q.    I'm not going to answer -- I'm asking you one
18   question about this document.  I'm trying to find out who
19   Scott Schlueter is.
20       A.    He was a terminal manager that worked at IPOS.
21   He was terminated.
22       Q.    Okay.  And so do you dispute that this is the
23   e-mail sending the quote for the No. 1 Flare Line UT?
24       A.    That's what it appears to be, yes.
25       Q.    And then that appears to have been sent to

199

1    Andrew Canning.  Do you see above, if you go to the very
2    top, Andrew Canning?
3        A.    Well, I don't know what's above that; so I don't
4    know if that was sent by me.
5        Q.    I have nothing.
6        A.    So I don't know -- I don't know who sent that to
7    him.
8        Q.    Is that No. 1 flare line the same thing as the
9    No. 1 -- the 1-inch flare line?
10       A.    Yes, I believe that's correct.
11       Q.    And was the No. 1 flare line not done in 2019
12   because it was decided that it was too expensive?
13       A.    I'm sorry.  We have a note on here says our
14   internet connection is unstable.  Can you repeat, please?
15       Q.    Sure.  Was the reason that the No. -- the 1-inch
16   flare line not done in 2019 is because Vitol thought it was
17   too expensive?
18       It's not in your e-mail.  I'm just simply asking you a
19   question.
20       A.    I'm sorry.  No, the network is -- is unstable.
21   Can you try one more -- it's just breaking up about every
22   third or fourth word.  I don't know if it's your side or
23   our side.
24       Q.    Well, I'm looking -- mine is stable so...
25       MS. FRANCIS:    Attorney Rohn, as you know, I

200

1    only find locations with unstable internet.
2    BY MS. ROHN:
3        A.    Do you mind repeating that one more time?  I'm
4    sorry.
5        Q.    Yes.  Was the reason that the No. -- 1-inch flare
6    line in 2019 did not go forward is because Vitol believed
7    it was too expensive?
8        A.    I don't recall.
9        MS. ROHN:    All right.  Exhibit 203.
10       (E-mails Bates No. Canning 19 were previously
11   marked as Exhibit 203 for identification.)
12       MS. ROHN:    You're gone way too far.  Hold on.
13   Just stop for a minute.  Stop.  What are you in?  No.
14   Okay, you're right.  You're right.  Keep going.
15   That's the document right before this.
16       203.  It's a big document.
17       Keep scrolling, please.  Keep scrolling, please.
18   We're looking for Canning 19.  I think you've
19   gone by it now.  Yep, you've gone by it.  Yep, you've
20   gone couple of documents by it.  Exhibit 203.
21       There it is.
22   BY MS. ROHN:
23       Q.    Exhibit 203 is an e-mail, January 9, 2019.  Start
24   at the top.  From David Smith to Andrew Canning about the
25   "1-inch Export Pump A Line."

201

1    "Andrew, Doesn't matter at this point.  Scott already
2    thinks it costs too much.  He told Chad they don't need to
3    do UT testing, just visual and I think this is for each
4    tank."
5        And then it says "I asked Chad for a list of
6    everything Scott asked him for.  I did sign the Petro
7    contract to bring them back.
8        "Just trying to get through this hurricane."
9        What did you mean by that?
10       A.    So a couple of things.  First of all, just for
11   point of order, I believe that that was 91, not 19, so it
12   was --
13       Q.    Oh, right.  I'm sorry.  You're right.  Yes,
14   September 1st.
15       A.    Okay.  So I was in Seaport when this happened,
16   and we were actually shut down for a hurricane warning; so
17   that's what I meant by trying to get through this
18   hurricane.
19       You know, the Petro contract -- again, this was, as we
20   discussed earlier, when we ran out of money, Vitol said we
21   had to send them home.  And so the new contract starts on
22   July 1st, and so, therefore, we were working on a new
23   contract for them to bring them back.
24       Scott was terminated less than a week after this, so
25   that's -- that's why I was involving Andrew in this.

202

1    MS. ROHN:    Okay. Exhibit 198, and go to
2    Canning 003 in 198.
3        (E-mails Bates Nos. Canning 1 to 7 were
4    previously marked as Exhibit 198 for identification.)
5        MS. ROHN:    It's about halfway down.
6        I think you've gone past it. Canning 003. No,
7    you're right there.
8    BY MS. ROHN:
9    Q.    This is an e-mail about the truck rack.
10    Was Petro involved in the truck rack, to your
11    recollection?
12    A.    The internet is -- yeah, the internet is jumping;
13    so if I can -- if you can just repeat that. I think I
14    understand --
15    Q.    Sure.
16    A.    -- what you said, but it's still jumping, the
17    Wi-Fi.
18    Q.    Was Petro involved in the truck rack?
19    A.    To the best of my knowledge, yes, that -- yes.
20    Q.    And was that an IPOS project or a Vitol project?
21    A.    Vitol. It was not an IPOS project.
22        MS. ROHN:    And if you go to Exhibit 46AB.
23        (E-mails Bates Nos. IPOS 9254 to 9256 were
24    previously marked as Exhibit 46AB for identification.)
25        MS. ROHN:    There we go. And if you scroll to

203

1    the end where this e-mail starts. Scroll down,
2    please. Keep going. You've gone too far. Go up one.
3    BY MS. ROHN:
4    A.    I'm sorry, the --
5    Q.    This is an e-mail from Andrew Canning,
6    January 18, 2020, to Merlin Figueira, David Smith, and
7    Glenn Sibbick.
8        Was Mr. Sibbick still there then?
9    A.    He had left the Virgin Islands, but he was still
10    doing occasional consulting for us.
11    Q.    Okay. So this e-mail from Andrew to Merlin
12    starts out "Prior to any conversation with Chad, I thought
13    it best to give you some background to the potential 'over
14    torque' of the manway closure on V-208 which occurred
15    yesterday. There had been a number of discussions between
16    IPOS (Cali)."
17        Is that Calvin?
18    A.    Yes.
19    Q.    "And PIS (Chad) on the tightening torque required
20    in the days leading up to the work and on the morning of
21    the 17th Bryan Melendez came to my office and asked for
22    confirmation of the torque required which I said I would
23    look into."
24        So was it -- did there come a time that there was a
25    problem with how the torque was done and some problems as a

204

1    result of the incorrect torque -- amount of torque? You
2    recall that in January of 2020?
3    A.    I apologize. It's still saying the -- the
4    network bandwidth is low. I only heard January 2020.
5    Q.    Okay. In January 2020 was there a problem with
6    the -- trying to figure out how -- how much torque to put
7    on the manway closure and a disagreement as to who had told
8    what to do as to the torque, that it caused the problem?
9        Did you hear that?
10    A.    I did not. I'm sorry.
11    Q.    Where are you exactly?
12    A.    In -- in the conference room. It was fine all
13    day.
14        MS. FRANCIS:    Can we take a two-minute break?
15    I'm trying to figure out if we can get technical
16    support.
17        MS. ROHN:    Sure, no problem.
18        (Off the record.)
19    BY MS. ROHN:
20    Q.    So my question was: In or about January of 2020,
21    was there an incident where there was a attempt to figure
22    out how much torque to put on -- hold on. -- the manway
23    closure, and there was a disagreement over who had
24    recommended the wrong torque between Mr. Canning and Petro?
25    Do you recall that?

205

1    A.    Can I see the entire e-mail? I see that part
2    that you're talking about.
3    Q.    This I'm asking you a general question. Do you
4    recall a problem with the incorrect torquing in that
5    project?
6    A.    I don't recall that specifically, no.
7    Q.    So, yes, you can read --
8        MS. ROHN:    Please note the time he spends
9    reading this.
10    BY MS. ROHN:
11    Q.    -- the Andrew Canning to Merlin Figueira and a
12    copy to yourself.
13    A.    Is that above that? The one that's on the screen
14    I've read. Well, you need to scroll down.
15        MS. ROHN:    Scroll down a little bit, will you,
16    Karima. If you can keep scrolling.
17    BY MS. ROHN:
18    Q.    Are you still reading?
19    A.    Clearly a new line paragraph; so you can
20    scroll --
21        MS. ROHN:    Can you scroll up a little bit
22    further? There you go.
23    BY MS. ROHN:
24    A.    Yes.
25    Okay. Thank you.

206

1     (Time noted reading e-mail 17:10:56 to 17:11:38.)
2     Q.   And the last line of that says "I assume that I
3  have your support in continuing to ensure the physical and
4  technical integrity of the plant despite attempts to
5  undermine this by communicating incorrect information with
6  you directly."
7     Do you know what was being referenced there?
8     A.   It was not me. I believe, if you go back up, it
9  must have been to Merlin.
10    Q.   Okay. But wasn't he accusing someone of telling
11 Merlin incorrect information about what caused the problem
12 with the torque?
13    A.   I can't speak to Andrew's mindset on it.
14    Q.   Okay. And then if you go to the next page, it
15 starts out --
16    MS. ROHN:   No, up. Up. Sorry.
17 BY MS. ROHN:
18    Q.   If you go to -- yes, you see it starts right
19 there, it says "Andrew."
20    MS. ROHN:   Now scroll back down. Down. There
21 it goes.
22 BY MS. ROHN:
23    Q.   It's Merlin to Andrew. "Let's have a Starleaf
24 discussion on Wednesday between yourself, David and me. We
25 need your support of protecting the integrity of the

207

1  Facility and we need to work jointly to figure out how can
2  we -- how we can effectively do so without any ripple
3  effects in the VI."
4     Do you know what Merlin was referring to?
5     A.   I don't know what he was specifically referring
6  to, no.
7     MS. ROHN:   And then if you scroll up to go to
8     the first page.
9  BY MS. ROHN:
10    Q.   There's an e-mail from Andrew to yourself, not
11 copied to Merlin.
12    "David, it's not easy trying to understand what Merlin
13 reads into things, definitely a difficult management
14 style."
15    Did you -- first of all, did you think that was an
16 appropriate e-mail to get from Mr. Canning?
17    A.   I would not have sent it. No.
18    Q.   And then he goes on to say "Were you there on
19 St. Croix during the meeting between Merlin and Chad where
20 they allegedly tried to say I was requesting the wrong
21 closure torque? If he continues to tiptoe around
22 incompetent practice and potentially undermine me then this
23 could become untenable. PIS know I am straightforward,
24 robust and fair in my dealings with them, so I don't see
25 any issue with calling non-competence incompetence.

208

1     "As a matter of interests, is there a date or
2  candidate for the permanent Terminal manager?"
3     Do you think this was a proper e-mail for Mr. Canning
4  to be sending to you?
5     MR. SIMPSON:   Objection.
6  BY MS. ROHN:
7     Q.   You may answer.
8     A.   I mean, I encourage everybody when they have
9  issues to raise them to me. Again, I would not have
10 written it this way.
11    Q.   And who did he think he was referring to about
12 tiptoeing through incompetence?
13    A.   I think you'd have to ask Mr. Canning. I'm not
14 sure.
15    Q.   Well, isn't the clear inference Chad who tried to
16 claim that it was he who made the mistake?
17    MS. FRANCIS:   Objection. Asked and answered.
18 BY MS. ROHN:
19    Q.   You may answer.
20    A.   I wasn't at that meeting; so I don't know if it
21 was Chad or, you know, who he was referring to.
22    MS. ROHN:   And if you scroll up to the top of
23    the page.
24 BY MS. ROHN:
25    Q.   There's an e-mail from yourself to

209

1  Andrew Canning, again, not copying Merlin.
2     "Hi Andrew, Sorry I missed this.
3     "I was present about the discussion on the torquing.
4  Brian had sent Adrian an e-mail or text saying he had the
5  manufacturers spec there. We didn't see it, Merlin just
6  said, 'if you have the spec, go ahead.'
7     "I think the concern about the incompetence boils back
8  to the litigious nature of VI, right or wrong they can
9  start a case based upon nothing. I think he was tiptoeing
10 but I could be wrong. Cali said he didn't walk it down
11 with you, he didn't turn -- didn't turn it back to
12 operations, so we thought it was the wrong forum to say
13 prior to allowing you the chance to discuss."
14    What are you referencing there?
15    MS. FRANCIS:   Objection. Vague.
16 BY MS. ROHN:
17    A.   Yeah, I --
18    MS. FRANCIS:   You just read four sentences.
19 BY MS. ROHN:
20    A.   I don't remember this.
21    Q.   Okay.
22    MS. ROHN:   Exhibit 46AD.
23    (E-mails Bates No. IPOS 9366 were previously
24    marked as Exhibit 46AD for identification.)
25 BY MS. ROHN:

210

1    Q.   There is an -- I'll let you read it.
2        MR. BECKSTEDT:    What exhibit was this? I'm
3    sorry.
4        MS. ROHN:    46AD. It's an IPOS 9366.
5        MR. BECKSTEDT:    Thank you.
6        MS. FRANCIS:    You say AB as in boy?
7        MS. ROHN:    D as in dog.
8    BY MS. ROHN:
9    Q.   Let me know when you're ready for her to scroll.
10   A.   Yes, ma'am.
11       Okay, you can keep going down.
12       Okay, I've read it. I don't know if there is more to
13   scroll or if that's it.
14   Q.   This starts out with an e-mail from Merlin to
15   Andrew Canning and yourself, David Smith.
16       "Alex, Calvin and I are going to meet Adrian and Chad
17   for lunch today. I am going to tell him that we have
18   discussed internally the quotes for the 1-inch vent line
19   and that due to the urgency and concerns from others on the
20   timing of the placement, we want to move ahead with the
21   quotations we already have."
22       Then if you scroll up, there's from Andrew Canning to
23   yourself and Garry Stoker.
24       "Sensitivity:  Company Confidential."
25       What does that mean?

