IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

PETRO INDUSTRIAL SOLUTIONS, LLC    )
(PETRO)                            )
                                   )CASE NO. 1:21-CV-00312
                    Plaintiff,     )
                                   )
        vs.                        )
                                   )
ISLAND PROJECT AND OPERATING       )
SERVICES, LLC, VITOL US HOLDING II )
CO., VITOL VIRGIN ISLANDS CORP.,   )
ANDREW CANNING and OPTIS           )
EUROPE, LTD.,                      )
                                   )
                    Defendants.    )
_____)


THE 30(B)(6) DEPOSITION OF **VITOL VIRGIN ISLANDS CORP.,**

**by CHARLOTTE HOROWITZ,** called for examination by the

Plaintiff in the above-entitled cause, for purpose of

discovery, for use in evidence and for such other and

further uses as are provided by the Federal Rules of Civil

Procedure, was taken before YVONNE SAMUEL-SETORIE,

Registered Professional Reporter, via Zoom video conference

on the 23rd day of May 2023, commencing at 9:02 a.m.,

pursuant to Notice.


ELITE REPORTING SERVICES, INC.
P.O. Box 5619
Christiansted, VI 00823
(340) 718-1318
elitereportingsvcs@gmail.com



EXHIBIT
9

Case: 1:21-cv-00312-WAL-EAH   Document #: 305-9   Filed: 04/08/24   Page 2 of 49
VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

2

1    A-P-P-E-A-R-A-N-C-E-S:

2    ON BEHALF OF THE PLAINTIFF:
     LEE J. ROHN AND ASSOCIATES, LLC
3    1108 King Street, Suite 3 (mailing)
     56 King Street, 3rd Floor (physical)
4    Christiansted, VI 00820

5    BY:  LEE J. ROHN, ESQ.

6
     ON BEHALF OF THE DEFENDANTS:
7    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
     Attorneys for Island Project and Operating Services, LLC
8    The Tunick Building, Suite 201
     1336 Beltjen Road
9    St. Thomas, VI 00802

10   BY:  SIMONE R. D. FRANCIS, ESQ.

11
     SUSMAN GODFREY L.L.P.
12   Attorneys for Vitol Defendants
     1000 Louisiana St., Suite 5100
13   Houston, TX 77002

14   BY:  ALEX KAPLAN, ESQ.
            - and -
15       SARAH HANNIGAN, ESQ.

16   BECKSTEDT & KUCZYNSKI LLP
     Attorneys for Vitol Defendants
17   2162 Church Street
     Christiansted, VI 00820

18
     BY:  CARL A. BECKSTEDT, III, ESQ.

19

20   ANDREW C. SIMPSON, P.C.
     Attorneys for Andrew Canning and OPTIS Europe, LTD.
21   2191 Church Street, Suite 5
     Christiansted, VI 00820

22
     BY:  ANDREW C. SIMPSON, ESQ.

23

24   Also Present:
     Adrian Melendez, Jr.
25

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

3

1                           I-N-D-E-X

2

3                                                   Page

4    Direct Examination by Ms. Rohn                 4

5

6

7

8

9

10

11                      E-X-H-I-B-I-T-S

12   Plaintiff's                                    Page

13   1    E-Mail Bates No. Canning 1                178

14   2    E-Mails Bates No. Canning 4               182

15   6    Quarterly Report (2Q 2019)                179

16   18   E-Mail Bates No. Canning 250              181

17

18

19

20

21

22

23

24

25

---

**4**

1      P-R-O-C-E-E-D-I-N-G-S

2

3          (CHARLOTTE HOROWITZ,

4   having been called as a witness, was duly sworn by the

5   Notary Public, was examined and testified as follows:)

6

7              DIRECT EXAMINATION

8   BY MS. ROHN:

9      Q.   Good morning.

10      A.   Good morning.

11      Q.   My name is Lee Rohn, and I represent the

12   plaintiff in this matter.

13      Could you state your name for the record, please?

14      A.   Charlotte Horowitz.

15      Q.   Ms. Horowitz, do you have anything in front of

16   you currently at this deposition?

17      A.   I have computer screens, my tea, some water, and

18   some exhibits in binders.

19      Q.   Okay.  So is your computer screen on or off?

20      A.   On.

21      Q.   Okay.  Please turn your computer screen -- I see

22   you have your computer screen because you need that to

23   see -- no, you wouldn't need it.

24      Why is your computer screen on?

25          MR. KAPLAN:    Let me explain the setup we have.

---

**5**

1   There's two monitors in front of her.  One is the

2   Zoom; one is a blank screen that has loaded on it the

3   PDF of 186 exhibits that you sent us.  The computer is

4   otherwise a dead computer that has no information or

5   files on it.

6          MS. ROHN:    Okay.  Thank you for that.

7   BY MS. ROHN:

8      Q.   And you said you had -- do you have a book that

9   your attorney has prepared for you?

10      A.   Yes.

11      Q.   Okay.  Is there a reason you didn't mention that?

12      A.   It's with the bind -- it's one of the binders.

13      Q.   Please refrain from using that book unless you

14   need it to refresh your recollection, and then please ask

15   or let me know that you need an opportunity to look at some

16   document to refresh your recollection.

17      A.   Yes, ma'am.

18      Q.   So, Ms. Horowitz, have you ever been deposed

19   before?

20      A.   Yes.

21      Q.   On how many occasions have you been deposed?

22      A.   One.

23      Q.   Okay.  And when was that?

24      A.   It was, let's see, March of last year or February

25   of last year.

---

**6**

1      Q.   What connection did you have with the case such

2   that you were deposed?

3      A.   I was one of the vessel operators that handled

4   the vessels in the state where the deposition was.

5      Q.   Okay.  You were one of the what?  I'm sorry.  You

6   broke up a little bit.

7      A.   One of the vessel operators.

8      Q.   And was a company that's associated with Vitol a

9   defendant in that case?

10      A.   Yes.

11      Q.   And who was the plaintiff in that case?

12      A.   The State of California.

13      Q.   What was the substance of the claims of the

14   State of California?

15      A.   On a high level, I think it was -- you know, I

16   don't remember all the details.

17      Q.   Well, if you were deposed, I'm sure you have at

18   least a rough idea of what the claims were, so please tell

19   me.

20          MR. KAPLAN:    Object to the form of the

21      question.  You may answer.  Object.  Outside the scope

22      of the topic -- the notice, but you may answer.

23   BY MS. ROHN:

24      A.   I think that it was a price -- I think it was

25   kind of a price manipulation, price fixing case, along

---

**7**

1   those lines.

2      Q.   Was this a civil case or criminal case?

3      A.   I don't know the answer to that.  Sorry.

4      Q.   Have you ever been convicted of any crimes in the

5   last ten years?

6      A.   No.

7      Q.   So from that deposition you may know what the

8   game plan is for deposition, but I'm gonna give you a brief

9   sketch.  Of course, you know you're under oath and the same

10   penalties of perjury.  While this is an informal setting

11   the same rules as to testimony apply.  If I ask you a

12   question that you don't understand, please let me know.

13   I'll try to rephrase the question.  Otherwise, I will

14   assume that you understood the question.

15      If you need a break, please just let me know.  This is

16   not an endurance test.  If you are unsure of anything, you

17   have every right to ask for clarification.  Otherwise, I'm

18   going to assume that you understood the question and that

19   your answer is to a question you understood.  Is that fair?

20      A.   Yes, ma'am.

21      Q.   Okay.  What have you done to prepare to be

22   deposed as -- as Vitol US Holding II?

23          MR. KAPLAN:    Counsel, to be clear, we are here

24      for the deposition of Vitol Virgin Islands Corp.  And

25      Ms. Horowitz is the designated representative for

---

8

1    Vitol Virgin Islands Corp.
2        MS. ROHN:    You are correct. Sorry. I'm
3    looking at the wrong piece of paper.
4    BY MS. ROHN:
5        Q.   For Vitol Virgin Islands Corp.?
6        A.   I met with counsel. I reviewed many documents.
7    I read your notice and reviewed the notice to prepare for
8    the topics. And I met with some key personnel that would
9    help me fully -- be able to fully answer your topic
10   questions.
11       Q.   And how long did you meet with counsel?
12       A.   It's been over multiple -- multiple days and
13   weeks.
14       Q.   In total what would you say you met?
15       A.   I think the whole process probably the work that
16   we -- that I and them have put in is probably 20 to
17   25 hours.
18       Q.   And who were the key personnel that you met with?
19       A.   The corporate secretary of Vitol Virgin Islands,
20   which is Ernie Kohnke, and our HR director, Scott Adams.
21       Q.   And in preparing for your deposition, did you
22   have any meetings with David Smith?
23       A.   David Smith, no.
24       Q.   Mr. -- it's a really hard name for me to say.
25   Merlin.

9

1        A.   Merlin. We'll just call him Merlin. It will be
2    easier.
3        Q.   It certainly will.
4        Did you meet with Merlin to prepare for -- to answer
5    questions?
6        A.   No.
7        Q.   And what information did you obtain from
8    Ernie Kohnke?
9        A.   Ernie is the corporate secretary; so I discussed
10   with him the structure of the company and when it was
11   incorporated, who its incorporator was. Yeah, I think that
12   was it.
13       Q.   And Mr. Scott Adams, what information did you
14   seek from Mr. Adams?
15       A.   We discussed the policies, the HR policies and
16   the various parts of the HR guidelines, antidiscrimination
17   policy and how one would report anything like that, and
18   non-retal -- non-retaliation policy that we have. Excuse
19   me.
20       Q.   No worries.
21       MR. KAPLAN:    Counsel, I'm sorry, I don't mean
22   to interrupt.
23       But, Madam Court Reporter, a moment ago I think
24   you had the video spotlighted on Ms. Horowitz, so it
25   zoomed in a bit. Is there a way to go back to that?

10

1    She seems a little far away.
2        (Off the record.)
3    BY MS. ROHN:
4        Q.   And when you said you reviewed numerous
5    documents, other than the multiple exhibits that have been
6    marked in this case, did you review any other documents?
7        A.   The notice and the interrogatory responses, and
8    then a lot of e-mails that have been put forth for the
9    case.
10       Q.   Were those e-mails exhibits or non-exhibits?
11       A.   I believe they're exhibits. Well, they're --
12   they were part of our interrogatory responses.
13       Q.   Okay. And where are you currently?
14       A.   In our outside counsel's office in Houston.
15       Q.   And where in that office?
16       A.   In a conference room.
17       Q.   Is anybody else in the conference room besides
18   you?
19       A.   Yes.
20       Q.   Your counsel?
21       A.   Yes, counsel.
22       Q.   Anybody besides counsel?
23       A.   No.
24       Q.   Can you tell me who you are currently employed
25   by?

11

1        A.   Vitol Inc.
2        Q.   And what is your present position with
3    Vitol Inc.?
4        A.   I'm a vessel operator or physical operator.
5        Q.   I got vessel operator, but I didn't get the
6    second one.
7        A.   A physical operator. It's another name for it.
8        Q.   Physical?
9        A.   Uh-huh.
10       Q.   What does a physical operator do?
11       A.   A physical operator moves commodities around the
12   world. So Vitol buys and sells commodities, the traders
13   will do the buying and selling. And because it's a
14   physical commodity, we often move it from location A to
15   location B, and I would be the person responsible for that
16   transportation of the commodity.
17       Q.   So do you actually operate the vessel?
18       A.   Personally, no. We have the captain and the
19   operating company that operates the vessel. I would send
20   orders and instructions to the -- to the vessel of where to
21   go and what to load and how much to load, and then where to
22   take it to.
23       Q.   And is there a particular commodity that you're
24   in charge of being a physical operator for?
25       A.   So I handle multiple products; LPG, propane and

## 12

1  butane, ethanol, gasoline.
2      Q.  How long have you held that position?
3      A.  At Vitol, 13 years.  It will be 13 years in
4  October.
5      Q.  And in that position, who do you report to?
6      A.  Sebastian Moretti.
7      Q.  And have you always reported to
8  Sebastian Moretti?
9      A.  No.  Prior to that a gentleman by the name of
10  Brian Colonna.
11     Q.  How long have you reported to Sebastian Moretti?
12     A.  I believe it's 10 years.  It will be -- it's
13  either 10 or 11.
14     Q.  And what is Mr. Moretti's position?
15     A.  He is the head of operations for the Americas, I
16  think.
17     Q.  And what company does he work for?
18     A.  Vitol Inc.
19     Q.  Prior to holding the position of physical
20  operator, where did you work?
21     A.  Prior to working at Vitol?
22     Q.  Prior to the position as -- well, at Vitol Inc.,
23  have you always been a vessel operator?
24     A.  Yes.
25     Q.  Prior to Vitol Inc., did you work anywhere --

## 13

1  that 13 years at Vitol Inc., where did you work?
2      A.  I've only been a physical operator at Vitol Inc.
3      Q.  So that's the first job you've had?
4      A.  No.  Prior to that I worked at Goldman Sachs.
5      Q.  And what did you do for Goldman Sachs?
6      A.  I was a trader.
7      Q.  And for how long?
8      A.  I worked there for three years, I think.
9      Q.  Can you tell me something about your educational
10  background?
11     A.  Yes.
12     Q.  I don't care about high school but after high
13  school.
14     A.  Sure.  I graduated from Oklahoma State
15  University.
16     Q.  OSU.
17     A.  Yes.
18     Q.  And when did you graduate from OSU?
19     A.  2001.  Yes.
20     Q.  Any other education?
21     I spent a good time, part of my life growing up in
22  Tulsa, Oklahoma.
23     A.  Oh, that's where I first moved when I came to
24  America from England.
25     Q.  So I get OSU.

## 14

1      So any other education after OSU?
2      A.  No.  Then I went to the workforce.
3      Q.  And your degree is in what?
4      A.  International business and --
5      (Interruption by the court reporter.)
6      A.  And finance.
7      Q.  And so was your first job after -- did you tell
8  me 2001?
9      A.  Yes.
10     Q.  So your first job was Goldman Sachs?
11     A.  No.  My first job was Williams, which was based
12  in Tulsa.
13     Q.  What is Williams?
14     A.  It's a trading -- a commodities trading company.
15  They also own pipelines.
16     Q.  So Mr. Moretti, who does he --
17     A.  Moretti.
18     Q.  Moretti, thank you.  Who does he report to?
19     A.  He reports to Ben Marshall, the CEO of Vitol Inc.
20     Q.  So can you explain to me why if you work for
21  Vitol Inc., you are being the 30(b)(6) deponent for
22  Vitol Virgin Islands Corp.?
23     A.  Vitol Virgin Islands Corp. has no employees.
24     Q.  What was the relationship between Virgin Islands
25  -- Vitol -- Vitol Virgin Islands Corp. and Vitol Inc.?

## 15

1      A.  It's just their -- I don't believe it's a direct
2  relationship.  It's just one of the Vitol groups.
3      Q.  So what company would be the parent company to
4  the rest of the Vitol groups?
5      MR. KAPLAN:     Object to the question.  Outside
6      the scope.
7      You may answer.
8  BY MS. ROHN:
9      A.  I didn't research all the Vitol groups.  I just
10  researched for the notice Vitol Virgin Islands Corp.
11     Q.  Well, who is the parent -- who was the parent or
12  is the parent of Vitol Virgin Islands Corp.?
13     A.  That is Vitol US Holding II Corp.
14     Q.  And does Vitol US Holding II Corp. have any
15  employees?
16     A.  No.
17     Q.  What does Vitol US Holding II Corp. do?
18     A.  It's a holding company.
19     Q.  And do you know what companies it holds?
20     A.  Just -- well, it holds
21  Vitol Virgin Islands Corp., and it is also a parent to
22  Vitol Aviation Corp.
23     Q.  And who owns Vitol US Holding II Corp.?
24     A.  May I refer to the org chart that I have in the
25  binder?

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

**16**

1   Q.   Absolutely.
2   A.   So Vitol US Holding II Corp. is owned by
3   Euromin Inc.
4   Q.   Okay.  And is Euromin Inc. one of the Vitol
5   related companies?
6   A.   It's the parent of Vitol US Holding II Corp.
7   Q.   And what does Euromin Inc. do?
8   A.   It's a holding company.
9   Q.   Of course, it is.
10       MR. KAPLAN:    Object to the sidebar.
11  BY MS. ROHN:
12  Q.   And who owns Euromin Holding Company?
13  A.   Euromin Inc. is owned by Vitol Holding B.V.
14  Q.   And what is Vitol Holding B.V. do?
15  A.   It's a holding company.
16  Q.   And who owns Vitol Holding B.V.?
17       MR. KAPLAN:    Objection.  Outside the scope.
18       You may answer.
19  BY MS. ROHN:
20  A.   I believe that's the top of the -- no -- no one.
21  Q.   What does Vitol Holding --
22  A.   May I -- may I rephrase that?
23  Q.   Yes, of course.
24  A.   So that's the -- that's the extent of my
25  knowledge and my research that Vitol Holding B.V. doesn't

**17**

1   have a parent.
2   Q.   Okay.  Is it a sister company to any other
3   companies?
4       MR. KAPLAN:    Same objection.
5       You may answer.
6   BY MS. ROHN:
7   A.   Is -- could you clarify the question, please?
8   Q.   Sure.  If you -- if you got to the very top and
9   then as you come down, are they -- are they sister
10  companies reporting to a common parent company?
11  A.   I didn't research that because it wasn't relevant
12  in the notice.
13  Q.   Do you know who the overall parent company is?
14  A.   For Vitol Virgin Islands Corp.?  I believe it's
15  Vitol Holding B.V.
16  Q.   So would you now say that
17  Vitol Virgin Islands Corp. has no employees.  When -- since
18  when has Vitol Virgin Islands Corp. had no employees?
19  A.   I believe always.
20  Q.   Are you familiar with the company called that I
21  know of as V -- VTTI?
22  A.   Yes, ma'am.
23  Q.   What is VTTI?
24  A.   VTTI is the parent of IPOS, and I believe it's a
25  terminal company that owns multiple terminals across the

**18**

1   world.
2   Q.   And do you know who is the parent of VTTI?
3   A.   I do not.  Oh, actually wait, hang on.  Sorry.
4   VTTI has three owners, IFM, ADNOC, and a Vitol entity,
5   which is a minority owned or which owns 45 percent.
6   Q.   And what is the name of that Vitol owner?
7   A.   It's not one of the defendants in this case, and
8   I'm not familiar with the -- with the exact name.
9   Q.   And what does IFM do?
10  A.   I don't know.
11  Q.   What does ADNOC do?
12  A.   I believe that's the -- I think it's the national
13  oil company of Dubai -- sorry, of Abu Dhabi.
14  Q.   Does Vitol Virgin Islands Corporation in any way
15  -- did in any way own or control IPOS?
16  A.   Sorry.  Can you repeat the question?
17  Q.   Sure.  Did Vitol Virgin Islands Corporation in
18  any way own or control IPOS?
19  A.   No.
20  Q.   And what does Vitol Virgin Islands Corporation
21  do?
22  A.   We have a contract with WAPA, the power -- the
23  Water and Power Authority in the U.S. Virgin Islands, and
24  we supply them with propane, and we own the propane
25  facilities.

**19**

1   Q.   So how does it have no employees?
2   A.   We -- myself as a member of VIC, we do the work
3   for it.
4   Q.   And VIC is?
5   A.   Sorry.  Vitol Inc.
6   Q.   Thank you.
7   A.   Sorry.
8   Q.   So what companies do the work for
9   Vitol Virgin Islands Corporation?
10  A.   Vitol Inc.
11  Q.   And is there some sort of service agreement to do
12  that?
13  A.   I'm not sure about that.
14  Q.   And how long has VIC done the work for
15  Vitol Virgin Islands Corporation?
16  A.   Always.
17  Q.   And can you tell me when Vitol Virgin Islands
18  Corporation was formed?
19  A.   In July of 2013.
20  Q.   And who formed it?
21  A.   A man by the name of John Zimmerman.
22  Q.   John Zimmerman?
23  A.   Yes.
24  Q.   And who is John Zimmerman?
25  A.   He was the -- he was one of the legal counsel at

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

---

**20**

1  Vitol Inc.
2      Q.   And who were the original -- who were the
3  original shareholders of Vitol U.S. -- sorry,
4  Vitol Virgin Islands Corporation?
5      A.   It has directors.  And that is in one of the
6  interrogatory responses.  I can read it if you want me to
7  get it.  But it's in one of the interrogatory responses.
8      Q.   Let's go just so I can -- can you tell me which
9  one?
10      A.   Yeah, sure.
11      Q.   I have them in front of me.
12      A.   Yeah, no problem.  Hang on one second.
13  It is --
14      I see it as a supplemental answer to
15  Interrogatory No. 2.
16      A.   Yes, exactly.  Supplement 2 of 2.
17      Q.   Right.
18      All right.  So Miguel Loya, who is he?
19      A.   He is -- he was the CEO of Vitol Inc.  He's
20  retired.
21      Q.   Who replaced him?
22      A.   Ben Marshall.
23      Q.   Ben Marshall?
24      A.   Yes, Benjamin Marshall.
25      Q.   And what does he do?

---

**21**

1      A.   He is the CEO -- the present CEO of Vitol Inc.
2      Q.   And as the CEO of Vitol Inc. -- so what does
3  Vitol Inc. do?
4      A.   Vitol Inc. trades commodities and owns different
5  assets.
6      Q.   One of those assets being the propane facility at
7  WAPA; correct?
8      A.   Vitol Virgin Islands Corp. owns those facilities.
9      Q.   Sorry.  And who is Patrick Gorgue?
10      A.   He is -- he was a -- he's retired.  He no longer
11  works with the firm.  And he was a propane trader.
12      Q.   Who replaced him?
13      A.   As on -- on here -- he's not one of the current
14  people .  So one of -- so Mike Loya, Patrick,
15  Eduardo Garcia, Ron Oppenheimer, Tim Essaye, Mike
16  Drifmeyer, John Zimmerman, Tony Oliver, Robert Viola, and
17  Abigail Carolan are no longer with the firm; and they've
18  been replaced by the individuals above.  Ben Marshall,
19  Richard Evans, Max Bulk, Ernest --
20      Q.   Wait.  Wait.  Ben Marshall.  Sorry.
21      A.   Ben --
22      Q.   I see.  I see.  I see.
23      A.   Yeah.
24      Q.   Let me just go to --
25      A.   So those are the current directors.

---

**22**

1      Q.   I see.
2      So Mr. Patrick Gorgue, he was a propane trader for
3  whom?
4      A.   Vitol Inc.
5      Q.   Vitol Inc.?
6      A.   Uh-huh.
7      Q.   All right.  So let me go to the current one.
8  Sorry.
9      A.   Yeah.  No problem.
10      Q.   So Richard Evans, what does he do?
11      A.   He is the CFO of Vitol Inc.
12      Q.   And other than being the CFO for Vitol Inc., does
13  he do anything else for --
14      A.   He's the -- one of the directors or officers of
15  VVIC.
16      Q.   Of what?
17      A.   Of Vitol Virgin Islands Corp.
18      Q.   Max Bulk, who's he?  What is he?  What is his
19  position?
20      A.   He was the -- he's retired.  And he was replaced
21  -- I'm not sure who replaced him.  I apologize.
22      Q.   No worries.  What did he do?
23      A.   He was the director of the Vitol Virgin Islands
24  Corp., and the COO of Vitol Inc.
25      Q.   And Ernest Kohnke, I think we've gone through.

