IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

PETRO INDUSTRIAL SOLUTIONS, LLC, )
                                 )
              Plaintiff,         )
                                 )
     vs.                         ) Case No. 1:21-CV-00312
                                 )
ISLAND PROJECT AND OPERATING     )
SERVICES, LLC; VITOL US HOLDING  )
II CO.; VITOL VIRGIN ISLANDS     )
CORP.; ANDREW CANNING; and OPTIS )
EUROPE, LTD.,                    )
                                 )
              Defendants.        )

THE VIDEO-RECORDED ORAL DEPOSITION OF ANDREW DAVID CANNING

was taken on the 16th day of June, 2023, via Zoom
teleconference, between the hours of 9:06 a.m. and
3:30 p.m., pursuant to Notice and Federal Rules of Civil
Procedure.

_____

Reported by:

Susan C. Nissman RPR-RMR
Registered Merit Reporter
Caribbean Scribes, Inc.
1244 Queen Cross Street, Suite 1A
Christiansted, St. Croix
U.S. Virgin Islands  00820
(340) 773-8161

---

APPEARANCES

A-P-P-E-A-R-A-N-C-E-S

For the Plaintiff:

Law Offices of Lee J. Rohn & Associates, LL
1108 King Street, Third Floor
Christiansted, St. Croix
U.S. Virgin Islands  00820

By:  Lee J. Rohn
     Karima Jenkins-Guzman, Assistant

For the Defendant Island Project and Operating Services,
LLC:

Law Offices of Ogletree, Deakins, Nash, Smoak & Stewart, LLC
The Tunick Building, Suite 201
1336 Beltjen Road
Charlotte Amalie, St. Thomas
U.S. Virgin Islands  00802

By:  Simone R.D. Francis

For the Defendant Vitol US Holding II Co. and Vitol Virgin
Islands Corp.:

Law Offices of Beckstedt & Kuczynski, LLP
2162 Church Street
Christiansted, St. Croix
U.S. Virgin Islands  00820

By: Carl A. Beckstedt, III

            and

Law Offices of Susman Godfrey
1000 Louisiana Street, Suite 5100
Houston, Texas  77002

By:  Alex Kaplan

---

APPEARANCES

For the Defendant Andrew Canning:

Law Offices of Andrew C. Simpson
2191 Church Street, Suite 5
Christiansted, St. Croix
U.S. Virgin Islands 00820

By: Andrew C. Simpson

Also Present:  Adrian Melendez, Jr.

---

INDEX

E-X-A-M-I-N-A-T-I-O-N

| Description | Counsel | Page |
|---|---|---|
| Direct | by Ms. Rohn | 6 |
| Cross | by Mr. Kaplan | 163 |
| Cross | by Ms. Francis | 174 |

E-X-H-I-B-I-T-S

| Exhibit | Description | Page |
|---|---|---|
| 1 – | Bates Stamp Canning 000001 | 102 |
| 4 – | Bates Stamp Canning 000008 | 105 |
| 8 – | Bates Stamp Canning 000129-132 | 108 |
| 28 – | Andrew Canning's Responses to Petro Industrial Solutions, LLC's First Set of Interrogatories | 110 |
| 30 – | Andrew Canning's Responses to Petro Industrial Solutions, LLC's First Set of Interrogatories - Question 7 | 119 |
| 31 – | Andrew Canning's Response to Petro Industrial Solutions, LLC's First Set of Interrogatories - Question 10 | 121 |
| 46 – | Island Project and Operating Services, LLC's First Supplemental Response to Plaintiff's First Set of Interrogatories | 132 |
| 251 – | Bates Stamp PIS007021-7023 | 140 |
| 252 – | E-mail chain dated July15, 2021. Subject:  Adrian Melendez Shared "3in Vent Line - QC Book" with You | 145 |
| 253 – | Bates Stamp PIS006992 | 148 |

EXHIBIT
10

| | | |
|---|---|---|
| 296 – | Bates Stamp IPOS 003896–003901 | 150 |
| 285 – | Bates Stamp IPOS 006118–004877 | 153 |
| 287 – | Bates Stamp IPOS 006706 | 155 |
| 289 – | Bates Stamp IPOS 006707–006708 | 157 |
| 290 – | IPOS 006702 | 163 |

ANDREW DAVID CANNING -- DIRECT

ANDREW DAVID CANNING,

called as a witness, having been first duly sworn,

testified on his oath as follows:

**DIRECT EXAMINATION**

BY MS. ROHN:

    Q.   Good morning, Mr. Canning.  My name is Lee Rohn.
I represent Petro.

    A.   Good morning.

    Q.   Could you state and spell your name for the
record, please?

    A.   Andrew David Canning.  That's A-N-D-R-E-W; David,
D-A-V-I-D; C-A-N-N-I-N-G.

    Q.   So Mr. Canning, have you ever had your deposition
taken before?

    A.   No, I haven't.

    Q.   Well, I'm sure your attorney has adequately
informed you about what a deposition is, but just to make
sure, a deposition is just as if you're in the courthouse
and swearing under oath and testifying.  Same penalties of
perjury apply.  It's just a little less formal setting.

    A.   Understood.

    Q.   So my -- my job is to ask you questions that are
clear and concise, and your job is to tell the truth.  So if
I ask you a question that you're not sure of, or something
that you don't understand, then you are free to ask me to

ANDREW DAVID CANNING -- DIRECT

clarify or rephrase my question.  Otherwise, I will assume
that you understood my question, and then you're required to
answer it.

        From time to time, there may be objections.
Those are mainly for the record, and you are required to
answer, unless your attorney instructs you otherwise.

    A.   Okay.

    Q.   Hold on one second.  Hello?

        Thank you.

        So can you tell me where you were born?

    A.   Portsmouth, England.

    Q.   And, sir, can you tell me -- well, first of all,
do you understand that you're testifying not only in your
own capacity, but on behalf of the company, Optis?

    A.   I do.

    MR. SIMPSON:  No, this is his personal
deposition, Lee.  The Optis deposition is noticed for 1:00,
and -- and we do not want to combine them.

    Q.   (Ms. Rohn)  Okay.  So you will be giving a
deposition on behalf of Optis.

        Do you understand that?

    A.   I do.

    Q.   So Mr. Canning, can you tell me your educational
background since high school?

    A.   Since high school.  Right.  I'm a qualified

ANDREW DAVID CANNING -- DIRECT

engineer in terms of I served a four-year apprenticeship
with the MOD.  During that time, I obtained a HNC in
mechanical engineering.

    Q.   I'm sorry.  Could you repeat what that is?  I
didn't understand what you said.

    A.   HNC.

    Q.   Peach NC?

    A.   Yeah.  Hotel --

    Q.   Peach, as in the fruit?

    A.   Hotel November.

    Q.   I'm sorry.  I can't understand you.

    A.   Hotel November Charlie, HNC.

    Q.   Okay.

    A.   Sorry.  Yes.

        After completing that apprenticeship after
four years, I then moved -- I was awarded professional and
technological officer, Grade 4.

    Q.   I'm sorry.  I didn't understand what you just
said.

        A what?  I heard technological.  Was that
professional and technological?

    A.   Correct.  Officer, Grade 4, in the MOD.  Ministry
of Defense.  Sorry.

        Since then, I've done other qualifications
specific to my role in the oil and gas industry.

ANDREW DAVID CANNING -- DIRECT

1  Q.  So, sir, do you have a college degree?
2  A.  No.
3  Q.  And when you said you're a qualified engineer
4  pursuant to the MOD, what is MOD?
5  A.  Ministry of Defense.
6  Q.  Ministry of Defense where?
7  A.  United Kingdom.
8  Q.  And when did you obtain that?
9  A.  1977.
10  Q.  And what did you do to obtain that?
11  A.  Completed my apprenticeship.  Completed the HNC,
12  and I was awarded the position.
13  Q.  Who awarded you the position?
14  A.  Ministry of Defense.
15  Q.  And -- well, can you -- how long was your
16  apprenticeship?
17  A.  Four years.
18  Q.  Can you describe it?
19  A.  Yes.  It was a practical and technical
20  apprenticeship.  Ministry of Defense required more practical
21  engineers to maintain their weapons platforms of ships.  So
22  I went through all the trade training to understand, gain a
23  detailed understanding of the various trades that were
24  involved in maintaining the ships and keeping them in
25  service, whilst also doing the technical qualification.

Susan C. Nissman, RPR-RMR
(340) 773-8161

ANDREW DAVID CANNING -- DIRECT

1  Q.  Does United Kingdom have different types of
2  engineering certificates or qualifications?
3  A.  I believe they do, yes.  To the U.S., we're
4  assuming, yes.
5  Q.  I'm sorry.  To what?
6  A.  Compared to the U.S., is that what we're saying?
7  Q.  Yes.
8  A.  Yes, I believe they do.
9  Q.  Okay.  Well, what other licenses, as an engineer,
10  can you get in the United Kingdom?
11  A.  You can be a chartered engineer.
12  Q.  What is a chartered engineer?
13  A.  Someone that has a charter awarded by a particular
14  institute they're affiliated to.  So mechanical engineers
15  would be a charter mechanical engineer.
16  Q.  That institute would be like a college, or is
17  that -- would that be fair?
18  A.  No.  It's a professional post-graduate
19  organization that sets the standards for individuals to
20  achieve.
21       Part of that reason is when graduates come
22  out, obviously they're educated in the technical aspects of
23  it, but it needs a practical aspect to apply that in the
24  workplace to be effective.
25  Q.  So there are colleges that give engineer degrees?

Susan C. Nissman, RPR-RMR
(340) 773-8161

ANDREW DAVID CANNING -- DIRECT

1  A.  There are universities.  Sorry.  College.  It's
2  terminology.  I'm sure we'll come across a few of these
3  issues.
4       Universities are able to give engineering
5  degrees or degrees.  My education was through a polytechnic.
6  Polytechnic, at the time, didn't have a charter to give
7  degrees, so those would be given by the universities that
8  actually have those charters.
9  Q.  Well, I asked you for your education since high
10  school.  So when you say my -- I went to polytechnic, what
11  is that?
12  A.  Polytechnic is effectively university without a
13  charter.
14  Q.  And when did you do that?
15  A.  1973 through to 1977.
16  Q.  And what is a HNC?
17  A.  Higher national certificate.
18  Q.  Did you -- I heard national certificate, but I
19  don't hear the first word.
20  A.  Sorry.  Higher national certificate.
21  Q.  And who gives out that HNC?
22  A.  In this case, Portsmouth Polytechnic.
23  Q.  Say the first word again, please.
24  A.  Sorry.  Could you repeat that?
25  MR. SIMPSON:  Portsmouth.

Susan C. Nissman, RPR-RMR
(340) 773-8161

ANDREW DAVID CANNING -- DIRECT

1  Q.  (Ms. Rohn) would you say the first word, please?
2  MR. SIMPSON:  Say the word, Portsmouth.
3  Q.  (Ms. Rohn) I heard Polytech.  What was the first
4  word?
5  A.  Portsmouth.  Sorry.  Polytechnic.  Sorry.  I
6  misheard you.
7  Q.  What is Portsmouth?
8  A.  It's a city.
9  Q.  So this is a -- is it university, or why is it
10  called polytech?
11  A.  At that time, it didn't have a charter.  It's now
12  called Portsmouth University.  But at that time, it didn't
13  have a charter to issue degrees.  The moderation was done by
14  an external university to do that.  It's just the way the
15  educational system was set up at that time in the United
16  Kingdom.
17  Q.  And so even though it couldn't give you a degree,
18  it could give you an HNC?
19  A.  Indeed, it could, yes.
20  Q.  And what is --
21  A.  Yeah.
22  Q.  What does HNC stand for?
23  A.  Higher national certificate.
24  Q.  Do you have any other licenses in the engineering
25  field?

Susan C. Nissman, RPR-RMR
(340) 773-8161

13

```
 1       A.   No.
 2       Q.   Okay.  Do you have any engineering licenses in the
 3  United States?
 4       A.   No.
 5       Q.   As a result of not being licensed as an engineer
 6  in the United States, are there certain types of documents
 7  that you are not allowed to sign off on?
 8            MR. SIMPSON:  Objection.
 9       Q.   (Ms. Rohn)  You may answer.
10       A.   Oh.  Can you repeat the question, please?
11       Q.   Sure.
12            As a result of not having an engineer -- a
13  United States engineering license or certificate, are there
14  certain documents that you are not able to sign off on?
15       A.   Probably.  I don't know for certain.  Would depend
16  on the type of document.
17       Q.   Well, you can't sign off on plans as an engineer,
18  can you, sir?
19            MR. SIMPSON:  Objection.
20            MS. ROHN:  Noted.
21       A.   Can you detail what you mean by "plans"?
22       Q.   (Ms. Rohn)  Engineering plans.  Engineering scopes
23  of work.
24       A.   So a scope of work required to undertake a job?
25       Q.   No, sir.  A scope of work for -- in order for --
```

14

```
 1  to describe the scope of the work, as a licensed engineer,
 2  you can't sign off on that, can you, sir?
 3            MR. KAPLAN:  Objection to the form of the
 4  question.
 5       Q.   (Ms. Rohn)  Can you answer my question?
 6       A.   Sorry.  Could you repeat?  Sorry.  Could you
 7  repeat?  I lost the thread.
 8       Q.   Well, engineering plans and -- and scopes, are you
 9  able to sign off of those -- on those as an engineer?
10            MR. SIMPSON:  Objection.
11            MS. ROHN:  Noted.
12       A.   A scope, in my understanding of the term, is
13  effectively what's encompassed within a particular job.
14       Q.   (Ms. Rohn)  Correct.
15       A.   So if we needed scaffolding, that forms part of
16  the scope.  If we needed painters, that forms part of the
17  scope.  We agree to a scope.  That's part of the job
18  definition.  It wouldn't require an engineer to sign off on
19  the scope.  That's a client requirement.
20       Q.   Okay.  Let's limit it to engineering plans that
21  have to be submitted to a government.
22            Can you sign off on those, sir?
23            MR. SIMPSON:  Objection.
24            When I object, you can still answer, unless I
25  tell you not to answer.
```

15

```
 1       Q.   (Ms. Rohn)  I told you that in the original
 2  instructions, sir.
 3       A.   Understood.
 4            A plan, again, is -- if we intend to start
 5  erecting scaffold on the 13th of July, and then we've got
 6  fabrication in August, that's a plan.  That's how we intend
 7  the job to be undertaken.
 8       Q.   Sir.
 9       A.   That's part of a job scope and --
10       Q.   Engineering drawings and schematics, can you sign
11  off on those, sir?
12       A.   Okay.  Engineering drawings.  Depends on the -- if
13  they're new, no, I couldn't.
14            If they're -- if they're fabrication
15  drawings, in other words, it's a plan by the technical or
16  detailed drawings by the technical authority, then I can
17  agree that they conform to the original, or interpretation
18  of the original drawing.  It's just a validation process.
19  So I'm not approving them in terms of technical content.  If
20  I was to sign off on that, I'm signing off to agree that
21  they do reflect what the technical authority is, as defined.
22       Q.   And you said earlier that you also have some
23  certificates in the oil -- related to oil and gas industry.
24            What certificates do you have, related to
25  oil and gas industry?
```

16

```
 1       A.   I have, in my role, offshore installation managers
 2  regulations.
 3       Q.   I didn't understand that, sir.  I --
 4       A.   Sorry.
 5       Q.   -- didn't hear what you said.  I'm sorry.  You
 6  have what?
 7       A.   Offshore installation managers regulations.
 8       Q.   Offshore installation manager regulations?
 9       A.   Yes, ma'am.
10       Q.   And who bestowed that on you?
11       A.   The health and safety executive.  It's a legal
12  requirement that offshore insulation managers should be
13  competent, not only in discharging their roles as managers,
14  but also understanding the regulations that regulate the
15  construction and operation of the facilities.
16       Q.   How is that unique to the oil and gas industry?
17       A.   Sorry.  Could you repeat that?
18       Q.   How is that unique to the oil and gas industry?
19       A.   It is unique because the offshore installation is
20  remote from the onshore island, or whatever it's related to.
21            So the offshore installation managers have
22  legal obligations in terms of protecting the asset, and the
23  personnel on that particular asset.
24       Q.   And the health and safety manager for whom
25  bestowed that on you?
```

ANDREW DAVID CANNING -- DIRECT

1    **A.**   Could you repeat that first part, please?

2    **Q.**   Sure.

3               The health and safety manager for whom gave

4    you that certificate?

5    **A.**   No, ma'am.  It's the health and safety executive.

6    This is part of the health and safety commission in the UK.

7    It's a government entity, which sets the standards for

8    operating hazardous plants.  And it covers, in this

9    particular case, the offshore installation.

10   **Q.**   Any other oil and gas certificates?

11   **A.**   I have competency certificates in managing major

12   emergencies.

13   **Q.**   And how is that unique to the oil and gas?

14   **A.**   We have a legal obligation, because we have no

15   support from the normal safety services, we don't have a

16   fire service, we don't have an ambulance service, we don't

17   have a formal way of evacuating the platform during an

18   incident, we have to be able to make competent decisions in

19   emergencies to protect life and the environment.

20   **Q.**   Are you referring to offshore oil rigs?

21   **A.**   I am, indeed, madam.

22   **Q.**   Do you have any certificates in the United States?

23   **A.**   No.

24   **Q.**   Do you have any certificates from the Virgin

25   Islands?

ANDREW DAVID CANNING -- DIRECT

1    **A.**   No.

2    **Q.**   Are you a licensed engineer in the Virgin Islands?

3    **A.**   No.

4    **Q.**   Are you licensed to do business in the Virgin

5    Islands?

6    **A.**   No.

7    **Q.**   After graduating from polytechnic, please tell me

8    where you went to work.  Oh, you did the apprenticeship?

9    **A.**   I did an apprenticeship, yes, ma'am.

10   **Q.**   And after your apprenticeship?

11   **A.**   This is when I was awarded PTO 4, Professional and

12   Technological Grade 4.  It's located in a city called Bath.

13   I was transferred to naval

14   headquarters in the UK.  It's located in a city called Bath.

15   I was part of the post-design group 222, looking after

16   operational classes of ships, which included guided missile

17   destroyers and frigate class vessels.

18   **Q.**   So the -- the degrees in engineering, you got them

19   as a result of being in the British navy; is that correct?

20   **A.**   No, ma'am.  I was a civilian trainee.  I declined

21   the offer to study further at Madden, which is the Naval

22   Academy in Dartmouth, where I would have been educated to

23   degree level, and become part of the naval engineering

24   service, but I declined that, and was deployed to PD 222 in

25   Bath.

ANDREW DAVID CANNING -- DIRECT

1    **A.**   Approximately one year.

2    **Q.**   And what did you do there?

3    **A.**   I looked at engineering and operational problems

4    with ships that were in operation.  An average ship has 25

5    years life.  During that time, legislation changes.  Also

6    technical problems emerge with the particular class of ship.

7    I was there to resolve problems.

8    **Q.**   And where did you go next?

9    **A.**   When I left the MOD, I resigned in 1978, yes, and

10   I went to Marconi Space & Defence.

11   **Q.**   Marconi what?

12   **A.**   Space & Defence.  Excuse me.

13   **Q.**   My -- my monitor says your bandwidth is very low,

14   which is why you're -- every once in a while, when you talk,

15   you come out garbled.

16               Andy, is there something you can do with your

17   bandwidth strength?

18   **MR. SIMPSON:**  Our bandwidth is fine.  We're

19   connected via cable directly to fiberoptic.

20   **MS. ROHN:**  Well, he's coming out garbled

21   every now and then.

22   **Q.   (Ms. Rohn)**  So why did you resign your MOD?

23   **A.**   I guess like -- I wanted job advancement.

24   **Q.**   And how long did you work for Marconi Space &

25   Defence?

ANDREW DAVID CANNING -- DIRECT

1    **A.**   Approximately just over two years.

2    **Q.**   And was that related to oil and gas?

3    **A.**   No, ma'am.

4    **Q.**   Okay.  And why did you leave after two years?

5    **A.**   I was offered a consultancy position.

6    **Q.**   With whom?

7    **A.**   Acoustic Technology, Limited.

8    **Q.**   Acoustic Technology, Limited?

9    **A.**   That's correct.

10   **Q.**   And what does Acoustic Technology, Limited do?

11   **A.**   At that time, it was involved with specialist,

12   analysis, and engineering of products and services

13   associated with -- they had noise and vibration as one of

14   their signatures.  That's probably not worded too well.

15               They were a consultancy group that operated

16   in the oil and gas industry, primarily, and they applied new

17   technologies to analyzing problems.

18   **Q.**   With things that made noise?

19   **A.**   No.  That was -- it was formed from South Hampton

20   University, originally operating with acoustics and noise,

21   and then acoustics and vibration are very similar.  They

22   then branched out, using the university's resources to start

23   analyzing machinery and equipment vibrations.

24   **Q.**   How long did you work there?  How long were you a

25   consultant there?

21

1    A.   Let me see.  From 1980 through to 1997, I believe.
2  Yeah.
3    Q.   And why did you leave there?
4    A.   I was offered an operational position
5  supporting -- well, working offshore.
6    Q.   For whom?
7    A.   At that time, it was Hamilton Brother Oil & Gas.
8    Q.   And what did you do for Hamilton Brothers Oil &
9  Gas?
10   A.   Initially, I was maintenance coordinator.  And
11 then during the operational phase, I was maintenance
12 supervisor.
13   Q.   And where did you work for them?
14   A.   In the Douglas Field, which comprises of one main
15 production platform, four satellites platforms, and a
16 floating storage facility.
17   Q.   Where is the Douglas Field located?
18   A.   It's located in the Irish Sea.
19   Q.   How long did you stay with them?
20   A.   Probably a year.
21   Q.   Why did you leave that position?
22   A.   I was offered a staff position with the owner and
23 operator of the Douglas facility.
24   Q.   Which name is?
25   A.   BHP Petroleum.

22

1    Q.   Is that -- what does that stand for?
2    A.   It's a minerals company.  I can't remember exactly
3  what.  It's an Australian company, so they're into
4  minerals.  Broken Hill.  I think it was Broken Hill
5  Proprieties.
6    Q.   And how long -- and what did you do for them?
7    A.   I was maintenance superintendent; then became the
8  offshore installation manager; and then became field
9  manager.
10   Q.   How long did you work with them?
11   A.   Through to 2000.
12   Q.   Why did you leave?
13   A.   My colleagues I was working with, there was
14 reduction, as often happens in the oil and gas industry when
15 the oil price drops, reduction in the manpower requirements.
16 My colleagues --
17   Q.   So did you get laid off?
18   A.   No, I wasn't, ma'am.
19   Q.   Well, sir, my question is, why did you leave?
20   A.   Can I finish?
21        MR. SIMPSON:  You interrupted him when he was
22 answering.  Please let --
23        MS. ROHN:  Well, because he wasn't answering
24 my question.  He was talking to me about prices in the oil
25 and gas industry.

23

1        MR. SIMPSON:  He was explaining his
2  transition, and you interrupted him.
3    Q.   (Ms. Rohn)  Why did you leave?
4    A.   We set up our own company.
5    Q.   And who's "we"?
6    A.   Three of my working colleagues:  A gentleman
7  called Glenn Sibbick; a gentleman called Jeffrey Regan; and
8  myself.
9    Q.   I thought you said three of your colleagues?
10   A.   Indeed, so.  Yes.
11   Q.   Well, that's two.  Jeff Sibbick and -- Glenn
12 Sibbick and Jeff Regan.
13        Who's the third?
14   A.   Well, it's myself.  Sorry.  I mis -- misquoted
15 that.
16   Q.   And did that company have a name?
17   A.   Yes.
18   Q.   What was the name?
19   A.   Optis Europe, Limited.
20   Q.   And what did that company do?
21   A.   Consultancy activities with specialist in oil and
22 gas operations.
23   Q.   And why did you form that company?
24   A.   Because we realized there was a requirement for
25 experienced engineers.  Because of the downturn in oil price

24

1  and the company shedding labor and offering that -- those
2  activities outside of the companies.
3    Q.   And have you been with that company ever since?
4    A.   Yes.
5    Q.   And does it still have the same owners?
6    A.   No.
7    Q.   When did that change?
8    A.   2007, if I recall correctly.
9    Q.   And what changed?
10   A.   Glenn Sibbick took a role with Centrica Energy.
11   Q.   And what percentage, currently, today, do you own
12 of Optis?
13   A.   Fifty percent.
14   Q.   I'm sorry.  You broke up.  What?
15   A.   Sorry.  Fifty.  Five zero percent.
16   Q.   And how are you compensated by Optis?
17   A.   I'm an employee of Optis, so I take a salary.  I
18 also share in profits.  So we take dividends, based on how
19 the company's performing.
20   Q.   Are the percent of dividends tied to whether or
21 not you bring in the profits?
22   A.   No.
23   Q.   So does Mr. Regan work as a consultant as well?
24   A.   He does.
25   Q.   And so you pull the money into the company and

**Page 25**

1  then your dividends come from equal share of the profits?

