IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. CROIX

PETRO INDUSTRIAL SOLUTIONS, LLC, )
　　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　vs.　　　　　　　　　　　　　　　　) Case No. 1:21-CV-00312
　　　　　　　　　　　　　　　　　　　)
ISLAND PROJECT AND OPERATING　　　　 )
SERVICES, LLC; VITOL US HOLDING　　　)
II CO.; VITOL VIRGIN ISLANDS　　　　 )
CORP.; ANDREW CANNING; and OPTIS　　 )
EUROPE, LTD.,　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　)
　　　　　　Defendants.　　　　　　　　)
_____

THE VIDEO-RECORDED ORAL DEPOSITION OF MERLIN FIGUEIRA

was taken on the 22nd day of June, 2023, via Zoom

teleconference, between the hours of 9:06 a.m. and

3:16 a.m. AST, pursuant to Notice and Federal Rules of Civil

Procedure.

_____

Reported by:

Susan C. Nissman RPR-RMR
Registered Merit Reporter
Caribbean Scribes, Inc.
1244 Queen Cross Street, Suite 1A
Christiansted, St. Croix
U.S. Virgin Islands  00820
(340) 773-8161

---

2

A-P-P-E-A-R-A-N-C-E-S

For the Plaintiff:

Law Offices of Lee J. Rohn & Associates, LL
1108 King Street, Third Floor
Christiansted, St. Croix
U.S. Virgin Islands  00820

By:　Lee J. Rohn
　　　Michael Williams, Assistant

For the Defendant Island Project and Operating Services,
LLC:

Law Offices of Ogletree, Deakins, Nash, Smoak & Stewart, LLC
The Tunick Building, Suite 201
1336 Beltjen Road
Charlotte Amalie, St. Thomas
U.S. Virgin Islands  00802

By:　Simone R.D. Francis

For the Defendant Vitol US Holding II Co. and Vitol Virgin
Islands Corp.:

Law Offices of Beckstedt & Kuczynski, LLP
2162 Church Street
Christiansted, St. Croix
U.S. Virgin Islands  00820

By: Carl A. Beckstedt, III

　　　and

Law Offices of Susman Godfrey
1301 Avenue of the Americas, 32nd Floor
New York, New York  10019

By:　Sarah Hannigan

---

3

APPEARANCES

For the Defendant Andrew Canning:

Law Offices of Andrew C. Simpson
2191 Church Street, Suite 5
Christiansted, St. Croix
U.S. Virgin Islands 00820

By: Andrew C. Simpson

Also Present:　Adrian Melendez, Jr.
　　　　　　　　Andrew Canning

---

4

INDEX

E-X-A-M-I-N-A-T-I-O-N

| Description | Counsel | Page |
|---|---|---|
| Direct | by Ms. Rohn | 7 |
| Cross | by Mr. Beckstedt | 170 |
| Cross | by Mr. Simpson | 172 |
| Cross | by Ms. Francis | 174 |

E-X-H-I-B-I-T-S

| Exhibit | Description | Page |
|---|---|---|
| 301 – | Bates Stamp IPOS 3902-3932 | 37 |
| 179 – | Bates Stamp Canning 456 | 41 |
| 180 – | Bates Stamp Canning 468-470 | 43 |
| 46AD – | Bates Stamp IPOS 9366 | 47 |
| 46AE – | IPOS 9385 | 55 |
| 242 – | PIS 7343 | 57 |
| 264 – | Bates Stamp PIS7239 | 59 |
| 46O – | Bates Stamp IPOS 667-668 | 61 |
| 268 – | Bates Stamp PIS 7642 | 68 |
| 280 – | Bates Stamp IPOS 4074 | 73 |
| 46T – | Bates Stamp IPOS 8440-8441 | 77 |
| 46G – | Bates Stamp IPOS 2621-2623 | 85 |
| 269 – | Bates Stamp PIS 7643 | 90 |
| 46E – | Bates Stamp IPOS 2544-2545 | 92 |
| 46B – | Bates Stamp IPOS 1401 | 96 |

EXHIBIT
15

| | | 5 | | | | 6 |
|---|---|---|---|---|---|---|
| **Index** | | | | **Index** | | |
| 46P – | Bates Stamp 6677–6678 | 100 | | 47H – | Bates Stamp IPOS 2389 | 167 |
| 46R – | Bates Stamp IPOS 6701 | 101 | | 47R – | Bates Stamp IPOS 6318 | 168 |
| 62J – | Bates Stamp IPOS 5571–5574 | 105 | | | | |
| 296 – | Bates Stamp IPOS 3896–3901 | 108 | | | | |
| 295 – | Bates Stamp IPOS 4856–4838 | 110 | | | | |
| 294 – | Bates Stamp IPOS 4835–4855 | 114 | | | | |
| 270 – | Bates Stamp PIS 7648 | 116 | | | | |
| 287 – | Bates Stamp IPOS 6700 | 118 | | | | |
| 288 – | Bates Stamp IPOS 4878 | 123 | | | | |
| 303 – | Bates Stamp Canning 14278–14280 | 125 | | | | |
| 285 – | Bates Stamp IPOS 6118, 2021, 2400, 2409, 2410 | 133 | | | | |
| 277 – | Bates Stamp IPOS 12066–12067 | 134 | | | | |
| 289 – | Bates Stamp IPOS 6707–6708 | 137 | | | | |
| 46K – | Bates Stamp IPOS 6262 | 140 | | | | |
| 46L – | Bates Stamp IPOS 6275–6276 | 142 | | | | |
| 252 – | E-mail dated July 15, 2021 from Tim Kologinczak | 144 | | | | |
| 274 – | Bates Stamp PIS 7663 | 145 | | | | |
| 46S – | Bates Stamp IPOS 7864–7846 | 148 | | | | |
| 47B – | Bates Stamp IPOS 2201–2206 | 149 | | | | |
| 260 – | Bates Stamp IPOS 7225–7230 | 157 | | | | |
| 47M – | Bates Stamp IPOS 5408 | 163 | | | | |
| 47J – | Bates Stamp IPOS 5343–5344 | 164 | | | | |
| 47C – | Bates Stamp IPOS 2211 | 165 | | | | |
| 61C – | Bates Stamp IPOS 2001 | 167 | | | | |

7

MERLIN FIGUEIRA -- DIRECT

1    MS. FRANCIS:  Good morning.  Simone Francis,
2  on behalf of IPOS.
3    And for the record, we object to the
4  recording of the deposition.  The deposition was not noticed
5  as a video deposition, and the rules require that a notice
6  specify the means by which the deposition will be taken, so
7  we object to any use of this recording for purposes of this
8  proceeding.
9    MS. ROHN:  Noted.
10    MERLIN FIGUEIRA,
11  called as a witness, having been first duly sworn,
12  testified on his oath as follows:
13    DIRECT EXAMINATION
14  BY MS. ROHN:
15    Q.  Good morning.  Could you state and spell your name
16  for the record, please?
17    A.  My name is Merlin Figueira.  Merlin is spelled as
18  M-E-R-L-I-N; last name, Figueira, F-I-G-U-E-I-R-A.
19    Q.  So I want to make sure I pronounce your last name
20  correctly.  It's Figueira?
21    A.  Yes, Figueira.  That's correct.
22    Q.  Okay.  I have to say that, because I wasn't sure.
23  I've just been referring to you as Merlin, so my apologies.
24    A.  No worry.
25    Q.  My name is Lee Rohn, and I represent Petro in this

8

MERLIN FIGUEIRA -- DIRECT

1  matter against IPOS, and various defendants.
2    Have you ever had your deposition taken
3  before?
4    A.  No, I have never.
5    Q.  So I'm sure your attorney has amply told you this,
6  but just for the record, a deposition is just as if you were
7  in the courthouse under oath.  Same penalties of perjury
8  apply.  It's just a more informal setting.  However,
9  everything that you're saying, and I'm saying, and anybody
10  else is saying, are being taken down by a court reporter,
11  and can be used at trial.
12    I have a job, which is to ask you
13  understandable and concise questions; and you have a job,
14  which is to tell the truth.  If I ask you a question that
15  is -- you're not sure of, or you don't understand, or you
16  need clarification, please let me know.  Otherwise, I will
17  assume that you understood my question.
18    This is not an endurance test, so if you need
19  to take a break at any time, please let me know, and I'll
20  try to accommodate you.
21    From time to time, you may hear lawyers say,
22  "objection."  That's for the record later for the judge.
23  Unless your lawyer, or IPOS's lawyer, instructs you not to
24  answer a question, you are then obligated to answer that
25  question.

**9**

1      Do you have any questions about that so far?
2      A.  No, I do not.
3      Q.  Okay.  So Mr. Figueira, where were you born?
4      A.  I was born in Kigoma, Tanzania.
5      Q.  Tanzania?
6      A.  That's correct.
7      Q.  Your -- the only reason I repeated it, there's a
8  little bit of a warble in your transmission, and so I'm
9  just -- sometimes I may repeat things, just to make sure I
10  heard them correctly.
11      A.  Okay.
12      Q.  And what race would you consider yourself?
13      A.  Well, that's -- that's a tough one.  I would -- I
14  would classify myself as -- as Indian.
15      Q.  And can you tell me what your educational
16  background is, post high school?
17      A.  I have a -- have an engineering degree, and I have
18  a master's in business.
19      Q.  And when did you get your engineering degree?
20      A.  I can't recall now.  I believe it was -- I
21  graduated in 1976.
22      Q.  And where did you get your engineering degree
23  from?
24      A.  I got my engineering degree from the University of
25  London.

Susan C. Nissman, RPR-RMR
(340) 773-8161

**10**

1      Q.  And when did you get your master's degree?
2      A.  My master's degree, I believe I got that in 1998.
3      Q.  And from where?
4      A.  I got my master's degree at -- gosh, I've
5  forgotten the name of the university, but it was in Moraga.
6  Moraga, California.  And -- oh, St. Mary's College.  Excuse
7  me.  St. Mary's College in Moraga, California.
8      Q.  Okay.  And how old are you, sir?
9      MS. FRANCIS:  Objection.
10      A.  Sixty-nine.
11      Q.  (Ms. Rohn)  And did you do anything to prepare to
12  be deposed?
13      A.  I -- I had a call with Simone that prepared me for
14  what this deposition is all about, but that's about it.
15      Q.  And when was that call?
16      A.  I -- I can't recall exact dates.
17      Q.  Well, weeks ago?  Months ago?  Days ago?
18      A.  I would say -- I would like to say weeks ago.
19      Q.  And during that call, did you review any
20  documents?
21      A.  I can't recall whether I did or not.
22      Q.  How long was that call?
23      A.  The call, I believe, was maybe a couple of hours.
24  I think two calls, couple of hours apiece.
25      Q.  Was anybody else on the calls besides yourself and

Susan C. Nissman, RPR-RMR
(340) 773-8161

**11**

1  Ms. Francis?
2      A.  No.  On those -- on those two calls, it was just
3  Simone Francis.
4      Q.  Has anyone contacted you about this case, other
5  than Ms. Francis?
6      A.  I had -- I had one call with David a long time ago
7  about the case, but that's about it.
8      Q.  And is that David Smith?
9      A.  That is correct.
10      Q.  And what was discussed on that call?
11      A.  Oh, Attorney Rohn, that's been a long time.  I --
12  I do not know the specifics.
13      Q.  Well, was it -- was it this case that was
14  discussed?
15      A.  Yes.
16      Q.  And was it the termination of the Petro contract
17  that was discussed?
18      A.  Attorney Rohn, I can't really recall.  It's
19  been -- it's been months.
20      Q.  Has anybody else discussed this case with you?
21      A.  Nobody else has.
22      Q.  Are you currently employed?
23      A.  Yes, I am.
24      Q.  Where are you employed?
25      A.  I'm employed at Navgas.

Susan C. Nissman, RPR-RMR
(340) 773-8161

**12**

1      Q.  And where is that?  Where are you located?
2      A.  In Lagos, Nigeria.
3      Q.  How long have you been employed by Navgas?
4      A.  On this -- on this assignment, since November 15,
5  2022.
6      Q.  And what is your job at Navgas?
7      A.  I'm the managing director of Navgas.
8      Q.  Is Navgas in any way related to any Vitol
9  companies?
10      MS. FRANCIS:  Objection.
11      A.  Attorney Rohn, you cut off.
12      Q.  (Ms. Rohn)  Is Navgas related in any way to any
13  Vitol companies?
14      MR. BECKSTEDT:  Objection.
15      MS. ROHN:  Noted.
16      Q.  (Ms. Rohn)  You may answer.
17      A.  No, it's not.
18      Q.  Do you know who owns Navgas?
19      A.  Navgas is owned by a group of shareholders.
20      Q.  Do you know who they are?
21      A.  I know of just one, Nidogas.  That's one of the
22  shareholders.
23      Q.  Could you repeat that?  You broke up.  Anitagas,
24  is that what you said?
25      A.  Yeah, Nidogas; N-I-D-O-G-A-S.

Susan C. Nissman, RPR-RMR
(340) 773-8161

MERLIN FIGUEIRA -- DIRECT

1    Q.  And what are your job duties for Navgas?

2    A.  Attorney Rohn, could you repeat that question

3 again?

4    Q.  Sure.

5           What are your job duties as managing director

6 for Navgas?

7    A.  My -- job responsibilities are to efficiently

8 and safely run this facility in Nigeria.

9    Q.  And you said this -- on this tour, which started

10 in November 2022, how many times have you worked for Navgas?

11    A.  This is my second tour with Navgas.

12    Q.  And when was your first tour?

13    A.  My first tour was -- I got a -- I got a estimate.

14 It was probably from 2017 to 2019.

15    Q.  What was your job title then?

16    A.  I was the managing director, at that time, as

17 well.

18    Q.  And why did you leave in 2019?

19    A.  I left in 2019, because my assignment had come to

20 an end.

21    Q.  And did you work anywhere between 2019 and 20 --

22 November 2022?

23    A.  Yes, I did.

24    Q.  Where did you work?

25    A.  I worked at IPOS.

Susan C. Nissman, RPR-RMR
(340) 773-8161

MERLIN FIGUEIRA -- DIRECT

1    Q.  And did you actually work directly for IPOS, or

2 for a different company, or some other company?

3    A.  I worked directly for IPOS.

4    Q.  And were you paid by IPOS?

5    A.  That is correct.

6    Q.  And what was your job at IPOS?

7    A.  I was the general manager of IPOS.

8    Q.  And how did you come to get that job as general

9 manager at IPOS after leaving Navgas in 2019?

10    A.  Well, I was -- I was assigned to IPOS because of

11 my -- my background with LPG.

12    Q.  Who -- who assigned you to IPOS?

13    A.  VTTI.

14    Q.  And how did you know VTTI?

15    A.  Well, VTTI owns several entities.  And because of

16 my background, I was assigned to IPOS.

17    Q.  Had you worked for VTTI before?

18    A.  No, I've never worked for VTTI.

19    Q.  Do you know -- do you have any knowledge as to how

20 VTTI knew you existed?

21    A.  Oh, because -- because they -- they manage several

22 facilities around the world.

23    Q.  And how did that have anything to do with you?

24    A.  Because I had -- because I had worked for entities

25 that -- that were -- were managed by -- were -- were

Susan C. Nissman, RPR-RMR
(340) 773-8161

MERLIN FIGUEIRA -- DIRECT

1 owned -- actually, they were independent entities that were

2 in several locations around the world, and VTTI had assigned

3 employees that had specific expertise to do subsidiaries.

4    Q.  Okay.  And what were those companies?

5          MS. FRANCIS:  Objection.

6    A.  I mean --

7    Q.  (Ms. Rohn) You may answer.

8    A.  There are -- there are several entities all around

9 the world.  I think they're based in several -- in all five

10 continents.  I can -- I will list a few of them.  I think --

11    Q.  As best you can.

12    A.  Seaport Canaveral.

13    Q.  Sorry.  I'm sorry.  Did you say Seaport Canaveral?

14 Hello?

15    A.  I'm sorry?

16    Q.  Did you say Seaport something?

17    A.  Seaport Canaveral Corporation.

18    Q.  And what period of time did you work for Seaport

19 Canaveral Association?

20    A.  No, I was responding to your question about what

21 other entities that come under VTTI, or that have VTTI

22 responsibility.  I was answering to your question on that.

23    Q.  Oh, okay.  Well, my question was, which of those

24 companies did you work for?

25    A.  Oh, okay.  I'm sorry.  I misunderstood your

Susan C. Nissman, RPR-RMR
(340) 773-8161

MERLIN FIGUEIRA -- DIRECT

1 question.

2    Q.  That's okay.

3    A.  I worked for -- I worked for Seaport Canaveral

4 Corporation.  I worked for VTTI Kenya.  I worked for IPOS.

5 I worked for Navgas.  I worked for PATSA in Panama.

6    Q.  I'm sorry.  Tell me what that one is again?

7    A.  PATSA, P-A-T-S-A, in Panama.

8    Q.  And you're breaking up.  Could you say that again?

9    A.  PATSA.  It's -- it's spelled as P-A-T-S-A.

10    Q.  Okay.  All right.  And did you just say Navgas is

11 a VTTI company?

12    A.  It's not -- Navgas is an independent --

13 independent company based in Nigeria.

14    Q.  But in some way, it's affiliated with VTTI; is

15 that correct?

16          MS. FRANCIS:  Objection.

17    A.  I would not say so.  It is --

18    Q.  (Ms. Francis) Well, sir, were you assigned to

19 Navgas by VTTI?

20    A.  Yes, I was.  Yes, I am.

21    Q.  And were you assigned to Seaport Canaveral by

22 VTTI?

23    A.  Yes, I was.

24    Q.  Were you assigned to VTTI Kenya by VTTI?

25          MS. FRANCIS:  Objection.  Relevance.

Susan C. Nissman, RPR-RMR
(340) 773-8161

1    **A.**   That is correct.

2    **Q.   (Ms. Rohn)** And were you assigned to PATSA by VTTI?

3    **A.**   Yes.

4    **Q.**   Okay.  So Seaport Canaveral, when did you work

5    there?

6    **A.**   I think it's 2009, all the way to 2011.

7    **Q.**   And what was your job there?

8    **A.**   I was a general manager.

9    **Q.**   And who did you report to?

10   **A.**   I reported to -- to our CEO, who was based in the

11   Netherlands.

12   **Q.**   I'm sorry.  Was based where?

13   **A.**   In the Netherlands.

14   **Q.**   And who did your CEO work for?

15          **MS. FRANCIS:**  Objection.  Relevance.

16   **A.**   That, I don't know.

17          **MS. ROHN:**  Noted.

18   **Q.   (Ms. Rohn)** Answer my question, please.

19   **A.**   I don't know.

20   **Q.**   Okay.  At VTTI Kenya, what was your job position?

21          well, first of all, when did you work there?

22   **A.**   From 2011 to 2014.

23   **Q.**   All right.  And what was your job position there?

24   **A.**   I was a general manager.

25   **Q.**   And who did you report to?

1    **A.**   I reported to Rob Nijst, CEO.

2    **Q.**   Is he the CEO of VTTI?

3    **A.**   Yes.

4    **Q.**   And at IPOS, who did you report to?

5    **A.**   At IPOS, I also -- I also reported to Rob Nijst.

6    **Q.**   And what period of time did you work at IPOS?

7    **A.**   From 20 -- gosh.  Okay.  I believe it was from

8    2015, I think, to 2017.

9    **Q.**   And then did you have a second tour at IPOS?

10   **A.**   Yes.

11   **Q.**   And what dates were those?

12   **A.**   I believe that was December 2019 to about midyear

13   2021.

14   **Q.**   And did you report to Rob Nijst the second period

15   as well?

16   **A.**   Yes.

17   **Q.**   And what were your titles of the first time you

18   were there?

19   **A.**   Neoport general manager.

20   **Q.**   And at Navgas, who do you report to?

21   **A.**   At Navgas, I report to a manager in -- in -- in --

22   actually in -- at VTTI.

23   **Q.**   And at PATSA, what years did you work at PATSA?

24   **A.**   Oh, at PATSA, I was just a few weeks collectively

25   between -- I'd like to say 2021 through about mid-2022.

1    **Q.**   And who did you report to at -- well, what was

2    your position at PATSA?

3    **A.**   Actually, at that point, I was a consultant.

4    **Q.**   And who did you report to as a consultant?

5    **A.**   Actually, as a consultant, I would report -- I

6    reported to PATSA wherever I worked.  Whatever entity I

7    worked for, I would report to the manager at those -- at

8    those entities.

9    **Q.**   I'm sorry.  So at PATSA, was there a name of a

10   person that you reported to?

11   **A.**   The name of the general manager there was Edmundo.

12   **Q.**   And do you know who Edwindo -- Edmundo reported

13   to?

14          **MS. FRANCIS:**  Objection.  Relevance.

15   **A.**   I believe to Rob Nijst.

16   **Q.   (Ms. Rohn)** Thank you.

17          At each of the various places that you were

18   employed -- assigned to by VTTI, were -- did you receive any

19   pay or benefits from VTTI?

20   **A.**   Never.

21          **MS. FRANCIS:**  Objection.  Relevance.

22          **MS. ROHN:**  Noted.

23   **Q.   (Ms. Rohn)** You can answer.

24   **A.**   I've never received any -- any wages from VTTI.

25   **Q.**   Do you belong to a VTTI pension fund?

1    **A.**   No, I do not.

2          **MS. FRANCIS:**  Objection.  You're not allowed

3    to find out this witness' assets.

4          **MS. ROHN:**  I'm not asking for his assets; I'm

5    asking for his affiliation with VTTI.  I would never ask him

6    what his -- amount of his pension was.

7    **Q.   (Ms. Rohn)** So are you a member of any pension

8    plan?

9          **MS. FRANCIS:**  Again.  Same objection.

10   Relevance.

11          **MS. ROHN:**  Noted.

12   **Q.   (Ms. Rohn)** You may answer.

13          **MS. FRANCIS:**  Same objection.

14          **MS. ROHN:**  Noted.

15   **A.**   No.

16   **Q.   (Ms. Rohn)** Are you a member of any one -- any

17   401(k) programs?

18          **MS. FRANCIS:**  Again, relevance.  Has no

19   relevance to this witness.

20          **MS. ROHN:**  Sure does.

21   **Q.   (Ms. Rohn)** Could you answer my question, please?

22   **A.**   The four -- the only 401(k) plan that I actually

23   had was at -- when I was employed by IPOS, and when I was

24   employed at Seaport.

25   **Q.**   And who controls that 401(k) plan?

**MERLIN FIGUEIRA -- DIRECT**

1  MS. FRANCIS: Absolutely irrelevant, Attorney
2  Rohn. If we need to --
3  MS. ROHN: Please don't yell at me. Really,
4  do not yell at me.
5  MS. FRANCIS: I am not yelling at you.
6  Q. (Ms. Rohn) Answer my question, please.
7  MS. FRANCIS: Please don't speak to the
8  witness in that disrespectful tone.
9  MS. ROHN: I did not have any tone of voice.
10  Thank God we're recording this.
11  Q. (Ms. Rohn) Who controlled those 401(k)s?
12  A. The -- the individual entities.
13  For example, at Seaport, it was Seaport --
14  Seaport Finance. When it was IPOS, it was IPOS Finance.
15  Q. Do you -- are you familiar with a company called
16  Petro?
17  A. Yes, I am.
18  Q. And how are you familiar with a company called
19  Petro?
20  A. Well, they did some -- they did some maintenance-
21  related work at IPOS.
22  Q. Were you, in any way, involved in the decision to
23  hire them to do maintenance work at IPOS?
24  A. No, I was not.
25  Q. When you got to IPOS, were they already there?

**MERLIN FIGUEIRA -- DIRECT**

1  A. That is correct. They were there.
2  Q. So I think your first stint was 2015 to 2017.
3  Was Petro there during that stint?
4  A. No.
5  Q. So your second stint was December 2019 to June
6  about 2021.
7  Were they there when you arrived during that
8  stint?
9  A. Yes.
10  Q. In addition to doing maintenance at the propane
11  terminals, are you aware of whether or not they did work on
12  special projects?
13  A. They did work on special projects.
14  Q. And was that work on special projects for IPOS or
15  for Vitol?
16  A. Those projects were for IPOS. Yes, they were for
17  IPOS.
18  Q. Well, David Smith was deposed yesterday, and he
19  indicated that some of the special projects were what we
20  call passed-through projects, that IPOS would pay for them,
21  but Vitol would pay IPOS back, because they were not part of
22  their regular budget.
23  Are you aware of that?
24  A. I -- I wasn't -- I wasn't there for -- for when
25  David spoke about that, so I -- I can't really comment on

**MERLIN FIGUEIRA -- DIRECT**

1  what exactly he may -- he may or may not have said.
2  Q. Okay. No. I'm asking whether or not you are
3  aware there were projects that Petro worked on that were
4  paid for by IPOS, but were passed through in the sense that
5  they were not budgeted, and Vitol would reimburse IPOS?
6  A. That is correct. I'm aware of them.
7  Q. And on those projects, who controlled those
8  projects?
9  MR. BECKSTEDT: Objection.
10  MS. ROHN: Noted.
11  Q. (Ms. Rohn) You may answer.
12  MS. FRANCIS: Objection.
13  MS. ROHN: Same.
14  Q. (Ms. Rohn) You may answer.
15  A. The -- the projects were -- the projects were
16  actually managed by -- by -- by a Vitol-contracted employee.
17  Q. And who was that contractor?
18  A. Andrew Canning.
19  Q. At the time that you had your -- well, during your
20  first stint with IPOS, from 2015 to 2017, was Mr. Canning
21  there?
22  A. He was there with a team of others. It was a
23  later part of my -- my tenure over there.
24  Q. And at that point, who employed him?
25  A. He was -- he was -- I -- I actually do not know

**MERLIN FIGUEIRA -- DIRECT**

1  who specifically hired him. I don't -- I don't have any
2  idea who exactly hired him at that -- at that time.
3  Q. Have you ever heard of a company called Optis?
4  A. Optis, I believe, was -- was -- was the contractor
5  that actually hired Andrew.
6  Q. And do you know --
7  A. Yeah.
8  Q. -- how -- do you know who Optis contracted with?
9  A. No, I do not.
10  Q. During the 2015-2017 period, did Mr. Canning
11  report to anybody at IPOS?
12  MR. BECKSTEDT: Objection.
13  MS. ROHN: Noted.
14  Q. (Ms. Rohn) You may answer.
15  MS. FRANCIS: Objection. Form.
16  MS. ROHN: Same thing.
17  Q. (Ms. Rohn) You may answer.
18  A. Actually, at that time, he -- he was doing the
19  punch work-related items for the project team at the time.
20  Q. And who was the project team?
21  A. It was an entity called VTTS.
22  Q. Is that a VTTI-related company?
23  A. I'm not so sure who they're affiliated with.
24  Q. Well, where is VTTS out of?
25  A. I believe -- I'm not sure. I can't answer that

1  with certainty.

