IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

PETRO INDUSTRIAL SOLUTIONS, LLC    )
(PETRO)                            )
                                   )CASE NO. 1:21-CV-00312
                    Plaintiff,     )
                                   )
        vs.                        )
                                   )
ISLAND PROJECT AND OPERATING       )
SERVICES, LLC, VITOL US HOLDING II )
CO., VITOL VIRGIN ISLANDS CORP.,   )
ANDREW CANNING and OPTIS           )
EUROPE, LTD.,                      )
                                   )
                    Defendants.    )
_____)


THE ORAL DEPOSITION OF **TIM KOLOGINCZAK**, called

for examination by the Plaintiff in the above-entitled

cause, for purpose of discovery, for use in evidence and

for such other and further uses as are provided by the

Federal Rules of Civil Procedure, was taken before

YVONNE SAMUEL-SETORIE, Registered Professional Reporter,

via Zoom video conference on the 14th day of June 2023,

commencing at 9:08 a.m., pursuant to Notice.


ELITE REPORTING SERVICES, INC.
P.O. Box 5619
Christiansted, VI 00823
(340) 718-1318
elitereportingsvcs@gmail.com



EXHIBIT
20

2

```
 1      A-P-P-E-A-R-A-N-C-E-S:

 2      ON BEHALF OF THE PLAINTIFF:
        LEE J. ROHN AND ASSOCIATES, LLC
 3      1108 King Street, Suite 3 (mailing)
        56 King Street, 3rd Floor (physical)
 4      Christiansted, VI 00820

 5      BY:  LEE J. ROHN, ESQ.

 6
        ON BEHALF OF THE DEFENDANTS:
 7      OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
        Attorneys for Island Project and Operating Services, LLC
 8      The Tunick Building, Suite 201
        1336 Beltjen Road
 9      St. Thomas, VI 00802

10      BY:  SIMONE R. D. FRANCIS, ESQ.

11
        SUSMAN GODFREY L.L.P.
12      Attorneys for Vitol Defendants
        1000 Louisiana St., Suite 5100
13      Houston, TX 77002

14      BY:  MICHAEL KELSO, ESQ.
                  - and -
15           SARAH HANNIGAN, ESQ.

16      BECKSTEDT & KUCZYNSKI LLP
        Attorneys for Vitol Defendants
17      2162 Church Street
        Christiansted, VI 00820
18
        BY:  CARL A. BECKSTEDT, III, ESQ.
19

20      ANDREW C. SIMPSON, P.C.
        Attorneys for Andrew Canning and OPTIS Europe, LTD.
21      2191 Church Street, Suite 5
        Christiansted, VI 00820
22
        BY:  ANDREW C. SIMPSON, ESQ.
23

24      Also Present:
        Adrian Melendez, Jr.
25      Andrew Canning
```

3

1                                  I-N-D-E-X

2

3                                                          Page

4    Direct Examination by Ms. Rohn                          5

5    Cross-Examination by Mr. Kelso                         136

6    Redirect Examination by Ms. Rohn                       149

7

8

9

10

11                              E-X-H-I-B-I-T-S

12   Plaintiff's                                            Page

13       1       E-Mails Bates No. CANNING 1                 37

14       2       E-Mails Bates No. CANNING 4                 39

15       6       Quarterly Report (2Q 2019)                  44

16      18       E-Mail Bates No. CANNING 250                45

17      19       E-Mail Bates No. CANNING 251                50

18      62A      E-Mails Bates No. PIS 76                   127

19      81       IPOS' First Supplemental Response to        51
                 Plaintiff's Request For Production of
20               Documents

21      252      E-Mails                                    125

22

23

24

25

4

1                          I-N-D-E-X

2
                         E-X-H-I-B-I-T-S
3    Defendant's                                              Page

4      1        E-Mail Bates Nos. IPOS 684 to 688              138

5      2        E-Mails Bates Nos. Vitol-014573 to             140
                014574
6
       3        E-Mails Bates No. IPOS 003865                  146
7
       4        Letter Dated August 27, 2021, and              146
8               Documentation Requirements Bates Nos.
                PIS 80 to 82
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1          P-R-O-C-E-E-D-I-N-G-S

2

3          (TIM KOLOGINCZAK,

4      having been called as a witness, was duly sworn by the

5      Notary Public, was examined and testified as follows:)

6

7               DIRECT EXAMINATION

8  BY MS. ROHN:

9      Q.   Good morning.  My name is Lee Rohn, and I

10  represent Petro.

11          Could you state and spell your name for the record,

12  please?

13      A.   Yes.  My name is Tim Kologinczak, T-i-m

14  K-o-l-o-g-i-n-c as in cat, z as in zebra, a-k.

15      Q.   Mr. Kologinczak, do you mind if I call you

16  Mr. K.?

17      A.   That is perfectly fine.  No worries.

18      Q.   Can you tell me where you are presently?

19      A.   I'm in my counsel's office.

20      Q.   Where is that?

21      A.   It's downtown Houston.

22      Q.   It's what?

23      A.   Downtown Houston.

24      Q.   Do you have any documents in front of you?

25      A.   No.  I have some exhibits that are digital.

6

1      That's it.

2      Q.   And have you done anything to prepare to be

3  deposed?

4      A.   I just spoke with my counsel.

5      Q.   And when did you speak with your counsel?

6      A.   The last two weeks.

7      Q.   How many times?

8      A.   Three times.

9      Q.   And for what period of time?

10      A.   Four hours for two of them, and then probably

11  about seven hours for one of 'em.

12      Q.   In preparing for your deposition, have you spoken

13  to anyone else besides counsel?

14      A.   No.

15      Q.   Have you been informed about any of the testimony

16  of any of the witnesses that have been deposed?

17      A.   No.

18      Q.   And approximately how many documents did you look

19  at?

20      A.   Quite a few.  I mean, it's hard to count exactly

21  how many, but decent amount of 'em.

22      Q.   Where were you born?

23      A.   Houston, Texas.

24      Q.   Have you ever been deposed before?

25      A.   I have not.

7

1      Q.   Well, I'm sure your counsel has done a great job

2  of explaining what a deposition is, but I'm gonna give you

3  kind of a shorthand.

4          A deposition is as if you were in court, under oath.

5  Same penalties of perjury apply.  The only difference is

6  it's in a more informal setting.  The court reporter, who

7  is Yvonne Setorie, is going to be take down everything that

8  everybody says, and it's typed up into a booklet.  You will

9  have an opportunity to review it and sign it or not to.

10          So my job is to ask questions of you that are clear

11  and are understandable.

12          (Off the record due to disconnection.)

13  BY MS. ROHN:

14      Q.   And your job is to give truthful answers.  If I

15  ask a question that is not clear, you have every right to

16  ask me to clarify the question or to make it so that you

17  understand.  Otherwise, I'll assume that you understood the

18  question when you spoke back.

19          From time to time, there'll be attorneys who may give

20  objections.  Those objections are actually for the record

21  for the court at some time in the future to rule on.  But

22  unless you're instructed not to answer by your attorney,

23  then you are required to answer the question.

24          This is not an endurance test; so if you need a break,

25  just tell me, and we'll take a break.

8

1          And do you have any questions so far?

2      A.   No, ma'am.

3      Q.   So can you tell me your educational background

4  after high school?

5      A.   I'm -- I have a bachelor's in civil engineering.

6      Q.   From where?

7      A.   Texas Tech University.

8      Q.   And when did you graduate?

9      A.   2012.

10      Q.   And can you tell me a brief thumbnail of your

11  employment since college?

12      A.   Sure.  My first employer was a engineering design

13  firm, and I worked there for two years, and then --

14      Q.   Does it have a name?

15      A.   TKE Engineering & Design.

16      Q.   Go ahead.

17      A.   And then I was employed by Vitol Midstream in

18  Midland, Texas.

19      Q.   Vitol what?

20      A.   Midstream.

21      Q.   Midstream?

22      A.   Yes.

23      Q.   And where?  I'm sorry.

24      A.   In Midland, Texas.

25      Q.   And how long did you work for Engineering -- TKE?

TIM KOLOGINCZAK

9

1    A.    Two years.
2    Q.    And what was your position with TKE?
3    A.    I was a project engineer.
4    Q.    And why did you leave TKE?
5    A.    New opportunities.
6    Q.    And what were those new opportunities?
7    A.    Growth and experience.
8    Q.    And who gave you growth and experience?
9    A.    Vitol Midstream.
10    Q.    And what did you do for Vitol Midstream?
11    A.    I was their field engineer and project manager.
12    Q.    And what types of projects did you work on?
13    A.    We did a lot of construction projects for truck
14 racks and terminals and injection stations.
15    Q.    What kind of terminals?
16    A.    Storage terminals.
17    Q.    Who did you report to?
18    A.    Brian Jones.
19    Q.    What was his title?
20    A.    He was the operations manager.
21    Q.    How long did you stay with Vitol Midstream?
22    A.    About two years.
23    Q.    Did you have the same position the entire two
24 years?
25    A.    Yes.

10

1    Q.    And then where did you go?
2    A.    Vitol Inc. in Houston.
3    Q.    And why did you go from Midstream to Inc.?
4    A.    They sold the asset to Energy Transfer.
5    Q.    So was this a transfer?
6    A.    Somewhat, yes.
7    Q.    Well, did you have to apply for the employment at
8 Vitol Inc.?
9    A.    I had an interview.  That was it.
10    Q.    And what position did you start with at
11 Vitol Inc.?
12    A.    Physical operator.
13    Q.    What?  I'm sorry.  Say that again.
14    A.    Physical operator.
15    Q.    What does a physical operator do?
16    A.    Operations and logistics.
17    Q.    For what?
18    A.    Moving commodities.
19    Q.    And what commodities was it in your case?
20    A.    Mostly refine products, such as gasoline, diesel,
21 and jet fuel.
22    Q.    How long did you hold that position?
23    A.    Seven years.
24    Q.    From when to when, if you can tell me?
25    A.    From 2000 and -- 2016 to 2023.

11

1    Q.    Do you currently have that same position?
2    A.    No.  I recently took a new position at another
3 company.
4    Q.    When did you leave Vitol Inc.?
5    A.    Mid-May.
6    Q.    Why did you leave Vitol Inc.?
7    A.    Growth and opportunities.
8    Q.    Where did you go?
9    A.    Atlas Oil.
10    Q.    And what do you do at Atlas Oil?
11    A.    Scheduling.  Basically the same thing I did at
12 Vitol.
13    Q.    When you were at -- first as a physical operator
14 at Vitol Inc., who did you report to?
15    A.    Sebastian Moretti.
16    Q.    Did there ever come a time that you stopped
17 reporting to Sebastian Moretti?
18    A.    No.
19    Q.    And did anyone report to you?
20    A.    No.
21    Q.    As part of your job as a physical operator, did
22 you have any involvement with the propane terminals in the
23 U.S. Virgin Islands?
24    A.    Yes.
25    Q.    What was that involvement?

12

1    A.    Overseeing the physical operations at the
2 terminal and some project involvement, oversight for that.
3    Q.    Had you ever done similar work to that before?
4    A.    I'd done some of that in Midland, yes, as project
5 management.
6    Q.    I'm sorry.  You'd done some of that where?
7    A.    In Midland.  When I was in Midland.
8    Q.    When did you begin having an involvement with the
9 propane terminals in the Virgin Islands?
10    A.    It's probably within the first couple months that
11 I came to Vitol in Houston.
12    Q.    So sometime in 2016?
13    A.    Yes, ma'am.
14    Q.    And what particularly did you start on doing?
15    A.    Mostly just going to the -- the plants and, you
16 know, getting an idea of what's all going on.  They'd just
17 finished building and commissioning the facility; so I just
18 kinda of, you know, got familiar with what was going on,
19 the personnel a little bit, and, you know, just kind of
20 providing some oversight on -- on what was going in the --
21 in the Virgin Islands.
22    Q.    And besides Mr. Moretti, did you work with anyone
23 else as far as the terminals in the Virgin Islands were
24 concerned?
25    A.    By working with, what do you mean by that?

TIM KOLOGINCZAK

13

1    Q.   Anybody else in Vitol Inc. that you worked with?
2    A.   Charlotte Horowitz.
3    Q.   Was that -- did that start in 2016, or was it at
4  a later date?
5    A.   Yes.
6    Q.   That was an imperfect question.
7       Did that start in 2016?
8    A.   Yes.
9    Q.   Okay.  And was there a division of job duties
10  between yourself and Ms. Horowitz?
11    A.   Yes.
12    Q.   And what was the division?
13    A.   She handled the resupply of the propane
14  facilities, and I just -- I mostly focused on operations.
15    Q.   During the time that you worked at Vitol Inc.,
16  did that division of responsibility change any between you
17  and Charlotte Horowitz?
18    A.   No, not really.
19    Q.   In connection with your work at the propane
20  terminals in the Virgin Islands, did you become familiar
21  with a company called Petro?
22    A.   Yes.
23    Q.   And how did you become familiar with Petro?
24    A.   Petro Industrial had done a lot of the work in
25  the facilities, a lot of the maintenance and some of the --

14

1  the projects.
2    Q.   And what was your involvement with Petro as far
3  as the work they were doing?
4    A.   I had a lot of oversight with the facilities and
5  some of the projects; so we had in passing, we talked and
6  met each other and occasionally discussed some of the
7  projects that were going on.
8    Q.   When you say "we," who were you talking to at
9  Petro?
10    A.   Adrian and Chad.
11    Q.   And at any time prior to 2021, did you have any
12  dissatisfaction with the work that they were doing?
13    A.   Not that I recall, no.
14    Q.   And prior to 2021, how would you categorize the
15  quality of their work?
16    A.   It was good.
17    Q.   In connection with your working -- well, let me
18  ask this way:  Have you ever had any interaction with
19  Andrew Canning?
20    A.   Yes.
21    Q.   And when did you first begin having any
22  involvement with Andrew Canning?
23    A.   Probably would have been when I started getting
24  involved with the facilities in 2016.
25    Q.   So you had not had any interaction with him prior

15

1  to that?
2    A.   No, ma'am.
3    Q.   And who did you understand Andrew Canning was?
4    A.   He was a contractor that provided a lot of
5  technical expertise.
6    Q.   Who did you understand Mr. Canning worked for?
7    A.   IPOS and OPTIS.
8    Q.   Prior to 2021 did you ever have any conversations
9  with Mr. Canning about Petro?
10    A.   Not really, just project-related updates.
11    Q.   Did he ever, to your recollection, have any
12  criticism of Petro that he made to you?
13    A.   No.
14    Q.   Did you ever observe the relationship between
15  Mr. Canning and the employees of Petro?
16    A.   No.
17    Q.   You never saw him interacting with the employees
18  of Petro?
19    A.   Not really, no, not in person or -- I mean, maybe
20  on a phone call, but no.
21    Q.   So how often starting in 2016 would you actually
22  physically be at the terminal -- terminals?
23    A.   Before COVID it was maybe once a quarter, and
24  then when COVID happened, I -- I hadn't returned.
25    Q.   So is it your testimony that post-COVID you never

16

1  were at the terminal facilities in the Virgin Islands?
2    A.   That I recall, yes.
3    Q.   And what was the purpose of your -- pre-COVID --
4  it's interesting how we mark our lives by that now, right.
5  Pre-COVID, what would you do once a quarter when you went
6  to the facilities?
7    A.   I visit the facilities just to check on the
8  maintenance and the upkeep, interact with some of the
9  personnel at IPOS, and oversee -- just check on the
10  projects if there were anything that was going on.
11    Q.   Generally how long would you stay?
12    A.   Maybe three days.  One per island.
13    Q.   Would you write any reports as to your
14  observations during those quarters?
15    A.   Not really.  Maybe a couple phone calls.
16    Q.   And who would you make those phone calls to?
17    A.   I talk to Sebastian or Eduardo.
18    Q.   Is that Eduardo Garcia?
19    A.   Yes, ma'am.
20    Q.   And what types of things would you talk to them
21  about?
22    A.   Just general maintenance updates, how things are
23  going.
24    Q.   Would you as a result of those visits make any
25  memos or e-mails to IPOS as to your observations?

17

1    A.   No.
2    Q.   And same question as to Sebastian Moretti or
3  Eduardo Garcia, would you send e-mails or anything as to
4  your observations?
5    A.   Not that I recall.
6    Q.   Generally, pre-COVID, what were your observations
7  when you would go once a quarter?
8    A.   Just checking on any of the -- any of the
9  projects and the maintenance.  There were some, you know,
10 work that was done to -- to, uh, clean up some of the
11 corrosion, piping issues they were having.  And
12 occasionally, we also had a truck rack that was built that
13 I would go look at as well.
14   Q.   I'm sorry.  Something about a track rack?
15   A.   Yes, a truck rack.
16   Q.   That was being building?
17   A.   Yes, ma'am.
18   Q.   Is that correct?
19   A.   Yes, ma'am.
20   Q.   So, generally speaking, when you would make --
21 when you would go to observe the plants, what was your
22 observation?  Did you think it was in good condition? it
23 needed work? it was in poor condition?  What was the nature
24 -- the general nature of your observations when you would
25 visit?

18

1    A.   Just some things that needed to be tidied up and
2  cleaned up.  Just general observation.
3    Q.   And is it correct that Mr. Sebastian Moretti also
4  worked for Vitol Inc.?
5    A.   Yes, ma'am.
6    Q.   And the same for Eduardo Garcia, he also worked
7  for Vitol Inc.?
8    A.   Yes.
9    Q.   During your tenure overseeing the propane
10 terminals in the Virgin Islands, did you ever have any
11 interaction with VTTI?
12   A.   I -- I don't know if that would be the entity.  I
13 -- I dealt mostly with IPOS.
14   Q.   Well, in -- did you know David Smith?
15   A.   Yes.
16   Q.   And when you -- when did you --
17       MS. ROHN:    Hold on a second.  I'm gonna try to
18 get rid of this.
19       I'm going to ignore it.  That's what I'll do.
20 I'll just ignore it.
21 BY MS. ROHN:
22   Q.   When you -- now I lost my train of thought.
23 When did you begin having any interactions with
24 David Smith?
25   A.   When he became the ops manager in the

19

1  Virgin Islands.
2    Q.   Did you say office manager?
3    A.   Ops, operations manager.
4    Q.   Ah, okay.
5  And do you recall approximately when that was?
6    A.   2018 maybe, '17.
7    Q.   And who was the operations manager prior to that?
8    A.   Merlin Figueira.
9    Q.   And what occurred that Merlin Figueira stopped
10 being the ops manager and David Smith became the ops
11 manager?
12   A.   I don't know.
13   Q.   You don't know?
14   A.   No.
15   Q.   Do you know where Merlin Figueira went when
16 David Smith became the ops manager?
17   A.   I don't.
18   Q.   And at some point are you aware that David Smith
19 went to VTTI?
20   A.   Yes.
21       MS. FRANCIS:    Objection.
22 BY MS. ROHN:
23   Q.   And how -- how did you become aware?
24 That was one of those objections I told you about.
25   A.   He was the --- he was moved to the operations

20

1  manager for Seaport Canaveral facility that I also did
2  operations at.
3    Q.   What was your understanding between the
4  relationship between VTTI and IPOS?
5    A.   I don't know.
6    Q.   Well, do you know how he would have been able to
7  be transferred from IPOS to VTTI?
8    A.   I don't.
9       MS. FRANCIS:    Objection.  Misstates the
10 record.  Foundation.
11 BY MS. ROHN:
12   Q.   When David Smith left, who became the ops manager
13 at IPOS?
14   A.   Terry.
15   Q.   Sorry?  Can I have a --
16   A.   Terry.  I don't know -- it starts with a K.  Or
17 Terence.
18   Q.   Now, during the time prior to 2021, were you
19 aware of any complaints against Mr. Canning?
20   A.   No.
21   Q.   During -- before 2021 did you have any
22 conversations with Mr. Melendez or Mr. Persuad about
23 Mr. Canning?
24   A.   No.
25   Q.   Prior to 2021 did you hear any complaints about

21

1  Mr. Canning from anyone?
2      A.  No.
3      Q.  From your observation of working with
4  Mr. Canning, how would you describe his ability to do work?
5      A.  He's good at his job.
6      Q.  And why do you say he's good at his job?
7      A.  He's very technical.  He understands the
8  facilities and the engineering behind a lot of it.
9      Q.  Didn't Mr. Canning have to leave the
10  Virgin Islands periodically because of his immigration
11  status?
12      A.  Yes.
13      Q.  And other than having to leave the Virgin Islands
14  for periods of time, were there any other limitations to
15  the work Mr. Canning could do as a result of his
16  immigration status?
17      A.  Not that I know of.
18      Q.  Were there certain types of sign-off on jobs that
19  he was unable to sign off for?
20      A.  I don't know.
21      Q.  Do you know whether or not Mr. Canning ever
22  became certified or licensed in the United States as a --
23  oh, I didn't write down what his job title was.  As a --
24  like a licensed engineer?
25      A.  Not that I know of.

