IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. CROIX

PETRO INDUSTRIAL SOLUTIONS, LLC,
Plaintiff,

vs.

ISLAND PROJECT AND OPERATING SERVICES, LLC; VITOL US HOLDING II CO.; VITOL VIRGIN ISLANDS CORP.; ANDREW CANNING; and OPTIS EUROPE, LTD.,
Defendants.

Case No. 1:21-CV-00312

THE VIDEOTAPED ORAL DEPOSITION OF JOHNAS PHILLIP SEMIEN was taken on the 28th day of July, 2023, via Zoom teleconference, between the hours of 2:39 p.m. and 4:24 p.m. AST, pursuant to Notice and Federal Rules of Civil Procedure.

Reported by:

Susan C. Nissman RPR-RMR
Registered Merit Reporter
Caribbean Scribes, Inc.
1244 Queen Cross Street, Suite 1A
Christiansted, St. Croix
U.S. Virgin Islands 00820
(340) 773-8161

A-P-P-E-A-R-A-N-C-E-S

**For the Plaintiff:**

Law Offices of Lee J. Rohn & Associates, LL
1108 King Street, Third Floor
Christiansted, St. Croix
U.S. Virgin Islands 00820

By: Lee J. Rohn

**For the Defendant Island Project and Operating Services, LLC:**

Law Offices of Ogletree, Deakins, Nash, Smoak & Stewart, LLC
The Tunick Building, Suite 201
1336 Beltjen Road
Charlotte Amalie, St. Thomas
U.S. Virgin Islands 00802

By: Simone R.D. Francis

**For the Defendant Vitol US Holding II Co. and Vitol Virgin Islands Corp.:**

Law Offices of Beckstedt & Kuczynski, LLP
2162 Church Street
Christiansted, St. Croix
U.S. Virgin Islands 00820

By: Carl A. Beckstedt, III

**For the Defendant Andrew Canning:**

Law Offices of Andrew C. Simpson
2191 Church Street, Suite 5
Christiansted, St. Croix
U.S. Virgin Islands 00820

By: Andrew C. Simpson

**Also Present:**

Adam Marinelli, Counsel for Acuren and Versa Integrity Group, Inc.

Fiona Sutherland, In-House Counsel for Acuren and Versa Integrity Group, Inc.

Adrian Melendez, Jr.

Andrew Canning

Max Stein, Videographer and Computer Technician

E-X-A-M-I-N-A-T-I-O-N

| Description | Counsel | Page |
|---|---|---|
| Direct | by Mr. Beckstedt | 6 |
| Cross | by Ms. Rohn | 43 |

E-X-H-I-B-I-T-S

| Exhibit | Description | Page |
|---|---|---|
| 1 - | Bates Stamp IPOS 6551-6562 | 17 |
| 2 - | Bates Stamp IPOS 6563-6576 | 37 |
| 3 - | Bates Stamp IPOS 6625-6638 | 39 |
| 4 - | Bates Stamp IPOS 6491-6509 | 39 |
| 5 - | Bates Stamp IPOS 6507-6527 | 39 |
| 6 - | Bates Stamp PIS 239-247 | 39 |
| 7 - | Bates Stamp PIS 288-295 | 41 |
| 8 - | Bates Stamp PIS 296-301 | 41 |
| 9 - | Bates Stamp PIS 361 | 41 |
| 10 - | Bates Stamp IPOS 207-216 | 55 |
| 11 - | Bates Stamp IPOS 18-29 | 57 |

EXHIBIT
23

THE VIDEOGRAPHER: We're now going on the video record at 2:39 p.m. on Friday, July 28, 2023.

This begins the remote videotaped deposition via Zoom videoconference of Johnas Semien, taken by the defendants in the matter of Petro Industrial Solutions, LLC versus Vitol, Inc., et al, filed in the District Court of the Virgin Islands, Division of St. Croix. Civil Number 1:21-CV-00312.

My name is Max Stein. I'm the videographer and computer technician employed by Precise, Inc. Our court reporter is Susan Nissman, representing Caribbean Scribes, Inc.

All counsel present will be noted on the stenographic record.

And the court reporter will now please swear in the witness.

MS. ROHN: Lee Rohn for -- good afternoon. Lee Rohn, for the plaintiff.

MR. BECKSTEDT: Good afternoon. Attorney Carl Beckstedt, on behalf of the Vitol defendants. We have Vitol U.S. Holding II Co., Vitol Virgin Islands Corp., and Vitol, Inc.

MS. FRANCIS: Good afternoon. Simone Francis, on behalf of Islands Project and Operating Services, LLC, also known as IPOS.

MR. SIMPSON: Good afternoon. Andrew Simpson, on behalf of Andrew Canning and Optis Europe.

MR. MARINELLI: Good afternoon. Adam Marinelli, on behalf of Versa Integrity Group, representing the deponent.

JOHNAS PHILLIP SEMIEN,

called as a witness, having been first duly sworn, testified on his oath as follows:

DIRECT EXAMINATION

BY MR. BECKSTEDT:

Q. Okay. Good afternoon, Mr. Semien. My name is Carl Beckstedt. I introduced myself a moment ago, representing the Vitol defendants, and I'm going to start the questioning today.

Could you please state your full name for the record?

A. Johnas Phillip Semien.

Q. And Mr. Semien, have you ever had a deposition taken before? What we're doing today, basically?

A. No.

Q. Okay. I'm sure your counsel has explained it to you, but I'm going to go over a few of the ground rules, just for the record, to make sure we're on the same page.

First of all, even though we're doing this proceeding remotely, via Zoom, and in an informal setting,

it is actually part of the proceedings in the U.S. District Court, District Court of the Virgin Islands, Division of St. Croix. And it's as if you were before the judge in the witness stand, sworn or affirmed to tell the truth, subject to the penalty of perjury.

You understand that?

A. I do.

Q. There's also a court reporter, who's taking down everything that we say, and it will be transcribed into a written form, which, actually, I'm sure your attorney will tell you, you have up to 30 days after receipt of it to review it and make any corrections.

But it's important for us, in order to help the court reporter to get an accurate record, that we follow a couple of basic rules. The biggest one is that we talk one at a time.

The second rule is that we use words when we answer the question. Even if they accompany a gesture or a shake or a nod, please also give a verbal response.

If you don't understand a question, let me know, and I'll rephrase it.

You might hear objections, from time to time, by the lawyers. Just let those play out, and then when they're done, you can answer the question, unless your lawyer tells you not to, but assume that you'll be answering

the question, notwithstanding the objection.

If you don't understand a question, ask me to clarify, if I didn't already tell you.

And then if you need a break for any reason, just let us know. We'll take a break. We only ask that if there's a question pending, you answer it before we take the break.

Do you understand those basic ground rules?

