IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

PETRO INDUSTRIAL SOLUTIONS, LLC    )
(PETRO)                            )
                                   )CASE NO. 1:21-CV-00312
                  Plaintiff,       )
                                   )
        vs.                        )
                                   )
ISLAND PROJECT AND OPERATING       )
SERVICES, LLC, VITOL US HOLDING II )
CO., VITOL VIRGIN ISLANDS CORP.,   )
ANDREW CANNING and OPTIS           )
EUROPE, LTD.,                      )
                                   )
                  Defendants.      )
_____)


        THE ORAL DEPOSITION OF **TERENCE KEOGH**, called for

examination by the Plaintiff in the above-entitled cause,

for purpose of discovery, for use in evidence and for such

other and further uses as are provided by the Federal Rules

of Civil Procedure, was taken before YVONNE SAMUEL-SETORIE,

Registered Professional Reporter, at the law offices of

Lee J. Rohn and Associates, 56 King Street, Christiansted,

Virgin Islands, on the 25th day of May 2023, commencing at

3:15 p.m., pursuant to Notice.



        ELITE REPORTING SERVICES, INC.
              P.O. Box 5619
          Christiansted, VI 00823
              (340) 718-1318
        elitereportingsvcs@gmail.com




EXHIBIT
24

2

1    A-P-P-E-A-R-A-N-C-E-S:

2    ON BEHALF OF THE PLAINTIFF:
     LEE J. ROHN AND ASSOCIATES, LLC
3    1108 King Street, Suite 3 (mailing)
     56 King Street, 3rd Floor (physical)
4    Christiansted, VI 00820

5    BY:  LEE J. ROHN, ESQ.

6
     ON BEHALF OF THE DEFENDANTS:
7    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
     Attorneys for Island Project and Operating Services, LLC
8    The Tunick Building, Suite 201
     1336 Beltjen Road
9    St. Thomas, VI 00802

10   BY:  SIMONE R. D. FRANCIS, ESQ. (Via Zoom)

11
     SUSMAN GODFREY L.L.P.
12   Attorneys for Vitol Defendants
     1000 Louisiana St., Suite 5100
13   Houston, TX 77002

14   BY:  SARAH HANNIGAN, ESQ. (Via Zoom)

15   BECKSTEDT & KUCZYNSKI LLP
     Attorneys for Vitol Defendants
16   2162 Church Street
     Christiansted, VI 00820
17
     BY:  CARL A. BECKSTEDT, III, ESQ.
18

19   ANDREW C. SIMPSON, P.C.
     Attorneys for Andrew Canning and OPTIS Europe, LTD.
20   2191 Church Street, Suite 5
     Christiansted, VI 00820
21
     BY:  ANDREW C. SIMPSON, ESQ. (Via Zoom)
22

23   Also Present:
     Adrian Melendez, Jr.
24

25

3

1                          I-N-D-E-X

2

3                                                    Page

4    Direct Examination by Ms. Rohn                    4

5    Cross-Examination by Mr. Beckstedt               71

6    Cross-Examination by Ms. Francis                 74

7    Redirect Examination by Ms. Rohn                 76

8

9

10

11

12                       E-X-H-I-B-I-T-S

13   No.                                             Page

14   53   IPOS' First Supplemental Response to Plaintiff's   58
          First Set of Interrogatories
15
     54   IPOS' First Supplemental Response to Plaintiff's   65
16        First Set of Interrogatories

17   81   IPOS' First Supplemental Response to Plaintiff's   70
          Request For Production of Documents
18

19

20

21

22

23

24

25

4

1          P-R-O-C-E-E-D-I-N-G-S

2

3          (TERRENCE KEOGH,

4    having been called as a witness, was duly sworn by the

5    Notary Public, was examined and testified as follows:)

6

7               DIRECT EXAMINATION

8    BY MS. ROHN:

9          Q.   Good afternoon, my name is Lee Rohn.  I represent

10   Petro in this matter.

11         Could you state your name for the record, please?

12         A.   It's Terence Keogh.

13         Q.   And, Mr. Keogh, have you ever had your deposition

14   taken before?

15         A.   No.

16         Q.   Okay.  So a deposition is just as if you're in

17   court.  You're sworn under oath.  It's just a more informal

18   setting.  Same laws as to perjury and requirements to tell

19   the jury are affected -- are enforced.

20         I have a job, which is to ask you questions that are

21   clear and concise that you can answer, and you have a job,

22   which is to tell me the truth.  So if I ask a question that

23   you are unsure of what the question is or it's confusing in

24   any way, please let me know, and I'll try to restate it or

25   rephrase it.  And then once I have -- if you don't tell me

5

1    that you don't understand the question, I'm going to assume

2    that you do understand it, and that your answer is truthful

3    to it.

4          Is that fair?

5          A.   Understood.

6          Q.   So this is not an endurance test, so if you need

7    a break, you're free to tell me I need a break, and you're

8    certainly entitled to have a break.  And we'll probably

9    take some breaks as we go along.

10         So, Mr. Keogh, what is your present -- is it Keogh?

11         A.   Keogh, yes.

12         Q.   Keogh.  What is your present occupation?

13         A.   I'm the operations manager for --

14         (Interruption by the court reporter.)

15         A.   Operations manager for Saintnals, LLC.

16         (Off the record.)

17   BY MS. ROHN:

18         Q.   And how long have you been the operations manager

19   for Saintnals?

20         A.   Since July of last year.

21         Q.   What is Saintnals?

22         A.   Saintnals is a company that manages the WAPA

23   facility here in St. Croix and St. Thomas.  The WAPA gas --

24   I should say the gas facility, Vitol's gas facility here in

25   St. Croix and St. Thomas.

6

1          Q.   So I think we've been calling that the propane

2    facility.

3          A.   Propane facility.

4          Q.   To your knowledge, when was Saintnals created?

5          A.   I believe August -- no.  Last year around July.

6          Q.   Same time you went to work for them?

7          A.   Yes.  To my knowledge.

8          Q.   And prior to being the operations manager of

9    Saintnals, were you the operations manager of IPOS?

10         A.   Yes.

11         (Interruption by the court reporter.)

12         A.   General manager for IPOS.

13         Q.   And what occurred to -- what happened to IPOS?

14         MS. FRANCIS:   Objection.  Form.

15         MS. ROHN:   Noted.

16   BY MS. ROHN:

17         Q.   Why did you cease working for IPOS?

18         A.   They're no longer doing business here.

19         Q.   Do you know if they're doing business anywhere?

20         A.   Not to my knowledge.

21         Q.   And so did you go directly from terminal manager

22   for IPOS to operations manager to Saintnals?

23         A.   Yes.

24         Q.   And how did you learn that you were going to go

25   to Saintnals?

7

1          A.   In discussions with Saintnals.

2          Q.   And who at Saintnals did you have a discussion?

3          A.   Oliver Garcia.

4          Q.   And what is -- and does Oliver Garcia work for

5    Saintnals or someone else?

6          A.   He's the president.

7          Q.   Of Saintnals?

8          A.   Yes.

9          Q.   Does he also work for a company called Exsol?

10         A.   Yeah, I believe so.

11         Q.   Is Saintnals a subsidiary of Exsol?

12         A.   I don't know.

13         Q.   Do you report to anyone at Exsol?

14         A.   No.

15         Q.   Am I saying that word correctly, Exsol?

16         A.   I believe so.

17         Q.   Did you have any conversations with anyone at

18   Vitol about transferring from IPOS to Saintnals?

19         A.   No.

20         Q.   And when -- and in your position as operations

21   manager for Saintnals, do you have conversations with

22   anyone at Vitol?

23         A.   Yes.

24         Q.   And who do you have conversations with at Vitol?

25         A.   Charlotte Horowitz I believe her name is.  I

8

1 don't know how to spell it.
2    Q.   Also a Tom K.? I can't say his last name.
3 Tom Kolo -- no? You don't have anything to do --
4 interaction -- no, Tim. Sorry. Tim K., Tim Kologinczak?
5    A.   Previously, yes.
6    Q.   And how about Sebastian Moretti?
7    A.   On occasion.
8    Q.   And when you say you had communication with
9 Tim K. previously, was that at IPOS or previously at
10 Saintnals?
11    A.   IPOS, yes. Saintnals, yes.
12    Q.   So having been terminal manager for IPOS and
13 operations manager for Saintnals, has the procedures and
14 policies of how Saintnals operates differed any from the
15 way that IPOS operated?
16        MR. SIMPSON:    Objection.
17 BY MS. ROHN:
18    Q.   You may answer. It's for the record.
19    A.   Yeah, I don't know. Very similar. It's a
20 different organization.
21    Q.   Do you have -- does Saintnals have a technical
22 engineer on staff?
23    A.   Not on staff.
24    Q.   Does it have access to a technical engineer?
25    A.   Yes.

9

1    Q.   And, first of all, who is that technical
2 engineer?
3    A.   Exsol.
4    Q.   So Exsol -- am I correct that Exsol provides
5 technical engineering capabilities to Saintnals?
6    A.   Yes.
7    Q.   And is there an extra charge for that?
8    A.   I don't know for sure. I would assume it is.
9        (Interruption by the court reporter.)
10        MS. FRANCIS:    Mr. Keogh, if you could keep
11    your voice up, because we cannot hear you. You're
12    looking down.
13 BY MS. ROHN:
14    A.   The answer would be yes.
15    Q.   What are your -- okay. So when you worked as
16 terminal manager for IPOS, what were your duties and
17 responsibilities.
18    A.   Manage the facility as the operations manager.
19    Q.   And what are your duties and responsibilities as
20 operations manager for Saintnals?
21    A.   Yes.
22    Q.   Same?
23    A.   No.
24    Q.   Okay. But what are your responsibilities and
25 duties as operations manager for Saintnals?

