*Execution Version*

## FACILITIES SERVICES AGREEMENT

This Facilities Services Agreement is made and entered into effective as of this 1st day of November, 2016 (the "**Effective Date**"), by and between Island Project and Operating Services LLC, a company with limited liability organized and existing under the laws of the United Stated Virgin Islands and having its principal place of business at 7 King Street, Christiansted St. Croix, VI 00820 ("**IPOS**") and Vitol Virgin Islands Corp. ("**Vitol**"), organized and existing under the laws of the State of Delaware and having its registered office at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Each of IPOS and Vitol are sometimes referred to herein individually as a "**Party**" and together as the "**Parties**".

## RECITALS

WHEREAS, Vitol has entered into an agreement with the Virgin Islands Water and Power Authority ("**WAPA**") to perform certain services related to the conversion of units 15, 18, 22 and 23 at the Randolph Harley Power Plant located on the island of St. Thomas and units 16, 17, 19 and 20 at the Richmond Power Plant located on the island of St. Croix and the development of infrastructure projects related thereto (together and inclusive, the "**Plants**").

WHEREAS, Vitol and IPOS are parties to a Project Management Agreement dated August 19, 2013, whereby IPOS provided technical, project management, construction management and consultancy services to Vitol relating to the construction of the Plants (the "**Project Management Agreement**");

WHEREAS, the Plants are, or will be in the upcoming months, operational and Vitol requires operational and support services to manage and run the Plants;

WHEREAS, the Parties have mutually agreed to clarify the operational support and services, supplies, consulting, materials, and/or equipment that IPOS is able and willing to provide to Vitol at the Plants as provided for herein; and

WHEREAS, the Parties wish to enter into this Facilities Services Agreement to set out the terms and conditions on which IPOS shall provide such Services to Vitol.

NOW THEREFORE, in consideration of the mutual promises set forth in this Facilities Services Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, IPOS and Vitol hereby agree as follows:

## I.    PURPOSE AND PARTIES

A.    Vitol requests and IPOS agrees that IPOS will provide the Services to Vitol. The scope of Services provided hereunder shall be as set forth on **Exhibit "A"** and Vitol shall have the right to request additional services upon the issuance of a written Services Order Request to IPOS, specifying the additional services to be provided and other information pertinent to the services. After IPOS's written acceptance of such issued Service Order Request, IPOS and Vitol shall agree on the price, schedule and the terms and conditions in good faith. If there is an agreement between the Parties on the price and the term and conditions of the

1

34078803.3

**EXHIBIT 28**

CONFIDENTIAL    VITOL-000012

*Execution Version*

additional service, such additional service will be deemed to be a Service. The form of the Services Order Request is attached hereto as **Exhibit "B"**.

B.     This Facilities Services Agreement and the terms and conditions of the Exhibits and all agreed and approved Services Order Request(s) (hereinafter collectively referred to as **the "Agreement"**) as attached hereto and incorporated herein for all purposes reflect the entire agreement of the Parties. In the event of any conflict between the provisions of this Agreement and a Services Order Request, the provisions of this Agreement shall prevail unless the Parties specifically agree that the a specific provision of a Services Order Request prevails.

## II.   TERM AND TERMINATION

A.     The term of this Agreement shall commence on the Effective Date and shall continue in effect for an initial period of five (5) years (the **"Initial Agreement Term"**). Thereafter, Vitol may extend the Initial Agreement Term for a period of two (2) years following expiration of the Initial Agreement Term by providing written notice of its election to so extend the Initial Agreement Term no later than 120 days prior to the expiration of the Initial Agreement Term (together with the Initial Agreement Term, the **"Term"**).

B.     This Agreement, or any extension hereof, may be terminated by either Party in the event of any material breach of this Agreement upon a termination notice, in the event the breaching Party has not remedied such material breach within 90 days of the notice. "Material breach" for purposes of this clause means with respect to a Party any act, change, effect circumstance, development issue, subject matter, arrangement, agreement, liability, obligation, responsibility, undertaking or alike that results or will likely result in (i) in a long term significant impairment to the earnings generation potential of such a Party's group taken as a whole; and/or (ii) a significant adverse effect on the business, asset or financial condition of such Party's group takes as a whole.

C.     IPOS shall have the sole right to terminate the Agreement, or any extension hereof, in the event the Plants are directly or indirectly divested and sold by Viol to a third party or in the event Vitol enters into an agreement with a third party which results in an change of control.

D.     Unless a notice of termination by either Party provides otherwise, upon receipt of a notice of termination, IPOS shall immediately: (i) cease its Services under this Agreement or any Services Order Request, (ii) discontinue the placement of any orders for equipment, materials, facilities, or supplies in connection with such Services to the extent that the same may be discontinued, (iii) cancel any existing orders for equipment, materials, facilities, or supplies in connection with such Services to the extent that the same may be cancelled, and (iv) and terminate all subcontracted Services with respect to such Services to the extent that the same may be terminated.

CONFIDENTIAL                                                        VITOL-000013

E.    Notwithstanding the term and termination provisions in Section II.A. and B. herein, the Confidentiality and Ownership Of Services Product provisions in Section IV, the Audit provisions of Section V.B, the Indemnification provisions in Section VI, the Compliance with Laws in Section IX, the Use of Services Product in provision in Section X, and the Miscellaneous provisions in Section XV shall survive the termination of this Agreement.

## III.    CONSIDERATION AND EXPENSES

A.    IPOS shall prepare an annual budget to include the expenses (the "**IPOS Expenses**") and the operating fees (the "**IPOS Fees**") for the Plants for the annual time periods commencing July 1st through June 30th (each, a "**Budget Year**") within the Term provided for herein for Vitol's review and mutual approval of the Parties. IPOS shall submit such budget to Vitol by the end of each February preceding the upcoming Budget Year. The IPOS Fees and IPOS Expenses for any given Budget Year comprise the "**Annual Budget**".

