| DISTRICT COURT OF THE VIRGIN ISLANDS |
| :---: |
| DIVISION OF ST. CROIX |

**PETRO INDUSTRIAL
SOLUTIONS, LLC,**

         **Plaintiff,**

     **v.**

**ISLAND PROJECT & OPERATING
SERVICES, LLC, VITOL US
HOLDING II, CO., VITOL VIRGIN
ISLANDS CORP., ANDREW
CANNING, OPTIS EUROPE, LTD.,**

         **Defendants.**

**1:21-cv-00312-WAL-EAH**

**TO:**     **Lee J. Rohn, Esq.**
          *On behalf of Plaintiff*
          **Andrew C. Simpson, Esq.**
          *On behalf of Andrew Canning & OPTIS Europe*

### <u>REPORT & RECOMMENDATION</u>

**THIS MATTER** comes before the Court on an Order referring to the undersigned for a Report & Recommendation the Motion for Summary Judgment, Dkt. No. 297, filed by OPTIS Europe, Ltd. and Andrew Canning ("Defendants"), and the Motion to Strike the Response to Defendants' Statement of Undisputed Material Facts ("SUMF") filed by Plaintiff, Petro Industrial Solutions, LLC ("Petro") and to deem the facts in Defendants' SUMF admitted, Dkt. No. 309. For the reasons that follow, the Court recommends that the District Judge grants in part and denies in part the motion to strike, as explained below. The Court also recommends granting in part Defendants' motion for summary judgment as to the discrimination claim and deferring the motion in part with regard to the tortious interference and defamation claims and the damages issue, and ordering additional briefing, as explained below.

## BACKGROUND

In September 2021, Petro filed a complaint against Island Project and Operating Services, LLC (IPOS), Vitol Holding Co., Vitol VI, and Andrew Canning in the Superior Court of the Virgin Islands. Dkt. No. 1-2. Defendants Vitol Virgin Islands Corp. ("VVIC") and Vitol US Holding Co. removed the case to district court. Petro filed a First Amended Complaint in October 2022 to correctly name the Vitol Defendants and add OPTIS Europe, Ltd. ("OPTIS") as a Defendant. Dkt. No. 111. In June 2023, the Court granted Petro's motion to amend to, inter alia, add additional Defendants, VTTI and Vitol Inc. Dkt. No. 238. Petro filed its Second Amended Complaint ("SAC") against IPOS, Vitol US Holding II Co., Vitol Virgin Islands Corp., Andrew Canning, OPTIS Europe, Ltd., VTTI, and Vitol, Inc. in June 2024. Dkt. No. 239. It alleged (1) breach of contract against IPOS; (2) violation of the Virgin Islands discrimination statutes against all Defendants; (3) tortious interference with contract as to Canning/OPTIS, the Vitol Defendants, VTTI, and Vitol, Inc.; and (4) defamation as to Canning/OPTIS and the Vitol Defendants. *Id.*

The SAC alleged as follows. IPOS, in conjunction with VTTI, operated the propane facilities on St. Croix and St. Thomas for the V.I. Water and Power Authority ("WAPA"). *Id.* ¶ 17. Canning was a consulting engineer for the "Vitol Defendants"[1] through a contract with OPTIS, and also reported to Defendants VVIC, Vitol US Holding, VTTI, and Vitol, Inc. *Id.* ¶ 18. OPTIS entered into a consulting agreement with VVIC to manage, in conjunction with IPOS, the operation of the propane facilities including implementation of maintenance activities

---

[1] This term was not defined in the SAC.

and special projects. *Id.* ¶ 24. OPTIS was the direct employer of Canning. *Id.* ¶ 26. Petro provided maintenance, construction, and other services at the propane facilities for IPOS and the Vitol Defendants. *Id.* ¶ 27. Petro is a "company made up of all local West Indian or local Hispanic employees, as are its management team and owners." *Id.* ¶ 28.

In September 2019, Petro entered into a contract with IPOS to perform preventive and remedial maintenance, scheduled projects, and provided equipment rentals and materials. *Id.* ¶ 31. While Petro's contract was with IPOS, Canning had to approve budgets and actions of Petro. *Id.* ¶ 34. Canning had a "racist attitude toward Petro because its workers are of color and predominantly West Indian" and believed that "as a result of their race, and national origin" they were less qualified, experienced and knowledgeable than stateside white employees. *Id.* ¶ 35. He (1) took "innocent scriber [sic] errors" concerning Petro employees' sign-in times and falsely accused Petro of stealing time, *id.* ¶ 37; (2) attempted to prevent Petro from receiving a bid by falsely claiming it had stolen information from Petro's supplier, and ultimately prevented Petro from getting the bid, *id.* ¶¶ 43-46; and (3) in January 2021, caused the Vitol Defendants to bar three of Petro's Hispanic workers from the Vitol jobsite, *id.* ¶¶ 54-56.

In February 2021, Canning fell through a platform, confronted one of Petro's employees, and called Petro's work "bullshit" and their welding "substandard." An investigation determined the platform giving away had nothing to do with welding but that it needed additional fastener clips, and was due to Canning jumping up and down on it to check its integrity. *Id.* ¶¶ 58-61. Another problem concerned welders' certificates. Petro

provided them when it began work; IPOS asked again for the certificates in February 2021; in March 2021, Canning questioned Petro's welding procedures and Petro produced the certificates again; an independent welding inspector performed an inspection and marked the welds OK; and IPOS confirmed that it received Petro's welder's certificates in April 2021. *Id.* ¶¶ 61-74. That month, "it was decided" that Canning should not have direct contact with Petro, which enraged OPTIS/Canning who determined to "get rid of" Petro. *Id.* ¶¶ 76-77. Canning took "unreasonable false positions" against Petro to get IPOS and the Vitol Defendants to withdraw the contract with Petro, including stating to the Vitol Defendants that the welders' certificates were forged. *Id.* ¶¶ 79-89. Eventually, Vitol, Inc. and VTTI instructed IPOS to cancel Petro's service contract, issued a non-bid contract to correct the welds, and did not approve Petro's payment on the project. *Id.* ¶¶ 93-101, 110. In August, IPOS—at the instigation of the Vitol Defendants and Canning/OPTIS—cancelled Petro's equipment rental contract. *Id.* ¶ 113. Petro sought damages. *Id.* at 17-18.

Defendants filed answers to the SAC. Dkt. Nos. 263, 264, 267, 278. In August 2023, the parties engaged in mediation. Petro resolved its claims against IPOS, Vitol US Holding II Co., VVIC, and Vitol Inc., and moved to dismiss the SAC against them with prejudice, which the District Judge granted in November 2023. Dkt. No. 289. Thereafter, the remaining Defendants—OPTIS and Canning—filed their motion for summary judgment. Dkt. Nos. 297-299. Petro opposed the motion, Dkt. Nos. 304, 305, and Defendants filed a reply. Dkt. No. 308. The Defendants also filed a motion to strike Petro's response to their SUMF. Dkt. Nos. 309-310. Petro opposed, Dkt. No. 311, and Defendants filed a reply, Dkt. No. 312.

*Petro Indus. Solutions v. IPOS*
1:21-cv-00312-WAL-EAH
Report & Recommendation
Page 5

## I.    Motion for Summary Judgment

In their motion for summary judgment, OPTIS and Canning asserted that Canning was a consulting engineer who provided operational support to VVIC and its affiliated company, IPOS; VVIC owned and IPOS operated the liquified petroleum gas plants adjacent to the WAPA power plants. Dkt. No. 298 at 1. The litigation arose because Petro failed to deliver its services in compliance with operational standards. *Id.* at 1-2. They argued that they were entitled to summary judgment on Petro's discrimination claim under the Virgin Islands Civil Rights Act ("VICRA") because Petro, as an LLC, was not a natural person or individual that the VICRA protected. *Id.* at 6-7. They were also entitled to summary judgment on the tortious interference with contract claim because (1) neither OPTIS nor Canning knew of Petro's second contract with IPOS, dated September 1, 2019, which is the subject of the lawsuit; and (2) even if they knew of that contract, Canning's alleged interference was justified by a genuine business purpose and privileged, because Canning was tasked with the ongoing operation of the plant, and the communications by Canning, including his reports on Petro's substandard work, were made pursuant to his role as an operational support consultant and made with a proper purpose and motive. *Id.* at 7-9. Canning acted pursuant to a genuine business interest (the consulting agreement), was a non-outsider, and his observations regarding the quality of Petro's welding work and inauthenticity of the welding certificates were truthful communications. Even considering the "racial animus" allegations, Petro could not prove that Canning added with an improper motive given his legitimate business objective in making his statements. *Id.* at 9-12. As to

*Petro Indus. Solutions v. IPOS*
1:21-cv-00312-WAL-EAH
Report & Recommendation
Page 6

the defamation claim, Petro's allegations were not specific enough to meet its burden of proof, and it could not prove the offending statements were defamatory. *Id*. at 14-15. Even if some statements may have been inaccurate, they were not defamatory but were part of bona fide reporting within the scope of Canning's job duties, not directed toward impugning Petro's character. *Id.* at 15-18.

