## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

PETRO INDUSTRIAL SOLUTIONS, LLC
(PETRO),

               Plaintiff,

      v.

ISLAND PROJECT AND OPERATING
SERVICES, LLC, VITOL US HOLDING II
CO., VITOL VIRGIN ISLANDS CORP,
ANDREW CANNING, OPTIS EUROPE,
LTD., VTTI, and VITOL, INC.,

               Defendants.

CASE NO. 1:21-CV-00312

<u>JURY TRIAL DEMANDED</u>

### PLAINTIFF'S CONCISE COUNTER-STATEMENT OF FACTS[1]

Petro Industrial Solutions, LLC, ("PIS" or "Petro" or "Plaintiff"), by and through undersigned counsel, and pursuant to Local Rule 56.1(b) files this Concise Statement of Facts raising genuine issues to be tried in Response to Defendant OPTIS Europe, Ltd. and Andrew Canning's Motion for Summary Judgment.

1. Adrian Melendez, Jr., Hispanic, created Petro in April 2018 in the Virgin Islands, and at all relevant times he was the sole member and President of Petro, LLC. (**Exhibit 1**, Melendez Depo., pp. 7-8, 18, 23).

2. Defendant OPTIS Europe Ltd.**,** is a consultancy company specializing in oil and gas operations co-founded by Defendant Andrew Canning (50% owner). (**Exhibit 10**, Canning Deposition, p. 24).

---

[1] All exhibits are a part of the record and were previously filed at ECF Doc. 305.

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.,* Case No. 1:21-CV-00312
**PLAINTIFF'S CONCISE COUNTER-STATEMENT OF FACTS**
Page 2

3. IPOS entered into a Facilities Services Agreement with Vitol Virgin Islands Corp., ("VVIC" or "Vitol") on November 1, 2016. (**Exhibit 28**, IPOS/Vitol Agreement).

4. Pursuant to the IPOS/Vitol Agreement, IPOS was an "independent contractor" and was not Vitol's "agent, servant, employee or representative." (**Exhibit 28**, Sec. V).

5. David Smith, IPOS's General Manager testified that OPTIS, an engineering company, did not have either a verbal or written contract with IPOS to provide IPOS with any services or support relating to the WAPA propane facilities. (**Exhibit 8**, David Smith Depo, pp. 44, 47-48).

6. OPTIS had a contract with VTTI, the construction company in charge of constructing the propane facility for WAPA. (**Exhibit 8** at p. 47).

7. Andrew Canning never worked for IPOS. (**Exhibit 8** at p. 46). "Andrew stayed for the punch list work that was agreed upon between . . . Vitol and WAPA, what was still remaining from the construction." (**Exhibit 8**, p. 46).

8. After the VTTI construction company left, OPTIS' invoices came to IPOS and IPOS took over the payments to OPTIS for Andrew Canning's services even though there was no contract. (**Exhibit 8**, pp. 47-49).

9. Mr. Canning was involved in IPOS's meetings to discuss what to do at WAPA's propane facilities. (**Exhibit 8**, pp. 48-49).

10. David Smith made clear that Canning was not supposed to "supervise" Petro, but "oversee" the maintenance work, up until IPOS hired Calvin Schmidt in St. Croix and Coury Hodge in St. Thomas to oversee maintenance. (**Exhibit 8**, pp. 54-56).

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S CONCISE COUNTER-STATEMENT OF FACTS**
Page 3

11. Once IPOS hired the two maintenance supervisors, Schmidt and Hodge, then Canning had oversight *only over special projects*. (**Exhibit 8**, pp. 55-56).

12. Merlin Figueira, former IPOS General Manager, confirmed that Canning "managed" the special projects Petro worked on for VITOL. (**Exhibit 15**, p. 23).

13. Petro and IPOS entered into a Maintenance Contract, that included Preventative Maintenance, Remedial Maintenance and Scheduled Projects.

14. This Maintenance Contract did not include the "special projects' that Petro would have to bid on or apply for with VITOL. (**Exhibit 26**).

15. David Smith testified that as the General Manager of IPOS, he was pleased with Petro's maintenance work for IPOS in 2018 under Petro's first contract with IPOS, and he renewed Petro's contract. (**Exhibit 8**, pp. 33-35).

16. Smith testified he was satisfied with Petro's maintenance work in 2019, 2020, and 2021. (**Exhibit 8**, pp. 36, 42-43).

17. Defendant Canning was directly involved in assessing Petro's bids on special projects and he criticized Petro's bids to get IPOS and VITOL to deny Petro the projects. (**Exhibit 6**, David Smith Declaration, ¶¶ 8-9).