211

1    A.   That's -- that's Andrew's own. I don't know. It
2    came from OPTIS. That's not anything I'm familiar with.
3    Q.   "David, I just heard from David Nagle that
4    Dave Tilden at Traeger Brothers had informed him in
5    discussion today that he had sent Adrian Melendez all the
6    material quote and fabrication quote information for the
7    1 inch line work. I have no idea why he did this, as it is
8    at a minimum unprofessional but probably more exactly
9    corrupt. No wonder Adrian and Chad were confident they
10   would -- could be competitive in their revised quotation,
11   but I suspect the quality aspects will have been
12   overlooked. I did wonder why Merlin, Cali and Alex were
13   suddenly invited out for lunch today -- I wonder what the
14   purpose of this has been?"
15       Is this an appropriate e-mail for Mr. Canning to be
16   sending to you?
17       MR. SIMPSON:    Objection.
18       MS. ROHN:    Noted.
19       MS. FRANCIS:    Objection. Beyond the scope.
20   BY MS. ROHN:
21   Q.   You may answer.
22   A.   I would not send an e-mail like this.
23   Q.   It goes on to say "Apparently Dave Tilden has
24   done the same before on earlier activities that we had been
25   working on with supply through Traeger Brothers. As I said

212

1    this morning before this all emerged, we have continued to
2    turn up multiple examples of Dave Tilden either totally
3    incompetent or attempting to hide excessive mark-up through
4    technical specification alteration and price hiking through
5    multiple corrective re-quoting and this incident suggests
6    that the motive for this may after all be corrupt.
7        "I would consider the actions of Dave Tilden for
8    Traeger Brothers and Adrian Melendez of Petro Industrial to
9    be corrupt and anti-competition and are worthy of removal
10   of both companies from IPOS approved vendors list."
11       What did you do when Mr. Canning advocated that
12   because Petro used a quote from Traeger Brothers that they
13   should be thrown off the job?
14   A.   We -- we didn't remove Traeger or Petro for this.
15   So again, Andrew is entitled to his position or his
16   opinion, but we didn't act on this.
17   Q.   Well, did you counsel Mr. Canning that this was
18   inappropriate?
19   A.   I'm sure I probably did verbally. I don't
20   remember any more discussion about it.
21   Q.   Well, would you agree with me that failure to
22   tell Mr. Canning that these types of e-mails are
23   inappropriate would only encourage him to continue?
24       MR. SIMPSON:    Objection.
25   BY MS. ROHN:

213

1    Q.   You may answer.
2    A.   I don't know that I can speak for Andrew,
3    whether, you know, I would tell him that.
4    Q.   Do you have any present recollection of telling
5    him that this is -- he should stop these types of e-mails?
6    A.   Not specifically related to this. However, yes,
7    I have had verbal conversations with him about that.
8    Q.   What would be the general substance of those
9    verbal conversations?
10   A.   Again, this is not the -- an appropriate type of
11   e-mail. I mean, it's -- to anyone. I don't send e-mails
12   like this to anyone; I don't expect to receive them from
13   anyone on that.
14   Q.   Well, did you threaten Mr. Canning that if he
15   kept doing that that his job would be in jeopardy?
16   A.   Well, at this point, when the timing of this was
17   happening, there's already discussions no moving him over
18   to Vitol; so there was essentially no threat that I could
19   make or did make to -- to have him removed.
20   Q.   Did you warn Vitol about his behavior?
21   A.   I don't recall.
22   Q.   Do you remember when he went to Vitol?
23   A.   It officially happened as the change of the
24   fiscal year; so it would have been June 30th of 2020, less
25   than six months, but the budget process was already

214

1 underway for the next -- for that -- for that cycle.
2    Q.   So officially he went to Vitol in June of --
3 June 30, 2020?
4    A.   That's correct.  It might -- I mean, July 1st,
5 June 30th.  I guess June 30th was last day with IPOS.
6 July 1st first day with Vitol.
7    Q.   Okay.
8        MS. ROHN:    Please go to 46AE.
9        (E-mail Bates No. IPOS 9385 was previously marked
10       as Exhibit 46AE for identification.)
11       MS. ROHN:    It's after 300.  Okay, this is it,
12   I think.  Keep going.
13   Yeah, 46AE.  Can you scroll back up to the top?
14 BY MS. ROHN:
15   Q.   So this is August 4, 2020.  This would have been
16 supposedly when Mr. Canning worked for Vitol.  But he is
17 sending an e-mail to you, "Subject:  Panic Stations.
18   "Shame that you were not on the maintenance call,
19 Merlin is in full panic mode speculating on the pipe
20 degradation in St. Croix bump alley, following a planned
21 review with David Nagle, Merlin, Alex and Chad with him
22 leading the team into not very well thought out options.
23 It now appears to -- it now appears to an indecisive mess
24 coming out of discussions with no clear strategy.  Sadly
25 this all appears to be driven by either PIS good intentions

215

1 (proposing patching an rewelding to replace small type
2 stabbings) or a grab for work rather than following the
3 logic of what was planned, but Merlin is the
4 Operations/General Manager.... and he appears to be running
5 scared again."
6    As a Vitol -- now working for Vitol, why would
7 Mr. Canning be sending that e-mail to you?
8        MR. SIMPSON:    Objection.
9 BY MS. ROHN:
10   Q.   You may answer.
11   A.   He was still involved with projects, and that is
12 as we were again transitioning pass-through and projects.
13 You know, it certainly wasn't -- again, he certainly had
14 the ability to notify me of issues that he thought was --
15 could impact the safety of the facility.
16   Q.   Did you investigate this?
17   A.   I don't recall.  I do think -- I -- I don't
18 recall.
19   Q.   Did you report this to Vitol?
20   A.   I don't recall.
21   Q.   Did you tell Merlin what Mr. Canning was up to?
22   A.   I'm sure that I had a conversation with Merlin
23 about Andrew and the -- trying to decide which was the
24 correct path to go on this.
25   Q.   Do you remember what you decided was the correct

216

1 path to go?
2    A.   I don't.  I know that the work was ultimately
3 completed, 'cause -- but -- but I really don't know.  This
4 is that 1-inch vent line project.  I don't remember
5 specifically after this what happened.
6        MS. ROHN:    Exhibit 264.
7        (E-mails Bates No. PIS 7239 were previously
8        marked as Exhibit 264 for identification.)
9 BY MS. ROHN:
10   Q.   And this goes from the bottom up.
11   So there's an e-mail from Adrian, September 10, 2008.
12 "Thank you once again for your time and understanding.
13 Please find the attached updated agreement for your review
14 and signature."
15   And then Merlin -- if you scroll up.
16       MS. ROHN:    Scroll up, please.
17 BY MS. ROHN:
18   Q.   Merlin says to Adrian and Chad, and you're copied
19 on this, "I wanted to add that we note that both Johnny and
20 Jackman are both excellent Employees.  They diligently work
21 to get the job done without any complaints.  They also do
22 quality work.  So from our viewpoint these 2 Employees are
23 a good choice to recognize with a raise."
24   And you say "I completely agree."
25   A.   Can you show me?

217

1    Q.   Oh, I'm sorry.
2        MS. ROHN:    Scroll up.  Sorry.  There we go.
3 BY MS. ROHN:
4    Q.   Did you understand that Johnny was the guy that
5 ran the St. Thomas crew for Petro?
6    A.   Yes.  Yes.
7    Q.   Are you aware that Mr. Persaud has testified that
8 Mr. Canning asked him to come over on the St. Thomas jobs
9 because he couldn't understand or work with Johnny?
10       MR. SIMPSON:    Objection.
11 BY MS. ROHN:
12   Q.   You may answer.
13       MS. FRANCIS:    Objection.  That
14   mischaracterizes testimony.  It does not point to a
15   specific page or line in the transcript.
16 BY MS. ROHN:
17   A.   Yeah --
18   Q.   Are you aware of that?
19   A.   I'm not aware of that.
20   Q.   Did you have any trouble working with Johnny?
21   A.   No.
22   Q.   Did you ever have a problem understanding Johnny?
23   A.   No.
24       MS. ROHN:    Exhibit 460.
25       (E-mails Bates Nos. IPOS 6667 to 6668 were

218

1    previously marked as Exhibit 46O for identification.)
2    BY MS. ROHN:
3        Q.   Okay.  This is an e-mail.  I'll let you scroll
4    and read it.
5        MS. ROHN:    So start at the top, please.
6    BY MS. ROHN:
7        Q.   It starts from Andrew Canning December 15, 2020,
8    to you, "PIS Reprimand.  Sensitivity Confidential."
9        MS. ROHN:    If you will scroll down a little
10       bit so he can read the first part of the e-mail.
11       Scroll down, please.  There you go.
12   BY MS. ROHN:
13       A.   Yes.
14       Q.   Can you read that?
15       A.   I can.  I'll let you know when I'm ready to
16   scroll.
17       Q.   Okay.
18       A.   Can you scroll up a little bit, please.
19       Q.   Up or down?
20       A.   I don't know, but that's the correct way.
21   Okay.
22       Q.   So this is an e --
23       A.   Yeah.
24       Q.   E-mail -- this is an e-mail.  The original e-mail
25   is from Andrew Canning to David, you, and Merlin.  And it

219

1    starts out "There may be some negative feedback from a
2    discussion this morning which culminated in me refusing to
3    sign timesheets for three of the PIS team:  Chad, Frank,
4    and Elias.
5        "The reason I refused to sign off 10 hours for the
6    three individuals is that they were absent from site most
7    of the afternoon under the auspices of going to the bank."
8    It says that "I believe there was -- their purpose was for
9    cash transaction between Elias and Chad.  And this event
10   was a culmination of several absences over the last week
11   whereby Chad & Frank would disappear for an hour or two on
12   errands some of which were agreed and required two persons
13   (not necessarily Frank the safety person) but of the few
14   that I was informed about, most could have been done by one
15   person."
16       Was this Mr. Canning's -- working for Vitol, was this
17   Mr. Canning's job about saying whether people were going to
18   the bank and who was going?  Is that part of his job now?
19       MR. SIMPSON:    Objection.
20   BY MS. ROHN:
21       A.   This project was a Vitol project; so he was
22   making us aware of it.  So he was supervising or overseeing
23   that project for them.
24       Q.   But why wasn't he sending this e-mail to
25   Charlotte and Tim K.?  And why was he sending it to you?

220

1        A.   There was still a pass-through, and because of
2    the fact that the invoices would have come to us, and he
3    was rejecting it, I believe he was probably trying to let
4    us know.  I don't know if he sent another separate e-mail
5    to them and I don't copy us.
6        Q.   And then it says "During the absence yesterday
7    the good progress of the morning by the welding team
8    stopped almost completely in the afternoon when Elias was
9    absent."
10       Do you know why Elias' absence would stop the welding
11   team?
12       A.   I believe he was the one that just gave the
13   deposition.  He's the welding supervisor, is what I believe
14   he just said; so that would -- that would be the only
15   reason that I could think is that the supervisor wasn't
16   there on-site.
17       Q.   And then if you scroll up to the top of the page,
18   there's an e-mail from Merlin to Canning and yourself, and
19   he says, "Thanks for the description and talking directly
20   with Chad.  I too will talk to Chad once I return late this
21   week to understand his version.  There is an element of
22   trust between us and PIS and I'd like to hear -- I will
23   like to hear what Chad has to say and to get reassurance
24   from him that the Timesheets are factual and accurate."
25       Did you and Merlin discuss this e-mail between Canning

221

1    -- the sent to Canning -- by Canning to you and Merlin?
2        A.   I don't recall specifically discussing this
3    e-mail.
4        Q.   Did you ever do any investigation into the claims
5    that Canning was making about the Petro employees?
6        A.   Well, in this case, I'm sure that Merlin did talk
7    to Chad, and that they came to some kind of resolution.
8    That's how -- how I would do it as well, is if there's a
9    problem, talk to the person directly and solve it.
10       MS. ROHN:    Okay, Exhibit 46I.
11       (VIWAPA Security Guard Log Sheet was previously
12       marked as Exhibit 46I for identification.)
13       MS. ROHN:    That's it right there.
14       MR. BECKSTEDT:    Was this 46I?
15       MS. ROHN:    Yeah.  IPOS 2635.
16       What I did was I took the documents out 46 and
17       gave them letters so I didn't have to go through the
18       whole thousand pages in Exhibit 46.
19   BY MS. ROHN:
20       Q.   Do you recognize this as the Virgin Islands Water
21   and Power Security Guard Log Sheet?
22       A.   It's -- it's very poor quality, but yes, that's
23   what I -- that's what it appears to be, yes.
24       Q.   And can you see the handwriting for -- on that
25   for the 1, 2, 3, 4, 5, the first five for January 13, 2021?

IPOS by DAVID SMITH

222

1    A.   I can only see that it's handwriting.  I really
2  -- I can't -- I can't read it.
3    Q.   Can you -- can you discern whether or not it
4  appears to be the -- as to those five the same handwriting?
5    MS. FRANCIS:   Objection.  Foundation.  Calls
6    for speculation.
7  BY MS. ROHN:
8    A.   I really -- I -- I really don't know.
9    Q.   Okay.
10    MS. ROHN:   280.
11    (E-mails Bates No. IPOS 4074 were previously
12    marked as Exhibit 280 for identification.)
13  BY MS. ROHN:
14    Q.   All right, this is IPOS 4074.  It starts at the
15  bottom.  It's from Adrian to Andrew Canning, Chad Persaud,
16  David Smith, Merlin, and it says "Please find three
17  attachments that include the following:
18    "Change Order No. 1 that was sent to Time on 12/12/19
19  regarding the changes from Polaris on the Loading Rack that
20  still need to get approved.
21    "Change Order 2 - Regarding the electrical disconnect
22  and re-install the loading skid due to anchoring.
23    And No. 3, Budget from the Electrical Scope for the
24  Reversed Loading based on the SOW from Suris."
25    And if you scroll up, this is dated January 5, 2021.

223

1    If you scroll up on April 28, 2021, Andrew Canning
2  responds, "Tim," that's Tim K.; correct?
3    A.   Yeah.  I believe in the bottom where you read
4  time, I think it was a spelling error and meant that it was
5  sent to Tim.
6    Q.   Oh, okay.
7    "Petro Industrial are requesting PO, purchase orders,
8  for the above variations of the truck rack, electrical
9  scope changes around the purge panel which I note includes
10  a shelter shade which was removed in preference and the
11  electrical connection reconnection of the truck rack.  I
12  cannot recall if these were approved by yourself can you
13  confirm whether this is the case, please?"
14    So do you have any idea why between January 5, 2021,
15  and April 28, 2021, Andrew Canning is just now asking about
16  these purchase orders that are outstanding?
17    MR. SIMPSON:   Objection.
18    MS. FRANCIS:   Objection.  Foundation.
19    MS. ROHN:   Noted.
20  BY MS. ROHN:
21    A.   What I don't know is if there's any other e-mails
22  that I'm not copied on.  This truck rack project, even
23  though Adrian sent it to us, was a pass-through project;
24  so, therefore, I know it had to be approved by Tim prior to
25  us executing the payments.  So I only know that I was

224

1  copied here then, but I don't know if -- I mean, I believe
2  that probably Adrian had also sent it to Tim directly for
3  approval, as he said there for the change orders and didn't
4  get feedback either.
5    Q.   And then on May --
6    MS. ROHN:   If you scroll up.
7  BY MS. ROHN:
8    Q.   On May 17, 2021, you respond to Tim K. and
9  Andrew Canning, "Tim, I'm following up on this.  Petro is
10  saying we are more than 90 days on payments and they are
11  asking what needs to happen.  I've only been on the fringe,
12  but IPOS can't make payment until receive some feedback."
13    You mean from --
14    A.   From Vitol, from Tim.  So, yeah.  If there was no
15  response, then I'm sure I went back to the April 28th
16  e-mail after Adrian called me and said can you help me get
17  some payments on this.  And so then I try to make that case
18  to Vitol to approve it.
19    MS. ROHN:   Exhibit 305.
20    (Time Records Bates Nos. IPOS 289 to 293 were
21    previously marked as Exhibit 305 for identification.)
22    MS. ROHN:   That's 305.
23    MS. FRANCIS:   I'm sorry.  What is the Bates
24    number?
25    MS. ROHN:   IPOS 289 to 293.