---

**23**

1      A.   Uh-huh.
2      Q.   Sebastian Moretti, what's his position?
3      A.   He is the head of operations for the -- for the
4  -- for the Americas.
5      Q.   For Vitol Inc.?
6      A.   And the director of Vitol Virgin Islands Corp.
7      Q.   And Kristin Muessig, what is her position?
8      A.   She is the -- I believe she's the treasurer of
9  Vitol -- of Vitol Inc. and director/officer of
10  Vitol Virgin Islands Corp.
11      Q.   John Christopher Robertson?
12      A.   I don't know his exact title.  He works with our
13  settlements team in accounting.
14      Q.   When you say "our settlements team," who's our?
15      A.   Vitol Inc.
16      And he's a director/officer of
17  Vitol Virgin Islands Corp.
18      Q.   And Dana Daigle?
19      A.   She has been replaced by a gentleman by the name
20  of Vinod, V-i-n-o-d.
21      Q.   V-i-n-o-d.  Uh-huh.
22      A.   And I believe he's the head of contracts for
23  Vitol Inc. and also a director/officer for
24  Vitol Virgin Islands Corp.
25      Q.   And finally, oh my goodness, Jurgen Oosthuizen or

---

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

---

24

1  something?
2      A.  Jurgen Oostuizen is the head of tax for
3  Vitol Inc. and a director/officer for
4  Vitol Virgin Islands Corp.
5      Q.  Does Vitol Virgin Islands Corp. hold regular
6  meetings?
7      A.  Does what, sorry?  I didn't hear you.
8      Q.  Does it hold regular meetings?
9      A.  Does who?  Sorry.
10     Q.  Does it hold regular meetings?
11     A.  Does who hold regular meetings?
12     Q.  Vitol Virgin Islands Corp.
13     A.  Not to my knowledge, no.
14     Q.  So as to decisions that would be made about
15  propane facilities at the WAPA plant, would those decisions
16  be made by Vitol Inc.?
17     A.  It would be, yes.
18     Q.  Did Vitol Inc. have any ownership interest in --
19  I may have asked this, but I'm already scrambled eggs here.
20     Did Vitol Inc. have any ownership interest of IPOS?
21     A.  No.
22     Q.  Did Vitol Inc. have any ownership interest of
23  VTTI?
24     A.  No.
25     Q.  Did employees of Vitol Inc. work or perform

---

25

1  services for IPOS?
2      A.  No.
3      Q.  Well, did you ever do any -- perform any services
4  for Vitol -- for IPOS?
5      A.  For IPOS, no.
6      Q.  Did any employees of Vitol Inc. perform any
7  services for VTTI?
8      A.  No.
9      Q.  So if IPOS wanted to get -- let me ask this:  Did
10  Vitol Virgin Islands Inc. perform any services for IPOS?
11     A.  Vitol Virgin Islands Corp. --
12     Q.  Yes.  Sorry.
13     A.  -- do anything for IPOS?
14     Q.  Yes.
15     A.  No.
16     Q.  Did Vitol -- Vitol, sorry.  I'm an old
17  southerner; so I call it Vitol, but I will remember to call
18  it Vitol now.
19     A.  It's okay.
20     Q.  Did Vitol Virgin Islands Corp. perform -- provide
21  any services to VTTI?
22     A.  No.
23     Q.  Did any employees of Vitol Inc. provide services
24  to IPOS?
25     A.  No.

---

26

1      Q.  Well, did you ever meet with my client, people
2  from Petro?
3      A.  Yes.
4      Q.  Okay.  And why would you be meeting with my
5  client?
6      A.  Because they asked if they could meet us in our
7  offices.  I believe they were in Houston visiting, and they
8  asked if they could come and visit.
9      Q.  And what did you discuss when they came and
10  visited with you?
11     A.  We discussed -- we discussed the facilities, the
12  maintenance of the facilities and their opinions of how the
13  maintenance was going.  We discussed some time sheet
14  problems that -- or they shared some issues with us.  And I
15  told them that we needed to change the process and make it
16  more streamline.  But we got a good understanding of -- of
17  their opinion of the maintenance of the facilities.
18     Q.  So why would you have any reason to know about
19  the maintenance of the facilities?
20     A.  Because we own the facilities.
21     Q.  We being whom?
22     A.  Vitol Virgin Islands Corp.
23     Q.  But you're not an employee of
24  Vitol Virgin Islands Corp.?
25     A.  I'm not.

---

27

1      Q.  Okay.  So why was -- since you work for -- oh, my
2  God.  Tell me again who you work for.
3      A.  Vitol Inc.
4      Q.  That's right, Vitol Inc.
5      Since you work for Vitol Inc., why would -- and you
6  don't have any relationship to Vitol Virgin Islands Corp.,
7  why would you -- and don't provide any services to them,
8  why would you want to know about that --
9          MR. KAPLAN:    Object to the form of the
10  question.
11  BY MS. ROHN:
12     Q.  -- as an employee of Vitol Inc.?
13         MR. KAPLAN:    Object to the form of the
14  question.
15     You may answer.
16  BY MS. ROHN:
17     A.  I do provide -- I do the operations on behalf of
18  Vitol Virgin Islands Corp.
19     Q.  As an employee of Vitol Inc.; correct?
20     A.  Correct.
21     Q.  So Vitol Inc. employees do provide services to
22  Vitol Virgin Islands Corp.; correct?
23     A.  Yes.
24     Q.  What kinds of services does Vitol Inc. provide to
25  Vitol Virgin Islands Corp.?

---

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

28

1    A.  Uhm, we schedule the propane into the facilities,
2  we help manage the -- well, we oversee the management to
3  the facilities, and we formulate the budget for the
4  facilities.  And I'm sure there are a few other things, but
5  those are the -- the ones off the top of my head today.
6    Q.  Okay.  So when you say you manage the overall
7  management of the facilities, what would that encompass?
8    A.  We -- we own the -- Vitol Virgin Islands Corp.
9  owns the facilities, and we have a terminal agreement, an
10  operating agreement with IPOS.  And so we manage the
11  relationship between IPOS and Vitol Virgin Islands Corp.
12  and any other vendors that we might have, and we manage the
13  relationship with WAPA.
14    Q.  So the terminal agreement, you said you manage
15  the terminal agreement with IPOS.  Can you be specific as
16  to who are the parties to the terminal agreement?
17    A.  Vitol Virgin Islands Corp. and IPOS.  I forget
18  the name.  That is the Island Project and Operating
19  Services, LLC.
20    Q.  Yeah, it's much easier -- we can just leave it as
21  IPOS.
22    A.  Okay.
23    Q.  And in what way do you manage that terminal
24  agreement?
25    A.  I -- we speak with the employees of IPOS and

29

1  discuss the management of the facility, how the facility is
2  run, and bringing the propane vessels into the facility;
3  the inventory levels within the facility.
4    Q.  And the management of the facilities, in what way
5  do you perform that function or people at VIAC -- well,
6  VIC, sorry, perform that function?
7    A.  Can you clarify the question?
8    Q.  Yes.  You said you -- when I asked what your
9  activities were as far as IPOS, you said -- you mentioned
10  terminal agreement and schedule propane, and you oversee
11  the management of the facilities.  And then you also do the
12  budget for the facilities; is that correct?
13    A.  Yes.
14    Q.  Who besides you at VIAC help manage Vitol?
15    MR. KAPLAN:    Object to the form of the
16  question.
17  BY MS. ROHN:
18    Q.  Sorry.  Who besides you help manage IPOS?
19    MR. KAPLAN:    Object to the form of the
20  question.
21    You may answer.
22  BY MS. ROHN:
23    A.  Can you be more specific?
24    Q.  Yes.  So you said that you're -- that you were
25  involved in these -- through VIAC were involved in these

30

1  various services or activities.  Who besides you are you
2  involved in those activities from VIAC?
3    A.  From Vitol Inc.?
4    Q.  I mean VIC.  Sorry.  VIC.
5    A.  Okay.  Sebastian Moretti and Tim Kologinczak.
6  I'm sure I butchered that.
7    Q.  Yeah.  I just call -- I just been calling him
8  Tim, Tim K.
9    A.  Tim K.  Great.
10    Q.  Okay.  And what does Mr. Moretti do as far as
11  IPOS in the handling of the facility?
12    A.  Mr. Moretti is the head of operations at -- for
13  the Americas, and Tim and I both work for him.
14    Q.  And do you know what Tim's position is?
15    A.  He's -- he's an operator, physical operator.
16    Q.  So let's get back to this meeting.  What makes --
17  what facts are you relying on that they asked to visit?
18    A.  Excuse me?
19    Q.  What facts are you relying on that Petro asked to
20  visit you?
21    A.  Uhm, I -- he -- they either called or e-mailed, I
22  don't remember which, and said they were going to be in
23  Houston and could they come visit us.
24    Q.  Had you had any interactions with Pe -- I have a
25  case Pedro and a case Petro all going on at the exact same

31

1  time and taking depositions in both cases at the exact same
2  time.  So pardon me.
3    A.  That's okay.
4    Q.  Had you had any interaction with Petro prior to
5  that meeting?
6    A.  Uhm, I believe Tim K. had.  Uhm, I don't -- I
7  don't remember if I had actually -- certainly hadn't met
8  the parties.  I don't know if I had e-mailed with them or
9  not.  I'm not a hundred percent sure on that.
10    Q.  There are so many e-mails I'm not a hundred
11  percent sure either.
12    All right.  So did you know of Petro before they --
13  before the visit?
14    A.  Yes.
15    Q.  Okay.  And how did you know of Petro before the
16  visit?
17    A.  Uhm, I knew that they were the maintenance
18  provider for IPOS, and one of IPOS' subcontractor.  I see
19  their invoices in the budget.
20    Q.  Prior to that visit had you heard any complaints
21  about Pedro -- Petro?  Sorry.
22    A.  I think there had been some complaints about the
23  accuracy of time sheets and some of the -- I think some --
24  on previous projects, perhaps some of the work that was
25  done.  I think there were some -- you know, questions as to

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

---

32

1 the -- how good the work was.

2     Q.   And as to the time sheets, who raised those

3 complaints?

4     A.   It would have been David Smith, Andrew Canning,

5 and Tim K. And perhaps Merlin also. I'm not sure.

6     Q.   Okay. I got David Smith, Andrew Canning. And

7 who was the third one?

8     A.   Tim K.

9     Q.   Okay.

10     A.   And potentially Merlin.

11     Q.   And were these complaints in person, by e-mail?

12 How did you receive them?

13     A.   I believe it was a range of communications.

14     Q.   And when did those complaints begin?

15     A.   I don't remember the exact date. I just --

16     Q.   Were they ongoing for years, were they something

17 in the -- how long were those complaints being made?

18     A.   I think, you know, whenever you have a contract,

19 it's over the period of the contract. So they were off and

20 on throughout the contract.

21     Q.   And as to the complaints of the quality of work,

22 where did you hear those complaints from?

23     A.   Uhm, those would be in our weekly meetings. And,

24 you know, we would ask for a status update of various

25 different activities and projects that were going on, and

---

33

1 they would be raised in that forum.

2     Q.   Who would raise those?

3     A.   Multiple parties in the forum. It would be

4 either IPOS employees, Andrew Canning.

5     Q.   So who would attend those weekly meetings?

6     A.   Myself, Tim K., the operators at -- sorry, the

7 managers at IPOS, the maintenance managers at IPOS, Merlin,

8 David Smith, and Andrew Canning.

9     Q.   And why would Canning attend those meetings?

10     A.   Because he was either employed by IPOS, or he was

11 a consultant for Vitol Virgin Islands Corp.

12     Q.   And was one of the persons who were making those

13 complaints Mr. Canning?

14     A.   Uh, yes.

15     Q.   And for how long were those complaints as to the

16 quality of the work ongoing?

17     A.   I don't remember the exact details of when or

18 when he didn't raise the concerns, but I think it was, you

19 know, whenever there's continuous work, people have queries

20 or questions or complaints about particular items.

21     Q.   Can you tell me what types of work the complaints

22 were about?

23     A.   Uhm, some of the -- the welds were called into

24 question, the time sheets, the -- the accuracy of labeling,

25 uhm -- those are the ones that come to mind today. I don't

---

34

1 know if there were more.

2     Q.   And can you recall when the welds were caused

3 into -- called into question? Was that towards the end of

4 the contract or towards the end of Petro's work or were

5 they continuous?

6     A.   It's obviously towards the end, and then I think

7 there were some other times previous to that too.

8     Q.   Can you recall when other times previous to that?

9     A.   I don't recall the exact date. I think one of

10 the complaints was in regards to the RIO panel project.

11 But I don't remember the exact date of that. I apologize.

12     Q.   And the accuracy of labeling, can you explain

13 what you mean by accuracy of labeling?

14     A.   Yes. On the 3-inch vent line project, WAPA had a

15 set of guidelines -- not guidelines, requirements for

16 labeling of the -- the pipe within their side of the

17 facility, and the labels were put on incorrectly.

18     Q.   And were you -- did you learn that that labeling

19 had been corrected at Petro's expense?

20     A.   What's that?

21     Q.   Did you learn that that labeling had been

22 corrected at Petro's expense?

23     A.   Yes.

24     Q.   And could you recall who complained about the

25 labeling?

---

35

1     A.   WAPA.

2     Q.   Who?

3     A.   Somebody that worked for WAPA.

4     Q.   Who conveyed to you that complaint?

5     A.   I believe it was e-mailed directly from WAPA. I

6 was on an e-mail chain from them directly. I think his

7 name was Matthias Clarke, I believe.

8     Q.   So in this meeting what information did you

9 receive from Petro as to their opinion of how the

10 maintenance was going?

11     A.   You're referring to the meeting in -- when they

12 came to our office?

13     Q.   Yes, ma'am.

14     A.   Okay. Sorry. Can you ask the question again?

15     Q.   Sure.

16     A.   Sorry.

17     Q.   In this meeting what did you learn from them --

18 from Petro about the -- their opinion on the maintenance

19 and how going -- how it was going?

20     A.   So we talked about maintenance for the whole, how

21 they thought the facility -- how it was. I believe I

22 asked, you know, you're -- you're the people there, is --

23 are there any items that you think should be focused on.

24     Q.   Okay. And what did they tell you about the

25 maintenance as a whole?

---

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

36

1    A.   Uhm, I -- I think that the facility was in a
2  reasonable condition.  There was place -- there were areas
3  of corrosion, and that the mound settlement was continuing
4  to worsen.
5    Q.   And who told you that?
6    A.   Adrian.  And Chad was also there, but I believe
7  Adrian led the conversation.
8    Q.   And what did they tell you about items that
9  needed to focused on?
10   A.   The mound settlement was the -- I think the --
11  the main area of concern.
12   Q.   And that's been an ongoing problem, am I correct,
13  for a number of years?
14   A.   Correct.
15   Q.   And then you also -- you say that they discussed
16  time sheet problems.  What did they discuss with you as to
17  time sheet problems?
18   A.   We talked about the accuracy of the time sheets,
19  and that it would be my preference that Mr. Canning sign
20  off on the time sheets, and that I thought that that should
21  be the -- the new procedure, as he was at the facility
22  overseeing some of the operations.
23   Q.   At the point where you had the meeting, did
24  Mr. Canning -- was Mr. Canning a consultant directly with
25  Vitol Virgin Islands Corp.?

37

1    A.   Yes.
2    Q.   Was there any discussion at that meeting about
3  the fact that questions as to accuracy of the time sheets
4  were sometimes raised months later?
5    A.   I don't -- I don't recall that exact detail.
6    Q.   Were there -- were you made aware that some of
7  Mr. Canning's disagreement with the time sheets were that
8  Mr. Canning would request that Chad Persaud oversee
9  St. Thomas jobs, and then when he was billed for that time,
10  three or four months later, there'd be a disagreement that
11  he -- there was no need for him to had been there?
12       MR. SIMPSON:    Objection.
13  BY MS. ROHN:
14   Q.   You may answer.
15   A.   Sorry.  The screen went all blank for a second.
16   Q.   Oh, I'm sorry.
17   A.   Can you ask the question again?  Sorry.
18   Q.   Sure.  Were you made aware that one of the
19  disagreements about the time sheets were that Mr. Canning
20  had difficulty dealing with the crew in St. Thomas and
21  asked Mr. Persaud to oversee the jobs in St. Thomas and
22  that Mr. Persaud agreed and would submit the time sheets;
23  and then some three months later, Mr. Canning would say,
24  well, we didn't need two project superintendents, we're not
25  paying that time sheet?

38

1    A.   I don't recall that level of detail.  I just know
2  that it was a -- subject as a whole.
3    Q.   Was it a subject as a whole that Mr. Canning was
4  holding up the entire bill or entire invoice and not paying
5  an entire invoice over a question of a couple -- a few
6  hours on a time sheet?
7        MR. SIMPSON:    Objection.
8  BY MS. ROHN:
9    A.   I don't -- I don't recall that, no.
10   Q.   So you were -- they didn't discuss with you that
11  they had -- on many occasions they changed the time sheets
12  simply because they needed to get paid?
13   A.   Not that I'm aware of, no.
14   Q.   And so the change in the process for the time
15  sheets, other than Mr. Canning approving -- signing off on
16  the time sheets, was there any other change that was put
17  into place?
18   A.   I don't believe so.
19   Q.   From that meeting did you -- what was your
20  overall feeling as to the suitability of Petro as a
21  maintenance contractor?
22   A.   I don't think I -- I don't think I can -- I'm not
23  qualified to speak to their suitability as a contractor.  I
24  think that's -- that's more for IPOS to determine.
25   Q.   Well, you were -- you were, however, meeting with

39

1  them to discuss what maintenance they thought needed to be
2  done, that sort of thing; correct?
3    A.   Correct.
4    Q.   Okay.  So from your conversation did you -- did
5  you come across -- did you come with the opinion that they
6  were well-versed on the maintenance requirements for the
7  propane facilities?
8    A.   For me it was an information seeking exercise.
9  They -- they asked to visit us.  We're not going to say no
10  if they ask to visit us.  And so I took the opportunity to
11  ask them.  But as to their technical expertise and their
12  ability to do the maintenance, that's not my area of
13  expertise; so I am not capable of making that assessment.
14  Did they have knowledge about the facility?  Yes.
15   Q.   You also said that one of the things --
16  complaints was the quality of their welds.
17       Can you tell me in more detail what was the issue with
18  -- that was brought up as to the quality of their welds?
19   A.   I am definitely not a welding expert; so I can't
20  speak to the technicalities of what one looks for in a weld
21  or doesn't.  So it was just brought to my attention that
22  there -- that there was a, you know -- some of the welds
23  were not as good as they could have been, I think.
24   Q.   At the time that you received those criticisms,
25  were you aware of the industry standard for the number of

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

**40**

1  welds that could not be perfect and the job still be
2  approved as a proper welding job?
3     MR. KAPLAN:    Object to the form of the
4  question.
5     You may answer.
6  BY MS. ROHN:
7     A.  Can you repeat the question?
8     Q.  Sure.  At the time of the complaints of the
9  welds, were you aware of the industry standards that
10  10 percent of the welds could not be perfect, but the
11  welding job itself would be acceptable?
12     MR. KAPLAN:    Same objection.
13     You may answer.
14  BY MS. ROHN:
15     A.  I -- so I -- so I know that 10 percent of the
16  welds are welded or -- sorry, are tested.  As to the exact
17  standards, I rely on IPOS and the technical expertise of --
18  of our technical consultants to, you know, give us that
19  technical expertise.
20     Q.  And that would be Mr. Canning?
21     A.  Mr. Can -- oh, it would be OPTIS, and their
22  employee is Mr. Canning, and IPOS.
23     Q.  And whose employee did you say IPOS was of?
24     A.  No, Mr. Canning of OPTIS.
25     Q.  Oh, OPTIS.  I'm sorry.  I missed that had one.

**41**

1  Okay.
2     A.  And then IPOS.
3     Q.  So who do you understand is OPTIS?  What company
4  do you understand OPTIS is?
5     A.  I believe Mr. Canning is a consultant for OPTIS
6  or --
7     Q.  Have you ever met anybody besides Mr. Canning
8  from OPTIS?
9     A.  I not -- I have never met them personally.  I've
10  spoken to them on the telephone, via e-mail.
11     Q.  And who did you speak to?
12     A.  A lady by the name of Wendy Williams.
13     Q.  And what is your understanding of what her
14  position is with OPTIS?
15     A.  I believe she is the finance and administration
16  manager.
17     Q.  Anybody else from OPTIS that you've ever dealt
18  with?
19     A.  There was, uhm, one of their individual that
20  signed the contract between OPTIS and
21  Vitol Virgin Islands Corp., but I don't remember his name.
22  I could look if -- in my binder, if you'd like.
23     Q.  No, we'll get to that.
24     A.  Okay.
25     Q.  When you had the meeting with Petro, did you

**42**

1  receive any complaints about Mr. Canning?
2     A.  No.
3     Q.  Did they -- you receive any complaints from Petro
4  at all?
5     A.  I don't believe so.
6     Q.  As a result of the meeting with Petro, other than
7  changing the time sheet process, were any other changes
8  made as a result of that meeting?
9     A.  I don't believe so.
10     Q.  Were any changes made towards the maintenance
11  plans?
12     A.  No.
13     Q.  Did you memorialize that meeting in any way --
14  report that meeting in any way?
15     A.  Report it to whom?
16     Q.  Anyone.
17     A.  No, I don't think so.
18     Q.  You didn't do a memo of the meeting and let
19  Mr. Moretti know or anything like that?
20     A.  Mr. Moretti was present.
21     Q.  Sorry.  I missed that.
22     To your knowledge, did anyone do a memorandum as to
23  what occurred at that meeting?
24     A.  Not to my knowledge, no.
25     Q.  Did you let IPOS know that you had that meeting?

**43**

1     A.  I believe so.
2     Q.  And how did you let IPOS know that you had that
3  meeting?
4     A.  I think it was probably in passing at our weekly
5  meeting.  And I also -- oh, I did ask to be included in the
6  weekly meeting between IPOS and Petro.  So I guess that was
7  one other change.  Sorry.  I learned that there was a
8  meeting between Petro and IPOS, and I asked that Tim K. and
9  I could be included.
10     Q.  You believe you would have discussed the fact
11  that you'd had a meeting with Petro at the weekly meeting
12  with IPOS and Canning; correct?
13     A.  I believe so.  And I think I -- I asked Merlin to
14  include me or to forward me the invitation to be a part of
15  that meeting with IPOS and Petro.
16     Q.  And why did you do that?
17     A.  Because I felt like I would get more information.
18     Q.  What type of information?
19     A.  Regarding maintenance.
20     Q.  And what about regarding maintenance?
21     A.  It was my understanding that the conversations
22  that they had at that weekly meeting between Petro and IPOS
23  was the -- a status update of all the maintenance items
24  that were going on at the facilities.
25     Q.  Did you cause or suggest that there be any

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

---

44

1  investigation into -- at any time after hearing complaints
2  about the welds, did you suggest any investigation into the
3  welds?
4      A.  No.
5      Q.  At any time did you receive additional
6  information about the complaints as to the quality of the
7  welds?
8      A.  Could you be more specific?
9      Q.  Yes.  At any time did you begin to -- did you
10  hear that there were questions as to the credentials of
11  Petro's welders?
12      A.  Yes.
13      Q.  And who did you hear that from?
14      A.  I believe David Smith.
15      Q.  And can you tell me, as best as you can recall,
16  what he told you in that regard?
17      A.  Well, we were -- WAPA required certain
18  documentation for the 3-inch vent line, and so we were
19  asking for those documents.  And IPOS and Andrew Canning
20  reviewed the documents, and I believe there were some
21  inconsistencies in the documents that then IPOS and
22  Andrew Canning investigated.
23      Q.  How did you learn that WAPA was -- had -- was
24  requiring certain documentation?
25      A.  WAPA asked me for them.