2  **A.** Sorry. Could you just repeat that?

3  **Q.** Sure.

4  Does the money that is earned by each of you,

5  as consultants, go into the company, and then you share

6  equally in the profits?

7  **A.** We -- it's a legal requirement that shareholders

8  take shares proportional to their shareholding, but there

9  are other income streams besides Jeffrey Regan and myself.

10  **Q.** Okay. What are the other income streams?

11  **A.** Optis Europe is a consultancy that retains or uses

12  other experienced engineers. So there are other consultants

13  in the Optis side of things.

14  There's also a specialist training to the

15  company that have specialist trainers.

16  **Q.** And do you get a share of what they bring in?

17  **A.** Effectively, yes. The profitability of the

18  company. So we don't take shares of individual income. It

19  depends on how the company looks on a month- or year-end

20  basis, and what we plan to do in the next year, as far as

21  further investment. So it's balancing the income with -- as

22  profits that we can take as dividends.

23  **Q.** And what did you do to prepare to be deposed?

24  **A.** I have met with my attorney, and also had a -- I

25  watched a couple of depositions.

**Page 26**

1  **Q.** Okay. Did you meet with any other attorneys,

2  besides your attorney?

3  **A.** Not specifically for this deposition, but I have

4  spoken to the other defendants' attorneys at various stages

5  in the past.

6  **Q.** Are you being -- is your -- are you being -- is

7  your attorney being paid by Vitol?

8  **MR. SIMPSON:** Object to the form.

9  **Q. (Ms. Rohn)** You may answer.

10  **A.** Sorry. Could you just repeat that?

11  **Q.** Sure.

12  Is your attorney being paid by Vitol?

13  **A.** No, I don't believe he is.

14  **Q.** Okay. Are you paying your attorney?

15  **A.** No.

16  **Q.** Who is paying your attorney?

17  **A.** I believe WIC is paying my attorney.

18  **Q.** And who do you understand WIC to be?

19  **A.** Vitol Virgin Islands Corporation.

20  **Q.** And have you, from time to time, met with the

21  attorney for WIC?

22  **A.** No.

23  **Q.** Never met with them; is that right?

24  **A.** I'm not even sure who the attorney for WIC is, to

25  be honest. So, no, I haven't met with him or her.

**Page 27**

1  **Q.** Well, who, besides -- what attorney, besides your

2  attorney, have you met with?

3  **A.** Regarding this case?

4  **Q.** Yes, sir.

5  **A.** No one, other than the video conferences we had

6  when we had initial discussions about the lawsuit. And then

7  I guess the meeting was by Zoom, where I actually met or saw

8  individuals.

9  **Q.** And what attorneys were on that video conference?

10  **A.** I can't recall all of them. It's Gloria. I can't

11  recall them, to be honest with you. Those -- I've seen --

12  again, there seems to be a number of attorneys involved with

13  this. I've seen additional attorneys notified, et cetera.

14  I honestly can't recall the attorneys' names.

15  **Q.** Well, approximately how many attorneys were on

16  that video conference?

17  **A.** If I recall correctly, probably three.

18  **Q.** So there were three attorneys on the conference.

19  Was your attorney one of them?

20  **A.** No. My attorney wasn't assigned at that

21  particular time.

22  **Q.** And how did you come about going on that video

23  conference?

24  **A.** Sorry. Could you be more specific on that?

25  **Q.** Yes.

**Page 28**

1  How did you know to go on that video

2  conference?

3  **A.** Oh, right. Thank you.

4  When we received the lawsuit, various

5  parties, I guess the accused parties, wanted to have a

6  discussion about the background. And a call was arranged

7  for the various attorneys to have those discussions with me.

8  **Q.** Now, initially, you were -- well, was this before

9  you were served or after you were served?

10  **A.** That meeting occurred before I was served.

11  **Q.** And who contacted you to attend this video

12  conference?

13  **A.** I recall that it was arranged through -- Charlotte

14  made the initial contacts, and then it was arranged after

15  that. I'm not sure how that was actually arranged.

16  **Q.** That would be Charlotte Horowitz?

17  **A.** Correct. Horowitz. That's correct.

18  **Q.** And who, besides the attorneys, were in that video

19  conference?

20  **A.** Just myself and the attorneys, if I recall

21  correctly.

22  **Q.** And did the attorneys work for one of the Vitol

23  companies?

24  **A.** I believe it was Vitol, yes, one of the attorneys.

25  And one of the other attorneys was for IPOS.

ANDREW DAVID CANNING -- DIRECT

1    Q.   And who was the third attorney for?
2    A.   I don't know, specifically.  I just recall there
3  were three attorneys, and the companies they were involved
4  with were Vitol and IPOS.
5    Q.   Do you recall who was the attorney for IPOS?
6    A.   No, I don't.
7    Q.   Does the name Simone Francis ring a bell?
8    A.   I've seen it on the paperwork, and some of the
9  communications, but I don't remember her at that particular
10 time.
11   Q.   How did you first learn about this lawsuit?
12   A.   I received notification from David Smith, I
13 believe.
14   Q.   Can you recall approximately when you received
15 that notification?
16   A.   No, ma'am, I can't.
17   Q.   And how did you receive that notification?  In
18 person?  Telephone?
19   A.   E-mail, if I recall correctly.
20   Q.   I haven't seen that e-mail.
21        What did the e-mail say?
22   A.   If I recall correctly, it was, we've had our
23 attorney, local, checking the legal records, and there's
24 indication that a lawsuit is in the process of being filed.
25   Q.   Do you know who that local attorney was?

Susan C. Nissman, RPR-RMR
(340) 773-8161

ANDREW DAVID CANNING -- DIRECT

1    A.   No, ma'am, I don't.
2    Q.   And did you respond to Mr. Smith?
3    A.   I'm sure I did respond.  I can't remember the
4  specific details.
5    Q.   Did you learn, at that time, that you were going
6  to be a defendant?
7    A.   No.
8    Q.   He didn't tell you, at that time, you're going to
9  be sued, too?
10   A.   I'm not sure he had the detail at that time.  He
11 just had notification that there was a lawsuit in the
12 process of being -- going through the legal system.
13   Q.   Okay.  And after that conversation, what occurred
14 between you and Mr. Smith after that?
15   A.   It was an e-mail.  I don't recall the detail, to
16 be honest.  Obviously, we progressed in some form, but I
17 don't recall the detail.
18   Q.   Okay.  Well, how did it progress?
19   A.   I believe there was some discussion between -- a
20 notification and discussion between Vitol and IPOS, and
21 that's when the legal team was mentioned, but I don't
22 recall, again, the specific detail.
23   Q.   Well, this discussion between Vitol and IPOS, were
24 you present for that?
25   A.   No.

Susan C. Nissman, RPR-RMR
(340) 773-8161

ANDREW DAVID CANNING -- DIRECT

1    Q.   How did you know it occurred?
2    A.   I may have heard, either from David Smith or maybe
3  Charlotte, that there have been discussions between legal
4  parties associated with those companies, but I don't know
5  the detail, or don't recall the detail.
6    Q.   And then you -- at the time that you had this
7  video conference with the legal department, did you know you
8  were going to be sued?
9    A.   If I recall correctly, at that time, the detail of
10 the lawsuit was known, and I featured as one of the
11 defendants in that.  So, if that's correct, then, yes, I
12 knew at that stage that I was going to be one of the
13 defendants.
14   Q.   And when did you first begin communicating with
15 any of the Vitol defendants about getting a defense?
16   A.   We had, if I recall correctly, a call, that I
17 mentioned before, where we --
18   Q.   Is that the video conference call?
19   A.   That's correct, ma'am.
20   Q.   Okay.  All right.
21   A.   I know at that point, obviously, the discussions
22 between companies and what they were going to do.
23        At that stage, there was -- I obviously
24 attended the call, but at that stage, there was no
25 discussion about separate counsel.

Susan C. Nissman, RPR-RMR
(340) 773-8161

ANDREW DAVID CANNING -- DIRECT

1    Q.   There was no discussion about separate counsel, is
2  that what you said?
3    A.   No, ma'am.  Yes, ma'am, I didn't raise my
4  reservations or concerns about not being personally
5  represented in that stage.
6    Q.   Okay.  Did you ask for representation?
7    A.   At a later meeting, I did say that, you know, I'd
8  like to have -- I'd like to have separate representation,
9  because obviously I'm a named defendant in that case, and I
10 needed someone, I thought, to look after my interests.
11   Q.   Well, how -- so you have this video conference.
12 And then at some time in -- later, you ask for separate
13 representation.
14        Was that when you got served?
15   A.   I don't recall, exactly.  I -- no, because, again,
16 I never actually got served.
17   Q.   Well, that's correct.  Your attorney agreed to
18 accept service for you, correct?
19   A.   We had a discussion, and, yes, I -- we agreed that
20 we would waive the requirement for service.
21   Q.   So between the video conference and when you
22 discussed wanting to have separate counsel, how many
23 meetings did you have with Vitol, the Vitol defendants, or
24 their attorneys?
25   A.   I can't recall exactly.  It may have been two or

Susan C. Nissman, RPR-RMR
(340) 773-8161

33

1  maybe three.

2      Q.   And who attended those two to three meetings?

3      A.   Pretty much the same people that were there in the

4  initial discussion.

5      Q.   Anybody besides attorneys present at those

6  meetings?

7      A.   No.  Well, other than myself, of course.

8      Q.   And did you have any discussions with IPOS or its

9  attorneys, other than those at the meetings?

10     A.   Not that I recall, ma'am.

11     Q.   And do you remember approximately when you decided

12 you wanted separate counsel?

13     A.   Around two or three meetings in, but I can't

14 remember the exact date.

15     Q.   Did you select who your counsel would be, or did

16 Vitol select it?

17     A.   Sorry.  Could you repeat that?

18     Q.   Did you select who your counsel would be, or did

19 Vitol select it?

20     A.   Vitol.

21     Q.   Now, since the first call with David Smith, or the

22 first e-mail with David Smith, how often did you have

23 conversations or e-mails or texts with David Smith about

24 this lawsuit?

25     A.   I don't recall the exact number.  No.  It would

34

1  have been a few initial communications back and forth, just

2  to see where things stood, because, again, I didn't have

3  access to the legal process in the Virgin Islands.

4           But David Smith and I used to -- on other

5  subjects, on operational subjects, used to communicate more

6  or less on a daily basis, so it may have been something

7  mentioned during those operations update calls.

8      Q.   And what were the general -- what was the content

9  of the comments about the lawsuit?

10     A.   It was just -- it was nothing really specific

11 about it.  We -- I was curious to understand whether --

12 initially, whether I'd actually been -- I don't know what

13 the term is legally, issued or whatever it is.  Filed, I

14 supposed is the term.  And then it was his understanding

15 of -- of IPOS's response.

16     Q.   And what was his understanding of IPOS's response?

17     A.   Was that they'd obviously notified their legal

18 department and/or group or person, or whatever it was.  And

19 they were looking into the content of that.  Of that

20 particular lawsuit, and their response they were going to

21 put forward.

22     Q.   At some point, you went from working as a

23 consultant for IPOS to a consultant for Vitol, correct?

24     A.   No, that's not correct.

25     Q.   You've never been a consultant for Vitol?

35

1      A.   No, I haven't.

2      Q.   Your company sent you as consultant for Vitol;

3  would that be fair?

4      A.   No, it's not fair.  Not correct.

5      Q.   Have you ever -- ever worked for Virgin Islands --

6  Vitol Virgin Islands?

7      A.   Is that Vitol Virgin -- is that WIC, effectively?

8  Virgin --

9      Q.   Yes.

10          MR. KAPLAN:  I object to the form of the

11 question.

12     Q.   (Ms. Rohn) You may answer.

13     A.   Yes.  I had a contract with WIC, or with the

14 company, I had a contract with WIC.

15     Q.   And when did that begin?

16     A.   December 2020.

17     Q.   And do you know why that occurred?

18          MR. SIMPSON:  Object to the form.

19     Q.   (Ms. Rohn) You may answer.

20     A.   My understanding, Eduardo Garcia, who was the

21 Vitol entity that set up the storage facilities at -- in the

22 USVI wanted to be more directly involved with project work

23 and other assets that Vitol were looking at.

24     Q.   What other assets?

25     A.   We never looked beyond the -- the Virgin Islands

36

1  assets.  It was an intent more than something that actually

2  materialized.

3      Q.   Well, how was your work different at WIC than it

4  was at IPOS?

5      A.   Primarily, the reporting route, but I still had

6  the same remit to ensure the --

7      Q.   Sorry.  What do you mean -- excuse me.  You have

8  the same what?

9      A.   The same -- I had a different reporting route.  So

10 my reporting route was direct to WIC.  Prior to that, it

11 was through IPOS.  But the same -- it was the same scope, to

12 ensure the safety and integrity and compliance of the -- the

13 asset.

14     Q.   And who, at WIC, did you report to?

15     A.   Charlotte was my contact point in WIC.

16     Q.   And who did you understand Charlotte worked for?

17     A.   I'm not certain, but my understanding was she was

18 probably WIC or Vitol.  Certainly, she was based in their

19 office.  I don't know exactly what her contract status was.

20     Q.   How often was Charlotte actually in the Virgin

21 Islands when you were working for WIC?

22     A.   I -- she wasn't here that often.  I'd say once or

23 twice, if that.

24     Q.   Did you -- did anyone else from Vitol, Inc. come

25 to the Virgin Islands?

ANDREW DAVID CANNING -- DIRECT

1    A.    We used to see Tim, and occasionally Sebastian

2    would -- would visit.

3    Q.    So when did you first start working for IPOS?

4    A.    Sorry.  Could you repeat that?

5    Q.    Sure.

6              When did you, through Optis, first begin

7    working for IPOS?

8    A.    September 2016.

9    Q.    And do you know how it came about that Optis sent

10   you to go work for IPOS?

11   A.    Yes.

12   Q.    Okay.  Can you answer why and how that came about?

13   A.    Yes.  The chief operating officer at VTTI

14   contacted us and said that they needed support in the U.S.

15   Virgin Islands to complete construction activities, and

16   commissioning activities.

17   Q.    And what do you understand is the relationship

18   between IPOS and VTTI?

19   A.    IPOS was -- my understanding, is IPOS was set up

20   as an operating arm of VTTI to operate the Vitol facilities

21   or VVIC facilities on St. Thomas and St. Croix.

22   Q.    And what did you understand was the scope of the

23   work that you were to be do?  Doing?

24   A.    Initially, as I said, from 2016, until we

25   commissioned the plant in 2017, was to assist construction

ANDREW DAVID CANNING -- DIRECT

1    and the commissioning teams to commission the plant.

2              And then after commissioning, 2017 -- I

3    believe we commissioned St. Thomas, February 2017, maybe

4    March, it was operations maintenance support.

5    Q.    And who, at IPOS, did you report to?

6    A.    Initially, during the construction completion

7    process, it was Merlin Figueira.

8              After that, 20 -- 2016, David Smith took over

9    as general manager.

10   Q.    And who did you understand Merlin worked for?

11   A.    He was a VTTI employee.

12   Q.    Who did you understand David Smith worked for?

13   A.    He was a VTTI employee.

14            MS. FRANCIS:  I'm sorry.  Objection.

15   Foundation to both of those.

16   Q.    (Ms. Rohn) And what types of things did you report

17   to Merlin?

18   A.    Observations in terms of -- well, operation

19   improvements, maintenance.  Again, setting up maintenance,

20   and looking at how that impacted reliability of the plant.

21   Q.    Did that change anything when David Smith took

22   over?

23   A.    Not from the operations and maintenance

24   perspective going forward, no.

25   Q.    And do you have an understanding as to why it

ANDREW DAVID CANNING -- DIRECT

1    changed from Merlin to David Smith?

2    A.    No.  I'd be speculating if I put anything forward

3    on that.

4    Q.    How did you learn that it was going from Merlin to

5    David Smith?

6    A.    Merlin announced that he was leaving, and that

7    VTTI had engaged a new general manager, and he would be

8    starting.

9    Q.    Where did you understand Merlin went to?

10   A.    In terms of communication, he went to Nigeria.

11   Q.    For what company?

12   A.    VTTI.

13   Q.    And how did you learn you were going from IPOS to

14   VVIC?

15   A.    The contract changed.  There was -- in June/July,

16   around that time, Eduardo Garcia said he'd like to set up a

17   contract with VVIC, and transition from IPOS to VVIC.

18   Q.    Did he tell you why?

19   A.    And my contract would transition or change from

20   IPOS to VVIC.

21   Q.    Did he tell you why he wanted to do that?

22   A.    He indicated that he wanted more direct support

23   for projects, and for other opportunities that Vitol may

24   have.

25   Q.    And when you worked for VVIC, I think that you

ANDREW DAVID CANNING -- DIRECT

1    said that you -- most of your communication was with

2    Charlotte; is that correct?

3             MR. KAPLAN:  Object to the form.  Misstates

4    prior testimony.

5             MS. ROHN:  Noted.

6    Q.    (Ms. Rohn) You can answer.

7    A.    My reporting route would have been back through

8    Charlotte, but I also kept IPOS general manager informed of

9    any observations or issues that I'd noted at site.

10   Q.    Did there come a time that the general manager of

11   IPOS changed from David Smith back to Merlin Figueira?

12   A.    No.

13   Q.    Did Merlin ever return to IPOS?

14   A.    He did.

15   Q.    And in what capacity?

16   A.    As a interim terminal manager.

17   Q.    And where did Mr. David Smith go?

18   A.    Seaport Canaveral.  VTTI facility there.

19   Q.    How was your relationship between you and David

20   Smith?

21   A.    Good.

22   Q.    How was your relationship between you and Merlin?

23   A.    Initially, good.

24   Q.    Why do you say, "initially, good"?

25   A.    Towards the latter part of the contract, we had

ANDREW DAVID CANNING -- DIRECT

1  challenges, which is normal in business, but -- so it wasn't
2  all cordial all the time.
3      Q.  Was one of the challenges over Petro?
4      A.  Not specifically, no.
5      Q.  Did you stay in communication with David Smith
6  when Merlin was interim terminal manager?
7      A.  Yes.  David Smith remained as general manager for
8  both facilities.
9      Q.  Did you criticize Mr. Figueroa -- Figueira to
10 David Smith?
11     A.  I raised concerns.
12     Q.  Did you send an e-mail that described what you
13 perceived as poor decision-making, and then said, but he's
14 your general manager?
15     A.  I don't recall that.
16     Q.  Did you attempt to undermine Mr. Figueira?
17     A.  No.
18     Q.  When did you first start doing work with Petro?
19     A.  Petro as a company, or Petro as employees that
20 worked for Petro?
21     Q.  I don't understand the distinction.
22     A.  Petro came out of the Vivot Corporation.  We
23 originally looked for a contractor to do operation -- sorry,
24 maintenance support activities when NIS finished their term
25 with us at the end of the construction phase.

ANDREW DAVID CANNING -- DIRECT

1      I was approached, and a case put forward.  I
2  put the case forward to David Smith to engage the Vivot
3  Corporation.
4      During that time, Adrian Melendez, and later
5  Chetram Persaud, worked for the Vivot Corporation in terms
6  of their maintenance support contract.
7      Later, I was approached by Adrian and Chad,
8  who said that they didn't believe that Vivot were not giving
9  us a good service, and were going to set up a company
10 independent of Vivot Corporation, and they were going to
11 take all the employees that were delivering the service at
12 site.
13     So in terms of Petro Industrial, when that
14 transition took place, I was already aware of the
15 individuals that formed Petro Industrial, and delivered
16 their service.
17     Q.  And did Petro come to IPOS to try to take over the
18 contract?
19     A.  Could you rephrase that?
20     Q.  Did the contract change from Vivot to Petro?
21     A.  Yes, it did.
22     Q.  Okay.  And how did that occur?
23     A.  I was approached, as I said, by Adrian Melendez,
24 Jr. and Chetram Persaud on site.  They said they weren't
25 happy with Patrick Vivot and the arrangement there.

ANDREW DAVID CANNING -- DIRECT

1      They said that they were considering setting
2  up a company.  Would I support them going forward?  And I
3  said, I have no issues with the service you're delivering.
4  Obviously, you tell me that you're going to take the
5  workers, the individuals that are delivering the service.  I
6  said, I'm more than happy with those individuals.  I
7  certainly will support you going forward.  And I put that
8  case to David Smith.
9      Q.  And what was David Smith's reaction?
10     A.  We had a discussion, and we're both in agreement
11 that it would be a logical way forward to retain the service
12 that we were getting.
13     Q.  Did you participate in the negotiation of the
14 contract with Petro?
15     A.  Not directly, no.
16     Q.  Did you indirectly participate in the contract
17 with Petro?
18     A.  I did.
19     Q.  Okay.  And how did you indirectly participate?
20     A.  David Smith ran the contract past me.  Up to that
21 stage, it was pretty new, in terms of contract issue direct
22 from IPOS, so he just asked me to check through the reading,
23 the logic, and the finer detail around the -- the contract,
24 to see if I could see any anomalies.
25     Q.  Do you know who drafted the contract?

ANDREW DAVID CANNING -- DIRECT

1      A.  I believe it was David Smith.
2      Q.  And what expertise do you have in drafting
3  contracts?
4      A.  Would you repeat that?  It was a bit noisy.
5      Q.  Yes.
6      What expertise do you have in drafting
7  contracts?
8      MR. SIMPSON:  Objection.
9      MS. ROHN:  Noted.
10     A.  No direct experience in drafting contracts, but
11 obviously in my role as offshore installation manager and
12 previous roles, I was obviously party to reviewing contracts
13 in terms of their acceptance.
14     Q.  (Ms. Rohn)  You were reviewing the contracts for
15 what?
16     A.  Content, and whether there were any particular
17 clauses that should or should not be in that type of
18 contract.
19     Q.  And that was for what type of facility?
20     A.  Oil and gas facility.
21     Q.  What type of oil and gas facility?
22     A.  Upstream production facility.
23     Q.  Is that an offshore?
24     A.  Could be, or it could be onshore.
25     Q.  Well, I don't want "could be."

1   was it?

2       A.   I dealt with facilities both onshore and offshore,

3   so it could have been either.

4       Q.   So you did contracts for both offshore and

5   onshore?

6       A.   I did, indeed, yes.

7       Q.   And for what companies?

8       A.   Well, yeah.  We have -- trying to remember now,

9   historically.  There would be the Chad -- the Chad contract

10  in Africa, which is the previous one.  That was with

11  Glencore.

12      Q.   Who, Glencore?

13      A.   Glencore, yes.

14           Prior to that, it was Kuwait, I believe.

15  And --

16      Q.   Who was the company, not the location, sir?

17      A.   That's how I view things.

18           It was a specific company set up by -- I

19  think it was Madiller -- Madillo Operating Company in -- in

20  Chad.

21      Q.   And what types of contracts did you review?

22      A.   Maintenance and operations, inspection contracts.

23  Anything that really encompasses the services that the

24  client required.

25      Q.   Okay.  So you indirectly reviewed the contract to

1   make sure it had the correct terms and conditions.

2            And then do you remember approximately when

3   you began to do work with the company, Petro?

4       A.   I don't recall exactly, no.

5       Q.   And how would you describe the type of oversight

6   that you had as to Petro?

7            MR. SIMPSON:  Objection.

8       Q.   (Ms. Rohn)  You may answer.

9       A.   It was monitoring the delivery of their service

10  against whatever criteria was applicable.

11      Q.   Did you have input on the budget for their

12  services?