2      Q.   When the punch list was completed, did VTTS stay

3  on the job, or did they complete their work?  Had they

4  completed their work?

5      A.   I left -- I left just before they had finished

6  their work, so I do not know.

7      Q.   Did you have any interactions -- well, were you

8  ever employed by VTTS at that time?

9      A.   I was never employed by VTTS.

10      Q.   What was your relationship between Optis and --

11  sorry.  What was the relationship between IPOS and VTTS?

12      A.   There was -- there was no connection between the

13  two entities.  We -- you know, IPOS was a separate entity in

14  its entirety.

15      Q.   During 2015-2017, what was IPOS engaged in?

16      A.   IPOS was engaged in operation.  Commissioning and

17  operating the -- the two facilities in St. Croix and

18  St. Thomas.

19      Q.   Now, during the second stint that you were there

20  from 2019 to mid-2021, did you have any interactions with

21  Mr. Sebastian Moretti?

22      A.   Yes, I did.

23      Q.   Okay.  And what sorts of interactions would you

24  have with Mr. Moretti?

25      A.   The interactions I had were related to vessels

1  coming in, operational issues, those -- those kind of

2  matters.

3      Q.   When you say, "operation issues," what would that

4  entail?

5      A.   There's a whole assortment of -- of items there.

6  It would be inventory.  It would be equipment breakdown.  I

7  mean, there's a whole series of things.

8      Q.   And who did you understand Mr. Moretti worked for?

9      A.   I do -- I do not know.  I do not know with

10  certainty.

11      Q.   Have you ever heard of a company called Vitol,

12  Inc.?

13      A.   I do.

14      Q.   Do you know whether or not he worked for Vitol,

15  Inc.?

16      A.   I could not --

17          MR. BECKSTEDT:  Objection.

18      A.   I don't know.

19      Q.   (Ms. Rohn)  How often, while you were there, would

20  you interact with Mr. Moretti?

21      A.   Possibly once a week.  Maybe once every other

22  week.

23      Q.   Were there regular meetings between yourself and

24  Mr. Moretti?

25      A.   I would not say -- I would not say so.  When you

1  say, "regularly," I would classify that as weekly.  That

2  never happened.  There were sporadic meetings within.

3      Q.   Did Mr. Moretti ever come to the Virgin Islands

4  while you were there?

5      A.   I believe he -- he -- he visited at the tail end

6  of my first tenure.

7      Q.   And do you know what the purpose was for his being

8  there?

9      A.   No, I do not.

10      Q.   Did you meet with him at that point?

11      A.   Yes, I did.

12      Q.   And what sorts of things did you discuss with him

13  when he was there?

14      A.   Well, I mean, the -- he wanted a tour of the

15  facility, which I did, and then he left.

16      Q.   During any of your time at IPOS, did you have any

17  interaction with Charlotte Horowitz?

18      A.   I did.

19      Q.   And what type of interaction would you have with

20  Ms. Horowitz?

21      A.   We had a similar -- similar kind of thing;

22  operational issues, inventory, potential issues with WAPA,

23  those kind of things.

24      Q.   And how often would you attend meetings with her?

25          MS. FRANCIS:  Objection.  Foundation.

1      A.   On my --

2      Q.   (Ms. Rohn)  You may answer.

3      A.   On my second tour, potentially it was a week or

4  once every two weeks.

5      Q.   And who would attend these meetings?

6      A.   I think it was Tim.  I've forgotten his last name,

7  but --

8      Q.   I call him Tim K., because I can't pronounce his

9  last name.

10      A.   Okay.  Okay.  He's the same guy, Tim K.

11      Q.   Okay.  Who else?

12      A.   For the most part, it was typically the two of

13  them, or maybe Tim on his own.

14      Q.   And yourself, and who else?

15      A.   I -- I would have attended with -- with operation

16  supervisors.  Sometimes a maintenance supervisor.  It all

17  depend -- depended on the content of the meeting.

18      Q.   Okay.  And who was the operation supervisor?

19      A.   There were two of them:  One was Granger in

20  St. Thomas; and Alex in St. Croix.

21      Q.   Is that Alex Etienne?

22      A.   Yes.

23      Q.   And who was the maintenance supervisor?

24      A.   His first name is -- I -- I've forgotten his last

25  name.  His first name is Coury.

MERLIN FIGUEIRA -- DIRECT

1  Q.  Coury Hodge?
2  A.  Yeah, that's it.
3  Q.  And why would your operation supervisor and/or
4  maintenance supervisor be meeting with Charlotte or Tim K.?
5  A.  Their interest was to make sure the facility was
6  run -- was run well.
7  Q.  Do you know who Charlotte Horowitz worked for?
8  A.  I -- I do not know for sure.
9  Q.  Do you know who Tim K. worked for?
10  A.  I do not know for sure.
11  Q.  Were you ever told that they worked for Vitol,
12  Inc.?
13  A.  No, not that I -- not that I can remember.
14  Q.  Do you know of a company called Vitol, Inc.?
15  A.  Yes, I do.
16  Q.  What do you understand Vitol, Inc. does?
17  A.  Vitol is a -- is a trader.  One of the largest
18  traders of crude and petroleum products in the world, so
19  they basically do trading of petroleum products around the
20  world.
21  Q.  Do you understand that -- whether or not Vitol,
22  Inc. had any ownership interest in the asset of the propane
23  terminals?
24  A.  I believe Vitol actually owned the facilities
25  at -- at -- on St. Thomas and St. Croix.

MERLIN FIGUEIRA -- DIRECT

1  Q.  How did you describe your interaction -- on your
2  second tour, how would you describe your interactions with
3  Mr. Canning?
4      MS. FRANCIS:  Objection.  Form.
5      MS. ROHN:  Noted.
6  Q.  (Ms. Rohn) You can answer.
7  A.  You know, I -- I've a good relationship with
8  almost anybody I worked.  So I think in -- in Andrew's case,
9  yes, I mean, I had, overall, a very good relationship with
10  him.
11  Q.  Were you aware that your relationship was
12  described by David Smith as a cold-war relationship?
13  A.  I am not aware.  I don't know what David said in
14  what context, so I can't comment on that one.
15  Q.  Were you aware that Mr. Canning would send e-mails
16  to David Smith, undermining your abilities as a general
17  manager?
18  A.  No, I'm not aware of any.
19  Q.  Did you -- what was your relationship to Petro
20  when you were in the second stint?
21  A.  As I -- as I said before, you know, my
22  relationship with most people is -- is -- is pretty
23  professional and -- and on -- on good terms.  I mean, I had
24  a good relationship with Adrian over there, and with Chad.
25  I mean, yes.  I mean, did I have some disagreements with --

MERLIN FIGUEIRA -- DIRECT

1  with -- with -- with a contractor?  Yes.  I mean, every --
2  every -- every person who manages a contract will have, for
3  the most part, a decent relationship and -- and -- and
4  issues with a contractor where work is not properly done.
5  Q.  Do you recall having discussions with Mr. Canning
6  about his relationship with Petro?
7  A.  I mean, I think there were.  I mean, with -- as I
8  just said earlier, you know, no contractor is perfect.  And
9  I think in -- in Andrew's situation, if there was work that
10  was not done in a workmanship manner, I mean, he would speak
11  out.
12  Q.  Sir, did you ever find that he would claim work
13  wasn't done in a proper manner, but when you investigated
14  it, his claims were false?
15  A.  No.
16  Q.  Did there ever come a time where you informed
17  Mr. Canning that he should not be interacting with Petro?
18  A.  Well, no, I -- I did not say that.
19  Q.  Well, what did you say?
20  A.  I -- I believe there was a -- a time where I had
21  asked Andrew to, if there's any issues, to bring them to me,
22  so that I can resolve them between the contractor or any
23  other individual.
24  Q.  Did Adrian complain to you about Mr. Canning, and
25  the way he treated his people?

MERLIN FIGUEIRA -- DIRECT

1      MS. FRANCIS:  Objection.  Form.
2      MS. ROHN:  Noted.
3  A.  I don't recall any -- any -- any -- any
4  conversations where Andrew -- where Adrian had said that
5  Andrew had mistreated anyone.  I don't recall a conversation
6  like that.
7  Q.  (Ms. Rohn) Do you recall conversations with Adrian
8  in which he complained that Andrew Canning's behavior
9  towards Petro was unfair?
10  A.  I'm not so sure what you mean by "unfair."
11  Q.  That he was making criticisms that were unfounded?
12      MS. FRANCIS:  Objection.  Form.  Foundation.
13  Q.  (Ms. Rohn) You may answer.
14  A.  I -- I -- I wouldn't -- I wouldn't really say
15  that.  Andrew was an engineer, or is an engineer.  And if
16  there was work that was not done in a workmanship manner, he
17  would speak up.  I think that was his job.
18  Q.  Did you ever have any conversations with Adrian in
19  which he complained that Andrew Canning was trying to make
20  sure that Petro was not given certain jobs?
21  A.  No.
22  Q.  Did you ever have any conversations with Adrian
23  about the fact that Canning was holding up the payment of
24  Petro's invoices?
25  A.  I can't remember.  I can't remember an instance

MERLIN FIGUEIRA -- DIRECT

1 like that.

2  Q.  Have you ever had any conversations with Adrian

3 about the fact that Mr. Canning was trying to throw certain of

4 his workers off the job site?

5  A.  Could you repeat the question, please?

6  Q.  Sure.

7       Did you ever have any conversations with

8 Adrian that Mr. Canning was trying to throw certain of

9 Petro's workers off the job site?

10  A.  I can't -- I can't remember a conversation like

11 that.

12  Q.  Did you ever have any conversations with Adrian

13 complaining that Mr. Canning was falsely accusing Petro of

14 falsifying timesheets?

15  A.  I do recall one -- one instance where some

16 timesheets were not accurately recorded.

17  Q.  And how do you know they weren't accurately --

18 accurately recorded?

19  A.  I -- I don't know the details, but I do know a

20 conversation that I had with -- with Andrew -- or that he

21 believed some timesheets were doctored, but I did not look

22 at those in details and nor could I validate whether that

23 was correct.

24  Q.  In fact, do you recall that the job that Petro was

25 working on when Mr. Canning attempted to claim they were

MERLIN FIGUEIRA -- DIRECT

1 falsifying timesheets was a not-to-exceed contract, and not

2 a time-and-material contract?

3  A.  No, I do not know anything about that one. I

4 can't recall.

5  Q.  Did there come a time that Mr. Canning claimed

6 that welder certificates had been forged by -- by Petro?

7  A.  Andrew -- Andrew Canning did bring it to my

8 attention that he believed that some of the welder

9 certificates were not authentic.

10  Q.  And were those welder certificates for Petro?

11  A.  I believe so.

12  Q.  Did you participate in the investigation of those

13 claims against Petro?

14  A.  No, I did not.

15  Q.  Who did?

16  A.  I can't -- I can't recall the -- the individuals

17 that were -- that did the investigation.

18  Q.  Were you aware that the person who issued those

19 certificates, or who did the testing for those certificates,

20 was a man named Guillermo Castro?

21       MS. FRANCIS:  Objection.  Foundation.

22  Q.  (Ms. Rohn)  You may answer.

23  A.  No, I do not know.

24  Q.  Ever heard the name Guillermo Castro?

25  A.  I -- I have heard.  I do -- I have heard his name

MERLIN FIGUEIRA -- DIRECT

1 being used, yes.

2  Q.  And in what context?

3  A.  I have no -- I mean, I only heard of his name. I

4 have no idea of his -- of his background, his expertise,

5 his -- and in what context his name was raised.

6  Q.  Did you -- do you recall that there came a time

7 that Mr. Castro offered to come to the Virgin Islands and

8 retest the welders for certification?

9       MR. SIMPSON:  Objection.

10  Q.  (Ms. Rohn)  You may answer.

11  A.  I do recall he -- him being made available to

12 travel to the Virgin Islands, but on -- on what -- on what

13 purpose, I do not know.

14  Q.  Did you participate in the decision to terminate

15 Petro's contract?

16  A.  No, I did not.

17  Q.  Do you know who made the decision to terminate

18 Petro's contract?

19  A.  I believe -- I -- I do not know for certain who --

20 who made that decision.

21  Q.  Did you -- were you ever asked if you agreed with

22 that decision?

23  A.  No.

24  Q.  Did you ever tell anyone you agreed to that

25 decision?

MERLIN FIGUEIRA -- DIRECT

1  A.  No.

2  Q.  Did you agree with that decision?

3       MS. FRANCIS:  Objection.

4  Q.  (Ms. Rohn)  You may answer.

5       MS. FRANCIS:  Relevance.

6  A.  Considering the issues that were raised, and the

7 thoughts surrounding the welder certificate, yes, I agree.

8  Q.  (Ms. Rohn)  And what did you believe were the

9 issues that were raised?

10  A.  The issues that were raised were that the --

11 welder certificates were not authentic.

12  Q.  And who raised -- and who -- who claimed that?

13  A.  I believe Andrew Canning, who was supervising that

14 work, discovered that the certificates were not authentic.

15  Q.  Did you rely on Mr. Canning's representations that

16 the certificates were not authentic, to believe that Petro

17 should have their contract terminated?

18       MR. BECKSTEDT:  Objection.

19  Q.  (Ms. Rohn)  You may answer.

20       MR. SIMPSON:  Objection.

21  Q.  (Ms. Rohn)  You may answer.

22       MS. FRANCIS:  Objection.

23  Q.  (Ms. Rohn)  You may answer.

24  A.  On -- on looking at the certificates, I -- the --

25 I would have agreed, or I still agree that there were

1  some -- some -- some data there that was -- looked as if it
2  was altered.
3      Q.  Did you ever see the letter from Guillermo Castro
4  explaining why those areas looked -- didn't look authentic,
5  because of how he had transposed things on an old document?
6          MR. BECKSTEDT:  Objection.
7          MS. FRANCIS:  Objection.  Foundation.
8      Q.  (Ms. Rohn)  You may answer.
9      A.  I've never seen something like that.
10     Q.  Okay.  Were you aware that Mr. Guillermo Castro
11 offered to have a telephone conference to answer any
12 questions about any anomalies in the certificates?
13         MR. SIMPSON:  Objection.
14         MS. FRANCIS:  Objection.  Foundation.
15     Q.  (Ms. Rohn)  You may answer.
16     A.  I don't recall.
17     Q.  I'm sorry.  I couldn't hear your answer.
18     A.  I don't recall.
19     Q.  I'm going to start sharing some documents with
20 you, and the other attorneys, so they will pop up,
21 hopefully, on your screen, and then I'll ask you some
22 questions about them.
23         The first is example -- is Exhibit 301.
24         (Deposition Exhibit No. 301 was
25             marked for identification.)

1          MS. FRANCIS:  Attorney Rohn, can we perhaps
2  take a two-minute break while your staff works to get the
3  exhibits up?
4          MS. ROHN:  Sure.  Why don't we take a
5  five-minute break?  It may take us longer than two.
6          MS. FRANCIS:  Okay.  Your call.  Thank you
7  very much.
8          MS. ROHN:  Thank you.
9          (Short recess taken.)
10     Q.  (Ms. Rohn)  Okay.  Mr. Figueira, do you see 301 on
11 the screen?
12     A.  I do.
13     Q.  Have you ever seen this document before?
14     A.  I have seen it, yes.
15         MS. FRANCIS:  Attorney Rohn, I'm sorry.
16 Before we continue, would you just identify the Bates
17 numbers, because we're only seeing one page of the document,
18 and the witness does not have electronic or physical copies
19 in front of him as to any documents?
20         MS. ROHN:  Okay.  Well, it's the same as
21 yesterday, but let me see here.
22         MS. FRANCIS:  Okay.
23         MS. ROHN:  It's 3 -- it's IPOS 3902 through
24 3932.
25         MS. FRANCIS:  Thank you very much.  I

1  appreciate it.
2          MS. ROHN:  Sure.
3          No, no, no.  She was asking what the Bates
4  numbers were.  Go back to the first.
5          MR. WILLIAMS:  Okay.
6      Q.  (Ms. Rohn)  All right.  So have you seen this
7  document before, sir?  I think you said yes.
8          What do you understand this document is?
9      A.  Well, that document, I have not read it in its
10 entirety, 'cause it wasn't really my job at the time, but I
11 believed it contained the specifications for -- for welding
12 on pipe.
13     Q.  And would that have been on the IPOS -- IPOS jobs?
14     A.  Yes.
15     Q.  And would it have also been on any jobs being done
16 for Vitol at the Virgin Islands propane terminals?
17     A.  Well, it's a -- it's a different thing.  The
18 specification was specifically done for -- for work at a
19 IPOS facility.
20     Q.  Well -- well, was the Virgin Islands' terminals
21 the IPOS facility?  Virgin Islands propane terminal?  Sorry.
22     A.  IPOS never owned the -- the propane facilities.
23 We were -- IPOS was the operator of the -- the facilities.
24     Q.  Okay.  But you said this applied to the IPOS
25 facility.  I'm trying to find out what you define as the

1  "IPOS facility"?
2      A.  Okay.  Well, I -- I'm using the term
3  interchangeably, because IPOS facility is the two facilities
4  we managed.  That's the facility in St. Thomas and
5  St. Croix.
6      Q.  And this document says "VTTI" at the top.
7          Do you know why that is?
8      A.  I -- I do not know.  I mean, I do not know with
9  certainty why.  Why that is there.
10     Q.  It indicates the USVI LPG Conversion Project.
11         Is that synonymous with the -- the Virgin
12 Islands Propane Terminal Project?
13         MR. BECKSTEDT:  Objection.
14     Q.  (Ms. Rohn)  You may answer.
15     A.  The USVI LPG Conversion Project is or was the --
16 the -- the construction of the two facilities in St. Thomas
17 and St. Croix.
18     Q.  And after the construction was completed, did
19 these -- these procedures remain in effect during the
20 maintenance and special projects at those facilities?
21     A.  That is correct.
22     Q.  And if you look at Bates Number 3904.  Are you on
23 3904?  You have to scroll down, so we can -- yeah, there you
24 go.
25         MS. FRANCIS:  Thank you.

MERLIN FIGUEIRA -- DIRECT

1  Q.  (Ms. Rohn) If you'll scroll down, please?  Right
2  there.  Applicable codes and standards.
3      Did you understand that the ASME codes and
4  standards applied to both the pressure piping, as well as
5  the welding done on the premises?
6      MR. BECKSTEDT:  Objection.
7  Q.  (Ms. Rohn) You may answer.
8  A.  Well, I mean, the -- the standard -- I mean,
9  the -- the procedure actually references these standards.  I
10  mean, it's very common for -- for a standard to reference
11  known standards within the United States.  And -- and that's
12  what -- what that is there for.  I -- I still don't get your
13  question.
14  Q.  Well, I think you answered it.  I have no more
15  questions about that.  You can take that down.
16      Exhibit 179, which is Canning 456.
17      (Deposition Exhibit No. 179 was
18          marked for identification.)
19      Okay.  And can you scroll down on this,
20  please?
21      All right.  This -- this starts with an
22  e-mail from yourself dated March 30th, 2016 to Tim K., Chris
23  Neophytou, and Petros Constantinou.  Subject:  Information
24  submittal to Vitol.
25      First of all, can you recall what you meant

MERLIN FIGUEIRA -- DIRECT

1  by "information submittal to Vitol"?
2  A.  I mean, I can't recall.  I mean, this -- this
3  e-mail is forwarded several times, so you really have to
4  start from the scratch, and look at the chain of e-mails to
5  really answer your question correctly.
6  Q.  Do you recall who Chris Neophytou or phytou was?
7  A.  Yes.
8  Q.  Who was he?
9  A.  He was the engineer that designed the -- the --
10  the -- the -- did the design for the St. Thomas and
11  St. Croix facilities.
12  Q.  Okay.  And do you know who he worked for?
13  A.  He worked for himself.
14  Q.  Okay.  And do you know who Petros Constantinou is?
15  A.  I -- I know of him, yes.  He worked for Hiteco.
16  Q.  Okay.  Hiteco, I take it, was the engineering firm
17  that designed the facilities; is that correct?
18  A.  That's correct.
19  Q.  Okay.  And did -- to your knowledge, did Petros
20  Constantinou ever work for a Vitol-related company, or a
21  VTTI-related company?
22  A.  No.
23      MS. FRANCIS:  Objection.  Compound.
24  Q.  (Ms. Rohn) Exhibit 1 -- 180.  It's just the next
25  one.  180 is Canning 485.  Well, Canning 468, 469, 470, and

MERLIN FIGUEIRA -- DIRECT

1  485.
2      MR. SIMPSON:  I believe Exhibit 180 is only
3  468 through 470.  It's three pages.
4      MS. ROHN:  No, it's also got 485 in my -- in
5  my exhibit.
6      MR. SIMPSON:  Well, the exhibit on the screen
7  only has three pages, and the exhibit provided to us only
8  has three pages.
9      MS. ROHN:  That's fine with me.  All right.
10  So have you scrolled down on this?  Just
11  scroll down.
12      (Deposition Exhibit No. 180 was
13          marked for identification.)
14  Q.  (Ms. Rohn) Okay.  So at the bottom is the start of
15  this e-mail chain, and it's from David Costas.
16      Do you know who David Costas is?
17  A.  No, I do not.
18  Q.  And it is to Tim K., and you are cc'd on this
19  e-mail.
20      Do you see that?
21  A.  I see that, yes.
22  Q.  And this also says, "Information submittal to
23  Vitol."  And then it says, "Hello Tim, some of submittals we
24  owed Vitol.  Please distribute as needed, I only added you
25  and Mr. Figueira to the distribution."

MERLIN FIGUEIRA -- DIRECT

1      Does that give you any more information to be
2  able to answer the question, what is these e-mails about
3  information submittal to Vitol is about?
4  A.  No, no, absolutely not.  I mean, you know, I have
5  to look at the entire chain of e-mails to really understand,
6  and these are just sections of e-mails.  It's hard for me to
7  even tell you what -- what this is all about.
8  Q.  Right.  So if you will scroll up to Canning 469 in
9  the middle of the page from Merlin Figueira?  Okay.  There.
10  Scroll down, please, so we can see the e-mail.
11      And there's an e-mail the same day from
12  yourself to Chris Neophytou and Tim K., Glenn Sibbick, and
13  Andrew Canning.
14      Do you know who Glenn Sibbick is?
15  A.  Yes, I do.
16  Q.  And you indicate, "Here are some drawings APR and
17  their welding Procedures."
18      Who was APR?
19  A.  I -- I don't see anything on your screen here.
20  Q.  You don't see from Merlin Figueira?
21  A.  No.  I see the screen is blank.
22  Q.  Well, it's on my screen.
23  A.  Well, not on my screen.
24      MS. ROHN:  Anybody else not see this
25  document?

45

1    MR. SIMPSON:  I can see it.

2    A.   All I can see here is you're viewing Michael's

3  screen.  View options, and there's an arrow going down, and

4  the screen is blank.  I can send you a photograph to tell

5  you what I see.

6    MS. ROHN:  No, no, no, I -- I trust what

7  you're saying.

8    Michael -- Michael will attempt to come out

9  and go back in and make sure everybody is on his screen.

10  Reception of his document.

11    (Respite.)

12    Q.   (Ms. Rohn) Can you see it now?

13    A.   No, I -- I see the same screen I saw before.

14  It's a -- it's a square that's just frankly blank.

15    MS. ROHN:  Simone, can you see the document?

16    MS. FRANCIS:  Not now, but I was able to see

17  the document.  I'm not sure what is happening with the

18  reception.  It does appear the witness was able to see the

19  prior documents, so I don't know if Mr. Williams can blow

20  the document up more so that it takes up more of the screen.

21    MS. ROHN:  Well, he would be able to see

22  something besides a sign that says, "Michael."

23    MS. FRANCIS:  Yeah, I don't know.  I cannot

24  explain that.

25    MS. ROHN:  Well, can you get an IT person in

46

1  there to figure out why you -- you're not able to access the

2  documents everybody else can see?

3    A.   Attorney Rohn, are you asking me that question?

4    MS. ROHN:  No.  I'm speaking to your -- to

5  Attorney Francis.

6    A.   Okay.

7    MS. FRANCIS:  Attorney Rohn, the witness and

8  myself are in completely separate locations, so I do not

9  have access to any IT people at the witness' location.

10    MS. ROHN:  Oh, I see.

11    MS. FRANCIS:  Mr. Figueira, are you able to

12  see the document now?

13    A.   No.  I -- I see just a -- a blank rectangle that

14  says, "You're viewing Michael's screen," and it says, "View

15  Options," and there's an arrow going down.  And the -- and

16  the rectangle is blank.  It's black.