22

1      Q.  Well, was there -- was there not jobs that had to
2  be signed off on by licensed engineers in the projects that
3  were done at the propane terminals in the Virgin Islands?
4      A.  Not that I recall.  Maybe the engineers that
5  designed the facility.
6      Q.  Give me one minute.
7          (Off the record.)
8          MS. ROHN:    I have a new judge in the
9  Superior Court on a FED that was filed that we -- to
10  -- that we got notice of two days ago, which we asked
11  for a continuance because we're in a deposition, who
12  has denied the continuance and requires me to be in
13  person at 11 o'clock at the Superior Court.
14          So I will have to break this deposition, go to
15  Superior Court for some period of time and return.  So
16  it's totally without my control.  Sorry about that,
17  guys.
18          MR. KELSO:    We can talk about it on the break.
19          MS. ROHN:    Huh?
20          MR. KELSO:    We can talk about it on the next
21  break if we need to.
22          MS. ROHN:    Okay.
23  BY MS. ROHN:
24      Q.  Prior to 2021 what cert -- what documents did
25  Petro have to provide to Vitol or to IPOS and/or Vitol Inc.

23

1  as to its weldings, its weldings on jobs?
2      A.  Depending on the project, it would have been
3  welding certifications for the job data books.
4      Q.  The what?
5      A.  Job data books.
6      Q.  Okay.  So, sir, when is the first time you recall
7  seeing welding certificates for Petro welders?
8      A.  I -- I don't think I ever saw them.
9      Q.  Then how do you know they gave them?
10      A.  It was IPOS and Andrew's responsibility to gather
11  those.
12      Q.  But my question is:  Do you know whether or not
13  they ever did?
14      A.  I do not.  Well, they -- they haven't provided
15  them from what I understand.  But I have not seen them, no.
16      Q.  I'm sorry.  Could you say that again?
17      A.  I have not seen any of the welding
18  certifications, but I do not know if they provided them.
19      Q.  Okay.  It got a little garbled in there.  Did you
20  say, I do not know if they provided them?
21      A.  I -- I do not know if they have physically
22  provided them.  From what I have been told, they have not.
23  I've never seen them.
24      Q.  Okay.  And prior to 2021 have you --- did you
25  ever see any Petro job data books?

24

1      A.  Not completed ones.
2      Q.  And prior to 2021, as you're overseeing these
3  projects, did you ever require or request that you be given
4  job data books?
5      A.  Yes.
6      Q.  And when is the first time that you made that
7  request?
8      A.  I don't recall exactly.
9      Q.  How do you know you made that request if you
10  don't recall when?
11      A.  I don't know the specific date, but I know that
12  we -- we requested them for specific projects.
13      Q.  What is the first project you requested them for?
14      A.  The truck rack.
15      Q.  And what precisely did you request?
16      A.  It's -- I don't know exactly what all is in it,
17  but there's a generic known list of requirements needed for
18  every project.
19      Q.  Well, the truck rack, was that in 2019?
20      A.  That sounds right.  I don't know exactly, though.
21      Q.  And in what way did you request a job data book
22  on the truck rack?
23      A.  It would have been through a scope of work and
24  through any kind of discussions.  I know we had several.
25      Q.  And who did you have those discussions with?

25

1    A.   It would have probably been Adrian.
2    Q.   And is it your testimony that you received the
3  job data books for the truck rack?
4    A.   No.
5    Q.   So did you receive any portion of the truck -- of
6  the job data books?
7    A.   Not that I recall.
8    Q.   And what do you contend was your conversations
9  with Adrian about the job data books?
10   A.   That we needed them to close out the projects so
11  that we could commission the --
12       (Interruption by the court reporter.)
13   A.   -- the asset.
14  BY MS. ROHN:
15   Q.   All right.  So when you didn't get the job data
16  books, what did you do?
17   A.   We requested the missing information to be
18  provided.
19   Q.   So you got some information, would that be
20  correct, if you're only asking for missing information?
21   A.   I don't know exactly.  I know I've seen some of
22  the documentation but not everything.
23   Q.   Was the truck rack commissioned?
24   A.   No.
25   Q.   Never been commissioned?

26

1    A.   No, ma'am.
2    Q.   Somebody using it?
3    A.   No.
4    Q.   Nobody is using the truck rack?  Oh, that's right
5  there's some -- there's some materials that are missing to
6  complete that project; is that correct?
7    A.   We've just put everything on hold for now.
8    Q.   And why did you put everything on hold?
9    A.   The big piece was the job data books being
10  missing, and you need that to put something into service.
11   Q.   So in what way did you request of Petro these
12  missing pieces of the job data book?
13   A.   It would have been communicated with them.
14   Q.   In what way?
15   A.   Conversations and potentially e-mails.
16   Q.   Have you seen e-mails in that regard?
17   A.   Not that I recall.
18   Q.   Well, isn't one of the reasons that the truck
19  rack is on hold is because there are -- there were still
20  materials that are missing to complete that job?
21   A.   Not that I recall.
22   Q.   Isn't one of the reasons that the truck rack
23  hasn't been commissioned because it's been -- was put in
24  the wrong place, and the fumes go into the control room?
25   A.   There were safety concerns, and there were a

27

1  couple of consultants brought in to specify what would need
2  to be provided or done to make that safer; but it's not in
3  the wrong place.
4    Q.   And who was in charge of making sure the truck
5  rack was -- was constructed in a safe manner?
6    A.   It would have been IPOS.
7    Q.   And would Mr. Canning have had a responsibility
8  for that as well?
9    A.   I don't know.  He provided technical oversight.
10   Q.   Do you know what those safety issues are?
11   A.   The proximity of the truck rack and the control
12  room was a concern due to if there were any leaks or
13  explosion, you know, there -- there could be some safety
14  concerns.
15   Q.   Other than the truck rack, do you have any
16  specific recollection of asking for job data books on any
17  other project that Petro did?
18   A.   Yes.
19   Q.   What other project?
20   A.   There was a vent line project.
21   Q.   Is that the 3-inch vent line project?
22   A.   Yes.
23   Q.   I'm sorry.  I didn't hear your answer.
24   A.   Yes.
25   Q.   Other than the truck rack and the -- the 3 vent

28

1  line project, did you ask for job data books on any other
2  jobs Petro did?
3    A.   Not that I recall.
4    Q.   And the guidelines for how these job data books
5  are to be provided, does that -- the procedures for those,
6  is that -- are those VTTI's procedures?
7    A.   They're standard procedures for most facilities.
8  I would presume that IPOS has the same standard.
9    Q.   Have you ever seen an IPOS standard on that
10  regard?
11   A.   No.
12   Q.   In fact, do you know -- do you know whether or
13  not IPOS used the VTTI standard?
14   A.   I don't know.
15   Q.   The other work that was done by Petro where you
16  didn't request job data books, were they commissioned?
17   A.   Most of those projects were maintenance projects.
18   Q.   Wasn't there a 1-inch vent line project?
19   A.   Yes.
20   Q.   That's not a maintenance project, is it?
21   A.   It was.  I believe the purpose of it was to
22  remove corrosion, pipe corrosion, and replace it with
23  better quality material; so I would consider that
24  maintenance.
25   Q.   You asked for a job data book on that?

TIM KOLOGINCZAK

29

1    A.   I don't remember.
2    Q.   You have any recollection of asking for a job
3  data book on that?
4    A.   I don't.
5    Q.   Were you aware of a reverse loading project in
6  St. Thomas?
7    A.   Yes.
8    Q.   Did you ask for a job data book on that project?
9    A.   I don't remember.
10    Q.   Do you have any present recollection of
11  requesting for a job data book for that project?
12    A.   Not that I recall.  I don't know.
13    Q.   When is the first time you can recall requesting
14  welding certificates for the Petro welders?
15    A.   I don't know exactly.
16    Q.   What project?
17    A.   Again, I don't know.
18    Q.   Well, did you have a procedure where every
19  project you asked for welding certificates?
20    A.   I never always specifically did, but it would
21  have been IPOS' responsibility to get that documentation.
22    Q.   I'm sorry.  I didn't hear the first part of your
23  answer.
24    A.   I don't know if I would have specifically asked
25  for all of them for all their projects, but IPOS would

30

1  have.
2    Q.   Well, if IPOS got them, why wouldn't they be
3  given to you?
4    A.   I don't know.
5    Q.   Wouldn't the procedure be that if IPOS got them,
6  then they would be given to you as part of the project?
7    A.   No, they're the -- they were the operator of the
8  facility, and that documentation stays with them.  It's
9  their responsibility.
10    Q.   Well, when did you begin asking for welding
11  certificates?
12    A.   Again, I don't recall exactly.
13    Q.   Well, did you ask for welding certificates on the
14  No. 3 vent line?
15    A.   Yes.
16    Q.   Do you recall ever asking for welding
17  certificates prior to that?
18    A.   I'm -- I don't recall exactly.  Maybe.  Maybe on
19  the truck rack.  Me specifically, I don't know.
20    Q.   What caused you to ask for the welding
21  certificate on the No. 3 vent line?
22    A.   It was WAPA's requirement.
23    Q.   And what document did you find that it was WAPA's
24  requirement?
25    A.   I don't remember specifically.  There was

31

1  communication with them, and they requested it.
2    Q.   There was communication with whom?
3    A.   WAPA.
4    Q.   You had that communication with WAPA?
5    A.   Yes.
6    Q.   All right.  Who at WAPA did you have that
7  communication with?
8    A.   I don't remember.
9    Q.   Was it by e-mail? in person?
10    A.   Again, I don't remember.  It may have been
11  through a call we had some kickoff discussions, and it
12  might have been brought up there.
13    Q.   Well, who were you dealing with on the No. 3 vent
14  line at WAPA?
15    A.   I don't remember his name.  There were several
16  people on the call.
17    Q.   Well, in fact, isn't it true in January you asked
18  for the welding certificates for the Petro welders, and in
19  February you were given those welding certificates?
20    A.   I don't recall.
21    Q.   Do you recall getting welding certificates from
22  Petro after you asked for them on the No. 3 vent line?
23    A.   No, I don't recall.
24    Q.   Do you recall asking for welding certificates of
25  the welders on the No. 3 vent line more than one time?

32

1    A.   Again, I don't recall.
2    Q.   Was the No. 3 vent line commissioned?
3    A.   Yes.
4    Q.   And was it commissioned without a data book, job
5  data book?
6    A.   Completed data book, yes.
7    Q.   And was IPOS paid for that work?
8    A.   I'm sorry.  IPOS or --
9    Q.   Yes.  Yeah, IPOS.  What was your answer?
10    A.   IPOS gets paid on a monthly basis due -- due to
11  our contract.  They don't get paid by a project basis.
12    Q.   Has WAPA, to your knowledge, ever complained
13  about the No. 3 vent line?
14    A.   Just some -- some of the labels and some other
15  small bits and pieces that I don't remember, but I think it
16  was just mostly the labels, I think, was the issue.
17    Q.   That was they were the wrong color.  And is it
18  not correct that Petro corrected those labels at its own
19  expense?
20    A.   I don't know.  I never seen them.  So I believe
21  they were corrected, but I'm not sure.
22    Q.   Other than that small problem, has WAPA ever, to
23  your knowledge, requested any changes to the No. 3 vent
24  line?
25        MR. KELSO:    Objection.  Form.

33

1  BY MS. ROHN:
2      Q.  You may answer.
3      A.  Not that I recall.
4      Q.  Have you ever had any discussions with
5  Mr. Canning about the certification of the Petro welders?
6      A.  Can you repeat the question?
7      Q.  Yes.  Have you ever had any conversations with
8  Mr. Canning about the certification of Petro's welders?
9      A.  Not that I recall.
10     Q.  Have you ever had any e-mails or seen e-mails in
11  which Mr. Canning claims that the certifications have
12  anomalies?
13     A.  I vaguely remember that, yes.
14     Q.  And had you -- do you recall any actual
15  one-on-one conversations with Mr. Canning about those
16  anomalies?
17     A.  No.
18     Q.  Were you involved in any conversations regarding
19  terminating Petro's contract?
20     A.  No.
21     Q.  Did you ever involve in any e-mail chains
22  regarding canceling Petro's contract?
23     A.  No.
24     Q.  Were you ever involved in any conversations
25  either by e-mail, text, or in person about canceling IPOS'

34

1  contract?
2      A.  No.
3      Q.  Did you understand that IPOS was a subsidiary of
4  Vitol -- of a -- of Vitol company?
5      MR. KELSO:    Objection.  Form.
6  BY MS. ROHN:
7      Q.  You may answer.
8      A.  Can you repeat the question?
9      Q.  Sure.  Did you understand that IPOS was a
10  subsidiary of a Vitol company?
11     MR. KELSO:    Objection.  Form.
12  BY MS. ROHN:
13     A.  No.
14     Q.  Were you aware that IPOS was a subsidiary of
15  VTTI?
16     A.  When you say "subsidiary," what do you mean
17  exactly?
18     Q.  That VTTI was a parent.
19     A.  No, I did not know that.
20     Q.  What did you understand to be the relationship
21  between VTTI and IPOS?
22     A.  I don't know.  I don't know what their
23  relationship was.
24     Q.  You ever do -- have any interactions with people
25  from VTTI?

35

1      A.  David Smith.  Well, no, I don't even -- they're
2  not even VTTI employees, so no.
3      Q.  So is it your testimony, sir, that with regards
4  to the Virgin Islands propane terminals, that you in
5  overseeing the work for those terminals never had any
6  interaction from anyone from VTTI?
7      A.  It was all with IPOS.
8      Q.  Why was Vitol Inc. overseeing the work done at
9  the Virgin Islands terminals?
10     A.  We own the asset.
11     Q.  So it's your testimony, sir, that Vitol Inc.
12  owned the propane terminals?
13     A.  It's -- I think maybe it's VVIC.  I don't know.
14  There is an entity that does own the facility, but it's our
15  responsibility to -- since it's our asset, to oversee it.
16     Q.  And when you say "our asset," who is our?
17     A.  VVIC or -- or Vitol.  Vitol.
18     Q.  Vital who?
19     A.  Vitol Inc.
20     Q.  The sale of this asset, is that Vitol Inc. that's
21  selling the asset?
22     A.  I -- I don't know.
23     MS. ROHN:    I'd like to take a short break now
24  see if I can't fix this 11 o'clock problem, because
25  I'm about to start some exhibits.  Is this a good time

36

1  for everybody to take like 10 minutes?
2      MR. KELSO:    That's fine.  We do need to
3  complete this deposition today.  But it's fine to take
4  a break.
5      MS. ROHN:    Well, if it's beyond my control, it
6  is beyond my control.
7      MR. KELSO:    Depo's got to be done today.
8      MS. ROHN:    I'm sorry.  I didn't understand
9  you.
10     MR. KELSO:    The deposition needs to be done
11  today.  The witness isn't available.  We got other
12  depositions scheduled, so... Yeah, we can talk about
13  it, if we need to get there, but the deposition does
14  need to end today.
15     MS. ROHN:    You can't make me do something
16  that's impossible, sir.  So if you want me to take
17  this up with the court, I'll be glad to.
18     MR. KELSO:    Let's try and get the deposition
19  done today.
20     MS. ROHN:    Why would I do anything else but
21  that?
22     (Inaudible.)
23     MR. KELSO:    Is that last comment on the
24  record, Yvonne?
25     COURT REPORTER:    I'm sorry, I didn't hear it.

---

**37**

1    MR. KELSO:    Counsel for Petro commented
2  "lovely human being" sarcastically.  Let's make sure
3  that's on the record.
4    MS. ROHN:    If the court reporter didn't hear
5  it, it can't make sure it's on the record.  And I was
6  speaking to my client, and didn't realize that there
7  was a mute -- that we weren't mute.  And I think that
8  you are being really hard to deal with when there's an
9  emergency that I have no control over.
10    MR. KELSO:    Counsel, we'll do what we can.
11  But the deposition needs to be completed today.
12    MR. SIMPSON:    I heard it as well.
13    (A recess was taken at this time.)
14    MS. ROHN:    We will start with Exhibit No. 1.
15    (E-mails Bates No. CANNING 1 were previously
16    marked as Exhibit 1 for identification.)
17    (Off the record.)
18    MS. ROHN:    Karima, could you scroll, please?
19    So if you go back up to the top, Karima, please.
20  BY MS. ROHN:
21    Q.   This appears to be an e-mail, December 10, 2019,
22  from yourself to Andrew Canning in response to a e-mail
23  from Andrew Canning and also copying Adrian Melendez,
24  Chad Persuad, David Smith, Eduardo Garcia, and
25  Andrew Canning, concerning the truck rack design

---

**38**

1  inconsistencies.
2    Would it be typical for you, sir, in -- as part of
3  your -- Vitol Inc.'s oversight to communicate by e-mail
4  directly with Adrian Melendez?
5    MR. KELSO:    Object to form.
6  BY MS. ROHN:
7    Q.   You can answer.
8    A.   Occasionally.
9    Q.   And what would determine whether or not you would
10  communicate with Petro directly?
11    A.   It just depends.  Varies, depending on situation.
12    Q.   Depends like on what -- what situation compared
13  to what situation?
14    A.   I mean, this case he's -- he's on the e-mail
15  cc'd, but I don't recall of any instances where I
16  consistently talked to Adrian directly via e-mail and only
17  Adrian.
18    Q.   And does this refresh your recollection -- well,
19  I didn't say only Adrian.  I said that he would be included
20  on an e-mail.
21    A.   Correct.
22    Q.   Does this refresh your recollection whether or
23  not the truck rack design -- truck rack project was
24  occurring in December of 2019?
25    A.   A bit, yes.

---

**39**

1    MS. ROHN:    And if you go to now Exhibit 2.
2    (E-mails Bates No. CANNING 4 were previously
3    marked as Exhibit 2 for identification.)
4  BY MS. ROHN:
5    Q.   That is an e-mail the same day, later in the day
6  from Andrew Canning to you, and then to David Smith,
7  Chad Persuad, Adrian Melendez, again about the truck rack
8  -- loading rack.
9    And if you look at the last sentence on that e-mail,
10  Mr. Canning says "I will talk with Chad to see his view on
11  whether additional equipment may be required to undertake
12  the tasks."
13    Was it normal for Mr. Canning to be contacting Petro
14  employees directly on projects as to adding equipment?
15    A.   Yes.
16    MR. SIMPSON:    Objection to form.
17  BY MS. ROHN:
18    Q.   And why is that?
19    A.   He was overseeing the projects in the field.
20    Q.   And who was he doing that for?
21    A.   IPOS.
22    Q.   Did there come a time that Mr. Canning stopped
23  working for IPOS and began working for Vitol Inc.?
24    MR. KELSO:    Object to form.
25  BY MS. ROHN:

---

**40**

1    Q.   You may answer.
2    A.   Not that I recall specifically.  He was a
3  contractor.
4    Q.   Well, I'm sorry.  Did there come a time that
5  OPTIS stopped contracting with IPOS and started contracting
6  with Vitol?
7    A.   I don't recall specifically.
8    Q.   Do you recall generally?
9    A.   Yes.
10    Q.   And what generally do you recall?
11    A.   I know that OPTIS is who he -- he did his work
12  through.
13    Q.   Well, and at some point he did his work through
14  -- for IPOS; correct?
15    A.   Correct.
16    Q.   And then at some point did his contract with IPOS
17  end, and he contracted with Vitol?
18    A.   Through OPTIS, I believe, he did.
19    Q.   And do you know why that change was made?
20    A.   No.
21    Q.   How did you learn that change was made?
22    A.   I'd seen some invoices from OPTIS.
23    Q.   And in what -- in what regard would you see those
24  e-mails?
25    A.   Just approval -- approval e-mails for payment.