A. Yes, I do.

Q. Okay. Is there any reason today, due to either some stress or physical ailment, that you are unable to proceed?

A. No. I'm able to proceed at this time.

Q. Okay. So, Mr. Semien, can you just tell us, are you currently employed?

A. I am.

Q. And who do you work for?

A. Versa Legacy/Acuren Inspection.

Q. Okay. And how long have you been working for that company?

A. A little over five years.

Q. All right. And was there a name change recently?

A. No.

Q. Okay. Have you ever heard of a company called Versa Integrity Group?

9
JOHNAS PHILLIP SEMIEN -- DIRECT

A. Yes.
Q. And did you ever work for that company?
A. I -- I did.
Q. Okay. And when was that?
A. 2017 through current. Or 2022.
Q. Okay. So through 2022?
MS. ROHN: He said 2022.
Q. (Mr. Beckstedt) Yeah. Two thousand twenty -- oh.
A. Correct.
Q. The year 2022, right?
A. Yes. Correct.
Q. Okay. And -- and now, if I understand correctly, Versa and Acuren merged, so now you're still with the company, but it's under a different name?
A. Right. We're still ongoing that process, but that's correct.
Q. Okay. And what is your current job position?
A. Current job position is CR Level II scanner/field supervisor.
Q. And what does CR stand for?
A. Computer radiography.
Q. And how long have you held that position with the Versa company?
A. 2019.
Q. And before 2019, what position did you hold?

Susan C. Nissman, RPR-RMR
(340) 773-8161

10
JOHNAS PHILLIP SEMIEN -- DIRECT

A. Just a radiography assistant.
Q. And once you -- so what is -- is there different levels that you go through as a computed radiographer?
A. Yes.
Q. Can you just give us a brief overview of what those levels are?
A. Certainly.
You start out as a trainee. As you accumulate on-the-job training and classroom hours, you're able to move up to a Level I technician. And then as you accumulate more on-the-job training and classroom hours, you become a Level II. And you take tests for each level.
Q. Are there any other levels beyond Level II?
A. Yes. You can become a Level III, as well.
Q. All right. Is that the highest level, Level III?
A. To my knowledge.
Q. All right. Okay. And what is computed radiography?
A. Could you be a little more specific with your question?
Q. Okay. I have -- what about my question don't you understand?
A. Do you want a full science explanation, or are you just looking for, how do you perform computer radiography?
Q. All right. If you met somebody and they didn't

Susan C. Nissman, RPR-RMR
(340) 773-8161

11
JOHNAS PHILLIP SEMIEN -- DIRECT

know what you did, have any clue, how would you describe what you do? Let's start with that.
A. All right.
Q. Just, generally. You don't have to go too specific.
A. Okay. We have a radioactive source that we -- that we take on site, and we use it to perform x-rays, using digital plates and a scanner, which is connected to a computer. And after we perform the x-rays, we load these phosphorous image plates into the scanner, and scan them into the computer, which makes it computer radiography.
Q. Is all that work that you just described done actually in the field at the location where you're doing the imaging?
A. In -- in some instances, yes. There are mobile equipment, but there's also a more bulky office type setups, which is generally more what my company uses, is the office-type setup, not the mobile equipment.
Q. So in the -- in the process that you just described, which part of that would be done in the field, versus which part would be done in the office?
A. Where you perform the actual x-rays would be done in the field.
Q. Okay. And then taking the plates, and having them scanned is done at the office?

Susan C. Nissman, RPR-RMR
(340) 773-8161

12
JOHNAS PHILLIP SEMIEN -- DIRECT

A. Correct.
Q. Okay. Now, in this particular case, are you familiar with the island of St. Croix?
A. I am.
Q. Okay. And how are you familiar with that?
A. Only through work.
Q. Okay. And was that through the work with Versa as a computed radiographer?
A. Correct.
Q. And when did you first come to St. Croix?
A. January of 2019.
Q. And how long were you in St. Croix during that -- at that time?
A. I stayed until August of 2021.
Q. Okay. And have you ever been back to St. Croix after August of 2021?
A. I have, yes.
Q. For work?
A. Yes.
Q. And when was your next time in St. Croix?
A. November of 2021.
Q. And how long were you here that time?
A. A week.
Q. Okay. And have you been back since your week in November of 2021 to St. Croix?

Susan C. Nissman, RPR-RMR
(340) 773-8161

13
JOHNAS PHILLIP SEMIEN -- DIRECT

A. I have not, no.
Q. And both of those trips were through your work with Versa?
A. Yes. Yes, sir.
Q. And where are you currently located?
A. Right now, I'm in Sabine Pass, Texas.
Q. So with respect to your work in St. Croix, are you familiar with the -- the Virgin Islands Water and Power Authority plant on St. Croix?
A. I am.
Q. Okay. And are you familiar with the -- with the propane facility on St. Croix at the WAPA plant?
A. Yes, sir.
Q. Okay. And by the way, if I use the term "WAPA," do you understand that to be the acronym for the Virgin Islands Water and Power Authority?
A. Yes. Yes.
Q. Okay. Now, did you ever have an occasion to perform any work at the propane facility at the WAPA power plant in St. Croix?
A. Yes.
Q. Okay. Can you tell me what work you performed at that location?
A. Yes. We did call-out work performing radiography at the job site.

Susan C. Nissman, RPR-RMR
(340) 773-8161

14
JOHNAS PHILLIP SEMIEN -- DIRECT

Q. Okay. And do you know who the customer was for the work that you did at that facility?
A. Petro. Petro Industrial.
Q. Okay. Did you ever do any work at that facility for any other clients?
A. Yes.
Q. Who were the other clients that you did work for at that facility?
A. IPOS.
Q. Okay. Anyone else, or is that it?
A. That's all.
Q. Okay. Now, in preparing for your deposition today, did you review any documents to refresh your recollection about work you may have done at that -- the WAPA facility in St. Croix?
A. Yes.
Q. What documents did you review?
A. Just reports.
Q. And do you recall which reports you reviewed? Which dates?
A. No, I do not.
Q. Do you recall how many reports you reviewed?
A. Five.
Q. Do you know if those are all of the reports for the work that you would have done at the WAPA facility in

Susan C. Nissman, RPR-RMR
(340) 773-8161

15
JOHNAS PHILLIP SEMIEN -- DIRECT

St. Croix?
A. No, that's not all the reports.
Q. Okay. Did you review -- all right.
Now, the reports that you reviewed, were you basically doing the same type of procedure that you've already described for me each time?
**MS. ROHN:** Objection to form.
Q. **(Mr. Beckstedt)** Do you understand my question?
A. No. Can you be more specific in what you're saying?
Q. Okay. You've described, basically, what you do when you do your radiography for me, right?
A. Um-hum.
Q. You gave me a rundown.
Is that the type of work you were doing at the WAPA facility in St. Croix when you went out there to do work?
A. Can you loop that in with the question? I'm not -- I'm not understanding where you're going.
Q. All right. You've described for me the work that you've done -- you do as a technician, right, for Versa? You go out. You do x-rays. You take the plates. You go back to the office, scan them, right?
A. Um-hum. Yes, sir.
Q. Okay. Is that the type of -- when you were doing

Susan C. Nissman, RPR-RMR
(340) 773-8161

16
JOHNAS PHILLIP SEMIEN -- DIRECT

work, field work, at the WAPA facility, is that what type of work you were doing?
A. Correct.
Q. Okay.
**MR. MARINELLI:** Carl, I'm sorry to interrupt. Our 30(b)(6) witness has signed on.
Max, if you could move him into a breakout, that would be great.
**THE VIDEOGRAPHER:** Will do.
Q. **(Mr. Beckstedt)** So why don't we -- why don't we start by getting into the reports, and you can walk me through the document.
So, Max, if you could, why don't we call up the Versa exhibit that's the report dated August 2nd, 2021.
**MS. ROHN:** Did you give me these?
**MR. BECKSTEDT:** Yeah. I sent them around to everybody.
**MS. ROHN:** When did you give them to me?
**MR. BECKSTEDT:** When was that, about three days ago?
**MS. ROHN:** I see it. I see it. Sorry. Didn't go far enough.
Q. **(Mr. Beckstedt)** All right. Do you have that report in front of you?
A. I'm able to see it, yes.