10

1    A.   To run the operation, responsible for day-to --
2 day-to-day activities, and assist between operations and
3 maintenance as needed.
4        MR. BECKSTEDT:    You're kind of trailing off at
5    the end, and I think they're having a hard time
6    hearing. It might be better -- it's going to be
7    difficult, but it might be better if when you answer
8    if you could kind of turn to the TV.
9        MS. ROHN:    You could sit over there, but look
10    this way.
11        MR. BECKSTEDT:    And just try to project. Like
12    pretend like you're talking to Simone.
13 BY MS. ROHN:
14    Q.   What do you mean by assist between operations and
15 maintenance?
16    A.   So coordinate between maintenance and operations
17 activities.
18    Q.   So what are operations activities?
19    A.   Day-to-day operation of the terminal.
20    Q.   And that would include what?
21    A.   Vessels coming in and out; discharge;
22 communication with vendors; communications with the
23 maintenance workforce; communications between St. Thomas
24 and St. Croix operations.
25    Q.   So when you were at IPOS, did you coordinate --

11

1 assist and coordinate between operations and maintenance?
2    A.   For a short time, yes.
3    Q.   And --
4    A.   While working -- while working for IPOS.
5    Q.   And was there a time when you worked for IPOS
6 when you did not coordinate between operations and
7 maintenance?
8    A.   In the -- so I arrived on the 6th of July, spent
9 approximately 30 days in an exchange.
10    Q.   What do you mean "in an exchange"?
11    A.   Well, the person I was taking the position for
12 was retiring?
13    Q.   Oh, that's Mr. Merlin; right?
14    A.   Correct.
15    Q.   Okay. And so while you were doing that first
16 30 days, you did not coordinate between operations and
17 maintenance?
18    A.   I was in -- it was a graduate process because --
19 yes, I was new on the job, so...
20    Q.   Do you know whether or not Merlin before he
21 retired coordinated between operations and maintenance?
22    A.   Yes.
23    Q.   And how long did you work for IPOS before you
24 went to work for Saintnals?
25    A.   Almost a year. I went to work for Saintnals on

12

1    July of last year 2000 --
2    Q.    2022?
3    A.    2022, yes.
4    Q.    So between July 2021 and July 2022, who did you
5    work for?
6    A.    IPOS.
7    Q.    And when did IPOS lose their contract?
8    A.    I don't know the exact date they lost their
9    contract.
10   Q.    Well, when did you stop working for IPOS?
11   A.    At the end of -- of July.  I don't know the exact
12   date.  I think it was at end of June, beginning of July.
13   Q.    Of 2022?
14   A.    Yes.  I don't recall the exact date.
15   Q.    Okay.  And who do you report to?
16   A.    I report to Stephen Myshak.
17   Q.    Who is Stephen Myshak?
18   A.    He's the director of operations for Saintnals.
19   Q.    And does Saintnals have a maintenance company?
20   A.    Yes.
21   Q.    Does Saintnals have any contracts with any
22   maintenance companies?
23   A.    I believe, yes.
24   Q.    And who are those?
25   A.    A company called Upkeep.

13

1    Q.    Say it again?
2    A.    Upkeep.
3    Q.    Upkeep?
4    A.    Yes.
5    Q.    And where are they out of?
6    A.    They're out of Puerto Rico, I believe.
7    Q.    And what sorts of things does Saintnals contract
8    with Upkeep with?
9          (Interruption by the court reporter.)
10   A.    General maintenance of the facility.
11   Q.    And would that include special projects as well?
12   A.    It depends.  They've only just started.
13   Q.    They've only just started.
14   When did they start?
15   A.    In the last month I think.
16   Q.    Prior to that was there someone else?
17   A.    TTI, TTI/Peak.
18   Q.    Is that Tampa Tanks?
19   A.    It's Tampa Tank -- it's TTI/Peak.
20   Q.    And what does TTI/Peak --
21   A.    It's a -- it's a USVI company.
22   Q.    And is Tampa Tank part of their name?
23   A.    Yes.
24   Q.    And when did Saintnals start contracting with
25   that company?

14

1    A.    I don't know the exact date.  Saintnals they took
2    over from IPOS.  They continued working with IPOS with that
3    company.
4    Q.    So, first of all, where were you born?
5    A.    London, England.
6    Q.    And please tell me your educational experience
7    post-high school.
8    A.    Post-high school, spent the last 40, 41 years in
9    the oil, gas business.
10   Q.    No education.
11   A.    That's my education.  41 years of experience.
12   Q.    Do you have any degrees?
13   A.    No.
14   Q.    Well, let me try it this way then.  Tell me prior
15   to working for IPOS, where did you work?
16   A.    I worked -- I started out working as a
17   petrochemical inspector in Houston.  I spent the following
18   eight years --
19   Q.    Hold on.  What company?
20   A.    A company called R.A. Bergeron, Incorporated.
21   Q.    Okay.  And do you remember what year that was?
22   A.    I think '82 to '83.
23   Q.    Okay.  And you spent how much time there?
24   A.    One year.
25   Q.    Okay.

15

1    A.    Following that I spent from 1983 to 1991 working
2    for a company called Petro United in Texas.  Transshipment
3    and storage facility for chemicals, jet fuel, various
4    chemicals.
5    Q.    Okay.
6    A.    And I spent from 1991 to 2011, on the island of
7    Sint Eustatius, I worked my way up from a operations
8    supervisor to vice president and general manager of the
9    facility.
10   Q.    And what company was that?
11   A.    That was multiple companies.  It was
12   Statia Terminals.  It was NuStar Energy LP.  It was --
13         (Interruption by the court reporter.)
14   MS. ROHN:    GTI.
15   A.    GTI.
16   In 2011 I was requested to take over NuStar's --
17   NuStar Energy LP's European region.
18   Q.    NuStar?
19   A.    Yeah, NuStar Energy LP.
20   I was asked to assist and take over the operation in
21   Europe.  So I managed the NuStar European companies for the
22   next two years; 2011, 2012.
23   Q.    And just let me stop you here.  What type of
24   company -- what kind of things did they do?
25   A.    Transportation, transshipment, storage, and

16

1  transportation company.
2      Q.   Of fuel?
3      A.   Of fuels, gases, liquid, various liquid
4  chemicals, crude oil, fuel oil, algal operations.
5      Q.   And then in 2012?
6      A.   I went -- I was asked to go back to
7  Sint Eustatius to help get some projects completed.  And
8  then I spent the next six years of 2011 -- well, actually,
9  hold that.  From 2012 to 2021.
10     Q.   And was there a company you worked with there?
11     A.   It was NuStar Energy LP.  They owned that
12 facility.  And then GTI took that facility over in 2019,
13 and they asked me to stay on; so I signed up for two -- two
14 more years and decided to reassess after that two years.
15     Q.   And what was the result of your reassessment?
16     A.   I decided to retire from the island for personal
17 reasons.
18     Q.   And were you unemployed for a period of time --
19 or retired for a period of time?
20     A.   No.
21     Q.   No?
22     A.   No.
23     Q.   And then your next job was?
24     A.   For IPOS.
25     Q.   For IPOS.

17

1      Q.   During the time that you worked at IPOS, was Petro a
2  contractor of IPOS?
3      A.   Yes.
4      Q.   I think -- let me just see if my notes are
5  correct.  I think that it looks to me like you came into
6  IPOS --
7      A.   July 6, 2021.
8      Q.   Right.  I was going to say right -- right in July
9  of 2021.
10     A.   Correct.
11 Sorry.
12     Q.   No worries.
13 So did you do anything to prepare to be deposed today?
14     A.   Yes.
15     Q.   You know, I've decided that my new what is a
16 deposition I should add you have to turn off your cell
17 phone.  No worries, take your time.  Take your time.
18     A.   Yes.
19     Q.   And what did you do to prepare for the
20 deposition?
21     A.   I spoke with Ms. Simone.
22     Q.   And when did you speak to her?
23     A.   Yesterday.
24     Q.   How long?
25     A.   Approximately two hours, two and a half hours.

18

1      Q.   Did you review any documents?
2      A.   A couple, yes.
3      Q.   What did you review?
4      A.   Some e-mails.
5      Q.   Can you identify the e-mails for me in some way?
6      A.   Not really, just e-mails from back in August last
7  -- I believe August last year.
8      Q.   Did you talk to any persons to refresh your
9  recollection about anything?
10     A.   No.
11     Q.   So when you came to -- prior to coming to IPOS in
12 2021, had you had any conversations with anybody about
13 coming to work, who had recruited you?
14     A.   David Smith.
15     Q.   And do you know how David Smith knew who you
16 were?
17     A.   I had worked with David some years before that.
18     Q.   And where was that?
19     A.   Sint Eustatius.
20     Q.   And what was David Smith doing in Sint Eustatius?
21     A.   He was not in Sint Eustatius.  He was based in
22 San Antonio, Texas.
23     Q.   And how did you work with him?
24     A.   A direct report to him.
25     Q.   And for what company?

19

1      A.   NuStar Energy.
2      Q.   And about when was that?
3      A.   2006 through -- well, '6 or '7 until -- I'm
4  trying to think now.  -- maybe 2011 or '12.
5      Q.   And so did David Smith contact you, or did you
6  know the position was available?  How did that happen?
7      A.   I -- I don't recall if I called him or he called
8  me.  I believe I -- I don't recall.  It was one or the
9  other --
10          (Interruption by the court reporter.)
11     A.   I had contacted him.
12     Q.   Was it for a particular job or just a job?
13     A.   In general.
14     Q.   And -- sorry.
15     A.   In general.
16     Q.   Were you aware that there was a manager job
17 available with IPOS at the time you contacted him?
18     A.   No.
19     Q.   And when you contacted him, what did he tell you?
20     A.   That the manager was retiring.
21     Q.   And at that time who did Mr. Smith work for?
22     A.   For VTTI.  And he managed IPOS.
23     Q.   Well, did you contact -- when did you contact
24 David Smith?
25     A.   I don't recall the exact date.