The Parties acknowledge and agree that within the IPOS Expenses category in each Annual Budget, the items labelled "Materials & Misc. Spare Parts" and "Maintenance & Repairs" are estimates only and the Parties will discuss in good faith any increases and/or decreases which may be necessary for these specific budget items as they occur from time to time. IPOS shall provide any necessary invoices and supporting documentation as requested by Vitol to determine the final amounts to be payable to IPOS for such budget items. All other items included in the agreed Annual Budget will not be subject to adjustments within the applicable Budget Year. Except where IPOS fails to adhere to prudent industry standards or is otherwise grossly negligent in the performance of the Services, IPOS shall not be responsible nor liable for the budget expenses for the maintenance and/ or repair and maintenance and/or repair related services and any cost overrun of such expenses. The general budget form to be used is attached hereto as Exhibit "D".

For the current Budget Year (beginning on the Effective Date of this Agreement and ending June 30, 2017), the Parties agree that the Annual Budget is as per Exhibit D with the monthly charges to Vitol to be as follows - $206,424 USD for Services provided for the St Thomas Plant and $211,424 USD for Services provided for the St Croix Plant. For the 2017-2018 Budget Year (i.e., July 1, 2017 through June 30, 2018), the Parties shall negotiate and agree to the applicable Annual Budget in February 2017 as per this paragraph A. The Parties agree that one component of the IPOS Fees for the 2017-2018 Annual Budget shall be the following agreed annual amounts (to be billed and paid on a monthly pro-rata basis) – Three Hundred Thousand USD ($300,000) for Services provided at St. Thomas and Three Hundred Thousand USD ($300,000) for Services provided at St. Croix.

B.    IPOS shall invoice Vitol on a monthly basis for the pro-rata amount of the current Annual Budget (the "**IPOS Monthly Budget**"). Vitol shall pay the undisputed portions of IPOS's invoices within thirty (30) days of the date of the invoices. In

34078803.3

3

    

*Execution Version*

the event Vitol disputes an invoice, Vitol shall send IPOS within 7 days of the due date of such invoice a motivated summary of the reasons for such dispute and shall send supported documents for such dispute. In any event disputes of an invoice shall only be related to the Services provided by IPOS. Notwithstanding the above IPOS shall have the right to charge interest of USD LIBOR +3.5 % on the total outstanding amount as from 30 days of the due date of such invoices. For the avoidance of doubt if Vitol disputes an invoice rightfully no interest will be charged for such rightfully disputed amount.

In addition, Vitol shall pay IPOS in accordance with any applicable Services Order Request.

The Parties acknowledge and agree that the Annual Budget shall be renegotiated and agreed to on an annual basis

C.   Unless otherwise expressly agreed by the Parties, IPOS shall prepay and be responsible for the correct and timely payment of all amounts payable to its subcontractors with respect to the Services hereunder, save for events Vitol has breached its payments obligation stipulated in Paragraph B of this Clause. Vitol shall not have any duty or obligation to any subcontractor with respect to payments or to the further distribution of any proceeds tendered to IPOS hereunder, unless Vitol has beached it payment obligations mentioned in Paragraph B of this Clause

D.   In the event that the annual budget as agreed between the Parties in any given Budget Year is met by IPOS. Vitol shall have the discretion to award IPOS a performance bonus up to two hundred and fifty thousand U.S. dollars ($250,000.00)

## IV.   CONFIDENTIALITY AND OWNERSHIP OF SERVICES PRODUCT

A.   The Parties agree that during the Term Vitol and IPOS may be exposed to information and materials which are extremely confidential, privileged, and proprietary in nature involving, without limitation, either Party's methods, expertise, operations, geological and geophysical data, exploration programs, financial matters, and other sensitive issues. By entering into this Agreement, both IPOS and Vitol hereby each separately acknowledge and agree to the other Party that any and all information and materials provided to one Party by the other Party or to which one Party gains access from the other Party in any form maintained or created whether documented or electronically stored or otherwise, shall at all times during the Term and two (2) years after its expiration, remain confidential, privileged and proprietary and shall be used only for the purposes contemplated by this Agreement. Neither Party shall disclose to any third party any information or material provided to one Party by the other Party without the prior written consent of such other Party. The obligation of confidentiality shall not apply to information and materials which: 1) now or hereafter become a part of the public domain other than as a result of a wrongful act or omission by the

34078803.3

4

receiving Party to this Agreement; 2) are disclosed to a Party to this Agreement by a third party who has, upon reasonable inquiry, the lawful right to make such disclosure; 3) are required to be disclosed by either Party to this Agreement in response to a judicial or administrative process from a court or governmental body of competent jurisdiction with lawful authority to demand the production of same (provided that the disclosing Party where legally permissible has given written notice to the other Party prior to such disclosure); 4) are currently in a Party's possession, or to which that Party to this Agreement is otherwise entitled at the time of disclosure, free of any confidentiality obligations; or 5) are independently developed by the receiving Party to this Agreement without the benefit or use of the confidential information received from the disclosing Party.

B.      Due to the fact that certain Vitol information and materials are extremely confidential, privileged, and proprietary in nature and may be disclosed by IPOS to third parties, IPOS and Vitol agree that each and every such third party shall enter into and sign a confidentiality agreement in such form as determined by Vitol in its sole reasonable discretion prior to IPOS's disclosure to said third party. IPOS shall notify Vitol when it desires that a third party receive any such confidential, privileged or proprietary Vitol information or materials, and shall only enter into a confidentiality agreement upon Vitol's prior written consent that such third party may enter into a confidentiality agreement and such information may be disclosed to such third party.