Defendants also contended that Petro had no competent evidence to prove damages. *Id*. at 18-20. It could only recover economic damages and it did not itemize its damages in its initial Rule 26 disclosures but stated it would retain an expert to calculate them. *Id.* at 18. At the Rule 30(b)(6) deposition, Petro's Adrian Melendez attempted to explain how Petro's lost profits were calculated and ultimately agreed that an accountant would need to provide such an opinion. *Id.* at 18-19. An expert produced a report purporting to project Petro's lost profits, but Petro withdrew the expert, stating it would rely on the testimony of Melendez to establish economic damages. *Id.* at 19. But Melendez was not competent to testify to Petro's business losses and, even if he was, he did not serve the required disclosure of his opinions *Id*. at 19-20. In support of its motion, Defendants provided an 11-page Statement of Undisputed Facts that set forth 53 short statements, along with citations to the record that supported the specific statements. Dkt. No. 299.

In its opposition to the motion, Dkt. No. 304, Petro incorporated its 41-page Response to Defendants' Statement of Undisputed Facts ("Response," Dkt. No. 305). On the merits, it argued that Defendants waived or forfeited their statutory standing defense—that Petro could not assert a discrimination claim under VICRA—because they did not raise

it in their answers or in a Rule 12 motion. Dkt. No. 304 at 2-4. If the defense was not waived or forfeited, Petro had statutory standing because a limited liability company ("LLC") under the Virgin Islands Uniform Limited Liability Company Act ("ULLA") "has the same powers as an individual" including power to "sue and be sued." *Id*. at 4. Further, the ULLA defined "person" as "an individual, corporation . . . limited liability company . . . or any other legal or commercial entity." Thus, as an "individual" and "person," Petro could sue for discrimination under VICRA. *Id*. at 4. Petro also cited the VICRA definitions provision, stating that the definition of "person was omitted as covered by section 41 of Title I." *Id*. Section 41 defined person to include "corporations, companies, associations, joint stock companies, firms . . . as well as individuals," 1 V.I.C. § 41, and therefore VICRA's definition of person included a company like Petro. Dkt. No. 304 at 5.

As to the defamation claim, Petro contended that Canning's statements that Petro's work was "shoddy," that it forged documents and produced false welder qualification certificates, submitted false timecards and invoices, and that its bid was corrupt, were all false and defamatory. *Id*. at 9-12. Petro cited its Response (to the SUMF) Nos. 6, 14, 15, 18, 19, 20 in support. It also argued that Defendants' defamatory statements were published to third parties, as opposed to being internal communications, *Id*. at 12-13, citing Response No. 2. Genuine disputes of fact existed on the tortious interference claim, as it made no difference whether Defendants knew the first IPOS contract had been replaced with a second one. Canning advocated for the termination of the IPOS-Petro contract, his statements about Petro were not privileged, and he furtively investigated the welders'

certificates. Moreover, Defendants were not "agents" based on the consulting agreement with VITOL and racial animus was not a proper business reason for Canning acting as he did—which resulted in IPOS terminating Petro's contract. *Id*. at 14-19. Petro produced competent evidence of its economic damages: an economic expert was not always necessary since a lay witness may have particularized knowledge by virtue of his/her personal experience, and Adrian Melendez had such knowledge. *Id.*

In their reply, Defendants reiterated that Petro had no admissible evidence of damages because Melendez lacked sufficient knowledge to so testify and Petro failed to provide the requisite written disclosure required. Dkt. No. 308 at 3-8. Petro failed to demonstrate that the VICRA applied to it, as it was not a "natural person," and its waiver/forfeiture arguments were meritless. *Id*. at 8-14. Defendants asserted that they were unable to respond to the remainder of Petro's opposition due to its gross violations of LRCi 56.1: Petro inserted so many supplemental arguments in its Response that it was nearly impossible to know what facts it admitted or denied, or to respond to arguments that should have been in its opposition to the motion for summary judgment, and appeared to be an end-run around the 20-page limit of LRCi 7.1. *Id*. at 14-15.

## II.    **Motion to Strike**

On the same day that Defendants filed their reply brief, they also filed a motion to strike with a supporting memorandum of law. Dkt. Nos. 309, 310. Citing LRCi 56.1(b) that describes documents that may be filed by an entity opposing a motion for summary judgment, Defendants argued that Petro's Response was so improper and non-responsive

*Petro Indus. Solutions v. IPOS*
1:21-cv-00312-WAL-EAH
Report & Recommendation
Page 9

that it should be stricken, and Defendants' 53 material facts in their SUMF should be deemed uncontested for purposes of summary judgment. Dkt. No. 310. Defendants claim that Petro's Response contained two categories of improper responses: (1) responses that were admitted but with argument improperly added, and (2) responses that were denied but not properly supported and with improper argument added. *Id.* In the first category, Defendants asserted that argument belongs in the opposition to the motion for summary judgment, not in the Response—particularly when a statement is admitted because no further embellishment is needed or appropriate. If the opposing party wanted to assert additional facts, and then argue those facts in opposition to the motion, LRCi 56.1(b) provides a procedure for filing a concise statement of additional facts—which Petro did not file. *Id.* at 7 & n.2. They point out that Petro properly admitted, without argument, only three facts (SUMF 9, 10, and 13). *Id*. In a chart, they set out 16 more SUMF that Petro admitted, but added argument, or argument and exhibit(s), despite the particular fact being uncontested. Some of those 16 Responses incorporated Responses to other SUMF, such as Response to No. 19 (7½  pages long), which in turn incorporated Responses No. 6 (3 pages long), 18 (1 ½ pages long), and 36 (1 page long). Some Responses involved Petro admitting its own self-serving version of Defendants' particular SUMF. *Id.* at 7-10.

The second category of Petro's improper Responses consisted of denials of the SUMF but those denials were not properly supported—therefore failing to demonstrate that the SUMF was contested. Some of those improper Responses incorporated Responses to other SUMF to support the denial without demonstrating how they did so, and often

added improper argument. *Id.* at 10-16. The Defendants set out 27 of Plaintiff's Responses in a chart format that indicated the length of the Response (if more than 1/3 page) and summarized the deficiencies of the Response. *Id.* at 12-16 (citing Plaintiff's responses to SUMF Nos. 1, 3, 4, 6, 8, 12, 14-21, 24-26, 28-34, 36, 39, 41-44, 46, 50, and 52). For example, (1) Response to SUMF 29 (which described Canning's motivation for looking at the welding certifications), did not challenge the motivation but simply argued that different companies had different opinions on what was an acceptable level of defects, *id.* at 13; (2) Response to SUMF 39 (asking Petro to admit that IPOS informed it of three categories of information it was waiting to receive from Petro), where Petro did not address two of the categories and argued with regard to the third category that it provided that information numerous times, and incorporated responses to SUMF 19, 20, and 35, *id.* at 14; (3) Response to SUMF 41, where the first sentence is responsive, although unsupported by the document it cited and the remainder was argument, *id.* at 15.

Defendants ask the Court to apply the provisions of LRCI 56.1(d), where a failure to respond to a SUMF may result in deeming the facts admitted for purposes of summary judgment. *Id.* at 16. They cite cases, and provide an Addendum, where this Court has employed other solutions when confronted with noncompliant responses to statements of facts (most of which were in cases where the plaintiff was represented by the same firm representing Petro here). However, those alternative solutions (such as permitting plaintiff to revise its noncompliant response to a SUMF) have not worked, effectively gave the plaintiff a second bite at the apple, and delayed the proceedings. *Id.* at 17-20. They have

been prejudiced by being unable to meaningfully respond to Petro's opposition and have been denied their right to respond to the additional facts Petro wove into its Responses rather than presenting a separate statement of additional facts. *Id*. at 17.

In its opposition to the motion to strike, Petro contended that the Defendants did not show that it violated the rules of civil procedure or that any alleged violation warranted the extreme remedy of striking its responses or deeming material facts uncontested. Dkt. No. 311. Although LRCi 56.1(b) provides for three potential answers to statements of fact, it does not specifically preclude an explanation of the response. *Id*. at 2-3. As an example, in its Response to SUMF 4 (where Defendants stated that OPTIS, through Canning, provided consulting services until October 31, 2020 and decried Petro's 2¼ page response), Petro asserted that it "point[ed] to each part of the record that substantiates that it was not Canning's role to provide operations support consulting services." *Id.* at 5. Explaining that actions do not operate in isolation, Petro argued that if a denial could be elucidated by another Response, it referred to that Response rather than repeating information found in other parts of the document. *Id*. It contextualized its admissions and denials, which is "particularly germane in discrimination cases" where the plaintiff has to demonstrate inconsistencies in the employer's proffered legitimate reasons for its action. *Id*. at 5-6.

Petro also argued that, even if it violated LRCi 56.1(b), Defendants did not provide legal authority for the requested relief. LRCi 56.1(d) states that a failure to respond to a movant's SUMF may result in those facts not being disputed, but Plaintiff responded. *Id.* at 6. Striking is an "extreme sanction" and the cases cited by Defendants, while "on the

surface" seem to support their requested relief, do not speak to the circumstances in this case, as the responses in those cases did not provide citations to the record, or did not provide a SUMF but incorporated four witness affidavits and answers to interrogatories for the court to ferret through. *Id.* at 7-8. Petro comprehensively addressed every statement of fact and supported its responses with citations to the record. *Id.* at 8. Other cases allow a party that has not complied with the rule to revise their statements of fact to properly respond. *Id.* at 11. Finally, Defendants have not suffered prejudice; if they wanted to reply to facts they felt were misplaced, they could have sought leave of court to file a surreply. Instead, they made charts to point out where they believed the document could have been better drafted, and the motion to strike distracts from the merits of the case. *Id.* at 11-12.