18. Canning admits he continued to inform IPOS about his view of Petro's work even after he was supposed to oversee only VITOL's special projects. (**Exhibit 12**, Canning's Resp. to Petro's First Set of Interrogatories, No. 5).

19. Merlin Figueira, IPOS former General Manager, testified that Canning's communications about Petro's special project work for VITOL were sent directly to IPOS personnel, despite

the projects being under VITOL (VVIC) supervision, which was inappropriate. (**Exhibit 15**, pp. 14-15, 93-94).

20. Canning used his position as a consultant to VITOL to intimidate, discriminate, and harass Petro, a Virgin Islands sole member LLC, and Petro's employees, who are mostly Black or Hispanic West Indians. (**Exhibit 5**, Affirmation of Calvin Schmidt, Petro's Maintenance Supervisor).

21. Mr. Schmidt attested:

I also reported his racist conduct to David Smith, and told him Canning would go behind our backs, take pictures of the gate log-ins, when we went to lunch, and constantly act like we were cheating, in keeping with his racist attitude that we couldn't be trusted. The security guards warned us that he was doing this. Even though we actually came to work at 7:00, if he didn't see us until 7:30, because we were somewhere else working, he would falsely claim we were falsifying our time records as part of his racist attitude.

(**Exhibit 5**, Schmidt Affirmation, ¶ 13).

22. Chetram Persuad, Petro's Black field superintendent, testified about Canning's racist behavior and improper criticism of Petro's work aimed solely at getting IPOS to terminate its contract with Petro. (**Exhibit 2**, Persuad Depo, pp. 156-160).

23. Persuad confirmed Canning made derogatory comments, referring to Petro employees as lazy "islanders," and "locals," and spoke negatively about Hispanics. (**Exhibit 2**, 156-160).

24. Persuad noted that Calvin Schmidt, a Petro maintenance supervisor, reported similar derogatory remarks by Canning about Petro employees being not up to par and referred to as "lazy islanders." (**Exhibit 2**, 156-160).

25. Mr. Persuad testified as follows:

Andrew Canning pretty much run the maintenance work for IPOS. And pretty much, he would give us [Petro] a potential task to do. And right off the bat, we'll come up with the

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S CONCISE COUNTER-STATEMENT OF FACTS**
Page 5

numbers, timewise, and he said, This is incorrect.  . . . We'll go over the task three or four times, and then we'll go back to the same initial one, and say this is better for him. . . . [Canning] was saying, You island boys don't know what you're doing. You island people cannot get it right. . . . Can you get somebody else to do this? We have been doing this job for several times for Andrew. And like I said, he always come back, saying that, You island people, or you locals cannot get it right.

(**Exhibit 2**, Persuad Depo, pp. 18-20).

26. Mr. Persuad also testified:

Our personnel out of Puerto Rico, [Canning] said, These guys are worthless. They don't know what they're doing. They can't even communicate  . . . . We need to get better personnel than these Hispanics. . . . Mr. Canning would make remarks, our payroll, our timesheets, even our quotes. Again, he would go back and say, You guys can't even get the numbers right as locals . . . . You can't even calculate hours on a timesheet as locals. And he would go on to say, As far as myself and Adrian Melendez, we're worthless at running the company. . . . Andrew Canning, on several occasion, accused us of forgery. Trying to rob [IPOS].

(**Exhibit 2**, pp. 18-20).

27. Regarding Petro's Hispanic employees, Calvin Schmidt, IPOS's maintenance supervisor on St.

Croix, noted:

[Canning] used to constantly refer to my maintenance workers as "Puerto Ricans" or "lazy Puerto Ricans", but never as Petro's employees or by their names. They were not all Puerto Ricans, but they were all Hispanics. It clearly showed his racist attitude.

(**Exhibit 5**, Schmidt Affirmation, ¶ 16; *see also* **Exhibit 3**, Rivera Depo, p. 12).

28. Canning banned four of Petro's Hispanic employees from working at the WAPA facility.

(**Exhibit 3**, Elias Rivera Depo, pp. 12-13; *see also* **Exhibit 12**, Canning's Resp. to Petro's First

Set of Interr. at No. 10, discussing his email of January 22, 2021; **Exhibit 30**, Canning's Email

January 22, 2021).

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S CONCISE COUNTER-STATEMENT OF FACTS**
Page 6

29. In his January 22, 2021 email to IPOS General Managers, Canning falsely accused three of Petro's Hispanic employees of conspiring with Petro to maximize earnings from "time and material activities" like poor timekeeping and loss of materials even though the job was a fixed price, such that Canning demanded the Hispanic employees be banned, which they were. (**Exhibit 30**).

30. Canning did not treat other non-Hispanic or non-Black employees in the same degrading way. (**Exhibit 2**, Persuad Depo, pp. 20-23) (describing how Canning showed respect and listened to David Nagle, a white man, unlike how Canning treated Petro's employees) ("How he treated David Nagle versus our employees and ourselves] was totally different.").