225

1    MS. FRANCIS:   Thank you.
2  BY MS. ROHN:
3    Q.   Do you recognize that's a Petro logo in the
4  corner?
5    A.   I believe that's what it's supposed to be.  It's
6  a pretty bad copy and handwritten, but yes, I believe
7  that's Petro.
8    Q.   And do you understand that these are the time
9  records given to -- well, if you scroll down.
10    MS. ROHN:   Scroll down.
11  BY MS. ROHN:
12    Q.   See the signature --
13    MS. ROHN:   No, Stop.  Stop.  Just on this one
14    page.
15  BY MS. ROHN:
16    Q.   See the signature of Calvin Schmidt?
17    A.   Yes.
18    Q.   You understand these to be time records for IPOS
19  -- I mean, for Petro?
20    A.   Yeah, it's -- it's some sort of timekeeping, yes.
21    MS. ROHN:   So if you scroll to the one that
22    says January 13, 2021.
23  BY MS. ROHN:
24    Q.   See that one?  The day that Mr. Canning swear --
25  claimed that the workers claim that they were working eight

IPOS by DAVID SMITH

226

1  hours for IPOS.
2      Do you recall that claim that Mr. Canning would be --
3  made? Eight hours a day when they were -- had signed in
4  fraudulently? Do you recall that charge Mr. Canning made?
5      MR. SIMPSON:    Objection.
6  BY MS. ROHN:
7      A.  I don't remember. I remember discussing that. I
8  don't remember the date.
9      Q.  Well, do you see on this work hours that there's
10 only a bill for a total of nine hours?
11     MR. SIMPSON:    Objection.
12     MS. FRANCIS:    Objection. Foundation.
13 BY MS. ROHN:
14     Q.  If you scroll down you will see that
15 Calvin Schmidt approved that time sheet? You see that?
16     A.  Yes.
17     Q.  Could Canning overrule Calvin Schmidt's approval
18 of the time sheet?
19     A.  Not on the maintenance, no.
20     MS. ROHN:    Exhibit 46T.
21     (E-mails Bates Nos. IPOS 8440 to 8441 were
22 previously marked as Exhibit 46T for identification.)
23     MS. FRANCIS:    Bates number, please?
24     MS. ROHN:    This is IPOS 8440.
25 BY MS. ROHN:

227

1      Q.  January 21, 2021. Andrew Canning to
2  Santhia Rodriguez, David Smith, Coury Hodge,
3  Cyla Gooding, Adrian Melendez, Chad Persaud,
4  Merlin Figueira, Kunal Patal.
5      It says "Updated AR." What's an AR?
6      A.  Accounts receivable. That came from Petro. It's
7  an RE, and so I guess a reply all. It's not a forward.
8      Q.  Was Andrew Canning allowed to tell Petro how --
9  what kinds of time sheets they had to fill out?
10     A.  Again, for the Vitol reimbursable projects, he
11 had that authority.
12     Q.  All right.
13     MS. ROHN:    Let's go to 46G.
14     (E-mails Bates Nos. IPOS 2621 to 2623 were
15 previously marked as Exhibit 46G for identification.)
16 BY MS. ROHN:
17     Q.  This is an --
18     MS. FRANCIS:    Bates number, please.
19     MS. ROHN:    It's IPOS 261 through 2623.
20 BY MS. ROHN:
21     Q.  And to you and Merlin, the RIO Shade Progress.
22     And if you go down to the middle of the page, there's
23 an allegation. "There have been numerous occurrences over
24 the two weeks that would appear to have been instigated
25 intentionally to stall the progress of the installation."

228

1      First one, "Poor timekeeping - It was made clear from
2  the start of the work that there was no justification in
3  working more than the regular 8 hours Monday to Friday time
4  shift for the installation however the following are a
5  sample poor timekeeping.
6      "Wednesday, 13th of January, 2021. I received a call
7  from Chad at 7:41 to say that the PR team had been called
8  out to the Cruzan Rum to fix a leak and they would not be
9  on-site until around 9:30. They arrived at 9:45, had a
10 1 hour lunch break, a 30 minute afternoon and left at
11 around 15:10. They submitted a timesheet for 8 hours which
12 was rejected and the hours marked down to 6 which was
13 generous given the actual site hours."
14     So does that tie you back to the January 13th sheet
15 which was signed off on by Calvin Schmidt?
16     A.  No, this is a project. Calvin was signing off on
17 the general maintenance I believe.
18     Q.  Okay.
19     A.  So it's two different crews. This is for the RIO
20 panels. So again, it was a Vitol project, Vitol
21 reimbursable. And what I believe that Calvin signed off on
22 was for the general maintenance crew that was on-site that
23 day.
24     Q.  And then if you go to the last -- page 2622. Is
25 that 2622?

229

1      A.  That's the number I can see on the bottom.
2      Q.  Okay. The bottom of 2622.
3      It says "as far as I am concerned the performance,
4  timekeeping, quality of work and overall
5  abilities/objectives of the following individuals has been
6  unacceptable on a number of levels both in the RIO shade
7  installation on St. Croix and during previous Reverse Flow
8  installation work on St. Thomas. If this is not the case
9  then I can only assume that they are complicit with PIS in
10 an objective of maximizing the earnings for PIS for time
11 and materials activities.
12     "PIS welding team individuals involved with the
13 underperforming installation activities are Elias Rivera."
14     MS. ROHN:    Let's go to the next page. Scroll
15 down.
16 BY MS. ROHN:
17     Q.  "Ricardo Velazquez and Juan Guigliotty.
18     "My recommendation is that these individuals be
19 removed / barred from attending the site in future and
20 classified as 'Not Required Back' for any current or future
21 Vitol project work and also any work that PIS may want to
22 engage them for IPOS operations activities associated with
23 Vitol assets."
24     Did Mr. Canning have the ability to throw workers of a
25 contractor off the job?

IPOS by DAVID SMITH

230

1          MS. FRANCIS:    Objection. Foundation.
2          MR. SIMPSON:    Objection.
3    BY MS. ROHN:
4          A.   That's a question for Vitol.  So, again, this
5    project is different than what we were talking about
6    before.  This is a project paid for by Vitol and managed by
7    them.
8          Q.   But this also is recommending that IPOS not allow
9    them on the job either.  Did you take him up on that
10   suggestion?
11         A.   We -- no, we didn't take him up on that
12   suggestion.  Again, these were specialized crew and not the
13   normal maintenance crew; and so there's not a lot of
14   welding and work that was done on the maintenance side.
15         MS. ROHN:    If you go to 46E, please.
16         Actually, you can go to 46B.
17         (E-mails Bates No. IPOS 1401 were previously
18   marked as Exhibit 46B for identification.)
19   BY MS. ROHN:
20         Q.   This is an e-mail from Canning, January 23, 2021,
21   to yourself and Merlin.  "Sensitive --"
22         A.   Can you scroll up?
23         Thank you.
24         Q.   It says -- starts out "Find attached the security
25   gate sign-in sheet."

231

1          So he's talking about January 13th again.
2          If you go to the second paragraph, "I think this is a
3    further example of the lies, deceit and what could be
4    regarded as fraudulent activity that surround this
5    particular PIS team.  We as a project have always carefully
6    scrutinized the time and expense claims for all contract
7    activities and I am confident that the timekeeping and
8    honesty of the embedded PIS maintenance team is good.
9    However with the dishonesty exhibited by this particular
10   team now evident, it may be prudent to review the time
11   recording and event cost of St. Thomas boiler room access
12   platform remembering that PIS (albeit maybe at the
13   transition from Vivot) had previously quoted 15,000 for the
14   installation at St. Croix."
15         Sir, when he sent you this document accusing people of
16   lies and deceit and fraudulent activity, and this is now
17   considerable months after he started doing this activity,
18   did you have a conversation with him about this?
19         A.   I'm not sure if this is the document.  I'm not
20   sure what's above that, but I know that there was something
21   that we had produced for you where Merlin addresses the RIO
22   shades and the bidding.  So I don't know if you're able to
23   scroll up, and if I can see if that's the one --
24         MS. ROHN:    You can scroll up.
25   BY MS. ROHN:

232

1          Q.   All you say -- it's from you, all you say in a
2    e-mail, "If this is correct, we also have to speak to our
3    Security company.  They should not allow anyone to be
4    misrepresenting time on site."
5          There's nothing in the e-mail that says, Mr. Canning,
6    this is not appropriate e-mail.
7          A.   Well, I don't know specifically which one, but I
8    know that there has been a document provided to you that
9    specifically refers to this.
10         Q.   And did you chastise Mr. Canning for his
11   defamation?
12         MS. FRANCIS:    Objection.
13         MR. SIMPSON:    Objection.
14         MS. FRANCIS:    (Indiscernible - Simultaneous
15   speech.) -- conclusion.  This witness is not a
16   lawyer, and, therefore, cannot testify as to what is
17   or is not defamation.
18         MR. SIMPSON:    Objection.
19         MR. BECKSTEDT:    Objection.
20   BY MS. ROHN:
21         Q.   Okay.  Sir, did you ever chastise him about
22   accusing people of deceit, fraud, lies?
23         A.   How would you define chastise?
24         Q.   Mr. Canning, you should not be doing that, and I
25   don't expect to see you do it again.  That would be a good

233

1    start.
2          MR. SIMPSON:    Objection.
3    BY MS. ROHN:
4          Q.   Did you do that, sir?
5          A.   There was definitely a conversation held about
6    the allegations made.  Again, like I said, the document has
7    been provided that you'd be able to see how we did
8    specifically address this.
9          Q.   Sir, there's been 25,000 documents produced in
10   this case.  So the ability to find that needle in this
11   haystack was quite difficult.
12         So what do you recall saying to him about this?
13         MS. FRANCIS:    Attorney Rohn, I understand
14   we've been going a long time, but that tone of voice
15   with this witness is not appropriate.
16   BY MS. ROHN:
17         Q.   What do you recall having conversation about?
18         MS. FRANCIS:    Objection.  Asked and answered.
19   BY MS. ROHN:
20         A.   If I -- again, I don't recall specifically.  I do
21   know that we addressed it, and this might have even been a
22   lump sum quote or a not to exceed quote.  I really don't
23   know without the document in front of me.  So, therefore,
24   no matter how it was managed, it wouldn't have been
25   appropriate.  But again, without the --

234

1    Q.   Well, sir, let me tell you, this is the RIO
2   shade, it was in fact a not to exceed quote.  So how if
3   they're spending more time would they be bilking anyone?
4        MR. SIMPSON:    Objection.
5   BY MS. ROHN:
6    A.   Again, I never said that they were bilking
7   anyone; so I can't answer that.  But I can tell you again,
8   it was addressed because of the fact it was a not to exceed
9   quote and said that that wasn't appropriate.  They can
10  manage it anyway they want.
11       MS. ROHN:    All right.  If we go to 46P, which
12       is IPOS 667.
13       (E-mails Bates Nos. IPOS 6677 to 6678 were
14       previously marked as Exhibit 46P for identification.)
15  BY MS. ROHN:
16   Q.   Which appears to be more response to this, that I
17  found somewhere else.
18       And then there's -- if you see --
19       MS. ROHN:    If you scroll up.
20  BY MS. ROHN:
21   Q.   You see your "Thank you Andrew," and then, scroll
22  up there's actually a response from Merlin.
23       "Agree David, we just need to check the data through
24  our CT -- CCTV system."
25       What is that?

235

1    A.   Our video camera system.
2    Q.   That would tell you when they came in and when
3   they came out?
4    A.   Well, it could, yes.
5    Q.   Did you ever do that?
6    A.   No, because once we determined this one
7   specifically was a lump sum, that's when we made the
8   determination again it doesn't matter.
9    Q.   Okay.
10       MS. ROHN:    And then if you go to 56R (sic).
11       (E-mails Bates No. IPOS 8701 were previously
12       marked as Exhibit 46R for identification.)
13  BY MS. ROHN:
14   A.   Can I take 15 seconds just to turn the air
15  conditioning down.  The sun is coming in, and it's very
16  warm.
17   Q.   You know what, would you like to take a 10-minute
18  break so you can go to the bathroom or do whatever you
19  want?
20   A.   I just wanted to make it a little cooler.  I
21  don't know how much time is left so...
22   Q.   Are you back?
23   A.   Yes.
24       MS. ROHN:    If you go to 56R.
25  BY MS. ROHN:

236

1    Q.   So this is from Merlin -- this is from
2   Mr. Canning to yourself, and David Smith, "St. Croix
3   Turbine Cavity Blowdown System Replacement.
4        "During Monday's WAPA KO meeting I was interested to
5   hear Adrian discuss the current location of the personnel
6   that PIS plan to use on the Gas Turbine cavity vent system
7   replacement.  He stated that one person was coming from
8   Puerto Rico and two were already on St. Croix.  I am hoping
9   that the one person from Puerto Rico is not Elias Rivera
10  (but rather a welder certified to weld 3E1) and the other
11  two are not Ricardo Velazquez and Juan Guigliotty, who were
12  redeployed to Cruzan Rum."
13       Why would Mr. Canning have the ability to tell you who
14  he hopes Petro will not bring on the job?
15   A.   This is a Vitol project; so he was managing it.
16   Q.   But he's not writing this to Vitol.  He's writing
17  it to you.
18   A.   Again, we grant the access to the site for
19  allowing people in.  We pay for the security as well.
20   Q.   So did you ever deny access to the site of Elias
21  and the other two?
22   A.   Not to my knowledge.  The reality is, I'm not
23  sure if it's this e-mail; however, in a document I know we
24  produced, Merlin researched it and found out he wasn't
25  there to work on-site for us, and so, therefore, it was a

237

1   non-event.
2        MS. ROHN:    You can start scrolling because I'm
3        going through a bunch of exhibits, and one of them is
4        big.
5        All right, if we go to 48A.  This is the grating
6        stuff.
7        I told you that's a big document; so you're going
8        to have to scroll through it.
9        (E-mails Bates No. IPOS 271 were previously
10       marked as Exhibit 48A for identification.)
11       MS. ROHN:    48A, it is IPOS 271.  It's dated
12  February 11, 2021.
13       46B, it was next page at 46B.
14  BY MS. ROHN:
15   Q.   It appears to be Andrew Canning's Near Miss
16  Report.
17       Was it a requirement that he do a Near Miss Report?
18   A.   Can you scroll down just so --
19   Q.   I'm sorry.
20       MS. ROHN:    Scroll down a little bit, Karima.
21  BY MS. ROHN:
22   A.   The other way, I guess.  That's fine.
23       But, yes, it is a requirement that any accident,
24  incident, near miss, we have something called lifesaving
25  rules is required to be reported.