---

45

1      Q.  And what documentation did they request?
2      A.  There were multiple -- there were many different
3  documents for that specific job, the 3-inch vent lines, and
4  it's a job data book, I think is the term that is used.
5  And it's a combination of many different documents which
6  verifies and validates the welding materials, the pipe
7  specifications, the traceability reports on the -- on the
8  material.  There are more, but that's all I recall off the
9  top of my head.
10      Q.  Okay.  And in what form did WAPA make this
11  request to you, e-mail? writing?
12      A.  Yeah, in e-mail.
13      Q.  And do you recall if this was before or after the
14  3-inch vent line was completed?
15      A.  It was before.  It was before, and we also
16  requested those documents ourselves to IPOS, and we made it
17  very clear that the documents would be necessary.
18      Q.  So who did you understand -- what company did you
19  understand had done the 3-inch vent line?
20      A.  Done what?  Sorry.
21      Q.  Done the work on the 3-inch vent line.
22      A.  Petro.
23      Q.  And when did you understand that Petro was
24  informed that they needed to have these documents?
25      A.  I believe I or Tim sent those documents in -- I

---

46

1  think it was -- it was at the very beginning of the -- of
2  the project.  It was either in February or March of 2001.
3  And so Tim K. sent the list at the very beginning of the
4  project.
5      Q.  And is it your contention that Tim K. sent that
6  list directly to Petro, or he sent that list to IPOS?
7      A.  I believe it was to both parties.
8      Q.  And so would that e-mail to both parties been as
9  a result of WAPA's job data book being received by
10  Vitol Virgin Islands Corp.?
11      A.  No.
12      Q.  Okay.  Why would those have been sent then?
13      A.  Sorry.  Your question doesn't -- can you clarify?
14  It doesn't make sense.  Sorry.
15      Q.  Well, you said that the -- there was -- the
16  documentation as to the welds were contained in the WAPA
17  job data book.
18      A.  No.  A job data book is something that the --
19  that the person who is doing the work, they would provide
20  that at the end of the job.
21      Q.  Oh, I'm sorry.  I thought that was something that
22  was generated by WAPA.
23      A.  No.
24      Q.  Okay.  Sorry.
25      A.  Any -- any job that one does, one should provide

---

47

1  a set of documents, and it's referred to as a job data
2  book.  And each job should have all these documents that I
3  referred to earlier as part of the job data book, which
4  signifies the completion of that job.  So not only do you
5  do the work, but you have to have the paperwork to back up
6  the work.
7      Q.  And had you seen job data books that Petro had
8  provided information from -- for previously?
9      A.  Completed ones, no.
10      Q.  Yes.
11          Had you ever seen any completed job data books for
12  projects at the WAPA propane facilities?
13      A.  No.
14      Q.  So did you see the job data book for the 3-inch
15  vent line?
16      A.  I saw parts of -- parts of the information were
17  sent across and -- and over the course of time.  So I
18  believe that there are still a few outstanding items.
19      Q.  So why would you see the job data book for this
20  project but not for other projects?
21      A.  Because this project -- I think you should see
22  job data books for all projects.  But in this particular
23  project, WAPA was involved.  Some of the work was being
24  done on WAPA's side of the fence.  And that is a
25  requirement by WAPA, and it was something that they asked

---

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

48

1  for at the very beginning. And I wanted to ensure that we
2  had absolutely all the documentation required.
3      Q.  But there were other jobs that Petro did where
4  WAPA was involved; correct?
5      A.  I don't know if that -- if that's the case or
6  not. On this particular one, this was the one that I was
7  involved in; so I can only speak to this one.
8      Q.  So how would it be determined whether or not you
9  would oversee a project or Tim K. would oversee a project?
10     A.  I would be involved in all of the projects and --
11  and Tim -- well, Tim K. started doing -- working on these
12  facilities before me. And so -- but once I became involved
13  in the facilities, then I would be involved in all of the
14  projects.
15     Q.  So, again, then -- then how are you not aware
16  whether or not Petro was involved in other WAPA -- WAPA --
17  other projects that WAPA was involved in?
18     A.  Because this was the first one that I was
19  personally involved in when WAPA was involved.
20     Q.  So how long were you involved in overseeing
21  projects at the WAPA facility?
22     A.  At the WAPA facility or the propane facility?
23     Q.  Well, I think that -- the propane facility which
24  goes through WAPA.
25     A.  Okay. So this was -- this was the first project

49

1  that I was actively involved in when it comes to requesting
2  documents and making sure all the documents were there.
3      Q.  That's not my question, though. How long had you
4  been involved in projects at the WAPA facility -- sorry, at
5  the propane facility?
6      A.  I started probably when Eduardo left,
7  Eduardo Garcia left.
8      Q.  I don't know when Eduardo left so that --
9      A.  I'm sorry. I said when Eduardo left, which was
10  in December -- it would have been December of '21.
11     Q.  I'm sorry. I was coughing.
12     A.  I think Eduardo left in -- I think it was
13  December of '20. And after that I became a lot more active
14  in the role of being involved in the projects. And prior
15  to that Eduardo Garcia was somebody that would speak
16  directly to Adrian and -- and then deal with IPOS.
17     Q.  And what information did you receive about the
18  question as to the qualifications or credentials of the
19  Petro welders?
20     A.  Can you repeat the question?
21     Q.  Yes. What information did you receive as to the
22  questioning of the credentials of the Petro welders?
23     A.  So at -- at the time, very little. I've -- I've
24  since learned through the documents in this lawsuit that
25  there were questions as to the validity of the

50

1  qualifications.
2      Q.  What were those questions?
3      A.  Uhm, that they were -- that the qualifications
4  were signed by an individual that stated he worked for
5  Acuren, Mr. Castro that worked for Acuren, and at that time
6  he didn't work for Acuren.
7      Q.  Did you see the letter from -- I believe we're
8  talking about Guillermo Castro; correct?
9      A.  Correct.
10     Q.  Did you see the letter from Mr. Castro that was
11  submitted by him as to the questions about the letter and
12  his willingness to come and give additional information?
13     A.  I did.
14     Q.  And, actually, his volunteering to come down and
15  retest all of the welders. Did you see that information?
16     A.  Yes.
17     Q.  And did you ever make any effort to speak to
18  Guillermo Castro?
19     A.  No.
20     Q.  What about the -- his offer to come down and
21  retest, why was that not accepted?
22     A.  That was a conversation between IPOS and
23  Mr. Castro and Adrian. Adrian is a -- Petro is a
24  subcontractor of IPOS, and so, you know, we allowed them to
25  handle the dealings with their subcontractor.

51

1      Q.  Did you make any recommendations in that regard?
2      A.  I did not.
3      Q.  Even though WAPA, Vitol's customer, was
4  questioning this?
5      A.  I looked to the people with the technical
6  expertise, which is IPOS, to provide the documents from
7  their subcontractor.
8      Q.  Do you know the qualifications of
9  Guillermo Castro?
10     A.  No.
11     Q.  Did you ever do anything to determine the
12  qualifications of Guillermo Castro?
13     A.  No.
14     Q.  And did Guillermo Castro ever represent that he
15  worked for Acuren, or did he use a Acuren form to put the
16  information on?
17     A.  I don't -- I don't know the difference between
18  that statement.
19     Q.  Okay.
20        MR. KAPLAN:    I was going to ask is now a good
21     time for a break?
22        MS. ROHN:    I think we've been going for about
23     an hour and a half. And let's take -- I got all that
24     in my brain. I am going to give it time to settle a
25     little bit. So how about a ten-minute break,

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

52

1    five-minute break, whatever anybody needs.
2         MR. KAPLAN:    Yeah, ten minutes sounds great.
3    Thank you.
4         MS. ROHN:    Perfect.
5         (A recess was taken at this time.)
6    BY MS. ROHN:
7    Q.   So Petro actually did work directly for Vitol as
8    well, did they not?
9    A.   Yes.
10   Q.   And you would -- would you in your position be
11   responsible -- one of the people responsible for the
12   decision to do those contracts with Vitol?
13   A.   No.  That was done by Eduardo Garcia when he was
14   there, and Tim K. facilitated with him.
15   Q.   But you would have overseen those projects;
16   correct?
17   A.   It was before I started overseeing the project.
18   Q.   Were you aware of whether or not on any of those
19   direct Vitol projects Petro was ever asked for a job data
20   book or the information put in the job data book?
21   A.   I'm not aware, no.
22   Q.   Now, this 3-inch vent line, this was something
23   that WAPA had -- had requested; correct?
24   A.   Correct.
25   Q.   And it was something that Vitol also needed to

53

1    have done to keep WAPA happy.  Would you say that?
2    A.   Correct.  Yeah.
3    Q.   So although IPOS was paying for the job, it was
4    actually work that benefited both Vitol and IPOS; correct?
5    A.   What do you mean by benefited?  Sorry.
6    Q.   Well, it was something that was needed in order
7    to be able to use the propane facility with WAPA; correct?
8    A.   Correct.
9    Q.   And it was something that was necessary for Vitol
10   to keep its customer, WAPA, happy; correct?
11   A.   Correct.
12   Q.   So it was a -- it was -- might have been budgeted
13   to for IPOS' budget, but it was a project that benefited
14   both Vitol and IPOS; correct?
15   A.   Correct.
16        MS. FRANCIS:    Objection.
17   BY MS. ROHN:
18   Q.   Now, in the meeting in -- was the meeting around
19   March of 2021?
20   A.   What meeting?
21   Q.   The meeting that you had with Petro.
22   A.   Yes.
23   Q.   And did you express or infer in that meeting that
24   you did not believe you were getting all the information
25   from IPOS and Canning and needed more information?

54

1    A.   Yes.
2    Q.   And was one of the reasons that you then asked to
3    be in the meeting between IPOS and Petro so you can get
4    more information?
5    A.   Yes.
6    Q.   And isn't it a fact that they never actually
7    allowed you to be in their weekly meetings?
8    A.   No.
9    Q.   No, that's not correct?
10   A.   It wasn't that they didn't allow me.  I don't --
11   the weekly meetings stopped.
12   Q.   Exactly.
13        And you didn't find that coincidental that the weekly
14   meetings stopped after you asked to be part of them?
15   A.   It's my under -- no.
16   Q.   What was your understanding as to why they
17   stopped?
18   A.   Because Petro was no longer the maintenance
19   manager.
20   Q.   Okay.  So are you saying that immediately after
21   you had a meet -- but Petro continued to be -- do
22   maintenance until July; correct?
23   A.   Yes.
24   Q.   Okay.  So why were there -- why did you attend no
25   meetings between March and July?

55

1    A.   I asked -- I asked Merlin to add us to the
2    invitation, and the first -- when he added us was at the
3    end of -- of their contract.
4    Q.   Were you aware that there were weekly meetings
5    between March and July that you weren't invited to?
6    A.   No.
7    Q.   Did you ever inquire what's happened to your
8    weekly meetings?
9    A.   No.  I think I asked to be added.
10   Q.   Now, were you aware that on the projects that
11   Petro worked directly for Vitol that Petro was never asked
12   for the documentation -- any documentation similar to what
13   was asked for on the 3-inch vent line?
14   A.   I wasn't involved in -- in those projects.  So,
15   no, I'm not.
16   Q.   And were you aware that Tim K. requested the
17   credentials of the welders from Petro in February of 2021,
18   and he received those certifications in late March 2021?
19   A.   Yes.
20   Q.   And can you explain to me why then again in July
21   Canning would request the same certifications?
22   A.   Say the question again.
23   Q.   Can you explain to me why then in July Canning
24   would then ask for the same certifications that had been
25   given to Tim K. in March of 2021?

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

56

1    A.  No.

2    Q.  Did you ask Canning to request those
3    certifications again?

4    A.  I -- I asked for all the documents that were
5    provided.  We were at the end of the project, and I didn't
6    know that we -- I knew that Tim had asked for them, and
7    after the fact, I knew that Adrian had sent them.  And at
8    the end of the project, I wanted to make sure that we had
9    all the documents, and so I think I asked for all the
10   documents again, and that was when they were sent again.

11   Q.  So when you say after the fact you learned that
12   Tim had them, what do you mean by "after the fact"?

13   A.  From -- from reading the -- the e-mails in this
14   case.

15   Q.  When you were looking for all the documentation,
16   did you go to Tim K. and say, what documentation do you
17   have on this job?

18   A.  I didn't, no.

19   Q.  Why not?

20   A.  Because I didn't -- I didn't know or remember
21   that he had -- that they had sent it.

22   Q.  So as I understand it, you -- you asked for this
23   documentation after the job had been completed; is that
24   correct?

25   A.  I don't know if it was after the job was

57

1    completed or towards the end of -- of the job, but it was
2    when WAPA asked for the documents.

3    Q.  When you were given some advice on -- or some
4    statements about the credentials of Petro's welding crew
5    and the testing of Petro -- Petro's welds, did you consult
6    with any qualified welder to see whether or not the
7    representations being made to you by Canning and IPOS were
8    valid or not?

9    A.  No.

10   Q.  And what did you understand from IPOS or Canning
11   were the requirements to have properly fulfilled the
12   welding requirements on this job?

13   A.  Can you repeat the question?

14   Q.  Well, I could try.

15       What did you understand were the qualifications that
16   were required to have properly fulfilled the welding
17   requirements on this job?

18   A.  I didn't -- I didn't ask either of them, I don't
19   believe, what the exact requirements are.  I looked to them
20   to ascertain whether they were satisfied with the documents
21   as the technical experts, and if they said they were, then
22   great.  If they said they weren't, then -- then I -- I
23   would take their word for that.

24   Q.  And what did Mr. Canning tell you as to the
25   satisfaction with -- sorry, with the meeting the

58

1    requirements?

2    A.  I don't believe Mr. Canning said anything.

3    Q.  Okay.  What did Mr. Smith tell you?

4    A.  Mr. Smith said that there were some abnormalities
5    in the documents that led it -- led them to believe that
6    the -- and this is -- that the documents -- that -- that
7    they were questioning the documents.

8    Q.  Well, did anyone tell you that they thought they
9    were not true documents?

10   A.  I don't believe they used those words, no.

11   Q.  Well, what words did they use?

12   A.  That there were some inconsistencies in the
13   certifications.

14   Q.  Okay.  And as to the quality of the welds, what
15   did they tell you about that?

16   A.  Nothing.

17   Q.  So they didn't -- would it be true that they did
18   not inform you that the quality of the work was not proper?

19       MR. KAPLAN:    Object to the form of the
20       question.

21       You may answer.

22   BY MS. ROHN:

23   A.  Can -- can you say it again?  I think we had --
24   we had a double negative there.  I want to make sure I
25   understood your question.

59

1    Q.  I sure did, didn't I.  I was sitting there going
2    I'm not even sure if she answers, I'll know what the answer
3    is.

4        Did anyone inform you that the -- that Petro had not
5    met the requirements for the -- for welding on the job?

6    A.  Yes.

7    Q.  Okay.  And what requirements did -- did you --
8    were you told had not been met?

9    A.  After the -- after the -- after the investigation
10   by IPOS, they had Acuren -- sorry, Versa come and retest
11   the welds, and I believe there were multiple welds that
12   failed and had to be replaced.

13   Q.  And who told you that these welds had to be
14   replaced?

15   A.  I believe it was Mr. Smith, David Smith.

16   Q.  Were you informed that Petro offered to correct
17   any imperfect welds free of charge?

18   A.  At the time, no.

19   Q.  Have you ever learned that?

20   A.  Since reading the documents in this case.

21   Q.  In fact, Versa, am I correct, was hired to
22   correct the welds?

23   A.  Versa, I believe, is a testing company.

24   Q.  Okay.

25       MR. MELENDEZ:    Tampa Tanks.

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

---

60

1    Q.  Tampa Tanks was hired to correct the welds;
2  correct?
3    A.  Correct.  Yes.
4    Q.  And were you aware that Tampa Tanks charged more
5  than overall cost of the job to fix those welds?
6    A.  I don't have the exact details.
7    Q.  Who ultimately paid for Tampa Tanks' work?
8    A.  IPOS.
9    Q.  And who -- did anybody reimburse IPOS?
10    A.  Yes, Vitol Virgin Islands Corp.
11    Q.  And does that ultimately get paid by WAPA?
12    A.  Yes.
13    Q.  So your customer paid hundreds of thousands of
14  dollars to correct welds that Petro would have corrected
15  for free; correct?
16        MR. KAPLAN:    Object to the form of the
17    question.
18        You may answer.
19        MR. SIMPSON:    Objection.
20  BY MS. ROHN:
21    A.  I wouldn't -- I wouldn't put it like that but --
22    Q.  Isn't it true that ultimately -- isn't it true
23  that ultimately the money that IPOS spends and the money
24  that Vitol Virgin Islands spends is ultimately paid by
25  WAPA?

---

61

1    A.  Yes.
2    Q.  And would Vitol have an -- well, did IPOS have an
3  obligation to tell Vitol that Petro would repair the welds
4  for free?
5        MS. FRANCIS:    Objection.
6  BY MS. ROHN:
7    Q.  You can answer.
8    A.  May you repeat the question?
9    Q.  Sure.  Did IPOS have an obligation to tell
10  Vitol Virgin Islands that Petro had offered to correct the
11  welds for free?
12    A.  I don't -- I don't know.
13    Q.  Well, ultimately, wasn't it Vitol that was going
14  to have to pay that?
15    A.  Yes.
16    Q.  So wouldn't that be the type of thing that they
17  should tell you so you don't expend funds -- Vitol doesn't
18  expend funds it doesn't need to?
19        MS. FRANCIS:    Objection.  Form.
20    Argumentative.
21        MS. ROHN:    Objection.  Tone of voice.  Thank
22    you.
23  BY MS. ROHN:
24    Q.  Can you answer that question?
25    A.  Sorry.  Can you repeat it?  There were so many

---

62

1  things flashing up on the screen.
2    Q.  Wouldn't Vitol expect its contractor to tell it
3  that it doesn't have to spend, I think, the sum was
4  $270,000 if somebody was going to do it for free?
5        MS. FRANCIS:    Objection.  Argumentative.
6        MR. KAPLAN:    Objection.  Form.
7        You may answer.
8  BY MS. ROHN:
9    A.  Sorry.  I get really thrown off by all the
10  objections.  One more time.
11    Q.  No worries.
12        Wouldn't you -- Vitol, V.I. -- Vitol Virgin Islands
13  expect its contractor to tell it you don't have to pay this
14  Tampa Tanks cost because Petro will do it for free?
15    A.  I think they had -- they should, you know, manage
16  the facility in the way that they deem to be the most
17  appropriate.  Yes, we have a budget, and that's a
18  forecasting mechanism, but ultimately, they have the -- the
19  responsibility, and they can manage their subcontractors
20  the way that they believe is the right way to do it.
21    Q.  Were you aware of whether or not the -- there was
22  a bidding process to bid the correction of the welds?
23    A.  I -- I'm not, no.
24    Q.  Normally should there have been a bidding process
25  to get the cheapest person to do -- or company to do the

---

63

1  bill -- the work?
2    A.  I think some projects are bid, and some projects
3  aren't.  And that would be up to IPOS.
4    Q.  So Vitol Virgin Islands would let its contractor
5  determine whether or not to bid a project, even though
6  Vitol is ultimately going to pay it?
7    A.  Yes.
8    Q.  Ultimately the contract between Vitol and IPOS
9  was terminated; correct?
10    A.  Uh, no.
11    Q.  Was it -- did it expire?
12    A.  Yes.
13    Q.  And why was it not renewed?
14    A.  It was a mutual agreement on both parties not to
15  renew it.
16    Q.  And David Smith, where did he go after there was
17  a mutual agreement?
18        MS. FRANCIS:    Objection.
19  BY MS. ROHN:
20    A.  Where did he go?
21    Q.  Yeah, who is he employed by now?
22    A.  I believe VTTI.
23    Q.  Which is the parent company of IPOS; correct?
24    A.  Correct.
25    Q.  The other -- the other -- were there other

---

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

64

1    persons from IPOS who then went to work for -- became
2    employees of VTTI?
3         MS. FRANCIS:    Objection.  Outside the scope.
4         MS. ROHN:    Noted.
5    BY MS. ROHN:
6         Q.   You could answer.
7         A.   I'm not -- I'm not sure.
8         Q.   You don't know of a single one other than
9    David Smith?
10        A.   I don't know exactly what happened to Merlin.  He
11   may have gone to work -- he may work for VTTI, but other
12   than that, I'm not sure.
13        Q.   After the contract was not renewed with IPO --
14   IPOS, who took over the job that IPOS was doing?
15        A.   Saintnals.
16        Q.   And was that position bid, or how did it come
17   about that that contract went to Saintnals?
18        A.   Vitol Virgin Islands Corp. hired Saintnals.
19        Q.   And how did Virgin -- Vitol Virgin Islands know
20   about Saintnals?
21        A.   We had done work previously with their parent
22   company.
23        Q.   And what was their parent company?
24        A.   EXSOL.
25        Q.   Excel?

65

1         A.   EXSOL, E-x-o -- sorry.  E-x-s-o-l.
2         Q.   Thank you.
3         And is there any relationship between EXSOL and any of
4    the Vitol companies?
5         A.   No.
6         Q.   And who took over the position that David Smith
7    would have filled at Saintnals?
8         A.   Steve -- Stephen Myshak.  I think I butchered
9    that.  Sorry.
10        Q.   I think we will call him Steven M.
11        A.   Excellent.
12        Q.   How long of a contract did they have -- do they
13   have?
14        A.   I believe it's a five-year contract.
15        Q.   Are they now contracting with a maintenance
16   company similar to Petro?
17        A.   Yes.
18        Q.   And what is the name of that company?
19        A.   I don't know the exact name.  Apologize.
20        Q.   No worries.
21        And do they get a budget similar to IPOS' budget?
22        A.   Yes.
23        Q.   And is that budget generated by
24   Vitol Virgin Islands?
25        A.   It's generated in conjunction with Saintnals and

66

1    Vitol Virgin Islands together.
2         Q.   And is that budget ultimately paid by
3    Vitol Virgin Islands?
4         A.   Yes.  Well, let me clarify.  It's -- the budget
5    isn't paid.  The budget is a forecasting document, and any
6    actual expenses are paid.
7         Q.   Correct.  Sorry.
8         A.   No worries.
9         Q.   And so the billings from Saintnals would be --
10   would be able to tell us what maintenance work has been
11   done at the propane facilities since the end of IPOS;
12   correct?
13        A.   Correct.
14        Q.   And the cost of those?
15        A.   Correct.
16        Q.   Are you aware of how much was spent in 2022 on
17   maintenance through Saintnals?
18        MR. KAPLAN:    Object to the form of the
19   question.  Scope.
20        You may answer.
21   BY MS. ROHN:
22        A.   Not off the top of my head.
23        Q.   Do you know what the range is?
24        A.   I wouldn't want to speak inaccurately.  We would
25   have to look at the exact invoices.

67

1         Q.   But you have access to those invoices; correct?
2         A.   Yes, ma'am.
3         Q.   What happened -- did the contract with
4    Mr. Canning either -- was it either terminated or did it
5    expire?  Sorry, with OPTIS.
6         A.   It was terminated.
7         Q.   And who made the decision to terminate that
8    contract?
9         A.   Sebastian Moretti.
10        Q.   And did he do that with his Vitol Virgin Islands
11   hat on?
12        MR. KAPLAN:    Object to the form of the
13   question.
14        You may answer.
15   BY MS. ROHN:
16        A.   Yes.
17        Q.   And why was it terminated?
18        A.   Because Saintnals, the new operations, or the
19   terminal operator had the technical expertise that was
20   necessary; so Mr. Canning was -- was no longer needed as
21   the technical expertise.
22        Q.   Was he contracted with any other Vitol company
23   after that?
24        A.   Not to my knowledge.
25        Q.   I see -- I mean, OPTIS.  Was OPTIS -- sorry, very

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

68

1  bad question.
2      Was OPTIS contracted with any other Vitol companies
3  after that?
4      A.  Not to my knowledge.
5      Q.  To your knowledge, did OPTIS have any technicians
6  other than Mr. Canning?
7      A.  I don't know.
8      Q.  Is Vitol -- VI Vitol a member or participant in
9  any service agreement with any other companies?
10     A.  Yes, with -- well, with IPOS, which is no longer,
11  as we spoke about.  Saintnals, who is the terminal operator
12  currently, and OPTIS, which is we've -- we've discussed is
13  terminated.  Those are the only service agreements.
14     Q.  So there's no service agreement between Vitol and
15  VIC?
16     A.  No.  Sorry, what was -- you said between Vitol
17  and VIC?
18     Q.  Vitol and VIC, Vitol Inc.
19     A.  Vitol Inc. and?
20     Q.  Sorry.  Vitol Inc. and VI Vitol.
21     A.  No.
22     Q.  Or Vitol Virgin Islands.
23     A.  No.
24     Q.  Okay.  So what is the arrangement between
25  Vitol Virgin Islands and Vitol Inc. such that the persons

69

1  who make decisions for Vitol -- Vitol Virgin Islands are
2  employed by Vitol Inc.?
3      A.  I think we do work on behalf of
4  Vitol Virgin Islands Corp.
5      Q.  No.  What is the arrangement that occurs?
6      A.  I -- I don't -- I don't know.  I don't know that
7  there is an arrangement.
8      Q.  Have any of the Vitol related companies or
9  affiliates or parents entered into consent judgments as
10  related to allegations of illegal activities, bribery, or
11  fraud in the last 10 years?
12         MR. KAPLAN:    Objection. Scope. Form.
13         You may answer.
14  BY MS. ROHN:
15     A.  Can you be more specific on the question?
16     Q.  Sure.  Have any of the parents or affiliates of
17  any of the Vitol companies entered into consent judgments
18  for criminal activity?
19     A.  No.
20         MR. KAPLAN:    Objection. Scope. Form.
21         You may answer.
22  BY MS. ROHN:
23     A.  No.
24     Q.  Are you aware of Vitol companies having entered
25  into consent judgments for bribery?