13      A.   Could you clarify that, please, a little bit more?

14      Q.   Sure.

15           Did you oversee, did you look at, make

16  comments about, the budget for their services?

17      A.   There would be occasion where, yes, when I was

18  asked to look at their submissions.

19      Q.   How would you describe your relationship with

20  the -- with Petro?

21      A.   Good.

22      Q.   Sir, did you ever refer to Petro or its employees

23  as incompetent or unprofessional?

24      A.   No.

25      Q.   Never?

1       A.   Not that I recall.

2       Q.   Did you have -- did there -- did Petro complain

3   about you, sir?

4       A.   I have no recollection of that, no.

5       Q.   Were you ever told by Merlin, or anyone at IPOS,

6   that you should not have direct communications with Petro?

7       A.   I was told that at one stage, that they'd rather I

8   didn't necessarily communicate with Petro, because of

9   particular issues that allegedly had occurred.

10      Q.   And what issues were those, sir?

11      A.   Sorry.  Could you repeat?  There was paper moving.

12      Q.   What issues were those, sir?

13      A.   Apparently, I told someone to stop a job.

14      Q.   And who was that, sir?

15      A.   Sorry.  Who was -- could you --

16      Q.   Who you apparently told to stop the job?

17      A.   I have no idea.  I didn't -- I didn't recall any

18  time that I actually told someone to stop a job, so no idea.

19      Q.   And who told you to stop communicating directly

20  with Petro?

21      A.   It was a discussion that I had with David Smith

22  and Merlin, and they advised me that under the current

23  climate and circumstances, that it would probably be better

24  not to communicate directly with -- with Petro.

25      Q.   And what were the current circumstances?

1       A.   The allegation that I had actually asked for a job

2   to be stopped.

3       Q.   Did you ever cause to have employees of Petro

4   removed from the job?

5       A.   No.

6       Q.   You didn't have three employees removed from the

7   job because you thought their timesheets were improper?

8       A.   I believe that decision was made by IPOS.

9       Q.   Did you ever advocate for that decision?

10      A.   What does "advocate" mean, exactly?

11      Q.   Recommend.  Approve.  Think it's a good idea.

12           MR. SIMPSON:  Objection.

13      Q.   (Ms. Rohn)  You may answer.

14      A.   I had questions over work quality and

15  productivity.  Whether those were considered to be, whatever

16  the word was you described, then, yeah, that was the extent

17  of it.

18      Q.   Were these the same employees who had worked for

19  Vivot?

20      A.   I don't recall them working for Vivot, no.

21      Q.   Were these the same employees that had started

22  originally with Petro?

23      A.   I don't recall them being original employees with

24  Petro, no.

25      Q.   And can you tell me precisely what about their

ANDREW DAVID CANNING -- DIRECT

1  work quality you had problems with?
2      A.  Yes.  I discussed this with -- with Adrian
3  Melendez.  It was the quality of the welding they'd done,
4  and apparent technical issues they had with -- during
5  reinforced concrete.
6      Q.  I'm sorry, apparent technical issues they had with
7  what?
8      A.  Apparent technical issues they had with
9  drilling -- drilling holes in reinforced concrete.
10     Q.  Sir, when you determined that they had problems
11 drilling holes in reinforced concrete, how long had they
12 been working for Petro?
13     A.  I don't know for sure.  No, I don't know.  I have
14 no idea their employment terms of whether they were working
15 at our site or other sites.
16     Q.  Would you agree with me it would have been more
17 than six months?
18     A.  If I can recall the contracts that I may have seen
19 them on, it may have been more than six months, yes.
20     Q.  And did you believe they were not qualified for
21 the entire six months?
22     A.  I don't think I've ever raised the question of
23 whether they're qualified for a particular time period.
24     Q.  Well, how long did you form the opinion that the
25 quality of the welding wasn't sufficient?

ANDREW DAVID CANNING -- DIRECT

1      A.  During the so-called RIO panel installation.  I
2  can't remember exactly when that occurred now.  Probably
3  early 2021.
4      Q.  Was the RIO panel in 2019?
5      A.  I don't recall.  I seem to remember 2021.  I don't
6  recall the exact date.  Early on in 2021, comes to mind.
7      Q.  And what welding did they have to do for the RIO
8  panel?
9      A.  Structural welding.  They had to attach frameworks
10 to existing structural steelwork.
11     Q.  And prior to that, had they been welding?
12     A.  I recall -- I believe.  Well, I couldn't say for
13 sure.  I have two jobs in mind that they may have welded on:
14 One was the -- a platform in St. Thomas; and the other was
15 some jetty rework at St. Croix.  Both jobs were, yeah,
16 welding jobs.
17     Q.  And did you believe that the quality of the
18 welding was bad on all those jobs, too?
19     A.  I wasn't required.  They were IPOS-lead jobs, not
20 project-related jobs, so I didn't have any direct
21 involvement on that.
22     Q.  Well, who lead jobs were those?
23     A.  IPOS.
24     Q.  I thought you said, I don't recall those were IPOS
25 jobs?

ANDREW DAVID CANNING -- DIRECT

1      A.  Sorry?
2      Q.  I thought you just said, I don't recall that those
3  were IPOS jobs?
4      A.  I don't believe I said that.
5      Q.  Okay.  Well, I misunderstood you, then.
6      A.  Okay.
7      Q.  Sir, then, did you believe the quality of their
8  welding on those jobs was insufficient?
9      A.  They were IPOS-lead jobs.  I wasn't involved with
10 those directly, so I don't know.
11     Q.  Well, are you saying there were jobs that were
12 lead by you?
13     A.  In terms of project, yes.  That was one of my
14 assigned tasks.
15     Q.  So what projects did you lead?
16     A.  In what time period?
17     Q.  From 2019 until 2021.  Through 2021.
18     A.  Yeah.  They would have been projects related --
19 legacy projects from the construction phase, and specific
20 projects that Vitol or VWIC were installing.
21     Q.  Sir, what were those projects?
22     A.  Sometime back.  Refreshing my memory.  Quite a few
23 of them.
24         We had to put additional handrails around
25 the -- well, that was before 2019.  I'd have to have a look

ANDREW DAVID CANNING -- DIRECT

1  at -- back at my notes to come up with specific projects.
2         But up to 2019, I'm just trying to think of
3  major activities that were occurring.  I can't recall exact
4  detail at this stage.  At this point.
5      MR. SIMPSON:  Lee, we've been going for about
6  an hour and a half.  When you come to a good stopping point,
7  can we take a five-minute break?
8      MS. ROHN:  This is a five -- yeah,
9  absolutely.
10         Again, Mr. Canning, this is not an endurance
11 test.  You are perfectly free to tell me if you would like
12 to stretch your legs or whatever, okay?
13     THE WITNESS:  Thank you very much.  Yes,
14 thank you very much, ma'am.
15     MS. ROHN:  Okay.
16     MR. SIMPSON:  We're going to take a
17 five-minute break now?
18     MS. ROHN:  Yeah, sure.  Five minutes is
19 great.
20     MR. SIMPSON:  Okay.
21         (Short recess taken.)
22     Q.  (Ms. Rohn)  My client reminded me that I failed to
23 ask you the name of the COO at VTTI that originally
24 contacted Optis about you guys doing work.
25         Who was that?

53

1    A.    Garry Stoker.

2    Q.    And how did you know Garry Stoker?

3    A.    Garry Stoker and I had worked together on

4  Liverpool Bay, the platform.  Liverpool Bay on the Douglas

5  platform.  Sorry.

6    Q.    I can't understand anything you just said.

7    A.    Okay.

8    Q.    So you worked for, and then you broke up.

9    A.    Sorry.  I know Garry as -- as I worked with him

10 and for him several times at different locations.

11   Q.    Okay.  And who did he work for when you worked for

12 him at different locations?

13   A.    we first met at BHP Petroleum, and we were working

14 on the Douglas Field.

15   Q.    All right.  And at any of the -- at any of the

16 other times that you worked with him, did he work for VTTI?

17   A.    No.

18   Q.    And can you describe for me the supervision that

19 you received from Optis on the jobs that you did for IPOS or

20 VVIC?

21   A.    In terms of super --

22        MR. SIMPSON:  Objection.  Go ahead.

23   A.    I'm sorry.

24   Q.    (Ms. Rohn) You can answer.

25   A.    Yeah.  In terms of supervision, it was really just

54

1  keeping the company informed generally how the contract was

2  going.  No direct supervision beyond that.

3    Q.    And how would you keep them informed as to how the

4  contract was going?

5    A.    Just if there were any particular issues.  That's

6  it.

7    Q.    well, how would you tell them?  Would that be

8  e-mail?  By report?

9    A.    By e-mail.  If there was an issue I'd been asked a

10 question on invoicing or whatever, yeah.

11   Q.    Well, I'm not asking about invoicing.  I'm asking

12 about -- I think you said if there were any issues about how

13 the contract was going.

14        Would you have e-mailed them about that?

15   A.    I would, yes, if there was an issue.

16   Q.    Have you searched your e-mails for those e-mails?

17   A.    Sorry.  Could you repeat that?

18   Q.    Have you searched your e-mails for those e-mails

19 to IPOS -- Optis, sorry, about any issues with the job?

20   A.    I don't recall any specific search for that.

21   Q.    During the time that you acted as a consultant for

22 Optis, do you -- first of all, do you still act as a

23 consultant for Optis?

24   A.    Yes.

25   Q.    Okay.  During the times that you act as a

55

1  consultant for Optis, did you ever receive any training in

2  discrimination?

3    A.    Yes.

4    Q.    Okay.  And what training and discrimination did

5  Optis give you?

6    A.    we have specific procedures, which we sign on or

7  signed on when we took employment.  And we are required to

8  review those, periodically.  They're discussed with, as a

9  team, with any issues -- sorry, with any questions we may

10 have on those.

11        And also when we started on this particular

12 project, although it's not directly Optis, we had a review

13 with Merlin Figueira.

14   Q.    Okay.  So you say you had specific procedures you

15 had to sign off on.

16        Who gave you those procedures?

17   A.    They're issued by the company.  Normally, it would

18 be our office manager that presents those procedures.

19   Q.    Okay.  And are those in written form or computer

20 form?

21   A.    well, they're controlled copies, so normally it

22 would be in computer form.

23   Q.    And can you describe those procedures?

24   A.    Business conduct refers to doing business in

25 countries where they may have different cultural standards

56

1  and requirements.  There's inclusion and diversity

2  considered.

3        And then specifically with IPOS in mind, it

4  was understanding the particular requirements of the Virgin

5  Islands, and, yeah, that was it.

6    Q.    Okay.  So I'm really focusing on Optis.  That's my

7  question.

8    A.    Okay.

9    Q.    So -- so you got something in a business conduct

10 about countries with different standards.

11        What else did you get, as far as

12 discrimination training?

13   A.    That was -- the only other thing that happens in

14 our processes is when we go to a new location, we've got a

15 specialist support/insurance support group.

16   Q.    I'm sorry.  You broke up.  Wait.  Stop.  You broke

17 up.  You got --

18   A.    Sorry.

19   Q.    You got a specialist, what?

20   A.    Travel insurance company.  And we look at

21 particular requirements.  As part of the risk assessment

22 process, the particular requirements of any particular

23 country, that includes not only the cultural requirements,

24 but also any security requirements we may require.

25   Q.    Now, the -- this Optis -- Optis, understand the

57

1  requirements of the Virgin Islands, or the -- this was from
2  Merlin.  Was this written or verbal?
3      A.  Oh, sorry.  The introduction?  It was -- it was a
4  written document.  He also had a briefing, the team that
5  came across with me, from Merlin, before we actually
6  attended site.
7      Q.  Okay.  And what was the verbal briefing?
8      A.  It gave the background of any -- any issues that
9  they actually encountered during the construction, early
10 commissioning phases.
11     Q.  What does that have to do with discrimination?
12     A.  One of the issues they had was alleged
13 discrimination.
14     Q.  Okay.  And what, precisely, did he tell you about
15 that?
16     A.  He gave us an indication what he thought the
17 causes were, and we had to -- yeah, that was it.
18     Q.  And what did -- what did he think the causes were?
19     A.  He was unsure.  It was an allegation.  But, yeah,
20 there was things like communication, et cetera.
21     Q.  Sir, this is a deposition --
22     A.  Oh, sorry.
23     Q.  -- so "et cetera" just doesn't do it.
24         So, sir, was there a charge against the --
25 IPOS for discrimination?

58

1      A.  There was a lawsuit raised against the crew that
2  we replaced.
3      Q.  Okay.  And who was the crew you replaced?
4      A.  They were contractors retained by VTTI for the
5  construction phase.
6      Q.  Named?
7      A.  I don't know.  They were separate contractors.  I
8  don't know.  There was no company as such.
9      Q.  And then you said, the team we brought down.
10         What team did you bring down?
11     A.  There were four.  I remember four individual
12 specialists.  I was one of them.
13     Q.  And who brought them down?
14     A.  VTTI.
15     Q.  Well, so when you say, "we brought down," who's
16 "we"?
17     A.  That's, I guess --
18         MR. SIMPSON:  Don't guess.
19     A.  Sorry.  It was just a figurative term.  It was, I
20 guess -- no, I don't guess.
21         I considered myself to be part of IPOS, so --
22 and, you know, it's just poor terminology, I'm afraid.
23     Q.  (Ms. Rohn) Who else was -- was involved, besides
24 you?
25     A.  In that particular team?

59

1      Q.  Yes.
2      A.  I can't remember everyone's names.  Glenn Sibbick
3  was one of them.  There was a process engineer, and also an
4  instrument and electrical engineer.  I can't remember their
5  names off -- at this particular time.
6      Q.  During the time that you worked for -- so the
7  conversation about discrimination with Merlin was the fact
8  that the last group had been sued for discrimination, or
9  IPOS had been sued for discrimination?
10     A.  I don't know the specifics of the -- lawsuit.
11     Q.  So he discussed that lawsuit with you.
12         Did he give you any other training about
13 discrimination?
14     A.  No, ma'am.
15     Q.  Okay.  Did he tell you anything about the unique
16 qualities of Virgin Islanders?
17     A.  I can't recall the exact detail.
18     Q.  During the time that you worked at IPOS, did you
19 ever receive any training in discrimination?
20     A.  Not that I recall.
21     Q.  During the time that you were at IPOS, did you
22 ever observe any of the employees of IPOS getting any
23 training in discrimination?
24     A.  I don't recall.
25     Q.  During the time that you worked for VVIC, did you

60

1  get any training in discrimination?
2          MR. KAPLAN:  Object to the form of the
3  question.  Misstates his relationship.
4          MS. ROHN:  Please stop making speaking
5  objections.
6          MR. KAPLAN:  It's just the question misstates
7  his prior testimony.
8          MS. ROHN:  Sir, I'm not going to get in an
9  argument with you.
10         MR. KAPLAN:  Don't instruct me what to do,
11 then.
12         MS. ROHN:  Okay.  I'll call the Court.  Would
13 you rather I do that?  Because you're not allowed to make
14 speaking objections.
15         MR. KAPLAN:  I'm allowed, under Rule 30, to
16 state the basis distinctly for my objection.
17         I stated the basis for my objection, which is
18 you misstated his prior testimony.
19         MS. ROHN:  Great.  Thank you.
20     Q.  (Ms. Rohn) Did you do work for VVIC as a
21 consultant?
22     A.  Sorry.  Is that -- is that directed to me?
23     Q.  Yes, sir.
24     A.  Could you repeat?
25     Q.  Did you work for VVIC?  Did you work for VVIC as a

1    consultant?

2        A.  Yes.

3        Q.  So did you get any training when you worked for

4    VVIC as a consultant?

5        A.  Not that I recall.

6        Q.  Okay.  Have you ever received any training, actual

7    sit-down training in discrimination?

8        A.  I don't recall.

9        Q.  Now, were there times when IPOS would contradict

10   procedures that you thought the work should be done by?

11           MR. SIMPSON:  Objection.

12       Q.  (Ms. Rohn) You may answer.

13       A.  Not that I recall.

14       Q.  There weren't times when Petro -- were there times

15   when Petro would contradict the procedures that you had in

16   place?

17          MR. SIMPSON:  Objection.

18       A.  I don't recall.

19       Q.  (Ms. Rohn) Were there times when there were

20   procedures for doing a job that you gave to Petro, where

21   Petro would tell you that that procedure would not work?

22       A.  Not that I recall.

23       Q.  Do you remember a -- the 1-inch vent line?  Was it

24   vent line?

25          MR. MELENDEZ:  Yes.

1        Q.  (Ms. Rohn) 1-inch vent line project?

2        A.  I recall a 1-inch vent and drain project for

3    St. Croix.

4        Q.  Okay.  And what was your -- what was your

5    participation in that project?

6        A.  Project support.

7        Q.  Would that project support include evaluating who

8    would receive the assignment to do that job?

9        A.  No, ma'am.

10       Q.  So you were not involved in overseeing the bids

11   for that job; is that correct?

12       A.  That's correct.

13       Q.  Did you participate in evaluating the bids in any

14   way?

15       A.  Only by -- only in summarizing and sending the

16   information on to IPOS.

17       Q.  Well, in your summary, did you point out pros and

18   cons?

19       A.  I recall I did.

20       Q.  And is -- was one of the persons who was

21   bidding -- one of the companies that was bidding for that

22   job Petro?

23       A.  It was.

24       Q.  Okay.  And did you have any criticisms of Petro in

25   your summary?

1        A.  Not that I recall.

2        Q.  Did you have any particular company that you

3   favored for that bid?

4       A.  No.

5       Q.  Did you initially take the position that Petro

6   could not bid for that job?

7       A.  No.

8       Q.  Was -- did anyone take the position that Petro

9   could not bid for that job?

10       A.  Not that I know of.

11       Q.  Do you recall having a discussion with Merlin

12   Figueira -- I think that's how you pronounce his name.  I

13   just call him Merlin -- came to you and said that it would

14   be in IPOS's best interest to allow Petro to bid on that

15   job?

16       A.  Not that I recall.

17       Q.  Did you recall having any discussions claiming

18   that IPOS had improperly included Traeger information in

19   that bid?

20          MR. SIMPSON:  Objection as to form.

21       A.  Sorry.  Could you repeat that?

22       Q.  (Ms. Rohn) Yes.

23          Did you ever have any conversation with

24   anyone that you believed that Traeger had improperly

25   provided information in that bid?

1        A.  I don't recall that, no.

2        Q.  Had you actually called Traegers' activity in that

3   bid criminal?

4       A.  No.

5       Q.  Do you recall who got that bid?

6       A.  I recall it was Specialty Fabrication.

7       Q.  Where were they out of?

8       A.  I recall somewhere in Florida, yeah.

9       Q.  And what do you understand Traeger Brothers is?

10       A.  A materials --

11       Q.  What do they do?

12       A.  A materials supply, primarily.

13       Q.  Okay.  Well, can you tell me why, sir, when it was

14   alleged in Paragraph of 34 of Plaintiff's First Amended

15   Complaint that Traeger Brothers is a supplying company, that

16   both IPOS, through Canning, and plaintiff, used for various

17   materials and supplies, you claim you lack sufficient

18   information to agree to that?

19       A.  Sorry.  Could you repeat that?

20       Q.  Yes, sir.

21          In -- when Mr. -- when Petro alleged in

22   Paragraph 34 of their Complaint that Traeger Brothers is a

23   supplying company, that both IPOS, through Canning, and

24   plaintiff, used for various materials and supplies, you

25   answered that you lacked sufficient information to admit or

ANDREW DAVID CANNING -- DIRECT

1   deny that.
2            Don't you, in fact, know that that's true,
3   sir?
4       A.   They also supply other services.
5       Q.   And material?  So admitting they supply IPOS and
6   Petro, correct?
7            MR. SIMPSON:  Objection.
8       A.   I don't know for sure that they actually provided
9   Petro with materials.  I recall they probably did.
10      Q.   (Ms. Rohn) Well, sir, wouldn't you see the bids,
11  and the bids would tell you where the materials are coming
12  from?
13      A.   Not necessarily.  We didn't require --
14      Q.   I don't mean always, sir.
15           Did you ever see bids where the materials
16  that Petro was using were coming through Traeger Brothers?
17      A.   I recall I probably did, yes.
18      Q.   Now, did there come a time that IPOS agreed to
19  meet directly with Traeger Brothers?
20      A.   I have no recollection of that.
21      Q.   And isn't it true, sir, that Traeger Brothers
22  pointed out that your advice to IPOS was causing them to
23  lose money, or spend more money than they needed to?  Do you
24  recall learning that, sir?
25           MR. SIMPSON:  Objection.

ANDREW DAVID CANNING -- DIRECT

1       A.   I don't recall that.
2       Q.   (Ms. Rohn) And that -- so you don't recall ever
3   knowing that there were meetings directly between Traeger
4   Brothers and IPOS?
5       A.   I don't recall any meetings directly between
6   Traeger Brothers and IPOS.
7       Q.   You didn't write any e-mails about that?
8       A.   Sorry.  Could you repeat that?
9       Q.   Is it your testimony you never wrote any e-mails
10  about that event?  That fact?
11           MR. SIMPSON:  Objection.  That's not what his
12  testimony was.
13      Q.   (Ms. Rohn) Sir, is it your -- please stop making
14  speaking objections.
15           Is it your testimony that you never wrote any
16  e-mails to anyone about the fact that IPOS was meeting
17  directly with Traeger?
18      A.   I don't recall that.
19      Q.   Sir, did you ever have to oversee and approve the
20  invoices submitted to IPOS by Petro?
21      A.   I did confirm correlation between site timesheets
22  and the invoice ahead of it being sent on to IPOS.
23      Q.   So is it your testimony that you only oversaw them
24  as to the labor costs?
25      A.   No.  I also received equipment hire.

ANDREW DAVID CANNING -- DIRECT

1       Q.   And, sir, when you would get the invoices for --
2   from Petro, would they be as the job progressed, or at the
3   end of the job?
4       A.   Depending, obviously, on the length of the job,
5   but, generally, as the job progressed.
6       Q.   So would you get them weekly?  Monthly?
7       A.   It varied.  It could be weekly.  Bi-weekly.
8       Q.   But not monthly?
9       A.   I don't recall.
10      Q.   Okay.  Did you ever get invoices at the end of a
11  job from like on special projects?
12      A.   We obviously get the final invoices, dependent, as
13  I said before, on the length of the job.
14      Q.   Were there times that you would get them on the
15  end of the job?
16      A.   Yes.
17      Q.   And how quickly would you turn those invoices
18  around as to your approval?
19      A.   As quickly as I could.
20      Q.   Well, how quick was that?
21      A.   Depended when I could dedicate the necessary time
22  to do it.
23      Q.   Well, sir, as to the Petro invoices, how long
24  would it take you to give your approval on those invoices on
25  special projects?

ANDREW DAVID CANNING -- DIRECT

1            MR. SIMPSON:  Objection.  Asked and answered.
2       Q.   (Ms. Rohn) You may answer.
3       A.   Sorry.  Could you repeat it?
4       Q.   As to Petro invoices on special projects, how
5   quickly would you turn those invoices around?
6       A.   As quickly as I could.
7       Q.   Well, what would prevent you from doing it within
8   a week?
9       A.   My day job.
10      Q.   Isn't that part of your day job, sir?
11      A.   Not exactly, no.  It was something I inherited
12  once the -- the project team wound down.
13      Q.   Well, sir, you got paid to do that, didn't you?
14  Optis got paid to do that?
15      A.   It wasn't in my role definition as operating
16  maintenance support.  It's something that I, as I said,
17  retained from the commissioning project winding down.
18      Q.   Sir, on this job, did you get paid directly by
19  IPOS or through Optis?
20      A.   Through Optis.
21      Q.   Huh?
22      A.   Through Optis.
23      Q.   Okay.  And was it Optis -- Optis that paid you, or
24  some other company?
25      A.   It was Optis that paid me.