17    Q.   (Ms. Rohn) So Mr. Figueira, I suggest that you

18  sign off, and then sign back into the Zoom, and see if that

19  helps.

20    A.   (witness complies.)

21    (Respite.)

22    I see -- okay.  For a brief moment, I saw the

23  screen, an e-mail, and then it went blank.  I only see

24  your -- your video from your office.

25    Q.   Okay.  We're going to go back in and see if you

47

1  see the screen?

2    A.   Okay.  I see it now.

3    Q.   Alrighty.  All right.  Michael, if you'll scroll

4  to Page 468?

5    MS. FRANCIS:  Are we still in Exhibit 180?

6    MS. ROHN:  Yes, we are.

7    MS. FRANCIS:  Thank you.

8    Q.   (Ms. Rohn) There's an e-mail from Chris to Merlin.

9  Do you see that, on March 30th -- can you blow that up some,

10  Michael -- regarding Petros reviewing the welding procedures

11  and will reply.

12    Do you know what welding procedures this is

13  referring to that Petro was going to review?

14    MS. FRANCIS:  Objection.  Misstates.  The

15  document says Petros, not Petro.

16    MS. ROHN:  Oh, thank you.  All right.  I can

17  go on to another exhibit.

18    (Respite.)

19    I'm just flipping to try to go to the first

20  e-mail in which Merlin is involved.  It will take me a

21  minute, so -- it's not -- it's not like I'm not here.  I'm

22  just trying to flip.

23    (Respite.)

24    All right.  If you go to E-mail 46AD.

25    (Deposition Exhibit No. 46AD was

48

1    marked for identification.)

2    MS. FRANCIS:  I'm sorry.  You said 46 what?

3    MS. ROHN:  AD.  It's IPOS 936.

4    MR. SIMPSON:  9366.

5    MS. ROHN:  9366.

6    MS. FRANCIS:  Thank you, Attorney.

7    MS. ROHN:  You got it, Michael?  Can you

8  scroll down?

9    Q.   (Ms. Rohn) Were you aware of a 1-inch vent line

10  project?

11    A.   Yes.

12    Q.   And where -- when you got -- came back to IPOS,

13  had that project already begun?

14    A.   No, it had not.

15    Q.   Were you aware that in 2019, Petro had given a bid

16  to do the work on the 1-inch vent line?

17    A.   I -- I'm not aware.  I -- I just don't know.

18    Q.   Okay.  And do you recall that there was a

19  decision, initially, not to do the 1-inch vent line back in

20  2019?

21    A.   I do not know that.

22    Q.   And then that there was a re-interest in the

23  1-inch vent line in 2020, to actually do that project?  Do

24  you recall that?

25    A.   I recall that part, yes.

MERLIN FIGUEIRA -- DIRECT

```
1        Q.   Okay.  And do you recall that Petro had
2   discussions with you that they wanted to have IPOS consider
3   their original 2019 bid?
4             MS. FRANCIS:  Objection.  Foundation.
5        Q.   (Ms. Rohn) You may answer.
6        A.   I -- I don't recall that conversation.
7        Q.   And do you recall that Mr. Canning was opposed to
8   allowing Petro to bid on that project?
9        A.   I can't recall such a discussion on -- on not
10  wanting them to bid on this work.
11       Q.   So there is an e-mail at the bottom of this page,
12  from June 17th, 2020 from yourself to Andrew Canning, with a
13  copy to David Smith.
14            First of all, why would you copy David Smith?
15       A.   Well, at that point, I had taken over from David,
16  and David had the responsibility for managing both -- I
17  mean, the IPOS facility, and that's why his -- his -- his --
18  his -- I copied him.
19       Q.   So was David still in the Virgin Islands, or had
20  he gone somewhere else?
21       A.   No.  He was -- he moved -- he was at Cape
22  Canaveral, Florida.
23       Q.   Was that Seaport?
24       A.   That's correct.
25       Q.   And so how did he manage the facilities, if he was
```

MERLIN FIGUEIRA -- DIRECT

```
1   in Seaport?
2        A.   Well, he managed it through me.
3        Q.   So this e-mail says, "Alex, Calvin and I are going
4   to meet Adrian and Chad for lunch today."
5             Would that be Alex Etienne and Calvin
6   Schmidt?
7        A.   That's correct.
8        Q.   Why -- all right.  And why would you be telling
9   Andrew Canning that?
10       A.   I -- I don't know.  I mean, I can't -- I can't --
11  I can't recall why -- why I was doing that at the time.
12       Q.   It says, "I am going to tell him," I'm assuming
13  "him" is Adrian and Chad, "that we had discussed internally
14  the quotes for the 1-inch vent line and that due to the
15  urgency and concerns for -- from others on the timing of the
16  replacement, we want to move ahead with quotations we
17  already have."
18            Do you recall having a discussion with
19  Mr. Canning about the fact that you should go with the --
20  the bids you already have?
21       A.   You know, it's -- it's -- that was three years
22  ago.  I -- I can't specifically remember a -- a conversation
23  on that, you know.
24       Q.   Okay.
25       A.   What he said to me.
```

MERLIN FIGUEIRA -- DIRECT

```
1        Q.   Well, would you have told -- would you have told
2   Mr. Canning that you were going to tell Adrian and Chad that
3   you and Canning had had discussions, if you hadn't had them?
4        A.   Probably not.
5        Q.   Okay.  And then if you scroll up.  All the way to
6   the top.  There is an e-mail from -- scroll down.  Okay.
7   From Andrew Canning to David Smith and Garry Stoker, for
8   which you are not included on, in which it says, "I just
9   heard from David Nagle and Dave Tilden at Traeger Brothers
10  had informed him in discussion today that he had sent Adrian
11  Melendez all the material quote and fabrication quote
12  information for the 1" line work.  I have no idea why he did
13  this, as it is at a minimum unprofessional but probably more
14  exactly corrupt."
15            Would you concur that Traeger Brothers giving
16  Petros information as to material quotes would be corrupt?
17       A.   I don't know in what context he's -- he's -- he's
18  stating that, so it's hard for me to comment.
19       Q.   Okay.  He goes on to say, "No wonder Adrian and
20  Chad were confident they could be competitive in their
21  revised quotation, but I suspect the quality aspects will
22  have been overlooked.  I did wonder why Merlin, Kali and
23  Alex were suddenly invited out for lunch today.  I wonder
24  what the purpose of this has been?"
25            Were you aware that Mr. Canning was sending
```

MERLIN FIGUEIRA -- DIRECT

```
1   this e-mail to Mr. Smith behind your back?
2        A.   No, I was not.
3        Q.   Goes on to say, "Apparently Dave Tilden has done
4   the same thing before on earlier activities and we have been
5   working on -- with -- we had been working on with supply
6   through Traeger Brothers.  As I said this morning before
7   this all emerged, we have continued to turn up multiple
8   examples of Dave Tilden either being totally incompetent or
9   attempting to hide excessive markup through technical
10  specification alteration and price hiking through multiple
11  corrective requoting and this incident suggests that the
12  motive for this may, after all, be corrupt."
13            Did you ever have such conversations with
14  Mr. Canning?
15       A.   No.
16       Q.   Had -- had Traeger Brothers been a vendor for
17  materials for IPOS?
18       A.   Could you repeat that question, please?
19       Q.   Had -- sure.
20            Had Traeger Brothers been a vendor for
21  materials for IPOS?
22       A.   Yes, but in a very small -- in a very small
23  portion of supplies.
24       Q.   And in the work that Petros did, did they often
25  use Traeger Brothers to source materials as part of their
```

1  bids?

2  MS. FRANCIS: Objection. Foundation.

3  Q. (Ms. Rohn) You may answer.

4  A. Which -- who -- which Petros are you talking

5  about?

6  Q. I'm sorry. Petro?

7  A. Okay. Could you now repeat the question, please?

8  Q. Sure. Sure. There's too many -- there's too many

9  initials in this case, I have to tell you.

10  So did Petro source many of their materials

11  in connection with bids to do work or in doing maintenance

12  work for IPOS?

13  A. They did -- they did buy stuff from Traeger

14  Brothers. I do not know the extent.

15  Q. Did you ever form any opinion that Traeger

16  Brothers were corrupt?

17  A. I think I could not -- I could not make that

18  determination. I do not have enough information to even --

19  even comment on something like that.

20  Q. Okay. He goes on to say, "I would consider the

21  actions of David Tilden for Traeger Brothers and Adrian

22  Melendez of Petro Industrial to be corrupt and

23  anti-competition, and are worthy of removal of both

24  companies from IPOS-approved vendors list, I'm not sure what

25  your views may -- might be?"

1  were you aware that Mr. Canning was

2  advocating barring Petro from being able to do work with

3  IPOS?

4  A. No, I was not.

5  Q. Did he ever express any such views to you?

6  A. Not that I can recall.

7  Q. In your meeting previously with -- that you

8  referenced in the e-mail below with Mr. Canning, if you had

9  known the motives of Mr. Canning to advocate against letting

10  Petros bid, would you have made the same decision?

11  MS. FRANCIS: Objection.

12  A. Could you please -- could you please repeat the

13  question?

14  Q. (Ms. Rohn) I can try.

15  If you had known the actual motives of

16  Mr. Canning, as expressed in this e-mail, when you had that

17  meeting with him on discussing whether or not Petro should

18  be allowed to bid, would you have made the same decision?

19  MR. SIMPSON: Objection.

20  MR. BECKSTEDT: Objection.

21  MS. FRANCIS: Objection. Form. Foundation.

22  A. I would -- I would require more facts to make such

23  a decision.

24  MS. ROHN: Exhibit 46AE.

25  MS. FRANCIS: Bates number?

1  (Deposition Exhibit No. 46AE was

2  marked for identification.)

3  Q. (Ms. Rohn) IPOS 9385.

4  This is an e-mail dated August 4, 2020 from

5  Mr. Canning to David Smith. Panic stations. "David, Shame

6  that you were not on the maintenance call, Merlin is in full

7  panic mode speculating on a pipe degradation in St. Croix

8  pump alley following a planned review with David Nagle,

9  Merlin, Alex and Chad with him leading the team into not

10  very well thought out options. It now appears to be an

11  indecisive mess coming out of discussion with no clear

12  strategy. Sadly, this all appears to be driven either by

13  PIS good intentions (proposing patching and rewelding to

14  replace small pipe stabbings) or a grab for work rather than

15  following the logic of what was planned, but Merlin is

16  Operations/General Manager ... and he appears to be running

17  scared again."

18  Were you aware that Mr. Canning was sending

19  these e-mails to David Smith behind your back?

20  MR. SIMPSON: Objection.

21  A. No, I'm not. No, I was not aware.

22  Q. (Ms. Rohn) were you ever running scared about the

23  pipe derogation at the St. Croix pump?

24  A. I can't say that I was -- I was -- I was scared,

25  because if I was scared, I would have done something

1  different.

2  Q. And isn't it true, sir, that Mr. Canning advocated

3  for one plan of action, and Petro suggested that you could

4  indeed patch and reweld the pipe, and you went with Petro's

5  suggestion?

6  A. I don't recall something like that.

7  Q. Well, do you have any idea why he would be

8  accusing Petro of trying to grab for work?

9  MR. BECKSTEDT: Objection.

10  A. No.

11  MR. SIMPSON: Objection.

12  Q. (Ms. Rohn) Have you ever formed the opinion that

13  Petro was grabbing for work?

14  A. No.

15  Q. How would you describe your dealings with Petro?

16  MS. FRANCIS: Objection.

17  Q. (Ms. Rohn) Did you find them competent, sir?

18  A. Could you please ask the question again, because

19  you asked two questions in one?

20  Q. Okay. I'll just ask one question: Did you find

21  the work that Petro did competent?

22  MS. FRANCIS: Objection. Form.

23  Q. (Ms. Rohn) You may answer.

24  A. I mean, with any contractor, there's -- there's

25  never a perfect job. So while they were competent in some

---

**57**

1 areas, there was some gaps in some other areas. So I -- I
2 cannot say to you that they were competent overall.
3      Q.   You can't?  You cannot say they were competent
4 overall, is that what you just said?
5      A.   That is correct.
6      Q.   You can or cannot?
7      A.   I cannot.
8      Q.   Okay.  Well, then, why did you keep them on the
9 job?
10     A.   Well, we kept them on the job to do specific work
11 that -- that we thought they could do pretty well.
12     Q.   Okay.  And so the work you assigned them, did you
13 believe they were indeed competent to do that work?
14     A.   Yes.
15     Q.   Did you ever feel that -- prior to July of 2021,
16 did you ever feel that Petro was not being above board in
17 their representations to IPOS?
18     A.   No.
19     Q.   Did you ever feel, prior to July of 2021, that
20 they were trying to fabricate work that wasn't needed to be
21 done?
22     A.   No.
23     Q.   Exhibit 242.
24          (Deposition Exhibit No. 242 was
25          marked for identification.)

---

**58**

1          It's the next one.  This is PIS 7343.
2          Please scroll down.  You're not on it yet.
3 It's the next exhibit.  Okay.  Can you scroll down?
4          This is an e-mail that originates
5 August 18th, 2020 from Adrian Melendez to yourself and David
6 Smith.  2020 maintenance contract.  It says, "Hi Gents,
7 Please find the attached signed maintenance agreement for
8 this past year.  Under 'terms of contract' please note that
9 this contract could be used for the first five years
10 starting on the commencement date for a minimum of one year.
11 Also under 'contract price' (b), adjustments shall and/or
12 can be made up to 10% of the service company (petro) cost of
13 labor increases/decreases.  As we stated before we would
14 like to give the employees that work under this contract a
15 much-needed raise and therefore a 10% increase on contract
16 labor rates has been requested and shown on the rate sheet
17 also attached.  Please let me know."
18          Did -- to your recollection, did the original
19 contract from 2019 continue in 2020?
20          MS. FRANCIS:  Objection.  Foundation.
21     A.   I believe so.
22     Q.   (Ms. Rohn)  And then your response is, if you
23 scroll up, "we are reviewing your" -- it says "Adrian and
24 Chad, we are reviewing your new Contract and associated rate
25 increase.  We will revert to the next week or so."

---

**59**

MERLIN FIGUEIRA -- DIRECT

1          Do you recall whether or not you agreed to
2 the rate increase?
3      A.   My -- my -- my -- if I recall correctly, I think
4 the rate increase they had asked for was -- was much higher
5 than what we had agreed.
6      Q.   well, didn't he -- so you believe that you gave a
7 rate increase, but less than 10 percent?
8      A.   No.  I believe they were asking for a slightly
9 higher rate.  Rate increase.  That is my -- my -- that is
10 what I recall.
11     Q.   well, you certainly got this e-mail that said they
12 were only asking for a 10 percent, correct?  Scroll down,
13 please.  Scroll down, please.
14          Do you see that, sir?
15     A.   Yeah.  Let me -- let me read through it.
16          (Respite.)
17          Okay.  Okay.  Yeah, my recollection is that
18 there was a verbal -- verbal exchange where, if I recall
19 correctly, I think the rate that was asked was a little bit
20 higher than 10 percent.  And we agreed on -- we agreed to
21 the 10 percent.  That is what I recall.
22     Q.   If you go to 264.  Scroll down.
23          (Deposition Exhibit No. 264 was
24          marked for identification.)
25          All right.  This is an e-mail from Adrian

---

**60**

MERLIN FIGUEIRA -- DIRECT

1 Melendez, September 10, 2020, to yourself and David Smith.
2 Maintenance Agreement - 2020.  "Good morning, Gents, Thank
3 you once again for your time understanding.  Please find the
4 attached updated agreement for your review and signature."
5          And then if you scroll up, on that same date,
6 you say to Adrian and David Smith, "Adrian and Chad, I
7 wanted to add that we note that both Johnny and Jackman are
8 both excellent Employees.  They diligently work to get the
9 job done without any complaints.  They do quality work.  So
10 from our viewpoint these 2 employees are good choice to
11 recognize with a raise.  Regards, Merlin."
12          See that e-mail that you sent?
13     A.   Yes, I do.
14     Q.   And who did you understand Johnny to be?
15     A.   Johnny, if I recall correctly -- Jackman, I
16 believe, was -- was one of the Petro employees in
17 St. Croix; and I believe Johnny was a Petro employee working
18 in St. Thomas.
19     Q.   Did he manage the maintenance crew in St. Thomas?
20     A.   I can't recall, you know, with -- with certainty.
21 I do know that Jackman, I believe, was -- was somebody that
22 wasn't a supervisor.  I think he was just an employee that
23 was -- was part of the team there.  And I'm trying to think
24 about Johnny.  I think Johnny may have been the -- lead
25 person in St. Thomas.

61

1   Q.   Did you ever have any trouble understanding Johnny
2   when you talked to him?
3   A.   I don't recall having any -- any -- any problem
4   understanding any one of them.
5   Q.   Were you ever made aware that Mr. Canning told
6   Chad -- sorry, told Chad that he needed to go and oversee
7   the work done in St. Thomas that Mr. Canning was in charge
8   of, because he couldn't understand Johnny, and couldn't get
9   Johnny to do what he wanted him to do?
10  MR. SIMPSON:   Objection.
11  MR. BECKSTEDT:   Objection.
12  Q.   (Ms. Rohn) You may answer.
13  A.   I wasn't there to hear any of -- any of that
14  communication, so I can't agree to -- to your statement.
15  Q.   Have you read any of the depositions in this case?
16  A.   No.
17  Q.   Exhibit 460.
18          (Deposition Exhibit No. 460 was
19          marked for identification.)
20          Four six -O-.  Four six -O- is IPOS 667 to
21  668.  Scroll down, please.  What are you doing?  Scroll up,
22  please.  Okay.  Stop there.
23          All right.  So this is an e-mail dated
24  December 15th, 2020, between Andrew Canning and David Smith
25  and yourself.  Subject:  PIS Reprimand.  Sensitivity:

62

1   Confidential.
2          When would you put "sensitivity confidential"
3   on e-mails?
4   MS. FRANCIS:   Objection.
5   Q.   (Ms. Rohn) Do you know when it would?  You may
6   answer.
7   A.   I mean, you know, I mean, it depends.  You know,
8   what I would term confidential would not necessarily be the
9   confidential that somebody else would have.  Would --
10  would -- would -- would entitle it or -- in terms of
11  sensitivity.
12  Q.   Okay.  So did you ever actually designate any of
13  your e-mails confidential?
14  MS. FRANCIS:   Objection.
15  A.   Yes.
16  Q.   (Ms. Rohn) Okay.  All right.  So Mr. Canning says,
17  "There may be some negative feed back from the discussion
18  this morning which culminated in me refusing to sign the
19  timesheets for three of the PIS team:  Chad, Frank, and
20  Elias."
21          Do you understand Chad to be Chad Persaud?
22  A.   Yes.
23  Q.   Do you understand Frank, to be Frank Klish the --
24  Kish -- Kirsch, the safety guy?
25  A.   Yes.

63

1   Q.   And do you understand Elias to be the supervisor
2   of welders?
3   A.   No, I'm not -- I can't recall Elias.
4   Q.   Goes on to say, "The reason I refused to sign off
5   10 hours for the three individuals is that they were absent
6   from site most of the afternoon under the auspices of 'going
7   to the bank'.  I believe that there were -- that their
8   purpose was for a cash transaction between Elias and Chad.
9   This event was a culmination of several absences over the
10  last week whereby Chad & Frank would disappear for an hour
11  or two on errands some of which were agreed and required two
12  persons (not necessarily Frank the safety person) but of the
13  few that I was informed about, those could have been done by
14  one person."  Stop there.
15          Did you ever have any problems with Chad
16  goofing off on the job?
17  MR. SIMPSON:   Objection.
18  A.   I never -- I was -- I never closely supervised
19  Chad or -- or any one of the Petro's guys, so it's hard for
20  me to -- to say -- to answer yes or no on that question.
21  Q.   (Ms. Rohn) Okay.  Well, did you, ever, yourself,
22  observe that?
23  A.   Attorney Rohn, like I answered before, I never
24  supervised these -- these gentlemen to the extent they would
25  give me an indication that they -- they had slacked off.  I

64

1   mean, there's no way I could have made that determination.
2   Q.   Okay.  Well, sir, who was supposed to supervise
3   them to determine whether or not Petros was actually working
4   and entitled to the money they were billing on behalf of
5   IPOS?
6   A.   Well --
7   MS. FRANCIS:   Objection.  Foundation.
8   A.   Sorry.  I -- I --
9   MS. FRANCIS:   You may proceed.
10  A.   Okay.  You know, there was a maintenance contract
11  that was, if I recall, a set time -- time per day, which
12  we -- clearly we -- we did not manage on a -- on a -- on an
13  hour-to-hour basis.
14          There were projects that Andrew was
15  responsible for, for which a timesheet was required for
16  the -- for that work.
17  Q.   (Ms. Rohn) Okay.  So were those special projects
18  IPOS projects?
19  A.   They were IPOS projects managed by Andrew.
20  Q.   And did Andrew manage them on behalf of IPOS?
21  MS. FRANCIS:   Objection.  Foundation.
22  Q.   (Ms. Rohn) You may answer.
23  A.   Those -- those projects were -- were -- were
24  facility-related, and -- and I would say indirectly, yes,
25  but most of the projects that he worked on were -- were --

1  were for -- were special projects for which they were paid

2  through -- by Vitol.

3      Q.  But he's sending this e-mail to you, not Vitol,

4  correct?

5      A.  That is correct.

6      Q.  So what does that tell you about what project this

7  is?

8              MS. FRANCIS:  Objection.  Foundation.

9              MS. ROHN:  Noted.

10     Q.  **(Ms. Rohn)** You may answer.

11     A.  I was -- I would have no clue from an e-mail that

12  goes back four years or three years, what this e-mail and

13  what project it's related to.  There's no way I would ever

14  know.

15     Q.  All right.  Second paragraph says, "I called Chad

16  to the office this morning and indicated my disappointment

17  in their absence and the timesheet claim for 10 hours each

18  and pointed out one of the primary reasons for having Frank

19  on site was on the request of Merlin with the understanding

20  that he would be at the main worksite full time, and this

21  was clearly not happening."

22          So, first of all, how is Mr. Canning calling

23  in one of the main people in a contractor's company and

24  scolding him?

25              MR. SIMPSON:  Objection.

1     Q.  **(Ms. Rohn)** Is that one of Mr. Canning's jobs?

2              MR. SIMPSON:  Objection.

3              MS. FRANCIS:  Objection.  Foundation.

4     Q.  **(Ms. Rohn)** You may answer.

5     A.  As I -- as I said earlier, there are some projects

6  that were under -- that were supervised by Andrew.  And as a

7  result of his -- his oversight of those projects, he -- he

8  was -- he wanted to make sure that the work was -- was

9  properly accounted for, timesheet wise and things like that.

10  So that is possibly why he -- he did what he did.

11     Q.  All right.  So, sir, he -- he then had the

12  ability, instead of coming to IPOS, and saying, IPOS, I saw

13  this.  What do you want to do about it, he could make that

14  determination himself, sir; is that correct?

15              MS. FRANCIS:  Objection.

16     A.  It all depends.  It all depends on the -- on the

17  project.  I mean, if the project was under his

18  responsibility, yes, he did have that right.

19     Q.  **(Ms. Rohn)** Okay.  Do you recall requiring that

20  Frank --

21          (Cell phone interruption.)

22     A.  Excuse me.  Let me turn this phone off, please.

23          Sure.

24     A.  Go ahead.

25     Q.  Do you recall requiring that Frank, the safety

1  man, be on site at the main worksite full time?

2     A.  Attorney Rohn, I -- I can't recall.  I mean, that

3  was -- you're asking me to comment on an incident that

4  occurred four years ago.  There's no way I can recall.

5     Q.  Okay.  So if you scroll up on this.  Scroll up.

6  Up.  There you go.

7          You respond to Mr. Canning, as subject, PIS

8  reprimand.  Same sensitivity.  Company confidential.  You

9  add, company confidential.

10         "Thanks for the description and talking

11  directly with Chad.  I too will talk to Chad once I return

12  late this week to understand his version.  There is an

13  element of trust between us and PIS and I like to hear what

14  Chad has to say and to get reassurance from him that the

15  Timesheets are factual an accurate."

16         What did you mean by that, sir?

17              MS. FRANCIS:  Objection.  Compound.

18     A.  well, the -- the obvious -- you know, to -- to

19  make a correct, or to form an opinion, one has to look at or

20  ask the -- the reasoning on both sides of the -- of the

21  issue.  And -- and for that reason, I wanted to check from

22  Chad what his version was, but he could have -- very well

23  have had a real good reason for doing what he did.  I mean,

24  I just don't know.

25     Q.  **(Ms. Rohn)** Okay.  And was there a element of trust

1  between PIS and IPOS while you were there?

2     A.  Yes.

3     Q.  And -- and what caused that element of trust?

4     A.  Well, I can't say specifically, but I think I had

5  a good rapport with both Adrian and -- and Chad.  And I

6  got -- I had a good feeling about the conversation and --

7  that I had with the two of them, and that is why I had a

8  reasonable trust with PIS.

9     Q.  Well, did you have -- one of the reasons that you

10  had a feeling of trust was -- with Petro was because you

11  found that what they told you was truthful?

12              MS. FRANCIS:  Objection.

13     Q.  **(Ms. Rohn)** You may answer.

14              MS. FRANCIS:  Form.  Foundation.

15     Q.  **(Ms. Rohn)** You still may answer.

16     A.  well, the -- the issues or the communications that

17  I had with Chad and -- and -- and Adrian on -- on -- on

18  matters related to maintenance and -- and this thing, I

19  always had some good positive answers from them.  And I

20  formed an opinion that -- that -- that there's trust between

21  IPOS and PIS.

22     Q.  Okay.  Exhibit 268.

23         (Deposition Exhibit No. 268 was

24         marked for identification.)