---

41

1    Q.   Just what?

2    A.   Approval e-mails.

3    Q.   And what would you have to approve?

4    A.   Just his work, time sheets.

5    Q.   Were you ever aware of complaints that

6   Mr. Canning was making as to Petro's time sheets?

7    A.   Vaguely.

8    Q.   And what vaguely were you aware of?

9    A.   I know there were some time sheets that he was

10  reviewing, and then maybe had some disputes with.  But

11  mostly it was just us, you know, making sure that his

12  initials or approval was made on those time sheets.

13   Q.   So walk me through the approval process for

14  Petro's -- Petro being paid.

15   A.   Andrew would confirm that the work was being

16  done.  So in some cases they would bill us for a specific

17  completion percentage and, you know, a part of that is the

18  time sheets for all the labor and the work and equipment.

19  So Andrew would go through and confirm and approve those

20  elements of the invoice.

21   Q.   And then what would happen?

22   A.   And if that was all approved and good, then we

23  would make payment.

24   Q.   And where would the payment come from?

25   A.   Vitol would pay that.  Well, sorry, IPOS paid

42

1   that.

2    Q.   How did IPOS get the money to pay it?

3    A.   IPOS is reimbursed by Vitol.

4    Q.   Did Vitol ever directly pay Petro?

5    A.   I believe in some instances we did.

6    Q.   And what about those instances resulted in Vitol

7   pay -- paying Petro directly?

8    A.   I don't know.

9    Q.   Well, who at Vitol would be in charge of deciding

10  when to and when not to pay Vitol -- Petro directly?

11   A.   I don't know.

12   Q.   How did you know that they were on occasions paid

13  directly?

14   A.   I'd -- I'd seen some invoices for approval, and I

15  know that there were some wiring issues in some cases, some

16  cyber security wiring issues; so I was aware that we were

17  trying to make direct payment to Petro Industrial.

18   Q.   You were trying to make direct payment on what?

19   A.   To Petro Industrial.

20   Q.   And when you say "wiring," are you meaning bank

21  wires or electrical wires?

22   A.   Bank wires.

23   Q.   And were you the person that had to approve the

24  invoices to have the wire -- the bank wiring occur?

25   A.   In some cases, yes.

43

1    Q.   And so, sir, in those cases, why were you

2   approving them directly for Vitol to pay?

3    A.   I wasn't.  It relied on oversight from IPOS and

4   Andrew to confirm that the work was done, and that

5   everything had been signed off.

6    Q.   I understand that, but then you -- you approved

7   the payment; correct?

8    A.   I approved the payment once the work was

9   complete, yes, and --

10   Q.   Right.

11   A.   -- it's confirmed.

12   Q.   And why would you be approving payment directly

13  to Petro?

14   A.   I don't know.  That's just part of the job.

15   Q.   Well, was -- did Vitol approve payment directly

16  to Petro on all the jobs?

17   A.   No.

18   Q.   Okay.  So why were there some jobs that it did?

19  Sir, why were there some jobs that it did?

20   A.   I don't know.

21      MR. KELSO:    Objection.  Asked and answered.

22      MS. ROHN:    I -- I couldn't hear his answer.

23  BY MS. ROHN:

24   A.   I don't know.

25   Q.   So there was no -- did someone tell you to

44

1   approve those jobs for payment directly?

2    A.   They were sent to us, yes, for approval and

3   payment.

4    Q.   And who sent them to you directly for approval?

5    A.   Uhm, in some cases our accounting department

6   would send it to us, depending on who they were -- they

7   were e-mailed to.

8    Q.   I'm sorry.  I heard sometimes it was the

9   accounting department and then I --

10   A.   And then -- and then it come through various

11  modes of communication, through different personnel.

12   Q.   Which would be who?

13   A.   Accounting and -- mostly just the accounting

14  department.

15   Q.   And who else?

16   A.   I don't know.  That's it.  That's all I recall.

17      MS. ROHN:    Exhibit 6, please.

18      (Quarterly Report (2Q 2019) was previously marked

19  as Exhibit 6 for identification.)

20      MS. ROHN:    Can you scroll, please?

21  BY MS. ROHN:

22   Q.   Do you generally recognize a document like this,

23  sir?

24   A.   No.

25      MS. ROHN:    If you could go to the top, Karima.

---

**45**

1    BY MS. ROHN:
2        Q.   So you would not get a quarterly -- you would not
3    receive the quarterly reports from IPOS.  Is that your
4    testimony?
5        A.   Not that I recall.
6            MS. ROHN:     And Exhibit 18.
7            (E-mail Bates No. CANNING 250 was previously
8        marked as Exhibit 18 for identification.)
9    BY MS. ROHN:
10       Q.   This is an e-mail from yourself to Coury Hodge
11   and Andrew Canning, "Subject:  Petro Industrial -
12   Maintenance Budget."
13           And your e-mail of tjk@vitol.com.  That was your
14   e-mail; is that correct?
15       A.   Yes.
16       Q.   Do you recall sending this e-mail?
17       A.   No.
18       Q.   Who did you understand Coury Hodge was?
19       A.   Coury was an IPOS employee.
20       Q.   What was his position?
21       A.   He was the maintenance person.
22       Q.   You know why his e-mail is cho@vtti.com?
23       A.   No.
24       Q.   Do you recognize that as a VTTI e-mail?
25       A.   It says vtti.com, but if that's -- if that's what

---

**46**

1    you're inferring, then, yes.
2        Q.   And do you recognize that there are people from
3    VTTI that also used that same vtti.com e-mail?
4        A.   No.  I don't pay attention to the domain.
5        Q.   It says "Coury/Andrew, after looking through the
6    budget numbers, it appears that we spent close to 1 million
7    with PI from July 18th to March 19th."
8            Is PI Petro Industrial?
9        A.   I don't know.  More than likely, yes.
10       Q.   Okay.  Was that unusual?
11       A.   Was what unusual?
12       Q.   To spend that amount of money on -- with Petro
13   pursuant to their contract?
14           MR. KELSO:     Object to form.
15   BY MS. ROHN:
16       Q.   You may answer.
17       A.   I don't know.  All projects range in different
18   prices and things like that.
19       Q.   It goes on to say "There really isn't a breakdown
20   in the figure, can you please provide what made up the
21   total 1 million in maintenance costs (job works done and
22   it's cost)?"
23           Sir, if there were job data reports or job data books,
24   wouldn't that tell you that information?
25       A.   No.

---

**47**

1        Q.   Tell me what's in a job data book.
2        A.   Job data book is essentially a compilation of --
3    of all the work that's done in the field.  You have a lot
4    of certifications.  It's essentially a -- a document that
5    ensures that everything was done properly in case of a
6    catastrophic event.
7        Q.   So when you say that it's a compilation of all
8    the work done in the fields, wouldn't that include
9    man-hours?
10       A.   Not typically.  I don't know exactly.
11       Q.   So you don't know if a job data workbook includes
12   man-hours?
13       A.   No, I -- I don't recall.  I don't remember.
14       Q.   Well, sir, were any companies besides Petro
15   expected to do job data books?
16       A.   I don't know.
17       Q.   Well, sir, did you ever see a job data book from
18   any -- any company besides Petro?
19       A.   No.
20       Q.   And then it says "We'd like to have something
21   early next week prior to another budget discussion."
22           Who were you having budget discussions with?
23       A.   I don't know in that instance.
24       Q.   Generally who did you have budget discussions
25   with when Petro was involved?

---

**48**

1        A.   Maybe Eduardo.
2        Q.   Who?
3        A.   Eduardo Garcia.
4        Q.   Eduardo Garcia?
5        A.   Yes.
6        Q.   Anyone else?
7        A.   No, not that I recall.
8        Q.   Charlotte is not on this e-mail.  Is there a
9    reason that she would not have been included on this
10   e-mail?
11       A.   No, I don't know.
12       Q.   Why is Mr. Canning included on this e-mail?
13       A.   Andrew is involved with all the maintenance and
14   the projects, the oversight for all of that; so that's the
15   reason why I would include him.
16       Q.   So would he attend budget discussions?
17       A.   Not that I recall.
18       Q.   And what was the -- what were the -- what was the
19   budget for?
20       A.   To keep track of how much money we're spending.
21       Q.   And keep track of how much money you're spending
22   where?
23       A.   For the projects.
24       Q.   At the -- at the terminals in -- in the
25   Virgin Islands?

---

49

1  A.  Yes.

2  Q.  And who would prepare these budgets?

3  A.  Eduardo would.

4  Q.  And up until the time you left, were there still

5  be -- being budgets prepared?

6  A.  Not that I recall.

7  Q.  When did they stop being prepared?

8  A.  I -- I really don't know.

9  Q.  Well, sir, you were involved in the budgets, were

10  you not?

11  A.  Not closely.  Most of it was just some of the

12  projects that I was involved with, but all the day-to-day

13  stuff, I wasn't heavily involved with those budget calls.

14  Q.  Well, who besides you would have been doing that?

15  A.  Maybe Charlotte.

16  Q.  Well, sir, can you tell me why in November

17  of 2019 you say after looking through the budget numbers?

18  Why were you looking through the budget numbers?

19  A.  I was probably told to look at them.

20  Q.  Who would have told you that?

21  A.  Maybe Eduardo.

22  Q.  And what was Mr. Garcia's position?

23  A.  I think he was business development.

24  Q.  He was what?

25  A.  Business development.

50

1  Q.  And do you know what his duties and

2  responsibilities were as business development?

3  A.  No.

4  MS. ROHN:  Exhibit No. 19.

5  (E-mail Bates No. CANNING 251 was previously

6  marked as Exhibit 19 for identification.)

7  BY MS. ROHN:

8  Q.  Appears to be another e-mail about the truck

9  wrack, and there's an e-mail, April 10, 2019, from

10  Andrew Canning to yourself.

11  "Tim, Petro-Industrial have asked about the

12  requirement for an additional pipe support for the propane

13  supply line and the propane vapor return line for the truck

14  loading rack where they exist -- exit the road crossing at

15  the storage mound."

16  And then he says "The concern is the span where the

17  new line exist, the extension support on the existing pipe

18  support, then assesses under the existing lines and enters

19  the road crossing sleeve where the next support being

20  located on the mound wall."

21  And then it asked you, "Could you confirm with Polaris

22  if the pipe stress levels are acceptable."

23  Why were you involved with Polaris on this project?

24  A.  Polaris is the third-party engineering firm we

25  used.

51

1  Q.  And was Canning not allowed to go directly to

2  Polaris?

3  A.  No.

4  Q.  Do you know why he was going through you to ask

5  something of Polaris?

6  A.  Because we -- we had directly hired Polaris to do

7  the third-party engineering.

8  Q.  We being Vitol Inc.?

9  A.  Yes.

10  MS. ROHN:  If you go to -- Karima, if you go

11  to Exhibit 81, Bates-stamped 4054.

12  (IPOS' First Supplemental Response to Plaintiff's

13  Request for Production of Documents was previously

14  marked as Exhibit 81 for identification.)

15  MS. ROHN:  Karima, can you get into 81?

16  We're looking at -- looking for 4054.

17  Okay.  So to be more streamline, it's 10:50.  I

18  would like to take a short lunch break, like can we

19  have lunch within 30 minutes, 45 minutes?

20  MR. KELSO:  Yes.

21  MS. ROHN:  And what I'm going to do, because I

22  have a lot of exhibits out of 81, because 81 was a

23  huge amount of documents, I'm going to just have the

24  documents that we are going to use out of 81 and 66

25  scanned in individually so we can just go one to the

52

1  other, rather than going all through Exhibit 81.  And

2  I will do that during the lunch break.

3  MR. KELSO:  That's fine, Counsel.  It's just

4  before 10 o'clock in the morning here in Houston; so I

5  suspect we will not eat right now.  But we can take a

6  longer break to allow you to go through this material.

7  We may just have to take a slightly longer break, if

8  we need to, when we get to like 12:30, 1:00 --

9  MS. ROHN:  Okay.  How about if I suggest -- I

10  forget you're in Houston.  So sorry.  How about if I

11  suggest a 15-minute break so we can scan these in in

12  an order so she can go from one to the next without

13  having to go through all of -- all of the numbers, and

14  we'll turn in 15 minutes?

15  MR. KELSO:  That would be fine.

16  MS. ROHN:  Okay.  Thank you.

17  (A recess was taken at this time.)

18  BY MS. ROHN:

19  Q.  This comes from Exhibit 81, which has got

20  hundreds of pages in it, and it is Bates-stamped 4054 to

21  4071.

22  MS. ROHN:  Karima, can you scroll, please?

23  Just briefly.

24  Okay, that's good.  You can go back to the top.

25  BY MS. ROHN:

53

1    Q.   This is an e-mail from David Smith dated
2    April 4, 2019, to Eduardo Garcia at eg@vitol.com and
3    Sebastian Moretti, and it's cc'd to Coury Hodge of --
4    "Petro contract.  As discussed, here is the contract."
5         Do you know why the contract between IPOS and Petro
6    would be sent to Vitol Inc.?
7    A.   No.
8    Q.   Did you ever in the course of your business
9    review Petro's contract?
10   A.   No.
11   Q.   Is this the first time you've ever seen this
12   contract?
13   A.   Yes.
14   Q.   Next exhibit starts with Bates-stamped 3349 with
15   373, 373.  This is an e-mail, July 30, 2000 --
16        MS. ROHN:  You have to go to the bottom.
17        No, the bottom of the first page.  Sorry.
18   BY MS. ROHN:
19   Q.   It's an e-mail, July 30, 2020, from
20   Sebastian Moretti to David Smith, "Subject:  Andrew Canning
21   contract with Vitol."
22        And it says "Hi, David, and happy holiday!  We are
23   working on Andrew's contract and we would like to add
24   Appendix 4 & 5 but both needs to be modified from VTTI to
25   Vitol.  Do you have the word format?"

54

1    Do you know why Mr. Canning's contract was apparently
2    with Vitol?
3    A.   No.
4    Q.   Do you know whether or not Mr. Canning ever had a
5    contract with VTTI?
6    A.   Uh, no.
7    Q.   Do you know whether or not Mr. Canning went from
8    working for IPOS to VTTI?
9    A.   No.
10   Q.   And then if you go on the top of that page on
11   July 3, 2020, from David Smith to Sebastian Moretti,
12   "RE:  Andrew Canning contract with Vitol?"
13        It says that "I think that Andrew and Eduardo had a
14   discussion about it.  But this is what IPOS currently uses.
15        "And I'm attaching Petro's as an example as well."
16        Do you know -- did you -- were you ever aware that
17   there was going to be a change in Canning's contract?
18   A.   No.
19   Q.   Were you involved at all in the contracting with
20   Canning?
21   A.   No.
22        MS. ROHN:    I am going to skip an exhibit,
23   Karima, and go to the one that's Exhibit -- from 74,
24   Bates No. 3902 to 4073.
25        And if you can scroll down.

55

1    BY MS. ROHN:
2    Q.   First of all, that's a VTTI with -- "USVI LPG
3    Conversion Project, 1309, Volume 4, Piping Specifications,
4    Welding."
5         MR. KELSO:     Counsel, I'm sorry, before you go
6    on, did you say Exhibit 74?
7         MS. ROHN:     It comes out of Exhibit 74, yes.
8         MR. KELSO:     Okay.  Sorry.  I think the witness
9    is trying to locate it in the electronic version, and
10   I just don't think it's attached.
11        MS. ROHN:     No.  That's why I put these in like
12   this.  He's gonna have to look at it on the screen.
13   So I didn't want him to have to go through Exhibit 74
14   and find those numbers.
15        MR. KELSO:     Okay.
16   BY MS. ROHN:
17   Q.   And this is for the -- have you ever seen this
18   document before?
19   A.   No.
20        MS. FRANCIS:     Attorney, Rohn, could you
21   identify the last Bates number on that?
22        MS. ROHN:     Sure.  It's 4073.  There's a bunch
23   of documents in here.  Okay.
24   BY MS. ROHN:
25   Q.   So this appears to be VTTI's Piping

56

1    Specifications for Welding.  Do you dispute that?
2    A.   I don't.
3    Q.   And that it pertains to the USVI LPG Conversion
4    Project?
5    A.   Correct.
6    Q.   Do you agree that the LPG Conversion Project is
7    the WAPA terminals project?
8    A.   Yes.
9    Q.   Okay.  Do you know why the VTTI piping
10   specifications would be used on an IPOS project?
11   A.   No.
12        MS. ROHN:     And if you go to Bates No. 3904.
13   And if you scroll down to "Applicable Codes &
14   Standards."
15        That's it right there.
16   BY MS. ROHN:
17   Q.   Do you see underneath there the "ASME Code for
18   Pressure Piping, ASME Boiler & Pressure"?
19        Do you dispute that the ASME standards were the
20   standards that were to be used on the Virgin Islands
21   propane terminals --
22   A.   I do not dispute --
23   Q.   -- as to -- I'm sorry.  What?
24   A.   I said I do not dispute this is what's used, yes.
25        MS. ROHN:     If you go to the 4073.  I don't

57

1    know why this is -- I picked this out and put it
2    there. But there's a series of e-mails. That's the
3    last page of the document, Karima.
4         That's it right there. No, keep going. That's
5    it, 4073, right.
6    BY MS. ROHN:
7    Q.   So this is an e-mail -- I don't know why, somehow
8    it got attached to this. So this is an e-mail from
9    yourself, if you look at the bottom. If you look at the
10   bottom, it says from Tim, that's you, to David Smith,
11   May 17, 2021, cc'ing Andrew Canning, Merlin Figueira,
12   Sebastian Moretti, "St. Thomas E&I estimates."
13        Do you know what that's referencing?
14   A.   I don't specifically, no. I don't know the
15   context.
16   Q.   It says "David, I spoke with Adrian a few weeks
17   back on this and had requested support for the invoice. It
18   was around the time they were busy with all the vent line
19   work so he may have forgotten.
20        "I need to see time sheets and material support before
21   I can approve them."
22   So, sir, were you not approving time sheets and
23   material supports?
24   A.   No.
25   Q.   Why did you say "I need to see the time sheets

58

1    and material supports before I can approve them"?
2    A.   I need to see the sign-off time sheets from
3    Andrew and the material purchase support before I can
4    approve the invoice.
5    Q.   Well, okay. And then there's an e-mail from
6    David Smith to yourself about four minutes later, "Gents
7    --" this goes to Chad Persuad and Adrian Melendez. "Gents,
8    FY."
9         And then a May 26th e-mail at the top from
10   Adrian Melendez to David Smith, Merlin Figueira, and
11   yourself, and Santhia Rodriguez.
12        Then it says "Good afternoon, David, In speaking to
13   Tim yesterday, we have send all supporting docs for this
14   invoice and ready for payment from IPOS."
15        Do you remember having a conversation with
16   Adrian Melendez where he showed you where you had those
17   documents?
18   A.   No, I don't recall.
19   Q.   Do you recall ever disputing Mr. Melendez's
20   representation that you had the documents, and they were --
21   and you should be paying IPOS?
22   A.   Again, I don't recall.
23   Q.   Do you recall any facts to indicate why you would
24   not pay that IPOS bill?
25   A.   No.