Susan C. Nissman, RPR-RMR
(340) 773-8161

17
JOHNAS PHILLIP SEMIEN -- DIRECT

Q. I think it's a 12-page report, according to the bottom. We can scroll through the 12 pages, just so you can see the whole document before --

MS. ROHN: Can you give me the Bates number of what you're looking at?

MR. BECKSTEDT: Sure. I'm sorry, it's cut off on my printer.

MS. ROHN: Is it 6551? Thank you. All right. I got it.

MR. BECKSTEDT: Thank you, Max.

MS. FRANCIS: What is the exhibit designation?

MR. BECKSTEDT: Yeah, let's designate this Exhibit 1.

(Deposition Exhibit No. 1 was marked for identification.)

MS. ROHN: It's exhibit what number? I didn't hear.

MR. BECKSTEDT: I just numbered it 1 for this deposition.

MS. ROHN: Okay.

Q. (Mr. Beckstedt) All right. I think we went through the 12 pages.

Do you recognize this document?

A. I do.

Susan C. Nissman, RPR-RMR
(340) 773-8161

18
JOHNAS PHILLIP SEMIEN -- DIRECT

Q. And is this one of the documents that you reviewed, prior to your deposition?

A. Yes.

Q. Okay. And incidentally, have we ever talked before?

A. No, I don't know you.

Q. And did -- did I, or anyone other than your lawyer, send you any questions that were going to be asked of you today?

A. No.

Q. Okay. What is this document that we've marked as Exhibit 1?

A. This is a computed radiography report.

Q. Okay. And who prepared this document?

A. I did.

Q. All right. And is this a document that you would typically prepare as part of your work that you described earlier?

A. Yes. This is a standard report.

Q. Okay. Are there any other documents that you prepare as part of the work that you perform, besides this report?

A. Meaning, like other reports?

Q. No.

A. Other types of reports.

Susan C. Nissman, RPR-RMR
(340) 773-8161

19
JOHNAS PHILLIP SEMIEN -- DIRECT

Q. Like if you go do work, a particular work/job, and then you said you prepare this report, standard report.

I'm just wondering, are there other documents that you prepare in relationship to that same job that we don't have here that would be part of, say, the -- the company file?

A. No, I -- I don't prepare any other, other than a report.

Q. Okay. Now, this report, it says it was prepared for IPOS, right?

A. Yes.

Q. And it says an examination date of August 2nd, 20 -- 2021.

So it would be -- that would be the date that you were actually in the field doing the x-rays?

MS. ROHN: Objection to form.

Q. (Mr. Beckstedt) You can answer.

A. Yes.

Q. All right. And what -- and for this report, what equipment were you examining?

A. 3-inch -- a 3-inch line.

Q. Okay. I see on the report, it has Unit 17.

What does that signify?

A. I don't -- I don't know.

Q. Okay. Let's go to the second page.

Susan C. Nissman, RPR-RMR
(340) 773-8161

20
JOHNAS PHILLIP SEMIEN -- DIRECT

Can you tell us what we're looking at here on the second page?

A. Yes.

Q. Could you tell us? Could you explain this to us?

A. Yes. This is our technique sheet. Here it explains the technique that we used to inspect the equipment, which is a 3-inch pipe. Here it states the type of radioactive source we used. The procedure that we used to inspect it, and the guidelines or the code that it was inspected to. Everything within the test parameters is what's listed here.

Q. Okay. And where do you get the test parameters from? Like what determines what test parameters you're going to use?

A. Well, the client, that we're working for, gives us all the information base for the equipment that we're testing. They also give us the acceptance criteria, that it is -- they let us know what code it's going to be tested to. And then it's our job, at that point, to look within the code to see what the -- what the acceptance is for -- for the particular equipment that we're testing.

Q. And what do you mean, when you say, "the acceptance"? Can you explain that to me?

A. Yes. Within the code, there are parameters or -- what's the word I'm looking for? Sorry. I'm drawing a

Susan C. Nissman, RPR-RMR
(340) 773-8161

blank here. There is -- you have acceptance criteria where -- where, within the code --

Q. This isn't meant to be a test, so we're just trying to understand the situation. It seems like you're having trouble finding the words, right?

A. Correct.

Q. Okay. So why don't we break it down a little bit? Try to make it a little easier.

Can you show me, on this document, where it indicates the procedure that you would have been applying for -- for this test?

A. Yes. Where it says RT procedures, the procedure that -- that we used to perform the test. Where it says specification, is the code, or where you access the grading criteria.

Q. Okay. And -- and is it within the code -- where -- where would you find the acceptance criteria or parameters?

A. Yes, you would access the code called ASME 31.3, normal fluid service. And within that code, you -- you search -- you search within the code, and in the code tells you what the acceptance is. You have to read through the code.

Q. Okay. Now, can you explain to me what you do to determine -- after you take an image, right? You -- did

you, then, personally review it to see whether it falls within or without the acceptance criteria?

A. Yes.

Q. Is that something that you do with your eyes?

A. Yes.

Q. Okay. I note that your lights went out. Do you -- is there --

A. They did.

Q. Is that something you need to take care of? Let's take --

A. Sorry. They're motion sensitive.

Q. Got it. No problem. I thought we were just done with the depo, and time to go home. I guess not.

All right. So -- so do you do that -- you do that with your eyes by looking at the images, and then is that how you do it to determine? Make that determination?

A. Correct.

Q. Okay. All right. So at the bottom, do you know whose signature that is on the document?

A. I do.

Q. Whose is it?

A. It's mine's.

Q. All right. Let's go to the next page.

Can you give us an overview of what this page -- the significance of this page?

A. This is the page where we list out the different equipment that we inspected. In this case, being welds. And this is where you would list all known relevant and irrelevant indications that -- that you see within each piece of equipment that you inspected.

Q. Okay. So is this basically a summary of what's to follow?

**MS. ROHN:** Objection to the form.

Q. **(Mr. Beckstedt)** You can answer.

A. Can you repeat the question?

Q. So is this page kind of a summary of what you -- what you examined and what your findings were?

**MS. ROHN:** Objection to form.

A. Yes.

Q. **(Mr. Beckstedt)** Can you walk me through one of them? Let's just go through the first one, if you would.

A. Yes. So the very first weld, 62. 462. Excuse me.

Q. Okay.

A. Which the welder stencil was JR2.

Q. So what's a welder stencil signify?

A. Welders have a -- like a number that's associated to them, so they can identify which welder welded what. So it's like an identification number for the welder.

Q. Okay. Do you happen to know what the name of the

welder is that uses the stencil JR2?