TERENCE KEOGH

20

1    Q.   Well, would it have been in 2020 or 2021?
2    A.   It would have been 2021.
3    Q.   Did you have to interview with anyone to get the
4  job at IPOS?
5    A.   Yes.
6    Q.   Who?
7    A.   Garry.  I don't remember his name -- last name.
8    Q.   Stroker?
9    A.   I don't remember --
10   Q.   Is it two r's in it?
11   A.   I don't recall the exact name.  Garry.
12   Q.   Anyone else?
13   A.   Uhm, well, David, Garry, and I believe one other
14  person.  I don't recall the name.
15   Q.   Who were they employed by?
16   A.   VTTI.
17   Q.   Did you meet anyone from Vitol -- I keep calling
18  them Vitol, but it's Vitol.  I understand that now.
19       Did you meet with anybody from Vitol before you were
20  employed?
21   A.   No.
22   Q.   And then I think you started in -- do you
23  remember when you had that conversation -- I might have
24  asked you this.  If I did, I'm sorry.  When you had the
25  conversation with Mr. Smith about the job opening?

21

1    A.   Sometime maybe a month or so before.
2    Q.   So around --
3    A.   I don't recall the exact date.
4    Q.   -- May, June of 2021?
5    A.   I don't know.  I don't recall.
6    Q.   A couple of months before July of 2021 when you
7  went to work?
8    A.   I -- maybe a month, maybe two months.  I don't
9  recall the exact time.
10   Q.   Okay.
11       Did they send you for any training before you started
12  work?
13   A.   With my experience and my background, no
14  additional training.  But I spent basically the first month
15  with Merlin.
16   Q.   At any time when you were with IPOS, did you
17  receive any sexual harassment, sorry, or discrimination
18  training?
19   A.   With IPOS I had to read the policies and sign off
20  on the various policies, which included sexual
21  discrimination and, you know, many, many, many -- various
22  things.
23   Q.   Now, when you came to work -- you said that Petro
24  was a contractor of IPOS when you came to work at IPOS; is
25  that correct?

22

1    A.   To my knowledge, yes.
2    Q.   Okay.  When you got to IPOS, were you aware that
3  there was some type of conflict between IPOS and Petro?
4        MS. FRANCIS:    Objection.  Foundation and form.
5        MS. ROHN:    Noted.  Noted.
6  BY MS. ROHN:
7    Q.   Go ahead.
8    A.   Not -- no.
9    Q.   While you were at IPOS, were you aware that they
10  -- there was some disagreement about the payment of
11  invoices to IPOS?
12   A.   No.
13   Q.   When you came to IPOS, were you aware that there
14  was some documentation being requested from Petro?
15   A.   After I started work, then, yes.
16   Q.   And how -- how did you learn that there was some
17  documentation issues?
18   A.   Via e-mail.
19   Q.   I'm sorry?
20   A.   Via e-mail.
21   Q.   And via e-mail from whom?
22   A.   From Andrew Canning and -- and/or David.  I don't
23  recall who the first e-mail came from.
24   Q.   And what was the substance of that -- those
25  e-mails?

23

1    A.   There was a concern on the documentation being
2  supplied, a lack of documentation being supplied.
3    Q.   Did you do anything as a new manager to try to
4  determine what the history of request for documentation had
5  been?
6    A.   Did I --
7    Q.   Do anything as the new manager to do any
8  investigation as to what the history about requesting
9  documentation had been?
10   A.   I had -- I had requested to see documentation.
11   Q.   What requests -- what documentation did you
12  request to see?
13   A.   The -- anything -- anything that was available
14  regarding the work that was being discussed.
15   Q.   And what would that include?
16   A.   Welding certifications, et cetera.
17   Q.   And what's et cetera?
18   A.   Welding certifications, materials, origin
19  materials, test certificates.
20   Q.   Anything else?
21   A.   That's basically -- test information, testing
22  documentation, the welding certification of welders, and
23  materials origin.
24   Q.   Had you learned that prior to being there that
25  there had been a discovery that some of the materials had

24

1   come from China?
2       A.   Not prior to getting there.
3       Q.   Oh, were you there when that was discovered?
4       A.   No, after I got there, I believe there was a
5   discussion on materials previously come but were corrected.
6       Q.   And am I correct that Petro had replaced the
7   materials at their cost?
8       A.   To my knowledge.
9       Q.   Did you ever form the opinion that they had
10  purposely done that?
11      A.   No.
12      Q.   And when you said you requested to see the
13  documentation available, who did you make that request of?
14      A.   I requested from -- at the time to look at the
15  documentation.  I believe I received it by e-mail from
16  Andrew.
17      Q.   And what e-mail -- what documentation received by
18  e-mail from Andrew?
19      A.   Some certificate -- certifications from others.
20      Q.   Was that the Guillermo Castro doctorate --
21  document?
22      A.   I don't remember the exact names.
23      Q.   And when you got that documentation from Andrew,
24  did he make any comments about his view of the
25  documentation?

25

1       A.   He felt they weren't genuine.
2       Q.   And did he tell you that?
3       A.   Yes.
4       Q.   And was that verbal or by e-mail?
5       A.   I don't recall.  I believe both.
6       Q.   Did you suggest that any investigation be done
7   about the documentation?
8       A.   Yes.
9       Q.   What investigation did you suggest?
10      A.   I requested assistance from VTTI's engineering
11  group.
12           (Off the record.)
13           MR. BECKSTEDT:    Do we want to take a
14  five-minute break?
15           MS. ROHN:   Would that be good for you?
16           THE WITNESS:   Thank you.
17           (A recess was taken at this time.)
18  BY MS. ROHN:
19      Q.   And why did you request the assistance of VTTI?
20      A.   So they'll have an engineering group and an
21  independent review of --
22           (Interruption by the court reporter.)
23      A.   Yeah, I wanted an independ -- someone independent
24  to review the documentation, compare it to the -- the
25  documents and the policies and the procedures requirements.

26

1       Q.   And who was that person?
2       A.   VTTI.  I can't remember the name.  That is VTTI
3   and Garry -- I don't recall the name.
4       Q.   We might find it in some of these e-mails.
5           During the time that you were doing this
6   investigation, were you aware that Mr. Guillermo Castro had
7   come back from Japan and offered to come and retest the
8   welders?
9           MS. FRANCIS:    Objection.  Foundation.
10  BY MS. ROHN:
11      Q.   You may answer.
12      A.   At the time I had gotten a call, I didn't -- I
13  don't recall.
14      Q.   Do you know that now?
15      A.   Yes.
16      Q.   And were you aware that there was a string of --
17  string of e-mails involve -- was -- was the person who you
18  had from VTTI Andre Constantinou?
19      A.   Possibly.  Yes, that rings a bell.
20      Q.   I'm cheating because I have my paper.
21          So were you aware that on or about July 22nd Chad from
22  Petro called David Smith and asked him to join a call with
23  Guillermo Castro, who conducted the welding tests, the
24  mechanical tests and the lab tests, that he had arrived
25  from Japan that night?

27

1       A.   I saw an e-mail yesterday, yeah.
2       Q.   You were on that e-mail chain, were you not, sir?
3       A.   I believe so, yes.
4       Q.   That Chad says he conducted all the tests in
5   Puerto Rico on all these welders.  He's available today
6   after 1:30.
7           MS. FRANCIS:    Attorney Rohn, I'm sorry, I
8   don't know.  You haven't identified what document
9   you're referring to.
10          MS. ROHN:   I understand that.
11  BY MS. ROHN:
12      Q.   Did you take up Mr. Castro on that offer?
13      A.   I did not.
14      Q.   Do you know whether anyone did?
15      A.   I don't, no.
16      Q.   Were you in charge of this investigation?
17      A.   No.
18      Q.   Who was?
19      A.   The -- so the information was given to VTTI to
20  look at it, and after that or during that, at that time I
21  was -- I had turned that over, so...
22      Q.   Do you know if anyone from VTTI took up the
23  opportunity to talk to Mr. Castro?
24      A.   I don't recall.  I don't know.
25      Q.   Well, wouldn't -- couldn't you have solved the

28

1   issue of the credentials and whether or not they were true
2   by talking to the person who had done the documents?
3         MR. BECKSTEDT:    Objection. Form.
4         MS. FRANCIS:    Objection.
5   BY MS. ROHN:
6      A.   I don't know.
7         MS. FRANCIS:    Calls for speculation. Lack of
8      foundation.
9   BY MS. ROHN:
10     Q.   Well, there were some questions as to PDF versus
11  Word and whether or not things had been changed. Why won't
12  talking to Mr. Castro and allowing him to explain how the
13  document was created have alleviated some of those
14  questions?
15        MR. BECKSTEDT:    Objection.
16        MS. ROHN:    Noted.
17        MS. FRANCIS:    Objection. Foundation.
18        MS. ROHN:    Noted.
19  BY MS. ROHN:
20     A.   I don't know.
21     Q.   You don't know why that wasn't done?
22     A.   No.
23     Q.   And was Mr. Constantinou's response that before
24  there's any meeting, he wants to see tests? Do you recall
25  that?

29

1      A.   I don't.
2      Q.   We showed this exhibit --
3         MS. ROHN:    Karima, are you on?
4         (Off the record.)
5   BY MS. ROHN:
6      Q.   Do you have a specialty in welding and welding
7   certifications, that sort of thing?
8      A.   No.
9      Q.   Do you know how welding tests are done and what
10  are the requirements for welding testing?
11     A.   I'm not qualified to give welding testing.
12     Q.   Okay. Do you know how welding testing is -- do
13  you know how often after someone's been certified as a
14  welder they have to be retested?
15        MR. BECKSTEDT:    Objection. Form.
16        MS. ROHN:    Noted.
17        MS. FRANCIS:    And it calls for a legal
18     conclusion or a specialized expert conclusion.
19        MS. ROHN:    Okay. Whatever.
20  BY MS. ROHN:
21     Q.   Can you answer?
22     A.   Yeah, I'm not certified to do that.
23     Q.   So did you in doing the investigation hire
24  someone who was knowledgeable in welding and welding
25  certifications?