## V.    RELATIONSHIP OF PARTIES

A.      It is the intent of the Parties hereto that the Services rendered to Vitol by IPOS shall be those of IPOS being an independent contractor maintaining an 'arms-length transaction' between the Parties, and no term or provision of this Agreement shall be construed as creating an agent, servant, employee, or representative relationship between IPOS and Vitol, except as provided in Section V.F, below. The personnel provided by IPOS to Vitol under this Agreement shall be the employees of, or contractors to, IPOS. IPOS shall be liable for hiring, directing, compensating), disciplining and firing the personnel IPOS provides hereunder. IPOS shall be solely liable for making any and all tax and other payroll deductions and withholdings in connection with its or its employees' compensation, including but not limited to any federal, state, or local payroll taxes, premiums for unemployment insurance, workers' compensation insurance, pensions, annuities, retirement benefits, thrift plans, profit sharing plans, health or life insurance, professional, educational or credential maintenance requirements, or any other benefits normally paid to IPOS's employees. No personnel provided by IPOS under this Agreement shall be entitled to any benefits provided by Vitol to its employees.

B.      Notwithstanding the independent contractor basis for this Agreement and any Services hereunder, IPOS agrees that Vitol shall have the right to audit IPOS's books and records related to the Services during the Term and for a period of six (6) months upon expiration of the Agreement during normal working hours. Vitol

34078803.3

5

*Execution Version*

shall notify IPOS as soon as reasonably possible in writing of such planned audit and provide the details of the representatives conducting such audit and the audited matters. Vitol shall only audit after having notified IPOS in accordance with the foregoing. IPOS shall maintain records and books of account showing its actual costs of all items of labor, material, equipment, supplies and other expenditures of whatever nature for which reimbursement is authorized under this Agreement. The system of accounting to be employed by IPOS shall conform with IPOS's usual practice.

C.      Nothing in this Agreement shall be construed to authorize or permit IPOS to create or incur any legal obligation, debt, or responsibility that might be binding upon Vitol and any such authorization or permission being expressly withheld, rejected, and denied.

D.      Nothing shall prevent IPOS from rendering services to any third party other than Vitol, and IPOS may enter into arrangements to provide similar services to other persons or other companies. Nevertheless, if any conflict of interest may arise, then IPOS shall notify Vitol, and the Parties shall appropriately resolve the issue. Furthermore, this Agreement does not obligate Vitol to request Services from IPOS.

E.      Vitol shall provide IPOS with appropriate access to Vitol's premises and work site for the Services to be performed.   IPOS shall implement policies and procedures in accordance with **Exhibit "C"**, and IPOS agrees to ensure that the applicable policies and procedures shall be adhered to by its employees and contractors if any. IPOS hereby acknowledges the right of Vitol to refuse access on its risk and account and have IPOS remove and replace any person IPOS provides to the Plants, premises or work site for justified reasonable reasons. IPOS shall as soon as possible (but in no event later than twenty four (24) hours) report in writing to Vitol any and all material accidents, occurrences, damages or claims of any person arising under this Agreement, and when requested by Vitol in writing provide such to Vitol's insurers.

## VI.     INDEMNIFICATION AND LIMITATION OF LIABILITY

To the fullest extent permitted by applicable law and except as specified otherwise elsewhere in this Agreement:

A.      Vitol shall be liable and defend, indemnify and hold harmless IPOS, its directors, employees and agents for and against any loss, damage, claim, suit, liability, judgment and expense (including attorneys' fees and other costs of litigation) arising out of injury, disease or death of any persons or damage to or loss of any property, fine or penalty caused by or resulting from the gross negligence or willful misconduct of Vitol, its employees, agents, contractors, or customers in the exercise of any of the rights granted hereunder. In the event Vitol is proven to be liable, its liability shall be limited to  USD 500,000.00 per event or sequences of events arising out of the same cause with a total cap of USD Two (2) Million.

34078803.3

6

B.  IPOS shall be liable and defend, indemnify and hold harmless Vitol, its directors, employees and agents for and against any loss, damage, claim, suit, liability, judgment and expense (including attorneys' fees and other costs of litigation) arising out of injury, disease or death of any persons or damage to or loss of any property, fine or penalty caused by or resulting from the gross negligence or willful misconduct of IPOS, its employees, agents, contractors, or customers in the exercise of any of the rights granted hereunder. In the event IPOS is proven to be liable, its liability shall be limited to USD 500,000.00 per event or sequences of events arising out of the same cause. For the avoidance of doubt the total liability of IPOS under this Agreement shall be capped at USD Two (2) Million.

C.  Subject to Clauses A and B immediately above, in the event of any spill, discharge or other pollution event which is not otherwise responded to or mitigated by IPOS, Vitol shall have the option to send a written request to IPOS to remove or procure removal of any pollution or contamination and in the event IPOS fails to abide to such a request of Vitol, Vitol may take part in any degree it deems necessary in the control and removal of any pollution or contamination.

D.  Indemnification Procedure.

The indemnified Party hereunder agrees to notify the indemnifying Party as soon as practicable after receiving notice of the assertion of any claim brought against it within the indemnities of this Agreement, and shall furnish the indemnifying Party with complete details within its knowledge and each Party shall render all reasonable assistance requested by the other in the defense of the claim. The indemnifying Party shall have the right to conduct the defense of any asserted claims. If the indemnifying Party fails to assume the defense as soon as reasonably possible but in any event no later than thirty (30) days after a claim is brought against the indemnified Party (or any other third party entitled to indemnification by the indemnifying Party under this clause), the indemnified Party may conduct such defense with all reasonable costs, including reasonable attorneys' fees, to be for the indemnifying Party's account.