In their reply, Defendants noted that eight of the nine cases from this District cited in their Addendum to the motion—in which the Court explained what was required in a response to a SUMF—involved the law firm representing Petro, a point that Petro did not address in its opposition. Dkt. No. 312. Petro's position that it did not fail to respond to the SUMF but "over-responded" and therefore LRCi 56.1(d) did not apply, misread the Rule. LRCi 56.1(d) applied to a "[f]ailure to respond . . . *as provided by these Rules*," and argumentative and lengthy responses did not comply. *Id.* at 2-3. They disputed Petro's claim that they were not prejudiced because they were unable to respond to portions of Petro's opposition to their motion. *Id.* at 3. Further, requesting permission to file a surreply, as Petro suggested, would be prejudicial because Defendants would incur additional legal expenses and the Responses were so convoluted that filing a surreply was not feasible. *Id.*

*Petro Indus. Solutions v. IPOS*
1:21-cv-00312-WAL-EAH
Report & Recommendation
Page 13

n.3. Prejudice was not required in any event when a court enforces a violation of a local rule. *Id.* at 3-4. They urge the Court to strike the Response, deem their SUMF to be undisputed and, based on those undisputed facts, determine whether they are entitled to summary judgment. *Id.* at 5.

**DISCUSSION**

**I.      Motion to Strike**

Through summary judgment, a court is empowered to dispose of claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a trial would be "an empty and unnecessary formality." *Univac Dental Co. v. Dentsply Int'l, Inc.*, 702 F.Supp.2d 465, 468 (M.D. Pa. 2010). A district court may properly grant a motion for summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49.

To facilitate resolving summary judgment motions, district courts have enacted local rules that provide additional guidance concerning the motion. The importance of Local Rules governing summary judgment cannot be underestimated. "The purpose of this

*Petro Indus. Solutions v. IPOS*
1:21-cv-00312-WAL-EAH
Report & Recommendation
Page 14

rule [Local Rule 56.1] is obvious: it enables the court to identify contested facts expeditiously and prevents factual disputes from becoming obscured by a lengthy record." *Pinegar v. Shinseki*, No. 07-cv-313, 2009 WL 1324125, *1 (M.D. Pa. May 12, 2009); *see also Landmesser v. Hazleton Area Sch. Dist.*, 982 F. Supp. 2d 408, 412 (M.D. Pa. 2013), *aff'd*, 574 F. App'x 188 (3d Cir. 2014) ("These statements [of material fact] are not merely superfluous abstracts of the evidence. Rather, they are intended to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions. They are, in short, roadmaps, and without them the court should not have to proceed further, regardless of how readily it might be able to distil the relevant information from the record on its own.").

In this District, Local Rule 56.1 provides, in pertinent part:

(a) Documents Filed by Movant. In addition to the documents authorized by LRCi 7.1, a party moving for summary judgment shall file a separate statement of the material facts about which the movant contends there is no genuine issue. Each fact paragraph shall be serially numbered and shall be supported by specific citation to the record. The movant shall affix to the statement copies of the precise portions of the record relied upon as evidence of each material fact.

(b) Documents Filed by Respondent. Any party adverse to a motion filed under this rule may file, in addition to the documents authorized by LRCi 7.1, a response to the movant's statement of material facts about which the movant contends there is no genuine issue. The respondent must address the facts upon which the movant has relied pursuant to subsection (a), using the corresponding serial numbering and either: (i) agree that the fact is undisputed; (ii) agree that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (iii) state that the fact is disputed. If the fact is disputed the respondent shall affix to the response copies of, and cite to, the precise portions of the record relied upon as evidence of each disputed material fact. In addition, the respondent may file a concise statement of any additional facts, serially numbered, that the respondent contends are material to the

> motion for summary judgment and as to which the respondent contends there exists a genuine issue to be tried.
>
> ***
>
> (d) Effect of Failure to Respond. Failure to respond to a movant's statement of material facts, or a respondent's statement of additional facts, as provided by these Rules may result in a finding that the asserted facts are not disputed for the purposes of summary judgment.

LRCi 56.1 (a), (b), (d). As the Local Rule makes clear, the parties are to include only facts and citations to the record that support those facts in their statement of material facts. If a respondent wishes to assert its own material facts, it has an opportunity to do so by filing a separate document (a counter-statement of material facts). By limiting the statement of material facts and the response only to facts, any factual and legal argument, conclusory statements, and other nonresponsive commentary that extends beyond the statement of facts (or response) is improper and does not comport with the rule. *See REVZIP, LLC v. McDonnell*, No. 19-cv-191, 2023 WL 3260662 at *13 (W.D. Pa. May 4, 2023) ("legal opinions and conclusions, statements about opposing counsel, what evidence is admissible at trial and other extraneous commentary, including whether a fact proffered by the [opposing party] is 'immaterial,' are not facts and thus, are not proper responses to a statement of material facts.") (internal quotation marks omitted); *see also Selective Ins. Co. of Am. v. Novitsky*, No. 17-cv-2376, 2019 WL 1009389, at *1 (M.D. Pa. Mar. 1, 2019) ("Where a party's Rule 56.1 statement is not short, concise or limited to material facts, and would hinder rather than facilitate the court's consideration of the pending motion, the court need not accept the statement."); *Greenblatt v. Klein*, No. 12-cv-4575, 2015 WL 1034633, at *1 (D.N.J. Mar. 10, 2015), *aff'd*, 634 F. App'x 66 (3d Cir. 2015) ("Generally, the Court must

disregard all factual and legal arguments, opinions and any other portions of the 56.1 Statement which extend beyond statements of facts.") (internal quotation marks omitted); *Abney v. Univ. of the V.I.*, No. 08-cv-116, 2013 WL 12354494, at *6 (D.V.I. Apr. 15, 2013).

The ability of district courts to regulate summary judgment practice through enactment of Local Rule 56.1 has long been recognized by the appellate courts, which have repeatedly sustained district court efforts to enforce compliance with this rule. *See, e.g., Romero v. Twp. of Tobyhanna*, No. 21-2886, 2023 WL 2728829, at *2 (3d Cir. Mar. 31, 2023) (affirming district court's striking statement of fact and deeming defendants' statements admitted, since it was "both fitting and beyond question that the District Court has the authority to strike filings that fail to comply with its local rules.") (internal quotation marks omitted); *Rau v. Allstate Fire & Cas. Ins. Co.*, 793 Fed. App'x 84, 87 (3d Cir. 2019) (upholding district court's decision to strike non-movant's non-responsive counter-statement of facts under Local Rule 56.1); *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018) ("Under these circumstances, the District Court's decision to employ any given sanction— out of the many possible sanctions available to it—is fully within the discretion of that Court. Plaintiffs offer no persuasive reason for us to disturb the District Court's conclusion that portions of plaintiffs' answer to the statement of facts were not concise and were argumentative in violation of Local Rule 56.1. Nor does the District Court's decision to strike the portions it concluded were noncompliant, rather than choosing to employ a more forgiving sanction, constitute an abuse of discretion. It is beyond question that the District Court has the authority to strike filings that fail to comply with its local rules."); *Smith v.*

*Addy*, 343 F. App'x 806, 808 (3d Cir. 2009) (per curiam) ("[T]he proper sanction for violating Rule 56.1 is . . . within the district court's discretion."); *see also Gov't of V.I. v. Mills*, 634 F.3d 746, 750 (3d Cir. 2011). "An abuse of discretion may occur as a result of an errant conclusion of law, an improper application of law to fact, or a clearly erroneous finding of fact." *McDowell v. Phila. Hous. Auth. (PHA)*, 423 F.3d 233, 238 (3d Cir. 2005).

If a court decides to strike all or a part of a statement of undisputed facts, a response to such a statement, or a counter-statement of facts, it has a variety of options at its disposal to proceed. As explained by one court in this Circuit:

> [T]he court can consider several options. For example, the court could . . . strike those portions of the statement of facts that it finds objectionable. This, however, would hinder rather than facilitate the court's direct and accurate consideration of Plaintiffs' motion for partial summary judgment because, in addition to requiring the court to review the statement of facts line-by-line separating argumentative statements from properly supported factual assertions, it would ultimately leave the court with a still lengthy statement of facts riddled with stricken statements. Alternatively, the court could . . . analyze . . . statement of facts trying to separate useful information from improper or unsupported entries. However, such deciphering is an ineffective use of the court's time and resources and it runs contrary to the central purpose of a statement of material facts which is to *aid* the court to *expeditiously* identify factual arguments. Rather, [often] the most effective option is to strike [the] entire statement of facts from the record and permit [the parties] to re-file in strict accordance with Local Rule 56.1. In doing so, the court seeks to enforce compliance with our local rules and promote judicial efficiency.

*Park v. Veasie*, No. 09-cv-2177, 2011 WL 1831708, *3 (M.D. Pa. May 11, 2011). Another option is to deem a statement of material facts admitted and, "in lieu of having Plaintiff attempt to remedy her mistakes," proceed to adjudicate the motion for summary judgment. *Walter v. McDonaugh, Sec'y, Dep't of Veterans Affairs,* No. 22-cv-1213, 2024 WL 4025877, at *3 (W.D. Pa. Sept. 3, 2024); *see also Lauchle v. U.S. Postal Serv.*, No. 22-cv-533, 2024 WL

*Petro Indus. Solutions v. IPOS*
1:21-cv-00312-WAL-EAH
Report & Recommendation
Page 18

643293, at *5 (M.D. Pa. Feb. 15, 2024) (deeming entirety of defendants SUMF admitted based on plaintiff's failure to comply with Local Rule 56.1 and adjudicating summary judgment motion); *Hengst v. PrimeCare Med., Inc.,* No. 20-cv-2023, 2021 WL 8084627, at *6 (M.D. Pa. Dec. 17, 2021), *R&R adopted,* 2022 WL 636725 (M.D. Pa. Mar. 4, 2022) (same).