31. Canning stopped Petro from getting a bid by accusing the Plaintiff of corruption. (**Exhibit 17**, Petro's Resp to VITOL Virgin Islands Corp's First Set of Interr., at No. 1).

32. In June 2020, a project called 1 inch vent line, was out for bid being overseen by Andrew Canning and David Nagle. (**Exhibit 17**, No. 1).

33. Petro had given IPOS a budgetary estimate in late 2019 for the same project. When Petro asked about the job, it was falsely told by Andrew Canning that it was too late for Petro to submit its bid. (**Exhibit 17**, No. 1).

34. Petro went to the general manager, Merlin, and finally, the bid package was given to Petro. (**Exhibit 17**, No. 1).

35. Petro submitted its bid, which was a competitive amount in Andrew Canning's words, but he then, in turn, falsely accused Petro of stealing viable information from supplier Traeger brothers. (**Exhibit 17**, No. 1).

36. IPOS General Manager David Mr. Smith attested:

> On June 17, 2020, Andrew Canning sent an email to me concerning a quotation for work on a 1" vent line. Specifically, Mr. Canning stated that he had learned from David Nagle that Dave Tilden at Trager Brothers, a supplier that IPOS had utilized from time to time, "sent Adrian Melendez all the material quote and fabrication quote information for the 1" line work." Mr. Canning stated "I have no idea why he did this, as it is at a minimum unprofessional but probably more exactly corrupt." Mr. Canning's email concluded by noting that he would consider the actions of David Tilden for Trager Brothers and Adrian Melendez of Petro Industrial "are worthy of removal of both companies from the IPOS approved vendors list."

(**Exhibit 6**, ¶ 8).

37. Petro explained to Merlin, David Smith, and Andrew Canning that Traeger had given Petro the pricing on a bill of material they had already submitted because of the short deadline.

(**Exhibit 17**, No. 1).

38. Because of Canning's false accusations, Petro lost the bid. (**Exhibit 17**, No. 1).

39. The bid was given to another contractor despite Petro offering the lowest bid. (**Exhibit 9**, Charlotte Horowitz Depo, pp. 114-16).

40. Cannings tried to block Petro from getting the RIO Shade Project. David Smith testified:

> On January 23, 2021, Andrew Canning copied me on an email to David Nagle about the RIO Shade Project in which he stated "it certainly helps if the contractor comes with the necessary tools and equipment to undertake the work, which is something Petro has consistently failed to do especially when most of their activities are time and materials – where is the incentive to get the work done and this certainly appears to be another example here?" Andrew Canning also represented that he did not feel that Petro had the necessary resources or capability to complete the Rio Shade Project in a reasonable timeframe or cost and advocated that quotations from Tampa Tank or another contractor from the states should be reviewed again, claiming that those other quotations "are starting to look very competitive alongside the PIS costs to date." (**Exhibit 6**, David Smith Affirmation, ¶ 9).

41. In August of 2018, Andrew Canning falsely accused Petro of falsifying the gate entry log, and said that he would report Petro to the authorities because Petro was a criminal. (**Exhibit 17**, No. 1).

42. Adrian Melendez proved to Canning the gate logs were right. (**Exhibit 1**, p. 43).

43. Canning did not apologize for the wrongful accusations. (**Exhibit 1**, pp. 43-44).

44. On February 14, 2021, IPOS recognized that Andrew Canning's repeated accusations against Petro appeared targeted at Petro and not borne out of any legitimate concerns. (**Exhibit 31**, Email from Merlin Figueria to David Smith dated February 14, 2021.)

45. In Canning's intrusive "oversight" of Petro's work, Canning exhibited a pattern of aggressively micro-managing, nit-picking, and falsely criticizing Petro's work. (**Exhibit 31**).

46. IPOS terminated Petro's contract and evicted Petro from the facilities because of Canning's complaints about Petro. (**Exhibit 6**, David Smith Declaration).

47. Charlotte Horowitz, VVIC's 30(b)(6) witness, who works for VITOL, Inc., admits that **Canning had absolutely NO entity or person supervising him at the WAPA facilities.** (**Exhibit 9** at p. 89; *see also* **Exhibit 11**, OPTIS Supp. Resp. to Interrogatory No. 3) (confirming Canning "is not supervised by anyone at OPTIS.")

48. Canning could do as he pleased as neither VITOL, Inc., nor VVIC, IPOS, or OPTIS had oversight over Canning's conduct, behavior, and actions in the Virgin Islands WAPA facilities. *Id.*

49. Canning made his alleged "observations" and "reports" about Petro to IPOS even though OPTIS/Canning did not have a verbal or written contract with IPOS to provide IPOS with any services or support relating to Petro's work at the WAPA propane facilities. (**Exhibit 8**, David Smith Depo, pp. 44, 47- 48).