238

1    Q.   And is he supposed to give that near miss to
2    IPOS?
3    A.   Yes.  We have a system that captures.  We don't
4    distinguish between contractors, vendors, employees.  We
5    record everything into a system to be able to track that
6    any corrective actions that are necessary and learn from
7    it.
8        MS. ROHN:    If you scroll up to the top.
9    BY MS. ROHN:
10   Q.   It says, from Merlin, "Andrew, We just spoke and
11   glad you didn't get hurt more than you did.  We spoke of
12   the preventive measures we will implement shortly?"
13       What preventive measures were those?
14   A.   From what I understand at the time was that Petro
15   acknowledged that they did not have enough clips for there,
16   and so they were going to get clips and make the repairs.
17   And then, again, I think it was going to be some sort of
18   access restriction or notification to the employees.
19   Q.   And then it says "Coury/Ganger will liaise with
20   you --"
21   A.   Liaise.
22   Q.   Yeah.
23   -- "should you need further support in writing the
24   Near Miss Report."
25       Was there any further Near Miss Report?

239

1    A.   It was ultimately put in.  It was not put in by
2    Andrew.  He didn't have access to VTTI system.  So Granger
3    ultimately put it into our system.
4        MS. ROHN:    Exhibit 48Q.
5        Is that 48Q?  I mean, sorry, 46Q.
6        (E-mails Bates Nos. IPOS 6693 to 6700 were
7        previously marked as Exhibit 46Q for identification.)
8        MS. ROHN:    If you'll go to the Bates-stamped
9        No. 6695.  I believe that might be.  Yeah, that's it.
10       If you will scroll to the top of the page.
11   BY MS. ROHN:
12   Q.   There's an e-mail from Merlin, February 14, 2021,
13   to yourself.
14       "Hello David, I think the differences of opinion and
15   animosity between Andrew and PIS and the IPOS team have
16   reached an apex and I have concerns, right or wrong, that
17   there may be repercussions.
18       "I have not spoken with PIS as yet, but the direct
19   conversations I have had with Coury, Calvin and Granger are
20   disturbing.  I'm not sure how to gauge that - is it
21   vindictiveness to a lapse in the Boiler platform
22   installation oversight by Coury/Calvin or is it Andrew
23   tying to make a case to throw PIS under the Bus.
24       "My concern is that all three parties; Andrew, PIS,
25   IPOS staff are unlikely to back down and to restart with a

240

1    clean slate without us doing something.  Therefore, once
2    you settled down from the events of last week let's have a
3    chat."
4        Did you talk to Merlin about this?
5    A.   Yes, I did.
6        MS. ROHN:    If you go to Bates-stamped 6697.
7        MS. FRANCIS:    Attorney Rohn, can we take a
8        break.  We've now been going in excess of an hour.
9        MS. ROHN:    As soon as I finish this one
10       exhibit, we certainly can.
11   BY MS. ROHN:
12   Q.   6697, you respond the same day, "Merlin, I
13   completely agree.  If half of what Petro says happened,
14   there is only trouble brewing.
15       "We should regroup while he is out and make sure we
16   are aligned and make sure Garry is aware then Sebastian
17   again."
18       When you say "regroup while he is out," are you
19   referring to Mr. Canning?
20   A.   Yes.
21   Q.   And what had Petro told you?
22   A.   This was the e-mail that I believe you showed me
23   earlier from Adrian where he had been told by -- I don't
24   want to speak out of turn, but I think you showed me the
25   document, the e-mail by Adrian that Chad and Frank said

241

1    that Andrew was going to sue IPOS and Petro related.
2    Q.   So what did you understand to be the animosity
3    and vindictiveness?
4    A.   I think specifically where -- you're referring to
5    Merlin's comments?
6    Q.   Yes, I am.
7    A.   Is it okay to go back up to that so I can see --
8    Q.   Sure.
9        MS. ROHN:    That's 6695.  Oh, actually I could
10       have gone down on the page you were on, but sorry.
11       MS. FRANCIS:    I don't think we're seeing what
12       the witness asked --
13       MS. ROHN:    Go to 6697 again, Kamia -- Karima.
14       And if you can scroll down, you can see -- scroll
15       down a little bit.  Scroll down.  Scroll down.
16   BY MS. ROHN:
17   Q.   That's Merlin's original e-mail.
18   A.   Okay, yes.  Thank you.
19       So the boiler work, as you can see, where he's talking
20   about IPOS, that was done by Coury and Calvin.  So, you
21   know, that's what Merlin is stating is it that Andrew was
22   upset he wasn't involved in that project or ultimately
23   that, you know, it wasn't done correctly or was more cost.
24   So that's the -- the IPOS side.  Or is it, again, is it
25   Andrew trying to make it a case to throw Petro under the

242

1    bus.
2         That's where you asked for the -- I think you said
3    animosity.  I forget the exact word that you used.
4    Q.   Vindictiveness.
5    A.   Oh, vindictiveness.  Okay.  Vindictiveness.
6    Sorry.
7         Yeah, so the vindictiveness is directly on, again, you
8    know, this boiler project was a maintenance project, not a
9    Vitol project.  And so Merlin is surmising is that -- is
10   that what caused the friction between IPOS and Andrew.
11   Q.   So would you think that -- did you draw the
12   conclusion -- you and Merlin draw the conclusion that the
13   reason that Canning was being so negative towards Petro was
14   because he was not being involved in the work that they
15   were doing?
16        MS. FRANCIS:    Objection.
17   BY MS. ROHN:
18   Q.   You may answer.
19   A.   I can't speak to what Andrew was thinking or not
20   thinking.
21   Q.   Well, did you guys draw the conclusion that that
22   was one of the motivating factors?
23        MS. FRANCIS:    Objection.  Foundation.
24   BY MS. ROHN:
25   A.   I don't recall.

243

1         MS. ROHN:    Okay, let's take a short break.
2         (A recess was taken at this time.)
3         MS. FRANCIS:    Before we start, I just want to
4    make clear we been going for more than six and a half
5    hours with this witness.  It is now 6:21 p.m.
6         During the deposition of Mr. Melendez, there was
7    a representation by counsel for Petro that she had to
8    pick up kids and that 5 o'clock was the cut-off, and
9    Mr. Melendez, who is sitting in counsel's office,
10   needed to move his car.
11        And so while we have been accommodating, other
12   counsel may need to ask questions, and this witness
13   cannot stay here all night.  That's not fair.  It's
14   not reasonable given the number of depositions in this
15   matter.  So --
16        MS. ROHN:    I'm entitled to seven hours, and we
17   broke to take another deposition.  So please don't
18   convey the idea that we have been going with this
19   witness until this time, as we have indeed gone with
20   other witnesses as well.
21        MS. FRANCIS:    We have gone longer with this
22   witness than any single witness in this case.
23        MS. ROHN:    Okay.  And I don't -- great.  And
24   that just took more time, and that will not go against
25   the time of my deposition.  So is there anything else

244

1    you would like to say before I start the deposition?
2         Could you go on the record, please.
3         Can you go on the record please, or are we on the
4    record?
5         THE COURT REPORTER:    We are on the record.
6         MS. ROHN:    Exhibit 295, please.
7         (E-mails Bates No. IPOS 4856, 4839, 4840, 4838
8    were previously marked as Exhibit 295 for
9    identification.)
10        MS. ROHN:    295.  Go ahead.  Keep going.  Just
11   scroll quickly, please.  You're going up instead of
12   down.
13        Okay, thank you.  You did find it.  You're doing
14   exactly right.
15        295, can you go to Bates-stamped 4840?  Actually,
16   4839.  So if you can go up to 4839.  To the bottom of
17   that page.
18   BY MS. ROHN:
19   Q.   There's an e-mail from Tim K. to Merlin,
20   Charlotte.  And if you go down to 4840, there's a list of
21   documentation that are needed for the No. 3 vent line.
22        Do you agree that that listing there prior to
23   commencement of work and after construction completion was
24   a list of documentation at the beginning of the project
25   that Charlotte informed Vitol would be needed on this job?

245

1    A.   I'm not copied on that e-mail, but me reading it,
2    yes, I would agree.
3         MS. ROHN:    46X.
4         Actually, I can skip that.
5         303.
6         (E-mails Bates Nos. Canning 14278 to 14280 were
7    previously marked as Exhibit 303 for identification.)
8         MS. ROHN:    It is after 288, so keep scrolling.
9         Keep scrolling, please.  It's after 288.
10        Okay, there it is.  That's 303.  Thank you.
11   BY MS. ROHN:
12   Q.   303 is an e-mail --
13        MS. FRANCIS:    What is the Bates number?
14        MS. ROHN:    The Bates numbers on this are
15   Canning 14278 through 4280.
16        And if you'll go to Canning 14278, which is the
17   third page of this e-mail.
18        That's it right there.
19   BY MS. ROHN:
20   Q.   There is an e-mail from Merlin to Andrew Canning
21   and copied to yourself.  "Conference Call on Monday.
22   "I like to have a call amongst us to reset our
23   relationship as there have been a few hiccups these last
24   few weeks.  Can we have a Starleaf call on Monday?"
25        Were you aware of what Mr. Merlin was talking about

246

1  when he sent out this e-mail saying that he wanted a
2  Starleaf call with Mr. Canning and Adrian Melendez?
3      A.  Not specifically, but some of the documents that
4  we've seen, I mean, it could be some of the issues related
5  to the RIO panels and the handling of that and some other
6  things we've discussed today, but specifically, no.
7          MS. ROHN:    If you go to 14279, which is the
8      first page of that exhibit.
9  BY MS. ROHN:
10     Q.  And this is Canning's response to Merlin,
11 yourself and Garry Stoker.
12         First of all, do you know why Garry Stoker would be
13 added to this by Mr. Canning?
14     A.  I don't.
15     Q.  "Merlin, I do not think the intended purpose of
16 the telephone conference on Monday with Petro Industrial
17 will be met ("to reset our relationship as there have been
18 a few hiccups after these last few weeks") unless I better
19 understand the comments you made in our brief telephone
20 discussion on Saturday where you talked about my -- 'my
21 continued interference with the operation and operations
22 led work.' I believe it is worth discussing this and
23 several other recent comments that you have made outside of
24 a call with the IPOS contractor PIS in an environment where
25 we can hopefully agree on how the working relationships may

247

1  operate in the future."
2          Were you aware of a call between Merlin and Canning
3  about his interference with operation and operations?
4      A.  Not that I recall.
5          MS. ROHN:    If you go to the second page of
6      that exhibit.
7  BY MS. ROHN:
8      Q.  Mr. Merlin copies you, takes Mr. Stoker off, and
9  says, "However, the comment that I made to you yesterday
10 was to reach out to me on issues of a project that is under
11 operations control."
12         What do you understand to be under operations'
13 control?
14     A.  So we call ourselves operations regardless of the
15 individual group. So Calvin and Coury, while they're
16 maintenance supervisors, were an operational entity. So
17 that's what he means by any maintenance project that would
18 have been completed, not as part of a project.
19     Q.  And he says "What I don't like to see is you
20 asking questions and/or giving directions to Contractors
21 under our direct control. For example, you were asking the
22 Security Guard for the Gate Logs. Both David and I have
23 spoken to you before of the sensitive of your review of
24 those logs."
25         Had you spoken to Mr. Canning about the sensitivity of

248

1  review of those logs?
2      A.  I don't recall.
3      Q.  Do you know why reviewing those logs would be
4  sensitive?
5      A.  Well, if -- if you're -- if you're going to look
6  at the logs, there are no secrets in IPOS or in that
7  facility; so somebody is going to tell somebody which is
8  then going to add animosity.
9      Q.  "In spite of discussing this with you, this
10 situation has reoccurred. As we discussed before the need
11 for you to have the gate information is not a problem, but
12 your direct request is creating a problem for us as
13 previously discussed."
14         Had you had such discussions with Mr. Canning before?
15     A.  No, I believe Merlin is talking about for himself
16 and Andrew discussed.
17     Q.  Goes on to say "The issue yesterday was that I
18 was informed by PIS that you stopped the work. I got this
19 from Petro, and for that reason I called you. My point to
20 you yesterday was to reach to me or Calvin first if you
21 have any questions or concerns and not engage the
22 Contractor who is working on an IPOS supervised project. I
23 didn't say to you in any way to 'not interfere in our work'
24 or words as such."
25         Were you aware of Mr. Canning stopping PIS work?

249

1      A.  I was not.
2      Q.  Did Mr. Merlin discuss that with you?
3      A.  I don't recall.
4      Q.  "The reason I like you and Petro on a call is
5  last week you spoke of a Petro employee who you believe may
6  be 'living in an IPOS site.' At the time, I asked
7  questions of you as a safety issue for us if someone is
8  indeed living on site as you perceived and not Petro or IPS
9  was -- not Petro or IPOS was aware of your observations."
10         Were you ever aware of a Petro employee living
11 on-site?
12     A.  No, ma'am.
13     Q.  Did you discuss this with Merlin?
14     A.  No.
15     Q.  Did you agree with Merlin that he should stop
16 having direct conversations with contractors, particularly
17 Petro?
18         MS. FRANCIS:    Objection. Form. Vague.
19 BY MS. ROHN:
20     Q.  Did you agree -- go ahead.
21     A.  No, as I said earlier, anyone can stop a job for
22 a safety reason, even if you're wrong. If you are wrong
23 and stop it, then we sit down and talk about it. You know,
24 so again, not knowing the specifics as to why this was
25 stopped, and I still haven't seen where it says that's the

IPOS by DAVID SMITH

---

**250**

1  specific behind it, stopping work is not -- is something we
2  always allow anyone to do, contractor, anyone in the site,
3  even if you're wrong so...
4       But I do understand Merlin's concern about Andrew
5  taking care of his projects and leaving the operations
6  folks take care of the operations and maintenance.
7       MS. ROHN:    If you can go to 46K, which is
8  right after 289.
9       (E-mails Bates No. IPOS 6262 were previously
10  marked as Exhibit 46K for identification.)
11       MS. FRANCIS:    Bates, please.
12       MS. ROHN:    Bates stamps IPOS 6262.
13       If you could scroll faster, I'm running out of
14  time here.  Right after 289.  I think you've gone too
15  far.
16       What date are you on?  You are definitely way too
17  far.
18       46K is April 24, 2021.  Do you have them listed
19  by number?  Can you just click on the one for the
20  exhibit?
21       (Off the record.)
22       MS. JENKINS-GUZMAN:    Can you see the document?
23       THE WITNESS:    I can see a document.
24       MS. FRANCIS:    We cannot see a date of that
25  document.  We cannot see who it was sent to or who the

---

**251**

1  sender was.
2       Thank you.
3       Now you need to scroll so the witness can read
4  the document.  Scroll down, please.
5       THE WITNESS:    Can you go back up just a little
6  bit?  Thank you.  Right there's good.
7       Can you continue to scroll towards the bottom of
8  the e-mail, please?
9       Thank you.
10       MS. FRANCIS:    Sorry, please scroll down.
11  Please scroll down into the body.  Thank you.
12       Scroll down just a little bit, please.  Thank
13  you.
14       Attorney Rohn, is there a question pending?
15       MS. GUZMAN, did we lose Attorney Rohn?
16       MS. ROHN:    Yes.  I answered three times.
17  BY MS. ROHN:
18       Q.  Is this a statement -- it's a operations project
19  or a special project?
20       MS. FRANCIS:    I think you were on mute while
21  you thought you were asking questions.
22       MS. ROHN:    Thank you.
23  BY MS. ROHN:
24       Q.  Can he answer the question?  Hello?
25       A.  Yes.  Yes.  No.  No, I'm -- I believe this was