70

1      A.  No.
2          MR. KAPLAN:    Objection. Scope. Form.
3          You may answer.
4  BY MS. ROHN:
5      A.  No.
6          MR. KAPLAN:    Counsel, may I have a value
7      objection for this line of questioning?
8          MS. ROHN:    You certainly may.
9          MR. KAPLAN:    Thank you.
10 BY MS. ROHN:
11     Q.  You -- Vitol Virgin Islands denied paragraph 8 of
12  Plaintiff's First Amended Complaint which reads,
13  "Vitol Virgin Islands is upon information the owner of both
14  propane facilities known as the Randolph Harvey Power Plant
15  and Richmond Power Plant for which Vitol Virgin Islands
16  entered into an agreement with WAPA to perform certain
17  services."
18      What's the basis of the denial of that allegation?
19     A.  May I get my binder to look at --
20     Q.  Yes, ma'am, you may.
21     A.  The camera has actually turned just on to Adrian,
22  and you're no longer in the picture.
23     Q.  The camera unfortunately has a mind of its own.
24     A.  There we go.  You're back.
25      So which response were you talking about?

71

1      Q.  Paragraph 8 of the Complaint -- First Amended
2  Complaint.
3      A.  First Amended Complaint, paragraph 8.
4      Okay.  So the First Amended Complaint No. 8 you said?
5      Q.  Yes, ma'am.
6      A.  Okay, I see that.
7      Q.  That allegation was denied by
8  Vitol Virgin Islands.  What is the factual basis for
9  denying that?
10     A.  The information is incorrect.
11     Q.  In what manner?
12     A.  So it reads "The owner of both propane facilities
13  known as Randolph Harvey Power Plant and Richmond Power
14  Plant." Those are the WAPA facilities.  They are the power
15  plants.  And Vitol Virgin Islands Corp. does not own the
16  power plants, WAPA does.
17     Q.  But they do own the propane facilities at those
18  power plants?
19     A.  Adjacent to.
20     Q.  Well, doesn't part of the Vitol piping go through
21  the WAPA power plants?
22     A.  It goes from one side of the fence to the other
23  and as we export propane into the power plant.  But the
24  facilities are separate.
25     Q.  Correct.  Okay.  So that's the -- okay.

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

72

1  The same as to No. 9, "Vitol US Holding II Co. upon
2  information has 99 companies that do work for this parent
3  company."
4      What is the basis for that denial?
5      A.   There are not 99 companies.  And do work is not
6  clear, but there are not 99 companies that operate for
7  Vitol Holding US Holding II Co.
8      Q.   How many are there?
9      It is a part of Vitol Aviation and
10  Vitol Virgin Islands Corp.
11      Q.   Oh, I'm sorry.  I'm sorry.
12      Now, how did Vitol Virgin Islands come to contract
13  with OPTIS to do work at its facilities at WAPA?
14      A.   Vitol Virgin Islands Corp. knew of Mr. Canning
15  when Mr. Canning was -- had an agreement with IPOS, and so
16  Mr. Canning transferred working for IPOS to working for
17  Vitol Virgin Islands Corp.  Sorry.  So the transfer of
18  OPTIS.
19      Q.   Could you say that again?  I'm sorry.  I lost
20  you.
21      A.   Sure.  OPTIS did work for IPOS.  Mr. Canning was
22  the technical engineer that -- that worked for IPOS, and
23  so he was already doing work at the facility with IPOS.
24  And we transferred -- we -- Vitol Virgin Islands Corp. then
25  took over the -- or we hired Mr. -- hired OPTIS as a

73

1  technical consultant on behalf of
2  Vitol Virgin Islands Corp.
3      Q.   So I take it that that expense would have gone
4  from the budget of IPOS to the budget of Vitol; correct?
5      A.   They're one in the same.
6      Q.   There's one budget that's both
7  Vitol Virgin Islands and IPOS?
8      A.   The IPOS -- the IPOS budget is -- so the
9  facilities -- the propane facilities have a budget, right.
10  That budget is set forth by the terminal operator in this
11  particular time, IPOS or Saintnals, and that budget is --
12  is put together in conjunction with the terminal operator
13  and Vitol Virgin Islands Corp.
14      Q.   So ultimately, whether or not it was an IPOS
15  budgeted item or a Vitol Virgin Islands budgeted items, it
16  was paid for by Vitol Virgin Islands; correct?
17      A.   Correct.
18      Q.   So trade -- so OPTIS going from IPOS to Vitol was
19  simply a budgetary change, wasn't it?
20      MR. KAPLAN:    Object to the form of the
21  question.
22      You may answer.
23  BY MS. ROHN:
24      A.   What do you mean by budgetary change?
25      Q.   Well, he switched from IPOS' budget to Vitol's

74

1  budget, but ultimately the same people -- the same company
2  paid him?
3      A.   Correct.
4      Q.   So why was he shifted?
5      A.   I don't know the exact details behind that.
6      Q.   Well, who would know that?
7      A.   Mr. Moretti.
8      MS. ROHN:    Will you tender Mr. Moretti as a
9  30(b)(6) witness on that issue?
10      MR. KAPLAN:    Yes.
11      MS. ROHN:    Okay.  Thank you.
12  BY MS. ROHN:
13      Q.   So you ultimately -- let me ask you this then:
14  Ultimately, when OPTIS contracted with, that would have
15  been a budgetary item on IPOS -- on the IPOS budget;
16  correct?
17      A.   Say it again.  OPTIS would be on the IPOS budget?
18      Q.   Originally OPTIS was a budgetary item on the
19  OPTIS budget; correct?
20      A.   OPTIS was the budgetary item on the IPOS budget.
21  Is that what you mean to ask?
22      Q.   That's what I thought I said.  But if I said
23  OPTIS, it's because there's just too many people -- too
24  many initials.  Yes, sorry, on the IPOS budget.
25      A.   So OPTIS was a budgetary item on the IPOS budget,

75

1  yes.
2      Q.   Okay.  And since that's a budget that is jointly
3  agreed to between IPOS and Vitol -- Vitol Virgin Islands,
4  what -- what was the basis for Vitol Virgin Islands
5  agreeing that OPTIS would be hired to do -- to do technical
6  assistance?
7      A.   I don't know the answer to that.  That would be a
8  question for Mr. Moretti.
9      Q.   Well, what did VI -- what did
10  Vitol Virgin Islands know of OPTIS' technical expertise
11  before the -- there was a contract entered into with OPTIS?
12      A.   We had witnessed Mr. Canning's technical
13  expertise while he worked for IPOS.
14      Q.   Okay.  But before it was allowed to become a
15  budgetary item for OPTIS, what did Vitol Virgin Islands
16  know of his qualifications or its qualifications for
17  technical assistance?
18      A.   Can you clarify the question?
19      Q.   Sure.  OPTIS -- as I understand it, there's a
20  joint budgeting.  So OPTIS -- sorry, so IPOS says we'd like
21  to get some technical assistance, and we want to hire OPTIS
22  because we want Mr. Canning.  What knowledge did
23  Vitol Virgin Islands have as to its qualifications to agree
24  to add that to the budget?
25      A.   I didn't research that level going to that.

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

76

1    Q.   Would Mr. Moretti know that?
2    A.   I'm not sure.
3         MS. ROHN:    Would you tender Mr. Moretti for
4    those two other questions as well?
5         MR. KAPLAN:    I'm not sure those were within
6    the scope of the notice.  But Mr. Moretti will be the
7    30(b)(6) on the topic that you asked, which is the
8    decision to contract between
9    Vitol Virgin Islands Corp. and OPTIS in 2020, and you
10   can ask him in that capacity questions about that
11   decision.  And certainly in his individual capacity,
12   you can ask him any questions that are relevant to the
13   case.
14        MS. ROHN:    Thank you.
15   BY MS. ROHN:
16   Q.   Other than Vitol Virgin Islands knowing that
17   OPTIS did work for IPOS, IPOS, what other knowledge did
18   Vitol Virgin Islands have as to the -- Mr. Canning's
19   technical abilities?
20   A.   Just our experience with IPOS.
21   Q.   And what about that experience with IPOS made
22   Vitol Virgin Islands decide that they wanted to hire him
23   directly for technical assistance?
24   A.   I didn't research to that level.  I don't know
25   the answer to that.

77

1    Q.   To your knowledge, had Vitol Inc. ever done work
2    with OPTIS or Mr. Canning prior to Mr. Canning going to
3    work for IPOS?
4    A.   Not to my knowledge.
5    Q.   And to this -- since the termination of the
6    agreement with OPTIS, has OPTIS or Mr. Canning done any
7    work for Vitol Inc.?
8    A.   Not to my knowledge.
9    Q.   Does Vitol -- sorry, Vitol.  I'm sorry.  I'm
10   not --
11   A.   It's okay.
12   Q.   The long i is just going to be with me forever.
13   Sorry.
14        Does Vitol know where Mr. Canning or OPTIS is working
15   now?
16   A.   Vitol who?
17   Q.   Any of the Vitols.
18   A.   No.  You said where he's working?
19   Q.   Correct, where he's currently working.
20   A.   No.  I believe he's still working for OPTIS, but
21   I don't -- I don't know where.
22   Q.   But you don't know where Mr. -- where OPTIS is
23   working?
24   A.   No.
25   Q.   Is OPTIS working for any of the Vitol companies?

78

1    A.   No.
2    Q.   Now, when there was -- when IPOS would have made
3    the decision to consider hiring IPOS -- sorry, Petro to do
4    work for it, I take it that that would have been a
5    budgetary discussion; correct?
6    A.   No.
7    Q.   I thought that you told me that the budget of
8    IPOS was a joint effort between IPOS and
9    Vitol Virgin Islands.  Is that not correct?
10   A.   The budget is on the -- on the budget it's a line
11   item for maintenance and repairs.  So -- so IPOS will
12   had a line item in their budget for maintenance and
13   repairs.  Whether that budget was for Petro or another
14   subcontractor, IPOS is able to assign that subcontractor
15   themselves.  So they wouldn't have come to us and said, we
16   want to hire Petro.  Petro would have fell under the budget
17   bucket of maintenance and repairs.
18   Q.   And so when did Vitol Virgin Islands first learn
19   that Petro was going to be doing maintenance in the propane
20   facilities?
21   A.   I would think it would be after they were hired
22   by IPOS.  And I'm sure it would have come up as a general
23   conversation that this was the person that was doing the
24   maintenance.
25   Q.   Well, would there have been discussions at the

79

1    weekly meetings between IPOS and Vitol Virgin Islands about
2    the consideration of hiring a maintenance company?
3    A.   I don't believe so.
4    Q.   Are there minutes from these weekly meetings?
5    A.   Minutes, no.  I think Tim K. would write a recap.
6    Q.   So if there had been such discussions, it would
7    be in his recap?
8    A.   Uhm, I don't know the -- the level at which he
9    would write it.  I think his focus was more on, you know,
10   what pending items there were and maintenance items, and
11   things of that nature.  You know, which valves were being
12   replaced or the -- whether tank -- which tanks were in
13   service.  More operational items as opposed to which
14   subcontractor IPOS is going to hire or not hire.
15   Q.   Were there any requirements that IPOS had to
16   adhere to in determining contractors to hire?
17   A.   It was our expectations that all subcontractors
18   would be professional, experienced; but in the term of
19   absolute policies, no.
20   Q.   Were there any policies or procedures to attempt
21   to hire local Virgin Islands companies?
22   A.   What do you mean?
23   Q.   To give preference to hiring local Virgin Islands
24   companies.
25   A.   Did IPOS have a policy?

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

80

1    Q.    Did Vitol Virgin Islands have such a policy that
2  there would be an effort to hire local Virgin Islands
3  companies by it or its contractors?
4    A.    Not to my knowledge.
5    Q.    Was there any -- was there any effort made to
6  hire stateside companies?
7    A.    By whom?
8    Q.    By either Vitol Virgin Islands or -- its
9  contractors?
10   A.    You mean an effort to hire them over the other or
11  just an effort --
12   Q.    Yes.
13   A.    -- in general?
14   Q.    Just an effort in general.
15   A.    I think the effort was to hire the -- the person,
16  you know, most suitable for the -- for the job, and IPOS
17  would determine that.
18   Q.    The company Saintnals, is that a Virgin Islands
19  company or a stateside company?
20   A.    Uhm, I don't know.
21   Q.    Would that be a question to ask Mr. Moretti?
22   A.    Uhm, I'm not -- I'm not sure he would know the
23  answer to that either.
24   Q.    So I think I've asked this, but just in case I
25  haven't, is Saintnals affiliated with any of the Vitol

81

1  companies?
2    A.    No.
3    Q.    So what -- do you know what was the motivation to
4  instead of using a Vitol-related company, to hire an
5  independent non-Vitol-related company?
6         MR. KAPLAN:    Object to the form.  Scope.
7         You can answer.
8  BY MS. ROHN:
9    A.    We had had dealings with the parent company of
10  Saintnals -- so the parent company of Saintnals, EXSOL, we
11  had had dealings with that company, and we believe that
12  they would be a good fit.  And given their level of
13  technical expertise, we thought that they would be
14  well-suited to manage the facilities.
15   Q.    And what prior experience was that?
16   A.    They have done work for us in -- on other
17  projects.
18   Q.    What projects?
19   A.    There was a project in Mexico that they worked on
20  with us.
21   Q.    And what was that project?
22   A.    I believe it was an ethane plant and also a
23  terminal.
24   Q.    But Vitol Virgin Islands -- let me ask this
25  question before I assume.  Did Vitol Virgin Islands, since

82

1  it was ultimately paying the bill, have to approve
2  expenditures entered into by IPOS?
3    A.    Did Vitol Virgin Islands Corp. have to approve
4  items -- expenditures by IPOS?
5    Q.    Yes.
6    A.    No.
7    Q.    So was IPOS allowed to enter into an agreement
8  that exceeded their budget?
9    A.    Allowed I think is -- is a strong word.  I
10  wouldn't -- I wouldn't phrase it that way.
11   Q.    Well, what was the purpose of the budget?
12   A.    The purpose of the budget was to set forth the --
13  kind of the expectation of what it would cost to run the
14  facilities and also give Vitol Virgin Islands Corp. and
15  WAPA, you know, a -- a budget, a forecasting tool of how
16  much that yearly cost would be.
17   Q.    And, of course, that's because WAPA ultimately
18  paid their final bill; correct?
19   A.    Correct.
20   Q.    Let me just understand this.  Did WAPA not -- was
21  there a charge to WAPA for the work done by IPOS itself
22  without -- aside from the contractors?
23   A.    There was a management fee, yes.
24   Q.    And was there also a cost to WAPA for the
25  management of Vitol Virgin Islands?

83

1    A.    Can you clarify the question?
2    Q.    Was there also a -- some fee or like a management
3  fee that was billed to WAPA for the work done by
4  Vitol Virgin Islands?
5    A.    No.
6    Q.    So Vitol Virgin Islands, the work that all you
7  guys did, all the pay that they paid to you guys, that
8  wasn't then paid by WAPA?
9    A.    No.
10   Q.    But was there a fee to WAPA for the work done by
11  Vitol Inc. as far as the running of the propane facility?
12   A.    A fee, no.
13   Q.    Was there some sort of charge?
14   A.    For what?
15   Q.    For the work done by either Vitol Inc. or
16  Vitol Virgin Islands?
17   A.    A fee, no.
18   Q.    No.  Some type of -- is there some type of pay
19  that was received from WAPA?
20   A.    For the propane.
21   Q.    Okay.  But not for any of the work done
22  overseeing IPOS or overseeing the maintenance or doing the
23  budgetary items, none of that was paid for in any way by
24  WAPA.  Is that your testimony?
25   A.    Correct.

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

84

1    Q.  So the purpose of the budget was to allow
2    Vitol Virgin Islands and ultimately WAPA to know what the
3    monthly and yearly costs for maintaining the propane
4    facility would be; correct?
5    A.  The expected value.  The estimated value.
6    Q.  And so would IPOS -- what was the policy of IPOS
7    attempting to remain within the budget?
8        MS. FRANCIS:   Objection.  Scope.  Form.
9    BY MS. ROHN:
10    Q.  You can answer.
11    A.  Okay.  I don't know what their policy was.  I
12    think that would be a question for IPOS.
13    Q.  Well, how could that be a question for IPOS, when
14    ultimately Vitol Virgin Islands and WAPA would be the
15    parties that would bear that cost?
16    A.  Because you asked what IPOS' policy was, and I
17    can't speak to IPOS' policy.  You should ask them.
18    Q.  Okay.  What was Vitol Virgin Islands' policy
19    about attempting to keep IPOS within its budget?
20    A.  So we didn't have a policy.  There was an
21    expectation that IPOS would, you know, work to the best of
22    its ability to stay within that budget, but obviously,
23    there are things that come up.  There are hurricanes and
24    events that are unforeseen.  The 3-inch vent line, for
25    example, was actually something that was unforeseen; and so

85

1    there are times when one has to go outside of the budget
2    due to events that -- that weren't forecasted.
3    Q.  So would there -- there be discussions at the
4    weekly meetings about the need to expend funds in excess of
5    what was budgeted?
6    A.  At the weekly meetings, no.
7    Q.  Well, there --
8    A.  Let me clarify.  If it was something that was --
9    3-inch vent line is a great example.  If it was something
10    that came up and -- and someone brought to our attention
11    and said this -- this wasn't in the budget, but it's
12    something that WAPA needs to do, then, yes, that would be a
13    discussion.
14    Q.  And then would that discussion -- there then be a
15    discussion between either IPOS or Vitol Virgin Islands or
16    affiliated company with WAPA that says we need to do this,
17    and you're going to need to be spending more money this
18    year than we told you?
19    A.  Yes.
20    Q.  And who would have that discussion with WAPA?
21    A.  Myself.
22    Q.  And who would you have that discussion with?
23    A.  So it would be the COO generally at the time.
24    Q.  Which was whom?
25    A.  So we've rotated through a few.

86

1    Q.  We have, haven't we.
2    A.  We've had Vernon Alexander, we've had
3    Michael Sharp, and now a lady by the name at Ashley Bryant.
4    Q.  And did WAPA have the ability to say no, don't
5    spend that money?
6    A.  Uhm, well, most of the -- the items that I
7    brought to their attention were things that required to be
8    done or they actually asked us to be done.
9    Q.  Did WAPA have to in any way agree to the hiring
10    of maintenance companies?
11    A.  No.
12    Q.  So that was -- that was a decision that was
13    solely between, at that time, IPOS and Vitol Virgin Islands
14    as to who would be the maintenance companies.  Would that
15    be correct?
16    A.  No.
17    Q.  That would not be correct.  What was wrong with
18    that?
19    A.  It would be IPOS' decision to hire the
20    maintenance contractor.
21    Q.  And so is it correct now that it is Saintnals'
22    prerogative as to who is the maintenance company?
23    A.  Yes.
24    Q.  Let's go back to the Complaint, paragraph 19.  I
25    think you have to look at paragraph 18 first.  The term --

87

1    they were talking about the Petro, IPOS contract.
2    "The term of the contract was to commence on
3    September 1, 2019, and could be terminated by either party
4    giving 60 days written notice to the other party after the
5    first five years."
6    Does Vitol Virgin Islands agree with that?
7    A.  May I use my booklet?
8    Q.  Of course.  Thank you.  Sorry.  I should have
9    said so.
10    A.  That's okay.
11    The answer to that was "Vitol Defendant shall -- Vitol
12    Defendants admit that upon information and belief,
13    Plaintiffs and Defendants IPOS entered into certain
14    maintenance contracts on or about September 1, 2019, which
15    contracts speaks for itself but otherwise deny the
16    allegations."
17    Q.  So what was denied about that paragraph?
18    A.  I think the notion that it could be the -- the
19    notion after it terminates.
20    Q.  I don't understand that answer.
21    A.  It says that the contract speaks for itself, and
22    that we agree that it was entered into on that period of
23    time, and the contract speaks for itself.  But otherwise
24    deny the allegations.
25    Q.  Is there anything about what is stated there that

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

88

1 is denied?

2      MR. KAPLAN: Objection to the extent it calls

3 for a legal conclusion.

4      You may answer.

5 BY MS. ROHN:

6      A. Uhm, I'm not sure a hundred -- I'm sorry. I'm

7 not a hundred percent sure. I think it --

8      Q. Okay. So the paragraph 19 says "Otherwise the

9 contract could only be canceled for cause after one year."

10      And does Vitol Virgin Islands agree with that

11 statement, or does it deny that statement?

12      A. "Vitol defendants admit that upon belief --

13 information and belief, Plaintiff and Defendant IPOS

14 entered into certain contract -- maintenance contracts on

15 or about September 1, 2019. The contract speaks for itself

16 but otherwise denies the allegations."

17      Despite of what it's denying is that it -- I'm no

18 lawyer, but I understand that a contract can be canceled at

19 any time for cause.

20      Q. And then paragraph 20 says, "While Plaintiff's

21 contract was with IPOS, Andrew Canning of OPTIS, with

22 supervision by the Vitol Defendants had to approve all

23 budgets and actions of Plaintiff." And that was denied.

24      What about that paragraph is denied?

25      A. Vitol didn't supervise OPTIS. And Andrew Canning

89

1 of OPTIS didn't have to approve all budgets and actions of

2 the plaintiff.

3      Q. Okay. So -- but at the time that the Petro

4 contract was terminated, Canning was contractor -- or OPTIS

5 was contracted by Vitol Virgin Islands; correct?

6      A. Yes.

7      Q. And you say that Vitol Virgin Islands didn't

8 supervise Mr. Canning in the work that he did?

9      A. I wouldn't put it that way.

10      Q. Well, who was supervising Mr. Canning?

11      A. We weren't supervising Mr. Canning.

12      Q. Who was?

13      A. Mr. Canning or OPTIS.

14      Q. Do you know a single person at OPTIS that had any

15 knowledge about what Mr. Canning was doing?

16      A. I don't.

17      Q. Does Vitol Virgin Islands know of a single person

18 at OPTIS that knew what Mr. Canning was doing such that

19 they were supervising him?

20      A. I don't.

21      Q. So who was supervising him?

22      A. I don't think anyone was supervising him.

23      Q. So he could do whatever he wanted; is that right?

24      A. I -- I don't think that's a correct statement.

25      Q. Well, who made sure he didn't do just whatever he

90

1 wanted?

2      A. It was our expectations that Mr. Canning acted in

3 accordance with the law and with professionalism and -- but

4 the means and methods of which he did his job at those

5 facilities, he was a technical consultant, and as a

6 consultant, those means and methods were -- were his

7 prerogative.

8      Q. So if Mr. Canning decided that he didn't like a

9 particular company, and he wanted to run them out of the

10 plant, what was there to stop him?

11      MR. SIMPSON: Objection.

12 BY MS. ROHN:

13      Q. You can answer.

14      A. Can you say the question again?

15      Q. Sure. If Mr. Canning decided that he didn't like

16 a particular company, and he wanted to run them out of the

17 plant by making false allegations against them, who was

18 there to supervise him?

19      MR. SIMPSON: Objection.

20      MS. ROHN: Noted.

21 BY MS. ROHN:

22      A. Well, I -- I don't have all the facts to that,

23 but it sounds like a hypothetical question. I'm not sure

24 I'm capable of analyzing that without particular facts.

25      Q. If Mr. Canning decided to make false

91

1 representations as to time sheets against the company, who

2 was supposed to overlook him to see if what he was alleging

3 was true or not?

4      A. I think if he made statements about time sheets,

5 the people at IPOS would look into those -- those time

6 sheets and -- and would probably ask him for the

7 information as to why he thought that.

8      Q. Well, at the time -- am I not correct that during

9 the last -- at least last year of the work that Petro did

10 at the propane facilities, Mr. Canning worked through a

11 contract with Vitol Virgin Islands? Am I not correct?

12      A. You're correct.

13      Q. So who at Vitol Virgin Islands was overlooking

14 Mr. Canning to make sure that the things he was telling

15 Vitol were true or not?

16      A. If Mr. Canning brought something to my attention,

17 we would -- we would discuss it. But if it was in regards

18 to Petro's time sheets, Petro was a subcontractor for IPOS;

19 so that -- that would be escalated to IPOS.

20      Q. So when Mr. Canning gave you information that he

21 believed Petro was not being accurate with their time

22 sheets, did you then send that to IPOS to investigate it?