69

1  Q.   And do you know who paid Optis?
2  A.   IPOS.
3  Q.   Well, when you worked for VVIC, who paid -- who
4  paid Optis?
5  A.   VVIC.
6  Q.   So, sir, did you tell anybody, I'm not doing this.
7  I'm not -- I'm not authorizing these invoices.  I just --
8  I'm not doing it?
9  A.   No.
10  Q.   Okay.  So -- and you knew, of course, Petro
11  couldn't be paid, until you reviewed their invoices,
12  correct?
13  A.   Understood that would be the position, yes.
14  Q.   And, sir, didn't you hold their invoices sometimes
15  for three or four months without approving them?
16  A.   I may have done it, if there were anomalies that
17  hadn't been clarified.
18  Q.   Okay.  Well, what would prevent you from telling
19  Petro about an anomaly for 90 days?
20  A.   Nothing.  But there was a lot of communication
21  backwards and forwards while the clarifications were sorted,
22  in some instances.
23  Q.   Do you recall an incident where -- do you recall
24  ever requesting that Chad Persaud go to St. Thomas and
25  oversee the St. Thomas jobs?

70

1  A.   There were probably occasions when he did go
2  across.
3        Sorry.  Could you repeat the question?
4  Q.   Yes.  Do you recall occasion when you told Chad
5  Persaud that you wanted him to personally oversee the
6  St. Thomas jobs?
7  A.   I don't recall that.
8  Q.   Do you recall on any occasion that you told Chad
9  Persaud you wanted him to oversee a St. Thomas job?
10  A.   I can't recall that.
11  Q.   What did you understand Chad Persaud's position
12  was at Petro?
13  A.   I understood him to be a part owner, and also
14  general manager, I believe.
15  Q.   Did you understand him to be the project manager?
16  A.   Sorry.  Could you repeat that?
17  Q.   Did you understand him to be the project manager?
18  A.   On certain tasks, I recall that he was referenced
19  as project manager.
20  Q.   Did you do any work with Johnny Alfonseca?
21  A.   Sorry.  Could you repeat that, please?
22  Q.   Did you do any work -- oversee any work done by
23  Johnny Alfonseca?
24  A.   Oh, Johnny, the Petro supervisor, is that the
25  person you're referencing?

71

1  Q.   Yes.
2  A.   Sorry.  Could you repeat the question again, then?
3  Q.   Did you oversee any work being done by Johnny?
4  A.   Yes, I did.
5  Q.   Okay.  Did you have any trouble with overseeing
6  the work done by Johnny?
7        MR. SIMPSON:  Objection.
8  A.   I monitored the work that was being done by
9  Johnny.  He lead the team over there.
10  Q.   (Ms. Rohn)  Sir, do you recall telling Mr. Persaud
11  that you couldn't understand Johnny, and that you needed to
12  have him oversee the work that Johnny was overseeing?
13  A.   No, I never did that.
14  Q.   Did you ever have Mr. Persaud work on jobs that
15  Johnny was the manager of?
16  A.   No, I never did that.
17  Q.   Did you -- would you, in the overseeing of the
18  invoices from Petro, hold up an entire invoice payment over
19  discrepancy in an employee's time?
20        MR. SIMPSON:  Objection.
21        MS. ROHN:  Noted.
22  A.   I don't recall that.
23  Q.   (Ms. Rohn)  You don't recall holding up the invoice
24  for the --
25  A.   Sorry.  The sound's gone.

72

1  Q.   Did you ever hold up a invoice for the reverse
2  loading for 90 days because of a question on Mr. Persaud's
3  time?
4  A.   I don't recall that.
5  Q.   Did you ever accuse Petro's employees of forging
6  timesheets?
7  A.   I don't recall that.
8  Q.   Did you ever accuse Petro's employees of purposely
9  putting down the incorrect times that they worked?
10  A.   I don't recall that.
11  Q.   Sir, is there a time that you claim that you fell
12  through some grating?
13  A.   I do recall an incident.
14  Q.   And do you recall where that incident occurred?
15  A.   St. Thomas boiler room.
16  Q.   Was on the WAPA property, correct?
17  A.   The ground full site is within the confines of the
18  WAPA facility, yes.
19  Q.   And, sir, when you went into that area, did you
20  have a permit to go in that area?
21  A.   No.
22  Q.   Were you required to have a permit to go in that
23  area?
24  A.   No.
25  Q.   Well, what was WAPA's permitting requirement?

ANDREW DAVID CANNING -- DIRECT

1    A.   This was an IPOS site.

2    Q.   The question is, what is WAPA's permitting

3 procedures?

4    A.   For that particular site?

5    Q.   No, sir. Not for that particular site, period.

6 What was their permitting procedure?

7    A.   Pretty much as IPOS. If you were doing particular

8 work activities, you had to request a permit to do those

9 work activities.

10    Q.   So for the -- something like, oh, the Number 3

11 vent line, would you have to get permits from WAPA to do

12 that?

13    A.   Yes, ma'am.

14    Q.   And who would be in charge of getting those

15 permits?

16    A.   The operations team.

17    Q.   And who would be the operations team?

18    A.   Depending on which side of the fence.

19    Q.   Well, how about on the WAPA side of the fence?

20    A.   It would be WAPA's permits.

21    Q.   It would be what?

22    A.   WAPA's permits.

23    Q.   Okay. And who would be in charge of getting those

24 permits?

25    A.   WAPA.

ANDREW DAVID CANNING -- DIRECT

1    A.   Well, WAPA issues them.

2       Who would get them for IPOS?

3    Q.   Who would prepare them? Is that the question.

4    A.   No, sir.

5       I understand that WAPA would issue the

6 permit. But who -- if you have something like the Number 3

7 vent line, if you had to get permits from WAPA, who would be

8 in charge of getting those permits on behalf of IPOS?

9    MR. SIMPSON: Objection.

10    A.   IPOS didn't get permits to do work for the 3-inch

11 line, that I recall.

12    Q.   (Ms. Rohn) Then who did? Did anyone?

13    A.   It would be Petro. They're the contractor working

14 on that site.

15    Q.   Okay. So what would be the procedure -- do you

16 know the procedure, what they would do to get that permit?

17    A.   I do.

18    Q.   What is that?

19    A.   The procedure is to describe the task that the

20 contractor wants to undertake. He discusses that with the

21 operations team. They then work on the requirements of the

22 permit, which considers what work and hazards are in that

23 particular area.

24       Once that permit is completed, the operator,

25 if it involves hot work, would send out one of his operating

ANDREW DAVID CANNING -- DIRECT

1 staff to do a gas test. Once that gas test is clear that

2 there's no flammable gas in that particular area, he would

3 come back, sign that detail onto the permit, and then the

4 head of operations, the daily operations, and the client

5 work representative would sign onto the permit they

6 understand the conditions, and any limitations for doing

7 that work.

8    Q.   Who would be on the operations team?

9    A.   WAPA personnel, if it was on the WAPA side.

10    Q.   I'm sorry. I couldn't hear. I couldn't

11 understand that answer.

12    A.   Sorry. The operations team, if you're raising a

13 permit on the WAPA side, will be WAPA's operating staff.

14    Q.   And did WAPA have to give permits for the work

15 done on the propane terminal side?

16    A.   No.

17    Q.   Okay. Was there a permitting process for the work

18 done on the propane terminal side?

19    A.   Yes.

20    Q.   And who -- how were -- how were those permits

21 issued?

22    A.   The same as on the -- the WAPA side, except it was

23 using IPOS permits, and IPOS staff doing the requisite

24 checks.

25    Q.   Okay. So this grating in the boiler on the WAPA

ANDREW DAVID CANNING -- DIRECT

1 facility, on the WAPA side, what caused you to fall?

2    MR. SIMPSON: Objection.

3    A.   Can I correct, in terms of it's a WAPA facility.

4 Just happens to be located -- it's an area assigned to IPOS,

5 and its IPOS jurisdiction over that particular area.

6    Q.   (Ms. Rohn) Sir, would you answer my question, what

7 caused you to fall?

8    A.   The grating yielding on an access platform.

9 Sorry.

10    Q.   And what do you believe caused the grate to yield?

11    A.   At the time, when I looked at it, it looked to be

12 insufficient support around the access hatch that gave way.

13    Q.   Well, how long after your fall did you look at it?

14    A.   Immediately. I recovered myself from the top of

15 the boiler, and made sure nothing was broken.

16    Q.   Okay. And what did you observe that caused you to

17 believe that there was insufficient support?

18    A.   There was no support steelwork in or around the

19 access hatch. It relied purely on angle iron on the

20 periphery of the grating. And within that, what appeared to

21 be insufficient support, as my weight transferred onto the

22 access hatch, the grating deflected, allowing the angle iron

23 to pass through the orifice that was in the grating.

24    Q.   Did you form an opinion at the time that there was

25 something wrong with the welding that was done on the grate?

1     A.   No.  There was no structural steel around there to
2  question.
3     Q.   Did you later learn what actually caused the fall?
4     A.   I haven't seen a report on it.
5     Q.   I'm sorry, sir.  Would you repeat yourself?  I
6  couldn't understand you.
7     A.   I have not received any information on that.
8     Q.   Sir, I didn't ask if you received a report.  I
9  asked if you later learned what actually caused you to fall?
10     A.   I have not received any information on that.
11     Q.   Sir, did you ultimately find out that the grating
12  clips had not been put on the grate because they hadn't
13  arrived yet, and they were -- therefore, it was not
14  finished?
15     A.   In a discussion with Chad Persuad, he told me that
16  the grating clips had not been installed.
17          We offered excess grating clips that we'd
18  actually purchased for work on the jetty, so he could
19  undertake any activity he needs to complete with clipping of
20  the grating.
21     Q.   Well, did you think Chad was not telling you the
22  truth, when he said what happened was, it was missing the
23  grating clips?
24     MR. SIMPSON:  Objection.
25     A.   Not at all.

1     Q.   (Ms. Rohn) So, sir, did you ultimately learn what
2  actually caused you to fall?
3     A.   I did not.
4     Q.   So you don't think that the failure to have
5  grating clips had anything to do with your fall; is that
6  right, sir?
7     A.   It may have had something to do it, but I don't
8  know if that was the actual final cause.
9     Q.   When this -- did anybody witness your fall?
10     A.   Yes.
11     Q.   Who?
12     A.   David Nagle.
13     Q.   Did he fall?
14     A.   No.  He was at the access ladder.
15     Q.   And when you fell, did you make any comments about
16  Petro, and its crew, and their ability to do work?
17     A.   Not that I recall.
18     Q.   Did you have any conversation with their safety
19  man?
20     A.   I did.
21     Q.   And what was the conversation you had with the
22  safety man?
23     A.   I asked if they inspected the platform as part of
24  the handover procedure.
25     Q.   Didn't you have a conversation with the safety

1  man, saying that the Petro crew was incompetent and had
2  caused you to fall?
3     A.   Not that I recall.
4     Q.   Did you send any e-mails out in that regard?
5     A.   No.
6     Q.   Did you ever refer to, when speaking to Mr. -- or
7  the safety man, the bullshit work that Petro does?
8     A.   Not that I recall.
9     Q.   You ever say, How could you guys consider yourself
10  a welding company when your work is substandard?
11     A.   Not that I recall.
12     Q.   And did the safety man tell you, I don't need this
13  shit?
14     A.   I don't recall that, exactly.
15     Q.   Well, what do you recall him telling you?
16     A.   In our conversation, I asked him about how the
17  inspection and sign-off process went.  I was hurting at the
18  time.  I sustained bruising.  So --
19     Q.   Sir, answer my question.  I asked you what you
20  heard him say.
21     MR. SIMPSON:  He was answering your question.
22     MS. ROHN:  No.  He was talking about where he
23  was injured.
24     MR. SIMPSON:  He's answering your question.
25  Stop interrupting him.

1     MS. ROHN:  I'll do what I want.  Please
2  answer, sir.
3     MR. SIMPSON:  Then we'll go to the judge.
4     Q.   (Ms. Rohn) This is a question, answer.  I ask a
5  question, and you tell me what you think you want to say.
6  question, you answer my question.  It's not I ask a
7     MR. SIMPSON:  He was in the process of --
8     Q.   (Ms. Rohn) Do we have that understanding, sir?
9     MR. SIMPSON:  He was in the process of
10  answering your question, and you interrupted him.  If you
11  had let him --
12     Q.   (Ms. Rohn) Sir, you understand that you
13  are supposed to answer my question?
14     MR. SIMPSON:  Do not interrupt me.  Do not
15  interrupt me, either.
16          Let him finish, and you will hear the answer
17  to your question.
18     MS. ROHN:  Great.  I thank you for your
19  lecture.
20     Q.   (Ms. Rohn) Sir, do you understand that this is a
21  question-and-answer procedure?
22     A.   Yes, I do.
23     Q.   I ask a question, you answer the question I'm
24  asking you.
25     A.   Yes, ma'am.  Could you ask the question again?

81

1  Q.  What did you hear the safety man say to you in
2  response?
3       MR. SIMPSON:  Which is a different question
4  than what you asked.
5  A.  What I recall is, he said, I don't need this
6  bullshit.  I'm leaving.
7  Q.  (Ms. Rohn)  And what did you think precipitated
8  that statement?
9  A.  I don't know.
10 Q.  Sir, what were you doing when you were on the
11 platform?
12 A.  I was inspecting the project-delivered access
13 gates and ladder, and also the project-delivered boiler feed
14 valves.
15 Q.  Were you jumping on the grate?
16 A.  Not that I recall.
17 Q.  Sir, what is your welding experience?
18 A.  We were trained as part of my apprenticeship to
19 undertake welding activities.  And obviously -- not
20 obviously.  And we've had welding done at other facilities
21 than this facility.
22 Q.  At other facilities, and what?  You broke up?
23 A.  And this.  And these facilities.
24 Q.  Well, let me see.
25      Have you done any welding since -- you,

82

1  personally, since you were an apprentice?
2  A.  Yes, I have.
3  Q.  Can you tell me what welding you've done?
4  A.  Car repairs at home.
5  Q.  Have you done any pipe welding since your
6  apprentice job?  Apprenticeship?
7  A.  No, ma'am.  No, ma'am.
8  Q.  Are you familiar with the ASME requirements for
9  welding?
10 A.  For pressure systems?
11 Q.  Yep.
12 A.  B31.3?
13 Q.  Yes.
14 A.  Yes.  Reasonably familiar.
15 Q.  And what is it?
16 A.  Sorry.  Did you ask a question?
17 Q.  Yes.  I said, what is it?
18 A.  It's a code.  A practice.
19 Q.  Well, what -- what are the requirements?
20 A.  Depends on -- it's got requirements for welding.
21 For inspection.  For welder certification.  For -- for
22 materials used in the weld.
23 Q.  So what is --
24 A.  It's --
25 Q.  what is the welding requirement for pressure pipe

83

1  welding?
2  A.  Depends on the classification of the pipe.
3  Q.  How about for stainless steel?
4  A.  Three one?  Yes.
5  Q.  Yes.
6  A.  Depends on the service, whether it's normal
7  service, or whether it's severe service, or whether it's
8  carrying pure liquids.  There are other categories there as
9  well.
10 Q.  How about for propane oil and gas services?
11      MR. SIMPSON:  Objection.
12 A.  Again, classified whether it's N category or
13 whether it's S category, would be slightly different
14 requirements.
15 Q.  Well, give me N first.
16 A.  Normal services, yes.  What would you like to know
17 about it?
18 Q.  What are the -- what are the requirements?
19 A.  The requirements are defined -- the requirements
20 are within B31.3.  I don't recall everything within that
21 particular standard.
22 Q.  What do you recall?
23 A.  Anything necessary to look up in that standard.
24 Q.  Do you recall a single requirement for that
25 welding standard?

84

1  A.  Yes.
2  Q.  Okay.  What do you recall?
3  A.  In terms of certification or actual welding
4  process?
5  Q.  Actual welding process, sir?
6  A.  The welding process is as defined -- it forms
7  between the -- or sits between the IPOS, or VTTI
8  specification, and the requirements of B31.3.  They align
9  pretty much the same.  One comes from the other.
10      The weld procedure depends on the -- or the
11 welding requirements depend on the thickness of the
12 material.  Normally -- not normally, always a requirement
13 for the welding procedure is a requirement before the weld
14 starts.
15      That weld then goes -- or that procedure is
16 then turned into a -- test, a proof test, of that
17 particular procedure is adequate to deliver the final
18 results in terms of strength of the weld.  And then the
19 welders that undertake that work, are tested and certified
20 to undertake that weld on that material.
21 Q.  Have you ever witnessed any weld tests?
22 A.  I don't recall.
23 Q.  Have you ever given any weld tests?
24 A.  Sorry.  Could you repeat that?
25 Q.  Have you ever given any weld tests?

ANDREW DAVID CANNING -- DIRECT

1  A.  No.

2  Q.  What would be your expertise of determining

3  whether or not a weld has been properly done or not?

4  A.  whether there's any indication of nonconformance

5  with the requirements of the welding procedure.

6  Q.  Oh, I mean by looking at a weld, what is your

7  expertise of telling, when you look at a weld, whether or

8  not it's been properly done or not?

9  A.  I'm not a welding inspector.  I don't have an

10  expertise on that.

11  Q.  Have you ever opined to anybody at IPOS that

12  particular welds were not properly done?

13  A.  Not that I recall.

14  Q.  Were you aware that there were projects that

15  Merlin had IPOS do for which he did not have you oversee

16  that work?

17      MR. SIMPSON:  Object to the form.

18      MS. ROHN:  Noted.

19  A.  I don't recall.

20  Q.  (Ms. Rohn)  Now, were you in charge of requesting

21  welder certificates for the workers?

22      MR. SIMPSON:  Object to the form.

23      Could you repeat the question, please?

24  Q.  (Ms. Rohn)  Yes.

25      was one of your duties, making sure that the

ANDREW DAVID CANNING -- DIRECT

1  Petro welding -- welding workers were certified?

2  A.  No.

3  Q.  Who was in charge of that?

4  A.  Could you repeat the question?

5  Q.  Who was in charge of that?

6  A.  Sorry.  The full question.

7  Q.  Who was in charge of making sure that Petro's

8  welding employees were certified?

9  A.  It would have been the contractor, Petro.

10  Q.  Well, who was in charge at IPOS to make sure that

11  that had occurred?

12  A.  The welders' certificate would have been passed to

13  IPOS.  And I would be asked -- well, no.  I'll step back on

14  that.

15      The welders' certification would be passed to

16  IPOS, and I would be asked to just take a look at the

17  certificates.  See if there's any anomalies.

18  Q.  On every certificate, sir?

19  A.  I don't know for sure.

20  Q.  Well, how many can you recall looking at?

21  A.  I recall the certificates for the 3-inch line.  I

22  also recall certification for the 1-inch fuel line to the

23  jetties.

24  Q.  And who asked you to review those certificates?

25  A.  It was part of my oversight on the job.  In this

ANDREW DAVID CANNING -- DIRECT

1  particular case, I recall they were probably sent to me by

2  either David Smith or Merlin.

3  Q.  And how do you recall that?

4  A.  I just recall it.

5  Q.  And what is your understanding of how welding

6  certificates are issued?

7  A.  It's defined in the welding procedures for -- or

8  from VTTI.

9  Q.  Okay.  Do you have, as you sit here today, an

10  understanding of how that's supposed to be done?

11  A.  I have an outline of it, yes.

12  Q.  Okay.  What is it?

13  A.  It's as I described earlier.

14  Q.  I'm sorry?

15  A.  Sorry.  I'll define it again.

16      It's -- under that particular procedure,

17  there's a requirement for the contractor that's awarded the

18  work to produce a welding procedure.  That welding procedure

19  is then proven.  In other words, the weld is undertaken

20  against that procedure.  And then once that procedure is

21  accepted, and the mechanical test indicates that the final

22  weld meets the mechanical requirements, then the welders are

23  certified against that particular procedure.

24  Q.  Do the welding certificates, the procedure to

25  certify the welders, have to occur on IPOS property?

ANDREW DAVID CANNING -- DIRECT

1  A.  No.

2  Q.  And is there a requirement as to the

3  qualifications of the person who is certifying that the

4  welds are proper?

5  A.  There is.

6  Q.  And what is that requirement?

7  A.  It's done by a certified company that have all the

8  necessary quality procedures in place to ensure that the

9  weld is done and managed in the proper manner.

10      And then the weld -- certified welding

11  inspector, would undertake the necessary visual examination

12  and interpret the mechanical test results to say whether the

13  welder is competent or not.

14  Q.  So is it your testimony that a certified welding

15  inspector can only certify welds if they work for a company?

16  A.  Sorry.  Could you rephrase that.

17  Q.  Is it your testimony that a certified welding

18  inspector can only give welding certificates if it -- if he

19  works for company?

20  A.  No.  He has to be a certified welding inspector,

21  and has to have the necessary equipment, either used or

22  available to him to do the necessary tests.

23  Q.  Okay.  And then is it correct that the welding,

24  certified welding inspector, informs the company that the

25  person works for, that they have passed the welding tests,

1   and the company then signs a certificate?

2      A.  Yes.  That outlines the process.

3      Q.  Do you know somebody by the name of Guillermo

4   Castro?

5      A.  No.

6      Q.  Okay.  Have you ever heard that name before, sir?

7      A.  I have.

8      Q.  Okay.  In what context did you hear that name?

9      A.  In the context of Petro Industrial welders

10  certification.

11     Q.  Do you know whether or not Guillermo Castro is a

12  certified welding inspector?

13     A.  In discussion with Doug Rice, there's an

14  indication that he never reached the Level III requirement

15  that Doug Rice said was necessary, or signed over.  So I

16  don't know, specifically.

17     Q.  Okay.

18     A.  That's the only information I know.

19     Q.  And who is Doug Rice?

20     A.  Doug Rice is the manager for Acuren Inspection.

21     Q.  And did you personally speak to Doug Rice?

22     A.  I did.

23     Q.  And did you know him previously to speaking to

24  him?  with him?

25     A.  I was aware of him, 'cause he delivered services

1   to the facility when they were a inspection team or business

2   set up on the islands.

3      Q.  And who suggested that you speak to Doug Rice?

4      A.  I was looking for a contact to ask questions about

5   certification we had.  That's the only number I could find.

6      Q.  So you decided to call Doug Rice; is that right?

7      A.  I did.  I did, yes.

8      Q.  And when you called Doug Rice, what did you tell

9   him you were contacting him for?

10     A.  I said, we had certificates that showed anomalies

11  on there.  I asked him if he could look up those particular

12  certificates in their system.

13     Q.  Did you tell him what you thought the anomalies

14  were?

15     A.  We talked about the test numbers.  That's all I

16  can recall talking to him about.

17     Q.  When did you have this conversation with Doug

18  Rice?

19     A.  I recall it was sometime in July 2021.

20     Q.  Okay.  And did you have this contact with Doug

21  Rice before you got the statement of Guillermo Castro as to

22  how the certificates were issued, or after?

23     A.  Sorry, ma'am.  We didn't have a contract with him.

24     Q.  Did you have contact with Doug Rice?  I'm sorry,

25  it wasn't contract.  It was contact.

1        Did you have this contact with Doug Rice

2   before or after Guillermo Castro issued his statement as to

3   how he issued the certificates?

4      A.  I believe it was before.

5      Q.  And so the anomalies that you discussed were the

6   numbers on the test.

7        And what else?

8      A.  Was this -- sorry.  Are you asking the

9   conversation with Doug Rice?

10     Q.  Yes, sir.

11     A.  Okay.  I had a number of discussions with Doug

12  Rice.

13     Q.  No.  I'm talking about the first discussion.

14     A.  It was -- first discussion, he was driving.  I

15  said, I wanted to check on certification.  We never got into

16  the detail at that particular time, as he was driving.

17     Q.  Okay.  And how many conversations did you have

18  with Doug Rice?

19     A.  I recall two.

20     Q.  So does that include the one where he was driving?

21     A.  That -- it did, yes.

22     Q.  Okay.  And when did you have the second

23  conversation with Doug Rice?

24     A.  It was, if I recall correctly, two or three hours,

25  maybe, after.  Maybe two hours, I don't recall exactly,

1   after the initial call.

2      Q.  So before you got the statement from Mr. Castro

3   about how the -- how the certificates were issued?

4      A.  I never received a statement from Guillermo Castro

5   direct, no.

6      Q.  No, sir.  I didn't ask you if you received it

7   direct.  I just asked you the statement.  Doesn't have to be

8   sent to you directly.