25              MS. FRANCIS:  Please identify Bates numbers,

MERLIN FIGUEIRA -- DIRECT

```
 1   Attorney Rohn.
 2        Q.   (Ms. Rohn)  PIS 7642.
 3             This is a text between yourself --
 4   January 5th, 2021 between yourself and Adrian.  And it
 5   starts out at the top, Adrian says, "Good morning Merlin.
 6   Could you let me know when I could meet with you regarding
 7   this years projects and projections?"
 8             My first question is, is did you and Adrian,
 9   in fact, text back and forth to each other?
10        A.   Yes.  Absolutely.
11        Q.   And then you answer, "No worries.  Wanted to check
12   if" -- you say -- I think you say -- he says, "Sorry.  Can't
13   talk right now," on January 7th.  You say, "No worries.
14   Wanted to check if 10 am tomorrow is a good time to have a
15   conference call."  He says, "I'm good with that.  Thank
16   you." You say, "Ok great."
17             And then you say, "Adrian, I note that Andrew
18   was not on the distribution of your email relating to some
19   of your learning on the RIO panels."
20             Do you know why you sent that text about him
21   about not keeping -- not having Andrew on some e-mails about
22   the RIO panels?
23        A.   No, I -- I can't recall.
24        Q.   Okay.  Do you recall that there was a project
25   which was the RIO panels?
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

MERLIN FIGUEIRA -- DIRECT

```
 1        A.   Yes, I do recall.
 2        Q.   Okay.  And do you recall that Mr. David Nagle did
 3   the design for the -- for the RIO shade panels?  Do you
 4   recall that?
 5        A.   Yes, I -- I -- I recall that.
 6        Q.   Okay.  And that Mr. Canning was overseeing that
 7   job?  Do you recall that?
 8        A.   Yes, I recall that.
 9        Q.   And do you recall that the design of the RIO
10   panels, when trying to put installation -- into
11   installation, did not work?
12        A.   I don't know what you mean, it didn't work.
13        Q.   Well, where they were supposed to install them,
14   they wouldn't be operable?
15        A.   I -- I -- I don't recall such a conversation or --
16   or such a comment.
17        Q.   Well, do you recall there being problems with the
18   RIO shade panels when they were trying to be installed in
19   St. Croix?
20        A.   I -- I don't recall there were problems with it,
21   because the panels were installed.
22        Q.   Okay.  Do you recall this being a not-to-exceed
23   job for -- for Petro?
24        A.   I -- I'm not aware of that.  Of that at all.
25        Q.   Well, on not-to-exceed jobs, the longer they take,
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

MERLIN FIGUEIRA -- DIRECT

```
 1   the less money the contractor makes, correct?
 2             MS. FRANCIS:  Objection.
 3        A.   I --
 4        Q.   (Ms. Rohn) You may answer.
 5        A.   I disagree.  I disagree with your -- with your --
 6   with your point of view.
 7        Q.   In what way?
 8        A.   Most contractors -- most contractors do make a
 9   profit.
10        Q.   But they make less profit if it takes longer and
11   they're spending more time on manpower, correct?
12             MR. SIMPSON:  Objection.
13        Q.   (Ms. Rohn) You may answer.
14        A.   That's incorrect.
15        Q.   Okay.  So let me see.  If they -- in bidding a
16   not-to-exceed job, they estimate in the not-to-exceed job
17   that it's going to take six days and 60 hours of manpower,
18   and instead it takes 12 days and a hundred and twenty hours
19   of manpower, aren't they losing money, sir?
20             MR. SIMPSON:  Objection.
21             MS. FRANCIS:  Objection.  Foundation.
22        Q.   (Ms. Rohn) You may answer.
23             MR. BECKSTEDT:  Same objection.
24        A.   Could you -- could you repeat that question again?
25        Q.   (Ms. Rohn) Sure.  Sure.
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

MERLIN FIGUEIRA -- DIRECT