59

1         MR. KELSO:   Object to form. Assumes facts.
2    BY MS. ROHN:
3    Q.   Next exhibit starts out 4589 to 4598. And this
4    starts out on the first page -- let's see here.
5         If you go to 4591 -- actually, 4590, there's an e-mail
6    at the bottom from Merlin, September 5, 2020, to Eduardo,
7    Charlotte, Sebastian, David Smith, Garry Stoker.
8         Who's Garry Stoker?
9    A.   I -- I don't know. I think he was -- he was
10   involved with IPOS. I think he might have been, uhm --
11   might have been David's superior. I -- I don't know.
12   Q.   Andrew Canning, Alexander Etienne.
13        Who's Alexander Etienne?
14   A.   Alex was one of the facility managers in
15   St. Croix.
16   Q.   When you say "facility manager," what would that
17   job entail?
18   A.   Overseeing the facility, making sure everything
19   is -- is running. He was typically the -- probably the
20   point of contact. I believe he -- he kind of oversaw all
21   the personnel there.
22   Q.   Okay. And who's Calvin Schmidt?
23   A.   Calvin, I believe, was another maintenance
24   employee.
25   Q.   And it says "Subject: Outage update. Ladies and

60

1    gents, on behalf of the team I'd like to give you --"
2         MS. ROHN:   Go to the next page. Go to 4591.
3         Okay, there you go.
4    BY MS. ROHN:
5    Q.   "I'd like to give you an update on the outage.
6    At the end of today, we have:" And it list a bunch of work
7    that's been done.
8         And then it goes, the next sentence, "We reached the
9    desired milestone yesterday and today, now our milestone
10   for tomorrow is the following:" Lists the items to be
11   done.
12        And then it says -- if you go down, it says "We have a
13   tailgate Safety Meeting each morning at 7am and an update
14   Meeting at 3pm. Our team as well as a Contractor attend
15   the Safety Meeting. In addition we invited the
16   Preventative Maintenance Manager at WAPA for these Meetings
17   and he has attended."
18        Do you know why Merlin Figueira would be making these
19   reports to Charlotte and Sebastian?
20   A.   Can you scroll up to the top of the e-mail?
21   Q.   Sure.
22   A.   Can we scroll down? I'm just trying to
23   understand the context of the e-mail.
24   Q.   Sure, of course. No worries.
25   A.   If you go down to whatever he's replying to in

61

1  the next segment?
2      Q.  We don't have the e-mail he's replying to.
3      A.  Oh, okay.
4  So what was your question?
5      Q.  Do you know why these progress reports would be
6  -- being reported to -- to Eduardo, Charlotte, Sebastian?
7      A.  No.  I mean, it looks like he's giving them an
8  update on one of the outages that were occurring.  So Vitol
9  supplies the propane to WAPA and obviously want to get them
10  up and running; so he's likely just providing a high-level
11  update on where things are at before we are able to
12  restart.
13      Q.  Okay.
14      MS. ROHN:    And then if you go to the first
15  page again, Karima.
16  BY MS. ROHN:
17      Q.  Eduardo responds in the middle --
18      MS. ROHN:    Down by -- towards the bottom.
19  Right there.
20  BY MS. ROHN:
21      Q.  "Well done, Merlin.  Thank you to the team for
22  the dedication and time spent over this holiday weekend."
23      MS. ROHN:    And then if you scroll to the top.
24  BY MS. ROHN:
25      Q.  Merlin Figueira says on September 8, 2020, "It

62

1  was indeed a Team effort; Alex -- Alex managed the Ops side
2  of the Outage."
3  Do you understand that to be Alex Melendez?
4      A.  No, that would be Alex Etienne.
5      Q.  Was who?
6      A.  Alex Etienne.  I forget, E-t-t-i -- he was the --
7      Q.  Oh.
8      MS. ROHN:    And then if you go to Bates-stamped
9  4592 in that document.
10  BY MS. ROHN:
11      Q.  At the top of that page is an e-mail from
12  Merlin Figueira to Charlotte Horowitz, Sebastian Moretti,
13  and yourself, and it says -- and cc'd to Andrew Canning.
14  And it says, "Subject:  VI WAPA IPOS St. Croix Issue" the
15  hashtag and then a number.
16  And there is -- if you scroll, this appears to be the
17  answer.  If you go to 4594 is where this starts.
18  And there is a -- there's an e-mail that says at the
19  bottom on 4594, from Charlotte to Larry J. Mondy.  It's
20  dated January 29, 2021.
21  Do you know who Larry J. Mondy is?
22      A.  I don't know, no.
23      Q.  And do you know who Kevin Smalls is?
24      A.  Kevin worked for WAPA.
25      Q.  Okay.  And it says "VI WAPA IPOS St. Croix

63

1  Issue."
2  And then if you scroll up to the next page on
3  February 1, 2021, from Larry Mondy.  He appears to be
4  somebody from WAPA.  You see that?
5      A.  Yes.
6      Q.  February 1, 2021, to Charlotte copying
7  Kevin Moretti.  And it says "Good afternoon, After
8  reviewing the documents I have a few additional questions."
9  And if you go to the next page, it has a listing of
10  questions.
11  Have you ever seen this document -- this e-mail chain
12  before, to your knowledge?
13      A.  No.
14      Q.  Okay.
15      MS. ROHN:    Okay, and then if you go to 4593.
16  BY MS. ROHN:
17      Q.  Charlotte sends an e-mail, "Merlin, do you think
18  you can get these answered."
19  And then if you look above, you see where Merlin then
20  sends on February 1, 2021, these questions to
21  Adrian Melendez?
22  Do you know why Adrian Melendez would be -- being
23  asked to answer questions that WAPA had of IPOS?
24      A.  No.
25      MS. ROHN:    And then if you go to 4592.

64

1  BY MS. ROHN:
2      Q.  You see -- the bottom.  Do you see where
3  Adrian Melendez answers those questions?
4      A.  Yes.
5      Q.  And then if you go to the second page where it
6  says -- there's a question.  One of the questions was, "Is
7  the work scope based on a complete outage of propane use
8  since the pipes are next to each other?  This would be a
9  outage that lasts for over three weeks?"
10  And then there's an answer from Adrian.  "Our plan is
11  to weld the entire piping system and set it in-place or
12  next to.  Where the spacing is not available, extensions to
13  the existing supports will be added.  This will reduce our
14  outage time to one to two days per unit with demoing of
15  piping out of unit 17."
16  Were you aware --
17      A.  Can you scroll back up?  I'm sorry.  I'm not able
18  -- they scrolled down.  I was -- there we go, okay.  Thank
19  you.
20      Q.  Sorry.
21  "Our plan is to weld the entire piping system and set
22  it in-place or next to.  Where the spacing is not
23  available, extensions to the existing supports will be
24  added.  This will reduce our outage time to one to two days
25  per unit -- while the demoing piping out -- with the

65

1  demoing piping out of unit #17."
2      And then it says "What would work schedule be?"
3      And the answer is "Our schedule will be 10 day shift
4  per day, 5 days per week." I think he means 10-hour.
5      A.  Ten hours, yes.
6      Q.  So were you aware that there was -- as part of
7  the work that was being done on the 3-inch vent line, a
8  concern for how much outage time there would be?
9      A.  No, but it would be in their interest to make it
10 as quickly as possible so that we can continue to supply
11 WAPA, 'cause they have a limited supply of diesel fuel.
12     Q.  And were you aware that part of the cost of Petro
13 doing the work was to pay overtime to its crew and to -- to
14 do its best to minimize the outage times?
15     A.  I don't recall that.
16     MS. ROHN:    Go to the top of page 4592.
17 BY MS. ROHN:
18     Q.  There is an e-mail from Merlin then sending
19 Adrian's e-mail answers to Charlotte, Sebastian, and
20 yourself. Do you see that?
21     A.  Yes.
22     Q.  So you were aware that, were you not, that he was
23 planning on doing ten-hour days, five days a week, and
24 actually going to the effort of doing all the piping work
25 instead of doing the piping work as it was in place?

66

1      A.  On the basis of this e-mail, I would have seen
2  it, but it wasn't something that I was directly involved
3  with making those decisions.
4      Q.  How much involvement did you have in the 3-inch
5  vent line?
6      A.  Not a whole lot. Everything was done through
7  IPOS to get the completion of the project done.
8      Q.  If you go to Bates-stamped 4597, and go to the
9  middle of the page, dated May 10, 2021, there's an e-mail
10 from Charlotte to Kunal Patal.
11     Do you know who Kunal Patal is?
12     A.  Yeah. I believe he was the accountant for IPOS.
13     Q.  Okay. And it says "M&R wish list 2021, 2022."
14 Do you know what M&R is?
15     A.  Let's see. No. It's maintenance and something.
16     Q.  And it says, "With our attached list, can you
17 complete -- complete the vendors who will be responsible
18 for this work and answer the questions in yellow. Also,
19 can you check to see if any other items can be deferred.
20     "I noticed there was a 1.3 million in M&R before the
21 wish list was added."
22     Why would Vitol Inc. be looking at the wish list for
23 the propane plant?
24     A.  Uhm, I -- I don't know. I mean, it -- we
25 obviously we -- the process is we pay for the work that's

67

1  done at the facility and -- so we would obviously want to
2  be involved with -- with what we're spending.
3      MS. ROHN:    Okay, if you go to 4596 at the
4      bottom page. 4596.
5  BY MS. ROHN:
6      Q.  Then there's an answer from Kunal Patal to
7  Charlotte.
8      Then the second paragraph on the page 4597 says "In
9  regards to the 1.3 million, 900k is what we project Petro
10 labor to be both islands for the year, and the remaining
11 401 -- 400k will be the 2.8% inflation factor, landscaping,
12 freight/customs clearing on M&R items."
13     Would the figure of 1.3 million to 900k be
14 inconsistent with what you had looked at for Petro's labor
15 on a yearly basis?
16     A.  I would -- I wouldn't know. I -- I didn't look
17 at their -- the budget every year. I wasn't heavily
18 involved with it.
19     Q.  Okay.
20     MS. ROHN:    Next exhibit is out of Exhibit 74.
21     I mean -- yeah. It is Bates stamps 3896 to 3901.
22 BY MS. ROHN:
23     Q.  Those appear to be, if you scroll through them,
24 the Welder Performance Qualification Record for various
25 welders for Petro.

68

1      MR. KELSO:    Objection.
2      MS. ROHN:    Can you scroll, please?
3      MS. FRANCIS:    Can you identify the last Bates
4      number? I didn't hear what you said.
5      MS. ROHN:    Yeah. 3901.
6  BY MS. ROHN:
7      Q.  So have you -- do you recall ever having seen
8  these welding qualification records before, these WPQs?
9      A.  No.
10     Q.  Do you know what a WPQ is?
11     A.  Based off the letterhead, it's Welder Performance
12 Qualification Record.
13     Q.  Had you ever asked for any Welder Performance
14 Qualification Records from Petro?
15     A.  We requested job data book information, which
16 includes their qualifications.
17     MS. ROHN:    Karima, if you go to the start of
18     that document, 3896, which is where you are.
19 BY MS. ROHN:
20     Q.  This is a qualification for Edgardo Batista.
21     MS. ROHN:    And if you'll scroll to the bottom
22     of page.
23 BY MS. ROHN:
24     Q.  This is dated February 19, 2021. And you see
25 where it says "Visual Examination Results: Face:

TIM KOLOGINCZAK

---

69

1  Acceptable. Root: Acceptable. Welding Test Conducted By:
2  Guillermo Castro."
3      You see that?
4      A.  Yes.
5      Q.  And Acuren, by -- then it's dated
6  February 19 2021; correct?
7      A.  Correct.
8      Q.  And then if you go to the next page, and go to
9  the bottom. This one is to Bernardo Cruz,
10  February 19, 2021, same Guillermo.
11      And if you go to the next page, 3898, as to
12  George Rodriguez, go to the bottom, same Guillermo Castro,
13  same February 19, 2021.
14      All right. And then if you go to the next page, 3899,
15  it's for Fernando Lebron, same Guillermo Castro. But this
16  one is April 1, 2021.
17      And then there's a next one, Jonathan Rodriguez,
18  April 1st.
19      MS. ROHN:    If you scroll down to the bottom.
20  BY MS. ROHN:
21      Q.  April 1, 2021.
22      And the last page it says to Richael Philips. If you
23  scroll to the bottom, March 22, 2021.
24      Do you know why these were being turned in for
25  different dates?

---

70

1      A.  I do not.
2      Q.  Did you ever question any of those welder
3  certificates?
4      A.  I never saw them, so no.
5      Q.  Who would have seen them?
6      A.  Uhm, IPOS and Andrew.
7      MS. ROHN:    If you go to out of Exhibit 81 IPOS
8  4836 and goes in reverse order to 4834.
9  BY MS. ROHN:
10      Q.  If you start at the 4834, there is an e-mail from
11  Adrian Melendez to -- to Merlin Figueira,
12  February 24, 2021, copy to yourself and Charlotte, "Re:
13  St. Croix - Vent Piping Project WAPA Deliverables."
14      And it is -- says to Merlin. "Merlin, I can help out
15  with the support for replacement of the pipes including the
16  inspection reports."
17      And then if you go up, there's an e-mail from
18  Merlin Figueira, "Ok, Adrian, let's discuss tomorrow to see
19  that we have what is requested. I may need your drawing
20  that show the existing lines to show what is going to be
21  demolished."
22      And if you scroll up, on February 24th, Mr. Adrian
23  replies -- Melendez replies, "Merlin, I will be in and out
24  of flights tomorrow but I will call you between my layover
25  and see if I can figure something else."

---

71

1      Do you know what this is talking about?
2      A.  I -- I don't. It's -- it's pretty vague. I
3  don't know the full context.
4      Q.  If you go -- if you go to 4385, there's an e-mail
5  from you that's the same day but at night, 6:19, to
6  Merlin Figueira cc Charlotte.
7      "Dear Merlin and Adrian, per our conversation on
8  Tuesday, you will be providing WAPA with all the job book
9  documentation for this project. This includes the
10  engineering/design/scope/construction documentation for
11  them to review - and after completion for their records as
12  this work is being done on their property.
13      "Can you please send over the following."
14      MS. ROHN:    If you go to the page 4836. Go
15  up. Up to 4836. Next page. There you go.
16  BY MS. ROHN:
17      Q.  You have --
18      MS. ROHN:    Up to the top. There you go.
19  BY MS. ROHN:
20      Q.  You have a listing of what you need for the job
21  data book; correct?
22      A.  That's what it looks like, yes.
23      Q.  Where did you get this list from?
24      A.  This would have been provided by WAPA.
25      Q.  So there should be a document from WAPA to

---

72

1  Vitol Inc. as to what documents they wanted?
2      A.  It -- it might have been via phone call where I
3  took notes on specifically what they wanted. There was
4  communication between knowing what they -- what they
5  wanted.
6      Q.  Okay. So did you have this conversation with
7  WAPA about what they wanted?
8      A.  Possibly. It more than likely would have been
9  like a kickoff call or a project call more than likely.
10      Q.  Okay. Who would be on a project call?
11      A.  Myself and IPOS and WAPA would have been on that
12  call for this particular project.
13      Q.  Would Charlotte have been on the call?
14      A.  Possibly. I don't recall if she was on it or
15  not.
16      Q.  Okay. And who from IPOS would have been on it?
17      A.  I would have presumed the ops manager and
18  potentially the facility manager.
19      Q.  And who are those by name?
20      A.  At that point I think Merlin was still the
21  operations manager; so it would have been Merlin and then
22  potentially Alex.
23      Q.  Okay. And so "Prior to the commencement of the
24  work," number one, "Support for the pipe replacement which
25  confirms that it will meet or exceed requirements for

---

TIM KOLOGINCZAK

73

1  operation."
2      Did you get that from Adrian?
3      A.  I don't recall.
4      Q.  Wasn't that what that e-mail we just went through
5  about can you get me these documents?
6      A.  I asked for those documents.  I don't recall if I
7  received them.
8      Q.  Well, is there a job data book?
9      A.  There should have been a job data book.
10     Q.  Did you ever construct a job data book?
11     A.  It's not my responsibility to construct it.  It's
12  the contractor's responsibility to put together all these
13  documents.  It's a standard procedure with -- with any kind
14  of project.  They -- they -- the contractor would have put
15  all this together, provided it to us at the completion of
16  the project.
17     Q.  And who would it have been provided to?
18     A.  IPOS.
19     Q.  Who at IPOS?
20     A.  I don't know.  Probably with Merlin.
21     Q.  "Demolition and LO/TO P&ID markups."
22  Did you receive -- was that received?
23     A.  Again, I don't recall.
24     Q.  "Permits."  Was that received?
25     A.  I don't recall.

74

1      Q.  And then "Any additional information that would
2  be worth noting to WAPA prior to construction."
3      How would Mr. -- How would Petro know what you're
4  referencing?
5      A.  They have a lot of experience constructing and
6  doing projects and maintenance within these facilities,
7  WAPA and IPOS specifically; so any additional highlights
8  that they'd like to make, then, you know, we'd like them to
9  bring it to our attention with their -- with their
10  thoughts.
11     Q.  So but how would Petro specifically know what you
12  were requesting?
13     MR. KELSO:    Objection.  Asked and answered.
14  BY MS. ROHN:
15     Q.  You could answer.
16     A.  What was the question again?
17     Q.  How would Petro know specifically what you were
18  requesting?  Is this something that you can just change at
19  any time and say now I want this, now I want this?
20     A.  No.  The job data books are standard with any
21  kind of construction project.  You do this anywhere around
22  the world, and it's very common to have everything that I
23  just listed here to be in that job data book.
24     Q.  But I think you previously testified that you
25  can't remember doing another -- other than maybe the one

75

1  project, you can't remember ever doing a job -- requesting
2  a job data book; isn't that true?
3      A.  For Petro Industrial?
4      Q.  For the Virgin Islands propane terminals.
5      A.  It's a -- again, it's a standard industry
6  practice to provide a job data book for these types of
7  projects everywhere.
8      Q.  That's not my question.  My question is:  Did you
9  ever send an e-mail like this to Petro telling them what
10  materials you want on any other job except this one?
11     A.  Me specifically, I don't know.  I don't recall.
12     Q.  And then it says "After construction completion,
13  Weld maps, Welder certs, NDT certifications, NDT reports,
14  Hydrotest procedures and reports, Inspection reports, MTR's
15  and Bill of material."
16     Sir, did you get the weld maps?
17     A.  I -- again, I don't recall.
18     Q.  Did you get welder certificates?
19     A.  I don't recall.
20     Q.  But you saw some, didn't you, sir?
21     MR. KELSO:    Object to form.
22  BY MS. ROHN:
23     Q.  What did you understand NDT certificates to be?
24     A.  Those are x-ray tests to ensure that the welds
25  are done properly and are pure and no impurities.