A. No.

Q. Okay. And where -- where are you getting that stencil information from?

A. This information is provided by the client.

Q. Okay. Is there anything in the field to verify it?

A. Normally, it's written on the equipment.

Q. Okay. And what about the weld number, where do you get that information?

A. Two places: Normally it's written on the equipment, and we also use isometric drawings to verify.

Q. Okay. And at what point in the process that you described for me earlier do you do the verification of the -- of the weld that you're examining to the isometric drawing?

A. At the beginning of the job, normally.

Q. Okay. So before you go out and do the x-ray, you -- you do that verification?

A. Correct.

Q. Okay. And then let's just walk across to the next column, Weld Description (Size & Thickness). Seems somewhat self-explanatory, but where do you get that information?

A. This is also provided by the -- by the client with a -- with a request sheet and the drawing, so they put

25

JOHNAS PHILLIP SEMIEN -- DIRECT

everything in a request-type format, and they have a drawing to go along with it.

Q. Okay. And do you do anything in the field to verify that description?

A. We -- we walk the equipment. We visually look at it, and we -- we compare it with what's on the request, as well as the drawing.

Q. Okay. Now, with respect to -- well, what's a location marker?

A. Location markers are -- they could be anything. They don't necessarily have to be numbers, but when you're shooting radiography, you have to have a location marker, just in case you find an indication that is -- that is -- that is relevant. So they have to be able to locate what area between it's in, so they can go back and repair that area. So your location markers are just to know where you are on the -- on the weld or the piece of equipment that you're examining.

Q. Okay. So can you explain, then, how those come into existence in the field?

A. Yes. It's part of our job to make what we call a number belt. And this is something that, I guess, it's -- it's taught within -- within the -- within the practice. So we make number belts, based on different sizes of equipment that -- that we inspect. So based on the size and

Susan C. Nissman, RPR-RMR
(340) 773-8161

26

JOHNAS PHILLIP SEMIEN -- DIRECT

thickness, the numbers could go from 1 all the way to 25. Just depends on how big the equipment is.

Q. Okay. Can you describe a number belt for me, so I can visualize it?

A. A number belt, well, we take a piece of lead, and we basically use a roll of tape. And we -- we measure out -- there's a formula that you -- that you do, based on the size of the equipment that you're -- that you're inspecting, so that your belt size, your number belt size, goes the exact circumference of the -- of the piece of equipment that you're inspecting. And then based on that, we divide it by the -- by the number of views that we think it will take to go around the pipe.

Q. Okay. And will those location markers show up in your radiography imaging?

A. Yes, it does.

Q. And will there be something left on the equipment after you're done with your imaging, in case someone needs to go back to the field to do something at that location to find the marker?

A. Yes. We use what's called a paint marker or something to -- to mark the equipment in the field with these exact location markers that are on the report, 1, 2, and 3.

Q. Okay. All right. So would I be correct, then, in

Susan C. Nissman, RPR-RMR
(340) 773-8161

27

JOHNAS PHILLIP SEMIEN -- DIRECT

understanding your testimony, to suggest that on the weld number FW462, you took three images: One between Markers 1-2, one between Markers 2-3, and one between Markers 3-1?

A. Correct.

Q. Okay. And this, just to understand, because this is a pipe weld, we're talking about actually a kind of 360-degree imaging around the circumference of the -- of the pipe wall?

A. Yes, sir.

Q. Got it.

Okay. What's the next -- so with respect to the welder stencil, welder number, and welder description, is there anything that you would do on a report, if you were unable to, say, verify any of that information?

A. Yes. We would get in touch with the -- with the client at that point.

Q. Okay. So that would be before you even did the examination, right?

A. Correct. We would notice some sort of discrepancy, and we would have to sort that out.

Q. Got it.

So would it be fair to assume, then, that for all of these welds that we're going to see in any of your reports, if -- if they're reported here, that means they -- they passed the verification process?

Susan C. Nissman, RPR-RMR
(340) 773-8161

28

JOHNAS PHILLIP SEMIEN -- DIRECT

A. I'm sorry. Can you -- can you repeat that?

Q. Okay. Once we see that you've actually examined a weld, does -- is that an indication that the verification passed? Was successful?

**MS. ROHN:** Object to the form.

Q. **(Mr. Beckstedt)** Do you understand my question?

**MS. ROHN:** Leading.

Q. **(Mr. Beckstedt)** No? You don't understand my question, right?

A. No. Can you repeat that?

Q. Sure.

If I understand your testimony correctly, there's -- you have to verify the weld number, and the thickness, and the stencil before you actually do your examination, right?

A. No, that's -- that's incorrect.

Q. Okay. What's incorrect about my understanding?

A. You saying that we have to. It's -- it's within good practice. I just don't understand what -- what you're trying to ask me. Are you trying -- are you trying to state -- no, please, just re-ask the question, please.

Q. Sure.

If I understood you correctly, the customer gives you some information about the welds, the weld number, the description, the size, the thickness, and then you do --

Susan C. Nissman, RPR-RMR
(340) 773-8161

29
JOHNAS PHILLIP SEMIEN -- DIRECT

you have a process, before you take the examination, where you go out in the field and you verify. Okay. We found this weld number. This matches with the size and thickness. And that's what I understood your testimony to be; is that correct?

A. That's correct.

MS. ROHN: Object to form.

Q. (Mr. Beckstedt) So my -- and you told me that if it doesn't check out, if it doesn't verify, then you have to go back to the customer, right?

A. Correct.

Q. Okay. So what I'm asking is, when we see that you've actually gotten through that process and then you've done an examination and it's on your report, that's an indication that the verification was successful? You didn't have any problems? You got through that verification process; is that correct?

MS. ROHN: Objection to form.

A. I can't answer that question. There's all types of scenarios that happen, so I can't -- I can't say. I can't say that.

Q. (Mr. Beckstedt) All right. Well, do you know if, on this particular test -- well, if it doesn't verify, do you write -- do you make any notation on your report to indicate that, well, we had a problem with the verification?

Susan C. Nissman, RPR-RMR
(340) 773-8161

30
JOHNAS PHILLIP SEMIEN -- DIRECT

A. If there's a problem with -- with verifying anything, we contact the client, as well as if the client has an issue where they notice that something is an issue, then they notify us. They can make contact with us.

Q. Okay. So do you know whether or not the Weld Number FW462 passed the verification process?

A. Well, Number Field Weld 62 passed the weld process, if it's on the verification process. If it's on my report, sir.

Q. Okay. That's what I was getting at.

So that would be true, then, for all of the welds that you examined on all of your reports, correct?

A. Yes, sir.

Q. Okay. Great.

Next column, Plate per Cassette. Can you explain what that means?

A. Yes. That is the image plate that goes inside a cassette. A cassette is what holds the image plate. And the Number 1 signifies how many plates are in the cassette.

Q. Okay. And then there's a middle column, Accept/Reject.

Can you explain what that's signifying?

A. They accept and reject portions of the report. It's broken down by the number of views that we inspected on the equipment. Each view has a check next to it if it was

Susan C. Nissman, RPR-RMR
(340) 773-8161

31
JOHNAS PHILLIP SEMIEN -- DIRECT

separated, or an X next to it if it was rejected.

Q. Okay. So for Weld Number FW462, how many views did you do?

A. Three views.

Q. Okay. And so the first view that was between Marker Locations 1 and 2, that was rejected?

A. Can you repeat that? I'm sorry. There was a noise on my end.

Q. All right. So if I'm reading your report correctly, the first image that you took of Weld Number FW462 was between 1 and 2, right?