30

1      A.   The information and data was given to the
2   engineering group.
3      Q.   And you keep saying group. Was there more than
4   one person?
5      A.   The VTTI has more than one person in their
6   engineering group.
7      Q.   And was there more than one person working on
8   this?
9      A.   I'm not sure how many people were working on it.
10     Q.   Why wouldn't you have accepted the -- Mr. Castro
11  coming to the plant and recertifying the welders?
12        MR. BECKSTEDT:    Objection. Form.
13        MS. FRANCIS:    Objection. Foundation.
14  BY MS. ROHN:
15     Q.   You may answer.
16     A.   The -- that was given to the -- you know, to the
17  engineering group. So I'm not sure.
18     Q.   Well, was IPOS required to follow what the
19  engineering group said?
20     A.   So they would, yes, have to follow.
21     Q.   Well, isn't IPOS an independent company?
22     A.   IPOS is a company -- subsidiary of VTTI.
23     Q.   So you're saying as a subsidiary, they had to
24  follow what VTTI told them -- VTTI told them?
25     A.   What you have is you had a list of rules and

31

1   regulations -- a list of policies and procedures for work
2   that has to be done. And if that's not followed, then you
3   -- then it has to be checked.
4      Q.   And I take it those policies and procedures are
5   VTTI policies and procedures?
6      A.   IPOS.
7      Q.   IPOS has its own procedures, or do they follow
8   VTTI's procedure?
9      A.   They have their own procedures; they also follow
10  VTTI.
11     Q.   As to welding do they follow VTTI's procedures?
12     A.   With welding there's a technical -- technical --
13  what's the word for it? Give me a moment.
14     You had a technical authority that design and builds
15  the facility. There's welding procedures, test procedures,
16  et cetera, that are right now. And then when it's
17  pertinent to policy and procedure, those documents are then
18  given to the contractors to follow. It tells them how
19  things have to be tested, whether to problem solve or
20  materials are required.
21     Q.   And, to your knowledge, were any of those
22  documents given to Petro?
23     A.   Yes.
24     Q.   You personally know they were?
25     A.   I believe e-mails. I do.

32

1    Q.   And what policies and procedures do you believe
2    were given to Petro?
3        A.   Welding requirements, test requirements.
4            (Interruption by the court reporter.)
5        MS. ROHN:    Painting.
6    BY MS. ROHN:
7        A.   Coating requirements, testing -- testing
8    requirements and welding requirements.
9        Q.   Now --
10       A.   And material requirements.
11       Q.   Sorry, didn't mean to interrupt.
12           And when do you believe those requirements were
13   given to --
14       A.   I don't know exactly.
15       Q.   -- Petro?
16           You saw e-mails.  Do you remember when they were from?
17       MS. FRANCIS:    Objection.  Argumentative.
18   BY MS. ROHN:
19       Q.   You can answer.
20       A.   I don't remember.
21       Q.   2021?  2020?
22       A.   I don't know.
23       MS. FRANCIS:    Objection.  Asked and answered.
24   BY MS. ROHN:
25       Q.   Were you made aware that in February 2021 that

33

1    Tim K. asked Petro for the certifications for their
2    welders, and it was given to Tim K. in March of 2021?
3        A.   No.
4        Q.   And that somehow those weren't transmitted, and
5    then they were asked for again in July of 2021?
6        A.   Again, I don't -- I don't know.
7        Q.   You're not aware of any of that?
8        A.   I don't recall.
9        MS. ROHN:    Karima, can you give me -- you have
10   to give me that document back.  Hold on.
11           (Off the record.)
12       MS. ROHN:    Karima, can you put that exhibit,
13   Bates Nos. 1984 to 1989.  And we can go to Bates
14   No. 1988.
15           Next page.  Down towards the bottom, please.
16       MR. BECKSTEDT:    I apologize, what exhibit was
17   this?
18       MS. ROHN:    This was used in Moretti's
19   deposition.  It's Exhibit 81, could be 67.  But it was
20   used in his deposition.
21   BY MS. ROHN:
22       Q.   So on July 22, 2021, you're included on this
23   e-mail, and your e-mail is VTTI.  Did you ever work for
24   VTTI?
25       A.   That was how the e-mail addresses were set up.

34

1    Q.   Okay.
2        And it says "Chad for Petro called me.  They want to
3    join a call."
4        This is the one we talked about earlier.  You were on
5    that e-mail.
6        And then there's at the next page --
7        MS. ROHN:    Next page, Karima.  Thank you.
8    BY MS. ROHN:
9        Q.   It says -- that's fine.
10       It says "I also don't know what this inspector is
11   going to say.  Would a notarized document that he actually
12   did this prove anything?  And Andrew suggested evidence of
13   his flights?  Maybe ask Petro to provide those prior to
14   scheduling call?"
15       This is from David Smith; correct?
16       So was Andrew Canning involved in all of this
17   investigation?
18       A.   Yes.  In part, yes.
19       Q.   Were you aware that there was a distinct falling
20   out between Petro and Andrew Canning such that
21   Andrew Canning had been advised to not speak with Petro
22   anymore?
23       MR. BECKSTEDT:    Objection to form.
24   BY MS. ROHN:
25       Q.   You may answer.

35

1    A.   I don't recall that.
2        Q.   Did Mr. Smith or Mr. Merlin -- because I have a
3    hard time with his last name. -- discuss with you the fact
4    that they had had several meetings with Petro about not
5    being able to get along with Mr. Canning because of how he
6    treated the employees at Petro?
7        A.   I don't recall.
8        MS. FRANCIS:    Objection.  Foundation.
9    BY MS. ROHN:
10       Q.   You were never made aware of that?
11       A.   I was aware that there was concerns on -- on this
12   issue.
13       Q.   And then --
14       MS. ROHN:    Scroll up, please, to the next --
15   to the first -- the page before that.  No, it's on
16   1988.  Got that.
17           Is that 1988?  No -- yes, that's it.  Okay.
18   Scroll up a little bit.  There you go.  Keep going,
19   just a little bit more.  All right, right there.
20   BY MS. ROHN:
21       Q.   There's an e-mail from Andrew Canning 11:18 a.m.
22   and you're copied on it.
23       "Previous operations welder qualification records
24   would also include photographic record of the test samples,
25   is this normal in the US?  Our welding procedures also call

36

1  for the welders to have photographic ID cards showing
2  welding certification. I have never seen this from PIS
3  with the exception of Daniel Martinez who was formally
4  trained and assessed at a welding facility. This should
5  also be part of the qualification record issued to the
6  client before the fabrication work starts."
7       So, first of all, at this point the work on the No. 3
8  vent had been completed by Petro, had it not?
9       A.  Yes.
10      Q.  So it's a little late to require these before --
11 before they start working; correct?
12          MS. FRANCIS:    Objection.
13          MR. BECKSTEDT:    Objection to form.
14          MS. FRANCIS:    Argumentative.
15 BY MS. ROHN:
16      Q.  You may answer.
17      A.  I don't understand the question.
18      Q.  Well, it said, we should require these -- these
19 photo IDs and certifications, quote, "before the
20 fabrication work starts."
21          MR. BECKSTEDT:    Objection.
22 BY MS. ROHN:
23      Q.  You see that?
24      A.  I see it.
25      Q.  Were these required of Petro before the work

37

1  started?
2       A.  I was not --
3          MS. FRANCIS:    Go ahead. Sorry.
4  BY MS. ROHN:
5       A.  I was not -- I'm not an employee of them -- IPOS
6  at the time. I don't know what was required.
7       Q.  And as part of your investigation, you didn't see
8  what was actually requested of them before they started the
9  work?
10      A.  Say again, please.
11      Q.  As part of your investigation, did you attempt to
12 see what they'd actually been requested to provide before
13 they started the work?
14      A.  I didn't -- when I started looking at it, I got
15 documents, I got -- this -- this is where -- I started
16 there July 6th; so it was a very short time I was there. I
17 don't recall if -- if I got documents.
18      Ask that -- give me the question again.
19      Q.  Whether or not, as part of your investigation,
20 you attempted to find out what documentation Petro was told
21 it needed to have before it started the work?
22      A.  That, uhm -- I'm trying to recall. I believe it
23 was, yes.
24      Q.  Okay. And what did you do to determine what they
25 were told -- what documents they were told they were going

38

1  to need before they started the work?
2       A.  Well, they're given the documents that -- that,
3  uhm, required the welding, the coding, and testing.
4       Q.  So let me rephrase the question. Were you --
5  were you -- did you have any information as to what
6  specific documents related to the -- doing the work itself
7  they would need to have prior to starting the work?
8       A.  Any of the welding work that they did had the
9  same documents.
10      Q.  And did you do any investigation to see whether
11 or not they were told before they began the work what
12 documents related to the work that was actually done they
13 would need to be able to produce?
14      A.  I didn't.
15      Q.  Andrew Canning then says "We also should have
16 proof of ID for Guillermo Castro, including his claimed NDT
17 qualifications."
18      Did anyone ask Mr. Castro for what his NDT
19 qualifications were?
20      A.  I don't know.
21      Q.  Are you aware to this day that he's one of the
22 top level with qualifications for welding testing?
23      A.  I don't know.
24          MR. BECKSTEDT:    Objection.
25 BY MS. ROHN:

39

1       Q.  And then there is an e-mail from David Smith at
2  11:18 that says, about 17 minutes later, "I was even
3  thinking one more step that we approach Acuren rather than
4  Guillermo and ask them to certify in writing?"
5          MS. FRANCIS:    We don't have that on the
6       screen.
7          MS. ROHN:    Could we scroll up, please? No,
8       that's down. Maybe do -- hold up. Scroll back down
9       to the top of the last page. There is David Smith.
10      And then you scroll down, and there is the statement
11      right there on that page.
12 BY MS. ROHN:
13      Q.  You see that?
14      A.  Uh-huh.
15      Q.  Did you agree that somehow you should talk to
16 Acuren before you ever talk to the person who did the
17 testing?
18          MS. FRANCIS:    Objection. Foundation.
19          MS. ROHN:    Noted.
20 BY MS. ROHN:
21      A.  The -- I believe this gentleman worked for them.
22      Q.  Well, did you ever find out that -- that
23 Mr. Guillermo Castro had done some contracting work for
24 Acuren, and he simply used one of their forms to put down
25 the information on?