## VII.  INSURANCE

A.  Vitol Insurance

(1) Without derogation from or limitation on IPOS's obligations hereunder, Vitol shall, at its own cost, obtain general liability, including wharfingers liability insurance and sudden and accidental pollution liability insurance, with limits of $10 million per occurrence and aggregate, with deductibles similar to what a commercially prudent owner or operator would assume. Such insurance shall include IPOS as a beneficiary name insured on a primary basis. It is intended that this insurance apply to both Parties on a primary basis, regardless of the indemnity obligations of

34078803.3

7

either Party. Such policy(ies) shall include a severability of interests clause or equivalent, which provides that the policy shall cover each insured against whom claim is made as if separate policies had been issued, except for the limit of liability.

IPOS acknowledges that the insurance aggregate limits may be eroded by claims against Vitol and/or IPOS for events at the Plants.

(2) Vitol as the owner of the Plants shall carry all risk property insurance covering losses or damage to the Plants and all other necessary insurances. Limits and deductibles shall be similar to what a commercially prudent owner or operator would purchase/ assume. Vitol further agrees that it shall be solely responsible for any deductibles on the all-risk property insurance carried by it pursuant to this Section 7.A.2, except for such incidents occasioned by the gross negligence or willful misconduct of IPOS in which event IPOS shall be liable in accordance with Paragraph B of Clause VI.

B.   IPOS Insurance

IPOS shall procure and maintain sufficient insurances for its employees, property, automobile and Services to comply with Applicable Law and which are necessary for the Services.

The coverages of insurance required herein shall in no way limit or restrict IPOS's liabilities or obligations assumed by IPOS under this Agreement.

Each Party shall require the carriers of any property or other first party insurance coverage to waive all rights of subrogation against the other Party and its representatives.

## VIII.  FORCE MAJEURE

In the event that performance by either Party of its obligation including but not limited, other than the obligation to make payment on amounts due and owing hereunder, is rendered impossible due to –threatened- act of God, fire, flood, or other natural catastrophe, or due to a change in laws prohibiting performance required hereunder, or due to an injunction or order of a government, court or agency having jurisdiction, or due to –threatened- insurrection, strike, civil strife, insurgency or war (declared or undeclared), or action by government, quasi-government, or those claiming control over governmental actions, or claims or actions against the government or the industry, that Party shall be relieved from performance of its obligation hereunder insofar as such non-performance is the result of such impossibility. Both Parties shall endeavour to use all reasonable and lawful means to complete performance contemplated under this Agreement. Either Party shall immediately notify the other Party in writing if a force majeure situation occurs. If a force majeure situation exists for a period of hundred and eighty (180) continuous days, then both Parties shall meet to discuss the way forward in good faith.

CONFIDENTIAL                                                                          VITOL-000019

*Execution Version*

## IX.    COMPLIANCE WITH LAWS

A.   It is agreed that in the performance of the Services provided for herein, all operations shall be conducted in full compliance with any and all valid and applicable U.S. Virgin Islands and United States laws, rules, and regulations adopted by any governmental agency, whether local, state or federal, including but not limited to any United States sanctions, embargos, and/or anti-corruption statutes, laws, decrees, or other restrictions. IPOS agrees, in the performance of its Services hereunder, to comply with the applicable provisions of the U.S. Fair Labor Standards Act of 1938, as amended, and with valid regulations having application thereto.

B.   Throughout the Term, IPOS shall conduct its Services or actions in good faith with all parties and shall not otherwise engage in any unlawful trade practices. IPOS shall comply with the provisions of the Foreign Corrupt Practices Act of 1977 of the United States of America (Public Law 95-213, Dec. 19, 1977), as amended, (Public Law 100-418, Title V, §5003, Aug. 23, 1988).

C.   IPOS shall comply with all local ordinances and United States laws regarding labor and equipment in effect at the time of execution of this Agreement or passed during the term hereof. IPOS shall include in its rates, and pay if applicable, all United States federal, U.S. Virgin Islands and local taxes (including, without limitation, all income, sales and use, excise, FICA, FUTA, state unemployment and workmen's compensation, withholding and / or payment obligations) and assessments on labor and materials.

D.   If the Services to be performed by IPOS under this Agreement involves operations, maintenance or emergency response functions on pipelines or related facilities subject to the regulations of 49 CFR Part 195, then IPOS warrants and certifies that it is in compliance with the provisions of the regulations governing anti-drug programs for pipeline personnel issued by the Research and Special Programs Administration, U.S. Department of Transportation, at 49 CFR Part 199. IPOS further warrants and certifies that it has established and operates a drug program to test its employees for the presence of "prohibited drugs," as defined in 49 CFR Section 199.3. IPOS warrants and certifies that only those employees who are included in IPOS's drug testing program and have not "failed," as defined in 49 CFR Section 199.3, or refused a test for prohibited drugs shall be allowed on Vitol's premises to perform Services for Vitol.

## X.    USE OF SERVICES PRODUCT

Vitol and IPOS agree that any Services document produced under this Agreement is based on information sources which Vitol and IPOS believe to be reliable, including information that was publicly available and information that was provided to Vitol and IPOS. IPOS shall perform its Services in accordance with the industry standards.

34078803.3

9

*Execution Version*

## XI.   WARRANTY

IPOS warrants that all Services shall be performed or rendered by IPOS in compliance with the specifications and requirements set forth in this Agreement or any Services Order Request. IPOS warrants that the equipment furnished under the terms and conditions of this Agreement will conform to IPOS's published specifications.