### A.    Application

The gravamen of Defendants' motion to strike lies in what they argue is Plaintiff's egregious failure to comply with LRCi 56.1, warranting the sanction of admitting all of their SUMF and then determining from the undisputed facts if their motion for summary judgment should be granted. Plaintiff opposes, contending that it did not violate the rule and, even if it did, such an "extreme" sanction is unwarranted. Defendants filed a SUMF with fifty-three Statements of Fact, consuming eleven pages. Dkt. No. 299. Petro's Response to the SUMF was forty-one pages. Dkt. No. 305.

Having analyzed Petro's Responses to Defendants' SUMF, the Court has divided them into five categories: (1) Responses that are properly admitted; (2) Responses that are admitted but add non-responsive detail and argument that should be stricken; (3) Responses that are properly denied; (4) Responses that are denied where part of the denial may stand and the rest of the text should be stricken; and (5) Responses that are denied but where the text should be stricken in full. The Court recommends that the text in categories (2), (4), and (5) be stricken because it is non-responsive, contains legal and/or factual argument, contains facts that should be included in a separate statement of facts pursuant to LRCi 56.1(b), or refers to other Responses such that an actual Response to the

SUMF cannot be discerned. Accordingly, Defendants' SUMF in categories (2) and (5) should be admitted for purposes of summary judgment based on Petro's violation of LRCi 56.1(b).

In the first group—Responses that are properly admitted—the Court includes Responses to SUMF 9, 10, 13. Petro responded with a simple and straightforward "admit," providing no additional commentary in its admission. The Court will also consider SUMF 2 as properly admitted, given that the additional text essentially cites the agreement at issue.

In the second group—Responses that are admitted but add non-responsive detail and argument, with some incorporating other Responses—the Court includes Responses to SUMF 5, 7, 11, 19, 22, 23, 27, 35, 37, 38, 40, 45, 47, 48, 49, 53. In this category, the Court accepts "Admit" as Petro's response, and recommends striking all subsequent text that seeks to qualify and/or characterize the admission, adding nonresponsive argument, legal/factual conclusions, and facts citing documents that support Petro's nonresponsive argument. While space limitations make it impossible to describe the deficiencies of each Response in this category, the Court will cite representative problems to explain Petro's non-compliance with LRCi 56.1(b).

- SUMF 5 provides: "From November 1, 2020 until November 20, 2022, OPTIS had a consulting agreement with Vitol Virgin Islands Corp. for similar operational support consulting services relating to the WAPA Facilities. Exh. A, Canning Declaration, ¶ 5; see also SAC ¶¶ 18, 24-25." Petro responds: *"**Admit** that OPTIS had a consulting agreement. (Exhibit 27, OPTIS Consulting Agreement). Pursuant to that Agreement, OPTIS and Canning were not "agents" of VITOL, nor was there any relationship between them other than independent contractor. (Exhibit 27, #4). **Deny** that VVIC was an entity that had any employees with whom OPTIS consulted with. VITOL Virgin Islands Corp. (VVIC) is under the umbrella of VITOL Inc. VVIC has "no employees" VITOL, Inc's employees do the work for VVIC. Therefore OPTIS was technically a consultant for VITOL, Inc."* The next paragraph discusses Canning's role as a consultant and whether anyone supervised him at the WAPA facilities.

*Petro Indus. Solutions v. IPOS*
1:21-cv-00312-WAL-EAH
Report & Recommendation
Page 20

  o The first sentence of Petro's response directly admits the SUMF. The second sentence seeks to characterize OPTIS's and Canning's role under that agreement to lay the basis for the third sentence that purports to deny the SUMF. But the SUMF did not mention or put at issue VVIC's corporate structure. Petro apparently introduced it in order to argue that OPTIS was "technically" a consultant for Vitol, Inc., which was non-responsive to the SUMF. The next paragraph is completely non-responsive to the SUMF: Petro seeks to describe Canning's role (where he allegedly worked without supervision) in keeping with its theory of the case. These additional "facts" could have been included in a separate counter-statement of facts, allowed by LRCi 56.1(b). But Petro declined to provide one. Instead, it included its own facts that it contended were material to the motion for summary judgment in the Response, with the result that it became impossible to tell what its Response was beyond the initial "admit." The Court recommends striking everything that follows the first sentence in Petro's Response No. 5.

- SUMF 19: "IPOS investigated the suitability and veracity of Petro's Welder Certificates, or WPS and WPQ, for compliance with Industry standards. See Exh. D, Resp. To Interrogatory Nos. 10 and 17; see also SAC ¶¶ 62-66, 74-75, 82-94." Petro responds: "***Deny*** *an investigation was necessary;* ***Admit*** *one was instigated solely at Andrew Canning's insistence. (Exhibit 6, David Smith Declaration).* ***Deny*** *there was anything wrong with Petro's Welder Certificates as they complied with industry standards.*" Petro then added 7½ pages of text that reprised Canning's "complaints" about the certificates, discussed how the certificates were "proper," pointed out Canning's "unauthorized interference" with Petro, and summarized Petro's testing procedure of the welders. This narrative cited numerous exhibits submitted by Petro and incorporated its Responses to SUMF Nos. 5, 18, and 36.

  o The first sentence of the Response is non-responsive, as whether the investigation was necessary was not mentioned in SUMF 19 and was not at issue. The second sentence admits SUMF 19, although the word "instigated" replaces "investigated" and the phrase "solely at Andrew Canning's insistence" is nonresponsive and argument. The third sentence is non-responsive, as SUMF 19 did not raise the issue of something being "wrong" with the certificates. Here, Petro took the liberty of changing the premise of the SUMF, and the 7½ pages that followed responded to *Petro's* premise, not the SUMF, and consisted of numerous "facts" and citations to documents it provided that were directed to its theory that Canning tortiously interfered in its contract. As indicated above, if Petro wished to provide its own material facts to support its theory of the case, it could have offered a counter-statement of material fact. But it did not do that, with the result that its

Response to SUMF 19 made it impossible for the Court to determine what part, if any, of SUMF 19 was disputed fact. The Response became extensive argument under the guise of a statement of fact, geared to supplement Petro's opposition brief, and served as an impermissible end-run around the 20-page limit per LRCi 7.1(c)(4). The Court recommends that SUMF 19 be admitted, based on Petro's admission and that the rest of that sentence and all of the other text in Response No. 19 be stricken.

In the third group, Responses properly denied, the Court includes SUMF 3 and 32.

The fourth group consists of Responses that Petro denied, but the Court concludes that they should be denied in part and stricken in part. These Responses are: SUMF 14, 15, 18, and 41. Here, Petro initially denies Defendants' SUMF and properly provides support for that denial in the record. However, it then goes on to add argument and non-responsive statements. The Court emphasizes that neither it, nor Defendants, should have to sift through a multi-page Response to find one or two responsive sentences to the SUMF. The fact that the Court did so for this group of Responses is an exercise of discretion that benefits Petro; however, it will not do so for the 27 denials in the fifth group.

- Petro's Response to SUMF 14 (stating that neither OPTIS nor Canning had any approval or decision-making authority over the bidding or selection process for projects at the WAPA facilities): The part of Petro's Response that addresses SUMF 14 that will be allowed as a denial is: "***Deny***. *Pursuant to Defendants' consulting agreement with VVIC, Defendants had authority to '[m]anage the procurement process for all phases of work in relation to the capital project.' (See Def's Ex. E, Consulting Agreement between OPTIS and VVIC, at § 2(b)(vi) Scope of Services. Further, Defendants influenced the bidding and selection process per IPOS General Manager David Smith. He attested that Canning was directly involved in assessing Petro's bids on special projects and criticizing Petro's bids to get IPOS and VITOL to deny Petro the projects. (Exhibit 6, David Smith Declaration ¶¶ 8-9).*" It is recommended that the remainder of Petro's Response to SUMF 14 (amounting to one page of text) be stricken as non-responsive and argument as it discussed matters far afield from the SUMF, such as Defendants' aspersions directed to Petro.

- Petro's Response to SUMF 15 (stating that neither OPTIS nor Canning had any approval or decision-making authority over the payment of Petro invoices): The part of Petro's response that addresses SUMF 15 that will be allowed as a denial are the first three sentences: "***Deny****. Canning refused to sign off on Petro's time sheets and blocked Petro from being paid numerous times. For instance, on December 15, 2020, Canning set an email to IPOS management stating he is 'refusing to sign the time sheets for three of the [Petro] team.' (Exhibit 15, Figueira Depo. at pp. 61-62). Canning had the authority to approve Petro's payments for special projects, and while IPOS made payments, they were ultimately for VITOL projects. (Exhibit 15, pp. 66-67, Exhibit 20, Tim Kologinczak Depo. P. 41).*" It is recommended that the rest of the Response (one page of text) be stricken as non-responsive and argument, as it involved Canning's criticisms and accusations directed to Petro, and his alleged interference in operational matters.