50. Mr. Smith admitted there were no "guidelines" in place for Canning in overseeing Petro's work. (**Exhibit 8**, David Smith Depo, p. 56).

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S CONCISE COUNTER-STATEMENT OF FACTS**
Page 9

51. Smith testified that Canning *was not supposed to inspect and oversee the welding* on IPOS maintenance projects. (**Exhibit 8**, pp. 85-86). His exact testimony reads:

Q. was it Mr. Canning's job to actually inspect and oversee the actual welding?

A.   No, it was not.  It was the responsibility of Petro to provide the documentation. (**Exhibit 8**, pp. 85-86).

52. Canning had the authority to approve Petro's payments for special projects, and while IPOS made payments, they were ultimately for VITOL projects. (**Exhibit 15**, pp. 66-67; **Exhibit 20**, Tim Kologinczak Depo, p. 41).

53. Canning sent an email on January 21, 2021, to IPOS, Petro, and others in which he falsely criticized Petro's timekeeping practices, falsely accused Petro of dishonesty and fraud with regard to their billing, and suggested that IPOS should consider subjecting Petro "to suspension, dismissal from the facility or cancellation of the contract and permanent removal from the approved contractor list" (**Exhibit 15**, pp. 56-57, 77, 79, 81-83).

54. Canning falsely indicated that changes were made to timesheets after his approval, which he found unacceptable and potentially fraudulent (**Exhibit 15** pp. 56-57, 82-83).

55. In an email dated January 23, 2021, Canning falsely accused a particular PIS team of engaging in "lies, deceit, and what would be regarded as fraudulent activity," suggesting a pattern of behavior aimed at maximizing earnings through time and material activities. He proposed a review of the St. Thomas boiler room access platform project in light of these concerns (**Exhibit 15**, pp. 97-98).

56. IPOS's Merlin Figueira reprimanded Canning for direct interference in IPOS's operational matters and making unauthorized requests for security gate logs, which Figueira noted as

creating problems due to the sensitive nature of these logs and the established protocol for accessing them. (**Exhibit 15**, pp. 129-130).

57. Figueira's request to Canning was to follow the correct procedure by reaching out to him first with any concerns or questions, instead of directly engaging with contractors working under IPOS supervision (**Exhibit 15**, pp. 129-130).

58. In February 2021, Canning fell on a platform after jumping up and down on it, even though Petro informed IPOS the platform was not complete. (**Exhibit 1**, pp. 95-97).

59. Petro still had to install clips to secure the grating. (**Exhibit 1**, p. 97).

60. Petro secured the platform with toeplates so no one could slip on it while waiting on the clips. (**Exhibit 1**, p. 97).

61. Petro's employees, Chad Persuad and Elias Rivera separately informed IPOS maintenance supervisor, Coury Hodge, that the platform was not secured. (**Exhibit 1**, p. 98).

62. To access the incomplete platform, Canning needed a WAPA area permit, which he did not obtain. (**Exhibit 1**, p. 99).

63. Canning was in violation of WAPA's regulations when he improperly accessed the platform area without an area permit. (**Exhibit 1**, pp. 99-100).

64. "You can't just walk around aimlessly because there's danger." (**Exhibit 1**, p. 100).

65. IPOS's own investigation noted there was no permit granted for Canning to be in that area, and IPOS called it a "near miss." (**Exhibit 1**, p. 101-103).

66. Canning verbally attacked the quality of Petro's work. (**Exhibit 1**, Melendez Depo, pp. 108-114).

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S CONCISE COUNTER-STATEMENT OF FACTS**
Page 11

67. Canning called Petro's work on the platform "shoddy" "bullshit work" and labeled the welding as "substandard." (**Exhibit 1**, pp. 104-105, 108-109, 111).

68. Following the platform incident, Canning confronted Chad Persuad (Petro's foreman) and Frank Kirsch (Petro's safety manager), in a confrontational and unprofessional manner. (**Exhibit 13,** Incident Report and email); (**Exhibit 1**, pp. 109-114).

69. Canning blamed Petro for almost falling through the platform and was "loud" and "cursing" at Chad Persuad and Frank. (**Exhibit 4**, pp. 20-21; **Exhibit 1**, pp. 103, 106).

70. Kirsch testified that Canning had a degrading attitude toward Petro employees. (**Exhibit 4**, p. 44).

71. Canning said that Petro's employees did not know how to do their jobs. (**Exhibit 4**, p. 51).

72. Kirsch refused to take the cursing from Canning and walked off. (**Exhibit 13**, Email from Melendez to Merlin Figueria and David Smith).