---

**252**

1  the -- the 1-inch project, which would have been a Vitol
2  project, I believe.
3       Q.  And the bottom of the first -- of the page, says
4  "Given the concerns over direct (potentially controversial)
5  communication with the contractors including the general
6  contractor PIS, I wonder if you could highlight the poor
7  practice concerns summarized above and ask what they plan
8  to do to mitigate the issues to date and going forward?"
9       First of all, this was -- were you supposed to address
10  these projects -- these issues with Petro if it was a
11  special projects project?
12       A.  If it was a Vitol project, then -- then, I mean,
13  again, we have interaction because we would be issuing
14  permitting and such, but, no, we were not responsible for
15  the project.
16       Q.  At the top of it it says --
17       MS. ROHN:    Top of the document.
18  BY MS. ROHN:
19       Q.  It says "Thanks Andrew we will discuss with PIS."
20  Was there discussion with PS -- PIS that you're aware
21  of?
22       A.  I'm not aware.
23       Q.  Okay.
24       MS. ROHN:    So, Karima, can you now go to 46C?
25  And I think it would be quicker to go out and then

---

**253**

1  just go to the document than scrolling.
2       (E-mails Bates No. IPOS 1972 were previously
3  marked as Exhibit 46C for identification.)
4       MS. FRANCIS:    What are the Bates numbers,
5  please?
6       MS. ROHN:    She hasn't gotten to it yet.
7       MS. FRANCIS:    I thought you had a paper copy
8  in front of you, Attorney Rohn.
9       MS. ROHN:    Well, I haven't had an answer to
10  whether she can go out and go back into 46C.
11       There we go, I guess she can.
12       The Bates number is IPOS 1972.
13       MS. FRANCIS:    Thank you.
14  BY MS. ROHN:
15       Q.  July 13, 2021.
16       MS. ROHN:    Can you scroll down, please?
17       Thank you.
18  BY MS. ROHN:
19       Q.  Andrew Canning to yourself, no cc to Merlin.
20  Do you recall getting this e-mail from Mr. Canning?
21       A.  The one from July 13th there on the screen?
22       Q.  Yes, sir.
23       A.  Yes.
24       Q.  Okay.  He indicates "It was interesting to see
25  Elias was back on the scene at the PIS offices and also see

---

IPOS by DAVID SMITH

---

254

1  his reaction when he knew I was on the call - slipping to
2  one side of the camera, any idea if he or others from the
3  slack working team have reappeared on site?"
4      Who did you understand to be "the slack working team"?
5      A.  I don't know.  I mean, I -- I can't speak for
6  Andrew.  I suspect it was the other e-mail that -- for the
7  people that he had during the RIO panel.  I think it was
8  Juan, Elias, and I don't remember the name of the third
9  person that he had asked to be removed from the project.
10  It was something we discussed earlier.
11      Q.  It says "On a related subject, I have some real
12  concerns with the poor quality work fabrication that PIS
13  has been producing and Merlin appears to have been
14  accepting over recent months."
15      Did you have any discussion with Merlin about whether
16  or not he was accepting poor quality work from PIS?
17      A.  Well, at this point, Merlin was already -- had
18  left and Terry had been on the job for about eight days.
19  So -- so again, seeing this now, no, I did not reach out to
20  Merlin.  I believe my response was Terry was going to be
21  proactive and make his own determination.
22      Q.  He says "The lack of PIS fabrication quality and
23  QA compliance is something I would like to address with you
24  and Terry once he is in position."
25      Did he ever have a discussion with you about that?

---

255

1      A.  I believe right after this is when the whole
2  discussion started related to the welder qualification.  So
3  I don't believe that that conversation happened.
4      MS. ROHN:    Could you go to the next exhibit,
5  which is 46L?
6      46L, the very next document.  There we go.
7      (E-mails Bates Nos. IPOS 6275 to 6277 were
8  previously marked as Exhibit 46L for identification.)
9  BY MS. ROHN:
10      Q.  This is the same e-mail, but you have an e-mail
11  from David to Terry saying "FYI, I told you that
12  Andrew/Merlin have a cold war going on.
13      "I told Andrew it would be good to talk to you and I
14  when he gets back."
15      When had you told Terry that Merlin and Andrew had a
16  cold war going on?
17      A.  I mean, sometime in that prior week.  Terry had
18  started I believe July 5th.
19      Q.  And what made you think there was a cold war
20  going on?
21      A.  I believe we discussed this earlier.  It was they
22  did not agree on engineering and how projects should be
23  done, and there was -- as we've seen through several of
24  these e-mails today, there's definitely some concern
25  between the two of them about the other and how they -- how

---

256

1  they work.
2      MS. ROHN:    If you could go to 252.  It's
3  probably easier to go out and come back in.
4      (E-mails dated July 15, 2021, were previously
5  marked as Exhibit 252 for identification.)
6      MS. ROHN:    It's probably easier if you come
7  out and go back in.  It's a lot of documents away.
8      Please go out and come back in.  You're -- this
9  is a June document.  You are passed it.
10      Wait, wait, wait.  Scroll up.  252.  Sorry, you
11  were there.
12      MS. FRANCIS:    What's the Bates number?
13      MS. ROHN:    I don't know.  The sticker is on
14  top of the Bates number.  Sorry.
15  BY MS. ROHN:
16      Q.  You see this where it says from Tim K.,
17  July 15, 2021.
18      "We're having issues gaining access to the Dropbox.
19  Can you please invite myself and Andrew to the files."
20      And then there's an e-mail added to the Dropbox.  It
21  says "Adrian Melendez shared 3-inch vent line - QC Book
22  with you."
23      What do you understand QC Book references?
24      A.  At this point, I did not have access to the
25  Dropbox so...  But QC is quality control.

---

257

1      Q.  All right.  Did you -- oh, I think we've had this
2  conversation.
3      MS. ROHN:    Can you go for to 46S, which there
4  is one exhibit in between, which is 273.  It has about
5  four pages in, which is 46S.
6      (E-mails Bates Nos. IPOS 7864, 7865, 7845, 7846
7  were previously marked as Exhibit 46S for
8  identification.)
9      MS. ROHN:    That's it right there.
10  BY MS. ROHN:
11      Q.  This is an e-mail from Andrew Canning to yourself
12  and Garry Stoker again.
13      Do you know why Andrew Canning keeps adding
14  Garry Stoker?
15      A.  They've known each other for more than, I don't
16  know, 15, 20 years.  I don't know how long but a long time.
17      Q.  And starts off -- this July 20, 2021.  "Per our
18  conversation this morning, I am now as certain as I can be
19  that the welders certification (WPQ) presented by
20  Petro Industrial Services are not genuine."
21      And then he goes on to list that they had been edited
22  by the welder's name.
23      A.  Can you scroll down, please?
24      Q.  Sure.
25      MS. ROHN:    Scroll down, please.

---

IPOS by DAVID SMITH

258

BY MS. ROHN:

1
2    A.    As you're saying it.  Thank you.
3    Q.    And then --
4        MS. ROHN:    Keep scrolling.
5 BY MS. ROHN:
6    Q.    He lists the various things that he find to be
7 anomalies.  And then he says "At best this falsification
8 puts VTTI in a very embarrassing position with Vitol and
9 WAPA at --"
10       Why would it put VTTI in an embarrassing position with
11 Vitol and WAPA?
12       MS. FRANCIS:    Objection.  Calls for
13 speculation.
14 BY MS. ROHN:
15    Q.    You may answer.
16    A.    Because of the fact that our contract says that
17 we're going to certify, do everything safely, do everything
18 within industry standards and records.
19    Q.    And then he says "at worst it compromises the
20 lack of quality assurance comprises the integrity of the
21 asset not only for this work but for all other fabrication
22 undertaken by this particular team and possibly other
23 previous fabrications undertaken by PIS 'certified
24 welders'.  Even worse is the potential affect on the supply
25 of propane to WAPA which could require a full stoppage

259

1 during the replacement of the compromised systems."
2        Did you agree with that supposition that that's what
3 would happen as a result of this confusion over the
4 certifications?
5        MS. FRANCIS:    Objection.  Form.  Objection to
6    the extent that the question mischaracterizes the
7    document.
8 BY MS. ROHN:
9    Q.    Sir, did you?  Can you answer my question?
10    A.    Yes.  Yes, I can answer your question.
11       Yes, at the very at least, it puts our credibility on
12 the line.  Again, not being an engineer, the concerns
13 raised for something that we needed to investigate to
14 figure out what would happen or could happen.
15       MS. ROHN:    And then if you go to 46D, which
16    is the next exhibit.
17       (E-mails Bates Nos. IPOS 1973 to 1974 were
18       previously marked as Exhibit 46D for identification.)
19 BY MS. ROHN:
20    Q.    At the top you say --
21       MS. FRANCIS:    What's the Bates number?
22 BY MS. ROHN:
23    Q.    You respond to Andrew to that same e-mail.
24    "Hi Andrew, I sent you a separate e-mail earlier.  Can
25 we have a call you and I then meeting adding Merlin and

260

1 Terry?"
2        Do you recall what you sent him in a separate e-mail?
3    A.    I don't recall.
4    Q.    And why did you have -- wanted to have a meeting
5 with just he and you before talking to Merlin and Terry?
6    A.    To find out, you know, the reason why he put all
7 these allegations down and what the concerns were, so we
8 could determine what the best path forward was.
9        MS. ROHN:    All right.  The next exhibit, 47U.
10       (E-mails Bates Nos. IPOS 8835 to 8836 were
11       previously marked as Exhibit 47U for identification.)
12       MS. ROHN:    The next exhibit, 47U.
13 BY MS. ROHN:
14    Q.    So if you'll scroll to the bottom of that
15 document, on July 20th, the same day, you have an e-mail
16 from David Smith to Andrew Canning.
17    "I spoke with Garry.  He wants us to get it moving
18 right away.  I have 8am or 10am for the call with Merlin."
19       Why did you speak to Garry?
20    A.    Again, he's the chief operating officer,
21 responsible for operations.  He was copied on the e-mail.
22 Andrew is not an employee, uhm, of the company; so,
23 therefore, Garry wanted to talk to me.
24    Q.    And what was the substance of your conversation?
25    A.    I don't recall.

261

1    Q.    Well, was it about Petro?
2    A.    Yes.
3    Q.    And was it about what to do about the allegations
4 against Petro?
5    A.    Yes.
6    Q.    And did Garry make any recommendations to you?
7    A.    I don't recall the recommendations.  However,
8 after -- after that, we brought Andreas, who's the -- we
9 spoke about him earlier, the global technical director, and
10 he took over from there.  So it must have been advice to
11 get people involved there that had the technical knowledge.
12    Q.    And Canning responds to you.
13       MS. ROHN:    If you scroll up.
14 BY MS. ROHN:
15    Q.    "You know my views on complicity an Merlin."
16       What were his views on complicity of Merlin?
17       MS. FRANCIS:    Objection.  Foundation.
18 BY MS. ROHN:
19    A.    Yeah, as you can see it from some of his previous
20 comments that you put in front of us today, you know, he
21 believed that Merlin was friendly with Petro at the risk of
22 work being performed and quality of work.
23    Q.    Then it says "I assume the message going out will
24 be that VTTI (namely Merlin) has initiated the
25 investigation and the presumed resultant immediate

IPOS by DAVID SMITH

262

1  suspension of all PIS activities and immediate exclusion
2  from site of all PIS personnel as a preemptive measure to
3  show decisive action to Vitol, therefore eliminating the
4  need for me to inform Vitol and removing me from the direct
5  involvement.  (But I'm pretty sure Merlin will tell PIS
6  anyway)."
7      Did you agree that immediately PIS should be removed?
8      A.  I -- I didn't agree.  I mean, this is Andrew's
9  comment.  This was not my comment.
10     Q.  And was he threatening that if you didn't remove
11 PIS, he would go to Vitol and tell Vitol what was going on?
12     A.  I can't speak to what Andrew is trying to convey
13 here about a threat or not.
14         MS. FRANCIS:    Attorney Rohn, we are now at
15 6:59 p.m.  It is 10 hours after this deposition was
16 noticed.  We have been on the record for seven hours
17 and two minutes with this witness.  And this
18 deposition is therefore concluded, subject to other
19 counsel having an opportunity to cross-examine
20 Mr. Smith.
21         We have been more than accommodating.  We have
22 had a series of depositions that should have been
23 directed to other witnesses who appeared for
24 deposition.  This is not fair or reasonable to anyone.
25 We have a deposition at 9:00 a.m. tomorrow.  So your

263

1  questions --
2          MS. ROHN:    I only have ten minutes more, and
3  I'd like to complete.
4          MS. FRANCIS:    You do not have ten minutes.
5  You have one day of seven hours.  Your seven hours has
6  concluded, Attorney Rohn.
7  BY MS. ROHN:
8      Q.  Who made the decision to terminate Petro?
9  Please answer my question.
10         MS. FRANCIS:    You have two minutes.  So ask
11 your two most important questions.  Your one day of
12 seven hours, Attorney Rohn, has concluded.  This is
13 not fair or humane.
14         MS. ROHN:    You're just taking up more time.
15 BY MS. ROHN:
16     Q.  Can you answer my question, please?
17         MS. FRANCIS:    Don't speak to the witness that
18 way, please.
19 BY MS. ROHN:
20     Q.  Who made the decision to terminate Petro?
21     A.  I made the decision to terminate Petro.
22     Q.  Did you do a consultation with anyone else?
23     A.  I reviewed all of the facts and -- all from the
24 technical folks and made the decision.
25     Q.  Did anybody -- did you ask -- did you discuss

264

1  your decision with terminating Petro before you finalized
2  your decision?
3      A.  I did not ask anyone for approval to make that
4  decision.
5      Q.  Did you -- did anyone else tell you that they
6  approved of the decision?
7      A.  After I made the decision, I think people
8  concurred with it, but I didn't seek any approval.
9      Q.  And who concurred with it?
10     A.  Merlin concurred with it.  Terry concurred with
11 it.  Andreas concurred with it.
12     Q.  How about Charlotte?
13     A.  I notified them after our decision was made.
14     Q.  Did she concur with it?
15     A.  I actually did not speak to Charlotte.  I
16 notified Vitol after a decision was made.
17     Q.  Who at Vitol did you notify?
18     A.  Sebastian Moretti.
19     Q.  Did he concur with it?
20     A.  He didn't have a say in what we chose to do.  He
21 could still feel free to continue with project work related
22 to it.  It was more of a formal notification to him that we
23 were changing contractors.
24         MS. ROHN:    I have no further questions.
25         Well, I have further questions, but you won't let

265

1  me ask 'em.
2          MR. SIMPSON:    I have no questions.
3          MR. BECKSTEDT:    This is Carl Beckstedt.  I do
4  have some questions, and I will try to make it short.
5  I understand that this has been a long day.
6          Do I have --
7          MS. FRANCIS:    Attorney Beckstedt, can we just
8  get just two minutes as a rest break, please?
9          MR. BECKSTEDT:    Oh, absolutely.
10         MS. ROHN:    I thought we just took two minutes.
11         MS. FRANCIS:    I don't think we just took two.
12 I need a comfort break, Attorney Rohn.
13         (A recess was taken at this time.)
14             CROSS-EXAMINATION
15 BY MR. BECKSTEDT:
16     Q.  Good evening, Mr. Smith.  My name is
17 Carl Beckstedt, and I represent Vitol US Holding II Company
18 and Vitol Virgin Islands Corp.  Okay?
19     A.  Yes, sir.
20     Q.  I have a couple of follow-up questions.
21     First of all, early on in your testimony you stated
22 that you think Petro did work for a Vitol entity on island.
23 That's what I wrote down.
24     Do you know whether Vitol (sic) ever did actually any
25 work directly for any Vitol entity on island?