23      A. I believe --

24      MR. SIMPSON: Objection.

25 BY MS. ROHN:

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

92

1    Q.   You may answer.
2    A.   I believe Mr. Canning would have communicated to
3    either myself or IPOS his concerns.
4    Q.   But you did tell me that one of the concerns that
5    Mr. Canning made to you was there is some discrepancies in
6    the time sheets; correct?
7    A.   Yes, to myself and IPOS.
8    Q.   Okay.  So -- but Mr. Canning was your -- through
9    OPTIS was your contractor; correct?
10   A.   Correct.
11   Q.   So what did you, as the party contracting with
12   Canning, do to determine whether or not Mr. Canning's
13   allegations were true or not?
14   A.   We would -- if it was brought to our attention,
15   then we would, you know, ask those who were directly
16   involved, which is IPOS, and we would ask them to verify
17   the information.
18       Then ultimately when it would comes to time sheets in
19   particular, Petro is subcontracted with IPOS; so it's IPOS'
20   responsibility to verify the data.
21   Q.   Well, but it's also Vitol Virgin Islands'
22   responsibility to make sure that its contractors are not
23   out there making false allegations by another contractor,
24   isn't it?
25       MR. KAPLAN:    Object to the form of the

93

1    question.  Scope.
2        You may answer.
3    BY MS. ROHN:
4    A.   We don't have any belief that Mr. Canning was
5    making false allegations.
6    Q.   How would you know if you didn't investigate
7    them?
8    A.   Nothing in his previous dealings with me would
9    lead me to believe that he's the type of person to make
10   false allegations.
11   Q.   When you had conversations with the meeting with
12   Petro, did you receive any information that Mr. Canning was
13   not disclosing all the information that he should to
14   Vitol Virgin Islands?
15   A.   What do you mean by all information that he
16   shared?  Can you clarify that?
17   Q.   Yes.  What was really happening with maintenance,
18   what the delays were, what were causing technical
19   difficulties, those types of things that caused you to want
20   now to be in on the meetings?
21   A.   I think we learned at that meeting that there was
22   just -- it would be better for us to be involved in -- in
23   all of it.  I don't think it was solely Mr. Canning.  I
24   think IPOS in addition to Mr. Canning could provide better
25   updates, and so hearing it straight from Petro would help

94

1    us be more up to date with the information.
2    Q.   And had you heard the criticisms as to Petro's
3    time sheets before or after Petro met with you?
4    A.   I believe before.
5    Q.   And did you then ask Petro about those
6    allegations when they met with you?
7    A.   I don't remember the exact details of the
8    conversation, but I -- I do know that we spoke about the
9    time sheets, and that I said that Mr. Canning should sign
10   off on all the time sheets to ensure the accuracy.
11   Q.   Well, I may have asked this, and if I did,
12   because I been going for so long.  But I think I've asked
13   this.  But did -- when you were in that meeting, did Petro
14   complain that many of the complaints about his time sheets
15   were made three and four months later?
16   A.   I don't know if they told me at that meeting, but
17   I do know that there have been instances where they have --
18   Mr. Canning has brought it up after the fact, yes.
19   Q.   And was that during the time that Mr. Canning was
20   a contractor with you through OPTIS?
21   A.   I don't recall.  I don't know the exact timing.
22   Q.   And when you learned that these late -- there
23   were late complaints about time sheets, did you in any way
24   inquire of Mr. Canning why that was so?
25   A.   I don't believe so, no.

95

1    Q.   Why not?
2    A.   I'm not sure I have a good answer for that.  I --
3    you know, I -- I think often when you get the time sheets,
4    there are some delays, and so I think I was used to there
5    being delays in the flow of time sheets and -- and billing.
6    Often you have bills coming in after the fact.  So I
7    thought that was probably part of the reason why it was
8    after the fact.
9        (Interruption by the court reporter.)
10       MS. ROHN:    Sorry.  I didn't mean to cut you
11       off.  I think she said the next day.  That's why I
12       asked you three or four months is not the next day.
13   BY MS. ROHN:
14   Q.   So was Vitol Virgin Islands copied on e-mails
15   from Petro to IPOS about the long delays in payments on
16   their invoices?
17       MR. KAPLAN:    Objection.  Form.
18       You can answer.
19   BY MS. ROHN:
20   A.   I don't -- I don't believe so.  We were involved
21   in some, but we weren't -- certainly weren't involved in
22   all of the communications.
23   Q.   But Vitol Virgin Islands at least had some
24   knowledge that there were delays in paying Petro; correct?
25   A.   Yes.

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

96

1    Q.   And was part of the time that they were aware of
2   that when Mr. Canning was directly contracted through OPTIS
3   to Vitol Virgin Islands?
4    A.   I don't know the exact dates.
5    Q.   If they were during that period of time, what
6   action would Vitol take to -- to investigate why there were
7   long delays in payment to Petro?
8        MR. KAPLAN:    Objection. Form.
9        You can answer.
10  BY MS. ROHN:
11   A.   Can you say it again?
12   Q.   So if some of them were during the Vitol direct
13  contract, what actions would Vitol take to determine why
14  there were delays in the payments of the invoices?
15   A.   I think that would depend on the -- the facts.
16  So without all the facts in the particular situation, I
17  don't think I'm able to answer that accurately.
18   Q.   Well, Mr. Canning had to -- one of Mr. Canning's
19  jobs, am I correct, when he worked directly for Vitol was
20  to approve the invoices; correct?
21   A.   To approve the time sheets.
22   Q.   Didn't he also approve the payment of the
23  invoices?
24   A.   Of what invoices?
25   Q.   The invoices of Petro to IPOS.

97

1    A.   Uhm, I believe so.  So he was -- he was approving
2   the time sheets, and then the invoices would be directed to
3   IPOS.  So if IPOS asked him to approve their invoices, then
4   that would be a question for IPOS.
5    Q.   But I'm talking about -- how long -- I think you
6   said you worked for Vitol Virgin Islands for about two
7   years; am I right?
8    A.   Are you talking about directly or --
9    Q.   Through OPTIS.  Sorry.  OPTIS contracted for
10  about two years?
11   A.   Sorry.  So who are you talking about?
12   Q.   The contract between OPTIS and Vitol, how long
13  was that?
14   A.   I believe it started in November of -- I don't
15  remember if it was '20 or '21, and it ran to October '22.
16   Q.   Okay.  So somewhere more than a year?
17   A.   Correct.
18   Q.   So during that period of time was Canning
19  responsible for approving invoices to be paid while he
20  was --
21   A.   What type of invoices?  Sorry.
22   Q.   Sorry.  Maintenance invoices from Petro.
23   A.   So those invoices are IPOS' invoices, because
24  Petro is a direct contractor with IPOS.  I believe IPOS
25  asked him to approve those invoices, but that would be a

98

1   question for you to clarify with IPOS.
2    Q.   So when he was directly contracted through OPTIS
3   working for Vitol Virgin Islands, that wasn't part of his
4   job duties was to -- to overlook the Petro invoices and to
5   approve or not approve them?
6    A.   His -- part of his responsibilities was to work
7   in conjunction with IPOS to facilitate the management of
8   the plans.
9    Q.   So was one of those responsibilities in doing
10  those approving Petro's invoices?
11   A.   If IPOS asked him to do that, then yes.
12   Q.   Well, who did Mr. Canning report to as to what
13  his activities were when he was contracted through OPTIS
14  with Vitol Virgin Islands?
15   A.   He would ultimately report to Mr. Moretti as the
16  -- as he's our senior person.
17   Q.   And who made sure he was doing what he was
18  supposed to do under the OPTIS contract?
19   A.   Mr. Canning had a range of responsibilities, one
20  of which is helping manage the facilities.
21   Q.   And who -- I'm sorry.  I thought you were
22  finished.  Go ahead.
23   A.   No.
24       So Vitol Virgin Islands Corp. would, you know -- he --
25  he helped IPOS manage the facilities.

99

1    Q.   And who over -- oversaw whether or not he was
2   doing that correctly?
3    A.   I don't -- I don't think the use of the word
4   overseen or oversaw is really relevant.  Mr. Canning -- the
5   scope of Mr. Canning's contract as a -- as a consultant was
6   to facilitate that.  So if we didn't believe he was
7   facilitating it, then, you know, Vitol Virgin Islands would
8   -- we would ask him why not.
9    Q.   So how would you know he wasn't facilitating that
10  if nobody was watching what he was doing?
11   A.   We -- our expectation would be that if -- if
12  somebody felt that he wasn't, they would -- they would
13  bring it to our attention.
14   Q.   Who would that be?
15   A.   The people -- the parties involved; so I think
16  that would be IPOS.
17   Q.   So you believe that IPOS, who didn't have a
18  contract with him, which he had no contractual duties as to
19  IPOS, would come tell you if he wasn't doing what he was
20  supposed to do.  Is that what you're saying?
21   A.   Yes, because his responsibility was to work in
22  conjunction with IPOS to manage their facilities.
23   Q.   Why wouldn't there be someone from
24  Vitol Virgin Islands who would be -- who's paying his
25  contract fees, who would be over -- at least observing what

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

---

**100**

1 he was doing?

2     A. I think there -- you know, our team at

3 Vitol Virgin Islands Corp. worked with him, you know, on a

4 maybe not daily basis but certainly a weekly basis. We had

5 meetings with him. He provided feedback to us. And we

6 gave him larger picture tasks. So, you know, he was to

7 work with IPOS in conjunction to manage the facilities, and

8 how he did those particular tasks, the means and the

9 methods that he used as a contractor, you know, that --

10 that was his determination.

11     Obviously we expected him to be professional. We

12 respected him -- we expected him to, you know, hold up all

13 the laws that are set forth in the place that he's working

14 and any other laws. But how he did those tasks to

15 accomplish the big picture goal, that was up to

16 Mr. Canning.

17     Q. And so what did Vitol do to supervise Mr. Canning

18 to determine if he was obeying the laws of the

19 Virgin Islands?

20     A. We didn't supervise him. He's an independent

21 contractor. The word "supervise" is not the appropriate

22 word.

23     Q. Okay. Who oversaw what he was doing to make sure

24 he wasn't violating the laws of the Virgin Islands?

25     A. I think the -- the word "oversee" or "oversaw" is

---

**101**

1 incorrect use also. Mr. Canning as an independent

2 contractor, through his means and methods, that was up to

3 him; and our expectation is that he behaves professionally

4 and upholds the laws.

5     MS. ROHN: So I think I beat that dead horse

6     long enough. It's 12:05. I suggest we break and come

7     back at about 1:50 -- 12:50, 1 o'clock. I don't know

8     where you are and how easily you can get food, so...

9     MR. KAPLAN: When you say come back at 1:00,

10     you mean your time, Atlantic Time?

11     MS. ROHN: Sorry, yeah.

12     MR. SIMPSON: That should be fine. We may

13     need an extra five minutes or so, but that should be

14     fine.

15     MS. ROHN: Okay, great. Have a nice lunch.

16     (A luncheon recess was taken at 12:06 p.m.)

17     (The afternoon session resumed at 1:11 p.m.)

18 BY MS. ROHN:

19     Q. So did IPOS, IPOS, ever share with you complaints

20 that Petro made to it concerning Canning?

21     A. No.

22     Q. Did IPOS ever tell you any complaints they had

23 with Canning?

24     A. No, I don't think so. I don't recall.

25     Q. And you, not being you personally but you being

---

**102**

1 Vitol VI?

2     A. No.

3     Q. So were you -- was Vitol Virgin Islands aware

4 that in September of 2020 IPOS began to do work with Petro

5 without involving Canning?

6     A. Say that again. That they did work with what?

7     Q. With Petro without involving Canning in the work.

8     A. No.

9     Q. And was the fact that IPOS was stopped -- was not

10 using Canning a reason why Canning shifted to the

11 Vitol Virgin Islands contract?

12     A. I couldn't speak to that. I don't know why.

13     Q. Well, do you know why -- generally, do you know

14 why the contract switched from IPOS to Vitol Virgin Islands

15 -- I'm sorry, Vitol. Sorry.

16     A. Do what, sorry?

17     Q. Do you know why the contract switched from IPOS

18 to Vitol?

19     A. Mr. Moretti would be able to answer that.

20     Q. Okay. That's on my list for Mr. Moretti. Okay.

21     Was there someone from IPOS that was assigned to

22 oversee costs on the job?

23     A. What type of costs?

24     Q. The cost of contracts, the cost of doing the

25 work. Was there someone at IPOS that was in charge of

---

**103**

1 overseeing the costs?

2     A. That would be a detail question for IPOS. From

3 our perspective, IPOS as a whole was responsible for their

4 budget. But as to who in particular that was, I think that

5 would be a question for IPOS.

6     Q. Was Canning a person that was delegated the

7 duties of overseeing the cost on various projects?

8     A. Mr. --

9     MR. SIMPSON: Objection.

10 BY MS. ROHN:

11     A. -- Mr. Canning was -- you know, as part of his

12 scope, in conjunction with IPOS, was responsible for the

13 running and maintenance of the facilities. So I -- I

14 believe he participated in that process.

15     Q. Did IPOS have a QA/QC in its employment?

16     A. I don't know what that means. Can you --

17     Q. Oh, sorry. A quality assurance/quality control.

18     A. A person or a policy?

19     Q. A person.

20     A. I don't know if there was somebody specifically

21 designated for that. That would be a question for them.

22     Q. Were you aware or not whether or not Mr. Canning

23 exercised the position or the duties of the QA/QC?

24     A. That would be a question for IPOS.

25     Q. Well, while Mr. Canning was a contractor for

---

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

---

104

1  Vitol Virgin Islands, was that one of his job functions?

2  A. He was responsible in conjunction with IPOS for

3  the -- for the maintenance and the running of the

4  facilities. We looked to him as a technical consultant to

5  -- to share his expertise. I'm not actually sure about the

6  -- the acronym that you're -- that you're utilizing and

7  what all that means.

8  Q. So you talked before we went to lunch about the

9  fact that Canning would sign off on time sheets. But isn't

10  it true that Mr. Canning signed off on much more than that?

11  He signed off on costs of materials, and he signed off on

12  the -- well, let me just say it one at a time. Cost of

13  materials.

14  A. He -- he participated in -- in the process, and

15  he was one of the parties involved in that in conjunction

16  with IPOS.

17  Q. And isn't it also true that he had the power to

18  veto particular materials to be used on a job?

19  A. I wouldn't put it like that, no.

20  Q. Well, are you familiar with the fact that he

21  required Petro to not use certain materials on a job

22  because they were Chinese originated and required them to

23  replace those with another material?

24  MR. SIMPSON: Objection.

25  BY MS. ROHN:

---

105

1  A. Yes.

2  Q. You may answer.

3  A. Yes. But it's my understanding that that was

4  IPOS' policy, not Mr. Canning's policy as an individual.

5  Q. But it was Mr. Canning who was making those

6  communications, was he not, to Petro?

7  A. I believe Mr. Canning made everybody aware of the

8  3 -- I think you're relating to -- you're talking about the

9  3-inch vent line substitution for the Chinese material.

10  Q. Yes, ma'am.

11  A. And I believe it was Mr. Canning that noticed

12  that the material was Chinese, and he escalated that to

13  IPOS.

14  Q. And are you claiming that that was solely an IPOS

15  requirement, or was that not also a Vitol Virgin Islands

16  requirement?

17  A. It is -- IPOS is the operating manager of the

18  facility, and it was their policy.

19  Q. Do you know why that policy was in place?

20  A. I believe it was from the -- the start of the

21  construction of the facility, and it was VTTI policy that

22  IPOS had.

23  Q. Generally, did IPOS follow the VTTI policies?

24  A. I can't speak to all the policies. This is the

25  only one I know of.

---

106

1  Q. Okay. So was it -- was Mr. Canning allowed to

2  sign off as a QC -- QA/QC on work done given his

3  nationality?

4  A. I don't understand the question.

5  Q. Were you -- do you understand that Mr. Canning

6  was not a U.S. citizen and was working on a visa?

7  A. Yes, I'm aware of that.

8  Q. And are you aware of requirements to be a QA/QC

9  on a job as to being a U.S. citizen?

10  A. I'm not familiar with the term QA/QC and what all

11  it entails.

12  Q. Were you aware whether or not there were IP --

13  IPOS employees who were complaining about Canning and his

14  treatment of them?

15  A. No.

16  Q. Were you aware that Mr. Canning had to exit the

17  United States for periods of time in order to keep his visa

18  current?

19  A. Yes.

20  Q. And what was your understanding -- what was

21  Vitol's understanding of that?

22  A. It was just that, that he left periodically to

23  keep his visa current.

24  Q. Who -- I don't think I asked you this. Who owns

25  Vitol VI?

---

107

1  A. Clarify your question.

2  Q. Who is the actual owner? Who owns the shares of

3  stock or whatever in Vitol Virgin Islands?

4  A. Vitol Virgin Islands' parent company is

5  Vitol US Holding II Co.

6  Q. I did ask you that. Couldn't remember. Thank

7  you.

8  If we go to the Complaint --

9  A. May I use my booklet?

10  Q. Of course.

11  A. Thank you.

12  Q. Paragraph 22 says "In addition, when experienced

13  employees of Plaintiff will point out to Andrew Canning

14  that his decisions as to operations were in error or

15  improper, Canning would become enraged and retaliatory

16  against Petro and make false allegations against Petro to

17  attempt to get IPOS and the Vitol Defendants to cancel the

18  contract."

19  And -- hold on. That is denied. What is the factual

20  basis of that denial?

21  A. Let me just read it. One second.

22  Q. Of course.

23  A. We have no knowledge or -- or evidence to that

24  statement.

25  Q. So how do you deny those are truthful facts? Why

---

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

---

**108**

1  would you say we have no knowledge and therefore deny. How
2  did you deny those facts?
3      A.  Because we don't believe them to be accurate. We
4  have no knowledge or evidence to that statement.
5      Q.  Well, what -- what investigation did
6  Vitol Virgin Islands do to find out if it does have
7  knowledge of those facts or to believe whether or not
8  they're true or not?
9      MR. KAPLAN:    Objection to the extent it
10     invades privilege or work product.
11         But based on facts that you know outside of any
12     privilege, you may answer.
13 BY MS. ROHN:
14     A.  Can you repeat the question, please?
15     Q.  Yes.  I think you said we did not have any
16 information to indicate that was true.  So my question was:
17 Well, what did you do to see if there was information out
18 there?
19     A.  In answering these complaints, we had -- there --
20 there was nothing brought to our attention that would lead
21 us to believe that these were accurate, so we kept -- we
22 don't believe these to be accurate if we don't have any
23 factual basis for that.
24     Q.  And No. 23, "Beginning in 2018, even before the
25 contract negotiations were completed between Petro and

---

**109**

1  IPOS, Canning would take innocent Scrivener errors as to
2  time signed in by Plaintiff's employees, which VVIC had
3  independent documents as to actual start times, which it
4  relied on, and falsely accused Plaintiff and its employees
5  of engaging in forgery."
6         And that is denied.  What's the basis for that denial?
7      A.  Can you clarify independent documents?  I don't
8  think it's clear to us what independent documents are, and
9  we also have no evidence that if there were innocent
10 Scrivener errors; so we don't have evidence of the
11 statement.
12     Q.  Well, you don't have evidence they were either,
13 do you?
14     A.  It's unclear what independent documents we're
15 speaking of here, and so we don't have any such evidence to
16 believe this to be true.
17     Q.  So how do Vitol understand employee time was
18 documented in St. Croix?
19     A.  Can you clarify the question?
20     Q.  Yes.  Did Vitol Virgin Islands understand that in
21 St. Thomas a security guard would sign in a Petro worker,
22 and the Petro worker would sign as being accurate, but in
23 St. Croix a security guard would simply sign in a worker
24 without having any agreement or signature by the employee?
25     A.  I don't think we have the -- those specific

---

**110**

1  details.  We don't have -- VVIC, Virgin Islands -- sorry.
2  Vitol Virgin Islands Corp. doesn't have the specific
3  details of how the subcontractor of IPOS signed in and out
4  of the facility.
5      Q.  Well, wouldn't you need to know that when
6  someone's claiming that there are false entries on time
7  sheets?
8      A.  IPOS would -- the contract between
9  Petro Industrial and IPOS is, you know -- that's what the
10 time sheets are -- let me -- let me start again.  Hang on
11 one second.
12         So, you know -- ask your question again.
13     Q.  Wouldn't you have to know that if you're being --
14 if you're being told that there are incorrect entries on
15 time sheets?
16     A.  How -- how they sign in?
17     Q.  Yeah.
18     A.  So I think the level of which they sign in and
19 out is not something that had been brought to our
20 attention.  And we rely on IPOS, as it's their
21 subcontractor, to validate whether they are being charged
22 correctly in conjunction with Mr. Canning's assistance.
23     Q.  That's what I'm going to say, you're actually
24 relying on Mr. Canning's representations when reviewing the
25 time sheets that he believes they're -- they're incorrect;

---

**111**

1  correct?
2      A.  No.
3      Q.  Okay.  Well, who reviews the time sheets to find
4  are claimed to be inconsistencies?
5      A.  My understanding is Mr. Canning and IPOS.
6      Q.  And who at IPOS is it your understanding actually
7  reviewed the time sheets?
8      A.  I -- I was under the impression it was the
9  terminal manager; so I think that's been David Smith or
10 Merlin.
11     Q.  And how did you get that impression?
12     A.  Just from discussing, just, you know, the
13 workflow, it's their responsibility for their
14 subcontractors.
15     Q.  Were there any punch machines or time clocks that
16 could be used to accurately reflect when employees came in
17 and out of the facility?
18     A.  I don't know the answer to that.
19     Q.  Is Vitol Virgin Islands aware of a 1-inch vent
20 line project that began in 2020?
21     A.  After reviewing the documents in this case, yes.
22     Q.  Okay.  And are -- do you recall when in 2020 that
23 bid process began?
24     A.  I don't.
25     Q.  But would you agree that it was put out to bid?

---

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

112

1    A.   Yes, it's my understanding it was.

2    Q.   And what -- what, if any, involvement would

3  Vitol Virgin Islands have in that bidding process?

4    A.   I don't believe we had any.

5    Q.   And why do you say that?

6    A.   Because I didn't even know about the project

7  until we reviewed the documents.  So had I participated in

8  -- had we participated in the process, I believe we would

9  have known about it without reviewing the documents.

10    Q.   Well, I thought you said that you started

11  actually late, and that Tim was involved in these -- Tim K.

12  was involved in these projects prior to you?

13    A.   Yes.

14    Q.   Did you ask Tim K. if he was aware of it or if he

15  had any involvement in it?

16    A.   I don't believe so, no.

17    Q.   You didn't -- you didn't ask him or you don't

18  believe he'd had?

19    A.   I didn't ask him.

20    Q.   And why do you believe he didn't have any

21  involvement?

22    A.   Because there was nothing in the documents that

23  we reviewed that would lead us to -- that was -- you know,

24  he wasn't copied or bcc'd I don't believe.

25    Q.   Who does Vitol contend drafted the bid?

113

1    A.   For the 1-inch vent line?

2    Q.   Yes, ma'am.

3    A.   I -- I don't know who did that.

4    Q.   Would that be something that normally Mr. Canning

5  would do?

6    A.   I think IPOS would -- would draft the bid in

7  conjunction with Mr. Canning.

8    Q.   And what is Vitol's knowledge as to that bidding

9  process for that 1-inch vent line?

10    A.   I believe there were multiple bids.  I think

11  there were three in total.  And IPOS awarded the party that

12  they saw fit.

13    Q.   Which was not Petro; correct?

14    A.   I don't believe so, no.

15    Q.   From your review does Vitol contest the fact that

16  Petro had previously provided information to do that work

17  in 2019 and had submitted it to IPOS and, therefore,

18  Mr. Canning, but that Mr. Canning declined to consider that

19  information initially as part of the bid process?

20        MR. SIMPSON:    Objection.

21  BY MS. ROHN:

22    Q.   You may answer.

23    A.   Sorry.  Can you repeat it?

24    Q.   I don't know about that.  Okay.

25  Was Vitol Virgin Islands aware that in 2019 Petro had

114

1  been approached to do the 1-inch vent line and had provided

2  a proposal as to the cost that Petro would charge for that,

3  and that Mr. Canning initially refused to consider that

4  information submitted by Petro as part of the bid

5  procedure?

6    A.   So you asked three separate questions; so I'm

7  going to try and answer the three separate questions that

8  you asked.

9    Q.   Okay.

10    A.   So were we aware that Petro submitted a bid in

11  2019?  Yes, after reviewing the documents of this case.

12  What was the next one?

13    Q.   Now, you're really gonna make me --

14  That initially Canning refused to consider those

15  documents as part of the bid process?

16    A.   For 2019 or for 2020?

17    Q.   Well, for -- for 2020.

18    A.   Okay.  So I don't know if it was the same scope

19  of work or not; so I can't really answer that.

20    Q.   Is Vitol Virgin Islands aware that subsequently

21  Canning -- through IPOS, Canning did include those bid

22  documents?

23    A.   I don't know if they're -- I don't know if

24  they're exactly the same bid documents, but I am aware that

25  that -- that Petro did bid on the 1-inch vent line in 2020.

115

1    Q.   What is Vitol Virgin Islands' position on why if

2  Petro was the low bidder, they weren't awarded the

3  contract?

4        MR. KAPLAN:    Object to the form of the

5  question.