9        Did you ever see --

10     A.  Okay.

11     Q.  -- the statement from Guillermo Castro, sir?

12     A.  It was forwarded to me, yes.

13     Q.  Okay.  So, sir, was this second conversation

14  before or after that statement was received by someone at

15  IPOS?

16     A.  Before.

17     Q.  And what was the substance of the second

18  conversation you had with him?

19     A.  Doug Rice wanted further details from the

20  certificate.  So I gave him all the details that were

21  contained verbally in that certificate, so he could check.

22  If he could find it, and the contents of it.

23     Q.  So what details did you give him?  What types of

24  details?

25     A.  I gave him the -- if I recall correctly, the

ANDREW DAVID CANNING -- DIRECT

1  certificate number.  The technician undertaking the
2  assessment.  And some other key details that he required to
3  look the certificate up in their records.
4      Q.   Okay.  Did he do that while you were on the phone?
5      A.   I can't recall, exactly.
6      Q.   Well, when did you find out what he found out?
7      A.   The same day.
8      Q.   Okay.  Was that the third conversation?
9      A.   I don't recall.  It may well have been.
10     Q.   And what did he tell you?
11     A.   He told me that he checked my records.  That the
12  records number didn't match anything they had on their
13  records.
14          He also pointed out that Acuren had left the
15  island, I believe, if I recall correctly, in 1999, and the
16  test equipment referenced in those documents was removed
17  from site at that time, so they wouldn't have been able to
18  do the test.
19          And he also checked on the employment status
20  of Mr. Castro, and said he hadn't -- he had no records of
21  him working in the last six months.  Those, I think, were
22  the main details.
23     Q.   Did he know Mr. Castro?
24     A.   No.
25     Q.   So how did he determine what credentials

ANDREW DAVID CANNING -- DIRECT

1  Mr. Castro had?
2          MR. SIMPSON:  Objection.
3      Q.   (Ms. Rohn) If you know.
4      A.   It was written on the certificate.
5      Q.   Were you aware that Mr. Castro had certified all
6  the welders at HOVENSA?
7      A.   No.
8      Q.   Were you aware that Mr. Castro had certified all
9  the welders at Diageo?
10         MR. SIMPSON:  Objection.
11     A.   No.
12     Q.   (Ms. Rohn) Did you do anything to investigate
13  whether or not Mr. Castro (sic) had tried to contact
14  Mr. Castro?
15     A.   Sorry.  Could you repeat that?
16     Q.   Did you do anything to try to contact Mr. Castro?
17     A.   Did I ever have contact?
18     Q.   Yes.  Did you try to contact him?
19     A.   No.
20     Q.   Did -- were you aware that Mr. Castro offered to
21  have a conversation with you, IPOS, in general, about the
22  certificates and how they were issued and his
23  qualifications?
24         MR. SIMPSON:  Objection.
25     A.   I recall an e-mail that was forwarded to me at

ANDREW DAVID CANNING -- DIRECT

1  some stage where that was mentioned, I believe.
2      Q.   (Ms. Rohn) Did you ever take him up on that offer?
3      A.   No.
4      Q.   To your knowledge, did anyone from IPOS ever take
5  him up on that offer?
6      A.   I have no knowledge of that.
7      Q.   Do you have any knowledge of anyone at IPOS taking
8  him up on that offer?
9      A.   No.
10     Q.   Do you know why no one took him up on that offer?
11     A.   No.
12     Q.   Were you ever made aware of the fact that he
13  offered to come and recertify every one of those welders at
14  IPOS?
15     A.   I recall there was something in the communications
16  that were forwarded to me at some stage.
17     Q.   Did you take him up on that offer?
18         MR. SIMPSON:  Objection.
19     A.   No.
20     Q.   (Ms. Rohn) Do you know -- to your knowledge, did
21  anyone at IPOS take him up on that offer?
22     A.   Not that I know of.
23     Q.   Do you know why people didn't -- the people at
24  IPOS didn't take him up on that offer?
25     A.   I have no knowledge.

ANDREW DAVID CANNING -- DIRECT

1      Q.   Nobody ever discussed with you in e-mails about
2  why they didn't want to do that?
3      A.   Not that I recall.
4      Q.   Did you ever advocate that -- that the
5  certificates were forged?
6          MR. SIMPSON:  Object to the form.
7      A.   I said, I recall that I raised the fact there were
8  anomalies or apparent anomalies in the certification.
9      Q.   (Ms. Rohn) Did you ever use the word "forged"?
10     A.   Not that I recall.
11     Q.   Did you advocate that Petro -- Petro's contract be
12  terminated?
13     A.   Sorry.  Could you repeat that?
14     Q.   Did you advocate that Petro's contract should be
15  terminated?
16     A.   Could you define what "advocate" means?
17     Q.   Think it's a good idea.  Tell people they ought to
18  do it.  Suggest that they ought to do it.
19         MR. SIMPSON:  Objection.
20     A.   I don't recall that, no.
21     Q.   (Ms. Rohn) To your knowledge, was Petro's contract
22  terminated?
23     A.   I did receive information in an e-mail that the
24  contract had been terminated.
25     Q.   Do you know who made the decision to terminate his

ANDREW DAVID CANNING -- DIRECT

1  contract?  Its contract?
2      A.   I believe it was IPOS.
3      Q.   Do you know who, at IPOS, made that decision?
4      A.   I don't for sure.
5      Q.   Do you know what part David Smith had in that
6  decision?
7      A.   I have no knowledge of that.
8      Q.   Do you know what part Garry Stoker had in that
9  decision?
10     A.   I have no knowledge of that.
11     Q.   At some point, was Optis's contract terminated?
12         MR. SIMPSON:  Object to the form.
13     A.   Terminated.  Sorry.  Could you be more specific?
14     Q.   (Ms. Rohn)  Yes.
15         At some point, did you stop working at the
16  terminals?
17     A.   Yes.
18     Q.   Okay.  And when did you stop working at the
19  terminals?
20     A.   October/November 2022.
21     Q.   Why did you stop working at the terminals?
22     A.   'Cause the VVIC contract was ended.
23     Q.   How long did you -- well, had there been more than
24  one contract between Optis and IPOS or VVIC?
25         MR. SIMPSON:  Object to the form.

ANDREW DAVID CANNING -- DIRECT

1      A.   Sorry.  Could you repeat the question?
2      Q.   (Ms. Rohn)  Had there been more than one contract
3  between Optis and VVIC?
4      A.   No.
5      Q.   Okay.  And what was the term -- did the original
6  contract have a term, or was it an open-ended contract?
7      A.   The initial contract was for one year.
8      Q.   And had it already expired by the time the July
9  event in 2021 had occurred?
10     A.   July 2021?  No.
11     Q.   Okay.  When did it expire?
12     A.   It would have expired -- the first term would have
13  expired in December 2021.
14     Q.   And was there a new contract put in place?
15     A.   No.  It was extended.
16     Q.   So why was the extension discontinued in October
17  of 2022?
18     A.   I have no knowledge.
19     Q.   How did you learn that the extension was no longer
20  going to be extended?
21     A.   A letter of notification was sent out to the
22  managing director of Optis.  And prior to that, I'd received
23  a telephone call from Sebastian Moretti.
24     Q.   And what did Mr. Moretti tell you?
25     A.   He said, the contract was going to be ended.

ANDREW DAVID CANNING -- DIRECT

1      Q.   Did he tell you why?
2      A.   Not that I recall.
3      Q.   Did you ever learn why?
4      A.   Under the contract, there needn't be a reason.
5  So, no, I never learned the reason why they made that
6  decision.
7      Q.   Where did you go to work after that?
8      A.   I've done consultancy activities to support WAPA.
9      Q.   To support WAPA?
10     A.   Yes.
11     Q.   And when did that begin?
12     A.   I did activities -- I'll have to find the dates.
13  January this year.
14     Q.   And what consulting did you do for WAPA?
15     A.   Wartsila Phase II.
16     Q.   I'm sorry.  I couldn't hear that.
17     A.   Wartsila Phase II.  LPG supply to the new direct
18  injection power generation units.
19     Q.   And how long did you do that consulting work?
20     A.   Initially, it was one month, waiting on a contract
21  revision.
22     Q.   I have no clue what that means.
23         How long did you do that work, beginning in
24  January 2023?
25     A.   One month in terms of consultancy activities,

ANDREW DAVID CANNING -- DIRECT

1  waiting on a contract.
2      Q.   Okay.  Have you done any other work -- what
3  contract are you referencing?
4      A.   A contract I'm waiting on from WAPA.  A revised
5  contract.
6      Q.   How long have you been waiting for that contract?
7      A.   Since January, I guess.  Yes, since January.  I
8  don't guess.
9      Q.   Have you done any work for anybody else since
10  then?
11     A.   Only supporting individuals at the company.
12     Q.   What does that mean?
13     A.   Means that if there are any engineers that require
14  assistance in delivering their activities, then I provide
15  that assistance to them within the company.
16     Q.   Sir, because you're not a licensed engineer in the
17  United States, are you allowed to sign off on engineering
18  specifications?
19         MR. SIMPSON:  Objection.  Asked and answered.
20     A.   Could you repeat the question, please?
21     Q.   (Ms. Rohn)  Sir, because you're not a certified
22  engineer in the United States, are you allowed to sign off
23  on engineering specifications?
24         Oh, we went through this whole thing.  You're
25  right.  I did ask that.

101

1    MR. KAPLAN:  Can we take a five-minute break
2    or so?  I need to use the restroom.
3         MS. ROHN:  So it is -- hold on.  It's
4    12 o'clock.  I'm about to go into a new area, so I suggest
5    we take our lunch.  I'm going to have a lot to do still with
6    Mr. Canning, so half an hour for lunch, and then we'll
7    reconvene.
8         Is that good for everybody?
9         MR. SIMPSON:  I don't know how quickly we can
10   get lunch in 30 minutes, but we'll shoot for it.  Might be
11   closer to 45.
12        MS. ROHN:  All right.  Anybody else
13   complaining?  All right.
14        MR. KAPLAN:  So we're saying 12:00 -- 12:45,
15   is that what you just said?  I couldn't hear.
16        MS. ROHN:  No, I said 12:30.  Well, 12:40.
17   we'll compromise.
18        MR. KAPLAN:  Okay.  Thank you.
19        MR. SIMPSON:  Sounds good.
20        (Lunch recess taken.)
21   Q.   (Ms. Rohn) Mr. Canning, I hope you had a nice
22   lunch.
23   A.   It was okay.  Thank you.
24   Q.   Um-hum.  Mr. Canning, where do you presently live?
25   A.   In the UK.

102

1    Q.   And how much time do you spend in the Virgin
2    Islands now?
3    A.   A lot less than I used to.
4    Q.   That doesn't tell me anything.
5    A.   Sorry.  Yeah.  Probably spent a month in the
6    last -- where are we?  What month are we?  In the last five
7    or six months, yeah.
8    Q.   Did you -- when you were here, did you -- did you
9    have -- did you own property?  Did you -- had you moved
10   partially here?
11   A.   I rented property.  And I don't know, when you say
12   "moved partially here," I spent a reasonable time here.
13   Q.   How much time, because of your immigration status,
14   can you not be here?
15   A.   I can be here any time up to 90 days, and then
16   normally I take two to three weeks out.
17   Q.   I'm going to start using some exhibits.  Karima,
18   I'm about to need your sharing help.
19        (Respite.)
20        Can you show -- Karima, can you show
21   Exhibit 1, please?
22        (Deposition Exhibit No. 1 was
23        marked for identification.)
24        Karima, it's not showing.
25        (Respite.)

103

1         Can you see that, Mr. Canning?
2    A.   I can, yes.
3    Q.   And there is a e-mail on the screen from yourself
4    to Tim -- I call him Tim K., because I have a hard time with
5    his last name.
6    A.   Yes.  There's an e-mail showing now to Tim, I
7    think.
8    Q.   Correct.
9    A.   Okay.  I'm sorry.  I thought you said the other
10   way around, yeah.
11   Q.   And this is on the truck rack design
12   inconsistencies, correct?
13   A.   That's what the first paragraph says, yes.
14   Q.   Well, it's the subject, truck rack design
15   inconsistencies, correct?
16   A.   Oh, yes.  Yep.
17   Q.   How often would you send e-mails similar to this
18   to Tim K.?
19        MR. SIMPSON:  Objection.
20   Q.   (Ms. Rohn) Similar in the sense of noting problems
21   with something that's going on at the terminals?  The
22   propane terminals.
23   A.   In this particular case, it relates to the truck
24   rack, which was a Vitol/VVIC installation.  It was separate
25   to the IPOS operation.  And this, generally speaking, when

104

1    Petro Industrial identified problems with the information
2    sent from Polaris, so it would vary on whatever they're
3    working on at any particular time.
4    Q.   And why would this be sent to -- I now get that
5    this is a VVIC project, but why would, on a VVIC project,
6    would you send this to Tim K.?
7    A.   Tim is the interface between Polaris and VVIC in
8    terms of the design.  It was -- the design was produced by
9    Polaris, but as I say, it was actually a VVIC/Vitol
10   installation, so he was the point of contact.
11   Q.   He was the point of contact for whom?
12   A.   Between Polaris/Vitol/VVIC, and installation,
13   so -- going on.
14        So Petro, in this particular case, approached
15   me to clarify drawings.  What year is it?  Yeah, that was
16   before I was a VVIC contractor.
17   Q.   Sir, point of contact for whom?
18   A.   For -- between the project installing it, and the
19   technical authority design of Polaris.
20   Q.   Sir, my question is, you said he's a point of
21   contact.
22        Is he a point of contact for VVIC?  Is he a
23   point of contact for Polaris?  Who is he the point of
24   contact to?
25        MR. KAPLAN:  Objection.  Asked and answered.

ANDREW DAVID CANNING -- DIRECT

1    Q.   **(Ms. Rohn)** Answer my question, please.

2    A.   Sorry. Yes. He was the VVIC representative.

3 Polaris was the designer. Any questions that came from the

4 project were routed through Tim to keep a single point of

5 contact for any information required.

6    Q.   Thank you.

7         Exhibit 4.

8         (Deposition Exhibit No. 4 was

9         marked for identification.)

10         This is an e-mail, October 3rd, 2019, from

11 yourself to David Smith, Rawle Granger, and copied to

12 yourself.

13         Why did you have a VTTI.com e-mail address?

14    A.   Everyone working at the facility had a VTTI --

15 sorry, involved with IPOS, directly, had a VTTI.com e-mail.

16    Q.   So why did you send -- originally send it from

17 your Optis address?

18    A.   The -- this would have come -- let me have a look.

19 This was while I was on St. Thomas. The internet connection

20 there wasn't good, so I had to resort to using the internal

21 e-mail to get a lot of communications in and out.

22    Q.   Okay. This e-mail says, "Gentlemen, Although

23 PIC" --

24    A.   PIS, yeah.

25    Q.   "Although PIC (sic) have received notification

Susan C. Nissman, RPR-RMR
(340) 773-8161

ANDREW DAVID CANNING -- DIRECT

1 this morning from Eric Douglas that the permits for the

2 trunk loading rack installation are ready for collection, I

3 have compiled the permit disclaimer which I suggest we

4 include as an attachment or copied onto the reverse of IPOS

5 safe work permit and have this disclaimer referenced on the

6 front of the permit under the section 'Special operational

7 attention for.'"

8         Who's Eric Douglas?

9    A.   If I recall correctly, Eric Douglas was a Virgin

10 Islands specialist in environmental requirements for the

11 government.

12    Q.   Who did he work for?

13    A.   He was an independent contractor, but he was

14 engaged by IPOS, I believe.

15    Q.   And why would you be involved in what's stated on

16 permits?

17    A.   I was part of the operations team.

18         In this particular case, if I recall

19 correctly, this was -- is it possible to scroll down? Is

20 there an earlier?

21    Q.   That's it. That's it.

22    A.   That's it. Yeah, my recollection of this was,

23 from my past perspective, we still had work to do to get the

24 safety approvals for the truck rack.

25         This was related to some work activities that

Susan C. Nissman, RPR-RMR
(340) 773-8161

ANDREW DAVID CANNING -- DIRECT

1 VVIC were asking us to progress. And it was a best

2 endeavors requirement to get the work done, so that's why we

3 thought it prudent to have a disclaimer. Yeah.

4       **MR. SIMPSON:** Counsel, I'm going to adjust

5 the screen. Before you go, I'm just going to adjust the

6 screen, because the Zoom interface is covering up a part of

7 the exhibit.

8       **MS. ROHN:** Not on my screen.

9       **MR. SIMPSON:** No. It's here. That's why I

10 adjusted it, so now he can see the whole document.

11    Q.   **(Ms. Rohn)** Okay. Next sentence says --

12    A.   Sorry. Yes, I can see it now. Okay.

13    Q.   Says, "As discussed, the permit Holder should be

14 jointly identified as Vitol & PIS."

15         Why did you put that?

16    A.   Sorry. Where? I don't see that at the moment.

17    Q.   It's the last sentence on the first paragraph.

18    A.   "The permit Holder should be jointly identified as

19 Vitol & PIS."

20         If I recall correctly, there was -- PIS were

21 engaged directly with Vitol, and so the permit would be

22 identified as Vitol and PIS. It was -- sorry.

23    Q.   Go ahead.

24    A.   No, although it would have been issued by IPOS as

25 the area of authority.

Susan C. Nissman, RPR-RMR
(340) 773-8161

ANDREW DAVID CANNING -- DIRECT

1         Yeah, it was -- it was -- I can't remember

2 the exact reason, but there was a reason for Vitol and PIS

3 to be identified on the permit.

4    Q.   And which Vitol are you referencing?

5    A.   In terms of the ownership of the truck rack. I'm

6 unclear of who the owner -- owners were who purchased it. I

7 believe it was Vitol, but it may well have been installed

8 with the intention of it becoming an asset for VVIC.

9    Q.   Okay. So which Vitol are you referencing? When

10 you say, it might have been Vitol, are you Vitol, Inc., or

11 which Vitol are you referencing?

12    A.   I'm unaware of the various divisions in Vitol. I

13 only knew them as Vitol or VVIC.

14    Q.   Exhibit 8.

15         (Deposition Exhibit No. 8 was

16         marked for identification.)

17         This is an e-mail chain that starts -- this

18 is an e-mail chain that starts with Canning 131.

19         Canning 131. There it goes. It starts with,

20 "Good Day, Shirley. As requested January and February log

21 of 2018."

22         And then there's a response from Cyla

23 Gooding. "This is not what I need. I wanted the actual

24 logs the guards used to sign people in on. I'm needing to

25 see employees for Vivot being signed in on the logs."

Susan C. Nissman, RPR-RMR
(340) 773-8161

1      So let me ask you this first.  This is from
2  2019.
3          How were employees signed in to the job in
4  2019 on St. Croix?
5          MR. SIMPSON:  Objection.
6      Q.  (Ms. Rohn)  You may answer.
7      A.  In this particular case, this relates to Vivot
8  Corporation in 2019, so post hurricane.  It would have been
9  daily timesheets completed by the appropriate Vivot
10  supervisor, signed, and then forwarded for review and
11  verification.
12     Q.  So why would somebody be asking for the guard logs
13  signing people in?
14         MR. SIMPSON:  Objection.
15     A.  In this particular case, it's unclear who was
16  actually -- kind of looks like it's Cyla Gooding that I read
17  on this.
18         There are invoice disputes that went back
19  around the hurricane period, when Vivot Corporation were
20  assisting with the recovery projects.  There were disputes
21  on the entries that were on those logs.  I'm sorry.  On
22  those timesheets for the particular period.
23     Q.  (Ms. Rohn)  Why question -- the question is, why
24  would it be asking the guards signing in people?
25         MR. SIMPSON:  Objection.

1      A.  The -- my recollection of this is these timesheets
2  went back to post-hurricane 2017, typically through 2018.
3  There was -- they claimed to be doing jobs at Carambola
4  putting roofs on.  At WAPA putting switch gears rooms up.
5  We --
6      Q.  (Ms. Rohn)  Sir, could you answer my question?
7      A.  I'm just -- if you bear with me just for a second.
8      Q.  Sir, I thought we had a discussion?
9          MR. SIMPSON:  Yeah, we did.
10         MS. ROHN:  I ask a question, you answer that
11  question.
12         MR. SIMPSON:  Right.  And we don't tell you
13  how to ask the question, and you don't tell us how to answer
14  the question.
15         MS. ROHN:  Oh, you tell me all the time how
16  to ask a question.
17         MR. SIMPSON:  Stop interrupting him.
18     Q.  (Ms. Rohn)  Sir, I don't care -- I don't care to
19  hear all the work you were doing after the hurricane.
20  That's not my question.
21         MR. SIMPSON:  And that wasn't his answer.
22     Q.  (Ms. Rohn)  Why were the guards signing in workers?
23         MR. SIMPSON:  He was answering your question.
24  Do you want him to answer it or not?
25         MS. ROHN:  I'm not having a dialogue with

1  you, Andy.
2      Q.  (Ms. Rohn)  Sir, can you explain -- isn't it true,
3  sir, that in St. Croix, the security guards would sign in
4  what time people came to work?
5          MR. SIMPSON:  Object to the form.
6      A.  That's incorrect.
7      Q.  (Ms. Rohn)  Okay.  So are you telling me that in
8  St. Croix, during the time that you worked there, no
9  security guard signed in on a log when workers came to work?
10         MR. SIMPSON:  Objection.
11     Q.  (Ms. Rohn)  Is that what you're saying, sir?
12     A.  Sorry.  Could you repeat the question?
13     Q.  Are you telling me that during the time that you
14  worked for IPOS, that no guards on St. Croix signed workers
15  in on a -- on a log at the gate?
16         MR. SIMPSON:  Objection.
17     Q.  (Ms. Rohn)  Is that what you're saying, sir?
18     A.  Sorry.  Could you just repeat that again?  I'm
19  just trying to get my head around the --
20     Q.  Is it your testimony that during the time that you
21  worked at IPOS, that on no occasion, did guards sign on a --
22  on a gate log when employees of contractors came to work?
23         MS. FRANCIS:  Objection to form.  Misstates
24  the record.
25     Q.  (Ms. Rohn)  Please answer my question.

1      A.  It varied.  Generally speaking, IPOS people were
2  signed in by the --
3      Q.  (Ms. Rohn)  I said contractors.
4      A.  Contractors signed themself in, generally.
5      Q.  And they signed themselves in.
6          Where do you claim they signed themselves in,
7  generally?
8          MR. SIMPSON:  Objection.
9      A.  At the gate, and on the sign-in log.
10     Q.  (Ms. Rohn)  What was the purpose for having them
11  sign themselves in at the gate?
12         MR. SIMPSON:  Objection.
13     A.  In case there was an emergency.  Obviously, when
14  we -- obviously, but when we evacuate the facility, we need
15  to understand if everyone's accounted for.
16     Q.  (Ms. Rohn)  Why would they need to know the time?
17     A.  So we knew if they were on site when the alarm
18  went off.
19     Q.  Well, wouldn't they give the time when they left?
20     A.  My understanding, reading the logs, and when I
21  looked at when I was signing in, they would sign people out.
22  There's only two entries.  In and out.  When they actually
23  left the site at the end of the day.
24     Q.  All right.  And so there is -- if you go to Bates
25  Stamp 130, there's -- at the bottom of the page, there's an

1  e-mail from Cyla Gooding in June 2019 to David Smith, and
2  copies to you.
3       "This was the e-mail sent yesterday from
4  Vivot.  They want to set up a conference call with you and
5  Andrew before the week is done."
6       And you write an e-mail to David Smith.
7  "Shirley used to work for VTTI as the office manager under
8  Paul Elkes and has now been recruited by Vivot."
9       A.  Sorry.  I can't see that.
10      Q.  Karima, please scroll up.
11          I forgot to give you the cue.  Sorry, Karima.
12      "Shirley used to work for VTTI as the office
13 manager under Paul Elkes and now been recruited by Vivot.
14 we have had" -- there's a hole punch in mine.  Okay.
15      "Some brief communications since she started
16 about the invoices that were passed over by Carlotta."
17      And it goes on to say, "The last
18 communication was by text last Friday when I reiterated,
19 excuse me, that all we needed was the timesheets to support
20 the invoices.  Unfortunately, it seems that they do not seem
21 to have them and they have suggested -- suggested in the
22 past payroll records or gate logs."
23      So Vivot had, indeed, been using gate logs,
24 correct?
25      **MR. SIMPSON:**  Objection.