```
 1             In bidding a not-to-exceed job, if they, as
 2   part of their bid to determine the cost of the job, estimate
 3   that it will take -- the job will take six days at 60 hours
 4   of manpower, and instead, the job takes 12 days and a
 5   hundred and twenty hours of manpower, they have lost money,
 6   sir, isn't that correct?
 7             MR. BECKSTEDT:  Objection.
 8             MS. FRANCIS:  Objection.
 9        Q.   (Ms. Rohn) You may answer.
10        A.   That is -- that is an incorrect statement, in my
11   view.
12        Q.   Okay.  How do you think that's incorrect?
13        A.   At times, a -- a job that is -- that is quoted as
14   not to exceed is -- is typically stated with hours and
15   material in its -- in its -- in its description.
16             So -- so I -- I -- I -- I don't agree with
17   you that a contractor would lose time -- would lose money if
18   they -- if they exceed the number of hours.
19        Q.   Well, if it's a not-to-exceed, you don't have --
20   IPOS doesn't have to pay the additional -- any additional
21   money, Petro has to pay that money, doesn't it?
22             MS. FRANCIS:  Objection.
23        A.   No, no, no, no, that's -- that is incorrect.  It
24   all depends on the -- on the way it is quoted.  When you
25   say, not to exceed x amount of money, with you, you know,
```

Susan C. Nissman, RPR-RMR
(340) 773-8161

73

1  there's a stipulation, and it's typically there in terms of
2  how much time it's going to take.
3          So -- so I'm not -- I'm not aware.  I have
4  not seen that specific contract to really migrate to your
5  point of view.
6     Q.   All right.  Exhibit 280.
7          (Deposition Exhibit No. 280 was
8            marked for identification.)
9          You got it?  Is it up there?  Okay.
10         MS. FRANCIS:  Bates numbers?
11         MS. ROHN:  Sure.  IPOS 4074.
12         Scroll.  Scroll.  Scroll.
13    Q.   (Ms. Francis) All right.  This is an e-mail,
14 January 5th, 2021, from -- which is the same date as your --
15 the original text to you from Adrian to David Smith and
16 yourself and Andrew Canning.
17         And it says, "Please find that three
18 attachments that include the following:  Change Order #1 -
19 this was sent to Time on 12/12/19 regarding the changes from
20 Polaris on the Loading Rack that still need to get approval;
21 Number 2) Change Order #2 - Regarding electrical disconnect
22 and re-install the loading skid due to anchoring; and Number
23 3) Budget for the Electrical Scope for the Reverse Loading
24 based on the SOW from Suris.  Please review and let us know
25 if you have any questions."

74

1          Now, first of all, why would this be sent to
2  Andrew Canning, from your experience on the job?
3     A.   Let me -- let me review that e-mail first.
4          (Respite.)
5          Okay.  Could you please repeat your question?
6     Q.   Why would this be sent to Andrew Canning?
7     A.   As I had said earlier, special projects were done
8  by Andrew.  And for that reason, this -- this e-mail was
9  sent to Andrew, because what I'm -- I'm surmising from
10 reading through this e-mail, is that these was special
11 projects.
12    Q.   And on special projects, did Mr. Canning have to
13 approve payments?
14    A.   Yes.
15    Q.   Okay.  And on whose behalf did he approve the
16 payments?
17         MR. BECKSTEDT:  Objection.
18         MS. ROHN:  Noted.
19    Q.   (Ms. Rohn) You may answer.
20    A.   These -- these projects were -- were -- were
21 done -- these were -- these projects were done on behalf of
22 Vitol.  And for that reason, Andrew had to review -- review
23 the change orders and approve the timesheets.
24    Q.   Okay.  Would you scroll up?
25         There's an Andrew Canning -- Andrew Canning

75

1  then sends an e-mail to Tim K.
2          Did you understand he was the -- one of the
3  representatives of Vitol, as far as payments on the job?
4          MR. BECKSTEDT:  Objection.
5     A.   I believe so, yes.
6     Q.   (Ms. Rohn) I'm sorry.  Could you state your answer
7  again?
8     A.   Yes.
9     Q.   And it's also copied to Sebastian Moretti.
10         Was he one of the people, on behalf of Vitol,
11 that oversaw the Vitol projects?
12    A.   I do not know the relationship of Sebastian
13 within -- within -- within that office, so it's -- it's hard
14 for me to -- to say what, exactly, he did.
15         But in terms of -- in terms of projects and
16 all that, yes, Sebastian was -- was one of those guys
17 that -- he was involved.
18    Q.   And so the original e-mail was generated in 2021,
19 and he's not sending, in this chain, anything to Vitol until
20 April 28, 2021.
21         MR. BECKSTEDT:  Objection.
22    Q.   (Ms. Rohn) Do you know why -- what would be the
23 cause of someone's waiting for payment on a change order to
24 wait that amount of time?
25         MR. BECKSTEDT:  Objection.

76

1     A.   No.  I -- I -- I -- I wasn't involved with -- with
2  those change orders, so I can't comment.
3     Q.   (Ms. Rohn) Okay.  And he doesn't copy you on the
4  communication with the Vitol people, correct?  He copies
5  David Smith, instead.
6     A.   Well, that's not always the case.
7     Q.   Well, on this e-mail --
8          MS. FRANCIS:  Excuse me.
9     Q.   (Ms. Rohn) In this e-mail, was that the case?
10         MS. FRANCIS:  The witness should be allowed
11 to answer.
12    Q.   (Ms. Rohn) In this e-mail, is that the case?
13    A.   In this e-mail, yeah, he wasn't -- I wasn't
14 copied.
15    Q.   Okay.  If you scroll up, David Smith, then, in --
16 on May 17, 2021, jumps in and sends an e-mail to Tim K., and
17 copies Canning and yourself and Mr. Moretti, stating, "I'm
18 following up on this.  Petro is saying we are more than 90
19 days on payments and they are asking what needs to happen.
20 I've only been on the fringe, but IPOS can't make payment
21 until we receive some feedback."
22         So even though this was a Vitol special
23 project, IPOS was making the payment, correct?
24    A.   That is correct.
25         These -- let me -- let me just rephrase that.

1       These were passed-through costs that were --
2  that were funneled back to -- to Vitol.
3     Q.  But in order for IPOS to make the payment, Canning
4  had to approve the making of the payment, correct?
5     A.  That is correct.
6          (Respite.)
7     Q.  Exhibit 46T, which is IPOS 8440 and 8441.
8          (Deposition Exhibit No. 46T was
9          marked for identification.)
10        This is an e-mail -- have you -- have you
11  scrolled to the top?  Okay.
12        This is an e-mail, January 21st, 2021 from
13  Andrew Canning to Ms. Rodriguez from Petro, David Smith,
14  Coury Hodge, Adrian Melendez, Chad Persaud, and yourself.
15        Do you see that?
16     A.  I do.
17     Q.  And also a Kunal Patal.
18        Who is Kunal Patal?
19     A.  Kunal was -- Kunal was, or is, somebody at -- our
20  finance guy at Seaport, that actually finally made those
21  payments.
22     Q.  And why would Seaport finally make the payments?
23     MS. FRANCIS:  Objection.
24     Q.  (Ms. Rohn)  You may answer.
25     A.  They made the payments on our behalf, because we

1  didn't have the staff.
2     Q.  Well, how often would they make payments on IPOS's
3  behalf?
4     A.  I -- if I recall correctly, they did most of
5  the -- most of the -- the contractual invoices, and -- and
6  things like that.
7     Q.  Were paid by -- through Mr. Patal?  Kunal Patal?
8     A.  Yes.
9     Q.  And who did he work for?
10     A.  He worked for -- for Seaport Canaveral.
11     Q.  So his e-mail is sc.vtti, so would sc be
12  designation for Seaport Canaveral?
13     A.  That's correct.
14     Q.  And your e-mail is Merlin Figueira as
15  mef@vtti.com.
16        Why did you have a VTTI e-mail?
17     A.  I had a VTTI e-mail because that was a common
18  e-mail that was set up for -- for our use at any -- any
19  entity that we work for.  When I work for IPOS, I have that
20  same e-mail address.  When I work for VTTI Kenya, I have the
21  same address.  But that has no connection between who paid
22  us.
23     Q.  So Andrew Canning to Santhia.
24        Did you understand Santhia Rodriguez to be
25  kind of an accounting person at Petro?

1     A.  Yes.
2     Q.  "Alterations to authorised Timesheets.
3        In respect of the timesheets, it is clear
4  that two of timesheets have been changed since signing which
5  under any circumstances is an unacceptable practice, however
6  two cases presented (11th and 12th December 2021) I am
7  satisfied there was no fraudulent intent related to the
8  changes just an oversight of the specialist welder who's
9  name, site hours and cumulative time has been entered after
10  I had signed the timesheets.  Clearly this oversight should
11  have been recognised and brought to my attention and no
12  amendments made on the signed and authorised timesheets.
13  Going forward it is clear that work hour recording and
14  authorisation procedures must be tightened up on both sides
15  so I am suggesting the following procedural changes."
16        On whose behalf was Mr. Canning making these
17  procedural changes?
18     A.  As I had said earlier, Andrew was responsible for
19  certain projects.  And as a result, he was making his
20  procedures for projects that -- that he wanted control of in
21  terms of timekeeping.
22     Q.  Okay.  But there's no Vitol persons on this
23  e-mail, correct?
24     A.  Can you scroll up, please, again?
25     Q.  Sure.

1        Scroll up, please, Michael.  Up.
2     A.  No, there are no -- no Vitol employees.
3     Q.  And if you scroll back down, please.
4        He says that the "work hour recordings and
5  authorisation procedures must be tightened up on both
6  sides."
7        Did you believe that there were problems with
8  Petro itself handling timesheets and authorization
9  procedures?
10     MS. FRANCIS:  Objection.  Asked and answered.
11     Q.  (Ms. Rohn)  You may answer.
12     A.  I -- I -- I knew there were some -- I had one
13  instance there was an issue.  I do not know the specifics of
14  what that issue was all about, or why did it come up, and
15  how it got resolved.
16     Q.  And Number 3, "Where at all practicable all
17  timesheets are be to be approved by the client project
18  supervisor (IPOS or VITOL) ideally at the end of the shift
19  or within 12 hours of the work shift being completed."
20        So do you take from this that he was making
21  these requirements both on behalf of IPOS, and on those jobs
22  that were Vitol jobs?
23     MS. FRANCIS:  Objection.  Foundation.
24     Q.  (Ms. Rohn)  You may answer.
25     A.  You know, I think Andrew was -- was making a

1  suggestion there. I mean, you know, as a -- as a -- as a
2  engineer working for Vitol, if there was -- if he was making
3  some realistic and good suggestions, we would accept that,
4  so I think that's the context why he's -- he's stating that
5  in his -- in his e-mail.
6      Q.   Did you think it was feasible for all timesheets
7  to be approved by the client project supervisor at the end
8  of each shift?
9      A.   Can you repeat that question, please?
10     Q.   Did you think it was practicable to have all
11 timesheets approved by the client project supervisor at
12 the end of each shift?
13     A.   It is practical.
14     Q.   Okay.
15     A.   It is done on most -- on most -- on most jobs.
16     Q.   And then it says, "Finally it should be
17 noted by all supervisory grades in the contractor
18 organisation that any unauthorised change (none validated by
19 approval authority) to approved timesheet will be regarded
20 as being potentially fraudulent activity, which could be
21 subject to suspension, dismissal from the facility or
22 cancellation of the contract and permanent removal from the
23 approved contractor list."
24          When you got this e-mail, did you approve the
25 statement that that's what would happen?

1      A.   Me receiving an e-mail like that does not -- does
2  not -- does not constitute me approving each and every item
3  there.
4      Q.   My question to you, sir, was, did you approve
5  that? Did you approve that, sir?
6      A.   No, I'm trying -- I'm trying to read -- read it
7  again --
8      Q.   Oh, I'm sorry.
9      A.   -- and give you an answer.
10     Q.   I'm sorry. I thought maybe you didn't hear my
11 question. Sorry.
12          (Respite.)
13     A.   I would agree to some of it.
14     Q.   Would you agree that if there was a problem with
15 the timesheet, it would be presumed to be fraudulent and
16 result in the suspension or dismissal and removal from
17 the -- from the -- and cancellation of the contract and
18 permanent removal?
19     A.   In -- in -- in -- in that instant, yes. It's --
20 it's a fraudulent activity, for which company funds were --
21 would have been fraudulently expensed, it would require
22 cancellation. It would require removal of -- from the
23 contractor list. I agree.
24     Q.   Even if it was inadvertent, sir?
25     A.   I'm sorry?

1      Q.   Even if it was inadvertent?
2          MR. SIMPSON: Objection.
3          MS. ROHN: Objection noted.
4      Q.   (Ms. Rohn) You may answer.
5      A.   I mean, one would -- one would not -- I mean, you
6  know, we're a professional organization, and so am I. I
7  would not, just on -- just because somebody had said that --
8  that a timesheet was -- was fraudulently altered, that I
9  would blindly accept that and evict a contract. I would --
10 I would have to come up with my own opinion.
11          But once I come up with my own opinion, and I
12 did find out that the timesheets were -- were fraudulently
13 altered, I would suspend the contract. Absolutely.
14     Q.   Okay. If you scroll to -- excuse me -- the next
15 page.
16          Okay. This is the levels of PIS management
17 charged -- excuse me -- in the same e-mail.
18          "Please explain the Justification for
19 Charging Elias firstly as a Project Superintendent (In my
20 opinion he might be regarded as discharging a foreman's role
21 as he has grade has stated previously) and then evaluating
22 Chad to a Project Manager. I don't remember this being
23 agreed in my opinion it is unjustified and more importantly
24 it does raise further the requirement for PIS to submit
25 clear a plan for the manning that they propose to use in

1  their roles on any future IPOS or Vitol work. So, I do not
2  expect to pay any more for Elias than I do for Johnny who
3  performed head and shoulders above his peers so please
4  correct Elias's grade on all timesheets to foremen and
5  reinstate Chad as Project Superintendent (who incidentally I
6  would have expect to be present at least for the normal day
7  shift to discharge his duties)."
8          Were you aware that there had been a
9  conversation between Canning and Chad, that he wanted Chad
10 to be on the St. Thomas jobs that he was overseeing,
11 because -- instead of Johnny being the superintendent on the
12 job?
13          MR. SIMPSON: Objection.
14          MS. FRANCIS: Objection.
15     Q.   (Ms. Rohn) You may answer. You may answer.
16     A.   I'm not aware of such a conversation.
17     Q.   And then when Chad then billed for his time of
18 being on the St. Thomas job, as requested by Canning,
19 Canning refused to make the payments for that?
20          MR. SIMPSON: Objection.
21     Q.   (Ms. Rohn) You may answer.
22     A.   I don't recall. I -- I can't recall that. That
23 instance.
24     Q.   Well, would you agree with me that if Canning
25 specifically asked for somebody to be on the job, and they

1 did what Canning asked, they should have been paid for what
2 they did?
3       MS. FRANCIS:  Objection.  Foundation.
4    Q.  (Ms. Rohn) Would you agree with that, sir?
5 Noted.
6    A.  If -- if he was -- if he was assigned to a job at
7 Andrew's discretion, he should be paid, provided that he did
8 the work that he was assigned to do.
9    Q.  And --
10   A.  The question is, did he do -- the question here
11 is, did he do the work that Andrew had assigned him to do?
12 And I have no knowledge of that.
13   Q.  Right.
14            (Respite.)
15         Exhibit 46G.
16       (Deposition Exhibit No. 46G was
17         marked for identification.)
18         Next e-mail.  I mean, next one.  Next in
19 line.  Is that it?  Okay.
20         This is 46G.  This is an e-mail from Andrew
21 Canning -- oh, it's IPOS 62 -- 2621 to 2623.  This is an
22 e-mail from Andrew Canning to David Smith and yourself on
23 the RIO shade progress.  Sensitivity:  Confidential.
24         "Gentlemen, It has become evident over the
25 last two weeks that the three man team (week 1) and then an

1 augmented five man team (week 2) set on by PIS to do the RIO
2 shades are struggling for many reasons to make what I
3 consider to be reasonable progress.  To date it has taken 2
4 x 4 day weeks to install two louvre shade assemblies on the
5 boiler room sampler panel and the RIO panel which
6 comprises," and then it has a list of what it's comprised.
7         Does this refresh your recollection about the
8 problems with completing the RIO shade project in St. Croix?
9    A.  Attorney Rohn, could you repeat your question,
10 please?
11   Q.  Does this refresh your recollection about the
12 problems with the RIO shade panels in St. Croix?
13   A.  Yes.
14   Q.  And then if you go down to the "there has been
15 numerous" -- can you scroll down, please?  Scroll.  Yeah.
16         Start with "There have been numerous
17 occurrences over the two weeks that would appear to have
18 been instigated intentionally to stall the progress of the
19 installation."
20         Bullet Point 1:  "Poor timekeeping - It was
21 made clear from the start of the work that there was no
22 justification in working more than the regular 8 hour Monday
23 through Friday day shift for the installation however the
24 following are a sample of the poor timekeeping practices."
25         So you got this e-mail.  Knowing now that

1 Mr. Canning was writing e-mails about how you were running
2 scared, and potentially making mistakes, would you take this
3 e-mail now with a grain of salt?
4       MS. FRANCIS:  Objection.
5    A.  It's hard for me to make -- to make that --
6 that -- that leap in your -- you're -- you're -- you're --
7 you're alluding to.  I mean, it's two separate events.
8 There's no way I can -- I can -- I can make such a -- agree
9 to such a statement.
10   Q.  (Ms. Rohn) Well, it does say about PIS, "would
11 appear to have instigated intentionally to stall the
12 progress of the installation."
13         For what you knew of PIS, are they the
14 company that would intentionally stall the progress of a
15 job?
16       MR. SIMPSON:  Objection.
17   Q.  (Ms. Rohn) You may answer.
18       MS. FRANCIS:  Yeah.  Objection.
19   A.  Attorney Rohn, there's no -- I mean, first of all,
20 I was not there to -- witness this thing in its entirety.
21 I cannot comment on it without having seen the job.  I -- I
22 have no idea.  I can't agree to -- to -- to -- to -- to your
23 point.  I just wasn't there to see it.
24   Q.  (Ms. Rohn) All right.  But I'm just asking you
25 generally, from your observation of PS -- P -- as to Petro

1 as a company, and from your dealings with them, did you ever
2 form the opinion that they were a company that would
3 intentionally stall a job?
4    A.  There's no way I can make such a leap, Attorney
5 Rohn.  I mean, you know, in my dealings with Petro, Adrian,
6 you know, I never had those instances that give me such, you
7 know, that they intentionally stalled a job.  But I was not
8 there for -- for this -- this RIO panel job, so it's hard
9 for me to -- to -- to comment on it.
10   Q.  Can we go to the next page?  Scroll down.
11         And if you go to the bottom, last paragraph,
12 Mr. Canning concludes, "As far as I am concerned the
13 performance, timekeeping, quality of work and overall
14 abilities/objectives of the following individuals has been
15 unacceptable on a number of levels both in the RIO shade
16 installation on St. Croix and during the previous Reverse
17 Flow installation work on St. Thomas.  If this is not the
18 case then I can only assume that they are complicit with PIS
19 in an objection -- objective of maximising the earnings for
20 PIS from time or material activities."
21         Did you ever ask Mr. Canning about any facts
22 to support these allegations against PIS?
23   A.  No.
24   Q.  Well, this is a pretty damning e-mail, wasn't it?
25       MS. FRANCIS:  Objection.

1    MS. ROHN:  Noted.

2    MR. BECKSTEDT:  Same objection.

3    Q.  (Ms. Rohn) You may answer.

4    A.  That may be -- that may be the case, but this is a

5  job that is supervised by Andrew, and it has nothing to do

6  with the -- the work that I -- that we, as IPOS, supervised,

7  you know, Petro.  So --

8    Q.  So why is he sending an e-mail to you?

9    A.  Well, he -- I have no idea what his intent was.  I

10  mean, I -- I just don't know.  I mean, it could be that he's

11  just letting me know, because -- because I'm the general

12  manager there, but other than that, I do not know what his

13  intent is.

14    Q.  Well, none of the people from Vitol, there's no

15  Charlotte, no Sebastian, no Tim K. on this e-mail, is there,

16  sir?

17    A.  There's no.

18    Q.  Well, did you say to Mr. Canning, why are you

19  sending this to me?  This is not my job?

20    A.  Attorney Rohn, there's several -- if I have to do

21  that to each and every e-mail, respond to everything, I'll

22  be -- I'll be wasting half of my day.  So there's some

23  e-mails that I just ignore, because for whatever reason, it

24  doesn't concern me.  It is not a project that is under my

25  watch, it's under somebody else's watch.

1    Q.  Okay.  And then if you scroll down, it says -- oh,

2  you are at the bottom.  "PIS welding team individuals

3  involved in the underperforming installation activities are:

4  Elias Rivera."  Scroll down.  "Ricardo Velazquez, and Juan

5  Guigliotty.

6    My recommendation is that these individuals

7  be removed/barred from attending the site in future and

8  classified as 'Not Required Back' for any current or future

9  VITOL project work and also any work that PIS may want to

10  engage them for IPOS operations activities associated with

11  VITOL assets."

12    As a result, were these people barred from

13  the job?

14    A.  I -- I -- I can't recall to that detail.

15    (Respite.)

16    Q.  And then Exhibit 269, which is PIS 7643.

17    (Deposition Exhibit No. 269 was

18    marked for identification.)

19    All right.  This is a text from you.  Starts

20  out January 22nd, 2021.  "I'll call you back.  Are you

21  available for a quick call?  Ok I will call you."  It says,

22  "Sure.  Ok I will call you short.  Call me please.  Will

23  call you shortly."

24    And then there's a statement, "There's a

25  changing story regarding the security log sheets," and then

1  there's a response, "Ok I will call you."

2    Do you remember what this text was about?

3    A.  No, absolutely not.

4    Q.  Was that a text between you and Adrian about

5  Mr. Canning's false claims of fabricated timesheets?

6    MR. SIMPSON:  Objection.

7    Q.  (Ms. Rohn) You may answer.

8    A.  Attorney Rohn, from a text message that goes back

9  several years, there's no way I can categorically respond in

10  the fashion that you're asking me to respond.

11    Q.  Well, sir, do you recall having a -- well, Adrian

12  contacting you and saying, let's have a conversation, and

13  then having a conversation with Adrian about what

14  Mr. Canning was up to as to the timesheets?

15    MR. SIMPSON:  Objection.

16    Q.  (Ms. Rohn) You may answer.

17    A.  I -- I -- in reference to this text, I have no

18  idea what this text is all about.

19    Q.  I'm just asking you generally, now, do you recall

20  that occurring?

21    MR. SIMPSON:  Objection.

22    A.  If I -- if the text says that, you know, I will

23  call you back, yes, I must have called him back.

24    I -- typically when somebody sends me a text

25  message, and I said I will call him -- call him or her back,

1  I -- I typically do.  So it must have happened.

2    Q.  (Ms. Rohn) Okay.  Exhibit 46E, which is IPOS 2544

3  to 2545.

4    MS. FRANCIS:  Could you please restate those

5  Bates numbers?

6    MS. ROHN:  2544 to 2545.

7    (Deposition Exhibit No. 46E was

8    marked for identification.)

9    Q.  (Ms. Rohn) Do you see that you are copied on an

10  e-mail from Andrew Canning to David Nagle, and then copied

11  to yourself and David Smith?

12    A.  I do see it.

13    Q.  All right.  And this is about the RIO shades

14  again.

15    And Mr. Andrew Canning says, "Thank you for

16  the construction photographs and reinforcing details as

17  built on the mound wall."

18    And then he claims, if you go down, this

19  "clearly does not constitute Adrian's recent email claim

20  that the scope has changed.  I agree, it certainly helps if

21  the contractor comes with the necessary tools and equipment

22  to undertake the work, which is something Petro has

23  consistently failed to do especially when most of their

24  activities are time and materials - where is the incentive

25  to get the work done and this certainly appears to be

MERLIN FIGUEIRA -- DIRECT

1    another example here?"

2                From your interacting -- interactions with

3    Petro on jobs for IPOS, did you experience them consistently

4    failing to come to work with the proper tools?

5        A.   Attorney Rohn, I can't compare the -- the work

6    that Petro did on a maintenance side with -- with project

7    work.  Project work takes special tools and -- and special

8    skills.  So there's no way I can comment or agree with you,

9    one way or the other.

10       Q.   Well -- well, sir, I'm just asking generally,

11   if -- okay.  First of all, on the maintenance side, did they

12   have the correct tools?

13       A.   On the maintenance side, it was typically wrenches

14   and very simplistic tools, and they had them, yes.

15       Q.   Okay.  So if this were indeed not a job that IPOS

16   was supervising, why is Mr. Canning sending this to you and

17   David Smith, and not anyone from Vitol?

18            MR. SIMPSON:  Objection.

19            MS. FRANCIS:  Objection.

20       Q.   (Ms. Rohn) You may answer.  You may answer.

21       A.   Attorney Rohn, that's a -- that's a question you

22   need to ask Andrew.

23       Q.   But he -- he wasn't doing it within any scope or

24   consulting work for IPOS; is that correct?

25       A.   No.

MERLIN FIGUEIRA -- DIRECT

1        Q.   That's not correct, or, that is correct?

2        A.   That is, he wasn't doing any work for IPOS, no.

3        Q.   All right.  Now, sir, isn't it true that

4    ultimately what happened is after Andrew supervised the RIO

5    shades in St. Croix, and it didn't go well, took longer than

6    expected, that in St. Thomas, he not only was not the

7    supervisor of the St. Thomas RIO shields, and that the

8    operation was managed by Calvin and Coury, and was completed

9    without Andrew and David Nagle?

10            MR. BECKSTEDT:  Objection.

11            MS. ROHN:  You may answer.

12            MR. SIMPSON:  Objection.

13       Q.   (Ms. Rohn) You may still answer.

14       A.   In -- in St. Thomas, you're correct.  The work in

15   St. Thomas, one of the panels, if I can recall correctly,

16   was done without Andrew or David Nagle present.

17       Q.   And there wasn't the same problems with that

18   installation that there was in the St. Croix installation;

19   isn't that correct?

20            MR. SIMPSON:  Objection.

21       A.   There -- there wasn't the same issues in

22   St. Thomas, but Attorney Rohn, one has to -- one has to

23   understand, huh, that the initial job was started in

24   St. Croix.  There was a variety of learning experience and

25   time that was invested in learning how this thing was put

MERLIN FIGUEIRA -- DIRECT

1    together.  As a result, when -- when the work was done in

2    St. Thomas, there was an ample of learning experience that

3    they had already earned, and made this thing very simple in

4    St. Thomas.

5        Q.   (Ms. Rohn) Isn't that because the original design

6    for St. Croix didn't work, and indeed, eventually, Petro

7    came up with a design that worked and got the job done?

8            MR. SIMPSON:  Objection.

9            THE WITNESS:  I -- I -- I can't agree to

10   that, that statement.

11       Q.   (Ms. Rohn) Okay.  Well, if the original design

12   worked, how would it not have -- how would it have taken so

13   long and needed learning information?

14            MR. SIMPSON:  Objection.

15       A.   Well, I mean, if I may just go to -- to something

16   that I'm more familiar with.  If I -- if I -- if I rebuild

17   an engine on the first car, two different cars are the same

18   brand, the first car is going to take much longer, because

19   I'm learning about the different tools that are required,

20   how to -- how to take certain parts apart.

21            When I do the second car a month later, it's

22   going to go a lot faster because of the learning that was

23   done on the first job.  It's -- it's just a normal

24   experience.

25       Q.   (Ms. Rohn) All right.  But -- but then if you're

MERLIN FIGUEIRA -- DIRECT

1    learning on the first job, and you're learning what tools

2    need to be done, then would it be appropriate for

3    Mr. Canning to -- to claim you're competent because you

4    didn't know what to -- you didn't bring tools you don't even

5    know were going to be needed?

6        A.   I -- Attorney Rohn, I -- I can't comment on what

7    happened in St. Thomas -- St. Croix, because I was simply

8    not there.  I did not see the job in its entirety.  I cannot

9    comment on -- on -- on your line of thinking.

10       Q.   All right.  Exhibit 46B.

11            (Deposition Exhibit No. 46B was

12            marked for identification.)

13            If you'll scroll down.  Scroll down.

14            This is an e-mail from Andrew Canning on

15   January -- Saturday, January 23rd, 2021.  Copy to David

16   Smith and yourself.  Importance:  High.  Sensitivity:

17   Confidential.

18       A.   Can you please scroll up, please?  I see part of

19   the e-mail.

20       Q.   Yes.  I'm going to -- that -- here.  Can you stay

21   right there?

22            You see that e-mail, sir?

23            (Respite.)

24            Have you had a chance to read it, sir?

25       A.   No.  I'm just reading.  I'm still in the first

1  paragraph. Sorry.
2      Q.   Okay. No worries. Just tell me when you're
3  finished.
4      A.   Okay. (Witness complies.)
5           Okay. I've read through it.
6      Q.   Okay. So Mr. Canning claims, in the second
7  paragraph, "I think this is a further example of the lies,
8  deceit and what would be regarded as fraudulent activity
9  that surround this particular PIS team. We as a project
10 have always carefully scrutinised the time and expense
11 claims for all contract activities and I am confident that
12 timekeeping and honestly of the imbedded PIS maintenance
13 teams is good. However with the dishonesty exhibited by
14 this particular team now evident, it may be prudent to
15 review the time recording and eventual cost of the
16 St. Thomas boiler room access platform remembering that PIS
17 (albeit maybe at the transition from vivot) had previously
18 quoted $15,000 for the installation in St. Croix."
19          Did you do anything to investigate the claims
20 of Mr. Canning that a particular team of PIS was engaging in
21 lies, deceit, and fraud?
22     MR. SIMPSON:  Objection.
23     A.   No, I did not.
24     Q.   (Ms. Rohn) And if you'll scroll -- if you scroll
25 up, David Smith says, "Thank you Andrew, If this is correct

1  we will also have to speak to our Security company. They
2  should not allow anyone to be misrepresenting time on site."
3          Why would the security company be keeping
4  employees' time?
5      MS. FRANCIS:  Objection. Foundation.
6      A.   Well, I -- I don't think they were specifically
7  keeping time.
8           The -- the U.S. Coast Guard rule is that when
9  somebody enters a -- a secure facility as -- as IPOS, they
10 had to sign in. And that was done at the security -- at the
11 security post.
12     Q.   (Ms. Rohn) Sir, isn't it correct that in
13 St. Croix, the -- the persons themselves didn't actually
14 sign in, the security guard signed them in?
15     MR. SIMPSON:  Objection.
16     Q.   (Ms. Rohn) You may answer.
17     A.   I don't know that for -- I -- I wasn't there to
18 actually state what actually occurred. There are times, and
19 I've observed this, that when -- when visitors come in,
20 the -- the security guard hands -- hands the visitor the --
21 the -- the log-in sheet, and they sign -- sign themselves
22 in, because of the -- of the -- of the -- it's easier for
23 the visitor to actually put their name in there. And -- but
24 I'm not so sure whether that was indeed what he was
25 referring to or not. I simply can't comment, because I

1  wasn't there.
2      Q.   Well, sir, isn't it a fact that when -- your first
3  stint from 2015 to 2017, that was true. But after COVID,
4  there was no more handing out of the security -- security --
5  nobody was allowed in the security booth, and the security
6  guards themselves would sign people in?
7      MR. SIMPSON:  Objection.
8      MS. FRANCIS:  Objection. Foundation.
9      Q.   (Ms. Rohn) Isn't that true, sir?
10     A.   Could you repeat the question one more time?
11     Q.   Yes.
12          Isn't it true that in your first stint in
13 2015 to 2017, it may be true that they handed out the -- the
14 books to people to sign in. But after COVID, there was
15 a new policy that people didn't actually personally sign in,
16 the security guard signed them in on a security book?
17     MR. SIMPSON:  Objection.
18     A.   I don't know what policy, I don't know what
19 security policy you are referring to, but I'm not aware
20 of -- of that being followed at -- at -- at IPOS.
21     Q.   (Ms. Rohn) All right. If you can scroll down to
22 the second page? Second page. You're supposed to be on
23 46P. Oh, wait. Wait. Wait. Sorry. Go to 46P. Sorry.
24 It's the next one.
25

1          (Deposition Exhibit No. 46P was
2           marked for identification.)
3          So 46P, if you'll scroll down. Stop right
4  there. Stop right there. This is -- you see we're picking
5  up on the chain. That's where Andrew -- where David says
6  they're going to look at the camera system. If you
7  scroll up, there's a statement from yourself.
8      MS. FRANCIS:  What is the Bates number,
9  please?
10     MS. ROHN:  6677.
11     Q.   (Ms. Rohn) You say, "Agree David. We just need to
12 check the data through our CCTV system."
13          What's your CCTV system?
14     A.   Close-circuit TV, I think. Close-circuit TV.
15     Q.   So that would tell you, would it not, exactly when
16 they came and when they left?
17     A.   That's not necessarily true, because it depends
18 whether the -- the camera was trained at the gate, and
19 whether, in fact, it was working.
20     Q.   Okay. So then if you scroll up, David says, "I
21 didn't see your response first, you have it spot on."
22          And that's not copied -- while your response
23 is to Andrew Canning and David, David's response is to you
24 only, correct?
25     A.   Let me -- let me see.

101

1    The response to -- from David was to me, yes.

2    Q.    Okay.  And then you respond to David, but not

3    Mr. Canning, "No worries.  Also spoke to Adrian of what we

4    are finding so that he is aware we will bring this up with

5    them on Tuesday."

6         Do you remember the substance of the

7    conversation that you had with Adrian?

8    A.    No, absolutely not.  I can't remember.  I mean,

9    that's going back three years.  As I say, I cannot remember.

10   Q.    Then there's an e-mail 56R, the next one.

11        MS. FRANCIS:  Attorney Rohn?

12        MS. ROHN:  Yes.

13        MS. FRANCIS:  Could we please take a break?

14   We've now been going for an hour and 58 minutes without a

15   break.

16        MS. ROHN:  Yes.  I'm just going to finish

17   this e-mail, because it's part of the chain.  It's part of

18   the same issue.  56R.  46R.

19        MR. WILLIAMS:  Oh, 46R.

20        MS. FRANCIS:  It's the next exhibit.

21        (Deposition Exhibit No. 46R was

22        marked for identification.)

23        MS. FRANCIS:  Could you provide the Bates

24   number while Mr. William is --

25        MS. ROHN:  6701 IPOS.

102

1    Q.    (Ms. Rohn)  All right.  Scroll down.

2         This is a February 23rd, 2021 e-mail from

3    Andrew Canning to yourself, and copied to David Smith.

4         "Merlin, During Monday's WAPA KO meeting I

5    was interested to hear Adrian discuss the current location

6    of the personnel that PIS plan to use on the Gas Turbine

7    cavity vent system replacement.  He stated that one person

8    was coming from Puerto Rico and two were already on

9    St. Croix.  I am hoping that the one person from Puerto Rico

10   is not Elias Rivera, quote, (but rather a welder who is

11   certified to weld 3E1) close, and the other two on St. Croix

12   are not Ricardo Valazquez and Juan Ghigliotty who were

13   deployed to Cruzian rum.  Hopefully I am wrong in my

14   concerns on the possible use of the excluded individuals.