76

1      Q.  What's an NDT report?
2      A.  It's a non-destruct test, I think, or
3  non-destructible test.
4      Q.  Do you know what exactly what it is?
5      A.  What the actual report is?
6      Q.  Uh-huh.
7      A.  It confirms that the weld was good.
8      Q.  Okay.  What's a hydrotest procedures and reports?
9      A.  It's a pressure test for the pipe.  You have
10  specific procedures you have to follow for them to be, you
11  know, done standardized, and the reports are all of the
12  pressure documentation that goes along with that to ensure
13  that it was done correctly to the proper standards and
14  procedures.
15     Q.  And inspection reports, what's -- what is -- what
16  is referred to as, quote, inspection reports?
17     A.  In some cases, projects have a -- an inspector,
18  so basically they -- they get a highlight of what was done
19  for that particular day and what was done and any kind of
20  findings and -- and things like that.
21     Q.  MTRs, what are those?
22     A.  They're documents, material -- I think it's
23  material traceability report.  It shows the origin of that
24  particular material, whether it's pipe or valves.  It
25  traces it back over the origin in case there is some kind

77

1  of a failure or anything then they can trace it back.
2      Q.   And bill of material, what is that?
3      A.   A list of all the material required for the
4  project.
5      Q.   And do you recall, sir, that there were MTR
6  documents for materials traceability.  And, in fact, as a
7  result of that, it was determined that some of the product
8  had come from China?
9      A.   I -- I vaguely remember that, yes.
10      Q.   So are you disputing that you were provided with
11  the MTR documents for material traceability?
12      A.   I'm denying that 'cause I -- I don't remember
13  specifically seeing the MTRs.  It was relayed to me that
14  some of the material was in fact of Chinese origin.
15      Q.   Well, they would know that from traceability
16  reporting, wouldn't they?
17      A.   Correct, but I did not see the MTRs.
18      Q.   Would you normally see the MTRs?
19      A.   No.
20      Q.   Did you ever follow up on this e-mail to
21  determine whether or not the documents had ever been
22  produced by Petro?
23      A.   The job data book information, all this?
24      Q.   Yes.
25      A.   Yes, I believe that I had followed up after WAPA

78

1  requested the documentation.
2      Q.   Well, there were certain documentation that were
3  supposed to be given prior to the commencement of work.
4  Would you agree with me that that documentation was given
5  because you couldn't have commenced the work?
6      A.   I suppose so.  That would have been approved by
7  IPOS to -- to give them the approval to start the work.
8      Q.   And are you aware of any particular document that
9  Petro had not given that WAPA was asking for?
10      A.   In the longevity of the entire project?
11      Q.   Yes.
12      A.   It's my understanding that there are still
13  outstanding documents that need to be provided for the job
14  data book for that project.
15      Q.   What are those documents?
16      A.   I don't know specifically.  I know that there
17  were a couple of the items that were still missing from the
18  job data book.
19      Q.   But you don't know what they are?
20      A.   I don't.
21      Q.   Where did you get that information?
22      A.   I received that from IPOS and -- and more than
23  likely Andrew as well.
24      Q.   Who at IPOS?
25      A.   It would have probably been Merlin.

79

1      Q.   And do you recall what Andrew Canning told you
2  about the supposed missing documentation?
3      A.   I don't recall, no.
4      Q.   Did you ever make any efforts to check what
5  Mr. Canning was telling you about Petro to see if it was
6  true or not?
7      A.   No.  He was our eyes and ears in the field; so
8  he's gonna have a better understanding than I would since
9  I'm not on the islands.
10          MS. ROHN:    All right, if you go to -- out of
11      Exhibit 81, Bates stamps 4861 to 4859.  And we'll
12      start at 4859.  No, I lie.  This one it goes the other
13      direction.
14  BY MS. ROHN:
15      Q.   Okay.  So the top of this document, so 4861, is
16  your e-mail; correct?
17      A.   Correct.
18      Q.   Dated February 24, 2021, at 6:19.
19      A.   Yes.
20      Q.   And if you go to the next page, there's an e-mail
21  from Merlin to Charlotte.  "With collective support from
22  Andrew and Adrian we were able to complete the following:
23      "Design check on suitability of 304L Stainless pipe as
24  replacement.
25      "LOTO for GT16, 17 and 20.

80

1      "Demo and replacement shown on the respective P --
2  P&ID."
3      Why would Merlin be sending that to Charlotte?
4      A.   I don't know.
5      Q.   Okay.  And then there is an e-mail from Charlotte
6  at 7:33 p.m., to Merlin, yourself, and Adrian Melendez.
7      "Merlin, Sebastian is requiring the following before
8  starting work because we need to pass them to WAPA.  Can we
9  get them before Monday?
10      No. 1, "Support of pipe replacement which confirms
11  that it will meet or exceed the requirements for the
12  operation and the demolition of LO/TO, ID -- P&ID markups."
13      Do you know why that was sent to Adrian?
14      A.   It would have been -- I don't know.  It looks
15  like it was sent to Merlin actually.
16      Q.   It was c -- it was copied to Adrian.
17      A.   He was cc'd in there.
18      Q.   Okay.
19      A.   We would have needed the -- we would have needed
20  this documentation prior to starting the project due to
21  WAPA requirement.
22      Q.   So if you look back at 4861 or go forward to
23  48 --
24          MS. ROHN:    Yeah, up there to 4861.
25  BY MS. ROHN:

81

1   Q.   There were four requirements before work was to
2   begin.   You're only sending to Adrian the top two; correct?
3   A.   I don't understand the question.
4        MR. SIMPSON:   Objection.
5   BY MS. ROHN:
6   Q.   If you look at prior -- if you look at prior to
7   the commencement of the work, there are four bullet points.
8   The first one is "Support of the replacement which confirms
9   it will meet or exceed requirement for operation."
10       The second one is a demolition of LO/TO, the third is
11  permits, and the fourth is any additional information.
12       If you go to the e-mail where Adrian is copied on the
13  next page, there's only -- on the -- on the e-mail from
14  Charlotte, where Mr. Petro -- where Petro is copied.
15       MS. ROHN:   Please go down.   Right there.
16  BY MS. ROHN:
17  Q.   The only two that's being sent to Adrian are
18  those two bullet points; correct?
19       MR. KELSO:   Objection.   Misleading.   Misstates
20       the document.
21  BY MS. ROHN:
22  Q.   Do you see anything else -- do you see permits or
23  anything else WAPA might need?
24  A.   Not in her e-mail, no, but they may have provided
25  them already.

82

1   Q.   Go ahead.
2        Who provided them already?
3   A.   I would presume that Petro had -- had already
4   provided them.
5   Q.   Do you know that, sir?
6   A.   I don't, no.
7   Q.   Why would Petro get the permits?
8   A.   It's -- it's standard to have the contractor
9   ensure that they have all the proper permitting to do the
10  work.
11  Q.   Okay.   And then on February 24th at 4:45, I think
12  that's because of the time difference between Houston and
13  the Virgin Islands, there's an e-mail to you from Merlin,
14  "Tim, We will have the documents listed for your files and
15  for onward transfer to WAPA."
16       See that?
17  A.   Can you scroll back up?
18  Q.   Sure.
19  A.   There you -- right there.   That was it.
20       I see that e-mail, yes.
21  Q.   Then if you go to the next e-mail on
22  February 25th, at 11:51, there is an e-mail from Charlotte
23  to Merlin, which says "Will -- Will do.   Thanks for your
24  help.
25       "Also, please tell the lady who does the billing if

83

1   she sees invoices for this project not to pay them."
2        Do you know why that was?
3   A.   No.
4   Q.   Well, if you go to the bottom -- well, if we
5   scroll down, Merlin -- e-mail from Merlin to Charlotte.   It
6   says "Charlotte, I've checked with Adrian about the project
7   writeup and he tells me that he provided everything now to
8   Tim, and apparently he is good with it.   If that isn't the
9   case, let me know.   Merlin."
10       So, sir, didn't you get that documentation?
11  A.   Again, I don't recall.   I don't know.
12  Q.   Will you dispute Charlotte's representation that
13  you'd gotten the documentation?
14  A.   I -- again, I don't recall.   I need to see the
15  whole context of -- of what occurred.
16  Q.   And then there's an e-mail below that from
17  Charlotte to Merlin and Adrian.   Charlotte says, "Merlin -
18  thanks for this information."
19       And then "Adrian - please know this project will be
20  paid directly by Vitol Virgin Islands Corporation, not via
21  IPOS.   Tim will be sending a PO --" purchase order --
22  "number which should be on each of your invoices."
23       So, sir, isn't it correct, sir, that this project was
24  not an IPOS project; it was a Vitol project?
25  A.   It was an IPOS project, but Vitol was paying it

84

1   directly.
2   Q.   Why?
3   A.   I don't know.
4        And whenever she was saying that she was going to
5   withhold payment or asking to withhold payment until we get
6   everything, it may have been due to IPOS not paying for
7   this project and with the intent that Vitol was going to
8   pay for it as well, so essentially, having double dipped on
9   the invoicing.   That may have been what she was referring
10  to, but I don't know the full context.
11  Q.   Okay.   I have no clue.
12       Who was double dipping?
13  A.   I'm sorry?
14  Q.   Who may have double dipped?
15  A.   If -- if these bills are being sent out to IPOS,
16  typically they pay them directly.   In this case, we were
17  responsible -- were going to be responsible for paying for
18  the invoices; so they just want to make sure that IPOS
19  didn't pay for them and then passes that invoice as well
20  and we pay them.   So I think there may have been some
21  communication there to clear that up.   But, again, I'm not
22  sure exactly the full context of what she meant.
23       MS. ROHN:   Okay.   This is 4 -- the next
24       exhibit -- the next exhibit is out of Exhibit 81,
25       6739, 6738.

85

1      And if you go to -- oops. I skipped one, Karima,
2  so...
3      If you go to the second page of this document.
4  BY MS. ROHN:
5      Q.  This goes back --
6      MS. ROHN:    6738.
7      You're on the wrong document.  This document --
8  yeah, I see what you're doing.  I want to go to 6738.
9  There we go.
10      If you'll scroll down.
11  BY MS. ROHN:
12      Q.  There's -- there's Charlotte's --
13      MS. ROHN:    Hold on, right there.
14  BY MS. ROHN:
15      Q.  There's Charlotte's e-mail from
16  February 24, 2021, listing the two bullet points.  You see
17  that?
18      A.  Yes.
19      Q.  Okay.
20      MS. ROHN:    And if you scroll up, Karima.
21  BY MS. ROHN:
22      Q.  There's an e-mail --
23      MS. ROHN:    Scroll up, please.  There -- thank
24  you.  Just scroll down a little bit.
25  BY MS. ROHN:

86

1      Q.  There's an e-mail from Adrian Melendez to Merlin,
2  which says, "Merlin.  I can help out with the support for
3  the replacement of pipes including the inspection reports."
4      Do you dispute that in fact Adrian did go and get
5  those documents and give them to Merlin?
6      A.  I don't know if he ever did.
7      Q.  You don't know that he didn't either, do you,
8  sir?
9      A.  I don't.
10      MS. ROHN:    Next document is -- next document
11  is -- I've skipped some.  It starts out 038 -- 3842.
12  BY MS. ROHN:
13      Q.  And you see that on February 25, 2021, you said
14  -- you say, from Tim to Charlotte, Merlin, Adrian,
15  Andrew Canning, Sebastian Moretti, David Smith?
16      A.  I see that, yes.
17      Q.  "Attached is the purchase order along with the
18  quote documentation.
19      "Please ensure your invoices have both the PO number
20  and requisition number on them when sent to us."
21      So you were aware of the purchase order and sent that
22  to Adrian; correct?
23      A.  Yes.
24      MS. ROHN:    Next document is 4863 to 69.  If
25  you go to 4864.

87

1      (Off the record due to disconnection.)
2  BY MS. ROHN:
3      Q.  If you go to 4864, this is the e-mail we just
4  looked at, correct, from February 25th?
5      MS. ROHN:    Karima, go to 4864, please.
6  BY MS. ROHN:
7      Q.  Correct.  That's the e-mail, correct, that we
8  just discussed?
9      A.  Can you scroll down a little bit?
10      Q.  Sure.
11      A.  Thank you.
12      Yes.
13      Q.  If you go to page 4863, which is the next day,
14  February 26th, from Charlotte to Adrian, copy to -- copy to
15  you.
16      "Hi Adrian, I received your revised budget from Tim.
17  We will need an itemized breakdown of why the cost has
18  changed from" bah, bah, bah "for WAPA."
19      "I would like to see the below format for the original
20  quote (which I assume you have, as this is how you would
21  have created the original quote) so WAPA can see exactly
22  where the quote changed."
23      MS. ROHN:    And if you go to the next page.
24      MR. SIMPSON:    Objection.
25  BY MS. ROHN:

88

1      Q.  If you go to the next page.  If you go to 4864,
2  you see that there?  Is that the normal way for which you
3  expected quotes on this project?
4      A.  It's pretty blurry, but the quote wasn't very
5  detailed.
6      Q.  Well, it says "Breakdown of Labor," and it has
7  supervisors and different categories, Breakdown of
8  Equipment and Materials and Materials Costs."
9      See that?
10      A.  Vaguely.
11      Q.  Yeah, well, this is the copy I got.
12      A.  Okay.
13      Q.  So do you acknowledge that that was the original
14  budget that Charlotte is referencing?
15      A.  Again, I don't recall.  I don't know.  It might
16  have been.  But it looks familiar in terms of the format.
17      Q.  And Adrian replies on February 28th and copies
18  you, "The additional costs are related to the updated plan
19  to deconstruct GT No. 16 and add/extend to existing
20  supports to be able to construct the new --"
21      MS. ROHN:    Scroll up, please.  Go to page
22  4863, please.  And if you'll scroll to the top.  There
23  we go.
24  BY MS. ROHN:
25      Q.  "Existing supports to be able to construct the

TIM KOLOGINCZAK

89

1   new SS piping system parallel to the existing vent line to
2   GT 20 and GT 17.  We will complete the entire piping system
3   to each GT, including NDT and hydrotest, prior to
4   deconstructing the existing systems which again is a change
5   to the original planning."
6       Do you dispute that the -- that Petro actually did the
7   NDT and hydrotest as they're confirming in this e-mail that
8   they're going to do?
9       A.   I don't know if they did it or not.  I wasn't in
10  the field to verify.
11      Q.   And then it says "Please see the attached
12  breakdown of labor and equipment.  As you will see on the
13  attachment, changes in labor include additional time for
14  demoing and welding of supports; and additional time for
15  equipment."  And gives the number.
16      Do you recall receiving this e-mail?
17      A.   Vaguely, yes.
18      Q.   Do you recall disputing any of the increases of
19  costs?
20      A.   Uhm, again, I don't recall whether I did or not.
21      MR. KELSO:    Counsel, we've been going for
22  about an hour.  Whenever you're in a position to,
23  I think it would be nice to a short break.
24      MS. ROHN:    Okay.  I'm just going to do this
25  one because it's the same date, and then -- it's 12:30

90

1   here; so I would suggest we break for lunch after I do
2   this one.  Is that okay with you?
3       MR. KELSO:    Fine.  Yes.
4       MS. ROHN:    Okay.  So the next one starts 4842
5   to 4845.
6   BY MS. ROHN:
7       Q.   This is the -- there is a discussion about
8   restarting the vent line previously.  On March -- on the
9   front page here, there's a from Merlin Figueira to
10  Charlotte, copy to yourself and Andrew Canning, "Vent
11  Piping restart."
12      And it says "I believe at yesterday Ops Meeting I
13  spoke of the 3-inch Vent piping on Monday --"
14      MS. ROHN:    Come to the bottom, please.  Sorry.
15      Just that first page -- front page.  There we go.
16  BY MS. ROHN:
17      Q.   This is from Merlin.  "I believe at yesterday Ops
18  Meeting I spoke of the 3-inch Vent piping restarting on
19  Monday next week as new piping materials are already
20  onsite."
21      Who would attain -- who would attend these ops
22  meetings?
23      A.   Depends.  So they had a meeting with WAPA weekly,
24  and then they also had a meeting with Vitol or me and
25  Charlotte weekly.  So if this -- I don't know which ops

91

1   meeting he's referring to, but if it would have been the
2   Vitol ops meeting, it would have been me and Charlotte on
3   the call.
4       Q.   All right.  And then it says "On Tuesday this
5   week, I verbally informed Damien, Maintenance Supervisor
6   St. Croix, to expect the vent piping project to restart
7   next Monday."
8       If you scroll up, there's one from Charlotte that
9   says --
10      MS. ROHN:    Scroll up.  You're going down.
11      Up.
12  BY MS. ROHN:
13      Q.   Says "Ok, let me know when this is confirmed with
14  Petro."
15      And at the top it says from Merlin, "Already confirmed
16  with Petro.
17      "Also, even though Damien was aware, I am now going to
18  e-mail WAPA so there are no unnecessary delays on issuance
19  of Work Permits on their side."
20      Isn't it a fact that the permits had to come from
21  WAPA?
22      MR. KELSO:    Counsel, we can't see the
23  document.
24  BY MS. ROHN:
25      A.   Can you scroll up, please?

92

1       MS. ROHN:    Scroll up, please.  Up.  There you
2   go.
3   BY MS. ROHN:
4       A.   Just give me a second to read.
5       Q.   Sure.
6       So it was IPOS and WAPA that were in charge of the
7   permits, isn't that correct, sir?
8       MS. FRANCIS:    Objection.  Foundation.
9   BY MS. ROHN:
10      Q.   You may answer.
11      A.   There are different types of permits that are
12  acquired by certain individuals.  The terminal and WAPA
13  would issue work permits, so like hot work permits,
14  basically just giving the permit to do work within the
15  facility.  So I don't know what specific permits they were
16  referring to here.
17      MS. ROHN:    Okay.  Let's take a break.
18      45 minutes, that give everybody time?
19      MR. KELSO:    Yes.
20      MS. ROHN:    Okay.
21      (A luncheon recess was taken at 12:49 p.m.)
22      (The afternoon session resumed at 1:27 p.m.)
23      MS. ROHN:    Karima, I need the exhibit that
24  starts 6702 to 6708 out of 66.
25      MR. KELSO:    Sorry.  Are we back on the record?

93

1        MS. ROHN:    Yes, we are.
2      So this is 6702 to 6708, please.
3      We're not seeing it on the screen, Karima.
4        (Off the record.)
5   BY MS. ROHN:
6      Q.   If we can go to start of this e-mail, 6703, which
7   would be --
8      Okay.  This is an e-mail March 3, 2021, from Adrian to
9   the team, Merlin, Andrew Canning, Chad Persuad, Alex, and
10  David Smith.
11     And it says "Good afternoon Team, Setup welding tent
12  and cover it with plastic as wind breaker, barricade areas
13  to demo.  Demo 90 feet of pipe."
14     So goes on to list what was done.  Then it says, the
15  last sentence of -- of what was done.
16     To your knowledge, was it supposed to be daily
17  statements of work done as part of documentation of the
18  work done on the vent line?
19     A.   I don't recall specifically.  I know that we had
20  requested some weekly updates just so that we were in tune
21  with what was going on and, you know, we were in tune with,
22  you know, what WAPA was -- was also seeing done on the
23  property.
24     Q.   And then there's an e-mail on March 5th from
25  Adrian.

94

1        MS. ROHN:    If you go to the page before.  Go
2   up.  It's 6702.  At the bottom of 6702.
3   BY MS. ROHN:
4      Q.   There's a "Good morning," and then if you go to
5   the top of 6703, there's another listing of work to be done
6   and work that was done and what's going to be done.
7      Does that refresh your recollection at all about the
8   -- the requirements of -- of documenting this on a daily
9   rather than a weekly basis?
10     A.   No.
11     Q.   And then on 6702 there's an e-mail from
12  Andrew Canning, sent March 5th to Moretti, Horowitz, and
13  yourself, so you would have gotten this chain, and
14  David Smith, "Subject:  3/4/21 SS Line Progress."
15     Is that the same thing as -- as the 3-inch vent line?
16     A.   I believe it is.
17     Q.   And then it says "Situation update as of 09:00
18  Friday, 5th March," and then he gives an update.
19     And then David Smith sends an e-mail to Merlin, "Not
20  sure why Andrew sent this?"
21     And Merlin says, "Not sure why he did so other than
22  they asked this of him or he is just trying to justify his
23  work."
24        MS. ROHN:    Scroll up, please, Karima.  Up.
25  BY MS. ROHN:

95

1      Q.   See that?
2      A.   Yes.
3      Q.   Was there any requirement that Mr. Canning give a
4   weekly update?
5      A.   Not that I recall.
6      Q.   All right.
7      A.   It wouldn't be uncommon, though, 'cause we would
8   have weekly calls.  But I don't believe we ever had a
9   requirement, to my knowledge, for him to send anything.
10     Q.   Then there's an e-mail on 6706 from
11  March 24, 2022.
12        MS. ROHN:    And if you go to the bottom of
13  6706.  There we go.
14  BY MS. ROHN:
15     Q.   There's an e-mail from David Smith to
16  Merlin Figueroa -- Figueira.  "Good morning Merlin, Petro
17  was in Houston a few weeks back and asked to meet
18  Sebastian, Tim, and Charlotte.
19     "I guess they called them and said tomorrow so they
20  are going.  Chad called to tell me and ask me about
21  Sebastian.
22     "They say they really don't have reason, just thought
23  when they were there it would be nice.
24     "I told them be honest and direct and factual."
25     Do you recall having a meeting with Adrian and Chad?