A. Correct.

Q. And that was rejected, correct?

A. Correct.

Q. Okay. So what are the columns to the right of the accept/reject portion of the report?

A. Listed to the right are known indications that you can find within a -- within a weld.

Q. Okay. And what are the various symbols that you can place in those boxes --

A. Only a check.

Q. -- and what is --

A. Only a check or an X.

Q. Okay. And what does a check signify?

A. The check signifies that the indication was within

Susan C. Nissman, RPR-RMR
(340) 773-8161

32
JOHNAS PHILLIP SEMIEN -- DIRECT

the parameters of codes allowable tolerance.

Q. And what does the X mean?

A. The X means that the indication was outside of the code's tolerance, which means it's not allowed in -- in the code.

Q. Okay. And what does a blank mean?

A. That there were no known indications in that particular view.

Q. Got it.

All right. So can you tell us what is a concave root?

MS. ROHN: Oh, Jesus.

A. A concave root is a type of indication that you may see in a radiograph.

Q. (Mr. Beckstedt) All right. What is a -- what is the window column?

A. The window column has to do with the settings on your CR software. Computer radiography software.

Q. Okay. And what about the level? Is that another setting?

A. Yes.

Q. Okay. And what is the significance of the filters/comments column?

A. This is where we list what is called a flash filter. We -- computer radiography, you have to use a flash

Susan C. Nissman, RPR-RMR
(340) 773-8161

33
JOHNAS PHILLIP SEMIEN -- DIRECT

filter to -- to view the image. And then behind that is the tolerance part of the code for each indication that's listed.

Q. Okay. And what -- what is the significance when you just put the word "flash" without any indication after it?

A. The word "flash" just indicates that the image or the view was flashed with the computer software.

Q. Okay. And what is a -- are you able to describe what it is that you see when you see a non-fusion?

A. Non-fusion indication would look like a void. Sharp void. Sharp line void of missing material.

Q. Got it.

And what would a lack of penetration be showing? Be showing you?

A. Lack of penetration means that the welder didn't break down enough of the pipe bevel wall when he was welding.

Q. All right. So let's turn to the third page of your report.

Can you just explain what we're looking at here?

A. Here we're looking at all three views that were -- that were shoot on this particular weld.

We have our location markers, which you see

Susan C. Nissman, RPR-RMR
(340) 773-8161

34
JOHNAS PHILLIP SEMIEN -- DIRECT

them. They're lead, because they stand out the most when you're shooting radiography on the -- on the equipment, as well as you see our -- our IQI, which is our sensitivity, and -- which shows how sensitive our radiographic image can be. And then you see the weld, as well as indications in the weld.

Q. Okay. So as I -- as you indicated in -- with respect to the earlier page, I take it we're looking at the first weld, FW462, right?

MS. ROHN: Object to the form.

A. Yes, it looks like that says FW462.

Q. (Mr. Beckstedt) All right. We just highlighted it.

Does that -- does that help you determine which weld this is?

A. Yes.

MS. ROHN: Objection. Asked and answered.

MR. BECKSTEDT: Well, you objected to my form. I'm rephrasing the question, so we don't have to like fight over these foundational questions.

Q. (Mr. Beckstedt) Which weld are we looking at on this page of the exhibit?

A. FW462.

Q. Okay. Now, are you able to point out and -- and just show for us what image was outside the tolerances, and

Susan C. Nissman, RPR-RMR
(340) 773-8161

35
JOHNAS PHILLIP SEMIEN -- DIRECT

did it pass the -- the test?

A. If you go to the last page of this report, we -- we snipped the image of the failed view, and we also have arrows pointing to the indication.

Q. Okay. Great. Let's go to it.

All right. Can you walk us through what we're seeing on the last page?

A. Yes. We're -- we're seeing a image -- the images of each view that failed in the group of welds that we inspected. I believe the first view is Field Weld 462.

Q. Okay.

A. And you will see it failed for non-fusion, and then there's an arrow pointed directly to where the non-fusion occurs.

Q. Okay. And what's the significance of the remark about -- above where you -- well, who -- who puts the words "non-fusion" with the arrow on this image?

A. Myself. The person that prepared the report.

Q. Okay. Did you add any other words -- well, above that, I see it says, "0.207 inches." Can you explain what that signifies?

A. Yes. That's the size of the indication measured.

Q. Okay. And what's the significance of the line with the two arrow heads immediately to the left of the size designation?

Susan C. Nissman, RPR-RMR
(340) 773-8161

36
JOHNAS PHILLIP SEMIEN -- DIRECT

A. That shows the actual measurement.

Q. Okay. So if you're a welder, and -- and you're given this report, and you have to go back out and redo the weld -- oh, strike that.

Okay. So would that be the same, then, for all of these welds that were outside of the acceptable tolerances that you indicate the area and the size of the failure?

A. Correct. Yes, sir. We --

Q. Do you -- um-hum.

A. We put in here in the report form. So the client reviews that, as well as we -- we go out to the field and we -- we mark the actual equipment up where we -- where we found the indication.

Q. All right. So this Exhibit Number 1 that we've looked at, is this a true and correct copy of the report that you completed on August 2nd, 2000 -- or regarding your examination date on August 2nd, 2021?

A. Yes. This -- this looks like my report, yes.

Q. Okay. And at the bottom of Page 3 of this exhibit, whose signature is that?

A. That's my signature.

Q. Okay. All right. Let's go to the next report, which is -- we'll mark that as Exhibit -- this is Exhibit 1, I believe. So this will be Exhibit 2. It's dated

Susan C. Nissman, RPR-RMR
(340) 773-8161

37
JOHNAS PHILLIP SEMIEN -- DIRECT

August 3rd, 2021.

(Deposition Exhibit No. 2 was marked for identification.)

Do you see that?

A. Yes. I'm able to see it.

Q. I just ask that we scroll through each page, so you can see each page.

MS. FRANCIS: Carl, is that IPOS 6563 to 6576?

MR. BECKSTEDT: Yes. Looks so.

I apologize, but whoever printed out my hard copies, it didn't print the -- the Bates numbers, but they're showing up on the exhibit on the screen.

MS. ROHN: Carl? Carl, I'm willing to stipulate that these are true and correct copies of all these depositions. I mean, all of these reports.

MR. BECKSTEDT: All right. That sounds good.

So why don't we put in, as Exhibit 3, the August 5th report; Exhibit 4, the August 13th report?

MS. ROHN: Two August 13th.

MR. BECKSTEDT: And Exhibit 5 is the second August 15th.

MS. ROHN: The one with 21 pages? The one with Pages 1 through 21?

MR. BECKSTEDT: Yes. Correct.

Susan C. Nissman, RPR-RMR
(340) 773-8161

38
JOHNAS PHILLIP SEMIEN -- DIRECT

So when you are -- I guess we have a stipulation on the record that all of these exhibits are authentic copies of the reports.

Lee, I have another Versa report that is PIS 239 through 247.

MS. ROHN: I don't have that one.

MR. BECKSTEDT: It was sent around with the exhibits. It's up on the screen right now.

MS. ROHN: What's it -- what's the Bates number?