TERENCE KEOGH

40

1    Did you ever see the letter from Mr. Guillermo Castro
2 explaining --
3    A.   I don't recall.
4    Q.   -- how -- the reason he used that form, and how
5 he had used it because he was -- didn't have a new form,
6 and he whited out stuff and then put the new information on
7 the form?
8    A.   I don't --
9        MS. FRANCIS:    Objection. Foundation.
10 BY MS. ROHN:
11   Q.   You don't recall?
12   A.   (Nodding.)
13   Q.   Well, wouldn't it have been important to you as
14 part of your investigation to see the communication from
15 Mr. Guillermo Castro explaining how the document was
16 created?
17   A.   Again, the investigation, I was concentrating on
18 operating the facility.
19   Q.   You were what?
20   A.   Concentrating on the operations of the facility.
21 That's why I requested a third -- another group.
22   Q.   Did you pay VTTI to do this investigation?
23   A.   I don't -- I don't know.
24   Q.   Or were they just doing it on your behalf?
25   A.   I -- I don't know how -- you'd have to ask

41

1 somebody at IPOS higher up in management.
2    Q.   Well, isn't the top person in IPOS -- well, at
3 that point, David Smith worked for VTTI, did he not?
4    A.   Correct.
5    Q.   So weren't you the top person in IPOS?
6    A.   Again, that financial arrangement, I don't know.
7        MS. ROHN:    And then if you'll go to 1987.
8    And to the bottom of that page.
9 BY MS. ROHN:
10   Q.   Five minutes later David --
11       MS. ROHN:    That's it right there.
12 BY MS. ROHN:
13   Q.   Five minutes later David Smith says "I have
14 another contractor here onsite, and he recommends
15 Richard L. Holdren, ARC Specialities."
16       What did you understand Richard Holdren was supposed
17 to do?
18       Wasn't he a guy that specialized --
19   A.   I'm reading the e-mail.
20   Q.   Oh, I'm sorry.
21   A.   So what was the question?
22   Q.   Was that somebody that -- that was -- was he a
23 specialist in welding certifications?
24   A.   That's what it states on the e-mail.
25   Q.   Was he ever utilized as part of the

42

1 investigation?
2    A.   I don't recall.
3        MS. ROHN:    Can you scroll up?
4 BY MS. ROHN:
5    Q.   On July 22nd at 6:26 in the evening, you're on
6 the e-mail.
7        "Just keep the conversation going.  I -- suppose -- I
8 spoke to Chad and asked -- just to keep the conversation
9 going.  I spoke to Chad and asked him in writing for the
10 test results?
11       "He told me that the lab test was Phased array, which
12 is the -- which is by the test was PAUT, which is why it's
13 not -- it was not bend test.
14       "That all these folks were from Puerto Rico and they
15 were certified while they were there.
16       "That he is a 3rd party to Acuren and that is why it
17 says that."
18       So you understood that at least through Chad there had
19 been some explanation given as to why the form was on
20 Acuren; correct?
21   A.   What was the question again on this?
22   Q.   So you had received information that the reason
23 it was on an Acuren form was that he was a third-party
24 contractor to Acuren; correct?
25   A.   Yeah.  That I don't recall, but that's what it

43

1 states.
2    Q.   And then there's a statement that says "I did
3 tell him that someone inside was talking about what is
4 going on and he needs to seal it up."
5    You know what David Smith was referring to?
6    A.   No.
7    Q.   "This out of respect, we do not tell our own
8 employees including Supervisors, yet everyone -- everyone
9 knows the story now."
10       Was he talking about the fact that they were being
11 accused of having false certifications?
12       MS. FRANCIS:    Objection.
13       MS. ROHN:    Objection noted.
14 BY MS. ROHN:
15   A.   Possibly.  When you have situations like this,
16 you try to keep it private.
17   Q.   And then he says "I'll let you know more -- when
18 I can. -- as I can.  Chad didn't -- speak to -- didn't
19 want to speak for Guillermo, but his knowledge is much
20 higher than mine in welding."
21       Did you take that to mean that Chad had more knowledge
22 about welding than David Smith?
23       MS. FRANCIS:    Objection. Foundation.
24 BY MS. ROHN:
25   A.   Yes.  That would make sense.

44

1        MS. ROHN:     And then if you scroll up.  Karima.
2    BY MS. ROHN:
3        Q.   Then Constantinou says at 6:29, about three
4    minutes later, "David, I'm preparing an e-mail to you with
5    all the required information we need from the contractor,
6    which is on the basis of an ASME job.  They need to give us
7    this documentation in full.
8        "I will forward it to you soon."
9        Wouldn't they really have had to have given the
10   information on the VTTI procedures, not -- I don't --
11   what's an ASME job?
12       MS. FRANCIS:    Object to the form.
13   BY MS. ROHN:
14       Q.   You may answer.
15       A.   It's an acronym.
16       Q.   For?
17       A.   I don't recall the exact.
18       Q.   Can you describe what kind of a job that is?
19       A.   It's about -- it's a -- for pressurized
20   equipment.
21       Q.   But wouldn't you follow the VTTI's procedures for
22   what -- what documentation supposed to be given?
23       MS. FRANCIS:    Objection.  Foundation.
24   BY MS. ROHN:
25       Q.   You may answer.

45

1        A.   Yeah, the documentation would have to follow the
2    procedure, the policy.
3        MS. ROHN:    All right.  Can you scroll up to
4        the next page, and then we'll come back down.  Okay,
5        Karima.
6        There you go, right here.
7    BY MS. ROHN:
8        Q.   Then at 18:50, Constantinou says, "David, I tried
9    to reduce the documentation required to the absolute
10   minimum having in mind that the below requirement might not
11   have been agreed up front from the -- with the contractor."
12       And then he's got a listing of various documentation.
13   Then it continues.
14       But do you need to see all the documentation?
15       A.   Sure.  Yeah --
16       MS. ROHN:    Scroll down.
17       A.   -- to answer your question on this.
18       MS. ROHN:    You can keep scrolling, Karima.
19   BY MS. ROHN
20       Q.   Are you ready for her to switch?
21       MS. ROHN:    Then you can scroll --
22   BY MS. ROHN:
23       Q.   Are you finished reading that?
24       A.   Yes.
25       MS. ROHN:    Scroll back up.

46

1    BY MS. ROHN:
2        Q.   So were you aware that -- should that type of
3    documentation be given on every welding job?
4        MS. FRANCIS:    Objection.  Form.  Foundation.
5        MS. ROHN:    Noted.
6    BY MS. ROHN:
7        Q.   Answer.
8        A.   The documentation -- once -- once you have an
9    established contractor that does work continuously and
10   you've given all the documentation that's required, so
11   you've given them the paint -- paint procedure and policy,
12   the coding -- well, the coding policy, the welding policy,
13   the testing requirements, inspection requirements, and they
14   should have that.  And they should follow that on all the
15   welding, all the coding and all the testing from that point
16   on.
17       Q.   Were you aware that historically Petro had not
18   been asked for any documentation on any welding jobs except
19   for the credentials of their welders?
20       A.   No.
21       Q.   And generally speaking, if someone is supposed to
22   give you particular documentation at the end of the job,
23   they would need to know that information as to expectation
24   at the beginning of the job; correct?
25       MS. FRANCIS:    Objection.  Foundation.

47

1    BY MS. ROHN:
2        Q.   You may answer.
3        A.   That would be --
4        (Interruption by the court reporter.)
5        MS. ROHN:    Normal.
6        Scroll up, please.  No, not to the next page.
7    This would on 1986, the long e-mail above what we were
8    just looking at.
9        There we go.
10   BY MS. ROHN:
11       Q.   This is an e-mail from Andrew Canning.
12       "Thank you for the documentation summary which will
13   provide a good basis to form an assessment from.
14       "One of the big document anomalies is with the
15   attached QPQ documents which were -- which are on close
16   inspection are obviously PDF edits of someone else's
17   original certification, and while it clearly states the
18   assessment was based on acceptance of guide bend test, they
19   are now telling us that the tests were done by phase array
20   for which I suspect (conveniently) no hard copy test
21   results were available."
22       Are you aware on phase array there are no hard copy
23   tests to be available for phase array?  It's not
24   convenient, that's just how the test is done?
25       A.   No.

48

1      MS. FRANCIS:   Objection.
2      MR. BECKSTEDT:   Form.
3  BY MS. ROHN:
4      Q.   It says "You did say that phase array testing
5  could be done using specialist software.  Can you provide
6  details and can you check if this software was used?  Other
7  original certificate anomalies exist such as stating that
8  the welds were completed on 1-inch pipe, whereas the actual
9  welds were to be made on 3-inch 304 stainless steel
10 pipework."
11     Sir, let me ask you this:  First of all, do you know
12 whether or not Mr. Canning has any particular knowledge of
13 welding and how welding tests are done?
14     A.   He's an engineer.
15     Q.   And you think that by being an engineer he knows
16 about how to do welding testing?
17     A.   That's -- I don't know what he knows
18 specifically.
19     Q.   And then he goes on on the last sentence of
20 that --
21     MS. ROHN:      Wait.  That paragraph.
22 BY MS. ROHN:
23     Q.   "Finally the number of defects identified by the
24 10 percent radiography on the stainless line is something I
25 find quite worrying up -- worrying (up to 63 percent of the

49

1  videography images showed defects, despite the acceptance
2  by the NDT company, however it is unclear who set the
3  acceptance criteria limits, some of the defect sizes are
4  quite large and defect densities high on the x-ray images."
5      So are you aware that in testing there's a percentage
6  of welds, you can't -- you can't fail more than a
7  percentage of whales but -- welds but all welds don't have
8  to be perfect?
9      MS. FRANCIS:   Objection.  Foundation.
10     MR. BECKSTEDT:   Yeah, same objection.
11 BY MS. ROHN:
12     A.   I'm not an expert on -- on this.
13     Q.   So do you know what Mr. Canning's expertise are
14 on how you test for welds?
15     A.   I don't know what his -- his expertise is.
16     MS. ROHN:      If you go to the -- scroll up to
17     the next page.
18 BY MS. ROHN:
19     Q.   There's an e-mail from David Smith at 19:33, that
20 says "Hi everyone.  Just to be clear, should I copy/paste
21 Andreas' comments?  And ask Petro to add Andreas and I to
22 the Dropbox?"
23     And then there's an answer from Andrew Canning,
24 "David, I was thinking more of asking PIS to submit their
25 complete Quality dossier and the full coding assessment

50

1  records for the welders.  To be honest, I think we probably
2  already have seen what they have to submit.
3      "Does anyone else think we should provide Andreas'
4  list for them to try to deliver against?
5      "I do think it would be useful for David and Andreas
6  to have access to the Dropbox and possible -- possibly a
7  more experienced weld inspector than myself."
8      So kind of admitting he's not the -- somebody more
9  qualified than him would have to look at these; correct?
10 Some more experienced weld inspector than myself.
11     Well, and then at 20:03, Andreas says, "Hello Andreas
12 (sic), we can ask them to submit their full documentation
13 package and benchmark with the minimum requirements I
14 mentioned below.  For this project and previous ones held
15 at our facilities.
16     "I agree with all your observations on their submitted
17 documents."
18     So there's a suggestion now, am I correct, that not
19 only do they want the documentation for these, but to go
20 back and give documentations for prior work as well?  Prior
21 work had been accepted; correct?
22     MS. FRANCIS:   Objection.  Foundation.
23 BY MS. ROHN:
24     Q.   What did you understand "for this project and
25 previous ones held at our facilities" meant?