## XII.   REPRESENTATIONS AND WARRANTIES

IPOS represents and warrants to Vitol as follows:

    (a)    IPOS is a corporation, limited liability company or limited partnership, as applicable, duly organized, validly existing, and in good standing under the laws of the country of its formation and jurisdiction;

    (b)    IPOS has all the requisite power and authority to execute and deliver this Agreement, and to perform its Services obligations hereunder;

    (c)    IPOS has taken all requisite action to allow it to enter into this Agreement, and that this Agreement when executed and delivered by such Party constitutes a legal, valid, and binding obligation by such Party, enforceable against it in accordance with its terms; and

    (d)    the execution and delivery by IPOS, the performance of its Services obligations hereunder, and the consummation of the Services contemplated herein will not:

        (i)    conflict with any provision of IPOS's certificate or articles of formation or by-laws, partnership agreement, or equivalent governing instruments;

        (ii)    violate any provision of, or, require any filing, consent, authorization, or approval by any other third party under any agreement or instrument, applicable to or binding on IPOS or to which IPOS is subject;

        (iii)    conflict with, or constitute a default under any material agreement or instrument to which IPOS is a party to or to which IPOS is otherwise subject to; and

        (iv)    no other person or entity, claiming by, through, or under IPOS or any of its affiliates and no shareholder, beneficial owner, officer, director, employee, or consultant of IPOS or any of its affiliates, is entitled to any fee or other compensation, the payment of which, the other Party or its affiliates, shareholders, officers, directors, or employees would be liable.

34078803.3

CONFIDENTIAL        VITOL-000021

Vitol represents and warrants to IPOS as follows:

(a)    Vitol is a corporation, limited liability company or limited partnership, as applicable, duly organized, validly existing, and in good standing under the laws of the country of its formation and jurisdiction;

(b)    Vitol has all the requisite power and authority to execute and deliver this Agreement, and to perform its obligations hereunder;

(c)    Vitol has taken all requisite action to allow it to enter into this Agreement, and that this Agreement when executed and delivered by such Party constitutes a legal, valid, and binding obligation by such Party, enforceable against it in accordance with its terms; and

(d)    the execution and delivery by Vitol, the performance of its obligations hereunder will not:

   (i)    conflict with any provision of Vitol's certificate or articles of formation or by-laws, partnership agreement, or equivalent governing instruments;

   (ii)    violate any provision of, or, require any filing, consent, authorization, or approval by any other third party under any agreement or instrument, applicable to or binding on Vitol or to which Vitol is subject;

   (iii)    conflict with, or constitute a default under any material agreement or instrument to which Vitol is a party to or to which Vitol is otherwise subject to; and

   (iv)    no other person or entity, claiming by, through, or under Vitol or any of its affiliates and no shareholder, beneficial owner, officer, director, employee, or consultant of Vitol or any of its affiliates, is entitled to any fee or other compensation, the payment of which, the other Party or its affiliates, shareholders, officers, directors, or employees would be liable.

## XIII.  MISCELLANEOUS.

A.    **THE PARTIES HERETO AGREE THAT WITH RESPECT TO ANY MATTER RELATING TO OR ARISING UNDER THIS AGREEMENT, THE LAWS OF THE STATE OF NEW YORK SHALL BE APPLIED, REGARDLESS OF ITS CONFLICTS OF LAWS PROVISIONS.  IF ALL OR ANY PART OF THIS AGREEMENT SHALL BE RULED OR HELD BY A COMPETENT AUTHORITY OF A JURISDICTION OR GOVERNMENT AS INVALID OR UNENFORCEABLE, SUCH PART(S) OF THIS AGREEMENT SHALL BE RENDERED AS STRICKEN, AND THE BALANCE OF THIS AGREEMENT REMAIN IN EFFECT,**

34078803.3

CONFIDENTIAL                              VITOL-000022

**PROVIDED THE PURPOSE AND INTENT OF THIS AGREEMENT REMAINS VALID AND PERFORMANCE BY EITHER OR BOTH PARTIES MAY OCCUR.**

B.  The Parties irrevocably and unconditionally consent and agree to submit to the exclusive jurisdiction of the federal courts located in New York in the state of New York. The Parties further irrevocably and unconditionally waive any objection based upon lack of personal jurisdiction, improper venue or forum non conveniens in this jurisdiction and consent to the granting of such legal or equitable relief as is deemed appropriate by the federal courts in this jurisdiction.

C.  Failure to enforce any or all of the terms contained in this Agreement in any particular instance shall not constitute a waiver thereof or preclude subsequent enforcement thereof. No term or provision of this Agreement may be altered except by written amendment duly executed by each of the Parties hereto.

D.  No assignment of this Agreement shall be made by either Party without the written consent of the other Party, which consent shall not be unreasonably withheld. Any assignment other than as provided in this paragraph shall be null and void for all purposes.

E.  Any notice contemplated by this Agreement shall be in writing, and sufficient and binding upon the Party to whom it is given by addressing the same:

If to IPOS:

**IPOS, LLC**
P.O. Box 303388        Saint Thomas, VI 00803
Email: mef@vtti.com
Telephone : (340) 2445070
Attn: Merlin Figueira

If to Vitol:

**VITOL VIRGIN ISLANDS CORP.**
2925 Richmond Ave., 11th Floor
Houston, TX 77098
Telephone: 713-230-1000
Fax: 713-230-1300
Email: xcontractshou@vitol.com
Attn: Contract Administration

and delivering it postage prepaid, return receipt requested or by overnight delivery service or other registered delivery. Notice shall be deemed to have been received by the addressee on the date shown on the delivery receipt. Email shall be used for emergency and immediate communication; however it shall not be considered official notice.

F.  This Agreement and any Services Order Requests issued pursuant hereto shall create no rights in any party other than the Parties and no other party is intended

34078803.3

12

*Execution Version*

to be a third-party beneficiary of this Agreement, except as specifically indicated herein.