- Petro's Response to SUMF 18 (stating that Canning did, in fact, fall through a platform at a WAPA Facility on February 11, 2021 that Petro was responsible for fabricating): The part of Petro's Response that addresses SUMF 18 that should be allowed as a denial is the first sentence: "***Deny****. Canning did not 'fall or accidentally fall through a platform.' (Exhibit 1, Melendez Depo. P. 95),*" and a sentence a page later that stated: "*Canning acted in an unsafe manner by jumping up and down on the platform, until it gave way. (Exhibit 1, Melendez Depo., pp. 108-114).*" The rest of the Response (one page of text) should be stricken as non-responsive and argument, as it variously discussed the need to install clips on the platform, the need for anyone accessing it to have a permit, and a confrontation that ensued between Canning and Petro employees.

- Petro's Response to SUMF 41 (stating that on July 26, 2021, Petro responded to an email from IPOS's general manager and admitted that it did not have the requested welding records but offered that "all welders could be requalified under IPOS/VTTI supervision via X-ray or PAUT if need be."). The first four sentences of Petro's response address SUMF 41 and will be allowed as a denial: "***Deny****. This email at IPOS 00623 clearly states that Petro had welders qualification certificates. But Petro offered to have them retested if IPOS and VITOL wanted that. Petro also informed VITOL and IPOS in that email exchange that the documents they were requesting such as the Inspection and Test Plan reports had not been required by VITOL/IPOS for the job, so they could not be produced. Further, Petro informed VITOL and IPOS that they did not have the failure reports, but they were including weld logs with all the relevant information requested. (See Def's Exhibit F at IPOS 006023).*" The rest of the Response should be stricken as argument and non-responsive as it does not relate to the email response that is at issue in SUMF 41 but concerns other emails and why IPOS terminated Petro's contract.

The final group consists of Responses to Defendants' SUMF that Petro denied; the Court recommends that these Responses should be stricken in their entirety and the respective SUMFs be deemed admitted. Petro's Responses contain factual and legal argument and/or conclusions, are non-responsive, incorporate other of Petro's often-lengthy Responses without pinpointing where in those other Responses the instant SUMF at issue is addressed, and/or changed the premise of the SUMF and responded to that new premise. The Responses in this group, 4, 6, 8, 12, 16, 17, 20, 21, 24, 25, 26, 28, 29, 30, 31, 33, 34, 36, 39, 42, 43, 44, 46, 50, 51, and 52.[2] Here, too, because space limitations make it impossible to describe the deficiencies of each Response, the Court will cite representative problems from this group to explain Petro's non-compliance with LRCi 56.1(b).

- SUMF 4 provides: "From September 2016 until October 31, 2020, OPTIS, through Andrew Canning, provided operational support consulting services relating to the WAPA Facilities to IPOS. See Exh. A, Canning Declaration, ¶¶ 4-6; see also SAC ¶¶ 24-26." Petro's denial runs 2½ pages. It starts by saying that IPOS's General Manager testified that OPTIS did not have a contract with IPOS, but had one with VTTI, without specifying a timeline. At another unspecified time, IPOS took over payments to OPTIS for Canning's services (those services were not specified), and goes on to discuss Canning's services regarding a "punch list" that Canning was supposed to "oversee" but not "supervise," that Canning had oversight of special projects from November 2020 onwards (beyond the timeframe at issue in SUMF 4), and refers to the 7½ page Response to SUMF 19 without specifying where in that extended Response facts relevant to SUMF 4 are to be found. The Response then describes how IPOS's General Manager was pleased with Petro's maintenance work

---

[2] In addition to the representative Responses set out below, the specific problems with the other Responses are: Response Nos. 6, 30, 34, 36, 42, 50, and 51 contain argument, are non-responsive, and contain additional facts that should be contained in a counter-statement of facts; Responses Nos. 8, 12, 29, 31, and 33 contain argument, are non-responsive, contain additional facts, and incorporate other Responses; Response Nos. 16, 17, 21, 26, and 39 incorporate other Responses; Response Nos. 28, 43, 44, and 52 contain argument, are non-responsive and incorporate other Responses; Response Nos. 25 and 46 contain legal argument and are non-responsive.

in 2018 through 2021, that there was a difference between IPOS's maintenance work with Petro and Vitol's special projects where Canning had oversight over the special projects (referring generally to the one-page Response to SUMF 12), and how Canning made "unauthorized communications to IPOS" concerning Petro's work, "aggressively" micro-managing and falsely criticizing Petro's work, and referred to the over three-page long Response to SUMF 6 (without specifying where the relevant facts were to be found). The narrative ends with a paragraph that Canning displayed overt and covert discrimination towards Petro, creating a hostile working environment.

- o This 2½ page narrative, incorporating over ten pages of other narrative Responses, makes it impossible to discern what facts Petro is pointing to that support its "denial" of SUMF 4 (such as what services Canning provided, and when). Some facts cited actually support SUMF 4, while others attempt to characterize or color evidence to support a denial of SUMF 4. The timeline contained in the Response is unclear, as SUMF 4 pertained only to September 2016 through October 31, 2020, while the Response refers in general terms to 2017, 2018, 2019-2021, and after November 2020. It cites four different exhibits to support particular assertions contained therein. Petro's extended Response is non-responsive—whether IPOS's general manager was pleased with Petro's work in 2018 was not at issue, nor was whether Canning treated Petro employees discriminatorily (which in any event is a legal conclusion). The Response also contains improper argument to support its discrimination and tortious interference causes of action. In sum, this Response is so improper on so many fronts that the Court recommends that the entire text be stricken and SUMF 4 be deemed admitted.

- SUMF 20 provides: "After investigation, IPOS concluded Petro's Welder Certificates, or WIPS and WPQ, did not meet Industry standards and were unacceptable. See Exh. D, Resp. To Interrogatories # 10 & # 17." Petro's response: "***Deny***. *The Welder Certificates met industry standards. See Response to No. 19. Petro knew at the beginning of the 3-inch vent line project that welder certificates were needed to deliver to WAPA for completion of the project. (Exhibit 1, p. 132). VITOL, through Tim Kologinczak, its field engineer and project manager for WAPA projects, requested welding certificates from Petro in February 2021 for the 3-inch vent line project and Petro produced them in March 2021. (Exhibit 9, Horowitz Depo. Pp. 55). That was the first time the welder certification[s] were requested and first time Petro produced them before being asked for them again by Canning in April 2021. (Exhibit 6, ¶ 12). If there was a problem with the welder certificates in March 2021, IPOS or VITOL's engineer would have notified Petro.*"

> o   While the first sentence denies the fact asserted in SUMF 20, Petro directs the Court to the 7½ page Response to SUMF 19 as record support for that position. But LRCi 56.1(b) provides that each Response must "cite to the precise portions of the record relied upon as evidence of each disputed fact," and a blanket citation to another Response, which in turn contains an extensive narrative with numerous citations to the record, is not "precise" and does not comply with the rule. The Rule is clear that a court should not be required to engage in a laborious search for a response buried in text when it is the litigant's responsibility to cite "the precise portions of the record" supporting each disputed material fact. *Id.* Further, the text following the reference to Response to No. 19 does not contest that the certificates were not compliant with industry standards. Rather, it discusses the process and time-line that Petro provided the certificates, which is non-responsive. The final sentence of the Response is complete speculation and argument with no support in the record. Thus, the Court recommends that this denial be stricken, and Defendants' SUMF 20 be admitted.

- SUMF 24 provides: "The WPQs referenced in Exh. H [7 pages of Welder Performance Qualification Records] indicated that Guillermo Castro conducted the welding tests and that Acuren Inspection Services conducted the Mechanical Tests." Petro's Response: "*Deny the implication that the WPQs were fraudulent. See Response to No. 19.*"

> o   Here, it is clear that Petro does not wish to "admit" a fact that is explicitly set out in the records cited. *See Bomba v. Commonwealth of Pa. Dep't of Corrs.*, No. 16-cv-1450, 2019 WL 177471, at *2 (M.D. Pa. Jan. 11, 2019) (noting that plaintiff was limited to "acknowledging that the testimony was accurately quoted" when responding to a defendant's SUMF that quoted documents or deposition testimony). As a result, Petro denies SUMF 23 by creating its own premise[3] for the SUMF (that the welders' certificates were or may be fraudulent), and responds to the premise it created with a denial. But nothing in SUMF 23 creates an implication that the WPQs were fraudulent, and

---

[3] Petro argues that the Local Rule does not "specifically preclude explanation" to justify its lengthy Responses. Dkt. No. 311 at 3. But, as occurred here, Petro often changed the premise of a SUMF and its Response then fulsomely addressed that new premise. *See Evans v. Kaye*, 19-cv-1112, 2021 WL 5416282, at *5 (M.D. Pa. Nov. 19, 2021) ("Plaintiff's statement of material facts does not directly respond to Defendant's statement and instead provides his own narrative of the relevant facts" and deeming defendants statement admitted). If Petro wished to frame its own facts to provide more "context" for the SUMF, it had the opportunity to do so by filing a counter-statement of facts, permitted under LRCi 56.1(b). Instead, it combined its Response with its own counter-statement of facts.

Petro's answer is non-responsive. Adding to its improper Response is Petro's reference to its Response to No. 19 as the record cite to support its denial. As noted above, the Response to No. 19 consists of 7½ pages of text that the Court (or an opposing party) should not have to parse to find the supporting cite—if in fact it exists—in that Response. Thus, the Court recommends that this denial be stricken, and Defendants' SUMF 23 be admitted.