73. One month later, in March 2021, Canning complained about Petro's welders' certificates. (**Exhibit 6**, ¶¶ 11-12).

74. Adrian Melendez had submitted the welder qualification certifications more than once to IPOS, Vitol, and WAPA for the 3-inch vent line project, emphasizing the necessity of accuracy in these records, and confirming the accuracy of the certifications submitted. (**Exhibit 1**, pp. 132-133; *see also* **Exhibit 16**, Email from Melendez, April 15, 2021, PIS 000862).

75. Mr. Smith, IPOS's General Manager with personal knowledge of the facts, testified:

With respect to the 3" vent line project, on March 31, 2021, Mr. Canning sent an email to Adrian Melendez of Petro, and to various other individuals including me, in which he requested clarification about a welding procedure because of "a few potential anomalies that I observed during a site visit earlier today."

On April 13, 2021, Mr. Canning sent an email to me and to IPOS Terminal Manager Merlin Figueira in which he requested that IPOS ask Mr. Melendez to provide IDs and qualification records for welders working on the vent line and for material certification and mechanical testing for the welding consumables being used.

(**Exhibit 6**, ¶¶ 11-12).

76. Petro's Melendez described the process and responsibility for preparing and signing these certifications, specifically explaining Guillermo Castro's role in testing, and certifying the welders in Puerto Rico in February 2021. (**Exhibit 1**, pp. 134-138; *see also* **Exhibit 14**, Petro's Resp. to IPOS' First Set of Interrogatories, No. 5).

77. Since actual test results are on the welders' qualification certificates, no other documentation exists nor was required. (**Exhibit 14**, No. 7).

78. Mr. Melendez explained, "[t]he procedure for storing records for welders are that welding procedure specifications (WPS), procedure qualification records (PQR), Welder's performance qualifications (WPQ), welder logs, weld maps, third party inspection reports, and equipment testing reports (Hydro/pneumatic) are maintained and stored at Petro Industrial Solution's office by the Quality Control Manager." (**Exhibit 14**, No. 9).

79. As the Welders' Certificates were proper, IPOS and VITOL informed Canning to leave Petro alone and to stop communicating with Petro directly. (**Exhibit 15**, pp. 125-126).

80. In early April 2021, IPOS Figueira requested to hold a conference call between David Smith, himself, Canning and Petro's Adrian Melendez to discuss Canning's unauthorized interference with IPOS's contractor, Petro. (**Exhibit 15**, pp. 125-126).

81. On April 4, 2021, Canning responded by email, refusing to have a conference call with Petro. He stated:

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S CONCISE COUNTER-STATEMENT OF FACTS**
Page 13

I do not think the intended purpose of the telephone conference on Monday with Petro Industrial will be met ('to reset our relationship as there have been a few hiccups these last few weeks') unless I better understand the comments you made in our brief telephone discussion on Saturday where you talked about my -- talked about 'my continued interference with the operation and operations led work.

(**Exhibit 15**, pp. 127-128).

82. On April 4, 2021 by email, Merlin Figueria, IPOS's General Manager, responded to Andrew Canning, saying he was happy to do a separate call, but pointing out, "What I don't like to see is you asking questions and/or giving directions to Contractors under our direct control. For example, you were asking the Security Guard for the Gate logs. Both David [Smith] and I have spoken to you before of a sensitive of your review of these logs. In spite of discussing this with you this situation has reoccurred." (**Exhibit 15**, p. 129).

83. Figueira's request to Canning was to follow the correct procedure by reaching out to him or Calvin first with any concerns or questions, instead of directly engaging with contractors working under IPOS supervision (**Exhibit 15**, pp. 129-130).

84. Figueira emphasized the need for Canning to communicate through proper channels within IPOS for any project-related queries or issues (**Exhibit 15**, pp. 129-130).

85. On June 22, 2021, a representative of Traeger, Dave Tilman, came for a site visit and informed Petro that they were missing critical information needed to move forward on various projects that had been delayed for months and even years. (**Exhibit 17**, No. 3.)

86. Andrew Canning was the one who had not given the needed information but blamed it on Petro. (**Exhibit 17**, No. 3.)

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S CONCISE COUNTER-STATEMENT OF FACTS**
Page 14

87. Andrew Canning was furious that Petro went over his head and went directly to IPOS for the information. (**Exhibit 17**, No. 3.)

88. Merlin Figueira set up a meeting a week later to discuss with Petro how Petro and IPOS could move forward without involving Andrew Canning. (**Exhibit 17**, No. 3.)

89. After IPOS asked Canning to stop interfering with Petro, and after the incident on June 22, 2021 when IPOS decided to avoid working with Canning, Canning refocused on discrediting Petro's welder certificates. (**Exhibit 6**, David Smith Declaration, ¶¶ 13-14).