266

1  A.  The only thing I know is that Vitol made direct
2  payments to Petro.  I don't know who that was to.
3  Q.  What do you know about that?
4  MS. ROHN:  Objection.  Form.
5  BY MR. BECKSTEDT:
6  Q.  What do you know about -- what knowledge does
7  IPOS or do you personally have about Vitol -- Vitol entity
8  making direct payments to Petro?
9  A.  Several projects such as the truck rack and the
10  reverse flow loading, we were -- we had to grant permits
11  for it.  So, therefore, the work that was being done didn't
12  come through us; however, there was work that was being
13  done from Petro as well that was then reimbursed by Vitol
14  to us.
15  Q.  You need to break that down for me.  So are you
16  saying that Vitol reimbursed you for payments that --
17  meaning IPOS, for payments that IPOS made to Petro?
18  A.  For work commissioned by Vitol, yes, that's one
19  part.
20  Q.  Okay.  So when you say -- so when you say that
21  Vitol paid Petro directly for work, it wasn't directly a
22  check from a Vitol entity to Petro; it was a Vitol paying
23  IPOS reimbursement for moneys that IPOS paid to Petro; is
24  that correct?
25  MS. ROHN:  Objection to form.

267

1  BY MR. BECKSTEDT:
2  Q.  I'm trying to understand your testimony, sir.
3  A.  No, there's two parts to it.  So one part,
4  correct.  But the other part was there was work that Vitol
5  commissioned directly to Petro that -- that we were not
6  involved in the work.  We were only involved in the
7  permitting on-site.
8  Q.  When you say -- when you say "we were not
9  involved in the work," you mean IPOS wasn't involved in the
10  work; correct?
11  A.  That is correct, yes.
12  Q.  And was IPOS -- was IPOS -- for that type of work
13  that you just described, was IPOS involved in any other
14  aspect of the relationship between the Vitol entity and
15  Petro for that work that you -- that IPOS issued permits
16  for?
17  A.  Again, for the second part of that, no, we were
18  not involved at all with that.
19  Q.  So you didn't -- you didn't receive any payments
20  from Vitol that you -- in reimbursement -- well, you didn't
21  pay Petro any money for that work on those projects?
22  A.  Again, it depends on the project.  But for that
23  part, for example, the reverse flow and truck rack, that is
24  correct, we made no payments to Petro on anyone's behalf.
25  We were not involved in the project.  We only issued

268

1  permits to allow access to the site.
2  Q.  Okay.  And when did that work occur?
3  A.  Various times through the year.  I mean, there
4  was other work that fell under the same category as well.
5  Those are just two examples.  The truck rack, I believe,
6  started in 2019, and the reverse flow, I believe, started
7  in 2020.
8  Q.  Okay.  And which Vivot entity do you understand
9  worked -- contracted directly with Petro?
10  A.  No, that's -- that's what I believe that I had
11  stated earlier.  I don't know which entity had contracted.
12  Q.  And how do you know -- and was it -- I think I
13  just misspoke.  Was it a Vitol entity?
14  A.  It was -- yeah.  I believe so, yes.
15  Q.  And what informs your belief that it was a Vitol
16  entity?
17  A.  There were occasions where invoices would come to
18  us instead, and we would say this is not us; this is for a
19  Vitol project.
20  Q.  When you say invoices came to us instead, do you
21  mean that Petro sent an invoice to IPOS for the work?
22  A.  Yes, as -- yes.  In some cases, yes, depending on
23  the project.
24  Q.  Okay.  And when you received these invoices from
25  Petro to IPOS for work that you did not believe or

269

1  understand that IPOS was responsible for paying, did you
2  give them back to Petro?
3  A.  That's correct.
4  Q.  And do you know what Petro did with them?
5  A.  I do not.
6  Q.  So you don't know which entity Petro ultimately
7  billed for that work or invoiced for that work; correct?
8  A.  That is correct.
9  Q.  And so, as you sit here today, IPOS doesn't know
10  whether it was a Vitol entity or some other entity like
11  WAPA itself directly; correct?
12  MS. ROHN:  Objection.  Form of the question.
13  Asked and answered.
14  BY MR. BECKSTEDT:
15  Q.  Am I correct, sir?
16  A.  No, you're not correct.
17  Q.  What is incorrect?
18  A.  The people from Vitol had told me that these
19  projects, since we weren't doing them, were going to be
20  done by Vitol.
21  Q.  Who told you that?
22  A.  Eduardo Garcia, Sebastian Moretti.  I mean, there
23  were other projects, APR, Aggreko tie in, the projects that
24  did not go through us.
25  Q.  Okay.  Now, did the RIO shades project go through

270

1  you, IPOS?
2      A.  Yes, it did.  Yes, it did.
3      Q.  Okay.  So am I correct that Petro performed that
4  work on the RIO shades project pursuant to its contract
5  with IPOS?
6      A.  I'm not sure I know the right answer to that.
7      MS. FRANCIS:    Objection to the extent that
8      calls for a legal conclusion.
9  BY MR. BECKSTEDT:
10     Q.  IPOS contracted with Petro; correct?
11     A.  That's correct.
12     Q.  And at the time of the RIO -- first of all, your
13 testimony earlier today was that after Adrian Melendez
14 informed IPOS he was leaving Vivot and starting his own
15 company, IPOS gave him some individual work without a
16 contract; correct?
17     A.  Correct.
18     Q.  And Petro did that work, and IPOS paid for it,
19 and then eventually you formed a contract with Petro;
20 correct?
21     A.  That's correct.
22     Q.  And the first contract -- that was the first
23 formal contract that you had with Petro for work at the
24 propane facilities that IPOS was managing; correct?
25     A.  That's correct.

271

1      MS. ROHN:    Objection.  Leading.
2  BY MR. BECKSTEDT:
3      Q.  Is that correct?
4      A.  That's correct.
5      Q.  And you had testified earlier that that contract
6  was drafted by you personally taking forms that you had
7  seen previously used by IPOS; correct?
8      A.  Yes.
9      MS. ROHN:    Objection.  Leading.
10 BY MR. BECKSTEDT:
11     A.  That's correct.
12     MR. BECKSTEDT:    It's foundational.  I'm
13     getting --
14     MS. ROHN:    You just having him repeat his
15     testimony.
16     MR. BECKSTEDT:    I'm leading up to something.
17 BY MR. BECKSTEDT:
18     Q.  And then after that contract was completed, there
19 was another contract that was entered, and that was the one
20 that Adrian Melendez drafted and presented to IPOS;
21 correct?
22     MS. ROHN:    Objection.  Leading.
23 BY MR. BECKSTEDT:
24     A.  Yes, that's correct.
25     Q.  All right.  I want to show you -- I'm going to

272

1  share with you a document.  You see this -- you see on your
2  screen a contract document that is IPOS -- starts with IPOS
3  Bates No. 4055 entitled "Services Agreement," and it has --
4      MS. ROHN:    Can you blow that up?  I can't see
5      it.
6      MR. BECKSTEDT:    Can you see it now?
7      MS. ROHN:    No, it's the same -- now I can.
8  BY MR. BECKSTEDT:
9      A.  I can see it.
10     Q.  All right.  I'm going to represent to you that
11 this was produced by IPOS in this case.  And it's Bates
12 No. 4055, and it appears to be 18 pages with attachments
13 that go to IPOS 4072.
14     Are you familiar with this document, or do you need me
15 to go through each page?
16     A.  I'm familiar with the document.
17     Q.  Can you identify it for me?
18     MS. FRANCIS:    Attorney Beckstedt.
19     MR. BECKSTEDT:    Excuse me?
20     MS. FRANCIS:    Do you wish to give this an
21     exhibit designation?
22     MR. BECKSTEDT:    Yeah, we'll designate -- thank
23     you, Attorney Francis.  We'll designate this
24     Defendant's Exhibit 1 for this deposition.
25     (Services Agreement Bates No. IPOS 4055 to 4072

273

1      was marked as Defendant's Exhibit 1 for
2      identification.)
3  BY MR. BECKSTEDT:
4      Q.  Can you identify it for the record for me?
5      A.  Yes, this was the first contract that was signed
6  between Petro Industrial and IPOS.
7      Q.  I'm going to show you what we'll mark as Defense
8  Exhibit No. 2.
9      (Maintenance Contract Bates Nos. PIS 2 to 7 was
10     marked as Defendant's Exhibit 2 for identification.)
11 BY MR. BECKSTEDT:
12     Q.  This is a document that it was actually produced
13 by Petro in this litigation, Bates No. page 2 to 7.  I just
14 scrolled through it.  I'm maximizing it on the screen.
15     Are you familiar with this document?
16     A.  Yes, I am.
17     MS. FRANCIS:    For the record, that's PIS 2
18     through PIS 7.
19     MR. BECKSTEDT:    Thank you.
20 BY MR. BECKSTEDT:
21     Q.  Can you identify it for me?
22     A.  That was the renewal contract signed between
23 Petro Industrial and IPOS.
24     Q.  Okay.  And was that the contract that was in
25 place between IPOS and Petro at the time of the RIO shades

IPOS by DAVID SMITH

274

1  project?
2      A.  Yes, that's correct.
3      Q.  And was that the contract that was in place
4  between IPOS and Petro at the time of the 1-inch vent and
5  3-inch vent projects?
6      A.  Yes, that's correct.
7      Q.  And were there particularly -- particular agreed
8  labor rates with Petro underneath it pursuant to this
9  maintenance contract that's at Defense Exhibit No. 2?
10     A.  Yes, there were.
11     Q.  Now, I believe you characterized the RIO shades
12  project, the vent -- the 1-inch and the 3-inch vent line
13  projects as Vitol pass-through projects; is that correct?
14         MS. ROHN:   Objection.  Leading.
15  BY MR. BECKSTEDT:
16     Q.  Is that how you characterized them?
17     A.  Yes.
18     Q.  All right.  For Vitol -- what you call Vitol
19  pass-through projects, what role did IPOS play in those
20  projects?
21     A.  We probably need to talk about each one.
22     Q.  Okay.
23         MS. FRANCIS:    Object to the extent this has
24      been asked and answered.
25  BY MR. BECKSTEDT:

275

1      A.  So --
2      Q.  Let me -- let's back up before we talk about
3  that.
4         At this particular time, did IPOS have a contract with
5  Vitol Virgin Islands Inc.?
6      A.  Yes.
7      Q.  All right.  Let me show you another exhibit.
8         MR. BECKSTEDT:    We'll mark this as Defense
9      Exhibit 3.
10        MS. FRANCIS:    Please provide Bates numbers.
11        MR. BECKSTEDT:    I will.  I'm sorry, just
12     trying to get it up on the screen.
13        This is Vitol Bates Nos. 12, and it's 25 pages.
14     It goes through to Vitol 36.
15        (Facilities Services Agreement Bates Nos. VITOL
16     12 to 36 was marked as Defendant's Exhibit 3 for
17     identification.)
18  BY MR. BECKSTEDT:
19     Q.  Are you familiar with this document and -- are
20  you familiar with this document?
21     A.  Yes, I am.
22     Q.  Can you identify it for me?
23     A.  It's the Facilities Service Agreement that was
24  signed prior to my arriving that said that IPOS would be
25  operating the Virgin Islands propane facility on behalf of

276

1  WAPA -- I'm sorry, on behalf of Vitol.
2      Q.  And when you say "Vitol," just so we're clear,
3  we're talking about the entity Vitol Virgin Islands Corp.;
4  correct?
5         MS. ROHN:   Objection.  Leading.
6         MR. BECKSTEDT:    Okay.  Fine.  I'm trying to
7      push this along with the foundational questions,
8      Attorney Rohn, rather than drag this out for
9      Mr. Smith.
10 BY MR. BECKSTEDT:
11     Q.  But at any rate, when you say "Vitol," what
12  entity are you referring to, sir?
13     A.  Vitol Virgin Islands Corp.
14        MS. FRANCIS:    Attorney Beckstedt, if you're
15     going to ask the witness about that document, may I
16     ask that you blow it out because it's quite small.
17        MR. BECKSTEDT:    I will.
18        MS. FRANCIS:    Thank you.
19 BY MR. BECKSTEDT:
20     Q.  Did IPOS have any other contractual agreements
21  with Vitol Virgin Islands Corp. for any work that IPOS
22  performed at the WAPA facilities on St. Thomas and
23  St. Croix other than this Facilities Services Agreement
24  that's marked as Exhibit 3, Defense Exhibit 3?
25     A.  No, it did not.

277

1      Q.  Okay.  Did the work that IPOS performed at the
2  WAPA facilities in St. Croix and St. Thomas for
3  Vitol Virgin Islands Corp., was all that work performed
4  under this Facilities Services Agreement?
5         MS. ROHN:   Objection.  Leading.
6  BY MR. BECKSTEDT:
7      A.  Yes, it was.
8      Q.  Okay.  So I'll ask it another way.  Did IPOS
9  perform any work related to the Randolph Harley Power Plant
10  in St. Thomas and/or the Richmond Power Plant located in
11  St. Croix under any other agreements or contracts other
12  than the Facilities Services Agreement at Defense
13  Exhibit 3?
14     A.  No, it did not.
15     Q.  Okay.  And turning to -- first of all, are you
16  familiar in -- in your line of business of -- with what are
17  called independent contractors?
18     A.  Yes, I am.
19     Q.  And what does that -- what does that mean to you
20  in your line of business, such as what IPOS was doing under
21  this contract?
22        MS. FRANCIS:    Just to be clear, that's asking
23     for this witness' understanding and not for a legal
24     conclusion.  Correct?
25        MS. ROHN:   And objection to the form.