6        You may answer.

7  BY MS. ROHN:

8    A.   I don't personally known they were the low

9  bidder, but that would be a question for IPOS, as they make

10  the decision.

11    Q.   Was Vitol Virgin Islands aware of any discussions

12  as to Traeger Brothers' involvement in Petro's bid -- bid

13  in the 1-inch vent line?

14    A.   After reviewing the documents, we were aware that

15  Traeger Brothers was the supplier of the materials.

16    Q.   And did you see whether Mr. Canning made

17  accusations that Petro had stolen information from Traeger

18  in its bid?

19    A.   Had they what?  Sorry.

20    Q.   Stolen information from Traeger in its bid.

21    A.   I don't recall that.

22    Q.   Do you -- did Vitol Virgin Islands have

23  discussions with IPOS as to Traeger's involvement in that

24  bid process?

25    A.   No.

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

116

1    Q.   What other companies bid on the 2021 1-inch vent
2    line project?
3    A.   The 1-inch vent line project?
4    Q.   Yes, ma'am.
5    A.   After reviewing the documents, I believe it was
6    Petro, a company named Specialty Fabrication, and I don't
7    recall the third one.  I'm sorry.
8    Q.   Well, that's Topic No. 25.  You don't have a
9    cheat sheet on that?
10        MR. KAPLAN:    Objection to the sidebar.  She's
11        given you the corporation's knowledge and has told you
12        about the corporation's involvement in that process,
13        that her answer is the corporation's knowledge on the
14        topic.
15   BY MS. ROHN:
16   Q.   Okay.  When was the bid awarded?
17   A.   I don't know.
18   Q.   And why was plaintiff not awarded the bid?
19   A.   I don't know.  That would be a question for IPOS,
20   as it was their decision.
21   Q.   What work -- to Vitol Virgin Islands' knowledge,
22   what work did Traeger Brothers do for each of the
23   defendants -- for Vitol from 2018 to 2021?
24   A.   What work did Traeger Brothers do for the
25   defendants Vitol?

117

1    Q.   Yes.
2    A.   No direct work.
3    Q.   So it would have all been indirect through a
4    contractor?
5    A.   I believe so, yes.
6    Q.   Was Vitol aware of any complaints of observations
7    by anyone at Traeger Brothers concerning Andrew Canning or
8    OPTIS?
9    A.   No.
10   Q.   And is Vitol Virgin Islands aware that in -- in
11   or around January 2021 there began to be holdbacks of
12   payments to Petro on accounts receivables?
13   A.   Yes.
14   Q.   And what is Vitol's understanding as to why those
15   holdbacks began to occur?
16   A.   In January of -- when?  Sorry.
17   Q.   January of 2021.
18   A.   I believe the work was not complete.
19   Q.   Any other reason?
20   A.   Not that I can recall here today.
21   Q.   Okay.  And where did Vitol get the information
22   that the work was not complete?
23   A.   From the documents in the case.
24   Q.   At the time of the holdbacks, was Vitol aware of
25   it at that time?

118

1    A.   I don't believe so.
2    Q.   And in what way from the documents you reviewed
3    did you determine that the work was not complete?
4    A.   Just from the various dialogs in the e-mail
5    between the parties.
6    Q.   Can you give me any examples of what you recall
7    about incompleteness?
8    A.   No, I don't remember the exact details.
9    Q.   During the time that this occurred in
10   January 2021 through July 2021, were there any discussions
11   between Vitol and IPOS about the holding back of payments?
12   A.   Yes.
13   Q.   And what were the natures of those discussions?
14   A.   The first discussion is -- was in July of '21,
15   and I believe the second one was in October of '21.  Both
16   of which of those -- those discussions were that the -- the
17   job data books for the works were not complete, and we
18   didn't felt -- feel like we had all of the documentation
19   that we should have been given for the jobs that were done.
20   Q.   That was in July; correct?
21   A.   Both -- both discussions surrounded the same
22   topics.
23   Q.   But in the July of 2021, when you -- when it was
24   determined that you had not gotten all the documentation,
25   how long had those invoices been outstanding in July

119

1    of 2021?
2    A.   I don't remember the exact date.
3    Q.   Would you agree with me that some of the invoices
4    had been outstanding for in excess of 90 days?
5    A.   I don't know the -- the exact dates.  I couldn't
6    -- I couldn't guess.  I don't want to guess.
7    Q.   Do you know that the invoices went back to
8    November of 2020?
9    A.   As I said, I don't have the exact dates, and I
10   wouldn't like to guess.
11   Q.   So is the documentation -- is part of the
12   documentation that's claimed to be missing time sheets?
13   A.   No, I don't believe so.
14   Q.   So what types of documentation do you recall
15   having been missing?
16   A.   So these -- these -- it's my understanding that
17   the invoices were for jobs that involved welding and other
18   services, and there should be a set of documents that
19   verifies the -- welding qualifications and the rest of
20   the traceability documents that I spoke of before.  That's
21   not all the documents that are acquired, but those are the
22   ones that I can, you know, just list right now.
23   Q.   And is it Vitol Virgin Islands' position that
24   those documents had been provided by Petro on other welding
25   projects?

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

120

1    A.   Repeat the question.  Sorry.  You cut out.

2    Q.   Sorry.  Is it Vitol Virgin Islands' position that
3  those welding documents had been provided by Petro on other
4  welding projects?

5    A.   That he did provide them?

6    Q.   Yes.

7    A.   I believe he did not provide them.

8    Q.   But then it's true, is it not, that Petro didn't
9  provide those documents on other welding projects but were
10  paid for those invoices?

11    A.   I -- I can't answer that with certainty.

12    Q.   Well, my question is:  If he got paid on other
13  invoices without those documents, what changed to then now
14  take the position that without those documents Petro
15  wouldn't be paid?

16    A.   That's after the 3-inch vent line and our -- our
17  increased involvement in the project, it was -- I think we
18  saw that not all the documents that should have been
19  acquired per project were acquired.

20    Q.   So if previously Petro had not been asked for
21  those documents or told to turn in those documents and been
22  paid without doing so, how would you expect that Petro
23  would have known on the 3-inch line project that they
24  wouldn't be paid without those documents?

25    A.   In the 3-inch vent line specifically?

121

1    Q.   Yeah.

2    A.   We told them that, and we made that very clear at
3  the beginning of the project that if they didn't provide
4  the documents, the job would not be considered complete.

5    Q.   And that was in February of 2021?

6    A.   Correct, February or March.  I think it was the
7  end of February.

8    Q.   Okay.  And then we know that Petro gave the
9  credentials of its welders in March of 2021; correct?

10    A.   Yes.

11    Q.   All right.  So what other documents were --
12  was -- not were, was Petro expected to give and at what
13  time periods?

14    A.   So at the end of every job, it's industry
15  standard to provide, you know, a set of documents.  I think
16  that Petro is well aware of all the documents that are
17  necessary to be provided for a job, as there is an industry
18  standard set.

19    It was unclear to Vitol Virgin Islands Corp. in July
20  that all of those documents had been provided to a level
21  that everybody was comfortable with.

22    Q.   Okay.  Let me break that down.  What industry --
23  how do you know this is an industry standard?  Is it
24  written somewhere?  How has this become an industry
25  standard?

122

1    A.   I don't know the particular details of that.
2  It's not my field of expertise.  Uhm, but I think with --
3  with live hydrocarbon facilities there are sets of
4  documents verifying the materials and the welds that are
5  necessary to ensure compliance.

6    Q.   So when Vitol calls it an industry standard, is
7  this a written standard?  I mean, or is this something
8  Mr. Canning or somebody told you was an industry standard?

9    A.   I don't know if it's a written standard or not.
10  I think it's something that I've heard over the course of
11  time, you know, with various different welding associations
12  and -- and I think that those standards are met across the
13  board.

14    Q.   So you are essentially a trader; am I correct?
15  You -- you're not really a tech -- a tech in the
16  construction field.  Would that be fair?

17    A.   I'm a physical operator.  And, no, I'm not a
18  technical expert in construction.

19    Q.   So where did you get the idea that these
20  particular documents were standard on that type of job?

21    A.   So I rely on the resources.  By technical
22  resources, which in this particular situation is IPOS and
23  OPTIS.

24    Q.   So and then you said you were unaware that Petro
25  had provided the documents to the level of everyone's

123

1  expectations.

2    So do I take from that that they gave documents but
3  that they were found not to be sufficient?

4    A.   So in that particular situation, I was asking for
5  additional documents because WAPA was asking for additional
6  documents.

7    Q.   Okay.  And was this the original set of documents
8  that WAPA was asking for at the beginning of the job, or
9  additional sets of documents that they were asking at the
10  completion of the job?

11    A.   So I believe the two sets of documents are the
12  same.  I don't think they asked for incremental documents,
13  but those documents weren't sent to WAPA at the beginning
14  of the job, to my knowledge.

15    Q.   But was the reason that they weren't sent to WAPA
16  at the beginning of the job because they didn't yet exist?

17    A.   Some of them, yes.

18    Q.   And were there other documents that did exist but
19  were not given to WAPA?

20    A.   Uhm, I'm not entirely sure whether the welding
21  documents that Adrian sent were forwarded to WAPA at that
22  time.

23    Q.   So you got them, but you're not sure that WAPA
24  got them?

25    A.   Correct.

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

124

1    Q.   You being Vitol, not you personally?
2    A.   Correct, yes.
3    Q.   And why won't they be sent to WAPA?
4    A.   I can't answer that question.
5    Q.   And was the reason that -- was WAPA refusing to
6    pay for the work on the vent line without these documents?
7    What -- what was the reason that WAPA was requiring these
8    documents at the end of the job?
9    A.   Uhm, because they -- they're documents that are
10   necessary for their -- for their kind of security and
11   safety protocols.
12   Q.   But had -- was WAPA holding back payment or had
13   they -- or were they paying?
14   A.   Paying what?
15   Q.   Paying the amount of money for the construction
16   of the 3-inch vent line.
17   A.   IPOS would have been paying Petro.  WAPA at this
18   time wouldn't have -- they wouldn't be paying on an -- on
19   an invoice by invoice basis.
20   Q.   Okay.  So I'm confused here.  How does WAPA pay?
21   A.   So we mentioned the budget, right.
22   Q.   Right.
23   A.   The budget is made at the beginning of every
24   year, and then the total amount of that budget is divided
25   by 12, and that becomes the monthly payment.  And WAPA

125

1    makes that monthly payment over the course of the year for
2    the budgeted cost of running the facilities.  And then at
3    the end of the year, there's a true-up between the budget
4    and then the actual expenses.  And so if the budget is
5    under budget, WAPA gets money back.  If the budget is over
6    budget, then they would pay the extra.
7    Q.   Has a budget ever been under budget?
8    A.   I believe last year it was under budget.
9    Q.   But during the time Petro was there, that's not
10   true; right?
11   A.   I don't believe so, no.
12   Q.   So WAPA would pay its monthly fees.  So WAPA --
13   did WAPA withhold its monthly fees because it didn't have
14   these documents?
15   A.   No.
16   Q.   So Vitol was getting paid for the work, IPOS was
17   getting paid for the work without the documents, but Petro
18   wasn't getting paid for the work; is that right?
19   A.   Yes.
20   Q.   Has WAPA ever demanded these documents from Vitol
21   or it wants its money back?
22   A.   No.
23   Q.   So WAPA is perfectly kept happy without these
24   documents; correct?
25   A.   I can't answer to WAPA's state of mind.

126

1    Q.   Well, WAPA -- has WAPA ever sent a letter to
2    Vitol saying, we demand these documents or we're going to
3    do something to you?
4    A.   No.
5    Q.   Did they ever follow up on getting those
6    documents after July of 2021?
7    A.   I don't remember the exact date that Terry of
8    IPOS forwarded the -- the documents.
9    Q.   Some time in 20 -- sometime in 2021?
10   A.   Sorry.  Repeat the question.
11   Q.   Would that be sometime in 2021?
12   A.   That they what?  Sorry.
13   Q.   That they got whatever documents you had?
14   A.   Yes.
15   Q.   And after that did they ever request any
16   additional documents?
17   A.   No.
18   Q.   So if there were no additional requests for the
19   documents, and it was WAPA that had the right to request or
20   forgive, why did there continue to be holdbacks on paying
21   Petro?
22   A.   Because Vitol Virgin Islands Corp. and IPOS, I
23   believe, were not satisfied with the documents they
24   received.
25   Q.   But these were documents that WAPA had originally

127

1    requested; correct?
2    A.   They were documents that Vitol had requested to
3    IPOS and Petro that we knew that WAPA would also want.
4    Q.   So did WAPA ever even originally ask for these
5    documents?
6    A.   Excuse me?
7    Q.   Did WAPA ever send and/or communicate these are
8    the lists of documents we want at the end of this job?
9    A.   Yes.
10   Q.   Okay.  And did it include all the documents you
11   were trying to get from Petro?
12   A.   They were in there, yes.
13   Q.   That's not what my question is.
14   So were you asking for more documents than WAPA was
15   asking for?
16   A.   Uhm, I don't recall exactly the list that they --
17   that their complete list at the beginning of the -- of the
18   project.
19   Q.   Can you tell me, as you sit here today, that all
20   the documents that you were requesting from Petro were the
21   same documents that WAPA was requesting?
22   A.   No.
23   Q.   And with -- in the decision to redo the welds,
24   was that done at the request of WAPA or a decision made by
25   IPOS and Vitol?

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

128

1    A.    A decision made by IPOS.

2    Q.    Did IPOS or Vitol ever give to WAPA the Versa

3  testing?

4    A.    I'm not sure.

5    Q.    So Vitol and IPOS decided to go and spend over

6  $200,000 to -- I think I've asked this, but I'm going to

7  ask it again. -- to redo welds without telling WAPA what

8  it was doing?

9        MR. KAPLAN:    Object to the form. Scope.

10  BY MS. ROHN:

11    Q.    You may answer.

12    A.    IPOS made the decision to redo the welds, yes.

13    Q.    Without -- did they give any notice to WAPA that

14  they were doing so?

15        MR. KAPLAN:    Objection. Scope. Form.

16        You can answer.

17  BY MS. ROHN:

18    A.    Notice was given to WAPA that the -- that the

19  terminal would be offline, yes.

20    Q.    That's not my question.

21        Was notice given to WAPA that IPOS was going to incur

22  200,000 plus dollars over budget to redo welds?

23    A.    I don't know the cost of the redoing of the

24  welds; so I can't speak to that.

25    Q.    Well, was notice given to WAPA that any amount of

129

1  money was going to be expended to redo welds?

2    A.    No.

3    Q.    Did WAPA accept the 3-inch vent line?

4    A.    Accept in what regard?

5    Q.    Accept it as completed.

6    A.    I'm not -- I'm not -- I can't speak to -- to

7  WAPA's thoughts.

8    Q.    Okay. But generally speaking, if you do a

9  project for WAPA and they had problems with it, they

10  communicate to IPOS and/or Vitol this job is not

11  acceptable, this or this or this needs to be done; correct?

12    A.    Correct.

13    Q.    Did they make any such comments on the 3-inch

14  vent line?

15    A.    Yes.

16    Q.    Okay. What were their comments?

17    A.    They requested the traceability documents, they

18  requested the welding documents, and they complained about

19  some safety items where pipes were laid in a -- in a

20  position that they deemed inappropriate and asked them to

21  be moved. They complained about the labeling of the pipes.

22  And to that -- that's all I can recall at this time.

23    Q.    All right. So -- and when did they complain --

24  was the complaints about the lack of documents after the

25  work was done or before the work was done?

130

1    A.    It was during. I think it was during towards the

2  end.

3    Q.    And then were the pipes moved?

4    A.    Yes, I believe so.

5    Q.    And I understand that Petro paid to relabel the

6  -- the pipes; correct?

7    A.    Who, Pedro?

8    Q.    Petro, yes.

9    A.    Petro, yes, I believe so.

10    Q.    It's that Pedro, Petro thing again. Sorry.

11    A.    It's okay.

12    Q.    And after the pipes were moved and the labeling

13  was corrected, did WAPA make any other complaints about the

14  job?

15    A.    Not to my knowledge.

16    Q.    And after the pipes were relabeled and the pipes

17  were moved, did WAPA ever again ask for any more

18  documentation?

19    A.    Not to my knowledge.

20    Q.    Did WAPA after that begin using the 3-inch vent

21  line?

22    A.    Yes.

23    Q.    And, to your knowledge, had they continued using

24  that 3-inch vent line?

25    A.    Yes.

131

1    Q.    Now, it's my understanding -- tell me if that's

2  not Vitol's understanding. -- that not only were the

3  payments for the 3-inch vent line not paid, but there were

4  payments on other welding projects that were not paid as

5  well; correct?

6    A.    Correct.

7    Q.    Now, as to the documents that were claimed to be

8  required to get -- and I think you said it was because of

9  missing documents; am I right?

10    A.    Correct.

11    Q.    So did WAPA on any of those projects request

12  documentation?

13    A.    No. I believe those projects were inside the

14  IPOS fence, if you will.

15    Q.    And were -- were the documents requested before

16  those projects were done or at sometime after the documents

17  had been completed?

18    A.    I believe afterwards.

19    Q.    And why weren't those documents requested at the

20  time that the job was assigned to Petro?

21    A.    I don't know the answer to that. That would be a

22  question for IPOS, as they have the direct contract with

23  Petro.

24    Q.    Would Vitol agree with me that if there were

25  certain documents that were required in a project, that the

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

132

1  contractor should be told that at the beginning of a
2  contract?
3      A.  No.
4      MS. FRANCIS:    Objection.
5  BY MS. ROHN:
6      Q.  How would the contractor know to keep or create
7  those documents without being told that they would be
8  needed?
9      MS. FRANCIS:    Objection.  Calls for
10  speculation.
11  BY MS. ROHN:
12      Q.  You may answer.
13  You may answer.
14      A.  May you repeat the question?
15      Q.  Sure.  How would they know that they needed to
16  create or keep those documents if they weren't told at the
17  beginning that they would be needed?
18      A.  So it's my understanding that there's a level of
19  reporting that's necessary that the IPOS policies regarding
20  pipe specifications and things like that, traceability, I
21  think it's laid out in their procedures.  And so if -- if
22  you are a sub -- one of the subcontractors doing work at
23  those facilities, I think they should have a level of
24  understanding of the policies under which they're
25  operating.

133

1      Q.  So one of the ways they could have that level of
2  understanding would be that IPOS would give those
3  procedures to them; correct?
4      A.  Correct.
5      Q.  Do you have any information that IPOS gave those
6  procedures to Petro prior to the work being done?
7      A.  I can't speak to that.
8      Q.  Okay.  Now, there was also weld -- there were
9  also invoices held back for work done -- welding work done
10  for Vitol, were there not?
11      A.  Yes.
12      Q.  Did Vitol before the job began give information
13  to Petro, these are the documents we're going to need at
14  the end of the job?
15      A.  I'm not a hundred percent sure on that, no.
16      Q.  Well, have you seen any documents to indicate
17  that?
18      A.  I have not.
19      Q.  So as you sit here today, you cannot say, am I
20  correct, that they were given to Petro?
21      A.  Excuse me?
22      Q.  Is that correct?
23      A.  Sorry.  I was just about to answer.  I didn't
24  hear what you said before.
25      Q.  Okay.  As you sit here today, have you seen any

134

1  documentary evidence that prior to the jobs, the welding
2  jobs that Petro did for Vitol that they were given a list
3  of documents that would be necessary to keep?
4      A.  No, I have not.
5      Q.  And in fact, isn't it true that the first time
6  they were given the information as to the need for these
7  documents was after the jobs had been completed?
8      A.  No.
9      Q.  Okay.  What document have you seen that said
10  prior to the receipt of the invoice that Petro would know
11  that some document needed to be given?
12      A.  That was made very clear on the 3-inch vent line.
13      Q.  No.  No.  I'm not talking about the 3-inch.  I'm
14  talking about the other welding invoices.
15      A.  Uh-huh.
16      Q.  Including welding invoices for Vitol that had --
17  were withheld for payment.  Isn't it true that the request
18  for those documents were made after the invoices had been
19  submitted and after the jobs had been complete?
20      A.  I haven't certainly read every document, but I
21  have not seen a document requesting those documents for
22  Vitol only work.
23      Q.  Okay.  You've not seen those -- the requests for
24  those documents.  Is that what you mean?
25      A.  Yes, ma'am.

135

1      Q.  And am I correct that Vitol accepted and used the
2  work that was done without those documents?
3      A.  That's not entirely accurate.
4      Q.  Okay.  In what way is that inaccurate?
5      A.  So I believe the documents that are missing are
6  in relation to the truck rack, and the truck rack is not in
7  service, has not been put into service.
8      Q.  Okay.  Anything else?
9      A.  No.
10      Q.  So the rest of them had been put in service;
11  correct?
12      A.  Yes.
13      Q.  Now, what is the reason that the truck rack has
14  not been put into service?
15      A.  It's not finished.
16      Q.  In what way is it not finished?
17      A.  I can't speak to the technical nature of it.  I
18  just know that it's not finished.
19      Q.  Hasn't that project been put on hold because
20  there's some equipment that's missing?
21      A.  It has been put on hold.  I don't think it's due
22  to missing equipment.
23      Q.  But why do you think it's been put on hold?
24      A.  Uhm, because I -- I don't -- I -- I can't speak
25  to -- I don't -- I wouldn't want to hazard a guess.  My

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

136

1  knowledge is that it's been put on hold.
2      Q.  Well, you're certainly not saying that it's been
3  put on hold because documents are missing, are you?
4      A.  No, I'm not saying it's been put on hold for
5  missing documents.  No.
6      Q.  Do you know that it's been put on hold because
7  Polaris hasn't finished the details of its work?
8      A.  Who's Polaris?
9      Q.  Polaris is an engineering firm for reverse
10 loading.
11         You can -- I'm acting like I know what I'm talking to,
12 but really someone is whispering in my ear.
13     A.  That's okay.  So I -- can you ask the question
14 again?
15     Q.  Sure.  Isn't it a fact that the reason it's been
16 put on hold is that Polaris has not finished its
17 engineering for the reverse loading?
18     A.  No.
19     Q.  No?  You're not aware or no, it's not true?
20     A.  That's not true.
21     Q.  Okay.  What is -- why do you believe it's been
22 put on hold?
23     A.  Well, you just asked about the reverse loading.
24     Q.  Uh-huh.
25     A.  So that's different to the truck rack.

137

1      Q.  Okay.  So we know that it is on hold, and we know
2  that the reason that it's on hold is not because the
3  documents are missing?
4      A.  Correct.
5      Q.  So the reason -- you have no facts, as you sit
6  here today, that the reason that it's on hold is because of
7  something Petro didn't do; correct?
8      A.  Correct.
9      Q.  But Petro still hasn't been paid that invoice;
10 correct?
11     A.  Correct.
12     Q.  The decision or the recommendation to withhold
13 payment on those invoices, did that at least in whole or in
14 part come from Mr. Canning?
15     A.  For which invoices?
16     Q.  The Vitol invoices that remain outstanding and
17 the IPOS, IPOS, invoices that remain outstanding.
18     A.  For the Vitol invoices, I asked Tim K. if he had
19 received all the documents that were necessary, and he said
20 no, that he hadn't received any documents.  And so I didn't
21 pay those invoices.
22     Q.  Okay.  Even though you know that the request for
23 the documents wasn't made until after the job was finished,
24 you still aren't paying them?
25     A.  The job's not finished.  That process isn't

138

1  finished.
2      Q.  Well, Petro's portion of the -- the work is
3  finished; correct?
4      A.  Yes.
5      Q.  So even though you know that these -- there's --
6  there was no request prior to the job for these documents,
7  and that these requests for these documents only occurred
8  after the invoices had been submitted, you are still
9  withholding payments, is that correct, because after the
10 job you asked for documents not previously asked for?
11     A.  So I think I stated before I'm not aware of any
12 requests that were made, but I can't say that for a fact.
13 I asked my colleague if he was satisfied with the documents
14 presented, and he said no.
15     Q.  That colleague would be Tim?
16     A.  Yes.
17     Q.  Are you aware of whether or not there were other
18 projects when Tim was in control that involved welding
19 where these documents weren't requested and Petro was paid?
20     A.  I don't know the answer to that.
21     Q.  Is Vitol aware of whether or not in January
22 of 2021 any members of Petro's crew were barred from the
23 jobsite?
24     A.  Only after reviewing the documents in this case.
25     Q.  At the time that it occurred, was Vitol aware?