1       A.  Can I ask what the question is about?  Whether
2  it's about invoicing or whether they were using gate logs.
3       Q.  **(Ms. Rohn)**  Gate logs to determine the times their
4  men worked?
5       A.  That's not how it reads, ma'am.
6       Q.  Okay.  Goes on to say, "As I pointed all the
7  invoices for the period submitted to IPOS covered work being
8  undertaken at WAPA, Diageo, Carambola, and the port as well
9  as IPOS recovery works (all on one set of timesheets) and
10 that once returned Vivot marked up with IPOS the tasks then
11 Vivot had reduced their claims by around 30 to 60% after
12 correction.  I don't see why payroll records would provide
13 any better indication of work actually undertaken at IPOS,
14 or gate logs for example as all the vivot personnel working
15 at WAPA were signing in as the IPOS gate before going into
16 WAPA."
17      Do you see that?
18      A.  I do.
19      Q.  So the workers were indeed signing in at the IPOS
20 gate, correct?
21      A.  That's correct.
22      Q.  All right.  And that David asked, "Thanks, Andrew.
23 I responded before I got to this."
24      A.  Sorry.  I'm not seeing --
25      Q.  Please scroll up.  It's my fault.  I'm supposed to

1  say, scroll up, and I didn't.
2       It says, "Thanks, Andrew.  I had responded
3  before I got to this.  Didn't they send the timesheets
4  originally?  Is that why they don't want to send them
5  anymore?"
6       Did they sign the timesheets originally?
7       A.  I don't recall the detail on this.
8       Q.  If you go to 129.  We're going to find out,
9  because you answer.
10      129, at the bottom.  "They sent invoices with
11 a payroll summary without a full set of supporting
12 timesheets for the ones processed and in dispute, and wanted
13 to substitute payroll information for personnel as evidence
14 of work on IPOS projects.  As I said, numerous timesheets
15 contain man hours for work clearly identified on the
16 timesheet as being at other sites (hence the 30 to 60%
17 reduction they applied by correcting the figure before
18 resubmission) but still fully billed to IPOS so my argument
19 is" --
20      A.  Sorry.  I can't see that.
21      Q.  Sorry.  Next page, please.  Go back to 130.
22      "So my argument is how would payroll records
23 have been an accurate indication of those weeks and why
24 would they be anymore representative of the weeks in
25 dispute?

1       what really riles me is that Shirley
2  contacted me and agreed to look at the disputed invoices on
3  the understanding she would pull all the information
4  together and contact me - instead we get the e-mail sent by
5  Cyla."
6       So did vivot ultimately lose the ability to
7  bill for the certain employees because they relied on
8  gate -- gate sheet sign-ins?
9       A.  Would you like me to answer this as read, or as
10 relayed by yourself?
11      Q.  No.  I'm asking you a question.
12      Did they ultimately lose the ability to get
13 paid for certain of their employees?
14      A.  Not that I recall.
15      Q.  Okay.  This e-mail goes on to say from David to
16 you.  Go to the first, Page 129.  Go up.  Too up.  Go down.
17 Go down.  Right there.
18      "Thanks, Andrew.  Yes, I just sent several
19 examples.  They have timesheets.  They have always been
20 tough to nail down.  But I think best thing is for us to
21 continue to state the obvious.  We don't pay anyone without
22 timesheets."
23      And then you respond back, "Perhaps I am just
24 being mean .... Again."
25      What were you referencing, sir?

ANDREW DAVID CANNING -- DIRECT

A. I was referencing a comment that David Smith and I had shared, when I told David Smith that we really can't justify paying Vivot for work that they did at Carambola to replace the roofs. And he said at that time, I think you're being mean.

Q. All right. So you say, "Perhaps I'm just being mean .... Again." And then David says, "No, I don't want to pay if we don't have proof." And then you say, "I just like being mean I think .... (NIS, VIVOT, PIS, CSI....)"

What did you mean by that, sir?

A. Following the comment I just made. It was a comment that David Smith made about not -- we discussed about the roofs at Carambola, and I said, we, you know, can we really justify paying for the roofs at Carambola?

Q. So, sir, why did you say, "I just like being mean"?

A. It was just following up on the comment.

Q. And why did you -- why did you list NIS, Vivot, PIS, and CSI?

A. I can't remember the context of that.

Q. Isn't that all the contractors that you were mean to?

A. I don't recognize CSI. And I do remember being mean to the contractors in -- working on roofs at Carambola.

Q. Okay. Exhibit 28.

ANDREW DAVID CANNING -- DIRECT

(Deposition Exhibit No. 28 was marked for identification.)

All right. This is your Interrogatory Number 5.

And it asks, "Please describe in detail your involvement, influence, approval, authorization, supervision, management, direction, control, instruction, and/or decision making with respect to any work performed by Plaintiff at the WAPA Propane Facilities in St. Thomas and St. Croix at any time from 2018 to 2021, identify the entity which granted you this authority, and provide all applicable dates."

So I'm really questioning the last paragraph. You stated under oath. Scroll up.

"I had no approval, authorization, supervision, management, direction, control, instruction and/or decision making with respect to work performed by PIS."

That's your statement under oath, is it not, sir?

A. That's correct.

Q. But, sir, in e-mails that we're going to look at, and e-mails that you sent, you made suggestions, did you not, as to what you thought people would -- should be doing, and you were in charge of overseeing the project for safety,

ANDREW DAVID CANNING -- DIRECT

for financials, in all those regards, were you not, sir?

MR. SIMPSON: Objection.

Q. (Ms. Rohn) You may answer.

A. No, that's not true. No, that's not true.

Q. What's incorrect about that?

A. The statement you just made.

Q. What's incorrect about the statement?

A. If you'd like to --

Q. what -- what was your purpose of being there as a consultant?

A. The eyes and ears of the client, and advising.

Q. Okay. And the eyes and ears of the client for what?

A. The operation, IPOS.

Q. Did that include safety?

A. I can comment on safety, yes.

Q. Would that include expenditures?

A. I was asked to verify the correlation between timesheets, if that's what you mean by expenditures.

Q. Does that include whether or not the work was being done correctly?

A. I can make observations against the procedures and the codes that are applicable.

Q. Okay. Exhibit Number 30.

(Deposition Exhibit No. 30 was

ANDREW DAVID CANNING -- DIRECT

marked for identification.)

Okay. This is Interrogatory Number 7. "Please describe in detail all communications between you or anyone on your behalf and any Co-Defendants in this matter concerning in any manner the estimate and/or bid submitted by Plaintiff for the project for the one-inch vent line for which a request for bids was published in or about June 2020, including but not limited to, any communications wherein you claimed that Plaintiff had stolen information from Traeger Brothers, and identify all persons involved in each communication."

And you say under B, "I did not claim" --

A. Sorry. Please scroll down.

Q. You say in B, "I did not claim, and am not aware of any communication with codefendant in which I claimed, that PIS had stolen information from Traeger Brothers."

You said that under oath, correct?

A. Correct.

Q. Okay. Sir, do you not require -- remember a meeting that you had with Merlin Figueira?

MR. MELENDEZ: Figueira.

Q. (Ms. Rohn) Figueira. Figueira about the -- whether or not inappropriate information from Traeger Brothers had been used?

MR. SIMPSON: Objection.

**Page 121**

1    A.   I don't recall that meeting.

2    Q.   (Ms. Rohn)  Sir, you don't recall Mr. Melendez

3  being in that meeting with you and Mr. Merlin Figueira?

4    A.   I don't recall that meeting.

5    Q.   Exhibit 32.  Oh, 31.

6         (Deposition Exhibit No. 31 was

7         marked for identification.)

8         Keep going.  Keep going.  There we go.  This

9  is Interrogatory Number 10.

10         "Please identify by date and describe in

11  detail all complaints, criticisms, and negative or

12  unfavorable remarks you made about Plaintiff, including, but

13  not limited to, remarks that Plaintiff did shabby work,

14  caused incidents, forged time sheets, recorded false times,

15  worked, provided false welders' certificates, or did

16  improper welds, identify the forum in which each remark was

17  made, identify by name, employer, and job title all persons

18  to whom these complaints, criticisms, or remarks were made,

19  and describe all facts which support each such remark."

20         And your answer, "See my e-mail of

21  January 22nd, 2021 sent at 2:44 to David Smith and Merlin

22  Figueira in which I described PIS workers as 'struggling for

23  many reasons to make what I consider to be reasonable

24  progress.'  In that e-mail, I noted that there had been

25  numerous occasions over the previously two weeks that would

**Page 122**

1  'appear to have been instigated intentionally to stall the

2  progress of the installation' and then described those

3  occurrences under the categories of 'poor timekeeping';

4  'apparent loss of materials'; 'poor workmanship'; and' --

5  scroll down, please -- "'Apparent lack of tools and or

6  ability to use them.' I included -- I concluded by stating.

7         As far as I am concerned the performance,

8  timekeeping, quality of work and overall abilities/

9  objectives of the following individuals has been

10  unacceptable on a number of levels both in the RIO shade

11  installments on St. Croix and during the Reverse Flow

12  installation work on St. Thomas.  If this is not the case

13  then I can only assume that they are complicit with PIS in

14  an objective of maximizing the earnings for PIS from time

15  and material activities.

16         PIS welding team individuals involved in the

17  underperforming installation activities:  Elias Rivera,

18  Ricardo" --

19    A.   Can you please scroll, please.

20    Q.   Please keep scrolling, Karima.

21         "Elias Rivera, Ricardo Velazquez, and Juan

22  Guigliotty."

23         What was the race of those three people?

24    A.   Spanish American, I believe.

25    Q.   And then you have here, "My recommendation is that

**Page 123**

1  these individuals be removed/barred from attending the site

2  in future and classified and 'Not Required Back' for any

3  current or future VITOL project work and also any work that

4  PIS may want to engage them in for IPOS operations

5  activities associated with VITOL assets."

6         Does that refresh your recollection about

7  complaining of three of the employees and requesting they be

8  removed from the job?

9    A.   I made a recommendation, but, yes, it does refresh

10  my memory.

11    Q.   It wasn't -- it was a recommendation, right, sir?

12    A.   That's correct, I suppose.

13    Q.   And you're the eyes and ears of the owner,

14  correct, sir?

15    A.   What date was this?  Whether this was the owner or

16  the operator.  I can't remember the date.  But, yes, that

17  was my role under both contracts.

18    Q.   So why wouldn't someone follow the eyes and ears

19  of the owner?

20    MR. SIMPSON:  Objection.

21    A.   Could you be more specific on that, please?

22    Q.   (Ms. Rohn) Sir, as a result of this e-mail, those

23  three people were barred from working at the propane

24  terminals, correct?

25    A.   I believe that was what IPOS decided to do.

**Page 124**

1    Q.   And why did you blind-copy Garry -- well, let's go

2  to the next one.  Scroll down.

3         In January 28, 2021, e-mail to Figueira and

4  Smith.

5    A.   Sorry.  You're going the wrong way.

6    Q.   Yeah, going the wrong way.  There you go.

7         "In a January 28, 2021 e-mail to Figueira and

8  Smith, with a blind copy to Garry Stoker, I contrasted this

9  work with the work of three other PIS employees who I

10  described as having done 'excellent work.'"

11         My question to you is, why would you be

12  blind-copying Garry Stoker?

13    A.   I don't recall the purpose for that.

14    Q.   Well, does Garry Stoker work for VVIC?

15    A.   He works for VTTI.

16    Q.   Did he work for IPOS?

17    A.   I don't think he was an employee of IPOS, no.

18    Q.   What do you understand that the relationship was

19  between VTTI and IPOS?

20    MS. FRANCIS:  Objection.  Relevance.

21    Q.   (Ms. Rohn) You can answer.

22    A.   IPOS was the operating arm of VTTI for the Virgin

23  Islands Vitol.  Sorry, VVIC installations.

24    Q.   Okay.  And then you have "Although not a

25  'complaint, criticism or negative or unfavorable comment' by

ANDREW DAVID CANNING -- DIRECT

1  me, on August 31st, 2018, David Smith informed me in an
2  e-mail that Kenia Johny' with her last known address -- 'had
3  been terminated by PIS and that she alleged she was
4  terminated for refusing to 'pay Brian for work he didn't
5  perform at IPOS' and that PIS had told her to charge IPOS
6  'for 3 folks that didn't show up 'because we [IPOS] wouldn't
7  know.'"
8        Sir, do you have any actual facts about this?
9        MR. SIMPSON:  Objection.
10       A.   You want me to just read that again?
11            I believe I have an e-mail that I received
12  from David Smith.
13       Q.   (Ms. Rohn) Right.  Who passed on a rumor, correct?
14       A.   Sorry.  Could you say that last comment?
15       Q.   Which passed on a rumor, correct?  He never talked
16  to Ms. Johny?
17       MR. SIMPSON:  Objection.
18       A.   I -- I have no knowledge whether David Smith
19  talked directly with Kenia.  It said she informed me by --
20  sorry.  David Smith.  I don't know whether she talked to
21  David Smith or not.  I have no knowledge of that.
22       Q.   (Ms. Rohn) Do you know that Ms. Johny was
23  terminated because she wasn't coming to work, and she was
24  billing for hours where -- when she -- she was double-
25  billing, both her former employer and Petro at the same time

Susan C. Nissman, RPR-RMR
(340) 773-8161

ANDREW DAVID CANNING -- DIRECT

1  for the same hours?
2        MR. KAPLAN:  Object to the form of the
3  question.
4        Q.   (Ms. Rohn) You may answer.
5        A.   I have no knowledge of that.
6        Q.   And then you claim, under oath, "Although not a
7  'complaint, criticism or negative or unfavorable comment,'
8  based upon what appeared to me to be anomalies in the
9  evidence of welder performance qualifications provided by
10  PIS, I requested from IPOS in an email to Figueira and Smith
11  dated April 13, 2021, UTC welder qualification records for
12  the PIS welders working on the WAPA vent line and the IPOS
13  vent and drain systems."
14            That's -- that's correct?
15       A.   Sorry.  Did you ask that?  I missed that.  Sorry.
16  Is that a question?
17       Q.   Yes.
18       A.   Hold on.  Hold on.
19       MR. SIMPSON:  Wait, wait.  Is there a
20  question?
21       Q.   (Ms. Rohn) Yeah, I was about to ask it.
22       A.   Sorry.
23       Q.   You claim that the e-mails that you wrote about
24  IPOS were not complaints, criticisms, or negative, or
25  unfavorable comments; is that right?

Susan C. Nissman, RPR-RMR
(340) 773-8161

ANDREW DAVID CANNING -- DIRECT

1        A.   That's correct.
2        Q.   You claim that under oath, correct, sir?
3        A.   That's correct.
4        Q.   And then you pulled from another e-mail.  "Further
5  to our conversation this morning."  Oh, next page.  Sorry.
6        A.   Sorry.  Yeah, please scroll up.
7        Q.   "Further to our conversation this morning, I am
8  now as certain as I can be that the welders certification
9  presented by Petro Industrial Services isn't genuine."
10            You don't think that's a criticism, sir?
11       MR. SIMPSON:  Objection.
12       A.   No.  It's an observation, I believe.
13            (Cell phone interruption.)
14            (Respite.)
15       Q.   Sorry.  A doctor.  Sorry.
16            You don't think that's a criticism that
17  they're handing in certificates that aren't genuine?
18       MR. SIMPSON:  Same objection, and asked and
19  answered.
20       MS. ROHN:  Well, I couldn't hear his answer,
21  because I had a call.
22       Q.   (Ms. Rohn) Huh?
23       A.   No.  I believe it was an observation.
24       Q.   All right.  If you can go to the next page?
25            Right there.  No, go up, up, up.  Right where

Susan C. Nissman, RPR-RMR
(340) 773-8161

ANDREW DAVID CANNING -- DIRECT

1  you were.  Yeah.  Yeah.  Yeah.  Right in there.  Starts out
2  with "At best."  Can you scroll -- there you go.  That's
3  perfect.
4            "At best this falsification puts VTTI in a
5  very embarrassing position with VITOL and WAPA at worst it
6  compromises the lack of quality assurance compromises the
7  integrity of the asset not only for this work but for all
8  fabrication undertaken by this particular team and possibly
9  other previous fabrications undertaken by PIS 'certified
10  welders'."
11            You don't -- you don't consider that a
12  criticism?
13       MR. SIMPSON:  Objection.
14       A.   No.  I believe it's a statement of view of where
15  it puts VTTI and Vitol in respect to the integrity of the
16  pressure containment system.
17       Q.   (Ms. Rohn) Well, it's actually accusing PIS of
18  actually literally all the projects not having certified
19  welders, does it not?
20       MR. SIMPSON:  Objection.
21       A.   Without -- this was particular about the 3-inch
22  and 1-inch line, that I remember.
23            My recollection is that we hadn't seen the
24  welder certificates for a number of activities that PIS had
25  undertaken.  So without those particular certificates,

Susan C. Nissman, RPR-RMR
(340) 773-8161

ANDREW DAVID CANNING -- DIRECT

1  materials certs, there is question over the pressure

2  containment integrity of those systems.

3      Q.  **(Ms. Rohn)** Sir, what you're saying is, I think

4  it's quite possible that PIS has been working without

5  certified welders; isn't that what that says?

6            MR. SIMPSON: Objection.

7      A.  No. It effectively says, do we have the

8  certificates for the -- all the information that were

9  required for previous jobs that were undertaken?

10     Q.  Okay. Great. I'll let a jury interpret that.

11           MR. SIMPSON: Objection.

12     Q.  **(Ms. Rohn)** Sir, you say, "At best this

13  falsification."

14           Aren't you accusing Petro of falsifying

15  documents?

16     A.  Summary above states the provisional investigation

17  that I undertook, and the discussion I had with Doug Rice.

18  The evidence I had, at that stage, were these documents were

19  not issued by Acuren, as described on the documents. And

20  for that reason, my belief at that stage was they were

21  probably not genuine, and, therefore, potentially falsified

22  in terms of the information that was on -- contained in

23  those documents.

24     Q.  Sir, you don't say "potential falsification," you

25  say "falsification," don't you, sir?

ANDREW DAVID CANNING -- DIRECT

1     A.  I do.

2           MR. SIMPSON: Objection.

3     A.  I do.

4     Q.  **(Ms. Rohn)** And then you send a follow-up.

5           And you say, "I hope the foregoing

6  summaries -- summarises my concerns adequately and the

7  findings of a brief review of the facts," correct? You're

8  saying, as a fact, they falsified these documents?

9           MR. SIMPSON: Objection.

10     Q.  **(Ms. Rohn)** Did you not, sir?

11     A.  The inference there is they're facts. If you

12  scroll up, the particular communication, those are the facts

13  as put forward. The brief facts.

14     Q.  Okay. And then there's a follow-up e-mail, July

15  22nd, 2021, to Andreas Constantinou.

16           Who is Andreas Constantinou?

17     A.  VTTI global maintenance manager, I believe.

18     Q.  Why would you send this to him?

19     A.  Because VTTI allocated him to run the

20  investigation on the welding certifications.

21     Q.  And why is that?

22           MR. SIMPSON: Objection.

23     A.  It was --

24     Q.  **(Ms. Rohn)** Do you know why VTTI -- go ahead.

25     A.  Go on. Sorry. I was going to ask for

ANDREW DAVID CANNING -- DIRECT

1  clarification, anyway. Continue.

2     Q.  **(Ms. Rohn)** All right. Why would VTTI be

3  investigating this?

4           MS. FRANCIS: Objection.

5     Q.  **(Ms. Rohn)** Go ahead.

6     A.  It was a decision that VTTI made. It was -- had

7  serious consequences for the safety and integrity of the

8  plant, and so they wanted to allocate it to their corporate

9  group to investigate.

10     Q.  If you go to the next page.

11           All right. And scroll. Yeah, this is

12  another e-mail. And if you'll scroll down just a little

13  more. Scroll down a little more. There we go. There we

14  go.

15           In the middle of this, you say, "Finally."

16  See that, where it starts out, "finally"?

17     A.  Yes, I do.

18     Q.  "The number of defects identified by the 10%

19  radiography on stainless steel line is something that I find

20  quite worrying (up to 63% of the radiology images showed

21  defects), despite the acceptance by the NDT company, however

22  it is unclear who set the acceptance criteria."

23           Isn't there an ASME acceptance criteria, sir?

24     A.  There is.

25     Q.  Okay. And wasn't the company that did the

ANDREW DAVID CANNING -- DIRECT

1  certification of the welds Versal -- Versa Integrity?

2     A.  I believe they may have been the company, yes.

3     Q.  And wasn't that the exact same company that you

4  hired to then re -- go back, and re-check all the welds?

5           MR. SIMPSON: Objection.

6     A.  I have no knowledge of that.

7     Q.  **(Ms. Rohn)** So what would make you think that a

8  well-established welding testing certification company

9  wouldn't follow ASME guidelines?

10     A.  I don't make that inference.

11     Q.  Well, yes you do.

12           MR. SIMPSON: Objection.

13     Q.  **(Ms. Rohn)** "However it is unclear who set the

14  acceptance criteria limits."

15           That's inferring that they would not follow

16  the ASME guidelines, is it not, sir?

17     A.  No.

18           MR. SIMPSON: Objection.

19           (Respite.)

20     Q.  **(Ms. Rohn)** All right. Exhibit 46.

21           (Deposition Exhibit No. 46 was

22           marked for identification.)

23           And when you get there, Karima, they're not

24  in -- they're not in numerical order. So you just have to

25  go from the beginning. And the first e-mail I want to talk

133

1  about is about two, three -- the 11th page.
2         MR. SIMPSON:  So the exhibit on the screen is
3  461 pages.  What was produced to us as Exhibit 46 is 457
4  pages.
5         MS. ROHN:  Well, we sent you a new one last
6  night that had additional pages.  Okay.
7         MR. SIMPSON:  What I got last night did not
8  have those, but, go ahead.
9     Q.  (Ms. Rohn)  This is a July 13, 2021 e-mail from
10  David Smith.  Well, let's start at the bottom.
11         Can you scroll down?  Actually starts with an
12  e-mail from you.  July 13, 2021.  Okay.  That's it.  Right
13  there.
14         "It was interesting to see Elias was back on
15  the scene at the PIS offices and also to see his reaction
16  when he knew I was on the call - slipping off to one side of
17  the camera view, any idea if he or others from the slack
18  working team have reappeared on site?"
19         That's referring to employees of Petro,
20  correct?
21     A.  It appears to have some relevance to that, yes.
22     Q.  And then you say, "On a related subject, I have
23  some real concerns with the poor quality work fabrication
24  that PIS have been producing and Merlin appears to have been
25  accepting over recent months.  VERSA were not actually part

134

1  of the weld preparation QA process but PIS presented the
2  perception that they were and some of the welds they have
3  produced have been pretty poor (possibly from uncertified
4  welders -- they presented Danny Martinez welding
5  certificates and procedures for the Turbine vent work before
6  I challenged them -- he separated from PIS almost 2 years
7  ago.)"
8         So you are, in fact, telling David Smith that
9  PIS has poor-quality work fabrication, correct?
10     A.  I said, I had some concerns over what I observed.
11     Q.  "With the poor quality work fabrication that PIS
12  had been producing," correct?
13     A.  Those was observations that I made.
14     Q.  But when I asked -- you were asked under oath if
15  you ever made any -- any criticisms in your interrogatory
16  answer, and you say, I have no recollection.  I did not
17  criticize them.  That is a criticism, is it not, sir?
18         MR. SIMPSON:  Objection.  That completely
19  mischaracterizes the interrogatory response.
20     Q.  (Ms. Rohn)  Sir, that's a criticism, is it not?
21     A.  I said, I have some real concerns.  I'm not sure
22  whether that's a criticism.
23     Q.  Well, with the poor-quality work fabrication,
24  that's a statement sir?
25     A.  An observation, yes.