15   However as I will be onsite when the work starts next Monday

16   I am interested in your and David's views and advice on how

17   I should deal with the situation of using excluded

18   individuals on either WAPA or IPOS premises if the situation

19   arises?"

20        So from that e-mail, were those three

21   actually excluded?

22   A.    Frankly, I -- I -- I -- I cannot -- I can't even

23   recall.  That was so long ago.  I -- I really do not know.

24   I mean, you know --

25   Q.    If you scroll up --

103

1    A.    I would be guessing.  I would be guessing.

2    Q.    And then if you scroll up, you respond to Andrew,

3    "I would be surprised if they brought the 2 or 3 guys back.

4    I don't believe they would do that.  If that were to happen

5    I suggest you contact David or me and allow us to handle it.

6    I believe we discussed the concern we have for you."

7         Is that discussing the concern they have with

8    him talking directly to Petro?

9    A.    I mean, I think that the concern we had was Andrew

10   was -- can be -- sometimes comes across as -- comes across

11   as a little bit more confrontational than anything else.

12   For the sake of maintaining harmony, we thought, between

13   David and myself, we could easily discuss this -- this issue

14   with -- with PIS.  And it was simply -- it was simply that.

15   We wanted harmony to -- to persist, and -- and that was the

16   reasons why that statement was made.

17   Q.    Is that the reason why Andrew Canning stopped

18   overseeing the IPOS -- the Petro maintenance work for IPOS?

19        MR. SIMPSON:  Objection.

20   Q.    (Ms. Rohn)  You may answer.

21   A.    I -- on my second tour at -- at IPOS, I have never

22   known, or I never had Andrew supervising any maintenance

23   work that was under the direct responsibility of the

24   facility, and it was me.

25        MS. ROHN:  Okay.  What time is it?  Is it

104

1    time for a lunch break?

2         THE WITNESS:  It's -- for us, for me, it's

3    time for a beer right now, but, yeah, it's okay.

4         MS. ROHN:  It's okay if you have a beer on

5    the break.

6         THE WITNESS:  No, no.  Well, let's take a --

7    I mean, how -- how -- how long of a break do you folks want

8    to take?

9         MS. ROHN:  What does everybody want?

10        Susan, how long would you like?

11        THE COURT REPORTER:  I'm good with whatever

12   anyone wants.

13        MS. FRANCIS:  Can we take 20 minutes?

14        MS. ROHN:  No.  I'm going to take lunch, so I

15   can't do that in 20 minutes.

16        MS. FRANCIS:  Okay.  Attorney Rohn, I would

17   ask you to be mindful and respectful of the fact that it is

18   6:00 p.m. for Mr. Figueira, so we certainly cannot go into

19   the middle of the night with this witness.

20        MS. ROHN:  I'm probably going to take my

21   seven hours, that's correct.

22        MS. FRANCIS:  We are not going into the

23   middle of night with this witness.

24        MS. ROHN:  Well, you know, it is what it is.

25   I have seven hours with Mr. Figueira, and I intend to take

1   the seven hours.  I had no -- I have -- you're the one who
2   knows where he is, and what should have been scheduled for
3   his time.  I had no idea where he was.  So you never
4   mentioned that until now.  So we could have scheduled him at
5   a different time, but --
6          MS. FRANCIS:  Attorney Rohn, I cannot --
7          MS. ROHN:  -- you didn't say, so we scheduled
8   him for 9:30.  So I'm going to take seven hours with
9   Mr. Figueira.
10         MS. FRANCIS:  We will go to the Court if we
11  need to.  Thank you.
12         MS. ROHN:  You're welcome.
13         (Lunch recess taken.)
14         (Deposition Exhibit No. 62J was
15              marked for identification.)
16     Q.  (Ms. Rohn)  Okay.  Can you scroll down just to the
17  first page?  Actually, first page.  First page.
18         MS. FRANCIS:  Can we have the Bates numbers,
19  please, before the questions?
20     Q.  (Ms. Rohn)  Sure.
21         IPOS 5571 to 57 -- 5572, is all I'm going to
22  use in this exhibit, but it's a bigger exhibit.
23  Can you scroll, please?  To the second page.  To the bottom
24  of this page.
25         There's an e-mail that starts from Merlin,

1   February 10th, 2021 to Andrew Canning.  Copies, David Smith.
2   Subject:  Updated AR.  "Andrew," scroll to the next page,
3   "where are we with the Vitol related Invoices?  PIS is
4   showing these as in our court."
5          What did you mean by that?
6      A.  Can you scroll up, please?
7      Q.  Sure.
8          It just starts out with that.  Starts out
9   with you in that e-mail.  That's the start.
10     A.  Okay.
11     Q.  Why would you say, the Vitol invoices are in
12  IPOS's court?
13     A.  Attorney Rohn, we've -- we've spoken about this
14  before, but just to repeat, the project work was a
15  pass-through cost from -- from IPOS through to Vitol, so
16  that is what I'm talking about there.
17     Q.  Okay.  So -- but even though it was a pass-through
18  instead of Vitol approving the invoices, IPOS had to approve
19  the invoices; is that correct?
20     A.  No.  Absolutely incorrect.
21     Q.  What?
22     A.  It's incorrect.
23     Q.  Well, then, why do you say these invoices are in
24  our court?
25     A.  Well, they are in our court.  The reason I said

1   "in our court," because we process them through, and get
2   them paid as a pass-through expense to Vitol.
3      Q.  What do you have to do before you pay them?
4      A.  Well, Andrew -- Andrew has to approve those costs.
5      Q.  Okay.  So if you scroll up, there's the e-mail
6   from Andrew dated February 10th to Merlin, cc David.  "The
7   120K one is with me (not sure who has the others), I need to
8   request more details on activities not specified on a time
9   sheet covering two weeks before the shutdown for Chad then
10  it should be ready to go.  I now also have Tim and Charlotte
11  wanting to go through 15 rebilled invoices from IPOS too."
12         What did you understand Canning meant by
13  that?
14     A.  Well, again, these are invoices for -- for
15  projects that was handled by Andrew.  They were processed
16  through IPOS, and then sent to Vitol to -- to reimburse
17  IPOS, and that is what that last sentence is.  They would --
18  they would not pay them without knowing clearly what -- what
19  they're paying.
20     Q.  Right.  So at this point, Vitol wanted Canning to
21  go through 15 invoices that IPOS had paid, but Vitol had not
22  paid back; is that correct?
23     A.  I'm -- I'm going to have to assume from this --
24  from that sentence.  I just don't know the facts as of
25  February 10, 2021, what that sentence meant.  But my guess

1   would be that they -- before they reimburse us, they wanted
2   to make sure what it is for.
3          MR. BECKSTEDT:  Objection.  Move to strike
4   the answer as speculation.
5          MS. ROHN:  Objection.
6      Q.  (Ms. Rohn)  Scroll up.
7          And then Merlin, you say, "Andrew, I'm not
8   wanting to push anyone so as to get this paid.  But, just
9   want to get this off our plate as both David and I get calls
10  of these outstanding Invoices.  So for selfish reasons I'm
11  checking on their status.  If there's anything we can assist
12  to be informed on the 15 Vitol rebills please let us know
13  and we can get Kunal and others involved."
14         So when Petro wouldn't get paid, it was -- it
15  was IPOS that Petro would go to, correct?
16     A.  Yes.
17     Q.  Exhibit 296.
18         (Deposition Exhibit No. 296 was
19              marked for identification.)
20         All right.  Scroll down, please.  296 is IPOS
21  3896 through 3901.  Scroll down.  Keep scrolling.  Slowly.
22         All right.  So you recognize these to be the
23  welding certifications that were in question as to Petro?
24     A.  I can't say with certainty that these were the --
25  the welder certificates, yes.

**109**

MERLIN FIGUEIRA -- DIRECT

1  Q.  Okay.  Scroll down a little bit on this one.
2  Scroll down.  Down.  Oh, shit.  You see where -- hold on.
3  Zoom in, please.
4          Do you see the name Guillermo Castro, LIII on
5  these -- on these invoices?  Does that help you refresh your
6  recollection?
7          MR. BECKSTEDT:  Objection.
8  Q.  (Ms. Rohn) You can answer.
9  A.  I mean, there's -- there's no way I would know
10  whether these were the same certificates that were shown to
11  me at that time.  I mean, you know, I just can't recall.
12  Q.  Okay.  Exhibit 46H.
13          It's the next exhibit.  Next exhibit.  You're
14  not on -- the cursor is not on the scroller.  46H is the
15  next one.  You can just scroll down to it.  The cursor is
16  not on the scroll bar.  46H is the next exhibit, if you just
17  scroll down.  You're not on the scroll bar.
18          (Respite.)
19          I can't have this.  We have limited time.  Go
20  back to 296.  I can't have this, because we have limited
21  time.  You have to be able to get out of that document.
22  That's the first document.  You cannot go to there.  Take it
23  off the screen.
24          (Respite.)
25          Come on, Michael.  It's right here.  The next

**110**

MERLIN FIGUEIRA -- DIRECT

1  document after 295.  296.
2          (Respite.)
3          (Deposition Exhibit No. 295 was
4          marked for identification.)
5  Q.  (Ms. Rohn) All right.  If you go to 295.  All
6  right.  All right.  Just take --
7          So were you aware that on February 24, 2021,
8  Mr. Canning sent an e-mail to David Smith, re the Wartsila
9  Project Fuel?
10          "FYI, thought it funny that Charlotte left
11  Merlin off the response and included me.  Good attempt by
12  Merlin to throw me under the bus yesterday for the apparent
13  delay in providing a cost basis breakdown and the need to
14  requote the turbine vent system replacement for PIS.
15  Incidentally -- I understand that -- there shouldn't be --
16  incidentally -- I understand that -- incidentally reducing
17  the cost.  Up until this point, PIS had no plan, strategy,
18  or basis for their quote.  (Their plan and time scales did
19  not fit the job but more justified their without foundation
20  and basis guesstimate.)  What is even more amusing in the
21  Vitol/IPOS meetings is that the Vitol team did not seem to
22  rate Merlin, and it was interesting that they had pushback
23  on his decision to sack the omissions company that they paid
24  for.  Interesting times.  Just not sure how much longer I
25  can resist not shoving back against Merlin's management

**111**

MERLIN FIGUEIRA -- DIRECT

1  approach to the facility.  Especially when he is -- his
2  knee-jerk reactions move from non-compliant towards risky.
3  As for his unwavering job creation approach to all things
4  PIS, I am at a loss.  How about you?"
5          Were you ever aware that Mr. Canning was
6  saying these things behind your back?
7          MS. FRANCIS:  Objection.  What you were
8  reading, that is not on the dock -- that's not on the
9  screen.
10          MS. ROHN:  And I'm trying to move along, and
11  we can't seem to get it on the screen.
12          Would you like me to take a 15-minute break
13  to figure out how to do that?
14  Q.  (Ms. Rohn) Sir, were you aware that Mr. Canning
15  thought you were too close to PIS?
16          MR. SIMPSON:  Objection.
17  Q.  (Ms. Rohn) You may answer.
18          MS. FRANCIS:  Same objection.
19  A.  I need to -- I need to -- I need to look at the
20  document to really -- to come to a --
21  Q.  Well, then, sir, I can take a ten-minute break and
22  try to figure out where -- where we are, and then I will do
23  so, and then we'll come back.
24          MS. FRANCIS:  Whatever break you take is
25  counted against the --

**112**

MERLIN FIGUEIRA -- DIRECT

1          MS. ROHN:  No, ma'am, that is not how it
2  works.  It's called actual deposition time.
3          MR. SIMPSON:  You're supposed to be prepared
4  for your deposition.
5          MS. ROHN:  I have a glitch in my computer,
6  and I know you've had glitches in your computer, sir, so,
7  really, give me a break.
8          MR. SIMPSON:  You're unable to present
9  exhibits in a deposition.  We've been enduring this for
10  every deposition in this case.
11          MS. ROHN:  Sir, thank you for your lecture.
12  I don't have to put up with it.
13          MR. SIMPSON:  It's not a lecture.  It's not a
14  criticism.
15          MS. ROHN:  Stop talking to me.
16          MR. SIMPSON:  It's an observation.
17          THE COURT REPORTER:  Excuse me, are we on the
18  record or off the record?
19          MR. SIMPSON:  We're still on the record.
20          (Respite.)
21          MS. ROHN:  Sir, this is my deposition, and I
22  am off the record.
23          MR. SIMPSON:  No, that's not how a deposition
24  works.  Unless everyone agrees to go off the record, it's on
25  the record.

MERLIN FIGUEIRA -- DIRECT

1  MS. ROHN:  No, sir.  I pay for this
2  deposition, and you can't unnecessarily bill for time that
3  is not part of the deposition.
4  MR. SIMPSON:  I do not agree to go off the
5  record right now.
6  MS. ROHN:  I'm not paying for any transcript
7  of this silliness.
8  (Respite.)
9  MS. ROHN:  Let's skip this exhibit, and go to
10  a different exhibit.  Can you get 293 up?  Okay.  293.
11  It's not 293.  Oh, yes, it is.  No, that is
12  not 293.  Okay, Michael.  Two nine three.
13  MR. SIMPSON:  It's on the screen.
14  MS. ROHN:  Okay.  Go to the first page.
15  Scroll up to the first page.  You're looking at an old
16  exhibit, Michael.  You do not have the new exhibits.
17  Put on the record, that the person who
18  usually does my sharing is out today, and we're trying to
19  pinch-hit with Michael, who is trying really hard to
20  pinch-hit well, but has the wrong set of exhibits.
21  MR. SIMPSON:  He has the exact same exhibit
22  that has been circulated to the parties.
23  MS. ROHN:  You know what, Andy?  I don't need
24  your help.  I was looking in my book for what is supposed to
25  be that exhibit.  So don't tell me what my exhibit looks

MERLIN FIGUEIRA -- DIRECT

1  like.
2  MR. SIMPSON:  I'm telling you what your
3  office --
4  MS. ROHN:  And I'm telling you, I don't care
5  what you say.
6  MR. SIMPSON:  Don't interrupt.  I am telling
7  you that the exhibit that your office circulated to the
8  defendants, prior to this deposition, is on the screen.  It
9  is six pages --
10  MS. ROHN:  Go to 294, please.
11  MR. SIMPSON:  -- as Exhibit 293.
12  MS. ROHN:  Go to 294.  All right.
13  Exhibit 294.
14  (Deposition Exhibit No. 294 was
15  marked for identification.)
16  There is an exhibit -- there is an e-mail, if
17  you scroll down, from Tim K. to you, Merlin, and Adrian
18  Melendez.  Vent Piping Project WAPA --
19  MS. FRANCIS:  Can we, please, get the Bates
20  numbers?
21  MS. ROHN:  IPOS 4835 through IPOS 4836.
22  Q.  (Ms. Rohn) There's an e-mail, "Per our
23  conversation" -- "Merlin and Adrian, Per our conversation on
24  Tuesday, we will be providing WAPA with all the job book
25  documentation for this project.  This includes the

MERLIN FIGUEIRA -- DIRECT

1  engineering/design/scope/construction documentation for them
2  to review - and after completion for their records as this
3  work is being done on their property.  Please send over the
4  following" -- scroll down, please, Michael.
5  It starts out with prior to commencement of
6  the work, a listing of things that needed to be done.
7  Prior to the start of the work, to your
8  knowledge, were those documents prevented -- presented to
9  Vitol to be given to WAPA?  Can you answer, sir?
10  MS. FRANCIS:  Attorney Rohn, the witness is
11  entitled to an opportunity to read the document.  Please.
12  MS. ROHN:  Well, I'm trying to hurry
13  for him, but I'll just take my time.
14  MS. FRANCIS:  The witness is under oath, and
15  he's entitled to an opportunity --
16  MS. ROHN:  Ma'am, really, you don't have to
17  repeat yourself.
18  A.  Attorney Rohn, sorry.  My mic was off.  Could you
19  repeat the question?
20  Q.  Yes.
21  If you look at the work that is supposed to
22  be done prior to commencement of work, is it correct that
23  that documentation was provided to Vitol to give to WAPA
24  before the work started?
25  MR. SIMPSON:  Objection.

MERLIN FIGUEIRA -- DIRECT

1  MS. ROHN:  Noted.
2  Q.  (Ms. Rohn) You may answer.
3  A.  Attorney Rohn, I can't remember whether we gave or
4  provided those documents at that time.  I mean, it's just so
5  long, I just don't know.
6  Q.  Well, from your experience at IPOS, did it matter
7  to WAPA whether they got these documents or not before you
8  started the work?
9  MS. FRANCIS:  Objection.  Foundation.
10  MS. ROHN:  Noted.
11  Q.  (Ms. Rohn) You may answer.
12  A.  I mean, in my view, it depended on the job, and it
13  depended on the people who we were working for.  There's
14  some that would require it, some would probably take it
15  later, after the fact.  I just don't know in this situation.
16  Q.  Okay.  That's a fair statement.
17  MR. SIMPSON:  Objection.
18  MS. ROHN:  Exhibit 270.
19  (Deposition Exhibit No. 270 was
20  marked for identification.)
21  It's not 270.  Oh, yes, it is.
22  Okay.  So this is a text, March 8th, 2021,
23  from your -- you to Adrian.  It starts out, I believe from
24  Adrian, "Call me when you can," and then your response,
25  "Hello Adrian."  Scroll down, please.  "Andrew just found

MERLIN FIGUEIRA -- DIRECT

1  stainless pipe at McMaster Carr.  So pipe that is not
2  Chinese is available and in stock or available within 1 or 2
3  weeks. Adrian you must find replacement pipe soon.  At
4  yesterday's Meeting with Vitol we were asked how could such
5  an error be made by PIS.  And when Vitol asks these kinds of
6  questions it tells me that may gradually lose confidence
7  with PIS. So you need to jump thru hoops to get this solved
8  and double your efforts to ensure no other issues surface.
9  Just giving you advice here as I know how Vitol works."
10          What did you mean by, "I know how Vitol
11  works"?
12      A.   I -- I mean, I'll be guessing.  I'll be guessing
13  at this point what -- what I meant, you know, two years
14  after the fact, you know.  So --
15      Q.   Well, sir, did Vitol have the ability to recommend
16  to IPOS to cancel contracts with vendors?
17      A.   Attorney Rohn, it depends on the circumstances,
18  huh?
19      Q.   Are -- are there circumstances --
20          MS. FRANCIS:  Attorney Rohn, please allow him
21  to finish his answer.
22      Q.   (Ms. Rohn)  I thought he was.  I apologize.  If you
23  can complete your answer.
24      A.   It all depends on the circumstances.  I mean, if
25  you had some serious issues, yes, they have the right as

---

1  to -- as to -- as the party paying for the project to cancel
2  anything or to tell us to suspend whoever is doing the work
3  for us.
4      Q.   Exhibit 287.
5          Scroll down, please.
6          (Deposition Exhibit No. 287 was
7           marked for identification.)
8          Thank you.
9          This is an e-mail -- oh, it's IPOS 6700.
10          This is an e-mail from David Smith to -- to
11  yourself, March 24, 2021.  "Petro was in Houston a few weeks
12  back and asked to meet Sebastian, Tim, Charlotte.  I guess
13  they called them and said tomorrow so they are going.  Chad
14  called to tell me and ask me about Sebastian.  They say they
15  really don't have reason, just thought when they were there
16  it would be nice.  I told them to be honest and direct and
17  factual."
18          And if you scroll up, you respond, "David, I
19  suggested to Adrian several weeks ago to meet the Vitol team
20  after Sebastian made some comments related to their
21  capability."
22          Do you remember the comments that Sebastian
23  made as to their capability?
24      A.   Absolutely not.  I can't remember that far back.
25      Q.   Okay.  "In addition to help them with possible

---

1  negative comments (behind the scene) from Andrew."
2          What negative comments behind the scene from
3  Andrew were you trying to help with the negative impact?
4      A.   I have no idea, at the time, what I meant.
5      Q.   Well, would you claim there were negative comments
6  by Andrew if he hadn't made negative comments?
7      A.   I -- I -- I can't.  I can't.  I really don't know.
8      Q.   Well, sir, would you send an e-mail to David
9  claiming that you were trying to correct negative comments
10  made by Andrew if you -- if Andrew hadn't made negative
11  comments?  Would you do something like that?
12          MR. BECKSTEDT:  Objection.
13      A.   I mean -- I mean, you know, I really do not know
14  what the negative comments were.  What the depth of those
15  comments were, or -- or anything like that, even to answer
16  your question.
17      Q.   (Ms. Rohn)  Sir, would you have made that
18  statement, if Andrew hadn't made negative comments about
19  Petro?
20          MR. SIMPSON:  Objection.
21          MR. BECKSTEDT:  Objection.
22      Q.   (Ms. Rohn)  You may answer.
23      A.   If you read the -- the line, "In addition to help
24  them with possible negative comments (behind the scene) from
25  Andrew," I mean, it could be anything.  It could be --

---

1      Q.   Okay.  But there were some --
2      A.   It could be -- I'm sorry?
3      Q.   But there was something, wasn't there, that Andrew
4  said that was negative?
5          MR. BECKSTEDT:  Objection.
6      A.   I -- I have no idea.
7      Q.   (Ms. Rohn)  So you would write an e-mail like that
8  back in March of 2021 if -- but it wasn't true; is that
9  right, sir?
10          MR. BECKSTEDT:  Objection.
11      A.   That is not true.
12          MR. BECKSTEDT:  Objection, too.
13      Q.   (Ms. Rohn)  What is not true?
14      A.   You're asking me about a -- a line there about
15  negative comments that I have no idea in what context I had
16  written that, that -- that sentence.
17      Q.   No, sir, that's not what I'm asking you.
18          I'm asking you, would you have written that
19  Andrew was making negative comments, if he wasn't?
20          MR. BECKSTEDT:  Objection.  That misstates
21  the document.  That's blatant, Attorney Rohn.
22      Q.   (Ms. Rohn)  Sir, that's my question.
23          MR. BECKSTEDT:  It doesn't say that.
24  Objection.
25          MS. ROHN:  Please stop making speaking

1  objections.
2          MS. FRANCIS:  Objection.  Foundation.
3          MR. BECKSTEDT:  You're blatantly
4  misrepresenting the document on the screen.
5          MS. ROHN:  Sir, stop making -- stop making
6  speaking objections.  Stop talking on the record so that I
7  don't cause this man to be sitting here while we're
8  bickering back and forth.
9      Q.  (Ms. Rohn) Sir, would you have made the statement
10  that Mr. Canning was making negative statements about Petro
11  if it was not true?
12          MR. BECKSTEDT:  Objection.
13          MR. SIMPSON:  Objection.
14          MS. ROHN:  Noted.
15      Q.  (Ms. Rohn) Answer.  Please answer.
16          MS. FRANCIS:  Join.
17      A.  With due respect, Attorney Rohn, that sentence
18  does not -- it does not imply that -- what those negative
19  comments were, whether they were related to -- to PIS or
20  whoever else in the world.
21      Q.  (Ms. Rohn) Okay.  Well, it says, "I suggested to
22  Adrian several weeks ago to meet the Vitol team after
23  Sebastian made some comments related to their capability.
24  In addition to help them."  That would be, of course,
25  Adrian, correct?  "With the possible negative comments

1  (behind the scene) from Andrew."
2          Would you have said that if you didn't know
3  what Andrew was saying?
4          MR. SIMPSON:  Objection.
5          MR. BECKSTEDT:  Objection.
6          MS. ROHN:  Noted.
7          MS. FRANCIS:  Objection.
8      A.  I -- I -- I -- I -- I cannot agree to -- to -- to
9  that statement, because I do not know.  The sentences are
10  not connected.  It could be anything negative that the man
11  had said is unrelated to PIS.
12      Q.  (Ms. Rohn) Sir, do you dispute that this is your
13  e-mail?
14      A.  That is my e-mail.
15      Q.  You go on to say, "Just last week Adrian called to
16  say they were meeting Vitol this week.  I am sorry I should
17  have passed that info to you.  He did ask about Sebastian's
18  background and I promised I would get that from you, but
19  forgot to do so.  I think the Meeting will be a good
20  relation building -- relationship building exercise and as
21  you right say that they be honest I told them the same
22  thing.  In addition I asked them to show that they are a
23  small company with low overhead so some things can move a
24  bit slow.  I also think it will help with undercutting
25  efforts by Andrew."

1          What efforts by Andrew are you referencing?
2      A.  I -- I -- I don't have a -- I don't have a certain
3  answer to what -- to what I had meant in that -- in that one
4  sentence.
5      Q.  Well, sir, would you have made a statement in an
6  e-mail that Andrew was making efforts to undercut Petro if
7  it wasn't true?
8          MR. BECKSTEDT:  Objection.
9      Q.  (Ms. Rohn) You may answer.
10      A.  The -- the -- the term undercutting efforts by
11  Andrew could -- could be half a dozen different things.  It
12  could be Petro.  It could be many other things.  I cannot
13  categorically say that the undercutting effort by him was
14  against Petro.  I -- I just can't agree to that.
15      Q.  But you wrote it in an e-mail to David, correct?
16      A.  It -- it is in my e-mail, but my -- my response
17  is, I do not know what his efforts were, whether related to
18  PIS.
19          (Respite.)
20      Q.  Exhibit 288.  Did you get it?  Okay.
21          (Deposition Exhibit No. 288 was
22          marked for identification.)
23          This is an e-mail, March 31st, 2021, from
24  Adrian to yourself, Andrew Canning, and others, including
25  Charlotte, Tim, and Sebastian, stating what today's progress

1  was.
2          Was there a requirement that Petro -- sorry.
3  Yeah, Petro, on a daily basis, give a statement of what work
4  they had done on that day?
5      A.  I -- I can't say for certainty.  I -- if -- if I
6  say something, it's -- it's probably going to be a guess,
7  and I'd rather not do that.
8      Q.  Well, do you know why Adrian was sending this to
9  you, then?
10          MS. FRANCIS:  Objection.  Mischaracterizes
11  the document.
12      Q.  (Ms. Rohn) Well, Adrian is sending it to him.
13          MS. FRANCIS:  And a number of other people,
14  so mischaracterizes the document.
15          MS. ROHN:  Oh, please.
16      Q.  (Ms. Rohn) Can you answer, please?
17      A.  I'm going to have to guess on this thing, because
18  I don't know with certainty.  He was probably giving us a
19  progress report.
20      Q.  But my question is, was there a requirement that
21  he do so on a daily basis?
22      A.  I have no idea what the requirement was two years
23  ago.  Three years ago.
24      Q.  Okay.  It says -- then it says, "Had 19 root welds
25  and sole plates PT (NDT) by Versa, all passed inspection."

1    Do you know why Petro would be telling you
2  and Vitol about the welding inspections of their work?
3      **A.**  As my response earlier to you was, it was this
4  e-mail was likely a progress report, and that's part of
5  the progress.
6      **Q.**  Okay.  And then it says, "Walked the job with
7  Merlin and Alex at about 2:00 o'clock pm this afternoon to
8  see the progress."
9      Would you, from time to time, walk the 3-inch
10  vent line job to observe the progress?
11      **A.**  I would.  As a -- as a general manager of IPOS, I
12  had -- I -- I -- I would walk any job I care to walk, and
13  any job that I found -- I had some interest to walk.  So
14  you're right, that is one of the things I did.
15      **Q.**  All right.  Exhibit 303.
16      (Deposition Exhibit No. 303 was
17          marked for identification.)
18      All right.  This is a Canning 14279 to --
19  14278 to 14280.  And if you will scroll to the last page.
20      On March 4 -- excuse me, April 3rd, 2021, you
21  wrote an e-mail to Andrew Canning and Adrian Melendez and
22  Chad, and you cc'd David Smith.  Conference call on Monday
23  at 9:00 am.
24      And it says, "I like to have a call amongst
25  us to reset our relationship as there have been a few

1  hiccups these last few weeks.  Can we have a Starleaf call
2  on Monday say at 9 am?  Regards, Merlin."
3      What were you referring to as the "hiccups"
4  in the last few weeks?
5      **A.**  You're scrolling through all the e-mails.  I -- I
6  don't know what -- where you're reading the text.
7      **Q.**  I asked you to go to the last page.  It says 303
8  on it.  Keep going.  Right there.
9      Can you see that e-mail?
10      **A.**  That e-mail is from Andrew, not from -- not from
11  me.
12      **Q.**  Go to 14278.  You haven't scrolled far -- oh,
13  this -- the reason -- problem with this, this is -- okay.
14  This is an old e-mail.  Here at the top here.  Sorry.  "I
15  like to have a call amongst us."  Do you see that one?
16      **A.**  Yes, I do.
17      **Q.**  What were the "hiccups" that you're referencing?
18      **A.**  Attorney Rohn, I have no idea, going back three
19  years, what the hiccups are.  There are hundreds of hiccups
20  we had all through that time.  So different -- different
21  hiccups.  There's no way I can zone in on that specific one.
22      **Q.**  Well, I think you had "hiccups" in plural, not
23  one?
24      **A.**  As I just said to you, there are hundreds of
25  hiccups I've had over several projects all over -- all over

1  the -- the -- the facilities I've been at.  So there's no
2  way I can remember.
3      **Q.**  Mr. -- Mr. --
4      **MS. FRANCIS:**  Attorney Rohn, you cannot
5  continue to interrupt and speak over the witness, please.
6      **Q.**  **(Ms. Rohn)**  Mr. Figueira, I'm not asking you about
7  hundreds.  I'm asking you, in particular, about hiccups
8  between Andrew Canning and Petro.
9      **A.**  Attorney Rohn, as I said to you earlier, I -- I
10  have listened and seen many hiccups.  I do not remember this
11  specific hiccup.  I -- I just can't.
12      **Q.**  Okay.
13      **A.**  I would be guessing.
14      **Q.**  Go to 14279.  That's in this document.  It's the
15  e-mail from Andrew Canning to Merlin, okay?
16      "Happy Easter."  This is from Andrew back to
17  you in response to your request.  This was dated April 4th.
18      "I do not think the intended purpose of the
19  telephone conference on Monday with Petro Industrial will be
20  met ('to reset our relationship as there have been a few
21  hiccups these last few weeks') unless I better understand
22  the comments you made in our brief telephone discussion on
23  Saturday where you talked about my -- talked about 'my
24  continued interference with the operation and operations led
25  work.'"

1      Does that refresh your recollection as to
2  what the hiccups were?
3      **A.**  No, I -- I can't.
4      **Q.**  Do you doubt that you said to Mr. Canning that he
5  was -- had interference with the operation and operations
6  led-work?
7      **A.**  I -- I don't deny that's what -- that's what I put
8  in print.
9      **Q.**  You say, "I believe it is worth discussing this
10  and several other recent comments that you have made outside
11  of a call with the IPOS contractor PIS in an environment
12  where we can hopefully agree on how the working relationship
13  may operate in the future.  I look forward to your comment
14  on delaying your proposed telephone conference and entering
15  into a separate, constructive and open dialogue on the
16  issues."
17      Do you dispute that Mr. Canning refused to
18  have a conference call with Petro, and wanted to only have a
19  conversation with you?
20      **MR. SIMPSON:**  Objection.
21      **Q.**  **(Ms. Rohn)**  You may answer.
22      **A.**  I mean, I -- I have to -- I have to understand the
23  context of -- of what he -- what the hiccups were, and what
24  the issues were.  I mean, yes.  I mean, if it was some
25  issues that were confidential, or -- or that kind of thing,

MERLIN FIGUEIRA -- DIRECT

1  maybe -- maybe it was the right step to have a private
2  conversation without -- without PIS.  So it's hard for me to
3  comment on -- on -- on -- on -- on what I was talking about
4  in that e-mail.
5      Q.   Okay.  Go to Bates Stamp 14280.
6           On April 4th, you responded to Andrew,
7  saying, "I am more than happy to talk to you on a separate
8  call.  However, the comment that I made to you yesterday was
9  to reach out to me on issues of a project that is under
10  operations control.  What I don't like to see you is you
11  asking questions and/or giving directions to Contractors
12  under our direct control.  For example, you were asking the
13  Security Guard for the Gate logs.  Both David and I have
14  spoken to you before of a sensitive of your review of these
15  logs.  In spite of discussing this with you this situation
16  has reoccurred.  As we discussed before the need for you to
17  have the gate information is not a problem, but your direct
18  request is creating a problem for us as previously
19  discussed."
20           What was the problem with him looking --
21  getting the gate logs?
22      A.   There's -- there's no problem in getting the gate
23  logs.  There's a certain protocol that has to be followed.
24  The facility was, or was, at that time, under my -- my
25  watch.  And -- and for the -- for the -- for the sake of the

MERLIN FIGUEIRA -- DIRECT

1  proper -- following the proper procedure, if he needed the
2  logs, he -- there's a process that he needs to follow,
3  because the facility is under my -- my watch.  If he needed
4  it, he could come to me and he could get it.  That's all we
5  wanted him to do.
6      Q.   The issue -- goes on to say, "The issue yesterday
7  was that I was informed by PIS that you stopped the work.  I
8  got this from Petro and for that reason I called you.  My
9  point to you yesterday was to reach to me or Calvin first if
10  you have any questions or concerns and not engage the
11  Contractor who is working on an IPOS supervised project.  I
12  didn't say to you in any way to 'not interfere' with our
13  work or words as such."
14           Had you gotten a complaint from Petro that
15  Mr. Canning had stopped their work?
16      A.   I -- I -- Attorney Rohn, I -- I cannot say with --
17  with certainty what job they were talking about if -- and
18  whether that work was actually stopped.  I mean, I don't
19  know.  I just don't know.
20      Q.   You're not disputing this is your e-mail, are you,
21  sir?
22      A.   No, that is my e-mail.
23      Q.   Okay.  And then it goes on to say, "The reason I
24  like you and Petro on a call is last week you spoke of a
25  Petro employee who you believe may be 'living on the IPOS

MERLIN FIGUEIRA -- DIRECT

1  site.'  At the time, I asked questions of you as it's a
2  safety issue for us if someone is indeed living on site as
3  you perceived and not Petro or IPOS aware of your
4  observations."
5           Do you recall the conversation about someone
6  from Petro living on site?
7      A.   Yes, I do recall that.
8      Q.   And what was that?
9      A.   My -- I'm -- once again, I'm trying to recollect
10  an incident that I occurred three years ago.
11      Q.   Great.  Tell me what you recall.
12      A.   And -- and I believe, if my recall is correct,
13  there was a perceived understanding or belief that a PIS
14  employee was actually living on -- in one of the containers.
15      Q.   Did you investigate whether or not that was true?
16      A.   I -- I believe -- I -- I believe I did, but I
17  can't -- I can't say with certainty.
18      Q.   And did you find that somebody was or was not
19  actually living on the premises?
20      A.   I -- I -- I -- I can't say with certainty what we
21  found out.
22      Q.   "I like a more direct communication between you
23  and the Contractor and/or myself of these kinds of issues as
24  soon as you note them.  If what you saw was correct we have
25  a safety situation above all in the event of an emergency.

MERLIN FIGUEIRA -- DIRECT

1  You also said that you needed the Gate logs to verify where
2  the 15 people signed in were working.  Also, you reported to
3  me that one of the welders banned from the site was observed
4  outside our Gate and you were concerned if he was working on
5  our site.  Don't you think these questions are better
6  answered by direct engagement of Petro or myself as soon as
7  those are noted?"
8           Did you ever investigate whether or not some
9  banned employee was on the site?
10      A.   I believe I did ask, and that wasn't -- that
11  wasn't a fact.
12      Q.   Okay.  Then you go to say, "The above are some of
13  the reasons why I like to have a Meeting between Petro, you
14  and ourselves.  I think, like you, we all want to see IPOS's
15  work done correctly and safely.  But, without direct
16  engagement of all parties I am afraid we may not be as
17  successful as we like.  I look forward to participation at
18  the Meeting tomorrow to work out communications on the
19  points raised above."
20           That meeting that was to be the next day, was
21  that only with Canning, or with Petro as well?
22      A.   I -- I cannot recall whether we -- we -- we -- I
23  cannot confirm we actually had the meeting, and who was in
24  there.  That was three years ago.
25      Q.   Okay.  Exhibit 285.

MERLIN FIGUEIRA -- DIRECT