96

1      A.   Yes, in our office, yes, in Houston.
2      Q.   And who do you recall being at that meeting?
3      A.   Myself, Sebastian, Charlotte, and then Chad and
4   Adrian were there.
5      Q.   And do you understand -- sorry.  Do you
6   understand why that meeting occurred?
7      A.   They were in Houston, I believe, just in town,
8   and just wanted to put a face with the name and just have
9   some face-to-face introductions.
10     Q.   And did you learn anything about their work or
11  anything that caused you any concern?
12     A.   No.  They -- the gist of the conversation was
13  just kind of high-level thoughts about, you know,
14  maintenance and things that were going on at the facility,
15  but no -- no other issues or concerns.
16     Q.   And then there's an e-mail from Merlin to
17  David Smith, March 24th.
18     "David, I suggested to Adrian several weeks ago to
19  meet the Vitol team after Sebastian made some comments
20  related to their capability.  In addition to help them with
21  possible negative comments (behind the scene) from Andrew."
22     Did you ever talk to Mr. Sebastian -- I mean,
23  Mr. Moretti about negative comments made by Andrew to him
24  about Petro?
25     A.   Not that I recall, no.

97

1    Q.   Did you ever hear Mr. Sebastian making any
2    comments about the capabilities of Petro in or around -- at
3    any time?
4    A.   No.
5    Q.   This goes on to say "So just last week Adrian
6    called to say they were meeting Vitol this week.  I am
7    sorry I should have passed that info by you.  He did ask
8    about Sebastian's background and I promised I would get
9    that from you, but forgot to do so."
10       And then it says "I think the Meeting will be a good
11   relationship building exercise, and as you right say --" I
12   think it's might say, "that they be honest, I told them the
13   same thing.  In addition I asked them to show that they are
14   a small company with low overhead so some things can move a
15   bit slow.
16       "I also think it will help with undercutting efforts
17   by Andrew."
18       See that, sir?
19   A.   Yes, ma'am.
20   Q.   I'm gonna ask you again, did Andrew ever say
21   anything not complimentary about Petro to you?
22       MR. KELSO:    Objection.  Asked and answered.
23   BY MS. ROHN:
24   Q.   You may answer.
25   A.   No, I don't recall him ever doing that.

98

1    Q.   And then if you go to 6707, there's an e-mail from
2    April 22, 2021, from Merlin to Andrew Canning and
3    David Smith.  "Subject:  SS 3-inch line."
4        That would be the same 3-inch vent line; correct?
5    A.   Correct.
6    Q.   It says "Company Confidential."
7        It says "Thanks for letting us know of your concerns
8    shown below.  Having read thru it and based on the
9    discussion we had yesterday I'm having difficulty in
10   responding to PIS on their estimated costs other than to
11   talk to them of their productivity.
12       "On a cost aspect, yourself, Vitol (Tim) and myself
13   accepted their written estimate and we issued a PO based on
14   that estimate."
15       Do you dispute that you participated in giving Petro a
16   purchase order on the No. 3-vent line?
17   A.   I don't recall, but it's likely.
18   Q.   Okay.  "We were collectively all copied on
19   e-mails related to the Vent Line Project and so it's my
20   opinion that there -- that what was submitted was approved
21   by Vitol."
22       You're saying this to Andrew.
23       "So if your precept -- perception is that they are
24   trying to make up the hours to match their estimate by
25   lazing on the job, that is one thing we may not able to

99

1    have much say.  It's a cost we have agreed to by issuing a
2    PO."
3        Did you ever hear allegations being made by Andrew
4    that the workers of Petro were lazing on the job and they
5    weren't really working?
6    A.   No.
7    Q.   It goes on to say "I believe that if yourself
8    and/or Vitol believe that PIS is generating money off IPOS
9    by stretching the job and making up the hours, then the
10   solution is to have all Vitol related work done on a Time
11   and Material basis where their time can be carefully
12   monitored.  That is a choice that you and/or Vitol need to
13   insist on going forward."
14       Did you have any conversation with Merlin about
15   changing it to time and materials?
16   A.   No.
17   Q.   And then it goes on at the end of that paragraph,
18   "So if Vitol believes there is a more cost effective way
19   for these types of Projects, then someone needs to solicit
20   estimates from other Contractors and do the comparison.  I
21   don't believe anyone on the IPOS side is opposed to do so,
22   but it's up to Vitol to assist us here."
23       Do you know why Mr. Figueira would be writing to
24   Andrew and telling Andrew what Vitol needs to do?
25   A.   No.

100

1    Q.   And who did David Smith work for at this time?
2    Didn't David Smith work for VTTI?
3    A.   I don't recall where he was at that point.  He
4    may have been the operations manager for their Seaport
5    facility at that time.  I believe that's the case, because
6    I believe Merlin was the operations manager for IPOS at
7    that point in time.
8    Q.   Merlin goes on to say "Frankly, Andrew, I'm not
9    sure of a way to solve your concerns.  I know you had
10   concerns of PIS productivity, proficiency and their ethics.
11   In my view we have 2 choices here; one is to have PIS on a
12   Time and Material Contract for all project work or you
13   solicit bids from another Contractor that you believe is
14   better suited.  I don't believe you will have any
15   opposition from David and I on either of these two
16   options."
17       Had you heard complaints of Andrew about the ethics of
18   PIS?
19   A.   No.
20   Q.   And then finally there's an e-mail from -- the
21   e-mail from Andrew Canning dated April 22, 2021, that this
22   -- we just read was a response to, to Merlin and
23   David Smith.
24       "Further to our discussion yesterday and my
25   speculation about extra, the extra team set on and 10 hour

101

1 days which I felt was being used to ensure the estimated
2 value of the estimate is collected in time sheet hours that
3 Vitol insist that I review. I walked the WAPA site today
4 (at around 08:00) and observed a 4/5 man tent -- sorry --
5 team either sitting outside the fabrication tent or leaning
6 on or against the pipework in the fabrication tent. Also
7 checked the actual fabrication welds on the pipe installed
8 in the rack to date (there is now two pipe runs in place on
9 the rack from the IPOS WAPA fence line running to the west
10 and east."
11      Do you know why Andrew would send this to Merlin and
12 David if this was actually a Vitol job?
13      A.  It's not really a Vitol job. It's -- they're the
14 contractors that are overseeing the work. So I don't know
15 why he would send -- I don't know what his context or
16 reason for sending it is, but it's not necessarily a Vitol
17 observed project.
18      Q.  Well, sir, it was a Vitol POS, was it not, sir?
19 Didn't we go over the e-mail where you said don't bill this
20 to IPOS, here is a PO from Vitol, use this PO?
21      MR. KELSO:    Objection. Misstates the
22 testimony.
23 BY MS. ROHN:
24      Q.  You may answer.
25      A.  Can you please repeat the question?

102

1      Q.  Isn't it a fact, sir -- do you remember the
2 e-mail we went through where you sent out and said don't
3 bill this job to IPOS, it's a Vitol job, use this Vitol
4 purchase order number?
5      A.  I never stated that in an e-mail. Somebody else
6 might have.
7      Q.  Was it a Vitol purchase order?
8      A.  We did provide a Vitol purchase order number,
9 yes, for the project.
10      MS. ROHN:    The next exhibit is 4878.
11 BY MS. ROHN:
12      Q.  This is -- looks like another progress report
13 dated March 31, 2021.
14      A.  What was the number again?
15      Q.  It's 4878.
16      MS. ROHN:    Do you have that, Karima?
17      There it is, right there on the screen.
18 BY MS. ROHN:
19      Q.  You see where it says "Had 19 root welds and sole
20 plates PT (NDT) by Versa, all passed inspection"?
21      A.  I see that in the e-mail, yes.
22      Q.  Did you ever ask to see the actual Versa
23 documents?
24      A.  No.
25      Q.  Why not?

103

1      A.  It's not my job to review those.
2      Q.  But you're on this e-mail; correct?
3      A.  I am on the e-mail, yes.
4      Q.  Well, you asked for other documentation from
5 Petro. Why wouldn't you ask for that documentation?
6      A.  Again, this deals mostly with the field
7 construction work that's being done. I'm not responsible
8 or supervising that. It is my job to provide what WAPA was
9 requesting in terms of the job data book information.
10      MS. ROHN:    The next one starts 4871 to 4877
11 out of Exhibit 81.
12      MR. KELSO:    Counsel, none of these documents
13 are in Exhibit 81, at least the version that we've
14 been provided.
15      MS. FRANCIS:    Can we have the Bates numbers
16 read into the record again, please?
17      MS. ROHN:    4871 through 4877.
18      MR. KELSO:    I'd ask that we be provided with a
19 copy of the actual exhibits that you're using with the
20 witness.
21      MS. ROHN:    I don't think that's unreasonable.
22 I'm assuming that this was in Exhibit 81, but it could
23 have been in Exhibit 66.
24      MR. KELSO:    Exhibit 81 is just the production
25 cover sheet that lists the Bates numbers. It doesn't

104

1      have the actual document.
2 BY MS. ROHN:
3      Q.  March 29, 2021, the front of this document,
4 states from Charlotte Horowitz to Merlin and Adrian, and a
5 bunch of people at WAPA, and Sebastian Moretti, and
6 Andrew Canning.
7      "Merlin/Adrian, I want to introduce you to
8 Matthias Clarke, he will be the WAPA representative
9 overseeing the vent line replacement project for WAPA."
10      Does that refresh your recollection as to who the guy
11 was from WAPA?
12      A.  They -- they have a slew of -- people, like a
13 big group that typically are on these calls and it varies;
14 so I don't really remember who specifically was on that
15 call.
16      Q.  Okay. And then it says "At the moment he would
17 like the manufacturer material data sheet for the
18 replacement piping procured for use."
19      And then if you go to 4872, do you see that on
20 March 29th --
21      MS. ROHN:    4872. 4872.
22      Pull up -- go down a little bit for the
23 Adrian Melendez, go down a little bit.
24 BY MS. ROHN:
25      Q.  And you see on the same day that that document

105

1  was asked for, it was asked for at 12:39, and at 1:24
2  Adrian Melendez sends a copy of the MTR as requested to
3  both Charlotte and Mr. Matthias Clarke?
4      A.   Can you please scroll down to see Charlotte's
5  e-mail? I'm sorry.
6      Q.   Sure.
7      A.   Just trying to get the chronological order
8  correct.
9      Okay, you can scroll up.
10      MS. ROHN:    Okay.
11 BY MS. ROHN:
12     A.   Got it, yes.
13     Q.   So do you dispute that Petro was prompt when
14 asked for documents?
15     A.   In this particular case, they were prompt.
16     Q.   Can you cite to me a case when they were not?
17     A.   Not specifically.  I know that we're still
18 waiting on materials for other projects that we've
19 requested.  It varies.
20     Q.   Really?  What materials are you waiting for?
21     A.   I'm sorry?
22     Q.   What materials are you waiting for?
23     A.   To my knowledge, we're still requiring job data
24 books to be provided for certain projects that we have not
25 received.

106

1      Q.   Well, sir, isn't it true that you were sent and
2  received and accessed a Dropbox with all those documents?
3      A.   There were some documents that were missing, and
4  in some cases there were disputes on the validity for
5  certain welding certs.
6      Q.   Well, those aren't documents that are the
7  missing; those are validity.  My question to you, sir, is
8  can you name a single document that is missing?
9      A.   I personally would not be able to label those,
10 but potentially Andrew could if he went through if there is
11 anything missing.
12     Q.   Did Andrew also get the Dropbox?
13     A.   I don't know.
14      MS. ROHN:    All right, document No. CANNING
15 14280.
16 BY MS. ROHN:
17     Q.   This is an e-mail, April 4, 2021, from Merlin to
18 David Smith and Andrew Canning, "Re:  Contractor conference
19 call Monday.
20     "Company Confidential."
21     It says, "Andrew, I am more than happy to talk to you
22 on a separate call.  However, the comment that I made to
23 you yesterday it was to reach out to me on issues of a
24 project that is under operations control.  What I don't
25 like to see is you asking questions and giving directions

107

1  to Contractors under our direct control."
2      Were you aware that there was a dispute between
3  Mr. Canning and IPOS about him going directly to
4  contractors?
5      MR. SIMPSON:    Objection.
6  BY MS. ROHN:
7      Q.   You may answer.
8      A.   No.
9      Q.   Goes on to say, "For example, you were asking the
10 Security Guard for the Gate Logs.  Both David and I have
11 spoken to you before of the sensitive of your review of
12 those logs.  In spite of discussing this with you, this
13 situation has reoccurred.  As we discussed before the need
14 for you to have the gate information is not a problem, but
15 your direct request is creating a problem for us as
16 previously discussed."
17     Were you aware that Mr. Canning was going directly to
18 the gate guards to get information?
19     A.   No.
20     Q.   Were you aware that Mr. Canning was attempting to
21 check Petro's time sheets by going to the guard gate logs?
22     A.   No.
23     Q.   You ever had any discussions with Mr. Canning
24 about that?
25     A.   No.

108

1      Q.   Goes on to say, "The issue yesterday was that I
2  was informed by PIS that you stopped the work.  I got this
3  from Petro and for that reason I called you.  My point to
4  you yesterday was to reach to me or Calvin first if you
5  have any questions or concerns and not engage the
6  Contractor who is working on an IPOS supervised project.  I
7  didn't say to you in any way to not interfere in our work
8  or words as such."
9      Do you -- were you aware that there was -- Petro --
10 excuse me, that IPOS was instructing Canning that this
11 3-inch vent line was a line that was being supervised by
12 IPOS?
13     A.   No, I wasn't aware.
14     Q.   Was that line being supervised by IPOS?
15     A.   Yes, it should have been.
16     Q.   Goes on to say "You also --" sorry.
17     "The reason I like you and Petro -- the reason I like
18 you and Petro on a call is last week you spoke to a Petro
19 employee who you believe may be living on an IPOS site."
20     Were you ever heard any complaints by anyone that
21 Petro had an employee living on IPOS site?
22     A.   No.
23     Q.   And it goes on to say "I like a more direct
24 communications between you, the Contractor, and/or myself
25 of these kinds of issues as soon as you note them."

109

1  Were you aware that there was a belief that
2  Mr. Canning wasn't giving IPOS information at the time he
3  received it?
4          MR. SIMPSON:    Objection.
5  BY MS. ROHN:
6      Q. You may answer.
7      A. Was there a question?
8      Q. I said were you aware that there were complaints
9  by IPOS that Canning was not giving them information at the
10  time that Canning received it?
11     A. No.
12         MR. SIMPSON:    Objection.
13  BY MS. ROHN:
14     Q. "You also said that you needed Gate logs to
15  verify where the 15 people signed in were working. Also,
16  you reported to me that one of the Welders banned from the
17  site was observed outside our Gate and you were concerned
18  if he was working on our site. Don't you think these
19  questions are better answered by direct engagement of Petro
20  or myself as soon as those are noted?"
21     Were you aware of the complaint of delay in bringing
22  matters to IPOS' attention?
23     A. No.
24     Q. Then it says "The above are some of the reasons
25  why I like to have a Meeting between Petro, you and

110

1  ourselves. I think, like you, we all want to see IPOS work
2  done correctly and safely. But, without direct engagement
3  of all parties, I am afraid we may not be as successful as
4  we would like.
5      "I look forward to your participation at the Meeting
6  tomorrow."
7      Were you aware that there was going to be a meeting
8  about the difficulties between Petro and Canning?
9      A. No.
10     Q. Then, Mr. Canning has an e-mail to Merlin and
11  Smith, "Contractor call Monday.
12     "Merlin, I do not think the intended purpose of the
13  telephone conference on Monday with Petro Industrial will
14  be met ('to reset our relationship as there have been a few
15  hiccups these last few weeks') unless I better understand
16  the comments you made in our brief telephone discussion on
17  Saturday where you talked about 'my continued interference
18  with the operation and operations led work.' I believe it
19  is worth discussing this and several other recent
20  comments."
21     Were you aware that Mr. Figueira, Merlin was also
22  complaining that Mr. Canning was not acting appropriately
23  with Petro?
24         MR. SIMPSON:    Objection.
25         MS. FRANCIS:    Objection. Foundation.

111

1  BY MS. ROHN:
2      Q. You may answer.
3      A. No.
4          MS. FRANCIS:    What is the Bates number of that
5      document, please?
6          MS. ROHN:    It's Canning 14280.
7          MS. FRANCIS:    Thank you.
8          MS. ROHN:    Next is IPOS 2020 to 23.
9  BY MS. ROHN:
10     Q. If you go to 2021 at the bottom, this is a
11  continuation of a March 31st e-mail.
12         MS. ROHN:    Go to 2021. Okay.
13  BY MS. ROHN:
14     Q. This is a continuation --
15         MS. ROHN:    If you go to the bottom -- if you
16     go to -- sorry. It's 2022. Go one -- go down one
17     more page. Okay.
18  BY MS. ROHN:
19     Q. So this was a comment -- this is a continuation
20  of the e-mail about giving -- getting the MTRs for WAPA --
21  for WAPA's to have, all right. And so you see that there
22  were -- there's the same comment about the MTR for your --
23  Adrian giving the requested MTR?
24     A. Yes.
25     Q. And so then it will start on page 2021, right

112

1  there at the bottom, March 31st, same March 31st, from
2  Andrew Canning to Adrian and Merlin and Charlotte, and
3  Sebastian, and David Smith.
4      It says, "Thank you for providing the complete MTR's
5  for the two material lot numbers, I checked samples of the
6  lots with bundle and heat numbers and all seemed to
7  correlate satisfactorily."
8      Was that one of Mr. Canning's job duties?
9      A. Yes.
10     Q. Okay. "Could you provide clarification on the
11  following:"
12     There's a bullet point. "Welding procedure, could
13  provide a copy of the welding procedure for 3E1 (I am
14  assuming this will be a VTTI procedure) as I am interested
15  in a few potential anomalies that I observed during a site
16  visit earlier today."
17     Do you know what the reference to 3E1 is?
18     A. No.
19     Q. The document that we saw earlier that was the
20  VTTI procedure, is that indeed the procedure that would
21  have been applicable for the 3 vent line?
22     A. I don't know. It might have been.
23     Q. Okay. So then it says --
24         MS. ROHN:    Can you scroll down, please?
25  BY MS. ROHN:

---

**113**

1    Q.   Next bullet point, "Use of purge gas.  I noticed
2  that the weld setup this afternoon was initially had the
3  weld ground made through a clamp attached to the pipe wall
4  at the open end.  After I inspected the setup, the team
5  removed the ground and installed a cap which was piped to a
6  gas cylinder, the ground was subsequently reattached by
7  wrapping the ground cable around the pipe with the clamp
8  set gripping the insulation of the cable which provided
9  limited contact and pressure to hold the clamp to the
10  material surface.  Would it be possible to provide a
11  suitable ground clamp that will grip the outside wall or
12  pipe?"
13    Was that one of Mr. Canning's job duties to talk about
14  how welders were welding?
15    A.   I don't know.  He could have made safety
16  recommendations.  It may have been a safety issue.  But I
17  -- I don't know if I would -- could give an answer whether
18  or not that's his job or not.
19    Q.   The second bullet point, "Root weld inspection.
20  How is the root weld being inspected, I could see no
21  evidence of NDT?"
22    Is Mr. Canning supposed to be asking how root welds
23  were inspected?
24    A.   Sorry, I'm just reading this as we're going
25  through.  Just give me a second.