MR. BECKSTEDT: PIS 239 through 247.

MS. ROHN: I don't have that one.

MR. BECKSTEDT: Well, I circulated it, and it is --

MS. ROHN: Circulated at the same time you circulated the other ones, or at a different time?

MR. BECKSTEDT: Same time. It was all in a Dropbox, and I -- and I sent it to everybody, so if the videographer has it, it must have been then.

MS. ROHN: Okay. No problem. Is it the same type of report?

MR. BECKSTEDT: Looks so to me.

MS. ROHN: I'll stipulate to it.

MR. BECKSTEDT: But it's not signed by Mr. Semien. Looks like a different technician.

Susan C. Nissman, RPR-RMR
(340) 773-8161

39
JOHNAS PHILLIP SEMIEN -- DIRECT

MS. ROHN: I don't care.

MR. BECKSTEDT: All right.

(Deposition Exhibit No. 3 was marked for identification.)

(Deposition Exhibit No. 4 was marked for identification.)

(Deposition Exhibit No. 5 was marked for identification.)

(Deposition Exhibit No. 6 was marked for identification.)

Q. (Mr. Beckstedt) Mr. Semien, are you familiar, in the industry, with respect to inspecting welds, whether or not there's like a pass or fail rate of how many welds can -- can be within or without acceptable tolerances?

A. No, I don't know.

Q. Okay. Are you aware, from any of the, I guess, the code provisions that you use when you're -- or apply when you're inspecting welds, whether or not any particular number of welds that are rejected act as a threshold that requires you to do further examination?

A. I'm not -- I'm not familiar with -- with that. We're asked to perform an inspection, and we provide the results.

Q. Got it.

So the client tells you, Hey, inspect these

Susan C. Nissman, RPR-RMR
(340) 773-8161

40
JOHNAS PHILLIP SEMIEN -- DIRECT

welds. Compare them to these code provisions, and tell us whether they pass or fail, and that's what you do?

MS. ROHN: Object to form.

A. Correct.

Q. (Mr. Beckstedt) Is that a fair summary or characterization, in that sense of what you're asked to do and do?

A. Correct. Yes.

Q. Okay. Give me one second.

Lee, can I just take a short break to check something?

MS. ROHN: Sure.

THE VIDEOGRAPHER: Going off the record. The time is 3:36.

(Short recess taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 3:54.

Q. (Mr. Beckstedt) All right. So when we were off the record, there were two additional reports that have been marked as Exhibit 7 and 8.

Exhibit 7 starts at Bates Number 288 and goes to Bates Number 295; and Exhibit 8 starts at Bates Number PIS 296 and goes to PIS 302. And these are both Versa Integrity Group computed radiology reports for the 3-inch vent line dated June 2nd, 2021, and June 3rd, 2021,

Susan C. Nissman, RPR-RMR
(340) 773-8161

respectively.

(Deposition Exhibit No. 7 was marked for identification.)

(Deposition Exhibit No. 8 was marked for identification.)

Mr. Semien, just a couple of brief questions.

What is a -- do you perform ultrasonic thickness reports?

A. I do not.

Q. Okay. Do you perform phased array imaging?

A. I do not.

Q. Okay. And then I'm going to show you a picture, which we're going to mark as Exhibit 9, and it's Bates Number PIS 361.

(Deposition Exhibit No. 9 was marked for identification.)

And I appreciate the fact that this is part of a phased array examination report, but I just want to -- you to look at the picture, and I have a couple of questions when that's up on the screen. Looks like it is.

A. I can see it.

Q. Okay. I see some -- there's writing on -- on the welding.

Is -- are you familiar with just that type of process of writing on a weld? Near welds?

A. Yes.

Q. Okay. Do you do that in your work at all?

A. Yes.

Q. Okay. And what are the -- what are the things that -- when you go out to do an exam, like you've explained to us in your reports earlier, what are the types of things that you would write on the piping, in this case, that you might be examining?

A. We write where our location markers were set up on the pipe, as well as, like I said, if there's a rejection, we go back and we mark up the rejection on the weld itself.

Q. Got it.

So in those images where you put the marks onto the imaging where you pointed to a rejection, like that you described earlier, you're also going to go and physically mark that area on the weld itself; is that what I'm hearing you say correctly?

A. Yes.

**MR. BECKSTEDT:** Okay. All right. I have no further questions. I pass the witness.

**MS. ROHN:** Anybody else have any questions?

**MR. SIMPSON:** Carl, did you attach Exhibit 7 and 8?

**MR. BECKSTEDT:** Attach?

**MR. SIMPSON:** Or make them a part of the

record. I didn't hear that on the record. Just want to make sure.

**MR. BECKSTEDT:** Yeah. I thought that when we first went on the record, I said Exhibit 7 is 288 and Exhibit 8 is --

**MS. ROHN:** Yeah, you did.

**MR. BECKSTEDT:** And we've stipulated to the -- to the authenticity, so, right, Lee?

**MS. ROHN:** Correct.

**MR. BECKSTEDT:** Okay.

**MR. SIMPSON:** I have no questions.

**MS. ROHN:** Simone, do you have any questions?

**MS. FRANCIS:** You can go ahead. I'm just trying to get my documents together, so to save time, you can go ahead.

**CROSS-EXAMINATION**

**BY MS. ROHN:**

Q. Good afternoon. I'm going to be as quick as I possibly can.

Do you -- do you do work for Petro?

A. Do I do work for Petro?

Q. For Petro, yes?

A. No.

Q. Okay. When was the last time you did work for Petro?

A. 2021.

Q. Okay. And were you paid to come to your deposition today?

A. Yes.

Q. Who paid you?

A. I don't know.

Q. How much did you get paid?

A. There was $40 with the subpoena.

Q. Did you get any other funds besides the $40?

A. No.

Q. You weren't paid $250 to come to the deposition today?

A. No. I don't know anything about that.

Q. So, generally speaking, when you're called out to a job to test welds, is there a particular percentage of welds that you test?

A. Can you repeat that question?

Q. Sure.

Generally, when you're called out to test welds, are there a normal percentage of welds that you test?

A. No. They -- we're provided with a request of welds. Pretty much a list of things to inspect. And we go out and inspect those things.

Q. So have you ever been requested to inspect 10 percent of the welds?

45

JOHNAS PHILLIP SEMIEN -- CROSS

A. No. I don't -- I don't know anything about that.

Q. Now, do you test a different number of welds, depending upon whether it's like a vent line that -- looks like you're frozen.

A. Sorry about that.

Q. No worries.

Is there a different number of welds that you test when it's like a vent line that goes to the atmosphere, as opposed to something like a propane line that carries fuel?

A. I don't know anything about that. We're provided with a request of things to inspect, and that's what we go and inspect.

Q. Okay. So are you the one who says whether or not the weld is acceptable or unacceptable?

A. Yes.

Q. Okay. So do you know a person by the name of Mark Scott?

A. Yes.

Q. And what position was he, compared to you, on the jobs you did on St. Croix?

A. Supervisor.

Q. Okay. So wasn't he the person who ultimately decided acceptable or unacceptable?

A. Meaning, did he give his approval on -- the

Susan C. Nissman, RPR-RMR
(340) 773-8161

46

JOHNAS PHILLIP SEMIEN -- CROSS

technician provides if the weld is acceptable or rejected.