51

1      A.   Exactly what it -- it says.
2      Q.   Correct.  They're asking for now documentation
3  for prior work done; correct?
4      A.   For all the work that had been done.
5      Q.   Right.  When they weren't asked the
6  documentation for; correct?
7      MR. BECKSTEDT:   Objection.
8  BY MS. ROHN:
9      A.   I don't know that.
10     Q.   Well, why would you have to ask them for it if
11 you already had it?
12     MS. FRANCIS:   Objection.  Argumentative.  Lack
13     of foundation.  Asked and answered.
14 BY MS. ROHN:
15     Q.   It says "I agree with all your observations on
16 their submitted docs."
17     MS. ROHN:      And then if you scroll up.
18 BY MS. ROHN:
19     Q.   This is also from Andrew at 4:22.  I don't know
20 why it says 4:22.
21     "David, I think that we should speak to
22 Guillermo Castro without Chad and Adrian so that we can
23 explore the full scope of the supposed welder certification
24 services, ideally video -- by video conference."
25     Did you respond to that e-mail at all by Andrew?

52

1    A.  I don't recall.
2    Q.  Okay.  Did you inquire why you thought that you
3  should meet with Guillermo Castro without the -- Chad and
4  Adrian being present?
5    A.  I don't recall.
6        MS. ROHN:     And then if you go to the first
7    page.
8  BY MS. ROHN:
9    Q.  David Smith says, "Andrew, they have made it
10  clear that they want -- speak -- they want us to speak
11  with him.
12      "We have an internal call with Garry tomorrow, will
13  develop a plan forward."
14      Did you -- do you recall that David Smith ever told
15  you that he wanted to speak to Guillermo Castro?
16    A.  I don't recall.
17    Q.  And then Andrew Canning says, does -- "Does us
18  that mean you, Merlin, Terry and Guillermo, Chad and
19  Adrian?"
20      And David Smith says "No, just Garry, Andreas, Wendy,
21  Merlin, Terry, and I.  Just VTTI internal to discuss with
22  Gary."
23      And that's the same person I asked you about if that
24  was Garry Stoker.  But you don't recall?
25    A.  Garry Stoker, I believe, that sounds familiar,

53

1  yes.
2    Q.  And Andrew Canning says, "Interesting, are you
3  and the VTTI team wavering on the invalidity of the
4  information and answers provided to date?"
5      And David Smith says "Just want the truth and to
6  understand what the implications are."
7      Is that -- was that part -- point of the investigation
8  to try to find out what the truth was?
9    A.  Absolutely.
10    Q.  Why was Guillermo Castro never spoken to?
11    A.  I don't -- don't know.
12    Q.  Were you aware that Petro provided a Dropbox with
13  -- with doc -- most of the documentation in it?
14    A.  Now I -- now I -- yeah.
15    Q.  Were you aware at the time?
16    A.  I don't recall, to be honest.
17    Q.  Was there any -- did you look at the
18  documentation in the Dropbox?
19    A.  I looked at welding certificates and some of the
20  -- some of that data, yes.
21    Q.  Were you aware of anything that was missing from
22  Drop -- missing from the documents that were requested?
23    A.  I don't -- don't recall.  I passed -- like I
24  said, I passed it along to the group to look at it.
25    Q.  Okay.  Was there --

54

1    A.  I had to run the facility.
2    Q.  So was there ever a report from VTTI to IPOS as
3  to their results of their investigation?
4    A.  I don't recall.
5    Q.  Was there ever an e-mail?
6    A.  I don't recall.
7    Q.  Well, there was a decision to terminate Petro's
8  contract; correct?
9    A.  At some point, yes.
10    Q.  Well, I think about eight days later.
11      What was the basis for that?
12    A.  I don't know the exact -- exact reason given at
13  the time.
14    Q.  Were you aware that -- I may have asked you this.
15  I've taken -- asked so many questions today.  I'm sorry if
16  I'm repeating myself.
17      Were you aware that Guillermo Castro offered to come
18  to the facility and retest the people?
19    A.  I -- I don't recall.
20        MS. FRANCIS:     And that was asked and answered.
21        MS. ROHN:     I thought so, but I repeat myself
22    or I read the deposition and figured out I hadn't
23    asked it.
24  BY MS. ROHN:
25    Q.  Do you know why Petro contract was terminated?

55

1    A.  My understanding is they didn't provide the
2  documentation that was required and lack of trust.
3    Q.  Well, in preparing for this deposition, you see
4  that they did provide the Dropbox; correct?
5        MR. BECKSTEDT:     Objection.
6  BY MS. ROHN:
7    Q.  You may answer.
8        MS. FRANCIS:     Objection.
9  BY MS. ROHN:
10    A.  Providing a Dropbox -- what was --
11    Q.  Well, with documents or certifications and
12  documents that had been requested; correct?
13        MR. BECKSTEDT:     Objection.  Foundation.
14        MS. FRANCIS:     Objection.  Foundation.
15        MR. BECKSTEDT:     You, yourself, when you asked
16    the question, said not all the documents.  You,
17    yourself, said that.
18        MS. ROHN:     Are we making speaking objections
19    now?
20        MR. BECKSTEDT:     No.  I'm objecting to the form
21    and misleading the witness.
22        MS. ROHN:     I thought we swore we weren't
23    making speaking objections.
24        MR. BECKSTEDT:     Objection to form.
25  BY MS. ROHN:

56

1    Q.  You don't know what documents were received and
2  what documents were not received; is that correct?
3    A.  I don't recall the documents that were received.
4  I have to get up and move around for a few minutes.
5    MS. ROHN:    No worries.
6    MR. BECKSTEDT:    Five-minute break?
7    THE WITNESS:    Yes.
8    MS. ROHN:    Sure.  Can I just follow up --
9  yeah, go ahead.  Go ahead.
10    THE WITNESS:    I can't sit this long.
11    MS. ROHN:    I don't mind if you stand up and
12  sit down as well when you're being questioned.
13    MS. FRANCIS:    Can we just take a five-minute
14  break, please?
15    MS. ROHN:    He certainly can.
16    MS. FRANCIS:    Thank you.
17    (Off the record.)
18  BY MS. ROHN:
19    Q.  Mr. Keogh, were you aware that the -- that it was
20  IPOS itself that hired Versa to test the welds after the --
21    (Interruption by the court reporter.)
22    Q.  -- completion of their work?
23    A.  Of -- who's their work?
24    Q.  Petro.  Petro's work.  Was Petro who themselves
25  hired Versa to test their welds?

57

1    A.  Okay.
2    Q.  Were you aware of that?
3    A.  Now I am, yes.  Yes.
4    Q.  Okay.  And that --
5    MS. FRANCIS:    Mr. Keogh, can you speak up,
6  please?
7    THE WITNESS:    Yes.
8    MS. FRANCIS:    You're voice is a trailing off.
9  Thank you.
10  BY MS. ROHN:
11    Q.  And that the Versa test -- through the Versa
12  testing, which is an independent group, the welds done by
13  Petro passed their -- the Versa test?
14    MS. FRANCIS:    Objection.  Foundation.
15    MR. SIMPSON:    Objection.
16    MS. FRANCIS:    Misstates the record.
17  BY MS. ROHN:
18    Q.  Were you aware of that?
19    A.  Yes.
20    MS. FRANCIS:    Objection.
21  BY MS. ROHN:
22    Q.  And are you aware that it's the same Versa Group
23  that IPOS then hired to retest the welds?
24    A.  So when the retesting was done, 100 percent was
25  done, not 10 percent.