G.  The Parties and their respective counsel have participated jointly in the negotiation and drafting of this Agreement. In addition, each of the Parties acknowledges that it is sophisticated and has been advised by experienced counsel and, to the extent it deemed necessary, other advisors in connection with the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. The Parties intend that each representation, warranty and agreement contained in this Agreement will have independent significance. If any Party has breached any representation, warranty or agreement in any respect, the fact that there exists another representation, warranty or agreement relating to the same subject matter (regardless of the relative levels of specificity) that the Party has not breached will not detract from or mitigate the fact that the Party is in breach of the first representation, warranty or agreement. Any reference to any law will be deemed to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The headings preceding the text of articles and sections included in this Agreement and the headings to the schedules and exhibits are for convenience only and are not be deemed part of this Agreement or given effect in interpreting this Agreement. References to sections, articles, schedules or exhibits are to the sections, articles, schedules and exhibits contained in, referred to or attached to this Agreement, unless otherwise specified. The word "including" means "including without limitation". The use of the masculine, feminine or neuter gender or the singular or plural form of words will not limit any provisions of this Agreement. The Parties do not intend for this Agreement to constitute a joint venture or general partnership and each Party acknowledges that the rights set forth herein are strictly contractual rights, with no imputed fiduciary duties to the other Party.

H.  This Agreement may be executed by the Parties in one or more separate counterparts with the same effect as if all parties thereto had signed the same document. All such counterparts shall be deemed an original, shall be construed together and shall constitute one and the same instrument.

I.  Each Party shall not make any public announcement, press release or other similar disclosures regarding this Agreement without the prior written approval of the other Party.

J.  The Parties agree that this written Agreement represents the complete agreement of the Parties regarding their relationship, and that there exists no other agreements, written or oral that override this Agreement.

K.  Capitalized terms not otherwise defined herein shall have their meaning as provided for in that certain Agreement for (1) the Construction, Ownership,

13

34078803.3

CONFIDENTIAL

VITOL-000024

*Execution Version*

Operation, Maintenance and Transfer of LPG Facilities, (2) LPG Supply and (3) Managing the Repowering of Certain Combustion Turbine Units dated as of July 25, 2013, by and between WAPA and Vitol as amended from time to time.

**[Remainder of page blank.  Signature page to follow.]**

34078803.3

**14**

VITOL-000025

*Execution Version*

IN WITNESS WHEREOF, this instrument is executed in duplicate the day and year first above written, and by signing herein, each signatory certifies that he or she is duly authorized to enter into this Agreement on behalf of the respective Party.

**Island Project and Operating Services LLC**

Signed: _____

Printed Name: MERLIN FIGVEIRA

Title: GEN MGR

Date: March 3, 2017

**Vitol Virgin Islands Corp.**

Signed: _____

Printed Name: Eduardo Garcia

Title: Vice President

Date: _____

34078803.3

CONFIDENTIAL

VITOL-000026

*Execution Version*

## EXHIBIT "A"

## SCOPE OF SERVICES

The Parties hereby agree that IPOS shall provide the following "**Services**" by itself or shall arrange the performance thereof by third parties (whether Affiliates or otherwise) to Vitol on the Plants:

(a)    IPOS shall operate and maintain the Plants in accordance with applicable laws and Prudent Industry Practices. In particular, IPOS shall:

      i.    Operate vaporizers in accordance with original manufacturer specifications and at the recommended range of temperature and pressure.

      ii.    Cooperate with WAPA to develop vaporizer operating procedures.

      iii.    Operate and maintain fuel meters to verify quantity and quality of LPG delivered to vaporizers.

      iv.    Assist Vitol in compliance monitoring with LPG specifications through testing and sampling LPG when unloaded from Feeder Vessels.

      v.    Notify Vitol of any non-conforming LPG as soon as reasonably practicable (in advance of any delivery of such non-confirming LPG).

      vi.    Take daily measurements of number of barrels of LPG in St. Thomas and St. Croix storage tanks at same time every day and timely inform Vitol of such measurements.

    IPOS shall determine the appropriate operating personnel (including any sub-contractors) to be engaged in the provision of Services for the Plants. Such personnel shall be qualified and experienced in the duties to which they are assigned. IPOS shall determine working hours, rates of compensation and all other matters relating to the employment of its personnel; provided that its determinations are consistent with the prevailing industry standards of comparable personnel performing comparable services. The importance of safety of all workers providing Services to the Plants shall be recognized, and IPOS shall make accident prevention an integral part of its activities and require the same of any counterparties employed or visiting the Project Site. Vitol shall have the right to request involvement in the hiring and retention of key operating personnel and upon Vitol's request,

(b)    IPOS shall assist Vitol in administering and managing the (i) operating budget process with WAPA and (ii) accounting and record-keeping functions in a manner so that Vitol can verify its share of operating and capital expenses. IPOS shall keep accurate and complete accounting and financial records regarding the provision of Services for the Plants.

34078803.3

A-1

           VITOL-000027

*Execution Version*

(c)    IPOS shall assist Vitol in monitoring, record keeping and any other activities as Vitol deemed necessary to comply with environmental Permits and any other requirements outlined by local and federal authorities.

(d)    IPOS shall coordinate the Services of any sub-contractors performing Services on the Plants.

(e)    IPOS shall notify Vitol as soon as reasonably possible upon the occurrence of any problems in connection with providing Services to the Plants and recommend a reasonable course of action when requirements of this Agreement are not being fulfilled.

(f)    IPOS shall assist Vitol in interfacing and communicating with WAPA regarding operational aspects of the Project. Keep WAPA reasonably apprised of operations and maintenance activities performed. Deliver quarterly maintenance reports setting forth relevant operations and maintenance activities for such quarter

(g)    IPOS shall keep accurate and complete records and supporting documentation of all invoices, charges, disbursements and/or expenses incurred in performing its obligations insofar applicable to comply with any governmental obligations.

(h)    IPOS prepare preliminary plan for annual scheduled maintenance. If there will be a deviation from such plan in the next Contract Month which would reduce the amount of LPG to be delivered, notify WAPA and Vitol prior to commencement of any such scheduled maintenance.

(i)    IPOS shall comply will all applicable taxes imposed by the USVI in relation to the Services.