The Court places SUMF 1 in a separate category. Defendants stated: "At all relevant times, Petro was a legal entity organized under the laws of the Territory and not a natural person. See Second Amended Complaint ("SAC"), ¶ 1." In response, Petro wrote: "Deny. Petro was a Limited Liability Company organized under the laws of the Virgin Islands," and quotes 13 V.I.C. § 1113(a), (b)(1). Here, while the first part of SUMF 1 states a fact (that Petro was a legal entity), the second part—that it was not a "natural person" (where "natural person" was not defined)—is a legal conclusion, not a fact. While Petro "admitted" it was a limited liability company, it apparently was denying that it was not a natural person—although not explicitly saying so—by quoting the Limited Liability Act referring to LLCs having the same powers as an individual to carry on business. Both the SUMF and Response focus on legal argument, which the parties have repeated in their briefs. It does not raise a disputed question of material fact. As a result, the Court will allow the Response.

The Court also recommends striking the introductory statements on pages 1 and 2 of Petro's Response that purport to "define" the relevant parties. These facts should be contained in its Responses, if relevant, or in a counter-statement of facts. They should not

*Petro Indus. Solutions v. IPOS*
1:21-cv-00312-WAL-EAH
Report & Recommendation
Page 27

be included as an ad hoc introduction that follows no format under LRCi 56.1, where some

of the "facts" are supported by record citations and others are not.[4]

### B.     Conclusion and Recommendation

Plaintiff's Responses were almost totally non-compliant with LRCi 56.1(b). As a

consequence, out of the 53 SUMF, the Court recommends (1) admitting SUMF 2, 9, 10, 13 as

properly admitted, as well as Response No. 1; (2) admitting SUMF 5, 7, 11, 19, 22, 23, 27,

35, 37, 38, 40, 45, 47, 48, 49, 53 and striking the accompanying detail in those Responses;

(3) striking Petro's Responses to SUMF 4, 6, 8, 12, 16, 17, 20, 21, 24, 25, 26, 28, 29, 30, 31,

33, 34, 36, 39, 42, 43, 44, 46, 50, 51, and 52, for failure to comply with LRCi 56.1(b) and

deeming those SUMF admitted; (4) accepting the denials of SUMF 3 and 32; and (5)

accepting in part the denials in response to SUMF 14, 15, 18, and 41, and striking the

Responses in part, as explained above. With this hodge-podge of admissions and denials of

Defendants' SUMF, the question now becomes—what is the best way to proceed?

For its part, Petro argues that even if it did violate the Local Rule, the Court should

not respond with the "extreme" sanction of admitting all of Defendants' SUMF —basically

permitting it a "do over" in the interests of justice. Dkt. No. 311 at 6-12. It quotes cases from

this District where the court refused to strike a plaintiff's response to four dispositive

motions because they were slightly untimely or refused to strike testimony in a criminal

case because the defendant had to wait an additional day for the transcript to be prepared.

*Id*. at 6. The procedural posture of those cases, the standards applied, and the issues

---

[4] Some of the alleged facts are contained in Petro's Response to SUMF 5.

addressed are inapposite to those involved here—although in *Williams v. Pennsylvania State Univ.*, No. 20-cv-0298, 697 F. Supp. 3d 297, 311-12 (M.D. Pa. 2023), which Petro did not cite in this context, the court denied a defendant's motion to strike a procedurally improper additional statement of facts as "too harsh a sanction" where it would result in a waiver of plaintiff's opportunity to defend her claims and there was little "material difference in the expedience" with which Court was able to evaluate parties' filings.

Petro acknowledges that the cases quoted by Defendants where courts have sanctioned a party for Local Rule violations "on the surface seem to support their requested relief," Dkt. No. 311 at 7, but attempts to demonstrate their inapplicability because the courts took issue with the dearth of information provided by the offending party or the lack of citations to the record, in contrast to its "thorough[ ] and comprehensive[ ]" addressing of every statement of fact, supported with detailed citations to the record. *Id.* at 6-8. But Petro fails to appreciate how its qualifications and denials of fact, in an effort to embroider its statement of the case through argument, consistently violated the local rule. This was not a situation where Petro provided "over inclusive" responsive information; it provided over-inclusive non-responsive information. LRCi 56.1(d) provides that a failure to respond to a movant's SUMF "as provided by these Rules"—meaning, that the concise responses should be responsive, should not contain argument, and should cite to the record for support (as opposed to another response)—"may result in a finding that the asserted facts are not disputed for the purposes of summary judgment." LRCi 56.1(d).

*Petro Indus. Solutions v. IPOS*
1:21-cv-00312-WAL-EAH
Report & Recommendation
Page 29

The Third Circuit has opined that a district court may "depart from the strictures of its own local procedural rules where (1) it has a sound rationale for doing so, and (2) so doing does not unfairly prejudice a party who has relied on the local rule to his detriment." *United States v. Eleven Vehicles, Their Equip. & Accessories*, 200 F.3d 203, 215 (3d Cir. 2000). The Court has found no sound rationale to so depart. This is not a technical violation of the rule in one or two instances that can be overlooked. In the Court's view, Petro has employed a litigation strategy that uses a consistent violation of Local Rule 56.1(b) to gain an improper advantage in summary judgment litigation. It has included pages of additional argument in its Response to Defendants SUMF, thereby engaging in an end-run around another Local Rule, 7.1(c)(4), that limits briefs to 20 pages unless leave of court is sought. By refusing to address a statement of undisputed fact and instead substituting its own statement of fact that comports with its theory of the case and then responding to *that* statement, Petro makes a mockery of the process, making it impossible for an opponent, much less the Court, to determine what material facts are at issue. And when called on its violations, Petro seeks to avoid any consequences by invoking "the interests of justice."

The Court is loathe to reward Petro for its flagrant local rule violations by permitting it to file a revised and compliant Response to Defendants' SUMF and a Counter-Statement of Material Facts, after Defendants filed their motion to strike and the Court has expended an inordinate amount of time in analyzing the extensive problems with Petro's Response. That approach is particularly ill-advised because the District Judge has, on numerous occasions, permitted Petro's counsel to resubmit compliant responses to

*Petro Indus. Solutions v. IPOS*
1:21-cv-00312-WAL-EAH
Report & Recommendation
Page 30

defendants' SUMF or revisions to its counter-statement of material facts after pointing out the same kind of violations of LRCi 56.1(b) on display here. *See. e.g., Bass v. Fed. Express Corp.*, No. 14-cv0060, 2016 WL 3892394, at *4-*6 (D.V.I. July 13, 2016) (noting that the court was criticizing plaintiff's counsel for the fourth time because the response to defendants' SUMF "contravenes the purpose and spirit of Local Rule 56.1(b) in that the individual responses are—in various parts—non-responsive, argumentative, . . . and improperly used by Plaintiff to argue [his] case-in-chief" but permitting plaintiff to refile its Response and counter-statement in compliance with the Local Rule) (citing *Moore v. U.S. V.I. Dep't of Tourism*, No. 14-cv-00081, Order, Dkt. No. 61 (D.V.I. June 10, 2016) at 5-8; *Kantz v. Univ. of the V.I.,* No. 08-cv-00047, Mem. Op. & Order, Dkt. No. 109 (D.V.I. Apr. 15, 2013) at 3-7; *Galloway v. Islands Mechanical Contractor, Inc.,* No. 08-cv-0071, 2012 WL 3984891, at *1 n.1 (D.V.I. Sept. 11, 2012); *see also Abney,* 2013 WL 12354494, at *6–7 (opining that the court would not sift through pages of non-responsive argument or inappropriate elaborations of responses to determine what facts plaintiff actually admitted or denied, and requiring plaintiff to re-file a Response to defendant's SUMF that complied with LRCi 56.1(b)). Petro's counsel has had ample notice that the Court does not approve of her failure to comply with LRCi 56.1(b). Further, it is clear that the Court's repeated exercise of discretion has not deterred Petro's counsel from violating LRCi 56.1(b) once again. In the Court's view, it would not be in the "interests of justice" to continually permit this kind of violation without some consequence.

*Petro Indus. Solutions v. IPOS*
1:21-cv-00312-WAL-EAH
Report & Recommendation
Page 31

In addition, the Court must consider whether not following LRCi 56.1(d) "unfairly prejudices" the party that "relied on the local rule to his detriment"—i.e., the Defendants. *Eleven Vehicles*, 200 F.3d at 215. The Court is convinced that Defendants have been unfairly prejudiced by Petro's violations of the Local Rule. Most of Petro's Responses made it impossible for Defendants to determine what facts from their SUMF were in issue. As a result, they were placed in a position where they could not file a reply that adequately responded to Petro's opposition, given that Petro's arguments against summary judgment on the defamation and tortious interference claims and damages argument were based on its improper Responses to the SUMF. To permit Petro a "second bite of the apple" to submit a proper response and likely a counter-statement of facts, would be tantamount to having Defendants underwrite Petro's violations by requiring them to respond to an entirely reconstituted opposition with the concomitant time and expense involved, where the entire exercise could have been avoided if Petro had followed the Local Rule to begin with. Petro blithely contests Defendants' position that they would be unduly prejudiced by asserting that if Defendants wanted to reply to facts in its Response that they felt were misplaced, they could have sought leave of Court to file a sur-reply. Dkt. No. 311 at 11-12. Rather than accepting any constraints for its violation, Petro puts the onus on Defendants to go to the time and expense of first seeking permission to file a sur-reply and then, if allowed, filing the document. This suggestion asks Defendants to shoulder more effort and expense that could and should have been avoided. And as Defendants point out, Petro's Responses are so convoluted that filing a sur-reply would not be feasible. Dkt. No. 312 at 3 n.3.