90. IPOS's David Smith attested:

On July 13, 2021, Andrew Canning sent me an email stating that he had "real concerns with the poor quality of work fabrication" Petro had been producing for months. He alleged that some of the welds were "pretty poor, possibly from uncertified welders." He claimed that Petro had presented Danny Martinez's welding certificate and procedures for the turbine work, which he had challenged. He claimed that Danny Martinez had actually separated from Petro almost two years ago.
(**Exhibit 6**, David Smith Declaration, ¶¶ 13-14).

91. Mr. Smith also attested:

As the project was drawing to a close, Mr. Canning on July 20, 2021 sent an email to me about certain documentation provided by Petro in which he stated that "*I am now as certain as I can be that the welders certification (WPQ) presented by Petro Industrial Services are not genuine.*" Discussing the documents furnished by Petro, Mr. Canning stated that "The WPQ documents for the welders (attached) have been edited (you can clearly see the font difference and clarity change if you zoom in this looks to be a basic PDF edit of a PDF scan)." Mr. Canning also noted that the documents stated that the welding test was conducted by Guillermo Castro LIII, and Mr. Canning asserted that he had reached out to the manager of Acuren Inspection Services who advised that there was no record of Guillermo Castro within their current or recent employee roll, and that LinkedIn has Castro in Japan for over two years. Mr. Canning went on to note that Acuren did not have any inspectors on the island in 2021 as the company left in 2020 when the NDT contract moved to Versa and that even if they had inspectors they did not have the equipment to perform the referenced bend test or pull test.

(**Exhibit 6**, David Smith Declaration, ¶¶ 13-14).

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.,* Case No. 1:21-CV-00312
**PLAINTIFF'S CONCISE COUNTER-STATEMENT OF FACTS**
Page 15

92. Guillermo Castro was a certified Level III welder known to Melendez as the Lead Inspector/Technician working on the Limetree Bay project. (**Exhibit 1**, p. 138).

93. Level III refers to the highest level of the craft. (*Id.,* p. 139).

94. Acuren certified Castro as a Level III welder, which Castro attaches to the back of the welder certifications he issues. (**Exhibit 1**, p. 139).

95. At the time Castro did the welding tests on Petro's welders in Puerto Rico to certify them, for which Petro paid $1000, Castro was not working for Acuren and Petro never claimed he was. (**Exhibit 1**, pp. 137-141).

96. Petro did welder testing with Castro at Limetree Bay project before February 2021. (**Exhibit 1,** p. 140).

97. Castro did two other certifications for Petro in March and April 2021. (**Exhibit 1**, p. 142).

98. On the certification forms, underneath Mr. Castro's name, it says, "Mechanical Tests 19 Conducted By: Acuren Inspection Services." (**Exhibit 1**, p. 142).

99. Melendez explained that he knew Castro was a Level III welder with authority to certify welders; he knew Castro met with, tested and certified Petro's welders; and the name Acuren was irrelevant, because Castro is authorized to certify welders as an independent welder. (**Exhibit 1**, p. 144).

100. Melendez stressed it is just a form. With the name "Acuren" on it. It is irrelevant to the fact that Petro's welders got tested and certified by an authorized person who is allowed to do that. (**Exhibit 1**, pp. 144-145).

101. Melendez was asked and answered:

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S CONCISE COUNTER-STATEMENT OF FACTS**
Page 16

> Q. You don't think it was important to have the name Acuren Inspection Services on this certification to indicate a company with a reputation for doing this type of work had actually done the mechanical tests?
>
> A. The actual -- the value of it is his name. The value is that he is a Level III. He is actually -- he is or was the highest-level technician for that firm.

(**Exhibit 1**, p. 145).

102. In July 20, 2021, after Canning sent his email to IPOS and IPOS asked Petro to explain, Melendez called Castro, who was working in Japan and told him the welders' certifications were being questioned. (**Exhibit 1**, pp. 155-156).

103. Mr. Castro wrote a letter back to Petro and explained how he tested the welders. (**Exhibit 1**, pp. 155-156; *see also* **Exhibit 18**, Castro's Letter re: welders' certification, PIS 000069; **Exhibit 19**, Petro's Resp. to VVIC's 4th Set of Interr).

104. Castro sent the letter on July 27, 2021, but it is dated July 29, 2021, which appears to be a scrivener's error. (**Exhibit 1**, p. 154; *see also* **Exhibit 18**).

105. Petro verified that six of Petro's welders were retested by Castro in early 2021 because he had personally qualified them at Limetree Bay while they were working in the terminals. (**Exhibit 19**, Nos. 14-15).