278

1      MR. BECKSTEDT:    Correct.
2  BY MR. BECKSTEDT:
3      Q.  I'm asking for your understanding from a business
4  perspective in your -- in your business work.
5      A.  The one company would ask or contract with either
6  another company or individual to perform services.
7  However, they are not representing the original company is
8  how I define it.
9      Q.  And who had control over the methods and means
10  that IPOS conducted its work?
11      A.  IPOS itself and shareholders.
12      Q.  And was Petro considered an independent
13  contractor with respect to its relationship with IPOS?
14      MS. ROHN:    Objection. Leading.
15  BY MR. BECKSTEDT:
16      A.  Again, legally I don't know.  But, I mean, I
17  would say yes, based upon the definition that I had given
18  you.
19      Q.  Right.  I'm just talking about in terms of your
20  -- your work relationships from a business perspective, not
21  from a legal perspective.
22      A.  Okay.  Then yes.
23      Q.  All right.  And who is responsible for the means
24  and methods of executing the actual work that -- that Petro
25  was contracted to do?

279

1      A.  That would be, again, depending on the project,
2  but that would be us, IPOS.
3      Q.  Well, in terms of if you hired Petro to do work
4  and you gave them a project or if they had -- they had work
5  to do, who was responsible for the actual work that was
6  being performed?
7      A.  Oh, Petro --
8      MS. ROHN:    Objection. Form.
9  BY MR. BECKSTEDT:
10      A.  -- was responsible for the work.
11      Q.  Okay.  And then what was -- fair enough.
12      Now, with respect to the projects, the Vitol
13  pass-through projects, I see here in the contract -- I'm
14  going to turn your attention to Exhibit A, paragraph (b).
15  I'm going to blow this up a little bit.
16      Can you see Exhibit A?
17      A.  I can see the top, yes, not -- not the paragraph
18  (b).  It's -- you need to scroll up.
19      Q.  I'm gonna scroll to it.  I'm going to direct you
20  to it.
21      So under paragraph -- well, first of all, Exhibit A,
22  Scope of Services, is this typical in contracting in your
23  business to have a Scope of Services as part of a contract?
24      MS. FRANCIS:    Objection.
25      MS. ROHN:    Objection to form.

280

1      MS. FRANCIS:    Form.  Overly broad.
2  BY MR. BECKSTEDT:
3      Q.  Are you familiar with -- let me reask it.  Are
4  you familiar with what a Scope of Services is?
5      A.  So actually not.  This is the only one that I've
6  ever worked with, and it was signed prior to me coming.
7      Q.  Fair enough.  Okay.
8      Under subsection (b), it says "IPOS shall assist Vitol
9  in administering and managing the operating budget process
10  with WAPA and to accounting and recording --" actually, let
11  me strike that a second.
12      I want to go down to subsection (d).  "IPOS shall
13  coordinate the Services of any sub-contractors performing
14  Services on the Plants."
15      Do you see that provision?
16      A.  Yes.
17      Q.  Okay.  Did that provision cover IPOS' role with
18  respect to the work performed by Petro in the Vitol
19  pass-through projects?
20      MS. ROHN:    Objection. Form.
21  BY MR. BECKSTEDT:
22      A.  I don't know the answer to that.
23      Q.  Okay.
24      There were a lot of questions in your testimony
25  earlier about the welding procedures that were required to

281

1  be followed with respect to the Petro work.
2      Do you recall generally that testimony?
3      A.  Yes, sir.
4      Q.  At one point there was some discussion about
5  requirement to inspect welds and only need the -- the need
6  only to inspect 10 percent of the -- of the welds.
7      Do you recall that testimony?
8      A.  Yes, sir.
9      Q.  Okay.  And my notes reflect that at one point
10  with respect to the 3-inch vent line, you talked about that
11  criteria being in a document provided by Vitol, is what I
12  wrote down was your testimony.
13      Was there a document provided by Vitol with respect to
14  that welding criteria or not?
15      A.  I -- if I said that, that's not what I meant.
16  The document was -- yeah.  Sorry.
17      Q.  That's fine.  Could you clarify then for the
18  record?
19      A.  Yes.  So the -- the Vitol person,
20  Tim Kologinczak, sent Petro an e-mail of what was required,
21  which would be like certifications.  However, the welding
22  -- the actual welding policy was a VTSS/IPOS welding
23  policy.
24      Q.  Okay.  So I'm gonna share -- I'm gonna share
25  Plaintiff's Exhibit 301 that was already used in this

282

1  deposition.
2      You have that in front of your screen?
3      A.  Yes, I can see it.
4      MS. FRANCIS:    Again, that's very small,
5  Attorney Beckstedt.
6      MR. BECKSTEDT:    I'm working on it.  Just you
7  have to bear with me.  I apologize.  Now my computer
8  just did something goofy.
9      MS. FRANCIS:    Yes, the goofy is you are no
10 longer sharing the document as far as we can see.
11     MR. BECKSTEDT:    Yeah.  And I've got Skype
12 opening up.  I got all kinds of goofy stuff happening.
13     Let me get back to this document.  And let me get
14 back to Zoom.
15 BY MR. BECKSTEDT:
16     Q.  Now, I don't know why I don't see it the way I
17 do, but is it getting big?
18     A.  Yes.
19     Q.  And do you recall looking at Plaintiff's
20 Exhibit 301, the "Piping Specifications For Welding"?
21     A.  Yes.
22     Q.  Is this the document that you're referring to?
23     A.  Yes.
24     Q.  Okay.  And this is a VTTI document; correct?
25     A.  Well, it's a VTSS document.  That was the

283

1  discussion about the letterhead says VTTI, but it was
2  produced originally by VTSS.
3      Q.  Okay.  And if I recall correctly, that's an
4  affiliate of IPOS; correct?
5      A.  It's not the affiliate.  It's the -- the
6  shareholder of the LLC, the --
7      Q.  So -- okay.  The bottom line is it's not a Vitol
8  document; correct?
9      A.  That is correct.
10     Q.  Okay.  Now, you mentioned about an e-mail from
11 Tim with respect to project documents that were gonna be
12 required; correct?
13     A.  Yes.
14     Q.  Would it -- for this 3-inch vent line project,
15 can you tell me specifically all the different things,
16 categories, I'm not asking for every specific minute spent,
17 but for categories, what was IPOS' role with respect to
18 coordinating that -- Petro for that pass-through project?
19     A.  So on that specific project, for example, when
20 the crew shows up for the day, it would be IPOS'
21 responsibility to write the work permit and issue the
22 permitting to, again, hot work, PPE, things I mentioned
23 earlier.  And then Vitol or Andrew Canning was the project
24 manager for that 3-inch project.
25     But, again, because it's happening on our facility,

284

1  just like on some of it was happening on WAPA's facility,
2  they would also permit it as well.  You know, WAPA safety,
3  IPOS safety were involved.  Merlin had been on-site as well
4  during this.  I mean, it was a big project.
5      Q.  What other roles did IPOS play in that project?
6      A.  Yeah, I'm not really aware of any other that I
7  can think of.
8      Q.  Didn't Petro give the bids to IPOS?
9      MS. ROHN:    Objection.  Leading.
10     MS. FRANCIS:    Objection.  As to what project?
11     MR. BECKSTEDT:    The 3-inch stainless steel
12 vent project I'm talking about right now.
13 BY MR. BECKSTEDT:
14     A.  I actually -- I don't know, but I think it was
15 given to Andrew, not to IPOS, but I don't know.
16     Q.  All right.  I'd like to show you a document see
17 if this refreshes IPOS' recollection.  Hold on a second.
18     There's an IPOS production that starts at IPOS 656 and
19 goes all the way to IPOS 666.  And I'm about to share that
20 with you.
21     MR. BECKSTEDT:    We'll mark that as DX 4.  So
22 this is a document produced by IPOS.
23     (Documents Bates Nos. IPOS 656 to 666 were marked
24 as Defendant's Exhibit 4 for identification.)
25 BY MR. BECKSTEDT:

285

1      Q.  Do you -- I'm going to blow it up.
2      Do you want me -- are you familiar with this document,
3  or do you want me to go through it?
4      A.  Well, I mean, if you can scroll through quickly,
5  but I am familiar with --
6      Q.  Okay.
7      A.  -- at least the Petro proposal.
8      MS. ROHN:    Can you put it bigger enough so we
9  can see it?
10     MR. BECKSTEDT:    All right.  I was -- I can do
11 that.  Is that big enough so you can see it?
12     MS. ROHN:    Sure.  Perfect.
13 BY MR. BECKSTEDT:
14     Q.  It's 11 pages.  I'm -- if I'm going too fast, I'm
15 just trying to see if you recognize it enough that you can
16 competently talk about it.
17     A.  Yes.
18     Q.  Okay.  So can you just identify what this is for
19 us?
20     A.  Yeah, that is the proposal that Petro had given
21 for the 3-inch vent lines.
22     Q.  Okay.  So that went to IPOS, and then what did
23 IPOS do with it?
24     A.  Well, it actually went to IPOS and
25 Andrew Canning.

IPOS by DAVID SMITH

286

1    Q.  Fine.  What did IPOS do with it?

2    A.  We -- to the best of my knowledge, we did nothing

3  with it.  It wasn't one of our projects.

4    Q.  Okay.  Did IPOS have any kind of communications,

5  though, with respect to this project?

6    A.  I can't speak to what Merlin may have done to

7  that, but, yes, he was somehow involved in this in the

8  discussions.

9    Q.  You're here today as a IPOS representative; so

10  I'm going to show you another document, and just see if

11  this refreshes IPOS' recollection.  Okay?

12    A.  Yes.

13    Q.  I only -- I believe -- well, I don't want to

14  misstate anything.  The document I have is a Vitol Bates

15  document, but I'm gonna show it to you, and see if you

16  recognize it.

17    MR. BECKSTEDT:    It's Vitol Bates No. 11500,

18  and we'll mark this as Defense Exhibit 5, I believe.

19    (E-mail Bates No. VITOL 11500 was marked was

20  Defendant's Exhibit 5 for identification.)

21    MS. ROHN:    Can you blow it up so we can see

22  it?

23    MR. BECKSTEDT:    I will.  Just bear with me.

24  BY MR. BECKSTEDT:

25    Q.  You see that?

287

1    A.  Yes.

2    Q.  All right.  This is February 24, 2021.  Would you

3  agree?

4    A.  Yes.

5    Q.  And it's from Tim Kologinczak.  I know I'm not

6  pronouncing that right.  I think the only one that can

7  pronounce it is the court interpreter earlier today.

8    A.  No, Kologinczak.

9    Q.  Kologinczak.  Thank you.

10    To Merlin and Adrian and cc'ing Charlotte.  You see

11  that?

12    A.  Yes.

13    Q.  Are you familiar with this document as the IPOS

14  representative?

15    A.  I -- I have seen it.  Obviously not -- was not

16  copied on it initially.

17    Q.  Right.  From an IPOS corporate perspective as a

18  representative, would it be fair to say that this is a

19  business record of IPOS, and IPOS has familiarity with it?

20    A.  Yes.

21    MS. FRANCIS:    Objection.  Objection.  That

22  calls for a legal conclusion, Attorney Beckstedt.

23  This witness is not here to testify as to issues of

24  law.

25    MR. BECKSTEDT:    Okay.  So I'm not asking an

288

1  issue of law.  That was asking whether or not this

2  would be a record of -- of IPOS.

3  BY MR. BECKSTEDT:

4    Q.  You do maintain -- IPOS does maintain its

5  e-mails; correct?

6    MS. FRANCIS:    Again, the e-mail is created not

7  by an IPOS person.  So I'm not trying to argue with

8  you, but this is an e-mail not authored by IPOS, is a

9  IPOS business record.

10    MR. BECKSTEDT:    All right, I'll withdraw the

11  question, Attorney -- I'll withdraw the question.

12  I'll recharacterize it.

13  BY MR. BECKSTEDT:

14    Q.  Did IPOS have any role with respect to

15  coordinating project documents for the work for the 3-inch

16  -- 3-inch vent line work?

17    A.  No.

18    Q.  All right.  Let's look at this e-mail.  Tim says

19  to Merlin "Per our conversation on Tuesday, we will be

20  providing WAPA with all the job book documentation --"

21  sorry.  I can't read that.  -- "for this project.  This

22  includes the engineering/design/scope/construction

23  documentation for them to review - and after completion for

24  their records as this work is being done on their property.

25    "Can you please send over the following."

289

1    And then there's a list of work prior to work and

2  after construction completion.  Do you see that?

3    A.  Yes.

4    MS. FRANCIS:    For the record, this is

5  addressed to Merlin and Adrian Melendez.

6    MR. BECKSTEDT:    Correct.

7  BY MR. BECKSTEDT:

8    Q.  And is it IPOS' position that it had no

9  responsibility to collect this documentation?

10    A.  That's correct.  Our responsibility was to

11  facilitate the safe work of this.

12    Q.  Okay.  Did IPOS play any role in corresponding

13  with Petro regarding concerns raised by WAPA with respect

14  to the project?

15    A.  I'm not aware.

16    Q.  All right.  Did there not come a time with

17  respect to the 3-inch vent line project where there was a

18  concern that Petro was not providing all of the

19  documentation that was required with respect to the

20  project?

21    MS. ROHN:    Objection to form.

22  BY MR. BECKSTEDT:

23    A.  Yes.

24    Q.  And that included things such as the welders'

25  certifications and qualification records that had been

IPOS by DAVID SMITH

290

1  discussed in your testimony earlier today; right?
2      A.  Yes.
3      Q.  And am I not correct that at some point
4  Mr. Andreas Constantinou got pulled into that issue?
5      MS. ROHN:    Objection to form. Leading.
6      MR. BECKSTEDT:    I'm asking.
7  BY MR. BECKSTEDT:
8      Q.  Did -- well, did Andreas Constantinou get pulled
9  into that issue?
10     A.  Yes.
11     MS. ROHN:    Objection. Leading.
12     MR. BECKSTEDT:    That's not -- okay, that's
13 fine.
14 BY MR. BECKSTEDT:
15     A.  Yes.
16     Q.  And what -- and what did -- what did he -- and he
17 was -- if I understand from your earlier testimony, his
18 assistance to IPOS was through a consulting -- or a
19 services agreement with an annual fee connected to it;
20 right?
21     MS. ROHN:    Objection. Leading question.
22     MR. BECKSTEDT:    It's foundational.
23 BY MR. BECKSTEDT:
24     Q.  Is that correct?
25     A.  Yes.