139

1      A.  No.
2      Q.  Did Vitol have any participation in the barring
3  of those employees?
4      A.  No.
5      Q.  Did either Mr. Canning or IPOS, at -- at or near
6  the time of the barring of the employees, inform Vitol that
7  it had done so?
8      A.  No.
9      Q.  Is Vitol aware that -- by Vitol, do you
10 understand that I'm referring to
11 Vitol Virgin Islands Corporation?
12     A.  I do.
13     Q.  Okay, good, because it's so much easier than
14 saying the whole thing every time.  Okay.  Sorry.
15         Was Vitol aware that Mr. Canning claimed that he fell
16 through some grating in February of 2021?
17     A.  After reviewing the documents in the case.
18     Q.  Was Vitol made aware of that supposed fall at or
19 near the time that it occurred?
20     A.  No.
21         MS. FRANCIS:    I'm sorry.  Can we take just a
22 really quick break?  I'm having connectivity issues.
23 I tried to log out and log back in, and I'm still
24 having issues.
25         MS. ROHN:    You know, we been going for a

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

140

1    while. Let's take a pause for the cause. Take a
2    five-minute break or ten-minute break.
3         MR. KAPLAN:    Okay.
4         (A recess was taken at this time.)
5    BY MS. ROHN:
6    Q.    So is one of the invoices that has not been paid
7    the loading rack, the invoice for the loading rack?
8    A.    For the truck rack?
9    Q.    I mean the truck rack. Sorry. Yes. Sorry,
10   terms. Truck rack, yes.
11   A.    I believe so.
12   Q.    So and is the reason that the invoice is being
13   held for the truck rack because of lack of documentation or
14   claims of poor welds or unqualified welders?
15   A.    Lack of documentation.
16   Q.    So there's no claim -- oops, then you went over
17   there.
18        So there's no claim of -- so there's no longer a claim
19   of lack of credentials for the -- for the welders?
20   A.    I believe that's part of the lack of
21   documentation.
22   Q.    Oh, okay.
23   A.    I didn't -- to be -- to be clear, I didn't ask
24   for the specifics of what documents were missing. I asked
25   Tim if there were documents -- if he had everything he

141

1    needed, and the answer was no, he was missing documents.
2    And that's to paraphrase, not to quote his words.
3    Q.    Yeah, I got that.
4         So originally, am I correct -- I just want to make --
5    gel this point. Originally, the client, my client, Petro,
6    was told we're withholding documents because we don't
7    believe the welders have qualified credentials and there
8    are some missing documents. Are those still the two
9    reasons that he's not been paid on those invoices -- it's
10   not been paid on those invoices?
11   A.    Can you clarify the invoices? I think there are
12   multiple different projects; so I want to make sure I'm
13   speaking accurately.
14   Q.    Okay. So my understanding is that IPOS as to the
15   invoices it was withholding payments on has now paid those
16   invoices. And the only invoices being withheld for payment
17   are Vitol invoices. Is that your understanding?
18   A.    I think that there are invoices that are
19   addressed to IPOS that are not being -- that have not been
20   paid.
21   Q.    And was that an IPOS decision or a Vitol -- Vitol
22   decision?
23   A.    That was a Vitol decision.
24   Q.    So let me rephrase it. I understand the only
25   invoices that are being withheld payment are those for

142

1    which Vitol has made the decision not to pay them; is that
2    correct?
3    A.    To my knowledge, yes.
4    Q.    And that IPOS individually has paid a number of
5    the invoices billed to IPOS; is that correct?
6    A.    You would have to speak to them. I don't know
7    what they've paid or not paid.
8    Q.    Now, Vitol is in the process of selling this
9    propane facility to WAPA, is it not?
10        MR. KAPLAN:    Objection. Scope.
11        You can answer.
12   BY MS. ROHN:
13   A.    Yes.
14   Q.    And part of the things that they're selling to
15   WAPA are the work that was done by Petro but never paid
16   for; correct?
17        MR. KAPLAN:    Same objection.
18        You can answer.
19   BY MS. ROHN:
20   A.    I'm not really sure what you're trying to get at
21   there.
22   Q.    Well, the truck rack is being sold to them;
23   correct?
24   A.    The whole facility.
25   Q.    Yes. Including these things that you don't think

143

1    Petro needs to get paid for because of lack of
2    documentation; correct?
3    A.    I think that they need to provide the documents
4    that should be provided for any project of the scope of the
5    two things that the -- the majority of the invoices are
6    for.
7    Q.    But you're selling them to a third party without
8    that documentation; correct?
9    A.    Well, yes.
10   Q.    Now, I think we're on this grate incident.
11   A.    I'm sorry. On the what incident? I couldn't
12   hear you.
13   Q.    Grate, Canning and the big grate incident.
14        At the time that this incident occurred, was Vitol
15   made aware of it?
16   A.    No.
17   Q.    How did Vitol become aware of it?
18   A.    Reviewing documents in this case.
19   Q.    So it was not brought up in any weekly meeting?
20   A.    No.
21   Q.    Nobody from -- from IPOS passed on to Vitol that
22   Canning claimed he fell through a grate?
23   A.    Not to my knowledge, no.
24   Q.    Okay. Did IPOS disclose to Vitol that
25   Mr. Canning went off into a rage and started screaming that

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

144

1 the reason that this grate fell through is because Petro's
2 people are run by a bunch of people with no qualifications,
3 and that locals don't know how to do anything, and that's
4 why he fell through the grate?
5     A.   No.
6          MR. SIMPSON:    Objection.
7          MS. FRANCIS:    Objection.  Form.  Foundation.
8 BY MS. ROHN:
9     Q.   In any of the conversations that you had with
10 Mr. Canning, has he ever gotten angry?
11    A.   Not that I recall.
12    Q.   And how often would you say you speak to Mr. --
13 well, used to speak to Mr. Canning?
14    A.   I would say on average once a week.  Sometimes if
15 there were -- there were more conversations necessary, more
16 than that, but at least once a week on average in the --
17 the weekly meetings.
18    Q.   And did Mr. Canning ever comment in any of those
19 meetings about local companies or island companies?
20    A.   No.
21    Q.   Did he ever advocate for stateside companies?
22    A.   No.
23    Q.   Now, what, if anything, did Vitol do to make sure
24 that its consultant, Mr. Canning, was trained in -- against
25 discrimination and retaliation?

145

1     A.   Mr. Canning or OPTIS is a independent contractor,
2 and so the training of Mr. Canning would be up to OPTIS.
3     Q.   Prior to accepting him as an independent
4 contractor, what inquiry did Vitol -- Vitol do to assure
5 that he had that training before accepting him as a
6 consultant?
7     A.   Can you repeat the question?
8     Q.   Sure.  What investigation did Vitol do before
9 accepting Mr. Canning as a consultant to make sure he was
10 properly trained as to discrimination and harassment?
11    A.   No investigation.
12    Q.   During the time did -- was Mr. Canning even asked
13 if he had such training?
14    A.   I don't believe so.
15    Q.   And not knowing whether or not he was trained in
16 that regard, what did Vitol do to monitor his conduct to
17 make sure that he did not act in inappropriate
18 discrimination or harassment?
19    A.   I think that we heard from Mr. Canning on a -- on
20 a weekly basing -- basis, and there was -- he didn't
21 demonstrate any cause for concern while he was employed or
22 under contract with IPOS, and we certainly didn't see any
23 evidence of any misconduct.  Nothing was brought to our
24 attention.
25         And in terms of you said monitor, you know, he's an

146

1 independent contractor, and so the means and methods under
2 which he operates are -- are up to him, but certainly our
3 expectation is that he follows the rules and -- and the
4 laws.
5     Q.   Were there questions directed at IPOS by Vitol
6 saying do you have any problems with Mr. Canning; is
7 anybody complaining about Mr. Canning?
8     A.   No.
9     Q.   Now, if Petro had been given jobs to do by IPOS
10 and they requested credentials from IPOS, would those
11 credentials be passed on to Vitol?
12    A.   Sorry.  I'm not sure I understand the question.
13 If --
14    Q.   Well -- go ahead.
15    A.   If Petro had asked for credentials?
16    Q.   No.  So if IPOS asked Petro for credentials, for
17 welding credentials on various projects beginning for when
18 they started the contract, would copies of those be given
19 to Vitol?
20    A.   So I -- I don't think any of those credentials
21 were passed to us other than the 3-inch vent line.  So
22 projects prior to that, no, they weren't passed to us.
23    Q.   Does Vitol have any information that prior to
24 that IPOS had ever asked for credentials?
25    A.   No direct information, no.

147

1     Q.   Was there indirect information?
2     A.   No.  I -- I -- we don't have any information that
3 they asked them.
4     Q.   So what does Vitol claim is the correct way to
5 certify employees as welders?
6     A.   So I -- I don't think we have claim of knowledge
7 of -- to that level of certifying welders.  We're not a
8 welding company, a construction company.  We own these
9 assets, and we look to our technical consultants to advise
10 us as to the qualifications of welders.  So we would look
11 to IPOS and to our technical consultant, OPTIS, to provide
12 that guidance.
13    Q.   What did either IPOS or OPTIS through Canning
14 tell you would be the proper credentials?
15    A.   Uhm, I think they would be credentials with
16 accurate and truthful information in those documents.
17    Q.   Okay.  And do -- is Vitol aware of what testing
18 needs to be done in order for a welder to be a credentialed
19 welder?
20    A.   No, we don't know the -- the details behind the
21 testing or qualification process.
22    Q.   And has either of your contractors, OPTIS or
23 IPOS, given you the information as to what the proper
24 testing is to get credentialed?
25    A.   The details, no, not to the, you know, granular

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

148

1  level, no.
2  Q.  Has VTTI, VTTI, ever done any work at WAPA?
3  A.  Has VTTI done work at WAPA?  No.
4  Q.  Yes.
5  A.  Not to my knowledge.
6  Q.  Has it done any work with OPTIS or
7  Andrew Canning?
8  A.  VTTI, not to my knowledge.
9  Q.  Did --
10  A.  One second.  I think just to correct myself.  I
11  -- I think Andrew may have worked for VTTI before he worked
12  for IPOS.  That would be something to clarify with them.  I
13  don't want to misspeak.
14  Q.  Okay.  Do you know what kind of work he did?
15  A.  I don't.
16  Q.  Do you know where -- what kind of work VTTI was
17  doing at the time that he would have done work with VTTI?
18  A.  If he did work for VTTI, I believe it would be in
19  the same construction of these terminals.  That's to the
20  extent of my knowledge.
21  Q.  Construction of terminals, is that what you said?
22  A.  Of these specific propane facilities.
23  Q.  Of these, you mean the WAPA ones?
24  A.  Of the -- yes, of the LPG facilities.
25  Q.  At WAPA?

149

1  A.  Yes.
2  Q.  So what way would VTTI have done work at WAPA?
3  A.  It's not work at WAPA.  It's work at the -- the
4  Vitol propane facilities located adjacent to the WAPA term
5  -- power plant.
6  Q.  Sorry.  So would that work -- on whose behalf did
7  VTTI do that work?
8  A.  The work at the facilities?
9  Q.  Yes, ma'am.
10  A.  They were responsible for the construction of the
11  facilities.
12  Q.  And did they do that under contract with someone?
13  A.  With -- I believe the contract is with
14  Vitol Virgin Islands Corp.
15  Q.  And do you know what time period that was?
16  A.  I believe the construction of that was from 2013
17  to 2016.
18  Q.  Now, to your knowledge, did IPOS ever use -- ever
19  use VTTI standards of procedures as their own?
20  A.  I believe so.
21  Q.  And do you know why they didn't have their own
22  standards of procedures?
23  A.  VTTI is the parent of IPOS.
24  Q.  And do you know what VTTI's policies and
25  procedures are as to welding?

150

1  A.  I do not.
2  Q.  Vitol doesn't know -- Vitol doesn't know what
3  those are?
4  A.  No.  I know that they have policies, but I don't
5  know the extent of those policies.
6  Q.  Do you know whether or not any of the work done
7  by Petro violated any of the VTTI policies or procedures as
8  to welding?
9  A.  I -- I don't know.  Wouldn't be able to speak to
10  that.
11  Q.  Does Vitol claim that any of the welding work
12  done by Petro violated the VTTI policies and procedures of
13  welding?
14  A.  Vitol Virgin Islands Corp.?
15  Q.  Yes.
16  A.  We're not familiar with the exact -- well, you
17  know, the exact policies of VTTI; so I can't speak to that.
18  Q.  Okay.  Well, as we're sitting here today, I'm
19  trying to figure out the claims of Vitol Virgin Islands.
20  Is Vitol Virgin Islands claiming that any basis for
21  not paying my client is because they violated the policies
22  and procedures of VTTI as to welding?
23  A.  As I stated, I'm not -- I don't know in-depth,
24  the VTTI procedures; so I can't comment on that.
25  Q.  So is your answer no, not as I'm sitting here

151

1  today?
2  A.  Your question -- your question isn't clear.
3  Q.  Does Vitol know what the policies, the procedures
4  of VTTI is as to qualification of welders?
5  A.  No.
6  Q.  Does VTTI know what the qualifications of the
7  policies and procedures are as to welding qualification?
8     MR. KAPLAN:  Objection.  Form.
9     You can answer.
10  BY MS. ROHN:
11  A.  You asked if VTTI knows what their own policies
12  are?
13  Q.  Sorry.  Sorry.  Does Vitol know what the VTTI
14  policies and procedures are as to welding?
15  A.  No.
16  Q.  So as you sit here today, is Vitol making a claim
17  that Petro violated any VTTI policies or procedures related
18  to welding?
19  A.  Sitting here today, Vitol Virgin Islands Corp.
20  knows that IPOS, the -- whose parent company is VTTI is not
21  -- was not satisfied with the welding documentation
22  provided by Petro.
23  Q.  That's all you know; is that right?
24     MR. KAPLAN:  Objection.  Form.
25  BY MS. ROHN:

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

152

1    Q.   On that issue.

2    A.   Correct.

3    Q.   Did Andrew Canning ever make any complaints about

4  Petro or any of its employees to Vitol?

5    A.   Complaints in what regard?  We've already spoken

6  about the time sheets.

7    Q.   Right.  Did they ever -- did they ever make

8  complaints that they weren't qualified to do the job, for

9  instance?

10   A.   Not to Vitol, no.

11   Q.   That it -- their employees were not qualified?

12   A.   No.

13   Q.   That they didn't know what they were doing?

14   A.   No.

15   Q.   Was Vitol involved in the decision to hire Versa

16  to test the welds on the No. 3 vent line?

17   A.   No.

18   Q.   Who made that decision?

19   A.   IPOS.

20   Q.   Was it discussed at the weekly meetings?

21   A.   I don't believe so, not until after the fact.

22   Q.   Did Canning ever discuss that with Vitol prior to

23  the testing being done by Versa?

24   A.   No.

25   Q.   And do you know what Versa's -- what Versa's

153

1  procedure was as to the percentage of welds that it tested?

2    A.   I -- in which iteration of testing?

3    Q.   The testing of the 3-inch vent line at the

4  conclusion of Petro's work.

5    A.   At the conclusion of Petro's work, I believe it

6  was 10 percent of the welds.

7    Q.   And what percentage of those welds failed?

8    A.   I don't know the answer to that question.

9    Q.   Do you know what percentage is the baseline for

10  determining if the welds are defective?

11   A.   No.  You asked me how -- what was the percentage

12  of the welds that were tested, and I said 10 percent.  But

13  I don't know what the percentage is that were found to be

14  defective.

15   Q.   Have you ever seen any reports from Versa?

16   A.   Yes.

17   Q.   Did you see from the reports what percentage were

18  -- failed?

19   A.   If I'm -- if I'm -- if we can speak frankly.

20  When I received those reports, they -- they weren't

21  terribly meaningful to me, because I had never seen them

22  before.  I'm not a welding expert, and I couldn't draw any

23  conclusions from those.

24   Q.   Did you ever speak to IPOS as to what their -- or

25  Canning as to what their interpretation was?

154

1    A.   They sent me the documents, and after -- after

2  they had made the decision to redo them, they said that

3  there were welds that were -- that failed.

4    Q.   Okay.  Do you understand that there can be welds

5  that fail, and in fact, normally, there are welds that

6  fail, it does not mean that the welds need to be redone?

7    A.   I don't have a -- good level of understanding

8  of the intricacies of welds.  I have a high level of

9  understanding -- and that's where we turn to our terminal

10  operator and our technical consultants for advice for.

11   Q.   So did someone represent to you that because of

12  the Versa report -- you being Vitol --

13   A.   Uh-huh.

14   Q.   -- that because of the Versa reports there was a

15  requirement to redo those welds?

16   A.   No, I don't.  I don't think they used the word

17  requirement.  I think that they had concerns regarding the

18  welds, and -- and I believe that Mr. Smith and I had a

19  conversation, and I said, well, you know -- and again, this

20  is to paraphrase.  You know, IPOS needs to do what it feels

21  necessary to remedy any welds that -- that they see to be

22  not fit, as obviously this is a live hydrocarbon facility,

23  and, you know, you need to make sure that you're making the

24  right choices to do the right things.

25   Q.   So what is the purpose of requesting a full

155

1  inspection and test plan as one of the documents that was

2  requested?

3    A.   I don't -- I don't know that -- the specifics of

4  that document.  But I'm under the understanding that that's

5  one of the documents that's normally provided in this type

6  of project.

7    Q.   What is the reason for requesting daily records

8  for welding filing?

9    A.   Again, I don't understand the -- the detailed

10  level of those requests.

11   Q.   What is the reason for requesting daily records

12  for field inspections?

13   A.   The same answer.

14   Q.   What is the reason for asking for welding and

15  mechanical tests of WPQs from the plaintiff?

16   A.   Can you say that again?

17   Q.   I sure can.  What is the reason for requesting

18  welding and mechanical tests of WPQs from Petro?

19   A.   I think that's the same answer.  I don't have

20  that detailed knowledge.  I think all of those documents

21  were requested by IPOS; so I think they would be able to

22  better answer that.

23   Q.   Well, I thought those were the documents that you

24  came up with that said those are the documents that every

25  job is supposed to have, and that's why we want them from

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

156

1 Petro?

2 A. So if -- if we requested those documents, I think

3 Tim would be able to speak more eloquently about exactly

4 what these documents are. But it's my understanding that

5 they're standard, industry standard documents for a job of

6 this complexity.

7 MS. ROHN: So, Alex, are you giving me Tim on

8 -- for 30(b)(6) on 45?

9 MR. KAPLAN: What topic are you on?

10 MS. ROHN: Topic 45.

11 MR. KAPLAN: No. I think Ms. Horowitz has

12 answered your questions on behalf of the company.

13 Those requests came from -- from WAPA and from IPOS

14 and from --

15 MS. ROHN: No, that's not her testimony. Not

16 her testimony. She testified some were included in

17 WAPA; some were not. And so on No. 45 is the -- is

18 who can testify to what was the purpose of requesting

19 a full inspection and test plan, daily records for

20 welding, filing -- welding, filing and field

21 inspections and welding and mechanical test of WPQs.

22 MR. KAPLAN: She testified that what was

23 requested of the plaintiff were documents that were

24 expected to be provided to WAPA. If you have specific

25 and different questions about either welding, the

157

1 wherewithal, the regulatory role, what are these

2 things used for, you can ask any witness their

3 personal knowledge about that. I have no objection to

4 that. But she's told you why --

5 MS. ROHN: Sir, you're attempting to

6 rehabilitate her testimony. But that's not what she

7 said.

8 MR. KAPLAN: I don't want to argue with you

9 about it. Why don't you finish the deposition. If

10 there's an open item, I'll be happy to talk to you

11 about it. We can --

12 MS. ROHN: All right.

13 BY MS. ROHN:

14 Q. Were you aware that beginning the end of December

15 that -- I think I asked you this, but I'll ask you again.

16 At the end of December that IPOS began doing work with

17 Petro without Mr. Canning? I think I asked you that, but I

18 want to ask you again.

19 A. In December of when?

20 Q. 2020.

21 A. No, I was not aware of that.

22 Q. Were you aware that around that time that there

23 were requests from Mr. Canning to cease having

24 conversations with Petro?

25 A. No.

158

1 Q. Have you learned that since reviewing the -- the

2 documents in this case?

3 A. Yes.

4 Q. Do you have any knowledge as to why IP -- IPOS

5 would ask Canning to stop having conversations with Petro?

6 A. No.

7 Q. What rules or procedures existed regarding not

8 purchasing or using materials manufactured in China?

9 A. For -- for whom?

10 Q. For work at the propane facility.

11 A. You said policies and procedures?

12 Q. Yes.

13 A. Whose policies and procedures?

14 Q. Did Vitol have such a policy and procedure?

15 A. No.

16 Q. Was Vitol aware that anyone else had such a

17 policy and procedure?

18 A. Yes.

19 Q. Okay. How was Vitol aware that someone else had

20 such a policy and procedure?

21 A. We knew that it was IPOS' procedure not to

22 procure Chinese material through their operation of the

23 facility.

24 Q. And does Vitol know why they had that procedure?

25 A. No.

159

1 Q. Did Vitol ever inquire why there was such a

2 procedure?

3 A. No.

4 Q. Does Vitol know the reason for that rule?

5 A. Pardon?

6 Q. Does Vitol know the reason for that rule?

7 A. That it -- it was one of their policies. It was

8 one of VTTI's policies; so I think that's why it was one of

9 IPOS' policies.

10 Q. Does Vitol know why it was one of VTTI's

11 policies?

12 A. No.

13 Q. Does Vitol know when that policy was adopted?

14 A. No.

15 Q. Does Vitol know what types of materials it

16 applied to?

17 A. No. Let -- let me rephrase that. I know that it

18 involved piping and valves, but I don't know if that's the

19 extent of the policy.

20 Q. Does Vitol know if that policy was ever conveyed

21 to Petro?

22 A. I don't.

23 Q. Does Vitol know whether or not generally not

24 accepting those types of materials manufactured in China is

25 an industry standard?

160

1   A.   I -- it's my understanding that it -- that it is
2   an industry standard or it has been an industry standard.
3   Q.   But does Vitol know why?
4   A.   The technical details, no.
5   Q.   Has that -- is that still a policy of either
6   Vitol or Saintnals or IPOS, to your knowledge?
7   A.   It's not a policy of Vitol Virgin Islands Corp.
8   I can't speak to whether it is still of IPOS, because we're
9   no longer have a contract with them.  And as to Saintnals,
10  I am not a hundred percent sure on that.
11  Q.   And does Vitol know whether or not any materials
12  obtained by plaintiff for IPOS were rejected because they
13  were Chinese manufactured?
14  A.   Yes, they were.
15  Q.   And did Vitol participate in that decision?
16  A.   No.
17  Q.   How did Vitol learn of that decision?
18  A.   So we learnt of that decision during the 3-inch
19  vent line project.  It was escalated to IPOS and us and
20  WAPA that the pipe was found to be of Chinese origin.  The
21  project was halted, and then the correct piping was
22  procured, and then the project restarted when the new pipe
23  arrived on the islands.
24  Q.   Who discovered that the piping was manufactured
25  by China?

161

1   A.   I think it was Mr. Canning who brought it to our
2   attention, and then the Material Traceability Report was
3   requested, and -- and those reports state that it was made
4   in China.
5   Q.   And how would Vitol have known what Mr. Canning
6   discovered?
7   A.   How did we know that?
8   Q.   Uh-huh.
9   A.   He e-mailed everybody, IPOS and -- and Vitol.
10  Q.   Did he copy Petro on the e-mail?
11  A.   I'm unsure.  I -- I believe so but I'm unsure.
12  Q.   Okay.  And is it correct that Petro then at its
13  own expense replaced that piping?
14  A.   Yes.
15  Q.   Was Vitol ever made aware or received any
16  information that anyone had concluded or voiced the belief
17  that plaintiff's welder certificates were forged or not
18  legitimate?
19  A.   Yes.
20  Q.   And when did Vitol learn of this?
21  A.   I think it was in -- towards August of '21, and
22  then also during the review of the documents in this case.
23  Q.   And who voiced that opinion?
24  A.   I believe it was David Smith.
25  Q.   And did he use the word "forged"?