135

1     Q.  And then -- and then you fault Merlin Figueira for
2  not -- not seeing what you see; is that right, sir?
3     A.  Sorry.
4         MR. SIMPSON:  Objection.
5     A.  You faded out.  Sorry.
6     Q.  (Ms. Rohn)  I said, then you fault Merlin Figueira
7  for his management ability; is that correct, sir?
8         MR. SIMPSON:  Objection.
9     A.  Sorry.  Could you repeat that?  I -- I did what?
10     Q.  (Ms. Rohn)  You fault Merlin Figueira for not
11  performing his management function, and wrongfully accepting
12  the work that that PI -- that Petro was doing, do you not,
13  sir?
14         MR. SIMPSON:  Objection.
15     Q.  (Ms. Rohn)  "Merlin appears to have been accepting
16  over recent months."
17     A.  Yes, ma'am.  I read that.
18     Q.  You and Merlin didn't get along so well, did you,
19  sir?
20     A.  We got on okay, but we did have, as in any
21  business relationship, have our differences at times.
22     Q.  Well, wouldn't one of the differences be going
23  behind his back to David Smith and criticizing him?
24     A.  My role was eyes and ears of the operation.  If I
25  felt there was an issue, I raised it to the appropriate

136

1  level.
2     Q.  Then the last line says, "The lack of PIS
3  fabrication quality and QA compliance is something I would
4  like to address with you and Terry once he is in position if
5  you feel that would be productive."
6         Terry was going to be the new manager,
7  correct?  Terry Keogh?
8     A.  He'd be the new terminal manager.  The role that
9  Merlin was covering temporarily.
10     Q.  Well, Merlin covered it until he retired, didn't
11  he, sir?
12     A.  I'm uncertain of his employment status.
13     Q.  So where did you get the idea there was no QA
14  compliance?
15         MR. SIMPSON:  Objection.
16     A.  I had no evidence presented to me when I requested
17  information from Merlin, I believe, was the case.
18     Q.  (Ms. Rohn)  Okay.  Can you go, Karima, to -- on
19  to -- one, two, third page from this one?  It starts out as
20  Bates Number 2544.
21         No.  Keep going down, Karima.  No, this is
22  still on Exhibit 46.  It's three pages down from the last
23  document we just did, which was 1972.  This one is Number
24  2544.  It's 13 from the front.
25         THE WITNESS:  Is it possible to take a break

ANDREW DAVID CANNING -- DIRECT

1  at some stage?
2          MS. ROHN:  Yes.  As soon as I finish this
3  document.
4          THE WITNESS:  Sorry.  Is that after this
5  document?  Okay.
6          MR. SIMPSON:  Yeah.  Unless you need to take
7  a break now.
8          THE WITNESS:  No, I can hang on.
9          MS. ROHN:  You know what?  Take a break, and
10  we'll find the document while you're on break.
11          THE WITNESS:  Thanks, ma'am.
12          (Short recess taken.)
13      Q.  (Ms. Rohn) There's an e-mail, February 24th, 2021,
14  from yourself to David Smith on the Wartsila Project.
15          "FYI, thought it funny short Charlotte left
16  Merlin off the response and included me ... Good attempt by
17  Merlin to 'throw me under the bus' yesterday for the
18  apparent delay in providing a cost basis breakdown and the
19  need to requote the turbine vent system replacement from PIS
20  (incidentally reducing the cost) - up until that point PIS
21  had no plan, strategy or basis for their quote (their 'plan'
22  and timescales still do not fit the job but more justify
23  their 'without foundation or basis' guesstimate."
24          So would you call that a criticism of PIS?
25      A.  No.  It's a observation.

ANDREW DAVID CANNING -- DIRECT

1      Q.  So -- so in your mind, your under-oath statement,
2  that these are the only things you ever said about PIS, you
3  don't consider this a criticism?
4          MR. SIMPSON:  Objection.
5      Q.  (Ms. Rohn) Is that true, sir?
6      A.  I don't believe this is criticism, no.
7      Q.  And would you think called -- accusing Merlin of
8  throwing you under the bus was a criticism?
9      A.  I can't remember the context of the proceeding
10  communication.
11          (Respite.)
12          MS. ROHN:  Go 21 pages down, Kimaya.  Karima.
13  Sorry.  Karima.  The Bates number is 6275.  Twenty-one down.
14          (Respite.)
15          MS. FRANCIS:  I'm sorry.  What is the Bates
16  number?
17          MS. ROHN:  6275.  They're not in
18  chronological order, Karima, so you have to count the number
19  of pages.  Did she pass it?  Jesus, this is why I should
20  have just marked them myself as exhibits.
21          One before 6262.  No, no, she's passed it.
22  What number are you on now?
23          Okay.  So go down three more pages.
24          6275.  Ah, Jesus.  6242, and then 6243, 6262,
25  and then 6275.  Go up.  One page.  One page.  That's -- I

ANDREW DAVID CANNING -- DIRECT

1  think that's it.  62 -- starts off with an e-mail to
2  Terrence Keogh.  What -- what page are you on?  What page
3  are you on?  Karima, I need to see a page number.  6325.
4  You've gone too far.  You need to go way back.  So you need
5  to go one, two, three, four, five pages back.  That's -- I
6  think that's it.  What -- what number is that one?  Yes,
7  that's it.
8      Q.  (Ms. Rohn) All right.  So we're back with your
9  criticism.  See the e-mail with your criticism, starts out
10  "It's interesting," the last one we just looked at
11  previously about no QA?  Do you recall that?
12          MR. SIMPSON:  Objection.
13      Q.  (Ms. Rohn) Do you recall --
14      A.  Sorry.  Could we scroll down?  I can see the top
15  part.
16      Q.  Yes.  Scroll down to the bottom of that e-mail.
17      A.  Right.  Thank you.
18      Q.  Okay.  Do you recall I asked you questions about
19  this e-mail?
20      A.  You did.
21      Q.  Scroll up, Karima, to the --
22          And then you see the response -- the e-mail
23  from David Smith to Terrence Keogh?
24          "FYI, I told you that Andrew/Merlin have a
25  cold war going on.  I told Andrew it would be good to talk

ANDREW DAVID CANNING -- DIRECT

1  to you and I when he gets back."
2          Do you see that?
3      A.  I do.
4      Q.  So do you dispute that you and Merlin actually had
5  a cold war going on?
6      A.  Define what a "cold war" is.
7      Q.  The relationship between America and Russia.
8      A.  I don't know whether that ascribes the
9  relationship that Merlin and I had, no.  That's purely an
10  opinion by David Smith.
11      Q.  Okay.  I'm going to switch to some Exhibits.  251.
12          (Deposition Exhibit No. 251 was
13          marked for identification.)
14          Do you have that, Kimaya?  I don't know why
15  I'm calling you my daughter's name.
16          251.  No, it's an exhibit.  Oh, you are on
17  251.  Sorry.  I'm on the first page.  Sorry.
18          If you will scroll to -- scroll to the first
19  e-mail, which will be on 7023.
20          And if you look at the top of that page,
21  there's a e-mail from Adrian from January 5, 2021, to you,
22  Andrew Canning.  No, on the last page, 7023.  Okay.  There
23  we are.
24          "Please find the three attachments that
25  include the following:  Change Order #1 - This was sent to

ANDREW DAVID CANNING -- DIRECT

1  Time on 12/12/19 regarding the changes from Polaris on the
2  Loading Rack that still need to get approved.
3       Change Order 2 - Regarding the electrical
4  disconnect and re-install the loading skid due to anchoring.
5       3) Budget for the Electrical Scope for the
6  Reverse Loading based on the SOW from Suris.
7       Please review and let us know if you have any
8  questions."
9       And if you go to the -- up to the next page,
10  the prior page, that's an e-mail from -- to you from Tim K.
11  April 28th, 2021.
12       "Petro Industrial are requesting PO for the
13  above variations for the truck rack, electrical scope
14  changes around the purge," et cetera, et cetera.
15       Can you tell me why it took you from
16  January 2021 to April of 2021 to send this information to
17  Tim K.?
18     A.  Sorry.  I'm just reading.
19       I can't, based on the information I'm seeing.
20     Q.  Well, this is an e-mail chain, sir, is it not?
21     A.  Seeing two e-mails.  If that constitutes a chain,
22  yes, it is.
23     Q.  Okay.  And you say, then, "I need to question" --
24  if you see the last paragraph -- "I need to question the
25  reverse flow ship loading phase," and some other things you

ANDREW DAVID CANNING -- DIRECT

1  need to do, right, in order to complete this.
2       The next e-mail is May 17th, 2021, Tim.  With
3  you copied.
4     A.  Sorry.  Can you scroll that?
5     Q.  Yeah, scroll up, please.  Scroll up, please.  Yes.
6  there you go.
7       David Smith to Tim K., with you copied.  "I'm
8  following up on this.  Petro is saying we are more than 90
9  days on payments so they are asking what needs to happen.
10  I've only been on the fringe, but IPOS can't make payment
11  until we receive some feedback."
12       Do you see that?
13     A.  I do.
14     Q.  Okay.  So does that refresh your recollection,
15  that you would, indeed, take months to approve their
16  invoices?
17     A.  No, I don't.
18     Q.  Oh, doesn't refresh your recollection?
19     A.  No.  Tim -- Tim was responsible for the payment.
20  That was a VVIC or Vitol project.  He authorized the payment
21  of those, those invoices.  So, no, I can't claim that was --
22  you know, it's to Tim.  David Smith has sent it to Tim.
23     Q.  No, actually, sir, the e-mail was to you in
24  January.  You don't forward it to Tim until April, and you
25  tell Tim, "I need to question the reverse flow ship" --

ANDREW DAVID CANNING -- DIRECT

1     A.  Sorry.  Sorry.
2     Q.  Sorry.  Come down.  Down, Karima.  Down.  Down
3  more.  Thanks.
4       "I am" -- the second paragraph.  "I need to
5  question the reverse flow ship loading phase 1 E&I scope and
6  request a more detailed breakdown as the majority of the
7  cable pulling was completed in December 2020 by the
8  mechanical and civil teams (and on another invoice) I want
9  to ensure this is not included in the budget estimate.  I
10  will question the shade shelter costs in the E&I truck rack
11  scope at the same time."
12       So, sir, you -- you do more than just look at
13  the timesheets, don't you, sir?
14     MR. SIMPSON:  Objection.
15     A.  Could you clarify, I looked more than timesheets?
16       As I said before, I was the -- Tim was the
17  technical interface, and also paid the invoices for a VVIC
18  project.
19       The work here was done in December 2020 while
20  we're doing the reverse flow.  I don't know when the
21  invoices were submitted to Tim.  I was just asked, I
22  believe, to have a look at --
23     Q.  Oh, please, sir.  You have to approve the
24  invoices, and then -- as to your scope, and then they go to
25  Tim, correct, sir?

ANDREW DAVID CANNING -- DIRECT

1     MR. SIMPSON:  Objection.
2     A.  No.  Not for a -- necessarily for a -- not for a
3  VVIC project.
4     Q.  (Ms. Rohn)  Well, then, sir, why are you telling
5  Tim you need to question certain things on the invoice?
6     A.  I don't know the detail of it, so I can't comment
7  on that.  All I was aware was that we did some early work in
8  2020.
9       Let me just read this again.
10       Right.  These are two different jobs.
11     Q.  There are three invoices that haven't been paid.
12  There's a budget that hasn't been approved; and two change
13  orders.
14     A.  Scroll down.  Can we read that again?
15     Q.  No, sir, you don't get to direct mine.
16       All right.  I've asked you a question.  You
17  claim whatever you claim.
18       Then if you scroll up, Karima.  You're on
19  7022.  Go to the top.  It says at the top, if you look, it
20  says, David.  David.
21       "Spoke with Adrian in a few weeks back on
22  this and have had requested support for the invoice.  It was
23  around the time they were busy with all the vent line work
24  so he may have forgotten."
25       And that's from David to Tim K., and that was

1   sent on the same May 17, 2021.  If you scroll further up, do

2   you see that, David, May 17, 2021?

3      A.   Yeah.

4      Q.   And then if you scroll all the way to the top of

5   7021, there is an e-mail from yourself to Adrian, Merlin,

6   David Smith.

7         "Please see email sent earlier today largely

8   approving the invoice but asking the status of the challenge

9   on the extra costs associated with expedited delivery

10  following actual late delivery."

11      Do you see that?

12     A.   I do.

13     Q.   Exhibit 252.

14       (Deposition Exhibit No. 252 was

15        marked for identification.)

16      Are we on 252?  Exhibit 252.  Yeah, we are.

17      All right.  This is an e-mail, July 15th,

18  2021.

19      How many of the jobs did IPOS require the

20  final data books?

21     A.   Sorry.  Could you ask that question again?

22     Q.   Sure.

23      How many of the jobs did IPOS request the

24  final data books at the end of a project?

25       MS. FRANCIS:  Objection.  Foundation.

1     Q.   (Ms. Rohn) Do you know?

2     A.   I don't know for certain, because it's IPOS'

3   request.

4     Q.   Okay.  You were the eyes and ears of the owner,

5   but you don't know if they're requesting data in data books?

6       MR. SIMPSON:  Objection.

7     A.   I am not -- sorry.  I'm not aware of all of the

8   communications, possibly.

9     Q.   (Ms. Rohn) Did you ever make it a requirement that

10  you wouldn't approve an invoice unless there was a final job

11  data book?

12       MR. SIMPSON:  Objection.

13     A.   I don't recall that.

14     Q.   (Ms. Rohn) Okay.  Do you know what's in a final

15  job data book?

16     A.   I know what's in a data book, yes.

17     Q.   Okay.  What's your understanding of what's in it?

18     A.   Sorry.  Could you repeat that last bit?

19     Q.   I said, what's your understanding as to what is in

20  it?

21     A.   It would be dependent upon the type of.  Activity

22  electrical data books are different to instrument data

23  books, which are different, again, to mechanical data books.

24     Q.   So --

25       (Respite.)

1       THE COURT REPORTER:  Hello?

2       MS. ROHN:  I'm just -- I'm just asking my

3  client a question.  I'm here.

4       THE WITNESS:  Oh, I'm sorry.

5     Q.   (Ms. Rohn) Do you know what final documentation

6  IPOS requires on projects?

7     A.   Yes.

8     Q.   Okay.  What -- what final data documentation do

9  they require?

10     A.   It's defined in the project specifications.

11     Q.   So were you aware that as a result of the 3-inch

12  vent line, that there was some requirement for a final data

13  book?

14     A.   There's always a requirement for data book

15  updates, depending on the type of work, and also new

16  projects, so, yes, in that case, I was aware.

17     Q.   Okay.  I was very specific about what project I

18  was asking you about, sir.

19     A.   I may have missed that.  I apologize.

20     Q.   For the Number 3 -- the 3-inch vent line, do you

21  know whether or not there was a holdup, because of a claim

22  of not having all the documentation for the final data book?

23       MR. SIMPSON:  Objection.

24     A.   I'm unaware --

25     Q.   (Ms. Rohn) You may answer.

1     A.   I'm unaware of the detail of that.

2     Q.   Well, in 252, you see where there's a e-mail

3  from -- on the bottom -- from Tim, in which you're copied

4  on, to "Adrian Melendez shared '3in Vent Line - QC Book'

5  with you"?  Do you see that?

6     A.   I do.

7     Q.   Okay.  Says, "We're having issues gaining access

8  to the dropbox.  Can you please invite myself and Andrew to

9  the files."

10     A.   That's what it says.

11     Q.   So does that refresh your recollection that you

12  were, indeed, going to review those books?

13       MR. SIMPSON:  Objection.

14     A.   It was certain that Tim asked -- was forwarding --

15  asked me -- for access for me to look at the Dropbox, yes.

16     Q.   (Ms. Rohn) Did you ever look at the Dropbox?

17     A.   I did, indeed.

18     Q.   Okay.  Exhibit 253.

19      Oh, my question is, did you find anything

20  missing from the documents that were needed?

21     A.   I can't recall the detail of that.

22     Q.   Okay.  253.

23       (Deposition Exhibit No. 253 was

24        marked for identification.)

25      This is an e-mail, March 29th.  E-mail, if

ANDREW DAVID CANNING -- DIRECT

1   you scroll down, starting with Andrew.  Andrew Canning to
2   Santhia Rodriguez.  She's a kind of accountant person with
3   Petro; is that correct?
4       A.   I believe so.
5       Q.   Well, you communicate with her a lot, don't you,
6   sir?
7       A.   I do, but I don't know her exact job title.
8       Q.   Importance: High.  And this is cc'd to Chad and
9   Adrian, Merlin, David.  Times turbine cavity blow down vent
10  timesheets.
11           "I talked with the Petro-Industrial foreman
12  today whilst on site and enquired about the whereabouts of
13  the daily timesheets that Chad & I had agreed would be
14  checked and signed by me on a daily basis (where
15  practical.)"
16           Do you see that, sir?
17      A.   I do.
18      Q.   Says, "As I have yet to see and approve a single
19  timesheet to date that relates to the WAPA vent project.
20  During the discussion the foreman said that he had been
21  delivering the timesheets to yourself on a daily basis."
22           Why were you checking their timesheets on a
23  daily basis, sir?
24      A.   It was an agreement made with Petro Industrial.
25      Q.   Why did you make that agreement?

ANDREW DAVID CANNING -- DIRECT

1       A.   It was always an agreement that the timesheets
2   would be signed on a daily basis, to eliminate any
3   misunderstanding.
4       Q.   258.
5            Do you have that?  Sorry.  This is a --
6   scroll through it.  Never mind.  I don't want that.
7            (Respite.)
8            I'm sorry.  I'm flipping through.
9            (Respite.)
10           All right.  I'm looking for a document.
11           (Respite.)
12           All right.  296.  296.  Can you scroll
13  through those?
14           (Deposition Exhibit No. 296 was
15           marked for identification.)
16           (Respite.)
17           All right, sir.  Are you -- are you familiar
18  with these welder performance qualification records?
19      A.   I appear to recognize.
20      Q.   Okay.  And can you tell me whether or not these
21  are the ones that you believe have the anomalies in them?
22      A.   I believe this is an example of one of those, yes.
23      Q.   And can you show me, on these, what you believe to
24  be the anomalies?
25      A.   Yes, ma'am.

ANDREW DAVID CANNING -- DIRECT

1       Q.   And can you tell me which ones, or if it's all of
2   them?
3       A.   It's all of them.  This would be a good example.
4            MR. SIMPSON:  When you say, "this," referring
5   to the first page of Exhibit 296?
6            MS. ROHN:  Yes.
7            THE WITNESS:  Yes.
8       Q.   (Ms. Rohn) All right.  And can you tell me what
9   you believe are the anomalies?
10      A.   Yes.  The certificates, I believe, were PDFs.
11      Q.   The stickers, what?  Wait.  What are you referring
12  to as stickers?
13      A.   I didn't say stickers, I said a PDF.
14           MR. SIMPSON:  Said, "the certificates."
15      Q.   (Ms. Rohn) What PDF?
16           MR. SIMPSON:  Said, "the certificates."
17      Q.   (Ms. Rohn) Oh, sorry.  I thought -- all I heard
18  was stickers.  All right.
19      A.   Yes.  I believe they were PDFs.
20           Anomalies that emerged were change in font
21  and clarity of the print.  Items such as welder's name.  I
22  can't see.  I'm talking.  Yeah, sorry.  The staff number.
23           There's also the base material used in the --
24  in the welder's test, if these were for stainless.  SA-106
25  is high-temperature carbon steel.

ANDREW DAVID CANNING -- DIRECT

1            If you scroll down, please.  Yes.  Stop
2   there, please.
3            Laboratory Test Number.  Again, there is a
4   font change, and clarity difference over the original
5   document.
6            And possibly the date.  I don't know.  Maybe.
7   Yes, I think the date as well.
8       Q.   All right.  And anything else that you thought
9   were an anomaly?
10      A.   From a visual check, no, but from a conversation
11  with Doug Rice, yes.
12      Q.   And what else do you think was an anomaly?
13      A.   The claim to have done guide bend test results, or
14  present those, Doug Rice confirmed that the machine to do
15  that was removed from the islands in 2019, if I recall
16  correctly.  So he said the bend tests could not have been
17  undertaken by themselves.
18           And he also said the dates of the
19  certificates, Guillermo Castro, L111, was not a employee of
20  Acuren Inspection Services.  And he also indicated that they
21  had no record, when he did work for them, that he was a
22  Level III inspector.
23      Q.   Did you ask how long ago it was that he had worked
24  with them?
25      A.   I don't recall asking that specific question.

153

1   Q.   And what made you think that Mr. Castro didn't own
2   his own equipment?
3       A.   I -- it claims here that the guide bend test
4   results were done by Acuren Inspection Services.  Mechanical
5   test conducted by Acuren Inspection Services.
6       Q.   Okay.  Can we go to 285?
7            (Deposition Exhibit No. 285 was
8            marked for identification.)
9            Can you scroll down to the first?  We're on
10  the first page.  The first page.  First page.  There we go.
11  Right there.
12            This is an e-mail from you to your cold-war
13  friend, Merlin, and also copied to David Smith about the
14  vent line project.
15            And you say, "Merlin, Given the sensitivities
16  on my direct communication with Petro, the recent
17  communication requesting data from WAPA and also to meet the
18  project Piping Lines.  Could you ask Adrian."
19            What are you referencing, sir?
20       MR. SIMPSON:  Object to the form.
21       A.   I was referencing the two-part aspect of two
22  bullet items.
23       Q.   (Ms. Rohn) No, sir.  You're asking -- "given the
24  sensitivities on my direct communication with Patro.
25  Petro."

154

1            What are you referencing, sir?
2       A.   Oh, sorry.
3            I'd had a meeting and conversation with
4   Merlin and David Smith about an allegation I'd stopped work
5   on probably this project on -- if I recall correctly --
6   Easter weekend.  And Merlin phoned me up and asked me why I
7   stopped the job.  I didn't have any recollection of that.  I
8   believe that's what I told him.  And he said, I'd prefer for
9   IPOS-led jobs, that you communicate your requests, or any
10  other communication, through myself or -- and I believe
11  Calvin Schmidt was also included in that.
12       Q.   Actually, sir, weren't you directed not to speak
13  to them by Merlin, and then you went ahead and spoke to
14  them?
15       MR. SIMPSON:  Objection.
16       A.   I don't recall that.
17       Q.   (Ms. Rohn) And then, actually, sir, wasn't there
18  an e-mail from Merlin to you, asking to have a group
19  meeting, in which you refused to do so?
20       A.   I recall an e-mail where we discussed the merits
21  and timing of that meeting, but I recall we did have the
22  meeting.
23       Q.   And what was that meeting about, sir?
24       A.   I don't recall, exactly.
25       Q.   Wasn't it about the fact that you were having --

155

1   that IPOS believed that you were being unfair -- I mean,
2   Petro believed you were being unfair to them?
3       A.   I do not recall that.
4       Q.   Exhibit 287.
5            (Deposition Exhibit No. 287 was
6            marked for identification.)
7            You want to scroll to the bottom?  This
8   e-mail isn't to you, but it's about a meeting with --
9   between Petro and Vitol, Inc., and Charlotte and Tim and
10  Sebastian.
11            You're aware that meeting occurred, correct,
12  sir?
13       A.   Not before the event.  I learned of it afterwards.
14       Q.   And you weren't very pleased about it, were you,
15  sir?
16       A.   I had no view on that.
17       Q.   So the e-mail from David Smith to Merlin Figueira
18  says, "Good morning, Merlin.  Petro was in Houston a few
19  weeks back and asked to meet Sebastian, Tim, Charlotte.  I
20  guess they called them and said tomorrow so they are going.
21  Chad called to tell me and ask me about Sebastian.  They say
22  they really don't have reason, just thought when they were
23  there it would be nice.  I told them be honest and direct
24  and factual."
25            And then if you scroll up, there's an e-mail

156

1   from Merlin.
2            "David, I suggested to Adrian several weeks
3   ago to meet the Vitol team after Sebastian made some
4   comments related to their capability.  In addition to help
5   them with possible negative comments ('behind the scene')
6   from Andrew.  So just last week Adrian called to say they
7   are meeting Vitol this week.  I'm sorry.  I should have
8   passed that info by you.  He did ask about Sebastian's
9   background and promised that I would get that from you, but
10  forgot to do so.
11            I think the meeting will be a good
12  relationship building exercise and as you right say that
13  they be honest, I told them that same thing.  In addition, I
14  asked them to show that we are a small company -- that they
15  are a small company with low overhead so some things can
16  move a bit slow.  I also think it will help with
17  undercutting efforts by Andrew."
18            Are you aware that the manager of the
19  terminals believed that was what you were doing?
20       A.   No.
21       Q.   Did you have discussions with Merlin about the
22  fact that he believed that's what you were doing?
23       MR. SIMPSON:  Objection.
24       A.   I have no recollection on that.
25       Q.   (Ms. Rohn) All right.  289.