```
1              (Deposition Exhibit No. 285 was
2               marked for identification.)
3        MS. FRANCIS:  Do you have the Bates
4    reference?
5        Q.  (Ms. Rohn)  Sure.  It's IPOS 6118, IPOS 2021, IPOS
6    2400, 2409, and 2410.
7              Let me see what I'm going to -- I'm going to
8    go to Page 2400.  2400.  There it is.  All right.  If
9    you'll -- there is an e-mail to you from Andrew Canning,
10   April 13, 2021 on the 3-inch vent line.
11             Says, "Given the sensitivities on my direct
12   communication with Petro, the recent communication
13   requesting data from WAPA and also to meet project Piping
14   Welding Specifications, could you ask Adrian to provide the
15   following information please:
16             Paragraph 1.12.3 ID's and qualifications
17   records for welders working on the -- both the WAPA vent
18   line and the IPOS vent line and drain systems (the
19   certification provided was for Daniel Martinez who I don't
20   think works -- work with PIS any longer).
21             Paragraph 2.2 material certification and
22   mechanical testing for the welding consumables being used.
23             It could be worth requesting this information
24   ahead of meeting that WAPA has called for wednesday
25   April 14th to discuss a number of these items."
```

MERLIN FIGUEIRA -- DIRECT

```
1        Prior to this April 2021 e-mail, do you dispute
2    that in February 2021, Petro had provided welding
3    certificates for its welders?
4        A.  Attorney Rohn, I can't remember whether they
5    actually did or not.
6        Q.  Okay.  The statement, "given the sensitivities of
7    my direct communication with Petro," do you know what
8    Mr. Canning is referencing?
9        A.  Attorney Rohn, I answered this question
10   previously, but let me repeat again.
11             Andrew had a -- a very -- a very direct,
12   sometimes confrontational approach, to asking questions and
13   things like that.  And that, in itself, sometimes could
14   solicit a -- a negative response.  And for that reason, we
15   had asked him if he needed something from Petro, or the
16   security guards, to let us know.  That was the sensitivity.
17   And we did that with -- because we -- we wanted to have a --
18   a peaceful environment and -- and -- and -- and we just
19   didn't want to have any issues, animosities that might arise
20   from just the way somebody communicates.
21       Q.  Okay.  So Exhibit 277.
22             (Deposition Exhibit No. 277 was
23               marked for identification.)
24             This is an e-mail from -- if you scroll
25   down -- Adrian.  Scroll down.  Adrian to you on the #3 vent
```

MERLIN FIGUEIRA -- DIRECT

```
1    line, dated April 16, 2021.
2              "Good afternoon team, I wanted your
3    consideration and approval to add an additional crew of five
4    people (3 welders/2 fitters) that have been working on the
5    #1 vent lines at IPOS to work on the Number 3 Wapa/IPOS
6    line.  By reducing crew's hours to 8 hours a day, no
7    overtime, and adding a new crew we would reduce our schedule
8    approximately a week.  By adding the new crew the budget
9    would increase by approximately $7000 but, in the spirit of
10   to reduce our exposure and our commitment to come within
11   budget; we will absorb the additional cost.  Please let me
12   know your thoughts as I will try to move the crew, if
13   approved, this Monday."
14             Do you recall receiving this e-mail?
15       A.  Yes.
16       Q.  Is this the kind of e-mail you would expect from
17   someone who's trying to pad his pocket at IPOS's expense?
18       MR. SIMPSON:  Objection.
19       MS. FRANCIS:  Objection.
20       A.  I -- I cannot -- I cannot migrate to your -- your
21   line of thinking by -- by just in this one e-mail.
22       Q.  (Ms. Rohn)  Okay.  Well, sir, isn't this typical of
23   Petro's can-do, will-try-to-work-anything-out kind of
24   attitude with IPOS?
25       MR. SIMPSON:  Objection.
```

MERLIN FIGUEIRA -- DIRECT