---

**114**

1    Can you please repeat the question?
2    Q.   Yeah.  Is it Mr. Canning supposed to be
3  determining how root welds are being inspected?
4    A.   I don't think it's uncommon for someone to ask.
5    Q.   "Final weld inspection.  How is this to be
6  undertaken (method and by whom) and what percentage of
7  welds will be inspected?"
8    Sir, isn't there a standard that says how many welds
9  will be inspected?
10    A.   There -- every contractor takes a different
11  approach.  Some require a certain percentage to be x-rayed
12  and tested.  Some cases they do all of them.  He --
13  everybody just does it differently.  So he probably was
14  just asking just to determine how many were going to be
15  done so he could figure out the percentage.
16    Q.   Well, but, sir, there was a VTTI procedure that
17  told you which ASME procedure to follow, isn't that
18  correct, sir?
19    A.   Correct.
20    Q.   And that ASME procedure will tell you how many
21  welds to inspect, would it not, sir?
22    A.   It would.  I believe the percentage is
23  10 percent.  But other contractors do different amounts.
24    Q.   Okay.  But in this job there was a particular --
25  a particular procedure that had been adopted; correct?

---

**115**

1    A.   Well, that procedure is used in all projects.
2  Again, contractors tend to go above and beyond the x-ray
3  percentage in some cases.
4    Q.   Is there a requirement anywhere in your VTTI that
5  you don't follow it, you do something different?
6    A.   Again, I wouldn't know.  I -- I don't -- I don't
7  go through the procedures or -- or enforcement.
8    Q.   Should Mr. Canning have known what the procedure
9  was and how many welds were supposed to be tested?
10    MR. SIMPSON:    Objection.
11  BY MS. ROHN:
12    Q.   You may answer.
13    A.   He would have a general idea, yes, but I don't
14  think it's an uncommon question to ask.
15    MS. ROHN:    If you go to 221.  Andrew Canning
16  -- if you go to 221, that's up.  And then go to the
17  middle.
18  BY MS. ROHN:
19    Q.   On March 31st he also asked with copy to
20  Ms. Horowitz, "Adrian one other question I have is on the
21  sole plates, are they being fabricated from the same batch
22  as the current material or earlier plates from the Chinese
23  material?"
24    Now, is Mr. Canning supposed to be going directly to
25  an IPOS contractor to ask them these questions?

---

**116**

1    A.   I don't know.
2    MR. SIMPSON:    Objection.
3  BY MS. ROHN:
4    Q.   You don't know?
5    A.   No.  I mean, he's overseeing the projects on a
6  project basis as one of their contractors' representatives,
7  so it's not uncommon to -- to do that.
8    Q.   Didn't we just read an e-mail from Mr. Merlin to
9  Canning saying stop going to our contractors?
10    A.   We did, yes.
11    Q.   And who -- and didn't you agree that it was IPOS
12  that was overseeing this job?
13    A.   They are one of the representatives overseeing
14  it.  Both Andrew and IPOS were overseeing the projects.
15    Q.   Well, who was -- who was Mr. Canning working for?
16    A.   OPTIS at this point.
17    Q.   And who was Mr. OPTIS working for?
18    A.   I'm sorry?  Can you restate that?
19    Q.   Who was OPTIS working for?
20    A.   OPTIS was working for Vitol at this time, I
21  believe, as a third-party contractor.
22    Q.   All right.  And then if you go up, there's an
23  e-mail -- if you go up to page 2020, there's an answer from
24  Adrian Melendez to Andrew, cc'ing Charlotte, Merlin,
25  Sebastian, David Smith.

---

TIM KOLOGINCZAK

---

**117**

1    "Please find the responds to your questions below in
2    red:
3        "Could you provide clarification on the following:"
4    And the first one is about the welding procedure.
5        And Mr. Melendez answers, "Attached are the WPS for
6    all types of welding for VTTI/IPOS which have been
7    previously provided?"
8        Do you recall also getting the WPSs for all types of
9    welding?
10   A.   Not that I recall.
11   Q.   Do you recall not getting it?
12   A.   Uh, I don't think I ever received them or saw
13   them.
14   Q.   In response to the clamp in the welding ground --
15       MS. ROHN:    Would you go to the next page,
16   Karima.
17   BY MS. ROHN:
18   Q.   The answer is, you see it in there, it says "The
19   cable wrapping around the pipe was mostly likely done in a
20   fitting and tacking phase of the weld and no purge is
21   needed.  Once the root is started, the line is purged and
22   the ground clap is attached directly to the pipe.  As far
23   as the burn marks, like would to review them with our site
24   supervisor tomorrow morning after a 1 inch vent line
25   walkdown if possible.  Javier Vazquez, site supervisor, is

---

**118**

1    on site every minute of the day would -- care of any --
2    take care of any questions or anomalies you may have
3    immediately."
4        Did you know Javier Vazquez?
5    A.   No.
6    Q.   And then as to the root weld inspection,
7    Mr. Adrian Melendez said, "At 2:00 pm this afternoon, the
8    PT technician for Versa Inspection performed the NDT
9    inspection on all the completed root welds (16) and marked
10   all the welds as PT okay with his initials.  An NDT report
11   will be provided once all the welds are -- on completed
12   IPOS/VTTI."
13       Did you get the Versa report as part of the documents
14   that Petro gave at the end of this job?
15   A.   I don't recall.
16   Q.   And then as the final weld inspection, question,
17   Versa Inspection will perform PAUT on 10% of all welds."
18       Isn't that what the norm is, sir?
19   A.   Again, I -- I have to look at the -- the
20   requirements.
21   Q.   And then if you go to the first page, there's an
22   e-mail from Andrew Canning to Merlin and David Smith.
23   April 13, 2021.
24       "Given the sensitivity on my direct communications
25   with Petro and recent communication requesting data from

---

**119**

1    WAPA and also to meet the project Piping Welding
2    Specifications, could you ask Adrian to provide the
3    following information please."
4        Then it has the qualification records of the welders,
5    and the material certification.
6        This is not copied to anyone at Vitol, is it?
7    A.   No.
8    Q.   So this isn't a request from Vitol, is it?
9    A.   No, this is not a request from Vitol.
10   Q.   This is a request for Mr. Canning; correct?
11   A.   A request from Andrew Canning, yes.
12   Q.   And then it says that the --
13       MS. ROHN:    Next to the last paragraph, you
14   scroll down a little.
15   BY MS. ROHN:
16   Q.   "I also do not have in my possession the project
17   welding specification chart for 304 stainless steel.  Could
18   you ask HITECO if they could send the welding specification
19   procedure for 304 stainless.  The reason I ask is a number
20   of the welds that have been made do appear to have a oxide
21   formation (coloration) in the heat affected zone either
22   side of the weld beads indicating localized overheating and
23   probable chromium depletion in that area (which will rust)
24   so I am interested in seeing if the HITECO / project
25   welding specifications chart requires increased welding

---

**120**

1    shield gas flow to cool the weld area."
2        Again, is Mr. Canning supposed to be telling people
3    how to do welding?
4    A.   It doesn't look like he's telling them how to do
5    the welding.  He's more so just asking for the
6    specifications on the welding.
7        MS. ROHN:    This is Exhibit -- this will be
8    Bates No. 4614 to 4626.
9    BY MS. ROHN:
10   Q.   And this starts on 4614 from Charlotte to Merlin,
11   copied to you, dated May 24, 2021, and it says, "Hi Merlin
12   - We have gone through the M&R budget and the quotes that
13   you sent over.  I believe we are missing 15 quotes.  Some
14   of the items will be deferred to next year as we do not
15   have the funds for this year because we are requesting so
16   many items at one time.
17       "Would you mind sending the quotes for the items in
18   yellow, understanding that Andrew is working on the mound
19   settling project quote."
20       Do you know what these quotes are about?
21   A.   I do not.
22       MS. ROHN:    So let me have you scroll --
23   Karima, can you scroll through these?
24       Stop right --
25   BY MS. ROHN:

---

TIM KOLOGINCZAK

121

1    Q.   You see this says "2021-2022 Maintenance and
2    Repair Budget"?
3    A.   Yes.
4    Q.   And that is a total of $260,000; correct?
5    A.   Correct.
6    Q.   And it says --
7         MS. ROHN:   Scroll down a little bit.
8    BY MS. ROHN:
9    Q.   It says "Attached Petro Quotations."
10        So all of that $260,000 work was anticipated to be
11   done by Petro; correct?
12   A.   No.
13        MR. KELSO:   Objection. Assumes facts.
14        And again, this is yet another document where the
15        witness nor counsel have been provided with a copy.
16        We would request it.
17        MS. ROHN:   Can you keep scrolling down?
18   BY MS. ROHN:
19   Q.   You see that's a quote from -- these are all
20   quotes from Petro.  You see that?
21        MS. ROHN:   Keep scrolling.
22   BY MS. ROHN:
23   Q.   And there's another one here for $132,000.
24        MS. ROHN:   Keep scrolling.
25   BY MS. ROHN:

122

1    Q.   Do you see --
2         MS. ROHN:   Keep scrolling, please.
3    BY MS. ROHN:
4    Q.   Do you see any quotes from anybody but Petro?
5    A.   Not currently, no.
6    Q.   And then if you go to the last page of that
7    document, 4262 -- 4626, then there's a project --
8         MS. ROHN:   You just went passed it.
9    BY MS. ROHN:
10   Q.   There's a project for a "Krohne Meter Factory
11   Calibration" and that says "Attached the Krohne quotation"?
12   A.   I see that, yes.
13   Q.   So, sir, what basis would you have that as to the
14   $260,000 that was not anticipated to be done by Petro?
15   A.   I'm sorry.  Can you rephrase the question?
16   Q.   What information do you have that as to the
17   $260,000 that was not contemplated to be done by Petro?
18   A.   These are all bids and estimates.  These aren't
19   contractually agreements that -- that they're going to do
20   the work.  On most of these are put together for budget
21   purposes as well; so we utilize these estimates as part of
22   the budget.  But they aren't guaranteed work to be done,
23   and there's no guarantee who we will select for those
24   particular projects.  It's a bid process in most of the
25   cases.

123

1         MS. ROHN:   Exhibit No. -- Bates No. 4881.
2         And if you'll scroll to the bottom.
3    BY MS. ROHN:
4    Q.   It's an e-mail from Matthias Clarke.  This is
5    dated June 17, 2021, from Matthias Clarke, Adrian Melendez,
6    yourself.  You see yourself on that?
7    A.   Yes.
8    Q.   "LPG Vent Line Replacement Outstanding.
9    "Good morning Charlotte/Adrian, The replacements of
10   the LPG vent lines have concluded successfully.  Please
11   provide a timeline for the outstanding items below:
12   "1.)  Indication Marking of pipes along the line
13   starting from flange visible from ground.
14   "2.)  Close-out Project Documentation.
15   "3.)  Removal of two sets of scaffolding around the
16   piping/rack."
17   You see that?
18   A.   Yes.
19   Q.   And if you scroll up --
20        MR. KELSO:   Counsel, can we please get a copy
21   of this document?
22        MS. ROHN:   It's IPOS 4881.
23        MR. KELSO:   We'll like a copy of the document
24   you're using with the witness.
25        MS. ROHN:   Thank you.

124

1    BY MS. ROHN:
2    Q.   You see this --
3         MS. ROHN:   I'll give you -- I'll arrange to
4    have a copy of all these documents sent to you.
5         MR. KELSO:   Okay.  When the witness is
6    answering questions about the document, we'd ask that
7    he have the actual document in front of him.  I think
8    that's a fair request.
9         MS. ROHN:   Sir, that would be impossible,
10   wouldn't it?  I'm not going to play these games.
11        MR. KELSO:   No, it wouldn't be impossible.
12   You sent copies of the exhibits over before the
13   deposition supposedly, which I understand was a prior
14   agreement between the parties, and yet the exhibits
15   you're using with the witness are different than the
16   copies that you provided to the witness.  That's
17   not --
18        MS. ROHN:   My understanding this is part of
19   Exhibit 81, which I gave you.  It is not my fault that
20   you guys put hundreds of pages in response to an
21   interrogatory.
22        MR. KELSO:   First of all, these aren't Vitol's
23   interrogatory responses.  Second --
24        MS. ROHN:   I'm not going to have an argument
25   with you, sir.

125

1    MR. KELSO:    All right.  Let's just be clear
2  for the record, counsel is refusing to provide the
3  witness and the witness' lawyer with a copy of the
4  documents she's asking about.
5    MR. SIMPSON:    And 81 provided by plaintiff's
6  counsel before the deposition consisted of two pages
7  total.
8  BY MS. ROHN:
9    Q.  "Good Morning Matthias, We'll install the
10  labeling of the two vent pipes and remove the two
11  scaffolding this week.  The project documentation will be
12  turned over midweek -- mid next week."
13    You were copied on this e-mail.
14    Do you dispute that in fact Petro replaced the pipe to
15  remove the scaffolding?
16    A.  I wasn't there to physically check to see.  I do
17  not know.
18    MS. ROHN:    The next one is IPOS 2986.  It
19  comes out of Exhibit 68.
20    I don't need that one.
21    Exhibit 541.
22    Actually, we just sent you exhibit -- during the
23  break Exhibit 251.  Let's go to 251.
24    252.  Sorry.
25    (E-mails were previously marked as Exhibit 252

126

1  for identification.)
2  BY MS. ROHN:
3    Q.  This is Exhibit 252 dated June 14, 2023, and --
4  sorry.  July 15, 2021, and this says from Tim to Merlin,
5  Charlotte, Adrian, David Smith, Terence Keogh,
6  Andrew Canning, Coury Hodge.
7    "Adrian, We're having issues gaining access to the
8  Dropbox.  Can you please invite myself and Andrew to the
9  files."
10    Do you understand that is the Dropbox where
11  Mr. Melendez sent the complete documentation for the job?
12    A.  I don't --
13    MR. KELSO:    Objection.  Form.
14  BY MS. ROHN:
15    Q.  You may answer.
16    A.  Can you please repeat?
17    Q.  Do you dispute that that's the Dropbox where
18  Petro sent the documentation for the job to be given to
19  WAPA?
20    A.  It might be.  I -- I'm not a hundred percent sure
21  unless I saw the link or where it was, but more than likely
22  that was the Dropbox link for the job data book that they
23  had put together.
24    Q.  And in fact, if you scroll up, he then says -- he
25  there says -- then says, "Done.  Thank you," where he sends

127

1  you the password to the Dropbox; correct?
2    A.  He says that he sent it, yes.
3    MS. ROHN:    And then 251.
4    I don't need that one.
5    Exhibit 62A.  It's PIS 76.
6    (E-mails Bates No. PIS 76 were previously marked
7    as Exhibit 62A for identification.)
8  BY MS. ROHN:
9    Q.  It's an e-mail dated August 24, 2021.  "Please
10  find attached Updated Account Received report which shows
11  $235,476.59 in past due invoices."
12    This is sent to you and Charlotte Pratt.
13    Do you recall receiving this?
14    A.  Vaguely.
15    Q.  Did you do anything to investigate why those
16  payments had not been made?
17    A.  Yes, I would of.
18    Q.  You didn't finish your answer.
19    A.  I said, yes, I would have.
20    Q.  Well, what would you have done?
21    A.  I would have looked to confirm that we had
22  received all the additional documentation required for the
23  project and/or time sheets and everything associated with
24  the project.  I don't know specifically what this invoice
25  amount is for, but that's what I would have done.

128

1    Q.  Well, let me show you Bates-stamped marked IPOS
2  543, which is 82.
3    There's the same e-mail, but then there is a e-mail --
4  do you see that?
5    A.  I don't see any -- anything else other than what
6  we just looked at.
7    Q.  Okay.  She hasn't gotten it up there yet.
8    A.  There we go.
9    Q.  Yeah, this is same.  This is 543, IPOS.
10    If you scroll down a little, you see this August 24th
11  e-mail saying "What's the status of these?"
12    And then if you'll scroll up, there's an e-mail from
13  David Smith to you and Charlotte Pratt, copy Moretti, where
14  it says "FY -- FYI, Sent to Petro today."
15    And then if you go to the next page, there's a listing
16  of the projects and some notes.  One of them says "Jetty
17  diesel line."  And it says "Danny Martinez welder
18  performance qualification."
19    Were these invoices being held up because of the
20  questions on the welding certifications?
21    A.  Which invoices were being held up?
22    Q.  Were any of these invoices being held up because
23  of the question on the certification of the welders?
24    A.  At this point it -- we wouldn't have held up any
25  kind of payment for other works being done probably at this

129

1   point.
2           MR. KELSO:    Counsel, we been going for about
3   another hour. I'd like to take a break whenever
4   you're at an appropriate stop.
5           MS. ROHN:    Okay. We can take a break.
6           (A recess was taken at this time.)
7           MS. ROHN:    This is Bates-stamped exhibit -- it
8   was in 66, it's Bates-stamped IPOS 6380 to 6385.
9   BY MS. ROHN:
10      Q.   And you will be happy to know this is my last
11  exhibit. You've been very patient.
12          MS. ROHN:    All right. If you will go to Bates
13  No. 6381. Oops, I'm so sorry. 6382.
14  BY MS. ROHN:
15      Q.   At the bottom of the page, there is an e-mail
16  from Matthias Clarke dated August 6, 2021, to
17  Adrian Melendez, Charlotte Pratt Horowitz, Merlin Figueira
18  and yourself. You see where you're cc, Tom -- Tim K.?
19      A.   Yes.
20      Q.   And it's the No. 3 vent line.
21          "Good morning, Adrian. What is the status of the pipe
22  labeling correction and project documents?
23          "When we spoke on the 20th, you indicated that there
24  was a Dropbox Link that was shared with Vitol to
25  access/download the project documents. Can you please

130

1   forward the link to me and a projected date for when the
2   labels will be corrected."
3           And we know that you got the Dropbox link on
4   July 15th, correct, from the documents we -- you looked at?
5           MR. KELSO:    Objection. Form.
6           MS. ROHN:    Noted.
7   BY MS. ROHN:
8       Q.   You can answer.
9       A.   This is the Dropbox link specifically for the
10  3-inch vent line, correct --
11      Q.   Yes.
12      A.   -- referring to?
13  Yes, we got the link.
14      Q.   So as of August 6th, WAPA still didn't have that
15  link. Can you explain why?
16      A.   All the information had not been either vetted or
17  -- or correct. I know there were some issues with welding
18  certs, and so we went through and were going to vet through
19  all the documentation before sending it to WAPA with
20  incorrect certs.
21      Q.   And what -- did you ever speak to
22  Guillermo Castro about the welding certs?
23      A.   No.
24      Q.   Did you see the letter from Guillermo Castro
25  where he offered to come and recertify the welding certs?

131

1       A.   I don't recall. We haven't seen it today.
2       Q.   So you gave WAPA no documents because you had a
3   question about the welding certs?
4       A.   Those documents are very critical for the
5   integrity of the facility. It's -- it's a hydrocarbon
6   facility, it's very dangerous, so ensuring that everything
7   was done correctly and everybody was certified per
8   requirement standards, we wanted to make sure that all the
9   documentation was accurate and valid before sending it over
10  to WAPA.
11          MS. ROHN:    And then if you go to 6381.
12  BY MS. ROHN:
13      Q.   In the middle of the page, there appears to be a
14  response to the question on the Dropbox, because it
15  indicates "We are working with vendor to supply all project
16  information as required, additionally at this time we have
17  a third party inspection being performed on the two 3-inch
18  vent lines which include a hundred percent x-ray of all
19  welds in the two 3-inch stainless steel lines, weather
20  permitting we hope to have these inspections physically
21  completed in field by Monday, August 16th."
22          Do you see that?
23      A.   Yes. Can you scroll up so I can see who's
24  sending what?
25      Q.   Well, the -- I don't actually have that. I just

132

1   have that Matthias Clarke sent an e-mail, and this is
2   added. And I'm assuming you guys added it.
3       A.   Can you scroll up a little bit?
4       Q.   Sure.
5       A.   There we go.
6       Q.   You know what, Terry sent it. "Please see
7   responses below regarding outstanding."
8           Do you see that?
9           MS. ROHN:    Scroll up, please.
10  6381, please go to the top of the page.
11  BY MS. ROHN:
12      A.   Can we keep going up a little bit? Oh, okay. So
13  here we go. "Responses below." Okay.
14      Q.   And the response is highlighted, the response "We
15  are working with the third party vendor."
16      A.   Can you scroll up a little bit more? Sorry. I'm
17  just trying to get the --
18      Q.   At the top of the page there.
19      A.   There you go. Okay.
20  I'm just trying to understand what he's responding to.
21  Can you keep scrolling up?
22          MS. ROHN:    Go to the top of the next page, of
23  638 -- 6380.
24  BY MS. ROHN:
25      Q.   That's the -- that's his e-mail and the listing

133

1 of who he's sending it to, to Matthias Clarke.