Q. Okay. And is there a -- a standard for how you decide if a weld is acceptable or unacceptable?

A. Yes. It's called the code that we -- for the particular equipment that we're inspecting that determines if a weld is acceptable or rejectable.

Q. Is it true that -- that this isn't a black-and-white issue? Some welds, one person would find a radiograph to be acceptable, and another person on radiograph would not find them to be acceptable?

**MR. SIMPSON:** Objection.

Q. (Ms. Rohn) You may answer.

**MR. BECKSTEDT:** Same objection.

**MS. ROHN:** Don't have to object more than once.

A. I'm sorry. Can you say that again?

Q. (Ms. Rohn) Yeah. Is -- isn't it a fact that in your line of work, that there's a variation of what people find acceptable or unacceptable? One person could look at it and find it acceptable, and another technician could look at it, find it unacceptable?

A. Yes. It is called interpretation.

Q. Okay. Now, have you had any conversations with anyone besides your -- Versa's attorney about your testimony today?

Susan C. Nissman, RPR-RMR
(340) 773-8161

47

JOHNAS PHILLIP SEMIEN -- CROSS

A. No.

Q. When you went out there the first -- you said you went to St. Croix two times?

A. Um-hum.

Q. Once in January of 2019 through August of 2021.

Do I have those dates correctly?

A. Yes.

Q. And what did you do on those dates? What work were you doing?

A. I -- was performing work at the -- at the refinery in St. Croix, Limetree Bay.

Q. And did you do any work for Petro at the refinery?

A. No.

Q. Okay. Who were you working for when you were working at Limetree Bay Refinery?

A. I was working for Versa.

Q. Okay. Who was -- who hired Versa?

A. Limetree Bay.

Q. Okay. Not Petro?

A. No, not Petro.

Q. Okay. All right. And then any time during that period from January -- January 2019 to August 2021, did Versa do any work for Petro?

A. Yes.

Q. Okay. And at what period of time did Versa do

Susan C. Nissman, RPR-RMR
(340) 773-8161

48

JOHNAS PHILLIP SEMIEN -- CROSS

work for Petro?

A. In August of 2021, and I also believe April.

Q. Of 2021?

A. Yes.

Q. And what work did you do in April of 2021 for them?

Well, first of all, were you on those crews?

A. Yes.

Q. Okay. And did you do the same work you've been describing today on those crews?

A. Yes.

Q. Okay. So what -- so what types of work were you doing for Petro in April -- for Versa in April of 2021?

A. Just radiography inspection.

Q. And do you remember the percentage of welds you were asked to test?

A. I do not.

Q. Okay. And do you remember what type of a test -- what kind of a line or -- the welds were in?

A. I do not.

Q. Okay. And did -- in doing those testings, did you find that the work that was being done on the welds acceptable?

A. Without looking at the report, I -- I can't remember off the top of my head.

Susan C. Nissman, RPR-RMR
(340) 773-8161

49
JOHNAS PHILLIP SEMIEN -- CROSS

Q. Okay. Did you ever determine that in April of 2021, that the level of welding that you were looking at was unprofessional?
A. No.
MS. FRANCIS: Objection.
Q. (Ms. Rohn) Did you -- did you come to a conclusion as to generally the level of welding on the welds you were looking at?
A. I'm sorry. Can you repeat that?
Q. Did you come to a conclusion, generally, the quality of the welds that you were looking at overall?
MS. FRANCIS: Objection.
MR. MARINELLI: Objection. Lee, if you could be more specific in what, exactly, the reports you're talking about, or the inspections.
MS. ROHN: I am not -- please stop making a speaking objection.
Q. (Ms. Rohn) Generally, as the welds you looked at, did you form an opinion as to whether or not the welds -- how the welding was, generally, on that job?
MS. FRANCIS: Objection.
Q. (Ms. Rohn) You may answer.
A. Do I have to answer that?
Q. Yes.
A. No.

Susan C. Nissman, RPR-RMR
(340) 773-8161

50
JOHNAS PHILLIP SEMIEN -- CROSS

Q. Okay. And then you -- what is the second time -- then you said you came also in August of 2021 for Petro. You also did welding testing in August of 2021; is that correct?
A. Yes.
Q. And do you recall what kind of a line you were doing the weld testing -- weld -- the testing -- the testing of welds on?
A. No. I -- I don't particularly remember.
Q. Okay.
A. Any line. Type of lines.
Q. Do you recall on that particular time, the percentage of welds you were testing?
A. No, ma'am.
Q. And then you did work for IPOS; is that correct? Well, you did work for Versa that was at the IPOS propane terminal, correct?
A. Yes.
Q. And IPOS had hired Versa, correct?
A. This is correct, yes.
Q. Okay. And do you recall doing a hundred-percent test on every weld at that time?
A. Yes. We were -- we were called back to inspect a hundred percent of -- of lines.
Q. Of welds, you mean?

Susan C. Nissman, RPR-RMR
(340) 773-8161

51
JOHNAS PHILLIP SEMIEN -- CROSS

A. Um-hum.
Q. Had you ever done that before?
A. No.
Q. Did you know why they wanted you to test a hundred percent of the welds?
A. No.
Q. Nobody ever told you why?
A. No.
Q. Have you ever done that since?
A. No.
Q. If -- if you find a bad, what you called an unacceptable interpretation of a weld, do you recommend what to do to correct it?
A. We just reject the weld. I mean, we provide the results. At that point, it's up to the client to provide the recommendations on how they're going to fix whatever needs to be fixed.
Q. Have you ever known a client to cut out the entire weld and redo it?
A. Yes. That's a common practice.
Q. Do you know Guillermo Castro?
A. Not particularly.
Q. Didn't work with him out at Limetree?
A. I -- I don't know. I don't know who -- who that is.

Susan C. Nissman, RPR-RMR
(340) 773-8161

52
JOHNAS PHILLIP SEMIEN -- CROSS

Q. How -- how do you know which welds to test?
A. It's provided to us by the client in a request format.
Q. Do you ever do any WPQ testing?
A. I don't know what that is, WPQ.
Q. Yeah. Where you test welders?
A. Oh, we don't test welders.
Q. Do you, yourself, do welding?
A. I do not.
MS. ROHN: Hold on one second. I'm going to ask my boss if I have any other questions.
(Respite.)
Thank you, sir, for your time.
MS. FRANCIS: Okay. I do have some questions.

CROSS-EXAMINATION

BY MS. FRANCIS:
Q. Good afternoon, Mr. Semien. I have some follow-up questions.
Do you know Adrian Melendez?
A. Yes.
Q. And did you speak to Mr. McCullough, prior to your deposition today?
A. No.
Q. Have you -- do you know Chad Persaud?