58

1    Q.  Right.  But the industry standard after finishing
2  a job was to test 10 percent of the welds.  Are you
3  familiar with that?
4    A.  Yes.
5    MR. SIMPSON:    Objection.
6  BY MS. ROHN:
7    Q.  It wasn't something that they -- that Petro
8  chose; that was the industry standard of how you test at
9  the end of the job; correct?  Are you aware of that?
10    A.  Yes.
11    Q.  And that subsequent to that, IPOS chose to then
12  test a hundred percent of the welds?
13    A.  Correct.
14    Q.  And when you said "lack of trust," what
15  constituted the lack of trust?
16    A.  Might have been the concern of the documentation.
17    Q.  The welding certificates?
18    A.  Yes.
19    Q.  I'm going to show --
20    MS. ROHN:    Karima, can you put up Exhibit 53,
21  please.
22    (IPOS' First Supplemental Response to Plaintiff's
23  First Set of Interrogatories was previously marked as
24  Exhibit 53 for identification.)
25    MS. ROHN:    Scroll down on that, please.  Yep,

59

1  that's 53.
2    Can you go to 1995?
3    Actually, can you go to 1999?
4  BY MR. ROHN:
5    Q.  There's an e-mail July 22nd that -- from
6  David Smith again about this investigation.
7    "Before we speak to Guillermo, we would like to have
8  all of the testing records.  If you can please provide
9  them, we will review them and then be prepared to speak to
10  Guillermo."
11    And that is to Chad and Adrian.  And that's copied to
12  you.
13    And on the same day, you were -- Adrian sent to
14  David Smith, "I have attached the welders' quals for your
15  review.  Let me know what else I can provide and when we
16  can meet with the inspector Guillermo for clarification."
17    Do you understand -- do you understand that the type
18  of testing that Guillermo did, there are no copies of test
19  welds?
20    MS. FRANCIS:    Objection.  Foundation.
21  BY MS. ROHN:
22    A.  I'm not -- I don't test people; so I don't know.
23    Q.  And then there's a response from David at the top
24  of that page, "Andreas, Sorry, I should have been clear.
25  Andreas is our Global Technical Director.  He had helped

60

1 with this.  If some of it is in the Dropbox you provided to
2 Vitol last week, can we please add Andreas and I?  This is
3 what he is looking for.  I added him, so you can ask any
4 questions."
5        And then there's the list.  You see that is the same
6 list --
7            MS. ROHN:     You can scroll down.
8 BY MS. ROHN:
9    Q.   Same list that was in the e-mail from Andreas to
10 the -- to your group about what should be asked for?
11    A.   Yes, I can see that on the e-mail.
12            MS. ROHN:     If you go to the next pile.
13 BY MS. ROHN:
14    Q.   There is a response from Adrian.  "Testing
15 requirements.  I just shared the 3-inch vent folder on
16 Dropbox with Andreas.  Andreas, most of what you're asking
17 for is in the folder.  Please let me know if anything else
18 is needed."
19        So immediately upon that request, the information that
20 they had they provided; correct?
21    A.   According to this e-mail.
22    Q.   And then it says from David Smith, "Hi, Adrian,
23 can you add me?  I never got it.  Me either."
24        And then Adrian, as you scroll up, copies David.
25        And then there's a e-mail from -- the next day, from

61

1 David Smith, "Good morning Adrian, Andreas has been
2 reviewing the documentation and is looking for some more
3 specific information.
4        "He will be sending me a list and we will make sure
5 you have it."
6        And then there's an e-mail, July 26th, which is three
7 days later, "Here is what Andreas is looking for.  Full
8 inspection and test plan.
9        "Daily records for (welding, fitting, visual
10 inspection).
11        "Welding and mechanical tests of WPQs."
12        And the same day, Adrian -- if you scroll up, Adrian
13 says, "Full inspection and -- full and test plan - no I&TP
14 reports were required from IPOS/Vitol and therefore none
15 can be provided."
16        Do you know that there was an original list of what
17 was being requested, and this was not on that list?
18    A.   I don't recall.
19    Q.   Then to "Daily records (for welding, fitting,
20 visual inspection) - we do not have daily reports but have
21 included weld logs with all NDT which includes VT on all
22 welds from the third party inspection company," i.e., he
23 gave the Versa report.
24        And "Welding and mechanical tests of WPQs," says "The
25 actual welders' qualification certificate was given to

62

1 Petro in lieu of PAUT report.  Each Welder was tested on
2 four different positioned coupons which were phase array
3 inspected and passed.  Certification were then approved,
4 accepted and signed by Petro."
5        So was one of the reasons that Petro was terminated
6 because they didn't have documents that hadn't been
7 requested at the first of the job?
8            (Interruption by the court reporter.)
9    A.   I don't know.
10    Q.   And then on the next day, David Smith writes to
11 Adrian and copies you and everybody else, "Good morning
12 Adrian, Two comments for us.
13        "In the place of the ITP and daily records, can you
14 please share the internal welding procedures you applied
15 for GT 17 and GT 20?  Assume these procedures are approved
16 by an ASME authorized inspection agency?
17        And "Related to the PAUT report, you signed the
18 qualification certificate on behalf of Acuren/Costas.  We
19 believe that there must be a report/certification/document
20 from Acuren/Costas --" I think he means Castro.  "-- in
21 order for you to sign the WPQ.  Can you please provide?
22        "We're trying to work through this, and I believe we
23 all recognize that time is of the essence."
24        And then on July 27th, the same day, Adrian responds,
25 "Please find our response to your comments.

63

1        "In place of the ITP and daily records, can you please
2 share the internals."  He's responded, "I assume these
3 procedures -- oh, sorry.
4        He responded "Petro's welding procedures were created
5 and approved in 2018 by INI Corp out of Puerto Rico under
6 Section IX of the ASME code.  INI Corp is an approved
7 ASME/ASNT procedures at Limetree Bay, IPOS, Diageo, and --"
8 sorry.  "Approved company by WPS and inspections.  Petro
9 has used and has continued to test (through numerous PAUT &
10 X-ray) these same procedures at Limetree Bay, IPOS, Diageo,
11 and Cruzan Rum since 2018."
12        So his testing procedures were ASME procedures and
13 he'd been using since 2018.
14        Did you read that e-mail?
15    A.   I --
16            MR. SIMPSON:     Objection.
17 BY MS. ROHN:
18    Q.   And the second question was:  "Related to the
19 PAUT report, you signed the qualification certificate on
20 behalf of ASME."
21        His answer is "Please see Mr. Castro's attached letter
22 regarding this question."
23        And that's the letter from Mr. Castro, which you I
24 think say you can't recall if you saw  it or not; is that
25 correct?

64

1        MR. SIMPSON:    Objection.
2  BY MS. ROHN:
3    Q.  Is that correct?
4        (Interruption by the court reporter.)
5        MS. ROHN:    He said correct.
6  BY MS. ROHN:
7    Q.  So was IPOS satisfied with -- that his procedure
8  -- welding procedures were ASME approved?
9        MS. FRANCIS:    Objection.  This witness is not
10  here as a designee of IPOS.
11  BY MS. ROHN:
12    Q.  Were you satisfied with that answer?
13        MS. FRANCIS:    Objection.  Foundation.
14  BY MS. ROHN:
15    Q.  As to his ASME approved procedures?
16    A.  I don't even recall the e-mail.
17        MS. ROHN:    And then 5416.
18        MS. FRANCIS:    Is there a document being
19  displayed, 'cause I'm not --
20        MS. ROHN:    I asked her for 5416.  She's
21  looking for it.
22        MS. FRANCIS:    Okay.  Thank you.
23        MS. ROHN:    Karima, if you're having trouble
24  finding that, 'cause it's already after 5:00, can you
25  go to Exhibit 54 and do 2002.

65

1        (IPOS' First Supplemental Response to Plaintiff's
2    First Set of Interrogatories was previously marked as
3    Exhibit 54 for identification.)
4  BY MS. ROHN:
5    Q.  Prior to this e-mail, was the e-mail that
6  explains that.
7        MS. ROHN:    Just scroll up.  Scroll up just a
8    little bit.  No, just a little bit.  No.  No.  No.
9    Scroll down -- up just a little bit more.  I wanna go
10    to the next page, but just to the top.  Okay, stop.
11    That's perfect.
12  BY MS. ROHN:
13    Q.  So that was the -- you see that was the answer
14  from Adrian as to the request for those two documents,
15  types of documents.
16        MS. ROHN:    Okay.  Now can you scroll to 2002?
17    And scroll to David --
18  BY MS. ROHN:
19    Q.  David Smith takes the answer from Adrian and
20  sends it --
21        MS. ROHN:    Stop.  Thank you.
22  BY MS. ROHN:
23    Q.  And sends it to Andrew Canning.  You see that?
24  He's forwarded.
25    A.  Okay.

66

1        MS. ROHN:    Can you scroll up?
2  BY MS. ROHN:
3    Q.  And it says I --
4        MS. ROHN:    Thank you.
5  BY MS. ROHN:
6    Q.  "I find it curious that the letter is dated
7  July 29th along with a number of inconsistencies such as
8  why he needed to change the name on what was supposedly
9  their preceding certificate."
10    So there are a bunch of things about the credentials;
11  correct?
12        MR. SIMPSON:    Objection.
13        MS. ROHN:    And then if you will go to the
14    next page --
15  BY MS. ROHN:
16    A.  You asked me a question if -- do I need to read
17  this?
18    Q.  No.  I am going to go to 2001, because this is
19  actually discussing 2001 by Andrew.  And now this is a
20  letter from Guillermo Castro.
21    Have you ever seen that letter before?
22        MR. SIMPSON:    Objection.
23  BY MS. ROHN:
24    A.  I don't recall.
25    Q.  It's dated July 29, 2021, and it's in response to

67

1  the questions about his testing.
2        MR. BECKSTEDT:    I join in that last objection.
3    Same objection for this question.
4        MR. SIMPSON:    Objection.
5        MS. ROHN:    Noted.  I haven't even asked a
6    question yet.
7        MS. FRANCIS:    Likewise.  Objection.
8        MR. BECKSTEDT:    Wait, there's a question
9    pending.
10        MS. ROHN:    Well, I asked if he had seen the
11    document before.
12        MR. BECKSTEDT:    Did he answer?  I didn't hear
13    it.
14  BY MS. ROHN:
15    A.  I don't recall.
16        MR. BECKSTEDT:    Okay.  I'm sorry.
17  BY MS. ROHN:
18    Q.  He informs Petro -- he has a document that says
19  that he worked in Puerto Rico from January to May 2021 for
20  an independent client.
21    "Adrian Melendez from Petro Industrial contact me to
22  test and qualify a few welders that I personally qualified
23  three years ago at Limetree.  I tested six welders for
24  Adrian at my Client's shop in Puerto Rico, but
25  unfortunately did not have the original Quals under my

68

1   Acuren -- did not have my -- did not have the original
2   Quals under Acuren saved and to re-certify the previous
3   reports I had to adjust the old welders' quals and changed
4   the welders' tensile number and qualification date and the
5   four test coupons."
6        You see -- you see where he says I took an old form
7   and redid it?
8        MR. SIMPSON:   Objection.
9        MS. FRANCIS:   Objection to the extent that
10  misstates the contents of the document.
11  BY MS. ROHN:
12       Q.   Then he says "I gave Petro Industrial a welder's
13  qualification certificate for each welder, which all
14  welders passed, in lieu of a PAUT report.  No qualification
15  reports were created due to each welder was just testing to
16  re-qualify."
17       You know whether or not when you're re-qualifying a
18  welder, that you don't have to keep test results?
19       A.   I'm not --
20       MR. BECKSTEDT:   Objection.
21  BY MS. ROHN:
22       Q.   Well, did you ever ask anybody?  Did you ever ask
23  Andreas?
24       A.   Not to my knowledge.  I don't recall.
25       Q.   And then he said "Should you need me to come to

69

1   the St. Croix to recertify the welders, I'm willing to do
2   so."
3        Did you know he was willing to come to the
4   Virgin Islands to --
5        A.   I don't recall.
6        Q.   And wouldn't -- given the fact that you were the
7   terminal manager -- were you terminal manager when you were
8   at IPOS?
9        A.   Yes.
10       Q.   Given the fact that you were the terminal manager
11  at IPOS, were you the one that made the decision to
12  terminate the contract?
13       A.   No.
14       Q.   Who made that decision?
15       A.   It was made by management.  I don't recall who --
16  who made that -- who actually made the decision.
17       Q.   Well, who was higher than you in management at
18  IPOS?
19       A.   David Smith.
20       Q.   I thought he worked for VTTI?
21       A.   He was a director of -- under the directorship of
22  IPOS.  Or officer of the company.
23       Q.   Were you aware that in addition to doing work for
24  IPOS, that Petro also did work for Vitol?
25       A.   I believe they did the truck rack.