(j)    IPOS shall maintain all Confidential Information furnished by Vitol and WAPA in strict confidence

**Vessel Arrival Notices:**  Vitol will be responsible for providing IPOS with a weekly schedule of anticipated feeder vessel deliveries to each Plant. IPOS will in all respects be prepared to berth each vessel on arrival.

**Vessel Departure Notices:**  Vitol and its local agent will be responsible for coordinating and sending notices to pilots, tugs, agency, and inspector with respect to vessel discharge details and instructions.

**Terminal Losses/Balances:**  Contractual Loss is expressed as the difference between all Product received for Vitol in-tank and re-delivered ex-tank minus losses associated with normal operations, venting, flaring, plant trips and maintenance activities that occurs during the day-to-day running and in the normal course of IPOS's operations.   The maximum allowable Contractual Loss is 0.25% volume and shall be calculated on an annual basis over all the Product handled for Vitol based on shore tank gauging. Subject to the limitations and cap's set out in Clause VI-B, any Contractual Loss exceeding 0.25% shall be for the account of IPOS.

34078803.3

CONFIDENTIAL               VITOL-000028

*Execution Version*

Notwithstanding the above, no claim shall be admitted by Vitol in respect of any deficiency of quantity of the Product if the Contractual Loss is 0.25% or less.

CONFIDENTIAL

VITOL-000029

*Execution Version*

## EXHIBIT "B"

## FORM OF SERVICES ORDER REQUEST

SERVICES ORDER REQUEST for IPOS to provide to Vitol certain services and/or material, equipment and supplies or as otherwise agreed by the Parties.

| | | | |
|---|---|---|---|
| Project Order No.: | [Sample] | Date: | \<Enter Date\> 20\< \> |
| Vitol Contact: | | Phone: | + |
| IPOS Contact: | \<Person's Name\> | Phone: | +1.\<IPOS Phone\> |

This Services Order Request is executed and entered into effective as of the date set forth above pursuant to the terms of the Facilities Services Agreement between Vitol Virgin Islands Corp. ("Vitol") and IPOS Terminal Support Services B.V. ("IPOS"), dated effective \<Date\> 201\<_\>.

All terms and conditions of the aforesaid Facilities Services Agreement are deemed to be incorporated herein and made a part hereof as though set out in full.

Vitol requests IPOS to furnish the following additional services against the following jointly agreed price and terms and conditions:

\<Describe operation and Services\>

Supplemental Provisions:

This Services Order Request is considered a request by Vitol for acceptance by IPOS, and upon IPOS's approval, shall become a binding agreement covering the Services herein described.

Requested with full authority by and on behalf of:    Agreed and Accepted by and on behalf of:

**Vitol Virgin Islands Corp.**                **IPOS Terminal Support Services B.V.**

By:_____              By:_____

Typed Name:_____              Typed Name:_____

Title:_____              Title:_____

Date:_____              Date:_____

34078803.3

B-1

CONFIDENTIAL                VITOL-000030

*Execution Version*

## EXHIBIT "C"

## HEALTH, SAFETY, SECURITY, ENVIRONMENT AND COMPLIANCE

**16.1      HSSE Standards**

16.1.1     In carrying out its duties IPOS shall:

a)     have an HSSE Management Program with a systematic approach for HSSE management designed to assure compliance with applicable law;

b)     have a HSSE policy, handbooks and similar materials reasonably assured to be understood by all staff and ensure such staff is trained and comply with such materials;

c)     have security controls in place to prevent unauthorized access to the Plants;

d)     have appropriate processes and controls in place to protect the environment, including identification and documentation of environmental impacts of activities, and management of waste, with a goal of preventing pollution of land, water and air;

e)     maintain, repair, renew and operate the Plants and carry out its obligations under this Agreement as required by applicable law and industry best practices;

f)     ensure that its personnel are competent appropriately trained and experienced in their field of activity and fit to work;

g)     maintain documented emergency plans covering response strategies for handling emergencies, including marine scenarios;

h)     maintain sufficient pollution control equipment at, or immediately in proximity to the Plants, appropriate to the products handled, and ensure that operators are aware of chemical hazards and are trained in response procedures;

i)     supervise all loading and unloading operations by competent, trained staff who are familiar with the products being handled.

34078803.3

CONFIDENTIAL                                                    VITOL-000031

*Execution Version*

**16.2    Specific HSSE Requirements**

16.2.1    IPOS shall conduct the Services in accordance with the US Occupational Safety and Health Administration (OSHA) Instructions and Technical Manuals, US Coast Guard (USCG)-approved Operations Manuals, USCG Emergency Manuals, industry safety best practices, including the International Safety Guide for Oil Tankers and Terminals (ISGOTT) and the Chemicals Distribution Institute Terminal scheme (CDI-T), and any specific requirements contained in Customer's materialsafety data sheets (MSDS), including, as applicable and without limitation, the following:

a)    have policies and prohibitions prohibiting smoking in areas where flammable materials are stored or handled;

b)    have a permit to work system and lock-out tag-out procedures that include entry into confined spaces, breaking of containment (e.g. opening equipment which may contain product), hot work (involving the use of energy sources, such as welding), and electrical lock out (when working on electrical equipment);

c)    have emergency showers and eye washes available in all loading/unloading areas or in their immediate vicinity;

d)    have means to readily escape from the loading/unloading areas in case of emergency;

e)    have effective fall protection systems on top of loading gantries (e.g. safety guardrail, safety harness, lanyard and lifeline);

f)    not use compressed air for product transfer or line clearance of flammable liquids;

g)    have appropriate controls in place for ignition sources, including static electricity, in areas where flammable materials are stored or handled;

h)    have product leakage detection and overfill protection procedures, systems and/or equipment in place;

i)    have facilities to contain spills and leaks.