*Petro Indus. Solutions v. IPOS*
1:21-cv-00312-WAL-EAH
Report & Recommendation
Page 32

The Court would be well within the exercise of its discretion to address the motion for summary judgment now, given that most of the SUMF are admitted or deemed admitted. But even after admitting many of Defendants' SUMF, the Court is "still required to conduct a full analysis to determine whether granting summary judgment was appropriate." *Weitzner*, 909 F.3d at 614. In the Court's view, however, it would not promote judicial efficiency to proceed with the motion based on the briefing now before the Court. This is because throughout the opposition brief, Petro cites its Responses to Defendants' SUMF to support its positions against summary judgment on the tortious interference and defamation claims, and on the damages issue. Its own Responses to Defendants' SUMF are so intertwined throughout the opposition that it is impossible to separate out the arguments that depend on those Responses with the arguments that do not. *Park*, 2011 WL 1831708, at *3. The Court will not expend the time attempting to unwind Petro's arguments based on properly supported factual assertions from those that are not.

Accordingly, the Court recommends that the best way to proceed would be to have Petro submit a new opposition brief based on the new legal landscape where most of Defendants' SUMF are admitted or deemed admitted, and some of Petro's denials stand, in full or in part, based on the analysis above. Petro will be tasked with ascertaining which of its arguments in opposition to summary judgment remain, based on those facts. In other words, Petro may submit a new opposition to Defendants' motion with the caveat that it may only make arguments based on the SUMF that are admitted and deemed admitted, or those Responses that the Court concluded were properly denied or properly denied in part;

it will not be permitted to make any arguments based on its improper Responses to the Defendants' SUMF, Dkt. No. 305. It may not submit a revised Response to the SUMF or a counter-statement of material facts. Defendants would then be permitted to submit a reply to Petro's opposition, after which the motion for summary judgment will be fully briefed. *See Weitzner*, 909 F.3d at 613 ("[T]he District Court is in the best position to determine the extent of a party's noncompliance with Local Rule 56.1, as well as the appropriate sanction for such noncompliance."). Petro may still defend its claims, but within the context it created. While this recommendation elicits more briefing, it does not turn the case back to a point where the facts will again be debated. The District Judge may also consider warning Petro that it will not look favorably on any attempt to circumvent the Court's ruling on the motion to strike when submitting its revised opposition to summary judgment.

## II.       Motion for Summary Judgment

The Court has recommended, *supra*, that the majority of the Defendants' SUMF be admitted, and that Petro be given another opportunity to oppose the motion for summary judgment based on that revised constellation of facts. Most of the SUMF relate to Petro's defamation and tortious interference claims. Only SUMF 1 touched upon the VICRA discrimination claim. And, as indicated above, the Court considers SUMF 1 to essentially set out a legal argument, which elicited a legal response from Petro. SUMF 1 did not raise a question of undisputed material fact. In that vein, because the parties' arguments for and against summary judgment on the VICRA discrimination claim are grounded in statutory

interpretation, the Court can proceed to adjudicate that claim as a matter of law. In doing

so, it recommends granting summary judgment on this cause of action, as explained below.

Petro's discrimination cause of action against OPTIS and Canning—entitled

"Violation of the Discrimination Statutes of the Virgin Islands"—does not specify under

which discrimination statute(s) of the Virgin Islands it brings its claim. This lack of

specificity may be because the claim is exceedingly unusual. In the ordinary course of

events, a plaintiff—a human being—will sue another person, a business entity, a union, or

the local government for discriminating against him or her based on certain personal

attributes protected by law, as set out in the Virgin Islands Civil Rights Act statute, 10 V.I.C.

§ 3(a) (Chapter 1, entitled "Equal Rights of All Persons Against Discrimination")—race,

creed, color, or national origin.[5] The V.I. discrimination statutes also provide robust

protections for a person claiming discrimination in employment, making it unlawful for an

---

[5] Section 3, "Rights of persons; prohibition against discrimination," provides, in part:
(a) All natural persons within the jurisdiction of the United States Virgin Islands, without regard to race, creed, color, or national origin, and subject only to the conditions and limitations established by law and applicable in like manner to all persons, are entitled to-
>    (1) equal treatment with respect to employment, pay and working conditions in any and all businesses and industry, and with respect to union membership.
>    (2) the full and equal accommodations, advantages, facilities, and privileges of any place of public accommodation, resort, or amusement.
>    (3) the full and equal privilege to purchase or rent any item of real estate, goods, commodities, service or any other thing offered for charge to others.
(b) No person, being the owner, proprietor, superintendent, manager, agent, or employee of any publicly licensed business or any other business or industrial establishment, shall directly, indirectly or by subterfuge, deny employment in or at such business to any applicant therefor, or engage in or permit any discrimination or differential in pay or working conditions for workers doing the same work, on account of race, creed, color, or national origin, subject only to the conditions and limitations established by law and applicable in like manner to all persons.
10 V.I.C. § 3(a), (b).

*Petro Indus. Solutions v. IPOS*
1:21-cv-00312-WAL-EAH
Report & Recommendation
Page 35

employer to discriminate against an individual on the basis of age, race, creed, color, national origin, place of birth, sex, sexual orientation, gender identity, disability and/or political affiliation by refusing to hire that individual or discharging him/her from employment, or failing to compensate that individual based on those characteristics. 10 V.I.C. § 64; *see also* 24 V.I.C. § 451.

The VICRA provides a private right of action under 10 V.I.C. § 3 (Chapter 1) and 24 V.I.C. § 451 (Chapter 17). *See Rennie v. HOVIC*, No. 14-cv-0028, 2015 WL 525941, at *9-11 (V.I. Feb. 6, 2015). The District Court has consistently held that no private right of action exists under 10 V.I.C. §§ 61- 72, although following amendment in 2011, the court held that a private right of action exists under 10 V.I.C. § 64(1), which pertains to discrimination in employment. *Kantz*, 2018 WL 6182626, at *3; *see also Bryan v. Gov't of the V.I.,* No. 2018 WL 1414841, at *2 (D.V.I. Mar. 20, 2018), *aff'd* 916 F.3d 242 (3d Cir. 2019).

Petro has not claimed, nor could it, that Canning and OPTIS were its "employers," and thus the provisions regarding discrimination in employment, 10 V.I.C. § 64 and 24 V.I.C. § 451, do not apply. The only VICRA section that might apply is 10 V.I.C. § 3. But the salient question is—does that discrimination statute protect Petro, an LLC? Petro cites no case, and the Court cannot find one, where an LLC has brought a claim under VICRA alleging that it has been discriminated against, in the over 70-year history of the statute. This of course makes sense on its face, because LLCs do not possess the attributes of age, race, creed, color, or national origin, much less place of birth, sex, sexual orientation, gender identity,

disability and/or political affiliation that the Virgin Islands Legislature has seen fit to protect from discrimination under the VICRA.

   In an attempt to overcome this obvious problem and avoid summary judgment on its discrimination claim, Petro advances a novel statutory argument. But first, it seeks to parry the issue entirely by contending that Defendants either waived or forfeited their statutory standing argument because they did not raise it as an affirmative defense.[6] Dkt. No. 304 at 2-4. Petro cites cases from outside the Third Circuit that statutory standing can be waived; asserts that it is a "jurisdictional inquiry" related to whether a party may pursue a cause of action pursuant to a specific statute; and cites a case holding that defendants cannot amend their affirmative defenses via a summary judgment motion. Dkt. No. 304 at 2-3. Petro adds that Defendants also forfeited the statutory standing defense by failing to raise it in their answers or by a Rule 12 motion. *Id.* at 3-4.

   Petro is incorrect. Governing case law provides that statutory standing is not jurisdictional—rather, it "goes to whether Congress has accorded a particular plaintiff the right to sue under a statute, but it does not limit the power of the court to adjudicate the case." *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 320 (3d Cir. 2015) (citing *Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 128-29 & n.4 (2014)). *Leyse* goes on to say that, "[a]s a result, a dismissal for lack of statutory standing is effectively the same as dismissal for failure to state a claim," and a motion to dismiss on this ground is brought

---

[6] Black's Law Dictionary (12th ed. 2014) defines waiver as "[t]he voluntary relinquishment or abandonment—express or implied—of a legal right or advantage," and defines forfeiture as "[t]he loss of a right, privilege or property because of a crime, breach of obligation, or neglect of duty."

pursuant to Rule 12(b)(6)[.]" *Id.* (internal quotation marks omitted). Because Defendants raised failure to state a claim as an affirmative defense in their answers, Dkt. Nos. 123, 134, they neither waived nor forfeited this argument, and the Court will consider it.

Petro's merits argument focuses on the Uniform Limited Liability Act ("ULLA") that governs Limited Liability Companies (LLCs) in the Virgin Islands. It quotes 13 V.I.C. § 1113 that provides, inter alia:

> (a) A limited liability company may be organized under this chapter for any lawful purpose, subject to any law of the Virgin Islands governing or regulating business.
> (b) Unless its articles of organization provide otherwise, a limited liability company has the *same powers as an individual* to do all things necessary or convenient *to carry on its business or affairs*, including power to:
>      (1) *sue and be sued*, and defend in its name[.]