106. Petro does not have the original records and only has a continuity log for each welder to track welds from then after. (**Exhibit 19,** No. 16; **Exhibit 1**, pp. 161-162).

107. The following are the bates numbers of the re-testing done in 2021:

**Daniel Martinez** - Bates No. PIS000192 - Not tested in 2021 because Petro had in its possession the continued weld logging such that retesting was not necessary

**Edgardo Batista** - Bates No. PIS000070 – tested 2/16/21

**Bernardo Cruz** - Bates No. PIS000071 – tested 2/16/21

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S CONCISE COUNTER-STATEMENT OF FACTS**
Page 17

> **George Rodriguez** - Bates No. PIS000072 – tested 2/16/21

> **Fernando Lebron** - Bates No. PIS000073 – tested 3/30/21

> **Jonathan Rodriguez** - Bates No. PIS000074 – tested 3/20/21

> **Richael Philips** - Bates No. PIS000075 – tested 3/17/21

> (**Exhibit 19**, Nos. 16, 17; *see also* **Exhibit 21**, WPQ Records).

108. Melendez testified that after Castro retested the six welders, he did not have the previous qualifications saved that were originally on an Acuren form, but he had a copy of the original Acuren procedures that were followed to qualify the welders. (**Exhibit 1**, pp. 161-162).

109. Acuren had originally qualified these welders through Castro and the new results were part of a continuous welding log, using the continuous welding procedures and welding tests for which Castro was qualified and authorized to re-test Petro's welders. (**Exhibit 1**, pp. 144-145; 161-162).

110. Petro tested these welders many times while working at IPOS and VITOL "through x-ray, through phase array, and different welds . . . requalifying the welder over and over," which Defendants Canning and OPTIS were well aware of. (**Exhibit 1**, p. 162).

111. Castro offered to come to St. Croix immediately and retest the welders again for IPOS and VITOL if the certification was an issue. (**Exhibit 18**).

112. IPOS's General Manager David Smith attested:

> Prior to Mr. Canning raising these complaints about Petro's work and raising concerns that the welding certificates were forged or illegitimate, **no one from IPOS had identified these issues with the quality of Petro's welding work or the certifications of the welders as IPOS accepted that Petro would perform work using properly qualified individuals**. In addition, IPOS had not experienced any significant issues with the quality of the maintenance services that Petro had provided

during the years that Petro had performed such services pursuant to a contract with IPOS.

(**Exhibit 16**, ¶¶ 17-18) (emphasis added).

113. Mr. Smith also attested:

As a direct result of the concerns and questions and statements made by Mr. Canning, I made the decision to enlist additional technical guidance concerning these issues, and began to seek additional documentation from Petro.

(**Exhibit 16**, ¶¶ 17-18) (emphasis added).

114. Petro knew at the beginning of the 3-inch vent line project that welder certificates were needed to deliver to WAPA for completion of the project. (**Exhibit 1**, p. 132).

115. VITOL, through Tim Kologinczak, its field engineer and project manager for WAPA projects, requested welding certificates from Petro in February 2021 for the 3-inch vent line project and Petro produced them in March 2021. (**Exhibit 9**, Horowitz Depo. pp. 55).

116. That was the first time the welder certifications were requested and the first time Petro produced them before being asked for them again by Canning in April 2021. (**Exhibit 6**, ¶ 12).

117. Melendez's signature on the welder certificates is certifying that the statements in the record are correct. He does not need authorization from Acuren to certify to that. (**Exhibit 1**, pp. 143-144).

118. There is never any saving of the test records, the welds of the welder are observed as they are done and then certified by the inspector. (**Exhibit 1**, p. 147).

119. Any defects in the welds for the replacement 3-inch stainless steel vent lines were within American Society of Mechanical Engineers (ASME) industry standard of 5-10 percent. (**Exhibit 22**, Michael McCullough Depo, pp. 12-13).

120. David Smith admitted that as part of the bid process under VITOL, Petro would follow industry standard and have ten percent of the welds tested. (**Exhibit 8**, Smith Depo, pp 123-124).

121. Petro paid Versa, a testing company, to test the welds. *Id.*

122. In addition, Johnas Phillip Semien, a Versa Integrity Group computer radiographer who tested welds for Versa testified that weld testers may vary on whether they find a weld to be acceptable or not. "It is called interpretation." (**Exhibit 23**, Johnas Phillip Semien Depo, p. 46).

123. VITOL hired a stateside firm, Tampa Tanks to replace Petro's welds. (**Exhibit 9**, Horowitz Depo, p. 60).

124. Canning had requested that VITOL and IPOS hire stateside firms to replace Petro. (**Exhibit 2**, Persuad Depo, pp. 169-173).