291

1      Q.  What assistance did Mr. Constantinou provide to
2  IPOS with respect to the document deficiencies on this
3  3-inch vent line project?
4      A.  He was given access to the Dropbox. He was given
5  the welder qualification records, anything associated with
6  it in helping us to determine what questions needed to be
7  asked of Petro to determine the validity of the
8  qualification of the welders.
9      Q.  Got it. Okay.
10     I want to talk about the RIO shades project. What
11 role did IPOS play with respect to the RIO shades project?
12     A.  So it was a little bit different on the two
13 islands. So, I mean, it -- should we start with one island
14 and kind of go to the next island?
15     Q.  Sure. Yes, that's fine.
16     A.  On St. Croix, so David Nagle was the one that did
17 the engineering design for the RIO shades panel and was
18 paid by the Vitol entity a pass-through on that -- for that
19 work, for the engineering work, as well as Andrew was the
20 project manager for that work and oversaw it there on
21 St. Croix.
22     And on St. Thomas, Andrew was not on the island -- was
23 out of the territory, and so it was done with IPOS
24 supervision to complete the project.
25     Q.  Okay. Am I correct that IPOS put out the bids

292

1  for the RIO shade project?
2      A.  I'd have to look --
3      MS. ROHN:    Objection.
4  BY MR. BECKSTEDT:
5      A.  I'd have to look at the exact date when the bids
6  were put out, because Andrew put the bid out, but I don't
7  know if he was contracted to Vitol at that point or
8  contracted to IPOS.
9      Q.  That brings up another good point. Let's just
10 cover that quickly.
11     In the beginning of your -- you don't know exactly the
12 date when Andrew went from a IPOS consultant -- when OPTIS
13 basically went from an IPOS consultant to a Vitol
14 consultant; correct?
15     A.  No, that's incorrect. It was June 30th was -- of
16 2020 was his last day as a IPOS/OPTIS. And June --
17 July 1st of that same year was when he became officially
18 contracted through Vitol.
19     Q.  So if there is a written contract between a Vitol
20 entity and OPTIS for their consulting -- engineering
21 consulting work that is dated November 1, 2021, you would
22 say that's in error?
23     A.  No. There is that contract. Sebastian Moretti
24 said for us as of July 1st no longer to pay. It was a
25 reimbursable expense handed direct to Vitol who paid that

293

1  outside of our -- out of our budget while they were
2  negotiating to get a contract done.
3      Q.  So can you just explain the mechanics of that for
4  me so I can understand what those words mean from like an
5  actual real sense?
6      MS. ROHN:    Objection to form.
7  BY MR. BECKSTEDT:
8      A.  Sure.
9      Q.  Thank you.
10     A.  So we submitted the budget prior to July 1st of
11 2020. And during that discussion, it was determined that
12 Andrew -- Eduardo Garcia from Vitol was still involved with
13 the discussions and still involved with the Virgin Islands;
14 so the budget was submitted to him. He had us remove any
15 of the OPTIS charges out of the IPOS budget, and -- which
16 we did, and then they said they were going to contract
17 directly with OPTIS for Andrew's services. And until the
18 actual contract was signed, they wanted to us continue to
19 pay and to pass it through as a reimbursable.
20     So earlier on today, they showed an invoice, for
21 example, and so there were invoices that were sent that
22 were for the actual operations. There were ones that were
23 sent for pass-throughs, and that was a pass-through that
24 was sent to them while they negotiated. It was not
25 recorded against our operational budget.

IPOS by DAVID SMITH

294

1    Q.   Okay.  So just to be clear, the services that
2  OPTIS provided from July 1, 2020, forward -- well, let's
3  strike that.
4        What was the date that IPOS no longer paid any money
5  to OPTIS?  And I'm not talking about -- I want to -- okay,
6  let's break it up.
7        If I understand your testimony correct, there came a
8  point in time after July 1st or starting July 1, 2020,
9  where IPOS wrote a check or paid -- wired money to OPTIS,
10 and then Vitol Virgin Islands Inc. or a Vitol entity then
11 reimbursed with a payment to IPOS to cover that so that it
12 was a wash on the IPOS books.  Do I have that correct?
13   A.   Well, it --
14        MS. ROHN:   Objection to form.
15        MR. BECKSTEDT:   I'm trying to --
16 BY MR. BECKSTEDT:
17   A.   So the money was transferred, but it was kept off
18 of the books.  It's a reimbursable expense.  I'm not
19 accountant, so I can't speak to the accounting behind it,
20 but it was not recorded as part of our operational
21 expenses.
22   Q.   I get it.
23        So from a general ledger perspective or an accounting
24 perspective, it went into a separate ledger account that
25 was not part of the financials for IPOS; right?

295

1        MS. FRANCIS:   He just testified he's not an
2  accountant.
3        MR. BECKSTEDT:   He's also testifying about a
4  pass-through expense.
5  BY MR. BECKSTEDT:
6    A.   Yeah, I'm not -- I'm not an accountant, but, yes,
7  I believe that to be the case.
8    Q.   Right.  So physically, the tender of the money,
9  it comes out of a IPOS account, or IPOS does the wiring of
10 the money or however you're going to pay it, to OPTIS, and
11 then IPOS gets a payment to cover that from the Vitol
12 entity.  That's really what happens at least practically in
13 the world.  That's how the money goes; right?
14        MS. ROHN:   Objection.  Form.
15 BY MR. BECKSTEDT:
16   A.   Yes.
17   Q.   Is that correct?
18   A.   Yes.
19   Q.   Okay.  I get it.
20        Now, how -- at what point in time, if you know, did
21 IPOS stop paying these we'll call them -- I guess you're
22 calling them Vitol expenses to OPTIS?
23   A.   I don't know exactly.  It was approximately
24 November of 2020, maybe December at the latest.  May have
25 been the last payment because of the lag of the billing.

296

1    Q.   Okay.  So if Andrew Canning were to have
2  testified that from his perspective December 1, 2020, was
3  when he started consulting for Vitol, that might jive with
4  when you stopped paying OPTIS -- I mean, IPOS stopped
5  paying OPTIS in this dynamic that you've explained?
6        MS. ROHN:   Object to form.
7  BY MR. BECKSTEDT:
8    Q.   Is that fair?
9        MS. FRANCIS:   Yeah, objection to form.
10 BY MR. BECKSTEDT:
11   A.   Yes.
12   Q.   Okay.
13        All right, getting back to the RIO shades, I want to
14 share with you -- no, I don't want to the share this with
15 you.  I want to share something else with you.  Where is
16 it?
17        MR. BECKSTEDT:   All right.  I'm gonna tell
18 you the Bates Nos.  We'll mark this Defense Exhibit 6.
19 And it goes from Bates No. IPOS 8322 to IPOS 8341.
20        (RFQ - RIO Shade Installation St. Croix Bates
21 Nos. IPOS 8322 to 8341 was marked as Defendant's
22 Exhibit 6 for identification.)
23 BY MR. BECKSTEDT:
24   Q.   Do you want me to scroll through this 20-page
25 document, or do you recognize it?

297

1    A.   You're gonna need to scroll through it if there's
2  going to be questions related to it.
3    Q.   Okay.  So I'm going to scroll through this and
4  ask you if recognize this document -- if IPOS recognizes
5  this document?
6        MS. FRANCIS:   Was this e-mailed to us,
7  Attorney Beckstedt?
8        MR. BECKSTEDT:   Excuse me?
9        MS. FRANCIS:   Was this e-mailed?
10        MR. BECKSTEDT:   Was this e-mailed?
11        MS. FRANCIS:   Yes, as a deposition exhibit.
12        MR. BECKSTEDT:   No, I didn't intend to use it
13 until it got into the deposition.  Do you want me to
14 e-mail it to you now?
15        MS. FRANCIS:   No.  You just need to scroll
16 through slowly so that I can see the document.  Thank
17 you.
18        MR. BECKSTEDT:   Okay.
19 BY MR. BECKSTEDT:
20   Q.   If this is going too fast, let me know.  If you
21 want to reduce the size and you can still see it well
22 enough to review, if you recognize it, let me know.
23   A.   Thank you.
24   Q.   Okay.  Do you recognize the document?
25   A.   It's -- it's one of our documents.

IPOS by DAVID SMITH

298

1    Q.   Okay.  And what's RFQ mean?
2    A.   Request for quotation.
3    Q.   Okay.  So would it be fair to say that IPOS put
4  out the request for quotes or bids for the RIO shade
5  installation in St. Croix Richmond Plant?
6        MS. ROHN:   Objection to form.
7  BY MR. BECKSTEDT:
8    Q.   What does this document -- I'll reask it.
9        What does -- what does -- what is this document
10  purport to be?
11   A.   Yes, a request for a quotation to perform the RIO
12  shade work.
13   Q.   And when were those bids due?
14   A.   Well, at least on this one, January 5, 2020.
15   Q.   Who was Andrew Canning working for -- who was
16  OPTIS contracted with and being paid by in January of 2020?
17       MS. FRANCIS:   Objection.
18  BY MR. BECKSTEDT:
19   A.   IPOS.
20       MR. BECKSTEDT:   What was the objection,
21  Attorney Francis?
22       MS. FRANCIS:   Objection.  Form.  Compound.
23  BY MR. BECKSTEDT:
24   Q.   And David Nagle was contracted by IPOS.  Who --
25  all right.  You already testified, right.  David Nagle was

299

1  -- who contracted with David Nagle for the RIO shade
2  project?
3    A.   At this point, IPOS.
4    Q.   Okay.  And I believe you said just a little while
5  ago to my questioning that David Nagle did the design for
6  St. Croix, and that was a pass-through reimbursable by
7  Vitol; is that correct?
8        MS. ROHN:   Objection to form.
9  BY MR. BECKSTEDT:
10   Q.   Is that your testimony?
11   A.   He did the design for both islands.
12   Q.   Oh, okay.
13       And was his design work for both islands -- did he
14  bill IPOS for that work?
15   A.   Again, it goes back to the pass-through.  So this
16  project by the time the quotations were received and the
17  work was actually done, did not go into the IPOS operations
18  expense budget.  It was a separate project that was a
19  pass-through to Vitol.
20   Q.   I understand.  But from a physical perspective,
21  did Mr. Nagle send the bill to IPOS for his work on this
22  project?
23   A.   Yes, similar to what I just explained, though, it
24  was -- again, without having exact accounting rules, it was
25  on a different ledger to use the example you gave earlier.

300

1    Q.   I get it.  Okay.
2        So getting back to my earlier question, what role did
3  IPOS play with respect to the RIO shades project.  We know
4  that IPOS issued the request for quotation; correct?
5    A.   Correct.
6    Q.   We know that IPOS contracted with Mr. Nagle, the
7  engineer, to do the design work, albeit on a pass-through
8  basis, but you guys coordinated that, correct, meaning
9  IPOS?
10       MS. ROHN:   Objection.  Leading.
11  BY MR. BECKSTEDT:
12   A.   Correct.
13   Q.   We know that -- I'll rephrase it.
14       We know that IPOS coordinated the contracting of
15  Mr. Nagle for his design work; correct?
16   A.   Correct.
17       MS. ROHN:   Objection.  Leading.
18  BY MR. BECKSTEDT:
19   Q.   And what else did IPOS do with respect to the RIO
20  shades project?
21   A.   Again, I believe we spoke about it.  On
22  St. Croix, it was overseen by Andrew Canning, and IPOS
23  issued the permit to work related to that.  And on
24  St. Thomas, he was out of the territory, and so all of the
25  work was overseen and project managed by IPOS.

301

1    Q.   Got it.
2        And so when IPOS -- just talk to me a little bit about
3  what IPOS does when it does the project management work on
4  St. Thomas for the RIO shades project.
5        Is IPOS actually directing the methods and means that
6  the Petro people are welding or doing their jobs?
7    A.   Well, on this specific project, I don't know that
8  I can answer that.
9    Q.   Okay.  Would you agree with me that IPOS' job in
10  supervising is making sure that the work meet spec?
11       MS. ROHN:   Objection to form.
12       MS. FRANCIS:   Objection.  Form.  Foundation.
13  Vague.
14       MR. BECKSTEDT:   Okay.
15  BY MR. BECKSTEDT:
16   Q.   Does IPOS play -- in its supervision of the work
17  of a contractor in this case, does -- does IPOS' role
18  include anything related to quality control for meeting
19  specifications of project?
20   A.   I would definitely say that IPOS has to ensure
21  that it is installed correctly and working properly, yes.
22   Q.   And to your knowledge, do you know if that would
23  be the same -- well, strike that.
24       MS. FRANCIS:   Attorney Beckstedt, we've now
25  gone another hour.  We're taking a break.

IPOS by DAVID SMITH

302

1    MR. BECKSTEDT:   That's fine.  You don't -- you
2 could have just asked.  I would have agreed to it.
3 You didn't have to command it.
4    How much time do you want.
5    MS. FRANCIS:   We've now been going almost
6 12 hours with this witness.  So I do apologize if I
7 sound a little sharp or inpatient, but I do need a
8 break.  Thank you very much.
9    MR. BECKSTEDT:   No problem.
10    (A recess was taken at this time.)
11 BY MR. BECKSTEDT:
12    Q.  And with respect to the 1-inch vent line project
13 and IPOS' role, would IPOS defer to whatever is, I guess,
14 shown in the e-mails and exhibits that have been -- and the
15 documents that have been produced in discovery with respect
16 to its role in the 1-inch vent line?
17    MS. FRANCIS:   Objection.
18    MS. ROHN:   Objection to form.
19    MS. FRANCIS:   Objection.  Form.  Objection.
20 That is too board of a question for the witness to
21 answer in a case --
22    (Interruption by the court reporter.)
23    -- where we have 15,000 documents.
24    MS. ROHN:   It's more than 15,000.
25    MR. BECKSTEDT:   All right.  I'll tell you

303

1    what, I'll just withdraw the question, and I'll move
2 on to the next topic, my last topic.
3 BY MR. BECKSTEDT:
4    Q.  Mr. Smith, you testified that -- I believe there
5 were some e-mails from Andrew Canning, and you testified
6 that -- I don't want to put words in your mouth, but
7 according to my notes, it's not the way you would have
8 communicated the issues that Andrew Canning communicated in
9 those e-mails.
10    Do you recall that testimony?
11    MS. ROHN:   Objection to form.  Leading.
12 BY MR. BECKSTEDT:
13    A.  Yes.
14    Q.  Okay.  With respect to Mr. Canning's conduct, did
15 you ever -- did IPOS -- well, first, did IPOS ever observe
16 any conduct either in action or in words by Mr. Canning
17 that it considered to be discriminatory?
18    A.  No.
19    Q.  Did IPOS ever observe any conduct by Mr. Canning
20 that it considered to be racist?
21    A.  No.
22    Q.  And --
23    MR. BECKSTEDT:   I have no further questions.
24 That's it.  Thank you.
25    MS. FRANCIS:   Attorney Simpson.

304

1    MR. SIMPSON:   I have no questions.
2    MS. FRANCIS:   Okay.  Thank you.  We are
3 concluded.
4
5    (At 8:13 p.m., the deposition of this witness
6 was concluded.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

305

1    CERTIFICATE OF REPORTER
2
3    I, YVONNE SAMUEL-SETORIE, Registered
4 Professional Reporter, do hereby certify that the above and
5 named witness, DAVID MICHAEL SMITH, after being duly sworn,
6 was examined and testified via Zoom video conference as is
7 set forth; and that the answers of said witness to the oral
8 interrogatories propounded by counsel were taken by me in
9 machine shorthand, and represents the official transcript
10 of said deposition; and that said deposition is true and
11 correct, to the best of my ability.
12
13    I FURTHER CERTIFY that I am not counsel,
14 attorney, or relative of either party, nor financially or
15 otherwise interested in the event of this lawsuit.
16
17    IN WITNESS WHEREOF, I have hereunto
18 subscribed my hand on this 31st day of July 2023.
19
20
21
22    _____
       YVONNE SAMUEL-SETORIE, RPR
23
24
25