162

1   A.   I don't recall the exact word he used.  He just
2   point to the -- pointed to the inconsistencies in the
3   documentation.
4   Q.   Did he infer that he thought the document was
5   forged?
6   A.   I don't --
7   MS. FRANCIS:   Objection.  Calls for
8   speculation.
9   BY MS. ROHN:
10  Q.   You may answer.
11  A.   I -- I don't recall.
12  Q.   Did he infer that the document was illegitimate?
13  MS. FRANCIS:   Same objection.
14  BY MS. ROHN:
15  A.   I don't recall.  They -- they stated that there
16  were some inconsistencies with -- with the documents.
17  Q.   And I think that I talked to you about that
18  earlier.
19  A.   Uh-huh.
20  Q.   And was Mr. Canning present at the time of this
21  conversation with Mr. Smith?
22  A.   I don't believe so.
23  Q.   Did you ever question Mr. Canning about these
24  documents?  Vitol, not you personal but Vitol.
25  A.   I don't believe we questioned him directly about

163

1   it.  I think the conversations that we had about the
2   documents were with IPOS.
3   Q.   And were those -- those comments as to
4   Guillermo Castro's letter?
5   A.   Yes.  I think I asked, you know, what was the
6   letter about.  You know, I didn't really understand why we
7   were receiving the letter.  And I think he -- you know, he
8   explained why they got the letter, and the letter was in
9   response to some questions of the inconsistencies that had
10  been found in the welder certifications.
11  Q.   Did anybody attempt to contact Guillermo Castro?
12  A.   No.  At Vitol, no.
13  Q.   And then was there -- well, did Vitol participate
14  in the request for the, quote, actual test results of the
15  welding test?
16  A.   No.
17  Q.   Was Vitol aware of whether or not its contractor
18  IPOS did so or Canning?
19  A.   Only through the documentation in this case.
20  Q.   Is it the testimony of Vitol that at the time of
21  this occurrence, they did not know Canning or IPOS was
22  doing that?
23  A.   The Castro letter, after the fact when we
24  received the Castro letter, which was late August, in
25  attachment to that letter was a chain of e-mails between

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

164

1  Petro and IPOS that asked for lots of different types of
2  welding documents, certifications, data, uhm --
3  Q.  So you -- so Vitol knew that at that time; is
4  that correct?
5  A.  Yes, it was late August.  I think it was around
6  the 28th or 29th, around there.
7  Q.  Was Vitol aware that Guillermo Castro had offered
8  to come to the Virgin Islands and personally retest
9  plaintiff's welders?
10  A.  Not until after the fact.
11  Q.  I think I've asked you this; so I'm gonna --
12  A.  You have.
13  Q.  Were there discussions with IPOS or Canning about
14  the -- about terminating Petro's contract?
15  A.  Like, in what -- in when?
16  Q.  Before or before the termination was made.
17  A.  No.
18  Q.  So Vitol was unaware that IPOS was going to
19  cancel Petro's contract?
20  A.  Correct.
21  Q.  How did Vitol find out that IPOS was canceling
22  Petro's contract?
23  A.  David Smith forwarded us the letter of
24  termination that he sent to Petro the day after the
25  termination was made.  I believe that was July 29th.

165

1  Q.  And had there been discussions about some type of
2  repercussion against Petro, maybe not termination but
3  something else with Vitol?
4  A.  No.
5  Q.  Was Vitol unhappy with the work that Petro had
6  done?
7  A.  I don't think we were at a technical level of
8  expertise to be able to comment on that.  We looked to our
9  technical operator -- our terminal operator and our
10  technical consultant for that type of advice and expertise.
11  Q.  Did Vitol then discontinue providing Petro any
12  work at the same time?
13  A.  Vitol didn't have any work with Petro at the
14  time.
15  Q.  Has Vitol had work similar to the work that Petro
16  would have done since then?
17  A.  So Vitol doesn't have.  The subcontractor, so
18  that was IPOS.  So I'm not sure I understand the question.
19  Q.  Petro did work directly for Vitol, did it not?
20  A.  Yes, in, I think, 2019.
21  Q.  Has, since the termination of his contract,
22  similar work been available at Vitol as had been done
23  before?
24  A.  What -- as been done before, can you clarify
25  that?  I'm not --

166

1  Q.  Okay.  Let me just break this down.  Prior to the
2  termination of Petro's contract, what work had Petro done
3  for Vitol either directly or indirectly?
4  A.  Okay.  So prior to the termination of the
5  contract with IPOS, Petro had been IPOS' subcontractor for
6  the maintenance contract.  They had also done some work
7  directly for Vitol in regards to -- there may be more
8  things, but things that I'm aware of is the truck rack that
9  Petro worked on with Eduardo Garcia, who's now retired, and
10  Tim.
11  Q.  And is that your claim that that's the only
12  project that they worked on for Vitol?
13  Aren't the RIO shades something that was also
14  indirectly for Vitol?
15  A.  I can't tell whether the RIO shades were just for
16  Vitol or not, because I believe some of the RIO shade work
17  was billed to IPOS.
18  Q.  Did they not also do the reverse loading and the
19  RIO panel for Vitol?
20  A.  So as I stated, I think the RIO panel and the
21  reverse flow was -- was started off as being billed to
22  Vitol directly, but I believe that that project was
23  transferred to being billed to IPOS and under IPOS' scope.
24  Q.  So similar work as that, has that occurred since
25  Petro loss their contract with IPOS?

167

1  A.  The truck rack is on hold; so no.  And the
2  reverse flow was completed by the new -- by an engineering
3  company.
4  Q.  And who was that?
5  A.  EXSOL.
6  Q.  And how about the RIO panel, is that completed?
7  A.  Sorry, are you asking me or Adrian?
8  Q.  No, I'm asking you.
9  A.  I'm not sure if it's been completed.  I think
10  there are some things that are still outstanding.
11  Q.  Has anybody been hired to complete them?
12  A.  Not to my knowledge.
13  Q.  And so is it your understanding that Vitol is
14  still willing to employ Petro on any projects that it has?
15  A.  Uhm, I'm not sure I understand the question.
16  That sounds like a hypothetical question.
17  Q.  Okay.  Well, given that IPOS has terminated
18  Petro, does that affect Vitol's likelihood of hiring Petro?
19  MR. KAPLAN:   Objection.  Form.  Scope.
20  MS. FRANCIS:   Objection.  Form.
21  BY MS. ROHN:
22  Q.  You may answer.
23  THE WITNESS:   Any more objections?
24  A.  So there's a new terminal operator now, which is
25  Saintnals, and I think it would be up to Saintnals to

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

168

1  determine whether or not they hire Petro.  But from
2  Vitol Virgin Islands Corp., I don't -- I -- I don't think
3  we have a position on that.
4      Q.  Does Saintnals now do the work for Vitol that
5  Petro would have done?
6      A.  Uhm, they -- Saintnals replaced IPOS.  I believe
7  that Saintnals has more technical expertise than IPOS; so
8  it is possible that they can do more of the work than IPOS
9  could have done themselves.
10     Q.  Does Vitol know why the maintenance portion of
11 Petro's contract was terminated when the contracts that
12 involved welding were terminated?
13         MR. KAPLAN:    Objection.  Form.
14 BY MS. ROHN:
15     Q.  You may answer.
16     A.  The exact reason as to why?
17     Q.  Yes.
18     A.  I think that there were inconsistencies in the
19 welding documents as to -- if that's related to the
20 termination, I'm not entirely clear.  The letter of
21 determination -- sorry, the termination letter didn't give
22 any reason as to why they were terminated.
23     Q.  Does Vitol know why the contract for rental of
24 equipment and of materials was canceled the same time as
25 termination of the service contract?

169

1          MS. FRANCIS:    Objection.  Form.  Foundation.
2  BY MS. ROHN:
3      Q.  You may answer.
4      A.  We have no knowledge of -- of a -- what did you
5  call it?
6      Q.  Equipment and materials.
7      A.  Equipment contract.
8      Q.  Was Vitol aware that when Petro was terminated
9  that its equipment and materials were left inside Petro?
10 Sorry, left inside IPOS' -- inside the propane facility.
11         MR. KAPLAN:    Objection.  Form.  Scope.
12         You can answer.
13 BY MS. ROHN:
14     A.  Only after reviewing the documents in this case.
15     Q.  What is the financial arrangement of Saintnals?
16     A.  You'll have to be more specific.
17     Q.  So is Saintnals under a maintenance contract?
18 What -- what is the contractual relation between Saintnals
19 and Vitol?
20     A.  They are the terminal operators.  And they have a
21 contract similar to IPOS'.
22     Q.  And what is the financial arrangement as to their
23 performing work?
24     A.  As to their what?  Sorry.  You cut out.
25     Q.  As to their performing work as the terminal

170

1  operator.
2      A.  Your question isn't clear.  Can you try to reword
3  that for me?
4      Q.  Sure.  How much are they getting paid for what?
5      A.  Uhm, I think that's not very specific.
6      Q.  Okay.
7      A.  Sorry.
8      Q.  Under the contract with IPOS, how were they paid?
9      A.  Under the contract with IPOS?  They're not in a
10 contract with IPOS.
11     Q.  No, ma'am.  When IPOS had a contract with Vitol,
12 how was IPOS paid?
13     A.  They had a management fee.
14     Q.  Exactly.  So Saintnals, do they have a management
15 fee?
16     A.  Yes.
17     Q.  Okay.  Do they have anything besides the
18 management fee?
19     A.  No.
20     Q.  Okay.  And what is that management fee?
21     A.  I don't know off the top of my head.
22     Q.  And as part of the 30(b)(6) Notice of Deposition,
23 what did you do to find out?
24     A.  I didn't research to that level.
25         MR. KAPLAN:    What topic are you on?

171

1          MS. ROHN:    No. 50.  The financial arrangements
2  of the company taking over the work.
3          MR. KAPLAN:    The witness answered the
4  question.  If you want to show her a document with
5  that level of detail, it might be helpful, but
6  otherwise --
7          MS. ROHN:    No, you guys refused to give me the
8  Saintnals document; so how could I do that?
9          MR. KAPLAN:    She can answer your question.
10         MS. ROHN:    Sir, I could if you hadn't refused
11 to give it to me.
12         MR. KAPLAN:    I don't know if what you're
13 saying is even true but --
14         MS. ROHN:    It is.  You objected.  Said it was
15 irrelevant.
16         MR. KAPLAN:    Ask the witness your question,
17 please.
18 BY MS. ROHN:
19     Q.  Sir, do you know -- sorry.  Ma'am, do you know if
20 the financial management fee is more or less than what IPOS
21 was?
22     A.  I believe it's slightly more.
23     Q.  And why would it be slightly more if they had
24 more technical expertise?  Why wouldn't it be significantly
25 more?

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

172

1    A.   Because that's the price they decided was fair.
2    I can't speak to their thought process there.
3    Q.   Did Vitol require IPOS to have a discrimination
4    and harassment policy?
5    A.   No.
6    Q.   Did Vitol require IPOS to train its employees on
7    discrimination or harassment?
8    A.   No.  They're independent contractors.  We expect
9    them to operate within the laws of the place that they're
10   operating in.
11   Q.   Did Vitol do anything to monitor or observe IPOS
12   as to whether or not they were engaging in discrimination
13   or harassment?
14   A.   There was -- it was never evident in the
15   communications that we had with them.  But we're not
16   monitoring independent contractors.
17   Q.   Is Vitol aware of whether or not the work that
18   was done by Tampa Tank to redo welds was put out for bid?
19        MR. KAPLAN:   Objection.  Asked and answered.
20        You may answer again.
21   BY MS. ROHN:
22   A.   We weren't involved in that process; so I don't
23   know.
24   Q.   Was Petro paid any work on the 3-inch vent line?
25   A.   Were they what?  Sorry.

173

1    Q.   Was Petro paid for any work it did on the 3-inch
2    vent line?
3    A.   I'm not a hundred percent sure of that.  You'd
4    have to ask IPOS, as the invoices were directed to them.
5    Q.   And what is the nature and scope of the contract
6    between Vitol and WAPA?
7        MR. KAPLAN:   Objection.  Form.
8        You can answer.
9    BY MS. ROHN:
10   A.   Can you be more specific?
11   Q.   What is the nature of the relationship between
12   Vitol Virgin Islands and WAPA?
13   A.   So Vitol Virgin Islands has a contract with WAPA
14   to do -- to supply propane.  We also built these facilities
15   for -- or with the hopes of -- of then giving -- of IPOS --
16   sorry.  Of WAPA then taking over the facilities.  And
17   that's the -- at a very high level, that's the crux of the
18   contract.
19   Q.   Now, does Vitol Virgin Islands actually own the
20   propane facility?
21   A.   Yes.
22   Q.   And is that -- is it Vitol Virgin Islands is
23   actually selling that facility to WAPA?
24   A.   Yes.
25   Q.   And is as part of that agreement to build the

174

1    propane facility, did Vitol also agree to maintain that
2    facility on behalf of -- for the benefit of WAPA?
3    A.   I believe so, yes.
4    Q.   So is there a maintenance agreement between WAPA
5    and Vitol?
6    A.   No.  It would be included in the overall
7    contract.
8    Q.   And with the sale of the facility to WAPA, will
9    Vitol discontinue maintaining the facility?
10   A.   Yes, I believe so.
11   Q.   And when will they discontinue doing so?
12   A.   I think that's been not determined at this time.
13   Q.   And who at WAPA did Vitol interface with for the
14   last five years?
15   A.   Would be -- and I'm -- I'm sure there might be
16   some more, but it's for the most part Vernon Alexander, who
17   was the COO at one point; Michael Sharp, who was the CEO
18   after him; Ashley Bryant, who was the CEO after -- the COO
19   after him; and Noel Hodges (sic), who was the CEO at one
20   point; Greg Rhymer, who was, I think, the COO at one point;
21   Andrew Smith, who is the present CEO; John Woodson;
22   Kevin Smalls.  And that's all I can remember here today.
23   Q.   And is the work, maintenance work that's going to
24   be done, is there a general requirement that any
25   maintenance work that's going to be done on the propane

175

1    facility that Vitol gives WAPA notice of that work before
2    it's done?
3    A.   So as we spoke about earlier, there's a budget,
4    and the budget forecasts the maintenance work that is put
5    forth for that year.  The budget is an estimate, right.
6    It's a way for everybody to say, okay, we know how much we
7    think it's going to cost, and that number can change.
8    Obviously, there are unforeseen events like natural
9    disaster, things like that, other projects that pop up that
10   were unforeseen.  That budget is sent to WAPA, and so WAPA
11   is made aware of the potential expense for that year.
12   Q.   But my question is:  When there are changes, is
13   WAPA notified of those changes prior to their occurring?
14   A.   No.
15   Q.   So how does WAPA learn of those changes?
16   A.   I'm not sure what you -- it's hard for me to say
17   when I don't know what those changes are.
18   Q.   Well, for instance, there's a decision that a
19   maintenance that was going to be done -- could be done two
20   years from now, there's a decision that it needs to be done
21   now, but it's not in the budget.  How does WAPA learn
22   that's going to be done in a year when it wasn't on the
23   budget?
24   A.   So they would -- so if it's something that WAPA
25   requested, obviously they would know about.  If is it

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

176

1  something that IPOS decided that could be deferred or
2  needed to be done now, they -- they have the latitude to be
3  able to make that decision if it's necessary for the
4  maintenance of the facility.
5      MS. ROHN:    Give me just a second.  I'm going
6  to go on mute.
7      Karima, I'm going to start using a few exhibits.
8      MR. KAPLAN:    Can we take a quick break before
9  you do?
10     MS. ROHN:    Of course.
11     MR. KAPLAN:    We be back in five-ish?
12     MS. ROHN:    Yeah, five or ten.
13     (A recess was taken at this time.)
14 BY MS. ROHN:
15     Q.  Was there any provision where either you and WAPA
16 or IPOS and WAPA would have regular meetings?
17     A.  I speak -- I speak -- Vitol Virgin Islands Corp.
18 speak to WAPA on a regular basis, just for the course of
19 the operations and the imagery levels, their diesel levels.
20     IPOS has, I believe, it's a weekly meeting with the
21 WAPA facility managers.
22     Q.  So at these meetings you wouldn't be telling WAPA
23 what -- we're doing something new, this is being moved from
24 here to there?  You wouldn't -- those wouldn't be told?
25     A.  I wasn't included in the -- well, VVIC,

177

1  Virgin Islands Corp., wasn't included in the weekly meeting
2  which is regarding the -- the operation of the facilities.
3  That was with IPOS and WAPA.  And I don't know if they
4  happened every week, but they -- I think they were -- there
5  was an aim to be weekly.
6      Q.  And if Vitol decided that it was going to engage
7  in some construction, wouldn't that be -- wouldn't that be
8  discussed with WAPA at its regular meetings?
9      A.  I think it would depend on what that construction
10 is.
11     Q.  Even though it was going to affect what WAPA
12 paid?
13     A.  Well, if it was normal -- if it was -- if its
14 normal things that are in the course of the maintenance of
15 the facilities, then what's that the budget covers, right.
16 It's a forecasting tool.
17     Q.  I'm referencing non-budgeted matters that decide
18 to be taken.  Wouldn't there be some discussion with WAPA
19 at those meetings?
20     A.  So like I said, they weren't necessarily
21 meetings.  They were generally one-on-one conversations
22 that I had with WAPA.  And if it was something -- if it was
23 some, you know, massive amount, then -- then, yes, I would
24 probably discuss it with WAPA.  But if it's in the natural
25 cause of maintenance, you know, that was part of our

178

1  agreement with WAPA is that we would operate the facility,
2  and we would take care of all those things.
3      Q.  So is it your testimony that IPOS would determine
4  to terminate their contract with Petro, and that wouldn't
5  be discussed at a weekly meeting?
6      A.  Correct.  I don't believe it was.
7      MS. ROHN:    Karima, can I have Exhibit 1,
8  please?
9      (E-mail Bates No. CANNING 1 was previously marked
10 as Exhibit 1 for identification.)
11 BY MS. ROHN:
12     A.  I'm sorry.  Do you want me to open Exhibit 1?
13     Q.  Oh, yeah.  But I'm asking Karima to share my
14 screen.
15     A.  May I open it on my screen?
16     Q.  Of course.  Of course.  Thank you.
17     (Off the record.)
18 BY MS. ROHN:
19     Q.  So this is just kind of an example e-mail.  This
20 came from Canning's $18,000 -- 18,000 page production.
21 It's an e-mail October 12, 2019, from Andre Canning (sic)
22 to Tim K. talking about the truck loading rack.
23     Now, you said the truck loading rack -- was the truck
24 loading rack a Vitol or was that a IPOS project?
25     A.  It was a Vitol project.

179

1      Q.  I thought you said that at some point it was
2  changed over to IPOS?
3      A.  So you are asking in that particular situation
4  about the invoices.  So this started as an -- as a Vitol
5  project that Eduardo Garcia and Tim wanted to do.  The POs
6  were given to Petro by Tim at some point, and then after --
7  as we continue through time, those invoices were then
8  directed to IPOS, not directly to Vitol.  So I was just
9  making that determination to you in the change of billing
10 protocol that Petro did.
11     Q.  So the reason that Tim is speaking directly to
12 Andrew Canning and Adrian Melendez is because at this time
13 this was a Vitol program -- project?
14     A.  That's my understanding, yes.
15     Q.  Okay.
16     MS. ROHN:    If you'll go to No. 6.
17     (Quarterly Report (2Q 2019) was previously marked
18 as Exhibit 6 for identification.)
19     MS. ROHN:    I think I have so many pages of
20 documents that it takes forever to open.
21     Does everybody have a copy of Exhibit 6?
22     MR. KAPLAN:    We have a copy in front of us.
23     MS. ROHN:    I'm sorry.  Who was speaking?
24     MR. KAPLAN:    It's Alex.  We have -- the
25 witness has a copy in front of her, and I have a copy

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

180

1    in front of me of Plaintiff's Exhibit 6.
2        MS. ROHN:    Okay.
3    BY MS. ROHN:
4    Q.    So Exhibit 6 is Quarterly Report, Second Quarter
5    2019 IPOS. Is that something that Vitol would also get?
6    A.    This document isn't familiar to me. That's not
7    to say they didn't send it to someone in 2019, but it's not
8    familiar to me.
9    Q.    At the bottom of the first page it says,
10   "Weekly --"
11       MS. ROHN:    The first page. First page.
12   First. First. There we go. Is that the first page?
13   No. Right there. Right there.
14   BY MS. ROHN:
15   Q.    "Weekly operational meetings between IPOS and
16   WAPA were held every Monday with meeting notes submitted to
17   all parties."
18   Did you -- would Vitol have gotten copies of those
19   meeting minutes?
20   A.    No. I don't believe so. I knew -- we knew that
21   they -- we knew that they happened, and it is -- it's
22   possible that IPOS forwarded some -- those minutes to
23   somebody, but to my knowledge, no.
24       MS. ROHN:    Okay. Well, I'm kind of
25   handicapped, because my trustee exhibit guy is not

181

1    here, and I can't identify where my exhibits are that
2    I wanted for this one. So at this point I am going to
3    let somebody go ahead and hopefully he returns to the
4    office, and I can find --
5    Let me go to No. 18 just before I do that.
6    BY MS. ROHN:
7    A.    So we're finished with this one?
8    Q.    Yes. Hopefully he comes back, and I can locate
9    these exhibits.
10       MS. ROHN:    No. 18.
11       (E-mail Bates No. CANNING 250 was previously
12   marked as Exhibit 18 for identification.)
13   BY MS. ROHN:
14   Q.    This is between Tim K. at Vitol, Coury Hodge at
15   VTTI, Andrew Canning at OPTIS. And "Subject:
16   Petro Industrial Maintenance Budget."
17   You see that?
18   A.    I do.
19   Q.    It's 2019.
20   So why would Coury Hodge be included in this e-mail?
21   A.    He is the maintenance -- or he was the
22   maintenance manager at IPOS.
23   Q.    Why does he have a VTTI e-mail?
24   A.    I -- I don't know the answer to that.
25   I believe all the IPOS employees had VTTI.com e-mail

182

1    addresses, as IPOS is the -- VTTI is the parent of IPOS.
2    Q.    Okay. This says "Coury/Andrew, after looking
3    through the budget numbers, it appears that we spent close
4    to $1 million with PI --" I think that's Petro Industrial.
5    "-- from July 18th to March 19th. There isn't really a
6    breakdown of the figure, can you please provide what made
7    up the total $1 million in maintenance cost, (job works
8    done and its cost)?"
9    Why would Tim be asking that question -- Vitol be
10   asking that question of IPOS?
11   A.    Because IPOS and Vitol work in conjunction to
12   manage the budget for the facility.
13   Q.    Okay.
14       MS. ROHN:    Then if we can go back to
15   Exhibit 2.
16       (E-mails Bates No. CANNING 4 were previously
17   marked as Exhibit 2 for identification.)
18   BY MS. ROHN:
19   Q.    If you got it in front of you, let me know.
20   This is an e-mail from Andrew Canning to Tim K.?
21   A.    Uh-huh.
22   Q.    But in this e-mail Andrew Canning's e-mail is
23   anc@vtti.com. Why would Andrew Canning, who's supposedly
24   an independent contractor, have a VTTI e-mail?
25   A.    I can't speak to that. It's during the time

183

1    period when he wasn't a independent contractor for us.
2        MS. ROHN:    I'm going to need to pass the
3    witness and hopefully see if anybody else has any
4    questions so that I can find the documents I'm looking
5    at.
6        MR. KAPLAN:    Did counsel for any other parties
7    have questions?
8        MR. SIMPSON:    Not for Andrew Canning.
9        MS. FRANCIS:    No, not for IPOS at this time.
10       MR. KAPLAN:    Vitol defendants have no questions
11   at this time.
12       MS. ROHN:    Well, in that event, I'll ask these
13   questions of one of the other witnesses for -- that
14   work for Vitol, because they're all e-mails that have
15   them on the chain. So at that point then, I -- I am
16   finished with the deposition.
17       MR. KAPLAN:    Okay, sounds good. Thanks all.
18
19       (At 4:08 p.m., the deposition of this witness
20   was concluded.)
21
22
23
24
25

VITOL VIRGIN ISLANDS CORP. by CHARLOTTE HOROWITZ

184

## CERTIFICATE OF REPORTER

1

2

3          I, YVONNE SAMUEL-SETORIE, Registered
4    Professional Reporter, do hereby certify that the above and
5    named witness, CHARLOTTE HOROWITZ, after being duly sworn,
6    was examined and testified via Zoom video conference as is
7    set forth; and that the answers of said witness to the oral
8    interrogatories propounded by counsel were taken by me in
9    machine shorthand, and represents the official transcript
10   of said deposition; and that said deposition is true and
11   correct, to the best of my ability.

12

13          I FURTHER CERTIFY that I am not counsel,
14   attorney, or relative of either party, nor financially or
15   otherwise interested in the event of this lawsuit.

16

17          IN WITNESS WHEREOF, I have hereunto
18   subscribed my hand on this 30th day of June 2023.

19

20

21

_____

22          YVONNE SAMUEL-SETORIE, RPR

23

24

25