157

1    (Deposition Exhibit No. 289 was
2    marked for identification.)
3        And if you'll scroll down, this is an e-mail,
4    April 22nd. E-mail train, April 22nd, 2021. And if you'll
5    scroll to the second page. Well, no. Scroll to the bottom
6    of the first page. Sorry. Thank you.
7        There's an e-mail from you to Merlin, David
8    Smith, on the 3-inch line. Importance, high. Sensitivity,
9    confidential.
10       You sent this, correct, sir?
11   A.   It looks as though I did, yes.
12   Q.   "Further to your discussion yesterday and my
13   speculation about extra, the extra team set on and ten hour
14   days, which I felt was being used to ensure the estimated
15   value of the estimate is collected in timesheet hours that
16   Vitol insist that I review. I walked the WAPA site today
17   around 8 o'clock and observed about a 4/5 man team either
18   sitting outside the fabrication tent or leaning on or
19   against the pipe work in the fabrication tent. I also
20   checked the actual fabrication welds on the pipe installed
21   in the rack to date (there is now two pipe runs in place on
22   the rack from the IPOS WAPA fence line running west to east
23   up to the first rack, turn on the north. The weld cap
24   was" --
25   A.   Correct. I think it's gone over the page. Could

158

1    you scroll down?
2    Q.   No, I'm on the first page.
3        Then it goes, "The weld count was" -- and now
4    if you go to the next page, it's how many welds were done.
5    A.   Yeah.
6    Q.   "This work reverts -- represents the efforts of 14
7    in number ten hours days of team four to five plus
8    occasional supervision and safety. Assuming the weld rate
9    that PIS and I determined a year or so ago when I was trying
10   to establish the basis and competitiveness of their quotes
11   three per day per welder then the fabrication in the rack
12   represents just over one week work for a single welder. I
13   am not sure on what basis the estimate was accepted however,
14   I do not recall a breakdown of the tasks as part of the
15   estimate. And it would seem to me that we are going through
16   a painfully slow process of a contractor extracting the
17   man-hour value of a contract because they are aware of their
18   site manning and time lining as being monitored. The
19   situation reinforces my belief and that of Vitol that PIS
20   must provide a detailed breakdown of their estimate or
21   they -- or we go out to competitive bids for all such work
22   based upon the detailed scope of work so that we can at
23   least validate the value that we are getting from PIS who
24   appear to be treating their unique position with IPOS as a
25   money generating relationship."

159

1        You don't think that's a criticism of Petro?
2        MR. SIMPSON: Objection.
3    A.   No. I believe it's a comment on productivity.
4    Q.   (Ms. Rohn) "Money generate." That's what you call
5    them, right?
6    A.   That's what it says, ma'am.
7    Q.   Did you ask Petro, before sending this defamatory
8    e-mail, what was the cause of the number of welds that they
9    had?
10       MR. SIMPSON: Objection.
11   A.   I don't recall.
12   Q.   (Ms. Rohn) Well, wouldn't that be something you
13   would need to do before you accused people of billing
14   without doing the work, is to find out if there's something
15   that slowed down the number of welds?
16       MR. SIMPSON: Objection.
17   A.   I -- if you recall the previous e-mails we looked
18   at, Merlin asked me not to communicate directly with Petro
19   Industrial.
20   Q.   (Ms. Rohn) Did you ask anybody else to ask them?
21   A.   The agreement was, I communicate between Mer --
22   through Merlin or David Smith.
23   Q.   Okay. But this isn't an e-mail that says, it
24   looks like the welds are slowing down, can you go ask them
25   why. This is an e-mail that says they're slow on their

160

1    welds, and that's because they're grabbing money?
2        MR. SIMPSON: Objection.
3    Q.   (Ms. Rohn) Would you agree with me?
4    A.   Not exactly, no.
5    Q.   Oh, well, what exactly don't you agree with?
6    A.   Well, we haven't seen preceding e-mails. There
7    was a request to move the 1-inch welders to the 3-inch line
8    to reduce the team hours from ten hours to eight hours.
9        And then a request came in, which I was asked
10   to comment on, to increase the increase team's hours from
11   eight hours to ten hours. I was asked to comment on whether
12   I thought that was a cost-effective approach.
13   Q.   All right. So who, at Vitol, agreed with this
14   statement that you made?
15       MR. KAPLAN: Objection. Form.
16   A.   I don't know whether I got agreement or not from
17   anyone at Vitol.
18   Q.   (Ms. Rohn) Well, it says you did. It says, "this
19   situation" -- let me finish. "This situation reinforces my
20   belief (and that of Vitol) that PIS must provide a detailed
21   breakdown of their estimates or that we go out to
22   competitive bids for all such jobs based a detail scope of
23   work so that we can at least validate the value that we are
24   getting from PIS who appear to be treating their unique
25   position with IPOS as money generating relationship."

161

1    Who, at Vitol, agreed to that?
2         MR. KAPLAN:  Objection.  Form.
3    A.   I'd been asked to -- because of single sourcing,
4    I'd been asked to request a detailed breakdown of Petro
5    Industrial's work, so we could evaluate their effectiveness.
6    Q.   (Ms. Rohn)  Asked by whom?
7    A.   I can't recall whether it was Charlotte or Tim,
8    but I believe both of them asked me at different times to
9    obtain a detailed breakdown on several jobs that Petro
10   Industrial quoted on.
11        MR. SIMPSON:  I'd like to note, for the
12   record, that's the second time that counsel for plaintiff
13   has laughed derisively during my client's answers.  If it
14   happens again, this deposition is over.
15   Q.   (Ms. Rohn)  If you scroll up to the top of the
16   page, it says, "Thanks for letting us know of your concerns
17   shown below.  Having read thru it and based on the
18   discussion we had yesterday, I'm having difficulty in
19   responding to PIS on their estimated costs other than to
20   talk to them of their productivity."
21        So you also had a conversation with Merlin
22   about this; is that correct?
23   A.   I don't recall exactly, but that's what it
24   indicates on the e-mail.
25   Q.   Then it goes on to say, "On the cost aspect,

162

1    yourself, Vitol (Tim) and myself accepted their written
2    estimate and we issued a PO based on that estimate.  We were
3    collectively all copied on emails relating to the Vent Line
4    Project, and so it's my opinion that what was submitted was
5    approved by Vitol.  So if your perception is that they are
6    trying to make up the hours to match their estimate by
7    lazing on the job that is one thing we may not be able to
8    have much say.  It's a cost we have agreed to by issuing a
9    purchase order.  However, we can talk to them of their
10   productivity in that we like to get the job completed on
11   schedule."
12        So, sir, did you, in fact, approve their
13   e-mail, when it said, we're going to get this amount of
14   money?
15        MR. SIMPSON:  Objection.
16   A.   I don't think I approved it.
17   Q.   (Ms. Rohn)  Well, did you oppose it?
18   A.   No.  It was a not-exceed total.  So it can come in
19   anywhere underneath that.
20        So based on the information, I didn't oppose
21   it, but it wasn't my role to approve such proposal.
22   Q.   And then the last paragraph, "Frankly, Andrew I'm
23   not sure of the way to solve your concerns.  I know you
24   had concerns of PIS's productivity, proficiency, and their
25   ethics."

163

1    what problems did you have with their ethics?
2    A.   I don't recall any problems with their ethics.
3    MS. ROHN:  Exhibit 290.
4         (Deposition Exhibit No. 290 was
5         marked for identification.)
6    Can we take a five-minute break?
7    MR. SIMPSON:  Sure.
8    MS. ROHN:  Okay.
9         (Short recess taken.)
10   MS. ROHN:  Wait a minute.  I may know where
11   it is.
12        (Respite.)
13   I have no -- I have no further questions.
14        CROSS-EXAMINATION
15   BY MR. KAPLAN:
16   Q.   Mr. Canning, good afternoon.  My name is Alex
17   Kaplan.  I am a lawyer for Vitol Virgin Islands Corp., and
18   also for Vitol U.S. Holding II Co.
19   You and I have never met, correct?
20   A.   We've never met in person, no.
21   Q.   Have we ever spoken?
22   A.   I don't remember speaking to you.  I -- I can't
23   remember whether you were one of the lawyers on our early
24   communication.  I can't recall.
25   Q.   All right, sir.  I'd like to ask you a few

164

1    questions.
2         Earlier today, you were being questioned by
3    plaintiff's counsel about this incident, where you fell
4    through a platform that was above a boiler.
5         Do you recall those questions?
6    A.   I do.
7    Q.   All right.  Could you describe for us, in your own
8    words, what happened at the moment when you fell through
9    this platform?
10   A.   At the moment I fell through.
11        Yes.  As I recall, I was walking across the
12   platform, which felt very flexible.  I turned to return to
13   the access ladder, and in turning, the access hatch below me
14   fell through.  I fell one or two feet.  My feet landed on
15   the boiler casing, causing me to -- my legs to fold behind
16   me, and me to fall to the left-hand side.  I caught my
17   motion on my left hand, and tried to stabilize my position.
18        Once I regained confimation that I hadn't --
19   I didn't believe I suffered any serious damage, then, I
20   proceeded to extract myself from the access way with the
21   assistance of David Nagle, I seem to recall.
22        We recovered the access hatch from the top of
23   the boiler, and put it into place, in the hope, in my view
24   of that stage, that if anyone else went to the platform in
25   our absence, they may not pass through that.

1      But, yeah, that's -- we -- we left the
2  platform.  Drove back to the control room.
3      Sorry.  Did you want me to -- the whole
4  event, or just the passing through the platform?
5      Q.    Passing through the platform.
6      Let me ask you this:  Was there any -- at the
7  time you went up to the platform, was there any type of
8  barricade that would have alerted you not to go onto the
9  platform?
10     A.    None.
11     Q.    Was there any type of tape or warning tape or
12 caution tape that would have alerted you, or anyone else,
13 not to go onto the platform?
14     A.    None.
15     Q.    Was there any sign, lights, cones, or other
16 indication that that was an area not safe for access, and
17 that you should not enter that area?
18     A.    No, there wasn't.
19     Q.    Okay.  If -- if, in fact, Petro believed that
20 additional grating clips or fasteners were necessary, would
21 you expect, based on your experience, there to be some
22 barricade, sign, cone, or other indication that the area was
23 not safe for entry?
24     A.    I would have expected that, yes.
25 (whereupon Zoom connection was lost and resumed as follows

1  after a few minutes;)
2      Q.    (Mr. Kaplan)  Okay.  Mr. Canning, had anyone at
3  Petro told you that day in February that it was unsafe for
4  entry because it needed additional grating clips or
5  fasteners?
6      A.    No.
7      Q.    All right, sir.  I'd like to ask you a few
8  questions about the allegations in this case.
9      Mr. Canning, did you ever discriminate
10 against Petro on account of the race of any of its
11 personnel?
12     A.    No.
13     Q.    Did you ever discriminate against Petro on account
14 of the nationality or origin of any of its personnel?
15     A.    No.
16     Q.    Did Mr. Melendez ever tell you that he believed
17 anything you ever said or did was racist?
18     A.    No.
19     Q.    Did Mr. Melendez ever tell you that he believed
20 anything you ever said or did was discriminatory in any
21 respect?
22     A.    No.
23     Q.    Did anyone at Petro ever tell you they believed
24 anything you said or did was racist or discriminatory?
25     A.    No.

1      Q.    And let me -- let me ask you this:  Did anyone at
2  Vitol, any Vitol company, ever direct you to defame Petro?
3      A.    No.
4      Q.    Did anyone at Vitol ever direct or instruct you to
5  discriminate against Petro in any way, shape, or form?
6      A.    No.
7      Q.    Mr. Canning, were you ever an employee of Vitol?
8      A.    No.
9      Q.    Now, you -- you talked earlier, in questioning
10 from plaintiff's counsel, about the company for which you
11 work, and are a shareholder of a company called Optis,
12 O-P-T-I-S.
13     Do you recall that?
14     A.    Yes.
15     Q.    Okay.  Optis is not owned, in any respect, by
16 Vitol, correct?
17     A.    That's correct.
18     Q.    Okay.  What did you understand the relationship to
19 be between Optis and Vitol Virgin Islands Corp.?
20     A.    Could you be more specific on "relationship"?
21     Q.    Sure.
22     You said Optis was not owned in any respect
23 by -- by any Vitol company.
24     Did Optis have a contract with Vitol Virgin
25 Islands Corp.?

1      A.    Yes.
2      Q.    And what was the nature of that contractual
3  relationship between Optis and Vitol Virgin Islands Corp.?
4      A.    Consultancy agreement.
5      Q.    Let me see if I can show you -- I'm going to try
6  and share my screen, Susan, so bear with me one moment,
7  everybody.
8      (Respite.)
9      Okay.  Can everybody see that document on the
10 screen?
11     MR. SIMPSON:  Not really.
12     A.    No.  I think you'll have to zoom in, from my
13 perspective, anyway.
14     MR. SIMPSON:  It's showing.  It's just small.
15     Q.    (Mr. Kaplan)  Okay.  Hold on.  How's that?  Is that
16 any better?
17     A.    Yes, but we're going to have to move this side
18 window.
19     MR. SIMPSON:  Yeah.
20     A.    Yeah.
21     Q.    (Mr. Kaplan)  Are you able to see that?
22     MR. SIMPSON:  Yes.  I'm just moving the Zoom
23 windows, so it's not blocking the document.
24     Q.    (Mr. Kaplan)  Okay.  Mr. Canning, what I'm showing
25 you is what I will mark as Defense Exhibit 1 to the Canning

1    deposition.
2            Do you recognize this -- and it's Bates
3    Number Vitol -- starts at Vitol 0001.
4            Do you recognize this document, sir?
5        A.  Yes.
6        Q.  Okay.  Can you tell us what it is?
7        A.  It's a contract between Vitol Virgin Islands
8    Corporation and Optis Europe for a consultancy agreement.
9        Q.  All right.  Do you see here, in the first
10   paragraph, where it has some definitions, and it defines
11   "the Company" as Vitol Virgin Islands Corp.?
12       A.  Yes.
13       Q.  And it defines "the Contractor" as Optis.
14           Do you see that?
15       A.  I do.
16       Q.  Okay.  I'd like to go down and show you
17   Paragraph 4 of the contract, where it says -- the heading is
18   Independent Contractor.
19           Do you see that?
20       A.  I do.
21       Q.  Okay.  And Section 4 says, "The parties agree that
22   the Contractor," that's Optis, as we just saw, correct?
23       A.  That's my understanding of it, yes.
24       Q.  All right.  Says, "The parties agree that the
25   Contractor at all times during the Term will be an

1    independent contractor engaged by the Company to perform
2    Services."
3            Do you see that?
4        A.  I do.
5        Q.  All right.  What do you understand it to mean that
6    Optis was an independent contractor?
7        A.  I'm not certain of the definition of an
8    independent contractor.  However, my interpretation of this
9    at this present time is that we worked independently of
10   VIC.
11       Q.  All right.  If you look down at the next
12   paragraph, it says, "Contractor will employ his own means
13   and methods and exercise his own professional judgment in
14   the performance of the Services."
15           Do you see that?
16       A.  I do.
17       Q.  In connection with your work at the St. Thomas and
18   St. Croix facilities, while Optis had this contract with
19   VIC, did you employ your own means and methods in
20   connection with the performance of your services?
21           MS. ROHN:  Objection.  Leading.
22       A.  Yes.  Yes.
23       Q.  (Mr. Kaplan) Did Vitol -- I can stop sharing now.
24           Is that document gone now?
25           MR. SIMPSON:  Yes, it is.

1        Q.  (Mr. Kaplan) Okay.  Did Vitol control the manner
2    by which you provided your consulting services at the
3    St. Thomas or St. Croix facilities?
4        A.  Could you define the term "control" in this?
5        Q.  Yes.
6            Did Vitol dictate the manner by which you
7    went about providing your consulting services under the
8    contract?
9        A.  No.
10       Q.  Did you exercise your own professional judgment
11   when performing these services under the consulting
12   agreement between Optis and VIC?
13           MS. ROHN:  Objection.  Leading.
14           MR. SIMPSON:  You can answer.
15       A.  Yes.
16       Q.  (Mr. Kaplan) Did you exercise your own judgment to
17   determine what maintenance work needed to be done at the
18   St. Thomas and St. Croix facilities?
19           MS. ROHN:  Objection.  Leading.
20       A.  Yes.
21       Q.  (Mr. Kaplan) Did anyone at Vitol dictate for you
22   how you went about your daily interactions with any
23   employees of Petro, in terms of how you communicated with
24   them?
25       A.  No.

1        Q.  When you evaluated the performance of Petro's
2    work, did anyone at Vitol dictate your conclusions about the
3    quality of Petro's work?
4        A.  No.
5        Q.  Did you make up your own mind when it came to your
6    evaluation of the maintenance work that was done at the
7    St. Thomas and St. Croix facilities?
8        A.  Sorry.  Could you be a bit more specific on
9    "making up my mind"?
10       Q.  Sure.
11       A.  Yeah.
12       Q.  Plaintiff's counsel showed you a series of e-mails
13   today where you're corresponding about work being done at
14   the St. Thomas and St. Croix facilities.
15           My question to you is, when you wrote those
16   e-mails, and you expressed your opinions, and made your
17   observations, were those your opinions and observations, or
18   were they somehow dictated by Vitol, or anybody else?
19       A.  I'd have to say they weren't dictated.  There may
20   have been some discussion, but they certainly weren't
21   dictated.
22       Q.  But ultimately, when you expressed an opinion or
23   observation about the quality of Petro's work, is that your
24   observation and your opinion, or is it someone else's
25   observation or opinion?

173

ANDREW DAVID CANNING -- CROSS

1  A.  It's mine.
2  Q.  Did you maintain your own schedule for how many
3  days you would spend at each facility, and how many days you
4  would spend on island in each given month during the term of
5  your consulting agreement?
6  A.  Yes.  In agreement with either IPOS or VVIC, so
7  they knew when I was on or off the facility.
8  Q.  Sir, did you ever say anything about Petro's work
9  that you did not believe to be true?
10              MS. ROHN:  Objection.  Form of the question.
11  A.  No.
12  Q.  (Mr. Kaplan) Did you ever provide IPOS with
13  information that you did not believe to be accurate?
14              MS. ROHN:  Objection.  Form of the question.
15  A.  No.
16  Q.  (Mr. Kaplan) Did you ever provide Vitol with
17  information that you did not believe to be accurate?
18              MS. ROHN:  Objection.  Form of the question.
19  A.  No.
20  Q.  (Mr. Kaplan) Sir, to your knowledge, who made the
21  decision to terminate the maintenance contract between Petro
22  and IPOS?
23  A.  My understanding is, it was IPOS.
24  Q.  Did you direct IPOS to make the decision to
25  terminate its maintenance contract with Petro?

Susan C. Nissman, RPR-RMR
(340) 773-8161

174

ANDREW DAVID CANNING -- CROSS

1              MS. ROHN:  Objection to form.
2  A.  No.
3  Q.  (Mr. Kaplan) Did anyone at Vitol ever direct or
4  instruct you to urge IPOS to terminate its maintenance
5  contract with Vitol?
6              MS. ROHN:  Objection to form.
7  A.  No.
8              MR. KAPLAN:  I have nothing further.  Thank
9  you, sir.
10              THE WITNESS:  Thank you.
11              MR. SIMPSON:  Simone, do you have any
12  questions?
13              MS. FRANCIS:  I do.
14              CROSS-EXAMINATION
15  BY MS. FRANCIS:
16  Q.  Good afternoon, Mr. Canning.  My name is Simone
17  Francis, and I represent IPOS in this litigation.  Island
18  Project and Operating Services.
19              I just have a few follow-up questions for
20  you.
21              Sir, were you ever an employee of IPOS?
22  A.  No.
23  Q.  During the times that you performed -- I'm sorry.
24  Let me scrap that, and restart the question.
25              Similar to the questions that you were asked

Susan C. Nissman, RPR-RMR
(340) 773-8161

175

ANDREW DAVID CANNING -- CROSS

1  by counsel for Vitol, did IPOS control the means and methods
2  by which you exercised your professional judgment when you
3  were performing services at the propane facilities in the
4  Virgin Islands?
5  A.  No.
6  Q.  Were you ever an employee of VTTI?
7  A.  No.
8  Q.  Did VTTI control the means and methods by which
9  you exercised your professional judgment while you were
10  performing services at the propane facilities in the Virgin
11  Islands?
12  A.  Can I ask for a clarification?  Is that possible?
13  Q.  No, you can answer the question, sir.
14  A.  Then, no.
15  Q.  Did IPOS have any ownership interest in Optis
16  during the time that you were performing services at the
17  propane services in the Virgin Islands?
18  A.  No.
19  Q.  Did VTTI have any ownership interest in Optis
20  during the time that you were performing services at the
21  propane facilities in the Virgin Islands?
22  A.  No.
23  Q.  One moment.  I'm just looking at my notes.
24              (Respite.)
25              I think Attorney Kaplan asked you whether

Susan C. Nissman, RPR-RMR
(340) 773-8161

176

ANDREW DAVID CANNING -- CROSS

1  anyone at IPOS directed you to discriminate against Petro.
2              Do you recall that question?
3  A.  I do.
4  Q.  Okay.  And your answer to that question was no,
5  correct?
6  A.  That's correct.
7  Q.  Okay.  Did anyone at VTTI ever direct you to
8  discriminate against Petro?
9  A.  No.
10  Q.  And in expressing opinions about the work that was
11  performed at the propane facilities in the Virgin Islands,
12  did you take into account, or were your opinions in any way
13  based upon the race of Mr. Melendez or anyone associated
14  with Petro?
15  A.  No.
16  Q.  And did you understand from the conversation that
17  you described on the first day that you were at the facility
18  with Mr. Figueira, that IPOS's policies prohibited
19  discrimination on the basis of race and national origin, and
20  other protected classifications?
21  A.  That was my understanding.
22              MS. ROHN:  Objection to form.
23  Q.  (Ms. Francis) And did you understand that it was
24  the expectation that in accordance with those policies, you
25  were to refrain from conduct that would constitute

Susan C. Nissman, RPR-RMR
(340) 773-8161

ANDREW DAVID CANNING - CROSS

1   discrimination on the basis of race, national origin, or any

2   other protected classification?

3       A.  Yes.

4           MS. FRANCIS:  I have no further questions for

5   you, Mr. Canning.

6           THE WITNESS:  Thank you.

7           MS. ROHN:  I have no further questions.

8           MR. SIMPSON:  I think we're done.

9           MS. ROHN:  Thank you.  Have a nice weekend.

10          MR. SIMPSON:  You, too.

11

12

13

14

15          (Whereupon the deposition concluded

16              at 3:30 p.m.)

17

18

19

20

21

22

23

24

25

Susan C. Nissman, RPR-RMR
(340) 773-8161

---

**C-E-R-T-I-F-I-C-A-T-E**

I, SUSAN C. NISSMAN, a Registered Merit Reporter and Notary Public for the U.S. Virgin Islands, Christiansted, St. Croix, do hereby certify that the above named witness, **ANDREW DAVID CANNING**, was first duly sworn to testify the truth; that said witness did thereupon testify as is set forth; that the answers of said witness to the oral interrogatories propounded by counsel were taken by me in stenotype and thereafter reduced to typewriting under my personal direction and supervision.

I further certify that the facts stated in the caption hereto are true; and that all of the proceedings in the course of the hearing of said deposition are correctly and accurately set forth herein.

I further certify that I am not counsel, attorney or relative of either party, nor financially or otherwise interested in the event of this suit.

IN WITNESS WHEREOF, I have hereunto set my hand as such Registered Merit Reporter on this the 28th day of June, 2023, at Christiansted, St. Croix, United States Virgin Islands.

                        /s/ Susan C. Nissman

My Commission Expires:    Susan C. Nissman, RPR-RMR
June 28, 2023             NP 234-19