```
1        Q.  (Ms. Rohn)  You may answer.
2        A.  You know, Petro -- we -- I mean, Petro, Adrian
3    and -- and Chad had a very good relationship with me.  I
4    mean, you know, I -- I would say that they would do
5    something like that to ensure that, you know, IPOS was
6    happy, and not -- not because they want -- they -- they want
7    to show that they're not padding their pocket.  That's
8    clearly not -- not how I view it.
9              I view this e-mail as a -- as a company
10   that's trying to work with a long-term customer that has
11   given them lots of work.
12       Q.  Okay.  And then if you go to 12067, there's an
13   e-mail -- well, it appears on 12606 (sic), you forwarded
14   that e-mail to Charlotte, and then on 1267 (sic), there's an
15   e-mail from Charlotte, April 16, 2021 to Adrian, copied to
16   yourself, and others.  "Thank you, Adrian.  We appreciate
17   this."
18             Are you on the right place?  Oh, Jesus.  Do
19   you see that?  And then if you scroll up, you send an e-mail
20   to Adrian, "Nice!"
21             Why did you send that e-mail?
22       A.  I -- I -- it's hard for me to -- to really surmise
23   why, exactly, I sent an e-mail.  I mean, I think there was a
24   good gesture on the part of Charlotte, so I -- I just
25   complimented Adrian on that.  I mean, there's no -- no --
```

MERLIN FIGUEIRA -- DIRECT

1 nothing else.

2     Q.  And then if you go to 289.  Go down to 289.

3 Exhibit 289.

4     (Deposition Exhibit No. 289 was

5     marked for identification.)

6     Okay.  If you'll scroll down to the bottom of

7 the first page.  First page.  Bottom.

8     Okay.  There's an e-mail six days later from

9 Andrew Canning to yourself and David Smith.  Sensitivity:

10 Confidential.

11     "Further to our discussion yesterday and my

12 speculation about the extra team set on a 10 hour days which

13 I felt was being used to ensure the estimated value of the

14 estimate is collected in timesheet hours that Vitol insist

15 that I review.  I walked the WAPA site today (at around

16 8 o'clock) and observed a 4/5 man team either sitting

17 outside the fabrication tent or leaning on or against the

18 pipe rack in the fabrication tent.  I also checked the

19 actual fabrication welds on the pipe installed on the rack

20 to date (there is now two pipe runs in place on the rack

21 from the IPOS WAPA fence line running west to east up to the

22 first rack turn to the north.  This weld count is -- says

23 the weld count."

24     Scroll down to the next page.

25     "This work represents the efforts of 14 in

MERLIN FIGUEIRA -- DIRECT

1 number 10 hour days for a team of 4 to 5 men (plus

2 occasional 'supervision' and 'safety').  Assuming the weld

3 rate that P&IS -- PIS and I determined a year or so ago when

4 I was trying to establish the basis and competitiveness of

5 their quotes (3 per day per welder) then the fabrication in

6 the rack represents just over 1 weeks work for a single

7 welder.  I'm not sure on what basis the estimate was

8 accepted, however I do not recall a breakdown of the tasks

9 as part of the estimate and it would seem to me that we are

10 going through a painfully slow process of the contractor

11 extracting the man hour value of a contract because they are

12 aware that their site manning and time writing is being

13 monitored.

14     This situation reinforces my belief (and that

15 of Vitol) that PIS must provide a detailed breakdown of

16 their estimates OR that we go out to competitive bids for

17 all such work (based on a detailed scope of work) so we can

18 at least validate the value that we are getting from PIS who

19 appear to be treating their unique position with IPOS as a

20 money generating relationship."

21     Do you see that e-mail from Mr. Canning?

22     A.  I do.

23     Q.  This is right after -- six days after Petro agreed

24 to eat $7,000 to help move the job around, isn't it?

25     MR. SIMPSON:  Objection.

MERLIN FIGUEIRA -- DIRECT

1     MS. ROHN:  Noted.

2     MS. FRANCIS:  Objection.  Foundation.

3     Q.  (Ms. Rohn) Correct, sir?

4     A.  Yeah.  It is a few days after that, yes.

5     Q.  Did you agree with this e-mail, sir?

6     A.  Attorney Rohn, I do not -- I have not observed the

7 work, or -- or can -- can warrant for the -- the numbers

8 that Andrew has cited there, so I -- I -- I -- I can't -- I

9 can't agree to something that I -- I'm not -- I have not

10 seen or witnessed.

11     Q.  So if you'll scroll up on Page 6707.  Up on.  Up.

12 6707.  That page.  Scroll up.

13     On April 22nd, you respond to Andrew

14 regarding this company confidential 3-inch vent line.  If

15 you look at the last paragraph.  Scroll down, please.

16     You say, "Frankly, Andrew I'm not sure of a

17 way to solve your concerns.  I know you had concerns of PIS

18 productivity, proficiency and their ethics.  In view we have

19 two choices here; one is we have PIS on a Time and Material

20 contract for all project work or you solicit bids from

21 another contractor that you believe is better suited.  I

22 don't believe you have any operation from David and I

23 on either of these two options."

24     What complaints had Canning made about

25 Petro's ethics?

MERLIN FIGUEIRA -- DIRECT

1     A.  I can't recall what comments he may have made on

2 ethics.  I mean, if I were to say something, I would have to

3 guess, and that's not -- that may or may not be right.

4     Q.  That's your e-mail, though, is it not, sir?

5     A.  It is my e-mail, but -- but Attorney Rohn, you're

6 asking me a question of an incident and a writing that

7 occurred three years ago.  I have difficulty remembering

8 things just yesterday, let alone three years ago.  So, I

9 mean, I just can't give you an answer that I can stand by.

10     Q.  Exhibit 47K.  Oh, yeah, 46K.  Sorry.

11     (Deposition Exhibit No. 46K was

12     marked for identification.)

13     Scroll to the bottom, please.  This is IPOS

14 6262.  April 24.  Two days later, Andrew Canning to Merlin

15 and David Smith.

16     "It is apparent that PIS are not following

17 good practice in the fabrication of the stainless steel

18 turbine cavity vent system.  They clearly do not recognise

19 the need to segregate stainless and carbon steel materials

20 in the handling, preparation and welding process."  And then

21 he goes on with his observations.

22     And then if you scroll to the last paragraph,

23 second-to-last paragraph, he says, "This observation may

24 appear on first read as 'petty' however the quality,

25 strength and integrity of the final fabrication of stainless

1  materials requires meticulous segregation, handling,
2  preparation and welding in a contamination controlled
3  environment, this does not appear to be happening."
4        And then it says, "Given the concerns over
5  direct (potentially controversial) communication with
6  contractors including the general contractor PIS, I wonder
7  if you could highlight the poor practice concerns summarised
8  above and ask what they plan to do to mitigate the issues to
9  date and going forward?"
10       Do you recall, sir, if you investigated his
11 allegations against PIS, as to whether or not they were
12 truthful or not?
13    A.   Attorney Rohn, I -- I -- I -- I did not
14 investigate that work, because it was after the fact, so it
15 was hard for me to -- to go back in time and -- and create
16 that situation, but I did talk to PIS about segregating
17 stainless from carbon steel in their work.
18    Q.   Right.  And did they respond to you that they were
19 already doing that?
20    A.   I -- I -- I can't recall what they exactly told
21 me.  I know what I told them.
22    Q.   Exhibit 46C.
23       This is an e-mail.  If you'll scroll down.
24 It's an IPS (sic) 1972.  There's an e-mail from Andrew
25 Canning, July 13, 2021.  Oh, this is to Mr. David.  It's not

1  copied to you.  I'll pass that exhibit.
2        Go to 46L.
3        (Deposition Exhibit No. 46L was
4        marked for identification.)
5        If you scroll down, please.  This is an
6  e-mail from Canning to David Smith complaining about PIS.
7     MS. FRANCIS:  Could we get a Bates number,
8  please?
9     MS. ROHN:  Oh, sure.  IPOS 6275 to 6276.
10    MS. FRANCIS:  Thank you.
11    Q.  (Ms. Rohn)  And then there's an e-mail from David
12 Smith to Terry Keogh.  You scroll up, where it says, "FYI, I
13 told you that Andrew/Merlin have a cold war going on.  I
14 told you Andrew it would be good to talk to -- I told Andrew
15 it would be good to talk to you and when I when he gets
16 back."
17       Had David Smith ever told you he thought you
18 and Mr. Canning were having a cold war?
19    A.   He didn't tell me, but he -- he knew we had some
20 disagreements.
21    Q.   And if you go to 6276.
22       So 6276, if you scroll to the bottom, is the
23 same e-mail from Andrew Canning from July 13th, 2021 about
24 Elias being back on the job.
25       And then if you scroll to the next page, it

1  says, "On a related subject, I have some real concerns with
2  the poor quality work, parentheses, fabrication that PIS has
3  been doing and Merlin appears to have been accepting over
4  recent months.  VERSA was not actually part of the weld
5  preparation QA process but PIS presented the perception that
6  they were and some of the welds that they have produced have
7  been pretty poor (possibly from uncertified welders - they
8  presented Danny Martinez welding certificates and procedures
9  for the Turbine vent before I challenged them - he
10 separated from PIS almost two years ago.)  From the
11 discussion today it seems that the VERSA departure from
12 St. Croix that IPOS may be accepting a greater degree of PIS
13 self QA, and the best qualified person they have had left
14 for that (Bryan Melendez) no longer appears to be around.
15 The lack of PIS fabrication quality and QA compliance is
16 something I would like to address with you and Terry once he
17 is in a position if you feel that would be productive?"
18       And if you scroll forward to the next page.
19 Forward.  Forward.  Up.  Okay.  Keep going.
20       There's an e-mail at the top from Terry
21 Keogh.  "Ok, we will be asking -- we will be asking Petro to
22 supply NDT and hydro test documents, I can also ask him for
23 the welders who did the work and certifications moving
24 forward."
25       Does that comport with your recollection that

1  the reason the certificates -- certifications were asked for
2  in July was because of the allegations made by Mr. Canning,
3  that he believed that there were uncertified welders on the
4  3-inch vent line working for Petro?
5     MR. SIMPSON:  Objection.
6     A.   Attorney Rohn, I can't -- I can't recall.
7     Q.  (Ms. Rohn)  Well, at any time, prior to that
8  July 2021 e-mail, did you have any belief or suspicion that
9  there were uncertified welders working for Petro?
10    A.   I -- I can't say.  I can't say I did.
11    Q.   And then do you recall that there was -- well,
12 Exhibit 252.
13       (Deposition Exhibit No. 252 was
14       marked for identification.)
15       Do you recall -- scroll down, please.  Do you
16 recall that there was a request from Petro to produce the QA
17 documents on the 3-inch vent line, and that Petro produced
18 those documents through, excuse me, a Dropbox?
19    A.   There was a request for -- for PIS to produce a QC
20 book, and -- and I can't say that -- that I know if it was
21 complete.
22    Q.   Okay.  But do you recall the documents being
23 produced through a Dropbox?
24    A.   Yes, I am aware of that.
25    Q.   Did you ever open that Dropbox?

145

1    A.  I did.

2    Q.  And were you able to access the documents?

3    A.  I do not know.  There were several documents.  And

4  there was several documents in the Dropbox.  Specifically on

5  the 3-inch vent line, I -- I can't say I did.

6    Q.  Okay.  And then 274.

7        (Deposition Exhibit No. 274 was

8        marked for identification.)

9        274 is text between yourself and Adrian on

10  July 22nd, 2022.  And it starts out, "When will the Labels

11  for WAPA be in your hands and when will they be in place?"

12        Do you recall that WAPA complained about the

13  labels being the wrong color, and Petro agreeing to correct

14  that at their own cost?

15    MS. FRANCIS:  Objection.  Foundation.

16    Q.  (Ms. Rohn) You may answer.

17    A.  I -- I know there were -- I know there were labels

18  that were -- were requested by WAPA.  I -- I can't -- I do

19  not know whether the labels that were already there that

20  were fixed, they were wrong.  I do know WAPA requested

21  labels, but other than that, I have no knowledge.  I have no

22  recollection.

23    Q.  Well, Adrian told you, "just ordering the new

24  ones.  Should have them back by Friday."

25        So they wouldn't have been on site, correct?

146

1    MS. FRANCIS:  Objection.

2    A.  Could you repeat your question again, please?

3    Q.  (Ms. Rohn) Sure.  It says, "I just ordering the

4  new ones.  Should have them back by Friday."

5        So there had to be a change in the labeling,

6  correct?  New labels ordered?

7    A.  Attorney Rohn, it's hard for me to -- to -- to say

8  with certainty what was meant by that e-mail.  I mean, it

9  could be the size.  It could be hundreds of different

10  things.

11    Q.  So were you -- were you aware that in response to

12  Terry Keogh's e-mail, saying, we're going to ask them for

13  certifications for the welders, that Petro gave the prior

14  certifications that were signed by Guillemmo Castro, and

15  that there was some question about those certifications?  Do

16  you recall that happening?

17    A.  Please repeat that question.

18    Q.  Sure.

19        Do you recall that as a result of Terry

20  Keogh's e-mail saying, we're going to ask for the testing of

21  the welds and certification of their welders, that there was

22  such a request, Petro gave the prior certifications as by

23  Guillemmo Castro, and there was a question as to the

24  authenticity of those certificates?  Do you recall that?

25    A.  I -- I can't recall whether that was as a result

147

MERLIN FIGUEIRA -- DIRECT

1  of that -- that request or not.

2    Q.  Okay.  Do you require -- do you recall that in

3  July of 2021, there was a question as to the authenticity of

4  the welders' certifications?

5    A.  Attorney Rohn, I don't know the exact time that --

6  that questions were asked about authenticity of the -- of

7  the welder certificates.

8    Q.  Okay.  If you scroll down on this Exhibit 274,

9  Adrian sends you an e-mail, "Hi Merlin, just a heads up,

10  we've contacted David Smith and we're trying to set up a

11  conference call with the actual inspector that qualified our

12  welders this afternoon.  David has some other meetings,

13  which I understand but trying to get this cleared up as soon

14  as possible."

15        And you answer, "Adrian, will check with

16  David and revert."

17        Do you dispute, sir, that Adrian was reaching

18  out to you to try to solve the perceived perception that

19  there was something wrong with the certifications?

20    A.  The communication was had between Adrian and --

21  and David Smith.  I am not privileged to have -- to know

22  what was discussed between the two of them, so it's hard for

23  me to -- to answer your question.

24    Q.  Well, he -- Adrian did send you a text telling you

25  he was trying to get David Smith to get with the actual

148

MERLIN FIGUEIRA -- DIRECT

1  inspector to clear this up, correct?

2    A.  Yes.

3    Q.  And you told him, I'll check with David and -- and

4  will revert?  Get back to you, correct?

5    A.  Yes.

6    Q.  Did you, in fact, try to set up that meeting with

7  David Smith?

8    A.  I -- I can't recall what I did, whether I just

9  called David or not, but I just can't recall.

10    Q.  Exhibit 46S.

11        (Deposition Exhibit No. 46S was

12        marked for identification.)

13        This is a e-mail from Andrew Canning,

14  July 20th, 2021, to Garry Stoker, David Smith.  IPOS welders

15  Certificate.  Importance: High.  Confidential.

16        And he says, "Further to our conversation

17  this morning, I am now as certain as I can be that welders

18  certification (WPQ) presented by Pestro -- Petro Services

19  are not genuine."

20        Do you recall having discussions about the

21  problems with the certification?

22    A.  I know there were -- I -- I heard -- I heard from

23  Andrew that there were problems with the certification, but

24  that was it.

25    Q.  Did you ever inquire of Adrian about the

MERLIN FIGUEIRA -- DIRECT

1  certifications, and how they came about?
2      A.   No, I did not.
3      Q.   And were you still in -- did you do anything to
4  follow up on the problems with the certifications?
5      A.   No, I did not, because David Smith was -- was
6  already in conversation with Adrian on -- on that same
7  issue.
8      Q.   All right.  Exhibit 47B.
9           (Deposition Exhibit No. 47B was
10          marked for identification.)
11          This is a e-mail dated July 22nd, 2021 from
12  David Smith to yourself -- same day as that text message you
13  had -- from David Smith to yourself and Andrew Canning and
14  Terence Keogh and Andreas Constantinou.  Subject --
15          MS. FRANCIS:  Can we get the Bates number?
16  I'm sorry, Attorney Rohn.
17          MS. ROHN:  2201.
18      Q.   (Ms. Rohn)  Scroll down, please.
19          Okay.  Subject:  Petro/Guillermo Castro.
20          "Hi everyone, Chad from Petro called me.
21  They want me to join a call with Guillermo Castro, the
22  person who conducted the welding tests, mechanical tests,
23  lab test.  He apparently arrived from Japan last night.
24          Chad says that he conducted all the tests in
25  Puerto Rico on all of these welders.  He is available today

MERLIN FIGUEIRA -- DIRECT

1  after 1:30.  I am not available till at least 4:00.  I think
2  we definitely need Andrew as he knows our requirements.
3  Chad said what we would expect, none of the defects failed.
4          I don't know best way to approach?  I don't
5  know availability, can just push until tomorrow.
6          I also suggest that this inspector is going
7  to say.  I also don't know what this inspector is going to
8  say.  Would a notarized document that he actually did this
9  prove anything?  And Andrew suggested evidence of his
10  flights?
11          Maybe ask Petro to provide those prior to
12  scheduling a call?"
13      Q.   Do you dispute you got this e-mail?
14      A.   I did get this e-mail.
15      Q.   So you were aware that -- besides from Adrian, you
16  were aware that David knew that Petro was trying to set up a
17  conference call or a meeting with Guillermo Castro to
18  explain the certifications, correct?
19      A.   Yes.
20      Q.   And it appears that Andrew suggested giving
21  evidence of Mr. Castro's flights?  Was there some assumption
22  that Mr. Castro was going to lie about where he was?
23      A.   Attorney, I do not know what the assumption was.
24  Frankly, I just don't know.
25      Q.   Did you ever discuss -- and then Mr. -- if you

MERLIN FIGUEIRA -- DIRECT

1  scroll up, there's a question from Andreas Constantinou.
2          What's -- what was your understanding of
3  Andreas Constantinou's participation in this investigation?
4          MS. FRANCIS:  Objection.  Foundation.
5      Q.   (Ms. Rohn)  You may answer.
6      A.   Andreas is a -- is a -- is an engineer by
7  profession.  He has expertise, detail expertise, on
8  construction practices.  And for that reason, we had -- we
9  had tried to bring him on board to try and help us out.
10      Q.   And who did he work for?
11      A.   He worked --
12          MS. FRANCIS:  Objection to form.
13      A.   Frankly, at the time, I do not know.
14      Q.   (Ms. Rohn)  And if you scroll down to the next
15  page, 2202.  Down.  2202.  Down.  Okay.  No, that's 2201.
16  Scroll down.  2201, 2202 -- oh, okay.  I'm sorry.
17          So we go to the top of that document.  Okay.
18  Stop right there.
19          There's a question from Constantinou that
20  says, "Do we have records of these tests?"
21          Are you aware of whether or not there are
22  actual test -- pictures taken, when you're just recertifying
23  a welder?
24          MR. SIMPSON:  Objection.
25      Q.   (Ms. Rohn)  Do you know?

MERLIN FIGUEIRA -- DIRECT

1      A.   I'm trying to understand what is written there.
2  It says, "No test records were supplied."
3          So what's your question?
4      Q.   Were you aware that in -- when you're retesting
5  a -- if you're recertifying an existing certified welder,
6  that you don't actually save the welding tests?
7      A.   I -- I -- I'm not -- I do not have that sort of
8  experience to tell you with certainty.
9      Q.   And then Andreas says, "Before any meeting with
10  them I would propose to first see the test records."
11          Did you -- do you recall any discussions in
12  that regard?
13      A.   No, I can't recall any discussions on these test
14  records.
15      Q.   Okay.  Scroll down to the next page, 2203.
16          Do you see that Andreas Constantinou that
17  sets out the ASME requirements for testing welds?
18      A.   Yes, I see it.
19      Q.   And then if you scroll down.  Andreas -- scroll
20  down.  Scroll down.  There you go.
21          Andreas Constantinou, on July 22nd, also
22  says, "David, I am preparing an email to you with all the
23  required information we need from the contractor, which is
24  on the basis of an ASME job.  They need to give us this
25  documentation in full."

1    would you agree that that documentation has
2  to do with the quality of the welds and not the
3  certification of the welders?
4    A.   Attorney Rohn, I'm not qualified enough to answer
5  that question.
6    Q.   Okay.  If you scroll down further, it says -- or
7  you're on further.
8         So there's an e-mail from David Smith to you,
9  and everyone else, "Just to keep the conversation going.  I
10 spoke to Chad and asked him in writing for the test results.
11 He told me that the lab test was placed -- Phased array,
12 which is by the test -- which is by the test was PAUT, which
13 is why it was not a bend test."
14         Scroll down.
15         "That all these folks were from Puerto Rico,
16 and they were certified while they were there.  That he is a
17 third party to Acuren, and that is why it says that.  I did
18 tell someone on his side is talking about what is going on
19 and he needs to seal it up.
20         That respect we did not tell our own
21 employees including Supervisors, yet everyone knows the
22 story now.  Chad didn't want to speak for Guillermo, but his
23 knowledge as much higher than mine in welding.  I need help
24 on the right information."
25         So you were aware that Chad had actually had

1  a conversation with David and explained to him the kinds of
2  welds, that the testing and recertification that was done,
3  and that -- that it was done in Puerto Rico.
4         And then do you know what date it was talking
5  about, that "everyone knows the story now"?
6         MR. SIMPSON:  Objection.
7    Q.   (Ms. Rohn)  You may answer.
8    A.   No, Attorney Rohn, I do not know what he meant by
9  that statement.
10   Q.   And then if you'll scroll down, there's an e-mail,
11 July 22nd, from David Smith to yourself and others, that
12 says -- at 11:35, that says, "I was even thinking one more
13 step that we approach Acuren rather than Guillermo and ask
14 them to certify in writing?"
15         Did you have any discussions with David Smith
16 about not talking to the person that actually did the
17 testing, but going to Acuren?
18   A.   No, no, I never had any conversation with David
19 about that.
20   Q.   Okay.  And if you scroll down, an e-mail from
21 Andrew Canning, July 22nd, to yourself and others.
22         "Previous operations welder qualifications
23 records would also include photographic records of the test
24 samples, is this normal in the US?  Our welding procedures
25 also call for the welders to have photographic ID cards

1  showing welding certification, I have never seen this from
2  PIS with the exception of Daniel Martinez who was formerly
3  trained and assessed at a welding facility (but he left PIS
4  2 years ago), this should also be part of the qualification
5  record issued to the client before the fabrication work
6  starts."
7         Are you telling me, at IPOS, did you require
8  welders to be wearing welding certification cards?
9         MR. SIMPSON:  Objection.
10        MS. FRANCIS:  Objection.  Foundation.
11   Q.   (Ms. Rohn)  You may answer.
12   A.   No.
13   Q.   And then he goes to say, "We also have proof of ID
14 from Guillermo Castro including his claimed NDT
15 qualifications."
16        was there a feeling that someone could come
17 in and pretend that they were Guillermo Castro?
18   A.   Attorney, are you asking me the question?
19   Q.   Yes?
20   A.   I -- I have no idea what -- what the intent was
21 there.  That's a question for Andrew.
22   Q.   All right.  Then go to Bates Stamp 2206.
23        And if you scroll to the bottom of that page,
24 there's an e-mail from Andreas, July 22nd, including you.
25        "Thank you for the documentation summary

1  which will provide a good basis to form an assessment from.
2         One of the big document anomalies" -- this is
3  from Andrew Canning to Andreas.  Sorry.  "One of the big
4  document anomalies is with the attached WPQ documents which
5  are on close inspection are obviously PDF edits of someone
6  else's original certification (if you zoom in you can see
7  the print clarity and font changes in certain fields) and
8  while it clearly states the assessment was based on
9  acceptance of guide bend test they now telling us that the
10 tests were done by phase array for which I suspect
11 (conveniently) no hard copy test results of available."
12        So were you -- was there a feeling that
13 Mr. Guillermo would come in and say he did tests that he
14 didn't do?
15        MR. SIMPSON:  Objection.
16   Q.   (Ms. Rohn)  Objection -- you can answer.
17   A.   I -- I can't comment on that.  I just simply do
18 not know.
19   Q.   Okay.  And then if you go up, there's an e-mail
20 from Andrew Canning, same day, including to yourself.
21        "David, I was thinking more of asking PIS to
22 submit their complete Quality dossier and the full coding
23 assessment records for the welders - to be honest I think we
24 probably already have seen what they have to submit.
25        Does anyone else think we should provide

MERLIN FIGUEIRA -- DIRECT

1  Andreas's list for them to try to 'deliver' against?
2           I do think it would be useful for David and
3  Andreas to have access to the drop box and possible a more
4  experience weld inspector than myself."
5           Do you know what Mr. Canning's expertise were
6  in welding?
7      A.  I do not know.
8      Q.  Okay.  Well, wasn't it -- wouldn't it be important
9  when he's telling everybody about what test should be done
10 and what should be showed, to know what his qualifications
11 are?
12          MR. SIMPSON:  Objection.
13          MR. BECKSTEDT:  Same objection.
14     Q.  (Ms. Rohn)  Okay.  Exhibit 279.  Oops.  260.
15 Sorry.
16          (Deposition Exhibit No. 260 was
17          marked for identification.)
18          If you scroll down to the bottom.  No, that's
19 not.  Two six -O-.  Oh, that is 2.  There we go.
20          At the bottom, there's an e-mail from David
21 Smith, which you are copied on, to Chad Persaud.
22          "Chad and Adrian, before we speak to
23 Guillermo, we would like to have all the testing records.
24 If you can please provide them, we will review and then be
25 prepared to speak to Guillermo.  If you have any questions

MERLIN FIGUEIRA -- DIRECT

1  please" -- the bottom of Page 7229.  There you go.  Yeah,
2  7229.  There you go.  Sorry.
3           "we would like to have all the" -- do you see
4  that there?
5      A.  Yes, I do.
6      Q.  So was it true, on July 22nd, 2021, there was an
7  agreement that they were prepared to speak to Guillermo?
8          MS. FRANCIS:  Object.  Foundation.
9      Q.  (Ms. Rohn)  You may answer.
10     A.  It's hard for me to say.  I think, based on the
11 e-mail, I would say yes.
12     Q.  Okay.
13     A.  I don't know that for a fact.
14     Q.  And then on July -- if you scroll up, there's an
15 e-mail from Adrian.
16          "Hi David.  I have attached the welders'
17 qualification for your review.  Let me know what else I can
18 provide and when we can meet with the inspector Guillermo
19 for clarification."
20          Do you see that?
21     A.  Yes.
22     Q.  And then if you go to Page 7228, at the top, two
23 hours later, Adrian Melendez sends to David Smith copies --
24 7228.  Okay.
25          And says -- sends to -- to David, and copies

MERLIN FIGUEIRA -- DIRECT

1  yourself and others, "I just shared the 3" vent folder on
2  Dropbox with Andreas.  Andreas, most of what you're asking
3  for is in the folder.  Please let me know if anything else
4  is needed."
5           Is that the same -- do you know if that's the
6  same Dropbox you got?
7      A.  I -- I don't know with certainty.  I know I
8  accessed a Dropbox.  Whether it's the same Dropbox, I -- I
9  can't tell with certainty.
10     Q.  Okay.  And then if you go to 7227, the top,
11 there's a -- there's a statement, "Good morning Adrian,
12 Here's what Andreas is looking for.  Full inspection and
13 test plan; Daily records (for welding, fitting, visual
14 inspection); and welding and mechanical test of WPQs."
15          So are you aware of any other documents
16 Andreas was looking for?
17          MS. FRANCIS:  Objection.  Foundation.
18     A.  I -- I can't say with certainty whether there was
19 other documents.  I just don't know.  I mean, it's -- it's
20 so many years have passed by.
21     Q.  (Ms. Rohn)  Okay.  Well, you would agree those
22 documents would have nothing to do with the certifications
23 of the welders, correct?
24     A.  I -- I -- I'm not qualified enough as a welder to
25 answer your question one way or the other.

MERLIN FIGUEIRA -- DIRECT

1      Q.  And then if you go to 7226, there appears to be an
2  e-mail from David that says, "In place" -- at the top, "In
3  place of the ITP and daily records, can you please share the
4  internal welding procedures you applied for GT 17 and GT 20.
5  I assume these procedures are approved by ASME Authorized
6  Inspection?
7           Related to the PAUT report, you signed the
8  qualification certificate on behalf of Acuren/Costas.  We
9  believe that there must be a report/certificate/document
10 from Acuren/Costas in order for you to sign the WPQ.  Can
11 you please provide?
12          we are trying to work through this and I
13 believe we all recognize that time is of the essence."
14          Why was time of the essence?
15     A.  Attorney Rohn, I have no idea what was meant by
16 that sentence.
17     Q.  All right.  And Mr. Melendez answers, at July 26
18 at 11:30 p.m., "Good evening, please find our response below
19 alongside with your question:
20          Full inspection and test plan - no ITP
21 reports were required from IPOS/Vitol and therefore none can
22 be provided."
23          In the jobs that you gave to Petro, did you
24 ever ask for I&TP reports?
25          MS. FRANCIS:  Objection.  Foundation.

161

MERLIN FIGUEIRA -- DIRECT

1    A.   I'm not so sure what is meant by the I&T reports.

2    Q.   (Ms. Rohn)  Okay.

3    A.   Certificates.

4    Q.   It says, "Daily records (for welding, fitting,
visual inspection) - we do not have daily reports but have
included weld logs with all NTD (sic) which includes VT on
all welds from a third party inspection company."

8        And then finally, "Welding and mechanical
tests of WPQs - The actual welders' qualification
certificate were given to Petro in lieu of a PUT -- PAUT
report.  Each welder was tested on four different position
coupons which were phase array inspected and passed.
Certification was then approved, accepted and signed by
Petro.

15       All welders could be re-qualified under
IPOS/VTTI supervision via X-ray or PAUT if needed."

17       When you go this e-mail, did you think that
reser -- that resolved the missing documentation?

19   A.   Scroll up, please.

20   Q.   Sure.

21   A.   This -- this e-mail was from Adrian to David, and
was copied to me, so -- so I think this is something that --
that it was addressed to David.

24   Q.   Well, weren't you -- weren't you on the chain?
Weren't you concerned about this?

162

MERLIN FIGUEIRA -- DIRECT

1    A.   I was on the chain, yes, but the e-mail was
addressed to David.

3    Q.   And then if you go to Bates Stamp 7225, on
July 27th, Mr. Melendez responds to a inquiry from David,
copied to you, as to testing requirements, "Please find the
response to your comments below."

7        The first original comment was "In place of
the ITP and daily records, can you please share the internal
welding procedures you applied for GT 17 and GT 20?  I
assume these procedures are approved by a ASME Authorized
Inspection Agency?"

12       And Petro answered, "Petro's welding
procedures were created and approved in 2018 by INI Corp out
of Puerto Rico under Section IX of the ASME code.  NI -- INI
Corp is an approved ASME/ASNT approved company for WPS and
Inspections.  Petro has used and have continued to test
(through numerous PAUT & X-ray) these same procedures at
Limetree Bay, IPOS, Diageo, and Cruzan Rum since 2018."

19       And the second question, "Related to the PAUT
report, you signed the qualification certificate on behalf
of Acuren/Costas.  We believe that there must be a
report/certificate/document from Acuren/Costas in order for
you to sign the WPQ.  Can you please provide?"  You say,
"Please see Mr. Castro's attached letter recording this
question," which we will get to in a minute.

163

MERLIN FIGUEIRA -- DIRECT

1        Did this e-mail allay your doubts about
whether or not these were proper welding procedures and
proper testing?

4    A.   Attorney Rohn, I'm not a -- I'm not a weld expert
for me to even comment on -- on -- on that question.

6    Q.   Okay.  And then on July 28th at 8 o'clock a.m.,
David Smith is copying you.  "We have some calls this
morning, but we will be able to review and respond later
today."

10       And then there's an e-mail on 47M.

11       (Deposition Exhibit No. 47M was
marked for identification.)

13       Do you see that, from yourself, Merlin
Figueira, July 22nd, to David Smith and Terence Keogh.
Testing requirements.  "Gents, Granted it may look like the
names were added and I am not supporting the theory that
this isn't the case.  However, the question I ask myself is
why would someone send more documents that are similar if
they were not accurate.  Would I want to dig myself a deeper
hole and make the situation worse for myself?  Then, if it
were me would I not correct the wrong on the new stuff I
submit?  Guys, still something still does not make sense to
me."

24       Isn't it true, sir, that you didn't think
that those welding certificates were -- were forged?

164

MERLIN FIGUEIRA -- DIRECT

1    A.   It's hard for me to -- to comment on that, because
at the time, I do not know what I was -- what I was -- what
I was talking about, or referencing.

4    Q.   Sir, you sent that e-mail, didn't you?

5    A.   I did, but doesn't mean I can remember three years
later what I -- what I -- what I meant in an e-mail.

7    Q.   Exhibit 47J.  Got that?

8        (Deposition Exhibit No. 47J was
marked for identification.)

10       Do you see on April -- July 22nd, 2021,
Terence Keogh sends an e-mail to yourself and David Smith?

12       "David, I will send Cyla note to insure she
will not pay any invoices for Petroindustrial until further
notice until given approval."

15       Do you know why --

16       MS. FRANCIS:  What's the Bates number?

17       MS. ROHN:  5343.

18       MS. FRANCIS:  Thank you.

19   Q.   (Ms. Rohn) Do you know why Mr. Keogh stopped any
payment to Petro?

21   A.   No, I -- I can't -- I can't say for -- for
certain.  This was something that -- this is something that
Terry would have to -- you have to ask Terry.

24   Q.   Okay.  And then if you scroll down, just slightly.
Scroll down.

1    On July 21st at 2021, Charlotte
2  Pratt-Horowitz sends an e-mail to Cyla, David Smith, Tim K.,
3  Andrew Canning, Sebastian.
4    "Good Morning Cyla - can you make sure you do
5  not pay the attached invoices." Vent piping for $120,039.
6    Q.  Did they have the right to tell IPOS who they
7  were going to pay and who they were not going to pay?
8    A.  Yes.
9    Q.  Okay.  And then Exhibit 47C.
10   (Deposition Exhibit No. 47C was
11    marked for identification.)
12   Got that?  Oh, sorry.
13   There's an e-mail at the top from Andrew
14  Canning to Andreas Constantinou, and copied to yourself,
15  July 22nd, 4:22 p.m. "I think we should speak to Guillermo
16  Castro without Chad and Adrian so we can explore the full
17  scope of the supposed welder certification services, idea --
18  ideally via videoconference."
19   Is there some belief that Chad and Adrian
20  would somehow influence Mr. Castro?
21   A.  Attorney Castro (sic), you're asking me a question
22  that is asked -- that is asked by somebody else.  I have no
23  idea what was meant by that statement.
24   Q.  If you go to 47E, IPOS 2236, here's a continuation
25  of that e-mail.  David Smith at the top.  David -- scroll

1  down a little bit, please.  Thank you.
2    David Smith replies on July 22nd, copy is
3  yourself. "They have made it clear that they want us to
4  speak with him.  We have an internal call with Garry
5  tomorrow, will develop a plan forward."
6    Q.  Why would Garry Stoker be involved in this?
7    A.  Garry Stoker had -- had some engineering
8  experience, and was a good problem-solver, and so for that
9  reason, he was involved.
10   Q.  And who did he work for?
11   A.  He worked for VTTI.
12   Q.  And did you ever -- I may have asked, did you ever
13  see the letter from Guillermo Castro, explaining what
14  happened with the cert -- certifications?
15   A.  No, I did not see that.
16   Q.  All right.  Exhibit 47F.
17   MS. FRANCIS:  Get we get a Bates number
18  before the question?
19   MS. ROHN:  Sure.  It starts -- it's IPOS
20  2277.
21   MS. FRANCIS:  Thank you.
22   Q.  (Ms. Rohn) And July 28, 2021, from Andrew Canning.
23  You're not on that e-mail.  I'll skip that one.
24   All right.  Exhibit 61C.
25

1    (Deposition Exhibit No. 61C was
2    marked for identification.)
3    This is the letter, July 29th, 2021.  I want
4  you to look at that, and tell me if you can recall ever
5  seeing that?
6    A.  (Witness complies.)
7    Attorney Rohn, I can't recall having seen
8  this letter.
9    Q.  You can or cannot?
10   A.  I cannot.
11   Q.  Reading that letter, as you sit here today, does
12  that explain to you some of the anomalies in the
13  certification?
14   A.  Attorney Rohn, I'm -- as I said earlier, I am not
15  an expert on welds, and to decipher welder certificates, so
16  it would be unfair for me to comment on something I do not
17  know.
18   Q.  Exhibit 47H.
19   (Deposition Exhibit No. 47H was
20    marked for identification.)
21   If you scroll to the bottom.  There you go.
22  There's an e-mail from yourself, July 28, 2021, to Andrew
23  Canning, on the 1-inch vent piping and reverse-flow
24  fabricated.
25   And it says, "Hello Andrew, We like to

1  collect data of above items for our Files.  Could you
2  forward the data of the materials used for the 8 spools
3  fabricated for St. Croix?  These are for the Export Transfer
4  Pumps.  In addition we like to have X-Ray or other QC tests
5  done on these spools.  We also like the same for the 1-inch
6  Vent Piping.  We also like the same for the Reverse Flow
7  Project that is currently installed in St. Thomas."
8    Do you recall why you were asking for those
9  records?
10   A.  I'm not sure why I asked for the records.  I can
11  only assume that I was leaving pretty close to -- to that
12  date, July 28.  I think it was the end of that month I left
13  the Virgin Islands, so I was probably trying to collect data
14  for -- for -- for Terry's files.  That's my best
15  recollection.
16   Q.  Well, were those the three outstanding jobs that
17  funds were being held in arrears to pay Petro?
18   A.  I have absolutely no clue.
19   Q.  Exhibit 47R.
20   (Deposition Exhibit No. 47R was
21    marked for identification.)
22   Were you aware that on July 21st, that Petro
23  was banned from coming on the premises of IPOS?
24   MS. FRANCIS:  Objection.  Foundation.
25   MS. ROHN:  Well, let's scroll down.

MERLIN FIGUEIRA -- DIRECT

1   MS. FRANCIS:  Can I get a Bates number
2  while --
3   MS. ROHN:  6318.
4   MS. FRANCIS:  Thank you.
5   Q.  (Ms. Rohn) "Please note that until further notice,
6  no employees or contractor working for or representing Petro
7  Industrial Services may be permitted onto IPOS property
8  either in St. Croix or St. Thomas.  There will be no
9  exceptions.  Permission to enter site must be received in
10 writing from either David Smith or I."  From Terry Keogh.
11  And then if you scroll up, you would have
12 gotten that e-mail as part of a chain, where you're on this
13 e-mail, saying, "Please note the permission's Granted," on
14 July 29th, "to allow access to Petro Industrial maintenance
15 supervisors to open containers and remove their personal
16 tools if requested in St. Thomas and St. Croix."
17  So does that refresh your recollection that
18 you knew that they had been banned from the site?
19   A.  Yes.
20   MS. ROHN:  I have no further questions.
21   MR. BECKSTEDT:  I have a couple of questions.
22 Do you want me to go next?
23   MS. FRANCIS:  That's fine.
24   Can we please take a five-minute break?
25 We've been going for two hours without a break.

MERLIN FIGUEIRA -- CROSS

1   MR. BECKSTEDT:  I'm perfectly happy with a
2  break.  Whatever anybody else wants, I'm good.
3   THE WITNESS:  Okay.
4   MS. FRANCIS:  Mr. Figueira, is five minutes
5  enough for you, or do you need more time?
6   THE WITNESS:  No, five minutes is pretty
7  good.  Thank you.
8   MS. FRANCIS:  Thank you.
9   (Short recess taken.)
10   CROSS-EXAMINATION
11 BY MR. BECKSTEDT:
12   Q.  Mr. Figueira, this is Attorney Carl Beckstedt.
13 I -- good evening.
14   A.  Good evening.
15   Q.  I represent Vitol U.S. Holding II Co., and Vitol
16 Virgin Islands Corp.  I just want to ask you a few
17 questions.
18   Did you ever caution Andrew Canning about
19 having a racist demeanor?
20   A.  I never had any conversations from Andrew that
21 were racist in nature at all.  I mean, absolutely none.  Not
22 even one.
23   Q.  So my question is a little different.  But I think
24 I understand your answer, but my question is this:
25 Notwithstanding any -- well, let me -- let me rephrase it.

MERLIN FIGUEIRA -- CROSS

1   Let me -- first of all, would I be correct in
2  understanding your answer to mean that you never observed
3  any conduct by Andrew Canning that was racist?
4   MS. ROHN:  Objection to form.
5   Q.  (Mr. Beckstedt) All right.  I'll re-ask it.
6   Did you observe any conduct by Andrew Canning
7  that was racist?
8   A.  Absolutely none.
9   Q.  Did you observe any conduct by Andrew Canning that
10 was discriminatory, based upon national origin?
11   A.  Absolutely none.
12   Q.  Did you ever, for any reason, even if it wasn't
13 based on your own observation --
14   MS. ROHN:  You're frozen.
15   MR. BECKSTEDT:  Am I unfrozen?
16   MS. ROHN:  Now you are.
17   THE WITNESS:  Yeah.
18   Q.  (Mr. Beckstedt) Okay.  My apologies.
19   Notwith -- putting aside your observations,
20 did anybody ever communicate to you anything related to
21 Mr. Canning having a racist demeanor?
22   A.  Absolutely none.
23   Q.  Okay.  And my last question, which was my first
24 question, is, did you ever caution Andrew Canning about him
25 having a racist demeanor?

MERLIN FIGUEIRA -- CROSS

1   A.  Never.  Never did, because none existed.
2   MR. BECKSTEDT:  No further questions.  Thank
3  you.
4   CROSS-EXAMINATION
5  BY MR. SIMPSON:
6   Q.  Good evening.  Let me get my camera on.
7   My name is Andrew Simpson, and I represent
8  Andrew Canning and Optis Europe, Limited.  I have just a few
9  questions.
10   Prior to Andrew Canning coming to work at the
11 LPG facilities, were there issues of a racial nature
12 involving a company called NIS?
13   A.  Attorney Andrew, I can't recall.  I know who NIS
14 is, but I can't recall any -- any issues between NIS and --
15 of a racial nature.
16   Q.  Okay.  Do you recall, prior to Andrew Canning
17 coming to the LPG facility, any issues with any contractor
18 at the facility, relating to racial issues?
19   A.  Not that I'm aware of.  I -- I -- I have to say
20 categorically, no.
21   Q.  Okay.  With respect to not-to-exceed types of
22 contracts, are those typically expressed in not to exceed a
23 dollar amount, rather than a number of hours amount?
24   MS. ROHN:  Objection to form.
25   Q.  (Mr. Simpson) You can answer.

173

MERLIN FIGUEIRA -- CROSS

1    A.   Attorney Andrew, that -- that type of contract
2  is -- is written in several forms.
3         Not to exceed x amount, assuming a labor and
4  man-hour count of x amount.
5         A not-to-exceed amount with both time and
6  material locked in.  So it all depends.  There are -- there
7  are many ways of -- of -- of generating a not-to-exceed
8  contract.
9    Q.   Okay.  In -- in these types of not-to-exceed
10 contracts, if the value that's not to be exceeded, whether
11 it's hours or dollars, or some other factor, comes in below
12 the capped amount, who gets the benefit of that, the
13 contractor or the person or entity purchasing the contract
14 and services?
15   A.   Attorney Andrew, could you re -- could you ask
16 that question again?  I think I got it, but I just want to
17 be sure.
18   Q.   Sure.
19        So -- and I'll try to be clearer.  Let's just
20 take as an example the not-to-exceed-a-dollar-amount
21 contract, and then I'll do the same thing with a
22 not-to-exceed-a-certain-number-of-hours contract.
23        With respect to a contract, and let's use a
24 set number to make it easier.  Let's say you have a contract
25 that says not to exceed a hundred thousand dollars, and the

174

MERLIN FIGUEIRA -- CROSS

1  work is done for $75,000.
2         Who gets the benefit of the $25,000 that was
3  not spent on that job?
4    A.   In the example that you just described, it would
5  be the contractor.
6    Q.   Okay.  And same question with respect to a
7  not-to-exceed-hours contract, if the job was not to exceed
8  50 hours, and it was done in 40 hours, who gets the benefit
9  of the 10 hours that were saved?
10   A.   The contractor.
11        MR. SIMPSON:  Okay.  I have no further
12 questions.
13             CROSS-EXAMINATION
14 BY MS. FRANCIS:
15   Q.   I just have a couple follow-up.
16        Good afternoon, Mr. Figueira.  As you know,
17 my name is Simone Francis, and I represent IPOS in this
18 matter.
19        Do you recognize -- there've been -- I'm
20 sorry.  You were shown some e-mails communications during
21 the direct examination by Petro's employees, both e-mails
22 and text messages, in which you communicated with Adrian
23 Melendez.
24        Do you recall those questions?
25   A.   I do.

175

MERLIN FIGUEIRA -- CROSS

1    Q.   Okay.  And Mr. Melendez, what role did you
2  understand him to hold with Petro Industrial?  Did you hear
3  me?
4    A.   Attorney Simone, are you asking me?
5    Q.   Yes.  What role did you understand Mr. Melendez
6  had with Petro Industrial?
7    A.   Okay.  I got -- I got to think here for a minute.
8    Q.   And that's Melendez, Jr.
9    A.   Okay.  I -- I got to ask this:  Are you talking
10 about specifically Adrian, or you're talking about the other
11 gentleman, who's also named -- I forget his first name.
12 Could you give me the first name, please?
13   Q.   Yes.  Adrian Melendez, Jr. I'm sorry.  There were
14 several Melendezes.
15   A.   Okay.  Okay.  So now I know who you're talking
16 about, could you ask -- ask the question again, please?
17   Q.   Sure.
18        What did you understand the role of
19 Mr. Adrian Melendez, Jr. to be with respect to Petro
20 Industrial?
21   A.   I -- I -- I understood Adrian and Chad to be
22 partners and co-owners of -- of Petro Industrial.  So in
23 discussing jobs, either one would -- would quote a job, and
24 provide a quotation.
25   Q.   And do you recognize Mr. Melendez, sitting in the

176

MERLIN FIGUEIRA -- CROSS

1  conference room with Attorney Rohn?
2    A.   Yeah, absolutely.  I recognize him very well.
3    Q.   Okay.  I'm going to represent to you, sir, that
4  Mr. Melendez was deposed, as you are being deposed today, on
5  April 28th, 2023, in connection with this lawsuit.
6         During his dep -- I want to just ask you, I
7  know you were not present, but I'd like to ask you a
8  question regarding testimony that Mr. Melendez, Jr. gave, he
9  was asked, "What about IPOS, did you, or to your knowledge,
10 anyone at Petro ever tell anyone at IPOS that Mr. Canning
11 had engaged in any racist or discriminatory behavior as to
12 Petro?"  Answer, "We have communicated, yes."  Question,
13 "Okay.  Tell me, who, at IPOS, you communicated that
14 Mr. Canning had engaged in some sort of racist or
15 discriminatory behavior as to Petro, and Mr. Melendez's
16 testimony, under oath, was both general managers, Merlin
17 Figueira, David Smith."
18        Did Mr. Adrian Melendez, Jr. ever communicate
19 to you that Mr. Canning had engaged in racist or
20 discriminatory behavior as to Petro?
21   A.   Absolutely not.  Not even once.
22        MS. FRANCIS:  Thank you.  No further
23 questions.
24        MS. ROHN:  I have no further questions.
25        MS. FRANCIS:  Okay.  Are you concluded?

**MERLIN FIGUEIRA - CROSS**

1        **MS. ROHN:**  We are.

2                Go have a beer, Mr. Figueira.  Nice to meet

3    you.

4        **THE WITNESS:**  Okay.  Thank you.  Same here,

5    Attorney Rohn.

6

7

8

9

10        (Whereupon the deposition concluded

11            at 3:16 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

C-E-R-T-I-F-I-C-A-T-E

I, SUSAN C. NISSMAN, a Registered Merit Reporter
and Notary Public for the U.S. Virgin Islands,
Christiansted, St. Croix, do hereby certify that the above
named witness, **MERLIN FIGUEIRA,** was first duly sworn to
testify the truth; that said witness did thereupon testify
as is set forth; that the answers of said witness to the
oral interrogatories propounded by counsel were taken by me
in stenotype and thereafter reduced to typewriting under my
personal direction and supervision.

I further certify that the facts stated in the caption
hereto are true; and that all of the proceedings in the
course of the hearing of said deposition are correctly and
accurately set forth herein.

I further certify that I am not counsel, attorney or
relative of either party, nor financially or otherwise
interested in the event of this suit.

IN WITNESS WHEREOF, I have hereunto set my hand as such
Registered Merit Reporter on this the 24th day of July,
2023, at Christiansted, St. Croix, United States Virgin
Islands.

_____
            /s/ Susan C. Nissman

My Commission Expires:    Susan C. Nissman, RPR-RMR
June 28, 2027             NP-644-23