2       A.   Right.  So he just says "give me a call."  Okay.

3 Can you scroll --

4       Q.   No, he says "Good day to all, Please see

5 response."

6       And then the response is he highlighted the question

7 from Matthias.

8       A.   But that's not what I'm -- that's not what I'm

9 seeing on my screen.  I'm sorry.  I --

10      MR. SIMPSON:   Objection.

11      MS. ROHN:   If you scroll to the middle of

12 6381.  63 -- yeah.

13 BY MS. ROHN:

14      Q.   The e-mail says -- before says, "Good day all,

15 Please see responses."

16      And then what he did was he took the e-mail from

17 Mr. Clarke and highlighted it and added to it --

18      MS. ROHN:   If you'll scroll down a little bit.

19 BY MS. ROHN:

20      Q.   Highlighted, "We are working with vendor to

21 supply all project information as required, additionally at

22 this time we have a third party inspection being performed

23 on the two 3-inch vent lines which includes 100% x-ray of

24 all welds in the two 3-inch stainless steel lines, weather

25 permitting we hope to have these inspections physically

134

1 completed in field by Monday August 16th."

2       That's been added; correct?

3       MR. SIMPSON:   Objection.

4 BY MS. ROHN:

5       A.   It's not clear what's been added or what hasn't

6 been added.  I'm just a little confused on the formatting.

7       Q.   So did you ever turn the Versa inspection over to

8 WAPA?

9       A.   I never looked at the Versa inspection.

10      Q.   Have you ever seen any e-mails turning the Versa

11 inspection over to WAPA?

12      A.   Not that I recall.

13      Q.   And do you dispute that when Mr. Clarke asked

14 Adrian to turn over the Dropbox, that you told him you

15 were the customer, and the customer would turn over the

16 Dropbox?

17      A.   I -- those words were never stated.

18      Q.   Do you recall having a conversation with

19 Mr. Melendez about forwarding the Dropbox password to

20 WAPA?

21      A.   Not to my knowledge, I don't recall.

22      Q.   And then if you look on page 6380, on

23 September 13th --

24      MS. ROHN:   6380.

25 BY MS. ROHN:

135

1       Q.   On September 13th, Matthias Clarke sends to

2 Terence Keogh, "Good morning Mr. Keogh, Can you please give

3 me a call sometime today."

4       And then Mr. Keogh, if you scroll up, sends an e-mail

5 to David Smith, "Just received this, would like to discuss

6 before calling him as it is regarding documentation for the

7 vent line installation."

8       So by September 13, 2021, this documentation had still

9 not been produced to WAPA; isn't that correct?

10      A.   It had not been -- more than likely it had not

11 been forwarded to them because we still were waiting on

12 complete job data books.

13      MS. ROHN:   I have no further questions at this

14 time.

15      MR. KELSO:   Okay, thanks.  We'd like to take a

16 short break.

17      MS. ROHN:   We just took one.

18      MR. KELSO:   Yes.  And we would like to confer

19 now that your examination is over amongst counsel to

20 see if we have any questions.

21      MS. ROHN:   Okay.  But please don't talk to the

22 deponent.

23      MR. KELSO:   Yes, of course.

24      MS. ROHN:   Thank you.

25      (A recess was taken at this time.)

136

1             CROSS-EXAMINATION

2 BY MR. KELSO:

3       Q.   Mr. Kologinczak, do you recall questions from

4 Petro's lawyer earlier about job data books?

5       A.   Yes.

6       Q.   What is a job data book?

7       MS. ROHN:   Objection.  Asked and answered.

8 BY MR. KELSO:

9       Q.   You can answer the question.

10      A.   A job data book is a compilation of all the

11 documentation for the construction, welding certifications,

12 hydro tests, x-rays, and assortment of other documentation

13 that's compiled for a project, and it is provided at the

14 end of the construction period and stored and saved for any

15 kind of use that you may need if there is an issue with any

16 of the asset.

17      Q.   There are two projects with outstanding invoices

18 in dispute in this case, the 3-inch vent line project and

19 then the truck rack and reverse flow projects.  I'd like to

20 ask first about the job data book on the 3-inch vent line

21 project.  Okay?

22      A.   Okay.

23      MS. ROHN:   Objection to form.  Assumes facts

24 not in evidence.

25 BY MR. KELSO:

TIM KOLOGINCZAK

137

1    Q.   I show you Exhibit 252, which is a document
2  Petro's lawyer showed you earlier.
3    Do you recall questions about Exhibit 252?
4    A.   Yes.
5    Q.   All right.  What project was the job data book
6  that --
7    MS. FRANCIS:    Attorney Kelso, you're on mute.
8    MS. ROHN:    Yeah.
9    MR. KELSO:    Let me ask the question loudly.
10  I don't want to get feedback from two mikes live in
11  the same room.
12    Can you hear me now?
13    MS. FRANCIS:    I can hear you.  I lost
14  connectivity briefly, but I am back online.
15    MS. ROHN:    We lost -- I think he lost
16  connectivity, because he was gone for a moment and
17  then he came back on.
18    MS. FRANCIS:    Okay.  I thought it was on my
19  end.  Thank you.
20    MR. KELSO:    But everyone can hear me now;
21  right?
22    MR. SIMPSON:    Yes.
23    MR. KELSO:    Good.
24  BY MR. KELSO:
25    Q.   We are talking about Exhibit 252, which Petro's

138

1  lawyer showed you earlier.  What project did the job data
2  book that Petro sent in Exhibit 252 pertain to?
3    A.   The 3-inch vent line project.
4    Q.   What was the problem with the job data book Petro
5  sent for the 3-inch vent line project, to the best of your
6  knowledge?
7    A.   The welding certifications were -- were
8  inaccurate and had anomalies.
9    Q.   Okay.  Based on the fact that Petro sent a job
10  data book for the 3-inch vent line project, do you think
11  Petro knew what a job data book was?
12    A.   Yes.
13    MS. ROHN:    Object to the form of the question.
14  Calls for speculation.
15  BY MR. KELSO:
16    Q.   Let's talk about the invoices then for the truck
17  rack and reverse flow project.
18    I'm going to show you Defendant's Exhibit 1 for
19  today's deposition.
20    (E-mails Bates Nos. IPOS 684 to 688 were
21    previously marked as Defendant's Exhibit 1 for
22    identification.)
23  BY MR. KELSO:
24    Q.   Defendant's Exhibit 1 is an e-mail from Terry --
25  how do you pronounce Terry's last name there?

139

1    A.   I don't really know.  I -- Keogh.
2    Q.   All right.  From Terence Keogh to Mr. Moretti,
3  Mr. Canning, Mr. Smith copying you and Ms. Horowitz and
4  Mr. Figueira on August 13, 2021.
5    Do you see the e-mail?
6    A.   Yes.
7    Q.   Mr. Keogh wrote "The signage was ordered and I
8  have confirmed receipt, it should be installed by
9  September 15th.  As far as remaining documentation, we are
10  working to gather from PIS and it had the same issues as
11  experienced regarding documentation for the Truck Loading
12  and Reverse flow projects when it comes to documentation
13  from vendor.  In the meantime we have a third party
14  performing an independent inspection of the two 3-inch
15  stainless steel vent lines which includes 100% x-ray of all
16  welds, weather permitting we should be complete in the
17  field on Monday, August 16th."
18    Do you see that?
19    A.   Yes.
20    Q.   All right.  As of August 13, 2021, did you
21  understand that IPOS was communicating with Petro about
22  getting the required documents --
23    MS. ROHN:    I'm sorry.  You're breaking up.
24  BY MR. KELSO:
25    Q.   Based on this e-mail and other communications

140

1  with IPOS, did you understand as of August 13, 2021, that
2  IPOS was communicating with Petro about getting the
3  required documentation for the truck loading and reverse
4  load project?
5    A.   Yes.
6    MS. ROHN:    Objection.  Leading.
7  BY MR. KELSO:
8    Q.   As of August 13, 2021, had Vitol or IPOS, to your
9  knowledge, receive the job data books for the truck rack
10  and reverse flow project?
11    A.   No.
12    MR. KELSO:    And for all counsel's reference, I
13  just placed that document into the chat.  And I'm also
14  going to add to the chat function the next document
15  we'll be talking about, DX 2, Bates label
16  Vitol-014573.
17    (E-mails Bates Nos. VITOL-014573 to 014574 were
18    previously marked as Defendant's Exhibit 2 for
19    identification.)
20    MS. ROHN:    Were these sent to me prior to this
21  deposition?
22    MR. KELSO:    No, but they're responsive to your
23  questions.
24    MS. ROHN:    You know, you could just answer me.
25  But thank you.

TIM KOLOGINCZAK

141

BY MR. KELSO:

Q. Mr. Kologinczak, Defendant's Exhibit 2 is e-mail correspondence between you and Mr. Smith and Mr. Keogh and Mr. Canning on August 13, 2021, about invoices on the truck rack and reverse flow projects from Petro.

Do you see this correspondence?

A. Yes. Let me just read it for a second.

Q. Please take your time.

A. Okay.

Q. So on August 10, 2021, it looks like David Smith and IPOS e-mailed you copying Mr. Canning, Mr. Keogh, and said, "Petro has asked about late payments, and some are from Truck Rack and Reverse Flow. Andrew said that he suggested to Vitol about QA packages prior to payment.

"I'd like to respond back to them on whatever requirements are needed or decisions Vitol is taking related to those projects.

"You would like to organize a call to discuss outside of project/maintenance call with smaller group, it would probably be better."

Do you see that e-mail from Mr. Smith on August 10th?

A. Yes.

Q. All right. Do you see that you responded to Mr. Smith at IPOS on August 13, 2021, and asked "Are there specific invoices they're referring to. And yes I agree

142

with Andrew on the QA packages. I personally haven't received any data book documentation on any of the project, has anyone at IPOS received anything?"

Do you see that?

A. Yes.

Q. In that e-mail were you referring to job data books for the truck rack and reverse flow project?

MS. ROHN: Objection. Leading.

BY MR. KELSO:

Q. How did Mr. Smith respond to your e-mail on August 13th?

A. "As far as payments, they mean the truck rack payments and reverse flow."

MS. ROHN: I didn't understand that answer. Could you repeat it?

THE WITNESS: I'm just reading the e-mails as it says. "As far as payments, they mean the truck rack payments and reverse flow."

BY MR. KELSO:

Q. Do you see above that line Mr. Smith told you "Checking in documents now"?

A. Yes.

Q. Do you think he meant checking on documents now?

MS. ROHN: Objection to form.

BY MR. KELSO:

143

A. More than likely.

Q. Based on your correspondence with Mr. Smith on August 13, 2021, did you understand that IPOS would have been communicating with Petro about job book documentation for the truck rack and reverse flow --

MS. ROHN: I can't hear you.

THE WITNESS: There's a fire alarm going on.

MR. KELSO: I'm sorry you all, we need to go off the record. There's a fire alarm going off in the building.

MS. ROHN: Oh my goodness. Okay. Well, let us know when you come back.

(Off the record.)

BY MR. KELSO:

Q. I believe we were talking about DX 2 when we last left.

Mr. Kologinczak, do you see Defendant's Exhibit 2?

A. Yes.

Q. Based on Mr. Smith's e-mail to you on August 13, 2021, saying, "Checking on documents now," referring to the truck rack and reverse flow project, did you understand that IPOS would be taking any action with respect to Petro or making any communications with Petro?

A. They should have, yes.

MS. FRANCIS: Objection to form.

144

MS. ROHN: I didn't hear your answer.

THE WITNESS: I said they should have, yes.

MS. FRANCIS: Objection. Foundation.

BY MR. KELSO:

Q. And what action would that have been?

MS. ROHN: Objection. Calls for speculation. I can't hear you.

(Interruption by the court reporter.)

BY MR. KELSO:

Q. What action did you expect IPOS to take based on their August 13th e-mail --

MS. ROHN: Objection. Form.

BY MR. KELSO:

Q. -- "Checking on documents now"?

A. They would have been reaching out to Petro Industrial to try and get that information, that documentation to provide for us.

Q. Let's look at Exhibit 62, which Petro's lawyer showed you earlier today. Specifically, correspondence from Mr. Melendez to you and Ms. Horowitz on August 24, 2021.

Do you see Exhibit 62?

A. Yes.

Q. In Exhibit 62 Mr. Melendez says he -- says Petro has $235,476.59 in past due invoices as of today.

TIM KOLOGINCZAK

145

1    And if we scroll to the attachment, do you see that a
2  couple of those invoices or a few of those invoices relate
3  to the track rack and reverse flow project?
4    A.  Yes.
5    Q.  What is the date on this e-mail from Mr. Melendez
6  to you and Ms. Horowitz checking on the invoices for the
7  truck rack and reverse flow project?
8    A.  August 24, 2021.
9    Q.  I am now pasting two documents into the chat.
10    MS. ROHN:    I don't have a chat -- I don't
11  have a computer in front of me, so that does me no
12  good.
13    MR. KELSO:    Would you prefer I e-mail them to
14  you, Counsel?
15    MS. ROHN:    I don't have a computer in front of
16  me.  It does me no good.
17    MR. KELSO:    I'm happy to send the documents to
18  you, and we can take whatever time you need to print
19  them out.  I also plan to screen share.
20    MS. ROHN:    But if you would enlarge the screen
21  -- if you would scan in on the screen shot, I would be
22  able to read them.  It's too small to read on the
23  screen.
24    MR. KELSO:    Very well.  That's what I plan to
25  do next.

146

1  BY MR. KELSO:
2    Q.  So I shared two documents.  DX 3 will be IPOS
3  003865; DX 4 will be PIS000080.
4    (E-mails Bates No. IPOS 003865 were previously
5  marked as Defendant's Exhibit 3 for identification.)
6    (Letter dated August 27, 2021, and Documentation
7  Requirements Bates Nos. PIS 80 to 82 were previously
8  marked as Defendant's Exhibit 4 for identification.)
9  BY MR. KELSO:
10    Q.  Let's look at DX 3 first.  Do you see that on
11  August 27, 2021, Mr. Smith at IPOS reply to Mr. Melendez's
12  e-mail about past due invoices from August 24th.
13    MS. ROHN:    Can you please zoom in?  I can't
14  read it.
15  BY MR. KELSO:
16    Q.  And said, "FYI, Sent to Petro today."  And
17  attached a letter.
18    A.  Yes, I see it.  It says "FYI."  I don't know if
19  there's attachment to it or not.
20    Q.  Do you see the attachments line in the e-mail?
21    A.  Yes.
22    Q.  Do you see that there is a PDF attachment called
23  "Petro Industrial 8-27-21.pdf"?
24    A.  Yes.
25    Q.  "Enclosure to Letter to Petro Solutions.DOCX."

147

1    A.  Yes.
2    Q.  Let's look at DX 4.
3    MS. ROHN:    I cannot read any of these because
4  they're too small.  So if you can't blow them up,
5  you're gonna have to send them to me.
6    MR. KELSO:    I'm blowing them up as much as I
7  can.  I sent them to you by chat.  Would you like me
8  to also e-mail them to you?
9    MS. ROHN:    Yeah, if you can e-mail them to me,
10  I can take a break and print them from my e-mail.
11    MR. KELSO:    That's fine.
12    Is this large enough for you to read the
13  document.
14    MS. ROHN:    No.  Sorry.
15    MR. KELSO:    How about this?
16    MS. ROHN:    Yeah.  Yeah, I could read that.
17    MR. KELSO:    Great.
18  BY MR. KELSO:
19    Q.  DX 4, is a letter on August 27, 2021, from IPOS
20  to Petro with the Re line "Maintenance Contract dated
21  September 1, 2019."
22    Do you see that?
23    A.  Yes.
24    Q.  Do you understand DX 4 to be the attachment to
25  IPOS' August 27th e-mail?

148

1    A.  Yes.
2    MS. ROHN:    Objection.  Calls for speculation.
3  BY MR. KELSO:
4    Q.  IPOS wrote to Mr. Melendez on August 27, 2021,
5  "This will respond to your communication of August 9, 2021
6  requesting the status of outstanding invoices as well as
7  access to retrieve certain equipment, tools and supplies
8  from the St. Croix facility."
9    Do you see that?
10    A.  Yes.
11    Q.  Do you see the second paragraph that IPOS wrote
12  to Mr. Melendez on August 27, 2021, "However, before we can
13  process any additional invoices, it is essential that we
14  are able to verify that the work was in fact performed by
15  properly qualified individuals, who utilized reasonable
16  care in the performance of their duties, as required by the
17  terms of the Contract.  To that end, please promptly
18  produce validated copies of all the QA documentation
19  required by the project specifications (the project data
20  books) for all new fabrication works, repairs and apparent
21  like for like replacement work activities undertaken since
22  2017."
23    Do you see that?
24    A.  Yes.
25    Q.  Did you understand IPOS -- sorry.

149

1       At any point after IPOS sent this e-mail on
2   August 27, 2021, to Petro requesting project data books in
3   connection with outstanding invoices through to the
4   present, has Petro sent Vitol or IPOS, to your knowledge,
5   the project data books for the truck racks and reverse
6   loading projects?
7       A.   No.
8            MS. ROHN:    Objection to form.
9            MR. KELSO:    Thank you, Mr. Kologinczak.
10           Pass the witness.
11           MR. SIMPSON:    I have no questions.
12           MS. FRANCIS:    On behalf of IPOS, I do not have
13   any questions for this witness.
14           MS. ROHN:    I have a few follow-up.
15                REDIRECT EXAMINATION
16   BY MS. ROHN:
17       Q.   As to the anomalies that you mentioned in the
18   data book, what anomalies were those?
19       A.   The welding certifications.
20       Q.   And as to the documents missing for the truck
21   rack, what documents were missing?
22       A.   I don't think I ever saw any documentation for
23   the project, not that I recall.
24           MS. ROHN:    I have no further questions.
25           MR. KELSO:    Nothing further from us.

150

1            MR. SIMPSON:    Nothing for Mr. Canning.
2            MS. FRANCIS:    Nothing for IPOS.
3
4            (At 3:44 p.m., the deposition of this witness
5   was concluded.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

151

1            CERTIFICATE OF REPORTER
2
3            I, YVONNE SAMUEL-SETORIE, Registered
4   Professional Reporter, do hereby certify that the above and
5   named witness, TIM KOLOGINCZAK, after being duly sworn, was
6   examined and testified via Zoom video conference as is set
7   forth; and that the answers of said witness to the oral
8   interrogatories propounded by counsel were taken by me in
9   machine shorthand, and represents the official transcript
10   of said deposition; and that said deposition is true and
11   correct, to the best of my ability.
12
13            I FURTHER CERTIFY that I am not counsel,
14   attorney, or relative of either party, nor financially or
15   otherwise interested in the event of this lawsuit.
16
17            IN WITNESS WHEREOF, I have hereunto
18   subscribed my hand on this 11th day of July 2023.
19
20
21
_____
22            YVONNE SAMUEL-SETORIE, RPR

23
24
25