Susan C. Nissman, RPR-RMR
(340) 773-8161

53
JOHNAS PHILLIP SEMIEN -- CROSS

A. No. I know Chad, only because for work when we worked for Petro. That's it.
Q. I'm sorry. Did you say you worked for Petro?
A. When we did our work for Petro.
Q. I see.
Okay. You know Mr. Persaud in that -- in that capacity as a --
A. Correct.
Q. -- employee of Petro? Okay.
And have you had any conversations with Mr. Persaud about the work that Petro did on the 3-inch vent line?
A. No, I have not.
Q. Have you spoken to Attorney Rohn, or anyone from her office, prior to your deposition today?
A. No.
Q. With respect to the testing that you did for Petro Industrial, I just want to make sure I understand.
Did they select which welds to test, and that was -- that was provided to you, and then you did the testing?
A. Correct.
Q. So the -- so the determination of which welds to test was not random or determined by you, it's determined by the client; is that correct?

Susan C. Nissman, RPR-RMR
(340) 773-8161

54
JOHNAS PHILLIP SEMIEN -- CROSS

A. It's not determined by us, no.
Q. And with respect to work you did for Petro, the percentage of welds that you were testing was determined or communicated to you by Petro as the client; is that correct?
A. Yes.
Q. The certification that you hold, can you just let me know how long you have held that particular certification? I think it says Level II on the reports that you provided.
A. Yes, ma'am.
Q. Okay. And how long have you held a Level II certification?
A. 2019, to the present.
Q. Okay. And is that subject to any sort of an annual or other periodic review process or testing process?
A. Yes, it is. We -- we retest every three years.
Q. So you've been retested or recertified on one occasion?
A. Yes.
Q. And prior to achieving a Level II certification, is there a Level I certification?
A. Not in CR. You have to become a -- a traditional radiography Level II before you can obtain a CR Level II.
Q. Okay. Just give me one minute to look at my notes.

Susan C. Nissman, RPR-RMR
(340) 773-8161

55
JOHNAS PHILLIP SEMIEN -- CROSS

(Respite.)
And is interpretation of images part of the testing that you do to become certified?
A. Yes.
Q. Or recertified?
A. Yes.
Q. Is Exhibit 10 the last one that was marked, or was it 9?
MS. ROHN: Nine.
THE VIDEOGRAPHER: Nine.
Q. (Ms. Francis) I'm going to show you a report that begins with the Bates Number IPOS 207, which has an examination date of August 6th, 2021, and direct your attention to IPOS 208.
(Deposition Exhibit No. 10 was marked for identification.)
Is that your signature, as the technician who performed that testing?
A. Yes, it is.
Q. And does your signature also appear on the page that's now on the screen, which is IPOS 209?
A. Yes.
Q. The Page IPOS 209 reflects different -- would I be correct in understanding this -- this reflects different portions of the 3-inch vent line in Unit 20 that you

Susan C. Nissman, RPR-RMR
(340) 773-8161

56
JOHNAS PHILLIP SEMIEN -- CROSS

inspected on -- on the date of this report?
A. Yes.
Q. Okay. And then in some cases, you accepted the work, and there's -- there's an X to show an area of the welding where you rejected; is that correct?
A. That's correct.
Q. And the pages that follow, 209, would these be photographs that you take at the time, or images that you capture at the time, you're doing the testing?
A. Yes, these are the -- the images from the test.
Q. The page designated as IPOS 216 has some markings.
Are these markings that you affixed to the image as part of the work that you did, sir?
A. Yes.
Q. And could you explain just briefly what these -- what the verbiage signifies?
A. Yes. In red, the .092 inches is the size of the indication. There's an arrow pointed to the indication, stating it's a tungsten inclusion. And the -- the yellow line is the length from the location marker to where you'll find the indication in this view.
Q. And is that marked -- is this area that you rejected, is that why you had words on this image and not the others?
A. Correct.

Susan C. Nissman, RPR-RMR
(340) 773-8161

57
JOHNAS PHILLIP SEMIEN -- CROSS

Q. I'm going to show you what we'll mark as Exhibit 11. That bears the Bates Numbers IPOS 16 to 29, and it's a report from August 2nd, 2021. Just give me a moment to display it.

(Deposition Exhibit No. 11 was marked for identification.)

Are you able to see that, Mr. Seaman?

A. Semien. Yes. Yes, I am able to see.

Q. I -- I apologize.

A. No problem.

Q. The page Bates Numbered IPOS 19, does that reflect your signature?

A. Yes.

Q. And this is a computed radio -- radiography report that you prepared, correct?

A. Yes.

Q. And does the Page IPOS 20 also bear your signature?

A. Yes.

Q. On the page designated IPOS 20, there are some entries for 3-inch vent line Unit 17; is that correct?

A. Yes.

Q. Okay. And this was part of the facility or area that you tested on behalf of IPOS, correct?

A. Correct.

Susan C. Nissman, RPR-RMR
(340) 773-8161

58
JOHNAS PHILLIP SEMIEN -- CROSS

Q. And do the Xs on this page also indicate areas in the welding that you rejected?

A. Yes.

Q. The page designated IPOS 29 that now appears on the screen, would the words that appear on this page, that appear to be superimposed on the image, is that information that you appended to the report as part of the work you were doing for IPOS?

A. Yes.

Q. And do these markings also indicate areas where the welding was rejected?

A. Yes, it does.

Q. Can you explain what non-fusion means?

A. Non-fusion is a lack of -- of fusion between the -- between the material that's welded to the -- to the pipe. The void in -- in material.

Q. And is that condition one of the conditions that would cause you to reject a report? A weld?

A. It is.

Q. Can you explain the significance of lack of penetration?

A. Yes. Lack of penetration would be a lack of the breakdown of the bevel wall during the welding process.

Q. And is that a condition that would cause you to reject a weld?

Susan C. Nissman, RPR-RMR
(340) 773-8161

59
JOHNAS PHILLIP SEMIEN -- CROSS

A. Yes.

Q. And as I understood your testimony, it is not part of your role, sir, is it, to determine whether a client -- to determine how many or the -- the amount of testing that a client should -- should request? That is something that the client determines, and you do what is instructed, correct?

A. Correct.

**MS. FRANCIS:** I have no further questions. Thank you.

**THE VIDEOGRAPHER:** Does anybody else have any questions?

**MR. BECKSTEDT:** No questions.

**THE VIDEOGRAPHER:** Okay. We're now going to go off the video record.

This concludes the videotaped deposition. The time is 4:24 p.m.

(Whereupon the deposition concluded at 4:24 p.m.)

Susan C. Nissman, RPR-RMR
(340) 773-8161

60

C-E-R-T-I-F-I-C-A-T-E

I, SUSAN C. NISSMAN, a Registered Merit Reporter and Notary Public for the U.S. Virgin Islands, Christiansted, St. Croix, do hereby certify that the above named witness, **JOHNAS PHILLIP SEMIEN**, was first duly sworn to testify the truth; that said witness did thereupon testify as is set forth; that the answers of said witness to the oral interrogatories propounded by counsel were taken by me in stenotype and thereafter reduced to typewriting under my personal direction and supervision.

I further certify that the facts stated in the caption hereto are true; and that all of the proceedings in the course of the hearing of said deposition are correctly and accurately set forth herein.

I further certify that I am not counsel, attorney or relative of either party, nor financially or otherwise interested in the event of this suit.

IN WITNESS WHEREOF, I have hereunto set my hand as such Registered Merit Reporter on this the 1st day of August, 2023, at Christiansted, St. Croix, United States Virgin Islands.

/s/ Susan C. Nissman

My Commission Expires: June 28, 2027

Susan C. Nissman, RPR-RMR
NP-644-23