70

1        Q.   And eventually did IPOS pay the outstanding
2   invoices to Petro?
3        A.   I -- I don't -- at the time there was -- it was
4   called.
5        Q.   But were they eventually paid?
6        A.   I don't know.
7        Q.   Who would know at IPOS?
8        A.   David Smith.
9        MS. ROHN:   Exhibit 81, Document 054.
10       (IPOS' First Supplemental Response to Plaintiff's
11       Request for Production of Documents was previously
12       marked as Exhibit 81 for identification.)
13  BY MS. ROHN:
14       Q.   After -- while she's looking for that.  After
15  Petro's contract was terminated --
16       (Interruption by the court reporter.)
17       MS. ROHN:   That's okay.  We're on hold.  He's
18  on the phone.
19       (Off the record.)
20       MS. ROHN:   Is this 0501?
21       That's okay, we can -- you know what, I can ask
22  these of David Smith.  Wait.
23       You know what, I can ask these of David Smith.
24       I don't have any further questions.
25       MR. BECKSTEDT:   I just have a couple

71

1   questions.
2        Should I go next, Andy or Simone?
3        MR. SIMPSON:   Sure.  I have no questions.
4        MS. FRANCIS:   I have no objection to you going
5   next, Attorney Beckstedt.
6        MR. BECKSTEDT:   Okay.
7                CROSS-EXAMINATION
8   BY MR. BECKSTEDT:
9        Q.   It's Keogh; right?
10       A.   Yes, sir.
11       Q.   Mr. Keogh, I'm Carl Beckstedt.  I represent the
12  Vitol defendants, Vitol Virgin Islands Corp. and
13  Vitol US Holding II Company.  Just a couple of questions.
14       You were -- if I understand correctly, you were the
15  terminal manager for IPOS for basically in July for a few
16  weeks before the IPOS contract -- or the Petro contract was
17  terminated; correct?
18       A.   Correct.
19       MS. ROHN:   Object to form.
20  BY MR. BECKSTEDT:
21       Q.   Okay.  Were you working as the terminal manager
22  at IPOS in July of 2021?
23       A.   Correct.
24       Q.   Okay.  And was Petro a maintenance --
25  Petro Industrial Solutions LLC a maintenance contractor for

72

1  IPOS at that time?
2      A.  Yes.
3      Q.  All right.  And was Andrew Canning a consultant
4  at that time --
5      A.  Yes.
6      Q.  -- with respect to that work?
7      A.  Yes.
8      Q.  Okay.  First of all, there's allegations in this
9  case of racist and discriminatory conduct against Petro
10  Industrial Solutions LLC and/or its employees.  Are you
11  aware of that?
12     A.  No.
13     Q.  Okay.  Did you ever observe any type of -- any
14  Vitol employees engaged in any racist conduct towards
15  Petro Industrial Solutions LLC or any Petro employees?
16     A.  No.
17     Q.  Did you ever -- specifically your -- I think
18  you've already mentioned this.  You're aware that there are
19  employees related to the Vitol companies,
20  Charlotte Horowitz, Sebastian Moretti, who's been --
21  Tim K., someone who's been referred to as Tim K., because
22  nobody can pronounce his last name, and also I think you
23  mentioned Eduardo Garcia; correct?  Or not?
24         MS. ROHN:    I don't think I asked him that.
25  BY MR. BECKSTEDT:

73

1      Q.  Okay.  Charlotte Horowitz, you know her?
2      A.  Yes.
3      Q.  And you associate her with Vitol?
4      A.  Yes.
5      Q.  And Sebastian Moretti, you know him?
6      A.  Yes.
7      Q.  And you associate him with Vitol?
8      A.  Yes.
9      Q.  And Tim K., do you know who I'm talking about?
10     A.  Yes.
11     Q.  Okay.  Is he associated with Vitol?
12     A.  To my knowledge, not anymore.
13     Q.  Okay.  Was he at the time in July 2021?
14     A.  Yes.
15     Q.  Okay.  Do you know somebody named Eduardo Garcia
16  or no?
17     A.  I don't recall.
18     Q.  That's fine.
19         With respect to any of those three people I just
20  mentioned that you associate with Vitol, did you ever
21  observe or hear them engaging in any type of racist or
22  discriminatory conduct towards
23  Petro Industrial Solutions LLC or any Petro employees?
24     A.  No.
25     Q.  Okay.  Did you observe Andrew Canning engaging in

74

1  any type of discriminatory or racist conduct against
2  Petro Industrial Solutions LLC or any Petro employees?
3      A.  No.
4      Q.  Did Petro Industrial Solutions LLC or any Petro
5  employees ever bring to your attention any complaints of
6  any type of discriminatory conduct or racism by
7  Andrew Canning to them?
8      A.  No.
9      Q.  And did it ever come to your attention that there
10  were any complaints of any racist or discriminatory conduct
11  against Petro Industrial Solutions LLC or its employees
12  that you received from anybody?
13     A.  No.  Not that I recall, no.
14     Q.  Okay.  Fair enough.
15         MR. BECKSTEDT:    I don't have any further
16  questions.
17         MS. ROHN:    Simone.
18         MS. FRANCIS:    Just -- just a few.
19                CROSS-EXAMINATION
20  BY MS. FRANCIS:
21     Q.  Mr. Keogh, continuing on that line of
22  questioning, did you ever observe any IPOS employees engage
23  in any racist or discriminatory conduct towards Petro LLC
24  or any Petro LLC employees?
25     A.  No.

75

1      Q.  And there was questions about the maintenance
2  work done after the Petro maintenance agreement was
3  terminated.  Do you recall that line of questioning?
4      A.  Yes.
5      Q.  And the next maintenance contractor that was
6  hired, as I understand it, was a company by the name of the
7  TTI/Peak; is that correct?
8      A.  Correct.
9      Q.  And in your capacity as the terminal manager for
10  IPOS, did you have occasion to observe or know what
11  employees TTI/Peak used when it was the maintenance
12  contractor?
13     A.  I believe they used all but, I think, six out of
14  seven of the employees in St. Croix and St. Thomas.  I
15  believe one left to remain with Petro Industrial.
16     Q.  I'm sorry.  When you say "six out of seven of the
17  employees," what do you mean six out of seven of the
18  employees?
19     A.  I believe at the time there was three in
20  St. Thomas and four in St. Croix.  And they were asked by
21  TT -- they were looked -- I guess their résumés were given
22  -- they gave their résumés to TTI.  They looked at them and
23  offered them positions.
24     Q.  So these are former Petro employees who then
25  worked for TTI/Peak?

76

1    A.  Correct.

2    Q.  And did those former employees who worked for

3  TTI/Peak, were any of those individuals, individuals of

4  Caribbean or African American descent?

5    A.  Yes.

6    Q.  In your capacity as terminal manager for IPOS,

7  did you ever engage in any racist or discriminatory conduct

8  towards Petro LLC or any Petro LLC employees?

9    A.  No.

10        MS. FRANCIS:    I have no further questions.

11        MS. ROHN:    I have a few, but they're short.

12            REDIRECT EXAMINATION

13  BY MS. ROHN:

14    Q.  Was Mr. Canning in favor of terminating Petro's

15  contract?

16        MR. SIMPSON:    Objection.

17  BY MS. ROHN:

18    Q.  You said yes?

19    A.  Yes.

20    Q.  Did you ever sit in any meetings with Mr. Canning

21  when he referred to Petro as an incompetent company or

22  didn't know what they were doing?

23    A.  Not that I recall.

24        MS. ROHN:    I have no further questions.

25        MR. BECKSTEDT:    No questions from the Vitol

77

1  defendants.

2        MR. SIMPSON:    No questions.

3        MS. FRANCIS:    I do not have further questions.

4  Thank you.

5

6        (At 5:30 p.m., the deposition of this witness

7  was concluded.)

78

1            CERTIFICATE OF REPORTER

2

3        I, YVONNE SAMUEL-SETORIE, Registered

4  Professional Reporter, do hereby certify that the above and

5  named witness, TERENCE KEOGH, after being duly sworn, was

6  examined and testified via Zoom video conference as is set

7  forth; and that the answers of said witness to the oral

8  interrogatories propounded by counsel were taken by me in

9  machine shorthand, and represents the official transcript

10  of said deposition; and that said deposition is true and

11  correct, to the best of my ability.

12

13        I FURTHER CERTIFY that I am not counsel,

14  attorney, or relative of either party, nor financially or

15  otherwise interested in the event of this lawsuit.

16

17        IN WITNESS WHEREOF, I have hereunto

18  subscribed my hand on this 7th day of July 2023.

19

20

21

_____

22        YVONNE SAMUEL-SETORIE, RPR

23

24

25