34078803.3

C-2

CONFIDENTIAL

VITOL-000032

j)      have high level alarms on storage tanks receiving products by vessels or pipelines;

k)      have an adequately sized and structurally sound secondary containment around tanks storing products; and

l)      have written loading/unloading procedures, including HSSE critical checks, and personnel trained in their use.

### 16.3    Drugs and Alcohol Policy

IPOS shall have a drugs and alcohol policy and practices that a support Vitol's objective to ensure that IPOS's personnel and contractors performing work at the Plants, do not create hazard to persons, property or the environment through the presence of (or individuals under the influence of) illegal or improperly used drugs or alcohol in the workplace.

### 16.4    Incident Reporting

16.4.1   IPOS shall timely investigate and report to Vitol and relevant authorities as required by law to the extent applicable all material incidents with relation to the Agreement (and upon request cooperate with Vitol in conducting investigations of incidents) which arise at the Plants.

In the event that a material incident (whether or not related to a Product release) results in or is likely to result in, death, life threatening injury, public disruption and/or media coverage, IPOS is required to notify Vitol immediately.

### 16.5    HSSE Audit

16.5.1   Vitol reserves the right to confirm by audit that IPOS is performing its duties in compliance with this Agreement (including these HSSE standards) and applicable law.

16.5.2   Without limitation to IPOS's obligations with respect to quality and HSSE requirements as set out in this Agreement, Vitol may initiate and conduct a safety audit by giving no less than thirty (30) business days' written notice to IPOS. The

CONFIDENTIAL                                    VITOL-000033

*Execution Version*

written notice to audit shall include a list of names of individuals Vitol will interview along with a detailed scope of the proposed audit.

16.5.3    The audit shall be carried out by Vitol and on its risk and account or by an external independent auditor nominated by Vitol on its risk and account to determine compliance with the quality and   HSSE requirements under this Agreement.

CONFIDENTIAL                                          VITOL-000034

*Execution Version*

Exhibit D: Budget Form

 **Vitol Virgin Islands Corp.**

**VTTI / IPOS O&M BUDGET: YEAR JUL 2016 - JUN 2017**

| ITEM | ST THOMAS (US$) | ST CROIX (US$) | COMMENTS |
|---|---|---|---|
| SALARIES & WAGES / OVERTIME | 878,240 | 878,240 | Supr (1), Op (6), Tech (1), Admin (1) per Terminal. IPOS management. |
| FICA TAXES & WORKMENS COMP | 67,185 | 67,185 | |
| GROUP HEALTH INSURANCE | 108,433 | 108,433 | |
| 401K PENSION PLAN | 70,260 | 70,260 | |
| TOTAL PERSONNEL EXPENSE | 1,124,118 | 1,124,118 | |
| | | | |
| OFFICE SUPPLIES | 20,354 | 20,354 | |
| TRAINING & EDUCATION | 20,533 | 20,533 | |
| MATERIALS & MISC SPARE PARTS | 80,000 | 80,000 | Estimated Costs only - Nitrogen bottles, boiler feed chemicals, gas testers etc. |
| VEHICLE FUEL & MAINTENANCE | 12,944 | 12,944 | |
| COMMUNICATIONS | 35,413 | 35,413 | |
| POSTAGE & FREIGHT | | | |
| PPE | 11,711 | 11,711 | Uniforms, hard hats and other safety clothes |
| TRAVEL | 50,426 | 50,426 | |
| OTHER PROF. SERVICES | 131,034 | 131,034 | Audit, HR, Payroll and HSE |
| LICENSES AND PERMIT FEES | 24,000 | 24,000 | |
| OTHER EXPENSES | 105,931 | 165,931 | |
| SECURITY | 240,275 | 240,275 | |
| MAINTENANCE & REPAIRS | 230,349 | 230,349 | Estimated Costs only.  Third party service contracts (DCS system, A/C, Pumps, Level gages, Generators, Flare, Boilers, Fire Pumps, MLA and Compressors) |
| SOFTWARE EXPENSES | 90,000 | 90,000 | Software licenses |
| TOTAL OPERATING EXPENSE | 1,052,970 | 1,112,970 | |
| | | | |
| O&M FEE (15%) | 300,000 | 300,000 | |
| | | | |
| TOTAL O&M | 2,477,088 | 2,537,088 | |
| TOTAL O&M PER MONTH PER TERMINAL | 206,424 | 211,424 | |

34078803.3

D-1

VITOL-000035

*Execution Version*

Exhibit D: Budget Form

## VTTI / IPOS O & M Budget template

| ITEM | St. Thomas (US$) | St. Croix (US$) | Comments |
|---|---|---|---|
| SALARIES & WAGES / OVERTIME | | | |
| FICA TAXES & WORKMANS COMP | | | |
| GROUP HEALTH INSURANCE | | | |
| 401K PENSION PLAN | | | |
| **TOTAL PERSONNEL EXPENSES** | | | |
| | | | |
| OFFICE SUPPLIES | | | |
| TRAINING & EDUCATION | | | |
| *MATERIALS & MISC SPARE PARTS* | | | *Vitol's responsibility (\*)* |
| | | | |
| VEHICLE FUEL AND MAINTENANCE | | | |
| MERCAPTAN (disposal) | | | |
| COMMUNICATIONS | | | |
| POSTAGE & FREIGHT | | | |
| PPE | | | |
| OTHER PROF. SERVICES | | | |
| LICENSES AND PERMIT FEES | | | |
| OTHER EXPENSES | | | |
| *MAINTENANCE & REPAIRS* | | | *Vitol's responsibility (\*)* |
| | | | |
| SECURITY | | | |
| SOFTWARE EXPENSES | | | |
| **TOTAL OPERATING EXPENSE** | | | |
| INTERESTS EXPENSE VTTI | | | |

O&M FEE

**TOTAL O&M**

**TOTAL O&M PER MONTH PER TERMINAL**

(\*) Subject to Clause III.A

34078803.3

D-2