13 V.I.C. § 1113 (emphasis added). Based on this text, Petro asserts that it is "a statutory 'individual' who can sue and be sued." Dkt. No. 304 at 4. It then cites the ULLA definitions section, noting that "person" means "an individual, corporation, . . . limited liability company, association, . . . or any other legal or commercial entity." 13 V.I.C. § 1102(n). Relying on and combining these two provisions, Petro asserts that, as an "individual" and a "person," it can sue for discrimination under the VICRA. Dkt. No. 304 at 5. For support, it quotes *Rennie,* 62 V.I. at 551-52, where the V.I. Supreme Court described the VICRA as providing that "all individuals, regardless of race or national origin" were entitled to "equal treatment with respect to employment, pay, and working conditions in any and all businesses" and prohibited employers from discriminating against workers. *Id.*

Petro's syllogistic attempt to cobble together a plausible basis for it to be covered by the VICRA is meritless. The ULLA states that an LLC has the same "powers as an individual" to "carry on its business," including the power to "sue and be sued." 13 V.I.C. § 1113(b). It does not say the LLC *is* an individual, but only that it has certain *powers* as an individual to *carry on its business*. Petro nevertheless interprets § 1113(b) as equating an LLC with an individual. It then looks to the ULLA definitions section, 13 V.I.C. § 1102(n), that defines "person" as both an individual and LLC. With that definitional bridge, Petro asserts that it is an individual and a person, and therefore VICRA § 3(a), referring to "all natural persons" being entitled to equal treatment, applies to it.

The ULLA's definition of "person" serves to define that word when it appears in the provisions of the ULLA. Section 1102 begins with the words, *"[i]n this chapter*, unless the context otherwise requires" person means "an individual . . . limited liability company . . . " 13 V.I.C. § 1102(n)(emphasis added). Thus, this definition, cabined to the ULLA, does not purport to define "person" throughout all sections of the Virgin Islands Code—such as when the word is used in a provision of the VICRA. And, tellingly, the word "person" is not mentioned at all in § 1113(b), which was the basis for Petro's argument that an LLC is a "person." Thus, Petro's attempt to generally equate "person" in § 1102(n) with "individual" and "limited liability company" has no application to the interpretation of § 1113(b). In addition, ULLA's definition of the word "person" is not particularly relevant because Petro provides no authority for its position that if "person" is defined as "individual" in § 1113(n), the converse of that definition is also true—that "individual" is defined as "person." *Cf.*

*Woessner v. Air Liquide Inc.*, 242 F.3d 469, 475 (3d Cir. 2001) (quoting Delaware state court decision for proposition that "while a fixture is, by definition, an improvement to real property, the converse is not true; an improvement to real property[,] in the ordinary sense of the term, need not be a fixture.").

A more significant statutory interpretation problem is that VICRA § 3(a) applies to "*natural* persons," not merely "persons." Courts "presume that a legislature knows the meaning of words, has used the words of a particular statute advisedly, and has expressed its intent by the words as found in the statute." *In re Holcombe,* No. 15-cv-0066, 2015 WL 75760037, at *16 (V.I. Nov. 25, 2015). The Virgin Islands Legislature used the words "natural person" in the VICRA advisedly; it did not intend for "natural person" to be the equivalent of "person," which would have rendered the adjective "natural" superfluous. *See Dupigny v. Tyson*, No. 2013-cv-0142, 2017 WL 729442, at *2 (V.I. Feb. 24, 2017) ("All the statutory language must be given effect when doing so does not undermine the legislative intent. Interpretations that are unjust or lead to absurd results must be avoided because they are inconsistent with legislative intent.") (citations omitted)). "An interpretation that renders a statute (or any part of language thereof) inoperative, nonsensical, or superfluous, or that defies rationality is absurd." *Willis v. People*, No. 2015-cr-0078 2019 WL 3291616, at *17 (V.I. July 11, 2019) (Swan, J., concurring).

Petro nevertheless points to the definition section of the VICRA, 10 V.I.C. § 2, which does not contain a definition of "person" (or "natural person") and cites the "Revision note" to Section 2 stating that "[t]he definition of 'person' was omitted as covered by section 41

of Title 1." 10 V.I.C. § 2, Revision note. Section 41 of Title 1, which sets forth "general definitions" for the Virgin Islands Code, *Evans-Freke v. Evans-Freke*, No. 2019-0046, 2021 WL 6210673, at *20 (V.I. Dec. 30, 2021) (Swan, J., concurring), provides: "As used in this Code . . . , *unless it is otherwise provided or the context requires a different construction*, application or meaning: . . . 'person' and 'whoever' respectively include corporations, companies, associations, joint stock companies, . . . as well as individuals." 1 V.I.C. § 41 (emphasis added). Petro cites this definition to conclude, without analysis, "[t]herefore, the definition of 'person' for Title 10 includes a company like Petro." Dkt. No. 304 at 5. Petro does not attempt to explain how the definition of "person" used in 1 V.I.C. § 41 includes the definition of "natural person" in 10 V.I.C. § 3 (or even in 13 V.I.C. § 1102(n)).

Virgin Islands courts will "apply any specific definitions that are statutorily prescribed. When no statutory definition is provided, words that have an accumulated legal meaning will be given that meaning, and other words will be given their common, dictionary, meaning." *Ubiles v. People*, 66 V.I. 572, 590 (V.I. 2017); *accord* 1 V.I.C. § 42 ("Words and phrases shall be read with their context and shall be construed according to the common and approved usage of the English language. Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to their peculiar and appropriate meaning.").

Although the Virgin Islands courts have not been called upon to define the phrase "natural person" in 3 V.I.C. § 10(a), its "accumulated legal meaning," *Ubiles,* 66 V.I. at 590, over the almost-70 years that the statute has been in existence leads to the conclusion that

the phrase means a "human being." The text of the statute illustrates that the VICRA was

passed to protect people in the Virgin Islands from discrimination based on their human

attributes of race, creed, color, and national origin (in addition to age, place of birth, sex,

sexual orientation, gender identity, disability and/or political affiliation)—attributes that

are not possessed by LLCs. Petro has cited no case where an LLC, as a plaintiff, brought a

discrimination cause of action under this statute based on these attributes. "Natural

person" in the VICRA "requires a different construction, application or meaning" from the

definition of "person" in 1 V.I.C. § 41 that generally equated "person" with "individual" and

"company." Thus, defining "natural person" to mean person, as either set out in 1 V.I.C. § 41

or 13 V.I.C. § 1102(n), would lead to an "absurd result"[7] that would be inconsistent with

legislative intent. *Dupigny*, 2017 WL 729442, at *2.

The Court therefore rejects Petro's tortured reading of 10 V.I.C. § 3(a) (as well as its

reading of 13 V.I.C. § 1113) that a "natural person" is synonymous with an LLC, and that the

---

[7] The Supreme Court of the Virgin Islands has interpreted certain statutes using the term "person" to mean "natural person." For example, in the criminal statutes, the V.I. Supreme Court has cited Black's Law Dictionary's definition of "person" as "a human being—also termed *natural person*." (emphasis in original). *Ponce v. People*, No. 2015-cr-0067, 2020 WL 1551324, at *39 (V.I. Apr. 1, 2020) (Swan, J. concurring in part, dissenting in part) (interpreting 23 V.I.C. § 481); *see also Ubiles,* 2017 WL 2313286, at *10 (interpreting the word "person" in 20 V.I.C. § 493(a)(1) as "unquestionably mean[ing] a human being" (citing, inter alia, Black's Law Dictionary 1324 (10th ed. 2014); *Rouse v. People*, No. 17-cr-0051, 2024 WL 181029, at *9 (V.I. Jan. 17, 2024) (interpreting "person" in 14 V.I.C. § 14— "all persons are capable of committing crimes"—as "mean[ng] a human being"). Clearly, those criminal statutes hold human beings, not LLCs, liable for criminal acts. Following this reasoning, "natural person" used in 10 V.I.C. § 3(a) would also "unquestionably mean a human being," as the context for the term "natural person" in the VICRA "requires a different construction, application or meaning" from that of 1 V.I.C. § 41 that generally equates "person" with "individual" and "company."

*Petro Indus. Solutions v. IPOS*
1:21-cv-00312-WAL-EAH
Report & Recommendation
Page 42

Virgin Islands Legislature intended that LLCs could sue under VICRA for discrimination. They cannot. The Court thus recommends to the District Judge that it grant Defendants' motion for summary judgment as to the discrimination claim.

## CONCLUSION

Accordingly, the Court **RECOMMENDS** that Defendants' Motion to Strike, Dkt. No. 309, be **GRANTED IN PART AND DENIED IN PART** as set out in detail above.

The Court further recommends that Defendants' Motion for Summary Judgment, Dkt. No. 297, be **GRANTED IN PART AND DEFERRED IN PART.** It recommends that the motion for summary judgment be **GRANTED** as to the discrimination claim under VICRA, and that the Court **DEFER** ruling on the defamation and tortious interference claims and on the damages issue until after the briefing described above is completed.

Any objections to this Report and Recommendation must be filed in writing within fourteen (14) days of receipt of this notice, 28 U.S.C. § 636(b)(1), and must "specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis of such objection." LRCi 72.3. Failure to file objections within the specified time shall bar the aggrieved party from attacking such Report and Recommendation before the assigned District Court Judge. *See, e.g., Thomas v. Arn*, 474 U.S. 140 (1985).

ENTER:

Dated: September 25, 2024

/s/ Emile A. Henderson III
EMILE A. HENDERSON III
U.S. MAGISTRATE JUDGE