125. Tampa Tanks came to St. Croix to repair welds for the cost of more than the entire project. (**Exhibit 9**, pp. 60-61).

126. That cost was billed to WAPA, and ultimately the rate payers. (**Exhibit 9**, pp. 60-61).

127. Neither IPOS nor VITOL had complained of Petro's work quality, professionalism, worker certifications or job completion for years of Petro working at the WAPA propane facilities. (**Exhibit 20**, Tim Kologinczak Depo, pp. 13-14).

128. Petro's welds were determined to be "professional" by Versa Integrity Group's radiography inspector, Johna Phillip Semien. (**Exhibit 23**, p. 49).

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S CONCISE COUNTER-STATEMENT OF FACTS**
Page 20

129. Mr. Kologinczak testified that WAPA accepted the 3-inch vent line project and only needed some labels colors changed, and some other "small bits and pieces" fixed. (**Exhibit 20**, pp. 32-33).

130. Melendez for Petro testified that IPOS and WAPA's labels for vent lines were different colors, so he switched the IPOS labels for the WAPA ones and the problem was fixed. (**Exhibit 1,** pp. 126-127).

131. Mr. Kologinczak testified that those issues were repaired and WAPA never requested any changes to the 3-inch line vent project. (*Id.*).

132. The July 2021 emails between VITOL, IPOS and Petro were requesting Petro to provide documents that were on WAPA's list of documents that VITOL needed to get WAPA to accept and pay for the 3-inch vent line job. (**Exhibit 20**, pp. 71-78, 103) (list of documents testified about in Mr. Kologinczak deposition aligns with those requested by the Global Technical Director in the emails of Def's Exhibit F).

133. Mr. Kologinczak testified it was his job as VITO's field engineer and project manager to provide WAPA with the Job Data book of requested documents. (**Exhibit 20**, pp. 71-78, 103).

134. Petro was terminated from its contract after completing the special project that WAPA accepted and paid for, including producing the required documents. (**Exhibit 20**, p. 32).

135. David Smith declared, "I substantially relied on the representations of Mr. Canning of OPTIS in making my decision to seek additional documentation from Petro. Soon thereafter, I made the decision to terminate the Maintenance Contract between IPOS and Petro because I felt that we needed to protect IPOS's integrity." (**Exhibit 6**, ¶ 18).

136. Smith admitted he was heavily influenced by Canning's emails painting Petro as a lying, fraudulent company. (**Exhibit 6**, ¶¶ 17-18, Smith Declaration).

137. Once the Maintenance Contract was terminated by IPOS on July 28, 2021, Petro ceased doing any work on welding or other projects at the facilities and removed its equipment from the site. (**Exhibit 6**, Smith Declaration, ¶ 19).

138. Terence Keogh, IPOS Terminal Manager testified that Canning wanted to terminate Petro's contract. (**Exhibit 24**, Terence Keogh Depo. p. 76).

139. Chetram Persuad, Petro's field superintendent, testified that he often heard Canning saying that IPOS should replace Petro with stateside contractors as they were allegedly better qualified. (**Exhibit 2**, Persuad Depo, pp. 169, 173-174, 177-178).

140. Petro's Adrian Melendez can testify to Petro's loss of profits and business opportunities as well as non-payment of past due invoices to IPOS (**Exhibit 17**, at No. 5).

141. Melendez confirms the accuracy of financial figures presented in Petro's Second Supplemental Response to Vitol's Third Set of Interrogatories, specifically addressing the breakdown of costs, projected profits, and the differentiation between project types (maintenance vs. project-specific work). (**Exhibit 1**, pp. 170-171; *see also* **Exhibit 25**, Petro's Second Supplemental Response to Vitol's Third Set of Interrogatories, No. 10).

*Petro Industrial Solutions, LLC v. Island Project and Operating Service, LLC, et. al.*, Case No. 1:21-CV-00312
**PLAINTIFF'S CONCISE COUNTER-STATEMENT OF FACTS**
Page 22

RESPECTFULLY SUBMITTED
LEE J. ROHN AND ASSOCIATES, LLC
Attorneys for Plaintiff

DATED:  October 14, 2024

BY:   /s/ Lee J.  Rohn
Lee J.  Rohn, Esq.
VI Bar No. 52
1108 King Street, Suite 3 (mailing)
56 King Street, Third Floor (physical)
Christiansted, St. Croix
U.S. Virgin Islands 00820
Telephone: (340) 778-8855
lee@rohnlaw.com

## CERTIFICATE OF SERVICE

**THIS IS TO CERTIFY** that on October 14, 2024, I electronically filed the foregoing with the Clerk of the Court using the electronic filing system, which will send a notification of such filing to the following:

To All Counsel of Record

BY:   /s/ Lee J.  Rohn          (dvn)